**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Greenbelt Division**

———————————————————————

|  |  |
|---|---|
| Kilmar Armando Abrego Garcia, *et al.*, | ) |
|  | ) |
| *Plaintiffs*, | ) |
|  | ) |
|  | ) Civil Action No. <u>8:25-cv-00951-PX</u> |
| v. | ) |
|  | ) |
| Kristi Noem, *et al.*, | ) |
|  | ) |
| *Defendants.* | ) |

———————————————————————

**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM**
<u>**IN SUPPORT OF INJUNCTIVE RELIEF**</u>

Plaintiff Kilmar Armando Abrego Garcia, by counsel, pursuant to Fed. R. Civ. P. 65(a) and this Court's order of March 25, 2025 (Dkt. No. 8), hereby files this supplemental memorandum in support of his request for injunctive relief (Dkt. No. 6), seeking an order from this Court restraining Defendants from continuing to financially support Plaintiff's further detention in El Salvador and ordering Defendants to request that the Government of El Salvador return Plaintiff to their custody. In support of this motion, Plaintiffs respectfully represent as follows:

<u>Introduction</u>

Plaintiff Kilmar Armando Abrego Garcia ("Mr. Abrego Garcia") won an order from an immigration judge ("IJ") prohibiting his removal to El Salvador, after he established it was more likely than not that he would be persecuted in that country on account of a statutorily protected ground. The government could have chosen to appeal that order, but did not. The government could have chosen to remove Mr. Abrego Garcia to any *other* country on earth, but did not. The government could later have filed a motion to reopen proceedings against Mr. Abrego Garcia and seek to set aside the order of protection, but did not. Instead, the government put Mr. Abrego

Garcia on a plane to El Salvador, seemingly without any pretense of a legal basis whatsoever. Once in El Salvador, that country's government immediately placed Mr. Abrego Garcia into a torture center—one that the U.S. government is reportedly paying the government of El Salvador to operate. This grotesque display of power without law is abhorrent to our entire system of justice, and must not be allowed to stand.

This memorandum is perhaps short, but that is because the legal argument for a judgment in favor of Plaintiff is clear and inescapable. This case may end up raising difficult questions of redressability in a subsequent phase, but a preliminary injunction should issue promptly, ordering Defendants to do the two most basic things that are clearly in their power: request that the government of El Salvador return Plaintiff to Defendants' custody; and cease paying the government of El Salvador to continue to detain Plaintiff in the notorious CECOT torture prison.

### Background

On October 10, 2019, at the conclusion of hotly contested removal proceedings before an IJ in Baltimore, Mr. Abrego Garcia won an order granting him withholding of removal, pursuant to Section 241(b)(3) of the Immigration and Nationality Act, 8 U.S.C. § 1231(b)(3), as to El Salvador. Dkt. No. 1-1 at 14. The government did not appeal. Dkt. No. 1-5 at 2. From October 2020 through January 2, 2024, Mr. Abrego Garcia attended his annual ICE reporting check-in without fail and without incident. Dkt. No. 1-3.

On March 12, 2025, Mr. Abrego Garcia was pulled over by ICE officers while driving his disabled U.S.-citizen son, Plaintiff A.A.V., home from school. Dkt. 1-2 at ¶ 30-34. His U.S.-citizen wife, Plaintiff Vasquez, was called to pick up the child and saw Mr. Abrego Garcia being taken into ICE custody. *Id.* Mr. Abrego Garcia was able to call his wife from ICE custody on five occasions thereafter, *id.* at ¶¶ 36-41. The last call was on March 15, 2015, at 11:00am, in which

Mr. Abrego Garcia told his wife that he was being deported to El Salvador, to a supermax prison called CECOT. *Id.* at ¶ 41. Mr. Abrego Garcia's wife later saw news photographs of her husband in the CECOT prison. *Id.* at ¶ 43-46; Dkt. No. 1-4 (photographs of Mr. Abrego Garcia in the CECOT prison, with Mr. Abrego Garcia circled in red). Since then, Mr. Abrego Garcia has not been able to contact his wife or legal counsel, and his wife and legal counsel have received no factual explanation or legal justification for his removal to El Salvador.

