UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

|  |  |
|---|---|
| Kilmar Armando Abrego Garcia, *et al.*, | ) |
| *Plaintiffs,* | ) |
| v. | ) Civil Action No. <u>8:25-cv-00951-PX</u> |
| Kristi Noem, *et al.*, | ) |
| *Defendants.* | ) |

**REPLY MEMORANDUM IN SUPPORT OF**
<u>**MOTION FOR PRELIMINARY INJUNCTION**</u>

# Table of Contents

Table of Contents ................................................................................................................... ii

Introduction ............................................................................................................................ 1

Standard of Review ................................................................................................................ 2

Argument ............................................................................................................................... 3

    I.    Defendant's "core habeas" argument makes no sense. ...................................... 3

    II.   The jurisdictional bar at 8 U.S.C. § 1252(g) only applies to removals carried out within the immigration laws. ................................................................................ 6

    III.  Plaintiff's requested relief could be successful in returning him to the United States. ...... 9

    IV.  Plaintiff has adequately shown irreparable harm, and need not prove torture. ................. 10

    V.   Equities and the public interest support the supremacy of law over power. ..................... 11

Conclusion ........................................................................................................................... 13

Certificate of Service ........................................................................................................... 14

**Introduction**

Defendants admit they knew that Plaintiff Kilmar Abrego Garcia won an order from an immigration judge finding that he would more likely than not be persecuted in El Salvador on account of a protected ground, and that this order was never appealed or otherwise set aside. Dkt. 11-3 at ¶¶ 9, 13. They admit that notwithstanding their awareness of this order, *id.* ¶ 13, they arrested Plaintiff, *id.* ¶ 11; transferred him to a staging area for flights to El Salvador, *id.*; and placed his name on a flight manifest to El Salvador, *id.* ¶ 14. In light of these factual concessions, this Court need not accept as true Defendants' conclusory and self-contradictory protestations that the deportation represented "administrative error," "an oversight," and "was carried out in good faith." Id. ¶ 15.

Defendants do not deny that Plaintiff is currently incarcerated in the infamous CECOT jail, they merely quibble over whether his treatment therein rises to the level of torture. Defendants do not deny that they have paid the government of El Salvador millions of dollars to detain Plaintiff and others like him in CECOT, that Defendant Marco Rubio thanked the President of El Salvador on Twitter for detaining Plaintiff in CECOT, and that Defendant Kristi Noem *went inside the CECOT jail* after the filing of this lawsuit yet took no steps to attempt or request to extract Plaintiff therefrom.[1]

Most shockingly, Defendants do not claim to be attempting to seek Plaintiff's return to the United States absent this Court's intervention.[2] This would be a very different case if Defendants

---

[1] Defendants spend most of their brief seeking to paint Plaintiff as a member of the MS-13 gang, *see* Dkt. 11 at 2, 15-17, a contention which Plaintiff disputes, *see* Dkt. 1 at ¶¶ 19-41 and exhibits cited therein. Plaintiff has been neither charged nor convicted with any crime, *see* Dkt. 1-2, a fact which Defendants do not dispute. In any event, Defendants do not contend that Plaintiff's alleged gang membership gave them legal authority to deport Plaintiff to El Salvador. In addition, although the White House has accused Plaintiff of involvement in human trafficking, Defendants' court filing omits any such scandalous accusation.

[2] This is a new and upsetting development for the Department of Justice. Undersigned counsel has litigated prior cases arising out of erroneous deportations. *See, e.g.*, *Tomas-Ramos v. Hott*, 1:19-cv-01587-AJT-JFA (E.D. Va., filed Dec. 18, 2019) (noncitizen requested Reasonable Fear Interview, but was erroneously removed prior to interview being

came before the court hat in hand, confessing error and assuring the court that remedial steps were underway, and arguing that the Court should not short-circuit measures that were already in process. Instead, Defendants have already washed their hands of Plaintiff, of his U.S.-citizen wife, of his autistic nonverbal five-year-old U.S.-citizen child. Defendants' proposed resolution of this state of affairs, which they caused either intentionally or at best recklessly, is nothing at all.

