IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KILMAR ARMANDO
ABREGO GARCIA, *et al.*,                     *

  Plaintiffs,                              *

               Civil Action No. 8:25-cv-00951-PX

   v.                                   *

KRISTI NOEM, Secretary,                      *
United States Department                     *
of Homeland Security, *et al.*,              *

  Defendants.

               *

              ***

## **MEMORANDUM OPINION**

In 2019, an immigration judge—acting under the authority delegated by the United States Attorney General and pursuant to powers vested by Congress—granted Plaintiff Kilmar Armando Abrego Garcia ("Abrego Garcia") withholding of removal, thereby protecting him from return to his native country, El Salvador.  ECF No. 1 ¶ 41; ECF No. 1-1.  Such protection bars the United States from sending a noncitizen to a country where, more likely than not, he would face persecution that risks his "life or freedom."  *See* Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(b)(3)(A); *see also* 8 C.F.R. §§ 208.16–.18 & .24 (setting forth the standard for withholding of removal and the procedures required for its termination).

Six years later, without notice, legal justification, or due process, officers from U.S. Immigration and Customs Enforcement ("ICE"), a subagency of the Department of Homeland Security ("DHS"), put him on a plane bound for the Terrorism Confinement Center ("CECOT")

in El Salvador.  ECF No. 1¶ 59. [1]  Neither the United States nor El Salvador have told anyone why

he was returned to the very country to which he cannot return, or why he is detained at CECOT.[2]

*See* Hr'g Tr., Apr. 4, 2025, 25: 13–14 (Mr. Reuveni: "We have nothing to say on the merits.  We

concede he should not have been removed to El Salvador."); *see* Hr'g Tr., Apr. 4, 2025, 34:25–

35:5 (The Court: "[W]hat basis is he held?  Why is he [in CECOT] of all places?" . . . Mr. Reuveni:

"I don't know.  That information has not been given to me.  I don't know.").

That silence is telling.  As Defendants acknowledge, they had no legal authority to arrest

him, no justification to detain him, and no grounds to send him to El Salvador[3]—let alone deliver

him into one of the most dangerous prisons in the Western Hemisphere.[4]  Having confessed

grievous error, the Defendants now argue that this Court lacks the power to hear this case, and they

lack the power to order Abrego Garcia's return.  ECF No. 11 at 3.  For the following reasons, their

jurisdictional arguments fail as a matter of law.  Further, to avoid clear irreparable harm, and

because equity and justice compels it, the Court grants the narrowest, daresay only, relief

warranted: to order that Defendants return Abrego Garcia to the United States.

## I.      Background

Abrego Garcia was born and raised in Los Nogales, El Salvador.  ECF No. 1-1 at 2.  His

family owned a small and successful pupuseria.  *Id.*  For years, they were subject to extortion and

---

[1] Louis Casiano, *U.S. Paid El Salvador to Take Venezuelan Tren de Aragua Members for 'Pennies on the Dollar,' White House Says*, FOX NEWS (Mar. 26, 2025), https://www.foxnews.com/politics/us-paid-el-salvador-take-venezuelan-tren-de-aragua-members-pennies-dollar-white-house-says.

[2] Defendants did not assert—at any point prior to or during the April 4, 2025, hearing—that Abrego Garcia was an "enemy combatant," an "alien enemy" under the Alien Enemies Act, 50 U.S.C. § 21, or removable based on MS-13's recent designation as a Foreign Terrorist Organization under 8 U.S.C. § 1189.  Invoking such theories for the first time on appeal cannot cure the failure to present them before this Court.  In any event, Defendants have offered no evidence linking Abrego Garcia to MS-13 or to any terrorist activity.  And vague allegations of gang association alone do not supersede the express protections afforded under the INA, including 8 U.S.C. §§ 1231(b)(3)(A), 1229a, and 1229b.

[3] ECF No. 11-3 at 3 ("Through administrative error, Abrego-Garcia was removed from the United States to El Salvador. This was an oversight . . . ."); Hr'g Tr., Apr. 4, 2025, 19:11–13 (Mr. Reuveni: "This person should -- the plaintiff, Abrego Garcia, should not have been removed. That is not in dispute.").

[4] ECF No. 1-4; ECF No. 10-2; ECF No. 10-3.

threats of death by one of El Salvador's most notorious gangs, Barrio 18. *Id.* at 2. The gang used Abrego Garcia as a pawn in its extortion, demanding that his mother give Abrego Garcia over to the gang or he and others in their family would be killed. *Id.* at 3. Attempting to escape the gang's reach, the family moved three times without success. *Id.* To protect Abrego Garcia, they ultimately sent him to the United States to live with his older brother, a U.S. citizen, in Maryland. ECF No. 1 ¶ 22.

Abrego Garcia lived in Maryland for many years without lawful status. *Id.* In early 2019, while waiting at the Home Depot in Hyattsville, Maryland, to be hired as a day laborer, Abrego Garcia was arrested. *Id.* ¶¶ 25–26. The Prince George's County Police Department questioned him about gang affiliation, but nothing came of it. *Id.* ¶ 27. He was then turned over to ICE custody. *Id.* ¶ 28.

