IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

KILMAR ARMANDO ABREGO GARCIA, et al.,

*Plaintiffs-Appellees,*

v.

KRISTI NOEM, Secretary of Homeland
Security, et al.,

*Defendants-Appellants.*

No. 25-1404

## EMERGENCY MOTION FOR STAY PENDING APPEAL
## AND PETITION FOR WRIT OF MANDAMUS

Article II of the Constitution bestows on the President—and through him, the

Executive Branch—the exclusive power over foreign relations. The Supreme Court

reaffirmed that principle in this very case, unanimously rejecting the District Court's

unprecedented command that the Executive actually *effectuate* the return of Abrego

Garcia from El Salvador—*i.e.*, force a foreign sovereign to relinquish one of its own

citizens. Under the guise of an amended order, however, the same District Court has

set down the same unjustifiable path, all in service of a member of a foreign terrorist

organization with no valid right to be in the United States in the first place. This

Court's immediate intervention is needed.

The federal courts do not have the authority to press-gang the President or his

agents into taking any particular act of diplomacy. Instead, in this context, the courts

only have the authority to order the Executive to "facilitate" the return of an alien

removed abroad. And as that term has long been understood and applied, that means

1

the Executive must remove any *domestic* barriers to the alien's return; it does not, and constitutionally cannot, involve a directive to take any act upon a foreign nation.

The District Court, though, has again crossed that line. Notwithstanding the fact Defendants have filed a declaration affirming that the United States is in the process of removing domestic impediments to any return on the part of Abrego Garcia—a member of a foreign terrorist organization (MS-13), who no longer has any right to withholding of removal in the first place—the District Court has demanded more. It has ordered the Executive to go beyond the longstanding understanding of what "facilitation" requires, necessarily going beyond what Article III allows a court to do. In the setting of a case involving a citizen of a foreign sovereign, who is a member of a foreign terrorist organization, held in the domestic custody of that sovereign, there is no question that the Executive's foreign affairs powers are at their apex. Yet here, a single district court has inserted itself into the foreign policy of the United States and has tried to dictate it from the bench. Emergency relief is needed.

As bad, while the District Court has rejected this "well-established" definition, *Noem v. Abrego Garcia*, 2025 WL 1077101, at *2 (Sotomayor, J., statement respecting the disposition of the application), it refused to provide any sort of definition of its own. And worse, it then ordered extensive and expedited discovery into the Executive Branch to probe how it has (or might) effectuate this ill-defined directive. The result is a fishing expedition, captained by plaintiffs armed with an open-ended mandate, who have already ordered scores of production requests, burdensome interrogatories, and at least four (and perhaps more) depositions of Executive Branch officials. At

minimum, *that* is untenable, and mirrors mistakes regarding governmental discovery that other appellate courts have corrected in mandamus.

This Court must act. It should stay the District Court's amended injunction, which extends beyond its equitable authority. And it should grant mandamus to direct the District Court to vacate its capacious discovery order. In the meantime, Defendants respectfully request this Court issue an immediate administrative stay. Counsel for Plaintiffs were contacted by e-mail and notified the undersigned that they oppose this motion.

## STATEMENT

**1.** Kilmar Armando Abrego Garcia is a citizen and native of El Salvador. ECF 1-1, at 1. Far from an ordinary resident of Maryland, Abrego Garcia is a member of the designated foreign terrorist organization MS-13. *See* ECF 64 ¶ 6. He has never been lawfully admitted into the United States; and in 2019, Abrego Garcia was ordered removed from this country. *Id.* ¶ 7; *see also* ECF 77 ¶ 6.

On March 15, 2025, Abrego Garcia was finally removed to El Salvador. While Defendants did not go through the formal procedures to terminate Abrego Garcia's withholding-of-removal order to El Salvador, Abrego Garcia is no longer eligible for that form of protection, given his membership in a foreign terrorist organization. *See* ECF 77 ¶ 7.

**2.** On March 24, 2025, Plaintiffs filed this suit, challenging Abrego Garcia's removal to his native country of El Salvador. On April 4, the District Court preliminarily enjoined Defendants to "facilitate and effectuate the return of [Abrego

Garcia] to the United States by no later than 11:59PM on Monday, April 7." ECF 21, at 2. Defendants then sought an immediate stay of the District Court's injunction.

On April 7, this Court affirmed. Judge Wilkinson concurred only in the denial of the motion for a stay pending appeal, and wrote to emphasize the District Court's original order should be read no broader than requiring "the government 'facilitate' the plaintiff's return to the United States." *Abrego Garcia v. Noem*, 2025 WL 1021113, at *6 (4th Cir. 2024) (Wilkinson, J., concurring). Judge Wilkinson stressed "the Executive's broad authority in international relations must afford it latitude as to how the facilitation of Abrego Garcia's release can best be accomplished." *Id.* at *7.

That day, Defendants appealed to the Supreme Court.

**3.** On April 7, Chief Justice Roberts issued an administrative stay to forestall the District Court's arbitrary deadline. A few days later, the Supreme Court granted Defendants' application in part. The Court affirmed that Defendants must "facilitate" Abrego Garcia's "release from custody in El Salvador." *Noem v. Abrego Garcia*, 2025 WL 1077101, at *1. But it did so only insofar as such directive gave "due regard for the deference owed to the Executive Branch in the conduct of foreign affairs," *id.*, and tracked the "well-established policy" of the Executive Branch, *id.* at *2 (Sotomayor, J., statement respecting the disposition of the application). The Court unanimously rejected the District Court's unprecedented directive to *effectuate* Abrego Garcia's removal from El Salvador—*i.e.*, force a foreign sovereign to relinquish one of its own citizens being "detained pursuant to [its] sovereign, domestic authority." ECF 63 ¶

3. The Court remanded for the District Court to "clarify" its order in a way that would not "exceed the District Court's authority." 2025 WL 1077101, at *1.

**4.** Notwithstanding the Supreme Court's command to give "due regard for the deference owed to the Executive Branch in the conduct of foreign affairs," *id.*, the District Court issued an amended preliminary injunction that evening, without even hearing from the Government, *see* ECF 50, 51. It revised its order to "DIRECT that Defendants take all available steps to facilitate the return of Abrego Garcia to the United States as soon as possible." *Id.* at 1. The District Court also ordered a supplemental declaration by 9:30 AM the next day (extended later to 11:30 AM) "from an individual with personal knowledge" of Abrego Garcia's status, as well as all steps taken to facilitate his return from El Salvador. *Id.* at 1-2.

Following a hearing, the District Court held Defendants had failed to comply with its new injunction. That court then ordered daily declarations from sufficiently senior executive officials, to give regular updates about Abrego Garcia's status, plus steps taken (or soon to be taken) to "facilitate his return." ECF 61, at 1.

**5.** Defendants submitted daily status reports in response to that court's order. On the first day, a declarant was able to attest that Abrego Garcia was "alive and secure" in El Salvador, "detained pursuant to the sovereign, domestic authority of El Salvador." ECF 63 ¶ 3; *see* ECF 64 ¶ 8 (affirming same next day). On April 14, while President Bukele of El Salvador visited Washington, a declarant emphasized that while "DHS does not have authority to forcibly extract an alien from the domestic custody of a foreign sovereign nation," the agency "has established processes for

taking steps to remove domestic obstacles that would otherwise prevent an alien from lawfully entering the United States." ECF 74 ¶ 7. The next day, that declarant affirmed that consistent with the processes DHS had established, "if Abrego Garcia does present at a port of entry," he would not be turned away. ECF 77 ¶ 8. Instead, even though Abrego Garcia is a member of a foreign terrorist organization, DHS would take him into "detention," satisfying any obligation to "facilitate Abrego Garcia's presence in the United States." *Id.* ¶ 9; *see also id.* ¶ 7.

**6.** On April 15, the District Court held a status conference and then ordered wide-ranging expedited discovery in connection with its amended injunctive order. ECF 79. Specifically, that court authorized Plaintiffs to demand (i) fifteen requests for production of documents, (ii) fifteen interrogatories, and authorized (iii) at least four high-ranking depositions, with the possibility of two more. *Id.* at 7. That court broadly defined the scope of this discovery as anything relating to Abrego Garcia's current status, as well as all past or future steps to facilitate his removal to the United States. *Id.* at 6-7. It also ordered all of this completed next week. *Id.* at 7-8.

## STANDARDS OF REVIEW

The decision of whether to grant a stay pending appeal turns on four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). A court may issue a writ of mandamus under the All Writs Act when

mandamus would vindicate a "clear and indisputable" right, "no other adequate means" of relief exists, and the writ is "appropriate under the circumstances." *Cheney v. United States Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004); 28 U.S.C. § 1651.

## ARGUMENT

### I. The District Court's Amended Injunction Is Unconstitutional.

The District Court has ordered Defendants to "take all available steps to facilitate the return of Abrego Garcia to the United States as soon as possible." ECF 51, at 1. And it has since made clear that command extends beyond how "facilitate" has been traditionally understood. ECF 79, at 4-6. That extension is well past what the Constitution permits; and it is not what the Supreme Court ordered. This Court should promptly stay the District Court's (yet again) unconstitutional directive.

**1.** The federal courts do not have the authority to force the Executive Branch to engage in a particular act of diplomacy or engage with a foreign sovereign in a given manner. That is the "exclusive power of the President as the sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936). Such power is "conclusive and preclusive." *Trump v. United States*, 603 U.S. 593, 607 (2024); *see, e.g.*, *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) (Foreign affairs decisions are "of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.").

A federal court thus cannot enjoin the Executive Branch to perform some diplomatic act—or issue an injunction where diplomatic action is essential for the Executive to come into compliance. This is because the "federal equity power cannot extend beyond what the separation of powers will allow." *In re Trump*, 958 F.3d 274, 297 (4th Cir. 2020) (Wilkinson, J., dissenting). And the Constitution's separation of powers compels the "President's independent authority" over "foreign affairs" must be "free from interference" by the judiciary. *Id.* at 307; *see also Abrego Garcia v. Noem*, 2025 WL 1021113, at *7 (Wilkinson, J., concurring in denial of stay).

Applying these principles, any court order to "facilitate" the return of a foreign national from a foreign land must be limited to domestic measures. Indeed, that is what the term has long meant in the immigration context—to "engage in activities" that would allow a removed alien to "travel to the United States," such as by granting "parole" should he arrive at a point of entry. *See* U.S. Immigration and Customs Enforcement, Directive 11061.1, § 3.1 (Feb. 24, 2012) (defining "facilitate an alien's return").[1] In other words, to "facilitate" an alien's return is to remove any *domestic* obstacles that would otherwise bar the alien's ability to return. The federal courts—including this Court—have consistently respected this limit and have ordered relief consistent with the outer bounds of their own authority. *See Ramirez v. Sessions*, 887

---

[1] Available at: https://www.ice.gov/doclib/foia/dro_policy_memos/11061.1_current_policy_facilitating_return.pdf.

F.3d 693, 706 & n.11 (4th Cir. 2018) (directing government to "facilitate" alien's return "pursuant to [ICE's] Directive").[2]

Unsurprisingly, that is precisely what the Supreme Court ordered in this case. Again, the Court unanimously rejected the District Court's unprecedented command that Defendants compel El Salvador to relinquish one of their own citizens. *Abrego Garcia*, 2025 WL 1077101, at *1. And in affirming that Defendants should "facilitate" Abrego Garcia's "release from custody in El Salvador," the Court emphasized that the scope of that order was conditioned by "the deference owed to the Executive Branch in the context of foreign affairs." *Id.* In more concrete terms, tracking what the Government pressed in its brief, the Court ordered that Defendants needed to follow the "well-established policy" just described. *Id.* at *2 (Sotomayor, J., statement respecting the disposition of the application) (relying on the ICE Directive).

**2.** The District Court has again breached this line, and "exceed[ed]" the bounds of its "authority." *Id.* at *1; *see Abrego Garcia*, 2025 WL 1021113, at *6-7 (Wilkinson, J., concurring in denial of stay). That court rejected the above as a "fallacy." ECF 79, at 4. And it insisted that its order went beyond "taking all available steps to remove any *domestic* obstacles" that would otherwise bar Abrego Garcia's return to the United States—although it did not specify the steps required. *Id.*; *see* ECF 51.

That is unlawful. The understanding of facilitate described above marks the outer bounds of what a federal court can order from the Executive. Anything further

---

[2] *E.g.*, *Lopez-Sorto v. Garland*, 103 F.4th 242, 249 (4th Cir. 2024) (defining "facilitate" by ICE Directive); *Garcia v. Garland*, 73 F.4th 219, 234 (4th Cir. 2023) (similar); *Nunez-Vasquez v. Barr*, 965 F.3d 272, 286 & n.10 (4th Cir. 2020) (similar).

intrudes upon the President's exclusive Article II domain. The District Court offered two justifications for this severe constitutional trespass. Neither is colorable.

*First*, the District Court relied on dictionary definitions of the word "facilitate" to argue that it required "more extensive governmental efforts." ECF 79, at 4. But as explained, in the immigration context, "facilitate an alien's return" is a term of art, informed by longstanding executive practice and the separation of powers. And *that* definition is far narrower than its ordinary meaning. It does not include all things to "make the occurrence of (something) easier." ECF 79, at 4. Rather, it is cabined to domestic measures, which do not reach past the sovereign lands of the United States. *See, e.g.*, *Ramirez*, 887 F.3d at 706 n.11 (explaining "facilitate" does not involve, among other things, "making flight arrangements for the alien").[3]

*Second*, the District Court asserted Defendants "appear to have done nothing" to facilitate Abrego Garcia's return. ECF 79, at 5. But that is just completely wrong. In the days following the Supreme Court's remand, "DHS has established processes

---

[3] The District Court cited documents collected in a 2014 SDNY case for the proposition that the Government can be ordered to engage in "more extensive" efforts to "facilitate" an alien's return. ECF 79, at 5 n.1 (citing *Nat'l Immigr. Project of Nat'l Laws. Guild v. U.S. Dep't of Homeland Sec.*, No. 11-cv-3235, 2014 WL 6850977 (S.D.N.Y. Dec. 3, 2014)). But that court overread these sources. Foremost, its main citation (a letter by then-Deputy Solicitor General Dreeben) pegged federal policy to the ICE Directive above. ECF No. 79-4, at 43 (citing ICE Directive 11061.1). As for its other cites, none involved facts like these, where a member of a foreign terrorist organization was being held in the custody of a foreign sovereign. *See, e.g.*, *Nat'l Immigr. Project of Nat'l Laws. Guild*, 2014 WL 6850977, at *2 (describing example where in 2014 "ICE refused to pay for [the] return" flight of an alien removed to Haiti, before reversing course as part of "mooting his appeal"). Nor do they speak to what is within the power of the federal courts to compel; even if the Executive Branch chooses to exercise its foreign affairs powers in certain cases, that would not mean the federal courts could commandeer them in future cases.

for taking steps to remove domestic obstacles that would otherwise prevent [Abrego Garcia] from lawfully entering the United States." ECF 77 ¶ 8. And just yesterday, DHS affirmed that "if Abrego Garcia does present at a port of entry," he would not be turned away—instead placed into "detention by DHS" for further processing. *Id.* ¶ 9.

The District Court's minimization of these efforts is indicative of its utter maximalist view of "facilitate." And it is a clear marker that the court below will try to force that view on Defendants until an appellate court stops it. This Court should do so immediately. It should stay the District Court's amended injunction insofar as it goes beyond how the Executive Branch—and for that matter, this Court—has long defined "facilitate." And it should stop the District Court's now recurring effort to effectively conduct our diplomacy with El Salvador from Greenbelt.

**3.** The District Court's amended injunction also violates the mandate rule. *Doe v. Chao*, 511 F.3d 461, 464-65 (4th Cir. 2007). The Supreme Court made clear the original preliminary injunction "require[d] clarification on remand" before it could become effective, and further ordered the "District Court should clarify its directive, with due regard for the deference owed to the Executive Branch in the conduct of foreign affairs." *Noem v. Abrego Garcia*, 2025 WL 1077101 at 1. The District Court flouted this mandate. Far from giving "due regard" to the Executive in clarifying its order, it refused even to permit the Executive to file a brief before an amended preliminary injunction issued, mere hours after the Supreme Court's April 10 stay decision. *See* ECF 50, 51. And as for its substance, the District Court relegated this Supreme Court directive to a footnote in a subsequent order after Defendants objected

to the amended injunction.  ECF 79 at 6 n.2.  And even there, that court failed to meaningfully engage with it, let alone tailor its order accordingly.

## II.    The District Court's Discovery Order Must Be Vacated.

No discovery is appropriate in this case, because Defendants have done (and are doing) exactly what the Supreme Court has ordered: They are removing domestic impediments to Abrego Garcia's return—*i.e.*, they are "facilitating" that return.  But even putting that aside, the District Court's discovery order harbors fundamental infirmities.  The Supreme Court has long recognized that a discovery order that improperly intrudes on the separation of powers satisfies the requirements of mandamus.  *See, e.g.*, *Cheney*, 542 U.S. at 382.  That is the case here.

**1.**  At true minimum, the District Court should have put forward a definition of "facilitate," before ordering invasive discovery into the Executive Branch.  But that court refused to do so, failing to offer any guidance beyond rejecting what Defendants proffered.  *See* ECF 79, at 4-6.  That does not work at all.  Before going down the road of intrusive discovery into what Defendants have done to date and what they will do in the future, it was incumbent on the District Court to define what they were in fact *supposed to do* under its order.  The alternative leaves a moving discovery target at best, and a blank check for plaintiffs at worst.  This Court should grant mandamus and order the District Court to first decide this threshold issue.

Ordering discovery into a separate branch of government is a weighty step that should never be taken lightly.  *Simplex Time Recorder Co. v. Secretary of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985).  At the very least, respect for a coordinate branch of

government requires a federal court to resolve all threshold issues *before* taking the extraordinary step of ordering discovery. Indeed, the D.C. Circuit recently stayed a discovery order into the Executive Branch for this exact reason, where the district court failed to first resolve a pending motion to dismiss. *See In re Musk*, 2025 WL 926608 (D.C. Cir. Mar. 26, 2025) (citing *Cheney*, 542 U.S. at 389-90).

Those principles apply here in full measure. The District Court ordered far-reaching discovery to probe, in particular, what added measures Defendants are able to perform to "facilitate" Abrego Garcia's return. ECF 79, at 6-7. But so long as that term is undefined, discovery will necessarily become open-ended. The result will be a fishing expedition, which is improper even in *ordinary* litigation. *See, e.g., Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.,* 334 F.3d 390, 403 (4th Cir. 2003). And on the other side, Defendants will be forced to endure the significant set of discovery requests authorized below, without any concrete metric by which to proffer objections.

That has already started to bear out in practice. This evening, Plaintiffs served on Defendants their written discovery requests. Pls.' 1st Set of Interrogatories to Defs. Appendix 25-30 ("Interrogatories"); Pls.' 1st Set of Requests for Production to Defs., Appendix 17-22 ("Production Requests"). Many of those requests turn entirely on how one understands "facilitate"—for instance, repeated requests for all past, present, and future actions to "Facilitate Abrego Garcia's return to the United States." Interrogatories Nos. 1-5; Production Requests Nos. 1-2. Of a piece, the uncertain scope of the District Court's discovery order has begotten a host of other

far-reaching requests, including: All communications between Defendants and the Government of El Salvador about Abrego Garcia, Interrogatories No. 7; Production Requests No. 4; any payments or detention arrangements between the United States and El Salvador, Interrogatories Nos. 9-11; Production Requests Nos. 6-8; and all instances since 2015 where Defendants "facilitated" the return of an alien anywhere in the world; Interrogatories Nos. 12-13; Production Requests Nos. 9-10.

That is no way to conduct discovery into a coequal branch. Before a federal court permits such an intrusion, it must carefully calibrate its scope—which at minimum, requires defining its terms with particularity. The District Court failed to do so; in fact, it disclaimed the enterprise. *See* Hearing Tr. 22:18-21 (Apr. 15, 2025). That is not palatable, especially given that the contemplated discovery here almost by definition implicates certain core privileges, such as attorney-client privilege (in the context of an Acting General Counsel for DHS) or certain executive privileges (given this case involves the removal of a member of a foreign terrorist organization). This Court should order the court below to vacate its discovery order, and first specifically state what that court believes it can still require from Defendants, beyond what the Executive Branch has already done.

**2.** Again, no discovery is appropriate. But depositions of Executive Branch officials are especially unjustifiable. If nothing else, this Court should grant mandamus to direct the District Court to set aside this portion of its order.

Compelling the testimony of high-ranking government officials is justified only in "extraordinary instances." *Village of Arlington Heights v. Metropolitan Hous. Dev.*

*Corp.*, 429 U.S. 252, 268 (1977). That is because "the compelled appearance of a high-ranking officer of the executive branch in a judicial proceeding implicates the separation of powers," and because "[t]he duties of high-ranking executive officers should not be interrupted by judicial demands for information that could be obtained elsewhere," *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008) (per curiam). Among much else, such depositions "create[] 'a tremendous potential for abuse or harassment.'" *K.C.R. v. Cnty. of Los Angeles*, 2014 WL 3434257, at *3 (C.D. Cal. July 11, 2014); *see also, e.g.*, *In re U.S. Dep't of Educ.*, 25 F.4th 692, 705 (9th Cir. 2022).

Federal appellate courts routinely have granted mandamus relief to guard against undue executive depositions. *E.g.*, *United States v. Morgan*, 313 U.S. 409, 421–22 (1941); *see also U.S. Bd. of Parole v. Merhige*, 487 F.2d 25 (4th Cir. 1973); *In re Paxton*, 60 F.4th 252 (5th Cir. 2023); *In re Off. of Utah Att'y Gen.*, 56 F.4th 1254 (10th Cir. 2022); *In re U.S. Dep't of Educ.*, 25 F.4th 692 (9th Cir. 2022); *In re United States*, 624 F.3d 1368 (11th Cir. 2010); *In re Cheney*, 544 F.3d 311 (D.C. Cir. 2008); *In re United States*, 197 F.3d 310 (8th Cir. 1999); *In re FDIC*, 58 F.3d 1055 (5th Cir. 1995); *In re Off. of Inspector Gen.*, 933 F.2d 276 (5th Cir. 1991). As these cases lay bare, a district court cannot properly authorize a deposition of a high-ranking official without first assessing at minimum, (1) "whether the information desired can be sought from alternative witnesses or must exclusively come from" the witness in question and (2) "whether the information desired can be obtained in another form." *In re Bryant*, 745 F. App'x 215, 220 (5th Cir. 2018) (per curiam).

Nowhere did the District Court make these findings. It did not even try. That court, instead, ordered "expedited" depositions of a number of high-ranking executive officials, without ever explaining why those witnesses were necessary or held information that could only be obtained via a deposition. In its zeal to raze every barrier to expeditious and extensive discovery, the District Court did not even let Defendants brief the issue—or offer alternatives. *See* Transcript 27:11-12, Appendix 70 ("[C]ancel vacation. Cancel other appointments."). That is grievous error. Depositions of senior executive officials are a means of last resort. The District Court's rushed and unsubstantiated compulsion of them cannot stand.

## III. The Equities Demand Relief.

There is no doubt that Defendants will suffer irreparable harm, absent this Court's intervention. There is severe and uncurable damage every moment that a federal court commandeers the core Article II prerogatives of the Executive Branch. *See, e.g.*, *Does 1–26 v. Musk*, No. 25-1273, 2025 WL 1020995, at *6 (4th Cir. 2025) (An injunction that "dictate[s] and restrict[s] a separate branch of government . . . truly is irreparable."). So too forcing the Executive to divert attention and resources to comply with unjustified and far-reaching discovery obligations.

On the other side of the ledger, vacating the injunction would not substantially or irreparably harm Plaintiffs. Plaintiffs have contended that Abrego Garcia faces irreparable harm from being detained in CECOT. But as the United States has reiterated, it would not have removed any alien to El Salvador for detention in CECOT if doing so would violate its obligations under the Convention Against

Torture.  More, Plaintiffs have argued that sending Abrego Garcia to El Salvador (in violation of his withholding order) is itself harmful.  But Plaintiffs do not contest that membership in a foreign terrorist organization renders one ineligible for withholding of removal; nor do they contest the United States could reopen Abrego Garcia's removal proceedings upon his return and proceed to remove him back to El Salvador.

The public interest strongly favors immediate relief.  If there is ever a situation where the federal courts should be *especially* careful about intruding on the exclusive foreign relations powers of the President, it should be in the context of facilitating the return of a member of a foreign terrorist organization presently being held in another land.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (recognizing clear public interest in removing "particularly dangerous" aliens).  Nor is the public interest served when key members of the Executive Branch entrusted with immigration enforcement are diverted from their positions to comply with burdensome discovery requests, let alone depositions.  *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009).  All the more so, where those officials are presently charged with combatting an immigration crisis that cannot tolerate a day's more delay.  *See, e.g.*, Exec. Order 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8,443 (Jan. 29, 2025); Exec. Order 14,157, *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, 90 Fed. Reg. 8,439 (Jan. 29, 2025).

## CONCLUSION

This Court should stay the District Court's amended injunction and issue a writ of mandamus vacating the District Court's discovery order. In the meantime, this Court should issue an immediate administrative stay of both of the orders below.[4]

                              Respectfully submitted,

                              **Yaakov M. Roth**
                              Acting Assistant Attorney General
                              Civil Division

                              **/s/ Drew Ensign**
                              **Drew C. Ensign**
                              Deputy Assistant Attorney General
                              Office of Immigration Litigation
                              Civil Division
                              U.S. Department of Justice
                              950 Pennsylvania Ave., NW
                              Washington, DC 20530
                              (202) 514-2000
                              drew.c.ensign@usdoj.gov

                              **John Blakeley**
                              Senior Counsel for Appellate Litigation
                              Office of Immigration Litigation

Dated: April 16, 2025          *Counsel for Defendants–Appellants*

---

[4] Because of the imminent timeline of the district court's order and because of the importance of the issues presented, Defendants will be concurrently seeking a stay pending appeal from the district court. *See* Fed. R. App. P. 8(a)(1).

**Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements**

1.  This document complies with the type-volume limit of Fed. R. App.

    P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed.

    R. App. P. 32(f), it contains 4767 words.

2.  This document complies with the typeface and type-style requirements of Fed.

    R. App. P. 32(a)(5)–(6) because it has been prepared in a proportionally spaced

    typeface (Century Schoolbook) using Microsoft Word for Microsoft 365.


Dated: April 16, 2025                    /s/ John Blakely_____
                                         U.S. Department of Justice
                                         *Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

**Relevant Record Materials Pursuant to FRAP 8(a)(2)(B)(iii) and Local Rule 8:**

Deposition Notices and Discovery Requests (April 16, 2025) .................. Add. 1-32

Letter Order Regarding the Filing of Discovery Motions (Apr. 15, 2025) (Dkt. 80) ........................................................................................................Add. 33

Order Granting Motion for Expedited Discovery (Apr. 15, 2025) (Dkt. 79) ……………………………………………………………………………...Add. 34-41

Transcript of status conference held on April 15, 2025 (Dkt. 81) ........... Add. 42-76

April 16, 2025, Status Report (Dkt. 83).........................................................Add. 77

April 15, 2025, Status Report (Dkt. 77)................................................. Add. 78-103

April 14, 2025, Status Report (Dkt. 74)................................................. Add. 104-05

April 13, 2025, Status Report (Dkt. 64)................................................. Add. 106-08

April 12, 2025, Status Report (Dkt. 63)................................................. Add. 109-10

Reply to Response to Motion for Additional Relief (Apr. 15, 2025) (Dkt. 75) ........................................................................................................Add. 111-13

Response to Motion for Additional Relief (April 13, 2025) (Dkt. 65)... Add. 114-20

Motion for Additional Relief (Apr. 12, 2025) (Dkt. 62)......................... Add. 121-28

Order (Apr. 11, 2025) (Dkt. 61) ............................................................. Add. 129-30

Response to Amended Temporary Restraining Order (Apr. 11, 2025) (Dkt. 59) ........................................................................................................Add. 131-32

Order Amending Temporary Restraining Order (Apr. 10, 2025) (Dkt. 51) .................................................................................. ………Add. 133-34

Memorandum Opinion (Apr. 6, 2025) (Dkt. 31) ................................... Add. 135-56

Order Granting Temporary Restraining Order (Apr. 4, 2025) (Dkt. 21)  Add. 157-59

Complaint (Mar. 24, 2025) (Dkt. 1)....................................................... Add. 160-207

Goebertus Declaration (Mar. 19, 2025) (Dkt. 10-2) .............................. Add. 208-13

Bishop Declaration (Mar. 19, 2025) (Dkt. 10-3) ................................... Add. 214-28

IJ Bond Order (Apr. 29, 2019) (filed Mar. 31 2025) (Dkt. 11-1) ........... Add. 229-31

BIA Opinion (Dec. 19, 2019) (filed Mar. 31, 2025) (Dkt. 11-2) ............ Add. 232-33

Cerna Declaration (Mar. 31, 2025) (Dkt. 11-3) ..................................... Add. 234-37

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### –Greenbelt Division–

KILMAR ARMANDO ABREGO GARCIA, ET AL.,

                Plaintiffs,

v.

KRISTI NOEM, ET AL.,

                Defendants.

Case No.: 8:25-CV-00951-PX

## NOTICE OF DEPOSITION

**PLEASE TAKE NOTICE** that in accordance with Rules 26 and 30 of the Federal Rules of Civil Procedure and the Order of this Court, *see* ECF 79, Plaintiffs Kilmar Armando Abrego Garcia, Jennifer Stefania Vazquez Sura, and A.A.V., by and through their undersigned counsel, will take the oral deposition of Michael G. Kozak, commencing at 9:30 AM EDT on April 22, 2025 at the United States District Court, District of Maryland, 6500 Cherrywood Lane, Greenbelt, Maryland 20770, or at such other time and location as the Parties may mutually agree, and will continue from day to day until completed.

The deposition will be conducted before an officer to administer oaths. The deposition will be recorded by stenographic, audio, video, and/or real-time transcription. The deposition is being taken for the purpose of discovery, for use at trial, or both, or for such other purposes permitted under the Rules of Civil Procedure and the ruling of the Court in this action.

1

**MURRAY OSORIO PLLC**
Simon Y. Sandoval-Moshenberg
Rina Gandhi
4103 Chain Bridge Road, Suite 300
Fairfax, VA 22030
(703) 352-2399
ssandoval@murrayosorio.com

**QUINN EMANUEL URQUHART &**
  **SULLIVAN, LLP**
Stephen E. Frank
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
stephenfrank@quinnemanuel.com

*/s/ Jonathan G. Cooper*
**QUINN EMANUEL URQUHART &**
  **SULLIVAN, LLP**
Jonathan G. Cooper (D. Md. Bar No. 21345)
Olivia Horton*
1300 I St. NW, Suite 900
Washington, DC 20005
(202) 538-8000
jonathancooper@quinnemanuel.com
oliviahorton@quinnemanuel.com
*admitted in Texas; not admitted in D.C.
Supervised by attorney admitted in D.C.*

Andrew J. Rossman
Sascha N. Rand
K. McKenzie Anderson
Samuel P. Nitze
Courtney C. Whang
Roey Goldstein
Sam Heavenrich
Victoria Martin
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
andrewrossman@quinnemanuel.com
sascharand@quinnemanuel.com
mckenzieanderson@quinnemanuel.com
samuelnitze@quinnemanuel.com
courtneywhang@quinnemanuel.com
roeygoldstein@quinnemanuel.com
samheavenrich@quinnemanuel.com
victoriamartin@quinnemanuel.com

*Counsel for Plaintiffs*

2

**Certificate of Service**

I, Jonathan G. Cooper, hereby certify that the Notice of Deposition was served upon the

registered parties electronically via email and via FedEx Overnight mail to the below counsel of

record on April 16, 2025.

**Drew C Ensign**
DOJ-Civ
U.S. Department of Justice
950 Pennsylvania Ave NW
20001
Washington, DC 20001
202-514-2000
Email: drew.c.ensign@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tarra DeShields Minnis**
DOJ-USAO
Lrm Gardner, Elizabeth
36 S. Charles Street
Fourth Floor
Baltimore, MD 21201
410-209-4800
Email: Tarra.DeShields@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erez Reuveni**
United States Department of Justice
450 Fifth St NW
Washington, DC 20530
202-307-4293
Fax: 202-616-8962
Email: erez.r.reuveni@usdoj.gov
*ATTORNEY TO BE NOTICED*

*/s/ Jonathan G. Cooper*
Jonathan G. Cooper


*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### –Greenbelt Division–

KILMAR ARMANDO ABREGO GARCIA,
ET AL.,

                    Plaintiffs,

v.                                                    Case No.: 8:25-CV-00951-PX

KRISTI NOEM, ET AL.,

                    Defendants.

## <u>NOTICE OF DEPOSITION</u>

**PLEASE TAKE NOTICE** that in accordance with Rules 26 and 30 of the Federal Rules of Civil Procedure and the Order of this Court, *see* ECF 79, Plaintiffs Kilmar Armando Abrego Garcia, Jennifer Stefania Vazquez Sura, and A.A.V., by and through their undersigned counsel, will take the oral deposition of Robert L. Cerna II, commencing at 9:30 AM EDT on April 23, 2025 at the United States District Court, District of Maryland, 6500 Cherrywood Lane, Greenbelt, Maryland 20770, or at such other time and location as the Parties may mutually agree, and will continue from day to day until completed.

The deposition will be conducted before an officer to administer oaths. The deposition will be recorded by stenographic, audio, video, and/or real-time transcription. The deposition is being taken for the purpose of discovery, for use at trial, or both, or for such other purposes permitted under the Rules of Civil Procedure and the ruling of the Court in this action.

1

**MURRAY OSORIO PLLC**
Simon Y. Sandoval-Moshenberg
Rina Gandhi
4103 Chain Bridge Road, Suite 300
Fairfax, VA 22030
(703) 352-2399
ssandoval@murrayosorio.com

**QUINN EMANUEL URQUHART &**
  **SULLIVAN, LLP**
Stephen E. Frank
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
stephenfrank@quinnemanuel.com

*/s/ Jonathan G. Cooper*
**QUINN EMANUEL URQUHART &**
  **SULLIVAN, LLP**
Jonathan G. Cooper (D. Md. Bar No. 21345)
Olivia Horton*
1300 I St. NW, Suite 900
Washington, DC 20005
(202) 538-8000
jonathancooper@quinnemanuel.com
oliviahorton@quinnemanuel.com
*admitted in Texas; not admitted in D.C.
Supervised by attorney admitted in D.C.*

Andrew J. Rossman
Sascha N. Rand
K. McKenzie Anderson
Samuel P. Nitze
Courtney C. Whang
Roey Goldstein
Sam Heavenrich
Victoria Martin
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
andrewrossman@quinnemanuel.com
sascharand@quinnemanuel.com
mckenzieanderson@quinnemanuel.com
samuelnitze@quinnemanuel.com
courtneywhang@quinnemanuel.com
roeygoldstein@quinnemanuel.com
samheavenrich@quinnemanuel.com
victoriamartin@quinnemanuel.com

*Counsel for Plaintiffs*

2

## Certificate of Service

I, Jonathan G. Cooper, hereby certify that the Notice of Deposition was served upon the registered parties electronically via email and via FedEx Overnight mail to the below counsel of record on April 16, 2025.

**Drew C Ensign**
DOJ-Civ
U.S. Department of Justice
950 Pennsylvania Ave NW
20001
Washington, DC 20001
202-514-2000
Email: drew.c.ensign@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tarra DeShields Minnis**
DOJ-USAO
Lrm Gardner, Elizabeth
36 S. Charles Street
Fourth Floor
Baltimore, MD 21201
410-209-4800
Email: Tarra.DeShields@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erez Reuveni**
United States Department of Justice
450 Fifth St NW
Washington, DC 20530
202-307-4293
Fax: 202-616-8962
Email: erez.r.reuveni@usdoj.gov
*ATTORNEY TO BE NOTICED*

*/s/ Jonathan G. Cooper*
Jonathan G. Cooper

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND
## –Greenbelt Division–

KILMAR ARMANDO ABREGO GARCIA,
ET AL.,

                Plaintiffs,

v.

KRISTI NOEM, ET AL.,

                Defendants.

Case No.: 8:25-CV-00951-PX

## <u>NOTICE OF DEPOSITION</u>

**PLEASE TAKE NOTICE** that in accordance with Rules 26 and 30 of the Federal Rules of Civil Procedure and the Order of this Court, *see* ECF 79, Plaintiffs Kilmar Armando Abrego Garcia, Jennifer Stefania Vazquez Sura, and A.A.V., by and through their undersigned counsel, will take the oral deposition of Joseph N. Mazzara, commencing at 9:30 AM EDT on April 23, 2025 at the United States District Court, District of Maryland, 6500 Cherrywood Lane, Greenbelt, Maryland 20770, or at such other time and location as the Parties may mutually agree, and will continue from day to day until completed.

The deposition will be conducted before an officer to administer oaths. The deposition will be recorded by stenographic, audio, video, and/or real-time transcription. The deposition is being taken for the purpose of discovery, for use at trial, or both, or for such other purposes permitted under the Rules of Civil Procedure and the ruling of the Court in this action.

1

**MURRAY OSORIO PLLC**
Simon Y. Sandoval-Moshenberg
Rina Gandhi
4103 Chain Bridge Road, Suite 300
Fairfax, VA 22030
(703) 352-2399
ssandoval@murrayosorio.com

**QUINN EMANUEL URQUHART &**
**  SULLIVAN, LLP**
Stephen E. Frank
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
stephenfrank@quinnemanuel.com

*/s/ Jonathan G. Cooper*
**QUINN EMANUEL URQUHART &**
**  SULLIVAN, LLP**
Jonathan G. Cooper (D. Md. Bar No. 21345)
Olivia Horton*
1300 I St. NW, Suite 900
Washington, DC 20005
(202) 538-8000
jonathancooper@quinnemanuel.com
oliviahorton@quinnemanuel.com
*admitted in Texas; not admitted in D.C.
Supervised by attorney admitted in D.C.*

Andrew J. Rossman
Sascha N. Rand
K. McKenzie Anderson
Samuel P. Nitze
Courtney C. Whang
Roey Goldstein
Sam Heavenrich
Victoria Martin
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
andrewrossman@quinnemanuel.com
saschaand@quinnemanuel.com
mckenzieanderson@quinnemanuel.com
samuelnitze@quinnemanuel.com
courtneywhang@quinnemanuel.com
roeygoldstein@quinnemanuel.com
samheavenrich@quinnemanuel.com
victoriamartin@quinnemanuel.com

*Counsel for Plaintiffs*

2

## Certificate of Service

I, Jonathan G. Cooper, hereby certify that the Notice of Deposition was served upon the registered parties electronically via email and via FedEx Overnight mail to the below counsel of record on April 16, 2025.

**Drew C Ensign**
DOJ-Civ
U.S. Department of Justice
950 Pennsylvania Ave NW
20001
Washington, DC 20001
202-514-2000
Email: drew.c.ensign@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tarra DeShields Minnis**
DOJ-USAO
Lrm Gardner, Elizabeth
36 S. Charles Street
Fourth Floor
Baltimore, MD 21201
410-209-4800
Email: Tarra.DeShields@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erez Reuveni**
United States Department of Justice
450 Fifth St NW
Washington, DC 20530
202-307-4293
Fax: 202-616-8962
Email: erez.r.reuveni@usdoj.gov
*ATTORNEY TO BE NOTICED*

*/s/ Jonathan G. Cooper*
Jonathan G. Cooper

*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### –Greenbelt Division–

KILMAR ARMANDO ABREGO GARCIA,
ET AL.,

           Plaintiffs,

v.

KRISTI NOEM, ET AL.,

           Defendants.

Case No.: 8:25-CV-00951-PX

## <u>NOTICE OF DEPOSITION</u>

**PLEASE TAKE NOTICE** that in accordance with Rules 26 and 30 of the Federal Rules of Civil Procedure and the Order of this Court, *see* ECF 79, Plaintiffs Kilmar Armando Abrego Garcia, Jennifer Stefania Vazquez Sura, and A.A.V., by and through their undersigned counsel, will take the oral deposition of Evan C. Katz commencing at 9:30 AM EDT on April 22, 2025 at the United States District Court, District of Maryland, 6500 Cherrywood Lane, Greenbelt, Maryland 20770, or at such other time and location as the Parties may mutually agree, and will continue from day to day until completed.

    The deposition will be conducted before an officer to administer oaths. The deposition will be recorded by stenographic, audio, video, and/or real-time transcription. The deposition is being taken for the purpose of discovery, for use at trial, or both, or for such other purposes permitted under the Rules of Civil Procedure and the ruling of the Court in this action.

1

**MURRAY OSORIO PLLC**
Simon Y. Sandoval-Moshenberg
Rina Gandhi
4103 Chain Bridge Road, Suite 300
Fairfax, VA 22030
(703) 352-2399
ssandoval@murrayosorio.com

**QUINN EMANUEL URQUHART &**
  **SULLIVAN, LLP**
Stephen E. Frank
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
stephenfrank@quinnemanuel.com

*/s/ Jonathan G. Cooper*
**QUINN EMANUEL URQUHART &**
  **SULLIVAN, LLP**
Jonathan G. Cooper (D. Md. Bar No. 21345)
Olivia Horton*
1300 I St. NW, Suite 900
Washington, DC 20005
(202) 538-8000
jonathancooper@quinnemanuel.com
oliviahorton@quinnemanuel.com
*admitted in Texas; not admitted in D.C.
Supervised by attorney admitted in D.C.*

Andrew J. Rossman
Sascha N. Rand
K. McKenzie Anderson
Samuel P. Nitze
Courtney C. Whang
Roey Goldstein
Sam Heavenrich
Victoria Martin
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
andrewrossman@quinnemanuel.com
saccharand@quinnemanuel.com
mckenzieanderson@quinnemanuel.com
samuelnitze@quinnemanuel.com
courtneywhang@quinnemanuel.com
roeygoldstein@quinnemanuel.com
samheavenrich@quinnemanuel.com
victoriamartin@quinnemanuel.com

*Counsel for Plaintiffs*

2

## Certificate of Service

I, Jonathan G. Cooper, hereby certify that the Notice of Deposition was served upon the

registered parties electronically via email and via FedEx Overnight mail to the below counsel of

record on April 16, 2025.

**Drew C Ensign**
DOJ-Civ
U.S. Department of Justice
950 Pennsylvania Ave NW
20001
Washington, DC 20001
202-514-2000
Email: drew.c.ensign@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tarra DeShields Minnis**
DOJ-USAO
Lrm Gardner, Elizabeth
36 S. Charles Street
Fourth Floor
Baltimore, MD 21201
410-209-4800
Email: Tarra.DeShields@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erez Reuveni**
United States Department of Justice
450 Fifth St NW
Washington, DC 20530
202-307-4293
Fax: 202-616-8962
Email: erez.r.reuveni@usdoj.gov
*ATTORNEY TO BE NOTICED*

*/s/ Jonathan G. Cooper*
Jonathan G. Cooper


*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## –Greenbelt Division–

KILMAR ARMANDO ABREGO GARCIA,
ET AL.,

               Plaintiffs,

v.

KRISTI NOEM, ET AL.,

               Defendants.

Case No.: 8:25-CV-00951-PX

### PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANTS

Pursuant to Federal Rules of Civil Procedure 26 and 34 and the Court's Order Granting Expedited Discovery (ECF No. 79), Plaintiffs propound the following requests for production that Defendants must respond to by 5:00 p.m. on April 21, 2025.

### DEFINITIONS

1.    "**Abrego Garcia**" means Plaintiff Kilmar Armando Abrego Garcia.

2.    "**CECOT**" means the Terrorism Confinement Center in El Salvador. *See* ECF No. 31 at 1–2; ECF No. 63 ¶ 3.

3.    "**Communication**" means any transmittal of information in any form and of any kind, including any electronic, oral, or written transmission.

4.    "**Document**" means any information stored in a medium from which the information can be obtained. A Document includes (but is not limited to) any calendar, chart, Communication, data, data compilation, database, diary, draft, drawing, electronically stored information, email, fax, floppy disk, graph, hard drive, image, index, instant message, letter, log, magnetic tape, memorandum, note, optical disk, photograph, report, sound recording, spreadsheet, storage device, text message, voicemail, writing, or any other category covered by Federal Rule of

Civil Procedure 34(a)(1)(A). Any copy of a Document that differs in any respect from the original of a Document constitutes a separate Document.

5.      "**Facilitate**" has the meaning ascribed to it in the Order Granting Expedited Discovery, ECF No. 79.

6.      "**You**" and "**Your**" mean the Defendants in this case, including, as applicable, any of their officials, employees, departments, components, commissions, representatives, agents, attorneys, assigns, predecessors, affiliates, third-party experts, service providers, and any other entities, instrumentalities, or persons acting or purporting to act on their behalf.

# INSTRUCTIONS

1.    **Timeframe**: Unless otherwise stated in a specific request, these requests seek responsive Documents from January 20, 2025, through the present.

2.    **Responses**: Respond to each request for production by producing each requested Document in its entirety, along with every family Document (such as any appendices, attachments, cover letters, enclosures, exhibits, and schedules), that is in Your possession, custody, or control. If no Document in Your possession, custody, or control is responsive to a particular request, provide a written response stating so.

3.    **Construction**: Construe each word in these requests in the broadest manner consistent with the Federal Rules of Civil Procedure, the Local Rules, and this Court's Orders.

4.    **Production Date**: In accordance with the Court's Order Granting Expedited Discovery (ECF No. 79), produce all responsive documents as soon as possible on a rolling basis and no later than 5:00 p.m. EDT on April 21, 2025.

5.    **Objections**: If You do not respond to a request in whole or in part based on an objection, state the objection and the basis for the objection in writing and with particularity. Respond to any portion of the request to which You do not object.

6.    **Privilege**: If You withhold or redact any responsive Document based on an assertion of privilege, provide a log setting forth with specificity the nature of the privilege and the information required by Federal Rule of Civil Procedure 26(b)(5) and Guideline 10(d) of this Court's Discovery Guidelines.

7.    **Form of Production**: Produce each responsive Document in accordance with any applicable order or agreement regarding the production of Documents. In the absence of any

applicable order or agreement, produce each responsive Document as it is kept in the ordinary

course of business, with all metadata intact, and with Bates numbering.

8.      **Service**: Serve all responses and productions on the undersigned attorneys via email

at  jonathancooper@quinnemanuel.com  and  qe-abregogarcia@quinnemanuel.com.  If  email  is

impractical,  You  can  serve  responses  or  productions  at  the  following  address:

> Quinn Emanuel Urquhart & Sullivan, LLP
> Attention: Jonathan Cooper
> 1300 I Street NW, 9th Floor
> Washington, DC 20005

9.      **Continuing Obligation**: These Requests are ongoing. If, after responding, You

obtain or become aware of an additional responsive Document in your possession, custody, or

control, then produce that Document promptly, in accordance with Federal Rule of Civil Procedure

26(e).

## REQUESTS FOR PRODUCTION

**Request No. 1**: All Documents concerning each action You have already taken, or plan to take in the future, to Facilitate Abrego Garcia's release from custody in El Salvador.

**Request No. 2**: All Documents concerning each action You have already taken, or plan to take in the future, to Facilitate Abrego Garcia's return to the United States.

**Request No. 3**: All Documents reflecting any request to release Abrego Garcia from custody in El Salvador, and any responses thereto.

**Request No. 4**: All Communications to or from anyone in the government of El Salvador or at CECOT concerning Abrego Garcia.

**Request No. 5**: All Documents concerning the legal basis for Abrego Garcia's confinement in CECOT.

**Request No. 6**: All Documents concerning any agreement, arrangement, or understanding between the governments of the United States and El Salvador to confine in El Salvador individuals of any nationality who were removed or deported from the United States or transported by You from the United States to El Salvador, including (but not limited to) the memorandum issued by El Salvador's Ministry of Foreign Affairs referenced at ECF No. 31 at 6.

**Request No. 7**: All Documents concerning the rights the government of the United States possesses, retains, or has exercised with respect to Abrego Garcia or other individuals of any nationality who were removed or deported from the United States or transported by You from the United States to El Salvador and who are detained at CECOT, including (but not limited to) Documents concerning the decision-making authority over the long term disposition of Abrego Garcia and the other removed or deported individuals.

**Request No. 8**: All Documents reflecting payments You made (or payments that are to be made) in connection with the detention at CECOT of Abrego Garcia and other individuals of any nationality removed or deported from the United States or transported by You from the United States to El Salvador.

**Request No. 9**: All Documents concerning each instance since 2015 in which You removed, deported or transported a person of any nationality to El Salvador and later undertook efforts to Facilitate that person's return to the United States (*e.g.*, ECF No. 31 at 5 n.7; Defendants' Status Update in *Grace v. Sessions*, No. 1:18-cv-01853-EGS (D.D.C. Jan. 11, 2019), ECF No. 113).

**Request No. 10**: All Documents concerning each instance since 2015 in which You undertook extraterritorial efforts to Facilitate the return to the United States of an individual of any nationality who was removed or deported from the United States or transported by You from the United States to a foreign country.

**Request No. 11**: All Documents in the possession, custody, or control of Robert L. Cerna, Evan C. Katz, Michael G. Kozak, or Joseph N. Mazzara that relate to Abrego Garcia.

**Request No. 12**: All Documents reflecting non-privileged discussions about any court order in this case, including the Supreme Court's order dated April 10, 2025.

**Request No. 13:** Without regard for timeframe, all Documents that You contend support Your assertions that Abrego Garcia "is a member of MS-13" (*e.g.*, ECF No. 77-1 at 12).

**Request No. 14:** All Documents You may rely on to support Your defenses.

Dated: April 16, 2025

**MURRAY OSORIO PLLC**
Simon Y. Sandoval-Moshenberg
Rina Gandhi
4103 Chain Bridge Road, Suite 300
Fairfax, VA 22030
(703) 352-2399
ssandoval@murrayosorio.com

**QUINN EMANUEL URQUHART &**
  **SULLIVAN, LLP**
Stephen E. Frank
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
stephenfrank@quinnemanuel.com

*/s/ Jonathan G. Cooper*

**QUINN EMANUEL URQUHART &**
  **SULLIVAN, LLP**
Jonathan G. Cooper (D. Md. Bar No. 21345)
Olivia Horton*
1300 I St. NW, Suite 900
Washington, DC 20005
(202) 538-8000
jonathancooper@quinnemanuel.com
oliviahorton@quinnemanuel.com
*admitted in Texas; not admitted in D.C.*
*Supervised by attorney admitted in D.C.*

Andrew J. Rossman
Sascha N. Rand
K. McKenzie Anderson
Samuel P. Nitze
Courtney C. Whang
Roey Goldstein
Sam Heavenrich
Victoria Martin
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
andrewrossman@quinnemanuel.com
sascharand@quinnemanuel.com
mckenzieanderson@quinnemanuel.com
samuelnitze@quinnemanuel.com
courtneywhang@quinnemanuel.com
roeygoldstein@quinnemanuel.com
samheavenrich@quinnemanuel.com
victoriamartin@quinnemanuel.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Jonathan G. Cooper, hereby certify that the Notice of Deposition was served upon the

registered parties electronically via email and via FedEx Overnight mail to the below counsel of

record on April 16, 2025.

**Drew C Ensign**
DOJ-Civ
U.S. Department of Justice
950 Pennsylvania Ave NW
20001
Washington, DC 20001
202-514-2000
Email: drew.c.ensign@usdoj.gov
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

**Tarra DeShields Minnis**
DOJ-USAO
Lrm Gardner, Elizabeth
36 S. Charles Street
Fourth Floor
Baltimore, MD 21201
410-209-4800
Email: Tarra.DeShields@usdoj.gov
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

**Erez Reuveni**
United States Department of Justice
450 Fifth St NW
Washington, DC 20530
2023074293
Fax: 2026168962
Email: erez.r.reuveni@usdoj.gov
ATTORNEY TO BE NOTICED

Date: April 16, 2025                    */s/ Jonathan G. Cooper*

                                        *Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**–Greenbelt Division–**

KILMAR ARMANDO ABREGO GARCIA,
ET AL.,

                 Plaintiffs,

v.

KRISTI NOEM, ET AL.,

                 Defendants.

Case No.: 8:25-CV-00951-PX

**PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANTS**

Pursuant to Federal Rules of Civil Procedure 26 and 33 and the Court's Order Granting Expedited Discovery (ECF No. 79), Plaintiffs propound the following interrogatories that Defendants must answer by 5:00 p.m. EDT on April 21, 2025.

**DEFINITIONS**

1.     "**Abrego Garcia**" means Plaintiff Kilmar Armando Abrego Garcia.

2.     "**CECOT**" means the Terrorism Confinement Center in El Salvador. *See* ECF No. 31 at 1–2; ECF No. 63 ¶ 3.

3.     "**Communication**" means any transmittal of information in any form and of any kind, including any electronic, oral, or written transmission.

4.     "**Facilitate**" has the meaning ascribed to it in the Order Granting Expedited Discovery, ECF No. 79.

5.     "**Identify**" means to give, to the extent known, the requested person's full name, present or last known address, present or last known place of employment, and job title.

6.     "**You**" and "**Your**" mean the Defendants in this case, including, as applicable, any of their officials, employees, departments, components, commissions, representatives, agents,

attorneys, assigns, predecessors, affiliates, third-party experts, service providers, and any other entities, instrumentalities, or persons acting or purporting to act on their behalf.

2

## INSTRUCTIONS

**1.    Timeframe**: Unless otherwise stated in a specific interrogatory, these interrogatories seek responsive information from January 20, 2025, through the present.

**2.    Responses**: Provide separate, complete, written, sworn responses to each interrogatory, in accordance with Federal Rule of Civil Procedure 33.

**3.    Construction**: Construe each word in these interrogatories in the broadest manner consistent with the Federal Rules of Civil Procedure, the Local Rules, and this Court's Orders.

**4.    Objections**: If You do not respond to an interrogatory in whole or in part based on an objection, state the objection and the basis for the objection in writing and with particularity. Respond to any portion of the interrogatory to which You do not object.

**5.    Privilege**: If You do not respond to an interrogatory in whole or in part based on an assertion of privilege, identify with specificity the nature of the privilege and provide the information required by Federal Rule of Civil Procedure 26(b)(5) and Guideline 10(d) of this Court's Discovery Guidelines.

**6.    Service**: Serve all responses and productions on the undersigned attorneys via email at qe-abregogarcia@quinnemanuel.com and jonathancooper@quinnemanuel.com. If email is impractical, You can serve responses or productions at the following address:

> Quinn Emanuel Urquhart & Sullivan, LLP
> Attention: Jonathan Cooper
> 1300 I Street NW, 9th Floor
> Washington, DC 20005

**7.    Continuing Obligation**: These interrogatories are ongoing. If, after responding, You obtain or become aware of additional or different responsive information, then amend or supplement Your responses promptly, in accordance with Federal Rule of Civil Procedure 26(e).

3

## INTERROGATORIES

**Interrogatory No. 1**: Describe with particularity each action You have already taken, and when, to Facilitate Abrego Garcia's release from custody in El Salvador.

**Interrogatory No. 2**: Describe with particularity each action You have already taken, and when, to Facilitate Abrego Garcia's return to the United States.

**Interrogatory No. 3**: Describe with particularity each action You plan to take in the future, and when, to Facilitate Abrego Garcia's release from custody in El Salvador.

**Interrogatory No. 4**: Describe with particularity each action You plan to take in the future, and when, to Facilitate Abrego Garcia's return to the United States.

**Interrogatory No. 5**: Identify and describe the role of each individual who has been involved, or whom You anticipate will become involved, in any of the actions responsive to Interrogatory Nos. 1–4 or in ordering or authorizing Abrego Garcia's removal to El Salvador, his initial placement in CECOT, or his continued confinement in CECOT.

**Interrogatory No. 6**: Describe with particularity each request for Abrego Garcia's release from custody in El Salvador that You conveyed to anyone in the government of El Salvador or at CECOT, including when, in what form, by whom, and to whom.

**Interrogatory No. 7**: Describe with particularity each Communication You have had with anyone in the government of El Salvador or at CECOT concerning Abrego Garcia, including when, in what form, by whom, and to whom.

**Interrogatory No. 8**: Describe with particularity the legal basis for Abrego Garcia's continued confinement in CECOT.

**Interrogatory No. 9**: Describe with particularity the terms of any agreement, arrangement, or understanding between the governments of the United States and El Salvador to confine in El

4

Salvador individuals removed or deported from the United States or transported by You from the United States to El Salvador, including any rights the government of the United States possesses, retains or has exercised concerning any individual removed or deported from the United States.

**Interrogatory No. 10**: Identify and describe the role of each individual involved in negotiating or approving any agreement, arrangement, or understanding between the governments of the United States and El Salvador to confine in El Salvador individuals removed or deported from the United States or transported by You from the United States to El Salvador.

**Interrogatory No. 11**: List each payment that has been, or will be, made or withheld in connection with the detention at CECOT of Abrego Garcia and other individuals removed or deported from the United States or transported by You from the United States to El Salvador, including when each payment was or will be made or withheld, in what amount, by whom, and to whom.

**Interrogatory No. 12:** Describe with particularity each instance since 2015 in which You removed or deported a person to El Salvador and later undertook efforts to Facilitate that person's return to the United States (*e.g.*, ECF No. 31 at 5 n.7; Defendants' Status Update in *Grace v. Sessions*, No. 1:18-cv-01853-EGS (D.D.C. Jan. 11, 2019), ECF No. 113).

**Interrogatory No. 13**: Describe with particularity each instance since 2015 in which You undertook extraterritorial efforts to Facilitate the return to the United States of any removed or deported individual.

**Interrogatory No. 14**: Describe with particularity the complete factual basis for Your assertions that Abrego Garcia "is a member of MS-13" (*e.g.*, ECF No. 77-1 at 12), including by identifying the source of that information.

**Interrogatory No. 15**: Identify and describe the role of each United States official or employee who has personal knowledge of facts alleged in the Complaint (ECF No. 1) or of facts alleged in Your submissions to this Court, the Fourth Circuit, or the Supreme Court in this case.

6

Dated: April 16, 2025

<div style="display:flex">

**MURRAY OSORIO PLLC**
Simon Y. Sandoval-Moshenberg
Rina Gandhi
4103 Chain Bridge Road, Suite 300
Fairfax, VA 22030
(703) 352-2399
ssandoval@murrayosorio.com

**QUINN EMANUEL URQUHART &**
**SULLIVAN, LLP**
Stephen E. Frank
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
stephenfrank@quinnemanuel.com

</div>

*/s/ Jonathan G. Cooper*
**QUINN EMANUEL URQUHART &**
**SULLIVAN, LLP**
Jonathan G. Cooper (D. Md. Bar No. 21345)
Olivia Horton*
1300 I St. NW, Suite 900
Washington, DC 20005
(202) 538-8000
jonathancooper@quinnemanuel.com
oliviahorton@quinnemanuel.com
*admitted in Texas; not admitted in D.C.*
*Supervised by attorney admitted in D.C.*

Andrew J. Rossman
Sascha N. Rand
K. McKenzie Anderson
Samuel P. Nitze
Courtney C. Whang
Roey Goldstein
Sam Heavenrich
Victoria Martin
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
andrewrossman@quinnemanuel.com
sascharand@quinnemanuel.com
mckenzieanderson@quinnemanuel.com
samuelnitze@quinnemanuel.com
courtneywhang@quinnemanuel.com
roeygoldstein@quinnemanuel.com
samheavenrich@quinnemanuel.com
victoriamartin@quinnemanuel.com

*Counsel for Plaintiffs*

7

## CERTIFICATE OF SERVICE

I, Jonathan G. Cooper, hereby certify that the Notice of Deposition was served upon the registered parties electronically via email and via FedEx Overnight mail to the below counsel of record on April 16, 2025.

**Drew C Ensign**
DOJ-Civ
U.S. Department of Justice
950 Pennsylvania Ave NW
20001
Washington, DC 20001
202-514-2000
Email: drew.c.ensign@usdoj.gov
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

**Tarra DeShields Minnis**
DOJ-USAO
Lrm Gardner, Elizabeth
36 S. Charles Street
Fourth Floor
Baltimore, MD 21201
410-209-4800
Email: Tarra.DeShields@usdoj.gov
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

**Erez Reuveni**
United States Department of Justice
450 Fifth St NW
Washington, DC 20530
2023074293
Fax: 2026168962
Email: erez.r.reuveni@usdoj.gov

ATTORNEY TO BE NOTICED

Date: April 16, 2025                 */s/* Jonathan G. Cooper
                                     *Counsel for Plaintiffs*

8



**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

CHAMBERS OF
Paula Xinis                                                                                     6500 Cherrywood Lane
UNITED STATES DISTRICT JUDGE                                                        Greenbelt, MD 20770

___

### <u>LETTER ORDER REGARDING THE FILING OF DISCOVERY MOTIONS</u>

      To promote the just, speedy, and inexpensive resolution of this case, *see* Fed. R. Civ. P. 1, the following procedure will be followed with respect to the filing of discovery motions (such as motions to compel, motions for a protective order, or motions seeking the imposition of sanctions). Any party seeking to file a motion must first serve on all parties and file with the Court a letter (not to exceed three pages, single-spaced) that includes a brief description of the proposed motion and a concise summary of the relevant factual and legal grounds. The letter should include the positions of all parties. Parties shall attach to the letter the disputed interrogatories or requests for production and the answers or responses to the same.

      Upon filing of the letter, the Court will schedule an expedited telephone conference to discuss the requested motion and to determine whether the issues may be resolved or otherwise addressed without the need for formal briefing. The telephone conference does <u>not</u> take the place of the parties' obligation to meet and confer in good faith pursuant to the Federal Rules of Civil Procedure to attempt resolution of the issues without Court involvement.

      If the issues are not resolved during the telephone call, the Court will set a briefing schedule in consultation with counsel.

      Although informal, this is an Order of the Court and shall be docketed as such.


Date: April 15, 2025                                    _____/S/_____
                                                                      PAULA XINIS
                                                                      United States District Judge

___

Northern Division • 4228 U.S. Courthouse • 101 W. Lombard Street • Baltimore, Maryland 21201• 410-962-2600
Southern Division • 200 U.S. Courthouse • 6500 Cherrywood Lane • Greenbelt, Maryland 20770 • 301-344-0660

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KILMAR ARMANDO
ABREGO GARCIA, *et al.*,                         *

    Plaintiffs,                                  *

    v.                                           *          Civil Action No. 8:25-cv-00951-PX

KRISTI NOEM, Secretary,                          *
United States Department                         *
of Homeland Security, *et al.*,                  *

    Defendants.

                      *
                 ***

## <u>ORDER GRANTING EXPEDITED DISCOVERY</u>

Pending before this Court is Plaintiff Kilmar Armando Abrego Garcia's ("Abrego Garcia")
motion for additional relief requesting "expedited discovery of the Government's actions (or
failure to act) to facilitate [his] return to the United States," and other interventions.  ECF No. 62
at 2.  Specifically, Abrego Garcia seeks discovery as to the "terms of any agreement, arrangement
or understanding regarding the Government's use of CECOT to house U.S. deportees"; his current
physical location and custodial status; and "what steps, if any, the Government has taken [and will
take] to facilitate Abrego Garcia's return to the United States."  *Id.* at 4–5.  Defendants oppose the
request, principally contending that the proposed relief is "not consistent with the Supreme Court's
order or the well-established meaning of 'facilitating' returns in immigration law and harbors
fundamental constitutional infirmities."  ECF No. 65 at 3.

For the following reasons, the Court GRANTS the motion for expedited discovery as
directed below.  The Court defers its decision on the remaining requests for relief.

Rule 26 of the Federal Rules of Civil Procedure provides that parties "may obtain discovery
regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional

to the needs of the case." In ascertaining whether discovery is proportional to the needs of the case, the Court must consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

Upon a showing of good cause, the Court may permit discovery "[w]here significant questions regarding noncompliance with a court order have been raised." *Cal. Dep't of Social Servs. v. Leavitt*, 523 F.3d 1025, 1033–34 (9th Cir. 2008); *see Palmer v. Rice*, 231 F.R.D. 21, 25 (D.D.C. 2005) (allowing discovery where, "without [it], plaintiffs will not be able to determine whether the government has complied with the court's injunctions"); *Blackberry Ltd. v. Typo Prods. LLC*, 2014 WL 4136586, at *5 (N.D. Cal. Aug. 21, 2014) (granting discovery where Plaintiff raised "serious questions . . . regarding [Defendant's] possible violations of the preliminary injunction").

To ascertain whether the good-cause standard is met, the Court considers the following non-exhaustive factors: (1) whether a preliminary injunction motion is pending; (2) the breadth of the requested expedited discovery; (3) the proffered reasons for the expedited discovery; (4) the burden on the opponent to comply with the request for expedited discovery; (5) whether the evidence sought could be obtained more efficiently from some other source; (6) the extent to which the discovery process would be expedited; and (7) whether a motion to dismiss for failure to state a claim is pending. *See Courthouse News Serv. v. Harris*, No. CV ELH-22-548, 2022 WL 3577255, at *4 (D. Md. Aug. 18, 2022) (citing *Mullane*, 339 F.R.D. at 663).

It is undisputed that Abrego Garcia is entitled to injunctive relief for the reasons previously discussed and affirmed without exception. *See Noem v. Abrego Garcia*, No. 24A949, 604 U.S.—

(2025), slip op. at 2.  As to the scope of such relief, the Supreme Court of the United States unanimously affirmed that "the [District Court's] order *properly requires* the Government to 'facilitate' Abrego Garcia's *release from custody in El Salvador and to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador*." *Id.* (emphasis added).  To that end, the Supreme Court forewarned the Government that they "should be prepared to share what it can concerning the steps it has taken and the prospect of further steps." *Id.*; *see also Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *6 (4th Cir. Apr. 7, 2025) (Wilkinson, J., concurring) ("In this situation, I think it legitimate for the district court to require that the government 'facilitate' the plaintiff's return to the United States so that he may assert the rights that all apparently agree are due him under law.  It is fair to read the district court's order as one requiring that the government facilitate Abrego Garcia's release, rather than demand it.").

This Court, in turn, ordered no more than what the Supreme Court endorsed: that Defendants "take all available steps to facilitate the return of Abrego Garcia to the United States as soon as possible," because bound within this remedy is Abrego Garcia's "release from custody" and the assurance that Abrego Garcia's "case is handled as it would have been had he not been improperly sent to El Salvador." *Abrego Garcia*, 604 U.S.—, slip op. at 2; ECF No. 51.  To advance that remedy, the Court required swift disclosure of that which stems most obviously from the Supreme Court's affirmance: (1) the current physical location and custodial status of Abrego Garcia; (2) what steps, if any, Defendants have taken to facilitate Abrego Garcia's immediate return to the United States; and (3) what additional steps Defendants will take, and when, to facilitate his return.  ECF No. 54.  This information is wholly consistent with ascertaining what, if anything the Defendants have done to "facilitate" Abrego Garcia's "release from custody in El Salvador" and accord him the process due "had he not been improperly sent to El Salvador."

*Abrego Garcia*, 604 U.S.—, slip op. at 2.

Notably, to "facilitate" means "to make the occurrence of (something) easier; to render less difficult." *Facilitate*, Black's Law Dictionary (12th ed. 2024). Merriam-Webster defines the term as "to make easier or less difficult: to free from difficulty or impediment." *Facilitate*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/facilitate (last visited Apr. 14, 2025). And the Oxford English Dictionary defines "facilitate" as "[t]o assist (a person); to enable or allow (a person) to do something, achieve a particular result, etc., more easily." *Facilitate*, Oxford English Dictionary, https://doi.org/10.1093/OED/5808503853 (last visited Apr. 14, 2025). Defendants therefore remain obligated, at a minimum, to take the steps available to them toward aiding, assisting, or making easier Abrego Garcia's release from custody in El Salvador and resuming his status quo ante. But the record reflects that Defendants have done nothing at all.

Instead, the Defendants obliquely suggest that "facilitate" is limited to "taking all available steps to remove any *domestic* obstacles that would otherwise impede the alien's ability to return here." ECF No. 65 at 3 (emphasis in original). The fallacy in the Defendants' argument is twofold. First, in the "immigration context" as it were, *id.*, facilitating return of those wrongly deported can and has included more extensive governmental efforts, endorsed in prior precedent and DHS

publications.[1]  Thus, the Court cannot credit that "facilitating" the ordered relief is as limited as Defendants suggest.

Second, and more fundamentally, Defendants appear to have done nothing to aid in Abrego Garcia's release from custody and return to the United States to "ensure that his case is handled as it would have been" but for Defendants' wrongful expulsion of him. *Abrego Garcia*, 604 U.S.—, slip op. at 2.  Thus, Defendants' attempt to skirt this issue by redefining "facilitate" runs contrary to law and logic.

Turning to the factors supporting expedited discovery. *See Courthouse News*, 2022 WL 3577255, at *4.  <u>First</u>, the Court already issued preliminary injunctive relief, which remains active and enforceable.  Expedited discovery in the instant case accords with that preliminary relief. <u>Second</u>, the requested discovery appears relatively narrow in scope but unworkable as Plaintiffs have proposed.  An immediate evidentiary hearing, as the Plaintiffs ask, elevates speed over effectiveness.  Instead, the Court will permit discovery as set forth below, adhering to those areas of inquiry the Supreme Court made clear are "properly require[d]." *Abrego Garcia*, 604 U.S.—,

---

[1]      For example, in *Nat'l Immigr. Project of Nat'l Laws. Guild v. U.S. Dep't of Homeland Sec.*, No. 11-CV-3235 JSR, 2014 WL 6850977 (S.D.N.Y. Dec. 3, 2014), the litigation centered entirely on the Government's practices and policies for returning wrongly removed noncitizens to the United States for further immigration proceedings.  In connection with that litigation, then-Deputy Solicitor General Michael Dreeben, clarified for the Supreme Court the Government's "policy and practice" of "facilitating" return after removal. *Nat'l Immigr. Project of Nat'l Laws. Guild*, No. 11-CV-3235 JSR (S.D.N.Y.), ECF No. 79-4 at 40–46.  As Dreeben noted, although the Government's efforts varied depending on the circumstances of the case, its ultimate objective was "[t]o effectuate return," which could include steps such as "grant[ing] parole and send[ing] a cable to the consulate or embassy nearest to the alien with instructions to issue a travel document…" *Id.*  To "avoid uncertainty in how to achieve" return, then-Director of U.S. Immigration and Customs Enforcement John Morton implemented notice procedures, designated points of contact, and engaged the Government's diplomatic channels worldwide to "take additional steps to further improve [facilitation of return], if necessary or appropriate." *Id.*

In one instance, the Government engaged the ICE Attaché in South Africa to facilitate the return of a removed noncitizen to Ethiopia. *Id.*, ECF No. 16-4 at 19–25.  In another, the Government worked with the U.S. Embassy in Tokyo to secure a return. *Id.*, ECF No. 38-6 at 31.  And yet in another, the Government facilitated the return of Jo Desire from Haiti with assistance from the United States Marshal Service, which manned the Government airplane that flew to Haiti to retrieve Desire. *See* Tianyin Luo & Sean Lai McMahon, *Victory Denied: After Winning On Appeal, An Inadequate Return Policy Leaves Immigrants Stranded Abroad*, NYU Sch. of Law Immigrant Rts. Clinic, at 1066 (Oct. 1, 2014); *Nat'l Immigr. Project of Nat'l Laws. Guild*, 2014 WL 6850977, at *2.  Lastly, of note, discovery generated in that matter reflected the Government's practice of "log[ging] all efforts" to facilitate return as a matter of course. *Nat'l Immigr. Project of Nat'l Laws. Guild*, 2014 WL 6850977, ECF No. 16-4 at 20.

slip op. at 2. Discovery will be carried out expeditiously but with sufficient time to allow development of the factual record.

Third, the discovery is necessary in light of Defendants' uniform refusal to disclose "what it can" regarding their facilitation of Abrego Garcia's release and return to the status quo ante, or present any legal justification for what they cannot disclose.[2]  *Id.*  Fourth, the burden on the Government is minimal, particularly because, as the Supreme Court underscored, it "should be prepared to share what it can concerning the steps it has taken and the prospect of further steps." *Id.*  Fifth, the request for discovery is timely in that Defendants have not yet complied with this Court's directives, and Abrego Garcia appears to remain inexplicably detained in CECOT.[3]  Sixth, discovery must proceed without delay, as Abrego Garcia is indisputably entitled to the due protections that Defendants have denied him—and to be free from the risk of grave injury resulting from his continued detention in CECOT.  Seventh, the absence of a dismissal motion is of no moment because Plaintiffs' request for expedited discovery focuses on securing compliance with this Court's amended order at ECF No. 51 and other related directives, and in the face of ongoing refusal to comply, to assist the Court in determining whether contempt proceedings are warranted.

Accordingly, the Court will permit expedited discovery to ascertain what, if anything, the

---

[2] Again, this Court is ever mindful of the Supreme Court's directive that the Court's injunctive relief must be accorded with "due regard for the deference owed to the Executive Branch in the conduct of foreign affairs." *Abrego Garcia*, 604 U.S.—, slip op. at 2. But this deference does not mean the Court must ignore the Defendants' repeated refusal to provide even the most basic information as to any steps they have taken to facilitate "Abrego Garcia's release from custody in El Salvador and to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador." *Id.* Thus far, the Defendants appear to have taken no steps, and provided no explanation, legal or otherwise, for such inaction.

[3] In this regard, State Department Official, Michael G. Kozak, has attested that Abrego Garcia is "detained" in CECOT "pursuant to the sovereign, domestic authority of El Salvador." ECF No. 63 at 2. And yet, the record thus far demonstrates that the United States had paid six-million dollars to house those detainees in custody "pending the United States' decision on their long-term disposition." *See* Matthew Lee & Regina Garcia Cano, *Trump Officials Secretly Deported Venezuelans and Salvadorans to a Notorious Prison in El Salvador*, ASSOCIATED PRESS (Mar. 15, 2025), https://apnews.com/article/trump-deportations-salvador-tren-aragua-64e72142a171ea57c869c3b35eeecce7. Plaintiffs are entitled to explore the lawful basis—if any—for Abrego Garcia's continued detention in CECOT, including who authorized his initial placement there and who presently authorizes his continued confinement.

Defendants have done to "facilitate Abrego Garcia's release from custody in El Salvador and to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador." *Abrego Garcia*, 604 U.S.—, slip op. at 2.  This includes evidence concerning: (1) the current physical location and custodial status of Abrego Garcia; (2) what steps, if any, Defendants have taken to facilitate Abrego Garcia's immediate return to the United States; and (3) what additional steps Defendants will take, and when, to facilitate his return.

(1)   By no later than **Wednesday April 16, 2025, at 5:00 PM**, and pursuant to Federal Rules of Civil Procedure 26(d)(1), 33, and 34, Plaintiffs may propound upon Defendants up to fifteen (15) interrogatories and fifteen (15) requests for production of documents focused on the above areas of inquiry.[4]  Defendants' shall serve their answers and responses to Plaintiffs by no later than **Monday April 21, 2025, at 5:00 PM.**

(2)   Plaintiffs may also, by no later than **Wednesday, April 16, 2025, at 5:00 PM**, notice the depositions of the following affiants: Robert L. Cerna (ECF No. 11-3), Evan C. Katz (ECF No. 64), Michael G. Kozak (ECF No. 63), and Joseph N. Mazzara (ECF Nos. 74 & 77).  Any such depositions must be completed by **Wednesday, April 23, 2025, at 5:00 PM.**

(3)   By no later than **Wednesday, April 23, 2025**, Plaintiffs may move for leave of Court to conduct up to two additional depositions of individuals with knowledge and authority to testify regarding the matters identified above. Defendants shall respond by **Thursday, April 24, 2025.**  If the Court grants such leave, it will set a deadline by which the depositions must be completed.

---

[4] One interrogatory served on all Defendants equals <u>one</u> interrogatory for purposes of this Order.  Likewise, one request for production of documents served on all Defendants equals <u>one</u> request for purposes of this Order.

To streamline review of any anticipated objections, the Court will file a separate letter order regarding discovery disputes.  The parties are to follow the procedures described in the letter for any disputes that cannot be resolved by good faith meet and confer.  At the conclusion of expedited discovery, by no later than **Monday, April 28, 2025**, Plaintiffs shall supplement their motion for requested relief.  Defendants shall respond by no later than **Wednesday April 30, 2025.**  The Court will hold in abeyance Plaintiffs' remaining requests for relief until the completion of expedited discovery and supplemental briefing.  That said, should Defendants fail or refuse to engage in the above-described discovery in good faith, Plaintiffs are free to seek separate sanctions on an expedited basis.

It is so ordered.

April 15, 2025                                              _____/s/_____
Date                                                          Paula Xinis
                                                              United States District Judge

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                    GREENBELT DIVISION

 3   _____
                                            )
 4   KILMAR ARMANDO ABREGO GARCIA,          )
     et al.,                                )
 5                                          )
          Plaintiff,                        )
 6                                          )Docket Number
                 vs.                        )8:25-cv-00951-PX
 7                                          )
     KRISTI NOEM, et al,                    )
 8                                          )
          Defendant.                        )
 9   _____)

10            TRANSCRIPT OF STATUS CONFERENCE
            BEFORE THE HONORABLE PAULA XINIS
11           UNITED STATES DISTRICT COURT JUDGE
            TUESDAY, APRIL 15, 2025, AT 4:00 P.M.
12   APPEARANCES:

13   On Behalf of the Plaintiff:

14        BY:  RINA GANDHI, ESQUIRE
               SASCHA RAND, ESQUIRE
15        MURRAY OSORIO
          4103 Chain Bridge Road, Suite 300
16        Fairfax, VA  22030
          (703)352-2399
17
          BY:  OLIVIA HORTON, ESQUIRE
18        QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
          1300 I Street NW
19        Suite 900
          Washington, DC  20005
20        (202)538-8000

21   (Appearances continued)

22

23

24

25        ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPED NOTES***
```

```
 1   On Behalf of the Defendants:

 2        BY:  DREW ENSIGN, ESQUIRE
          DEPUTY ASSISTANT ATTORNEY GENERAL
 3        CIVIL DIVISION, DEPARTMENT OF JUSTICE
          950 Pennsylvania Avenue NW
 4        Washington, DC 20530
          (202)514-2000
 5
     ALSO PRESENT: Jennifer Vasquez Sura, Plaintiff
 6                 Ernest Molina, Esquire, DOJ
                   Joseph N. Mazzara, Esquire, DHS
 7                 Thomas McGuire, Esquire

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                 P R O C E E D I N G S

 2       (Court called to order.)

 3           DEPUTY CLERK:  All rise.  The United States District

 4   Court for the District of Maryland is now in session.  The

 5   Honorable Paula Xinis presiding.

 6           THE COURT:  Good afternoon, everyone.  You all can

 7   have a seat.

 8       Mr. Ulander?

 9           DEPUTY CLERK:  The matter now pending before the

10   Court is Civil Action Number PX25-951, Kilmar Armando Abrego

11   Garcia, et al., v. Kristi Noem, et al.  The matter comes before

12   this Court for a status conference.

13       Counsel, please identify yourselves for the record.

14           MS. GANDHI:  Rina Gandhi for the plaintiff, from

15   Murray Osorio.

16       Simon Sandoval-Moshenberg sends his regrets for an

17   ill-timed family vacation.

18       We have here with us Sascha Rand and Olivia Horton from

19   Quinn, Emanuel.

20           THE COURT:  Okay.  And Ms. Vazquez, good to see you.

21           MS. GANDHI:  I'm so sorry.  And Ms. Vazquez.

22           THE COURT:  Okay.  Thank you very much.

23           MR. ENSIGN:  Good afternoon, Your Honor.  Drew Ensign

24   for the United States.  My teammate, their appearances?

25           MR. MOLINA:  Good afternoon, Your Honor.  My name is
```

1   Ernesto Molina with the Department of Justice.

2        **THE COURT:**  And who else is with us?

3        **MR. MAZZARA:**  Client representatives for DHS, Joseph

4   Mazzara and Tom McGuire.

5        **THE COURT:**  Okay.  Thank you.  Just give me one

6   minute.

7        All right.  So, Counsel, since the last time we saw one

8   another, the plaintiff has filed a motion for other relief, and

9   that is at ECF 62.  There has been a response, a reply, and

10  certain status reports after that.

11       So I'm going to take this in the ordinary course and turn

12  to the plaintiffs first to argue this motion, and then I'll

13  hear from you, Mr. Ensign.

14       I'll likely give the plaintiffs the last word, since it's

15  their motion.  Okay?

16       **MS. GANDHI:**  Your Honor, may I present from the

17  table?

18       **THE COURT:**  You sure -- you sure can.  If you do, I

19  would suggest you either sit, because it's hard to hear you, or

20  somehow move the microphone so everyone can hear you.

21       **MS. GANDHI:**  Thank you, Your Honor.  Is this better?

22       **THE COURT:**  Yes, it is, thanks.

23       **MS. GANDHI:**  Your Honor, the Supreme Court ruled in

24  that injunction that the government is properly required to

25  facilitate Mr. Abrego Garcia's release from custody in

 1  El Salvador; his release from custody in El Salvador.

 2       To date, there is no evidence in the record of what, if

 3  anything, the government has done to facilitate

 4  Mr. Abrego Garcia's return.  The government has not even

 5  unambiguously requested his return.

 6       There is no evidence concerning whether and how the

 7  government has exercised its contractual rights under the

 8  agreement to secure Mr. Abrego Garcia's return.

 9       Putting aside that agreement or contract, the government

10  routinely seeks return by taking low-level actions outside the

11  United States which do not implicate foreign policy.  The

12  policy manual at Paragraph 4.1 specifically instructs DHS

13  supervisors to fully coordinate at the international level.

14       As an immigration attorney myself, this is not my day job,

15  we have seen it time and time again.

16       At this point, we believe we need evidence under -- under

17  Rule 30(b)(6), a deposition of all steps taken to facilitate

18  generally and pursuant to the arrangement or contract of DHS

19  and DOS.  We need to -- we would ask that you direct the

20  government to declare it wants Mr. Abrego Garcia.

21       **THE COURT:**  You would not be opposed to

22  interrogatories and requests for production of documents,

23  either, would you?

24       **MS. GANDHI:**  I would not.

25       And we would ask that the government provide actual steps

1   to affirmatively -- that they will affirmatively take to comply

2   with both your and the Supreme Court's orders.

3       Thank you.

4       **THE COURT:**  And so -- because if I understand your

5   motion, and I -- and this is a fast moving and obviously

6   extremely important case to both sides.  Your motion asked for

7   broader relief.  It sounds as if the plaintiff is right sizing

8   it to say take it in the ordinary -- or not the ordinary, but

9   give it the process it's due.

10      **MS. GANDHI:**  Absolutely.

11      **THE COURT:**  And just so everyone knows where -- where

12  my current thinking is, Mr. Abrego Garcia has already won his

13  injunctive relief.  All four *Winter* factors were conclusively

14  established.  It was affirmed not only by the Fourth Circuit,

15  by the Supreme Court.

16      We're here today to talk about the scope of the remedy,

17  which means that while expeditiousness is of the utmost

18  importance, because it is a fact now of this record that every

19  day Mr. Abrego Garcia is detained in CECOT is a day of further

20  irreparable harm.

21      But at the same time, if not this Court, who to engage in

22  process?  It's process that is the -- the -- in the roots of

23  our constitution, so we have to give process to both sides.

24  But we're going to move.  There will be no tolerance for

25  gamesmanship or grandstanding.  We'll talk about the contours

1  of this.  But that's where I am right now.

2      I'll hear from you, defense, as well, about where -- I'll

3  share with you where I am on this, and you -- you weigh in.

4  But this -- this process, which is expedited discovery, that's

5  sort of the core of what you're asking for right now,

6  plaintiffs, right?

7          **MS. GANDHI:**  Correct, Your Honor.

8          **THE COURT:**  I think that's well within my authority.

9      Okay.  All right.  Thank you.

10     Mr. Ensign?  So let's take off the table right now a

11  hearing today.  I'm not going to issue a show cause today for

12  contempt findings, but I do find it well within my authority to

13  proceed with expedited discovery specifically to determine

14  whether you are abiding by the court order, my court orders,

15  whether you intend to abide by the court orders -- and I mean

16  your clients, obviously, and their agents and assigns.  And if

17  not, is it in bad faith?  Is it in good faith?  Do you have

18  legitimate objections?  Not sort of hand waving at those

19  objections, but let's get to the bottom of it.  Let's get the

20  record established.  Let's hear you on your objections.  And

21  let me rule.

22     Any problem with that?

23          **MR. ENSIGN:**  No, Your Honor.

24          **THE COURT:**  Okay.

25          **MR. ENSIGN:**  Your Honor, as we've just filed

```
 1  recently, I can represent that -- that defendants are prepared

 2  to facilitate the return of Abrego Garcia to the United States

 3  as facilitate -- as -- you know, under the meaning of

 4  facilitate within the immigration context and within the ICE

 5  policy directive which was provided by the Supreme Court.

 6          THE COURT:  With --

 7          MR. ENSIGN:  Yes.

 8          THE COURT:  Sure.  So let's talk a little bit about

 9  that.

10          MR. ENSIGN:  Yes.

11          THE COURT:  Because I'm assuming that you're

12  referencing your response to the plaintiffs' motion, right?

13          MR. ENSIGN:  Yes, Your Honor.

14          THE COURT:  Okay.  And in that motion, you say to me

15  that you're going to define -- one, you say that somehow my

16  order is inconsistent with the Supreme Court.

17       And I'm going to squarely reject it here; I'm going to

18  squarely reject it in writing.  The Supreme Court could not

19  have been clearer that the scope of relief which it affirmed is

20  the following:  That I properly required the government to

21  facilitate Mr. Abrego Garcia's release from custody in

22  El Salvador, and to ensure that his case is handled as it would

23  have been had he not been improperly sent to El Salvador.

24       And to that end, the Supreme Court forewarned be prepared

25  to share what it can, the government, the defense, concerning
```

 1   the steps it has taken and the prospect of further steps.

 2        Okay.  Now, in response, not only do you say the actions

 3   I've taken so far are inconsistent, and I disagree with you on

 4   that, but further, you say that "facilitate" should be limited

 5   only to removing domestic obstacles.

 6        You said that in your -- in your pleading, correct?

 7             **MR. ENSIGN:**  Yes, Your Honor.

 8             **THE COURT:**  Okay.  And you don't cite me any law,

 9   right?

10             **MR. ENSIGN:**  We cited the ICE policy manual; we are

11   also prepared to cite the Sotomayor concurrence, in the Supreme

12   Court, specifically cites to that ICE policy directive on Page

13   4 of the slip opinion.

14             **THE COURT:**  Okay.  So let's -- let's just take a

15   moment.  I want to make sure that I'm fair to you in the

16   reading that I have here.

17        I'm reading from Page 3 of your response at ECF 65 where

18   you say:  Taking, quote, all available steps to facilitate the

19   return of Abrego Garcia is thus best read as taking all

20   available steps to remove any domestic obstacles that would

21   otherwise impede the alien's ability to return here.  Indeed,

22   no other reading of facilitate is tenable or constitutional

23   here.

24        You don't cite one authority there, am I right?

25             **MR. ENSIGN:**  I disagree, Your Honor.

1          **THE COURT:**  In that paragraph, just tell me, because

2   that's -- that's your bottom line.  So I want to know -- and

3   then you talk about the Supreme Court's order, which we'll get

4   to.  Because "facilitate" has to be read in the context of my

5   order as affirmed by the Supreme Court.

6      Fair?

7          **MR. ENSIGN:**  Your Honor, I don't believe so.  I think

8   the brief is meant to be read as a whole, and the citations on

9   the second full paragraph of Page 3, including the -- the cite

10  to the Sotomayor concurrence, which, in turn, in the

11  parenthetical, cites the ICE policy directive, I think that

12  cite was supporting what we read "facilitate" to be -- and to

13  be.  It is a term of art within immigration law, has a

14  well-understood meaning.

15         **THE COURT:**  Well, the well-understood meaning was not

16  terribly fleshed out in the seven-page pleading that I got.

17  There's law that suggests that well-established meaning goes

18  beyond just removing domestic obstacles.  I'm not even sure

19  what you mean.

20     But as a factual matter, we -- I do need evidence in this

21  regard, because to date, what the record shows is nothing has

22  been done.  Nothing.

23     I've asked for daily reports, daily -- by individuals with

24  personal knowledge, and I've gotten very little information of

25  any value.

1      **MR. ENSIGN:** Your Honor, I think what we have

2  submitted reflects that there have been significant steps.  In

3  particular, we cited to this issue was raised at the highest

4  possible levels yesterday.  It was raised in the Oval Office

5  between two heads of State, between President Trump and

6  President Bukele; the issue was specifically discussed.

7      **THE COURT:** A reporter asked a question.  The

8  defendants have never responded to the question:  What steps

9  have you taken?"

10      The plaintiff is asking, why don't the defendants just

11  ask:  You will release him?

12      We've got no -- I've got no answer on that.

13      And in response to this notion that what happened in the

14  Oval Office is satisfactory, it's not before the Court.  I

15  mean, you -- you include a transcript.  I don't know if this

16  transcript is -- what this transcript is supposed to be

17  assisting me in.

18      But the bottom line is, it was a very simple directive.

19  My -- my question that the Court, the high court squarely

20  affirmed I can ask:  What have you done?

21      I've gotten nothing.  I've got no real response, nor have

22  I gotten any legitimate legal justification for not answering

23  the question.  That's why we need to move to the next step.

24      Because in fairness, Mr. Ensign, you're not going to

25  answer the questions that the plaintiffs put within the scope

1  of my order, then you'll justify why.  You'll cite privilege,

2  you'll follow the rules, I'll make a determination.  That's

3  what we do in this house.

4       That's -- that's the most fair I can be.  And I don't

5  consider what happened yesterday as really evidence before this

6  Court, yet -- so -- so what do you think I should take away

7  from yesterday?

8            **MR. ENSIGN:**  A couple of things, Your Honor.  I think

9  that the issue was specifically raised with the highest

10 authority in El Salvador, and that, you know, we got his

11 position as to whether or not he would release

12 Mr. Abrego Garcia.  He said specifically, "Yeah, but I'm not

13 releasing -- we're not fond of releasing terrorists into this

14 country, we just turned the murder capital of the world into

15 the safest country in the western hemisphere, and you want us

16 to go back to releasing criminals so we can go back to the

17 murder capital of the world?"

18           **THE COURT:**  Okay.  That's a nonresponsive answer if

19 that were in a court of law.  Asking about Mr. Abrego Garcia,

20 and not answering the question would have real infirmities for

21 a -- in a trial, in a court of law.

22      So whatever, you know, you wish for me to take from it, it

23 is not a direct response, nor is the quip about smuggling

24 someone into the United States.  I imagine, since you cited it

25 in a status report to me, you're going to raise it today, so

 1    let's just get right to it.

 2        If you were removing domestic barriers, as you say,

 3    "facilitate" would warrant, then there would be no smuggling,

 4    right?

 5        So this is all, you know, two very misguided ships passing

 6    in the night, frankly.  I think we just have to get to the

 7    discovery in the way that the rules warrant, and that way you

 8    have a full and fair process that will move very quickly, and I

 9    will have the record before me to call it as I see it.  Because

10    if I make a finding of contempt, it will be based on the record

11    before me, and then it will go from there.  I'm not -- I'm not

12    saying one way or the other what I'm going to do, because I

13    don't have the record before me.

14        And -- and no, I don't consider the -- the transcript that

15    you gave me 15 minutes ago to be answering the questions.  I

16    just don't.

17        The question was:  Defendants, what have you done to

18    facilitate Mr. Abrego Garcia's release from CECOT?  That was

19    one that the Supreme Court affirmed squarely within my order.

20        And the other is:  What have you done to facilitate

21    Abrego Garcia's not only release, but to ensure -- this is the

22    Supreme Court's words, these are not mine, ensure that his case

23    is handled as it would have been had he not been improperly

24    sent to El Salvador.

25        I've gotten nothing that comes close to that, and I just

1  asked -- asked some very basic questions, like, what have you

2  done?  What do you plan to do?  If you can't tell me, tell me

3  why.

4            **MR. ENSIGN:**  Your Honor, several things, if I may.

5            **THE COURT:**  Uh-huh.

6            **MR. ENSIGN:**  We do think that transcript represents

7  an important step towards compliance.  We think ascertaining

8  the position of the government of El Salvador was an important

9  step towards complying with this Court's order.

10      Also in that transcript, is a statement from Attorney

11  General Bondi that we will facilitate his return if -- if

12  El Salvador chooses to release him.

13           **THE COURT:**  Okay.  We're going to do this, again,

14  pursuant to the Federal Rules of Civil Procedure.  Okay?  So --

15  so no press releases is going to move the Court the same way

16  that sworn, under-oath testimony from persons with knowledge,

17  answers to interrogatories, which are signed by the defendants,

18  again, under penalties of perjury, that everything is true and

19  accurate.  And if you have objections, you're going to have to

20  make them consistent with the rules.

21      Follow the rules as to how you -- you shore it up, and I'm

22  ready, willing, and able to call that.  That's what district

23  judges do.

24      And, again, I'll remind everybody here, there are no

25  business hours while we do this.  It's going to be two weeks of

 1  intense discovery targeted.  If the plaintiffs go too wide, you

 2  tell me, and I'll call it.  You don't comply, they tell me, and

 3  I'll call it.  And once we have a record, we'll take it from

 4  there.

 5       **MR. ENSIGN:**  Your Honor, I understand that that --

 6  the Court's position, but if I may continue, the declaration

 7  today also sets forth evidence consistent with the Federal

 8  Rules of Civil Procedure.  It makes clear -- and excuse me,

 9  while they pull that up.

10    Your Honor --

11       **THE COURT:**  Point me where you want me to look.

12       **MR. ENSIGN:**  Yes, Your Honor.  It's -- it is at

13  Paragraph 9.

14       **THE COURT:**  Of the declaration?

15       **MR. ENSIGN:**  Yes, Your Honor.

16       **THE COURT:**  Okay.  And it reads, "I, Mr. Mazzara" --

17  who is with us today, correct?

18       **MR. ENSIGN:**  Yes, Your Honor.

19       **THE COURT:**  Okay.  That Mr. Mazzara has been

20  authorized to represent that if Mr. Abrego Garcia does present

21  at a port of entry, he would become subject to detention by

22  DHS.  In that case, DHS would take him into custody in the

23  United States and either remove him to a third country or

24  terminate his withholding of removal because of his membership

25  in MS-13, a designated foreign terrorist organization, and

 1  remove him to El Salvador.

 2      Okay.  First of all, we're not there because

 3  Mr. Abrego Garcia is not in the United States.  And this --

 4  this -- what do you want me to know about this paragraph that

 5  you think is relevant and probative to this inquiry?

 6          MR. ENSIGN:  Your Honor, because we believe that

 7  satisfies "facilitate return" within the meaning of immigration

 8  law.  If --

 9          THE COURT:  Have you done it?  Have you done this?

10  Have you -- have you made sure that you've done everything you

11  can, taken steps, facilitate, aid, assist, abet, help, whatever

12  plain language you want to put on "facilitate," have you done

13  it to assure or to facilitate that Mr. Abrego Garcia is

14  presented at the border?

15          MR. ENSIGN:  No, Your Honor, we --

16          THE COURT:  No.  And so let's stop for a second.

17      If you haven't done it, then the rest of it is

18  hypothetical, it's speculative, because you haven't done it.

19          MR. ENSIGN:  Your Honor, let me clarify.

20          THE COURT:  Okay.

21          MR. ENSIGN:  We -- under "facilitate," what it means

22  in immigration law is just to remove U.S. side barriers.  And

23  so those barriers, as set forth under Paragraph 9, are now

24  removed.  If Mr. Abrego Garcia presents at a port of entry or

25  the U.S. Embassy, we will facilitate his return into the United

```
 1   States.

 2              THE COURT:  Okay.

 3              MR. ENSIGN:  He would be taken into custody.  But we

 4   therefore think what we have is a very narrow interpretive

 5   dispute about what the word "facilitate" means, for which

 6   discovery is not necessary.

 7              THE COURT:  I disagree with you.  I disagree with

 8   your characterization of the word "facilitate."  It flies in

 9   the face of the plain meaning of the word.

10     My cursory research on prior cases demonstrates otherwise

11   in the immigration context.  You know, you can make your

12   arguments and your pleadings to me, but in the end of the day,

13   I'm going to -- and I will, I'm prepared to issue an order

14   which expands on my view of the definition of "facilitate."

15   And until this matter is over and a final order is issued, we

16   will operate within the parameters of that ruling.

17     And it is consistent with the Supreme Court, and it is

18   consistent with the plain meaning of the term, and it is also

19   consistent with the common practice in immigration law, when a

20   wrongfully removed individual from the United States is outside

21   the borders, it's not so cut and dry that all you have to do

22   is, as you say, remove obstacles domestically.  That's a

23   characterization, and that's a characterization that's not

24   really bound in fact right now, and I need the facts.

25              MR. ENSIGN:  Your Honor, I think three responses to
```

1    that.

2        First, I think the meaning of the word facilitate is a

3    pure question of law that does not require discovery.

4        Second of all, I point this Court to the Fourth Circuit's

5    decision in *Ramirez v. Sessions*, 887 F.3d at 706, and Note 11,

6    where the Fourth Circuit says that facilitate, quote, does not

7    necessarily include funding an alien's travel via commercial

8    carrier to the United States or making flight arrangements for

9    them.

10       If it doesn't reach even such, you know, steps like

11   that --

12           **THE COURT:**  No, the word "necessarily" is operative.

13       The context of this directive, as I have understood it

14   is -- it is -- it can be -- and again, plaintiff, I'll give you

15   an opportunity to be heard on this, this is your wheelhouse,

16   after all.

17       It can be case dependent, case specific.

18       This case, the Supreme Court has made very clear is a

19   context not -- not just -- not just in the ether about what --

20   it's not a matter of just pure law.  It's a matter of whether

21   the defendants are complying with this order, which the Supreme

22   Court said properly requires the government to facilitate

23   release from custody in El Salvador, and to ensure that his

24   case is handled as it would have been had he not been

25   improperly sent to El Salvador.

1          Let me put it a different way.

2          The ICE directive is illustrative.  It is not exhaustive.

3    It's not the end of the story.  You have -- you have, according

4    to the ICE directive, tools in your tool kit.  According to law

5    surrounding that ICE directive, going back several years, the

6    government has taken different positions in that regard as to

7    what "facilitate" means.

8          But in the end of the day, again, it's not exhaustive, so

9    it doesn't necessarily, in some other case, mean you have to

10   gas up a plane.  But you have done it in other cases, and the

11   question is, what steps are you going to take here?

12         So I just keep focusing us back to the facts, and the

13   facts need to be developed in this regard.

14              MR. ENSIGN:  Well, Your Honor, I guess returning to

15   the earlier point you said.  If you're going to issue an order

16   that would expand upon what "facilitate" means, we would ask

17   that you either stay that pending appeal or at least delay the

18   compliance deadline with sufficient time that we could seek

19   expedited appeal in a very expedited but orderly manner.

20              THE COURT:  It -- the Supreme Court has spoken.  I'm

21   cleaving as closely as one can cleave to the Supreme Court.  My

22   order is clear.  It's direct.  There is, in my view, nothing to

23   appeal.

24         Now we get to the facts.  You've put up four affiants.

25   Those affiants have personal knowledge.  Two weeks of targeted

1    discovery will at least give you the factual predicate to then

2    apply the law to the facts.  That's where I am.

3         So unless you want -- do you wish to be heard on the scope

4    of discovery?  Or the manner in which we're going to take

5    discovery?

6              MR. ENSIGN:  Certainly, Your Honor, you know, I think

7    targeted, and then, you know, starting narrow, and then seeing

8    what the needs may be beyond that certainly makes sense.  I

9    think starting perhaps with interrogatories, and then that can

10   hopefully define the scope of it.

11        Additionally, you know, if this Court wants to issue an

12   additional injunction or order clarifying the injunction, then

13   we can understand what the Court has in mind, because in our

14   view --

15             THE COURT:  You keep saying that, and I just

16   completely disagree with you.  I just don't think it's that

17   difficult.  I think you want to make it that difficult, because

18   let's just -- you know, getting to the facts may not be

19   terribly favorable.  But it's not that difficult.

20        The Supreme Court has spoken.  And what I'm talking about

21   is, let's start with what the Supreme Court has unequivocally

22   found to be lawful.  Okay?

23        So you made your jurisdictional arguments.  You made your

24   venue arguments, you made your arguments on the merits, and

25   those are put to bed.  You lost.

1      This is now about the scope of the remedy.  And the scope

2  of the remedy that was clearly affirmed, I have said countless

3  times, and so has the plaintiff in their pleadings, that's

4  where the discovery will begin.  Okay?

5      It will also give me the factual predicate I need to

6  decide if -- if the defendants are acting in good faith or not.

7  Good faith goes far in a court of law.

8      So -- so it will give you that opportunity.  And so we're

9  not going to -- we're going to -- we're going to do it in a

10  targeted way, but we're not going to -- to take a whole lot of

11  time doing it.

12          **MR. ENSIGN:**  Well, certainly, Your Honor, we would

13  like to understand -- you know, we have made very clear that we

14  don't believe the Article III Judiciary has the authority to

15  direct the Executive to make -- you know, particular requests

16  of foreign sovereigns that --

17          **THE COURT:**  I'm not doing that.

18      There's so much daylight between what you keep saying and

19  what the actual -- the posture of this case is.  I'm not doing

20  that.  Nothing I've read to you in the Supreme Court or my

21  order at all does that.

22      Now it's up to the plaintiff to make their requests.  You

23  can make that argument if you think that the requests somehow

24  impinge on these -- these categories, these -- these legal

25  constructs.  And then you'll show your work and I'll call it.

1    But to talk in -- in generalities now is simply delaying

2  the -- the process that we have to go through to determine have

3  you done what you can to fulfill the order that I've issued.

4  And if not, have you not in good faith?

5        **MR. ENSIGN:**  Your Honor, I disagree that it's

6  generalities, and certainly it's how plaintiffs themselves read

7  the order.  Here's what their reply filed today on Page 1

8  says:  --

9        **THE COURT:**  Okay.

10        **MR. ENSIGN:**  -- To give any meaning to the Supreme

11  Court's order, the government should at least be required to

12  request the release of Abrego Garcia.

13    So they are specifically asking for the relief that we

14  have argued is barred by separation of powers, principals, and

15  that's how plaintiffs themselves are reading your order.  And

16  so --

17        **THE COURT:**  Well, I -- but that -- the plaintiffs are

18  not the Court.  And the Court hasn't directed you to do that.

19  As stunning as it is that the government's position is we can't

20  ask El Salvador to release him, I'm not ordering you to do

21  that.  I'm not there yet.

22    Where I am -- and I don't know if I'll ever be there,

23  because if you convince me that that would be to exceed my

24  authority, then I will abide by the law since we all are -- you

25  know, we're a country of laws, after all.  But we're not there

1  yet.

2  I'm just -- that's why I keep going back to what the

3  Supreme Court said is squarely within my power to do.

4  And my view, that you have not yet fulfilled the mandate,

5  the order that I've issued.  And so we have to -- you know,

6  discovery will bear out whether you have, in fact, because the

7  affidavits are insufficient; and if you haven't, whether it's a

8  choice for a justified ground.

9  **MR. ENSIGN:**  I understand the Court's position.  I

10  think we disagree because the question of what "facilitate"

11  means, as teed up by plaintiffs themselves in their reply, is a

12  pure question of law that does not turn on any discovery.

13  **THE COURT:**  And I understand your position as you've

14  laid it out.  I'm prepared, in a written order, to reject it.

15  And so you know that.

16  So now if you wish to be heard, and I'll give you my --

17  both sides, I'll give you my rough thoughts on what this

18  discovery will look like.  In the end of the day, I'll issue

19  the order.

20  This order, again, just so everyone is clear in terms of

21  how the Federal Rules of Civil Procedure work, this is what

22  courts, district courts are principally authorized to do is

23  when there is a discoverable dispute, and it requires the --

24  that formal discovery be taken pursuant to the rules, the

25  Court's the referee.  And that's what I'll be in the next two

```
 1   weeks.

 2       So I will find -- I'll issue a written order as to why I

 3   do find that expedited discovery is warranted.  It will occur

 4   in two weeks.  I will issue a certain number of interrogatories

 5   and requests for production of documents for the plaintiff.

 6   I'll give the plaintiff the opportunity to notice the

 7   deposition of the affiants, and then make a showing for up to

 8   two additional depositions, if you wish.  There will be

 9   milestone dates for all of this.

10       Look, obviously the defense will have an opportunity to

11   respond to those interrogatories and requests for production of

12   documents.  I expect you'll do so in good faith.  And if you

13   have objections, that you follow the rules and put the

14   objections with specificity as the rules require.

15       And then if there is a -- a dispute that cannot be

16   resolved by a good-faith meet-and-confer -- and so for those of

17   you who are not lawyers, what that means is, even when two

18   sides don't see it the same way, the lawyers are duty bound to

19   try to work it out, the discovery dispute, among themselves

20   before they bring it to the Court.  That's in the law.

21       If you engage in that good-faith meet-and-confer, and you

22   can't come to a resolution, I'm also going to enter a letter

23   order that explains to you how you will get expedited review.

24   It's a simple process.  It's an important one, though.  You put

25   your dispute to me in a letter.  No more than three pages.  You
```

1    put both sides, both positions in that letter.  You attach the

2    discovery that is in dispute.  And then I hold a recorded

3    conference, and I will decide it.

4        So, in my view, if everyone is operating in good faith,

5    this will get done in two weeks.  If you're not, that will be a

6    fact in and of itself for this Court to consider.  Okay?

7        Now, Mr. Ensign, a question for you, with regard to the

8    affiants, the -- the turnaround time is going to be roughly

9    between the 16th of Wednesday -- the Wednesday, April 16, is

10   when the plaintiff is going to determine whether you want these

11   depositions or not.  So you'll notice them.

12       And then the depositions are to be completed by Wednesday,

13   April 23rd.

14       If you work it out as to how the manner in which you want

15   to take the deposition, I'll have no issue with it.  Any

16   impediments to that?  A week to get the affiants done.

17          MR. ENSIGN:  We understand that, the Court's

18   position, Your Honor.

19          THE COURT:  Okay.  And so that means no -- no

20   impediment that you see right now?

21          MR. ENSIGN:  Your Honor, we don't know the deponents

22   or the subjects, so we --

23          THE COURT:  No.  I'm telling you who the deponents

24   are.  At a minimum, they are the four affiants, the people who

25   you have said have personal knowledge of the issues before the

1  Court.  I've asked for daily updates.  There's Mr. Cerna, who

2  was part of the initial response, and then by my count, there

3  are three additional affiants, all of whom you've told me have

4  personal knowledge with regard to the areas that you've put

5  before me.

6      They do raise very important issues.  There's questions of

7  fact that the plaintiffs may wish to explore.

8      I can't imagine if you put them up as affiants you are

9  going to have any issue with their depositions.  Am I right

10 about that?

11         MR. ENSIGN:  Your Honor, I -- I'm not prepared to

12 make a comprehensive set of objections at this juncture.

13     One of them is the Acting General Counsel of DHS, so that

14 might present some issues that we would certainly need to

15 consider.

16         THE COURT:  Like -- like privilege?

17         MR. ENSIGN:  Yes.

18         THE COURT:  Well, then you -- you do have to consider

19 what happens with that waiver of privilege when you put him up

20 as an affiant.  But that was your decision.  You made that, so

21 to the extent you have now privilege questions, make sure you

22 get it in front of me as expeditiously as possible so I can

23 determine whether there is existing privilege on the areas

24 in -- in question because you've already put him up as an

25 affiant.

```
 1        I'll leave that to you.

 2        I suppose, let me put it this way, in terms of legal

 3   arguments aside on privilege, and things of that nature, again,

 4   any issue with producing -- so if I say the deponents shall sit

 5   for some or all of the deposition that the plaintiff wishes to

 6   take, any issue with presenting that deponent for the

 7   deposition itself?

 8        MR. ENSIGN:  Your Honor, I don't know right now their

 9   availability.  I assume that can be arranged in a seven-day

10   period, but I can't say that conclusively.

11        THE COURT:  Well, cancel -- cancel vacation.  Cancel

12   other appointments.  I'm usually pretty good about things like

13   that in my courtroom, but not this time.  So I expect all hands

14   on deck.  It won't be a convenience issue.

15        That's why I'm saying, I will be flexible if you need to

16   accommodate depositions, you know, whether it's in the

17   courthouse, because you like -- you have the -- the Court

18   available to call balls and strikes as the depositions go on.

19   I'm going to be available.  If you need to do it at odd hours

20   or weekends, I'm also available.

21        So that's what I'm talking about, really, is just maybe

22   the manner in which you're going to take these depositions to

23   maximize it, if you have any issues of scope, of privilege,

24   that we handle them as expeditiously as possible, and that

25   there isn't going to be unnecessary delay.
```

1           **MR. ENSIGN:**  We will move expeditiously, Your Honor.

2           **THE COURT:**  Okay.  I appreciate that.  All right.

3       Anything else, Mr. Ensign, that you wish to be heard on

4   before I turn to the plaintiffs?

5           **MR. ENSIGN:**  Your Honor, just for the record, we

6   don't believe that discovery is appropriate because we think

7   what's presented here is a legal dispute.  And Your Honor at

8   one point indicated that you might specifically flesh out what

9   you think that "facilitate" means, that certainly might help

10  refine the scope of this.  So that --

11          **THE COURT:**  Excuse me.  Yep.  Okay.  Yep.  I hear

12  you.

13      I -- and I will -- in a written order, I'm going to

14  respond directly to your arguments in your papers.  So you will

15  have some written guidance in that regard, and your objection

16  to discovery is preserved for sure.

17          **MR. ENSIGN:**  Thank you, Your Honor.

18          **THE COURT:**  Okay.  Thank you.

19      Ms. Gandhi?

20          **MS. GANDHI:**  Your Honor, we agree with your proposed

21  plan, and we intend to move forward with all initial discovery

22  requests expeditiously.

23      No further statements.

24          **THE COURT:**  Okay.  All right.  And so you know, it's

25  a tight timeline.

1          **MS. GANDHI:**  Yes.

2          **THE COURT:**  You're going to be propounding your

3    interrogatories and requests for production of documents, as

4    well as noticing, if you wish, any of the affiants by Wednesday

5    at 5:00 p.m.

6          **MS. GANDHI:**  Yes, Your Honor.

7          **THE COURT:**  And, again, this is all going to be in a

8    written order, but in case there's any question about this,

9    it's going to be 15 interrogatories and 15 requests for

10   production, each of which will be counted as one request for --

11   or interrogatory propounded to all defendants.

12      So in other words, it's not going to be one interrogatory

13   to each defendant is counted as six; it's counted as one.

14      But at the same time, if you don't need 15, don't propound

15   15 because it's just going to delay the inquiry.  Okay?  Keep

16   it targeted, keep it tight, and that will help keep it moving.

17   All right?

18      There will be, as I said, a window of time where you will

19   move for leave to conduct up to two additional depositions,

20   again, on a showing of good cause.

21      And I will give defendants an opportunity to respond as to

22   whether those are warranted.

23      And then my current target is going to be that at the

24   conclusion, the plaintiffs supplement their motion, because I'm

25   going to hold the other requests for relief, I'm going to defer

1   on those.  You're going to supplement by no later than Monday,

2   April 28; defendants will respond April 30, and we will turn to

3   it as quickly as possible.  All right?

4      Okay.  Unless there's any other questions, I appreciate

5   all of your time.  Thank you.

6          **MS. GANDHI:**  Thank you, Your Honor.

7          **DEPUTY CLERK:**  All rise.  This Honorable Court now

8   stands adjourned.

9      (Proceedings were concluded at 4:41 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4        I, Paula J. Leeper, Federal Official Court Reporter, in

 5   and for the United States District Court for the District of

 6   Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that

 7   the foregoing is a true and correct transcript of the

 8   stenographically-reported proceedings held in the

 9   above-entitled matter and the transcript page format is in

10   conformance with the regulations of the Judicial Conference of

11   the United States.

12                            Dated this 15th day of April 2025.

13

14

15                            /S/ Paula J. Leeper
                              _____
16
                              Paula J. Leeper, RPR, CRR
17                            Federal Official Reporter

18

19

20

21

22

23

24

25
```

DEPUTY CLERK: [3]    3/3  3/9  30/7
MR. ENSIGN: [3]    3/6  3/13  22/7
MR. MAZZARA: [1]    4/1
MR. MOLINA: [1]    3/25
MS. GANDHI: [12]    3/14  3/21  4/16  4/21  4/23  5/24
6/10  7/7  28/20  29/1  29/6  30/6
THE COURT: [51]

## /

/S [1]    31/15

## 1

11 [1]    18/5
13 [1]    15/25
1300 [1]    1/18
15 [6]    1/11  13/15  29/9  29/9  29/14  29/15
15th [1]    31/12
16 [1]    25/9
16th [1]    25/9

## 2

2000 [1]    2/4
20005 [1]    1/19
202 [2]    1/20  2/4
2025 [2]    1/11  31/12
20530 [1]    2/4
22030 [1]    1/16
2399 [1]    1/16
23rd [1]    25/13
28 [2]    30/2  31/6

## 3

30 [2]    5/17  30/2
300 [1]    1/19
352-2399 [1]    1/16

## 4

4.1 [1]    5/12
4103 [1]    1/15
4:00 [1]    1/11
4:41 [1]    30/9

## 5

514-2000 [1]    2/4
538-8000 [1]    1/20
5:00 p.m [1]    29/5

## 6

62 [1]    4/9
65 [1]    9/17

## 7

703 [1]    1/16
706 [1]    18/5
753 [1]    31/6

## 8

8000 [1]    1/20
887 [1]    18/5
8:25-cv-00951-PX [1]    1/6

## 9

900 [1]    1/19
950 [1]    2/3
951 [1]    3/10

## A

abet [1]    16/11
abide [2]    7/15  22/24
abiding [1]    7/14
ability [1]    9/21
able [1]    14/22
above [1]    31/9
above-entitled [1]    31/9
ABREGO [20]    1/4  3/10  4/25  5/4  5/8  5/20  6/12  6/19
8/2  8/21  9/19  12/12  12/13  13/18  13/21  15/20  16/3
16/13  16/24  22/12
Abrego Garcia's [1]    13/21
Absolutely [1]    6/10
accommodate [1]    27/16
according [2]    13/9  19/4
accurate [1]    14/19
acting [2]    21/6  26/13
Action [1]    3/10
actions [2]    5/10  9/2
actual [2]    5/25  21/19
additional [4]    20/12  24/8  26/3  29/19
Additionally [1]    20/11
adjourned [1]    30/8
affiant [2]    26/20  26/25
affiants [9]    19/24  19/25  24/7  25/8  25/16  25/24
26/3  26/8  29/4
affidavits [1]    23/7
affirmatively [2]    6/1  6/1
affirmed [6]    6/14  8/19  10/5  11/20  13/19  21/2
after [3]    4/10  18/16  22/25
afternoon [3]    3/6  3/23  3/25
again [10]    5/15  14/13  14/18  14/24  18/14  19/8  23/20
27/3  29/7  29/20
agents [1]    7/16
ago [1]    13/15
agree [1]    28/20
agreement [2]    5/8  5/9
aid [1]    16/11
AIDED [1]    1/25
al [4]    1/4  1/7  3/11  3/11
alien's [2]    9/21  18/7

all [29]    5/6  6/7  6/11  7/2  9/18  9/23  11/12
16/2  17/7  17/9  18/10  18/18  20/25  21/6  21/6
27/12  27/20  27/21  27/22  27/23  28/4  28/11  28/12
30/1  31/13
already [1]    26/24
also [8]    2/5  9/11  14/10  15/7  17/18  21/5  24/22
27/20
am [6]    7/1  7/3  9/24  20/2  22/22  26/9
among [1]    24/19
another [1]    4/8
answer [3]    11/12  11/25  12/18
answering [3]    11/22  12/20  13/15
answers [1]    14/17
anything [2]    5/3  28/3
appeal [3]    19/17  19/19  19/23
appearances [3]    1/12  1/21  3/24
apply [1]    20/2
appointments [1]    27/12
appreciate [2]    28/2  30/4
appropriate [1]    28/6
APRIL [6]    1/11  25/9  25/13  30/2  30/2  31/12
April 16 [1]    25/9
April 23rd [1]    25/13
April 28 [1]    30/2
April 30 [1]    30/2
areas [2]    26/4  26/23
argue [1]    4/12
argued [1]    22/14
argument [1]    21/23
arguments [6]    17/12  20/23  20/24  20/24  27/3  28/14
ARMANDO [2]    1/4  3/10
arranged [1]    27/9
arrangement [1]    5/18
arrangements [1]    18/8
art [1]    10/13
Article [1]    21/14
ascertaining [1]    14/7
aside [2]    5/9  27/3
ask [6]    5/19  5/25  11/11  11/20  19/16  22/20
asked [6]    6/6  10/23  11/7  14/1  14/1  26/1
asking [4]    7/5  11/10  12/19  22/13
assigns [1]    7/16
assist [1]    16/11
ASSISTANT [1]    2/2
assisting [1]    11/17
assume [1]    27/9
assuming [1]    8/11
assure [1]    16/13
attach [1]    25/1
attorney [2]    2/2  5/14  14/10
authority [6]    7/8  7/12  9/24  12/10  21/14  22/24
authorized [2]    15/20  23/22
availability [1]    27/19
available [5]    9/18  9/20  27/18  27/19  27/20
Avenue [1]    2/3
away [1]    12/6

## B

back [5]    12/16  12/16  19/5  19/12  23/2
bad [1]    7/17
balls [1]    27/18
barred [1]    22/14
barriers [3]    13/2  16/22  16/23
based [1]    13/10
basic [1]    14/1
bear [1]    23/6
because [24]    4/19  6/4  6/18  8/11  10/1  10/4  10/21
11/24  13/9  13/12  15/24  16/2  16/6  16/18  20/13  20/17
22/23  23/6  23/10  26/24  27/17  28/6  29/15  29/24
become [1]    15/21
bed [1]    20/25
before [12]    1/10  3/9  3/11  11/14  12/5  13/9  13/11
13/13  24/20  25/25  26/5  28/4
begin [1]    4/1
Behalf [2]    1/13  2/1
believe [5]    5/16  10/7  16/6  21/14  28/6
best [1]    9/19
better [1]    4/21
between [4]    11/5  11/5  21/18  25/9
beyond [2]    10/18  20/8
bit [1]    8/8
Bondi [1]    14/11
border [1]    16/14
borders [1]    17/21
both [6]    6/2  6/6  6/23  23/17  25/1  25/1
bottom [3]    7/19  10/2  11/18
bound [2]    17/24  24/18
Bridge [1]    1/15
brief [1]    10/8
bring [1]    24/20
broader [1]    6/7
Bukele [1]    11/6
business [1]    14/25

## C

call [6]    13/9  14/22  15/2  15/3  21/25  27/18
called [1]    3/2
can't [5]    14/2  22/19  24/22  26/8  27/10
cancel [3]    27/11  27/11  27/11
cannot [1]    24/15
capital [2]    12/14  12/17
carrier [1]    18/8
case [11]    6/6  8/22  13/22  15/22  18/17  18/17  18/18
18/24  19/9  21/19  29/8
cases [2]    17/10  19/10
categories [1]    21/24
cause [2]    7/11  29/20
CECOT [2]    6/19  13/18
Cerna [1]    26/1
certain [2]    4/10  24/4
certainly [6]    20/6  20/8  21/12  22/6  26/14  28/9
CERTIFICATE [1]    30/10
certify [1]    31/6

characterization [1]    21/5
choice [1]    4/18
chooses [1]    14/16
Circuit [2]    6/14  18/6
Circuit's [1]    18/4
citations [1]    10/8
cite [6]    9/8  9/11  9/24  10/9  10/12  12/1
cited [3]    9/10  11/3  12/24
cites [2]    9/12  10/11
CIVIL [5]    2/3  3/10  14/14  15/8  23/21
clarify [1]    16/19
clarifying [1]    20/12
clear [5]    15/8  18/18  19/22  21/13  23/20
clearer [1]    8/19
clearly [1]    21/2
cleave [1]    19/21
cleaving [1]    19/21
Client [1]    4/3
clients [1]    7/16
close [1]    13/25
closely [1]    19/21
come [1]    24/22
comes [2]    3/11  13/25
commercial [1]    18/7
common [1]    17/7
completed [1]    25/12
completely [1]    20/16
compliance [2]    14/7  19/18
comply [2]    6/1  15/2
complying [2]    14/9  18/21
comprehensive [1]    26/12
comply [1]    1/25
COMPUTER-AIDED [1]    1/25
concerning [2]    5/6  8/25
concluded [1]    30/9
conclusion [1]    29/24
conclusively [2]    6/13  27/10
concurrence [2]    9/11  10/10
conduct [1]    29/19
confer [2]    14/16  24/21
conference [4]    1/10  3/12  25/3  31/10
conformance [1]    31/10
consider [5]    12/5  13/14  25/6  26/15  26/18
consistent [5]    14/20  15/7  17/17  17/18  17/19
constitution [1]    6/23
constitutional [1]    9/22
constructs [1]    21/22
contempt [2]    7/12  13/10
context [5]    8/4  10/14  17/11  18/13  18/19
continue [1]    15/6
continued [1]    1/21
contours [1]    6/25
contract [2]    5/9  5/18
contractual [1]    5/7
convenience [1]    27/14
convince [1]    22/23
coordinate [1]    5/13
core [1]    7/5
correct [4]    7/7  9/6  15/17  31/7
Counsel [3]    3/13  4/7  26/13
count [1]    26/2
counted [3]    29/10  29/13  29/13
countless [1]    21/2
country [4]    12/14  12/15  15/23  22/25
couple [1]    12/8
course [1]    4/11
court [48]
Court's [9]    6/2  10/3  13/22  14/9  15/6  22/11  23/9
23/25  25/17
courthouse [1]    27/17
courtroom [1]    27/13
courts [2]    23/22  23/22
criminals [1]    12/16
CRR [1]    31/16
current [2]    6/12  29/23
cursory [1]    17/10
custody [6]    4/25  5/1  8/21  15/22  17/3  18/23
cut [1]    17/21
cv [1]    1/6

## D

daily [3]    10/23  10/23  26/1
date [2]    5/2  10/21
Dated [1]    31/12
dates [1]    24/9
day [8]    5/14  6/19  6/19  17/12  19/8  23/18  27/9  31/12
daylight [1]    21/18
DC [2]    1/19  2/4
deadline [1]    19/18
decide [2]    21/6  25/3
decision [2]    18/5  26/20
deck [1]    27/14
declaration [2]    15/6  15/14
declare [1]    5/20
defendant [2]    1/8  29/13
defendants [11]    2/1  8/1  11/8  11/10  13/17  14/17
18/21  21/6  29/11  29/21  30/2
defense [3]    7/2  8/25  24/10
defer [1]    29/25
define [2]    8/15  20/10
definition [1]    17/14
delay [3]    19/17  27/25  29/15
delaying [1]    22/1
demonstrates [1]    17/10
DEPARTMENT [2]    2/3  4/1
dependent [1]    18/17
deponent [1]    27/6
deponents [3]    25/21  25/23  27/4
deposition [5]    5/17  24/7  25/15  25/7  25/7
depositions [8]    24/8  25/11  25/12  26/9  27/16  27/18
27/22  29/19
DEPUTY [1]    2/2

designated [1]
detained [6] 1/15/25
detention [1] 3/11
determination [1] 12/2
determine [4] 7/13 22/2 25/10 26/23
developed [1] 19/13
DHS [7] 2/6 4/3 5/12 5/18 15/22 15/22 26/13
different [2] 19/1 19/6
difficult [3] 20/17 20/17 20/19
direct [4] 5/19 12/23 19/22 21/15
directed [1] 22/18
directive [8] 8/5 9/12 10/11 11/18 18/13 19/2 19/4 19/5
directly [1] 28/14
disagree [7] 9/3 9/25 17/7 17/7 20/16 22/5 23/10
discoverable [1] 23/23
discovery [20] 7/4 7/13 13/7 15/1 17/6 18/3 20/1 20/4 20/5 21/4 23/6 23/12 23/18 23/24 24/3 24/19 25/2 28/6 28/16 28/21
discussed [1] 11/6
dispute [7] 17/5 23/23 24/15 24/19 24/25 25/2 25/7
district [9] 1/1 1/1 1/11 3/3 3/4 14/22 23/22 31/5 31/5
DIVISION [2] 1/2 2/3
do [29] 4/18 5/11 7/12 7/17 9/2 10/20 12/3 12/6 13/12 14/2 14/2 14/6 14/13 14/23 14/25 16/4 17/21 20/3 21/9 22/18 22/20 23/3 23/22 24/3 24/12 26/6 26/18 27/19 31/6
Docket [1] 1/6
documents [4] 5/22 24/5 24/12 29/3
doing [3] 21/11 21/17 21/19
DOJ [1] 2/6
domestic [4] 9/5 9/20 10/18 13/2
domestically [1] 17/22
DOS [1] 5/19
DREW [2] 2/2 3/23
dry [1] 17/21
due [1] 6/9
duty [1] 24/18

**E**

each [2] 29/10 29/13
earlier [1] 19/15
ECF [2] 4/9 9/17
either [4] 4/19 5/23 15/23 19/17
El [12] 5/1 5/1 8/22 8/23 12/10 13/24 14/8 14/12 16/1 18/23 18/25 22/20
El Salvador [5] 5/1 5/1 8/22 13/24 14/12
else [2] 4/2 28/3
EMANUEL [2] 1/18 3/19
Embassy [1] 16/25
end [5] 8/24 17/12 19/3 19/8 23/18
engage [2] 6/21 24/21
ENSIGN [7] 2/2 3/23 4/13 7/10 11/24 25/7 28/3
ensure [4] 8/22 13/21 13/22 18/23
enter [1] 24/22
entitled [1] 31/9
entry [2] 15/21 16/24
Ernest [1] 2/6
Ernesto [1] 4/1
ESQUIRE [7] 1/14 1/14 1/17 2/2 2/6 2/6 2/7
established [8] 6/14 7/20 10/17
et [4] 1/4 1/7 3/11 3/11
ether [1] 18/19
even [4] 5/4 10/18 18/10 24/17
ever [1] 22/22
every [1] 6/18
everybody [1] 14/24
everyone [5] 3/6 4/20 6/11 23/20 25/4
everything [2] 14/16 16/5
evidence [6] 5/2 5/6 5/16 10/20 12/5 15/7
exceed [1] 22/23
excuse [2] 15/8 28/11
Executive [1] 21/15
exercised [1] 5/7
exhaustive [2] 19/2 19/8
existing [1] 26/23
expand [1] 19/16
expands [1] 17/14
expect [2] 24/12 27/13
expedited [6] 7/4 7/13 19/19 19/19 24/3 24/23
expeditiously [4] 26/22 27/24 28/1 28/22
expeditiousness [1] 6/17
explains [1] 24/23
explore [1] 26/7
extent [1] 26/21
extremely [1] 6/6

**F**

F.3d [1] 18/5
face [1] 17/9
facilitate [2]
fact [5] 6/18 17/24 23/6 25/6 26/7
factors [1] 6/13
facts [6] 17/24 19/12 19/13 19/24 20/2 20/18
factual [3] 10/20 20/1 21/5
fair [4] 9/15 10/6 12/4 13/8
Fairfax [1] 1/16
fairness [1] 11/24
faith [9] 7/17 7/17 21/6 21/7 22/4 24/12 24/16 24/21 25/4
family [1] 3/17
far [2] 9/3 21/7
fast [1] 6/5
favorable [1] 20/19
Federal [5] 14/14 15/7 23/21 31/4 31/17
filed [3] 4/8 7/25 22/7
final [1] 17/15
find [3] 7/12 24/2 24/3
finding [1] 13/10
findings [1] 7/12

first [5]
flesh [1]
fleeting [1]
fleshed [1]
flies [1] 17/8
flight [1] 18/8
focusing [1] 19/12
follow [3] 12/2 14/21 24/13
following [1] 8/20
fond [1] 12/13
foregoing [1] 31/7
foreign [3] 5/11 15/25 21/16
forewarned [1] 8/24
formal [1] 23/24
format [1] 31/9
forth [2] 15/7 16/23
forward [1] 28/21
found [1] 20/22
four [3] 6/13 19/24 25/24
Fourth [3] 6/14 18/4 18/6
frankly [1] 13/6
front [1] 26/22
fulfill [1] 22/3
fulfilled [1] 23/4
full [2] 10/9 13/8
fully [1] 5/13
funding [1] 18/7
further [4] 6/19 9/1 9/4 28/23

**G**

gamesmanship [1] 6/25
GANDHI [3] 1/14 3/14 28/19
GARCIA [14] 1/4 3/11 5/20 6/12 6/19 8/2 9/19 12/12 12/19 15/20 16/3 16/13 16/24 22/12
Garcia's [4] 4/25 5/4 5/8 8/21 13/18 13/21
gas [1] 19/10
gave [1] 13/15
GENERAL [3] 2/2 14/11 26/13
generalities [2] 22/1 22/6
generally [1] 5/18
getting [1] 20/18
give [13] 4/5 4/14 6/9 6/23 18/14 20/1 21/5 21/8 22/10 23/16 23/17 24/6 29/21
go [6] 12/16 12/16 13/11 15/1 22/2 27/18
goes [2] 10/17 21/7
going [40]
good [34] 3/6 3/20 3/23 3/25 7/17 21/6 21/7 22/4 24/12 24/16 24/21 25/4 27/12 29/20
good-faith [2] 24/16 24/21
got [5] 10/16 11/12 11/12 11/21 12/10
gotten [4] 10/24 11/21 11/22 13/25
government [13] 4/24 5/3 5/4 5/7 5/9 5/20 5/25 8/20 8/25 14/8 18/22 19/6 22/11
government's [1] 22/19
grandstanding [1] 6/25
GREENBELT [1] 1/2
ground [1] 23/8
guess [1] 19/14
guidance [1] 28/15

**H**

hand [1] 7/18
handle [1] 27/24
handled [3] 8/22 13/23 18/24
hands [1] 27/13
happened [2] 11/13 12/5
happens [1] 26/19
hard [1] 4/19
harm [1] 6/20
hasn't [1] 22/18
heads [1] 11/5
hear [6] 4/13 4/19 4/20 7/2 7/20 28/11
heard [4] 18/15 20/3 23/16 28/3
hearing [1] 7/11
held [1] 31/8
help [3] 16/11 28/9 29/16
hemisphere [1] 12/15
hereby [1] 31/6
high [1] 11/19
highest [2] 11/3 12/9
him [8] 11/11 14/12 15/22 15/23 16/1 22/20 26/19 26/24
his [12] 3/16 5/1 5/5 6/12 8/22 12/10 13/22 14/11 15/24 15/24 16/25 18/23
hold [2] 25/2 29/25
Honor [39]
HONORABLE [3] 1/10 3/5 30/7
hopefully [1] 20/10
HORTON [2] 1/17 3/18
hours [2] 14/25 27/19
house [1] 12/3
huh [1] 14/5
hypothetical [1] 16/18

**I**

I'll [19] 4/12 4/14 7/2 7/2 12/2 14/24 15/2 15/3 18/14 21/25 22/22 23/16 23/17 23/18 23/25 24/2 24/6 25/15 25/17
I'm [35]
I've [31] 9/3 10/23 10/24 11/12 11/21 11/21 13/25 21/20 22/3 23/5 26/1
ICE [7] 8/4 9/10 9/12 10/11 19/2 19/4 19/5
identify [1] 3/13
III [1] 21/14
ill [1] 3/17
ill-timed [1] 3/17
illustrative [1] 19/2
imagine [2] 12/24 26/8
immigration [7] 5/14 8/4 10/13 16/7 16/22 17/11 17/19
impede [1] 9/21
impediment [1] 25/20

ingredients [1]
impin- [1]
impliedly [1]
importance [1]
important [5] 6/6 14/7 14/8 24/24 26/6
improperly [3] 8/23 13/23 18/25
include [2] 11/15 18/7
including [1] 10/9
inconsistent [2] 8/16 9/3
Indeed [1] 9/21
indicated [1] 28/8
individual [1] 17/20
individuals [1] 10/23
infirmities [1] 12/20
information [1] 10/24
initial [2] 26/2 28/21
injunction [3] 4/24 20/12 20/12
injunctive [1] 6/13
inquiry [2] 16/5 29/15
instructs [1] 5/12
insufficient [1] 23/7
intend [2] 7/15 28/21
intense [1] 15/1
international [1] 5/13
interpretive [1] 17/4
interrogatories [7] 5/22 14/17 20/9 24/4 24/11 29/3 29/9
interrogatory [2] 29/11 29/12
irreparable [1] 6/20
is [104]
isn't [1] 27/25
issue [15] 7/11 11/3 11/6 12/9 17/13 19/15 20/11 23/18 24/2 24/4 25/15 26/9 27/4 27/6 27/14
issued [3] 17/15 22/3 23/5
issues [4] 25/25 26/6 26/24 27/23
itself [2] 25/6 27/7

**J**

Jennifer [1] 2/5
job [1] 5/14
Joseph [2] 2/6 4/3
JUDGE [1] 1/11
judges [1] 14/23
Judicial [1] 31/10
Judiciary [1] 21/14
juncture [1] 26/12
jurisdictional [1] 20/23
JUSTICE [2] 2/3 4/1
justification [1] 11/22
justified [1] 23/8
justify [1] 12/1

**K**

keep [7] 19/12 20/15 21/18 23/2 29/15 29/16 29/16
KILMAR [2] 1/4 3/10
kit [1] 19/4
knowledge [5] 10/24 14/16 19/25 25/25 26/4
knows [1] 6/11
KRISTI [2] 1/7 3/11

**L**

laid [1] 23/14
language [1] 16/12
last [2] 4/7 4/14
later [1] 30/1
law [16] 9/8 10/13 10/17 12/19 12/21 16/8 16/22 17/19 18/3 18/20 19/4 20/2 21/7 23/24 23/12 24/20
lawful [1] 20/22
laws [1] 22/25
lawyers [2] 24/17 24/18
least [3] 19/17 20/1 22/11
leave [2] 27/1 29/19
Leeper [3] 31/4 31/15 31/16
legal [4] 11/22 21/24 27/2 28/7
legitimate [2] 7/18 11/22
letter [3] 24/22 24/25 25/1
level [2] 5/10 5/13
levels [1] 11/4
likely [1] 4/14
limited [1] 9/4
line [2] 10/2 11/18
little [2] 8/8 10/24
LLP [1] 1/18
look [3] 15/11 23/18 24/10
lost [1] 20/25
lot [1] 21/10
low [1] 5/10
low-level [1] 5/10

**M**

made [7] 16/10 18/18 20/23 20/23 20/24 21/13 26/20
make [12] 9/15 12/2 13/10 14/20 17/11 20/17 21/15 21/22 21/23 24/7 26/12 26/21
makes [2] 15/8 20/8
making [1] 18/8
mandate [1] 23/4
manner [4] 19/19 20/4 25/14 27/22
manual [2] 5/12 9/10
MARYLAND [3] 1/1 3/4 31/6
matter [7] 3/9 3/11 10/20 17/15 18/20 18/20 31/9
maximize [1] 27/23
may [6] 4/16 14/4 15/6 20/8 20/18 26/7
maybe [1] 27/21
Mazzara [4] 2/6 4/4 15/16 15/19
McGuire [2] 2/7 4/4
mean [4] 7/15 10/19 11/15 19/9
meaning [9] 8/3 10/14 10/15 10/17 16/7 17/9 17/18 18/2 22/10
means [9] 6/17 16/21 17/5 19/7 19/16 23/11 24/17 25/19 28/9
meant [1] 10/8
meet [2] 24/16 24/21

**membership [1]** 15/22
**merits [1]** 20/15
**microphone [1]** 4/20
**might [3]** 26/14 28/8 28/9
**milestone [1]** 24/9
**mind [1]** 20/13
**mine [1]** 13/22
**minimum [1]** 25/24
**minute [1]** 4/6
**minutes [1]** 13/15
**misguided [1]** 13/5
**Molina [2]** 2/6 4/1
**moment [1]** 9/15
**Monday [1]** 30/1
**more [1]** 24/25
**Moshenberg [1]** 3/16
**most [1]** 12/4
**motion [8]** 4/8 4/12 4/15 6/5 6/6 8/12 8/14 29/24
**move [8]** 4/20 6/24 11/23 13/8 14/15 28/1 28/21
29/19
**moving [2]** 6/5 29/16
**Mr. [23]** 3/8 4/13 4/25 5/4 5/8 5/20 6/12 6/19 7/10
8/21 11/24 12/12 12/19 13/18 15/16 15/19 15/20
16/3 16/13 16/24 25/7 26/1 28/3
**Mr. Abrego [11]** 4/25 5/8 5/20 6/12 6/19 8/21 12/19
13/18 15/20 16/13 16/24
**Mr. Abrego Garcia [2]** 12/12 16/3
**Mr. Abrego Garcia's [1]** 5/4
**Mr. Cerna [1]** 26/1
**Mr. Ensign [5]** 4/13 7/10 11/24 25/7 28/3
**Mr. Mazzara [2]** 15/16 15/19
**Mr. Ulander [1]** 3/8
**Ms [2]** 3/21 15/25
**MS-13 [1]** 15/25
**Ms. [2]** 3/20 28/19
**Ms. Gandhi [1]** 28/19
**Ms. Vazquez [1]** 3/20
**much [2]** 3/22 21/18
**murder [2]** 12/14 12/17
**MURRAY [2]** 1/15 3/15
**myself [1]** 5/14

**N**

**name [1]** 3/25
**narrow [2]** 17/4 20/7
**nature [1]** 27/3
**necessarily [3]** 18/7 18/12 19/9
**necessary [1]** 17/6
**need [11]** 5/16 5/19 10/20 11/23 17/24 19/13 21/5
26/14 27/15 27/19 29/14
**needs [1]** 20/8
**never [1]** 11/8
**next [2]** 11/23 23/25
**night [1]** 13/6
**no [22]** 5/2 5/6 6/24 7/23 9/22 11/12 11/12 11/21
13/3 13/14 14/15 14/24 16/15 16/16 18/12 24/25
25/15 25/19 25/19 25/23 28/23 30/1
**NOEM [2]** 1/7 3/11
**nonresponsive [1]** 12/18
**not [65]**
**Note [1]** 18/5
**NOTES [1]** 1/25
**nothing [6]** 10/21 10/22 11/21 13/25 19/22 21/20
**notice [2]** 24/6 25/11
**noticing [1]** 29/4
**notion [1]** 11/13
**number [3]** 1/6 3/10 24/4
**NW [2]** 1/18 2/3

**O**

**oath [1]** 14/16
**objection [1]** 28/15
**objections [7]** 7/18 7/19 7/20 14/19 24/13 24/14
26/12
**obstacles [4]** 9/5 9/20 10/18 17/22
**obviously [3]** 6/5 7/16 24/10
**occur [1]** 24/3
**odd [1]** 27/19
**off [1]** 7/10
**Office [2]** 11/4 11/14
**OFFICIAL [3]** 31/1 31/4 31/17
**Okay [29]** 3/20 3/22 4/5 4/15 7/9 7/24 8/14 9/2 9/8
9/14 12/18 14/13 14/14 15/16 15/19 16/2 16/20 17/2
20/22 21/4 22/9 25/6 25/19 28/2 28/11 28/18 28/24
29/15 30/4
**OLIVIA [2]** 1/17 3/18
**once [1]** 15/3
**one [13]** 4/5 4/7 8/15 9/24 13/12 13/19 19/21 24/24
26/13 28/8 29/10 29/12 29/13
**only [4]** 6/14 9/2 9/5 13/21
**operate [1]** 17/16
**operating [1]** 25/4
**operative [1]** 18/12
**opinion [1]** 9/13
**opportunity [5]** 18/15 21/8 24/6 24/10 29/21
**opposed [1]** 5/21
**order [27]** 3/2 7/14 8/16 10/3 10/5 12/1 13/19 14/9
17/13 17/15 18/21 19/15 19/22 20/12 21/21 22/3
22/7 22/11 22/15 23/5 23/14 23/19 23/20 24/2 24/23
28/13 29/8
**ordering [1]** 22/20
**orderly [1]** 19/19
**orders [3]** 6/2 7/14 7/15
**ordinary [3]** 4/11 6/8 6/8
**organization [1]** 15/25
**OSORIO [2]** 1/15 3/15
**other [10]** 4/8 9/22 13/12 13/20 19/9 19/10 27/12
29/12 29/25 30/4
**otherwise [2]** 9/21 17/10
**out [6]** 10/16 23/6 23/14 24/19 25/14 28/8
**outside [2]** 5/10 17/20

**Oval [2]** 11/4 11/10
**over [1]** 5/23

**P**

**p.m [3]** 1/11 29/5 30/9
**page [6]** 9/12 9/17 10/9 10/16 22/7 31/9
**pages [1]** 24/25
**papers [1]** 28/14
**paragraph [6]** 5/12 10/1 10/9 15/13 16/4 16/23
**parameters [1]** 17/16
**parenthetical [1]** 10/11
**part [1]** 26/2
**particular [2]** 11/3 21/15
**passing [1]** 13/5
**PAULA [5]** 1/10 3/5 31/4 31/15 31/16
**penalties [1]** 14/18
**pending [2]** 3/9 19/17
**Pennsylvania [1]** 2/3
**people [1]** 25/24
**perhaps [1]** 20/9
**period [1]** 27/10
**perjury [1]** 14/18
**personal [4]** 10/24 19/25 25/25 26/4
**persons [1]** 14/16
**plain [3]** 16/12 17/9 17/18
**plaintiff [14]** 1/5 1/13 2/5 3/14 4/8 6/7 11/10
18/14 21/3 21/22 24/5 24/6 25/10 27/5
**plaintiffs [12]** 4/12 4/14 7/6 11/25 15/1 12/6
22/15 22/17 23/21 26/7 28/4 29/24
**plaintiffs' [1]** 8/12
**plan [2]** 14/2 28/21
**plane [1]** 19/10
**pleading [2]** 9/6 10/16
**pleadings [2]** 17/12 21/3
**please [1]** 3/13
**point [5]** 5/16 15/11 18/4 19/15 28/8
**policy [5]** 5/11 5/12 8/5 9/10 9/12 10/11
**port [2]** 15/21 16/24
**position [7]** 12/11 14/8 15/6 22/19 23/9 23/13
25/18
**positions [2]** 19/6 25/1
**possible [4]** 11/4 26/22 27/24 30/3
**posture [1]** 21/19
**power [1]** 23/3
**powers [1]** 22/14
**practice [1]** 17/19
**predicate [2]** 20/1 21/5
**prepared [6]** 8/1 8/24 9/11 17/13 23/14 26/11
**present [4]** 2/5 4/14 15/20 26/14
**presented [2]** 16/14 28/7
**presenting [1]** 27/6
**presents [1]** 16/24
**preserved [1]** 28/16
**President [2]** 11/5 11/6
**presiding [1]** 3/5
**press [1]** 14/15
**pretty [1]** 27/12
**principally [1]** 23/22
**principals [1]** 22/14
**prior [1]** 17/10
**privilege [7]** 12/1 26/16 26/19 26/21 26/23 27/3
27/23
**probative [1]** 16/5
**problem [1]** 7/22
**Procedure [3]** 14/14 15/8 23/21
**proceed [1]** 7/13
**proceedings [2]** 30/9 31/8
**process [8]** 6/9 6/22 6/22 6/23 7/4 13/8 22/2 24/24
**producing [1]** 26/17
**production [5]** 5/22 24/5 24/11 29/3 29/10
**properly [3]** 4/24 8/20 18/22
**proposed [2]** 28/20
**propound [1]** 29/14
**propounded [1]** 29/11
**propounding [1]** 29/2
**prospect [1]** 9/1
**provide [1]** 5/25
**provided [1]** 8/5
**pull [1]** 15/9
**pure [3]** 18/3 18/20 23/12
**pursuant [4]** 5/18 14/14 23/24 31/6
**put [13]** 11/25 16/12 19/1 19/24 20/25 24/13 24/24
25/1 26/4 26/8 26/19 26/24 27/2
**Putting [1]** 5/9
**PX [1]** 1/4
**PX25 [1]** 3/10
**PX25-951 [1]** 3/10

**Q**

**question [13]** 11/7 11/8 11/19 11/23 12/20 13/17
18/3 19/11 23/10 23/12 25/7 26/24 29/8
**questions [6]** 11/25 13/15 14/1 26/6 26/21 30/4
**quickly [2]** 13/8 30/3
**QUINN [2]** 1/18 3/19
**quip [1]** 12/23
**quote [2]** 9/18 18/6

**R**

**raise [2]** 12/25 26/6
**raised [3]** 11/3 14/14 12/9
**Ramirez [1]** 18/5
**Ramirez v. Sessions [1]** 18/5
**RAND [2]** 1/14 3/18
**reach [1]** 10/10
**read [6]** 9/19 10/4 10/8 10/12 21/20 22/6
**reading [4]** 9/16 9/17 9/22 22/15
**reads [1]** 15/16
**ready [1]** 14/22
**real [2]** 11/21 12/20
**really [3]** 12/5 17/24 27/21
**recently [1]** 8/1
**record [10]** 3/13 5/2 6/18 7/20 10/21 13/9 13/10

**recorded [1]** 31/7
**Reference [4]** 5/3 28/7
**Reference [1]** 11/11
**reference [1]** 11/12
**refine [1]** 28/10
**reflects [1]** 11/2
**regard [6]** 10/21 19/6 19/13 25/7 26/4 28/15
**regrets [1]** 3/16
**regulations [1]** 31/10
**reject [3]** 8/17 8/18 23/14
**release [11]** 4/25 5/1 8/21 11/11 12/11 13/18 13/21
14/12 18/23 22/22 22/20
**releases [1]** 14/15
**releasing [3]** 12/13 12/13 12/16
**relevant [1]** 16/5
**relief [6]** 4/8 6/7 6/13 8/19 22/13 29/25
**remedy [5]** 6/16 21/1 21/2
**remind [1]** 14/24
**removal [1]** 15/24
**remove [5]** 9/20 15/23 16/1 16/22 17/22
**removed [2]** 16/24 17/20
**removing [3]** 9/5 10/18 13/2
**reply [3]** 4/9 22/7 23/11
**report [1]** 12/25
**reported [1]** 31/8
**reporter [4]** 11/7 31/1 31/4 31/17
**reports [2]** 4/10 10/23
**represent [2]** 8/1 15/20
**representatives [1]** 4/3
**represents [1]** 14/6
**request [2]** 22/12 29/10
**requested [1]** 5/5
**requests [10]** 5/22 21/15 21/22 21/23 24/5 24/11
28/22 29/3 29/9 29/25
**require [2]** 18/3 24/14
**required [3]** 4/24 8/20 22/11
**requires [2]** 18/22 23/23
**research [1]** 17/10
**resolution [1]** 24/22
**resolved [1]** 24/16
**respond [4]** 24/11 28/14 29/21 30/2
**responded [1]** 11/8
**response [8]** 4/9 8/12 9/2 9/17 11/13 11/21 12/23
28/2
**responses [1]** 17/25
**rest [1]** 16/17
**return [10]** 5/4 5/5 5/8 5/10 8/2 9/19 9/21 14/11
16/7 16/25
**returning [1]** 19/14
**review [1]** 24/23
**right [20]** 4/7 6/7 7/1 7/5 7/6 7/9 7/10 8/12 9/9
9/24 13/1 13/4 17/24 25/20 26/9 27/8 28/2 28/24
29/17 30/3
**rights [1]** 5/7
**RINA [2]** 1/14 3/14
**rise [2]** 3/3 30/7
**Road [1]** 1/15
**roots [1]** 6/22
**rough [1]** 23/17
**roughly [1]** 25/8
**routinely [1]** 5/10
**RPR [1]** 31/16
**rule [2]** 5/17 7/21
**ruled [1]** 4/23
**rules [10]** 12/2 13/7 14/14 14/20 14/21 15/8 23/21
23/24 24/13 24/14
**ruling [1]** 17/16

**S**

**safest [1]** 12/15
**Salvador [12]** 5/1 5/1 8/22 8/23 12/10 13/24 14/8
14/12 16/1 18/23 18/25 22/20
**same [4]** 6/21 14/15 24/18 29/14
**Sandoval [1]** 3/16
**Sandoval-Moshenberg [1]** 3/16
**SASCHA [2]** 1/14 3/18
**satisfactory [1]** 11/14
**satisfies [1]** 16/7
**saw [1]** 4/7
**saying [4]** 13/12 20/15 21/18 27/15
**scope [9]** 6/16 8/19 11/25 20/3 20/10 21/1 21/1
27/23 28/10
**seat [1]** 3/7
**second [3]** 10/9 16/16 18/4
**secure [1]** 5/6
**see [4]** 3/20 13/9 24/18 25/20
**seeing [1]** 20/7
**seek [1]** 19/18
**seeks [1]** 5/10
**seen [1]** 5/15
**sends [1]** 3/16
**sense [1]** 20/8
**sent [3]** 8/23 13/24 18/25
**separation [1]** 22/14
**session [1]** 3/4
**Sessions [1]** 18/5
**set [2]** 16/23 26/12
**sets [1]** 15/7
**seven [2]** 10/16 27/9
**seven-day [1]** 27/9
**seven-page [1]** 10/16
**several [2]** 14/4 19/5
**shall [1]** 27/4
**share [2]** 7/3 8/25
**ships [1]** 13/5
**shore [1]** 14/21
**show [2]** 7/11 21/25
**showing [2]** 24/7 29/20
**shows [1]** 10/21
**side [1]** 16/2
**sides [5]** 6/6 6/22 23/17 24/18 25/1
**signed [1]** 14/17
**significant [1]** 11/2

Simon [1]  3/1
simple [2]  11/25 26/5
simply [1]  22/1
since [4]  4/7 4/14 12/24 22/24
sit [2]  4/19 27/14
six [1]  29/13
sizing [1]  6/7
slip [1]  9/13
smuggling [2]  12/23 13/3
so [56]
somehow [3]  4/20 8/15 21/23
someone [1]  12/24
sorry [1]  3/21
sort [2]  7/5 7/18
Sotomayor [2]  9/11 10/10
sounds [1]  6/7
sovereigns [1]  21/16
specific [1]  18/17
specifically [8]  5/12 7/13 9/12 11/6 12/9 12/12
  22/13 28/8
specificity [1]  24/14
speculative [1]  16/18
spoken [2]  19/20 20/20
squarely [5]  8/17 8/18 11/19 13/19 23/3
stands [1]  30/8
start [1]  20/21
starting [2]  20/7 20/9
State [1]  11/5
statement [1]  14/10
statements [1]  28/23
STATES [14]  1/1 1/11 3/3 3/24 5/11 8/2 12/24 15/23
  16/3 17/1 17/20 18/8 31/5 31/11
status [4]  1/10 3/12 4/10 12/25
stay [1]  19/17
stenographically [1]  31/8
stenographically-reported [1]  31/8
STENOTYPED [1]  1/25
step [3]  11/23 14/7 14/9
steps [11]  5/17 5/25 9/1 9/1 9/18 9/20 11/2 11/8
  16/11 18/10 19/11
stop [1]  16/16
story [1]  19/3
Street [1]  1/18
strikes [1]  27/18
stunning [1]  22/19
subject [1]  15/21
subjects [1]  25/22
submitted [1]  11/2
such [1]  18/10
sufficient [1]  19/18
suggest [1]  4/19
suggests [1]  10/17
Suite [2]  1/15 1/19
SULLIVAN [1]  1/18
supervisors [1]  5/13
supplement [2]  29/24 30/1
supporting [1]  10/12
suppose [1]  27/2
supposed [1]  11/16
Supreme [22]  4/23 6/2 6/15 8/5 8/16 8/18 8/24 9/11
  10/3 10/5 13/19 13/22 17/17 18/18 18/21 19/20
  19/21 20/20 20/21 21/20 22/10 23/3
Sura [1]  2/5
surrounding [1]  19/5
sworn [1]  14/16

T

table [2]  4/17 7/10
taken [8]  5/17 9/1 9/3 11/9 16/11 17/3 19/6 23/24
taking [3]  5/10 9/18 9/19
talk [5]  6/16 6/25 8/8 10/3 22/1
talking [2]  20/20 27/21
target [1]  29/23
targeted [5]  15/1 19/25 20/7 21/10 29/16
teammate [1]  3/24
teed [1]  23/11
tell [5]  10/1 14/2 14/2 15/2 15/2
telling [1]  25/23
tenable [1]  9/22
term [2]  10/13 17/18
terminate [1]  15/24
terms [2]  23/20 27/2
terribly [2]  10/16 20/19
terrorist [1]  15/25
terrorists [1]  12/13
testimony [1]  14/16
thanks [1]  4/22
themselves [4]  22/6 22/15 23/11 24/19
therefore [1]  17/4
things [4]  12/8 14/4 27/3 27/12
think [21]  7/8 10/7 10/11 11/1 12/6 12/8 13/6 14/6
  14/7 16/5 17/4 17/25 18/12 20/6 20/9 20/16 20/17
  21/23 23/10 28/6 28/9
thinking [1]  6/12
third [1]  15/23
Thomas [1]  2/7
though [1]  24/24
thoughts [1]  17/23
three [3]  17/25 24/25 26/3
through [1]  22/2
thus [1]  9/19
tight [2]  28/25 29/16
time [11]  4/7 5/15 5/15 6/21 19/18 21/11 25/8
  27/13 29/14 29/18 30/5
timed [1]  3/17
timeline [1]  28/25
times [1]  21/3
today [7]  6/16 7/11 7/11 12/25 15/7 15/17 22/7
told [1]  26/3
tolerance [1]  6/24
Tom [1]  4/4

tool [1]  14/11
tools [1]  14/14
town [1]  28/20
traffickers [1]  11/24 11/25
we'10 31/7 31/9
TRANSCRIPTION [1]  1/25
travel [1]  18/7
trial [1]  12/21
true [2]  14/18 31/7
Trump [1]  11/5
try [1]  24/19
TUESDAY [1]  1/11
turn [5]  4/11 10/10 23/12 28/4 30/2
turnaround [1]  25/8
turned [1]  12/14
two [10]  11/5 13/5 14/25 19/25 23/25 24/4 24/8
  24/17 25/5 29/19

U

U.S [2]  16/22 16/25
U.S.C [1]  31/6
Uh [1]  14/5
Uh-huh [1]  14/5
Ulander [1]  3/8
unambiguously [1]  5/5
under [8]  5/7 5/16 5/16 8/3 14/16 14/18 16/21
  16/23
under-oath [1]  14/16
understand [7]  6/4 15/5 20/13 21/13 23/9 23/13
  25/17
understood [3]  10/14 10/15 18/13
unequivocally [1]  20/21
UNITED [14]  1/1 1/11 3/3 3/24 5/11 8/2 12/24 15/23
  16/3 16/25 17/20 18/8 31/5 31/11
unless [2]  20/3 30/4
unnecessary [1]  27/25
until [1]  17/15
up [12]  14/21 15/9 19/10 19/24 21/22 23/11 24/7
  26/8 26/19 26/24 29/19
updates [1]  26/1
upon [1]  19/16
URQUHART [1]  1/18
usually [1]  27/12
utmost [1]  6/17

V

v. [1]  18/5
VA [1]  1/16
vacation [2]  3/17 27/11
value [1]  10/25
Vasquez [1]  2/5
Vazquez [2]  3/20 3/21
venue [1]  20/24
very [11]  3/22 10/24 11/18 13/5 13/8 14/1 17/4
  18/18 19/19 21/13 26/6
via [1]  18/7
view [5]  17/14 19/22 20/14 23/4 25/4
vs [1]  1/6

W

waiver [1]  26/19
want [10]  9/15 10/2 12/15 15/11 16/4 16/12 20/3
  20/17 25/10 25/14
wants [2]  5/20 20/11
warrant [2]  13/3 13/7
warranted [2]  24/3 29/22
was [15]  6/14 8/5 10/12 10/15 11/3 11/4 11/6 11/18
  12/9 13/17 13/18 14/8 21/2 26/2 26/20
Washington [2]  1/19 2/4
waving [1]  7/18
way [8]  13/7 13/7 13/12 14/15 19/1 21/10 24/18
  28/8
we'll [3]  6/25 10/3 15/3
Wednesday [4]  25/9 25/9 25/12 29/4
week [1]  25/16
weekends [1]  27/20
weeks [5]  14/25 19/25 24/1 24/4 25/5
weigh [1]  7/3
well [13]  7/2 7/8 7/12 10/14 10/15 10/15 10/17
  19/14 21/12 22/17 26/18 27/11 29/4
well-established [1]  10/17
well-understood [2]  10/14 10/15
western [1]  12/15
whatever [2]  12/22 16/11
wheelhouse [1]  18/15
whether [11]  5/6 7/14 7/15 12/11 18/20 23/6 23/7
  25/10 26/23 27/16 29/22
while [3]  6/17 14/25 15/9
whole [2]  10/8 21/10
whom [1]  26/3
wide [1]  15/1
willing [1]  14/22
window [1]  29/18
Winter [1]  6/13
wish [7]  12/22 20/3 23/16 24/8 26/7 28/3 29/4
wishes [1]  27/5
withholding [1]  15/24
within [10]  7/8 7/12 8/4 8/4 10/13 11/25 13/19
  16/7 17/16 23/3
won [1]  6/12
won't [1]  27/14
word [6]  4/14 17/5 17/8 17/9 18/2 18/12
words [2]  13/22 29/12
work [4]  21/25 23/21 24/19 25/14
world [2]  12/14 12/17
writing [1]  8/18
written [5]  23/14 24/2 28/13 28/15 29/8
wrongfully [1]  17/20

X

XINIS [2]  1/10 3/5

Yeah [1]  12/12
years [4]  12/12
Yep [2]  28/11 28/11
Yes [11]  4/22 8/7 8/10 8/13 9/7 15/12 15/15 15/18
  26/17 29/1 29/6
yesterday [3]  11/4 12/5 12/7
yet [4]  12/6 22/21 23/1 23/4
you'll [6]  12/1 12/1 12/2 21/25 24/12 25/11
yourselves [1]  3/13

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| KILMAR ARMANDO ABREGO GARCIA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, Secretary of Homeland Security, *et al.*, <br><br> Defendants. | No. 8:25-cv-00951-PX <br><br><br> Declaration Of Joseph N. Mazzara |

**DECLARATION OF JOSEPH N. MAZZARA**

I, Joseph N. Mazzara, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      Please refer to my prior declarations for the foundation of my personal knowledge, *Abrego Garcia v. Noem*, No. 8:25-cv-00951-PX (D. Md. Apr. 13, 2025), ECF No. 74 ¶¶ 2, 4–6; ECF No. 77 ¶¶ 2, 4–6.

2.      Given the government's prior clear and unequivocal notice to the Court regarding how the government will facilitate Abrego Garcia's return within the contours of existing law and regulation, there are no further updates.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of April 2025.

Joseph N. Mazzara
Acting General Counsel
U.S. Department of Homeland Security

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

KILMAR ARMANDO ABREGO
GARCIA, *et al.*,

  Plaintiffs,

v.

KRISTI NOEM, Secretary of Homeland
Security, *et al.*,

  Defendants.

No. 8:25-cv-00951-PX

Declaration Of Joseph N. Mazzara

## DECLARATION OF JOSEPH N. MAZZARA

I, Joseph N. Mazzara, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am the Acting General Counsel at the Department of Homeland Security.

2.      I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from other Department of Homeland Security (DHS) employees.

3.      I am aware that the instant lawsuit has been filed regarding the removal of Kilmer Armando Abrego Garcia (Abrego Garcia) to El Salvador.

4.      On March 15, 2025, Abrego Garcia, a native and citizen of El Salvador, was removed to El Salvador, pursuant to Title 8 of the United States Code. *See* Declaration of Evan C. Katz, *Abrego Garcia v. Noem*, No. 8:25-cv-00951-PX (D. Md. Apr. 13, 2025), ECF No. 64 ¶ 4.

5.      During bond proceedings in 2019, an Immigration Judge upheld DHS's decision not to grant bond, finding that DHS's determination that he was a member of MS-13 was "trustworthy" and "supported by other evidence," and noted that Abrego Garcia "failed to present evidence to rebut that assertion." The Board of Immigration Appeals upheld the finding when

Abrego Garcia appealed. *See* Declaration of Evan C. Katz, *Abrego Garcia v. Noem*, No. 8:25-cv-00951-PX (D. Md. Apr. 13, 2025), ECF No. 64 ¶ 6.

6.     Abrego Garcia was ordered removed by an Immigration Judge. He was also granted withholding of removal by an Immigration Judge. Abrego Garcia is no longer eligible for withholding of removal because of his membership in MS-13, which is now a designated foreign terrorist organization. *See* Declaration of Evan C. Katz, *Abrego Garcia v. Noem*, No. 8:25-cv-00951-PX (D. Md. Apr. 13, 2025), ECF No. 64 ¶ 7.

7.     Abrego Garcia is being held in the sovereign, domestic custody of the independent nation of El Salvador. DHS does not have authority to forcibly extract an alien from the domestic custody of a foreign sovereign nation.

8.     DHS has established processes for taking steps to remove domestic obstacles that would otherwise prevent an alien from lawfully entering the United States. I have been authorized to represent that DHS is prepared to facilitate Abrego Garcia's presence in the United States in accordance with those processes if he presents at a port of entry.

9.     I have been authorized to represent that if Abrego Garcia does present at a port of entry, he would become subject to detention by DHS. In that case, DHS would take him into custody in the United States and either remove him to a third country or terminate his withholding of removal because of his membership in MS-13, a designated foreign terrorist organization, and remove him to El Salvador.

10.     I am aware that the President of El Salvador, Nayib Bukele, was in Washington, D.C. yesterday to meet with President Donald Trump. President Bukele and President Trump held a bilateral summit at the White House yesterday.

11.     What I understand to be the unofficial transcript of the meeting is attached to this declaration, with the relevant discussion beginning at the 16:34 timestamp.  The transcript can also be found here: https://www.rev.com/transcripts/trump-meets-with-the-president-of-el-salvador.


        I declare under penalty of perjury that the foregoing is true and correct.


Executed this 15th day of April 2025.

Joseph N. Mazzara
Acting General Counsel
U.S. Department of Homeland Security

# Attachment 1

Donald Trump (00:00):
Well, thank you very much. It's an honor to have a friend of mine because we went through this together and got along very well for my entire period of time. So I knew him as a very young man. Now, he's just a young man and he's done a fantastic job. Mr. President, it's an honor to have you.

Nayib Bukele (00:23):
Thank you.

Donald Trump (00:24):
You're doing incredibly for your country, and we appreciate working with you because you want to stop crime and so do we, and it's very, very effective. And I want to just say hello to the people of El Salvador and say they have one hell of a president. And I mean that, and I know him well. I know him as a very young man, Marco, even younger than you. You know, he started pretty young.

Marco Rubio (00:52):
I'll always be younger.

Donald Trump (00:54):
Young at heart. But I want to thank you for the great job you're doing. I appreciate it.

Nayib Bukele (01:00):
Thank you. Well, it's an honor to be here in the Oval Office with the president and leader of the free world. We're very happy and we're very eager to help. We know that you have a crime problem, a terrorism problem that you need help with, and we're a small country, but if we can help, we will do it. And we actually turned the murder capital of the world… That was the journalists call it, right? Murder capital of the world to the safest country in the the Western Hemisphere. And sometimes they say that we increase in thousands. I like to say that we actually liberated millions, so-

Donald Trump (01:44):
It's very good. Who gave him that line? Do you think I can use that?

Nayib Bukele (01:50):
Yes, you can use it.

Kristi Noem (01:51):
Yes.

Nayib Bukele (01:51):
And in fact, Mr. President, you have 350 million people to liberate. But to liberate 350 million people, you have to imprison some. That's the way it works, right? You cannot just free the criminals and think crimes are going to go down magically. You have to

1

imprison them, so you can liberate 350 million Americans that are asking for the end of crime and the end of terrorists. I mean, it can be done. I mean, you're doing it already. And I am sure that people have seen the change in the streets. A long way to go because you're just initiating your second term, but it's clear that with the numbers at the border, even in Democrat run cities, they get help from the work you're doing. So I'm really happy to be here, honored and eager to help.

Donald Trump (02:43):
Well, we had a terrible thing happen. We had an administration that allowed people to come in freely into our country from not only South America, but from all over the world. Many from the Congo and Africa, Asia, all over the world. Europe, rough parts of Europe. And they came from prisons and they came from mental institutions and they came from gangs and the gangs of Venezuela and other places, and hundreds of thousands, and even millions of them came. 21 million people altogether. But many of the people that came, just a tremendous percentage of them, were criminals. In some cases, violent criminals. We had 11,088 known murderers. Half of them murdered more than one person. This was allowed by a man who… What he did to our country is just unbelievable. So we're straightening it out. We're getting them out.
(03:41)
But what they did and what that party did to our country, open borders, anybody could come in. As soon as I heard that, I said, "Every prison's going to be emptied out into our country." That's what happened. And we're straightening it out. And we just had numbers. We had the highest recruiting numbers in the history of our country going into police departments. And a year ago, we had the lowest numbers. You couldn't hire a policeman.

Nayib Bukele (04:04):
Biggest change. From the lowest to the highest.

Donald Trump (04:06):
And the military now, Marines, the Army, air Force, Coast Guard, every slot is… I mean, we have the best numbers we've ever had. We call it recruitment numbers, and we've never had anything like it. We had records at every single level. But very important, the policemen. The policemen are joining forces now that we really were having a hard time with policemen because we weren't protecting our police. And we cherish our police. The police are great and the firemen and everybody else, but we have the highest numbers that we've ever had. The most enthusiasm, great enthusiasm, and on trade and other things we're doing great. We're taking in billions and billions of dollars. I gave them a little bit of a pause because you have to show a little flexibility. But we go back to what we have to do.
(05:02)
The markets have been very strong once they got used to it, but we were losing $2 billion a day. There's no company big like this. This is the biggest deal ever made. Now we're making $3 billion a day. We're a great country, but we had stupid people running this country, and I can say it, but what they've done to us at the border should never and can never be forgotten. It's a sin what they did, and you are helping us out, and we appreciate it.

2

Nayib Bukele (05:36):
Thanks. Thank you. Actually, what you're doing with the border is remarkable. It has dropped what? 95%? It's incredible.

Donald Trump (05:46):
As this morning, 99.1% to be exact.

Marco Rubio (05:51):
Why are those numbers not in the media?

Donald Trump (05:54):
Well, they get out with the fake news like CNN. CNN over here doesn't want to put them out because they don't like putting out good numbers. They only like putting out… because I think they hate our country, actually, but it's a shame. You're right. Isn't that a great question? Why doesn't the media… Why don't they put out numbers?

Nayib Bukele (06:11):
Yeah, I mean 99%. I mean, it's crazy, right?

Donald Trump (06:14):
We're doing a great-

Nayib Bukele (06:15):
It's a crazy turnaround.

Donald Trump (06:16):
Kristi, could you maybe say a couple of words about the border, how we do it?

Kristi Noem (06:20):
Yeah. It's just been absolutely phenomenal what a great leader can do. Clear direction. Our laws matter. We should only have people in our country that love us and the border patrol and our ICE officers and law enforcement officers have done fantastic work, so we're proud of them. Now we just need to get the criminals and murderers and rapists and dangerous gang members and terrorist organizations out of our country. So, Mr. President Bukele, we thank you very much for your partnership. It has been wonderful for us to be able to have somewhere to send the worst of the worst and someone to partner with. And we'd like to continue that partnership because it's been a powerful message of consequences. Mr. President, you wanted people to know that there was consequences if you break our laws and harm our people and endanger families, and this is a clear consequence for the worst of the worst that we have somewhere to put them.

Nayib Bukele (07:12):
Thank you very much. Yeah. We even had this gang member from Venezuela, from one of the ones you sent, and we interviewed him just to get some information, et cetera from them. And he said, "Oh, well, I got arrested six times, but they released me the six times,

3

so I should be released again." And then I said, "Well, what's the last thing you do?" And he said, "Well, I shot a cop in the leg, but I didn't kill him. I just shot him in the leg." And we're like, "This guy was arrested six times here in the United States. Six times. He was released five times. And the last time he was sent to El Salvador, so he's not getting a release." But the last time he shot a cop, actually, and he shot him in the leg. So these are-

Donald Trump (07:57):
[inaudible 00:08:00]

Nayib Bukele (07:59):
Yeah, there's something broken.

Donald Trump (08:02):
The Liberal establishment, but they're not running things anymore in this country. And we're run by, and I don't say conservative, I don't say anything. We're run by people with great common sense.

Nayib Bukele (08:13):
Yeah, common sense.

Donald Trump (08:14):
'Cause it's all common sense. It's not liberal conservative. It's common sense.

Nayib Bukele (08:17):
Exactly, yeah.

Donald Trump (08:19):
Do you allow men to play in women's sports? Do you allow men to box your women and boxing? 'Cause I know you have a lot of boxers.

Nayib Bukele (08:26):
That's violence.

Donald Trump (08:29):
That's abuse of a woman.

Nayib Bukele (08:31):
Violence against women.

Donald Trump (08:31):
It's abuse of a woman. But we have people that fight to the death because they think men should be able to play in women's sports. And some of those sports, it wouldn't matter much, but it still matters. But some of them are very dangerous for women.

Nayib Bukele (08:44):

4

Some years ago, like we said, a decade ago or so, women rights movements were pressuring so that we enact a specific laws to avoid men abusing women. And I think those laws were brave because there were a lot of men abusing women. But now some of the same people are trying to backtrack on that and actually trying to make new laws, allowing men to abuse women, women in sport. So actually that doesn't make sense.

Donald Trump (09:12):
We do it in sports.

Nayib Bukele (09:13):
It doesn't make sense.

Donald Trump (09:14):
It's crazy. They have weightlifting records, right?

Nayib Bukele (09:16):
Yeah.

Donald Trump (09:17):
A woman gets up this weight. She's incredible. A guy gets up and beats her by a hundred pounds. What are you going to do? A record that hadn't been broken in 18 years. They put on an ounce and an ounce, quarter of an ounce, eighth of an ounce for 18 years. Now they have a guy come up, ping. The whole thing is crazy. But they continue to fight. And I don't like talking about it because I want to save it for just before the next election. I said to my people, "Don't even talk about it because they'll change." But I watched this morning, there was a congressman fighting to the death for men to play against women in sports. And you say to yourself, "Why? What are they doing? What are they doing?" But your country's not too big on that.

Nayib Bukele (10:06):
No. No, of course not. We're big on protecting women.

Donald Trump (10:10):
That's a very important form of protection.

Nayib Bukele (10:13):
And as you can see, most of my cabinet are women.

Donald Trump (10:16):
That's impressive.

Nayib Bukele (10:17):
Yeah. Yeah.

Donald Trump (10:18):
That's why you bring them.

<div align="center">5</div>

Nayib Bukele (10:18):
And they're not DEI hires or anything, they're just great at what they do, right?

Donald Trump (10:23):
That's right. This is very impressive. This is a first. We've had women, but we've never had three of them right here.

Nayib Bukele (10:30):
Four and three men.

Donald Trump (10:32):
Look at what you have. Do you guys feel a little bit mistreated? That's great. I like it. We've been advanced. I've been very advanced in that regard too. We have, Pam and Sue's been so fantastic.

Nayib Bukele (10:47):
Yes, I know. It's her birthday.

Donald Trump (10:49):
Kristi, and the most powerful woman they see in my office.

Speaker 1 (10:51):
Exactly.

Donald Trump (10:53):
They're all afraid of Susie Wiles. They say, "Oh, she's tough." Most powerful woman in the world according to magazines. What do I know? But
(11:00)
Yeah. She probably is.

Donald Trump (11:00):
I think she probably is.

Nayib Bukele (11:00):
Yeah, she probably is.

Donald Trump (11:00):
Yeah, she probably is.

Nayib Bukele (11:04):
Congratulations.

Donald Trump (11:05):
And Stephen has done such a great job. We have great people-

6

Nayib Bukele (11:10):
Very famous staff.

Donald Trump (11:11):
… but we love working with [inaudible 00:11:13]. He really lets him have it, right.

Nayib Bukele (11:14):
Yeah, exactly.

Donald Trump (11:15):
There's no games.

Nayib Bukele (11:16):
No, no. Very good.

Donald Trump (11:17):
He knows. Do you have any questions, please?

REPORTERS (11:20):
President Trump?

Donald Trump (11:21):
Go ahead. Let's not start with CNN because they're so, they're just so-

REPORTERS (11:25):
Mr. President?

Donald Trump (11:25):
… wrong. Yeah, please.

REPORTERS (11:27):
Yeah. Thank you, Mr. President. You repeatedly mentioned last night that Russia's attack on Ukraine was a mistake. What is the exact mistake? And had you given Putin a deadline to actually move toward a ceasefire?

Donald Trump (11:39):
The mistake was letting the war happen. If Biden were competent, and if Zelenskyy were competent, and I don't know that he is. We had a rough session with this guy over here. He just kept asking for more and more. That war should have never been allowed to happen. That war… I went four years and Putin wouldn't even bring it up. And as soon as the election was rigged and I wasn't here, that war started. There was no way that war should have been allowed to happen. And Biden should have stopped it.
(12:09)
And you take a look at Putin, I'm not saying anybody's an angel, but I will tell you I went four years and it wasn't even a question. He would never. And I told him, "Don't do it.

7

You're not going to do it." And it was the apple of his eye, but there was no way that he would've done it.

(12:26)

All you had to do is lower oil prices. If you lowered oil prices… Biden kept the prices so high because he made it impossible to get it. If you lowered oil prices, you would've never had the war, but you wouldn't have had it with me anyway. That war would've never happened. And I think it's a great abuse.

(12:42)

So now what do you do? You get a country where 25% of its land is gone and the best locations. Where millions of people are killed, you haven't reported accurately the death. And this was Biden's war and I'm trying to stop it. And I think we're going to do a good job, I hope we're going to do it. They lose 2,500 young people a week, on average. Now they're Russians and they're Ukrainians, but it's 2000. We don't care. It's like whatever it is. They're not from your country, they're not from mine, but I want to stop it.

(13:17)

2,500, it's a killing field. It's like the Civil War. You take a look. I look at the satellite pictures. This should not be happening in our time. Of course, our time can be pretty violent as we know. But that's a war that should have never been allowed to start. And Biden could have stopped it and Zelenskyy could have stopped it and Putin should have never started it. Everybody's to blame.

REPORTERS (13:46):
Have you spoken to President Zelenskyy, sir, out his offer to purchase more Patriot missile batteries?

Donald Trump (13:51):
Oh, I don't know. He's always looking to purchase missiles. He's against… Listen, when you start a war, you got to know that you can win the war, right? You don't start a war against somebody that's 20 times your size and then hope that people give you some missiles. If we didn't give them what we gave, remember I gave them Javelins. That's how they won their first big battle. With the tanks that got stuck in the mud and they took them out with Javelins. They have an expression that Obama, at the time, Obama gave them sheets and Trump gave them Javelins. But just something that should have never happened. It's a really shame. The towns are destroyed. Towns and cities are largely destroyed.

(14:36)

They have the spires, the beautiful spires that go up. They say that we're the most beautiful in the world, in Ukraine for whatever reason, but the most beautiful in the world. They're mostly laying on their side, shattered and broken. And most importantly, you have millions of people dead. Millions of people dead because of three people, I would say three people. Let's say Putin, number one. But let's say Biden who had no idea what the hell he was doing, number two and Zelenskyy. And all I can do is try and stop it. That's all I want to do. I want to stop the killing. And I think we're doing well in that regard. I think you'll have some very good proposals very soon.

REPORTERS (15:20):

8

Last question, sir, have you attributed a motive through the FBI investigation behind the attack on Governor Josh Shapiro over the weekend?

Donald Trump (15:29):
No, I haven't, but the attacker was not a fan of Trump, I understand. Just from what I read and from what I've been told. The attacker basically wasn't a fan of anybody. It's probably just a whack job and certainly a thing like that can not be allowed to happen.

REPORTERS (15:45):
Is your good relations with President Bukele the best guarantee that this time you won't terminate the temporary protected status-

Donald Trump (15:54):
I have a great relationship with this man.

REPORTERS (15:55):
… [inaudible 00:15:56] nationals of El Salvador?

Donald Trump (15:55):
I have the best relationship with him. We've known each other. I've known him since he was a very young man. As I said, very, very young. And I was impressed. I said, "Look out, this guy is…" In fact, you sort of look like a teenager.

Nayib Bukele (16:08):
That's good.

Donald Trump (16:10):
You look like a teenager. I said what kind of a country is this?

Nayib Bukele (16:13):
I don't know if that's good or bad, Mr. President.

Donald Trump (16:16):
He grew up well in the last five years.

REPORTERS (16:19):
Do you support extension for nationals of El Salvador under temporary protected status?

Donald Trump (16:22):
I support him.

REPORTERS (16:22):
Do you plan to-
(16:22)
President Bukele?

9

(16:22)
President Trump?

Donald Trump (16:22):
Let's hear the question from this very low-rated anchor at CBS.

REPORTERS (16:34):
President Trump, do you plan to ask President Bukele to help return the man who your administration says was mistakenly deported?

Donald Trump (16:38):
Which one is it?

REPORTERS (16:39):
The man who was mistakenly deported to El Salvador?

Donald Trump (16:41):
Well, let me ask. Pam, would you answer that question?

Pam Bondi (16:45):
Sure President. First and foremost, he was illegally in our country. He had been illegally in our country. And in 2019, 2 courts, an immigration court and an appellate immigration court ruled that he was a member of MS-13 and he was illegally in our country. Right now, it was a paperwork, it was additional paperwork had needed to be done. That's up to El Salvador if they want to return him, that's not up to us. The Supreme Court ruled President that if, as El Salvador wants to return him, this is international matters, foreign affairs. If they wanted to return him, we would facilitate it, meaning provide a plane.

REPORTERS (17:28):
So will you return him President Bukele?

Donald Trump (17:30):
And you are doing a great job. Thank you.

Pam Bondi (17:32):
Thank you.

Donald Trump (17:32):
Wait a minute. Can you just also respond to that question? Because it's asked by CNN and they always ask it with a slant. Because they're totally slanting because they don't know what's happening. That's why nobody's watching them. But would you answer that question also, please?

Steve Miller (17:47):
Yes, gladly. So as Pam mentioned, there's an illegal alien from El Salvador. So with respect to you, he's a citizen of El Salvador. So it's very arrogant, even for American

media to suggest that we would even tell El Salvador how to handle their own citizens as a starting point, as two immigration courts found that he was a member of MS-13. When President Trump declared MS-13 to be a foreign terrorist organization, that meant that he was no longer eligible under federal law, which I'm sure you know, you're very familiar with the INA, that he was no longer eligible for any form of immigration relief in the United States.

(18:25)

So he had a deportation order that was valid. Which meant that under our law, he's not even allowed to be present in the United States and had to be returned because of the foreign terrorist designation. This issue was then, by a district court judge, completely inverted, and a district court judge tried to tell the administration that they had to kidnap a citizen of El Salvador and flying back here. That issue was raised with the Supreme Court.

(18:51)

And the Supreme Court said the District court order was unlawful and its main components were reversed 9-0 unanimously stating clearly that neither Secretary of State nor the President could be compelled by anybody to forcibly retrieve a citizen of El Salvador from El Salvador, who again is a member of MS-13. Which is, I'm sure you understand, rapes little girls, murders women, murders children, is engaged in the most barbaric activities in the world. And I can promise you, if he was your neighbor, you would move right away.

REPORTERS (19:22):
So you don't plan to ask for-
(19:22)
But the Supreme Court is asking to-

Donald Trump (19:24):
And what was the ruling in the Supreme Court, Steve? Was it nine to nothing?

Steve Miller (19:29):
Yes. It was a 9- 0-

Donald Trump (19:31):
In our favor?

Steve Miller (19:32):
In our favor against the District Court. Ruling saying that no district court has the power to compel the foreign policy function of the United States. As Pam said, the ruling solely stated that if this individual, at El Salvador's sole discretion, was sent back to our country, that we could deport him a second time.

(19:49)

No version of this legally ends up with him ever living here because he's a citizen of El Salvador. That is the president of El Salvador. Your questions about it per the court can only be directed to him.

11

REPORTERS (20:02):
I ask, President Bukele, what is your… Can President Bukele weigh in on this? Do you plan to return him?

Nayib Bukele (20:06):
Well, I'm supposed you're not suggested that I smuggle a terrorist in the United States, right?

Donald Trump (20:11):
It's only CNN.

Nayib Bukele (20:13):
How can I smuggle… How can I return him to the United States? Like I smuggle him into the United States, or whether do I do? Of course I'm not going to do it. It's like the question is preposterous. How can I smuggle the terrorist into the United States? I don't have the power to return him to the United States.

REPORTERS (20:29):
But you can release him inside of El Salvador.

Nayib Bukele (20:31):
Yeah, but I'm not releasing… We're not very fond of releasing terrorists into our country. We just turned the murder capital of the world into the safest country of the Western Hemisphere. And you want us to go back into releasing criminals so we can go back to being the murder capital of the world? That's not going to happen.

Donald Trump (20:46):
Well, they'd love to have a criminal released into our country.

Nayib Bukele (20:49):
I mean, there's a fascination-

Donald Trump (20:51):
They would love it.

Nayib Bukele (20:52):
Yeah.

Donald Trump (20:54):
These are sick people. Marco, do you have something to say about that?

Marco Rubio (20:57):
Yeah, I mean, Stephen, I don't understand what the confusion is. This individual is a citizen of El Salvador. He was illegally in the United States and was returned to his country. That's where you deport people, back to their country of origin. Except for Venezuela that was refusing to take people back of places like that. I can tell you this, Mr.

12

President. The foreign policy of the United States is conducted by the President of the United States, not by a court. And no court in the United States has a right to conduct a foreign policy of the United States. It's that simple. End of story.

REPORTERS (21:26):
More specifically-

Steve Miller (21:27):
And that's what the Supreme Court held, by the way. To Marco's Point, the Supreme Court said exactly what Marco said. That no court has the authority to compel the foreign policy function in the United States. We won a case 9-0. And people like CNN are portraying it as a loss, as usual, because they want foreign terrorists in the country who kidnap women and children. But President Trump, his policy is foreign terrorists that are here illegally get expelled from the country, which by the way is a 90/10 issue.

REPORTERS (21:52):
Well, Mr. President, you said that if the Supreme Court said someone needed to be returned, that you would abide by that. You said that on Air Force One just a few days ago. And they said-

Donald Trump (21:59):
How long do we have to answer this question today?

REPORTERS (21:59):
…

Speaker 2 (22:00):
It must be facilitated.

Donald Trump (22:02):
Why don't you just say, "Isn't it wonderful that we're keeping criminals out of our country?" Why can't you just say that?

Speaker 2 (22:07):
Well, it's illegal to, so I just wanted some clarity on it.

Donald Trump (22:08):
Why do you go over and over? And that's why nobody watches you anymore. You have no credibility. Please, go ahead.

Speaker 3 (22:15):
President Trump, thank you so much. How many illegal criminals are you planning on exporting to El Salvador? And, President Bukele, how many are you willing to take from the U.S.?

Donald Trump (22:25):

As many as possible. And I just asked the president … it's this massive complex that he built, jail complex. I said, "Can you build some more of them, please?" As many as we can get out of our country that were allowed in here by incompetent Joe Biden through open borders. Open borders. You probably hear open borders and you can't even understand it, because nobody can understand. Nobody smart or with common sense can understand it. So we have millions of people that should not be in this country that are dangerous. Not just people, because we have people, but we have millions of people that are murderers, drug dealers. They've been allowed to come into our country by other countries that were very smart.

(23:10)

When they heard that this very low IQ president … and by the way, I took my cognitive exam as part of my physical exam and I got the highest mark. And one of the doctors said, "Sir, I've never seen anybody get that kind of a … that was the highest mark." I hope you're happy with that. Although they haven't been bugging me too much to take a cognitive, but I did do my physical and it was released. I hope you're all happy with it. I noticed there's no question, so probably you are. But the cognitive, they said to me, "Sir, would you like to take a cognitive test?" I said, "Did Biden take one?" "No." "Did anybody take one?" "No, not too many people took them." I said, "What about Obama? Did he take one?" "No, he didn't take one either." I said, "Let me be the only one to take one." But I've actually taken them three times already. I like taking them, because they're sort of … they're not too tough for me to take.

(24:05)

But we had a great physical exam, so I know you're going to ask that. And the doctors who are total professionals, Walter Reed Medical Center, they're great people. And I visited a soldier that was badly wounded. Incredible soldier. Lost his leg. And … who I spent a lot of time with him, I mean, [inaudible 00:24:26] with his mother, and it was really a very great thing. They do a phenomenal job. I just want to say Walter Reed, I was there for, what? Five, six hours. You were there with me. But I took a full physical and it came out perfecto, so that's good. That means you've got me for a little longer.

Speaker 3 (24:40):
Would the U.S. be willing pay for those facilities to be opened if new ones were going to be built [inaudible 00:24:45]?

Donald Trump (24:44):
I'd do something. We'd help them out. Yeah, we'd help them out. They're great facilities, very strong facilities, and they don't play games. I'd like to go a step further. I said it to Pam. I don't know what the laws are. We always have to obey the laws, but we also have homegrown criminals that push people into subways, that hit elderly ladies on the back of the head with a baseball bat when they're not looking, that are absolute monsters. I'd like to include them in the group of people to get them out of the country, but you'll have to be looking at the laws on that, Steve. Okay?

Speaker X (25:21):
[inaudible 00:25:22]

14

Speaker 4 (25:21):
[foreign language 00:25:22].

Speaker 5 (25:21):
How special is it for you guys to be locking up these prisoners, and do you think more presidents should follow suit, like you guys, in as far as taking a stand on crime here in the United States?

Donald Trump (25:31):
Well, I do. I think everybody has to. The president said it better than anybody. He said, "You have liberty and you have to have liberty. But to have liberty, you're going to … not everybody is going to be good." And some are bad, because they're sick. They're mentally deranged, they're bad. Then you have to take them … if you're going to have a country, you're going to have to take those people out. And we've been doing that. But this was like an unforced error, they would call it, where we had people that may hate our country or maybe they're just stupid people. I think they're probably stupid people more so. A lot of people said they did it for the vote, but I did better with Hispanic people than they did, because they always use Hispanic. I did better. Your people love me. I saw my poll numbers in your country, up through the roof, right? 91%. No, no. Some people think they do it for the vote. But they don't have to do it for the vote. They cheat. They're professional cheaters. That's about the only thing they do well.
(26:34)
So we just have had a great relationship and it's become bigger, because of a strange thing that's happened. I came back. We had no war in Ukraine. We had no war with … we had no October 7th, Middle East problem. We had nothing. We had no inflation. We didn't have the Afghanistan most embarrassing moment in the history of our country, the Afghanistan … not withdrawing, because I would have been out … I had it all set to bring people out with dignity and pride. That was the worst, most embarrassing moment in the history of our country. Afghanistan. We didn't have any of that. You wouldn't have had the war with Russia-Ukraine. You wouldn't have had the Middle East problem, because Iran was broke. They had no money, because we had secondary sanctions on and lots of other sanctions.
(27:23)
And now every single thing. Got a problem with Iran, but I'll solve that problem. That's almost an easy one. We got to solve a war that should have never started, Ukraine and Russia, and we'll get that solved. And we have to solve problems. And we already solved inflation. If you look at the numbers, the numbers are incredible, actually. Stock markets up, and we're not letting other countries take advantage of this country like they have for the last 40 years, so thank you very much. Do you have a question, please?

Speaker 6 (27:55):
[inaudible 00:27:55], Mr. President. Thank you so much. You scored another major investment win this morning when NVIDIA pledged to build its AI supercomputer, for the first time, ever right here in the United States.

Donald Trump (28:05):

Thank you. Now that's a question I like. That's true.

Speaker 6 (28:09):
What is your reaction to this announcement, Sir, and how will this positively [inaudible 00:28:13] Americans across the entire country.

Donald Trump (28:17):
Well, it's one of the biggest announcements you'll ever hear, because NVIDIA, as you know, controls almost the entire sector, which is one of the most important sectors in the world, between chips and semiconductors and everything else, and they're the biggest. And the other biggest, we already have coming in and spending 300 million, as you know. They announced two weeks ago. But NVIDIA is so highly respected, and this was an announcement that a lot of people, I knew it was going to happen, but not to the extent that it happened. It's big. And the reason they did it is because of the election on November 5th, and because of a thing called tariffs. As I say, the most beautiful word in the dictionary, after love, God, relationship. The press actually hit me. I said, "Tariff is the most beautiful word in the dictionary." "What about family, love, God?"
(29:13)
So I got hit even on that. Do you understand? I said, "Okay." So now I say it's my fifth most favorite word, because they get you on anything. But no, it's one of the great companies of the world. Modern, super modern companies. It controls segments that nobody … it sort of control the world, in a sense. And they're coming in here, in the biggest way, with hundreds of billions of dollars. Not like millions of dollars. Hundreds of billions of dollars, and I'm honored by it. And want to thank Jensen and all the people that we deal with. They're great people. They're brilliant people. And without tariffs, they wouldn't be doing it. Thank you very much. That was a very good [inaudible 00:29:59]. Yeah, please. Go ahead.

Speaker 7 (30:00):
Are you considering additional sanctions against Russia after their latest attack? And do you have an update on the rate and when you might announce semiconductor tariffs?

Donald Trump (30:08):
Well, I already have sanctions on Russia. I put them there. If you remember Nord Stream 2, that's the big pipeline that goes through Europe, I stopped it. That's Russia's pipeline. The largest pipeline, I think, in the world. Goes to Germany. And I stopped it. And when Biden came in, he approved it, and then they say, "Oh, I'm friendly with Russia." No, no. Putin said, "If you're my friend, I'd hate to see you when you're my enemy." I stopped the biggest economic job they ever had. I stopped it cold. Right? It was dead. You know that, right? And Biden came in and he immediately approved it. What was that all about?

Speaker 7 (30:47):
What about additional sanctions, Sir?

Donald Trump (30:49):

16

And it's a pipeline that takes care of a lot of the needs. Now, it was a very controversial thing, but I stopped it and Biden approved it. Question?

Speaker 8 (31:01):
On tariffs, do you have an update-

Donald Trump (31:02):
No, not you?

Speaker 4 (31:02):
[foreign language 00:31:04].

Speaker X (31:02):
[inaudible 00:31:05].

Speaker 9 (31:05):
[inaudible 00:31:05] update today on [inaudible 00:31:06] semiconductor tariffs, and potentially pharmaceuticals?

Donald Trump (31:09):
What?

Speaker 9 (31:09):
Semiconductor tariffs, and potentially pharmaceuticals, any update on that?

Donald Trump (31:12):
Pharmaceuticals, we're going to do. We don't make our own drugs, our own pharmaceuticals. We don't make our own drugs anymore. The drug companies are in Ireland and they're in lots of other places. China. And all they have to do is impose a tariff. The more, the faster they move in. The higher the tariff, it's very … it's inversely proportional. The higher the tariff, the faster they come. And, yeah, we're going to be doing that. That's going to be like we have on cars. We have, as you know, a 25% tariff on cars. We have a 25% tariff on steel and aluminum. And that's what that category fits right now.

Speaker 9 (31:52):
Do you have a percentage in mind and the timeline?

Donald Trump (31:54):
I have a timeline. Not too distant future. We're doing it, because we want to make our own drugs. We're doing it, because we want to make our own steel and aluminum, lumber, other things. And they're all coming in. We have record numbers, $7 trillion since I announced, a month and a half ago. Since I came. Basically, since I came in, we have over $7 trillion being invested in the country. We didn't have 1 trillion, we didn't have a half a trillion dollars with some of these guys. I didn't know what the hell they were doing. So we have the largest investment that we've ever heard of, and we're only two

17

months in. And that'll continue at levels that you've never seen before. It's going to happen. And even the stock market's up today. We also … a lot of people didn't say it the way it was. We had the largest gain in the stock market in history, on every single category, last week. That was a nice game, because we were getting a little hit, because people didn't understand the power

Donald Trump (33:00):
… power of our country economically, if you use it right. Do you have something to say on that, JD?

Steve Miller (33:09):
Yes, sir. I mean, look, for 40 years we have lost manufacturing capacity. Workers have seen their wages stagnate, and some of the most critical things that we need from the pharmaceuticals, the drugs that we give to our children, the antibiotics that we give to our kids, to the weapons that we actually need to fight a war if, God forbid, we had to fight a war, we don't make enough of that stuff. And so President Trump ran explicitly on changing that. Yes, as the president mentioned, it caused a little bit of disruption in the market. But I actually think over the long term, workers are going to benefit, stocks are going to go up. American businesses are going to benefit as we reinvest and re-industrialize our country.

Donald Trump (33:45):
And the autoworkers and the teamsters and all of the unions, not traditionally Republican, but I'm winning those unions by… We're up 40, 50 points on the Democrats. They're losing everything. And they're losing everything because they just have policies that are not believable. They fight for policies that are 5% popular, and nobody knows who the 5% are. I mean, nobody can find the 5%. But if you go back to Ohio… And by the way, we have the great championship team from Ohio coming in today. Right?

Steve Miller (34:20):
Very big day.

Donald Trump (34:21):
And that's going to be a little bit later. And if you want to stick around, I'll introduce you to some nice people. You'll see some very large people. You'll see some people that… Even you have not seen people like this. These are 6'7, 380 pounds, with no fat. That's pretty good. But the national championship team is being honored today at the White House. So that'll be exciting. If you want to stay around, I'll have you up there. You can tell them all about your prison, how you have to behave.

Speaker 10 (35:00):
Mr. President, for businesses that want clarity-

Donald Trump (35:01):
Who else?

18

**Speaker 10 (35:01):**
… how temporary are those exemptions on electronics?

**Donald Trump (35:01):**
Go ahead, please.

**Speaker 11 (35:03):**
You said yesterday that you're making a decision on Iran very quickly. What do you mean by that? Is that a decision to strike Iran?

**Donald Trump (35:10):**
Well, they have to solve to their problem very quickly. Iran wants to deal with us, but they don't know how. They really don't know how. We had a meeting with them on Saturday. We have another meeting scheduled next Saturday. I said, "That's a long time." That's a long time. So I think they might be tapping us along. But Iran has to get rid of the concept of a nuclear weapon. They cannot have a nuclear weapon. He can't have a nuclear weapon. We can't have anybody having nuclear weapons. We can't have nuclear weapons. And I think they're tapping us along because they were so used to dealing with stupid people in this country. And I had Iran perfect. You had no attacks. You would've never had October 7th in Israel, the attack by Hamas, because Iran was broke. It was stone-cold broke when I was president. And I want them to be a rich, great nation. The only thing is… One thing, simple. It's really simple. They can't have a nuclear weapon. And they've got to go fast because they're fairly close to having one, and they're not going to have one. And if we have to do something very harsh, we'll do it. And I'm not doing it for us. I'm doing it for the world. These are radicalized people, and they cannot have a nuclear weapon.

**Speaker 11 (36:27):**
Does that include an eventual strike on Iranian nuclear facilities?

**Donald Trump (36:30):**
Of course it does.

**Speaker 11 (36:32):**
And just a follow-up question, a clarification. You mentioned that you're open to deporting individuals that aren't foreign aliens, criminals to El Salvador. Does that include potentially US citizens, fully [inaudible 00:36:45]?

**Donald Trump (36:45):**
If they're criminals and if they hit people with baseball bats over their head that happen to be 90 years old, if they rape eighty-seven-year-old women in Coney Island, Brooklyn, yeah. Yeah, that includes them. Do you think they're a special category of person? They're as bad as anybody that comes in. We have bad ones too. And I'm all for it, because we can do things with the president for less money and have great security. And we have a huge prison population. We have a huge number of prisons. And then we have the private prisons. And some are operated well, I guess, and some aren't. But he does a great job

19

with that. We have others that we're negotiating with too. But no, if it's a homegrown criminal, I have no problem.

(37:38)

Now, we're studying the laws right now. Pam is studying. If we can do that, that's good. And I'm talking about violent people. I'm talking about really bad people, really bad people. Every bit as bad as the ones coming in. And I made the statement when I heard about this a long time ago now, four years ago, when I heard that this guy was having open borders, I said, "Every single criminal from all over the world is going to be dumped into our country." And that's what happened. The jails of the Congo were emptied out. The jails of Venezuela were emptied out. And you know what happened? Their crime went way down. But now Venezuela has other problems. You know what the problem is? They have no money because I shut off their oil and we put secondary tariffs because they're not doing what's right over there. They know what to do. We spoke to them. I spoke to them. They know what to do. But they have no money. Venezuela has no money. But Iran had no money, and Iran behaved so beautifully. And then Biden took all those secondary tariffs on. I told China, "You can't buy oil. If you buy oil from Iran…" China. I told it to President Xi… "then we no longer want you to do business with the United States of America." And those ships disappeared from that harbor so quickly. China. Get along great with China.

Speaker 10 (39:05):
Are the talks with Iran productive? Do you want to continue that?

Donald Trump (39:07):
What?

Speaker 10 (39:09):
The talks with Iran, do you believe those are productive? Do you want to continue that?

Donald Trump (39:12):
I think Iran could be a great country as long as it doesn't have nuclear weapons. If they have nuclear weapons, they'll never get a chance to be a great country. They will never get a chance. It won't even come close.

Speaker 12 (39:24):
Sir, on tariffs.

Donald Trump (39:24):
Yeah. Please.

Speaker 12 (39:25):
Yeah. Thank you. Yesterday, you mentioned short-lived product exemptions. Which specific products are you considering and how long is short-lived? Weeks, months?

Donald Trump (39:34):

I'm looking at something to help some of the car companies where they're switching to parts that were made in Canada, Mexico, and other places. And they need a little bit of time because they're going to make them here, but they need a little bit of time. So I'm talking about things like that.

Speaker 12 (39:51):
What about any Apple products, other cell phones?

Donald Trump (39:55):
Look, I'm a very flexible person. I don't change my mind, but I'm flexible. And you have to be. You just can't have a wall. No, sometimes you have to go around it, under it or above it. There'll be maybe things coming up. I speak to Tim Cook. I helped Tim Cook recently, that whole business. I don't want to hurt anybody, but the end result is, we're going to get to the position of greatness for our country. We're the greatest economic power in the world if we're smart. If we're not smart, we're going to hurt our country very badly. We lost, with China, over the Biden years, trillions of dollars on trade, trillions of dollars. He let them fleece us. And we can't do that anymore. And you know what? I don't blame China at all. I don't blame President Xi. I like him. He likes me. I mean, who knows? Who the hell cares?

Speaker 12 (40:54):
Do you have any updates on talks with China?

Donald Trump (40:55):
What?

Speaker 12 (40:55):
Do you have any updates with talks with China?

Donald Trump (40:56):
No. Let me just tell you this. I don't blame China. I don't blame Vietnam. I see their meeting today. Isn't that wonderful? That's a lovely meeting. The meeting trying to figure out, "How do we screw the United States of America?" Don't forget, the European Union was formed to do just that. The European Union was formed to hurt the United States on trade, and they get us on NATO because they don't pay their bills. But now, since I got involved, they have been paying their bills. I took in over $600 billion for NATO. Nobody took in anything. I mean, they were all delinquent. Eight nations out of 28 paid their bills. The rest of them were way delinquent. And I said, "If you don't pay your bills, we're not going to protect you anymore." And the money poured in. The Secretary General last week made that statement. He said, "I've never seen anything like it. We couldn't get anybody to pay," because the United States was footing the bill for NATO. (41:53)
Well, we got hurt there and we got hurt on trade likewise, European Union. And they've got to come to the table, and they're trying to, they're trying to. But the European Union is taking terrible advantage. They don't take our food products. They don't take our cars. We have millions of their cars. BMW, Volkswagen, Mercedes-Benz, many others. They come

21

in by the millions. There were no Chevrolets in Munich, I can tell you that. I said to Angela Merkel when she was there as she was letting millions of people infiltrate Germany, which was not so good from… We would call them illegal immigrants, but she made them legal. But I said to her… And I get along with her very well. I said, "How many Chevrolets do we have in Munich or Frankfurt?" "None, Donald. None." I said, "You're right." And yet we take in millions and millions of cars. No, those days are over. (42:54)

Okay. Thank you very much everybody.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

KILMAR ARMANDO ABREGO
GARCIA, *et al.*,

  Plaintiffs,

v.

KRISTI NOEM, Secretary of Homeland
Security, *et al.*,

  Defendants.

No. 8:25-cv-00951-PX

Declaration Of Joseph N. Mazzara

## DECLARATION OF JOSEPH N. MAZZARA

I, Joseph N. Mazzara, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am the Acting General Counsel at the Department of Homeland Security.

2.      I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from other Department of Homeland Security (DHS) employees.

3.      I am aware that the instant lawsuit has been filed regarding the removal of Kilmer Armando Abrego Garcia (Abrego-Garcia) to El Salvador.

4.      On March 15, 2025, Abrego Garcia, a native and citizen of El Salvador, was removed to El Salvador, pursuant to Title 8 of the United States Code. *See* Declaration of Evan C. Katz, *Abrego Garcia v. Noem*, No. 8:25-cv-00951-PX (D. Md. Apr. 13, 2025), ECF No. 64 ¶ 4.

5.      During bond proceedings in 2019, an Immigration Judge upheld DHS's decision not to grant bond, finding that DHS's determination that he was a member of MS-13 was "trustworthy" and "supported by other evidence," and noted that Abrego Garcia "failed to present evidence to rebut that assertion." The Board of Immigration Appeals upheld the finding when

Abrego Garcia appealed. *See* Declaration of Evan C. Katz, *Abrego Garcia v. Noem*, No. 8:25-cv-00951-PX (D. Md. Apr. 13, 2025), ECF No. 64 ¶ 6.

6.    Abrego Garcia was ordered removed by an Immigration Judge. He was also granted withholding of removal by an Immigration Judge. Abrego Garcia is no longer eligible for withholding of removal because of his membership in MS-13, which is now a designated foreign terrorist organization. *See* Declaration of Evan C. Katz, *Abrego Garcia v. Noem*, No. 8:25-cv-00951-PX (D. Md. Apr. 13, 2025), ECF No. 64 ¶ 7.

7.    DHS has established processes for taking steps to remove domestic obstacles that would otherwise prevent an alien from lawfully entering the United States. DHS does not have authority to forcibly extract an alien from the domestic custody of a foreign sovereign nation.

8.    I am aware that the President of El Salvador, Nayib Bukele, was in Washington, D.C. today to meet with President Donald Trump. President Bukele and President Trump held a bilateral summit at the White House this morning.

9.    I understand that, in response to a question regarding Abrego Garcia, President Bukele said, "I hope you're not suggesting that I smuggle a terrorist into the United States. How can I smuggle a terrorist into the United States? Of course I'm not going to do it. The question is preposterous." A video of the meeting here: https://www.youtube.com/watch?v=QhY79kjmhh4.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of April 2025.

_Joseph N. Mazzara_
_____

Joseph N. Mazzara
Acting General Counsel
U.S. Department of Homeland Security

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

KILMAR ARMANDO ABREGO GARCIA,
   *et al.,*

   *Plaintiffs,*

          v.

KRISTI NOEM, Secretary of Homeland
   Security, *et al.,*

   *Defendants*

No. 8:25-cv-00951-PX

Declaration Of Assistant Director
Evan C. Katz

**DECLARATION OF EVAN C. KATZ**

I, Evan C. Katz, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

    1.    I am Assistant Director for the Removal Division, within the Department of Homeland Security, U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO).

    2.    In this capacity, I am responsible for leading the division, which is composed of ICE Air Operations, International Operations, and Removal Management. I coordinate with the 25 ERO Field Offices to support case management and facilitate the removal of aliens from the United States. I have held this position since December 2023. Before this assignment, I served as the Acting Assistant Director for the Removal Division from January 2023 to November 2023 and Deputy Assistant Director for the Removal Division from January 2015 to December 2022. I have been in service with ICE since 2003 and prior to that, the Legacy Immigration and Naturalization Service since November 1997.

3.      I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other Department of Homeland Security (DHS) employees, and information portals maintained and relied upon by DHS in the regular course of business.

4.      I am aware that the instant lawsuit has been filed regarding the removal of Kilmer Armando Abrego-Garcia (Abrego-Garcia) to El Salvador.

5.      I am aware that after this Court's preliminary injunction issued, that the Government sought a stay pending appeal from the Fourth Circuit on the same day and ultimately the Supreme Court. On March 7, Chief Justice Roberts issued an administrative stay of that preliminary injunction order. On March 10, the Supreme Court held that "the deadline in the challenged order is no longer effective" and that aspects of this Court's injunction needed to be clarified before they could become effective.

6.      During proceedings in 2019, an immigration judge upheld DHS's decision not to grant bond, finding that DHS's determination that he was a member of MS-13 was "trustworthy" and "supported by other evidence," and noted that Abrego-Garcia "failed to present evidence to rebut that assertion." The Board of Immigration Appeals upheld the finding when Abrego-Garcia appealed.

7.      On March 15, 2025, Abrego-Garcia, a native and citizen of El Salvador, was removed to El Salvador, pursuant to Title 8 of the United States Code. Although Abrego-Garcia has an order of removal issued by an immigration judge, I understand that he should not have been removed to El Salvador because the immigration judge had also granted Abrego-Garcia withholding of removal to El Salvador. However, I also understand that Abrego Garcia is no longer

eligible for withholding of removal because of his membership in MS-13 which is now a designated foreign terrorist organization.

8.      I have reviewed the declaration of Mr. Michael Kozak, which was filed in this case yesterday, April 12, 2025.  It is my understanding that Defendants have no updates for the Court beyond what was provided yesterday.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of April 2025.

_____

Evan C. Katz
Assistant Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KILMAR ARMANDO ABREGO GARCIA, *et al.*<br><br>Petitioner,<br><br>v.<br><br>KRISTI NOEM, Secretary of the Department of Homeland Security, *et al.*,<br><br>Respondents. | Civil Action No. 8:25-cv-00951-PX<br><br>Declaration Of Michael G. Kozak |

## DECLARATION OF MICHAEL G. KOZAK

I, Michael G. Kozak, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am Senior Bureau Official in the Bureau of Western Hemisphere Affairs, United States Department of State. As Senior Bureau Official, I am a member of the Senior Executive Service responsible for, among other things, coordination of the conduct of our diplomatic activities in the countries of the Western Hemisphere.  Before that, I was Senior Coordinator for Afghan Refugees in the Bureau of Population, Refugees and Migration of the United States Department of State and have held various other roles in the Department of State since 1971.

2.      I am aware that the instant lawsuit has been filed seeking the return of Kilmar Armando Abrego Garcia to the United States from El Salvador. I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from other State Department employees.

3.      It is my understanding based on official reporting from our Embassy in San Salvador that Abrego Garcia is currently being held in the Terrorism Confinement Center in El Salvador.  He is alive and secure in that facility.  He is detained pursuant to the sovereign, domestic authority of El Salvador.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of April 2025.

                        Michael G. Kozak
                        Senior Bureau Official

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### –Greenbelt Division–

KILMAR ARMANDO ABREGO GARCIA,
ET AL.,

               Plaintiffs,

v.

KRISTI NOEM, ET AL.,

               Defendants.

Case No.: 8:25-CV-00951-PX

## PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS'
## MOTION FOR ADDITIONAL RELIEF

The Government contends that the term "facilitate" is limited to "remov[ing] any *domestic* obstacles that would otherwise impede the alien's ability to return here." ECF No. 65 at 3 (emphasis in original). Not so. The Supreme Court ordered the Government "to 'facilitate' Abrego Garcia's *release from custody in El Salvador* and to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador." *Noem v. Abrego Garcia*, 604 U.S. ___, 2025 WL 1077101, at *1 (Apr. 10, 2025) (emphasis added). That order is rendered null if construed solely to require removing "domestic obstacles." To give any meaning to the Supreme Court's order, the Government should at least be required to request the release of Abrego Garcia. *Id.* To date, the Government has not done so.

Contrary to the Government's assertion that it lacks "authority" to take any such actions, ECF No. 65 at 5, its own ICE Policy Directive requires DHS supervisors to "fully coordinate at the . . . international . . . level[]" to facilitate the return of removed individuals.[1] The Secretary of

---

[1]  U.S. Immigration and Customs Enforcement, Directive 11061.1, Facilitating the Return to the United States of Certain Lawfully Removed Aliens, § 4.1 (Feb. 24, 2012),

State announced that the Government delivered an additional ten detainees to El Salvador on Saturday.[2] That involved all three of the actions that the Government contends the courts cannot order: "(i) mak[ing] demands of the El Salvadoran government (A1), (ii) dispatch[ing] personnel onto the soil of an independent, sovereign nation (A2), and (iii) send[ing] an aircraft into the airspace of a sovereign foreign nation . . . (A3)." ECF No. 65 at 4. The Government holds contractual rights to send prisoners to its "contract facility," where the United States has "outsourced" part of its prison system, and it holds "the power to secure and transport [its] detainees, Abrego Garcia included." ECF No. 31 at 11–12. It can exercise those same contractual rights to request their release, as the detainees are being held "pending the United States' decision on [their] long term disposition." *Id.* at 6.

Since this Court's April 10 order on remand, clarifying that the Government is required to "take all available steps to facilitate the return of Abrego Garcia to the United States as soon as possible," ECF No. 51 at 1, and this Court's April 11 order requiring daily updates, ECF No. 61 at 2, the Government's updates do not indicate that any steps have been taken to comply with this Court's and the Supreme Court's orders, ECF Nos. 63, 64, 74. There is no evidence that anyone has requested the release of Abrego Garcia.

---

https://www.ice.gov/doclib/foia/dro_policy_memos/11061.1_current_policy_facilitating_return. pdf (noting that "ERO, HSI, and OPLA supervisors must fully coordinate at the local, international, and Headquarters levels to effectuate this policy.").

[2] Secretary Marco Rubio (@SecRubio), X (Apr. 13, 2025), available at https://x.com/SecRubio/status/1911430462305694170.

Dated:  April 15, 2025

**MURRAY OSORIO PLLC**
Simon Y. Sandoval-Moshenberg
Rina Gandhi
4103 Chain Bridge Road, Suite 300
Fairfax, VA 22030
(703) 352-2399
ssandoval@murrayosorio.com

**QUINN EMANUEL URQUHART &
 SULLIVAN, LLP**
Stephen E. Frank
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
stephenfrank@quinnemanuel.com

*/s/ Jonathan G. Cooper*
**QUINN EMANUEL URQUHART &
 SULLIVAN, LLP**
Jonathan G. Cooper (D. Md. Bar No. 21345)
Olivia Horton*
1300 I St. NW, Suite 900
Washington, DC 20005
(202) 538-8000
jonathancooper@quinnemanuel.com
oliviahorton@quinnemanuel.com
*admitted in Texas; not admitted in D.C.
Supervised by attorney admitted in D.C.*

Andrew J. Rossman
Sascha N. Rand
K. McKenzie Anderson
Samuel P. Nitze
Courtney C. Whang
Roey Goldstein
Sam Heavenrich
Victoria Martin
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
andrewrossman@quinnemanuel.com
sascharand@quinnemanuel.com
mckenzieanderson@quinnemanuel.com
samuelnitze@quinnemanuel.com
courtneywhang@quinnemanuel.com
roeygoldstein@quinnemanuel.com
samheavenrich@quinnemanuel.com
victoriamartin@quinnemanuel.com

*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| KILMAR ARMANDO ABREGO GARCIA et al., | Civil No.: 8:25-cv-00951-PX |
| *Plaintiffs*, | |
| v. | **DEFENDANTS' RESPONSE PLAINTIFFS' MOTION FOR ADDITIONAL RELIEF** |
| KRISTI NOEM, Secretary of Homeland Security, et al., | |
| *Defendants*. | |

### RESPONSE TO PLAINTIFFS' MOTION FOR ADDITIONAL RELIEF

On Friday, April 11, 2025, the Court found that Defendants failed to comply with the Court's order, entered hours earlier, directing Defendants to submit sworn testimony revealing sensitive information and previewing nonfinal, unvetted diplomatic strategies. ECF 61 at 1. The Court then ordered "that beginning April 12, 2025, and continuing each day thereafter until further order of the Court, Defendants shall file daily, on or before 5:00 PM ET, a declaration made by an individual with personal knowledge as to any information regarding: (1) the current physical location and custodial status of Abrego Garcia; (2) what steps, if any, Defendants have taken to facilitate his immediate return to the United States; (3) what additional steps Defendants will take, and when, to facilitate his return." ECF 61 at 2.  In addition, the Court set a deadline for Plaintiffs to seek any additional relief by April 12, 2025. In response, Plaintiffs moved for three categories of relief: (1) an order superintending and micromanaging Defendants' foreign relations with the

independent, sovereign nation of El Salvador, (2) an order allowing expedited discovery and converting Tuesday's hearing into an evidentiary hearing, and (3) an order to show cause for why Defendants should not be held in contempt. ECF 62 at 3-5.

The Court should deny Plaintiffs' requests for further relief. The relief sought by Plaintiffs is inconsistent with the Supreme Court's instruction requiring this Court to respect the President's Article II authority to manage foreign policy. The Court should therefore reject Plaintiffs' request for further intrusive supervision of the Executive's facilitation process beyond the daily status reports already ordered.[1]

**I.** Plaintiffs' requested, additional relief is not consistent with either the Supreme Court's order or the well-established meaning of "facilitating" returns in immigration law, and harbors fundamental constitutional infirmities. This Court should deny the motion, and adhere to the best reading of its amended order.

On April 10, 2025, the Supreme Court granted in part the Government's motion to stay this Court's original preliminary injunction order. The Supreme Court explained that on remand, any new order must "clarify" the "scope of the term 'effectuate,'" in a manner that did not "exceed the District Court's authority." Order, at 2. The Court instructed that any "directive" must give "due regard for the deference owed to the Executive Branch in the conduct of foreign affairs." *Id.* And it made clear that any "directive" should concern "Abrego Garcia's release from custody

---

[1] Defendants object to the requirement of daily status reports and reserve the right to challenge that requirement further.

in El Salvador" and "ensure that his case is handled as it would have been had he not been improperly sent to El Salvador." *Id.* In response, this Court amended its prior order that evening, to "DIRECT that Defendants take all available steps to facilitate the return of Abrego Garcia to the United States as soon as possible." ECF No. 51, at 1.

Defendants understand "facilitate" to mean what that term has long meant in the immigration context, namely actions allowing an alien to enter the United States. Taking "all available steps to facilitate" the return of Abrego Garcia is thus best read as taking all available steps to remove any *domestic* obstacles that would otherwise impede the alien's ability to return here. Indeed, no other reading of "facilitate" is tenable—or constitutional—here.

This reading follows directly from the Supreme Court's order. Order, at 2 (holding any "directive" must give "due regard" to the Executive Branch's exclusive authorities over "foreign affairs"). It tracks longstanding executive practice. *Id.* at 4 (Statement of Sotomayor, J.) (describing ICE Policy Directive as the "well-established policy" of the United States). And it comports with how the federal courts have understood the outer bounds of their own power. *See* Reply in Support of Application to Vacate the Injunction, at 5-7 (Sup. Ct.) (No. 24A949) (collecting authorities).

On the flipside, reading "facilitate" as requiring something more than domestic measures would not only flout the Supreme Court's order, but also violate the separation of powers. The federal courts have no authority to direct the Executive Branch to conduct foreign relations in a particular way, or engage with a foreign

sovereign in a given manner. That is the "exclusive power of the President as the sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936). Such power is "conclusive and preclusive," and beyond the reach of the federal courts' equitable authority. *Trump v. United States*, 603 U.S. 593, 607 (2024).

Plaintiffs' additional relief runs headlong through this constitutional limit. They ask this Court to order Defendants to (i) make demands of the El Salvadoran government (A1), (ii) dispatch personnel onto the soil of an independent, sovereign nation (A2), and (iii) send an aircraft into the airspace of a sovereign foreign nation to extract a citizen of that nation from its custody (A3). ECF 62 at 4. All of those requested orders involve interactions with a foreign sovereign—and potential violations of that sovereignty. But as explained, a federal court cannot compel the Executive Branch to engage in any mandated act of diplomacy or incursion upon the sovereignty of another nation.

Plaintiffs invite this Court to "exceed" its own "authority" in the precise sort of way the Supreme Court cautioned against. Order, at 2. This Court should decline the invitation.

**II.** No additional relief is warranted at this time. Consistent with the Court's latest order, ECF 61 at 2, Defendants are providing daily status reports that "share what [they] can" as the government determines an appropriate course of action. Although Defendants were not prepared to share information with the Court within hours of its order, Defendants responded to the first of the Court's questions

yesterday evening and confirmed that Mr. Abrego Garcia is "alive and secure" in the custody of El Salvador at the Terrorism Confinement Center (CECOT). ECF 63 at ¶ 3. It is now public information that the President of El Salvador, Nayib Bukele, is currently in the United States and will be meeting with President Donald Trump on Monday, April 14, 2025. Politics Chat: Trump to meet with Salvadoran President Nayib Bukele, National Public Radio (Apr. 13, 2025). Defendants will continue to share updates as appropriate. Any further intrusion into this sensitive process—and any directive from the Court to take action against the nation of El Salvador—would be inconsistent with the care counseled by the Supreme Court.

As discussed above, the Court should decline Plaintiffs' requests as the requested steps both exceed Defendants' authority and are inconsistent with the Supreme Court's direction. The Court could not, and should not, enter an order directing any of these steps.

For many of the same reasons the Court should deny the expedited discovery requested by Plaintiffs. This discovery, including the presentation of live witnesses, would probe the Executive's preliminary thinking on diplomatic efforts, and would go well beyond requiring the Executive to reveal "what it can" about the status of this process. Order at 2. That request is particularly inappropriate given that such discovery could interfere with ongoing diplomatic discussions—particularly in the context of President Bukele's ongoing trip to the United States.

In addition, Plaintiffs' request for "documents . . . reflect[ing] the terms of any agreement, arrangement or understanding regarding the Government's use of

CECOT to house U.S. deportees," ECF 62 at 4, calls for the immediate production of classified documents, as well as documents that Defendants may elect to assert are subject to the protections of attorney-client privilege and the State Secrets privilege. It would be inappropriate for this Court to hastily order production of these sensitive documents, particularly where Defendants are continuing to regularly update the Court here.

Finally, the Court should not issue an order to show cause. Plaintiffs began their motion with a quote from the President confirming his respect for the Supreme Court and intention to comply with its order. ECF 62 at. 1. Defendants remain in compliance with the Supreme Court's order.  Based on the Supreme Court's Order and respect for both the Executive Branch's authority over foreign affairs and the sovereignty of El Salvador, the Court should take no further action in response to Plaintiffs' motion.

<div style="text-align:center">**Respectfully Submitted,**</div>

**Yaakov M. Roth**
Acting Assistant Attorney General
Civil Division

**/s/ Drew C. Ensign**
**Drew C. Ensign**
Deputy Assistant Attorney General
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 514-2000
drew.c.ensign@usdoj.gov

<div style="text-align:center">6</div>

**ERNESTO MOLINA**
Deputy Director
Office of Immigration Litigation
*Counsel for Defendants*

Filed By:
Tarra DeShields (Bar No. 07749)
Assistant United States Attorney

7

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### –Greenbelt Division–

| | |
|---|---|
| KILMAR ARMANDO ABREGO GARCIA, ET AL., | |
| Plaintiffs, | |
| | Case No.: 8:25-CV-00951-PX |
| v. | |
| KRISTI NOEM, ET AL., | |
| Defendants. | |

## PLAINTIFFS' MOTION FOR ADDITIONAL RELIEF

Yesterday, President Trump confirmed that the United States has the power to facilitate Abrego Garcia's release from prison and return to the United States: "If the Supreme Court said, 'Bring somebody back,' I would do that. ... I respect the Supreme Court."[1] Of course, that is *precisely* what the Supreme Court did when it ruled that this Court's injunction "properly requires the Government to 'facilitate' Abrego Garcia's release from custody in El Salvador and to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador." *Noem et al. v. Abrego Garcia et al.*, 604 U.S. ____, 2025 WL 1077101, at *1 (Apr. 10, 2025). The Government should be required to comply with the Supreme Court's order that it "ensure that his case is handled as it would have been had he not been improperly sent to El Salvador," by taking all available steps to release and return Abrego Garcia to Maryland.

The President's acknowledgement of the United States' power to bring Abrego Garcia back notwithstanding, the Department of Justice and other Government agencies continue to resist this

---

[1] Alan Feuer & Aishvarya Kavi, *White House Continues Defiant Stance on Seeking Return of Deported Man*, N.Y. TIMES (Apr. 11, 2025), https://www.nytimes.com/2025/04/11/us/politics/us-maryland-man-deportation-delay.html.

Court and the Supreme Court. At yesterday's hearing, the Government defied an order of this Court, and of the Supreme Court, by refusing to provide even basic information about Abrego Garcia's current location and status and what it is doing to comply with the injunction. *See id.* at *1 (directing Government to "be prepared to share what it can concerning the steps it has taken and the prospect of further steps"); ECF No. 51 (ordering Government to submit a declaration addressing three questions); *see also* ECF No. 61 (Order finding "that the Defendants have failed to comply with this Court's Order at ECF No. 51"). As a direct consequence of the Government's recalcitrance, Abrego Garcia continues to suffer irreparable harm from his illegal removal to a country where he faces persecution and gang violence, and where he is being held at the United States' behest.

In accordance with the Court's Order authorizing Plaintiffs to seek additional relief beyond what this Court previously ordered, ECF No. 61 at 2, Plaintiffs request that the Court order three additional types of relief. First, order the Government to take by end of the day Monday, April 14, 2024, the specific steps set forth below to comply with the injunction in this case. Second, order expedited discovery of the Government's actions (or failure to act) to facilitate Abrego Garcia's return to the United States. Third, order the Government to show cause by 10 a.m. Monday, April 14, 2025, as to why it should not be held in contempt due to its failure to comply with the Court's prior orders, including any failure to a comply with the Court's order of April 11, 2025 (ECF No. 61).

## I.    Applicable Law

This Court has "broad" power to enforce its own injunction by issuing additional orders, "particularly where the enjoined party has not 'fully complied with the court's earlier orders.'" *Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.*, 98 F. Supp. 2d 25, 26–27

(D.D.C. 2000) (quoting *Hutto v. Finney*, 437 U.S. 678, 687 (1978), and citing *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)); s*ee also Damus v. Wolf*, 2020 WL 601629, at *2 (D.D.C. Feb. 7, 2020) ("[A] court has the authority to issue additional orders to enforce a prior injunction."). Among other things, the Court is empowered to order expedited discovery "where significant questions regarding noncompliance with a court order have been raised," *Damus v. Nielsen*, 328 F.R.D. 1, 3–4 (D.D.C. 2018) (cleaned up) (granting expedited discovery into Government's compliance with a preliminary injunction); *see also, e.g.*, *Mons v. Wolf*, 2020 WL 4201596, at *2–3 (D.D.C. July 22, 2020) (collecting cases). And the Court has "inherent power to enforce compliance with [its] lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966); *see also Rainbow School, Inc. v. Rainbow Early Educ. Holding LLC*, 887 F.3d 610, 617 (4th Cir. 2018) ("To ensure compliance with its orders, a district court has the inherent authority to hold parties in civil contempt.").

With respect to discovery, under the Federal Rules of Civil Procedure, this Court has "broad discretion" and "wide latitude in controlling discovery." *Mey v. Phillips*, 71 F.4th 203, 217 (4th Cir. 2023) (citations omitted). Among other things, this Court can order depositions of high-level government officials where they have "unique first-hand knowledge related to the litigated claims or . . . the necessary information cannot be obtained through other, less burdensome or intrusive means." *Lederman v. N.Y. City Dep't of Parks & Rec.*, 731 F.3d 199, 203 (2d Cir. 2013).

## II.    Relief Requested

Plaintiffs request that the Court order the following relief to ensure compliance with its prior orders.

## A.    Facilitation of Abrego Garcia's Return

The Court should order the Government to take the following specific steps—in addition to whatever other steps are within its power—to "'facilitate' Abrego Garcia's release from custody in El Salvador," *Noem*, 604 U.S. ____, 2025 WL 1077101, at *1, and return to the United States:

1.    Request that its agents and contractors release Abrego Garcia from custody in El Salvador pursuant to the contract or arrangement providing for his detention there at the Government's direction. *See* ECF No. 31 at 11–12 ("the record reflects that Defendants have 'outsource[d] part of the [United States'] prison system" and "just as in any other contract facility, Defendants can and do maintain the power to secure and transport their detainees, Abrego Garcia included").

2.    Dispatch personnel to accompany Abrego Garcia upon his release from CECOT to ensure his safe passage to the aircraft that will return him to the United States.

3.    Provide air transportation for Abrego Garcia to return to Maryland, because he may not be in current possession of sufficient identification to board a commercial flight.

4.    Grant Abrego Garcia parole pursuant to the Immigration and Nationality Act Section 212(d)(5), 8 USC § 1182(d)(5), and prepare all paperwork and forms required to allow him to reenter the United States.

## B.    Expedited Discovery

Plaintiffs request that the Court order the following expedited discovery:

1.    The Government should be ordered to immediately produce contemporaneously prepared documents, in such form as they existed at the time of Abrego Garcia's removal, sufficient to reflect the terms of any agreement, arrangement or understanding regarding the Government's use of CECOT to house U.S. deportees.

To the extent the Government contends that such documents do not exist, it should be ordered to produce a witness for Tuesday's hearing who can testify from personal knowledge about the terms of the arrangement.[2]

2.    The Government should be ordered to produce witnesses for Tuesday's hearing from the Department of Homeland Security, Department of Justice, and Department of State who can testify from personal knowledge about (i) Abrego Garcia's current physical location and custodial status; (ii) what steps, if any, the Government has taken to facilitate Abrego Garcia's return to the United States; (iii) whether the Government has informed officials at CECOT that it wishes Abrego Garcia to be released into U.S. custody;  and (iv) what, if any, additional steps the Government intends to take, and when, to facilitate Abrego Garcia's return.  *See* 4/11/25 Hearing Tr. at 12:17–18 ("This is a case that involves three different cabinet departments ....").

**C.    Order To Show Cause**

This Court has already found "that the Defendants have failed to comply with this Court's Order at ECF No. 51" because they did not provide the required declaration. ECF No. 61 at 1. The Government's failure to provide that declaration also calls into question whether the Government is complying with the Court's Order Granting Preliminary Injunction, ECF No. 21, as modified by ECF No. 51. Defendants accordingly request that the Court order the Government to show cause why it should not be held in contempt for failing to comply with this Court's orders, in accordance with its inherent authority. *See Shillitani*, 384 U.S. at 370; *Rainbow School*, 887 F.3d at 617.

---

[2]  The Government has not asserted—let alone properly substantiated—any privilege that would allow it to withhold the information sought and Plaintiffs are aware of none.

## III.    Conclusion

For the foregoing reasons, Plaintiffs request that the Court (1) order the Government to take by end of the day Monday, April 14, 2025, the specific steps set forth above to comply with the injunction in this case; (2) order expedited discovery as set forth above; and (3) order the Government to show cause by 10 a.m. Monday, April 14, 2025 why it should not be held in contempt due to its failure to comply with the Court's prior orders.

Dated:  April 12, 2025

**MURRAY OSORIO PLLC**
Simon Y. Sandoval-Moshenberg
Rina Gandhi
4103 Chain Bridge Road, Suite 300
Fairfax, Virginia 22030
(703) 352-2399
ssandoval@murrayosorio.com

**QUINN EMANUEL URQUHART &**
  **SULLIVAN, LLP**
Stephen E. Frank
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
stephenfrank@quinnemanuel.com

*Counsel for Plaintiffs*

*/s/ Jonathan G. Cooper*

**QUINN EMANUEL URQUHART &**
  **SULLIVAN, LLP**
Jonathan G. Cooper
Olivia Horton*
1300 I St. NW, Suite 900
Washington, DC 20005
(202) 538-8000
jonathancooper@quinnemanuel.com
oliviahorton@quinnemanuel.com
*admitted in Texas; not admitted in D.C. Supervised by attorney admitted in D.C.*

Andrew J. Rossman
Sascha N. Rand
K. McKenzie Anderson
Samuel P. Nitze (*pro hac vice pending*)
Courtney C. Whang
Roey Goldstein
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
andrewrossman@quinnemanuel.com
sascharand@quinnemanuel.com
mckenzieanderson@quinnemanuel.com
samuelnitze@quinnemanuel.com
courtneywhang@quinnemanuel.com
roeygoldstein@quinnemanuel.com

Ive UNITED STATES DISTRICT COURT
**DISTRICT OF MARYLAND**
**–Greenbelt Division–**

|  |  |
|---|---|
| KILMAR ARMANDO ABREGO GARCIA, ET AL., | |
| Plaintiffs, | Case No.: 8:25-CV-00951-PX |
| v. | |
| KRISTI NOEM, ET AL., | |
| Defendants. | |

## [PROPOSED] ORDER

Upon the Plaintiffs' Motion for Additional Relief, and this Court's prior Orders [ECF Nos. 51, 61], it is

ORDERED THAT by the end of the day Monday, April 14, 2025, the Government shall take the following steps to comply with the preliminary injunction entered in this case, ECF No. 21, as modified by ECF No. 51.

1. Request that its agents and contractors release Abrego Garcia from custody in El Salvador pursuant to the contract or arrangement providing for his detention there at the Government's direction.

2. Dispatch personnel to accompany Abrego Garcia upon his release from CECOT to ensure his safe passage to the aircraft that will return him to the United States.

3. Provide air transportation for Abrego Garcia to return to Maryland, because he may not be in current possession of sufficient identification to board a commercial flight.

4. Issue Abrego Garcia parole pursuant to INA Section 212(d)(5), 8 USC § 1182(d)(5), and prepare all paperwork and forms required to allow him to reenter the United States.

ORDERED THAT the Government shall produce the following expedited discovery:

1.    The Government should immediately produce contemporaneously prepared documents, in such form as they existed at the time of Abrego Garcia's removal, sufficient to reflect the terms of any agreement, arrangement or understanding regarding the Government's use of CECOT to house U.S. deportees. To the extent the Government contends that such documents do not exist, it should be ordered to produce a witness for Tuesday's hearing who can testify from personal knowledge about the terms of the arrangement.

2.    The Government should produce witnesses for Tuesday's hearing from the Department of Homeland Security, Department of Justice, and Department of State who can testify from personal knowledge about (i) Abrego Garcia's current physical location and custodial status; (ii) what steps, if any, the Government has taken to facilitate Abrego Garcia's return to the United States; (iii) whether the Government has informed officials at CECOT that it wishes Abrego Garcia to be released into U.S. custody;  and (iv) what, if any, additional steps the Government intends to take, and when, to facilitate Abrego Garcia's return.

ORDERED THAT by 10 a.m. on Monday, April 14, 2025, the Government shall show cause why it should not be held in contempt due its failure to comply with the Court's prior orders, including any failure to comply with the Court's order of April 11, 2025 [ECF No. 51].

IT IS SO ORDERED

Dated:  April __, 2025

_____
The Honorable Paula Xinis

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KILMAR ARMANDO
ABREGO GARCIA, *et al.*,                    *

    Plaintiffs,                          *

    v.                                   *          Civil Action No. 8:25-cv-00951-PX

KRISTI NOEM, Secretary,                     *
United States Department                    *
of Homeland Security, *et al.*,             *

    Defendants.

                              *
                           ***

## <u>ORDER</u>

For the reasons discussed during today's status conference, the Court finds that the

Defendants have failed to comply with this Court's Order at ECF No. 51.  In advance of the

conference, the Court had directed Defendants to file a supplemental declaration from an

individual with personal knowledge, addressing the following: (1) the current physical location

and custodial status of Abrego Garcia; (2) what steps, if any, Defendants have taken to facilitate

Abrego Garcia's immediate return to the United States; and (3) what additional steps Defendants

will take, and when, to facilitate his return.  ECF No. 51.  Defendants made no meaningful effort

to comply.  Instead, they complained that the Order is "unreasonable and impracticable," and

involves "sensitive country-specific considerations wholly inappropriate for judicial review."

ECF No. 59 at 2.

During the hearing, the Court posed straightforward questions, including: Where is Abrego

Garcia right now?  What steps had Defendants taken to facilitate his return while the Court's initial

order on injunctive relief was in effect (from the afternoon of April 4, 2025, through the morning

of April 7, 2025, and since 6:35 PM last night)?  Defendants' counsel responded that he could not

answer these questions, and at times suggested that Defendants had withheld such information from him.  As a result, counsel could not confirm, and thus did not advance *any* evidence, that Defendants had done anything to facilitate Abrego Garcia's return.  This remained Defendants' position even after this Court reminded them that the Supreme Court of the United States expressly affirmed this Court's authority to require the Government "facilitate" Abrego Garcia's return.  *See Noem v. Abrego Garcia*, 25A949, 604 U.S. ___ (2025), Slip Op. at 2.  From this Court's perspective, Defendants' contention that they could not answer these basic questions absent some nonspecific "vetting" that has yet to take place, provides no basis for their lack of compliance.

Accordingly, it is hereby ORDERED that beginning April 12, 2025, and continuing each day thereafter until further order of the Court, Defendants shall file daily, on or before 5:00 PM ET, a declaration made by an individual with personal knowledge as to any information regarding: (1) the current physical location and custodial status of Abrego Garcia; (2) what steps, if any, Defendants have taken to facilitate his immediate return to the United States; (3) what additional steps Defendants will take, and when, to facilitate his return.[1]  A follow-up in-person hearing will be scheduled for Tuesday, April 15, 2025, at 4:00 PM.

To the extent Plaintiffs seek additional relief, their motion shall be filed no later than 5:00 PM ET on Saturday, April 12, 2025.  Defendants shall file any response by 5:00 PM ET on Sunday, April 13, 2025.

So Ordered.

___April 11, 2025_____          _____/S/_____
Date                                   Paula Xinis
                                       United States District Judge

---

[1] Defendants' assertion that "foreign affairs cannot operate on judicial timelines" sorely misses the point.  ECF No. 59.  All parties appearing before this Court are obligated to comply with court-ordered deadlinness unless and until they demonstrate good cause to depart from them.  *See Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008).  Defendants' vague reference to "foreign affairs" alone does not justify their lack of compliance.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Greenbelt Division)

|  |  |
|---|---|
| KILMAR ARMANDO ABREGO GARCIA et al., | Civil No.: 8:25-cv-00951-PX |
| *Plaintiffs,* | **DEFENDANTS' RESPONSE TO AMENDED PRELIMINARY INJUNCTION ORDER** |
| v. | |
| KRISTI NOEM, Secretary of Homeland Security, et al., | |
| *Defendants.* | |

## <u>RESPONSE TO AMENDED PRELIMINARY INJUNCTION ORDER</u>

Defendants are unable to provide the information requested by the Court on the impracticable deadline set by the Court hours after the Supreme Court issued its order. The Supreme Court's order directs the Court to "clarify its directive, with due regard for the deference owed to the Executive Branch in the conduct of foreign affairs." *Abrego Garcia v. Noem*, 25A949, 604 U. S. ____ (2025), Op. at 2. The Court has not yet clarified what it means to "facilitate" or "effectuate" the return as it relates to this case, as Plaintiff is in the custody of a foreign sovereign. Defendants request— and require—the opportunity to brief that issue prior to being subject to any compliance deadlines. Needless to say, Defendants were under no obligation to take action under the court's order while it was administratively stayed by the Chief Justice of the United States. In light of the insufficient amount of time afforded to review the Supreme Court's Order following the dissolution of the administrative stay

in this case, Defendants are not in a position where they "can" share any information requested by the Court. That is the reality. Defendants received the order late in the evening last night. They are reviewing the order and actively evaluating next steps. It is unreasonable and impracticable for Defendants to reveal potential steps before those steps are reviewed, agreed upon, and vetted. Foreign affairs cannot operate on judicial timelines, in part because it involves sensitive country-specific considerations wholly inappropriate for judicial review.

Respectfully Submitted,

**Yaakov M. Roth**
Acting Assistant Attorney General
Civil Division

**Drew C. Ensign**
Deputy Assistant Attorney General
Office of Immigration Litigation
950 Pennsylvania Avenue
Washington, DC 20530
Phone: (202) 514-2000
Email: drew.c.ensign@usdoj.gov

**Ernesto Molina**
**Deputy Director**
Office of Immigration Litigation
*Counsel for Defendants*

**Tarra DeShields** (Bar No. 07749)
Assistant United States Attorney
U.S. Attorney's Office, District of MD
36 S. Charles Street, Fourth Floor
Baltimore, MD 21201

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KILMAR ARMANDO
ABREGO GARCIA, *et al.*,                         *

    Plaintiffs,                              *

                          Civil Action No. 8:25-cv-00951-PX

    v.                                       *

KRISTI NOEM, Secretary,                          *
United States Department                         *
of Homeland Security, *et al.*,                  *

    Defendants.

                       *
                  ***

### ORDER

The Supreme Court's April 10, 2025 decision in *Noem v. Abrego Garcia*, 604 U.S.——,

No. 24A949, affirmed this Court's Order at ECF No. 21 (the "Order"), and directed that on

remand, this Court clarify its use of the term "effectuate," according proper deference to the

Executive Branch in its conduct of foreign affairs. *See* Slip Op. at 2. To this end, the Court

hereby amends the Order to DIRECT that Defendants take all available steps to facilitate the

return of Abrego Garcia to the United States as soon as possible.

Further, as the Supreme Court made clear, "the Government should be prepared to share

what it can concerning the steps it has taken and the prospect of further steps." *See* Slip Op. at 2.

Accordingly, the Court DIRECTS Defendants to file, by no later than 9:30 AM ET on Friday,

April 11, 2025, a supplemental declaration from an individual with personal knowledge,

addressing the following: (1) the current physical location and custodial status of Abrego Garcia;

(2) what steps, if any, Defendants have taken to facilitate Abrego Garcia's immediate return to

the United States; and (3) what additional steps Defendants will take, and when, to facilitate his

return. To the extent Defendants believe any portion of their submission must be filed under

seal, they shall comply with the Court's Local Rules governing the sealing of materials.  *See* D. Md. Loc. R. 105.11.

 Finally, the Court will hold an in-person status conference on Friday, April 11, 2025, at 1:00 PM ET, at the United States District Court for the District of Maryland, 6500 Cherrywood Lane, Greenbelt, Maryland 20770.

  April 10, 2025         /S/
Date               Paula Xinis
               United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KILMAR ARMANDO
ABREGO GARCIA, *et al.*,                              *

    Plaintiffs,                                  *

    v.                                           *                    Civil Action No. 8:25-cv-00951-PX

KRISTI NOEM, Secretary,                              *
United States Department                             *
of Homeland Security, *et al.*,                      *

    Defendants.

                                 *

                          ***

## <u>MEMORANDUM OPINION</u>

In 2019, an immigration judge—acting under the authority delegated by the United States Attorney General and pursuant to powers vested by Congress—granted Plaintiff Kilmar Armando Abrego Garcia ("Abrego Garcia") withholding of removal, thereby protecting him from return to his native country, El Salvador. ECF No. 1 ¶ 41; ECF No. 1-1. Such protection bars the United States from sending a noncitizen to a country where, more likely than not, he would face persecution that risks his "life or freedom." *See* Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(b)(3)(A); *see also* 8 C.F.R. §§ 208.16–.18 & .24 (setting forth the standard for withholding of removal and the procedures required for its termination).

Six years later, without notice, legal justification, or due process, officers from U.S. Immigration and Customs Enforcement ("ICE"), a subagency of the Department of Homeland Security ("DHS"), put him on a plane bound for the Terrorism Confinement Center ("CECOT")

in El Salvador.  ECF No. 1¶ 59. [1]  Neither the United States nor El Salvador have told anyone why

he was returned to the very country to which he cannot return, or why he is detained at CECOT.[2]

*See* Hr'g Tr., Apr. 4, 2025, 25: 13–14 (Mr. Reuveni: "We have nothing to say on the merits.  We

concede he should not have been removed to El Salvador."); *see* Hr'g Tr., Apr. 4, 2025, 34:25–

35:5 (The Court: "[W]hat basis is he held?  Why is he [in CECOT] of all places?" . . . Mr. Reuveni:

"I don't know.  That information has not been given to me.  I don't know.").

That silence is telling.  As Defendants acknowledge, they had no legal authority to arrest

him, no justification to detain him, and no grounds to send him to El Salvador[3]—let alone deliver

him into one of the most dangerous prisons in the Western Hemisphere.[4]  Having confessed

grievous error, the Defendants now argue that this Court lacks the power to hear this case, and they

lack the power to order Abrego Garcia's return.  ECF No. 11 at 3.  For the following reasons, their

jurisdictional arguments fail as a matter of law.  Further, to avoid clear irreparable harm, and

because equity and justice compels it, the Court grants the narrowest, daresay only, relief

warranted: to order that Defendants return Abrego Garcia to the United States.

## I.    Background

Abrego Garcia was born and raised in Los Nogales, El Salvador.  ECF No. 1-1 at 2.  His

family owned a small and successful pupuseria.  *Id.*  For years, they were subject to extortion and

---

[1] Louis Casiano, *U.S. Paid El Salvador to Take Venezuelan Tren de Aragua Members for 'Pennies on the Dollar,'* *White House Says*, FOX NEWS (Mar. 26, 2025), https://www.foxnews.com/politics/us-paid-el-salvador-take-venezuelan-tren-de-aragua-members-pennies-dollar-white-house-says.

[2] Defendants did not assert—at any point prior to or during the April 4, 2025, hearing—that Abrego Garcia was an "enemy combatant," an "alien enemy" under the Alien Enemies Act, 50 U.S.C. § 21, or removable based on MS-13's recent designation as a Foreign Terrorist Organization under 8 U.S.C. § 1189.  Invoking such theories for the first time on appeal cannot cure the failure to present them before this Court.  In any event, Defendants have offered no evidence linking Abrego Garcia to MS-13 or to any terrorist activity.  And vague allegations of gang association alone do not supersede the express protections afforded under the INA, including 8 U.S.C. §§ 1231(b)(3)(A), 1229a, and 1229b.

[3] ECF No. 11-3 at 3 ("Through administrative error, Abrego-Garcia was removed from the United States to El Salvador. This was an oversight . . . ."); Hr'g Tr., Apr. 4, 2025, 19:11–13 (Mr. Reuveni: "This person should -- the plaintiff, Abrego Garcia, should not have been removed. That is not in dispute.").

[4] ECF No. 1-4; ECF No. 10-2; ECF No. 10-3.

threats of death by one of El Salvador's most notorious gangs, Barrio 18.  *Id.* at 2.  The gang used Abrego Garcia as a pawn in its extortion, demanding that his mother give Abrego Garcia over to the gang or he and others in their family would be killed.  *Id.* at 3.  Attempting to escape the gang's reach, the family moved three times without success.  *Id.*  To protect Abrego Garcia, they ultimately sent him to the United States to live with his older brother, a U.S. citizen, in Maryland. ECF No. 1 ¶ 22.

Abrego Garcia lived in Maryland for many years without lawful status.  *Id.*  In early 2019, while waiting at the Home Depot in Hyattsville, Maryland, to be hired as a day laborer, Abrego Garcia was arrested.  *Id.* ¶¶ 25–26.  The Prince George's County Police Department questioned him about gang affiliation, but nothing came of it.  *Id.* ¶ 27.  He was then turned over to ICE custody.  *Id.* ¶ 28.

On March 29, 2019, DHS initiated removal proceedings against Abrego Garcia pursuant to 8 U.S.C. § 1182(a)(6)(A)(i).  ECF No. 1 ¶ 29.  On April 24, 2019, Abrego Garcia appeared before an immigration judge ("IJ") where he conceded his deportability and applied for asylum, withholding of removal, and protection under the Convention Against Torture.  ECF No. 1-1.

Pending resolution of the requested relief, DHS argued for Abrego Garcia to be detained in ICE custody.  ECF No. 1 ¶ 30.  DHS relied principally on a singular unsubstantiated allegation that Abrego Garcia was a member of MS-13.[5]  The IJ ultimately detained Abrego Garcia pending the outcome of his requested relief from deportation, a decision affirmed by the Board of Immigration Appeals.  ECF Nos. 11-1 & 11-2.

October 10, 2019, following a full evidentiary hearing, the IJ granted Abrego Garcia

---

[5] The "evidence" against Abrego Garcia consisted of nothing more than his Chicago Bulls hat and hoodie, and a vague, uncorroborated allegation from a confidential informant claiming he belonged to MS-13's "Western" clique in New York—a place he has never lived.  ECF No. 31.

withholding of removal to El Salvador pursuant to 8 U.S.C. § 1231(b)(3)(A).  As a matter of law, withholding of removal prohibits DHS from returning an alien to the specific country in which he faces clear probability of persecution.  In Abrego Garcia's case, the IJ concluded that he was entitled to such protection because the Barrio 18 gang had been "targeting him and threatening him with death because of his family's pupusa business."  ECF No. 1-1 at 2.  DHS never appealed the grant of withholding of removal, and so the decision became final on November 9, 2019.[6]  *See* Hr'g Tr., Apr. 4, 2025, 24:15–16 (Mr. Reuveni: "The government did not appeal that decision, so it is final.").  Accordingly, as Defendants have repeatedly admitted, they were legally prohibited from deporting Abrego Garcia to El Salvador.  *See* Hr'g Tr., Apr. 4, 2025, 25:6–7 (Mr. Reuveni: "There's no dispute that the order could not be used to send Mr. Abrego Garcia to El Salvador.").

For the next six years, Abrego Garcia lived in Maryland with his wife and their three children.  ECF No. 1 ¶¶ 24–25.  He complied fully with all directives from ICE, including annual check-ins, and has never been charged with or convicted of any crime.  ECF No. 1-3, ECF No. 1 ¶ 45.

On March 12, 2025, while driving home from work with his young son in the car, Abrego Garcia was stopped by ICE agents.  *Id.* ¶¶ 48–49.  The officers had no warrant for his arrest and no lawful basis to take him into custody; they told him only that his "status had changed."  *Id.* ¶ 50.  He was first transported to an ICE facility in Baltimore, Maryland.  *Id.* ¶¶ 51–53.  Next, ICE agents shuttled him to detention facilities in Louisiana and La Villa, Texas.  *Id.* ¶¶ 54–57.  He was allowed a handful of calls to his wife.  He said that he was told he would see a judge soon.  *Id.*  But

---

[6] A decision by an IJ becomes final "upon waiver of appeal or upon expiration of the time to appeal if no appeal is taken within that time."  8 C.F.R. § 1003.39.  The deadline for filing an appeal to the Board of Immigration Appeals is 30 days from the date of the decision.  *See* 8 C.F.R. § 1003.38(b).  Once final, a grant of withholding of removal prohibits removal to the country of feared persecution absent formal reopening and termination of that protection. *See* 8 C.F.R. § 208.24.

that never happened.

Three days later, on March 15, 2025, without any notice, legal process, or hearing, ICE forcibly transported Abrego Garcia to the Terrorism Confinement Center ("CECOT") in El Salvador, a notorious supermax prison known for widespread human rights violations. ECF No. 1 ¶ 59; ECF No. 11-3 at 2; ECF No. 10-2. On that day, two planes carried over 100 aliens to CECOT purportedly pursuant to the Alien Enemies Act, ECF No. 11-3 at 2, the legality of which is the subject of separate litigation. *See J.G.G. v. Trump,* No. 1:25-cv-766 (JEB), 2025 WL 890401 (D.D.C. Mar. 24, 2025). A third plane included "aliens with Title 8 removal orders;" many of them were in ICE custody awaiting asylum and other protective hearings in the United States. ECF No. 11-3 at 2; *see J.G.G. v. Trump,* No. 1:25-cv-766 (JEB), ECF Nos. 67-5–67-20.

Once the planes arrived in El Salvador, the male detainees[7] were stripped and shackled. Their heads were shaved, and they were marched into CECOT to join nearly 40,000 other prisoners held in some of the most inhumane and squalid conditions known in any carceral system. ECF No. 10-3. Since then, no one has heard from Abrego Garcia. ECF No. 1 ¶ 41.

To effectuate a mass relocation of those detained by the United States, the federal government struck an agreement with El Salvador whereby it would pay the Salvadoran government six-million dollars for placement of the detainees in "very good jails at a fair price that will also save our taxpayer dollars." Marco Rubio (@SecRubio), X (Mar. 16, 2025, 7:59 AM), https://x.com/SecRubio/status/1901241933302825470. El Salvador's President, Nayib Bukele, has publicly touted the agreement terms: "We are willing to take in only convicted criminals (including convicted U.S. citizens) into our mega-prison (CECOT) in exchange for a

---

[7] Female detainees were returned to the United States because the prison would not accept them. *See, e.g.*, *J.G.G. v. Trump*, No. 1:25-cv-766 (JEB), ECF No. 55-1.

fee."[8]   ECF No. 10-5; Nayib Bukele (@nayibbukele), X (Apr. 4, 2025, 10:23 AM), https://x.com/nayibbukele/status/1901245427216978290.  According to a memorandum issued by El Salvador's Ministry of Foreign Affairs, the agreement provides that the detainees will be held "for one (1) year, pending the United States' decision on [their] long term disposition."  *See* Matthew Lee & Regina Garcia Cano, *Trump Officials Secretly Deported Venezuelans and Salvadorans to a Notorious Prison in El Salvador*, ASSOCIATED PRESS (Mar. 15, 2025), https://apnews.com/article/trump-deportations-salvador-tren-aragua-64e72142a171ea57c869c3b35eeecce7.

After Abrego Garcia was transferred to CECOT, Defendant, DHS Secretary, Kristi Noem, personally toured the facility alongside senior Salvadoran officials.  U.S. Dep't of Homeland Sec., *Inside the Action: Secretary Noem's Visit to El Salvador*, DHS, https://www.dhs.gov/medialibrary/assets/video/59108 (last visited Apr. 4, 2025).  From inside the prison walls, Secretary Noem declared that transferring individuals previously detained on U.S. soil to CECOT remains "one of the tools in *our* [the United States'] toolkit that we will use if you commit crimes against the American people."  U.S. Dep't of Homeland Sec., *How It's Going*, DHS, https://www.dhs.gov/medialibrary/assets/video/59108 (last visited Apr. 4, 2025) (emphasis added).

Although the legal basis for the mass removal of hundreds of individuals to El Salvador remains disturbingly unclear, Abrego Garcia's case is categorically different—there were no legal grounds whatsoever for his arrest, detention, or removal.  Nor does any evidence suggest that Abrego Garcia is being held in CECOT at the behest of Salvadoran authorities to answer for crimes in that country.  Rather, his detention appears wholly lawless.

---

[8] It is unclear what qualifies as a "convicted criminal" under the terms of the agreement, but Abrego Garcia has not been convicted of any crime.

Based on these events, Abrego Garcia, through counsel, and along with his wife, Jennifer Stefania Vasquez Sura, and their son, A.A.V., by and through his mother and next friend, [9] filed suit in this Court on March 24, 2025, against DHS Secretary Noem; Acting Director of U.S. Immigration and Customs Enforcement, Todd Lyons; Acting Executive Associate Director of ICE Enforcement and Removal Operations, Kenneth Genalo; ICE Baltimore Field Office Director, Nikita Baker; Attorney General, Pamela Bondi; and Secretary of State, Marco Rubio (collectively "Defendants"). Abrego Garcia specifically alleges that his removal to El Salvador violated the Immigration and Nationality Act, 8 U.S.C. § 1231(b)(3)(A)(Count I); the Due Process Clause of the Fifth Amendment (Count II); and the Administrative Procedure Act, 5 U.S.C. § 706(2) (Count III); and, pleaded in the alternative, qualifies him for habeas relief pursuant to 28 U.S.C. § 2241 (Count V). ECF No. 1. The matter is now before the Court on Plaintiffs' motion for preliminary injunction, ECF No. 6, following full briefing and a hearing held on April 4, 2025. This Memorandum Opinion sets forth the Court's findings in support of the Order entered on April 4, 2025.

## II.    Jurisdictional Challenges

The Defendants' only meaningful challenge to the motion is that this Court lacks the power to hear this case. They advance three arguments. The Court considers each in turn.

### A.    The Court lacks Jurisdiction Because the "Core" of the Claims Sound in Habeas

Defendants first argue that because Abrego Garcia challenges his confinement in CECOT, the "core" of his claims sound only in habeas brought pursuant to 28 U.S.C. § 2241 *et seq*. ECF No. 11 at 7, citing *DHS v. Thuraissigiam*, 591 U.S. 103, 117 (2020) ("habeas…is the appropriate

---

[9] Vasquez Sura and A.A.V's claims are not the subject of this decision, and so for clarity, the Court refers solely to Plaintiff Abrego Garcia.

remedy to ascertain…whether any person is rightfully in confinement or not."). And as such, suit is proper only against the immediate "custodian" (the Warden of CECOT) and in the jurisdiction where Abrego Garcia is confined (El Salvador). *Id.* at 9.

Defendants are wrong on several fronts. Abrego Garcia exclusively challenges his lawless return to El Salvador, not the fact of his confinement. ECF No. 1 at 16-20. This is the core of his claim, as Defendants concede, which is why his suit would remain equally strong had Defendants released Abrego Garcia to the streets of El Salvador instead of CECOT. Hr'g. Tr., Apr. 4, 2025, at 19. As Defendants did in *J.G.G. v. Trump*, Civil Action No. 25-766 (JEB), 2025 WL 890401, at *7–8 (D.D.C. Mar. 24, 2025), they fundamentally ignore the difference between challenging legality of *removal* as opposed to confinement. *Id.*[10] For purposes of this decision, however, Abrego Garcia simply does not challenge his confinement. The removal itself lies at the heart of the wrongs. Thus, the Court need not wade into the murky jurisdictional implications that flow from such a challenge.

But even if the Court considers the thorny question of "custody" as it pertains to Abrego Garcia's habeas claim (Count V), the Defendants are not out of the woods. They do indeed cling to the stunning proposition that they can forcibly remove any person—migrant and U.S. citizen alike —to prisons outside the United States, and then baldly assert they have no way to effectuate return because they are no longer the "custodian," and the Court thus lacks jurisdiction. As a practical matter, the facts say otherwise.

The facts are that the United States exerts control over each of the nearly 200 migrants sent to CECOT. The Defendants detained them, transported them by plane, and paid for their

---

[10] In this context, habeas claims need not be brought to the exclusion of all other claims. *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 185–186 (D.D.C. 2015) (noting that "APA and habeas claims may coexist" where aliens challenge their detention in violation of removal procedures).

placement in the mega-jail until "the United States" decides "their long-term disposition."[11] Against this backdrop, Defendants have produced *no evidence* to suggest they cannot secure one such detainee, Abrego Garcia, for return to the United States. Equally important, to credit Defendants' argument would permit the unfettered relinquishment of any person regardless of immigration status or citizenship to foreign prisons "for pennies on the dollar."[12]

Nor do the Defendants cite any authority to support this eye-popping proposition. Sure, they point the Court to *Munaf v. Green*, 553 U.S. 674 (2008), but that decision has little bearing here. In *Munaf*, the Court reviewed whether plaintiffs, American citizens who voluntarily traveled to Iraq and were subsequently detained for violations of Iraqi law, could challenge their detention. The Court concluded that while the district court retained jurisdiction in the first instance, *id.* 686, the merits of the habeas challenge failed because "Iraq has the sovereign right to prosecute Omar and Munaf for *crimes committed on its soil*." *Id.* at 695 (emphasis added).

Here, by contrast, Abrego Garcia is *not* being held for crimes committed in or against El Salvador, the United States, or anywhere else for that matter. His claims do not implicate any question of competing sovereign interests, and so, *Munaf* offers little guidance.[13] Thus, while the

---

[11] *See* Matthew Lee & Regina Garcia Cano, *Trump Officials Secretly Deported Venezuelans and Salvadorans to a Notorious Prison in El Salvador*, ASSOCIATED PRESS (Mar. 15, 2025), https://apnews.com/article/trump-deportations-salvador-tren-aragua-64e72142a171ea57c869c3b35eeecce7.

[12] *Louis Casiano, U.S. Paid El Salvador to Take Venezuelan Tren de Aragua Members for 'Pennies on the Dollar,' White House Says*, FOX NEWS (Mar. 26, 2025), https://www.foxnews.com/politics/us-paid-el-salvador-take-venezuelan-tren-de-aragua-members-pennies-dollar-white-house-says.

[13] Defendants also urged this Court to follow *Kiyemba v. Obama*, 561 F.3d 509 (D.C. Cir. 2009), wherein the United States Court of Appeals for the District of Columbia held that a claim could not sound in habeas where the plaintiff sought relief to avoid "torture" in the receiving country. The *Kiyemba* Court held that because a "district court may not question the Government's determination that that a potential recipient country is not likely to torture a detainee," the habeas claims fail on the merits. *Id.,* citing *Munaff*, 553 U.S. at 514. That is not this. Defendants have already determined that Abrego Garcia must not be returned to El Salvador because he had established under the INA that he faces persecution from Barrio18. ECF No. 1-1. Defendants remain bound to that decision just as much today as they were when they decided not to appeal that determination. Defendants' violation of the INA in detaining Abrego Garcia in El Salvador does not implicate United States' policy decisions as to El Salvador's possible propensity to violate the Convention Against Torture writ large. ECF No. 11 at 16 (this Court should defer to the Defendants' determination that Abrego Garcia will not likely be tortured or killed in El Salvador, this implicating Executive policy decisions). Accordingly, *Kiyemba* does not counsel a different outcome.

success of Abrego Garcia's preliminary injunction motion does not depend on the success of his habeas claim, Defendants also fail to convince this Court that the claim will not survive in the end. For purposes of this decision, suffice to say the Court retains jurisdiction because Abrego Garcia challenges his removal to El Salvador, not the fact of confinement.

### B.      Redressability

Defendants next make a narrow standing argument, contending that because the claims are not redressable, this Court lacks the power to hear the case.  ECF No. 11 at 10.  Federal courts are ones of limited jurisdiction, hearing only live "Cases" and "Controversies."  U.S. Const. art. III, § 2.  A party's standing to maintain an action "is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Davis v. Fed. Election Comm.*, 554 U.S. 724, 733 (2008) (citations omitted).  To satisfy Article III standing, the plaintiff must make plausible that he "(1)[] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

The Defendants' redressability argument, simply put, is that their placement of Abrego Garcia in an El Salvadoran prison deprives them of any power to return him.  Thus, they say, even if Abrego Garcia succeeds on the merits, Defendants are powerless to get him back.  The facts demonstrate otherwise.

First, Defendants can and do return wrongfully removed migrants as a matter of course. This is why in *Lopez-Sorto v. Garland*, 103 F.4th 242, 248–53 (4th Cir. 2024), the Fourth Circuit concluded that the Defendants could redress wrongful removal to El Salvador by facilitating the

plaintiff's return per DHS' own directives.  *Id.* at 253*; see also Nken v. Holder*, 556 U.S. 418, 436 (2009) ("Aliens who are removed may continue to pursue their petitions for review, and those that prevail can be afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal.").

Second, Defendants unilaterally placed hundreds of detainees behind the walls of CECOT without ceding control over the detainees' fates, as the detainees are in CECOT "*pending the United States' decision on their long-term disposition.*"  *See* Matthew Lee & Regina Garcia Cano, *Trump Officials Secretly Deported Venezuelans and Salvadorans to a Notorious Prison in El Salvador*, ASSOCIATED PRESS (Mar. 15, 2025), https://apnews.com/article/trump-deportations-salvador-tren-aragua-64e72142a171ea57c869c3b35eeecce7.  Unlike Abrego Garcia, for whom *no* reason exists to detain him, Defendants transported many individuals who had been detained in the United States while awaiting immigration proceedings.[14]  Yet, despite Defendants' power to transfer those awaiting hearings to CECOT for a "good price," Defendants disclaim any ability to secure their return, including Abrego Garcia.  ECF No. 11 at 11.  Surely, Defendants do not mean to suggest that they have wholesale erased the substantive and procedural protections of the INA in one fell swoop by dropping those individuals in CECOT without recourse.  Instead, the

---

[14] *See, e.g.,* 25-cv-766-JEB, ECF No. 55-1 (Declaration of S.Z.F.R., a female detainee formerly held at Webb County Detention Center in Laredo, Texas awaiting a merits hearing on her asylum claims was part of the mass transport to CECOT but ultimately returned to the United States because CECOT would not accept females); ECF 67-10 (Declaration of immigration attorney for Jose Hernandez Romero, who had been detained at Otay Mesa Detention Center pending his asylum hearing at time was transported to CECOT); ECF No. 67-11 (Declaration of immigration attorney for detainee, G.T.B., a native of Venezuela who had been detained at Aurora Contract Detention Facility awaiting deportation proceedings when transported to CECOT without warning.  ICE ultimately returned her to the United States); ECF No. 67-11 (Declaration of immigration attorney for detainee, Jerce Reyes Barrios, who had been housed at Otay Mesa Detention Center awaiting hearing on protected status, prior to transport to CECOT); ECF No. 67-14 (Declaration of immigration attorney for detainee, E.V., who had been housed at  Moshannon Valley Processing Center in Philipsburg, Pennsylvania awaiting hearing on final order of removal when transported to CECOT); ECF No. 67-16 (Declaration of immigration attorney for detainee J.A.B.V, who had been detained domestically prior to his removal hearing scheduled for April 7, 2025 was transported to CECOT); ECF No. 67-17 (Declaration of immigration attorney for detainee, L.G., who had been detained at Moshannon Valley Processing Center in Philipsburg, Pennsylvania, awaiting removal proceedings prior to transfer to CECOT).

record reflects that Defendants have "outsource[d] part of the [United States'] prison system."[15]

*See also* U.S. Dep't of Homeland Sec., *How It's Going*, DHS, https://www.dhs.gov/medialibrary/assets/video/59108 (last visited Apr. 4, 2025) (quoting Defendant Noem: "This facility is one of the tools in our toolkit that we will use")."[16] Thus, just as in any other contract facility, Defendants can and do maintain the power to secure and transport their detainees, Abrego Garcia included.

In the end, Defendants' redressability argument rings hollow. As their counsel suggested at the hearing, this is not about Defendants' *inability* to return Abrego Garcia, but their lack of desire.

> THE COURT: Can we talk about, then, just very practically, why can't the United States get Mr. Abrego Garcia back?
>
> MR. REUVENI: Your Honor, I will say, for the Court's awareness, that when this case landed on my desk, the first thing I did was ask my clients that very question. I've not received, to date, an answer that I find satisfactory.

Hr'g Tr., Apr. 4, 2025, at 35–36. *See also id.* at 50 (counsel seeking 24 hours to persuade Defendants to secure Abrego Garcia's return). Flat refusal, however, does not negate redressability. The record reflects that the remedy is available. Abrego Garcia maintains standing to sue.

### C.    Section 1252(g) of the INA Does Not Strip the Court's Jurisdiction in this Case

Lastly, Defendants argue that 8 U.S.C. § 1252(g) ("Section 1252(g)") deprives the Court of jurisdiction to review this matter. The statute reads:

---

[15] Nayib Bukele (@nayibbukele), X (Mar. 19, 2025, 8:12 PM), https://x.com/nayibbukele/status/1886606794614587573

[16] U.S. Dep't of Homeland Sec*., How It's Going*, DHS, https://www.dhs.gov/medialibrary/assets/video/59108 (last visited Apr. 4, 2025) (quoting Defendant Noem: "This facility is one of the tools in our toolkit that we will use").

> Except as provided in this section and notwithstanding any other provision of law (statutory or non-statutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g).

Defendants concede that *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 482 (1999), commands a narrow construction of Section 1252(g), limiting application solely to the Attorney General's exercise of lawful discretion to (1) commence proceedings; (2) adjudicate cases; or (3) execute removal orders. *Id.* ("It is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings."). *See also Bowrin v. U.S. I.N.S.*, 194 F.3d 483, 488 (4th Cir. 1999) (noting that Section 1252(g) only stripped federal courts of jurisdiction to review the "Attorney General's decision to exercise her *discretion* to initiate or prosecute the specific stages in the deportation process."). As the *Reno* Court explained, "there was good reason for Congress to focus special attention upon, and make special provision for, judicial review of the Attorney General's *discrete acts* . . . which represent the initiation or prosecution of various stages in the deportation process." *Id.* (emphasis added). Thus, this Court is deprived of jurisdiction only for the discretionary decisions made concerning the three stages of the deportation process. *See Bowrin*, *v. U.S. INS,* 194 F.3d 483, 488 (4th Cir. 1999); *U.S. v. Hovsepian,* 359 F.3d 1144, 1155 (9th Cir. 2004); *Coyotl v. Kelly*, 261 F. Supp. 3d 1328, 1339–1341 (N.D. Ga. 2017); *Gondal v. U.S. Dep't of Homeland Sec.*, 343 F. Supp. 3d 83, 92 (E.D.N.Y. 2018). *But see Silva v. United States*, 866 F.3d 938 (8th Cir. 2017).

Defendants press that Section 1252(g) precludes jurisdiction here because the claims concern Defendants' "execution of his removal order."  ECF No. 11 at 13.  The argument fails in both fact and law.

First, the Court cannot credit that Defendants removed Abrego Garcia pursuant to an "executed removal order" under the INA.  Defendants have not produced *any* order of removal as to Abrego Garcia, executed or otherwise, or submitted any proof that they had removed him pursuant to one.  Hr'g Tr. Apr. 4, 2025, at 20 (counsel admitting no order of removal is part of the record); *see also id.* at 22 (counsel confirming that "the removal order" from 2019 "cannot be executed" and is not part of the record).  Nor have any other corollary documents surfaced, such as a "warrant for removal/deportation" customarily served on an alien as part of a lawful deportation or removal.  *Id.*[17]  From this, the Court cannot conclude that Abrego Garcia was spirited to CECOT on an "executed removal order" such that Section 1252(g) is implicated.

Second, even if there were an executed order of removal for Abrego Garcia, his claims do not seek review of any discretionary decisions.  He is not asking this Court to review the wisdom of the Attorney General's lawful exercise of authority.  Rather, he asks that the Court determine whether his return to El Salvador violated the INA.   In this circumstance, the Fourth Circuit has spoken.

*Bowrin v. U.S. INS,* 194 F.3d 483 (4th Cir. 1999) made plain that review of agency decisions involving pure questions of law "do not fall into any of the three categories enumerated in § 1252(g)."  *Bowrin*, 194 F.3d at 488.  Section 1252(g), the *Bowrin* Court emphasized, "does not apply to all claims arising from deportation proceedings, because §

---

[17] *See* sample warrant for removal at https://www.ice.gov/sites/default/files/documents/Document/2017/I-205_SAMPLE.PDF

1252(g) stripped the federal courts of jurisdiction only to review challenges to the Attorney General's decision to *exercise her discretion* to initiate or prosecute these specific stages in the deportation process." *Id.* (citing *American-Arab Anti-Discrimination Committee*, 525 U.S. at 482) (emphasis added). *See also Hovsepian*, 359 F.3d at 1155 ("The district court may consider a purely legal question that does not challenge the Attorney General's discretionary authority, even if the answer to that legal question . . . forms the backdrop against which the Attorney General later will exercise discretionary authority."); *Siahaan v. Madrigal*, Civil No. PWG-20-02618, 2020 WL 5893638, at *5 (D. Md. Oct. 5, 2020) ("To insist, as the Respondents do, that this Court lacks jurisdiction because of § 1252(g) to determine the purely legal questions of whether his removal under these circumstances violates the statutory and constitutional provisions that his habeas petition has raised runs contrary to the consistent rulings of the Supreme Court for at least twenty years."); *Coyotl*, 261 F. Supp. 3d at 1339–41. Accordingly, and after exhaustive analysis, *Bowrin* concluded that "absent express congressional intent . . . to eliminate the general federal habeas corpus review pursuant to 28 U.S.C.A. § 2241, the remedy remains available to Bowrin and other aliens similarly situated." *Bowrin*, 194 F.3d at 489 (collecting cases).

Like *Bowrin*, Abrego Garcia presents to this Court a pure question of law: whether Defendants exceeded their authority in returning him to El Salvador, in violation of the 8 U.S.C. § 1231(b)(3)(A). Hr'g Tr., Apr. 4, 2025, at 24. In this Court's view, no plainer question of statutory interpretation could be presented. Thus, Section 1252(g) does not deprive the Court of jurisdiction over the claims.

In sum, the Court retains jurisdiction over this case. And even though Defendants concede that if this Court retains jurisdiction, Abrego Garcia prevails on the merits of his preliminary injunction,[18] for the benefit of all, the Court briefly addresses why this concession makes sense.

## III. Merits of Preliminary Injunctive Relief

A preliminary injunction is an extraordinary remedy that should be granted only upon "a clear showing that the plaintiff is entitled to relief." *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (internal quotation marks omitted) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008)). Generally, injunctions are sought to "preserve the status quo so that a court can render a meaningful decision after a trial on the merits." *Hazardous Waste Treatment Council v. State of S.C.*, 945 F.2d 781, 788 (4th Cir. 1991) (quotation omitted); *see also United States ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 489, 498 (4th Cir. 1999). By contrast, injunctions which alter the status quo, known as "mandatory injunctions," are highly disfavored, *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980), and should be granted only when "necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind," *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003), *abrogation on other grounds recognized in Bethesda Softworks, LLC v. Interplay Entm't Corp.*, 452 F. App'x 351, 353–54 (4th Cir. 2011); *see also Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024). Abrego Garcia requests relief designed to retore the status quo ante, or the "last uncontested status between the parties which preceded the controversy." *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). That is, to return him to where he was on March 12, 2025, before he was apprehended by ICE and spirited away to

---

[18] *See* Hr'g Tr., Apr. 4., 2025, at 25:10–14 (Mr. Reuveni: "if you're not buying our jurisdictional arguments, like, we're done here . . . . We have nothing to say on the merits.").

CECOT.

To receive the benefit of injunctive relief, Abrego Garcia must demonstrate by preponderant evidence four well-established factors: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that issuing the injunction is in the public interest. *See Winter*, 555 U.S. at 20. The Court considers each factor separately.

### A.　　Likelihood of Success of the Merits

As to likelihood of success on the merits, Abrego Garcia need only demonstrate a likelihood of success on one cause of action. *See Mayor & City Council of Baltimore v. Azar*, 392 F. Supp. 3d 602, 613 (D. Md. 2019). Defendants concede success as to Count I, their violation of the INA. The Court agrees.

An alien "may seek statutory withholding under [8 U.S.C.] § 1231(b)(3)(A), which provides that 'the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.'" *Johnson v. Guzman Chavez*, 594 U.S. 523, 530 (2021)). "If an alien is granted withholding-only relief, DHS may not remove the alien to the country designated in the removal order unless the order of withholding is terminated. 8 C.F.R. §§ 208.22, 1208.22. The withholding of removal is country-specific and more stringent than other forms of relief from deportation because once the noncitizen "establishes eligibility for withholding of removal, the grant is mandatory." *Amaya v. Rosen*, 986 F.3d 424, 427 (4th Cir. 2021), *as amended* (Apr. 12, 2021) (quoting *Gandziami-Mickhou v. Gonzales*, 445 F.3d 351, 353–54 (4th Cir. 2006)).

Accordingly, pursuant to Section 1231(b)(3)(A), once an alien is granted withholding of

removal, the Defendants "may not" remove the alien to the identified country. It is undisputed that "Abrego Garcia, was removed to El Salvador despite a grant of withholding of removal to that country." ECF No. 11. Even more disturbing, the Defendants concede that it cannot even produce the documents which reflect *any* authority, lawful or otherwise, to transfer him to El Salvador. Thus, the record plainly reflects that Defendants' forced migration to El Salvador violates Section 1231(b)(3)(A). He is guaranteed success on the merits of Count I.

Next as to Count II, the procedural due process claim, Abrego Garcia alleges that Defendants forced removal to El Salvador without *any process* constitutes a clear constitutional violation. This the Defendants also concede. But for completeness, the Court briefly addresses why the parties are correct. To succeed on a Fifth Amendment due process claim, the plaintiff must show that he possesses "a constitutionally cognizable life, liberty, or property interest"; that he was deprived of that interest because of "some form of state action"; and "that the procedures employed were constitutionally inadequate." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013).

Abrego Garcia has demonstrated that he had a liberty interest by virtue of the INA in avoiding forcible removal to El Salvador. "In order for a statute to create a vested liberty or property interest giving rise to procedural due process protection, it must confer more than a mere expectation (even one supported by consistent government practice) of a benefit." *Mallette v. Arlington County Employees' Supplemental Ret. Sys. II*, 91 F.3d 630, 635 (4th Cir.1996). There must be entitlement to the benefit as directed by statute, and the statute must "'act to limit meaningfully the discretion of the decision-makers.'" *Id.* (quoting *Board of Pardons v. Allen*, 482 U.S. 369, 382 (1987) (O'Connor, J., dissenting))." Here, the statutory scheme which conferred withholding of removal also entitled Abrego Garcia to not be returned to El Salvador absent

process. Further, the statutes at issue eliminated the discretion altogether. Thus, this element is easily met.

As to the third element, Defendants deprived Abrego Garcia of this right without *any procedural protections* due to him. Indeed, nothing in the record suggests that Abrego Garcia received any process at all. Accordingly, he is likely to succeed on the merits of Count II.

Last, and for similar reasons, Abrego Garcia is likely to succeed on the merits of the APA claim, Count III. The APA mandates that "agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414(1971), *abrogated by Califano v. Sanders*, 430 U.S. 99; 5 U.S.C. § 706(2); *W. Virginia v. Thompson*, 475 F.3d 204, 209 (4th Cir. 2007). An agency action is arbitrary and capricious when the agency disregards rules or regulations still in effect or departs from a prior policy without "articulat[ing] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *See Sierra Club v. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018). In short, an agency may not "depart from a prior policy sub silentio or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).

The Defendants do not dispute that its expulsion of Abrego Garcia to El Salvador constitutes a final agency action. Nor do they dispute that the decision was without any lawful authority whatsoever. Nor have Defendants articulated any rationale for taking such action. Their action was lawless, and thus in violation of the APA.

Abrego Garcia, as all who have touched this case recognize, is likely to succeed on the merits of these claims. The first *Winter* factor is thus satisfied.

### B.     Irreparable Harm

Regarding the second *Winter* factor, Abrego Garcia must show that he will be irreparably harmed in the absence of preliminary injunctive relief.  *See Winter*, 555 U.S. at 20.  This standard requires more than the mere "possibility" of irreparable harm; rather, the plaintiff must "demonstrate that irreparable injury is likely in the absence of an injunction."  *Id.* at 21.

Obviously, "the risk of torture, beatings, and even death clearly and unequivocally supports a finding of irreparable harm."  *J.G.G.,* 2025 WL 890401, at *16*, citing United States v. Iowa*, 126 F.4th 1334, 1352 (8th Cir. 2025) (torture); *Leiva-Perez v. Holder*, 640 F.3d 962, 970 (9th Cir. 2011) (physical abuse).  Perhaps this is why Defendants anemically suggested that Abrego Garcia failed to show he would be "harmed" in CECOT, but then abandoned that contention at the preliminary injunction hearing.  Certainly as to Abrego Garcia, the IJ found that returning him to El Salvador *at all* would likely subject him to persecution at the hands of Barrio 18, to include the risk of death.  ECF No. 1-1 at 7.

More fundamentally, Defendants do not dispute that their placement of Abrego Garcia at CECOT invites this very harm.  Defendants effectuated his detention in one of the most notoriously inhumane and dangerous prisons in the world.  Defendants even embrace that reality as part of its well-orchestrated mission to use CECOT as a form of punishment and deterrence.  ECF No. 10-5 at 4 (Defendant Noem announcing while standing in front of caged prisoners at CECOT "if an immigrant commits a crime, this is one of the consequences you could face . . . . You will be removed and you will be prosecuted.").

But particular to Abrego Garcia, the risk of harm shocks the conscience.  Defendants have forcibly put him in a facility that intentionally mixes rival gang members without any regard for protecting the detainees from "harm at the hands of the gangs."  ECF No. 10-3 at 15.  Even worse,

Defendants have claimed—without any evidence—that Abrego Garcia is a member of MS-13 and then housed him among the chief rival gang, Barrio 18. Not to mention that Barrio 18 is the very gang whose years' long persecution of Abrego Garcia resulted in his withholding from removal to El Salvador. To be sure, Abrego Garcia will suffer irreparably were he not accorded his requested relief. He has satisfied the second *Winter* factor.

## C.    Balance of Equities and Public Interest

The Court considers the last two factors in tandem because "the balance of the equities and the public interest . . . 'merge when the Government is the opposing party.'" *Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 242 (D. Md. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). As to the balance of the equities, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S., at 24 (quoting *Amoco Prod. Co. v. Gambell, AK*, 480 U.S. 531, 542 (1987)). When considering the public interest, the Court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). The Court is mindful that it may not collapse this inquiry with the first *Winter* factor. *See USA Farm Lab., Inc. v. Micone*, No. 23-2108, 2025 WL 586339, at *4 (4th Cir. Feb. 24, 2025) (explaining that it is "circular reasoning" to argue that a government "program is against the public interest because it is unlawful" and that such argument "is nothing more than a restatement of their likelihood of success").

"Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken,* 416 U.S. at 436. Equally important, the public remains acutely interested in "seeing its governmental institutions follow the law. . . ." *Roe v. Dep't of Def.*, 947 F.3d at 230–31 (4th Cir. 2020) (internal quotation

marks and citation omitted).  The absence of injunctive relief places this interest in greatest jeopardy, as demonstrated by Abrego Garcia's experience over the past three weeks.

Defendants seized Abrego Garcia without any lawful authority; held him in three separate domestic detention centers without legal basis; failed to present him to any immigration judge or officer; and forcibly transported him to El Salvador in direct contravention of the INA.  Once there, U.S. officials secured his detention in a facility that, by design, deprives its detainees of adequate food, water, and shelter, fosters routine violence; and places him with his persecutors, Barrio 18. In short, the public interest and companion equities favor the requested injunctive relief.[19]

## IV.    Conclusion

Based on the foregoing, the Court retains jurisdiction to hear this case.  Abrego Garcia has also demonstrated that he is entitled to the injunctive relief sought.  The Court's April 4, 2025 Order thus remains in full force and effect.[20]

Date: April 6, 2025

/S/
_____
Paula Xinis
United States District Judge

---

[19] Defendants suggested in their response that the public retains an interest in not returning Abrego Garcia to the United States because "he is a danger to the community," ECF No. 11, only to abandon this position at the hearing. Again, with good reason.  No evidence before the Court connects Abrego Garcia to MS-13 or any other criminal organization.
[20] For these same reasons, the Court denies Defendants' Motion to Stay the Court's April 4, 2025 Order.  ECF No. 29.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KILMAR ARMANDO
ABREGO GARCIA, *et al.*,                          *

     Plaintiffs,                                *

     v.                                       *          Civil Action No. 8:25-cv-00951-PX

KRISTI NOEM, Secretary,                          *
United States Department                         *
of Homeland Security, *et al.*,                  *

     Defendants.                                *
                                                 ***

_____ FILED          _____ ENTERED
_____ LOGGED   *BU*  _____ RECEIVED

APR 4 2025

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

### ORDER GRANTING PRELIMINARY INJUNCTION

The Court has reviewed Plaintiffs' Motion for Injunctive Relief pursuant to Rule 65 of the Federal Rules of Civil Procedure, along with supporting memoranda, reply briefs, and the record in this case. ECF No. 6. The Defendants named in this suit are the United States Secretary of Homeland Security, the Attorney General of the United States, the United States Secretary of State, the Acting Director of U.S. Immigration and Customs Enforcement ("ICE"), the Acting Executive Associate Director of ICE Enforcement and Removal Operations, and the Director of ICE's Baltimore Field Office (collectively, the "Defendants"). ECF No. 1.

Kilmar Armando Abrego Garcia ("Abrego Garcia"), a native of El Salvador, was granted withholding of removal in 2019, which prohibited his removal to El Salvador. The record reflects that Abrego Garcia was apprehended in Maryland without legal basis on March 12, 2025, and, without further process or legal justification, was removed to El Salvador by March 15, 2025. Abrego Garcia is detained in El Salvador's Terrorism Confinement Center (Centro de Confinamiento del Terrorismo or "CECOT"). Plaintiffs contend that his removal violated 8 U.S.C.

§ 1231(b)(3)(A) and its implementing regulations, as well as the Fifth Amendment to the United States Constitution, the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and other applicable legal protections.

Based on the record before the Court, I find that this Court retains subject matter jurisdiction. I further find that: (1) Plaintiffs are likely to succeed on the merits because Abrego Garcia was removed to El Salvador in violation of the Immigration and Nationality Act, specifically 8 U.S.C. § 1231(b)(3)(A), and without any legal process; (2) his continued presence in El Salvador, for obvious reasons, constitutes irreparable harm; (3) the balance of equities and the public interest weigh in favor of returning him to the United States; and (4) issuance of a preliminary injunction without further delay is necessary to restore him to the status quo and to avoid ongoing irreparable harm resulting from Abrego Garcia's unlawful removal. For the reasons stated above, the Court hereby DIRECTS Defendants to return Abrego Garcia to the United States no later than 11:59 PM on April 7th, 2025. A memorandum opinion further setting forth the basis for this ruling will be issued in due course.

Accordingly, it is this 4th day of April, 2025, by the United States District Court for the District of Maryland, hereby ORDERED that:

1. Plaintiffs' Motion (ECF No. 6), construed as one for preliminary injunctive relief, is GRANTED;

2. Defendants are hereby ORDERED to facilitate and effectuate the return of Plaintiff Kilmar Armando Abrego Garcia to the United States by no later than 11:59 PM on Monday, April 7, 2025;

3. This preliminary relief is issued to restore the status quo and to preserve Abrego Garcia's access to due process in accordance with the Constitution and governing immigration

statutes;

4. The Clerk is DIRECTED to TRANSMIT copies of this Order to the parties.

_____

Paula Xinis
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Greenbelt Division**

| | | |
|---|---|---|
| Kilmar Armando Abrego Garcia, | ) | |
| Jennifer Stefania Vasquez Sura, | ) | |
| A.A.V., *a minor, by and through his next friend* | ) | |
| *and mother, Jennifer Vasquez Sura,* | ) | |
| | ) | |
| c/o Murray Osorio PLLC | ) | |
| 8630 Fenton Street, Suite 918, | ) | |
| Silver Spring, MD 20910 | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | Civil Action No. _____ |
| v. | ) | |
| | ) | |
| Kristi Noem, *Secretary of Homeland Security,* | ) | |
| | ) | |
| Secretary of Homeland Security | ) | |
| Washington, DC 20508 | ) | |
| | ) | |
| Todd Lyons, *Acting Director, U.S. Immigration* | ) | |
| *and Customs Enforcement,* | ) | |
| Kenneth Genalo, *Acting Executive Associate* | ) | |
| *Director, ICE Enforcement and Removal* | ) | |
| *Operations,* | ) | |
| Nikita Baker, *ICE Baltimore Field Office Director,* | ) | |
| | ) | |
| 500 12th St., SW | ) | |
| Washington, D.C. 20536 | ) | |
| | ) | |
| Pamela Bondi, *Attorney General,* | ) | |
| | ) | |
| 950 Pennsylvania Avenue, NW | ) | |
| Washington, DC 20530-0001 | ) | |
| | ) | |
| Marco Rubio, *Secretary of State,* | ) | |
| | ) | |
| The Executive Office of the Legal Adviser | ) | |
| and Bureau of Legislative Affairs | ) | |
| Suite 5.600 | ) | |
| 600 19th Street NW | ) | |
| Washington DC 20522 | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

1

## COMPLAINT FOR INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT

In 2019, Plaintiff Kilmar Armando Abrego Garcia won an order from an immigration judge granting him a form of relief called withholding of removal, which prohibits Defendants from removing him to El Salvador. Should Defendants wish to remove Plaintiff Abrego Garcia to El Salvador, the law sets forth specific procedures by which they can reopen the case and seek to set aside the grant of withholding of removal. Should Defendants wish to remove Plaintiff Abrego Garcia to any other country, they would have no legal impediment in doing so. But Defendants found those legal procedures bothersome, so they merely ignored them and deported Plaintiff Abrego Garcia to El Salvador anyway, ripping him away from his U.S.-citizen wife, Plaintiff Vasquez Sura, and his disabled U.S.-citizen child, Plaintiff A.A.V. Defendants sent Plaintiff Vasquez Sura to El Salvador knowing that he would be immediately incarcerated and tortured in that country's most notorious prison; indeed, Defendants have *paid the government of El Salvador millions of dollars to do exactly that*. Such conduct shocks the conscience and cries out for immediate judicial relief.

### JURISDICTION AND VENUE

1.      This Court has jurisdiction to hear this case under 28 U.S.C. § 2201, the Declaratory Judgment Act, and 28 U.S.C. § 1331, Federal Question Jurisdiction; and because the individual Defendants are United States officials. 28 U.S.C. § 1346(a)(2).

2.      The Court has authority to enter a declaratory judgment and to provide temporary, preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, 28 U.S.C. §§ 2201-2202, the All Writs Act, and the Court's inherent equitable powers.

3.      Venue lies in this District because Plaintiffs reside in Beltsville, Maryland and each Defendant is an agency or officer of the United States sued in his or her official capacity.  28

2

U.S.C. § 1391(e)(1). In addition, Defendant Baker's principal place of business is in Baltimore, Maryland, and the legal violations described herein took place at the direction and under the supervision of her predecessor in office.

## THE PARTIES

4.      Plaintiff Kilmar Armando Abrego Garcia is a citizen and native of El Salvador who resides in Beltsville, Maryland. Defendants have deported him to El Salvador without any legal process whatsoever, and in violation of an immigration judge order and a federal statute prohibiting them from doing so.

5.      Plaintiff Jennifer Vasquez Sura is a U.S. citizen, and the wife of Plaintiff Abrego Garcia.

6.      Plaintiff A.A.V., a U.S. citizen, is a minor child.  He is the child of Plaintiff Abrego Garcia and Plaintiff Vasquez Sura.

7.      Defendant Kristi Noem is the Secretary of the Department of Homeland Security ("DHS"). She is the cabinet-level secretary responsible for all immigration enforcement in the United States.

8.      Defendant Todd Lyons is the Acting Director of U.S. Immigration and Customs Enforcement ("ICE"). He is the head of the federal agency responsible for all immigration enforcement in the United States.

9.      Defendant Kenneth Genalo is the Acting Executive Associate Director of ICE Enforcement and Removal Operations. He is the head of the ICE office that carries out arrests of noncitizens and removals from the United States.

3

10.　　Nikita Baker is the ICE Baltimore Field Office Director. She is the head of the ICE office that unlawfully arrested Plaintiff, and such arrest took place under the direction and supervision of her predecessor in office.

11.　　Pamela Bondi is the Attorney General of the United States. The Immigration Judges who decide removal cases and application for relief from removal do so as her designees.

12.　　Marco Rubio is the Secretary of State of the United States. He is the individual whom Plaintiffs request this Court order to request the return of Plaintiff Abrego Garcia to the United States from El Salvador.

13.　　All government defendants are sued in their official capacities.

## LEGAL BACKGROUND

14.　　Federal law prohibits the government from removing a noncitizen to a country where he is more likely than not to face persecution on account of a statutorily protected ground. 8 U.S.C. § 1231(b)(3)(A). This protection is usually referred to as "withholding of removal."

15.　　For an immigration judge (serving as the designee of Defendant Bondi) to grant withholding of removal to a noncitizen, the noncitizen must prove that he is more likely than not to suffer persecution. "The burden of proof is on the applicant for withholding of removal [] to establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 1208.16(b).

16.　　If a noncitizen is granted withholding of removal, "DHS may not remove the alien to the country designated in the removal order unless the order of withholding is terminated." *Johnson v. Guzman Chavez*, 594 U.S. 523, 531 (2021). No exceptions lie. However, withholding

4

of removal is a country-specific form of relief, and an individual granted withholding of removal can still be deported to any other country.

17.     Federal regulations provide a procedure by which a grant of withholding of removal issued by an immigration judge may be terminated: DHS must move to reopen the removal proceedings before the immigration judge, and then DHS will bear the burden of proof, by a preponderance of the evidence, that grounds for termination exist. 8 C.F.R. § 1208.24(e). After a grant of withholding of removal is terminated, there would be no impediment to removal.

## FACTS

18.     Plaintiff Kilmar Armando Abrego Garcia is a citizen of El Salvador and no other country.

19.     Plaintiff Abrego Garcia is not a member of or has no affiliation with Tren de Aragua, MS-13, or any other criminal or street gang. Although he has been accused of general "gang affiliation," the U.S. government has never produced an iota of evidence to support this unfounded accusation.

20.     Plaintiff Abrego Garcia has no criminal history. He has never been charged or convicted of any criminal charges, in the United States, El Salvador, or any other country.

### _Plaintiff Abrego Garcia's 2019 removal proceedings_

21.     Plaintiff Abrego Garcia left El Salvador when he was around sixteen years old, fleeing gang violence. Beginning around 2006, gang members had stalked, hit, and threatened to kidnap and kill him in order to coerce his parents to succumb to their increasing demands for extortion.

22.     Sometime around 2011, Plaintiff Abrego Garcia entered the United States without inspection. He then made his way to the state of Maryland, where his older brother, a U.S. citizen, resided. In the United States, Plaintiff Abrego Garcia has only ever resided in Maryland.

23.     Around 2016, Plaintiff Abrego Garcia met Plaintiff Jennifer Vasquez Sura, a U.S. citizen with two U.S.-citizen children from a prior relationship. Over time, they became close and eventually became romantically involved.

24.     Around December 2018, Plaintiff Abrego Garcia moved in with Plaintiff Vasquez Sura and her two children, after Plaintiff Vasquez Sura learned she was pregnant with their child. Plaintiff Abrego Garcia supported himself, Plaintiff Vasquez Sura, and her two children through work in the construction industry.

25.     On March 28, 2019, Plaintiff Abrego Garcia went to a Home Depot in Hyattsville, Maryland to solicit employment. When he arrived, he joined three other young men who were also at Home Depot soliciting employment, two of whom he recognized from prior occasions at the Home Depot, though he had never interacted with them in any other context. The young men proceeded to chat to pass the time.

26.     At 2:27 PM, while the four of them were chatting, a detective from the Hyattsville City Police approached the group. The detective did not speak to Plaintiff Abrego Garcia, but only one of the other men. Soon thereafter, officers from Prince George County Police Department ("PGPD") arrived on the scene and proceeded to handcuff all four young men, including Plaintiff Abrego Garcia. At no point did police explain why they were arresting Plaintiff Abrego Garcia, nor was Plaintiff Abrego Garcia ever charged with any crime. This was Plaintiff Abrego Garcia's first and only time in state custody.

6

27.     At the police station, the four young men were placed into different rooms and questioned. Plaintiff Abrego Garcia was asked if he was a gang member; when he told police he was not, they said that they did not believe him and repeatedly demanded that he provide information about other gang members. The police told Plaintiff Abrego Garcia that he would be released if he cooperated, but he repeatedly explained that he did not have any information to give because he did not know anything.

28.     Plaintiff Abrego Garcia was then transferred to another room and told that ICE officers would be coming to take him into federal immigration custody. Eventually, ICE officers arrived and took Plaintiff Abrego Garcia into detention.

29.     The following day, Plaintiff Abrego Garcia was served with a Notice to Appear, 8 U.S.C. § 1229, commencing removal proceedings against him pursuant to 8 U.S.C. § 1229a. He was charged as removable pursuant to 8 U.S.C. § 1182(a)(6)(A)(i) ("An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible"), and no other charges.

30.     On April 24, 2019, Plaintiff Abrego Garcia appeared for his first hearing in immigration court. Through counsel, he moved for release on bond pursuant to 8 U.S.C. § 1226(a), submitting over seventy pages of evidence in support thereof. ICE opposed a change in custody status, arguing that Plaintiff Abrego Garcia presented a danger to the community because local police had supposedly "verified" that he is an active gang member.

31.     In support thereof, ICE offered a Gang Field Interview Sheet ("GFIS") generated by PGPD. The GFIS explained that the only reason to believe Plaintiff Abrego Garcia was a gang member was that he was wearing a Chicago Bulls hat and a hoodie; and that a confidential informant advised that he was an active member of MS-13 with the Westerns clique. The GFIS

had been entered into PGPD's database at 6:47 PM, approximately four hours after police met Plaintiff Abrego Garcia for the first time.

32.    According to the Department of Justice and the Suffolk County District Attorney's Office, the "Westerns" clique operates in Brentwood, Long Island, in New York, a state that Plaintiff Abrego Garcia has never lived in.

33.    The attorney for Plaintiff Abrego Garcia subsequently made multiple attempts to obtain additional information from law enforcement concerning these allegations. PGPD indicated that it did not have any incident report related to the Home Deport episode at all, nor did the Department have any incident reports containing his name. The Hyattsville City Police Department ("HCPD"), on the other hand, confirmed it had an incident report for the Home Depot incident, but that only 3 people were named and Plaintiff Abrego Garcia was not one of them, nor did it have any other incident reports with his name in its database. His attorney also contacted the PGPD Inspector General requesting to speak to the detective who authored the GFIS sheet, but was informed that the detective had been suspended. A request to speak to other officers in the Gang Unit was declined.

34.    On June 25, 2019, Plaintiff Vasquez Sura and Plaintiff Abrego Garcia were married in the Howard Detention Center. Plaintiff Vasquez Sura was in her third trimester of pregnancy at the time. Due to a pre-existing condition, uterus didelphys, her pregnancy was categorized as high-risk. *See* Ex. B (Declaration of Plaintiff Vasquez Sura).

35.    Plaintiff Abrego Garcia then filed an I-589 application for asylum, withholding of removal, and protection under the Convention Against Torture with the Baltimore Immigration Court and was scheduled for an individual hearing. His individual hearing spanned over two days: August 9, 2019, and September 27, 2019.

36.     In advance of his hearing, Plaintiff Abrego Garcia, through counsel, filed a motion for a subpoena to require the appearance of two PGPD detectives, and any evidence substantiating his alleged gang membership.

37.     In addition, Plaintiff Abrego Garcia, through counsel, submitted a legal brief and a voluminous evidentiary filing establishing his eligibility for protection and contesting the unfounded allegation of gang membership levied against him.

38.     On August 9, 2019, the attorney for ICE indicated on the record that ICE had conferred with its law enforcement partners and that all the evidence and intelligence they had was what was contained in the GFIS. As a result, a subpoena was deemed unnecessary.

39.     On August 11, 2019, Plaintiff Vasquez Sura gave birth to the couple's son, Plaintiff A.A.V. Plaintiff Abrego Garcia was unable to witness the birth of his son as he remained detained, awaiting to continue the second part of his hearing.

40.     A.A.V. was born with Microtia, congenital malformation of the external ear, resulting in an underdeveloped ear. Testing later confirmed that A.A.V. was deaf in his right ear. *See* Ex. B (Declaration of Plaintiff Vasquez Sura).

41.     On October 10, 2019, Plaintiff Abrego Garcia was granted withholding of removal pursuant to 8 U.S.C. § 1232(b)(3)(A), after the immigration judge agreed that he had established it was more likely than not that he would be persecuted by gangs in El Salvador because of a protected ground. *See* Ex. A (Immigration Judge order). ICE did not appeal the grant of relief, *see* Ex. E (immigration court "Automated Case Information" page); and Plaintiff Abrego Garcia was then promptly released from custody.

42.     Plaintiff Abrego Garcia went home to his wife and children. They all have continuously resided in Prince George's County, Maryland.

9

43. In addition to hearing problems, A.A.V., who is now five years old, is intellectually disabled and has a speech disorder. To this day, he is unable to verbally communicate and in October 2024 he was diagnosed with autism.

44. Both Plaintiff Vasquez Sura and Plaintiff Abrego Garcia work to support their family of five. Plaintiff Abrego Garcia is a union member and is employed full-time as a first-year Sheetmetal Apprentice. In addition, he has been pursuing his own license at the University of Maryland.

45. As a condition of his withholding of removal status, Plaintiff Abrego Garcia is required to check in with ICE once a year, and has been fully compliant. He appeared for his most recent check-in on January 2, 2025, without incident. *See* Ex. C (ICE check-in record).

46. Aside from these check-ins, after being granted withholding protection and being released from custody, Plaintiff Abrego Garcia has had no contact with any law enforcement agency.

47. Plaintiff Abrego Garcia has never been arrested or charged with any crime in the U.S. or in El Salvador. There is no known link or association between him and the MS-13 gang. Prince George's County law enforcement never again questioned him regarding MS-13 or accused him of membership in MS-13.

### *Plaintiff Abrego Garcia's 2025 arrest and removal*

48. In the early afternoon of Wednesday, March 12, 2025, after completing a shift as a sheet metal worker apprentice at a new job site in Baltimore, Plaintiff Abrego Garcia picked up his five-year old son, A.A.V., from his grandmother's house.

10

49. While driving with his son A.A.V. in the backseat, Plaintiff Abrego Garcia was pulled over by ICE officers acting at the direction and under the supervision of Defendant Baker's predecessor in office.

50. One ICE officer, who identified himself as part of Homeland Security Investigations, told Plaintiff Abrego Garcia that his "status has changed." Within minutes, Plaintiff Abrego Garcia was handcuffed and detained in one of several ICE vehicles on the scene. Plaintiff Vasquez Sura was called and instructed to appear at their location within ten minutes to get her five-year old son, A.A.V.; otherwise, the ICE officers threatened that the child would be handed over to Child Protective Services. *See* Ex. B (Declaration of Plaintiff Vasquez Sura).

51. After Plaintiff Vasquez Sura arrived at the scene, she was able to briefly talk with Plaintiff Abrego Garcia, who appeared confused, distraught, and crying. Moments later, Plaintiff Abrego Garcia was driven away. No explanation was provided to Jennifer as to why her husband was detained, where he was going, or what was happening. *Id.*

52. Almost immediately after Plaintiff Vasquez Sura left with her son A.A.V., she began to try to locate Plaintiff Abrego Garcia through the online ICE Detainee Locator system and by calling various immigration detention centers and facilities. It appeared that between Wednesday, March 12, and Saturday, March 15, Plaintiff Abrego Garcia was moved to various different locations across the country. *See* Ex. B (Declaration of Plaintiff Vasquez Sura).

53. The evening after his arrest, Plaintiff Vasquez Sura received a call from Plaintiff Abrego Garcia. At that time, it appeared that he was in Baltimore. During that conversation, Plaintiff Abrego Garcia informed Plaintiff Vasquez Sura that he was being questioned about gang affiliations. He repeatedly informed his interviewers that he was never a gang member and had no gang affiliations. He was shown several photos where he appeared in public, and asked about other

11

people in those photos, but was unable to provide any information on them, as he did not know them or anything about them. Plaintiff Abrego Garcia also told his wife that he had been told that he would go before an immigration judge and then be released. *See* Ex. B (Declaration of Plaintiff Vasquez Sura).

54.    Plaintiff Vasquez Sura received a call from Plaintiff Abrego Garcia on the evening of March 13. Plaintiff Abrego Garcia told his wife that he believed he was in Louisiana, but was not sure because he had been moved around so many times. Plaintiff Abrego Garcia indicated to his wife that he was very confused. However, he was still being assured that he would be brought before an immigration judge soon. *See* Ex. B (Declaration of Plaintiff Vasquez Sura).

55.    In an attempt to ascertain his actual location and find further information about his arrest and detention, Plaintiff Vasquez Sura called different detention centers, trying to speak to someone. She recalls one brief conversation where she was told that "El Salvador was asking for him." Her attempts to protest by saying that he had won protection from being removed to El Salvador fell on deaf ears. *See* Ex. B (Declaration of Plaintiff Vasquez Sura).

56.    Around 11:00 AM on Saturday, March 15, 2025, Plaintiff Vasquez Sura received her last call from Plaintiff Abrego Garcia. During that conversation, Plaintiff Abrego Garcia informed her that he was being held by ICE at the East Hidalgo Detention Center in La Villa, Texas. *See* Ex. B (Declaration of Plaintiff Vasquez Sura).

57.    Plaintiff Abrego Garcia then relayed that he was told that he was being deported to El Salvador. With a sense of urgency, he asked his wife to contact his mother so their family could get him from "CECOT," as that is where he was told they were sending him.[1]

---

[1] CECOT is the Terrorism Confinement Center in El Salvador, one of the largest prisons in the world.

58.    Since that conversation, Plaintiff Vasquez Sura has not had any further contact with Plaintiff Abrego Garcia. *See* Ex. B (Declaration of Plaintiff Vasquez Sura).

59.    The following day, on Sunday, March 16, Ms. Vasquez Sura was sent a photo from a news article discussing the deportation of alleged Venezuelan gang members that were deported without a hearing. The photo showed men kneeling on the ground, with their shaved heads bowed and their arms over their head. Their faces were not visible. Upon inspection, Jennifer identified one of these men as Plaintiff Abrego Garcia based on her husband's distinctive tattoos and two scars on his head. See Ex. D (CECOT photos).

60.    For the next few days, the ICE Detainee Locator continued to indicate that Plaintiff Abrego Garcia was located at the East Hidalgo Detention Center, even though staff at that detention center told Plaintiff Vasquez Sura that he had left on Saturday. *See* Ex. B (Declaration of Plaintiff Vasquez Sura). (Now, Plaintiff Abrego Garcia no longer appears in the ICE Detainee Locator.)

61.    Watching the news, Plaintiff Vasquez Sura was horrified to see more photos of CECOT prisoners that included her husband, and a video where Plaintiff Abrego Garcia was frog-walked through the CECOT prison.  Plaintiff Abrego Garcia's family subsequently hired a lawyer in El Salvador, who has confirmed that Plaintiff Abrego Garcia is, in fact, being held at CECOT. The lawyer has ascertained that to date, there are no known criminal charges levied against Plaintiff Abrego Garcia in El Salvador either.

62.    ICE and DHS took no steps to reopen the removal case of Plaintiff Abrego Garcia, nor to rescind his order of withholding of removal. *See* Ex. E (immigration court "Automated Case Information" page, showing no activity since October 10, 2019).

13

63.     Upon information and belief, ICE and DHS leadership, including Defendants Noem, Lyons, Genalo, and the predecessor in office of Defendant Baker, decided to deport Plaintiff Abrego Garcia without following the law. Upon information and belief, they did so knowing and intending that the Government of El Salvador would detain Plaintiff Abrego Garcia in CECOT immediately upon arrival.

*Conditions in CECOT*

64.     On March 15, 2025, Defendants deported 261 noncitizens, including 238 Venezuelan nationals and 23 Salvadoran nationals, to El Salvador without going through any legal processes whatsoever in front of an immigration judge. Upon information and belief, Plaintiff Abrego Garcia was one of those 23 Salvadoran nationals. Salvadoran President Nayib Bukele confirmed they have been sent to the country's mega-prison CECOT, the Terrorism Confinement Center. Upon information and belief, Defendants carried out this deportation through extrajudicial means because they believed that going through the immigration judge process took too long, and they feared that they might not win all of their cases before immigration judges.

65.     Upon information and belief, ICE and DHS has paid or continues to pay the Government of El Salvador six million dollars in order for the Government of El Salvador to detain these individuals, including Plaintiff Abrego Garcia.[2]

66.     Upon information and belief, all Defendants are aware that the government of El Salvador tortures individuals detained in CECOT. Indeed, U.S. President Donald Trump has made comments to the press expressing glee and delight at the torture that the Government of El Salvador inflicts upon detainees in CECOT.

---

[2] "US to pay El Salvador to jail 300 alleged gang members, AP reports" (Mar. 15, 2025), *available at* https://www.reuters.com/world/us/us-pay-el-salvador-jail-300-alleged-gang-members-ap-reports-2025-03-15/.

14

67.     CECOT conditions have garnered attention from human rights organizations. Each of the 256 cells is intended to hold approximately 80 inmates but often holds nearly double.[3] The cramped cells are equipped with tiered metal bunks without mattresses, two basins for washing, and two open toilets. There are no windows, fans, or air conditioning, despite the region's warm and humid climate.[4]

68.     Inmates in CECOT are confined to their cells for 23.5 hours daily and cannot go outdoors. They are denied access to reading materials, including even letters from friends or family. Inmates are prohibited from receiving visits from family and friends. Meals are provided through the bars, and the facility enforces strict regulations to maintain order.[5]

69.     In May 2023, Cristosal, a leading human rights organization in El Salvador, released a comprehensive report detailing severe human rights abuses within the country's prison system, especially CECOT.[6] The investigation documented the deaths of 153 inmates between March 27, 2022, and March 27, 2023, attributing many to torture, beatings, mechanical asphyxiation (strangulation), and lack of medical attention. *Id.* Autopsies revealed common patterns of lacerations, hematomas, sharp object wounds, and signs of choking or strangulation. *Id.* Survivors reported being forced to pick food off the floor with their mouths, subjected to

---

[3] Leire Ventas & Carlos García, "El Salvador's Secretive Mega-Jail," *BBC News* (July 14, 2023), *available at* https://www.bbc.com/news/resources/idt-81749d7c-d0a0-48d0-bb11-eaab6f1e6556.

[4] Maanvi Singh, "US Deportees Face Brutal Conditions in El Salvador Mega-Prison: 'Severe Overcrowding, Inadequate Food,'" *The Guardian* (Mar. 20, 2025), *available at* https://www.theguardian.com/us-news/2025/mar/20/trump-deportations-venezuela-prison

[5] "Inside El Salvador's prison holding Venezuelans deported from US," *CNN* (March 17. 2025), *available at* https://edition.cnn.com/2025/03/17/world/video/el-salvador-prison-holding-venezuelans-deported-us-trump-digvid.

[6] Noé López, "Inmates in El Salvador Tortured and Strangled: A Report Denounces Hellish Conditions in Bukele's Prisons," *El País* (May 29, 2023), *available at* https://english.elpais.com/international/2023-05-29/inmates-in-el-salvador-tortured-and-strangled-a-report-denounces-hellish-conditions-in-bukeles-prisons.html.

15

electric shocks, and exposed to untreated skin fungus epidemics. *Id.* Cristosal's director has emphasized that these systemic violations have become state policy. *Id.*

70.    Plaintiff Abrego Garcia is at imminent risk of irreparable harm with every additional day he spends detained in CECOT, included but not limited to torture and possible death.

71.    Plaintiff Abrego Garcia has exhausted all administrative remedies. No administrative remedies are available to Plaintiff Abrego Garcia, precisely because Defendants made the choice to unlawfully forego proceedings before the immigration judge, which would entail a right to administrative review before the Board of Immigration Appeals and then a petition for review to the U.S. Court of Appeals for the Fourth Circuit.

<div align="center">

**FIRST CAUSE OF ACTION:**
**VIOLATION OF THE WITHHOLDING OF REMOVAL STATUTE,**
**8 U.S.C. § 1231(b)(3)(A)**
**(Plaintiff Abrego Garcia)**

</div>

72.    Plaintiffs incorporate the foregoing paragraphs 1-71 by reference.

73.    The Withholding of Removal statute, 8 U.S.C. § 1231(b)(3)(A), prohibits Defendants from removing a noncitizen to any country from which he has been granted withholding of removal, unless such grant is formally terminated by lawful means.

74.    As set forth above, Defendants removed Plaintiff Abrego Garcia to El Salvador, the country from which he had been granted withholding of removal, without formally terminating his grant of withholding of removal, thus violating this law.

75.    Defendants' violation of law, as set forth herein, is causing Plaintiff Abrego Garcia irreparable harm with each day that he spends outside the United States and detained in CECOT.

<div align="center">

16

</div>

76.    Even if Plaintiff Abrego Garcia were released from CECOT, he would still be suffering irreparable harm in the form of separation from his U.S. citizen wife, Plaintiffs Vasquez Sura, and his severely disabled U.S. citizen child, Plaintiff A.A.V.

77.    Plaintiffs ask the Court to immediately order Defendants to take all steps reasonably available to them, proportionate to the gravity of the ongoing harm, to return Plaintiff Abrego Garcia to the United States. This should begin with ordering that Defendants immediately halt all payments to the Government of El Salvador to hold individuals in CECOT, and an order that Defendants immediately request that the Government of El Salvador release Plaintiff Abrego Garcia from CECOT and deliver him to the U.S. Embassy in El Salvador.

### SECOND CAUSE OF ACTION:
### PROCEDURAL DUE PROCESS
### U.S. CONSTITUTION, AMENDMENT V
### (Plaintiff Abrego Garcia)

78.    Plaintiffs incorporate the foregoing paragraphs 1-71 by reference.

79.    Plaintiff Abrego Garcia has a procedural due process right not to be removed to El Salvador, the country from which he had been granted withholding of removal, without an immigration judge first carrying out the procedures set forth in statute and federal regulations.

80.    As set forth above, Defendants removed Plaintiff Abrego Garcia to El Salvador, the country from which he had been granted withholding of removal, without formally terminating his grant of withholding of removal, thus violating his procedural due process rights under the Fifth Amendment to the U.S. Constitution.

81.    Defendants' violation of law, as set forth herein, is causing Plaintiff Abrego Garcia irreparable harm with each day that he spends outside the United States and detained in CECOT.

17

82.      Even if Plaintiff Abrego Garcia were released from CECOT, he would still be suffering irreparable harm in the form of separation from his U.S. citizen wife, Plaintiffs Vasquez Sura, and his severely disabled U.S. citizen child, Plaintiff A.A.V.

83.      Plaintiffs ask the Court to immediately order Defendants to take all steps reasonably available to them, proportionate to the gravity of the ongoing harm, to return Plaintiff Abrego Garcia to the United States. This should begin with ordering that Defendants immediately halt all payments to the Government of El Salvador to hold individuals in CECOT, and an order that Defendants immediately request that the Government of El Salvador release Plaintiff Abrego Garcia from CECOT and deliver him to the U.S. Embassy in El Salvador.

### THIRD CAUSE OF ACTION:
### SUBSTANTIVE DUE PROCESS
### U.S. CONSTITUTION, AMENDMENT V
### (All Plaintiffs)

84.      Plaintiffs incorporate the foregoing paragraphs 1-71 by reference.

85.      Plaintiff Abrego Garcia has a substantive due process right under the Fifth Amendment to the U.S. Constitution not to be subjected to government conduct that shocks the conscience. Defendants' conduct as set forth above violates that right.

86.      Plaintiffs Vasquez Sura and A.A.V., as the U.S.-citizen spouse and minor child of Plaintiff Abrego Garcia, also have a family unity interest in Plaintiff Abrego Garcia not being removed from the United States in a manner that shocks the conscience. Defendants' conduct as set forth above violates that right.

87.      Defendants' conscience-shocking actions, as set forth herein, is causing Plaintiff Abrego Garcia irreparable harm with each day that he spends outside the United States and detained in CECOT.

88.    Even if Plaintiff Abrego Garcia were released from CECOT, he would still be suffering irreparable harm in the form of separation from his U.S. citizen wife, Plaintiffs Vasquez Sura, and his severely disabled U.S. citizen child, Plaintiff A.A.V.

89.    Plaintiffs ask the Court to immediately order Defendants to take all steps reasonably available to them, proportionate to the gravity of the ongoing harm, to return Plaintiff Abrego Garcia to the United States. This should begin with ordering that Defendants immediately halt all payments to the Government of El Salvador to hold individuals in CECOT, and an order that Defendants immediately request that the Government of El Salvador release Plaintiff Abrego Garcia from CECOT and deliver him to the U.S. Embassy in El Salvador.

### FOURTH CAUSE OF ACTION:
### ADMINISTRATIVE PROCEDURE ACT
### 5 U.S.C. § 706(2)(A)
### (Plaintiff Abrego Garcia)

90.    Plaintiffs incorporate the foregoing paragraphs 1-71 by reference.

91.    The Administrative Procedure Act provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion."  5 U.S.C. § 706(2)(A).

92.    Defendants' actions as set forth herein were arbitrary, capricious, and an abuse of discretion.

93.    Defendants' arbitrary and capricious actions, as set forth herein, are causing Plaintiff Abrego Garcia irreparable harm with each day that he spends outside the United States and detained in CECOT.

94.    Even if Plaintiff Abrego Garcia were released from CECOT, he would still be suffering irreparable harm in the form of separation from his U.S. citizen wife, Plaintiffs Vasquez Sura, and his severely disabled U.S. citizen child, Plaintiff A.A.V.

19

95.      Plaintiffs ask the Court to immediately order Defendants to take all steps reasonably available to them, proportionate to the gravity of the ongoing harm, to return Plaintiff Abrego Garcia to the United States. This should begin with ordering that Defendants immediately halt all payments to the Government of El Salvador to hold individuals in CECOT, and an order that Defendants immediately request that the Government of El Salvador release Plaintiff Abrego Garcia from CECOT and deliver him to the U.S. Embassy in El Salvador.

<div align="center">

**FIFTH CAUSE OF ACTION:**
**HABEAS CORPUS**
**28 U.S.C. § 2241**
**(Plaintiff Abrego Garcia)**

</div>

96.      Plaintiffs incorporate the foregoing paragraphs 1-71 by reference.

97.      The writ of habeas corpus is available to any individual who is held in custody of the federal government in violation of the Constitution or laws or treaties of the United States.

98.      As set forth herein, Plaintiff Abrego Garcia is being held in custody by the Government of El Salvador, but the Government of El Salvador is detaining Plaintiff Abrego Garcia at the direct request of Defendants, and at the financial compensation of Defendants.  Such detention is in violation of the Constitution or laws or treaties of the United States.

99.      Plaintiffs ask the Court to immediately order Defendants to immediately cease compensating the Government of El Salvador for its detention of Plaintiff Abrego Garcia, and to immediately request that the Government of El Salvador release Plaintiff Abrego Garcia from CECOT and deliver him to the U.S. Embassy in El Salvador.

<div align="center">

**REQUEST FOR RELIEF**

</div>

Plaintiffs pray for judgment against Defendants and respectfully request that the Court enters an order:

<div align="center">

20

</div>

a) Declaring that Defendants' actions, as set forth herein, violated the laws of the United States and the Fifth Amendment to the U.S. Constitution;

b) Immediately ordering Defendants to immediately cease compensating the Government of El Salvador for its detention of Plaintiff Abrego Garcia;

c) Immediately ordering Defendants to immediately request that the Government of El Salvador release Plaintiff Abrego Garcia from CECOT and deliver him to the U.S. Embassy in El Salvador;

d) Should the Government of El Salvador decline such request, ordering Defendants to take all steps reasonably available to them, proportionate to the gravity of the ongoing harm, to return Plaintiff Abrego Garcia to the United States;

e) Granting Plaintiffs costs and fees under the Equal Access to Justice Act; and

f) Granting such other relief at law and in equity as justice may require.

Respectfully submitted,

*//s// Simon Sandoval-Moshenberg*                                    Date: March 24, 2025
Simon Y. Sandoval-Moshenberg, Esq.
D. Md. Bar no. 30965
*Counsel for Plaintiff*
Murray Osorio PLLC
4103 Chain Bridge Road, Suite 300
Fairfax, Virginia 22030
Telephone: 703-352-2399
Facsimile: 703-763-2304
ssandoval@murrayosorio.com

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
BALTIMORE, MARYLAND

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | IN REMOVAL PROCEEDINGS |
| | ) | |
| | ) | |
| Kilmar Armando ABREGO-GARCIA | ) | File #A 201-577-119 |
| | ) | |
| | ) | |
| RESPONDENT | ) | |

**INDIVIDUAL HEARING DATE:**   August 9 and September 27, 2019

**CHARGE:**   Section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA" or the "Act"), as amended, in that the Respondent is an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General.

**APPLICATIONS:**   INA § 208, Asylum; INA § 241(b)(3), Withholding of Removal; Protection Under Article 3 of the Convention Against Torture.

## APPEARANCES

**ON BEHALF OF RESPONDENT**
Lucia Curiel
Khatia Mikadze

**ON BEHALF OF THE DHS**
Amy Donze-Sanchez

## MEMORANDUM OF DECISION AND ORDER

### I.   Procedural History

The Respondent is a native and citizen of El Salvador. The Department of Homeland Security ("DHS") issued the Respondent a Notice to Appear ("NTA") on March 29, 2019 which alleged that the Respondent: (1) is not a citizen or national of the United States; (2) is a native and citizen of El Salvador; (3) entered the United States at or near an unknown place on or about an

EOIR – 1 of 14

unknown date; and (4) was not then admitted or paroled after inspection by an immigration officer.

At a Master Calendar Hearing the Respondent, through counsel, admitted the factual allegations contained in the NTA and conceded removability as charged. Based on the Respondent's admissions and concessions, the Court found his removability to be established by clear and convincing evidence as required by INA § 240(c)(3). *See also Woodby v. INS*, 385 U.S. 276 (1966). As relief from removal, the Respondent filed a Form I-589, Application for Asylum, Withholding of Removal, and Relief under Article 3 of the Convention Against Torture ("CAT"). The Respondent and his wife both testified in support of the applications. The Court reserved the matter for the issuance of a written decision.

The Court has considered the arguments of both parties and the entire record carefully. The following documentary evidence was considered by the Court and admitted into the record: Exhibit 1, the Notice to Appear; Exhibit 2, the I-213; Exhibit 3, the Respondent's application with all supporting documents; and Exhibit 5, Part A, explanation of the wife's pregnant condition while testifying.[1] All evidence and testimony admitted has been considered, even if not specifically addressed in the decision. Having reviewed the evidence of record and the applicable law, the Court's written decision and order now follow.

## II.    **Testimonial Evidence Presented**

### A. Respondent

The Respondent is a 24-year old native of El Salvador. He was born in 1995 in Los Nogales neighborhood, San Salvador, El Salvador. The Respondent testified that he fears returning to his country because the Barrio 18 gang was targeting him and threatening him with death because of his family's pupusa[2] business. The Respondent's mother, Cecilia, ran the business out of her home. Although the business had no formal storefront, everyone in the town knew to get their pupusas from "Pupuseria Cecilia." The Respondent's father, brother and two sisters all helped run the family business. The Respondent's job was to go to the grocery store to buy the supplies needed for the pupusas, and then he and his brother would do deliveries four days a week to the people in

---

[1] Exhibit 4 is a Prince George's County Police Department Gang Field Interview Sheet. It was admitted for the limited purpose of showing that the Respondent was labeled a gang member by law enforcement.

[2] El Salvadorian stuffed tortillas.

2

the town that ordered pupusas from Cecilia.

At some point, Barrio 18 realized the family was making money from their family business and they began extorting the Respondent's mother, Cecilia. They demanded a regular stipend of "rent" money from the business, beginning with a monthly payment and then requiring weekly payments. The gang threatened to harm the Respondent, his older brother Cesar, and the family in general if their demands were not met. Alternatively, they told Cecelia that if she could not pay the extortion money, she could turn Cesar over to them to become part of their gang. The Abrego family paid the money on a regular basis, whenever they could, and hid Cesar from the gang. On one occasion, the gang came to the family's home and threatened to kill Cesar if the family did not pay the rent. The family responded by sending Cesar to the U.S.

After Cesar left, the gang started recruiting the Respondent. They told Cecilia that she would not have to pay rent any more if she let him join the gang. The mother refused to let this happen. The gang then threatened to kill the Respondent. When the Respondent was around 12-years old, the gang came to the home again, telling Cecilia that they would take him because she wasn't paying money from the family's pupusa business. The Respondent's father prevented the gang from taking the Respondent that day by paying the gang all of the money that they wanted. During the days, the gang would watch the Respondent when he went back and forth to school. The members of the gangs all had many tattoos and always carried weapons.

Eventually, the family had enough and moved from Los Nogales to the 10th of October neighborhood. This town was about 10 minutes away, by car, from Los Nogales. Shortly after the family moved, members of Barrio 18 from Nogales went to the 10th of October and let their fellow gang members know that the family had moved to that neighborhood· Barrio 18 members visited the house demanding the rent money from the pupusa business again. They went to the house twice threatening to rape and kill the Respondent's two sisters and threatening the Respondent. The Respondent's parents were so fearful that they kept the Respondent inside the home as much as possible. Finally, the family decided they had to close the pupusa business and move to another area, Los Andes, about a 15 minute drive from their last residence. Even at this new location, the family kept the Respondent indoors most of the time because of the threats on his life. After four months of living in fear, the Respondent's parents sent the Respondent to the U.S.

Even though the Respondent's father was a former policeman, they family never reported anything to the police regarding the gang extorting the family business. The gang members had

threatened Cecilia, telling her that if she ever reported anything to the police that they would kill the entire family. The family believed them, because they were well aware of the rampant corruption of the police in El Salvador and they believed that if they reported it to the police, the police would do nothing.

At present, even though the family has now shut down the pupusa business, Barrio 18 continues to harass and threaten the Respondent's two sisters and parents in Guatemala. Additionally, they have targeted a brother-in-law who now lives with the family.

## B. The Respondent's Wife

The Respondent's wife also testified, but her testimony related to two other particular social groups not reached in this decision.[3]

## III.    Eligibility for Asylum, Withholding and CAT Relief

### A.    Asylum

An applicant for asylum bears the burden of establishing that he meets the definition of a refugee under INA § 101(a)(42)(A), which defines a refugee in part as an alien who is unable or unwilling to return to her home country because of persecution, or a well-founded fear of persecution, on account of race, religion, nationality, membership in a particular social group, or political opinion. *Matter of S-P-*, 21 I&N Dec. 486, 489 (BIA 1996); 8 C.F.R. § 1208.13(a); INA § 208(b)(1)(B). The alien's fear of persecution must be country-wide. *Matter of Acosta*, 19 I&N Dec. 211, 235 (BIA 1985). Additionally, the alien must establish that he is unable or unwilling to avail himself of the protection of his country of nationality or last habitual residence. INA § 101(a)(42)(A); *see also Matter of A-B-*, 27 I&N Dec. 316, 325–26 (A.G. 2018). An applicant who establishes statutory eligibility for asylum still bears the burden of demonstrating that he merits a grant of asylum as a matter of discretion. INA § 208(b)(1); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987).

### i.    Credibility and Corroboration

An alien bears the evidentiary burden of proof and persuasion in connection with any

---

[3] The other two particular social groups are: 1) Salvadoran male deportees labeled as MS-13 gang members by U.S. law enforcement; and 2) Immediate family of Jennifer Vasquez (the Respondent's wife.) The Court will not address the alternative claims for relief, as it is not necessary to do so at this time.

4

EOIR - 4 of 14

asylum application pursuant to section 208 of the Act. 8 C.F.R. § 1208.13(a); *see also Matter of S-M-J-*, 21 I&N Dec. 722, 723 (BIA 1997); *Matter of Acosta*, 19 I&N Dec. 211, 215 (BIA 1985); *Matter of Mogharrabi*, 19 I&N Dec. 439, 446 (BIA 1987). The Board of Immigration Appeals (BIA) has recognized the difficulties an asylum applicant may face in obtaining documentary or other corroborative evidence to support his claim of persecution. *Matter of Dass*, 20 I&N Dec. 120, 124 (BIA 1989). As a result, uncorroborated testimony that is credible, persuasive, and specific may be sufficient to sustain the burden of proof to establish a claim for asylum. *See* INA § 208(b)(1)(B)(ii); 8 C.F.R. § 1208.13(a); *Matter of Mogharrabi*, at 445. However, where it is reasonable to expect corroborating evidence for certain alleged facts, such evidence must be provided as long as the applicant has the evidence or can reasonably obtain it. *Matter of S-M-J-*, 21 I&N Dec. at 725. The absence of such corroboration may lead to a finding that an applicant has failed to meet his burden of proof. *Id.* at 725–26. The immigration judge must provide the applicant an opportunity to explain the lack of corroborating evidence and ensure that the applicant's explanation is included in the record. *See id.*; *Lin-Jian v. Gonzales*, 489 F.3d 182, 192 (4th Cir. 2007). The Board has made clear that an asylum applicant cannot meet his burden of proof by "general and vague" testimony, and "the weaker an alien's testimony, the greater the need for corroborative evidence." *Matter of Y-B-*, 21 I&N Dec. 1136, 1139 (BIA 1998).

In the instant matter, the Respondent provided credible responses to the questions asked. His testimony was internally consistent, externally consistent with his asylum application and other documents, and appeared free of embellishment. Further, he provided substantial documentation buttressing his claims. Included in this evidence were several affidavits from family members that described the family's pupusa business, and the threats by Barrio 18 to the various family members—in particular the Respondent—over the years. The court finds the Respondent credible. This finding is applicable to his other two claims as well (withholding under the Act and CAT protection).

## ii.    One-Year Filing Deadline

Under INA § 208(a)(2)(B), an applicant for asylum must demonstrate by clear and convincing evidence that the application has been filed within one year after the date of the alien's arrival in the United States. Following the *Mendez Rojas v. Johnson* case (305 F. Supp. 3d 1176 (W.D. Wash., Mar. 29, 2018)), in a joint stay agreement, the Government agreed to treat pending

asylum applications by four classes of applicants as though filed within one year of arrival.[4] *See* 305 F. Supp. 3d at 1179. Members of Class A.II are individuals in removal proceedings who have been released from DHS custody after having been found to possess a credible fear of persecution, did not receive notice from the DHS of the one-year deadline, and filed an untimely asylum application. *See id.* Members of Class B.II are individuals in removal proceedings who express a fear of return to their country of origin, were released from DHS custody without a credible fear determination, did not receive notice from the DHS of the one-year deadline, and filed an untimely asylum application. *See id.*

Here, the Respondent's asylum application is time-barred without exception. INA § 208(a)(2)(B); 8 C.F.R. § 1208.4(a)(2). The Respondent testified that he entered the U.S. in 2012. However, he did not file his application for asylum until after he was detained in August 2019, seven years after his entry into the U.S. and well-beyond the one-year filing deadline. *See* Exh. 3. He has shown no changed or extraordinary circumstances that would entitle him to relief from the one-year bar. See 8 C.F.R. § 1208.4(a)(4) and (5). Based on the foregoing, the Respondent's application for asylum is time-barred and must be denied. We turn next to withholding of removal under the Act.

**B.    Withholding of Removal Pursuant to INA § 241(b)(3)**

Withholding of removal, in contrast to asylum, confers only the right not to be deported to a particular country rather than the right to remain in the U.S. *INS v. Aguirre-Aguirre*, 526 U.S. 415 (1999). To establish eligibility for withholding of removal, a respondent must show that there is a clear probability of persecution in the country designated for removal on account of race, religion, nationality, membership in a particular social group, or political opinion. *INS v. Stevic*, 467 U.S. 407 (1984). Such a showing requires that the respondent establish that it is more likely than not (i.e., a clear probability) that the alien would be subject to persecution if returned to the country from which the alien seeks withholding of removal. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987). The standard for withholding of removal is thus more stringent than the standard for asylum. *Stevic*, 467 U.S. at 429-430. Under the withholding of removal regulations at 8 C.F.R. § 1208.16(b)(1), however, if an applicant has suffered past persecution, then there is a presumption that the applicant's life or freedom would be threatened in the future in the country of removal.

---

[4] Classes A.I and B.I apply only to individuals who are not in removal proceedings. *See Mendez Rojas*, 305 F. Supp. 3d at 1179.

6

### i.     Past Persecution

Persecution has been interpreted to include serious threats to an individual's life or freedom, or the infliction of significant harm on the applicant. *See Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985); *Li v. Gonzales*, 405 F.3d 171 (4th Cir. 2005). Persecution is generally assessed cumulatively, and relevant incidents are not to be evaluated in isolation. *See Baharon v. Holder*, 588 F.3d 228 (4th Cir. 2009). A death threat qualifies as persecution. *See Crespin-Valladares v. Holder*, 632 F.3d 117 (4th Cir. 2011). Extortion may constitute persecution, even if physical harm will be inflicted only upon failure to pay. *Oliva v. Lynch*, 807 F.3d 53 (4th Cir. 2015).

The Respondent suffered past persecution as he was threatened with death on more than one occasion. Therefore, DHS bears the burden of establishing "a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five grounds" or that "[t]he applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so." *See* 8 C.F.R. § 1208.16(b)(1).

The "one central reason" standard that applies to asylum applications pursuant to section 208(b)(1)(B)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1158(b)(1)(B)(i) (2006), also applies to applications for withholding of removal under section 241(b)(3)(A) of the Act, 8 U.S.C. § 1231(b)(3)(A) (2006). *Matter of C-T-L-*, 25 I&N Dec. 341 (BIA 2010). An applicant must demonstrate that a statutorily protected ground would be "at least one central reason" for the feared persecution. *See* INA § 208(b)(1)(B)(i); *Matter of J-B-N- & S-M-*, 24 I&N Dec. 208 (BIA 2007) (holding that in a mixed motive asylum case, an applicant must prove that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for the claimed persecution). An alien need not show that a statutorily protected ground would be the central reason or even a dominant central reason, but rather must show that such a ground was more than an "incidental, tangential, superficial or subordinate" reason for the past persecution or feared future persecution. *Matter of J-B-N- & S-M-*, 24 I&N Dec. at 214; *see also Crespin-Valladares v. Holder*, 632 F.3d 117 (4th Cir. 2011); *Quinteros-Mendoza v. Holder*, 556 F.3d 159, 164 (4th Cir. 2009). Persecution may be on account of multiple central reasons or intertwined reasons, and the full factual context must be taken into account when analyzing nexus. *Oliva v. Lynch*, 807 F.3d 53 (4th Cir. 2015).

### ii.    Well-Founded Fear of Future Persecution and Internal Relocation

Based on the above, the Respondent has demonstrated the he was subject to past persecution on account of a statutorily protected ground. He is entitled to the presumption under the regulations that he would have a clear probability of future persecution on account of a protected ground. Given his testimony and other evidence concerning official corruption and other abuses, he has demonstrated that authorities were and would be unable or unwilling to protect him from past or feared future persecution. Given country conditions and the Respondent's inability to avoid the threat through internal relocation, the Respondent could not necessarily avoid the threat through internal relocation, nor would it be reasonable to expect him to do so. DHS has failed to carry their burden to show that there are changed circumstances in Guatemala that would result in the Respondent's life not being threatened, or that internal relocation is possible and reasonable. The facts here show that the Barrio 18 gang continues to threaten and harass the Abrego family over these several years, and does so even though the family has moved three times.[5]

### iii.    Nexus to a Protected Ground

To be cognizable under the statute, members of a "particular social group" must share a "common immutable characteristic," which may be an innate characteristic or a shared past experience. *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018). In either case, it must be a characteristic that members of the group either cannot change or should not be required to change. To constitute a "particular social group" under the statute, the group must be (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question. *See Matter of A-B-*, 27 I&N Dec. 316 (married women in Guatemala who are unable to leave their relationships do not constitute a particular social group); *Matter of W-G-R-*, 26 I&N Dec. 208 (BIA 2014) (former members of Mara 18 gang in El Salvador who renounced gang membership do not constitute a particular social group); *Matter of M-E-V-G-*, 26 I&N Dec. 227 (BIA 2014); *Matter of C-A-*, 23 I&N Dec. 951 (BIA 2006) (former noncriminal drug informants do not present a cognizable social group); *Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985).

Under well-established Fourth Circuit precedent, family ties may provide the basis for a

---

[5] The court understands that the family's moves have been only 15 minutes away each time. However, DHS has failed to show that internal relocation is not only possible, but reasonable to expect the Respondent to so relocate.

EOIR - 8 of 14

cognizable particular social group under the INA. *See, e.g., Crespin-Valladares v. Holder,* 632 F.3d 117, 124-126 (4th Cir. 2011) ("we can conceive of few groups more readily identifiable than the family"); *Hernandez-Avalos v. Lynch,* 784 F.3d 944, 949 (4th Cir. 2015) ("membership in a nuclear family qualifies as a protected ground for asylum purposes"); *Cruz v. Sessions,* 853 F.3d 122, 127 (4th Cir. 2017) ("by virtue of her domestic partnership with Martinez, Cantillano Cruz was a member of a cognizable particular social group, namely, 'the nuclear family of Johnny Martinez'"), *Salgado-Sosa v. Sessions,* 882 F.3d 451, 457 (4th Cir. 2018) ("Salgado-Sosa's family qualifies as a 'particular social group,' protected for purposes of his asylum and withholding of removal claims"). Neither those who resist recruitment efforts by gangs nor their family members generally constitute a particular social group under the INA, nor do such bases amount to political opinion. *See Matter of S-E-G-,* 24 I&N Dec. 579 (BIA 2008); *see also INS v. Elias-Zacarias,* 502 U.S. 478 (1992) (forced recruitment or attempts to forcibly recruit into a guerrilla organization does not necessarily constitute persecution on account of political opinion). Membership or perceived membership in a criminal gang also does not constitute membership in a particular social group under the INA. *See Matter of E-A-G-,* 24 I&N Dec. 591 (BIA 2008); *see also Lizama v. Holder,* 629 F.3d 440 (4th Cir. 2011) (claimed particular social group of "young, Americanized, well-off Salvadoran male deportees with criminal histories who oppose gangs" not cognizable under the INA). At the same time, the BIA has noted that social group determinations are made on a case by case basis. *Matter of M-E-V-G-,* 26 I&N Dec. 227.

Ascertaining whether membership in a family-based social group is at least one central reason for any past or feared future persecution may present challenges, and the Fourth Circuit has encouraged an expansive view of nexus in these cases. *See Hernandez-Avalos v. Lynch,* 784 F.3d 944 (4th Cir. 2015) (mother who refused to allow her son to join a gang was persecuted on account of her membership in the particular social group of his family); *Cruz v. Sessions,* 853 F.3d 122 (4th Cir. 2017) (nexus to family relationship established because wife of murdered man was more likely than others to search for her husband, confront the suspect, and express an intent to go to the police); *Salgado-Sosa v. Sessions,* 882 F.3d 451 (4th Cir. 2018) (nexus found where man fought back when he was in his family's home during attack targeted at stepfather because membership in the family was why the man and not some other person became involved); *but see Velasquez v. Sessions,* 866 F.3d 188 (4th Cir. 2017) (personal dispute among family members may not equate to persecution on account of family group membership); *Matter of A-B-,* 27 I&N Dec. at 338-339;

*Cortez-Mendez v. Whitaker*, 912 F.3d 205 (4th Cir. 2019) (circumstantial evidence presented did not establish as a factual matter that the respondent's relationship to his father was at least one central reason for his mistreatment by gang members who sought to forcibly recruit him).

The evidence in this case indicates quite clearly that at least one central reason the Respondent was subject to past persecution was due to him being his mothers' son, essentially as a member of his nuclear family. That the Respondent is his mothers' son is the reason why he, and not another person, was threatened with death. He was threatened with death because he was Cecilia's son and the Barrio 18 gang targeted the Respondent to get at the mother and her earnings from the pupusa business. Pursuant to unambiguous and repeated guidance from the Fourth Circuit, the nexus requirement is satisfied in this case. *See generally Hernandez-Avalos v. Lynch*, 784 F.3d at 944; *Cruz v. Sessions*, 853 F.3d at 122; *Salgado-Sosa v. Sessions*, 882 F.3d at 451.

The Court finds that the Respondent's proposed social group, "Immediate Family Members of the Abrego Family," essentially his nuclear family, is cognizable. Membership in this family group is immutable. It is also sufficiently particular, as it is clearly delineated and easy to determine who is and is not in the group, and it is socially distinct.

With respect to social distinction, the immediate family lived in the same home, and his mother ran a pupusa business. Neighbors and others in the community recognized the family as a distinct group that was related, and ran a family business. Everyone knew that Cecilia Abrego was where you purchased your pupusas and that if you could not make it to the family's home, then the Respondent would deliver the pupusas to your house four days a week. As with many other precedential cases involving immediate family members, the proposed social group in this case too satisfies all of the legal requirements for recognition as a cognizable social group. *Cf. Crespin-Valladares v. Holder*, 632 F.3d at 124-126; *Hernandez-Avalos v. Lynch*, 784 F.3d at 949; *Cruz v. Sessions*, 853 F.3d at 127; and *Salgado-Sosa v. Sessions*, 882 F.3d at 457.

This finding—that the Abrego family was socially distinct—does not run afoul of the Attorney General's (AG) recent case, *Matter of L-E-A-*, 27 I&N Dec. 581 (A.G. 2019). In that case, the AG did not bar all family-based social groups from qualifying from relief. *Id.* at 595. Rather, the AG required that "[a]n applicant must establish that his specific family group is defined with sufficient particularity and is socially distinct in his society." *Id.* at 586. This case is a close call. But, the Court finds that the Respondent has established that Cecilia's family pupusa business was well-known in the community and therefore the family was socially distinct in society.

10

## C.    Relief from Removal Under CAT

The applicant for withholding of removal under the CAT bears the burden of proving that it is "more likely than not" that he or she would be tortured if removed to the proposed country of removal. 8 C.F.R. § 1208.16(c)(2). An applicant who establishes that he or she is entitled to CAT protection shall be granted withholding of removal unless he is subject to mandatory denial of that relief, in which case he shall be granted deferral of removal. 8 C.F.R. §§ 1208.16(c)(4), 1208.17(a). An applicant is subject to mandatory denial of withholding of removal under the CAT if that individual has participated in the persecution of others, has been convicted of a particularly serious crime, has committed a serious nonpolitical crime outside of the U.S., or is a danger to U.S. national security. Under applicable provisions of law at 8 C.F.R. § 1208.16(d) and INA § 241(b)(3)(B), an alien who has been convicted of an aggravated felony for which the alien was sentenced to an aggregate term of imprisonment of at least five years is considered to have been convicted of a particularly serious crime. That does not preclude other crimes from being considered particularly serious crimes.

"Torture" is defined in the treaty and at 8 C.F.R. § 1208.18(a)(1). It is defined in part as the intentional infliction of severe physical or mental pain or suffering by, or at the instigation of, or with the consent or acquiescence of a public official. Acquiescence of a public official requires that the official have awareness of or remain willfully blind to the activity constituting torture prior to its commission, and thereafter breach his or her legal responsibility to intervene to prevent such activity. *See* 8 C.F.R. § 1208.18(a)(7).

To qualify for protection under the CAT, "specific grounds must exist that indicate the individual would be personally at risk." *Matter of S-V-*, 22 I&N Dec. 1306, 1313 (BIA 2000). The mere existence of a pattern of human rights violations in a particular country does not constitute a sufficient ground for finding that a particular person would be more likely than not to be tortured. *Id.*

In assessing the likelihood of future torture, the Court must consider all evidence relevant to the possibility of future torture, including: evidence of past torture inflicted upon the applicant; evidence that the applicant could relocate to a part of the country of removal where he is not likely to be tortured; evidence of gross, flagrant or mass violations of human rights within the country of removal; or other relevant information of conditions in the country of removal. 8 C.F.R. § 1208.16(c)(3). In order for an alien to meet the burden of proof for relief under the CAT, he or she

must demonstrate that each step in the necessary chain of events is more likely than not to happen. *Matter of J-F-F-*, 23 I&N Dec. 912 (A.G. 2006). Under Fourth Circuit precedent, the $^{risk}$s of torture from all sources must be aggregated when determining whether an individual is more likely than not to be tortured in a particular country. *Rodriguez-Arias v. Whitaker*, 915 F.3d 968 (4th Cir. 2019).

Instances of police brutality do not necessarily rise to the level of torture, nor does the indefinite detention of criminal deportees in substandard conditions. *Matter of J-E-*, 23 I&N Dec. 291, 301-02 (BIA 2002) (indefinite detention of criminal deportees in substandard conditions in Haiti does not constitute torture where there is no evidence that government officials intentionally and deliberately detain deportees under such conditions in order to inflict torture). Abusive or squalid conditions in pretrial detention facilities, prisons, or mental health institutions will not constitute torture when those conditions occur due to neglect, a lack of resources, or insufficient training and education, rather than a specific intent to cause severe pain and suffering. *Matter of J-R-G-P-*, 27 I&N Dec. 482 (BIA 2018).

Torture must come at the hands of the government. *Matter of S-V-*, 22 I&N Dec. at 1311-12. This can include acquiescence of officials provided it meets the conditions set out in the regulations at 8 C.F.R. § 1208.18(a)(7) ("Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity"). Awareness can include actual knowledge and willful blindness. *See* Senate Exec. Rep. 101-30 at 9 (1990); *see also Matter of S-V-*, 22 I&N Dec. at 1312. In *Matter of S-V-*, the BIA elaborated that a respondent needs to show more than that government officials are aware of the activity and powerless to stop it and needs to show that government officials are willfully accepting of the activity. *Matter of S-V-*, 22 I&N Dec. at 1311-1312. Following *Matter of S-V-*, the Attorney General, in *Matter of Y-L-, A-G-, & R-S-R-*, 23 I&N Dec. 270 (A.G. 2002), elaborated on the definition of acquiescence and indicated that the relevant inquiry is "whether governmental authorities would approve or 'willfully accept' atrocities committed." *Id.* at 283.[6]

The Fourth Circuit has clarified that "willful blindness can satisfy the acquiescence

---

[6] That decision noted in part that it would not suffice for a respondent to show that isolated, rogue government agents were involved in atrocities despite a government's best efforts to root out misconduct.

12

component of 8 C.F.R. § 1208.18(a)(1)." *See Suarez-Valenzuela v. Holder*, 714 F.3d 241, 246 (4th Cir. 2013). Pursuant to the willful blindness standard, government officials acquiesce to torture when they have actual knowledge of or turn a blind eye to torture. *Id.* at 245-246.

Decisions regarding an alien's likely future mistreatment are factual determinations subject to review only for clear error; the determination as to whether any such mistreatment constitutes torture as a legal matter is subject to de novo review. *Turkson v. Holder*, 667 F.3d 523 (4th Cir. 2012); *see also Kaplun v. Attorney General*, 602 F.3d 260 (3d Cir. 2010). Whether the government would acquiesce in any future torture is likewise a mixed question of law and fact. *Cruz-Quintanilla v. Whitaker*, 914 F.3d 884 (4th Cir. 2019).

Here, the Respondent has not shown that it is "more likely than not" that he would be tortured if he were to be removed to El Salvador.

## IV.   Conclusion

The Respondent's application for asylum is time-barred without exception. However he has established past persecution based on a protected ground, and the presumption of a well-founded fear of future persecution. DHS has not shown there are changed circumstances in Guatemala that would result in the Respondent's life not being threatened, or that internal relocation is possible and reasonable under the circumstances. Therefore, the Respondent's application for withholding under the Act is granted. Finally, his CAT claim fails because he has not shown that he would suffer torture.

## ORDER

It is hereby ordered that:

I.   the Respondent's application for asylum pursuant to INA § 208 is **DENIED**;

II.  the Respondent's application for withholding of removal pursuant to INA § 241(b)(3) is **GRANTED**; and

III. the Respondent's application for withholding of removal under the Convention Against Torture is **DENIED**;

10 /10 /19
Date

David M. Jones
United States Immigration Judge
Baltimore, Maryland

**Appeal Rights**

Each party has the right to appeal this Court's decision to the Board of Immigration Appeals. Any appeal must be filed within 30 calendar days of the mailing of this decision. Under the regulations, a notice of appeal must be received by the Board by that deadline. The notice of appeal must also state the reasons for the appeal. *See* 8 C.F.R. § 1240.15.

EOIR – 14 of 14

14

## AFFIDAVIT OF JENNIFER STEFANIA VASQUEZ SURA

1. My name is Jennifer Stefania Vasquez Sura. I was born on December 20, 1995, in Fairfax, VA. I am a U.S. citizen. I currently reside at 4502 Beltsville, MD, 20705. I am married to Kilmar Armando Abrego Garcia, who was born on July 26, 1995, in El Salvador. Kilmar was granted humanitarian protection by an immigration judge in October 2019.

2. Kilmar and I have three children together. I had two children from a prior relationship, D.T.V. and X.T.V., and Kilmar and I have one biological child together, A.A.V.. All three of our children have special needs.

3. D.T.V., was born on July 23, 2014, in La Plata, Maryland. She suffers from epilepsy and started having seizures in July 2024.

4. X.T.V, was born on October 26, 2015, in La Plata, Maryland. He was diagnosed with autism.

5. A.A.V., was born on August 11, 2019, in Silver Spring, Maryland. He was also diagnosed with autism.

6. Although having three small children with special needs can be challenging, Kilmar and I love our children and are grateful to be their parents. Having Kilmar as my partner in life and in raising and caring for them has been the greatest blessing to our family.

7. Both Kilmar and I work to support our family and care for our children.

8. I work in the dental field, and Kilmar is a sheet metal worker.

### Kilmar's Arrest and Immigration Custody

9. On March 27, 2019, we had an appointment with a perinatal specialist. My pregnancy was considered high-risk because I was born with two uteruses. My condition is called Uterus didelphys. We were excited to learn we were expecting a boy.

1

Doc ID: 5e3a65259dd107b58750c203adf756f9cf147a1e

10. The following morning, Kilmar was worried about my pregnancy risks and so he drove me and the kids. We dropped off X.T.V at the babysitter and D.T.V at school. He then drove me to work. The plan was for him to look for work during the day and then pick me up when I was done with work.

11. After Kilmar dropped me off, he went to Hyattsville, seeking work in construction. Someone suggested that he go to Home Depot for day labor opportunities.

12. Kilmar would often bring me lunch while I was at work. However, that day, I texted him telling him that I had food. He told me he would have lunch at a nearby buffet restaurant.

13. At the end of my work shift, I texted him asking him to pick me up. I remember seeing that the message was marked as "read," but Kilmar did not respond, which was not like him. I called him, but he did not answer. Shortly after, his phone was turned off.

14. That evening, Kilmar never arrived to pick me up. I had to ask a co-worker for a ride and to pick up my son from daycare. We had to take an Uber home.

15. By 7 p.m., I was frustrated and worried. At 9 p.m., I contacted his friends, and they informed me he had been at Home Depot but was arrested. I called various jails, but no one had information on his whereabouts. The next morning, around 10 a.m., Kilmar called me from ICE custody.

16. I hired a lawyer to get him out on bond. I attended his bond hearing and was shocked when the government said he should stay detained because Kilmar is an MS-13 gang member. Kilmar is not and has never been a gang member. I'm certain of that. Because of these false accusations, he was denied bond. This left me alone to care and provide for our family, while I was very far along in my pregnancy, under extreme stress. I was terrified that he could be deported to El Salvador and our son would not have a father.

**Our Marriage in Detention and Our Family's Struggles**

17. From the moment Kilmar was detained, my children and I were sad and worried. Kilmar has always been a loving, reliable partner and father. We struggled without him emotionally and economically. By then, we both knew we wanted to build a life together

2

Doc ID: 5e3a65259dd107b58750c203adf756f9cf147a1e

as husband, but we did not know if he would be deported. Facing that possibility, Kilmar and I both felt getting married in detention might be our only chance to get married, even though it was far from how we ever imagined it.

18. We got married on June 25, 2019, while he was detained. I coordinated with the detention center and a local pastor to officiate our wedding. We were separated by glass and were not allowed physical contact. The officer had to pass our rings to each other. It was heartbreaking not to be able to hug him.

19. Next came his final hearing on August 9, 2019, where it would be decided if he would be granted humanitarian protection or if he would be deported. The hearing lasted over five hours and focused on two things: the false accusations against Kilmar and the risk to Kilmar's life if he was deported to El Salvador. The hearing was continued until September because they could not get through everything.

20. During the first hearing, I began having contractions. Our son, A.A.V., was born two days later on August 11, 2019. It was a complicated C-section. However, A.A.V. was born and I instantly fell in love with him. A.A.V. was born with microtia, a congenital ear deformity. Testing later showed that he is deaf in one ear. Kilmar missed A.A.V.'s birth because he was detained.

21. Throughout his hearings, I testified and so did Kilmar. I testified a lot about Kilmar's character. It was so emotional and unfair. It was so clear that they had absolutely no evidence that Kilmar was ever a gang member, yet they made us prove he was not one. It should be the other way around. Kilmar also testified about difficult things he went through in El Salvador before I met him. He testified about how he was a victim of gang violence in El Salvador when he was a teenager and he came to the U.S. to escape all of that.

22. The judge did not make a decision on his case until October 19, 2019. That day, Kilmar's attorney called and told me the news: Kilmar won his case. She explained that the judge granted him a special status that allows him to stay in the U.S. and makes it illegal to deport him to El Salvador. She told me that he cannot leave the country or he would lose his status.

Doc ID: 5e3a65259dd107b58750c203adf756f9cf147a1e

**Kilmar's Release and Family Life**

23. When I got the news that he was being released, I rushed to pick him up. It was the first time he held his son. He was emotional, as were our children when they saw him after school.

24. Although our family separation was hard, the love we have for each other and our kids has sustained us. Kilmar appeared to be a little more reserved and he now had a sadness about him that I didn't see before he went into immigration custody.

25. Kilmar resumed working as a sheet metal worker and did everything he could to secure a better future for himself and our family. In September 2024, he secured a job with W.E. Bowers and he began a five-year apprenticeship program to become a licensed journeyman. He was enrolled at the University of Maryland and had classes every other Thursday. The license would allow him to earn better wages.

26. By 18 months old, our son, A.A.V., showed signs of autism. We were placed on a waiting list to be evaluated for autism under our child's health insurance plan, but due to extremely long wait times, Kilmar and I decided to pay for it out of pocket. Even then, there was still a significant wait, but we were able to get A.A.V a much earlier appointment this way and he was formally diagnosed with autism by a pediatric specialist on October 21, 2024.

27. Both of our older children attend school and both have Individualized Education Plans. Both Kilmar and I are active participants in our children's education and development.

28. In August 2024, A.A.V. started to attend a regular school but due to his condition in late October 2024 he was transferred to a special school. Now he is in a special program for children with special needs. When he finishes school, he will receive a completion certificate rather than a high school degree.

29. Kilmar continued to be the supportive, loving, reliable, and law-abiding man I know and love. He was never arrested or accused of a crime. And to my knowledge, he never again was stopped by the police officers that accused him of being a gang member in 2019. We

4

Doc ID: 5e3a65259dd107b58750c203adf756f9cf147a1e

really believed that the false accusations had been cleared up and that they were behind us.

**The Second Arrest and Deportation**

30. On Wednesday March 12, 2025, Kilmar was sent to a new job site in Baltimore. After work, he picked up A.A.V. from his mother's house to bring him home. Shortly after he picked up our son, Kilmar called me, saying he was being pulled over. We each share our location with each other and I could see that he was close to home. I told him to put me on speaker when he was talking with the police because he does not feel confident speaking English. He did.

31. Kilmar thought it was a routine traffic stop. He pulled over in an Ikea parking lot and rolled down the window. The person at his window told him to turn off the car and get out. In English, Kilmar told the officer that his son was in the backseat of the car and had special needs. At that point, I heard the officer take Kilmar's phone and hang up.

32. A few minutes later, someone identifying themselves as with the Department of Homeland Security called me back and said that I needed to get there in 10 minutes to pick up my son or they would call child protective services.

33. I arrived within minutes and they flagged me down as if they knew my car. When I arrived, Kilmar was on the curb in handcuffs. They had taken his work boots and his belt off. There were two male officers and a female officer with my child. They claimed his "immigration status had changed" and were taking him away.

34. I put A.A.V in my car seat, who was crying. They asked me if I wanted to say goodbye to Kilmar. Kilmar was crying and I told him he would come back home because he hadn't done anything wrong.

35. A.A.V. has been very distressed since Kilmar has been gone. He is very close to Kilmar and one of the few people A.A.V. trusts. Although he cannot speak, he shows me how much he missed Kilmar. He has been finding Kilmar's work shirts and smelling them, to smell Kilmar's familiar scent. He has been crying and acting out more than usual since

Doc ID: 5e3a65259dd107b58750c203adf756f9cf147a1e

Kilmar was arrested. As an autistic child, he needs stability and patterns. The sudden disappearance of his father is a big change for A.A.V. that makes him very distressed, and makes him act out physically.

36. Kilmar has called me a total of five times since his arrest on March 12, 2025. He called me twice from an immigration facility in Baltimore, twice from Louisiana, and once from Texas.

37. At approximately 9:00 PM the night he was arrested, Kilmar called me from Baltimore. He told me that he was questioned about a past traffic stop and that out of nowhere, they were bringing up the old, false accusations of MS-13 gang membership that we thought were behind us. He said that when they interrogated him about his connections to MS-13 that they asked him about his visits to Don Ramon, a restaurant we frequented as a family, and asked him about a photo they had of him playing basketball with others at a local public court. Kilmar did not understand what was happening or why. He was reassured he would see a judge.

38. Kilmar called me once more from Baltimore, basically saying the same thing. He was being asked the same questions and he would repeat the truth again and again - that he was not in a gang and didn't know anything about any gang members.

39. After that, I started to regularly check the ICE detainee locator. Whenever I would see his name somewhere, I would call that detention center, and I would tell them to give Kilmar the free call he was entitled to and I would ask them why he was there. I was desperate. None of this made any sense. No one would tell me why he was detained.

40. Kilmar called me two more times from Louisiana. Those calls were sad and confusing to us both. Kilmar still had hope that this nightmare would end soon because he was still being told that he would speak with a judge.

41. The final call I received from Kilmar was Saturday morning, March 15, 2025, at approximately 11:00 AM. That call was short and Kilmar's tone was different. He was scared. He was told he was being deported to El Salvador. He was told he was being deported to El Salvador to a super-max prison called "CECOT." He asked me to contact

6

Doc ID: 5e3a65259dd107b58750c203adf756f9cf147a1e

his mom with all his U.S. immigration paperwork so they can give that to a lawyer in El Salvador.

42. After that, I never heard from Kilmar again.

**Aftermath**

43. On Sunday, my brother in law, Cesar, texted me a photo of deportees sent to the Salvadoran super-max, CECOT. The photo was part of an article discussing the deportation of alleged Venezuelan gang members without court hearings. It was a group of men bent over on the ground, with their heads down and their arms on their heads. None of their faces were visible. There was one man who had two scars on his head like Kilmar does, and tattoos that looked similar to Kilmar's. I zoomed into get a closer look at the tattoos. My heart sank. It was Kilmar.

44. The ICE detainee locator continued to indicate that Kilmar was at the East Hidalgo Detention Center, but when I called, they told me he was no longer there and could not tell me where he was. They told me to call the number for the Baltimore ICE office provided by the detainee locator website. When I called, the number was disconnected. Now, Kilmar no longer appears in the ICE detainee locator.

45. I keep seeing news footage from El Salvador. These reports are talking about horrible gang members from Venezuela. No one is talking about my husband and the fact that he is not a gang member, has no criminal history, is married to a U.S. citizen and has three special needs U.S. citizen children, and won legal protection in the United States. These reports and articles had some more pictures of CECOT prisoners where Kilmar is photographed. I know its him from his tattoos and his head scars. I also saw a video of him where he is being dragged by prison guards.

46. Nonetheless, Kilmar was with this group in the news. I recognized Kilmar by his hand tattoos and scars on his head. His family also confirmed his detention in El Saldavor, who hired an attorney in El Salvador. Still, we have received no answers from either the U.S. or El Salvador government.

7

Doc ID: 5e3a65259dd107b58750c203adf756f9cf147a1e

47. This has been a nightmare for my family. My faith in God carries me, but I am exhausted and heartbroken. My children need their father. A.A.V, especially, requires constant care and stability. I need to know when my husband is coming home.

I, **JENNIFER STEFANIA VASQUEZ SURA**, hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowlege.

*Jennifer Vasquez*
_____
Signature

03 / 23 / 2025
_____
Date

8

Doc ID: 5e3a65259dd107b58750c203adf756f9cf147a1e



Audit trail

| | |
|---|---|
| **Title** | 2 - AFFIDAVIT OF JENNIFER STEFANIA VASQUEZ SURA.docx (1).pdf |
| **File name** | 2%20-%20AFFIDAVIT...ocx%20%281%29.pdf |
| **Document ID** | 5e3a65259dd107b58750c203adf756f9cf147a1e |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

This document was requested from app.clio.com

## Document History

| | | |
|---|---|---|
| SENT | **03 / 23 / 2025**<br>21:34:09 UTC | Sent for signature to Jennifer Vasquez (jvasquez2326@yahoo.com) from lucia@kinzlerimmigration.com<br>IP: 136.49.107.44 |
| VIEWED | **03 / 23 / 2025**<br>21:42:54 UTC | Viewed by Jennifer Vasquez (jvasquez2326@yahoo.com)<br>IP: 174.192.192.238 |
| SIGNED | **03 / 23 / 2025**<br>21:43:24 UTC | Signed by Jennifer Vasquez (jvasquez2326@yahoo.com)<br>IP: 174.192.192.238 |
| COMPLETED | **03 / 23 / 2025**<br>21:43:24 UTC | The document has been completed. |

Powered by ✖ Dropbox Sign



DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

**ORDER OF SUPERVISION (Continuation Page)**

| | | Picture | Right Index Print |
|---|---|---|---|
| Alien Name | ABREGO-GARCIA, KILMER ARMADO | | |
| File Number | 201 577 119 | | |
| Date | October 22, 2019 | | |
| Alien's Signature | | | |
| Alien's Telephone Number (if applicable) | 4434846987 | | |
| Alien's Address 4505 Birchtree LN Temple Hills MARYLAND, 20748 | | | |

**PERSONAL REPORT RECORD**

| Date | Officer | Comment/Changes |
|---|---|---|
| 10/23/2020 | JS | Next report date 10/25/2021 @ 0800 am |
| 10/25/21 | JS | NRD 10/26/2022 @ 0730 |
| 01/02/2024 | JS | |
| 10/26/2023 | JS | NRD 01/02/2024 @ 0730 |
| 1/2/24 | US | NRD 01/18/2025 @ 0700 |
| | | NRD 1/8/2026 @ 0700 |

| Signature | RODRIGUEZ, L, 7923 | Title | DO |
|---|---|---|---|

Page 2 of 4

CE Form I-220B (10/15)







## DECLARATION OF JUANITA GOEBERTUS,
## DIRECTOR, AMERICAS DIVISION, HUMAN RIGHTS WATCH

I, Juanita Goebertus, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

1. I am the Director of the Americas Division of Human Rights Watch and have worked with the organization since 2022. I hold BAs in Law and Political Science from the Universidad de los Andes (Colombia) and an LLM from Harvard Law School. I oversee Human Rights Watch's work on El Salvador and have traveled to the country several times, most recently in 2024. I provide this declaration based on my personal knowledge and experience.

2. Individuals deported pursuant to the 1789 Alien Enemies Act have been sent to the Center for Terrorism Confinement, the Centro de Confinamiento del Terrorismo (CECOT) in Tecoluca, El Salvador. The prison was first announced for a capacity of 20,000 detainees. The Salvadoran government later doubled its reported capacity, to 40,000.  As Human Rights Watch explained to the UN Human Rights Committee in July 2024, the population size raises concerns that prison authorities will not be able to provide individualized treatment to detainees, thereby contravening the UN Standard Minimum Rules for the Treatment of Prisoners.

3. People held in CECOT, as well as in other prisons in El Salvador, are denied communication with their relatives and lawyers, and only appear before courts in online hearings, often in groups of several hundred detainees at the same time. The Salvadoran government has described people held in CECOT as "terrorists," and has said that they "will never leave." Human Rights Watch is not aware of any detainees who have been released from that prison. The government of El Salvador denies human rights groups

USCA4 Appeal: 25-1404 Doc: 46-4 Filed: 04/16/2025 Pg: 211 of 239 Total Pages:(230 of 258)
Case 1:25-cv-00766-JEB Document 44-3 Filed 03/19/25 Page 3 of 72
Case 1:25-cv-00695-LXP-X Document 11-2 Filed 04.05.2025 Page 30 of 258

DocuSign Envelope ID: D678340-7A56-4ED9-96E-232DA7493D56

access to its prisons and has only allowed journalists and social media influencers to visit CECOT under highly controlled circumstances. In videos produced during these visits, Salvadoran authorities are seen saying that prisoners only "leave the cell for 30 minutes a day" and that some are held in solitary confinement cells, which are completely dark.

4. While CECOT is likely to have more modern technology and infrastructure than other prisons in El Salvador, I understand the mistreatment of detainees there to be in large part similar to what Human Rights Watch has documented in other prisons in El Salvador, including Izalco, La Esperanza (Mariona) and Santa Ana prisons. This includes cases of torture, ill-treatment, incommunicado detention, severe violations of due process and inhumane conditions, such as lack of access to adequate healthcare and food.

5. Prison conditions in El Salvador should be understood within the context of the country's three-year-long state of emergency, which has suspended constitutional due process rights. Since the state of emergency was instituted in March 2022, security forces report detaining 85,000 people (the equivalent of 1.4% of the country's population). Although the government has denied Human Rights Watch information on the number of detainees it holds and its prison capacity, Human Rights Watch estimates based on official data that there are 109,000 people held in prisons with an official capacity for 70,000. Since the state of emergency was instituted, over 350 people have died in El Salvador's prisons according to Salvadoran human rights groups, including the organization Cristosal, which jointly authored our December 7, 2022 report on El Salvador's prisons titled, "We Can Arrest Anyone We Want" (hereinafter "We Can Arrest Anyone").[1]

---

[1] Human Rights Watch, *"We Can Arrest Anyone We Want": Widespread Human Rights Violations Under El Salvador's "State of Emergency"*, WWW.HRW.ORG, Dec. 7, 2022, https://www.hrw.org/report/2022/12/07/we-can-arrest-anyone-we-want/widespread-human-rights-violations-under-el#3683 (last visited Mar. 19, 2025).

USCA4 Appeal: 25-1404    Doc: 46-4    Filed: 04/16/2025    Pg: 212 of 239    Total Pages:(231 of 258)
Case 1:25-cv-00766-JEB    Document 44-3    Filed 03/19/25    Page 4 of 72
Case 1:25-cv-00691-XPX    Document 61-2    Filed 04/16/25    Page 34 of 258

6. In July 2024, Human Rights Watch published a report on abuses committed against children during the state of emergency, titled "Your Child Does Not Exist Here." Over 3,300 children have been detained, many without any ties to gang activity or criminal organizations. Human Rights Watch documented 66 cases of children subjected to torture, ill-treatment and appalling conditions, including at times extreme overcrowding, unhygienic conditions, and inadequate access to food and medical care while in custody. In February, the Legislative Assembly approved a law ordering the transfer of children detained for organized crime offenses to the country's adult prison system, exposing them to a heightened risk of abuse and violating international juvenile justice standards.

7. For "We Can Arrest Anyone," and in "Your Child Does Not Exist Here," Human Rights Watch has interviewed more than 30 people released from El Salvador's prisons, including children, and dozens of people who have relatives in jail.[2] These interviews were conducted in person in several states in El Salvador or by telephone and corroborated by additional research and media reports.

8. One of the people we spoke with was an 18-year-old construction worker who said that police beat prison newcomers with batons for an hour. He said that when he denied being a gang member, they sent him to a dark basement cell with 320 detainees, where prison guards and other detainees beat him every day. On one occasion, one guard beat him so severely that it broke a rib.

---

[2] Human Rights Watch, "*Your Child Does Not Exist Here": Human Rights Abuses Against Children Under El Salvador's "State of Emergency"*, WWW.HRW.ORG, Jul. 16, 2024, https://www.hrw.org/report/2024/07/16/your-child-does-not-exist-here/human-rights-abuses-against-children-under-el (last visited Mar. 19, 2025).

Case 1:25-cv-00766-JEB   Document 44-3   Filed 03/19/25   Page 5 of 7
Case 1:25-cv-00961-JEB   Document 11-2   Filed 04/03/25   Page 3 of 258
USCA4 Appeal: 25-1404   Doc: 23-2   Filed: 04/16/2025   Pg: 213 of 239   Total Pages:(232 of 258)
DocuSign Envelope ID: 1781A6-4D56-4ED9-88-932D47493D56

9.  The construction worker said the cell he was imprisoned in was so crowded that detainees had to sleep on the floor or standing, a description often repeated by people who have been imprisoned in El Salvador.

10. Another detainee we interviewed was held for two days in a police lock-up with capacity for 25 people, but he said that when he arrived, there were over 75 prisoners. He slept on the floor next to "the bathroom," a hole in the ground that smelled "terrible." He was sent in a group of other prisoners to Izalco prison on the third day, where they were ordered the group to take off their clothes. They were forced to kneel on the ground naked looking downwards for four hours in front of the prison's gate. Guards took the group to a room with five barrels full of water with ice, he said. Fifteen guards forced him and others to go into the barrels for around two hours in total, as they questioned them. The detainee was forced into a barrel "around 30 times," and was kept there for about a minute each time. Guards forced his head under water so he could not breathe. "I felt I was drowning," he said. Guards repeatedly insulted them, calling them "dogs" and "scum" and saying they would "pay for what [they] had done."

11. A third detainee held in prison in June 2022 described being sent to what he described as a "punishment cell." He said officers moved him and others there to "make room for other detainees." The new cell was constantly dark, detainees had to sleep standing due to overcrowding, and there was no regular access to drinking water.

12. For "We Can Arrest Anyone," Human Rights Watch and Cristosal gathered evidence of over 240 cases of people detained in prisons in El Salvador with underlying health conditions, including diabetes, recent history of stroke, and meningitis. Former detainees often describe filthy and disease-ridden prisons. Doctors who visited detention sites told

us that tuberculosis, fungal infections, scabies, severe malnutrition and chronic digestive issues were common.

13. Out of the estimated 350 detainees who have died in El Salvador's prisons, we documented 11 of these cases in detail in "We Can Arrest Anyone", based on interviews with victims' relatives, medical records, analysis by forensic experts, and other evidence.

14. In one case, a person who died in custody was buried in a mass grave, without the family's knowledge. This practice could amount to an enforced disappearance if authorities intentionally concealed the fate or whereabouts of the detainee.

15. In at least two other cases, officials appear to have failed to provide detainees the daily medication they required to manage underlying health conditions such as diabetes.

16. In at least four of the eleven cases, photographs of the bodies show bruises. Members of the Independent Forensic Expert Group (IFEG) of the International Rehabilitation Council for Torture Victims (IRCT), who reviewed the photos and other evidence in two of the cases, told Human Rights Watch and Cristosal that the deaths were "suspicious" given that the bodies "present multiple lesions that show trauma that could have been caused by torture or ill-treatment that might have contributed to their deaths while in custody."

17. In a separate Human Rights Watch report from February 2020, titled "Deported to Danger," Human Rights Watch investigated and reported on the conditions in Salvadoran prisons experienced by Salvadoran nationals deported by the United States.[3] In interviews with deportees and their relatives or friends, we collected accounts of three

---

[3] Human Rights Watch, *Deported to Danger: United States Deportation Policies Expose Salvadorans to Death and Abuse*, WWW.HRW.ORG, Feb. 5, 2020, https://www.hrw.org/report/2020/02/05/deported-danger-united-states-deportation-policies-expose-salvadorans-death-and (last visited Mar. 19, 2025).

Case 1:25-cv-00766-JEB    Document 44-3    Filed 03/19/25    Page 7 of 9
Case 1:25-cv-00766-JEB    Document 61-2    Filed 04/16/25    Page 234 of 258
USCA4 Appeal: 25-1161    Doc: 32-3    Filed: 04/16/2025    Pg: 215 of 239    Total Pages:(234 of 258)

male deportees from the United States who said they were beaten by police or soldiers during arrest, followed by beatings during their time in custody, which lasted between three days to over a year. During their time in prison, two of these individuals reported being kicked in the face and testicles. A third man described being kicked by guards in his neck and abdomen, after which he sustained injuries requiring an operation for a ruptured pancreas and spleen, month-long hospitalization, and 60 days of post-release treatment.

Executed on this 19th day of March, 2025 in Villa de Leyva, Colombia.

Signed by:

*Juanita Goebertus*

F2D78A8897CF4A6…

JUANITA GOEBERTUS

USCA4 Appeal: 25-1404    Doc: 4-2    Filed: 04/16/2025    Pg: 216 of 239    Total Pages:(235 of 258)
Case 1:25-cv-00766-JEB    Document 44-2    Filed 03/19/25    Page 2 of 16
Case 8:25-cv-00951-PX    Document 61-3    Filed 04/16/25    Page 35 of 258

# Declaration of Dr. Sarah C. Bishop
## Risks for Non-Salvadoran Actors Facing Third Country Removal to El Salvador

## Introduction

1.  I am writing this expert witness report to address human rights abuses in Salvadoran prisons. I am a full professor with tenure at Baruch College, the City University of New York. I was the 2020-2021 Fulbright Scholar to El Salvador during which time I lived and conducted fieldwork in the country; I have since returned to El Salvador each year for fieldwork related to both published and in-process projects about the State of Exception, human rights abuses by state actors, gang activity, and prison conditions.

2.  Deportees who are imprisoned in El Salvador are highly likely to face immediate and intentional life-threatening harm at the hands of state actors and a secondary threat of violence from incarcerated gang members.

## Expert Qualifications

3.  I was the 2020/2021 Fulbright scholar to El Salvador, during which time I lived and worked in the Department of La Libertad consulting with local academics and non-profit personnel to develop a project that chronicles the experiences of individuals affected by gang-, government-, and domestic-based violence, as well as the professional and psychological outcomes for deportees. I have interviewed multiple people who have been deported back to El Salvador after failed asylum claims and have also interviewed personnel from non-profit organizations working to support individuals who had been deported by the United States or by another government.

4.  I have published three books on the experiences of refugees and undocumented immigrants in the United States. In 2022, Columbia University Press published my book *A Story to Save Your Life: Communication and Culture in Migrants' Search for Asylum*. The book won the Abraham Brilloff Prize in Ethics and the Oral History Association's Best Book Award in 2023. My book *Undocumented Storytellers: Narrating the Immigrant Rights Movement* was published by Oxford University Press in 2019 and was the winner of the Best Book Award from the American Studies Division of the National Communication Association. *U.S. Media and Migration: Refugee Oral Histories* was published by Routledge in 2016 and won the Sue DeWine Distinguished Scholarly Book Award.

5.  I am a migration scholar with a Ph.D. in Intercultural Communication from the University of Pittsburgh (2014). My dissertation was an oral history project analyzing the push factors and migration experiences of 74 refugees living in the United States. I received an M.A. from New York University in 2009 in Media, Culture, and Communication during which I took classes such as "Refugees and IDPs: Protection and Practice." I received a B.A. from the University of Akron in 2008.

6.  I have published numerous articles in peer-reviewed academic journals on the experiences of forced migrants from Central America, including most recently "Hidden in Plain Sight: The In/Visibility of Human Rights in El Salvador's Prisons Under the State of Exception" coauthored with Salvadoran expert Dr. Mneesha Gellmen and forthcoming in *Latin American Research*

*Review* in 2025; "Beyond the Glowing Headlines: Social Science Analysis of the State of Exception in El Salvador," *Columbia Regional Expert Series,* coauthored with Salvadoran experts Dr. Tom Boerman and Dr. Tommie Sue Montgomery in 2023; "An Illusion of Control: How El Salvador's President Rhetorically Inflates His Ability to Quell Violence," published in *Journalism and Media* in 2023; "'What Does a Torture Survivor Look Like?': Nonverbal Communication in Asylum Interviews and Hearings," published in the *Journal of International & Intercultural Communication* in 2021; "Intercultural Communication, the Influence of Trauma, and the Pursuit of Asylum in the United States," published in the *Journal of Ethnic and Cultural Studies* in 2021; "An International Analysis of Governmental Media Campaigns to Deter Asylum Seekers," published in the *International Journal of Communication* in 2020. All of my books and the articles I have published in academic journals have been subject to peer review by other experts.

7.    I regularly give talks about country conditions in El Salvador and the root causes of forced migration, including "Violence for Peace: Authoritarian Justifications of Human Rights Abuses in Central America," to be presented at the Anthropology of Peace, Conflict, and Security Conference in June 2025; "Intergovernmental Criminal History Information Sharing: Justice on Paper, Violence in Practice for Forced Migrants," presented at the Marxe School for International Affairs in March 2025; "Populism, Rhetorical Strategy, and the Regression of Democracy in Central America," presented at Cristosal in San Salvador in February 2023; "Addressing Misinformation and Distortion of Statistics in Country Conditions Research," presented at the International Studies Association in November 2024; "An Illusion of Control: How El Salvador's President Rhetorically Inflates His Ability to Quell Violence," presented at the annual meeting of the American Sociological Association in August 2022; "Health and Safety in El Salvador," presented at the Fulbright Pre-departure Orientations in June 2022, June 2023, and June 2024; and "The Returned: Communication and Culture in the Post-Deportation Lives of Former Asylum Seekers from El Salvador," presented at the annual meeting of the International Association for the Study of Forced Migration in July 2021.

8.    I have received several competitive grants for my research on El Salvador, including a 2025 grant from the American Council of Learned Societies (ACLS) and a 2024 grant from the Waterhouse Family Institute to study post-deportation experiences in El Salvador through a family communication approach; a 2022-2023 PSC CUNY Grant for research that documents post-deportation harm in El Salvador; a 2022 grant from the Robert Bosch Stiftung Foundation to travel to El Salvador and meet with investigative journalists and human rights activists for a project about President Nayib Bukele's recent actions against independent media; and a 2018 fellowship from the Institute for the Study of Human Rights at Columbia University to study obstacles to human rights and efforts to promote peace in post-conflict societies including El Salvador.

9.    I remain current on events in El Salvador through regularly reading local, national, and international sources including academic and government studies and investigative journalism studies, through frequent conversations with colleagues in the U.S. and El Salvador, and by presenting my research on El Salvador at national and international academic conferences.

10.   At Baruch College, I teach classes on migration to the United States and global communication in the Department of Communication Studies, the Macaulay Honors College, and the Masters in International Affairs. I am affiliate faculty in the Department of Black and Latino Studies.

USCA4 Appeal: 25-1404    Doc: 4-2    Filed: 04/16/2025    Pg: 218 of 239    Total Pages:(237 of 258)
Case 1:25-cv-00766-JEB    Document 44-3    Filed 03/19/25    Page 3 of 15
Case 8:25-cv-00951-PX    Document 40-3    Filed 04/16/25    Page 37 of 258

11. My migration research has been recognized for being ethical and applied to real-world contexts: I won the Abraham J. Briloff Prize in Ethics in 2017 and 2023, and the Stanley L. Saxton Applied Research Award in 2018. Moreover, in keeping with the New York State Ethics Commission Reform Act of 2022, I undergo annual ethics training at CUNY.

12. Methodologically, I rely on oral history, ethnography, critical-cultural analysis of governmental communication, and qualitative comparative analysis to conduct my research about country conditions in El Salvador. These are standard and widely used social science methodologies. At Baruch, I am responsible for teaching a graduate level required course on qualitative methods in which I train master's level students in these methods.

13. In 2025 I received $75,000 from the Russell Sage Foundation to continue the project "Recovering the Visibility of Post-Deportation Experiences in El Salvador: A Family Communication Approach" for the years 2025-2027 to involve additional participants who have family members who have been deported under the State of Exception.

### Democratic Erosion and Governmental Corruption in El Salvador

14. El Salvador is experiencing a severe democratic decline that threatens the human rights and general safety of the whole population. The 2023 U.S. State Department's Human Rights Reports on El Salvador cites "credible reports of: unlawful or arbitrary killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; arbitrary or unlawful interference with privacy; extensive gender-based violence, including domestic and sexual violence, and femicide; substantial barriers to sexual and reproductive health services access; trafficking in persons, including forced labor; and crimes involving violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons."[1]

15. President Bukele was discovered through meticulously documented reporting by investigative journalists working for *El Faro* in 2020 to have been negotiating with imprisoned gang leaders who reportedly agreed to a reduction in homicides and electoral support in exchange for additional prison privileges and other benefits for incarcerated gang members.[2] During the weekend of March 25, 2022 there was a record-setting string of around eighty-seven gang-committed homicides across El Salvador that resulted from the unraveling of that secret pact between Bukele and the gangs in what MS-13 called a "betrayal" of Bukele's loyalty. The Monday following the homicides, Bukele successfully called on the Salvadoran Legislative Assembly to pass a State of Exception, which suspends many constitutional protections including due process, drastically increases police and military powers to arrest and imprison suspected gang members, and curtails the right to legal defense.

---

[1] "El Salvador 2023 Human Rights Report." US Department of State. https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/ p 1.
[2] Carlos Martínez, Óscar Martínez, Sergio Arauz, and Efren Lemus. "Bukele has been negotiating with MS-13 for a reduction in homicides and electoral support." *El Faro.* 6 September 2020. https://elfaro.net/en/202009/el_salvador/24785/Bukele-Has-Been-Negotiating-with-MS-13-for-a-Reduction-in-Homicides-and-Electoral-Support.htm

USCA4 Appeal: 25-1404    Doc: 4-2      Filed: 04/16/2025    Pg: 219 of 239    Total Pages:(238 of 258)
Case 1:25-cv-00766-JEB    Document 44-4    Filed 03/19/25    Page 3 of 18
Case 8:25-cv-00951-PX    Document 60-3    Filed 04/16/25    Page 3 of 258

16.    As a result of the government's actions under the current State of Exception, El Salvador currently has the highest incarceration rate in the world.[3]

17.    Salvadoran Vice President Félix Ullóa revealed plainly to the *New York Times*, "To these people who say democracy is being dismantled, my answer is yes — we are not dismantling it, we are eliminating it, we are replacing it with something new."[4] The politicized use of all three branches of government to enact and extend the power of the State of Exception disallows any guarantee of justice for Salvadorans against whom the State has acted.

18.    The government of El Salvador claims that it has been effective at establishing peace in the country. Americas director at Amnesty International Ana Piquer explained in December 2024, "What the government calls 'peace' is actually an illusion intended to hide a repressive system, a structure of control and oppression that abuses its power and disregards the rights of those who were already invisible—people living in poverty, under state stigma, and marginalization—all in the name of a supposed security defined in a very narrow way."[5]

19.    Bukele's director of prisons, Osiris Luna Meza, was indicted by the United States Federal Government for arranging meetings in prison for negotiations with MS-13.[6] As the U.S. Treasury Department reveals, "Osiris Luna Meza (Luna) and Carlos Amilcar Marroquin Chica (Marroquin) [chairman of Bukele's Social Fabric Reconstruction Unit] led, facilitated, and organized a number of secret meetings involving incarcerated gang leaders, in which known gang members were allowed to enter the prison facilities and meet with senior gang leadership. These meetings were part of the Government of El Salvador's efforts to negotiate a secret truce with gang leadership."[7] Luna has also been deemed corrupt by the U.S. Department of Treasury for developing a scheme with another senior Bukele official to embezzle millions of dollars from the prison commissary system.[8]

---

[3] "El Salvador Opens 40,000-Person Prison as Arrests Soar in Gang Crackdown." *Reuters*. 1 February 2023. https://www.reuters.com/world/americas/el-salvador-opens-40000-person-prison-arrests-soar-gang-crackdown-2023-02-01/#:~:text=SAN%20SALVADOR%2C%20Feb%201%20(Reuters,the%20prison%20population%20to%20soar.

[4] Natalie Kitroeff. "He Cracked Down on Gangs and Rights. Now He's Set to Win a Landslide." New York Times. 2 February 2024. https://www.nytimes.com/2024/02/02/world/americas/el-salvador-bukele-election.html

[5] "El Salvador: A thousand days into the state of emergency. 'Security' at the expense of human rights." Amnesty International. 20 December 2024. https://www.amnesty.org/en/latest/news/2024/12/el-salvador-mil-dias-regimen-excepcion-modelo-seguridad-a-costa-derechos-humanos/

[6] United States District Court. Eastern District of New York. Paragraph 35. chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.justice.gov/usao-edny/press-release/file/1569726/download

[7] "Treasury Targets Corruption Networks Linked to Transnational Organized Crime." U.S. Treasury Department. 8 December 2021. https://home.treasury.gov/news/press-releases/jy0519

[8] "Treasury Targets Corruption Networks Linked to Transnational Organized Crime." U.S. Department of the Treasury. 8 December 2021. https://home.treasury.gov/news/press-releases/jy0519

---

*Expert Declaration of Sarah C. Bishop, Ph.D.*                                                    *Page 4 of 15*

USCA4 Appeal: 25-1404    Doc: 4-2        Filed: 04/16/2025    Pg: 220 of 239    Total Pages:(239 of 258)
Case 1:25-cv-00766-JEB    Document 44-4    Filed 03/19/25    Page 5 of 15
Case 8:25-cv-00951-PX    Document 10-3    Filed 04/16/2025    Page 35 of 258

20.   In multiple recent documented cases, the Salvadoran government has falsified records, ignored international human rights laws, and detained and prosecuted individuals without evidence to support the ongoing expansion of the State of Exception and indiscriminately punish those who resist or oppose it. As described by Human Rights Watch, "In many cases, detentions appear to be based on the appearance and social background of the detainees, or on questionable evidence, such as anonymous calls and uncorroborated allegations on social media. In these cases, police and soldiers did not show people a search or arrest warrant, and rarely informed them or their families of the reasons for their arrest. A mother who witnessed the detention of her son said that police officers told her, 'We can arrest anyone we want.'"[9]

## General Living Conditions in Prison

21.   The 2023 U.S. State Department Human Rights Report on El Salvador emphasizes that "Prison conditions *before* the state of exception were harsh and life threatening …The addition of 72,000 detainees under the state of exception exacerbated the problem."[10] Rather than merely being a result of overcrowding, the same U.S. State Department report cites testimonies from released prisoners that show that the life threatening nature of the prison is a result of "systemic abuse in the prison system, including beatings by guards and the use of electric shocks."[11]

22.   Salvadoran government officials have directly stated that the dangerous and unsanitary conditions for prisoners taken into custody during the State of Exception are being created intentionally: for example, the U.S. State Department notes that "From the start of the state of exception, the government frequently advertised on social media the overcrowded conditions and lack of adequate food in the prisons as appropriate treatment for gang members."[12] The Directorate General of Penal Centers advertised: "All the suffering these bastards have inflicted on the population, we will make happen to them in the prisons, and we will be very forceful with this. They live without the light of the sun, the food is rationed… they sleep on the floor because that is what they deserve."[13] Paradoxically, this was the same director who was indicted by the United States Federal Government for arranging meetings in prison for negotiations with MS-13,[14] and who has been deemed corrupt by the U.S. Department of Treasury for developing a scheme with another senior Bukele official to embezzle millions of dollars from the prison commissary system, emphasizing the scope of corruption common in prison leadership.[15]

23.   In response to international human rights organizations that have raised the alarm about current conditions in El Salvador, President Bukele tweeted "Let all the 'human rights' NGOs know that we are going to destroy these damn murderers and their collaborators, we will throw them in

---

[9] Human Rights Watch and Cristosal. "We Can Arrest Anyone We Want": Widespread Human Rights Violations Under El Salvador's "State of Emergency." 7 December 2022, https://www.hrw.org/report/2022/12/07/we-can-arrest-anyone-we-want/widespread-human-rights-violations-under-el

[10] "El Salvador 2023 Human Rights Report." US Department of State. https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/ p 7, emphasis added

[11] Ibid., p 5.

[12] "El Salvador 2022 Human Rights Report." https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/el-salvador/ p 6.

[13] Cited in Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December 2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/ p 34.

[14] United States District Court. Eastern District of New York. Paragraph 35. chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.justice.gov/usao-edny/press-release/file/1569726/download

[15] "Treasury Targets Corruption Networks Linked to Transnational Organized Crime." U.S. Department of the Treasury. 8 December 2021. https://home.treasury.gov/news/press-releases/jy0519

*Expert Declaration of Sarah C. Bishop, Ph.D.*                                                           *Page 5 of 15*

prison and they will never get out. We don't care about their pitying reports, their prepaid journalists, their puppet politicians, nor their famous 'international community' that never cared about our people."[16]

24.   El Salvador's Public Security Minister has confirmed the plan not to release prisoners and claimed that there are 40,000 serial killers in El Salvador. He stated in an interview with CNN in 2024: "Someone who every day killed people, every day raped our girls, how can you change their minds? We are not stupid…In the US, imagine a serial killer in your state, in your community being released by a judge … how would you feel as a citizen? We don't have facts that someone can change a mind from a serial killer … and we have more than 40,000 serial killers in El Salvador."[17]

25.   In October 2021 the Salvadoran government declared that information relating to all detained persons would be considered confidential; over 325 complains to the Interamerican Commission on Human Rights show that when family members have requested information about their detained loved ones, "authorities either refused or provided false information about their whereabouts."[18] In a sample of 131 cases, Cristosal found that 115 family members of detainees have not received any information about the whereabouts or wellbeing of their detained family members since the day of their capture.[19]

26.   During my January 2024 visit to El Salvador, I visited Mariona prison where many informal vendors were set up outside the prison gates selling packets of food, medicine, soap, and clothing to individuals with detained family members. Family members can seek to protect their detained relatives from illness or starvation in prison if their family is able to purchase these expensive packets, which cost $100-$300 per month although the national minimum monthly wage is only $365.[20] However, even families who can afford these packets have no assurance that the resources they try to send will ever reach their loved ones inside the prison; there are reports of prison officials deliberately withholding medicine and food even when it is available,[21] and reports of guards forcing women to do sexual acts in exchange for food and medicine.[22]

---

[16] Nayib Bukele. 16 May 2023. https://x.com/nayibbukele/status/1658608915683201030?s=20

[17] David Culver, Abel Alvarado, and Evelio Contreras. "Exclusive: Locking eyes with mass murderers in El Salvador." 13 November 2024 https://www.cnn.com/2024/11/06/americas/el-salvador-inside-cecot-prison/index.html

[18] Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December 2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/ p 29.

[19] Noah Bullock. "The State of Exception in El Salvador: Taking Stock." Testimony before the United States Congress, Tom Lantos Human Rights Commission. 10 December 2024. https://www.youtube.com/watch?v=ChTW-gm-5SI

[20] Mneesha Gellman. "El Salvador voters set to trade democracy for promise of security in presidential election." *The Conversation.* 29 January 2024. https://theconversation.com/el-salvador-voters-set-to-trade-democracy-for-promise-of-security-in-presidential-election-221092

[21] "Testimonios: Sobrevivientes de las Cárceles del Régimen." A weekly series from *El Faro.* https://especiales.elfaro.net/es/testimonios/

[22] "El Silencio no es opción: Investigación sobre las practices de tortura, muerte, y justicia fallida el el regimen de excepción." 10 July 2024. Cristosal Foundation. https://cristosal.org/ES/presentacion-informe-el-silencio-no-es-opcion/

USCA4 Appeal: 25-1404    Doc: 4-2    Filed: 04/16/2025    Pg: 223 of 239    Total Pages:(241 of 258)
Case 1:25-cv-00766-JEB    Document 44-1    Filed 03/19/25    Page 8 of 15
Case 8:25-cv-00951-PX    Document 40-3    Filed 04/16/2025    Page 41 of 258

27.   A 2024 Report on the Violation of the Right to Health in the Country's Penal Centers from the Human and Community Rights Defense Unit (UNIDEHC) found that upon arrival in prison, detainees under the State of Exception "were received by guards, where many of them were beaten to pressure them to declare which 'gang they belonged to,' and if they refused to say so, they were beaten and tortured more, some convulsed from the beatings they received and others died in these practices, on the first day of transfer."[23] In February 2025, the spokesperson for the organization who produced this report was arbitrarily detained during a raid on the organization's headquarters; Amnesty International concluded his detention was "particularly concerning, as he has been both a witness to and a denouncer of torture in penitentiary centers."[24]

28.   The Human and Community Rights Defense Unit (UNIDEHC) also reported in 2024 after a round of interviews with a health professional who worked in a clinic that served some inmates from Mariona prison that inmates were "not provided with medication to treat their diseases that they already suffered from; for example: people with hypertension, diabetes, kidney failure, respiratory problems, among others. They did not receive medication, which caused decompensation and death in some cases. Guards were repeatedly asked for help when someone convulsed or felt ill, but they did not arrive until the following day, or the person's health became more complicated or they died, waiting for help from the prison authorities."[25]

29.   Both the 2022 and 2023 U.S. State Department's Human Rights Report on El Salvador state that prison officials repeatedly denied access to the Salvadoran Human Rights Ombudsman's Office, the entity responsible for investigating accusations of human rights abuses in prison.[26]

30.   In 2023, Bukele announced the opening of the new "mega-prison" called the *Centro de Confinamiento del Terrorismo* or CECOT. An analysis of the CECOT's design using satellite footage found that if the prison were to reach full supposed capacity of forty thousand, each prisoner would have less than two feet of space in shared cells—an amount the authors point out is less than half the space required for transporting midsized cattle under EU law.[27]

31.   The U.S. State Department confirms that prisoners have been held in grossly overcrowded prisons with as many as 80 prisoners held in cells designed for just 12 so that they must sleep standing up.[28]

## Systemic Torture as State Policy in Salvadoran Prisons

32.   Although El Salvador is a signatory to both the Convention Against Torture and the International Covenant on Civil and Political Rights, Amnesty International has concluded that there is a

---

[23] Human and Community Rights Defense Unit (UNIDEHC). Violation of the Right to Health in the Country's Penal Centers. 2024. https://heyzine.com/flip-book/9849749093.html#page/1 p 17.

[24] "El Salvador: Repression against human rights defenders and community leaders." Amnesty International 5 March 2025. https://www.amnesty.org/en/documents/amr29/9100/2025/en/

[25] Human and Community Rights Defense Unit (UNIDEHC). Violation of the Right to Health in the Country's Penal Centers. 2024. https://heyzine.com/flip-book/9849749093.html#page/1

[26] "El Salvador 2022 Human Rights Report." U.S. Department of State. https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/el-salvador/ p 4.

[27] Christine Murray, and Alan Smith.. "Inside El Salvador's mega-prison: the jail giving inmates less space than livestock." Financial Times, 6 March 2023. https://www.ft.com/content/d05a1b0a-f444-4337-99d2-84d9f0b59f95.

[28] "El Salvador 2022 Human Rights Report." U.S. Department of State. https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/el-salvador/ p 6.

USCA4 Appeal: 25-1404   Doc: 4-2        Filed: 04/16/2025    Pg: 223 of 239    Total Pages:(242 of 258)
Case 1:25-cv-00766-JEB   Document 44-4   Filed 03/19/25   Page 8 of 18
Case 8:25-cv-00951-PX   Document 40-3   Filed 04/16/25   Page 42 of 258

"systemic use of torture in Salvadoran prisons."[29] The organization notes with concern the three primary characteristics of the crisis: "1) the massive number of human rights violations being committed; 2) the high degree of state coordination in the design and implementation of this measure; and 3) a state response that tends to conceal and minimize these actions, refusing to recognize and diligently investigate the abuses."[30] They confirm that "torture and cruel, inhuman, and degrading treatment have become habitual practice rather than isolated incidents in the prisons."[31]

33.  The range of violence occurring inside prisons in El Salvador at the hands of gangs and prison guards is acknowledged in the 2022 and 2023 U.S. State Department's Human Rights Reports on El Salvador; detainees are subject to beatings, waterboarding, and use implements of torture on detainees' fingers to try to force confessions of gang affiliation.[32] Likewise, family members of the detained have been threatened with arrest by security forces to "stop asking questions."[33]

34.  A July 2024 report from Cristosal—compiled from 3,643 reports of abuses or rights violations, 110 interviews, case-by-case analyses of 7,742 detainees' experiences—concluded that "Torture has become a state policy, with cruel and inhuman treatment regularly practices in prisons and places of detention."[34]

35.  Human Rights Watch conducted 90 interviews about human rights abuses under the State of Exception and published in July 2023 evidence of torture including suffocation, burning, and mock executions against children.[35] The report also found that authorities use abusive language and death threats when making arrests of children who are subjected to human rights violations before, during, and even after their release, and that "In many cases, authorities coerced children into making false confessions to crimes through a combination of abusive plea deals and sometimes mistreatment or torture."[36]

36.  An extensive December 2022 investigative report by Human Rights Watch and Cristosal about the State of Exception found that "human rights violations were not isolated incidents by rogue agents. Rather, similar violations were carried out repeatedly and across the country, throughout a period of several months, by both the military and the police."[37]

---

[29] Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December 2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/
[30] Ibid.
[31] Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December 2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/ p 33.
[32] "El Salvador 2022 Human Rights Report." U.S. Department of State. https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/el-salvador/ p 5; "El Salvador 2023 Human Rights Report." US Department of State. https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/ p 2, 15.
[33] Ibid.
[34] "El Silencio no es opción: Investigación sobre las practices de tortura, muerte, y justicia fallida el el regimen de excepción." 10 July 2024. Cristosal Foundation. https://cristosal.org/ES/presentacion-informe-el-silencio-no-es-opcion/
[35] Human Rights Watch. "Your Child Does Not Exist Here: Human Rights Abuses Against Children Under El Salvador's 'State of Emergency.'" 16 July 2024. https://www.hrw.org/report/2024/07/16/your-child-does-not-exist-here/human-rights-abuses-against-children-under-el
[36] Ibid. p 2.
[37] Human Rights Watch and Cristosal. "We Can Arrest Anyone We Want": Widespread Human Rights Violations Under El Salvador's "State of Emergency." 7 December 2022, https://www.hrw.org/report/2022/12/07/we-can-arrest-anyone-we-want/widespread-human-rights-violations-under-el; The Minister of Security is determined to see the number of arrests rise. See: Mario Gonzalez. "Security Minister wants to imprison 80,000 gang members." *El Diario de Hoy.* 17 June 2022. https://www.elsalvador.com/noticias/nacional/regimen-de-excepcion-ministro-gustavo-villatoro/968181/2022/

*Expert Declaration of Sarah C. Bishop, Ph.D.*                                    *Page 8 of 15*

USCA4 Appeal: 25-1404    Doc: 4-3    Filed: 04/16/2025    Pg: 224 of 239    Total Pages:(243 of 258)
Case 8:25-cv-00766-3EB    Document 49-4    Filed 03/19/25    Page 10 of 16
Case 8:25-cv-00951-PXX    Document 86-13    Filed 03/08/25    Page 240 of 258

37.  In some cases, many inmates are punished if one does not obey the guards' orders. UNIDEHC found in an interview with a health professional who had worked at Mariona prison, "In some cells, when an order of the guards or person was not obeyed, they were punished, some examples are: wetting all the people in the cell including their belongings with high-pressure hoses with ice cold water, invading the cell with tear gas; electric shocks, beatings with objects, confinement in the 'punishment cell,' where there were insects and animals (cockroaches, scorpions and mice)…[and] to deprive the right to food, use of the bathroom, and going out in the sunlight, for many days."[38]

38.  Amnesty International confirms that "the grave human rights violations being committed under the state of emergency are systematic in nature due to the widespread and sustained manner in which they are occurring; the level of state organization and planning involving the convergence of the three branches of the state; the impunity and lack of accountability; the lack of transparency and access to information; and the widespread criminalization of poverty, as an aspect of discrimination."[39] This is not a matter of isolated acts of violence and torture but rather a coordinated dismantling of the rule of law and widespread practice of grave violations of human rights as the current norm.

39.  A team of investigative journalists working to produce a report of human rights abuses under the State of Exception for an *Al Jazeera* documentary shared with me during my visit to El Salvador in early 2023 their preliminary findings, including an interview with an adolescent who had been released from Izalco prison who reported that there were daily beatings in prison, that "the guards would ignore people's requests for medical attention," that "guards would beat someone [un]til they were dead and then bring the body back into the cells and leave it there until the body started stinking," that food rations were so meager that they sometimes had to split one hard-boiled egg between two people for a meal, and that "usually the gang members in the cells would bully weaker people for their food." Former inmates revealed that tear gassing in the overcrowded prisons were so frequent that detainees would reserve one of the three small cups of water they usually received each day to flush their eyes after being gassed.[40]

40.  Because the Salvadoran government has been actively attempting to conceal the human rights abuses occurring in prison, a team of investigative journalists at *El Faro* has been recording and publish weekly testimonies of individuals who survived incarceration under the State of Exception. These testimonies corroborate the reports cited above by confirming widespread torture including public beatings to death in front of other inmates, the deliberate withholding of medicine from sick inmates that has resulted in the need for appendages to be amputated, officials throwing prisoners' food on the ground so that inmates must lick the floor to survive, and guards knowing about but failing to take action to prevent some inmates from raping other inmates.[41]

41.  Further testimonies gathered and published by the newspaper *El Pais* reveal practices such as prison officials in Izalco prison hosing down the floor of an overcrowded cell with water then

---

[38] Human and Community Rights Defense Unit (UNIDEHC). Violation of the Right to Health in the Country's Penal Centers. 2024. https://heyzine.com/flip-book/9849749093.html#page/1 p 18.

[39] "El Salvador: One year into state of emergency, authorities are systematically committing human rights violations." Amnesty International. 3 April 2023. https://www.amnesty.org/en/latest/news/2023/04/el-salvador-state-emergency-systematic-human-rights-violations/

[40] Mark Scialla, Salvadoran-based investigative journalist and director of documentary on human rights abuses under the State of Exception for *Al Jazeera* "Fault Lines." 28 February 2023, via message to Sarah Bishop.

[41] "Testimonios: Sobrevivientes de las Cárceles del Régimen." A weekly series from *El Faro*. https://especiales.elfaro.net/es/testimonios/

USCA4 Appeal: 25-1494    Doc: 4-3    Filed: 04/16/2025    Pg: 225 of 239    Total Pages:(244 of 258)
Case 8:25-cv-00766-JEB    Document 86-3    Filed 03/19/25    Page 11 of 16
Case 8:25-cv-00951-PXX    Document 66-3    Filed 03/08/25    Page 244 of 258

sending an electric current through the water to shock everyone inside, guards responding to inmates' pleas for medicine or food with beatings (sometimes to the point of death), and state officials' explicit threats to murder inmates and fabricate justifications, such as "I can shoot you right now and say you wanted to escape."[42]

42.  El Salvador's government has repeatedly been accused of committing crimes against humanity. Zaria Navas, former Inspector General for the Salvadoran National Police and now head of Cristosal's Law and Security program, declared in June 2023 that due to the systemic and widespread human rights abuses committed during the State of Exception: "There is enough evidence for El Salvador to be tried for crimes against humanity."[43]  Likewise, in July 2023, former Salvadoran Human Rights Ombudsman David Morales equated the abuses occurring in the prisons under the State of Exception with the 1932 genocide against the country's indigenous population and the atrocities committed during El Salvador's 1980-1992 civil war; like Navas, he described the government's actions as crimes against humanity.[44] More recently, in December 2024, Leonor Arteaga from the Due Process of Law Foundation concluded, "it is also likely that some of the torture enforced disappearances and extrajudicial executions that have been documented may constitute crimes against humanity which implies the existence of a plan or a policy to commit them involving a chain of command of government actors in El Salvador."[45]

### Deaths in Prison

43.  The deaths of around 375 incarcerated individuals since the start of the State of Exception have been recorded so far, but the human rights nongovernmental organization (NGO) Socorro Jurídico Humanitario that the actual number of deaths may exceed 1000 because of an estimated minimum of fifteen deaths per month that are not reported.[46]

44.  In a sample of 100 cases of prison deaths that occurred during the first year of the State of Exception and for which a cause of death could be determined, Cristosal found through photographic, forensic, and testimonial evidence that 75% of the deaths were violent, probably violent, or with suspicions of criminality on account of a common pattern of hematomas caused by beatings, sharp object wounds, and signs of strangulation on the cadavers examined.[47] Others have died due to being denied medical care.[48]

---

[42] David Marcial Pérez. "The rampant abuse in El Salvador's prisons: 'They beat him to death in the cell and dragged him out like an animal'." *El Pais.* 26 March 2023. https://english.elpais.com/international/2023-03-26/the-rampant-abuse-in-el-salvadors-prisons-they-beat-him-to-death-in-the-cell-and-dragged-him-out-like-an-animal.html

[43] Julia Gavarrete. "There is Enough Evidence for El Salvador to be Tried for Crimes Against Humanity." *El Faro.* 7 June 2023. https://elfaro.net/en/202306/el_salvador/26881/there-is-enough-evidence-for-el-salvador-to-be-tried-for-crimes-against-humanity#

[44] Lissette Lemus. "David Morales: Los Crímenes que está Cometiendo el Gobierno Actual son de Lesa Humanidad." *El Salvador.com.* 16 July 2023.  https://www.elsalvador.com/noticias/nacional/capturados-cristosal-regimen-de-excepcion-breaking-news/1076092/2023/

[45] Leonor Arteaga. "The State of Exception in El Salvador: Taking Stock." Testimony before the United States Congress, Tom Lantos Human Rights Commission. 10 December 2024. https://www.youtube.com/watch?v=ChTW-gm-5SI

[46] Socorro Jurídico Humanitario (Humanitarian Legal Aid). 16 March 2025. https://x.com/SJHumanitario/status/1901454047162372257

[47] Cristosal (2023). One Year Under State of Exception: A Permanent Measure of Repression and Human Rights Violations. https://cristosal.org/EN/wp-content/uploads/2023/08/One-year-under-the-state-of-exception-1.pdf. Page 29.

[48] David Bernal. "Socorro Jurídico ya contabiliza 235 reos muertos bajo régimen de excepción en El Salvador." 24 February 2024. *La Prensa Grafica.* https://www.laprensagrafica.com/elsalvador/Socorro-Juridico-ya-contabiliza-235-reos-muertos-en-regimen-20240223-0089.html

USCA4 Appeal: 25-1494    Doc: 4-3    Filed: 04/16/2025    Pg: 226 of 239    Total Pages:(245 of 258)
Case 8:25-cv-00766-3EB    Document 84-3    Filed 03/28/25    Page 245 of 258
Case 8:25-cv-00951-PXX    Document 86-3    Filed 03/28/25    Page 245 of 258

45.   The actual number of deaths is impossible to confirm because of the government's opacity on the matter.[49] Noah Bullock, the director of Cristosal, explains, "Our investigations demonstrate a clear pattern of torture within the prisons and so we don't discount that the number of people who have died in the State of Emergency could be much higher."[50] The Salvadoran state maintains that all prison deaths have been the result of natural causes despite forensic evidence to the contrary.[51]

46.   The known death rate in Salvadoran prisons is around 70 times greater than the international violent death according to the United Nations' 2024 Global Prison Population report.[52]

47.   The organization MOVIR (Movimiento de Victimas del Régimen de Excepción, or Movement of Victims of the Regimen of Exception) has corroborated that a considerable number of the deaths evaluated so far have been a result of physical attacks of various kinds carried out by state agents, in addition to "beatings inflicted by other prisoners with acquiescence of the prison authorities."[53]

48.   The testimony of Professor Mario Alberto Martínez, who was arrested and detained after making a public statement denouncing the arbitrary detention of his daughter, includes the account of his being in a highly overcrowded cell where inmates were not allowed to speak or even to pray. When three boys were caught talking, the guards removed them from the cell and beat them until they appeared to be dead. Martinez reports that "people died every day" while he was in prison.[54]

49.   Even the deaths described by medical legal obituaries as nonviolent have in some cases involved cadavers that show forensic evidence of torture. One 45-year-old man with an intellectual disability died in prison and was buried by the state in a mass grave with a legal obituary that showed he died from a "pulmonary edema." However, photographic evidence of the cadaver showed edemas of his face, and interviews with individuals detained in the same prison reveal that he was beaten so severely that he lost mobility including the ability to eat.[55] Others have been released from prison in such severe physical states that they have died within days of release because of injuries they sustained in prison; they are not counted among the numbers of deaths in prison.[56]

---

[49] Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December 2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/. p 33.
[50] "El Salvador's Prison State." *Fault Lines, Al Jazeera English*. May 24, 2023. https://www.aljazeera.com/program/fault-lines/2023/5/24/el-salvadors-prison-state
[51] Bryan Avelar. "Inmates in El Salvador tortured and strangled: A report denounces hellish conditions in Bukele's prisons." *El Pais*. 29 May 2023. https://english.elpais.com/international/2023-05-29/inmates-in-el-salvador-tortured-and-strangled-a-report-denounces-hellish-conditions-in-bukeles-prisons.html
[52] United Nations Office on Drugs and Crime (UNODC). "Global prison population and trends. A focus on rehabilitation." 15 August 2024. https://www.cdeunodc.inegi.org.mx/index.php/2024/08/15/global-prison-population-and-trends-a-focus-on-rehabilitation/; The figure of 366 deaths among an inmate population of 83,000 translates to a ratio of 404.82 deaths per 100,000, a rate 69.8 times greater than the international violent death rate of 5.8 per 100,000.
[53] Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December 2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/. P 33.
[54] Williams Sandoval. ""Vi cuando llevaban gente tiesa; todos los días moría gente": así narra un profesor su paso por las cárceles del régimen de excepción." *La Prensa Grafica*. 14 June 2024. https://www.laprensagrafica.com/elsalvador/Vi-cuando-llevaban-gente-tiesa-todos-los-dias-moria-gente-asi-narra-un-profesor-su-paso-por-las-carceles-del-regimen-de-excepcion-20240614-0056.html
[55] Bryan Avelar. "Inmates in El Salvador tortured and strangled: A report denounces hellish conditions in Bukele's prisons." *El Pais*. 29 May 2023. https://english.elpais.com/international/2023-05-29/inmates-in-el-salvador-tortured-and-strangled-a-report-denounces-hellish-conditions-in-bukeles-prisons.html
[56] Cristosal. "One Year Under the State of Exception." May 2023. https://cristosal.org/EN/2023/08/17/report-one-year-under-the-state-of-exception/ p 53.

*Expert Declaration of Sarah C. Bishop, Ph.D.*                                    *Page 11 of 15*

50.    It sometimes takes several months for family members to learn of the death of a loved one in prison, as was the case for a 76-year-old woman who was arrested in April 2022, died while in custody the following November, and was buried in a mass grave. Her children were not advised of her death and continued to send care packages to the prison until February 2023 when a lawyer told them their mother would be released on bail if they paid $3,000. When they arrived at the prison to deliver one last care package before their mother's release, guards told them she had been dead for months.[57]

### Governmental Attempts to Obscure the Visibility of Human Rights Violations

51.    Public access to national data is a central tenet of democracy that has been severely curtailed under Bukele as a means of maintaining popularity while allowing widespread human rights abuses to be committed out of public view. The government of El Salvador is intentionally restricting access to previously publicly available information especially as related to the police and military, prisoners, and the judiciary. As a result, it is becoming increasingly difficult for academics, NGOs, and other governments to access the information and statistics that would reveal the full scope of the disregard for human rights taking place in El Salvador. To produce evidence that is statistically significant instead of just anecdotal in this repressive context requires a coordinated approach to identify patterns and fidelity among pockets of available data in the rapidly unfolding human rights crisis.

52.    As I and my coauthors in a 2023 report in Columbia University's *Regional Expert Series* explain, President Bukele's government has attempted to prevent public knowledge of continuing and widespread human rights abuses through strategies that include (1) denying outsiders access to the prisons, including the Salvadoran Human Rights Ombudsman's Office; (2) criminalizing the media and threatening journalists; (3) subjecting family members of the detained to threats of arrest if they speak publicly of their loved ones' experiences; and (4) routinely charging that individuals and groups who expose the abuses associated with the State of Exception are supporters of gang members and terrorists, in some cases leading to their imprisonment.[58]

53.    Though international NGOs have been working for all three years of the State of Exception to document and corroborate widespread claims of human rights abuses taking place in El Salvador, this work is made highly difficult and sometimes impossible by the government's resistance. As described by Amnesty International in December 2023, "It is not possible to obtain official statistics such as the number of prisoners, overcrowding rate at detention centres, deaths of prisoners, number of crimes, [and] whether abuses of force by public security agents are being recorded and disciplined, among other citizen security variables used to monitor and assess the security situation and state of emergency."[59] Likewise, clandestine graves discovered in El Salvador are deemed by Bukele's government as matters of national security and the identities of their contents classified.

---

[57] "Relato: Las mentiras de un abogado y el deterioro en el penal le costaron la vida a Rosa." La Prensa Grafica. 11 February 2023. https://www.laprensagrafica.com/elsalvador/Relato-Las-mentiras-de-un-abogado-y-el-deterioro-en-el-penal-le-costaron-la-vida-a-rosa-20230210-0095.html

[58] Sarah Bishop, Tommie Sue Montgomery, and Tom Boermann. "Behind the Glowing Headlines: Social Science Analysis of the State of Exception in El Salvador" CeMeCA's Regional Expert Series No. 9, 2023.

[59] Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December 2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/ p 64.

54. The State Department's 2023 Human Rights Report on El Salvador explicitly remarks on the invisibility of and lack of access to national data: "Human rights groups observed that the government increasingly declined to make public data for monitoring and analysis purposes. *Gato Encerrado,* an investigative newspaper, noted the government continued to expand the types of information it classified as confidential and not subject to public disclosure requirements."[60] Without reliable access to national data, neither the State Department nor any other concerned party can provide a more exhaustive view of country conditions that would be possible in more democratic contexts.

55. There are increasing instances of the government blatantly obscuring evidence of state violence. For example, the Attorney General of El Salvador claims to have investigated 143 deaths in prison during the State of Exception and found that every one of the 143 was due to pre-existing conditions or natural causes. However, the U.S. State Department Human Rights report released in 2024 offers evidence from sources including Socorro Jurídico Humanitario, Cristosal, and *El Pais* determining through forensic evidence dozens of violent deaths in prison including those where prison guards beat inmates to death.[61] What the U.S. State Department calls "systemic abuse in the prison system" is effectively denied by the Salvadoran State.

56. The government's clampdown on information related to human rights appears to be devolving. Whereas the 2022 U.S. State Department Human Rights report on El Salvador revealed that "The government reported varying numbers of disappearances and sporadically declined to provide media with numbers and additional data on disappearances, often claiming the statistics were classified,"[62] the report from the following year explains that the Minister of Justice and Public Security had announced the total suspension of investigations into disappearances.[63] These kinds of data would be more readily available in more democratic contexts and offer evidence of El Salvador's sharp democratic decline.

57. To create an illusion of improving country conditions with respect to gang violence, Bukele relies on rhetorical strategies that include selectively revealing and concealing national data.[64] The Inter-American Commission on Human Rights (IACHR) has criticized the Salvadoran State for "a lack of access to statistical data and official records on violence and crime from the Attorney General's Office and the Institute of Forensic Medicine, as well as other data from the PNC [National Civil Police], making it difficult to verify, contrast, and analyze information on citizen security."[65] IACHR notes the "absence of updated official data on incidents of injured or dead persons related to police or Armed Force officers that could be construed as human rights violations."[66] In other

---

[60] "El Salvador 2023 Human Rights Report." US Department of State. https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/ p 27.
[61] Ibid, p 2.
[62] "El Salvador 2022 Human Rights Report." US Department of State https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/el-salvador/ p 3.
[63] "El Salvador 2023 Human Rights Report." US Department of State. https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/ p 4.
[64] Parker Assmann. "El Salvador to Omit Key Data from Official Homicide Tally." *Insight Crime.* 18 July 2019. https://insightcrime.org/news/brief/el-salvador-omit-key-data-homicides/;  Sarah C. Bishop. "An Illusion of Control: How El Salvador's President Rhetorically Inflates His Ability to Quell Violence." *Journalism and Media, 4,* no. 1 (2023): 16-29.
[65]Inter-American Commission on Human Rights. "Follow-up of Recommendations Issued by the IACHR in its Country or Thematic Reports: El Salvador." 2022. https://www.oas.org/en/iachr/docs/annual/2022/Chapters/12-IA2022_Cap_5_El_Salvador_EN.pdf. p 874.
[66] Ibid., p 876.

words, the state has repeatedly refused to provide the information that would be necessary to know the full scope of and prosecute instances of police and military violence.

58. Americas Director for Amnesty International Ana Piquer reported in March 2024 that "the denial, minimization and concealment of reported serious human rights violations reflect the government's unwillingness to fulfil its duty to respect and promote human rights in the country."[67] By strategically concealing both the nature and scope of human rights abuses taking place, the government of El Salvador has managed to mitigate international awareness.

## Gang Activity During the State of Exception

59. Publicly visible gang activity outside the prisons has quieted during the State of Exception, though gang violence inside the prisons subsists.[68] Since 2004, a practice had been in place to hold members of the two most powerful gangs in El Salvador, MS-13 and Barrio 18, in separate prisons in a measure designed to prevent both rival inter-gang violence and violence between gang members and civilians. Former Salvadoran Security Minister Bertrand Galindo explained, "The point was that if we left them in the same facilities, with the level of violence that was occurring and the weakness of the infrastructure, the state was not going to be able to prevent them from killing each other."[69] Bukele changed this policy in 2020 and reaffirmed on Twitter during the opening of his new 2023 mega-prison that gang members would be mixed together and held for decades[70]—a change certain to result in violence between the gangs and indicative of the Salvadoran state's determination not to protect its detained citizens from harm at the hands of the gangs.

60. The high probability of violent gang activity in prisons during the State of Exception in El Salvador since the policy changed has been confirmed by a range of instances such as a January 2025 riot in Izalco prison in which active gang members mixed together in a cell with retired gang members reportedly attacked each other using iron bars they had removed from their beds, resulting in at least three deaths.[71] Two weeks after the riot, three inmates from Izalco prison died in hospitals; the families of the deceased were informed that the cause of their deaths was "illness." [72]

---

[67] Amnesty International. "El Salvador: The institutionalization of human rights violations after two years of emergency rule." 27 March 2024. https://www.amnesty.org/en/latest/news/2024/03/el-salvador-two-years-emergency-rule/

[68] "El Salvador 2022 Human Rights Report." U.S. Department of State. https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/el-salvador/ p 5.

[69] Roberto Valencia. "How El Salvador Handed its Prisons to the Mara Street Gangs." *InsightCrime* 3 September 2014. https://insightcrime.org/news/analysis/how-el-salvador-handed-its-prisons-to-the-gangs/#:~:text=On%20September%202%2C%202004%20the,active%20gang%20members%20call%20pesetas.

[70] Bukele, Nayib (@NayibBukele). 2023. Twitter, February 24, 2023. Translated from Spanish by Sarah C. Bishop. https://twitter.com/nayibbukele/status/1629165213600849920.

[71] David Bernal, Cindy Castillo y Claudia Espinoza. "Pedirán una investigación por motín en penal de Izalco." *La Presna Grafica.* 10 January 2025. https://www.laprensagrafica.com/elsalvador/Pediran-una-investigacion-por-motin-en-penal-de-Izalco-20250110-0063.html

[72] Oscar Reyes. "Reos de penal de Izalco mueren en hospitals." 28 January 2025. *La Prensa Grafica.* https://www.laprensagrafica.com/elsalvador/Reos-de-penal-de-Izalco-mueren-en-hospitales-20250128-0083.html

*Expert Declaration of Sarah C. Bishop, Ph.D.*                    *Page 14 of 15*

USCA4 Appeal: 25-1404   Doc: 4-2   Filed: 04/16/2025   Pg: 230 of 239   Total Pages:(249 of 258)
Case 1:25-cv-00766-JEB   Document 44-4   Filed 03/19/25   Page 16 of 16
Case 8:25-cv-00951-PXX   Document 86-3   Filed 04/08/25   Page 249 of 258

61. Bukele's failure to protect detainees from gang violence has been widely criticized by human rights organizations. Director for the Americas at Human Rights Watch José Miguel Vivanco stated that not separating gang-affiliated detainees from each other or from other detainees showed the government's "wickedness and cruelty;"[73] the Human Rights Commission of El Salvador stated that the practice "carries a total risk of mutinies or selective or collective murders."[74] Still, much of the news reporting on Bukele's change in procedure referenced the country's general prison overcrowding, as though the move was an inevitable reality in a national context where the prison population was already double its stated capacity. The fact that Bukele reiterated his intention to mix gang members together in the announcement of the opening of the new mega-prison that was promised to solve the issue of overcrowding reveals this practice as a deliberate strategy in knowing acquiescence to the violence likely to result rather than an unfortunate necessity.

62. In practice, this means that Salvadoran citizens, many of whom have been arrested arbitrarily, continue to be victim to gang control and authority even while detained. In some prisons, MS-13 and Barrio 18 are designating leaders of crowded cells to set cell rules and determine who receives food and water. Breaking the gang's rules may result in physical beatings.[75]

### Conclusion

63. Deportees who are imprisoned in El Salvador are highly likely to face immediate and intentional life-threatening harm at the hands of state actors and a secondary threat of violence from incarcerated gang members.

---

### Signature

I declare under penalty of perjury that the foregoing is true and correct to best of my knowledge.

_____          March 19, 2025          _____

Signature                                          Date

---

[74] Marcos González Díaz. "Bukele contra las maras: las impactantes imágenes con las que El Salvador anunció que juntó a presos de diferentes pandillas en las celdas para combatir la violencia." *BBC News Mundo.* 28 April 2020. https://www.bbc.com/mundo/noticias-america-latina-52450557
[75] Stephen Dudley et al. "El Salvador's (Perpetual) State of Emergency: How Bukele's Government Overpowered Gangs." December 2023. https://insightcrime.org/investigations/el-salvador-perpetual-state-emergency-how-bukele-government-overpowered-gangs/#:~:text=In%20March%202022%2C%20the%20government,suspected%20gang%20members%20and%20collaborators p 6.

*Expert Declaration of Sarah C. Bishop, Ph.D.*                    *Page 15 of 15*

**United States Department of Justice**
**Executive Office for Immigration Review**
**Immigration Court**
**Baltimore, Maryland**

---

| | | |
|---|---|---|
| In the Matter of | : | **In Bond Proceedings** |
| | : | |
| | : | |
| **ABREGO-GARCIA, Kilmer Armado** | : | **Case #A** ████████ |
| | : | |
| | : | |
| **Respondent** | : | |
| | : | |

---

| | |
|---|---|
| **Charges:** | Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i) |
| **Application:** | Change in Custody Status |
| **Hearing Date:** | April 29, 2019 |
| **Appearances:** | Himedes Chicas, Esq., on behalf of the Respondent; Jennifer Hastings, Esq., on behalf of the Department of Homeland Security |

### BOND MEMORANDUM

The Respondent is a native and citizen of El Salvador. On March 29, 2019, the Department of Homeland Security (DHS) served the Respondent with a Notice to Appear (NTA), which sets forth the following factual allegations: (1) the Respondent is not a citizen or national of the United States; (2) he is a native and citizen of El Salvador; (3) he arrived in the United States at an unknown place, on an unknown date; and (4) he was not then admitted or paroled after an inspection by an immigration officer. Accordingly, the Respondent was charged with removability pursuant to INA § 212(a)(6)(A)(i), as an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General. Exh. 1. The Respondent was held in custody by the DHS.

The Respondent requested a bond redetermination hearing, which the Court conducted on April 24, 2019. At his bond hearing, the Respondent, through counsel, requested a $5,000 bond. He argued that he is not a flight risk. He asserted that he has lived in the United States for eight years. He has two brothers who are legal permanent residents. His fiancé is a United States citizen, and the Respondent is helping to raise and support her two children. His fiancé is also five months' pregnant with a child by the Respondent; her pregnancy is high-risk. He stated that he failed to appear for hearings on some traffic violations because he was not aware of those hearings, and he intends to hire an attorney to resolve his traffic proceedings. In addition, the

Respondent stated that he intends to apply for relief in the form of asylum and adjustment of status based on his relationship to his fiancé, whom he intends to marry. The Respondent also argued that he is not a danger to the community. He has no criminal convictions. He denied being a gang member and objected to the admissibility of the Form I-213 and the Prince George's County Police Department Gang Field Interview Sheet because he lacked the opportunity to cross-examine the detective who determined that he is a gang member.

The DHS opposed the Respondent's request for bond. The DHS asserted that the Respondent is a verified gang member. The Respondent was arrested in the company of other ranking gang members and was confirmed to be a ranking member of the MS-13 gang by a proven and reliable source. The DHS argued that the Form I-213 is admissible as a legally reliable document in immigration court.

An alien seeking a custody redetermination under section 236(a) of the Act bears the burden of demonstrating that he merits release on bond. *Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006). The respondent may satisfy this burden by demonstrating that his release does not pose a danger to persons or property, a threat to national security, or a risk of flight, and that he is likely to appear for any future proceedings. *Matter of Siniauskas*, 27 I&N Dec. 207, 207 (BIA 2018); *Matter of Adeniji*, 22 I&N Dec. 1102, 1111–13 (BIA 1999).

An immigration judge has broad discretion to consider any matter deemed relevant to determining whether an alien's release on bond is permissible or advisable. *Matter of Guerra*, 24 I&N Dec. at 40 (noting that an immigration judge "may choose to give greater weight to one factor over others, as long as the decision is reasonable"). Relevant factors include: (1) whether the alien has a fixed address in the United States; (2) the alien's length of residence in the United States; (3) the alien's family ties in the United States, and whether they may entitle the alien to reside permanently in the United States in the future; (4) the alien's employment history; (5) the alien's record of appearance in court; (6) the alien's criminal record, including the extensiveness of criminal activity, the recent nature of such activity, and the seriousness of the offenses; (7) the alien's history of immigration violations; (8) any attempts by the alien to flee prosecution or otherwise escape from authorities; and (9) the alien's manner of entry to the United States. *Id.*; *see also Matter of Saelee*, 22 I&N Dec. 1258 (BIA 2000).

After considering the information provided by both parties, the Court concluded that no bond was appropriate in this matter. The Court first reasoned that the Respondent failed to meet his burden of demonstrating that his release from custody would not pose a danger to others, as the evidence shows that he is a verified member of MS-13. *Matter of Siniauskas*, 27 I&N Dec. at 210; *Matter of Adeniji*, 22 I&N Dec. at 1111–13; 8 C.F.R. § 1003.19(h)(3). The BIA has held that, absent any indication that the information therein is incorrect or was the result of coercion or duress, Form I-213 is "inherently trustworthy and admissible." *Matter of Barcenas*, 19 I&N Dec. 609, 611 (BIA 1988). The Respondent contends that the Form I-213 in his case erroneously states that he was detained in connection to a murder investigation. He also claims that the I-213 is internally contradicts itself as to whether the Respondent fears returning to El Salvador. The reason for the Respondent's arrest given on his Form I-213 does appear at odds with the Gang Field Interview Sheet, which states that the Respondent was approached because he and others were loitering outside of a Home Depot. Regardless, the determination that the Respondent is a

2

gang member appears to be trustworthy and is supported by other evidence in the record, namely, information contained in the Gang Field Interview Sheet. Although the Court is reluctant to give evidentiary weight to the Respondent's clothing as an indication of gang affiliation, the fact that a "past, proven, and reliable source of information" verified the Respondent's gang membership, rank, and gang name is sufficient to support that the Respondent is a gang member, and the Respondent has failed to present evidence to rebut that assertion.

The Court further held that no bond was appropriate in order to ensure the Respondent's appearance at future hearings, as he had not met his burden of showing that he would not be a flight risk. *See* 8 C.F.R. § 1003.19(h)(3). The Respondent's case presents limited eligibility for relief, thereby significantly diminishing his incentive to appear for future immigration proceedings. He is not married to his fiancé, and any immigration relief that he can be expected to gain from a marital relationship with her in the future is speculative. Although the Respondent stated that he intends to file for asylum, his eligibility appears limited to withholding of removal and protection under the Convention Against Torture due to his failure to file an application within one year of his arrival in the United States. Those forms of relief are limited and contain standards that are difficult to meet. In addition, the record evidence shows that the Respondent has a history of failing to appear for proceedings pertaining to his traffic violations. *See* Bond Exh. 2, Tab I at 28–29. He asserted that he did not receive notice of these proceedings, but in his written statement, he admitted that he remembers receiving citations that he chose not to follow up on. *See* Bond Exh. 2, Tab B at 5. The Respondent's lack of diligence in following up on his traffic court cases indicates that he cannot be trusted to appear in immigration court.

In light of these findings, the Court concluded that no bond was appropriate in this matter. That order was issued on April 24, 2019. The Respondent reserved the right to appeal.

5.22.2019

Date

Elizabeth A. Kessler
Immigration Judge

3

**U.S. Department of Justice**                    Decision of the Board of Immigration Appeals
Executive Office for Immigration Review

Falls Church, Virginia 22041

File:    ███████ – Baltimore, MD          Date:

**DEC 1 9 2019**

In re: Kilmer Armado ABREGO-GARCIA

IN BOND PROCEEDINGS

APPEAL

ON BEHALF OF RESPONDENT:   Lucia Curiel, Esquire

ON BEHALF OF DHS:   Jennifer L. Hastings
                    Assistant Chief Counsel

APPLICATION:   Redetermination of custody status


    The respondent, a native and citizen of El Salvador, appeals from an Immigration Judge's April 24, 2019, decision denying his request for release on bond from the custody of the Department of Homeland Security pursuant to section 236(a) of the Immigration and Nationality Act, 8 U.S.C. § 1226(a). On May 22, 2019, the Immigration Judge issued a memorandum setting forth the reasons underlying her conclusion that the respondent did not show that he is not a danger to the community or that he presents a flight risk capable of being mitigated by bond. The appeal will be dismissed.

    This Board reviews the Immigration Judge's factual findings for clear error. 8 C.F.R. § 1003.1(d)(3)(i); *see also Matter of Fatahi*, 26 I&N Dec. 791, 793 n.2 (BIA 2016). We review all other issues de novo. 8 C.F.R. § 1003.1(d)(3)(ii).

    An alien "must demonstrate to the satisfaction of [the Immigration Judge] that [his or her] release would not pose a danger to property or persons . . . ." 8 C.F.R. § 1236.1(c)(8); *see also Matter of Adeniji*, 22 I&N Dec. 1102, 1111-12 (BIA 1999). Thus, only if an alien has established that he or she would not pose a danger to persons or property should an Immigration Judge decide the amount of bond necessary to ensure the alien's presence at proceedings to remove him or her from the United States. *Matter of Urena*, 25 I&N Dec. 140, 141 (BIA 2009).

    The respondent argues that the Immigration Judge clearly erred in determining that he is a verified member of MS-13 because there is no reliable evidence in the record to support such a finding (Respondent's Br. at 6-9). In this regard, the respondent asserts that a Prince George's County Police Department Gang Field Interview Sheet ("GFIS") is based on hearsay relayed by a confidential source (Exh. 4). The respondent also claims that he presented sufficient evidence to rebut the allegation that he is affiliated with MS-13, including character references and criminal records showing that he has only been charged with traffic offenses. Therefore, the respondent contends that the Immigration Judge erroneously ruled that he did not show that he is not a danger to the community (Respondent's Br. at 9-10).

We adopt and affirm the Immigration Judge's danger ruling (IJ at 2-3). *See Matter of Burbano*, 20 I&N Dec. 872, 874 (BIA 1994). Notwithstanding the respondent's challenges to the reliability of the GFIS, the Immigration Judge appropriately considered allegations of gang affiliation against the respondent in determining that he has not demonstrated that he is not a danger to property or persons. *See Matter of Fatahi*, 26 I&N Dec. at 795 (in determining whether an alien presents a danger to the community and thus should not be released on bond pending removal proceedings, an Immigration Judge should consider both direct and circumstantial evidence of dangerousness); *Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006) (stating that Immigration Judges may look to a number of factors in determining whether an alien merits release on bond, including "the alien's criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses").

Consequently, we need not address the Immigration Judge's flight risk determination (Respondent's Br. at 10-11).

Accordingly, the following order is entered.

ORDER: The appeal is dismissed.

FOR THE BOARD

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Greenbelt Division)

|  |  |
|---|---|
| Kilmar Armando Abrego Garcia*, et al.*, | |
| Plaintiffs, | |
| v. | No. 8:25-cv-00951-PX |
| Kristi Noem, Secretary of Homeland Security, *et al.*, | Declaration Of Acting Field Office Director Robert L. Cerna |
| Defendants. | |

## DECLARATION OF ROBERT L. CERNA

I, Robert L. Cerna, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.     I am an Acting Field Office Director Enforcement and Removal Operations ("ERO") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2.     As the (A)FOD of the Harlingen Field Office, I am responsible for, among other things, the detention and enforcement operations of more than 350 employees, assigned to six ERO Harlingen offices. ERO Harlingen encompasses fifteen South Texas counties and is responsible for six detention facilities with a combined total of 3,790 detention beds.

3.     I am aware that the instant lawsuit has been filed regarding the removal of Kilmer Armado Abrego-Garcia (Abrego-Garcia) to El Salvador.

4.      I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

5.      On March 15, 2025, President Trump announced the Proclamation *Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua.*

6.      On March 15, 2025, two planes carrying aliens being removed under the Alien Enemies Act ("AEA") and one carrying aliens with Title 8 removal orders departed the United States for El Salvador. Abrego-Garcia, a native and citizen of El Salvador, was on the third flight and thus had his removal order to El Salvador executed. This removal was an error.

7.      On March 29, 2019, the Department of Homeland Security (DHS) served Abrego-Garcia with a Notice to Appear, charging him as inadmissible pursuant to Section 1182(a)(6)(A)(i) of Title 8 of the United States Code, "as an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the [Secretary of Homeland Security]."

8.      During the course of his proceedings, Abrego-Garcia remained in ICE custody because the Immigration Judge (IJ) with the Executive Office for Immigration Review denied Abrego-Garcia bond at a hearing on April 24, 2019, citing danger to the community because "the evidence show[ed] that he is a verified member of [Mara Salvatrucha] ('MS-13')]" and therefore posed a danger to the community. The IJ also determined that he was a flight risk. Abrego-Garcia appealed, and the Board of Immigration Appeals upheld this bond decision in an opinion issued on December 19, 2019, citing the danger Abrego-Garcia posed to the community.

9.      On October 10, 2019, an IJ ordered Abrego-Garcia's removal from the United States but granted withholding of removal to El Salvador pursuant to 8 U.S.C. § 1231(b)(3)(A). This grant of protection prohibited his removal to El Salvador.

10.     Following this grant of withholding of removal, Abrego-Garcia was released from ICE custody.

11.     On March 12, 2025, ICE Homeland Security Investigations arrested Abrego-Garcia due to his prominent role in MS-13. Over the next two days, Abrego-Garcia was transferred to the staging area for the removal flights discussed in Paragraph 6.

12.     The operation that led to Abrego-Garcia's removal to El Salvador was designed to only include individuals with no impediments to removal. Generally, individuals were not placed on the manifest until they were cleared for removal.

13.     ICE was aware of this grant of withholding of removal at the time Abrego-Garcia's removal from the United States. Reference was made to this status on internal forms.

14.     Abrego-Garcia was not on the initial manifest of the Title 8 flight to be removed to El Salvador. Rather, he was an alternate. As others were removed from the flight for various reasons, he moved up the list and was assigned to the flight. The manifest did not indicate that Abrego-Garcia should not be removed.

15.     Through administrative error, Abrego-Garcia was removed from the United States to El Salvador. This was an oversight, and the removal was carried out in good faith based on the existence of a final order of removal and Abrego-Garcia's purported membership in MS-13.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31st day of March 2025.

_____

Robert L. Cerna
Acting Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security