# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### Greenbelt Division

Kilmar Armando Abrego Garcia, *et al.*,

                Plaintiffs,

v.

Kristi Noem, *et al.*,

                Defendants.

Case No.: 8:25-CV-00951-PX
**REDACTED VERSION**

**Plaintiffs' Memorandum of Law Regarding Privilege Assertions**

# Table of Contents

Table of Authorities............................................................................................................ ii

Introduction..................................................................................................................... 1

Background...................................................................................................................... 3

Argument ........................................................................................................................ 6

I.      The Court should overrule the state secrets objections...................................... 6

      A.      DHS and DOJ have not properly invoked the state secrets privilege. .................. 6

      B.      The Government has not shown reasonable danger of harm to national security from answering the discovery and deposition questions. ...................................... 8

            1.      This Court must review the assertion of state secrets privilege very carefully and with a skeptical eye. ............................................................. 9

            2.      The Rubio Declaration does not show that the privilege applies here...... 12

      C.      If there is any privileged information, it can and should be separated. ............... 21

II.     The Court should overrule the deliberative process objections. ....................................... 21

III.    The Court can review ostensibly privileged materials *in camera*.................................... 23

Conclusion ..................................................................................................................... 25

## Table of Authorities

**Page(s)**

**Cases**

*Abilt v. CIA*,
848 F.3d 305 (4th Cir. 2017) ........................................................................ passim

*Abrego Garcia v. Noem*,
2025 WL 1021113 (4th Cir. Apr. 7, 2025) ............................................ 11

*Abrego Garcia v. Noem*,
2025 WL 1135112 (4th Cir. Apr. 17, 2025) ........................................... 12

*ACLU v. Brown*,
619 F.2d 1170 (7th Cir. 1980) (*en banc*) ............................................ 25

*Al-Haramain Islamic Found., Inc. v. Bush*,
507 F.3d 1190 (9th Cir. 2007) ......................................................... 9, 13

*Ayyad v. IRS*,
2018 WL 704849 (D. Md. Feb. 2, 2018) ............................................... 24

*Burks v. Islamic Republic of Iran*,
2020 WL 13303322 (D.D.C. Aug. 21, 2020) ........................................ 20

*Ellsberg v. Mitchell*,
709 F.2d 51 (D.C. Cir. 1983) ..................................................... 10, 11, 21

*El-Masri v. United States*,
479 F.3d 296 (4th Cir. 2007) ........................................................ 10, 24

*Empower Oversight Whistleblowers & Rsch. v. NIH*,
122 F.4th 92 (4th Cir. 2024) ............................................................... 23

*FBI v. Fazaga*,
595 U.S. 344 (2022) ....................................................................... 8, 9

*Fitzgerald v. Penthouse International, Ltd.*,
776 F.2d 1236 (4th Cir. 1985) ............................................................ 14

*FWS v. Sierra Club, Inc.*,
592 U.S. 261 (2021) ............................................................................ 22

*Hall v. Baltimore Police Dep't*,
2025 WL 1024069 (D. Md. Mar. 31, 2025) ........................................... 23

*Heine v. Raus*,
399 F.2d 785 (4th Cir. 1968) ............................................................................... 21

*Hepting v. AT & T Corp.*,
439 F. Supp. 2d 974 (N.D. Cal. 2006) ................................................................. 16

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) ................................................................................................. 10

*In re Grand Jury Subpoena Dated Aug. 9, 2000*,
218 F. Supp. 2d 544 (S.D.N.Y. 2002) ................................................................. 14

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997) ............................................................................. 21

*J.G.G. v. Trump*,
--- F. Supp. 3d ----, 2025 WL 1119481 (D.D.C. Apr. 16, 2026) .......................... 15

*Mohamed v. Jeppesen Dataplan, Inc.*,
614 F.3d 1070 (9th Cir. 2010) (*en banc*) ................................................... 9, 12, 15

*NAACP v. Bureau of the Census*,
401 F. Supp. 3d 608 (D. Md. 2019) .......................................................... 3, 22, 23

*Noem v. Abrego Garcia*,
145 S. Ct. 1017 (2025) .................................................................................. passim

*Northrop Corp. v. McDonnell Douglas Corp.*,
751 F.2d 395 (D.C. Cir. 1984) ............................................................................... 8

*Rahman v. Chertoff*,
2008 WL 453440 (N.D. Ill. Apr. 16, 2008) .......................................................... 21

*Rein v. U.S. Patent & Trademark Office*,
553 F.3d 353 (4th Cir. 2009) ............................................................................... 24

*Rep. of China v. Nat'l Union Fire Ins. Co.*,
142 F. Supp. 551 (D. Md. 1956) .......................................................................... 14

*Republic Steel Corp. v. United States*,
538 F. Supp. 422 (C.I.T. 1982),
*vacated on other grounds by* 5 C.I.T. 1 (Jan. 6, 1983) .......................................... 15

*Solers, Inc. v. IRS*,
827 F.3d 323 (4th Cir. 2016) ............................................................................... 24

*Sterling v. Tenet*,
416 F.3d 338 (4th Cir. 2005) ........................................................................ passim

*Tri-State Hosp. Supply Corp. v. United States*,
    226 F.R.D. 118 (D.D.C. 2005) ........................................................................................ 3, 21

*U.S. Steel Corp. v. United States*,
    578 F. Supp. 409 (C.I.T. 1983),
    *vacated on other grounds by* 7 C.I.T. 117 (Mar. 27, 1984)..................................................... 14

*United States v. Reynolds*,
    345 U.S. 1 (1953)............................................................................................................ passim

*United States v. Zubaydah*,
    595 U.S. 195 (2022)........................................................................................................ passim

*Wikimedia Found. v. NSA/Cent. Sec. Serv.*,
    14 F.4th 276 (4th Cir. 2021)........................................................................................... passim

**Introduction**

A full month has passed since the United States Supreme Court found that Kilmar Armando Abrego Garcia's "removal to El Salvador was . . . illegal" and affirmed that this Court "properly require[d] the Government to 'facilitate' Abrego Garcia's release from custody in El Salvador and to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador." *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025). Yet Abrego Garcia remains in El Salvador, and the Government has produced no evidence showing that it has made the slightest effort to facilitate his release. To the contrary, the President has insisted on national television that, although he has the power to bring Abrego Garcia back, he won't, because his lawyers have advised him against it.[1] Other cabinet members, including the Secretary of Homeland Security, have likewise testified before Congress that "there is no scenario where Abrego Garcia will be in the United States again."[2] Meanwhile, in sealed, *ex parte* proceedings, the Government presumably has told this Court the opposite, as it has repeatedly sought to draw out this litigation.

