1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
2                      GREENBELT DIVISION

3  _____
                                        )
4  KILMAR ARMANDO ABREGO GARCIA,        )
   et al.,                              )
5                                       )
        Plaintiff,                      )
6                                       ) Docket Number
            vs.                         ) 8:25-cv-00951-PX
7                                       )
   KRISTI NOEM, et al,                  )
8                                       )
        Defendant.                      )
9  _____)

10               TRANSCRIPT OF MOTIONS HEARING
              BEFORE THE HONORABLE PAULA XINIS
11            UNITED STATES DISTRICT COURT JUDGE
               FRIDAY, MAY 16, 2025, AT 1:00 P.M.
12

   APPEARANCES:
13

   On Behalf of the Plaintiff:
14
        BY:  ANDREW ROSSMAN, ESQUIRE
15           SASCHA RAND, ESQUIRE
        QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
16      295 5th Avenue
        New York, NY  10016
17      (212)849-7000

18      BY:  JONATHAN COOPER, ESQUIRE
             OLIVIA HORTON, ESQUIRE
19      QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
        1300 I Street NW
20      Suite 900
        Washington, DC  20005
21      (202)538-8000

22      BY:  SIMON SANDOVAL-MOSHENBERG, ESQUIRE
        MURRAY OSORIO
23      4103 Chain Bridge Road, Suite 300
        Fairfax, VA  22030
24      (434)218-9376

25      ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPED NOTES***

```
 1   APPEARANCES CONTINUED:

 2   On Behalf of the Defendants:

 3        BY:  JONATHAN GUYNN, ESQUIRE
          DEPUTY ASSISTANT ATTORNEY GENERAL
 4        CIVIL DIVISION, DEPARTMENT OF JUSTICE
          950 Pennsylvania Avenue NW
 5        Washington, DC 20530
          (202)856-4809
 6
     ALSO PRESENT: Alexis Raleigh, Paralegal
 7                 Jennifer Vasquez Sura, Plaintiff
                   Ernesto Molina, Esquire, DOJ
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2        (Court called to order.)
 3            DEPUTY CLERK:  All rise.  The United States District
 4   Court for the District of Maryland is now in session.  The
 5   Honorable Paula Xinis presiding.
 6            THE COURT:  Good afternoon, everyone.  You can have a
 7   seat.
 8        Mr. Ulander?
 9            DEPUTY CLERK:  The matter now pending before the
10   Court is Civil Action Number PX-25-951, Kilmar Armando Abrego
11   Garcia, et al., versus Kristi Noem, et al.  The matter comes
12   before this Court for a motions hearing.
13        Counsel, please identify yourselves for the record.
14            MR. ROSSMAN:  Good afternoon, Your Honor.  Andrew
15   Rossman for the plaintiffs.
16            MR. COOPER:  Jonathan Cooper for the plaintiffs, Your
17   Honor.
18            MR. SANDOVAL-MOSHENBERG:  Simon Sandoval-Moshenberg.
19            MR. RAND:  Sascha Rand for the plaintiffs, Your
20   Honor.
21            THE COURT:  All right.  And we have Ms. Abrego
22   Garcia -- I'm sorry, I want to get it right.  Ms. Vasquez Sura,
23   am I right?  Okay.  All right.  Thank you.
24            MR. GUYNN:  And Your Honor, good afternoon.  You have
25   Jonathan Guynn and Ernesto Molina with the Department of
```

1 Justice on behalf of defendants.

2       **THE COURT:**  Okay.  Good to see you all.  Thank you so

3 much for coming today.  We have a lot to do.

4     What I have before me are two letter pleadings, one at

5 ECF 112, and one at ECF 143, both make the request to file --

6 for the plaintiffs to file a motion to compel certain discovery

7 and some alternative disposition, if not short of that.

8     At ECF 117 is plaintiffs' motion to take three 30(b)(6)

9 depositions.  And ECFs 125 through 29 are the supplemental

10 pleadings that I asked for with respect to the scope of and the

11 invocation of any privileges.

12     My preliminary thinking is that we're going to do as much

13 of this in open court as possible.  And the privileges

14 question, while it may implicate certain documents that are

15 under seal, I think a lot of it can be discussed without worry

16 in that regard.

17     And to the extent there is -- at any point either side

18 wishes to be heard under seal, we've got headsets and we can

19 jump on the headsets.  If, at any point, that becomes

20 unworkable, we can start making a list of things that need to

21 be discussed in a separate proceeding under seal, and we'll

22 work that out as we go.  But my presumption is that we're going

23 to do a lot of that discussion in the open court.

24     And with respect to that, I just have one semi

25 housekeeping matter before I turn to the plaintiffs to get sort

1    of your -- your view on how you -- how you believe we should

2    address these issues and sort of in what order.

3        My -- my current thinking is on the question of state

4    secrets privilege, there's only one affidavit before me about

5    one agency, and that is Secretary of State Rubio's.  And as I

6    see it, most, if not all, of that affidavit has been disclosed.

7        There are paragraphs that are identical to the paragraphs

8    in the affidavit that were filed in JGG, in the United States

9    District Court in the District of Columbia, and then there are

10   large portions that were cited by the defense in their open

11   pleading at 125.

12       My view is that given those two things, there's really not

13   much, if anything, to keep under seal.  And so I am prepared

14   to -- to take that off of the underseal docket so we can talk

15   about this issue in open court.

16       So think about that, defense.  And if not, you're going to

17   have to make an argument as to what in that affidavit

18   specifically needs to be sealed, because so much of it has

19   already been disclosed.  Okay?

20       But you don't have to answer right this second because I

21   can turn to the plaintiffs and get their perspective on what

22   they think we can accomplish today.

23           **MR. GUYNN:**  Can I just briefly be heard on that

24   point, Your Honor?

25           **THE COURT:**  Sure.

1          **MR. GUYNN:**  So on ECF 115, the Court was clear that
2   at this hearing, we would address solely the matters raised in
3   ECF Number 112 and the parties' supplemental briefing.  And so
4   those are the issues that we're primarily prepared to speak
5   about today.
6          **THE COURT:**  Okay.  112 is the first motion to compel.
7          **MR. GUYNN:**  Yes, but not the 30(b)(6) depositions.
8          **THE COURT:**  Okay.  Well, I might still want to hear
9   from you on it.
10         **MR. GUYNN:**  Sure.
11         **THE COURT:**  And --
12         **MR. GUYNN:**  Understood.
13         **THE COURT:**  And I suppose you can give me your
14  working -- working thoughts on it if it implicates what we're
15  talking about today.
16     Kind of why I want to hear from the plaintiffs, because I
17  received 143 last night, and to a large degree, it does feel to
18  me as if a number of the discovery issues are still a moving
19  target.  And that even implicates the question of privilege and
20  the scope of privilege.
21     So I'm not -- I'm not really sure whether -- that's why I
22  kind of want to hear from you.
23     And I'll hear from you as well, defense, as to what the
24  scope of today's hearing should be.  But squarely, the
25  pleadings at 125 through 129 are before me, correct?

1          **MR. GUYNN:**  Agreed.

2          **THE COURT:**  And do you wish to be heard on the

3  affidavit now, or you want to give it some thought while I talk

4  to the plaintiff?

5          **MR. GUYNN:**  I -- Your Honor, I think we're

6  comfortable it doesn't need to be sealed.

7          **THE COURT:**  I'm sorry?

8          **MR. GUYNN:**  The affidavit does not need to be sealed.

9          **THE COURT:**  Okay.

10          **MR. GUYNN:**  The state secrets affidavit.

11          **THE COURT:**  Okay.  That will make it a lot easier to

12  have a, I think, a fair conversation in the open -- in open

13  court.  Okay.

14      Mr. Cooper?

15          **MR. ROSSMAN:**  It's Mr. Rossman.

16          **THE COURT:**  I'm sorry, I'm looking at the wrong

17  lawyer.  Sorry about that.

18          **MR. ROSSMAN:**  Not at all.

19          **THE COURT:**  I need better glasses.

20      Okay.  Mr. Rossman.

21          **MR. ROSSMAN:**  I'll take that as a compliment.

22          **THE COURT:**  Tell me a bit about how you see all of

23  the four pleadings, that I've identified, fitting in in terms

24  of an order of operation that make sense in terms of priority

25  in terms of resolution of issues, and what we can continue

1   to -- what you can continue to accomplish in discovery while I

2   resolve some of these issues like privilege.

3          **MR. ROSSMAN:**  Okay.  Can I take the podium, Your

4   Honor?  Is that --

5          **THE COURT:**  Yep, wherever you're most comfortable.

6          **MR. ROSSMAN:**  Yeah, only because the bending over is

7   going to kill me.

8          **THE COURT:**  Okay.  Or you can sit.  I'm not a big

9   standing -- I don't have to stand, so you don't have to stand.

10         **MR. ROSSMAN:**  It would be hard to overcome my

11  training of standing before the Court, Your Honor.

12         **THE COURT:**  Understood.

13         **MR. ROSSMAN:**  The Court deserves the respect.

14         **THE COURT:**  Thank you.  I appreciate that.

15         **MR. ROSSMAN:**  So we're practical folks, and we have,

16  throughout this process, tried to get the answers to the

17  questions that Your Honor posed, the three fundamental

18  questions.  Our discovery is really all implementation of those

19  three questions, which is what's the custodial status of

20  Mr. Abrego Garcia; what steps, if any, have been taken to

21  facilitate his release and return to the United States; and

22  what steps, if any, the government plans to take to comply with

23  the Court's order.  And that's what we've been after since Your

24  Honor entered the order on April 4th.

25         And we -- what we don't know is what the right sources of

1    information are.

2        So, you know, we went about this in, I thought, very

3    straightforward ways, which is we asked the government to tell

4    us who are the knowledgeable people.

5        And, Your Honor, when you -- when you set out the original

6    order authorizing us to take discovery, it was of the four

7    declarants.  And I think your presumption and our presumption

8    was that those declarants should have been individuals with

9    firsthand knowledge.

10        **THE COURT:**  That's because I ordered it, and that's

11    how they were produced.  And I don't want to tell you how long

12    it took my wonderful law clerks to count up the "I don't knows"

13    in each of those depositions.  So --

14        **MR. ROSSMAN:**  I stopped counting.

15        **THE COURT:**  Yeah.

16        **MR. ROSSMAN:**  So, you know, the point of all that is

17    we're earnestly trying to get the answers to the information

18    from knowledgeable witnesses.  And we're not trying to harass

19    busy government officials.  We're not trying to engage in

20    pointless discovery.

21        **THE COURT:**  Let me ask you, though, it does seem like

22    112 and 143, to some degree, again, you seem to have made some

23    progress.  I mean, 112 talked about artificial discovery cutoff

24    dates from your perspective.  The government is now saying

25    we're going to -- we're actually going -- we agree, you know,

1  that the dates need to be expanded.  There have been additional

2  custodians, according to the government, that have been

3  identified.

4       So that sounds to me like there's at least some progress

5  in terms of getting some of these answers; is that right?

6            **MR. ROSSMAN:**  Correct.  That's correct.

7            **THE COURT:**  Okay.

8            **MR. ROSSMAN:**  And, you know, what we tried to do,

9  like we would in any civil discovery exercise, is ask them to

10  tell us who are the knowledgeable people.  We vet that.  They

11  provide more names.

12       They have agreed to a number of more custodians, and I

13  think helpfully so.  The problem is, we don't have the

14  documents from them yet.  They have been quite slow in

15  producing the documents.

16       We have expanded the date range slightly, but we expanded

17  the date range.  I think May 1 is the date they agreed to

18  provide documents up to.

19            **THE COURT:**  Okay.

20            **MR. ROSSMAN:**  The theory being there should be some

21  stopping date so they can collect.  And, you know, we've

22  accepted that for the moment.

23            **THE COURT:**  So you've agreed May 1?

24            **MR. ROSSMAN:**  Yes, May 1.

25            **THE COURT:**  Okay.  All right.

1          **MR. ROSSMAN:**  So what we're awaiting is we're

2    awaiting, you know, the actual production of documents from

3    knowledgeable individuals, and that -- and it goes up to --

4    they have agreed to produce documents from Secretary Rubio,

5    they have agreed to produce documents from Secretary Noem.  So,

6    you know, they are not resisting us in terms of the knowledge

7    of, you know, high-ranking government officials of this issue.

8          **THE COURT:**  When did that change, just so I have sort

9    of a date stamp on -- it sounds like it's recent, in the

10   last --

11         **MR. ROSSMAN:**  It's in the last -- certainly within

12   the last two weeks.

13         **THE COURT:**  Okay.

14         **MR. ROSSMAN:**  I don't have a photographic memory of

15   all the voluminous correspondence, but we've been at it on

16   almost a daily basis, trying to be as cooperative as we can.

17   Let's just get the answers, has been our approach.

18      So I understand they have agreed to that.  That's great.

19   That solves a lot of our problems.  We just need the documents,

20   we need them ASAP.  We should have had them back in April, but

21   we are where we are, and we're trying to get them.

22      So, you know, we also need witnesses, and so we --

23         **THE COURT:**  Can I ask you, in terms of 112 and 143 --

24         **MR. ROSSMAN:**  Yes, Your Honor.

25         **THE COURT:**  -- can you give some thought to what, if

1  anything, you need for me to resolve today?  Because it -- it's

2  not clear to me, because 112 references problems that seem to

3  be solved by the time we get to 143.

4       **MR. ROSSMAN:**  So -- so my -- what our goal was in

5  sending you 143, Your Honor, was to give you the latest and

6  greatest information about where we are in terms of where we've

7  resolved some issues in discovery and where we still have

8  outstanding issues.  And the hope is that in the meantime,

9  while that sits in the queue, and we cover the issues that were

10 on the docket for resolution today, that maybe we'll get some,

11 you know, help from the government in actually solving some of

12 those.

13      **THE COURT:**  Okay.

14      **MR. ROSSMAN:**  So that's why we did it.  We don't

15 expect it to be ripe for argument today, although I'm prepared,

16 you know, to argue anything before Your Honor.  But that was --

17 that was the thought in sharing that.

18      And I hope that, you know, if we can get at least some

19 indication from the government of when they expect to make

20 those additional documents available -- and I just want to --

21 so -- because, Your Honor, as you can see what we get in

22 discovery, and I want to make sure you understand how

23 frustrated we've been about this process, the government has

24 produced over a thousand -- the government says it's produced

25 over a thousand pages of documents.

1          The reality is -- you know, I had someone count that to

2     date, we have received 164 documents from the government.  132

3     of those are photocopies of court filings and discovery

4     requests that we sent them.  So they produced a total of 32

5     documents.

6          **THE COURT:**  Wait, wait, wait.  Hold on.  Let me make

7     sure I understand that.

8          So you're saying what was produced back to you were like

9     your interrogatories?

10         **MR. ROSSMAN:**  Yes.  And court filings.

11         **THE COURT:**  And you mean like good faith

12     meet-and-confer correspondence?  About the scope of discovery?

13         **MR. ROSSMAN:**  No, like the actual interrogatory

14     requests themselves, for example.  Those were produced back to

15     us, or briefs that were filed with the Court.

16         **THE COURT:**  Can I ask you -- and this is going to

17     seem like a really technical question, but there's a reason for

18     it.

19         **MR. ROSSMAN:**  Of course.

20         **THE COURT:**  Are you getting the documents, whatever

21     you are getting, Bates stamped?

22         **MR. ROSSMAN:**  We are getting the documents Bates

23     stamped.

24         **THE COURT:**  Okay.  And -- and there's going to be a

25     question later about a privilege log and why those documents

1    are not Bates stamped.  So just so you know that.

2        Whatever is withheld, has that been Bates stamped as well?

3            **MR. ROSSMAN:**  I don't know the answer to that.

4            **THE COURT:**  Okay.  I need to know that when the time

5    comes, just so you know, and I wanted to ask it and get it out

6    before I forget.  So go ahead.

7            **MR. ROSSMAN:**  It's a great question.  We would expect

8    there to be Bates stamps.

9            **THE COURT:**  Sure, because otherwise it's going to

10   take me -- I'm going to be chasing my tail trying to figure

11   out -- but there's lots of reasons we have to clean this aspect

12   of it up.

13       But anyway, okay, so you got 32 pages.

14           **MR. ROSSMAN:**  32 documents.

15           **THE COURT:**  Documents.

16           **MR. ROSSMAN:**  Let's be fair.

17       Of those, half of them related to the Senator's visit to

18   El Salvador, so they weren't telling us anything we didn't see

19   in the news.

20       In contrast, you'll see, as Your Honor has seen the

21   privilege log, there are 1,140 documents that have been logged

22   as privileged, every manner of privilege virtually that I've

23   ever heard of:  State secrets, deliberative process, executive

24   privilege, attorney-client, attorney work product, and so

25   forth.

```
 1          THE COURT:  The reason I'm asking this, is because

 2   you know it, Mr. Cooper, but so when the government has an

 3   opportunity --

 4          MR. ROSSMAN:  Rossman.

 5          THE COURT:  Sorry, Rossman.  Sorry.  I'm going to

 6   need name tags for a minute until I get used to this.

 7          MR. ROSSMAN:  That's okay.  You may hear from

 8   Mr. Cooper today.

 9          THE COURT:  Cooper, Rossman; Cooper, Rossman; Cooper,

10   Rossman.  Okay.  Got it.

11          MR. ROSSMAN:  Yes.  Glasses; younger, handsomer

12   fellow, yeah.

13          THE COURT:  When we get to talking about this in more

14   detail, so you know, I can't figure out, looking at it, which

15   privilege has been invoked and for what purpose.  So we're

16   going to need a bit more work on that.

17       And I need to know from you, plaintiffs, because the two

18   privileges that it sounds like we're all prepared to discuss

19   today are deliberative process and state secrets.

20          MR. ROSSMAN:  Correct.

21          THE COURT:  Of the others, where does the plaintiff

22   stand?  Or is it we don't know where we stand because we can't

23   figure out from the log what they are invoking?  Or where are

24   you?

25          MR. ROSSMAN:  Yeah, we're not at the point where
```

1    we're trying to pierce the attorney-client or work product or

2    other privileges yet.

