UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| KILMAR ARMANDO ABREGO GARCIA, *et al.*, | * * * |
| Plaintiffs, | * * |
| v. | * Civil Action No. 8:25-cv-00951 (PX) |
| KRISTI NOEM, *et al.*, | * * * |
| Defendants. | * * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

### *AMICI CURIAE* BRIEF IN OPPOSITION TO DEFENDANTS' INVOCATION OF THE STATE SECRETS PRIVILEGE

Heidi Kitrosser, Mark J. Rozell, and Mitchel A. Sollenberger (collectively "Amici") respectfully submit this *Amici Curiae* Brief in Opposition to Defendants' invocation of the state secrets privilege to avoid providing information in response to the Court's orders and Plaintiffs' discovery requests.

### INTERESTS OF *AMICI CURIAE*[1]

Amici are law professors and/or scholars who teach, research, and/or write about topics related to governmental privileges. They submit this Brief in support of Plaintiffs to explain why there is no legitimate basis for an invocation of the state secrets privilege in this case and, even if one were theoretically to exist, that the Government has not met its burden for its extraordinary claims. Their interest in this case is ensuring that this powerful governmental privilege cannot be

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4), as largely incorporated by this Court's Local Civil Rule 105(12)(b), undersigned counsel states that no party's counsel authored this Brief in whole or in part. Nor did any party or party's counsel, or any other person other than *amici curiae* or their counsel, contribute money that was intended to fund preparing or submitting this Brief.

abused to suit the whims of Executive Branch officials purely seeking to avoid accountability for their actions.

## ARGUMENT

There are numerous issues with the Government's attempt to invoke the state secrets privilege, even based solely on the information currently in the public record.[2] Amici agree with and endorse Plaintiffs' prior arguments regarding the lack of merit to the Government's contentions and present their own supplemental analysis for the Court's consideration.

### I.   THERE ARE NO SEPARATION OF POWERS CONCERNS

Perhaps the most egregious example of overreach in the Government's argument in *J.G.G.*—and presumably in this case—is the naked claim that the question before the Court has *anything* to do with separation of powers. *See*, *e.g.*, Not. Invoking State Secrets Privilege, ECF No. 56, at 1 (filed Mar. 24, 2025), *J.G.G. v. Trump*, No. 25-766 (D.D.C.) ("Further intrusions on the Executive Branch would present dangerous and wholly unwarranted separation-of-powers harms with respect to diplomatic and national security concerns that the Court lacks competence to address."). By making this claim, the Government attempts to conflate two *very* different privileges while only claiming one: the one that does not involve separation of powers.

As the Government recognized in *J.G.G.*—apparently without recognizing the significance—"[t]he state secrets privilege is a *common law* evidentiary rule that protects information from discovery when disclosure would be inimical to the national security." *Id.* at 2-3 (emphasis added) (quoting *In re United States*, 872 F.2d 472, 472 (D.C. Cir. 1989)). *See also*

---

[2] Because the Government filed its supplemental evidence under seal, Amici have not been given the chance to review the Supplemental Declaration of Secretary of State Marco Rubio or its accompanying papers, and so they are forced to rely on the previous Rubio Declaration, arguments made in other filings, and the arguments made in *J.G.G. v. Trump* ("*J.G.G.*"), in which the Government also asserted the state secrets privilege over similar information. (*See*, *e.g.*, 1st Rubio Decl., ECF No. 112-5, ¶¶ 8-11 (filed May 7, 2025) (quoting Rubio Declaration filed in *J.G.G.*

2

*Wikimedia Found. v. NSA/Central Sec. Serv.*, 14 F.4th 276, 294 (4th Cir. 2021) ("We have indeed observed that the state secrets privilege is an evidentiary rule based in the common law of evidence.") (cleaned up). This distinction is fatal to the Government's talismanic invocation of the separation of powers, as summarized by Graham and Murphy, *inter alia*:

> Some writers have argued that the state secrets privilege is constitutionally required. They rely upon the Supreme Court's apparent conflation of the state secrets and executive privileges in the Watergate Tapes Case. The argument seems to be based on the doctrine of separation of powers. It apparently assumes that the Constitution gives the executive branch the exclusive power to determine what national security requires by way of secrecy; hence, any attempt by Congress or the courts to limit such secrecy by refusing the recognize or limiting governmental secrecy is an invasion of the Presidential prerogative and hence unconstitutional. However, the Supreme Court does not seem to think that it was acting unconstitutionally when it promulgated Rejected Rule 509 over the objections of the executive branch that it provided insufficient protection for state secrets. Nor did anyone argue that Congress acted in violation of the Constitution when it declined to adopt the Rejected Rule and left the question of whether or not to recognize a privilege for state secrets and the scope of that privilege to the courts. The better view would seem to be that the state secrets privilege is not a constitutional privilege, but may be altered by legislation or judicial decision.

26 Kenneth W. Graham, Jr. & Ann Murphy, Fed. Prac. & Proc. Evid. § 5663 (1st ed.) (footnotes omitted) (citing multiple sources).

The privilege that the Government is *trying* to invoke by implication—but cannot in reality invoke—is a narrow subcategory of *executive privilege* that pertains to "military or diplomatic secrets" that *is* constitutional in nature, although most court opinions, briefs, and articles only cite *dicta* from *United States v. Nixon* in support of its existence. That case, in which the President attempted to invoke a blanket executive privilege over all Presidential communications and was denied by a unanimous Court, contained the *dicta*:

> Absent a claim of need to protect military, diplomatic, or sensitive national security secrets, we find it difficult to accept the argument that even the very

---

at length and explicitly reasserting claims).) If the Court denies the Government's motion to seal (ECF No. 156), Amici respectfully request leave to supplement this Brief in light of the new information.

3

> important interest in confidentiality of Presidential communications is significantly diminished by production of such material for in camera inspection with all the protection that a district court will be obliged to provide.
>
> \*      \*      \*
>
> [The President] does not place his claim of privilege on the ground they are military or diplomatic secrets. As to these areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities.
>
> \*      \*      \*
>
> Nowhere in the Constitution, as we have noted earlier, is there any explicit reference to a privilege of confidentiality, yet to the extent this interest relates to the effective discharge of a President's powers, it is constitutionally based.

418 U.S. 683, 711 (1974).

Over the years this language has been twisted and tangled into the following virtually unrecognizable staple of Government pleadings:

> Any doubt that the privilege is rooted in the Constitution was dispelled in *United States v. Nixon,* in which the Supreme Court explained that, to the extent a claim of privilege "relates to the effective discharge of the President's powers, it is constitutionally based." The Court went on to recognize expressly that a "claim of privilege on the ground that [information constitutes] military or diplomatic secrets"—that is, the state secrets privilege—necessarily involves "areas of Art. II duties" assigned to the President.
>
> \*      \*      \*
>
> It is well settled . . . that the courts should [determine if the privilege has been invoked properly] by according the "utmost deference" to the expertise and judgment of national-security officials.

Letter from U.S. Att'y Gen. Michael Mukasey to Sen. Patrick Leahy (Mar. 31, 2008), *available at* http://www.fas.org/sgp/jud/statesec/ag033108.pdf (last accessed May 30, 2025). More alarmingly, some courts have on occasion cited twisted versions of this *dicta* falsely equating the state secrets privilege (which was not at issue in *Nixon*) with executive privilege. For instance, the Fourth Circuit once characterized *Nixon* as "observing that the *state secrets privilege*

provides exceptionally strong protection because it concerns 'areas of Art. II duties [in which] the courts have traditionally shown the utmost deference to Presidential responsibilities.'" *El-Masri v. United States*, 479 F.3d 296, 303 (4th Cir. 2007) (emphasis added). In contrast, the most cited case for the standard of "utmost deference" to the Executive Branch in national security matters, *Halkin v. Helms* (a later iteration of which the Government cites no less than four times in *J.G.G.*), itself clarified that "the Court in *United States v. Nixon* strongly indicates that state secrets are not analogous to the Presidential communications at issue there." 598 F.2d 1, 7 (D.C. Cir. 1978).