The CECOT prison is a notorious torture chamber. As Judge Boasberg wrote earlier this week in *JGG v. Trump*, declining to vacate a Temporary Restraining Order on behalf of a group of Venezuelan nationals removed to El Salvador on the same airplane as Mr. Abrego Garcia:

> In Salvadoran prisons, deportees are reportedly "highly likely to face immediate and intentional life-threatening harm at the hands of state actors." ECF No. 44-4 (Sarah Bishop Decl.), ¶ 63.
>
> The country's government has boasted that inmates in CECOT "never leave"; indeed, one expert declarant alleges that she does not know of any CECOT inmate who has been released. See ECF No. 44-3 (Juanita Goebertus Decl.), ¶ 3; see also Bishop Decl., ¶ 23 ("[W]e will throw them in prison and they will never get out.") (quoting Nayib Bukele (@nayibbukele), X (May 16, 2023, 7:02 p.m.), https://x.com/nayibbukele/status/1658608915683201030?s=20). Once inmates enter the prisons, moreover, their families are often left in the dark. See Bishop Decl., ¶ 25 ("In a sample of 131 cases, [it was] found that 115 family members of detainees have not received any information about the whereabouts or wellbeing of their detained family members since the day of their capture.").
>
> Plaintiffs offer declarations that inmates are rarely allowed to leave their cells, have no regular access to drinking water or adequate food, sleep standing up because of overcrowding, and are held in cells where they do not see sunlight for days. See Goebertus Decl., ¶¶ 3, 11; Bishop Decl., ¶ 31.
>
> At CECOT specifically, one declarant states that "if the prison were to reach full supposed capacity ..., each prisoner would have less than two feet of space in shared cells ... [which] is less than half the space required for transporting midsized cattle under EU law." Bishop Decl., ¶ 30. Given poor sanitary conditions, Goebertus points out, "tuberculosis, fungal infections, scabies, severe malnutrition[,] and chronic digestive issues [a]re common." Goebertus Decl., ¶ 12.

> Beyond poor living conditions, Salvadoran inmates are, according to evidence presented, often disciplined through beatings and humiliation. One inmate claimed that "police beat prison newcomers with batons …. [W]hen he denied being a gang member, they sent him to a dark basement cell with 320 detainees, where prison guards and other detainees beat him every day. On one occasion, one guard beat him so severely that [he] broke a rib." Id., ¶ 8. Three prior deportees from the United States reported being kicked in the face, neck, abdomen, and testicles, with one requiring "an operation for a ruptured pancreas and spleen." Id., ¶ 17. One inmate reported being forced to "kneel on the ground naked looking downwards for four hours in front of the prison's gate." Id., ¶ 10. That same prisoner also said that he was made to sit in a barrel of ice water as guards questioned him and then forced his head under water so he could not breathe. Id.
>
> One scholar avers that, since March 2022, an estimated 375 detainees have died in Salvadoran prisons. See Bishop Decl., ¶¶ 15, 43. Although the Salvadoran government maintains that all deaths have been natural, others respond that 75% of them "were violent, probably violent, or with suspicions of criminality on account of a common pattern of hematomas caused by beatings, sharp object wounds, and signs of strangulation on the cadavers examined." Id., ¶¶ 44–45. When an inmate is killed, there are also reports that guards "bring the body back into the cells and leave it there until the body start[s] stinking." Id., ¶ 39.

*J.G.G. v. Trump*, No. CV 25-766 (JEB), 2025 WL 890401, at *16 (D.D.C. Mar. 24, 2025).[1] The few available photographs of Mr. Abrego Garcia's treatment are consistent with this narrative. Dkt. No. 1-4.

Defendants not only knew that Mr. Abrego Garcia would be detained in CECOT upon his arrival in El Salvador, they even told him so. Dkt. 1-2 at ¶ 41. Defendants have celebrated the CECOT detention of Mr. Abrego Garcia and the planeload of Venezuelan nationals whom he accompanied to El Salvador. *See* Ex. A hereto (tweet by Salvadoran president Nayib Bukele noting that "23 MS-13 members wanted by Salvadoran justice" were transferred to CECOT, along with 238 Venezuelan nationals, and stating that "[t]he United States will pay a very low fee for them[.]"; Ex. D hereto (tweet by Defendant Rubio thanking President Bukele for his assistance). On March 26, 2025, one day after the first telephonic hearing in this case, Defendant Noem visited CECOT.

---

[1] The two declarations cited by Judge Boasberg are attached hereto as Exs. B and C, and their contents are incorporated herein by reference.

Mary Beth Sheridan and Maria Sacchetti, "Noem visits El Salvador prison where deportees are in 'legal limbo,'" *The Washington Post* (March 26, 2025), *available at* https://www.washingtonpost.com/world/2025/03/26/el-salvador-noem-cecot-venezuelans/ (noting that the U.S. government has paid six million dollars to El Salvador to hold 238 Venezuelan nationals, along with 23 Salvadoran nationals accused of being MS-13 members, in CECOT). Defendant Noem was granted a special tour inside the CECOT prison, separated from the prisoners by mere metal bars. *See* "Photos Show Kristi Noem's Visit Through Notorious El Salvador Prison," *Newsweek* (March 26, 2025), Ex. E hereto.

Unfortunately, Secretary Noem did not return to the United States with Mr. Abrego Garcia. He remains in CECOT.