This is an outrageous set of facts. If Defendants' actions in this case are allowed to remain without redress, then the withholding of removal statute and orders of immigration courts are meaningless, because the government can deport whomever they want, wherever they want, whenever they want, and no court can do anything about it once it's done.

### Standard of Review

Defendants seek to paint the injunction requested by Plaintiff as mandatory rather than prohibitive, *see* Dkt. 12-1 at 5, citing *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994); *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). They fail to respond to Plaintiff's citation to *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014), in which the Fourth Circuit explained that an injunction such as this one, restoring Plaintiff to his "last uncontested status between the parties which preceded the controversy," is considered a prohibitive injunction in the Fourth Circuit. *See also Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012) ("The status quo to be preserved by a preliminary injunction, however, is not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the last uncontested status between the parties which preceded the controversy. To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but . . . such an injunction restores, rather than disturbs, the status quo ante." (Internal

---

schedule). In prior cases, as soon as they realized a noncitizen had been erroneously deported, DOJ and DHS worked quickly to attempt to return him. Here, they are uninterested in helping unless ordered to do so by this Court.

2

citations omitted.)). Accordingly, this case—which seeks to restore Plaintiff's status as being physically present in the United States—would be analyzed under the more permissive standard for prohibitive injunctions.

## Argument

It is hard for Defendants to argue that Plaintiff is unlikely to succeed on the merits of this case when they admit all the facts that give rise to liability. Defendants' jurisdictional argument cites cases regarding disputed removal orders and challenges to removals under the law; Plaintiff's removal was wildly extrajudicial and undisputedly devoid of any basis in law, so the cited jurisdictional bars do not apply. Irreparable harm does not require a showing of actual torture, and the treatment that Plaintiff is suffering rises to the level of irreparable harm, whether or not it constitutes torture (although it does). Defendants' unsubstantiated belief that Plaintiff is an MS-13 member could well have formed a basis for them to file a motion before the immigration court seeking to set aside his order of protection, but it does not retroactively immunize his blatantly and concededly unlawful deportation to the one country where his removal was prohibited by an order from an immigration judge. Finally, the two things Plaintiff asks this Court to order are well within this Court's power, and Defendants ought not be heard to complain that such simple remedial steps will necessarily be ineffective if they have not attempted any steps whatsoever to remedy their grievous conduct.

### I. Defendant's "core habeas" argument makes no sense.

This case was filed as a complaint for injunctive relief. Dkt. 1. Defendants argue that "because Plaintiffs' claims sound in habeas, they can proceed only in habeas. But because Plaintiffs concede that Abrego Garcia is not in United States custody, this Court cannot hear those claims." In other words, since Plaintiff's claims somehow *implicate* detention (because detention

goes hand-in-hand with removal), they should have been brought as habeas claims; but because his claims do not *challenge* current detention, the habeas claims would fail.[3]

This argument makes no sense, and is divorced from the facts of this case and the manner in which the complaint was pled. Plaintiff's core contention in this case is that Defendants *removed him from the United States* without legal justification, not that they *continue to detain him* without legal justification. For example, Plaintiff's first cause of action complains that "Defendants removed Plaintiff Abrego Garcia to El Salvador, the country from which he had been granted withholding of removal, without formally terminating his grant of withholding of removal, thus violating this law." Dkt. 1 at ¶ 74. His second cause of action complains that "Defendants removed Plaintiff Abrego Garcia to El Salvador, the country from which he had been granted withholding of removal, without formally terminating his grant of withholding of removal, thus violating his procedural due process rights under the Fifth Amendment to the U.S. Constitution." *Id.* at ¶ 80. And so on.

The fact that Plaintiff is now detained in the notorious CECOT jail rather than at liberty within El Salvador is relevant to Plaintiff's TRO motion on the irreparable harm prong, but is not relevant to liability on the core claim: Defendants deported him to a prohibited country. Since Plaintiff does not challenge his present confinement by Defendants, most of their case citations are irrelevant. *See, e.g.*, Dkt. 12 at 6 ("Habeas corpus 'is the appropriate remedy to ascertain . . . whether any person is rightfully in confinement or not,'" quoting *DHS v. Thuraissigiam*, 591 U.S. 103, 117 (2020)).