On March 29, 2019, DHS initiated removal proceedings against Abrego Garcia pursuant to 8 U.S.C. § 1182(a)(6)(A)(i). ECF No. 1 ¶ 29. On April 24, 2019, Abrego Garcia appeared before an immigration judge ("IJ") where he conceded his deportability and applied for asylum, withholding of removal, and protection under the Convention Against Torture. ECF No. 1-1.

Pending resolution of the requested relief, DHS argued for Abrego Garcia to be detained in ICE custody. ECF No. 1 ¶ 30. DHS relied principally on a singular unsubstantiated allegation that Abrego Garcia was a member of MS-13.[5] The IJ ultimately detained Abrego Garcia pending the outcome of his requested relief from deportation, a decision affirmed by the Board of Immigration Appeals. ECF Nos. 11-1 & 11-2.

October 10, 2019, following a full evidentiary hearing, the IJ granted Abrego Garcia

---

[5] The "evidence" against Abrego Garcia consisted of nothing more than his Chicago Bulls hat and hoodie, and a vague, uncorroborated allegation from a confidential informant claiming he belonged to MS-13's "Western" clique in New York—a place he has never lived. ECF No. 31.

withholding of removal to El Salvador pursuant to 8 U.S.C. § 1231(b)(3)(A). As a matter of law, withholding of removal prohibits DHS from returning an alien to the specific country in which he faces clear probability of persecution. In Abrego Garcia's case, the IJ concluded that he was entitled to such protection because the Barrio 18 gang had been "targeting him and threatening him with death because of his family's pupusa business." ECF No. 1-1 at 2. DHS never appealed the grant of withholding of removal, and so the decision became final on November 9, 2019.[6] *See* Hr'g Tr., Apr. 4, 2025, 24:15–16 (Mr. Reuveni: "The government did not appeal that decision, so it is final."). Accordingly, as Defendants have repeatedly admitted, they were legally prohibited from deporting Abrego Garcia to El Salvador. *See* Hr'g Tr., Apr. 4, 2025, 25:6–7 (Mr. Reuveni: "There's no dispute that the order could not be used to send Mr. Abrego Garcia to El Salvador.").

For the next six years, Abrego Garcia lived in Maryland with his wife and their three children. ECF No. 1 ¶¶ 24–25. He complied fully with all directives from ICE, including annual check-ins, and has never been charged with or convicted of any crime. ECF No. 1-3, ECF No. 1 ¶ 45.

On March 12, 2025, while driving home from work with his young son in the car, Abrego Garcia was stopped by ICE agents. *Id.* ¶¶ 48–49. The officers had no warrant for his arrest and no lawful basis to take him into custody; they told him only that his "status had changed." *Id.* ¶ 50. He was first transported to an ICE facility in Baltimore, Maryland. *Id.* ¶¶ 51–53. Next, ICE agents shuttled him to detention facilities in Louisiana and La Villa, Texas. *Id.* ¶¶ 54–57. He was allowed a handful of calls to his wife. He said that he was told he would see a judge soon. *Id.* But

---

[6] A decision by an IJ becomes final "upon waiver of appeal or upon expiration of the time to appeal if no appeal is taken within that time." 8 C.F.R. § 1003.39. The deadline for filing an appeal to the Board of Immigration Appeals is 30 days from the date of the decision. *See* 8 C.F.R. § 1003.38(b). Once final, a grant of withholding of removal prohibits removal to the country of feared persecution absent formal reopening and termination of that protection. *See* 8 C.F.R. § 208.24.

that never happened.

Three days later, on March 15, 2025, without any notice, legal process, or hearing, ICE forcibly transported Abrego Garcia to the Terrorism Confinement Center ("CECOT") in El Salvador, a notorious supermax prison known for widespread human rights violations. ECF No. 1 ¶ 59; ECF No. 11-3 at 2; ECF No. 10-2. On that day, two planes carried over 100 aliens to CECOT purportedly pursuant to the Alien Enemies Act, ECF No. 11-3 at 2, the legality of which is the subject of separate litigation. *See J.G.G. v. Trump*, No. 1:25-cv-766 (JEB), 2025 WL 890401 (D.D.C. Mar. 24, 2025). A third plane included "aliens with Title 8 removal orders;" many of them were in ICE custody awaiting asylum and other protective hearings in the United States. ECF No. 11-3 at 2; *see J.G.G. v. Trump,* No. 1:25-cv-766 (JEB), ECF Nos. 67-5–67-20.

Once the planes arrived in El Salvador, the male detainees[7] were stripped and shackled. Their heads were shaved, and they were marched into CECOT to join nearly 40,000 other prisoners held in some of the most inhumane and squalid conditions known in any carceral system. ECF No. 10-3. Since then, no one has heard from Abrego Garcia. ECF No. 1 ¶ 41.