Plaintiffs have sought discovery to uncover the truth as to the Government's efforts (or lack thereof) as well as its abilities to facilitate Abrego Garcia's return—the essential issue in this case. Over and over, the Government has stonewalled Plaintiffs by asserting unsupported privileges—primarily state secrets and deliberative process—to withhold written discovery and to instruct witnesses not to answer even basic questions. Even as the Government speaks freely about Abrego Garcia in public, in this litigation it insists on secrecy. The Supreme Court directed the Government

---

[1] *See* Cooper Decl. ¶ 2, Ex. A (President Trump interview by Kristen Welker), *video at* https://www.nbcnews.com/politics/trump-administration/read-full-transcript-president-donald-trump-interviewed-meet-press-mod-rcna203514 (at 27:13–27:24); Cooper Decl. ¶ 3, Ex. B (President Trump interview by Terry Moran), *video at* https://abcnews.go.com/Politics/trump-abrego-garcia-back-el-salvador/story?id=121298276 (at 5:46–6:06).

[2] Cooper Decl. ¶ 4, Ex. C (Secretary Noem testimony to U.S. Senate committee), *video at* https://www.appropriations.senate.gov/hearings/a-review-of-the-presidents-fiscal-year-2026-budget-request-for-the-department-of-homeland-security (at 45:48–46:33).

"to share what it can concerning the steps it has taken and the prospect of further steps." *Id.* But it has shared almost nothing, in part because of privilege assertions this Court previously found "specious." ECF No. 100 at 2. That is no accident. The Secretary of State announced at a Cabinet meeting, while seated next to the President, that he would "never tell" "a judge" whether the Government had formally requested that El Salvador return Abrego Garcia.[3]

On its face, there is little reason to believe that compliance with a court order to facilitate the release and return of a single mistakenly removed individual so that he can get his day in court implicates state secrets at all. No military or intelligence operations are involved, and it defies reason to imagine that the United States' relationship with El Salvador would be endangered by any effort to seek the return of a wrongfully deported person who the Government admits never should have been removed to El Salvador in the first place. The Government does not come close to making a showing that would disturb the common sense conclusion that there are no genuine state secrets at play here.

***First***, neither the Department of Homeland Security (**DHS**) nor the Department of Justice (**DOJ**) have lodged formal claims of privilege from their department heads based on actual personal consideration by those officers. *See United States v. Zubaydah*, 595 U.S. 195, 205 (2022). That absence is dispositive for those two agencies, so the DHS and DOJ Defendants cannot rely on the privilege. ***Second***, the declaration by Secretary Rubio for the Department of State fails to show a "reasonable danger of harm to national security." *Id.* This Court must review Secretary Rubio's assertion of the state secrets privilege "with a very careful, indeed a skeptical, eye, and not . . . accept at face value the government's claim or justification of privilege." *Abilt v. CIA*, 848

---

[3] Cooper Decl. ¶ 5, Ex. D (Secretary Rubio statement at Cabinet meeting), *video at* https://www.nbcnews.com/now/video/rubio-refuses-to-say-if-administration-has-asked-for-kilmar-abrego-garcia-s-return-238636613921.

F.3d 305, 312 (4th Cir. 2017) (citation omitted). The Rubio Declaration's vague and boilerplate justifications do not satisfy this exacting standard. The fact that the Government has repeatedly *publicized* information—in congressional testimony, public interviews, and social media posts—about Abrego Garcia and its unwillingness to facilitate his return confirms that answering the requested discovery would not imperil national security. More likely, the Government's assertion of state secrets is consistent with an effort to avoid judicial scrutiny of its actions.

The deliberative process privilege is likewise inapplicable, for at least three reasons. ***First***, the privilege does not apply where, as here, "there is reason to believe that government misconduct has occurred." *Tri-State Hosp. Supply Corp. v. United States*, 226 F.R.D. 118, 135 (D.D.C. 2005). ***Second***, this privilege yields where, as here, Plaintiffs have a compelling need for the discovery. *See NAACP v. Bureau of the Census*, 401 F. Supp. 3d 608, 617–18 (D. Md. 2019). ***Third***, the Government has not carried its burden of showing that the requested discovery is deliberative and pre-decisional, as is required for the privilege to apply. *Id.* at 611–17.

In sum, the Court should hold that neither the state secrets privilege nor the deliberative process privilege shields the Government here from answering Plaintiffs' basic discovery requests and deposition questions about the Government's facilitation efforts and abilities—efforts that the Supreme Court itself ordered the Government to share.[4]

### Background

On April 15, following the Supreme Court's order, this Court ordered expedited discovery "to ascertain what, if anything, the Defendants have done to 'facilitate Abrego Garcia's release from custody in El Salvador and to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador.'" ECF No. 79 at 6–7 (quoting *Noem*, 145 S. Ct. at 1018).

---

[4] Plaintiffs reserve all rights to challenge other privilege assertions by the Government.

Plaintiffs promptly served discovery requests, including Interrogatory Nos. 1–7 and Request for Production of Document (**RPD**) Nos. 1–4, which seek discovery about the Government's efforts to facilitate Abrego Garcia's release and return to the United States, and Interrogatory Nos. 9–11 and RPD Nos. 6–8, which seek discovery about the Government's agreement, arrangement, or understanding with El Salvador related to Abrego Garcia's detention in El Salvador. ECF Nos. 98-1 & 98-2.

In response to nearly every request, the Government raised boilerplate privilege objections. *E.g.*, ECF No. 98-1 at 3



; *id.* at 3–17

; ECF No. 98-2 at 3–15                                         .

On April 22, the Court overruled most of the Government's objections because they "reflect[ed] a willful and bad faith refusal to comply with discovery obligations," relied on an "arbitrarily cramped reading of the Court's order," or involved "specious" and "boilerplate" privilege assertions. ECF No. 100 at 2–4. The Court directed the Government to supplement its responses with "the specific legal and factual bases for each asserted privilege and produce a privilege log that fully complies with the Federal Rules of Civil Procedure and this Court's Local Rules"—and warned the Government that if it did not, it would "lose the protections [it] failed to properly invoke." *Id.* at 3–4. The Court also ordered Plaintiffs to refine their requests about the El Salvador agreement "to focus specifically on any agreement, arrangement, or understanding between the United States and El Salvador related to the removal and confinement of Abrego Garcia and any other individuals who were transported with him on March 15, 2025." *Id.* at 6.