3         So our thought on the order of operations, Your Honor, was

4    the roadblock seems to be state secrets and deliberative

5    process.  And, you know, we observe that in the depositions

6    where, you know, where you don't see "I don't know" answers,

7    you see instructions not to answer.

8         So, you know, there are long transcripts that contain

9    essentially no information.

10        And the -- you know, we -- we pause on the depositions,

11   and we haven't taken Mr. Kozak's deposition yet in particular

12   because we thought we should all get in this courtroom and get

13   on the same page about what privileges, you know, do apply, and

14   what's the scope of those privileges.

15        **THE COURT:**  Well, that's the only privilege that's

16   been invoked, at least with regard to the state secrets, and

17   he -- Ambassador Kozak is under the State Department.

18        **MR. ROSSMAN:**  Correct.

19        **THE COURT:**  Right?  So that's why we got -- smart to

20   have done it this way.

21        **MR. ROSSMAN:**  Exactly.

22        And our thinking was, you know, sufficient unto the day,

23   if we could get guidance on where we are with respect to those

24   privileges, that would unlock a lot for us.

25        **THE COURT:**  Okay.

1          **MR. ROSSMAN:**  And then we could be practical about

2    where we may need Your Honor to police other privileges, and we

3    would do that in a very targeted way.

4          So, you know, we don't -- this is not an example of a case

5    where we're going to need, like, to take a microscope to every

6    last document.  We want to get the answers to the fundamental

7    questions that Your Honor has -- has asked.  And -- and right

8    now, we're not even allowed to pose those basic questions at

9    deposition without running into the roadblock of state secrets

10   and deliberative process.  So that's what animated coming here

11   today on this motion.

12         **THE COURT:**  And -- and, again, mostly for the

13   defendants' benefit, but also because I want us to be clear,

14   that in addition to those three questions, what has prompted

15   this expedited discovery is a question of whether the

16   government was following these orders in good faith or in bad

17   faith.

18         So there's another layer to this inquiry, which is the

19   question of intent.

20         And so do you want to speak to that, or do you disagree

21   with that before we turn to the privileges?  Because I think it

22   matters, at least as to deliberative process.

23         **MR. ROSSMAN:**  I vehemently agree with that, Your

24   Honor.  And I'll say it from our perspective, okay?

25         There are two things that are distressing to us.  One is

18

1   the government rather astonishingly writes in their brief that

2   they have already shown plaintiffs that they are in compliance

3   with the Court's order.

4        I most assuredly can tell you they have not.  Okay?  They

5   have not.

6        And the -- you know, the idea that they can say that and

7   try to portray themselves as facilitating Mr. Abrego Garcia's

8   release and return to Your Honor, while at the same time, the

9   highest officials of the government are saying the exact

10  opposite in public statements, in sworn Congressional

11  testimony, in official accounts, all of that is deeply

12  disturbing.  That dichotomy for us causes us to raise the very

13  question Your Honor did, which is what's lurking behind what

14  the government is saying it's doing, right?

15       So we don't want to be presented with effectively a wink

16  and a nod here where the government is saying -- and I don't

17  want to say this with reference to any sealed material, but if

18  the government were to try to put forth the proposition that

19  they are asking or have asked for the return of Mr. Abrego

20  Garcia, and that's coming from, you know, hearsay from a -- you

21  know, mid-level or even, you know, relatively senior government

22  official, but that person's boss, that person's boss's boss,

23  and, you know, the ultimate boss of all of the departments, the

24  President, are saying the exact opposite, that does not seem,

25  to us, to be in compliance with a court order.

1    So, you know, that's why we have to examine the good faith

2  of what they are putting forth, and requires more than just

3  accepting, you know, what -- and I'll -- and I don't want to be

4  starting with this Your Honor, but the sum total of all of the

5  purported evidence of the government's facilitation efforts can

6  be found in two places in the record.  Okay?  And one is

7  ECF 117, and that's our May 7th letter.  We appended to it,

8  Exhibit C, which is their response to our Amended Interrogatory

9  Number 1.

10    And I won't read it out because it's, you know, under

11  seal.  But the last two sentences of the government's response

12  to Amended Interrogatory Number 2, source number one, I'll give

13  Your Honor a moment to read it because it will only take a

14  moment, not much there.

15    And then there's the recent declaration, I won't even

16  disclose the name of the individual, the May 9th declaration,

17  that was appended to our supplemental filing, ECF 141,

18  Paragraph 11, the last three sentences of that paragraph.

19    That's it.  That's it.  That's all we have seen.  They are

20  conclusory, hearsay, they come from formulation of a government

21  attorney.

22    **THE COURT:**  On the steps taken or will take?  Have

23  taken or will take?

24    **MR. ROSSMAN:**  What -- I'm focused now on what steps

25  they have taken.

1              **THE COURT:**  Okay.

2              **MR. ROSSMAN:**  So that's Interrogatory Number 1.

3              **THE COURT:**  And --

4              **MR. ROSSMAN:**  Two, I believe, is will take.  It's

5    nearly identical in terms of the absence.

6         The only difference is there is some discussion of steps

7    that they would be prepared to take domestically if Mr. Abrego

8    Garcia were to present himself at a port of entry.

9              **THE COURT:**  Where are you saying the first one is?

10   117 where?

11             **MR. ROSSMAN:**  So ECF 117, which is our May 7th

12   letter, Exhibit C.  And --

13             **THE COURT:**  It's not -- C is something else.

14        117-3?

15             **MR. ROSSMAN:**  Oh, I'm sorry, it's interrogatory --

16   tell me if you have the interrogatory, Your Honor.  Maybe my

17   reference is --

18             **THE COURT:**  So my --

19             **MR. ROSSMAN:**  -- off.

20             **THE COURT:**  My 117-3, is that what I'm looking at,

21   Counsel, or 117 -- give me the 117 dash number.

22             **MR. ROSSMAN:**  I have -- it should be ECF 117-C,

23   Exhibit C attached to it.

24             **THE COURT:**  Okay.  Exhibit C is not an interrogatory.

25             **MR. ROSSMAN:**  It should be defendants' objections in

1  responses to plaintiffs' amended first set of interrogatories.

2          **THE COURT:**  No, I have plaintiffs' first notice of

3  deposition, is 117-3 Exhibit C.

4          **MR. ROSSMAN:**  Okay.  Do we have a loose copy that I

5  can hand up?

6      I don't think there's any dispute about the document, Your

7  Honor.  We'll get you the right docket cite.

8          **THE COURT:**  That's fine.  I don't want to hold up the

9  progress.

10      But I hear your point.  Okay.

11          **MR. ROSSMAN:**  But -- and I'm trying to honor the

12  sealing requirement.

13          **THE COURT:**  Sure.  Yep.

14          **MR. ROSSMAN:**  And not blurt these things out in

15  court.

16      But when Your Honor sees it, Your Honor will see the

17  interrogatories are straightforward.  You know, describe -- you

18  know, Interrogatory Number 1 is describe with particularity

19  each action you've already taken and when to facilitate Abrego

20  Garcia's release from custody in El Salvador.

21      Interrogatory --

22          **THE COURT:**  Three?

23          **MR. ROSSMAN:**  -- 2 is with respect to his return to

24  the United States.

25          **THE COURT:**  Okay.

1          **MR. ROSSMAN:**   Interrogatory Number 3 is with respect

2    to intended steps regarding the release.

3          Interrogatory Number 4, intended steps with regard to the

4    return.

5          **THE COURT:**  Right.

6          **MR. ROSSMAN:**  Very straightforward.

7          And when you see the responses to those interrogatories,

8    you'll see how empty they are.

9          And the same thing with the declaration that was recently

10   submitted to us; conclusory, double hearsay, I would submit,

11   and barren of substance.

12         So, you know, that's all we have.  When the government

13   tells us that they have shown us that they have complied,

14   that's what I'm --

15         **THE COURT:**  But for much of that, at least the first

16   four, a lot of this is turned on invocation of privilege.  So

17   if I -- if I resolve the privilege issue, then there should be

18   a more robust response?

19         **MR. ROSSMAN:**  Correct.

20         **THE COURT:**  Because at least what I saw in the

21   depositions and in the answers, it's all about the two

22   privileges largely that we're talking about today?

23         **MR. ROSSMAN:**  Exactly right, Your Honor.

24         **THE COURT:**  Okay.

25         **MR. ROSSMAN:**  That's why we're here.

1    Mr. Cooper has saved me, ECF 112.  My reference, 113, my

2    fault.

3              **THE COURT:**  112-3.

4         **MR. ROSSMAN:**  It's 112, Exhibit C, and you can see

5    the interrogatory responses that I mentioned.

6              **THE COURT:**  Got it.  Okay.  Thank you.

7    All right.

8         **MR. ROSSMAN:**  So you want me to sit at this moment,

9    Your Honor, or you want me to actually address the privileges?

10             **THE COURT:**  Well, so -- well, my thought is that

11   since the government bears the burden of invoking the

12   privilege, I want to hear from them first.

13        **MR. ROSSMAN:**  Sure.

14             **THE COURT:**  And I think to some degree, some of the

15   issues involving deliberative process do require a showing on

16   the plaintiffs' part, but that can be in your response after I

17   hear from the government.  So that's my thoughts on it.

18        **MR. ROSSMAN:**  Terrific.

19   And if it's acceptable to Your Honor, I'm going to share

20   the argument with Mr. Cooper.  I'll address the state secrets

21   and any other discovery issues or case management issues Your

22   Honor has, and I would intend to have Mr. Cooper address the

23   deliberative process privilege.

24             **THE COURT:**  Okay.  Great.  Thank you.

25        **MR. ROSSMAN:**  Thank you, Your Honor.

1          **THE COURT:**  All right.  Mr. Guynn, are you up?

2          **MR. GUYNN:**  Yes.  Your Honor, I think it would be

3     helpful to respond to some of the framing points that

4     Mr. Rossman, slash, Cooper just shared with us.

5          **THE COURT:**  Sure.

6          **MR. GUYNN:**  But then we would, like, be happy -- we

7     would like the opportunity to respond to some of the more

8     detailed sort of nitty-gritty discovery issues that

9     Mr. Rossman, you know, raised for Your Honor, and then I would

10    be happy to then launch into our discussion with state secrets

11    privilege, if we can do it that way.

12         **THE COURT:**  Sure.  If there's something you think, in

13    terms of framing this, I should know first.

14         **MR. GUYNN:**  Yeah, Your Honor, the Supreme Court

15    anticipated that we would have this discovery dispute when it

16    ruled that this Court had properly required defendants to

17    facilitate Abrego Garcia's release from custody in El Salvador

18    and to return him to U.S. custody.

19       Recall that the Supreme Court held that the government

20    should be prepared to share what it can.

21         **THE COURT:**  Not what it won't.  Right?

22         **MR. GUYNN:**  I agree with that.  But what it can.

23         **THE COURT:**  Right.  I know that, sir, but you can't

24    tell me that these depositions that I read are a good faith

25    effort to do that.

1    Listen, I very purposely said, when I have made the

2    finding that you weren't complying with that order -- not you

3    personally, you know that.  You and I just got to know each

4    other, Mr. Guynn, so this is not -- I'm not trying to shoot the

5    messenger.

6    But I made a finding that the Supreme Court was quite

7    clear.  I had colloquy with counsel about what the word

8    facilitated means, and the government asked for further

9    briefing on that, and I denied it.

10    I then amplified why my ruling was what it is, according

11    to the Supreme Court.

12    And then when I still didn't get a response to a very

13    basic question, I required daily briefings on the three

14    questions, right?  Custodial status, what you've done, what

15    steps you've taken, what steps will you take.  And I required a

16    person, an individual with personal knowledge to be the

17    affiant.

18    The affidavits were lacking, but they all said "I have

19    personal knowledge."  Maybe not of every prong, but on

20    something.

21    And then those are the individuals that once the

22    government filed their initial responses, which, in my view,

23    were -- well, I made -- I made the findings I made because of

24    them, just a willful refusal to answer the question.

25    Now we were at the point where depositions were going to

1  be taken.  And it was quite, frankly, deliberate that I asked

2  for people with personal knowledge in the event it went this

3  way so that the plaintiffs could get answers from people with

4  personal knowledge.

5       And each of those depositions, to varying degrees, were an

6  exercise in utter frustration.  And we can go through them, if

7  you want.  But I don't see how you can make the point to me

8  that this is some, you know, good faith effort to comply with

9  the Court's order, at least in terms of the deponents.

10          MR. GUYNN:  Well, what I'll say, Your Honor, is to

11  the extent the Court was dissatisfied that Mr. Cerna and Katz

12  and Mazzara had personal knowledge about that issues --

13          THE COURT:  Yeah.

14          MR. GUYNN:  -- it's not -- it's not surprising that

15  in their depositions they would continue to have -- to lack

16  knowledge about some of the specific issues.

17          THE COURT:  True, to be sure.  But you chose those

18  witnesses; I didn't choose them, you did.

19          MR. GUYNN:  We didn't -- we didn't choose for them to

20  be the deponents though, Your Honor.

21          THE COURT:  No.  No, no, no.  I said to you, when I

22  wanted those daily updates, I said an individual with personal

23  knowledge who will swear under oath to the information.  Then

24  you chose the people.

25       And then I thought, quite logically and fair to you, I

     1   would give the plaintiffs the opportunity to explore those

     2   individuals with personal knowledge.  And what we got is a

     3   bunch of "I don't knows."

     4          **MR. GUYNN:**  I --

     5          **THE COURT:**  I don't see who's -- you know, you could

     6   have always switched out and said, nope, you know what, these

     7   folks don't have the knowledge that we're talking about here

     8   that we need, so we'll talk with the plaintiffs and get some

     9   other individuals with personal knowledge.  That didn't happen.

    10      And instead, in your pleadings, you're suggesting this is

    11   the plaintiffs' fault, that they don't answer -- they don't ask

    12   the right questions, they were on frolic and detours, and I

    13   don't read it that way.

    14          **MR. GUYNN:**  Well, Your Honor, I just -- going back to

    15   the Supreme Court's order, I would just say that the Supreme

    16   Court acknowledged that there would be some and maybe even many

    17   details that we can't share.

    18          **THE COURT:**  Okay.  So tell me -- those are the things

    19   that would be invoked by way of privilege, right?

    20          **MR. GUYNN:**  Right.

    21          **THE COURT:**  Okay.  So those are not the "I don't

    22   know" answers, those are the "don't answer because of

    23   privilege."

    24      Is that fair?

    25          **MR. GUYNN:**  That's fair.

1      **THE COURT:**  Okay.  So I'm happy to talk about what I

2   think is now before me, which is the contours of these

3   privileges.  But we can stick with the depositions for a

4   second, because the depositions were of DHS witnesses.  And I

5   understand at the time you may not have made that final

6   decision about whether you were going to invoke state secrets

7   for DHS witnesses, because you invoked the state secret

8   privilege throughout all three depositions.

9      But to date, we're here to talk about this, it's true,

10  there is no declaration from the head of DHS, correct?

11      **MR. GUYNN:**  We disagree.  We think that the state

12  secret declarations from JGG of General Bondi, Secretary Noem,

13  and also of Secretary Rubio can be applied in this case as

14  well.

15      **THE COURT:**  They don't.  That's not this case.  There

16  is no precedent for me to look to another case about another

17  set of plaintiffs at another time in another district and

18  credit that.  And I'm really quite stunned that that's the

19  proposition you're taking.

20      Get an affidavit or don't.  But you're coming into court

21  now with no affidavit, so right now you have no privilege.

22      **MR. GUYNN:**  Respectfully, Your Honor, I disagree.

23      **THE COURT:**  Give me some authority for this.

24      **MR. GUYNN:**  Because the state secret declarations are

25  to be prepared in response to a motion to compel, a motion to

1   compel which they have filed leave to file.

2       And so we -- we have provided the state secrets

3   declaration of Secretary Rubio, but we have not provided

4   additional ones for the other secretaries in this case because

5   we don't think that we need to at this point, and we think that

6   we can rely on the JGG declarations in this case.

7           THE COURT:  Okay.  You cannot rely on the JGG

8   declarations.  It's a different case with different issues.

9   And I don't have to debate you on that.  I'm telling you as the

10  Court that I am not going to look -- as a matter of fact, it's

11  contrary to what you did with Secretary of State Rubio's

12  affidavit.

13      You knew that that doesn't really square logically, so in

14  Secretary Rubio's affidavit, he incorporated the parts of JGG

15  that you wanted me to consider in this case.  So that -- that

16  cuts against what you're telling me to do, which is go to

17  another docket and credit that that -- that declaration is

18  substantial and real enough to demonstrate in this case a

19  danger to foreign relations if I allow discovery.

20      And how can I do that?

21          MR. GUYNN:  And again, respectfully, I disagree,

22  because, Your Honor, the declarations in JGG from DHS and the

23  DOJ, and from Secretary Rubio in that case, do rely to the

24  details related to removal, that our issue about what happened

25  in March at the time that Mr. Abrego Garcia was removed to

1  El Salvador.

2          **THE COURT:**  Well --

3          **MR. GUYNN:**  And then the supplemental --

4          **THE COURT:**  Let me ask you a question, though.  Are

5  you comfortable -- I mean, if you want me to make a ruling on

6  that, I'll do it.  If you're not -- if you're telling me you're

7  not going to -- you're not asking for leave in the alternative

8  for a little more time to get declarations so I can look at it

9  in this case, that's fine.  Just tell me that and I'll make the

10  decision as to whether it is at all proper to send me to

11  another case at another time -- which, by the way, that judge

12  said, "If I have to reach this issue, these are probably not

13  enough."