Lastly, insofar as the Government is arguing that the state secrets privilege *itself* presents separation of powers concerns, the claim that the Executive Branch has plenary control over all classified information issues has been comprehensibly refuted for decades through the simple act of legislation. Without going into a complete discussion of the various ways in which the statutes confer authority on courts to make determinations regarding classified information, it will suffice for the purposes of this Brief to point out that Congress has on numerous occasions explicitly conferred such authority—often over the objections of the Executive Branch—with such examples as the Classified Information Procedures Act, 18 U.S.C. app. 3 §§ 1-16; the Foreign Intelligence Surveillance Act, Pub. L. No. 95-511 (codified as amended at 50 U.S.C. §§ 1801-1885 and in scattered sections of 18 U.S.C.); and the Freedom of Information Act, 5 U.S.C. § 552 (most notably § 552(a)(4)(8), which expressly requires judges to review agency invocations of Exemption (b)(1), dealing with classified materials, *de novo*).

In short, Judge Sullivan could have been describing the Government's position in this case when he wrote over two decades ago:

> If this were the law, the Pentagon Papers case, *New York Times Co. v. United States*, which allowed the publication of classified material, was wrongly decided.

> If this were the law, *Snepp* [*v. United States*] and *McGehee* [*v. CIA*], which require judicial review of pre-publication classification decisions, were wrongly decided. If this were the law, the provision of the Freedom of Information Act that allows judicial review of documents withheld for national security purposes would be unconstitutional. If this were the law, the provisions of the Classified Information [Procedures] Act that require disclosure of classified information to criminal defense counsel, would be unconstitutional. Finally, if the government's theory of separation of powers carried the day, *Youngstown Sheet & Tube Co. v. Sawyer* in [which] the Supreme Court held that the President unconstitutionally assumed the legislative power in the name of national security, was wrongly decided.

*Stillman v. DOD*, 209 F. Supp. 2d 185, 212-13 (D.D.C. 2002) (citations omitted), *rev'd on other grounds sub nom. Stillman v. CIA*, 319 F.3d 546 (D.C. Cir. 2003).

## II.     REGARDLESS OF CLASSIFICATION, THE GOVERNMENT FAILS

From the information available on the public record, the Government has never actually claimed that the allegedly privileged information is classified. (*See*, *e.g.*, Pls.' Opp'n Defs.' Interim Mot. Seal Defs.' Ex Parte Not., ECF No. 166, at 5 (filed May 28, 2025) ("To date, the Government has indicated that there are no classified materials to be reviewed by cleared counsel.") [hereinafter Pls.' Opp'n to Sealing]; Pls.' Mem. Law Re: Privilege Assertions, ECF No. 128, at 14 ("Here, Secretary Rubio does not claim that answering Plaintiffs' questions about Abrego Garcia would endanger classified weapons systems or other military secrets.") [hereinafter Pls.' SSP Opp'n].) The 1st Rubio Declaration—and in fact the Government's argument in the 16 May 2025 hearing—only refers to "sensitive information" (1st Rubio Decl. ¶¶ 8, 12; Tr. of 5/16/25 Mot. Hrg., ECF No. 147, at 42:10-43:4 (filed May 19, 2025) [hereinafter 5/16/25 Tr.]), but "sensitive" is not a classification level; the only classification levels are Confidential, Secret, and Top Secret. Exec. Order 13526 § 1.2. The 1st Rubio Declaration likewise asserts numerous times that disclosure of the information in question "reasonably could be expected to cause *significant* harm to the foreign relation [sic] and national security interests

of the United States." (1st Rubio Decl. ¶¶ 3, 6, 7, 8, 11 (emphasis added)), but, like "sensitive," "significant" is not a recognized level of harm for classification purposes. *See* Exec. Order 13526 § 1.2 (stating that "Confidential" means that disclosure could cause damage, "Secret" means that disclosure could cause serious damage, and "Top Secret" means that disclosure could cause exceptionally grave damage).[3]