## **Legal Standard**

A preliminary injunction is an "extraordinary remedy" and "shall be granted only if the moving party clearly establishes entitlement to the relief sought." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citations omitted). The Fourth Circuit differentiates between a prohibitory injunction which seeks to maintain the status quo, and a mandatory injunction which seeks to alter the status quo, *see League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014); the latter is disfavored. "We have defined the status quo for this purpose to be the last uncontested status between the parties which preceded the controversy. To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but such an injunction restores, rather than disturbs, the status quo ante." *Id.* at 236 (internal citations omitted). Since the controversy in this matter arose when Defendants removed Mr. Abrego Garcia from the United States, the "last uncontested status between the parties" was one in which Mr. Abrego Garcia was present in the United States.

A court may issue a preliminary injunction upon notice to the adverse party. Fed. R. Civ. P. 65(a). It is well settled law that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). A movant seeking a preliminary injunction must establish each of the four *Winter* elements: (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Id.* at 20. Demonstrating a likelihood of success does not require a plaintiff to "establish a certainty of success"; instead, the plaintiff "must make a clear showing that he is likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).

## Argument

### I.    Plaintiff is likely to succeed on the merits of this case.

Plaintiff is likely to succeed on the merits of this case, since the government removed him to a country to which the law clearly and indisputably prohibited them from doing so, without observing proper (or indeed any) legal procedures. As the Supreme Court has explained, a noncitizen "may seek statutory withholding under [8 U.S.C.] § 1231(b)(3)(A), which provides that 'the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.'" *Johnson v. Guzman Chavez*, 594 U.S. 523, 530 (2021). Plaintiff Abrego Garcia won just such an order in 2019. Dkt. No. 1-1. "If an alien is granted withholding-only relief, DHS may not remove the alien to the country designated in the removal order unless the order of withholding is terminated. [8 C.F.R.] §§ 208.22, 1208.22. But because withholding of removal is a form of country specific relief, nothing prevents DHS from removing [the] alien to a third country other than the country to which

removal has been withheld or deferred, [8 C.F.R.] §§ 208.16(f), 1208.16(f); *see also* §§ 208.17(b)(2), 1208.17(b)(2)." *Guzman Chavez*, 594 U.S. at 531-32 (some internal citations omitted). It is clear, therefore, that the Immigration and Nationality Act ("INA") prevented the government from removing Mr. Abrego Garcia to El Salvador.

Nor is it an excuse for the government to protest that Mr. Abrego Garcia is a member of the MS-13 gang (he is not) and therefore a terrorist (he is not) subject to removal outside of removal proceedings pursuant to 8 U.S.C. § 1229a: no proceedings were ever brought against him in the Alien Terrorist Removal Court, 8 U.S.C. § 1532; nor were federal criminal or extradition proceedings ever brought against him.

Finally, this Court need not wade into tricky issues about the centuries-old Alien Enemies Act, 50 U.S.C. § 21 *et seq.*: as a national of El Salvador, Plaintiff is simply not subject to the proclamation against the Venezuelan gang Tren de Aragua, *see* Proclamation, "Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua" (March 15, 2025), *available at* https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/, at § 1 ("I proclaim that all ***Venezuelan citizens*** 14 years of age or older who are members of [Tren de Aragua], are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies.") (Emphasis added.)

Plaintiff has brought several viable claims for relief, *inter alia* under the Administrative Procedure Act, 5 U.S.C. § 702. Plaintiff is a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," and is therefore "entitled to judicial review" under the APA. *Id.* His removal represented "final agency action" that is "subject to

judicial review." 5 U.S.C. § 704. Likewise, Plaintiff's procedural due process claim is a viable one. Having been granted withholding of removal Mr. Abrego Garcia—a "person" within the meaning of the Due Process Clause of the Fifth Amendment—had a property and liberty interest in not being removed to El Salvador without observance of legal procedures. *Rusu v. INS*, 296 F.3d 316, 320 (4th Cir. 2002) (deportation proceedings are subject to procedural due process requirements).

For the foregoing reasons, Plaintiff is likely to succeed on the merits of this litigation.

**II.    Plaintiff is likely to suffer irreparable harm in the absence of preliminary relief.**

Although "the burden of removal alone cannot constitute the requisite irreparable injury," *Nken v. Holder*, 556 U.S. 418, 435 (2009), this case presents far more immediate injury than the garden-variety removal case in which "[a]liens who are removed may continue to pursue their petitions for review, and those who prevail can be afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal," *id.*

Mr. Abrego Garcia is suffering irreparable harm with each day that he remains detained in the CECOT torture prison.  As Judge Boasberg recently held in *JGG*, "the risk of torture, beatings, and even death clearly and unequivocally supports a finding of irreparable harm." 2025 WL 890401, at *16, citing *United States v. Iowa*, 126 F.4th 1334, 1352 (8th Cir. 2025) (torture); *Leiva-Perez v. Holder*, 640 F.3d 962, 970 (9th Cir. 2011) (physical abuse).