Defendants' citations (Dkt. 12 at 7) to *Nance v. Ward*, *Heck v. Humphrey* and *Preiser v.*

---

[3] An exception lies under *Smith v. Ashcroft*, 295 F.3d 425 (4th Cir. 2002), recognizing continuous jurisdiction over habeas corpus petitions filed while the Petitioner was still in custody but removed thereafter, as long as legal rights and obligations continue to stem therefrom.

*Rodriguez* for the principle that a challenge to detention implicating the underlying legal basis for the detention (e.g. a criminal conviction) must only be brought in habeas, are also inapposite here.[4] This case presents no controversy over the underlying legal judgment at issue, the 2019 grant of withholding of removal; both parties agree that was lawfully entered and remains in force. Nor is there a controversy regarding the actual removal by airplane to El Salvador, which both parties agree was not legally authorized. *Preiser* and its progeny are simply not implicated.

In the alternative, but not as Plaintiff's core legal contention, Plaintiff did bring a fifth cause of action under habeas corpus, alleging that he is in the constructive custody of the U.S. government, given that the government of El Salvador is detaining him "at the direct request of Defendants, and at the financial compensation of Defendants." Dkt. 1 at ¶ 98. This cause of action rests on the theory that the government of El Salvador is detaining Plaintiff at the behest of Defendants and subject to financial compensation from Defendants. Such a claim *does* fall within the core of habeas jurisprudence and is a viable claim. *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723 (2008).[5] ICE frequently contracts with other governmental entities to hold its detainees.[6] Where ICE detainees are held in jails run by other governmental entities, the immediate custodian for purposes of habeas corpus is "the federal official most directly responsible for overseeing that contract facility when seeking a habeas writ." *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1185 (N.D. Cal. 2017), *aff'd*, 905 F.3d 1137 (9th Cir. 2018); *see also Jarpa v. Mumford*, 211 F. Supp.

---

[4] Likewise, *Plyler v. Moore*, 129 F.3d 728 (4th Cir. 1997), which held that challenges to the length of confinement are properly brought at habeas petitions, has no bearing on this case.

[5] Plaintiff, who has lived in the United States with a legal work permit for five years after being granted immigration relief, has a stronger claim to access to the writ of habeas corpus than did Guantanamo detainees who had never set foot in the territorial United States.

[6] "ICE primarily uses intergovernmental service agreements (IGSA) to acquire detention space. Officials said IGSAs offer several benefits over contracts, including fewer requirements for documentation or competition." GAO, Report to the Chairman, Committee on Homeland Security, House of Representatives (January 2021), *available at* https://www.gao.gov/assets/gao-21-149.pdf, at 2 (showing 59 percent of ICE detainees housed in a facility operated by another governmental entity).

3d 706, 724 (D. Md. 2016) (where habeas petitioner held in local county jail on ICE contract, "[a]pplying the immediate custodian rule here would yield the 'impractical result' of having the immediate custodian . . . unable to grant the relief requested. Rather, the relief sought can only practically be delivered by the head of the agency in charge of interpreting and executing the immigration laws."); *Wilkinson v. Dotson*, 544 U.S. 74, 92 (2005).

This habeas corpus cause of action is therefore viable, on the theory that the government of El Salvador is acting as the jailer for Defendants pursuant to financial compensation from Defendants, as did the local county jail in *Jarpa*. *See* Dkt. 10-4 (tweet from El Salvador president acknowledging receipt of a "low fee" for detaining Plaintiff; response from Defendant Rubio thanking El Salvador president for same); Mary Beth Sheridan and Maria Sacchetti, "Noem visits El Salvador prison where deportees are in 'legal limbo,'" *The Washington Post* (March 26, 2025), *available at* https://www.washingtonpost.com/world/2025/03/26/el-salvador-noem-cecot-venezuelans/ (noting that the U.S. government has paid six million dollars to El Salvador to hold 238 Venezuelan nationals, along with 23 Salvadoran nationals accused of being MS-13 members—one of whom is Plaintiff—in CECOT). Again, Defendant's memorandum does not deny paying the government of El Salvador to detain Plaintiff in CECOT.