To effectuate a mass relocation of those detained by the United States, the federal government struck an agreement with El Salvador whereby it would pay the Salvadoran government six-million dollars for placement of the detainees in "very good jails at a fair price that will also save our taxpayer dollars." Marco Rubio (@SecRubio), X (Mar. 16, 2025, 7:59 AM), https://x.com/SecRubio/status/1901241933302825470. El Salvador's President, Nayib Bukele, has publicly touted the agreement terms: "We are willing to take in only convicted criminals (including convicted U.S. citizens) into our mega-prison (CECOT) in exchange for a

---

[7] Female detainees were returned to the United States because the prison would not accept them. *See, e.g.*, *J.G.G. v. Trump*, No. 1:25-cv-766 (JEB), ECF No. 55-1.

fee."[8]   ECF No. 10-5; Nayib Bukele (@nayibbukele), X (Apr. 4, 2025, 10:23 AM),
https://x.com/nayibbukele/status/1901245427216978290.  According to a memorandum issued by
El Salvador's Ministry of Foreign Affairs, the agreement provides that the detainees will be held
"for one (1) year, pending the United States' decision on [their] long term disposition."  *See*
Matthew Lee & Regina Garcia Cano, *Trump Officials Secretly Deported Venezuelans and
Salvadorans to a Notorious Prison in El Salvador*, ASSOCIATED PRESS (Mar. 15, 2025),
https://apnews.com/article/trump-deportations-salvador-tren-aragua-
64e72142a171ea57c869c3b35eeecce7.

        After Abrego Garcia was transferred to CECOT, Defendant, DHS Secretary, Kristi
Noem, personally toured the facility alongside senior Salvadoran officials.  U.S. Dep't of
Homeland Sec., *Inside the Action: Secretary Noem's Visit to El Salvador*, DHS,
https://www.dhs.gov/medialibrary/assets/video/59108 (last visited Apr. 4, 2025).  From inside
the prison walls, Secretary Noem declared that transferring individuals previously detained on
U.S. soil to CECOT remains "one of the tools in *our* [the United States'] toolkit that we will use
if you commit crimes against the American people."  U.S. Dep't of Homeland Sec., *How It's
Going*, DHS, https://www.dhs.gov/medialibrary/assets/video/59108 (last visited Apr. 4, 2025)
(emphasis added).

        Although the legal basis for the mass removal of hundreds of individuals to El Salvador
remains disturbingly unclear, Abrego Garcia's case is categorically different—there were no legal
grounds whatsoever for his arrest, detention, or removal.  Nor does any evidence suggest that
Abrego Garcia is being held in CECOT at the behest of Salvadoran authorities to answer for crimes
in that country.  Rather, his detention appears wholly lawless.

---

[8] It is unclear what qualifies as a "convicted criminal" under the terms of the agreement, but Abrego Garcia has not
been convicted of any crime.

Based on these events, Abrego Garcia, through counsel, and along with his wife, Jennifer Stefania Vasquez Sura, and their son, A.A.V., by and through his mother and next friend,[9] filed suit in this Court on March 24, 2025, against DHS Secretary Noem; Acting Director of U.S. Immigration and Customs Enforcement, Todd Lyons; Acting Executive Associate Director of ICE Enforcement and Removal Operations, Kenneth Genalo; ICE Baltimore Field Office Director, Nikita Baker; Attorney General, Pamela Bondi; and Secretary of State, Marco Rubio (collectively "Defendants").  Abrego Garcia specifically alleges that his removal to El Salvador violated the Immigration and Nationality Act, 8 U.S.C. § 1231(b)(3)(A)(Count I); the Due Process Clause of the Fifth Amendment (Count II); and the Administrative Procedure Act, 5 U.S.C. § 706(2) (Count III); and, pleaded in the alternative, qualifies him for habeas relief pursuant to 28 U.S.C. § 2241 (Count V).  ECF No. 1.  The matter is now before the Court on Plaintiffs' motion for preliminary injunction, ECF No. 6, following full briefing and a hearing held on April 4, 2025.  This Memorandum Opinion sets forth the Court's findings in support of the Order entered on April 4, 2025.

## II.    Jurisdictional Challenges

The Defendants' only meaningful challenge to the motion is that this Court lacks the power to hear this case.  They advance three arguments.  The Court considers each in turn.

### A.    The Court lacks Jurisdiction Because the "Core" of the Claims Sound in Habeas

Defendants first argue that because Abrego Garcia challenges his confinement in CECOT, the "core" of his claims sound only in habeas brought pursuant to 28 U.S.C. § 2241 *et seq*.  ECF No. 11 at 7, citing *DHS v. Thuraissigiam*, 591 U.S. 103, 117 (2020) ("habeas…is the appropriate

---

[9] Vasquez Sura and A.A.V's claims are not the subject of this decision, and so for clarity, the Court refers solely to Plaintiff Abrego Garcia.

remedy to ascertain…whether any person is rightfully in confinement or not.").  And as such, suit is proper only against the immediate "custodian" (the Warden of CECOT) and in the jurisdiction where Abrego Garcia is confined (El Salvador).  *Id.* at 9.

Defendants are wrong on several fronts.  Abrego Garcia exclusively challenges his lawless return to El Salvador, not the fact of his confinement.  ECF No. 1 at 16-20.  This is the core of his claim, as Defendants concede, which is why his suit would remain equally strong had Defendants released Abrego Garcia to the streets of El Salvador instead of CECOT.  Hr'g. Tr., Apr. 4, 2025, at 19.  As Defendants did in *J.G.G. v. Trump*, Civil Action No. 25-766 (JEB), 2025 WL 890401, at *7–8 (D.D.C. Mar. 24, 2025), they fundamentally ignore the difference between challenging legality of *removal* as opposed to confinement.  *Id.*[10]  For purposes of this decision, however, Abrego Garcia simply does not challenge his confinement.  The removal itself lies at the heart of the wrongs.  Thus, the Court need not wade into the murky jurisdictional implications that flow from such a challenge.