Plaintiffs served amended discovery requests later on April 22. ECF Nos. 112-1 & 112-2. The next day, the Government moved for a stay of discovery, ECF No. 101, and the Court granted a stay until April 30, ECF No. 103. On April 30, the Court denied a further stay and ordered the Government to "answer and respond to all outstanding discovery requests and supplement [its] invocation of privilege(s), consistent with the Court's Order at ECF No. 100, by no later than Monday, May 5, 2025." ECF No. 107 at 1.

On May 5, the Government served objections and responses along with a privilege log and a state secrets declaration from Secretary of State Rubio (**Rubio Declaration**). ECF Nos. 112-3, 112-4, 112-5, 112-6. Once again, the Government ███████████████████████████████████ ████████████████████████████████. *See* ECF No. 112-3 at 2–19 ████████████ ████████████████████████████████; ECF No. 112-4 at 4–19 ██████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████. ECF No. 112.

Meanwhile, Plaintiffs deposed three DHS personnel, two on April 22 (Evan Katz and Joseph Mazzara), and a third on May 7 (Robert Cerna). At the depositions, ██████████ ████████████████████████████████████████████████ ████████████████████████████████. *See* Cooper Decl. ¶ 6, Ex. E ████████████████████████████████; *see also* Cooper Decl. ¶¶ 7–9, Exs. F, G, H (transcripts of depositions). ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ Cooper

Decl. ¶ 7, Ex. F at 95:5–13, 121:12–19. ███████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ Cooper Decl.

¶ 8, Ex. G at 141:10–142:5. ████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████ *id.* at 101:21–102:7, ████████████

██████████████████████████████████████████████████████████████.

Also on May 7, the Court ordered the parties to file by May 12 "formal briefing of the Defendants' invocations of privilege, principally the state secrets and deliberative process privileges, as discussed in ECF No. 112," with the briefing to address "the legal and factual bases for the invocation of those privileges, including Plaintiff's request for the Court to conduct *in camera* review of the withheld documents." ECF No. 115 at 1. Plaintiffs respectfully submit this brief in accordance with the Court's May 7 order.

**Argument**

**I.    The Court should overrule the state secrets objections.**

"The state secrets privilege permits the Government to prevent disclosure of information when that disclosure would harm national security interests." *Zubaydah*, 595 U.S. at 204. "[T]he Government bears the burden of showing that the privilege should apply." *Id.* at 209. To do so, it must satisfy both procedural and substantive requirements. *See Wikimedia Found. v. NSA/Cent. Sec. Serv.*, 14 F.4th 276, 302 (4th Cir. 2021). Here, it satisfies neither.

**A.    DHS and DOJ have not properly invoked the state secrets privilege.**

To invoke the state secrets privilege, "the Government must submit to the court a 'formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer.'" *Zubaydah*, 595 U.S. at 205 (quoting *United States*

*v. Reynolds*, 345 U.S. 1, 7–8 (1953)). The Government typically satisfies this procedural requirement by providing "affidavits or declarations made personally by the department head." *Sterling v. Tenet*, 416 F.3d 338, 344 (4th Cir. 2005) (collecting cases).

The Court ordered the Government to serve "the specific legal and factual bases for each asserted privilege," ECF No. 100 at 3–4, by "May 5, 2025," ECF No. 107 at 1. And it cautioned the Government that in the event of a failure to do so, it "will lose the protections [it] failed to properly invoke." ECF No. 100 at 3.

Here, the only formal claim of privilege the Government has lodged is the Rubio Declaration. By its terms, ████████████████████████████████████████████ ███████████████████████████████████████████████████████████ Rubio Declaration ¶ 3. Because Secretary Rubio is not the head of either DHS or DOJ, he did not (and could not) claim state secrets privilege for those departments. And neither the head of DHS (Secretary Noem) nor the head of DOJ (Attorney General Bondi) lodged their own claims of state secrets privilege. The absence of declarations from Secretary Noem and Attorney General Bondi in this case is in notable contrast to *J.G.G. v. Trump*, where Secretary Rubio, Secretary Noem, *and* Attorney General Bondi each submitted declarations to assert state secrets for their departments. *See J.G.G. v. Trump*, No. 1:25-cv-00766 (D.D.C.) at ECF No. 56-1 (Bondi declaration), ECF No. 56-2 (Rubio declaration), and ECF No. 56-3 (Noem declaration). The Government thus *knew* it needed to lodge formal claims of privilege from Secretary Noem and Attorney General Bondi if it wished to assert state secrets privileges for DHS and DOJ, but it elected not to do so in this case.

In a recent deposition, ██████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████ Cooper Decl. ¶ 8, Ex. G

at 80:3–15. The Government should not be permitted to deliberately ignore legal requirements and then ███████████████████████████████████████████████████████████████████ ██████. That is particularly true where it has been warned of the need for compliance.

"Consideration of the state secrets privilege can only proceed if the privilege was properly invoked under the procedures described by *Reynolds*." *Sterling*, 416 F.3d at 345. Because DHS and DOJ deliberately chose to ignore those procedural requirements, this Court should hold that DHS and DOJ lost "the protections they failed to properly invoke." ECF No. 100 at 3; *see also Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 400, 404–07 (D.C. Cir. 1984) (rejecting invocation of state secrets privilege for State Department where it had not submitted a declaration showing that its allegedly privileged materials had "been examined or considered by the head of the department," even while sustaining privilege for Department of Defense because "the head of the department, Secretary of Defense Weinberger," did submit the requisite affidavit).

Accordingly, the Court should reject the Government's efforts to hide behind the state secrets privilege and compel all Defendants from DHS and DOJ to fully respond to written discovery and all deponents from those departments to fully answer deposition questions.

Even if DHS and DOJ had lodged formal claims of privilege, they would not support the state secrets privilege here for the same reasons the Rubio Declaration fails to do so, as the next section explains.