14      Do you -- do you want me to do that?

15          **MR. GUYNN:**  I would respectfully disagree with Judge

16  Boasberg as well.

17      But in the alternative, Your Honor, yes, we would request

18  leave to -- if Your Honor believes that we can't rely on the

19  JGG declarations, to acquire declarations for this case.

20          **THE COURT:**  You know, but you didn't even brief that,

21  really.  You dropped a footnote that said, "By the way, look

22  over at JGG."

23      I mean, I'll think about it.  And the only reason I'm even

24  entertaining it is because I do take my role as a member of the

25  third branch of government very, very seriously.  And when I

1    read the binding precedent that tells me, well, I have to make

2    an independent determination, and I can't leave it to the

3    caprice of the executive branch to tell me when privilege is

4    properly invoked, I also have to make sure that there is a

5    substantial and real danger here.

6        So because I'm taking my job really seriously in that

7    regard, I am entertaining this.  But I will not look to another

8    case and say that that affidavit in another case is sufficient

9    here.

10       So let's put that to the side for a second, because it

11   sounds like what you're asking me to do is give you a little

12   more time to obtain those declarations.

13       Am I right?

14           **MR. GUYNN:**  That's right.

15           **THE COURT:**  Okay.  And I'll hear from the plaintiffs

16   on that before we adjourn for the day.

17       Okay.  So now let's talk about the affidavit that you did

18   supply and the requirements under the state secrets privilege.

19       Tell me -- tell me why, in your view, what you've given me

20   is enough.

21           **MR. GUYNN:**  So, first, I think it might be helpful to

22   sort of address some of the finer points -- well, I don't think

23   they are finer points, but apparently they are -- of the state

24   secrets privilege.  So, for instance, plaintiffs had said the

25   state secrets privilege doesn't apply to foreign affairs, but

1    it does.

2          **THE COURT:**  Sure, okay.  I'll accept that generally,

3    as a general -- yeah.

4          **MR. GUYNN:**  Plaintiffs had said it only applies to

5    classified documents.  That's wrong.

6          **THE COURT:**  That's fine.  Okay.

7          **MR. GUYNN:**  Plaintiffs argue that the analysis of the

8    privilege is strict and critical and even leery of the

9    government's explanation for --

10          **THE COURT:**  I'm sorry, the last part, I didn't hear

11    that.

12          **MR. GUYNN:**  Leery, suspicious of the government's

13    explanation for why the privilege applies, but binding a case

14    law, that even plaintiffs cite, hold the opposite.

15          **THE COURT:**  Well, it's a little more -- it's a little

16    more complicated than that.  But I'll give you that there's an

17    analysis that has to be done.

18          **MR. GUYNN:**  I would love to -- I would love to read a

19    case from the Fourth Circuit if it would be helpful.

20          **THE COURT:**  Which one are you looking at?

21          **MR. GUYNN:**  I'm looking at *El-Masri*.

22          **THE COURT:**  Yep, I got that one.  I like that one

23    because it's got some very good language about what I have to

24    do --

25          **MR. GUYNN:**  Okay.

1          **THE COURT:**  -- to assess the privilege, right?

2          **MR. GUYNN:**  I agree.

3          **THE COURT:**  So where are you reading from?

4          **MR. GUYNN:**  I'm reading from 479 F.3d 296 at Page

5     305.

6          **THE COURT:**  Okay.  Let me get there.

7        You're at 305, you said?

8          **MR. GUYNN:**  I am.

9          **THE COURT:**  Okay.  Are you reading from the *Reynolds*

10    court, balance those concerns by leaving the judiciary firmly

11    in control of deciding whether an executive assertion of the

12    state secret privilege is valid but subject to a standard

13    mandating restraint in its exercise of its authority?

14        That's where I am at 305.

15          **MR. GUYNN:**  I believe so.  I have the quote here, but

16    let me make sure we're reading from the same paragraphs.

17        So the language is, in assessing -- I want to make sure I

18    get it exactly right.

19        Okay.  So it's in the middle of the very large paragraph,

20    if you have it printed, Your Honor.  It's the first full

21    paragraph in 305.

22        It starts --

23          **THE COURT:**  Yeah, I started that paragraph, right?

24          **MR. GUYNN:**  Yeah, so it starts it's "In assessing the

25    risk."  Do you see where I'm reading?  Right after the

1  quotation to *Reynolds* -- the citation to *Reynolds*?  "In

2  assessing the risk of such a disclosure"?

3          **THE COURT:**  Yes, "might pose to national security."

4          **MR. GUYNN:**  "A court is obliged to accord the utmost

5  deference to the responsibilities of the executive branch.

6  Such deference is appropriate not only for constitutional

7  reasons but also practical ones.  The executive and the

8  intelligence agencies under his control occupy a position

9  superior to that of the courts in evaluating the consequences

10 of release of sensitive information."

11     And, Your Honor, I think that applies equally to the

12 Department of State about the release of state secrets that

13 relate to foreign affairs.

14         **THE COURT:**  Oh, I -- I agree, but the whole test

15 applies.  So if -- if -- if you -- if what you're asking me to

16 acknowledge is that diplomatic relations or foreign affairs is

17 an area of the executive branch's power to which the state

18 secrets doctrine may apply, I agree with you.  But you didn't

19 read me that part.  You read me some of what *El-Masri* and

20 *Reynolds* says.

21     The other part of it is that the Supreme Court has been

22 crystal clear I need enough information to make an independent

23 determination, without violating the privilege itself, to

24 satisfy myself that the executive branch has demonstrated

25 there's a real -- a reasonable danger, right, of -- of

1    affecting, in this case, foreign affairs.  Right?

2            **MR. GUYNN:**  Agreed.  And -- and -- but that's a

3    deferential review.  And as --

4            **THE COURT:**  Sure, I agree with you on that.  But I

5    have to have something to be able to review.

6            **MR. GUYNN:**  I -- the government agrees.

7            **THE COURT:**  Because otherwise, what happens is

8    exactly what *Reynolds* says should not happen.  It's left to the

9    caprice of the executive branch to tell me when evidence shall

10   be cut off in the case, and we can't have that either.

11       So it really is probably the -- the kind of privilege

12   where the -- the co-equal branches and their respective

13   interests are at an impasse and which one is going to give,

14   right?

15           **MR. GUYNN:**  I appreciate that framing of it, Your

16   Honor.

17       I would also just note that although -- and I appreciate

18   how much attention the Court is obviously paying to this issue,

19   because although plaintiffs have quote mined the cases, they

20   have largely misread the cases that they have even cited.

21       Of the 23 cases that they cited, 16 uphold in full or --

22           **THE COURT:**  And shall we count how many had not only

23   a public affidavit but a classified affidavit?  Shall we count

24   how many had declarations that looked more like this from the

25   CIA directors?  I mean, that's the problem I have right now, is

1  you're asking me to take -- you have not given me anything that

2  I can really say, okay, I understand -- first, I understand

3  what of the plaintiffs' request or the Court's order, in the

4  government's view, poses a reasonable danger to diplomatic

5  relations.  That's one.

6      And then two, I understand how it does.  Not specifically

7  what -- what is going on, what are the details, because then

8  you would be giving up the privilege, but how -- how does it

9  affect the workings of the executive branch?  I don't have that

10 here.  That's -- it's like I can't get out of box one or step

11 one.

12      **MR. GUYNN:**  Well, I -- I would respectfully disagree,

13 Your Honor.  I think -- I think that between -- so I think -- I

14 think the Secretary Rubio declaration in this case, it's

15 modeled after successful declarations in other cases that the

16 DOJ has handled.  And in combination with the discovery

17 material defendants have provided and the in camera

18 presentations that we have made to Your Honor, we think that

19 the Court has -- we think defendants easily meet the --

20      **THE COURT:**  Okay.  Let's -- walk me through the

21 steps.  Walk me through step one.

22      **MR. GUYNN:**  Sure.

23      **THE COURT:**  Okay?  And tell me how -- first, what --

24 if you can, can you articulate all of the requirements of step

25 one?  And then we can talk about whether the affidavit -- you

1    know, why you think the affidavit satisfies step one.

2              **MR. GUYNN:**  Sure.

3        So we think the *Abilt* case does a good job on unpacking

4    what step one looks like.

5              **THE COURT:**  *Abilt.*

6              **MR. GUYNN:**  *Abilt*, 848 F.3d 305 Fourth Circuit, 2017.

7              **THE COURT:**  Okay.

8              **MR. GUYNN:**  *Abilt,* the Court explained that the

9    defendant is -- it requires the defendant to assert the

10   privilege, provide a formal claim of privilege lodged by the

11   head of the department with control over the matter, and the

12   formal claim must be made only after actual personal

13   consideration by that officer.

14             **THE COURT:**  Right.

15       And it has to be enough so that the judge can satisfy

16   himself that the dangers asserted by the government are

17   substantial and real.  And that way I know I shouldn't probe

18   further, right?  That's also in *Abilt*.

19             **MR. GUYNN:**  I read it the judge "herself" must

20   satisfy.

21             **THE COURT:**  You're very kind.  Yeah, it doesn't say

22   that, but I'll take it.

23             **MR. GUYNN:**  But, Your Honor, we do believe that we

24   have met that standard, and recall that the standard is a low

25   one, that there is a reasonable danger that compulsion of

1  evidence will expose state secrets.

2      We think that Secretary Rubio's declaration is

3  sufficiently detailed to explain what the nature of the

4  material is and why it's -- it's -- it is state secret, and why

5  its production, why its sharing could -- could reasonably harm

6  the United States foreign affairs.

7          **THE COURT:**  So -- so, for example, I have to satisfy

8  myself that the proper head of state has provided the right

9  affidavit.  And I do believe that Secretary Rubio is that

10 person.

11     There is a paragraph that discusses -- and he also has to

12 have, after actual personal consideration, right, of the

13 question, as to whether the evidence that's to be disclosed

14 would pose a reasonable danger to, in this case, foreign

15 relations, right?

16         **MR. GUYNN:**  Right.

17         **THE COURT:**  Okay.  How do I know from this affidavit

18 what Secretary Rubio considered?  Because that sort of leads to

19 the next point, which is how do I know from this affidavit what

20 about the request is going to pose a reasonable danger to

21 diplomatic relations or foreign affairs?  In other words, how

22 do I -- how do we even assess that?  These are -- it's very,

23 very general.

24         **MR. GUYNN:**  Well, part of the issue that it's so

25 general is that -- is the way that plaintiffs have teed this

1  up, is that they are essentially -- they are seeking a

2  categorical piercing of the state secrets privilege across this

3  entire case.  We're not talking about specific documents they

4  want to see.

5          **THE COURT:**  There's three questions to ask.  I don't

6  understand that.

7          **MR. GUYNN:**  Well, there's --

8          **THE COURT:**  There are -- there are three areas that

9  this whole discovery, expedited discovery is based on, and

10  perhaps 3.5:  The existence of the agreement, the physical

11  custodial status of Abrego Garcia, what steps have you taken,

12  what steps will you take.

13      So why are you saying it's a categorical piercing?  I

14  mean, those -- that's the subject, right?

15      And the requests are categorized by those four subjects.

16          **MR. GUYNN:**  Well, Your Honor, we're not saying that

17  any answer in response to those -- those questions is state

18  secret.  We're saying we believe that in our interrogatory

19  responses, in our documents -- the documents that we've

20  produced or that we've logged, and that might be protected for

21  some other privilege -- and, you know, can I just drop a

22  footnote on that, Your Honor?

23      There's -- there's been a lot of handwringing from

24  plaintiffs just now about that privilege log.  First off, they

25  haven't asked us to meet and confer about a single --

 1          **THE COURT:**  Wait a minute.  I want to stay with the

 2   affidavit.  This is your burden.  Okay?

 3      The privilege log is a whole other can of worms that I'm

 4   not sure if we can do in open court or if we have to go under

 5   seal.

 6      But can we just stick with the affidavit, and my really

 7   simple -- I just want an answer to how it is that this

 8   affidavit tells me how turning over evidence related to any one

 9   of those four areas will pose a reasonable danger to foreign

10   affairs.

11          **MR. GUYNN:**  I mean, I can read the paragraph -- the

12   relevant paragraphs from the declaration into the record, if

13   you would like.

14          **THE COURT:**  Sure.  Just tell me where they are so --

15   because they seem so vague in general that I'm not sure how it

16   keys in to each or any of the four.

17          **MR. GUYNN:**  Okay.  Let's start with Paragraph 7.

18          **THE COURT:**  Okay.

19          **MR. GUYNN:**  I can read it, or if Your Honor would

20   like to review portions of it together, we can do that.

21          **THE COURT:**  Well, the first half of the paragraph

22   talks about logistical details, and that comes, if I recall

23   correctly, largely from JGG because there, there was questions

24   about flights and flight patterns.  And here, I'm not sure what

25   logistical details you're talking about.

1        What logistical details are you referencing here?

2            **MR. GUYNN:**  There have been questions about why was

3    he detained, what evidence do you have that he's MS-13.

4            **THE COURT:**  And Senator -- Secretary of State Rubio

5    said to the public that's not his decision, that's not the

6    State Department's decision, that has nothing to do with his --

7    with his department; that's DHS.

8        So that can't be it.

9            **MR. GUYNN:**  And respectfully, Your Honor, I think

10   that comes back to why we believe that the JGG declarations

11   apply, and then in the alternative, why we would ask for

12   permission to obtain declarations from Secretary Noem and

13   General Bondi if this Court disagrees.

14           **THE COURT:**  That's fine.  But Secretary Rubio's

15   affidavit can't be about that because Secretary Rubio told us

16   all that that's not his bailiwick.  I mean, it's -- it's in

17   the -- it's in the public domain.

18       So I'm just trying to understand what logical -- what

19   logistical details that is referenced in Paragraph 7 have to do

20   with the plaintiffs' request?  Because it says --

21           **MR. GUYNN:**  So --

22           **THE COURT:**  When the United -- it talks about removal

23   of individuals.

24           **MR. GUYNN:**  Well, I think you're referencing just,

25   you know, the -- the ways and means that, you know, ICE and DHS

1    use to detect people, locate them, and then transport them.

2        But what Paragraph 7 is talking about is a different

3    aspect of removal.  It talks about when the United States seeks

4    to remove individuals to a foreign country, the United States

5    must negotiate the logistical details of that removal with the

6    foreign country.  That's Department of State.

7        This requires nonpublic, sensitive, high stakes

8    negotiations with the foreign state.  That's Department of

9    State.

10       Those negotiations cover sensitive issues such as the

11   nature of the working relationship between the United States

12   and the destination country's government and migration policies

13   that may impact regional neighbors.  This is Department of

14   State.

15       Sensitive factual details of foreign policy priorities

16   revealed in the course of highly sensitive negotiations and the

17   content of those negotiations, such as the categories of

18   individuals the country may be willing to consider accepting or

19   information necessary to facilitate removals as subsequent

20   entry into the receiving country which can impact the foreign

21   state's willingness to accept the removed aliens and the

22   procedures that were employed in doing so.  That is Department

23   of State.

24           **THE COURT:**  Okay.

25           **MR. GUYNN:**  Compelled disclosure of any sensitive

1  communication or discussions with the government of El Salvador

2  regarding Abrego Garcia's removal and confinement in CECOT and

3  Centro Industrial threaten significant harm to the United

4  States' foreign affairs and national security interest.

5          THE COURT:  Stop right there.  Okay.  Let's stay with

6  that last sentence.  Okay?

7          MR. GUYNN:  Sure.

8          THE COURT:  Because it sounds like that's the heart

9  of the matter.

10     You're saying compelled disclosure of these communications

11  will threaten or could -- or threaten significant harm to

12  foreign affairs and national security interest.

13     Where in the affidavit do you explain how that is, why is

14  it national security in there as well as foreign relations?

15  What about national security is at issue?  There's simply no

16  detail.

17     This is -- this is basically "take my word for it."

18     And I'm not saying in the end of the day, you won't be

19  able to make the privilege.  But what I'm saying is I don't

20  have enough there there to understand are you -- are you saying

21  it's the communication piece that is the protected -- the

22  most -- the protected part of this because it would impact what

23  aspect of foreign affairs?  Or national security?

24          MR. GUYNN:  I mean, I --

25          THE COURT:  I just don't know what that means, I

1    mean, or how I'm supposed to independently determine whether

2    the privilege applies.

3            **MR. GUYNN:**  Respectfully, Your Honor, I think that

4    the fact that we can't and shouldn't share the who, what, when

5    and where with you is the sine qua non of the state secret

6    privilege.

7            **THE COURT:**  Well, if I respectfully disagree with

8    you, right, that I think you need to do more, and I don't -- I

9    am not suggesting.  I'm suggesting this with the utmost

10   deference to the executive branch, and with the understanding

11   that this really is in the world of, as Judge Wilkinson put it,

12   it's like a self-incrimination determination.

13       If I look at all the evidence, and I can't make that

14   determination without a little more structure to the proffer,

15   then I have to tell you that in fairness to you.

16       And so I'm -- I -- let me give you an example.

17       It seems like throughout the -- you know, this iterative

18   process between you and the plaintiffs, at first there was an

19   invocation of this privilege when it comes it an arrangement

20   with El Salvador with regard to these individuals.  That seems

21   to be changing, according to the pleadings.

22       Is that fair?

23            **MR. GUYNN:**  So previously, Your Honor, that

24   arrangement was reflected in classified diplomatic notes --

25            **THE COURT:**  Right.

1           **MR. GUYNN:**  -- which are now no longer classified.

2           **THE COURT:**  Okay.  So that's changed, correct?

3           **MR. GUYNN:**  Correct.