In contrast, "sensitive" *does* apply to a type of unclassified information recognized at the State Department, known as "Sensitive but Unclassified information." "Sensitive but Unclassified (SBU) information is information that is not classified for national security reasons, but that warrants/requires administrative control and protection from public or other unauthorized disclosure for other reasons." 12 FAM 541(a), *available at* https://fam.state.gov/fam/12fam/12fam0540.html (last accessed May 30, 2025). It is therefore safe to assume that the information for which the Government is asserting the state secrets privilege in this case is SBU information (*see*, *e.g.*, Defs.' Resp. Pls.' Mot. Add'l Relief, ECF No. 65, at 5-6 (filed Apr. 13, 2025) ("Plaintiffs' request . . . calls for the immediate production of classified documents, *as well as documents that Defendants may elect to assert are subject to the protections of . . . the State Secrets privilege.*") (emphasis added)), although the court will be easily able to ascertain the classification level—or not—from reviewing the information itself, since classified information and SBU must be clearly marked. *See* 5 FAM 482.10-482.11, *available at* https://fam.state.gov/FAM/05FAM/05FAM0480.html (last accessed May 30, 2025).

---

[3] While the Government's motion to seal the Supplemental Rubio Declaration does admittedly refer to "Confidential" information, it uses that term as it is defined in the Court's Stipulated Confidentiality Order, not Executive Order 13526. (*Compare* Defs.' Interim Mot. Seal Defs.' Ex Parte Not., ECF No. 156, at 2 (filed May 23, 2025) ("Defendants have designated the Notice of Ex Parte Communication and Secretary Rubio's Supplemental Declaration with Ex Parte Addendum as 'Confidential' and 'Attorney's Eyes Only' under the Stipulated Confidentiality Order because they contain 'sensitive government information.'"), *with* Pls.' Opp'n to Sealing at 5 ("To date, the Government has indicated that there are no classified materials to be reviewed by cleared counsel.").)

This is a critical distinction separating the Government's claim in this case from all other state secrets privilege cases: neither Amici nor their undersigned counsel have found *a single case* prior to *J.G.G.* where the Government attempted to invoke the state secrets privilege to withhold wholly unclassified information.[4]

As a brief aside, the State Department routinely cites Executive Order 13526 with respect to SBU information, despite the fact that the Executive Order has no applicability to SBU information. For instance, on 30 May 2025 the State Department sent a cable to all diplomatic and consular posts, the beginning of which reads as follows:



---

[4] To be clear, this is not to say that unclassified information is never the subject of a state secrets privilege invocation. However, when it is, it is *always* intertwined with classified information. When the Government argues that Plaintiffs are wrong to say the privilege only applies to classified documents, *this* is the context to which it is speaking, not wholly unclassified information. The special case of invocations made prior to November 1953 is addressed below.