In addition, all plaintiffs are suffering irreparable harm by virtue of the unlawful family separation without notice. *See* Dkt. No. 1-2 at ¶¶ 35 (noting the distress of Plaintiff A.A.V., Mr. Abrego Garcia's autistic U.S.-citizen child); 47. "Even absent First Amendment injury, family separation alone causes irreparable harm." *Int'l Refugee Assistance Project v. Trump*, 883 F.3d

233, 308 (4th Cir. 2018) (Gregory, C.J., concurring), *vacated on other grounds*, 585 U.S. 1028 (2018).

For these reasons, Plaintiff has made an adequate showing of irreparable harm to justify preliminary injunctive relief under the second *Winter* factor.

**III.    The balance of equities tips in Plaintiff's favor, and an injunction is in the public interest.**

"Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party. *Nken*, 556 U.S. at 435.

Here, the balance of equities and the public interest tilt sharply in favor of the issuance of a preliminary injunction. Again, Judge Boasberg: "There is, moreover, a strong public interest in preventing the mistaken deportation of people based on categories they have no right to challenge. *See* [*Nken*, 556 U.S. at 436] ("Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."). The public also has a significant stake in the Government's compliance with the law. *See, e.g.*, *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations.")" *JGG*, 2025 WL 890401, at *17.

To the extent Defendants argue danger to the community based on Plaintiff Abrego Garcia's supposed ties to MS-13, again, he has neither been convicted nor charged with any crime. If the government wishes to reinstitute removal proceedings against him, and an immigration judge grants its motion to reopen his order of withholding of removal, he will indeed be subject to detention pursuant to 8 U.S.C. §1226(a), but he will be eligible to seek a bond hearing from an

immigration judge and request release on bond. No evidence weighs against Plaintiff in the balancing of the equities and the public interest.

**IV.    No jurisdictional bar applies in this case.**

Several jurisdictional bars often apply in cases challenging removal under Title 8 of U.S. Code, but none applies in this case. As 8 U.S.C. § 1252(f)(2) provides, "[n]otwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law." To the extent that this section of law applies since Plaintiff is seeking to be restored to the *ex ante* position he held prior to his removal to El Salvador, the "clear and convincing evidence" standard is easily met here, for the reasons set forth above. Nor does 8 U.S.C. § 1252(g) apply here, since the facts described herein do not represent the Attorney General's "decision or action" to "execute removal orders" against Mr. Abrego Garcia: there was no removal order to execute, and if it was executed, it certainly was not done "under this chapter" (Chapter 12 of Title 8, U.S. Code) as that chapter prohibited such removal. The discretionary bars at 8 U.S.C. § 1252(a)(2)(B) do not apply, as the withholding of removal statute is mandatory and admits of no discretion; the criminal-alien bar, 8 U.S.C. § 1252(a)(2)(C) does not apply where Plaintiff has no criminal conviction. Finally, the zipper clause, 8 U.S.C. § 1252(b)(9), does not apply, because, again, Mr. Abrego Garcia was not removed "under this subchapter." Accordingly, no provision of law strips this Court of jurisdiction to hear and decide this action.

## Conclusion

Where the government casts aside laws and the orders of courts, including administrative courts, state power consists solely of the capacity to commit violence. This Court can reassert the

primacy of due process by ordering Defendants to take reasonable steps within their power to (1)

request that the government of El Salvador remove Mr. Abrego Garcia from the CECOT torture

prison in which Defendants caused him to be placed, and return him to the custody of the United

States; and (2) stop compensating the operators of the CECOT torture prison for their continued

detention of Mr. Abrego Garcia. A preliminary injunction should issue.


Respectfully submitted,

*//s// Simon Sandoval-Moshenberg*                            Date: March 28, 2025
Simon Y. Sandoval-Moshenberg, Esq.
D. Md. Bar no. 30965
*Counsel for Plaintiff*
Murray Osorio PLLC
4103 Chain Bridge Road, Suite 300
Fairfax, Virginia 22030
Telephone: 703-352-2399
Facsimile: 703-763-2304
ssandoval@murrayosorio.com

**Certificate of Service**

      I, the undersigned, hereby certify that on this date, I uploaded the foregoing, along with all attachments thereto, to this Court's CM/ECF case management system, which will send a Notice of Electronic Filing (NEF) to all case participants.

Respectfully submitted,

*//s// Simon Sandoval-Moshenberg*                      Date: March 28, 2025
Simon Y. Sandoval-Moshenberg, Esq.
D. Md. Bar no. 30965
*Counsel for Plaintiff*
Murray Osorio PLLC
4103 Chain Bridge Road, Suite 300
Fairfax, Virginia 22030
Telephone: 703-352-2399
Facsimile: 703-763-2304
ssandoval@murrayosorio.com

12