For the foregoing reasons, Plaintiff's complaint for injunctive relief did not need to be filed as a habeas corpus petition, and therefore all of Defendants' caselaw arguing against habeas corpus in the post-deportation context is irrelevant, and the Plaintiff is likely to succeed on the merits; in the alternative, since Plaintiff *did* plead a viable cause of action for habeas corpus, the complaint is likely to succeed on the merits.

**II.     The jurisdictional bar at 8 U.S.C. § 1252(g) only applies to removals carried out within the immigration laws.**

Defendants' argument for application of the jurisdictional bar at 8 U.S.C. § 1252(g)

6

attempts to improperly frame this case as a "challenge to the legality of a removal order[.]" Dkt. 12 at 14. But all parties agree that Plaintiff's removal was not legal nor pursuant to any removal order. The jurisdictional bar does not apply.

Section 1252(g) covers "any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien *under this chapter*." (Emphasis added.) But Section 1252(g) does not apply to a removal conducted "not [as] part of Title 8, Chapter 12." *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *28 (D.C. Cir., Mar. 26, 2025) (Millett, J., concurring).

As the District Court explained in *Coyotl v. Kelly*, Section 1252(g) "does not apply to the entire universe of deportation-related claims, but instead 'applies only to three discrete actions that the Attorney General may take: her "decision or action" to "*commence* proceedings, *adjudicate* cases, or *execute* removal orders." There are of course many other decisions or actions that may be part of the deportation process[.]'" 261 F. Supp. 3d 1328, 1340 (quoting *Reno v. AADC*, 525 U.S. 471, 482 (1999). *See also Welch v. Reno*, 2000 WL 1481426, at *1 (D. Md., Sept. 20, 2000) (noting that the Supreme Court in *AADC* "defined the jurisdictional limitations of Section 1252(g) narrowly.").

Defendants argue that notwithstanding Section 1252(g)'s narrow scope, their actions fall within the provision stripping jurisdiction over the Secretary's "decision or action to . . . execute removal orders." Dkt. 11 at 11. But here, *there was no removal order as to El Salvador at all*. Such removal had been withheld. Surely if Defendants had removed Plaintiff to Panama, their Section 1252(g) argument would hold more water, as the parties would be fighting over whether such removal was carried out with observance of proper legal formalities and respect for due process. But here, there is no dispute over "the government's authority to execute a removal order" because

7

the government claims no such authority; and there was no removal-to-El-Salvador order for Plaintiff to attack. *See also Enriquez-Perdomo v. Newman*, 54 F.4th 855, 865 (6th Cir. 2022) ("Congress' purpose, as articulated in *AADC*, supports our interpretation that 'execute removal orders' contemplates removal orders that are subject to execution. By definition, when a removal order is not subject to execution, government officials have no authority, discretionary or otherwise, to execute it."); *Guerra-Castaneda v. United States*, 656 F. Supp. 3d 356, 362–63 (D. Mass. 2023) ("[T]he government had no authority to execute a removal order with respect to Guerra-Castaneda because there was no extant removal order for it to carry out. . . . The plain meaning of § 1252(g) does not extend to the government's removal of a non-citizen in the face of a court order precluding its authority to do so.").[7] Indeed, Defendants' corrected brief (Dkt. 12 at 12) cites to *Madu v. Attorney General*, 470 F.3d 1362, 1368 (11th Cir. 2006), which agrees that Section 1252(g) does not bar claims challenging deportation without lawful authorization. Defendants' citation to *Camarena v. Director, ICE*, 988 F.3d 1268, 1273–74 (11th Cir. 2021), therefore does not carry the day.

Finally, Defendants' suggestion in fn.2 that Plaintiff was somehow the party responsible to prevent his own removal by filing a motion to reopen and seeking a stay of removal, makes no sense. Plaintiff *had already won the order* barring his removal to El Salvador, there was no reason for him to seek it a second time. The party that was supposed to file a Motion to Reopen—and the party that would have born the burden of proof on such motion—was the government. 8 C.F.R. § 1208.24(f). Had they done this correctly, the parties could have taken the case back to the immigration judge, and then, as the government suggests in its fn.2, to the Board of Immigration

---

[7] Defendants' citation to *Mapoy v. Carroll*, 185 F.3d 224, 228 (4th Cir. 1999) does not change this outcome, as that case involved a dispute over whether the Board of Immigration Appeals was correct to deny a stay of removal. Here, again, Plaintiff won his case outright within the immigration court system; Defendants, convinced that he was an MS-13 gang member, decided to list him on a flight manifest and then put him on an airplane anyway.