But even if the Court considers the thorny question of "custody" as it pertains to Abrego Garcia's habeas claim (Count V), the Defendants are not out of the woods.  They do indeed cling to the stunning proposition that they can forcibly remove any person—migrant and U.S. citizen alike —to prisons outside the United States, and then baldly assert they have no way to effectuate return because they are no longer the "custodian," and the Court thus lacks jurisdiction.  As a practical matter, the facts say otherwise.

The facts are that the United States exerts control over each of the nearly 200 migrants sent to CECOT.  The Defendants detained them, transported them by plane, and paid for their

---

[10] In this context, habeas claims need not be brought to the exclusion of all other claims.  *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 185–186 (D.D.C. 2015) (noting that "APA and habeas claims may coexist" where aliens challenge their detention in violation of removal procedures).

placement in the mega-jail until "the United States" decides "their long-term disposition."[11] Against this backdrop, Defendants have produced *no evidence* to suggest they cannot secure one such detainee, Abrego Garcia, for return to the United States.  Equally important, to credit Defendants' argument would permit the unfettered relinquishment of any person regardless of immigration status or citizenship to foreign prisons "for pennies on the dollar."[12]

Nor do the Defendants cite any authority to support this eye-popping proposition.  Sure, they point the Court to *Munaf v. Green*, 553 U.S. 674 (2008), but that decision has little bearing here.  In *Munaf*, the Court reviewed whether plaintiffs, American citizens who voluntarily traveled to Iraq and were subsequently detained for violations of Iraqi law, could challenge their detention. The Court concluded that while the district court retained jurisdiction in the first instance, *id.* 686, the merits of the habeas challenge failed because "Iraq has the sovereign right to prosecute Omar and Munaf for *crimes committed on its soil*."  *Id.* at 695 (emphasis added).

Here, by contrast, Abrego Garcia is *not* being held for crimes committed in or against El Salvador, the United States, or anywhere else for that matter.  His claims do not implicate any question of competing sovereign interests, and so, *Munaf* offers little guidance.[13]  Thus, while the

---

[11] *See* Matthew Lee & Regina Garcia Cano, *Trump Officials Secretly Deported Venezuelans and Salvadorans to a Notorious Prison in El Salvador*, ASSOCIATED PRESS (Mar. 15, 2025), https://apnews.com/article/trump-deportations-salvador-tren-aragua-64e72142a171ea57c869c3b35eeecce7.

[12] *Louis Casiano, U.S. Paid El Salvador to Take Venezuelan Tren de Aragua Members for 'Pennies on the Dollar,' White House Says*, FOX NEWS (Mar. 26, 2025), https://www.foxnews.com/politics/us-paid-el-salvador-take-venezuelan-tren-de-aragua-members-pennies-dollar-white-house-says.

[13] Defendants also urged this Court to follow *Kiyemba v. Obama*, 561 F.3d 509 (D.C. Cir. 2009), wherein the United States Court of Appeals for the District of Columbia held that a claim could not sound in habeas where the plaintiff sought relief to avoid "torture" in the receiving country.  The *Kiyemba* Court held that because a "district court may not question the Government's determination that that a potential recipient country is not likely to torture a detainee," the habeas claims fail on the merits.  *Id.,* citing *Munaff*, 553 U.S. at 514. That is not this.  Defendants have already determined that Abrego Garcia must not be returned to El Salvador because he had established under the INA that he faces persecution from Barrio18.  ECF No. 1-1.  Defendants remain bound to that decision just as much today as they were when they decided not to appeal that determination.  Defendants' violation of the INA in detaining Abrego Garcia in El Salvador does not implicate United States' policy decisions as to El Salvador's possible propensity to violate the Convention Against Torture writ large.  ECF No. 11 at 16 (this Court should defer to the Defendants' determination that Abrego Garcia will not likely be tortured or killed in El Salvador, this implicating Executive policy decisions).  Accordingly, *Kiyemba* does not counsel a different outcome.

success of Abrego Garcia's preliminary injunction motion does not depend on the success of his habeas claim, Defendants also fail to convince this Court that the claim will not survive in the end. For purposes of this decision, suffice to say the Court retains jurisdiction because Abrego Garcia challenges his removal to El Salvador, not the fact of confinement.

### B.     Redressability

Defendants next make a narrow standing argument, contending that because the claims are not redressable, this Court lacks the power to hear the case.  ECF No. 11 at 10.  Federal courts are ones of limited jurisdiction, hearing only live "Cases" and "Controversies."  U.S. Const. art. III, § 2.  A party's standing to maintain an action "is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Davis v. Fed. Election Comm.*, 554 U.S. 724, 733 (2008) (citations omitted).  To satisfy Article III standing, the plaintiff must make plausible that he "(1)[] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

The Defendants' redressability argument, simply put, is that their placement of Abrego Garcia in an El Salvadoran prison deprives them of any power to return him.  Thus, they say, even if Abrego Garcia succeeds on the merits, Defendants are powerless to get him back.  The facts demonstrate otherwise.