**B.      The Government has not shown reasonable danger of harm to national security from answering the discovery and deposition questions.**

For the privilege to apply, the Government must show "a reasonable danger of harm to national security" from answering the requested discovery. *Zubaydah*, 595 U.S. at 205; *accord, e.g.*, *FBI v. Fazaga*, 595 U.S. 344, 356–57 (2022) ("when the state secrets privilege is asserted, the central question is . . . whether its disclosure would harm national-security interests"); *Wikimedia*,

14 F.4th at 302 (court "must determine, 'from all the circumstances of the case,' whether 'there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged'") (quoting *Reynolds*, 345 U.S. at 10).

Under the circumstances in this case, the Rubio Declaration fails to satisfy the exacting review the Court must apply to the Government's assertion of state secrets privilege. This provides yet another, independent basis for the Court to compel production of the withheld information. *See Fazaga*, 595 U.S. at 357 ("[A] court considering an assertion of the state secrets privilege may order the disclosure of lawfully obtained evidence if it finds that disclosure would not affect national security (assuming that the information is otherwise subject to disclosure).").

### 1.     This Court must review the assertion of state secrets privilege very carefully and with a skeptical eye.

It is this Court's obligation to evaluate an assertion of state secrets privilege "with a very careful, indeed a skeptical, eye." *Abilt v. CIA*, 848 F.3d 305, 312 (4th Cir. 2017) (quoting *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007)); *accord Wikimedia*, 14 F.4th at 300 ("Indeed, the court stands as a gatekeeper to the privilege, and we take very seriously our obligation to review the government's claims with a very careful, indeed a skeptical, eye.") (cleaned up). During this review, the Court must not "accept at face value the government's claim or justification of privilege." *Abilt*, 848 F.3d at 312 (quoting *Al-Haramain*, 507 F.3d at 1203).

To satisfy this "very careful" review, the Government must present its privilege claim "in sufficient detail for the court to make an independent determination of the validity of the claim of privilege and the scope of the evidence subject to the privilege." *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1080 (9th Cir. 2010) (*en banc*). "Simply saying 'military secret,' 'national security' or 'terrorist threat' or invoking an ethereal fear that disclosure will threaten our nation is insufficient to support the privilege." *Al-Haramain*, 507 F.3d at 1203.

This scrutiny reflects a "compromise." *Reynolds*, 345 U.S. at 9. "[I]n assessing the Government's claim that disclosure may harm national security, courts must exercise the traditional reluctance to intrude upon the authority of the Executive in military and national security affairs." *Zubaydah*, 595 U.S. at 205 (cleaned up). But at the same time, the Supreme Court's "precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010). The Judicial Branch—not the Executive Branch—"must determine whether the circumstances are appropriate for the claim of [state secrets] privilege" because "[j]udicial control over the evidence in a case cannot be abdicated to the caprice of executive officers." *Zubaydah*, 595 U.S. at 205 (quoting *Reynolds*, 345 U.S. at 8, 9–10). A very careful and skeptical review of assertions of the state secrets privilege is thus "vital to protect against the 'intolerable abuses' that would follow an 'abandonment of judicial control.'" *Abilt*, 848 F.3d at 312 (quoting *Reynolds*, 345 U.S. at 8); *see also Ellsberg v. Mitchell*, 709 F.2d 51, 58 (D.C. Cir. 1983) ("To ensure that the state secrets privilege is asserted no more frequently and sweepingly than necessary, it is essential that the courts continue critically to examine instances of its invocation.").

The precise level of scrutiny that a court applies to test an assertion of state secrets privilege depends on the particular facts of the case. Heightened scrutiny is warranted here for two reasons.

***First***, "[t]he degree to which . . . a reviewing court should probe" the Government's assertion of privilege "depends in part on the importance of the assertedly privileged information to the position of the party seeking it." *Wikimedia*, 14 F.4th at 302 (quoting *El-Masri v. United States*, 479 F.3d 296, 305 (4th Cir. 2007)). "Where there is a strong showing of necessity, the claim of privilege should not be lightly accepted." *Zubaydah*, 595 U.S. at 205 (quoting *Reynolds*, 345 U.S. at 11). "A 'showing of need' . . . consists of a demonstration that the information is relevant

to a material aspect of the litigant's case and that the litigant is unable to obtain the crucial data (or adequate substitute) from any other source." *Ellsberg*, 709 F.2d at 59 n.37.

Here, Plaintiffs have great need for the requested discovery. The Supreme Court already directed the Government "to share what it can concerning the steps it has taken and the prospect of further steps." *Noem*, 145 S. Ct. at 1018. Plaintiffs' requested discovery about the Government's efforts to facilitate Abrego Garcia's return goes to "the steps it has taken." And discovery about the Government's agreement to detain Abrego Garcia in El Salvador goes to "the prospect of further steps." Abrego Garcia (and other detainees) are confined in El Salvador "pending the United States' decision on their long-term disposition," ECF No. 31 at 11 (citation omitted), so information about the agreement goes to the prospect of the Government exercising its contractual rights "to secure and transport [its] detainees, Abrego Garcia included," back to the United States, *id.* at 12. This discovery is essential to achieving the remedy Plaintiffs seek in this case and fulfilling the orders of the Supreme Court and this Court that the Government is "to 'facilitate' Abrego Garcia's release from custody in El Salvador and to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador." *Noem*, 145 S. Ct. at 1018. Indeed, this Court has already ruled that this discovery is relevant and that Plaintiffs are entitled to it, *see* ECF Nos. 79 & 100, not least because Abrego Garcia is suffering irreparable harm "every minute he is in El Salvador," *Abrego Garcia v. Noem*, 2025 WL 1021113, at *6 (4th Cir. Apr. 7, 2025) (Thacker, J., concurring, joined by King, J.); *see* ECF No. 31 at 20–21. And the Government has not pointed to any alternative source from which Plaintiffs could obtain this discovery.