4           **THE COURT:**  And you may not be invoking the state

5    secrets privilege with regard to the existence or the details

6    of the agreement; maybe, maybe not, I'm not sure.  But this is

7    an example of why I can't look at this affidavit and, frankly,

8    know what the Secretary considered and know what the Secretary

9    is considering invoking the privilege on and how -- I mean, it

10   doesn't have to be super detailed, but it has to give me

11   something, how it affects that aspect of the department which

12   in this case is diplomatic relations or foreign affairs.

13          **MR. GUYNN:**  And, Your Honor, I appreciate that, and I

14   understand where your frustration is coming from.  Again, I

15   think the challenge is the way this has been teed up.

16          **THE COURT:**  Well, I think part of the challenge is,

17   before we get out of the box, the affiant has told the world

18   that "I'm not" -- "I'm not telling the judge," which is another

19   piece of this.  It's, like, what am I -- again, it's the

20   dueling narrative.  What am I supposed to believe?

21       Am I supposed to believe that, "If the judge who is the

22   final arbiter of the scope of the privilege says this is what I

23   have to turn over, I will do it"?  Or is this a situation

24   where, "I'm not going to give the judge enough even to make the

25   determination because I'm never saying it"?

1     You see, this is getting very complicated in that regard.

2     So I'm asking, really, in good faith for the executive

3  branch to do a little bit more to show its work as to why the

4  privilege applies.  And you can do it as many other

5  declarations have; you can do it as a classified document, you

6  can do it as an ex parte document.

7     And -- and, you know, you can look at other examples,

8  because I do not agree that this is like many other affidavits

9  where the affiant lays out the categories, you know, for

10 example, of what -- what aspects of the -- of the agency

11 function or structure would be disclosed.

12    You know, the CIA is the easiest one.  Right?  In these --

13 in these surveillance cases or in these cases where folks have

14 alleged the CIA to have abused them, the -- the affidavit reads

15 we can't disclose this information because it would reveal the

16 identities of CIA operatives, it would reveal the locations of

17 CIA detention facilities, it would reveal the inner workings of

18 the program that are not public.

19    And so that's very easy to understand without giving me --

20 giving the judge the meat of it.  It's telling me what about

21 national security would this impact?

22    That's -- the equivalent, in this case, is, "Judge, take

23 my word for it, it -- it impacts national security."

24    If the affiant in these other cases did that, it may not

25 have been the same outcome in the 23 cases that you're citing.

1      That's what I have here.  It affects foreign affairs and

2  national security.  I don't know how.  Really.

3          **MR. GUYNN:**  Respectfully, Your Honor, I think there's

4  a lot more meat on the bone than you're giving this declaration

5  credit for.

6      And I would also say that in the in camera presentations,

7  then also discovery materials, there is voluminous additional

8  meat that's on the bone that allows the parties and this Court

9  to know some of those details that you believe might be lacking

10  in this declaration.

11          **THE COURT:**  But then -- but then the Secretary of

12  State has to let me know what he's reviewed.  It doesn't have

13  to be super detailed, just categories, something.  And how,

14  even if it's a referral to that, so that I know -- I've got --

15  I've got -- is it about -- is it about discussions?  Is it

16  about the contract or the arrangement?  Is it about the details

17  or the logistics?  In this case, what is it about?

18      I don't -- again, I just don't think this affidavit cuts

19  it, and I would imagine if I'm telling you that now, you would

20  elect to take some time to supplement, but maybe not.  You tell

21  me.

22          **MR. GUYNN:**  If this Court were to rule this was not

23  sufficient, then we would certainly take that under advisement

24  and likely choose a supplement.

25          **THE COURT:**  Okay.  And so you know, if that's where I

1  end up after today, you certainly have all the protections that

2  have been accorded in, you know, numerous of the cases that

3  we've been discussing and others that have been cited where you

4  can file the open one we have, and you can file a classified

5  document that is a bit more targeted with contours so I can

6  really make the call.

7      So -- okay.  So why don't we talk about, then, do you

8  think it's worthwhile discussing prongs two and three?  Or do

9  you think if I'm at a pretty hard-stop position on prong one,

10  it's probably better to table the rest until you make the

11  decision as to whether you want to supplement the affidavit?

12      **MR. GUYNN:**  I actually do think that discussion would

13  be helpful.

14      **THE COURT:**  Okay.

15      **MR. GUYNN:**  Particularly -- I mean, I don't want to

16  put the cart before the horse, but I was surprised the Court

17  wanted to address this, because the parties didn't really brief

18  prong three very much because prong three, the question is,

19  well, then what do we do -- if the state secrets privilege has

20  been properly invoked, and if the Court is satisfied that there

21  are state secrets, well, then what do we do?  And very

22  frequently, what we do is the case is dismissed.

23      **THE COURT:**  But that's not this case.

24      **MR. GUYNN:**  Right.  And so --

25      **THE COURT:**  You know that's not this case.  We're not

1    even close to there because I don't believe you've given me a

2    sufficient affidavit, and that's going to really drive the

3    analysis.  So -- and frankly, this is about remedy, this is not

4    about liability.

5            MR. GUYNN:  I --

6            THE COURT:  This is about good faith versus bad

7    faith, so --

8            MR. GUYNN:  I understand that, Your Honor.  And

9    that's why I'm wondering if it's not clear if the third prong

10   is worth discussing now, because, you know, just to push back a

11   little bit, sure, maybe we're not talking about liability, but

12   it -- it surely might become the case that an enforcement

13   proceeding does present many of the problems --

14           THE COURT:  Right.

15           MR. GUYNN:  -- that eventually cause a court, on

16   liability grounds, to nevertheless dismiss a case, because the

17   prima facie case can't be proven without state secrets, the

18   defense can't be proven without state secrets.

19           THE COURT:  No, I doubt we're going to be there,

20   right?  Because it's a fact beyond change that

21   Mr. Abrego Garcia was removed without lawful authority.  You've

22   conceded it.  You have come to court.  There's affidavits.

23   There's witness testimony.

24       Whatever might be -- the attempt to revise that is going

25   to be exceptionally difficult.

1          **MR. GUYNN:**  I'm not -- well, not to split hairs with

2    Your Honor, but he was removed lawfully.  He shouldn't be in

3    the United States.

4          **THE COURT:**  He was removed in error.  He was --

5          **MR. GUYNN:**  He was -- he was sent to El Salvador when

6    there was a notice of withholding of removal.

7          **THE COURT:**  Correct.

8          **MR. GUYNN:**  And so that -- that was --

9          **THE COURT:**  That's not lawful.

10         **MR. GUYNN:**  But his removal from the United States

11   was lawful.

12         **THE COURT:**  Well, no, it wasn't, because there's

13   actually the INA, which says that if the United States elects

14   to remove someone to a third country, there's a process.

15   Congress has set out that process.  The Executive has to follow

16   that process.

17        So it is not determined yet whether removal to a third

18   country would be appropriate.  That's why the Court, Supreme

19   Court said what it said, return him to the status quo ante so

20   you can have that process.

21        You may win on that.  I'm not here to decide that.  But I

22   do have to push back that that's a foregone conclusion.

23         **MR. GUYNN:**  And then just returning to the third

24   prong, Your Honor, it may -- the third component of the third

25   prong is that --

1    **THE COURT:**  Yeah.

2    **MR. GUYNN:**  -- even if the prima facie case and the

3    defense can move forward without --

4    **THE COURT:**  Right.

5    **MR. GUYNN:**  -- disclosing state secrets, it may

6    nevertheless be the case that moving forward with the

7    litigation does present an unacceptable risk of disclosing

8    state secrets.

9        And I'm not saying that we're there now, but we may get to

10   a point where the government comes to Your Honor and says

11   that's where we are in this enforcement proceeding, and we can

12   raise that at the appropriate time.

13   **THE COURT:**  Yeah, because I don't -- I don't -- I

14   mean, I'm actually just responding to your hypothetical, that

15   this might have something to do with he's lawfully -- he can be

16   lawfully removed to a third country, and I say, no, not without

17   process, I'm not sure how any of that is a state secrets.

18       I'm just following -- you know, I'm like the cat with the

19   ball of string, and I'm trying to keep up with the ball of

20   string.

21       So the ball of string is what you said to me a moment ago,

22   which is he was lawfully removed.  And I -- maybe, maybe not,

23   but you got to go through the process.  That's not a state

24   secret.

25   **MR. GUYNN:**  I guess I'm largely responding, Your

1   Honor, to some of the public statements that this Court and

2   that plaintiffs have -- have focused on in their framing and

3   their understanding of defendants' good faith compliance with

4   the order.

5       I --

6           THE COURT:  Do you mean the statements of your

7   clients?

8           MR. GUYNN:  The statements, for example, of Secretary

9   Noem.

10          THE COURT:  Your client?

11          MR. GUYNN:  Where she said he won't ever -- well,

12  let's quote it.

13          THE COURT:  He will not return.  That one?  Or the

14  ones that were recently --

15          MR. GUYNN:  Yeah, I mean, Your Honor, I say read with

16  the appropriate nuance, we don't think that's at all

17  inconsistent with our good faith compliance.

18      He'll never walk free in the United States.  He'll be in

19  U.S. custody, and then the United States will begin removal

20  proceedings either to remove him to a third-party country or to

21  cancel his notice of withholding of removal and send him back

22  to El Salvador.

23          THE COURT:  I'm not sure that's exactly what she

24  said.

25      I mean, I don't have the Congressional testimony in front

of me, but this is from Exhibit M, Homeland Security at DHS

gov.

    "This woman beater, criminal terrorist and illegal alien

will never be allowed to return to the United States."

        **MR. GUYNN:**  I would say that if -- if I were to say

that with a little bit more precision, I might say without

being in U.S. custody.

        **THE COURT:**  "He will not return to our country

under -- to our country under the Trump administration."

    That sounds to me like an admission of your client that

your client will not take steps to facilitate the return,

release or return.  At least return, right?  "Will not return

to our country."  That's about as clear as it can get.

        **MR. GUYNN:**  I disagree, because these questions

are -- these questions are asked as though, you know, can we

return to, like, you know, the status quo ante, you know,

ceteris paribus.  And what the U.S. government is saying is no.

        **THE COURT:**  I'm sorry, these weren't questions put.

This was a post.  This was a voluntary post by DHS.

        **MR. GUYNN:**  Right.  But many of the quotes to which

I'm responding, which are in the briefing here, are

question-and-answer format, and that's why --

        **THE COURT:**  Maybe so.  Maybe so.  But the one I'm

highlighting to you is a post.  "I'm going to" -- "It's my

agency, and I'm going to tell the world my view on this," which

1   is contrary to any representation that you're going to follow

2   my order that the Supreme Court has affirmed.

3      So it's problematic.

4       **MR. GUYNN:**  I would just respectfully, you know, add,

5   Your Honor, that defendants have provided, in this proceeding,

6   more than enough material for you to conclude that we are

7   currently complying, and we plan to comply, and we have

8   complied with --

9       **THE COURT:**  Who is the "we"?

10      **MR. GUYNN:**  The defendants.

11      **THE COURT:**  All three?

12      **MR. GUYNN:**  Yes.

13      **THE COURT:**  DHS?

14      **MR. GUYNN:**  Yes.

15      **THE COURT:**  After what we just read?

16      **MR. GUYNN:**  Yes.

17      **THE COURT:**  What evidence is there of compliance?

18      **MR. GUYNN:**  I think we'll need to have a sidebar, if

19   you want me to discuss it in detail.

20      **THE COURT:**  Are you pointing to under-seal material?

21      **MR. GUYNN:**  I will be pointing to deposition

22   testimony that has been designated confidential.

23      **THE COURT:**  Okay.  Well, why don't we put that -- we

24   can either do it now, if you think it's a quick response.  I'm

25   fine with that because I am curious as to what --

1              **MR. GUYNN:**  And also, the -- it might even be more

2    efficient to just look at the interrogatory responses, which, I

3    think, provide similar detail.

4              **THE COURT:**  As to what DHS has done?

5              **MR. GUYNN:**  Yes.

6              **THE COURT:**  I'm not sure I'm reading the right rogs.

7              **MR. GUYNN:**  Well, I would love to elaborate on them,

8    if they are unclear.

9              **THE COURT:**  Yeah, because the DHS witnesses -- and

10    those are not under seal, are they?  Oh, they are.  You may not

11    want me to get into the detail, then, of the depositions.

12              **MR. GUYNN:**  Correct, we do not.

13              **THE COURT:**  Got it.  Okay.  Understood.  Understood.

14     Do you want to address that now with the headphones on, or

15    do you want me to put that on the list of stuff we might need

16    to talk about in a separate under-seal portion?  And I can make

17    a list.

18              **MR. GUYNN:**  I think it would -- I think it would

19    probably be helpful for counsel to be able to talk more freely

20    about that.

21              **THE COURT:**  Freely?  Okay.  All right.  Fair enough.

22    Got it.

23              **MR. GUYNN:**  So I'm not sure where we left off.

24     You mentioned how you were very expertly keeping up with

25    the ball that I was throwing around, but I think that we were

1  just about to start talking about the second prong of the state

2  secrets inquiry.

3           **THE COURT:**  Okay.  All right.

4           **MR. GUYNN:**  So the standard as articulated in

5  *Reynolds* is that the Court must sustain defendants' state

6  secrets privilege invocation, quote, if it is satisfied that

7  there is a reasonable danger that compulsion of the evidence

8  will expose state secrets, closed quote.

9           **THE COURT:**  Right.

10          **MR. GUYNN:**  And the materials the defendants are

11 seeking to withhold here are -- again, if you look at the

12 privilege log, Your Honor, there are zero documents that are

13 withheld solely on the basis of the state secrets privilege;

14 zero.

15    There are 43 documents that are withheld on the basis of

16 the deliberative process privilege alone.

17    There is one document that's withheld based on the dual

18 assertion of deliberative process and state secrets.

19          **THE COURT:**  Okay.  Then I'm not sure what privilege

20 log I'm looking at, because when I did a word search, state

21 secrets is invoked 246 times, and deliberative process 1400

22 times, or something of that -- so how is this?

23          **MR. GUYNN:**  Well, what I'm saying is, then there are

24 also multiple other privileges, such as attorney-client work

25 product, that are implicated throughout the discovery request,

1  and state secret privileges are also invoked alongside those as

2  well.

3           **THE COURT:**  I understand that.

4       And so what is it -- I guess -- okay.  First of all, we

5  have to have a conversation about this privilege log --

6           **MR. GUYNN:**  Great.

7           **THE COURT:**  -- offline.  Right?  Or under seal.

8       How is that responsive to prong two, what this privilege

9  log reflects?

10          **MR. GUYNN:**  It's that much -- much of the material --

11 the material the defendants are seeking to withhold is -- under

12 the state secrets privilege is a residual of the significant

13 material that has already been provided or that has to be

14 withheld pursuant to other privileges that are not being

15 challenged right now.

16          **THE COURT:**  Okay.  Well, the government -- the

17 plaintiffs' position is you haven't provided much at all.  And

18 I -- I can't make a final determination on that because I don't

19 have all of the evidence, but I do -- or the discovery, but I

20 do have the proffer that's gone unrebutted that this is 32

21 documents, much of which is in the public domain.

22      I have the depositions, which are a goose egg.

23      I'm not sure about your view on it, that's number one.

24 But number two, don't I have to do -- at least with state

25 secrets, especially with prong two, if I get to prong two, and

1    I find that you have an independent -- that you have shown --

2    you have shown that the danger is real not -- not -- not vague,

3    that's --

4           **MR. GUYNN:**  I think that is prong two.  I think that

5    is prong two, Your Honor.

6           **THE COURT:**  Well, this is my point, is about

7    necessity.  How does necessity fall into this?

8       If the need is great and the showing is weak, then what

9    the cases suggest is I have to then go to an in camera

10   inspection.

11      Now, I fully recognize that unlike other qualified

12   privileges where in camera inspection is a bit more accepted

13   and part of the ordinary course, that's not the case with state

14   secrets, right?

15          **MR. GUYNN:**  Right.  I don't think it's right to say

16   that if there's a showing of need, that triggers in camera

17   review.

18          **THE COURT:**  Really?

19          **MR. GUYNN:**  What I would say is this, is that need is

20   not a substantive factor in the analysis.  The asserted need

21   informs just how stringently the Court probes the government's

22   explanation to satisfy the reasonable danger standard.

23          **THE COURT:**  All right.  Let me direct you to *Sterling*

24   *v. Tenet,* this is Judge Wilkinson, quote, there may be, of

25   course, cases where the necessity for evidence is sufficiently

1  strong and the danger to national security sufficiently unclear

2  that in camera review of all materials is required to evaluate

3  the claim of privilege.

4       Required.

5       See, where I am right now is this affidavit is

6  sufficiently unclear.

7       There is other cases, like *Ellsberg,* which suggests,

8  Judge, take it real slow.  Make sure you got the affidavit that

9  is the best work of the agency head to show the claim of

10 privilege, and then decide whether you should look in camera.

11      *Sterling* suggests, today, if I find that the need is

12 sufficiently strong, and the danger is sufficiently unclear, I

13 can do an in camera inspection to figure out whether there are

14 any documents that fall under the state secrets --

15           **MR. GUYNN:**  I think that many of the cases do suggest

16 that there may be some circumstances where an in camera review

17 could be appropriate.

18           **THE COURT:**  Right.

19           **MR. GUYNN:**  But *Sterling* is really not one of them.

20           **THE COURT:**  I'm not saying *Sterling* is one of them.

21 I'm saying Judge Wilkinson's pronouncement of the law is.

22           **MR. GUYNN:**  But, Judge, I think we should also

23 follow -- take a close look at Judge Wilkinson's caution

24 against an in camera review.

25           **THE COURT:**  Yes, he says --

1          **MR. GUYNN:** Which I think is triggered in this case,

2  in fact, in their brief.