Despite the fact that this cable is clearly marked as UNCLASSIFIED and SBU, with "Captions: SENSITIVE" to further indicate as much, it still cites Executive Order 13526 as the controlling authority for such markings. In Amici's experience, this kind of line blurring is common at the State Department, and it can be seen in its litigation conduct in this case as well. For instance, the Government admitted that information it originally claimed to be classified was not, while still maintaining that it "remains *sensitive* and protected." (Defs.' Resp. Opp'n Press Movants' Mot. Intervene & Unseal Court Records, ECF No. 151, at 5 n.1 (filed May 20, 2025) (emphasis added); *see also* 5/16/25 Tr. at 44:23-45:1 ("So previously, Your Honor, that arrangement was reflected in classified diplomatic notes . . . which are no longer classified.").) The Court should be skeptical of this strategic ambiguity, especially where the evidence strongly indicates that the Government is merely seeking to obtain a litigation advantage by employing it.[5]

However, while it appears clear that the information in question is unclassified, the Court should not be concerned by any perceived uncertainty on that point, because as a matter of law much of the information *cannot be classified*. Executive Order 13526 established the currently controlling rules for the current classification system, and that Order is explicit:

> In no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to:
>
> (1) conceal violations of law, inefficiency, or administrative error;
> (2) prevent embarrassment to a person, organization, or agency; . . . or
> (4) prevent or delay the release of information that does not require protection in the interest of the national security.

Exec. Order 13526 § 1.7(a).

---

[5] The Court should be similarly concerned that even though it explicitly invited the Government numerous times in the 16 May Hearing to file a declaration from the Secretary of Homeland Security *and* to file a classified declaration (*e.g.*, *id.* at 28:15-31:12, 48:4-6), it instead chose to do *neither*. The Government continues to refuse to do the bare minimum required by the law in its dogged pursuit of a litigation advantage.

This provision is often misunderstood to mean that information may not be classified for any of these reasons, but it is in fact significantly more strict in that respect. What this means in practice is that information may not be classified *solely* for any of these reasons. For instance, if detainee records demonstrated the Government's use of illegal interrogation methods, those records could still be properly classified, not because they concealed violations of law, but because they would reveal intelligence sources and methods *as well as* conceal violations of law. *See ACLU v. DOD*, 584 F. Supp. 2d 19, 24 (D.D.C. 2008). Because of this limitation, this provision is *extraordinarily* difficult to trigger, but in this particular case it comes into play.

Simply put, to the extent that the information in question pertains to "specific steps the United States . . . has not taken, or . . . elects not to take, to facilitate Mr. Abrego Garcia's release from custody and/or return to the U.S." (1st Rubio Decl. ¶ 7), that information cannot be classified for any of the accepted reasons because it will have no bearing on U.S. foreign relations with El Salvador or any other country; it will solely be relevant to the Government's internal lack of compliance with court orders. The Court cannot draw a logical connection between information about an action the Administration has not and will not take vis-à-vis a foreign country and U.S. foreign relations with that country, any more than an internal memo showing that a car dealership has not and will not require a blood sacrifice to buy a car would affect its negotiations with customers.

This places any such classification decision squarely in the categories described by Section 1.7(a), which necessarily means that, according to the Executive Branch's *own rules*, it cannot be properly classified. This fact alone would warrant the Court's recognition of its "obligation to review the documents with a very careful, indeed a skeptical, eye, and not to accept at face value the government's claim or justification of privilege." *Al-Haramain Islamic*

*Found., Inc. v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007). "This skepticism is all the more justified in cases that allege serious government wrongdoing. Such allegations heighten the risk that government officials may be motivated to invoke the state secrets doctrine not only by their obligation to protect national security but also by a desire to protect themselves or their associates from scrutiny." *Mohamed v. Jeppesen Dataplan, Inc.* 614 F.3d 1070, 1085 n.8 (9th Cir. 2010) (en banc). And, as noted above, if the information in question is not properly classified, this Court would be the first to allow it to be withheld under the state secrets privilege.[6]