Appeals and then ultimately the Fourth Circuit if necessary. But the government cut off that path by deporting him without lawful process in front of an immigration judge.

For the foregoing reasons, no jurisdictional bar prevents this Court from hearing and deciding Plaintiff's request for emergency injunctive relief.

### III.     Plaintiff's requested relief could be successful in returning him to the United States.

Plaintiff has requested that this Court order Defendants to request his return from the government of El Salvador: first, just ask them nicely to please give him back to us. It is inexplicable that Defendants have not done so already. Meanwhile, Plaintiff also asks this Court to order Defendants not to mix their messages by continuing to pay the government of El Salvador further compensation to hold on to him. Defendants' argument that this Court cannot order redress for their concededly unlawful removal of Plaintiff leaves a bitter aftertaste where the government has taken no voluntary steps in attempt to rectify what they themselves describe as an error.

As the Supreme Court explained in *Nken v. Holder*, 566 U.S. 418, 435 (2009), citing the government's brief which explained their successful track record in bringing noncitizens back to the United States, noncitizens who prevail in litigation challenging their removal "can be afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal." *See also Lopez-Sorto v. Garland*, 103 F.4th 242 (4th Cir. 2024) (ICE can bring a prevailing party back to the United States if that party prevails on their appeal).

The Fourth Circuit has held that the redressability requirement "is not onerous," that a plaintiff "need not show that a favorable decision will relieve their every injury," and that a plaintiff "need only show that they personally would benefit in a tangible way from the court's intervention." *Deal v. Mercer Co. Bd. of Ed.*, 911 F.3d 183, 189 (4th Cir. 2018). Here, there are no facts from which to conclude ICE cannot possibly be successful in bringing Plaintiff back to

9

the United States if they were ordered to try in good faith to do so, no specific reason to believe that the government of El Salvador would not simply hand Plaintiff over to the United States government upon our government's request. This is the same government of El Salvador that allowed Defendant Kristi Noem to enter its CECOT prison and take photographs with the detainees therein. Dkt. 10-3.[8] How can Defendants ask this Court to find as a matter of law that there is no possible redress for Plaintiff's injuries, when one Defendant stood within the same prison walls as him, after this action was filed, after this Court's first scheduling conference in this case, and made no effort to try? If anything, it is speculative to contend that simply asking the government of El Salvador *will likely not* be effective.[9]

For the foregoing reasons, it is wildly premature to hold that this Court can order no further redress for Plaintiff's injuries. Plaintiff's requested emergency injunctive relief should issue, and then if (and only if) it is unsuccessful, the parties can come back before this Court to make arguments as to why further efforts would be necessary or, to the contrary, futile.

### IV. Plaintiff has adequately shown irreparable harm, and need not prove torture.

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012), quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Defendants' brief implies that Plaintiff cannot meet the *Winter v. NRDC* standard for irreparable harm unless he makes a showing that he is being tortured, which they claim he is not. Dkt. 11 at 14. Regardless of whether his treatment rises to the level of torture (Judge Boasberg

---

[8] Notably, Defendants also do not deny paying six million dollars to the Government of El Salvador to continue to detain Plaintiffs and others in CECOT; they merely note that "[t]here is no showing that any payment made to El Salvador is yet to occur." Dkt. 11 at 9.

[9] It is disturbing to consider that Defendants' redressability argument would logically seek to prevent this Court from issuing the requested relief even if Plaintiff were a U.S. citizen.

10

found that conditions in CECOT present "the risk of torture, beatings, and even death," *J.G.G. v. Trump*, 2025 WL 890401, at *16 (D.D.C. Mar. 24, 2025)), it certainly rises to the level of irreparable harm. *See* Dkt. 1-4 (photos of Plaintiff's harsh treatment in CECOT); Dkt. 10-2 at ¶ 3 ("People held in CECOT, as well as in other prisons in El Salvador, are denied communication with their relatives and lawyers[.]"); Dkt. 10-3 at ¶ 30 ("An analysis of the CECOT's design using satellite footage found that if the prison were to reach full supposed capacity of forty thousand, each prisoner would have less than two feet of space in shared cells—an amount the authors point out is less than half the space required for transporting midsized cattle under EU law."). Such treatment rises to the level of irreparable harm.