First, Defendants can and do return wrongfully removed migrants as a matter of course. This is why in *Lopez-Sorto v. Garland*, 103 F.4th 242, 248–53 (4th Cir. 2024), the Fourth Circuit concluded that the Defendants could redress wrongful removal to El Salvador by facilitating the

plaintiff's return per DHS' own directives.  *Id.* at 253*; see also Nken v. Holder*, 556 U.S. 418, 436 (2009) ("Aliens who are removed may continue to pursue their petitions for review, and those that prevail can be afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal.").

Second, Defendants unilaterally placed hundreds of detainees behind the walls of CECOT without ceding control over the detainees' fates, as the detainees are in CECOT "*pending the United States' decision on their long-term disposition.*"  *See* Matthew Lee & Regina Garcia Cano, *Trump Officials Secretly Deported Venezuelans and Salvadorans to a Notorious Prison in El Salvador*, ASSOCIATED PRESS (Mar. 15, 2025), https://apnews.com/article/trump-deportations-salvador-tren-aragua-64e72142a171ea57c869c3b35eeecce7.  Unlike Abrego Garcia, for whom *no* reason exists to detain him, Defendants transported many individuals who had been detained in the United States while awaiting immigration proceedings.[14]  Yet, despite Defendants' power to transfer those awaiting hearings to CECOT for a "good price," Defendants disclaim any ability to secure their return, including Abrego Garcia.  ECF No. 11 at 11.  Surely, Defendants do not mean to suggest that they have wholesale erased the substantive and procedural protections of the INA in one fell swoop by dropping those individuals in CECOT without recourse.  Instead, the

---

[14] *See, e.g.,* 25-cv-766-JEB, ECF No. 55-1 (Declaration of S.Z.F.R., a female detainee formerly held at Webb County Detention Center in Laredo, Texas awaiting a merits hearing on her asylum claims was part of the mass transport to CECOT but ultimately returned to the United States because CECOT would not accept females); ECF 67-10 (Declaration of immigration attorney for Jose Hernandez Romero, who had been detained at Otay Mesa Detention Center pending his asylum hearing at time was transported to CECOT); ECF No. 67-11 (Declaration of immigration attorney for detainee, G.T.B., a native of Venezuela who had been detained at Aurora Contract Detention Facility awaiting deportation proceedings when transported to CECOT without warning.  ICE ultimately returned her to the United States); ECF No. 67-11 (Declaration of immigration attorney for detainee, Jerce Reyes Barrios, who had been housed at Otay Mesa Detention Center awaiting hearing on protected status, prior to transport to CECOT); ECF No. 67-14 (Declaration of immigration attorney for detainee, E.V., who had been housed at Moshannon Valley Processing Center in Philipsburg, Pennsylvania awaiting hearing on final order of removal when transported to CECOT); ECF No. 67-16 (Declaration of immigration attorney for detainee J.A.B.V, who had been detained domestically prior to his removal hearing scheduled for April 7, 2025 was transported to CECOT); ECF No. 67-17 (Declaration of immigration attorney for detainee, L.G., who had been detained at Moshannon Valley Processing Center in Philipsburg, Pennsylvania, awaiting removal proceedings prior to transfer to CECOT).

record reflects that Defendants have "outsource[d] part of the [United States'] prison system."[15]
*See also* U.S. Dep't of Homeland Sec., *How It's Going*, DHS,
https://www.dhs.gov/medialibrary/assets/video/59108 (last visited Apr. 4, 2025) (quoting
Defendant Noem: "This facility is one of the tools in our toolkit that we will use")."[16] Thus, just
as in any other contract facility, Defendants can and do maintain the power to secure and transport
their detainees, Abrego Garcia included.

In the end, Defendants' redressability argument rings hollow.  As their counsel suggested
at the hearing, this is not about Defendants' *inability* to return Abrego Garcia, but their lack of
desire.

> THE COURT: Can we talk about, then, just very practically, why can't the United States
> get Mr. Abrego Garcia back?
>
> MR. REUVENI: Your Honor, I will say, for the Court's awareness, that when this case
> landed on my desk, the first thing I did was ask my clients that very question. I've not
> received, to date, an answer that I find satisfactory.

Hr'g Tr., Apr. 4, 2025, at 35–36.  *See also id.* at 50 (counsel seeking 24 hours to persuade
Defendants to secure Abrego Garcia's return).   Flat refusal, however, does not negate
redressability.  The record reflects that the remedy is available.  Abrego Garcia maintains standing
to sue.

### C.     Section 1252(g) of the INA Does Not Strip the Court's Jurisdiction in this Case

Lastly, Defendants argue that 8 U.S.C. § 1252(g) ("Section 1252(g)") deprives the Court
of jurisdiction to review this matter.  The statute reads:

---

[15] Nayib Bukele (@nayibbukele), X (Mar. 19, 2025, 8:12 PM),
https://x.com/nayibbukele/status/1886606794614587573
[16] U.S. Dep't of Homeland Sec., *How It's Going*, DHS, https://www.dhs.gov/medialibrary/assets/video/59108 (last
visited Apr. 4, 2025) (quoting Defendant Noem: "This facility is one of the tools in our toolkit that we will use").

> Except as provided in this section and notwithstanding any other provision of law (statutory or non-statutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g).