**Second**, "skepticism" of the Government's assertion of state secrets privilege "is all the more justified in cases that allege serious government wrongdoing," as such allegations "heighten the risk that government officials may be motivated to invoke the state secrets doctrine . . . by a

desire to protect themselves or their associates from scrutiny." *Mohamed*, 614 F.3d at 1085 n.8. Here, the Government "acknowledges that Abrego Garcia was subject to a withholding order forbidding his removal to El Salvador, and that the removal to El Salvador was therefore illegal." *Noem*, 145 S. Ct. at 1018; *accord Abrego Garcia v. Noem*, 2025 WL 1135112, at *1 (4th Cir. Apr. 17, 2025) ("[T]he government has conceded that Abrego Garcia was wrongly or 'mistakenly' deported."). This undisputed serious government wrongdoing justifies exacting review of the Government's assertions that it is invoking state secrets privilege to protect national security rather than to shield its misdeeds from scrutiny. The fact that the Government has apparently suggested to this Court—belatedly, and in sealed *ex parte* communications—that it was working to secure Abrego Garcia's return, *see* ECF Nos. 101 & 104, even as senior officials from the President on down were saying *precisely the opposite* to the American public, underscores the skepticism that should be accorded the Government's attempts to hide behind the state secrets privilege.

**2.**     **The Rubio Declaration does not show that the privilege applies here.**

Applying this exacting scrutiny, the Rubio Declaration fails to satisfy the Government's burden of "establish[ing] 'that there is a reasonable danger that compulsion of the evidence [at issue] will expose . . . matters which, in the interest of national security, should not be divulged.'" *Zubaydah*, 595 U.S. at 209 (quoting *Reynolds*, 345 U.S. at 10).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████



The Court must not "accept at face value" this "claim or justification of privilege." *Abilt*, 848 F.3d at 312 (quoting *Al-Haramain*, 507 F.3d at 1203).

"Simply saying . . . 'national security' . . . is insufficient to support the privilege." *Al-Haramain*, 507 F.3d at 1203.

Courts evaluating assertions of state secrets privilege over foreign or diplomatic communications recognize that "national security is rarely involved in communications outside the realm of military or intelligence matters." *U.S. Steel Corp. v. United States*, 578 F. Supp. 409,

412 (C.I.T. 1983), *vacated on other grounds by* 7 C.I.T. 117 (Mar. 27, 1984); *accord In re Grand Jury Subpoena Dated Aug. 9, 2000*, 218 F. Supp. 2d 544, 559 (S.D.N.Y. 2002). The leading decisions of the Supreme Court and Fourth Circuit applying state secrets privilege all involved military or intelligence secrets. *See, e.g.*, *Zubaydah*, 595 U.S. at 212 ("existence (or nonexistence) of a CIA facility in Poland"); *Reynolds*, 345 U.S. at 10 (Air Force's "secret electronic equipment" for a "military plane"); *Wikimedia*, 14 F.4th at 302 ("operational details of" NSA "intelligence operations"); *Abilt*, 848 F.3d at 314–15 ("specific CIA programs," "identities of certain CIA officers," and other intelligence information); *El-Masri*, 479 F.3d at 309 ("how the CIA organizes, staffs, and supervises its most sensitive intelligence operations"); *Sterling*, 416 F.3d at 345–46 ("CIA sources and methods"); *Fitzgerald v. Penthouse International, Ltd.*, 776 F.2d 1236, 1242 (4th Cir. 1985) (Navy's "top secret marine mammal weapons system").

Here, Secretary Rubio does not claim that answering Plaintiffs' questions about Abrego Garcia would endanger classified weapons systems or other military secrets, nor does he claim that it will expose classified CIA operations or other intelligence secrets. This Court did once accept an assertion of state secrets privilege over foreign communications where no military or intelligence issues were at stake—back in 1956, where the requested discovery concerned the extremely sensitive foreign policy question of whether the United States would recognize "Communist China." *Rep. of China v. Nat'l Union Fire Ins. Co.*, 142 F. Supp. 551, 556 (D. Md. 1956). Needless to say, the materials sought in this case about the Government's efforts and abilities to facilitate a single individual's return to the United States, after he was illegally removed, do not "in any way approach[] that level of sensitivity." *U.S. Steel*, 578 F. Supp. at 412 (rejecting assertion of state secrets privilege over communications between the United States and Brazil pertaining to international trade); *see also Republic Steel Corp. v. United States*, 538 F. Supp. 422,

423 (C.I.T. 1982) (same for communications between the United States and Romania), *vacated on other grounds by* 5 C.I.T. 1 (Jan. 6, 1983).

Indeed, Secretary Rubio does not even claim that the non-military, non-intelligence, non-major-foreign-policy information that Plaintiffs seek is classified. And classification alone is not *sufficient* for the state secrets privilege to apply. *See Abilt*, 848 F.3d at 312 n.5 ("[A]n executive decision to *classify* information is insufficient to establish that the information is privileged.") (quoting *Mohamed*, 614 F.3d at 1082). But it is likely a *necessary* condition. *See J.G.G. v. Trump*, --- F. Supp. 3d ----, 2025 WL 1119481, at *21 (D.D.C. Apr. 16, 2026) ("Defendants . . . have identified no case in which unclassified material was nonetheless protected by the privilege.").

Rather than claim harm to military or intelligence capabilities or to a major foreign relations issue like recognizing Communist China, ██████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████. Perhaps discovery would show that the United States represented to El Salvador that it would send only convicted criminals, *see* ECF No. 31 at 5–6 ("El Salvador's President, Nayib Bukele, has publicly touted the agreement terms: 'We are willing to take in only convicted criminals . . . in exchange for a fee.'"),[6] when in fact "Abrego Garcia has not been convicted of any crime," *id.* at 6 n.8. Perhaps discovery would reveal that, despite the orders of the Supreme Court and this Court to facilitate Abrego Garcia's return, *see Noem*, 145 S. Ct. at 1018, the United

---

[6] *See also, e.g.*, Cooper Decl. ¶ 10, Ex. I at 3 (*Behind Trump's Deal to Deport Venezuelans to El Salvador's Most Feared Prison*) ("As part of the agreement with the Trump administration, Mr. Bukele had agreed to house only what he called 'convicted criminals' in the prison.").

States has represented to El Salvador that he need not be returned, hence Defendant Secretary Noem's public testimony on May 8 that "there is no scenario where Abrego Garcia will be in the United States again." Cooper Decl. ¶ 4, Ex. C. Or perhaps it would expose other mistaken or questionable representations by the United States to El Salvador.