3          He said that the Court needs to be extremely careful about

4  fishing expeditions, and those are his words. He said, "Once

5  the judge is satisfied there is a reasonable danger of state

6  secrets being exposed, any further disclosure is a sort of

7  fishing expedition the Court" --

8          **THE COURT:** Right. Let's talk about what

9  Judge Wilkinson said is the reasonable danger. Because the

10  next sentence in the quote that I just read to you is, "Both

11  Supreme Court precedent and our own cases provide that when a

12  judge has satisfied himself that the dangers asserted by the

13  government are substantial and real, he need not, indeed should

14  not, probe further."

15          So that's -- that's the watermark. I have to satisfy

16  myself that the danger is substantial and real, in which case I

17  do not look at the documents in camera.

18          So the whole -- this is -- this is the Fourth Circuit's

19  view on in camera review.

20          And how can I say, in a situation like this, I think the

21  need is great? And that -- and right now, at least, the

22  affidavit is sufficiently unclear, but you may have an

23  opportunity to amend that and the analysis may very well

24  change.

25          **MR. GUYNN:** I also -- I think there's no need, Your

1    Honor, or at least the need --

2         **THE COURT:**  How do you say there's no need?  Let me

3    understand that.

4         **MR. GUYNN:**  Okay.  So, Your Honor, first off, in --

5    in encouraging this Court to perform an in camera review, the

6    plaintiffs have concocted farfetched scenarios that they think

7    would justify doing that.

8         **THE COURT:**  No, just tell me why there's no need.

9    Just tell me why there's no need.  In terms of the balancing,

10   you're saying the plaintiff has no necessity to understand the

11   steps that are taken, pursuant to the Supreme Court's

12   affirmance of my order, to facilitate his return to a country

13   where he was unlawfully expelled from.

14        **MR. GUYNN:**  I think that's not articulating the

15   analysis correctly.

16        **THE COURT:**  Okay.

17        **MR. GUYNN:**  It's not their need to know the

18   underlying facts and get information relative to their claims,

19   it's their need for these materials.

20        **THE COURT:**  No, no, no.  The need is to the steps.

21   There's -- there's the existence of the agreement.  There's his

22   physical custody.  That's the steps you've taken and the steps

23   you will take.

24        He has been wrongly removed.  How is it not central to

25   understand what, if anything, you've done to return him,

1  especially in the face of executive statements from the

2  President on down, "We could; we will not return him"?  How is

3  it not a need?

4       **MR. GUYNN:**  Again, I don't think that's the right

5  need.  I think we can look to *Reynolds* to --

6       **THE COURT:**  No, the need in this case.  The need in

7  this case.

8       **MR. GUYNN:**  Right, but to understand what the need in

9  the analysis even refers to.

10     The need in the analysis refers to the evidence that is

11  sought, that is -- that is over which the defendants have

12  asserted state secrets privilege.

13      **THE COURT:**  Right, which is what steps have you

14  taken, what steps will you take, what's the nature of the

15  agreement.  That's -- that's it.

16      **MR. GUYNN:**  It's the additional materials information

17  that --

18      **THE COURT:**  About that.

19      **MR. GUYNN:**  -- has been excluded from the

20  interrogatory responses.  We already think we've answered that

21  question.  But --

22      **THE COURT:**  Wait, wait, wait, wait.  Wait.

23     What you think you've done and what the areas of inquiry

24  are substantively are two different things, so just stick with

25  me for a second.

1   Isn't it true that the areas of evidence are the ones I've

2 just identified?

3     **MR. GUYNN:**  The areas of relevant inquiry over which

4 they have been permitted to take discovery, yes, are over those

5 questions.

6     **THE COURT:**  And that's what you're asserting

7 privilege on, right?

8     **MR. GUYNN:**  Not blanketly, no.

9     **THE COURT:**  Well, let's just stick with steps.

10   You're saying that the state secret privilege is going to

11 cover steps, right?  Steps you've taken and steps you will

12 take?

13     **MR. GUYNN:**  Aspects of the steps we've taken.

14     **THE COURT:**  So you haven't even told me which aspects

15 in the affidavit, but let's put that to the side.

16   Isn't the need great for the plaintiffs to know if you're

17 going to do anything?

18   The whole reason we're here is because I've said

19 repeatedly you've done nothing, and now you tell the world

20 you're not going to do anything, so isn't it about what you

21 have done?

22   Maybe you're right.  Maybe in the end of the day, the

23 basic proposition is we've done something but we can't tell you

24 what the something is.  We might get there.

25     **MR. GUYNN:**  I just -- I -- I don't agree with the

1    Court's characterization that we have these three areas of

2    inquiry, and defendants are asserting state secret privilege

3    over providing any information.

4        We think we've provided significant information that

5    allows them to know the answers to those questions, but they

6    want more.  And what we're saying is --

7        **THE COURT:**  Well, we'll talk about that in the

8    under-seal.  Because I got to tell you, I take umbrage in a

9    discovery dispute for one side to tell the other you have

10   everything you need.  That's what you've done.

11       **MR. GUYNN:**  Well, that's frequently what happens in

12   the state secrets context.  And what I'll --

13       **THE COURT:**  But that's not in the state secrets

14   context.  That's in the general context.  That was -- that was

15   in the pleadings not necessarily about state secrets, but more

16   generally, whether the discovery has been fully complied with,

17   is the Court's decision, not the parties'.  The plaintiffs

18   don't get to say it, you don't get to say it.  It's up to me.

19       **MR. GUYNN:**  I understand.

20       And so I think it would be very helpful, though -- and I

21   worry that we're talking past each other, about what the need

22   inquiry is getting to.  And I think it would be helpful if I

23   could just very briefly share a snippet from *Reynolds* that I

24   think would clarify --

25       **THE COURT:**  Okay.

1          MR. GUYNN:  And you can tell me where I'm making a

2    mistake, if that's what you still think.

3          THE COURT:  Okay.  Sure.  All right.  Yep.

4          MR. GUYNN:  So recall that in *Reynolds,* that was a

5    case about what appeared to be some sort of covert military

6    airplane flight where they were testing electronic equipment.

7          THE COURT:  Right.

8          MR. GUYNN:  And the airplane had four civilians in

9    it, and the airplane crashed, and three of the four civilians

10   died.  Their widows sued the government, and they said we need

11   that report.  There is a report that the government put

12   together about the accident.

13         THE COURT:  Right.

14         MR. GUYNN:  And they thought that report is going to

15   tell us if there was negligence or, you know, why --

16         THE COURT:  Right.

17         MR. GUYNN:  Essentially, why our husbands are dead

18   and why the government should be liable.

19         THE COURT:  Right.

20         MR. GUYNN:  And in evaluating need, the Court didn't

21   say do you need to know about whether there was something wrong

22   with the airplane?  Do you need to know if the electric

23   equipment that you were -- that was being tested malfunctioned?

24   No, the need was do you have need of getting access to that

25   report?

1    And the Court said, no, you don't have a need.  And the

2    reason you don't have a need is because you've had the

3    opportunity to take the deposition of the individuals who

4    provided, you know, some information that was incorporated into

5    that report.

6        **THE COURT:**  Well, it was also that the articulation

7    of the state secret was sufficiently defined so that the Court

8    can make an independent determination it applied.  In other

9    words, the -- it goes back to Judge Wilkinson's analysis,

10   right?  If -- if you articulate the privilege sufficiently

11   detailed enough, then it's game over, because it's a -- it's

12   a -- it's an absolute bar.

13       So the point here is when that balance is off in the first

14   instance.

15       I don't disagree with how you're framing *Reynolds*.  It was

16   about a single report that would certainly have, if I'm saying

17   it right, help the plaintiffs' case.  But bottom line, it was

18   going to disclose sensitive military information about how

19   these planes are built and how they run, right?  It was the

20   playbook.

21       Isn't that right?

22       **MR. GUYNN:**  Yes, and that's where we find ourselves

23   right now.

24       We've given them interrogatory responses.  We've given

25   them the documents that we can.  We've given them many

declarations.  There's even an additional declaration recently from an individual that was filed under seal.  We've given them lots of information that lets them know the answers to all of those questions:  Where is he, what have you done to facilitate his return, what are you going to do.

THE COURT:  I haven't -- but here's the thing --

MR. GUYNN:  And then their need is we need more. Tell us that -- give us that delta you're not giving us.

THE COURT:  No, no, no.  No, no.  Their need is, you need it at all -- they need it at all.  There's no available alternative like there was in *Reynolds*.  There's no other source.  It's you.  It's your clients.  Those are the only ones who can facilitate release and return, or return perhaps.  And, I mean, I know that there's sort of a narrative about, well, he's not in our control anymore; therefore, we can't -- we have no control over this.

But in terms of the *Reynolds* analysis, what's the alternative, if not from the State Department?  Where do they get this information?

MR. GUYNN:  I -- they have received this information.

THE COURT:  See, I disagree with you.  At least the discovery I've seen, they have not.  Okay?  So maybe we just got to get into the weeds on what you think you've provided and why, and that we will have to do under seal.  And you can convince me otherwise.

1          **MR. GUYNN:**  I -- honestly, I'm not sure -- at least

2     it's becoming clear to me right now that this discussion is not

3     productive without us being able to refer extensively to

4     discovery materials.

5          **THE COURT:**  Right.  And if at the end of the day, you

6     convince me otherwise, so be it, and I'll rule.  You know, go

7     back, look at it really carefully and rule.  But you may have

8     to supplement.

9          **MR. GUYNN:**  I understand.

10         **THE COURT:**  And it will be up to you.

11         **MR. GUYNN:**  I understand.

12         **THE COURT:**  Okay.  So we'll table the remainder of

13    that discussion for the under-seal portion.

14       Do you want to -- well, let me ask, do you have anything

15    else to say in the open record before I turn back to

16    Mr. Rossman or Mr. Cooper?  I don't -- I don't remember who is

17    doing state secrets.

18         **MR. ROSSMAN:**  Me, Mr. Rossman.

19         **THE COURT:**  Rossman?  Okay.

20       Is there anything else you want to talk about before I

21    turn to Mr. Rossman?

22         **MR. GUYNN:**  I mean, we haven't had an opportunity yet

23    to do, I think, like the hand-to-hand combat we're probably

24    going to have on, like, some of the discovery details.

25         **THE COURT:**  Right.

1            **MR. GUYNN:**  But we don't need to do that now, if the

2    Court would prefer to do that -- talk about state secret and

3    tie the bow on that.

4            **THE COURT:**  Yeah, I --

5            **MR. GUYNN:**  So, I don't -- given the exchange, I'm

6    not sure that there's anything right now that I have to add

7    further on state secrets.

8            **THE COURT:**  All right.  Very good.

9        So, Mr. Rossman, you're up on that.

10           **MR. ROSSMAN:**  Yes, Your Honor.  Thank you.

11       My head is spinning, Your Honor, with what I've just heard

12   from the government.  It is astonishing that they would offer

13   the proposition that they have told us all that we need to

14   know, not simply because that would be astonishing in any civil

15   discovery case, but because of the record that we've shown Your

16   Honor, they have told us nothing, zero, nothing at all about

17   what steps they have taken to return my client to the United

18   States or seek his release from El Salvador.

19       They -- there is information, to be fastidiously clear,

20   Your Honor, and I won't divulge what it is, there is -- and I

21   think this is what Mr. Guynn was referring to, there is some

22   information from DHS about what they typically do if someone

23   returns and is presented at a port of entry.  Not that they

24   have actually taken any of those steps, but they describe what

25   they typically do.

1        **THE COURT:**  Right.

2        **MR. ROSSMAN:**  That's it.  That's the sum total.

3   Everything else is nonsense.

4        And for them to stand here and say that they are complying

5   with the Court's order, and that we have the information in

6   discovery to satisfy ourselves that they have complied, is

7   simply false.  It's not true, Your Honor.

8        So that's -- that's my starting point for this.

9        I want to -- before I get into state secrets, I want to

10  make sure I don't forget to address Your Honor's point about

11  whether they should be permitted a second bite at the apple in

12  terms of putting up declarations from Homeland Security and DOJ

13  as they did in the JGG case.

14       They obviously knew, Your Honor, that they have that

15  requirement.  They knew because they did it in JGG, they knew

16  it because that's the law.

17       We cite in the *McDonnell Douglas* case where the Defense

18  Department put up an appropriate declaration and State didn't,

19  and the Court found that State didn't make the showing because

20  it didn't have the declaration from the head of the department.

21       So this was not a surprise to them.

22       And they knew it because Your Honor was very clear in Your

23  Honor's order that they had to come forward at this hearing in

24  these motions and specify the bases.

25       So I cannot, in good conscience, with my duties to my

1   clients, consent to giving them a second bite at the apple.

2   Your Honor will make whatever decision Your Honor makes, and

3   we, of course, will honor it.  But I can't.

4       And I have to take a minute to just remind the Court and

5   myself, frankly, of the chronology here.  It's -- you know,

6   since April 4 -- since April 4, when Your Honor issued your

7   preliminary injunction order, that was six days later upheld by

8   the United States Supreme Court, since that day, we've been

9   waiting to see, you know, what steps we're taking -- were being

10  taken, or what steps could be taken to facilitate

11  Mr. Abrego Garcia's return and release.

12      The courts have moved with lightning speed, astonishing

13  speed, Your Honor, on a daily basis.  The Fourth Circuit with

14  astonishing, unprecedented speed.  And the Supreme Court, to go

15  from this courtroom to the Supreme Court in six days, not

16  something I've ever seen.

17      And, Your Honor, the same day that the Supreme Court order

18  came out, you immediately amended and clarified your order.

19  And it's been crystal clear, since April 10th, exactly what

20  they are supposed to do.

21      The government has offered the proposition that it wasn't

22  until the second affirmance by the Fourth Circuit, the second

23  affirmance, that, you know, was written in rather beautiful

24  language, that that one was the one that finally caused them to

25  realize that they had to take steps to facilitate.

1        And what they have suggested in this courtroom, in in

2  camera submissions that I only know, you know, based on sealed

3  filings, generic description of, I don't know what's in them at

4  all still to this day, but what the Justice Department lawyers,

5  on behalf of their clients, have suggested is that there is

6  some, some effort to comply with the Court's order.

7        And I can tell you, there's zero, zero evidence of it in

8  the discovery record; not in the depositions, not in the, you

9  know, paltry number of documents that we've received, not in

10 the interrogatory responses, which I've referred Your Honor to.

11       I can't speak to what's in the in camera submissions, but

12 I have great difficulty accepting that that is the case when

13 all of the senior officials in the government have been

14 stating, have been shouting from the rooftops that they are not

15 going to allow Mr. Abrego Garcia to return to the United States

16 in unequivocal terms.  Not terms that can be parsed or nuanced

17 to suggest that what they mean is that he'll return and then be

18 placed in ICE custody.

19       **THE COURT:**  So is your point that, like, one, it's no

20 secret; and two, what -- what -- why should we now allow for

21 further complication of this nonsecret about what steps, if

22 any, will be taken?

23       **MR. ROSSMAN:**  Yes.  The government is delaying for

24 delay's sake at the expense of an individual who was wrongly

25 removed from this country, wrongly incarcerated without being

1    charged with a crime and since rotting in a foreign prison

2    subject to, by the minute -- by the minute -- irreparable harm,

3    as the Fourth Circuit described it.

4        So the idea that we should give -- and I will respect

5    without question Your Honor's decision on this.  I appreciate

6    the gravity of the issues.  But the idea that the government

7    continues to get more and more and more and more bites at the

8    apple just allows them to continue to play out this game.

9            THE COURT:  But on the other hand, I mean, we've got

10   other things that we need to discuss and iron out.

11           MR. ROSSMAN:  I agree.  I agree.

12           THE COURT:  And I'm not giving months, but I could

13   give some short period of time for the government to cure its

14   error.  Because I do think it's error to say I should look to

15   another affidavit in another case.

16           MR. ROSSMAN:  Yes.

17           THE COURT:  And now that I have determined that, I

18   can give them a short period of time to cure the error, and now

19   everyone is on full notice that I don't think what I've been

20   given so far, at least pending further discussion, is

21   sufficient.

22       So, yeah, I -- I think in a situation like this -- I hear

23   you.  I hear you.  And it's a tough one.  But I -- I --

24           MR. ROSSMAN:  We would urge Your Honor that they be

25   kept on as tight a leash as we can keep them knowing the stakes

1 that are here.

2          **THE COURT:**  Yes, I understand that.

3          **MR. ROSSMAN:**  And knowing the resources that the

4 government has, that they are already devoting, you know, to

5 this question, speaking publicly about it on a near daily

6 basis.  So, you know, the government can get answers quickly.

7      And I'll observe one other thing, Your Honor, the -- and

8 then I want to get into the substance of the state secret

9 argument.  It's a legal argument, so if you don't mind allowing

10 me to put back my lawyer hat for a second.

11      The requirement in all the cases, *you know Reynolds* to

12 *Zubaydah,* okay, the requirement is that, as Your Honor noted,

13 that there would be a declaration with adequate specificity to

14 allow Your Honor, as gatekeeper, to make a decision.  And it

15 has to be based on the personal knowledge of the head of the

16 agency.

17      So it requires that in this case, Secretary Rubio,

18 actually having engaged with the issues, ideally with the

19 documents, to be able to identify where the lines were drawn.

20          **THE COURT:**  Or with someone who has -- who has

21 provided an under -- under penalties-of-perjury affidavit to

22 the contents.  I mean, there's ways to do it, but the point is,

23 you got to do it.

24          **MR. ROSSMAN:**  He has to do it, right, yes.  I

25 don't -- I don't doubt that he's got a supervisory function

1    and --

2              **THE COURT:**  Right.