### III. THIS COURT IS COMPETENT

As several courts have stressed, "deference is not equivalent to acquiescence." *Campbell v. DOJ*, 164 F.3d 20, 30 (D.C. Cir. 1998). *See also Holder v. Humanitarian L. Proj.*, 561 U.S. 1, 34 (2010) ("[C]oncerns of national security and foreign relations do not warrant abdication of the judicial role."); *ACLU v. DOD*, 901 F.3d 125, 134 (2d Cir. 2018) ("Deference to the executive's national security and military judgments is appropriate only where we have sufficient information to evaluate whether those judgments were logical and plausible."); *Fuld v. PLO*, 578 F. Supp. 3d 577, 594 (S.D.N.Y. 2022) ("Judicial deference in the area of national security is certainly warranted. But deference is not equivalent to acquiescence.") (quoting *Open Soc'y Just. Initiative v. DOD*, No. 20-5096, 2021 U.S. Dist. LEXIS 132445, at *20 (S.D.N.Y. July 15, 2021)); *Elec. Frontier Found. v. CIA*, No. 09-3351, 2013 U.S. Dist. 142146, at *13 (N.D. Cal. 2013) ("Deference is not equivalent to acquiescence.") (citing *Campbell*). Moreover, "there

---

[6] To be clear, a small number of state secrets privilege cases, including the seminal case *United States v. Reynolds*, 345 U.S. 1 (1953), involved Government assertions which predated the modern classification system, which was first established by President Eisenhower in Executive Order 10501 in November 1953. By definition, any state secrets privilege invocation made before November 1953 would necessarily involve unclassified information, because the classification system was not yet developed at the time the privilege was invoked.

comes a point where [a] Court should not be ignorant as judges of what [they] know as men [and women]." *Watts v. Indiana*, 338 U.S. 49, 52 (1949).

It is for these two reasons that the D.C. Circuit has held that it is entirely proper for a District Court to "rel[y] on its own experience with litigation involving highly sensitive government information and its confidence that the Government's security concerns could be accommodated" when adjudicating a state secrets privilege invocation. *In re United States*, 872 F.2d at 478. The Court does not need to pretend that it is unfamiliar with the issues in play in this matter, and it may rely on its own expertise with such matters when evaluating the merits of the Government's claim. More to the specific point of this claim, the D.C. Circuit held in that same case that the fact that the information the Government was attempting to withhold would be part of a bench trial and not a jury trial was relevant, because that "will reduce the threat of unauthorized disclosure of confidential material." *Id.* Needless to say, if the Government has less legitimate need to invoke the state secrets privilege in a bench trial than it does in a jury trial, it would have even *less* legitimate need to invoke it to avoid providing information to the Court and Plaintiffs *under seal and a stipulated confidentiality order*. Given the stakes of this case and the prospect of the Government using this privilege to avoid any semblance of accountability for its apparent violations of various court orders, the Court should reject the Government's claim.

### IV.    THE APPLICABILITY OF THE PRIVILEGE TO FOREIGN RELATIONS

The Court specifically asked Amici to weigh in on two topics, the first of which was, "The application of the state secrets privilege in the context of diplomatic communications and foreign relations." Plaintiffs effectively addressed the three cases known to Amici where diplomatic communications were at issue (*see* Pls.' SSP Opp'n at 14-15 (discussing *Rep. of China v. Nat'l Union Fire Ins. Co.*, 142 F. Supp. 551 (D. Md. 1956), where the privilege claim

was upheld, and *U.S. Steel Corp. v. United States*, 578 F. Supp. 409 (C.I.T. 1983), and *Rep. Steel Corp. v. United States*, 538 F. Supp. 422 (C.I.T. 1982), where the privilege claim was rejected)), and so Amici have only a small amount of information to add to that analysis.

First, it is not clear from the record in *Republic of China* whether the information in question was classified, and if so at what level. From the opinion, the information for which the state secrets privilege was invoked was created in 1950-51, while the decision was not issued until July 1956, and it is not clear when the Government formally invoked the state secrets privilege. As noted above, this places *Republic of China* in a transition period, since the classification system was not established until November 1953. So even if the information in that case was not classified, that does not necessarily mean anything for the purposes of this case.