The government's argument that "this Court should defer to the government's determination that Abrego Garcia will not likely be tortured or killed in El Salvador," Dkt. 11 at 14, is particularly ironic given the facts of this case. It is immigration judges who determine whether individuals will or will not be tortured in a country of removal. 8 C.F.R. §§ 1208.16, 1208.17. Defendants do not claim to have performed that review prior to deporting Plaintiff to El Salvador in violation of an IJ's order and without seeking to reopen proceedings before the IJ; indeed, by so doing, they prevented that IJ review from happening at all. The last immigration judge who looked at Plaintiff's case determined that he *would* more likely than not face persecution in El Salvador. Dkt. 1-1.

For the foregoing reasons, Plaintiff has established irreparable harm under *Winter*.

V.  **Equities and the public interest support the supremacy of law over power.**

Once Plaintiff is returned to the United States, this Court will not and cannot be the entity that decides whether he may continue to remain pursuant to a grant of withholding of removal, or whether that grant of withholding of removal is to be terminated; that role falls to the immigration

court (and then, ultimately, the U.S. Court of Appeals for the Fourth Circuit), with the government bearing the burden of proof that withholding of removal is no longer appropriate. 8 C.F.R. § 1208.24(f). It is also the immigration court that will decide whether Plaintiff may be at liberty or must remain detained while such proceedings are pending. 8 U.S.C. § 1226(a). Defendants' protestation that Plaintiff is an MS-13 member, their legal argument that he is estopped for arguing otherwise, and Plaintiff's contention that the gang allegations arise from the flimsiest of unreliable anonymous informants, will be properly addressed to that forum.

In this forum, "[t]here is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal citations omitted). As the Supreme Court stated in *Nken*, "[o]f course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm"; but this must be balanced against any injunctive relief that "permits and prolongs a continuing violation of United States law." 556 U.S. at 436, quoting *AADC*, 525 U.S. at 490. Here, however, the "continuing violation of United States law" is Plaintiff's *absence* from the United States, not his presence therein.

In the end, the public interest is best served by restoring the supremacy of laws over power. The Department of Homeland Security must obey the orders of the immigration courts, or else such courts become meaningless. Noncitizens—and their U.S.-citizen spouses and children—must know that if this nation awards them a grant protection from persecution, it will honor that commitment even when the political winds shift; and if the government seeks to rescind such a grant of protection, it will do so only by means of renewed judicial proceedings accordance with the rules of procedure as set forth in the Code of Federal Regulations, and the Due Process clause

of the Fifth Amendment. Plaintiff's deportation was carried out by force, not by law; the public interest favors righting that wrong.

## Conclusion

For the foregoing reasons, this Court should enter a preliminary injunction as sought by Plaintiff. Dkt. 6-3.

Respectfully submitted,

*/s// Simon Sandoval-Moshenberg*                                   Date: April 2, 2025
Simon Y. Sandoval-Moshenberg, Esq.
D. Md. Bar no. 30965
*Counsel for Plaintiff*
Murray Osorio PLLC
4103 Chain Bridge Road, Suite 300
Fairfax, Virginia 22030
Telephone: 703-352-2399
Facsimile: 703-763-2304
ssandoval@murrayosorio.com

**Certificate of Service**

I, the undersigned, hereby certify that on this date, I uploaded the foregoing, as well as all attachments thereto, to this Court's CM/ECF system, which will send a Notice of Electronic Filing (NEF) to all counsel of record.

Respectfully submitted,

| | |
|---|---|
| *//s// Simon Sandoval-Moshenberg* <br> Simon Y. Sandoval-Moshenberg, Esq. <br> D. Md. Bar no. 30965 <br> *Counsel for Plaintiff* <br> Murray Osorio PLLC <br> 4103 Chain Bridge Road, Suite 300 <br> Fairfax, Virginia 22030 <br> Telephone: 703-352-2399 <br> Facsimile: 703-763-2304 <br> ssandoval@murrayosorio.com | Date: April 2, 2025 |