Defendants concede that *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 482 (1999), commands a narrow construction of Section 1252(g), limiting application solely to the Attorney General's exercise of lawful discretion to (1) commence proceedings; (2) adjudicate cases; or (3) execute removal orders. *Id.* ("It is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings."). *See also Bowrin v. U.S. I.N.S.*, 194 F.3d 483, 488 (4th Cir. 1999) (noting that Section 1252(g) only stripped federal courts of jurisdiction to review the "Attorney General's decision to exercise her *discretion* to initiate or prosecute the specific stages in the deportation process."). As the *Reno* Court explained, "there was good reason for Congress to focus special attention upon, and make special provision for, judicial review of the Attorney General's *discrete acts* . . . which represent the initiation or prosecution of various stages in the deportation process." *Id.* (emphasis added). Thus, this Court is deprived of jurisdiction only for the discretionary decisions made concerning the three stages of the deportation process. *See Bowrin*, *v. U.S. INS*, 194 F.3d 483, 488 (4th Cir. 1999); *U.S. v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004); *Coyotl v. Kelly*, 261 F. Supp. 3d 1328, 1339–1341 (N.D. Ga. 2017); *Gondal v. U.S. Dep't of Homeland Sec.*, 343 F. Supp. 3d 83, 92 (E.D.N.Y. 2018). *But see Silva v. United States*, 866 F.3d 938 (8th Cir. 2017).

Defendants press that Section 1252(g) precludes jurisdiction here because the claims concern Defendants' "execution of his removal order."  ECF No. 11 at 13.  The argument fails in both fact and law.

First, the Court cannot credit that Defendants removed Abrego Garcia pursuant to an "executed removal order" under the INA.  Defendants have not produced *any* order of removal as to Abrego Garcia, executed or otherwise, or submitted any proof that they had removed him pursuant to one.  Hr'g Tr. Apr. 4, 2025, at 20 (counsel admitting no order of removal is part of the record); *see also id*. at 22 (counsel confirming that "the removal order" from 2019 "cannot be executed" and is not part of the record).  Nor have any other corollary documents surfaced, such as a "warrant for removal/deportation" customarily served on an alien as part of a lawful deportation or removal.  *Id.*[17]  From this, the Court cannot conclude that Abrego Garcia was spirited to CECOT on an "executed removal order" such that Section 1252(g) is implicated.

Second, even if there were an executed order of removal for Abrego Garcia, his claims do not seek review of any discretionary decisions.  He is not asking this Court to review the wisdom of the Attorney General's lawful exercise of authority.  Rather, he asks that the Court determine whether his return to El Salvador violated the INA.   In this circumstance, the Fourth Circuit has spoken.

*Bowrin v. U.S. INS,* 194 F.3d 483 (4th Cir. 1999) made plain that review of agency decisions involving pure questions of law "do not fall into any of the three categories enumerated in § 1252(g)." *Bowrin*, 194 F.3d at 488.  Section 1252(g), the *Bowrin* Court emphasized, "does not apply to all claims arising from deportation proceedings, because §

---

[17] *See* sample warrant for removal at https://www.ice.gov/sites/default/files/documents/Document/2017/I-205_SAMPLE.PDF

1252(g) stripped the federal courts of jurisdiction only to review challenges to the Attorney General's decision to *exercise her discretion* to initiate or prosecute these specific stages in the deportation process." *Id.* (citing *American-Arab Anti-Discrimination Committee*, 525 U.S. at 482) (emphasis added). *See also Hovsepian*, 359 F.3d at 1155 ("The district court may consider a purely legal question that does not challenge the Attorney General's discretionary authority, even if the answer to that legal question . . . forms the backdrop against which the Attorney General later will exercise discretionary authority."); *Siahaan v. Madrigal*, Civil No. PWG-20-02618, 2020 WL 5893638, at *5 (D. Md. Oct. 5, 2020) ("To insist, as the Respondents do, that this Court lacks jurisdiction because of § 1252(g) to determine the purely legal questions of whether his removal under these circumstances violates the statutory and constitutional provisions that his habeas petition has raised runs contrary to the consistent rulings of the Supreme Court for at least twenty years."); *Coyotl*, 261 F. Supp. 3d at 1339–41. Accordingly, and after exhaustive analysis, *Bowrin* concluded that "absent express congressional intent . . . to eliminate the general federal habeas corpus review pursuant to 28 U.S.C.A. § 2241, the remedy remains available to Bowrin and other aliens similarly situated." *Bowrin*, 194 F.3d at 489 (collecting cases).

Like *Bowrin*, Abrego Garcia presents to this Court a pure question of law: whether Defendants exceeded their authority in returning him to El Salvador, in violation of the 8 U.S.C. § 1231(b)(3)(A). Hr'g Tr., Apr. 4, 2025, at 24. In this Court's view, no plainer question of statutory interpretation could be presented. Thus, Section 1252(g) does not deprive the Court of jurisdiction over the claims.

In sum, the Court retains jurisdiction over this case. And even though Defendants concede that if this Court retains jurisdiction, Abrego Garcia prevails on the merits of his preliminary injunction,[18] for the benefit of all, the Court briefly addresses why this concession makes sense.