Whatever it may be, the state secrets privilege is not for hiding governmental blunders or malfeasance. When read "with a very careful, indeed a skeptical, eye," *Abilt*, 848 F.3d at 312 (citation omitted), all that the Rubio Declaration indicates is that the Government is either seeking to avoid embarrassment or potentially covering up its defiance of court orders. But the state secrets privilege exists "to protect national security," not to protect "government officials . . . or their associates from scrutiny" for mistaken representations or wrongdoing. *Mohamed*, 614 F.3d at 1085 n.8; *see also Hepting v. AT & T Corp.*, 439 F. Supp. 2d 974, 996 (N.D. Cal. 2006) ("[I]f the government has not been truthful, the state secrets privilege should not serve as a shield for its false public statements."). Nothing in the Rubio Declaration shows that answering discovery requests about the Government's efforts and abilities to facilitate the return of a single individual rises to the level of posing a "reasonable danger of harm to national security." *Zubaydah*, 595 U.S. at 205. This information is not a state secret but instead just represents what the Government is or is not doing to comply with orders of the Supreme Court and this Court.

Over and over again, official statements by the Government—in congressional testimony, television interviews, and social media—confirm that producing this information would *not* imperil national security. The state secrets privilege "allows the Government to bar the disclosure of information that, *were it revealed*, would harm national security." *Zubaydah*, 595 U.S. at 199 (emphasis added). In *Zubaydah*, the Supreme Court held that the privilege could apply to information "made public through unofficial sources"—as distinct from official sources—because

there can be a material difference between official and unofficial acknowledgement of a fact. *Id.* at 207–08. Here, over the past several weeks, the Government has officially and repeatedly discussed its opposition to Abrego Garcia's return, so it cannot now claim that such information is a state secret. Rather than "steadfastly refus[ing] to confirm or deny the accuracy of public speculation," *id.* at 208, about its efforts to facilitate Abrego Garcia's release from custody in El Salvador, the Government has publicly and prominently discussed its efforts. For example:

- On April 16, Defendant Attorney General Bondi stated[7]:

  > He is not coming back to our country. President Bukele said he was not sending him back. That's the end of the story. If he wanted to send him back, we would give him a plane ride back. . . . But he's from El Salvador. He's in El Salvador, and that's where the president plans on keeping him.

- On April 18, the official White House account posted that "he's NOT coming back"[8]:



---

[7] Cooper Decl. ¶ 11, Ex. J (*Bondi says mistakenly deported man 'not coming back to our country'*), *video at* https://thehill.com/homenews/administration/5251491-pam-bondi-kilmar-abrego-garcia-return/ (at 0:34–1:01).
[8] Cooper Decl. ¶ 12, Ex. K (White House post on X).

- On April 25, President Trump stated in a public interview[9]:

> [Q] Have you asked President Bukele to return him?
>
> [President Trump] I haven't, uh, he said he wouldn't.
>
> [Q] Did you ask him?
>
> [A] But I haven't asked him positively, but he said he wouldn't.
>
> [Q] But if you haven't asked him, then how are you facilitating his release?
>
> [A] Well, because I haven't been asked to ask him by my attorneys. Nobody asked me to ask him that question, except you.
>
> . . .
>
> [Q] You could fix this simply by bringing him back and going through the legal process—
>
> [A] But I leave that decision to the lawyers. At this moment, they just don't want to do that. They say we're in total compliance with the Supreme Court.

- On April 29, President Trump stated in a public interview[10]:

> [Q] You could get him back. There's a phone on this desk.
>
> [President Trump] I could.
>
> [Q] You could pick it up, and with all—
>
> [A] I could.
>
> [Q] —the power of the presidency, you could call up the president of El Salvador and say, 'Send him back right now.'
>
> [A] And if he were the gentleman that you say he is, I would do that. But he's not.
>
> [Q] But the Court has ordered you to facilitate his release.

---

[9] Cooper Decl. ¶ 13, Ex. L at 12–13 (*Donald Trump's '100 Days' Interview With TIME*).

[10] Cooper Decl. ¶ 3, Ex. B (President Trump interview by Terry Moran), *video at* https://abcnews.go.com/Politics/trump-abrego-garcia-back-el-salvador/story?id=121298276 (at 5:46–6:06).

[A] I'm not the one making this decision. We have lawyers that don't want to do this.

- On May 2, the official DHS account posted that Abrego Garcia "will never be allowed to return to the United States."[11]

- Also on May 2, the official DHS account posted that Abrego Garcia "will not return to our country under the Trump Administration."[12]

- On May 4, President Trump stated in a public interview[13]:

  [Q] Just to put a fine point on this, do you have the power to bring Abrego Garcia back as the Supreme Court has ordered?

  [President Trump] Well, I have the power to ask for him to come back if I'm instructed by the attorney general that it's legal to do so. But the decision as to whether or not he should come back will be the head of El Salvador.

  . . .

  [Q] Is anyone in your administration right now in contact with El Salvador about returning Abrego Garcia to the United States?

  [A] I don't know. You'd have to ask the attorney general that question.

- On May 8, Defendant Secretary Noem testified in a Senate hearing[14]:

  [Senator Murphy] I assume you have read the Supreme Court decision in the case of Kilmar Abrego Garcia?

  [Secretary Noem] Yes.

  [Q] That Court decision requires the Administration to facilitate Kilmar Abrego Garcia's release from El Salvador. Can you describe the steps that you have taken to facilitate this release and specifically

---

[11] Cooper Decl. ¶ 14, Ex. M (DHS post 1 on X).

[12] Cooper Decl. ¶ 15, Ex. N (DHS post 2 on X).

[13] Cooper Decl. ¶ 2, Ex. A (President Trump interview by Kristen Welker), *video at* https://www.nbcnews.com/politics/trump-administration/read-full-transcript-president-donald-trump-interviewed-meet-press-mod-rcna203514 (at 27:13–27:24, 30:23–30:35).

[14] Cooper Decl. ¶ 4, Ex. C (Secretary Noem testimony to U.S. Senate committee), *video at* https://www.appropriations.senate.gov/hearings/a-review-of-the-presidents-fiscal-year-2026-budget-request-for-the-department-of-homeland-security (at 45:48–46:33).

can you answer as to whether you have reached out to your counterpart in El Salvador to facilitate Mr. Abrego Garcia's release?

[A] Abrego Garcia is a citizen of El Salvador and should never have been in this country and will not be coming back to this country. There is no scenario where Abrego Garcia will be in the United States again.