3              **MR. ROSSMAN:**  -- you know, folks that he can rely on

4    in a responsible way.  But he actually has to sign it under

5    penalty of perjury and it has to be, you know, based on that

6    personal work and understanding of the Secretary.

7         Now, I understand -- it was very interesting to me, from

8    Mr. Guynn's presentation, that they are not taking a

9    categorical view that all steps are under a blanket of state

10   secrets, but the aspects of the steps are, you know, protected

11   by state secrets.  We can talk about that.  And there are

12   prescribed ways to get at that.

13        But the starting point has to be a showing by the

14   government to your satisfaction, as gatekeeper, that there are

15   lines that should be drawn, and that they are rational lines,

16   and there are reasons why crossing those lines would have a

17   tendency to endanger national security.  That's the test.

18             **THE COURT:**  Or diplomatic relations or foreign

19   relations.  Right.

20             **MR. ROSSMAN:**  Or diplomatic relations.  Okay?

21        But it's a very thin category of items that are subject to

22   state secrets.  And while deference is due to the executive

23   branch, there is, for the very reason that Your Honor quoted,

24   you know, quite rightly in *Reynolds*, it's for Your Honor to

25   police it.  It's for Your Honor to make sure it's not subject

1    to arbitrary or, you know, capricious whim of the Executive.

2    So that showing has to be made as a starting point.

3        So if Your Honor does give them the opportunity to, you

4    know, have a second bite, I would ask that there be real

5    specificity.

6        You've seen -- I don't have to tell you, you're already

7    familiar with the cases, where there are both public and the

8    classified declarations that were submitted.  In case after

9    case after case, those are with great detail that, you know,

10   specify exactly what it is and why that providing that

11   information would tend to -- you know, would tend to divulge.

12           **THE COURT:**  As are many of the ultimate rulings.  I

13   mean, there's some rulings that, yes, the liability case is

14   extinguished, and it's with great consternation that the courts

15   do it.

16       But there are other cases where it's a mixed bag.  The --

17   the Court, I thought it was in -- maybe it was in *Ellsberg,*

18   where the Court said, listen, the district court messed up,

19   because the identities of the attorney generals who had issued

20   these warrantless taps, that's not -- that's not a state

21   secret.  In that case, the identities weren't, but in another

22   cases, it was.

23       So there's certain -- that's why I'm asking for more than

24   just a take my word for it, so I can assess by category what is

25   truly a reasonable danger to foreign relations and what isn't.

77

1          **MR. ROSSMAN:**  I wholeheartedly agree, Your Honor.

2          **THE COURT:**  Okay.

3          **MR. ROSSMAN:**  So with that, we talked about step one

4    of prong one, which is the procedural requirement.

5          **THE COURT:**  Okay.

6          **MR. ROSSMAN:**  And I want to talk about prong two.

7      And the first thing, the first thing that *Reynolds* teaches

8    the Court, you've got to look at the context of the case,

9    right?  *Reynolds* says, "The Court should consider all the

10   circumstances of the case and consider whether there is a

11   reasonable danger that compulsion of the evidence will expose

12   military" -- in that case, military matters -- "which in the

13   interest of national security should not be divulged," right?

14     So context matters.

15     Here, the context that we're talking about is a single

16   individual being wrongfully deported.  That's it.  That's what

17   we're asking for.  And we're asking for the steps that were

18   taken to try to bring that person back.

19       To our understanding, there's not even an argument being

20   made that that affects any military action or intelligence

21   gathering, you know, the typical state secret cases that we

22   see.

23          **THE COURT:**  No, it seems to be the sensitive

24   relations between two countries.

25          **MR. ROSSMAN:**  Right.

1      And on that, it is not remotely obvious to us, Your Honor,

2   that requesting the return of one person who was, even if I

3   take the most generous view of matters, mistakenly deported by

4   the government, okay?  Removed by the government.  Even if we

5   take that view, the idea that requesting the return of one

6   person who is a product of the government's error, okay, I'll

7   say it neutrally, that that would somehow endanger relations

8   with El Salvador is a very difficult one to swallow from a

9   commonsense --

10          **THE COURT:**  But doesn't it matter what the -- what

11   that -- the there is?  So in other words, one can say that if

12   it's a mere ask, right?  Like, again, this is all hypothetical.

13   Right?

14          **MR. ROSSMAN:**  Of course.

15          **THE COURT:**  This is all we're just -- we're just

16   spinning some of these out.

17      Maybe your point is well taken if the -- if the issue in

18   question is have you asked?  Yes or no?

19      Yes, I asked.

20      Okay.  But what if it's more?  What if the inquiry

21   involves what kind of pressures have you put on the country?

22   What kind of quid pro quo have you -- in other words, because

23   we know that in -- in foreign relations, all the time this

24   country puts certain conditions or certain -- ultimatums is a

25   strong word, but certain conditions on a country's behavior

1   with respect to immigration policy, such as revoking visas or,

2   you know, limiting entry into the United States in exchange for

3   that country -- for that country's compliance with something

4   that this country wants, right?

5        So in this situation, even though it's just

6   Mr. Abrego Garcia, if the inquiry goes down the line of, you

7   know, what specific negotiations have you had with regard to

8   future aid or future entry into our -- into our borders of your

9   residence or your citizens, that's getting, in my view, closer.

10       So in terms of -- that's why I need the meat of it, right?

11            **MR. ROSSMAN:**  That's precisely right.

12       So, Your Honor, I think -- I think about it the same way

13   that you have been thinking about it, which is you -- Your

14   Honor and I could pool our imaginations to come up with

15   theoretical actions, if you will, or, you know, communications

16   even, that would, you know, potentially be state secrets.

17   Okay?

18       I am not standing here saying that there's, you know, no

19   conceivable state secrets at play here.  That's not the

20   proposition I'm offering the Court.  Okay?

21       But rather than us, you know, talk about that in a

22   speculative way --

23            **THE COURT:**  Right, in a theoretical vacuum.

24            **MR. ROSSMAN:**  -- the question is what have you

25   actually done?

1          And they know the answer to that question.

2          And what do you plan to do, if anything?

3          The court order is crystal clear.  Okay?

4          They either have taken steps or they haven't.  They can

5     make a list.  They can put those steps to the Secretary, and

6     the Secretary can decide maybe, you know, steps one, two and

7     three are okay, steps three and four --

8               **THE COURT:**  Not okay.

9               **MR. ROSSMAN:**  -- are not okay, and here's why.

10              **THE COURT:**  Go tell the Court.

11              **MR. ROSSMAN:**   And then tell the Court, and Your Honor

12    can make that decision.  Okay?

13         They are not saying that.  I suspect there are no steps,

14    and nothing has happened in reality.  Or they are performative

15    steps, not real ones.  Okay?

16         But putting that aside, I'm speculating, there's an

17    answer.  They have that answer.  Their obligation is to put

18    forward something to the Court based on the actual facts on the

19    ground.

20         They also know -- they may not be able to tell the future,

21    but they certainly know what plans they currently have to take

22    any steps to facilitate the release and return of my client.

23    They haven't done that.  They too can articulate, here's our

24    plan:  Steps one, two and three we can share; steps four and

25    five, we have to tell the Court we can't, and here's why.

1          **THE COURT:**  Or maybe they can even say, listen, we

2     can't even tell you the details, or that would be giving up the

3     privileged information.

4          **MR. ROSSMAN:**  Right.

5          **THE COURT:**  But there has to be some contour to it

6     that allows me to independently determine --

7          **MR. ROSSMAN:**  Precisely.

8          **THE COURT:**  -- that's true.

9          **MR. ROSSMAN:**  So -- so, Your Honor, I want to -- I

10    want to spend a minute in talking about the importance of the

11    information to us, and only a minute, because I think Your

12    Honor is on the point.

13        It's critical.  It's critical.  Obviously, a life is in

14    the balance.  We have due process in the balance.

15        And, you know, even more than what is obviously of utmost

16    importance to my clients, Your Honor, there's a question of the

17    role of the Judiciary.  And you talked about, you know, the

18    role of the Judiciary, you know, being co-equal -- you know,

19    being a co-equal branch of government.

20        In a speech last week that someone pointed out to me,

21    Chief Justice Roberts said, "The Judiciary area is co-equal

22    branch of government separate from the others with the

23    authority to interpret the Constitution as law and strike down,

24    obviously, acts of Congress or acts of the President."

25        So here what we have is a truly unique situation.  That's

1  why I have described it in briefing as a one of one case.

2      We have -- not only was Mr. Abrego Garcia initially

3  removed illegally, and that's the language of the Supreme

4  Court's order, it was illegal because of the withholding order,

5  but we now have Your Honor's order, which has been affirmed all

6  the way up to the Supreme Court.  And the question in this

7  proceeding is whether or not the government has complied with

8  the order.  That's the question.

9      And I would submit that, you know, when the question is

10  whether the government has complied with a valid order of the

11  Judiciary and, indeed, the Supreme Court, that that's an arena

12  where it is the Judiciary as a co-equal branch of the

13  government that is deserving of respect.

14      And, you know, we ought to be careful to pay heed to the

15  interest of the Judiciary.

16      That's on the importance prong.  Couldn't be more

17  important.  And the importance prong informs the degree to

18  which Your Honor engages in a probing inquiry of whether or not

19  there's state secrets that are shown.

20      So, you know, our simple proposition to the Court is it

21  can't be that you issued an order and the Supreme Court issued

22  an order that's meaningless, that's empty.  You know, the

23  Supreme Court -- the language of the Supreme Court's order is

24  that Your Honor's order properly requires the government to

25  facilitate Abrego Garcia's release from custody in El Salvador,

1 and to ensure that this case is handled as it would have been

2 had he not been improperly sent to El Salvador.

3      That -- by definition, that requires some

4 extraterritoriality.  It requires the government take some

5 steps that have an impact or could potentially have an impact

6 on El Salvador in causing them to release him from custody.

7 That is the only way that you could read meaning into the

8 Supreme Court's order.

9      And the idea, the proposition that we can throw a -- the

10 government can throw a shroud of state secrets over that order

11 and not comply, and then tell the Court that you can't inquire

12 as to whether or not they have complied, is a proposition that

13 the Court should not accept.

14      And so, you know, our view, Your Honor, is that, you know,

15 there's -- there's great reason for searching inquiry here and

16 great reason for skepticism.  That's the phrase that's used in

17 the Fourth Circuit.

18           **THE COURT:**  Right.

19           **MR. ROSSMAN:**  There should be great skepticism of the

20 state secret.

21      For now, the -- you know, and it's exacerbated by what I

22 describe is a disturbing dichotomy between public statements

23 and what's being offered in the Court.  And we do want to get

24 to the good faith of it.  We want to know what steps have

25 actually been taken.

1      We talked about -- Your Honor, I think has talked about

2  the Rubio declaration.  You know, what I would say, and you

3  know, cite to the *Al-Haramain* case in our briefs, the Ninth

4  Circuit case, simply says national security is insufficient.

5          **THE COURT:**  Right.  It's not enough.

6          **MR. ROSSMAN:**  It's not an incantation, you have to

7  show it.  Right?  You have to show -- as you put it, you have

8  to show your homework.

9      I was surprised Mr. Guynn said it doesn't have to be

10  classified in order for it to be a state secret.  We're not

11  aware of cases that, you know, have -- have established as

12  state secrets that which is not classified.  You know, and that

13  is something that --

14          **THE COURT:**  But it does go the other way, something

15  that is classified is not automatically a state secret.

16          **MR. ROSSMAN:**  Correct.

17          **THE COURT:**  It's just not -- the other way doesn't --

18          **MR. ROSSMAN:**  I agree with that.

19      And we were prepared -- and we have lawyers who have

20  security clearances on the team.  We were prepared to look at

21  classified information that is not state secrets.

22      But the point is, it would be strange for something to be

23  a state secret and not classified.  And that's not coming from

24  me, that's coming from Judge Boasberg in the JGG case in his

25  April 16th decision --

1          **THE COURT:**  Right.

2          **MR. ROSSMAN:**  -- where he says the government hasn't

3  found a case where something is not classified in a state

4  secret.

5      The fact that the Rubio declaration is not classified, you

6  know, makes it quite distinct from, you know, classified

7  declarations from CIA directors, like we saw in *El-Masri* and

8  *Sterling*, from the FBI director in the *Fazaga* case.  There's

9  ways to do this right, and they haven't done it.

10     So, you know, I also -- you read out, I think, the crucial

11  sentence in Paragraph 7 from the declaration that shows you

12  it's pure conclusion.  There's no whys or wherefores.  And,

13  again, that contrasts with the leading state secret cases that

14  involve substantive things that you can describe in general

15  terms, like we don't want to reveal the names of covert CIA

16  operatives.

17          **THE COURT:**  Right.

18          **MR. ROSSMAN:**  We don't want to reveal the location of

19  CIA detention sites.  We don't want to reveal sources and

20  methods of intelligence gathering.  We don't want to reveal --

21  and this is in the original *Reynolds* case -- secret military

22  technology, right?  So those are all things that you can say.

23     In *Reynolds,* there was an available alternative.  You

24  didn't need to prove that the plane crashed because of the

25  technology, that wasn't the proposition, so you don't need the

1    government's report, right, in order to bring your tort case.

2        Here, we have no case without knowing what steps they have

3    taken or what steps they haven't taken.

4        You know, so -- and I don't think even Mr. Guynn is saying

5    that they can't tell us anything at all.  They haven't.  They

6    haven't yet.  But, you know, I hope that there are things that

7    they can tell us that even they would admit are not a state

8    secret.

9        And then as to the rest, Your Honor can look at it.

10       And the last thing that I would mention is the in camera

11   review is an absolutely viable proceeding here.  And, you know,

12   you quote the very language of *El-Mazri* that I was going to

13   quote to Your Honor, so you beat me to it.

14       But it's important.  It's important.  Because the role of

15   the Court is to call balls and strikes.  And, you know,

16   different pitches land in different parts, you know, either

17   over the plate or off the plate.  And so you've got to look at

18   the individual ones.

19       And, you know, I am not at all suggesting that, you know,

20   the entirety of, you know, the privilege log or all the

21   information as to which they assert state secrets should be

22   made available to Your Honor in camera.  But we do propose that

23   to the extent there is anything that is legitimate, that is,

24   you know, established, you know, at least at a facial level as

25   potentially state secrets, that that is something that Your

1    Honor can and should look at to satisfy yourself, right?

2        That the government has actually given, you know, the

3    grave skepticism that I think, you know, is warranted here, I

4    think, you know, the Court can satisfy yourself.  And maybe

5    that doesn't mean you need to look at everything, maybe you can

6    look at some things and it's enough at some point to reach a

7    conclusion, or you can say as to this category, yes, I

8    understand why that may be something -- as extreme as it is,

9    that may be something that's protected by the state secrets

10   privilege, but not to all these other categories.

11           **THE COURT:**  Well, I can't even -- I can't even get

12   there on this.

13           **MR. ROSSMAN:**  I agree.

14           **THE COURT:**  I mean, the problem that I'm having, and

15   I guess, you know, not to beat a dead and frustrated horse --

16   frustrated and dead horse, is that I can't do it on the

17   affidavit that's been provided.

18       And, yes, while discovery has been on an expedited basis

19   for very good reason, it has been going on for a while.  So it

20   is -- it is, I suppose, more information that at some point

21   will make its way into a memorandum to me, but that's where we

22   are.

23           **MR. ROSSMAN:**  I mean, just so Your Honor, you know,

24   is reminded of the point, if I had to write a memorandum to you

25   tomorrow of all the discovery that we had, there would be

1  nothing in it, you know, in terms of actual, meaningful

2  information regarding steps taken.

3          **THE COURT:**  Yeah.

4          **MR. ROSSMAN:**  I've showed it to you.  That's all I

5  have.

6          **THE COURT:**  Okay.

7          **MR. ROSSMAN:**  Thank you, Your Honor.

8          **THE COURT:**  All right.  So, Counsel, we've been going

9  a couple of hours.  We still have to discuss deliberative

10 process.  I'm happy to do that and sort of wrap up what we can

11 do, I think, in open court, and then take a break and go under

12 seal for some of the details regarding documents that at least

13 for now are sealed.

14    And I think out of a fairness to the balancing between

15 public disclosure and information that needs to be kept

16 confidential at this point, we need to do it under seal.

17    So would you prefer a break now, or do you want to press

18 on and talk about deliberative process before we break?

19         **MR. ROSSMAN:**  Whatever you want, Your Honor.

20         **MR. GUYNN:**  I mean, I'm happy to press on, if you

21 prefer, or I can take a break.

22         **THE COURT:**  Okay.  Let's talk about the law and

23 deliberative process because I think it will then be a good

24 stopping point and we can go under seal.

25    Okay.  Now, this -- this one, in my view, is in some ways

1  a little more -- it's a little mushier.  Because while it seems

2  as if deliberative process would come into play because there

3  are, at least from the privilege log, very generally speaking,

4  pre-decisional back-and-forth to some degree, there are aspects

5  of this case that either take it -- in my view, could

6  potentially take it out of the privilege altogether, or in

7  balancing what is a qualified privilege, could yield to

8  disclosure.

9      So -- but I want to start with wherever you want to start,

10 government, because it's your privilege that you're asserting,

11 and then I'll turn to Mr. Cooper.

12         **MR. GUYNN:**  Again, I think context is everything here

13 again.  And I -- I would like an opportunity to be able to

14 present the context.

15     So although I do appreciate why the Court ordered

16 expedited discovery and why it was expedited, I do understand

17 that.  I do think it's worth bearing in mind, though, that it

18 was expedited, and although plaintiffs are sort of dismissing

19 the difficulties and the practical difficulties of collecting

20 documents, identifying appropriate custodians, processing,

21 reviewing, logging with the wave of their hand, there's a

22 reason why under the federal rules you get more than seven

23 days, and then 14 days, and then 21 days.