However, it is likely that the information in that case *was* classified because Executive Order 10501 was significantly more permissive than later Executive Orders. Compared to the current classification system, in which most classified diplomatic information is classified at the lowest Confidential level, that Executive Order specifically stated that information which could "lead[] to a definite break in diplomatic relations affecting the defense of the United States" would be classified at the highest Top Secret level, while information which could "jeopardize[e] the international relations of the United States" would be classified at the middle Secret level. Exec. Order 10501 § 1(a)-(b). Given that the court appears to have accepted that this information implicated "military secrets," *see* 142 F. Supp. at 556 ("When respondents issued their insurance policies they knew, or should have known, that where military secrets and similar matters are at stake, certain information is privileged."), this Court should presume that the information at issue

13

in *Republic of China* was both classified and related to military secrets,[7] which sets it apart from the information in this case.

As stated above, is it permissible—and in fact not uncommon—for diplomatic communications to be classified. One of the specifically identifiable categories of classifiable information is information which "pertains to . . . foreign relations or foreign activities of the United States," Exec. Order 13526 § 1.4(d), and "'[d]amage to the national security' means harm to the national defense or foreign relations of the United States from the unauthorized disclosure of information, taking into consideration such aspects of the information as the sensitivity, value, utility, and provenance of that information." *Id.* § 6.1(l). However, the mere fact that information *can* be classified does not mean it *is* classified, and, as noted above, there is no indication that the information at issue in this case is classified. As a result, as noted above, it is not properly covered by the state secrets privilege.

## V.     THE UTILITY OF *IN CAMERA* REVIEW

This Court also asked Amici to address "[t]he propriety of this Court's in camera review prior to adjudicating the state secrets privilege, and how such review may support the Court's obligation to independently assess the scope and validity of the privilege." This query is significantly easier to address. Courts often examine information *in camera* to determine the propriety of a state secrets privilege invocation. For instance, in *Al-Haramain*, the Ninth Circuit held that *Reynolds* "requir[ed] an *in camera* review of" the document in question due to the plaintiff's "admittedly substantial need for the document" and then upheld the Government's privilege invocation after *in camera* review. 507 F.3d at 1203. "The process of *in camera* review

---

[7] This conclusion is bolstered by the fact that the Supreme Court's *Reynolds* decision issued only three years before *Republic of China* only addressed "military secrets," 345 U.S. at 11, which at that time was the only context in which the state secrets privilege had been considered. If the information at issue in *Republic of China* did not pertain

14

ineluctably places the court in a role that runs contrary to our fundamental principle of a transparent judicial system. It also places on the court a special burden to assure itself that an appropriate balance is struck between protecting national security matters and preserving an open court system." *Id.*

This is also the clear law in this Circuit. "In some situations, a court may conduct an in camera examination of the actual information sought to be protected, in order to ascertain that the criteria set forth in *Reynolds* are fulfilled. The degree to which a reviewing court should probe depends in part on the importance of the assertedly privileged information to the position of the party seeking it." *El-Masri*, 479 F.3d at 305 (citing *Sterling v. Tenet*, 416 F.3d 338, 345 (4th Cir. 2005)).

## CONCLUSION

"With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law." *Youngstown*, 343 U.S. 579, 655 (1952) (Jackson, J., concurring). For the reasons provided above, the Court should reject the Government's attempt to avoid the consequences of its actions by laying claim to a privilege which does not apply.

Date:   June 2, 2025

                                                  Respectfully submitted,

                                                   /s/ Bradley P. Moss
                                                  Bradley P. Moss, Esq.
                                                  MD Bar #17379
                                                  National Security Counselors
                                                  1451 Rockville Pike
                                                  Suite 250
                                                  Rockville, MD  20852

---

to military secrets, then that decision would have constituted a significant expansion of an unambiguous Supreme Court decision by a district court only three years after its issuance.

501-301-4672
240-681-2189 fax
Brad@MarkZaid.com

*Counsel for* Amici Curiae