## III.    Merits of Preliminary Injunctive Relief

A preliminary injunction is an extraordinary remedy that should be granted only upon "a clear showing that the plaintiff is entitled to relief." *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (internal quotation marks omitted) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008)). Generally, injunctions are sought to "preserve the status quo so that a court can render a meaningful decision after a trial on the merits." *Hazardous Waste Treatment Council v. State of S.C.*, 945 F.2d 781, 788 (4th Cir. 1991) (quotation omitted); *see also United States ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 489, 498 (4th Cir. 1999). By contrast, injunctions which alter the status quo, known as "mandatory injunctions," are highly disfavored, *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980), and should be granted only when "necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind," *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003), *abrogation on other grounds recognized in Bethesda Softworks, LLC v. Interplay Entm't Corp.*, 452 F. App'x 351, 353–54 (4th Cir. 2011); *see also Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024). Abrego Garcia requests relief designed to retore the status quo ante, or the "last uncontested status between the parties which preceded the controversy." *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). That is, to return him to where he was on March 12, 2025, before he was apprehended by ICE and spirited away to

---

[18] *See* Hr'g Tr., Apr. 4., 2025, at 25:10–14 (Mr. Reuveni: "if you're not buying our jurisdictional arguments, like, we're done here . . . . We have nothing to say on the merits.").

CECOT.

To receive the benefit of injunctive relief, Abrego Garcia must demonstrate by preponderant evidence four well-established factors: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that issuing the injunction is in the public interest. *See Winter*, 555 U.S. at 20. The Court considers each factor separately.

### A.    Likelihood of Success of the Merits

As to likelihood of success on the merits, Abrego Garcia need only demonstrate a likelihood of success on one cause of action. *See Mayor & City Council of Baltimore v. Azar*, 392 F. Supp. 3d 602, 613 (D. Md. 2019). Defendants concede success as to Count I, their violation of the INA. The Court agrees.

An alien "may seek statutory withholding under [8 U.S.C.] § 1231(b)(3)(A), which provides that 'the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.'" *Johnson v. Guzman Chavez*, 594 U.S. 523, 530 (2021)). "If an alien is granted withholding-only relief, DHS may not remove the alien to the country designated in the removal order unless the order of withholding is terminated. 8 C.F.R. §§ 208.22, 1208.22. The withholding of removal is country-specific and more stringent than other forms of relief from deportation because once the noncitizen "establishes eligibility for withholding of removal, the grant is mandatory." *Amaya v. Rosen*, 986 F.3d 424, 427 (4th Cir. 2021), *as amended* (Apr. 12, 2021) (quoting *Gandziami-Mickhou v. Gonzales*, 445 F.3d 351, 353–54 (4th Cir. 2006)).

Accordingly, pursuant to Section 1231(b)(3)(A), once an alien is granted withholding of

removal, the Defendants "may not" remove the alien to the identified country.  It is undisputed that "Abrego Garcia, was removed to El Salvador despite a grant of withholding of removal to that country." ECF No. 11.  Even more disturbing, the Defendants concede that it cannot even produce the documents which reflect *any* authority, lawful or otherwise, to transfer him to El Salvador. Thus, the record plainly reflects that Defendants' forced migration to El Salvador violates Section 1231(b)(3)(A).  He is guaranteed success on the merits of Count I.

Next as to Count II, the procedural due process claim, Abrego Garcia alleges that Defendants forced removal to El Salvador without *any process* constitutes a clear constitutional violation.  This the Defendants also concede.  But for completeness, the Court briefly addresses why the parties are correct.  To succeed on a Fifth Amendment due process claim, the plaintiff must show that he possesses "a constitutionally cognizable life, liberty, or property interest"; that he was deprived of that interest because of "some form of state action"; and "that the procedures employed were constitutionally inadequate."  *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013).

Abrego Garcia has demonstrated that he had a liberty interest by virtue of the INA in avoiding forcible removal to El Salvador.  "In order for a statute to create a vested liberty or property interest giving rise to procedural due process protection, it must confer more than a mere expectation (even one supported by consistent government practice) of a benefit."  *Mallette v. Arlington County Employees' Supplemental Ret. Sys. II*, 91 F.3d 630, 635 (4th Cir.1996).  There must be entitlement to the benefit as directed by statute, and the statute must "'act to limit meaningfully the discretion of the decision-makers.'"  *Id.* (quoting *Board of Pardons v. Allen*, 482 U.S. 369, 382 (1987) (O'Connor, J., dissenting))."  Here, the statutory scheme which conferred withholding of removal also entitled Abrego Garcia to not be returned to El Salvador absent

process.  Further, the statutes at issue eliminated the discretion altogether.  Thus, this element is easily met.

As to the third element, Defendants deprived Abrego Garcia of this right without *any procedural protections* due to him.  Indeed, nothing in the record suggests that Abrego Garcia received any process at all.  Accordingly, he is likely to succeed on the merits of Count II.

Last, and for similar reasons, Abrego Garcia is likely to succeed on the merits of the APA claim, Count III.  The APA mandates that "agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414(1971), *abrogated by Califano v. Sanders*, 430 U.S. 99; 5 U.S.C. § 706(2); *W. Virginia v. Thompson*, 475 F.3d 204, 209 (4th Cir. 2007).  An agency action is arbitrary and capricious when the agency disregards rules or regulations still in effect or departs from a prior policy without "articulat[ing] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *See Sierra Club v. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018).  In short, an agency may not "depart from a prior policy sub silentio or simply disregard rules that are still on the books."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).