Both the United States and El Salvador have also officially discussed their agreement in which the United States pays El Salvador to house its detainees for one year. For example:

- On February 3, the official account of President Bukele posted that El Salvador "offered the United States of America the opportunity to outsource part of its prison system," and that El Salvador was "willing to take in only convicted criminals (including convicted U.S. citizens) into our mega-prison (CECOT) in exchange for a fee."[15]

- Also on February 3, Secretary Rubio publicly announced an agreement with El Salvador in which President Bukele "agreed to accept for deportation any illegal alien in the United States who is a criminal from any nationality, be they MS-13 or Tren de Aragua and house them in his jails."[16]

- On March 28, Secretary Rubio stated in a public interview: "I can tell you . . . that the agreement to house criminal aliens was reached with President Bukele back in February. . . . And so we spoke—I've spoken to him since then, but obviously this—those days that I was there we did because we had a couple of open questions that we wanted answers to and that he wanted answers to, and we were finalizing that."[17]

Given this extensive official public record that the Government has created about its efforts to facilitate—or *not* to facilitate—Abrego Garcia's return to the United States, as well as its agreement with El Salvador to house detainees, Secretary Rubio's assertion of state secrets privilege over these topics cannot be credited. *See Burks v. Islamic Republic of Iran*, 2020 WL 13303322, at *11 (D.D.C. Aug. 21, 2020) (rejecting assertion of state secrets privilege because the topic at issue "has long been a matter of official public record"); *Rahman v. Chertoff*, 2008 WL

---

[15] Cooper Decl. ¶ 16, Ex. O (Bukele post 1 on X); *see also* ECF No. 31 at 5–6, 11–12.

[16] Cooper Decl. ¶ 17, Ex. P (Department of State press release).

[17] Cooper Decl. ¶ 18, Ex. Q at 13 (Secretary Rubio remarks to press).

4534407, at *6 (N.D. Ill. Apr. 16, 2008) (rejecting assertion of state secrets privilege where the "factual backdrop" already revealed the alleged state secret).

### C.    If there is any privileged information, it can and should be separated.

Because the state secrets privilege "may not be used to shield any material not strictly necessary to prevent injury to national security," *Abilt*, 848 F.3d at 312 n.5 (quoting *Ellsberg*, 709 F.2d at 57), it follows that, "whenever possible, sensitive information must be disentangled from nonsensitive information to allow for the release of the latter," *Ellsberg*, 709 F.2d at 57. So, for example, in *Heine v. Raus*, the Fourth Circuit affirmed a district judge's handling of a deposition of a CIA agent, which was held in the presence of the judge, who "ruled upon each question calling for information arguably within the [state secrets] privilege, requiring [the deponent] to answer those which the Court thought would not impair the privilege while foreclosing answers to those questions which apparently would." 399 F.2d 785, 788 (4th Cir. 1968).

Thus, if the Court were to find that any of the discovery or deposition testimony Plaintiffs seek is privileged, it should order the Government to separate out the privileged information and provide the remaining non-privileged information.

## II.    The Court should overrule the deliberative process objections.

The Court should reject the Government's assertion of deliberative process privilege for at least three reasons. ***First***, the deliberative process privilege does not apply where, as here, "there is reason to believe that government misconduct has occurred." *Tri-State Hosp. Supply Corp. v. United States*, 226 F.R.D. 118, 135 (D.D.C. 2005). Indeed, this privilege "disappears altogether when there is any reason to believe government misconduct occurred." *In re Sealed Case*, 121 F.3d 729, 746 (D.C. Cir. 1997); *see also id.* at 738 ("[W]here there is reason to believe the [information] sought may shed light on government misconduct, 'the privilege is routinely denied,' on the

grounds that shielding internal government deliberations in this context does not serve 'the public's interest in honest, effective government.'").

*Second*, even assuming the deliberative process privilege applies, the privilege is overcome where, as here, Plaintiffs have a compelling need for the discovery. *NAACP v. Bureau of the Census*, 401 F. Supp. 3d 608, 617–18 (D. Md. 2019). Courts consider several factors in this analysis, including: (1) the relevance of the evidence; (2) the availability of alternative evidence; (3) the government's role in the litigation; and (4) "the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *Id.* at 617.

The Court has already ruled that the discovery Plaintiffs seek about the Government's facilitation efforts and abilities is relevant. *See* ECF Nos. 79 & 100. The requested information is also solely within the control of the Government, which has not pointed to any alternative sources. Nor has the Government put in any evidence to support a showing that disclosure would chill any frank discussion or deliberation by the Government. The Court ordered the Government to submit "the specific legal and factual bases for each asserted privilege," ECF No. 100 at 3–4, by "May 5, 2025," ECF No. 107 at 1. By failing to submit any declaration or other evidence providing factual support for its assertion of deliberative process privilege, the Government has "los[t] the protections [it] failed to properly invoke." ECF No. 100 at 3.

*Third*, the Government has not carried its burden of showing the requested discovery is deliberative and pre-decisional. Deliberative process privilege protects only those "documents that reflect an agency's preliminary thinking about a problem, as opposed to its final decision about it." *FWS v. Sierra Club, Inc.*, 592 U.S. 261, 266 (2021). To qualify as privileged, the document must be both pre-decisional ("generated prior to the agency's final decision on the matter") and

deliberative ("prepared to help the agency formulate its position"). *Empower Oversight Whistleblowers & Rsch. v. NIH*, 122 F.4th 92, 105 (4th Cir. 2024).

As noted above, the Government has not submitted any declaration or other evidence justifying its assertion of the deliberative process privilege. And its assertions of the privilege in particular instances appear on their face to be improper. To take one example, ███████████ ████████████████████████████████████████████████████████████ ███████████████████████████████. *See* Cooper Decl. ¶ 19, Ex. R. The Government has not explained what, if anything, in the document is deliberative, and what final decision this document preceded. Because the Government has failed to show the information it seeks to shield is both pre-decisional and deliberative, the Court should reject the assertion of the deliberative process privilege. *See NAACP*, 401 F. Supp. 3d at 611–17.

## III.    The Court can review ostensibly privileged materials *in camera*.

For the reasons above, the Court can reject the Government's assertions of the state secrets and deliberative process privileges based on the papers already submitted. But if the Court nonetheless believes the question is close, then it can and should review *in camera* the allegedly privileged information to confirm that it is not protected by these privileges.