24     And indeed, preparing declarations from witnesses, whether

25 they are state secrets or otherwise, that's the work of months,

1 not days and weeks.

2          **THE COURT:**  Well, it's not going to be in this court.

3 We're not doing months.  So I hear you, I'm -- I hear you.

4          **MR. GUYNN:**  All I'm saying is that to the extent

5 plaintiffs and the Court is frustrated, like we are doing

6 everything we can to get things out as quickly as we can.  And

7 indeed, today we're serving interrogatory -- I meant

8 supplemental responses on the basis of the ongoing

9 meet-and-confers that we're having.

10          **THE COURT:**  Okay.

11          **MR. GUYNN:**  And normally they would -- our

12 interrogatory responses wouldn't have been done probably -- due

13 until today, based on when expedited discovery was ordered, in

14 the ordinary course of things.

15          **THE COURT:**  But it wasn't the ordinary course, and

16 that's my order.  And once again, you know, I have to push back

17 a little bit.  If I order it, you do it, or you show me why you

18 can't.  But you don't tell me that you decide.  Okay?

19      So let's not go down that road again.  That is where

20 we're -- we're going to have a problem, because this is my

21 court, and at least with regard to discovery, I set the dates.

22 If the dates are not workable, you tell me why, but you don't

23 come to court and use it as an argument.

24      Now, that said, I appreciate that this is an ongoing

25 conversation with the plaintiffs.  And I do see evidence that

1  you're working hard to identify custodians, to figure out a way

2  to do this.  So that's all accepted.  Okay?

3          **MR. GUYNN:**  Right.

4          **THE COURT:**  You've asserted this privilege pretty

5  broadly.  I mean, it's, like, in everything.

6      And so can we talk about the -- how you see it fitting

7  into this case?

8          **MR. GUYNN:**  Sure can.

9      I -- I think, though, just to go back to the context,

10 recall -- and we've had an opportunity to address this in other

11 hearings, the government obviously disagreed with the Court

12 about what "facilitate" meant.  And even after it came down

13 from the Supreme Court.

14     And we had that discussion with you.  And then we appealed

15 it to the Fourth Circuit.  And the Fourth Circuit clarified

16 what --

17         **THE COURT:**  What's so interesting to me about that

18 is, you had to have the Fourth Circuit tell you.  My decision

19 wasn't good enough.  You see, we go right back to that.

20     My decision was take steps.  Tell me what the steps are.

21 And until a court tells you I'm wrong, that's this court's

22 decision.

23     And so when I see that in your responses, it just reminds

24 me of how difficult it is to follow a court order from me.

25         **MR. GUYNN:**  The reason that I'm sharing that context

1    is because the -- as the government has said in its -- I

2    believe -- well, actually, Your Honor, we might need to have a

3    side bar for me to share the next portion of what I think is

4    important to set the stage to have this conversation.

5              **THE COURT:**  Okay.  Well, can you talk to me, though,

6    about the law on deliberative process?

7              **MR. GUYNN:**  Sure.

8              **THE COURT:**  So, yes, in certain contexts, usually in

9    FOIA requests, that's where I've see it come up a lot, there is

10   a privilege asserted, I think it's usually in the statute, for

11   pre-decisional deliberative iterations so we protect the

12   government from, you know, the worry that if your conversations

13   got out, it would chill sort of open, candid conversations

14   getting to the ultimate decision.  That's my words for

15   deliberative process.

16        But there are exceptions to it, right?

17             **MR. GUYNN:**  Right.

18        So, first off, I just want to affirm that we do think

19   these are pre-decisional and deliberative communications and

20   documents.

21        And the reason I was sharing the context earlier, Your

22   Honor, is there was significant question about what defendants

23   had to do, should do in response to some of the orders in this

24   case.

25        And the reason why many, many, many, many of the documents

are logged as deliberative process, but also attorney-client,

is lawyers were involved in many of those conversations about

what does this mean, what should we do?

     And as a result of the custodians that, you know, were

naturally implicated in the early collections of data in this

case, they were just -- they were just shot through with

privileged information.

     It may be the case that subsequent custodians from whom we

get documents, it might -- there might not be some of those

problems that we've initially seen.

          THE COURT:  So it sounds like there may be a more

fundamental attorney-client privilege problem that could

obviate some of these deliberative process issues.

          MR. GUYNN:  That may be correct, Your Honor.

          THE COURT:  And the reason why that's important, and

I think we can talk about this generally, and then more

specific later, but for example, in the privilege log, you do

cite many privileges for a single document.  And often

deliberative process and attorney-client privilege are going

hand in hand.

     I'll tell you right now, though, the way in which the log

is, as it stands, it's almost impossible to figure it out from

the log on what basis you're asserting attorney-client

privilege.

     So, for example, if you got a to and a from, and 18 CCs,

1    right, 18 people CC'd, unless I have a better proffer from you

2    as to why none of that breaks the privilege or, more

3    specifically, between whom is the privilege, then I can't

4    really assess whether the privilege holds and the plaintiff

5    can't respond to it.

6        And so it may be that that's really where we need to go

7    next, because if I find, for example, that there are ten

8    documents, and eight of them are protected by attorney-client

9    privilege, and the other two don't involve deliberative

10   process, then it moots the issue.  There's just so much

11   overlap, and maybe it's a product of moving as quickly as you

12   are, that that's problem number one that I see.

13       And then the second problem may be that I don't believe

14   the deliberative process privilege is perhaps as broad in this

15   case because the government's intent is at issue.  That's just

16   a fact of this case.

17       And whether it be the intent to comply with the orders,

18   the intent to facilitate, the intent to comply with my order,

19   and the cases -- and it's logical, right?  I mean, if intent is

20   at issue, then the privilege would often swallow up the

21   evidence of intent.

22       And I don't necessarily know if I have to get there if

23   there are other privileges which really are driving the bus

24   here, like attorney-client privilege.

25           **MR. GUYNN:**  Your Honor, when you refer to intent, are

1    you referring to what plaintiffs have referenced in their

2    briefs as the exception based on misconduct?

3          **THE COURT:**  Well, know there's actually a related but

4    separate issue that comes up, and I can give you some of the

5    cases that I've been thinking about with my wonderful law

6    clerks who are so helpful and so smart.  That there is a

7    proposition that it -- it really doesn't apply when intentional

8    acts are at issue.

9          So, you know, in the context of a discrimination claim,

10   right, what two parties might do in the government with respect

11   to treatment of a particular employee might be deliberative, it

12   might be pre-decisional.  What did they all talk about before

13   they fired Mr. Smith, the plaintiff?  Sounds pre-decisional and

14   deliberative.

15         The final decision is the termination.  Everything leading

16   up to it is the pre-decisional and deliberative acts or

17   communications.

18         Courts have said that's not privilege, because if that's

19   privileged, then you can never get to the government's intent.

20         And we have, I think, a factually and distinguishable

21   problem here, because the government's intent, by the clients'

22   own acts and words, is squarely at issue.  It's the dueling

23   narrative that the plaintiff has talked about.

24         So unless I see what has gone into the decision not to

25   comply or to comply, but in certain ways, and not until now,

1    and are you really going to bring him back or try to bring him

2    back, I mean, that all goes to intent.

3        So I'm -- that's why I'm frankly trying to figure out the

4    cleanest way of handling these documents, which are you've

5    invoked multiple privileges to figure out do I really need to

6    reach this issue or not.

7        **MR. GUYNN:**  I think it would be helpful for the

8    parties to review those authorities on intent and maybe provide

9    supplemental briefing, but I don't want to concede at this

10   point that intent is at issue here.  I would say that

11   compliance is at issue, and have the steps been taken, has an

12   ask been made, that is at issue.

13       I don't think that intent is necessarily entangled with

14   that.

15       **THE COURT:**  Even though there have been, again, very

16   public statements, "I could ask, I won't ask," "He will not

17   return," at least from other defendants, right?  Maybe not --

18   each -- this is kind of the problem, right?  Is that each

19   agency and each agency head has taken -- including up to the

20   President, has taken different tacts with the public.  But the

21   bottom line is intents has not been generated from those very

22   public statements?

23       **MR. GUYNN:**  I don't think it has.

24       **THE COURT:**  Okay.  We can table that, because I may

25   disagree with you, but that's only one aspect of this inquiry,

1    because that aspect would say that the privilege doesn't apply

2    if intent is at issue.

3        The misconduct exception, though, the plaintiffs have

4    briefed.  And I do think that they need to make that showing.

5        So do you wish for them to go first on that, and then you

6    be heard?

7            **MR. GUYNN:**  Sure.  That would be great.

8            **THE COURT:**  Okay.  All right.  Mr. Cooper?

9        Let's do misconduct and then the necessity as sort of the

10   balancing test.  Because I do think that this privilege is --

11   it's -- it's a game of tennis, and to some degree, you got to

12   lob the ball back to the government with some showing, and so

13   it makes sense that you go first, to me.

14           **MR. COOPER:**  Certainly, Your Honor.

15       I do just want to be clear, though, as well --

16           **THE COURT:**  Sure.

17           **MR. COOPER:**  -- that -- as I think Your Honor already

18   set out, it is the government's burden in the first instance to

19   show that privilege applies, and so we would submit they have

20   not done that here.

21       Your Honor has talked a lot about the documents and the

22   privilege log, but I would refer Your Honor also to the

23   depositions and, in particular, to the interrogatory responses.

24       So in the interrogatory responses, to a lot of them, the

25   government has objected only on two privileges.  It didn't

1  object on attorney-client, it didn't object on work product or

2  other privileges.  It objected primarily on state secrets and

3  deliberative process.  And so that's part of the reason why

4  those are the two privileges we fronted here.

5      There may be, as Your Honor has noted, certain documents

6  that are protected by other privileges, but they have not

7  asserted those privileges, for the most part, in response to

8  the key interrogatories we've pointed Your Honor to.

9      And this case is unlike any I've ever seen before in

10 dealing with deliberative process where the government has not

11 put in a shred of evidence, hasn't put in a declaration.

12     In all of the cases that we cited, and that I believe Your

13 Honor has already referred to, the government puts in a

14 declaration that says somebody who is sufficiently high at the

15 agency says "I've reviewed these documents, these are

16 deliberative, and disclosing them would damage the deliberative

17 process at the agency."  There's none of that here.

18     And the government, in their brief, acknowledges that.

19 They say, "Yeah, we do have to put in a declaration, we just

20 don't have to do it yet.  We don't have to do it until there's

21 a motion to compel," is what they say on Page 19 of their

22 brief.

23     We respectfully submit that is inconsistent with this

24 Court's order that very specifically said you must put forward

25 all the factual and legal bases for privilege assertions by

May 5th.  That was ten days ago.  They didn't do that.

So our submission would be, Your Honor, they have not proven that the privilege applies at all, because they haven't put in evidence of it.  And you could stop right there.

But going on to the misconduct exception and the need exception.

I think, Your Honor, the misconduct exception interrelates to the intent point you were just making, because in that discrimination context, and that comes up in these misconduct cases, the issue is at the end of the day about government misconduct, did the government discriminate.  And so when that intent is at issue and the government misconduct in the deliberations is at issue, then the privilege just doesn't apply at all.

And we would submit, Your Honor, that's squarely the case here.

A lot of this, I think, was already discussed, much more ably than I will, by my colleague Mr. Rossman, in the state secrets context.  But there is this dueling narrative.

And more than that, Your Honor, when -- when Your Honor set an expedited discovery, it did so only after a finding that good cause had been shown that there was significant questions about the government's compliance with this Court's orders.  That's the precise reason this Court gave for ordering expedited discovery.

1          And then as Your Honor also knows, after you saw some of

2     the initial discovery responses from the government, you found

3     that many of their objections were in bad faith, reflected a

4     bad faith and willful refusal to comply with its discovery

5     obligations.

6          So this is not a case where the government is innocent.

7     This is a case where, from the getgo, the case has been about

8     government misconduct.

9          As the Supreme Court found Mr. Abrego Garcia's removal was

10    illegal, and then after that, when the Court ordered it to

11    provide discovery, it continually engaged in bad faith

12    compliance with the discovery obligations, as this Court has

13    already indicated.

14         So misconduct is squarely at issue here, and given the

15    ongoing dueling narrative of what the government says in this

16    court and in its papers in this case versus what it is saying

17    publicly, we think there is significant question about whether

18    the government is following its obligations and that

19    deliberative process should, therefore, not apply.

20         One more point just on that, Your Honor, is, you know, the

21    Supreme Court said the government needs to be prepared to

22    disclose what it can.  And so the government has been aware, at

23    least since that April 10th order from the Supreme Court, that

24    none of its -- what it's doing here to comply with the Court's

25    orders, it should expect to be covered by at least the

1  deliberative process privilege.

2      It should be expecting that it's going to have to turn

3  over information about what it's doing to comply, because

4  that's what the Supreme Court said it's going to have to do.

5  It did have the words "show what it can."

6          **THE COURT:**  Right.

7          **MR. COOPER:**  But that, I believe, does not refer to a

8  thing like a qualified privilege like deliberative process.

9          **THE COURT:**  As opposed to an absolute privilege?

10         **MR. COOPER:**  Right.  It realized it was under the

11  gun, it was going to be under the microscope.  And if anything

12  it was doing after April 10th, and it said it didn't do

13  anything until at least April 17th at the earliest, that there

14  shouldn't be any deliberative process for anything at least

15  after that cutoff date.

16         **THE COURT:**  And I suppose at a minimum, unlike state

17  secrets, there's a more relaxed standard for when I can review

18  the documents in camera to determine what's covered by the

19  privilege and what's not.  Right?

20         **MR. COOPER:**  That's absolutely correct, Your Honor.

21         **THE COURT:**  And I don't want to make more work for

22  myself, but that may be the shortest road to the biggest house,

23  is let's just get the documents, you know, in a way --

24  documents disclosed in a way that makes the review most

25  efficient and most fair.

102

1          **MR. COOPER:**  That's correct, Your Honor.  And we

2    cited several cases on this in our brief, including the *Ayyad*

3    case that Your Honor decided several years ago that

4    deliberative process privilege, its application can absolutely

5    be reviewed in camera.  It's not required, but Your Honor, in

6    your surround discretion, can absolutely say that's the best,

7    most efficient way.  Certainly not --

8          **THE COURT:**  Right.  It's not prohibited either.

9      There's no argument that says if I say this is how it's

10   going to go, I've somehow overstepped, as long as I find that

11   there's a balancing test that needs to be implemented, and

12   that's the best way to do it, right?

13         **MR. COOPER:**  Correct.

14     And Your Honor, usually what happens when there's an in

15   camera review, is usually the government has put in a

16   declaration and says these documents are split into these three

17   or four categories.

18         **THE COURT:**  Right.

19         **MR. COOPER:**  And this category is deliberative for

20   this reason, that category is deliberative for that reason, and

21   disclosure of category one would cause this harm, disclosure of

22   category two would cause that harm.  There's nothing like that

23   here.  We don't know what categories of information they are

24   withholding.  We don't know what final decisions.

25         **THE COURT:**  Can't you tell, at least from -- I mean,

1    I hear you on the interrogatories and some of the dep answers,

2    but can't you tell from the privilege log?

3              **MR. COOPER:**  So from the privilege log, you can try

4    to squint and make it out.  It's certainly not in their

5    descriptions of it.

6        You know, you can look at the -- who is on the e-mails and

7    make guesses, but we shouldn't have to make guesses, Your

8    Honor.

9              **THE COURT:**  No, no, that's -- absolutely no.

10             **MR. COOPER:**  They should be putting in declarations

11   with sworn evidence explaining these things.

12       So we would submit, Your Honor, that under all of that,

13   and the cases we cite, like the *Tri-State Hospital* case, the

14   deliberative process privilege just doesn't apply given this

15   conduct exception.

16       In addition, and a separate independent reason, there's

17   the compelling need exception.  And this Court in the *NAACP v.*

18   *Bureau of Census* case set out the factors there.  There are

19   four factors.  We would submit, Your Honor, that all four of

20   those squarely support production here and overriding any

21   deliberative process privilege.

22       Number one factor is the relevance of the evidence.  You

23   already had a lengthy colloquy with my colleague, Mr. Rossman,

24   about why this evidence is not only relevant but essential, so

25   I won't belabor the point.

1       But I would simply note when Your Honor ordered expedited

2   discovery in ECF Number 79, and when it overrode the

3   government's objections in ECF 100, it was finding both

4   explicitly and implicitly that this discovery is relevant and

5   important.  So we think that factor is pretty squarely

6   satisfied.

7       Second, the government has not pointed to any alternative

8   sources of this information.  It says in its brief that it has

9   produced documents and made deponents available.  This was

10  already discussed with my colleague, Mr. Rossman, we view that

11  as a fig leaf.  There's been no substantive production of the

12  information that's key and critical here.

13      And I would note, Your Honor, and I think Your Honor

14  already pointed this out a little bit, you know, we've only

15  received roughly 30 documents that are not, you know,

16  reproductions of court filings and things like that, versus, it

17  appears from our counting, about 500 documents on the privilege

18  log have been withheld under the deliberative process

19  privilege, and also sometimes other privileges.  So it's not

20  only that privilege, to be clear.

21          **THE COURT:**  Right.

22          **MR. COOPER:**  But they are withholding a lot, at least

23  in part, based on this privilege.

24      And, you know, that privilege log may also expand given

25  that they are going to be producing more documents from more

1    custodians, so there may be additional documents that they try

2    to withhold, and that's why we view it so important to get a

3    clear ruling now so we don't have to come back weeks or more

4    later and have the same fight again.

5        Third -- the third factor is the government's role in the

6    litigation.  And here, the government concedes it's an active

7    participant in the case, it's not at the periphery.  This is

8    not a case where, you know, we're trying to get at information

9    from the government as a third party that's marginal to the

10   case.  The government's action is central here.