The Defendants do not dispute that its expulsion of Abrego Garcia to El Salvador constitutes a final agency action.  Nor do they dispute that the decision was without any lawful authority whatsoever.  Nor have Defendants articulated any rationale for taking such action.  Their action was lawless, and thus in violation of the APA.

Abrego Garcia, as all who have touched this case recognize, is likely to succeed on the merits of these claims.  The first *Winter* factor is thus satisfied.

**B.      Irreparable Harm**

Regarding the second *Winter* factor, Abrego Garcia must show that he will be irreparably harmed in the absence of preliminary injunctive relief.  *See Winter*, 555 U.S. at 20.  This standard requires more than the mere "possibility" of irreparable harm; rather, the plaintiff must "demonstrate that irreparable injury is likely in the absence of an injunction."  *Id.* at 21.

Obviously, "the risk of torture, beatings, and even death clearly and unequivocally supports a finding of irreparable harm."  *J.G.G.,* 2025 WL 890401, at \*16*, citing United States v. Iowa*, 126 F.4th 1334, 1352 (8th Cir. 2025) (torture); *Leiva-Perez v. Holder*, 640 F.3d 962, 970 (9th Cir. 2011) (physical abuse).  Perhaps this is why Defendants anemically suggested that Abrego Garcia failed to show he would be "harmed" in CECOT, but then abandoned that contention at the preliminary injunction hearing.  Certainly as to Abrego Garcia, the IJ found that returning him to El Salvador *at all* would likely subject him to persecution at the hands of Barrio 18, to include the risk of death.  ECF No. 1-1 at 7.

More fundamentally, Defendants do not dispute that their placement of Abrego Garcia at CECOT invites this very harm.  Defendants effectuated his detention in one of the most notoriously inhumane and dangerous prisons in the world.  Defendants even embrace that reality as part of its well-orchestrated mission to use CECOT as a form of punishment and deterrence.  ECF No. 10-5 at 4 (Defendant Noem announcing while standing in front of caged prisoners at CECOT "if an immigrant commits a crime, this is one of the consequences you could face . . . . You will be removed and you will be prosecuted.").

But particular to Abrego Garcia, the risk of harm shocks the conscience.  Defendants have forcibly put him in a facility that intentionally mixes rival gang members without any regard for protecting the detainees from "harm at the hands of the gangs."  ECF No. 10-3 at 15.  Even worse,

Defendants have claimed—without any evidence—that Abrego Garcia is a member of MS-13 and then housed him among the chief rival gang, Barrio 18. Not to mention that Barrio 18 is the very gang whose years' long persecution of Abrego Garcia resulted in his withholding from removal to El Salvador. To be sure, Abrego Garcia will suffer irreparably were he not accorded his requested relief. He has satisfied the second *Winter* factor.

### C.    Balance of Equities and Public Interest

The Court considers the last two factors in tandem because "the balance of the equities and the public interest . . . 'merge when the Government is the opposing party.'" *Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 242 (D. Md. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). As to the balance of the equities, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S., at 24 (quoting *Amoco Prod. Co. v. Gambell, AK*, 480 U.S. 531, 542 (1987)). When considering the public interest, the Court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). The Court is mindful that it may not collapse this inquiry with the first *Winter* factor. *See USA Farm Lab., Inc. v. Micone*, No. 23-2108, 2025 WL 586339, at *4 (4th Cir. Feb. 24, 2025) (explaining that it is "circular reasoning" to argue that a government "program is against the public interest because it is unlawful" and that such argument "is nothing more than a restatement of their likelihood of success").

"Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken,* 416 U.S. at 436. Equally important, the public remains acutely interested in "seeing its governmental institutions follow the law. . . ." *Roe v. Dep't of Def.*, 947 F.3d at 230–31 (4th Cir. 2020) (internal quotation

marks and citation omitted).  The absence of injunctive relief places this interest in greatest jeopardy, as demonstrated by Abrego Garcia's experience over the past three weeks.

Defendants seized Abrego Garcia without any lawful authority; held him in three separate domestic detention centers without legal basis; failed to present him to any immigration judge or officer; and forcibly transported him to El Salvador in direct contravention of the INA.  Once there, U.S. officials secured his detention in a facility that, by design, deprives its detainees of adequate food, water, and shelter, fosters routine violence; and places him with his persecutors, Barrio 18. In short, the public interest and companion equities favor the requested injunctive relief.[19]

## IV.    Conclusion

Based on the foregoing, the Court retains jurisdiction to hear this case.  Abrego Garcia has also demonstrated that he is entitled to the injunctive relief sought.  The Court's April 4, 2025 Order thus remains in full force and effect.[20]

Date: April 6, 2025

/S/
_____
Paula Xinis
United States District Judge

---

[19] Defendants suggested in their response that the public retains an interest in not returning Abrego Garcia to the United States because "he is a danger to the community," ECF No. 11, only to abandon this position at the hearing. Again, with good reason.  No evidence before the Court connects Abrego Garcia to MS-13 or any other criminal organization.

[20] For these same reasons, the Court denies Defendants' Motion to Stay the Court's April 4, 2025 Order.  ECF No. 29.