Courts may review *in camera* materials that one party contends are privileged and another party contends must be produced. *See, e.g.*, *United States v. Zolin*, 491 U.S. 554, 556 (1989) (*in camera* review for crime-fraud challenges to privileged materials); *United States v. Abu Ali*, 528 F.3d 210, 245 (4th Cir. 2008) ("Evidentiary privileges . . . may be tested by in camera and ex parte proceedings before the court for the limited purpose of determining whether the asserted privilege is genuinely applicable.") (cleaned up). Generally, it is up to this Court's sound "discretion" whether "to conduct an *in camera* review of documents claimed to be privileged or protected." *Hall v. Baltimore Police Dep't*, 2025 WL 1024069, at *1 (D. Md. Mar. 31, 2025) (cleaned up).

Consistent with that general rule, courts are empowered to review *in camera* materials allegedly protected by the deliberative process privilege. *See, e.g.*, *Rein v. U.S. Patent & Trademark Office*, 553 F.3d 353, 368 (4th Cir. 2009) (discussing when *in camera* review is appropriate); *Ayyad v. IRS*, 2018 WL 704849, at *11 (D. Md. Feb. 2, 2018) (Xinis, J.) (same); *see also Solers, Inc. v. IRS*, 827 F.3d 323, 328–30 (4th Cir. 2016) (affirming *in camera* review).

*In camera* review is likewise available to evaluate assertions of the state secrets privilege. The Fourth Circuit has held that, "[i]n some situations, a court may conduct an in camera examination of the actual information sought to be protected, in order to ascertain that the criteria [for state secrets privilege] set forth in *Reynolds* are fulfilled." *El-Masri*, 479 F.3d at 305. The Supreme Court confirmed that point in *Zubaydah*. There, the Court held that "*in camera* review is not always required." 595 U.S. at 205–06. But eight Justices explicitly agreed in various opinions that *in camera* review is available in some situations.[18]

While the Fourth Circuit has not prescribed a precise test for when *in camera* review should occur, it has indicated that *in camera* review is appropriate—and potentially even *required*—in cases where (1) the party seeking disclosure has a strong need for the evidence and (2) the alleged threat to national security is unclear. *See Sterling*, 416 F.3d at 345 ("There may of course be cases where the necessity for evidence is sufficiently strong and the danger to national security

---

[18] *See Zubaydah*, 595 U.S. at 212 (plurality opinion of Breyer, J., joined by Roberts, C.J., Kavanaugh, J., and Barrett, J.) ("It is true that sometimes a court must personally review the evidence at issue in order to assess the Government's assertion of the state secrets privilege."); *id.* at 220 (concurring opinion of Thomas, J., joined by Alito, J.) ("*in camera* review" is available as "'a last resort'") (citation omitted); *id.* at 233 (concurring opinion of Kavanaugh, J., joined by Barrett, J.) ("If the requester has demonstrated a 'strong' need for the information, the court may under certain circumstances review the requested documents *in camera* to confirm that the information falls within the privilege."); *id.* at 254 (dissenting opinion of Gorsuch, J., joined by Sotomayor, J.) ("when assessing a state secrets claim courts may—and often should—review the evidence supporting the government's claim of privilege *in camera*").

sufficiently unclear that in camera review of all materials is required to evaluate the claim of privilege."); *see also ACLU v. Brown*, 619 F.2d 1170, 1173 (7th Cir. 1980) (*en banc*) ("[A] party's showing of need often compels the district court to conduct an in camera review of documents allegedly covered by the privilege in order to determine whether the records are properly classified 'secret' by the Government. Any other rule would permit the Government to classify documents just to avoid their production even though there is need for their production and no true need for secrecy."). Conducting *in camera* review at least when those two elements are met is consistent with the views of a majority of the Justices in *Zubaydah*. There, four Justices opined that *in camera* review, while appropriate in some cases, was not warranted in that case because the two elements identified by *Sterling* were not satisfied, namely (1) Zubaydah had little need for the discovery, and (2) the Government's affidavit from the CIA Director by itself made clear the danger to national security. *Zubaydah*, 595 U.S. at 212–13 (plurality opinion). Implicit in that ruling is that *in camera* review *would* be appropriate if those two elements had been met. Two other Justices took the even broader view that courts "often should" review evidence *in camera*, potentially even in cases where both of those elements are not met. *Id.* at 254 (Gorsuch, J., dissenting).

As explained above, Plaintiffs satisfy both of those elements. They have great need for the information the Government is withholding under the state secrets privilege. *See* Section II.B.1, above. And the Government's expansive claim of state secrets privilege here is suspect and unclear. *See* Sections II.B.2, above. Accordingly, if the Court believes the applicability of the state secrets or deliberative process privileges to be a close question, then the Court can and should review *in camera* the information the Government is withholding based on those privileges.

## Conclusion

For the reasons set forth above, the Court should reject the Government's assertions of the state secrets and deliberative process privileges.

Dated: May 12, 2025

**MURRAY OSORIO PLLC**
Simon Y. Sandoval-Moshenberg
Rina Gandhi
4103 Chain Bridge Road, Suite 300
Fairfax, Virginia 22030
(703) 352-2399
ssandoval@murrayosorio.com

**QUINN EMANUEL URQUHART &**
  **SULLIVAN, LLP**
Stephen E. Frank
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
stephenfrank@quinnemanuel.com

*/s/ Jonathan G. Cooper*

**QUINN EMANUEL URQUHART &**
  **SULLIVAN, LLP**
Jonathan G. Cooper (D. Md. Bar No. 21345)
Olivia Horton*
1300 I St. NW, Suite 900
Washington, DC 20005
(202) 538-8000
jonathancooper@quinnemanuel.com
oliviahorton@quinnemanuel.com
*admitted in Texas; not admitted in D.C.*
*Supervised by attorney admitted in D.C.*

Andrew J. Rossman
Sascha N. Rand
K. McKenzie Anderson
Samuel P. Nitze
Courtney C. Whang
Roey Goldstein
Sam Heavenrich
Victoria Martin
Morgan L. Anastasio
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
andrewrossman@quinnemanuel.com
saschararand@quinnemanuel.com
mckenzieanderson@quinnemanuel.com
samuelnitze@quinnemanuel.com
courtneywhang@quinnemanuel.com
roeygoldstein@quinnemanuel.com
samheavenrich@quinnemanuel.com
victoriamartin@quinnemanuel.com
morgananastasio@quinnemanuel.com

*Counsel for Plaintiffs*