11       And then finally, the government -- and this fourth factor

12   is about what the harm would be to the government from

13   disclosure.  I believe that really is a showing required from

14   the government, not our burden to prove.  But the government

15   has put in zero evidence of that.  They haven't put in a

16   declaration.  They haven't put in testimony.  They put in no

17   evidence of what harm would come partly because they haven't

18   even really told us what they are withholding, at least with

19   respect to, you know, interrogatories and deposition questions.

20       But even if Your Honor were to accept the statements in

21   their briefs, which are just lawyer talk and not evidence, I

22   would refer Your Honor to the *Cipollone* case from the Fourth

23   Circuit where the Court there found the need was great and said

24   the government's assertions of harm to the deliberative process

25   were conclusory.

1    And that's really all you have here.  You have the

2  government saying -- citing other cases where courts found harm

3  to the deliberative process.  It hasn't in any way explained

4  what documents are being withheld here and specifically why

5  their disclosure would harm the process.

6    So unless Your Honor has further questions on those

7  issues, I'm happy to cede my time.

8         **THE COURT:**  Okay.  Thank you.

9    All right.  Mr. Guynn?

10         **MR. GUYNN:**  So I guess I'll take it in the same order

11  that Mr. Cooper did.

12    So misconduct.  So plaintiffs have argued that the -- the

13  privilege doesn't apply because the government engaged in

14  misconduct.  It's not clear, even from Mr. Cooper's discussion

15  right now, what the misconduct is.  Is it the misconduct in

16  removing Mr. Abrego Garcia?  Is it the misconduct in compliance

17  with the order?

18         **THE COURT:**  Or lack thereof, or all of the above?

19         **MR. GUYNN:**  Or none of the above.

20         **THE COURT:**  But you're not there.  You are not there.

21  Because this Court has found more than once that you haven't

22  complied, and you haven't in bad faith.

23    So we're not -- we're not going backwards to revisit

24  those.  And that's why it's just are we really starting there,

25  that we don't know what Mr. Cooper was talking about?

1          **MR. GUYNN:**  What I'm saying is I would like to

2    address both of those things.

3          **THE COURT:**  Okay.  Let's do that.

4          **MR. GUYNN:**  Okay.  So I -- the cases that involve

5    misconduct involve, you know, extreme government wrongdoing,

6    nefarious motives.  And the courts have warned that this

7    exception should be applied very narrowly because every hint of

8    marginal misconduct would suffice to erase a privilege and the

9    exception could swallow the rule.

10          **THE COURT:**  Okay.

11          **MR. GUYNN:**  And, Your Honor, the removal of

12   Mr. Abrego Garcia was inadvertent error, as we have -- as -- in

13   the record, in some of the declarations.  We don't concede that

14   that is misconduct by the government, you know, as that word is

15   technically --

16          **THE COURT:**  Where does the word "inadvertent" show

17   up?  It didn't in my opinion and it didn't in any of the

18   testimony or the documents.  And as a matter of fact, your

19   clients now persist in it wasn't an error at all.  I mean

20   that's the dueling narrative, right?  So how is this not

21   misconduct?

22          **MR. GUYNN:**  It was -- so Mr. Cerna's declaration

23   refers to it as administrative error.  And again --

24          **THE COURT:**  He shouldn't have been removed.

25          **MR. GUYNN:**  To El Salvador.

1        **THE COURT:**  Correct, to El Salvador, that was a

2    violation of the INA.

3        **MR. GUYNN:**  And so Abrego Garcia had an order of

4    removal, he was lawfully detained and could be removed from the

5    United States.

6        **THE COURT:**  He was lawfully detained?

7        **MR. GUYNN:**  Yes.

8        **THE COURT:**  No, he wasn't.  I've already made that

9    finding, and it has not been challenged by the government.

10   Mr. Garcia was arrested on the streets of Hyattsville or

11   Beltsville without any lawful authority.  Mr. Reuveni confirmed

12   that.  There was no order of removal.  There was no warrant for

13   removal.  There was nothing.  That was the first hearing.

14       **MR. GUYNN:**  So then on the issue of misconduct, Your

15   Honor, what I would say is that defendants' witnesses have

16   acknowledged that Abrego Garcia was subject to withholding of

17   removal, and that was missed at the time of his removal from

18   the United States.

19       And so although that was an administrative error that he

20   was removed to a place he should not have been removed to,

21   that's not misconduct.

22       **THE COURT:**  Okay.  But you -- but you didn't even

23   respond to what I just said.

24       **MR. GUYNN:**  I'm sorry, go ahead.

25       **THE COURT:**  A DHS attorney came, an officer of the

1  court, and confirmed at that first hearing that there was no

2  lawful basis to seize Mr. Abrego Garcia in the first instance.

3  That misconduct started from jump.

4      And we had a very specific conversation about what would

5  have been in the record and what wasn't in the record, right?

6      Why are we skipping over that as part of the misconduct at

7  issue, especially in light of the pattern that I'm now faced

8  with on this day?

9          **MR. GUYNN:**  So, Your Honor, I can't speak to what

10  happened in that first hearing, and I don't --

11          **THE COURT:**  You've seen the transcript, Mr. Guynn,

12  come on.  You took over for this case.  There's a transcript of

13  it.  And then it was highly publicized that Mr. Reuveni was

14  benched for being disloyal because he was an officer of the

15  court answering my questions.

16      So you can't honestly tell me you haven't seen this.

17          **MR. GUYNN:**  I will stipulate that that statement was

18  made on the record and that Your Honor has relied on it.

19      What I won't stipulate to is that that is government

20  misconduct within the meaning of these cases that would be --

21  that would, therefore, put this case into an exception to the

22  deliberative process privilege.

23          **THE COURT:**  Okay.  So your argument is assuming it's

24  true, because I won't make you say it, assuming it's true that

25  there was a warrantless seizure, a seizure without lawful

1    authority, a detention for which there is no proof right now in

2    front of me, that's not government misconduct relevant to this

3    analysis?

4         **MR. GUYNN:**  Right.  Without conceding the point, but

5    nevertheless assuming it's true --

6         **THE COURT:**  Yeah.  Right.

7         **MR. GUYNN:**  -- for purposes of this analysis, the

8    government's position is that is not misconduct.

9         **THE COURT:**  Why not?

10        **MR. GUYNN:**  For purposes of the deliberative process

11   privilege.

12        **THE COURT:**  Why not?

13        **MR. GUYNN:**  We just do not think it raises to the

14   level of nefarious, extreme government wrongdoing.  We think --

15   yeah, that is our position.

16        **THE COURT:**  Okay.  All right.  Just so I understand

17   the government's position, that the warrantless, baseless

18   seizure of a person off the streets of our state, country, is

19   not government misconduct.  Okay.  All right.

20        **MR. GUYNN:**  Well, I'm not conceding that factual

21   basis.

22        **THE COURT:**  No, you're saying assuming it's true.

23   I'm not making you concede it.  I'm not asking you to.  That's

24   a finding that I either have to -- I made, and I consider it a

25   finding that is, again, not challenged, not in dispute.

1     But just for the sake of this argument, I want to

2 understand your position.  And your position is if that fact is

3 true, that's not government misconduct?

4        **MR. GUYNN:**  That's right, Your Honor, that's our

5 position.

6        **THE COURT:**  All right.

7        **MR. GUYNN:**  Within the meaning of deliberative

8 process privilege.  It wouldn't rise to the level of an act

9 that was taken with nefarious motives that would evidence

10 circumstances of extreme government wrongdoing.  We would not

11 concede that that is -- that is evidence there.

12        **THE COURT:**  Even though there are cases in which when

13 the FBI released information, security clearance information

14 about employees, that was enough to be considered misconduct?

15        **MR. GUYNN:**  I understand the Court's position.

16        **THE COURT:**  Do you see what I'm saying?

17        **MR. GUYNN:**  I think I've made my position clear as

18 well.

19        **THE COURT:**  Sure, that's fine.  Go ahead.

20        **MR. GUYNN:**  Your Honor, we would also not concede

21 that there's been any misconduct in compliance with the Court's

22 order.  And we got into this before, but to be sure, defendants

23 disagreed and appealed this Court's order on what "facilitate"

24 meant.  But as soon as that was clarified, defendants have

25 diligently complied with it.  We -- we have not refused -- we

1  have not refused to provide information about Mr. Abrego

2  Garcia's custodial status right now.

3        **THE COURT:**  But you kind of sort of have, right?  I

4  mean, I've asked more than once, and maybe it wasn't with you,

5  and I've made it clear that I don't believe it's sufficient to

6  say he's in the domestic authority, isn't that the word?  The

7  domestic custody of El Salvador?  And I've asked very

8  specifically what does that mean?

9        **MR. GUYNN:**  That may be in our interrogatory

10  responses, Your Honor.

11        **THE COURT:**  No, it was also in court.  Because I

12  asked what does that mean.  And maybe you weren't here.  It

13  might be another lawyer.

14        **MR. GUYNN:**  I can clarify, Your Honor.  We've --

15  Mr. Abrego Garcia is currently being held in -- I wanted to

16  make sure I get the name right.

17        **THE COURT:**  Sure.  Centro -- right.

18        **MR. GUYNN:**  In El Centro penitentiary in Santa Ana,

19  El Salvador.  And he is -- we're told by the Salvadoran

20  government that he is in good health.  We received an update

21  from them yesterday.  He's gained weight.

22        **THE COURT:**  How about -- how about the basis for his

23  incarceration?

24        **MR. GUYNN:**  I believe we have shared that with the

25  Court and plaintiffs, Your Honor, but I believe it's in a

 1  context that I can't discuss openly in court right now.

 2          THE COURT:  Well, okay.  So how about we do it this

 3  way?

 4      If a person is wanted in another country for an offense,

 5  right?  And the United States is considering returning that

 6  person to the country from which they are wanted, you would

 7  agree with me, there's actually a mechanism and a procedure for

 8  that?  There's an extradition treaty.  It's an agreement

 9  between two countries about when and under what circumstances

10  persons will be removed to that other country to answer to

11  charges, right?

12          MR. GUYNN:  Yes.

13          THE COURT:  And in this case, there is an extradition

14  treaty between El Salvador and the United States.  And so if

15  the suggestion is that Mr. Abrego Garcia is being held under a

16  particular statute or a crime or offense, then one would expect

17  this is not hard to disclose or to share in more detail,

18  because the ordinary course would be it would be part of an

19  extradition treaty and an extradition process, and all of that

20  information would be disclosed upfront.

21          MR. GUYNN:  And, again, Your Honor, I believe that

22  has been shared with the Court and with plaintiffs both in

23  discovery responses and with the Court in camera.

24          THE COURT:  Okay.  I don't think that the plaintiff

25  has gotten any responses.  And this is a different point.

1          If it were done right under the extradition treaty,

2    because if what you're saying is there's some criminal reason

3    why a person is being wanted and then transported for that

4    criminal reason, that's done by an extradition treaty.

5          And in the treaty, it says right upfront, here are the

6    crimes for which one country can ask the other country to

7    transport the person, here are the procedural protections, here

8    are the rights that that person has to a hearing.  And only

9    then, after the person either elects to proceed under the

10   extradition treaty or fights it in the United States, is a

11   person transported.

12         You see what I'm getting at?  Is that it's not helpful to

13   say to me it's in the domestic custody of El Salvador without

14   any more detail because I don't know what bucket to put it in.

15         Is it because of an offense?  Because of a crime?  Well,

16   that shouldn't be hard to tell me because we have a treaty with

17   the country.

18              **MR. GUYNN:**  We've already shared with the Court the

19   details that -- that got him into El Salvador.  He was not

20   extradited to El Salvador.

21              **THE COURT:**  I know.

22              **MR. GUYNN:**  So, Your Honor, that analogy, though

23   helpful in the abstract, I don't think is especially helpful

24   here.

25         What I would just say is --

 1          **THE COURT:**  Doesn't it go to the misconduct?

 2          **MR. GUYNN:**  I don't think so.

 3          **THE COURT:**  Really?

 4          **MR. GUYNN:**  Really.  His -- his current basis for

 5   being detained in El Salvador --

 6          **THE COURT:**  Right.

 7          **MR. GUYNN:**  -- pursuant to El Salvadoran law, I don't

 8   think that that fact goes to misconduct, no, I don't.

 9          **THE COURT:**  Because the United States didn't know it?

10   You didn't know what was going to happen when you removed

11   Mr. Abrego Garcia to El Salvador?  Is that the position, is you

12   were totally caught unawares?

13          **MR. GUYNN:**  That's not the position.  I -- I think

14   it's clear from the record that the United States believed, and

15   still believes, that Abrego Garcia is a member of the MS-13

16   gang.  And that is why he was on the plane and he was removed

17   to El Salvador.

18      Now, we've already talked about the administrative error

19   where it was missed that there was a notice of withholding from

20   El Salvador.

21          **THE COURT:**  Okay.

22          **MR. GUYNN:**  But that is why he was sent to

23   El Salvador.

24          **THE COURT:**  Okay.

25          **MR. GUYNN:**  And that's why he's being held now by

1   El Salvador under a Salvadoran law, is because they believe

2   he's a member of the MS-13 gang.

3         **THE COURT:**  And wouldn't that be something covered by

4   a treaty regarding criminal offenses that a person commits for

5   which they are wanted in another country?  Putting to the side

6   whether this could be Mr. Abrego Garcia, given that he hasn't

7   been in El Salvador since he was 14 years old, right?

8       I want to understand, then, what world are we living in?

9   Like what sort of legal world are we living in?

10        **MR. GUYNN:**  Well, Your Honor, I think we provided

11  that clarity both to the Court in camera and recently in

12  materials that were produced to plaintiffs which we would be

13  happy to discuss under seal.

14        **THE COURT:**  Okay.  Maybe we need to do that.  Because

15  I have to tell you, if I'm asking these questions, it's

16  probably because it is not altogether clear what the basis is.

17        **MR. GUYNN:**  And I'm hopeful that my explanation will

18  make it clear for you, Your Honor.

19        **THE COURT:**  Okay.  Then we'll table that.  And that

20  goes to what you say is no misconduct on the government's part.

21  So we'll have to table that discussion.

22      What else would you like me to know about the deliberative

23  process privilege?

24        **MR. GUYNN:**  Well, I don't think there's a compelling

25  need exception to deliberative process privilege.

1          **THE COURT:**  Sure there is.

2          **MR. GUYNN:**  The way I think of it is, it's a

3    balancing act.

4          **THE COURT:**  Right, exactly.

5          **MR. GUYNN:**  And the sufficiently strong showing of

6    need can result in the privilege giving way in some

7    circumstances, but it's not just we need it, we really -- we

8    really need it, and so we get all of it, and we get all of it

9    without any reservations.

10         **THE COURT:**  That's not what the plaintiffs are

11   saying.

12         **MR. GUYNN:**  Okay.

13         **THE COURT:**  They are saying you've got to assert it

14   and then you've got to show it, right?

15         **MR. GUYNN:**  Right.

16         **THE COURT:**  And then I can engage in the balancing

17   act.

18       Have you shown it?

19         **MR. GUYNN:**  I think we'll stand on our papers.  We

20   think we've shown it, Your Honor.

21         **THE COURT:**  Okay.  All right.  I totally agree it's a

22   balancing act.  And you've taken the position that you've shown

23   it.  So we'll -- we'll go with that.

24       Is there anything else we can talk about in the open court

25   before we get into some of the nitty-gritty?

1          **MR. COOPER:**  Your Honor, just one quick rebuttal

2     point on the misconduct issue where the government said it

3     doesn't believe what is at stake here rises to the level of

4     government misconduct.

5          I would just refer the Court to the more recent opinion by

6     the Fourth Circuit where Judge Wilkinson said, in terms more

7     eloquent than my own, that -- and I believe this is the exact

8     argument that the government is making here, he says, quote,

9     the government is asserting a right to stash away residents of

10    this country in foreign prisons without the semblance of due

11    process that is the foundation of our constitutional order.

12         Further, it claims, in essence, that because it has rid

13    itself of custody, that there is nothing that can be done.

14    This should be shocking not only to judges, but to the

15    intuitive sense of liberty that Americans far removed from

16    courthouses still hold dear.

17         I would submit, Your Honor, that something that shocks the

18    consciousness of Judges Wilkinson, King and Thacker suffices to

19    show government misconduct for purposes of this issue.

20         **THE COURT:**  Okay.  All right.  I thank everyone for

21    their patience.  It's almost 4:00.  I thank you all who are in

22    the courtroom who have come to hang tough during some very

23    difficult arguments.  Your presence is noted and appreciated.

24         At this point, though, we're going to take a ten-minute

25    recess, and I'm going to ask the courtroom deputy and the CSOs

 1   to make sure that the courtroom is sealed.  And we will take it

 2   from there.

 3        There likely will be an order as to the next steps that

 4   will be on the public docket.

 5        Thank you all.

 6             **DEPUTY CLERK:**  All rise.  This Honorable Court now

 7   stands in recess.

 8        (Recess taken from 3:35 p.m. until 3:55 p.m.)

 9   **\*\*The following proceedings are SEALED by order of the Court\*\***

10        (Whereupon, sealed proceedings were held and are not a

11   part of this transcript.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     CERTIFICATE OF OFFICIAL REPORTER

2

3

4          I, Paula J. Leeper, Federal Official Court Reporter, in

5     and for the United States District Court for the District of

6     Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that

7     the foregoing is a true and correct transcript of the

8     stenographically-reported proceedings held in the

9     above-entitled matter and the transcript page format is in

10    conformance with the regulations of the Judicial Conference of

11    the United States.

12                              Dated this 17th day of May 2025.

13

14

15                              /S/ Paula J. Leeper
                                _____
16
                                Paula J. Leeper, RPR, CRR
17                              Federal Official Reporter

18

19

20

21

22

23

24

25