# EXHIBIT C

# *How Trump Officials Debated Handling of the Abrego Garcia Case: 'Keep Him Where He Is'*

A Maryland man's deportation to El Salvador set off a fierce debate among officials in three cabinet agencies, despite agreement there had been a mistake.

▶ Listen to this article · 15:49 min   Learn more

 

**By Hamed Aleaziz and Alan Feuer**

Hamed Aleaziz and Alan Feuer cover the legal cases arising from the Trump administration's deportation policies.

May 21, 2025   Updated 6:56 p.m. ET

A mistake had been made. That much was clear.

The Trump administration had deported a Maryland man named Kilmar Armando Abrego Garcia to a prison in El Salvador, even though a judge had issued a ruling expressly prohibiting that from happening.

But when the news reached the Department of Homeland Security, it set off a dayslong scramble and clashes among officials in three different agencies over how to deal with what everyone knew had been an error. As it became clear that keeping it quiet was not an option, D.H.S. officials floated a series of ideas to control the story that raised alarms among Justice Department lawyers on the case.

In the days before the government's error became public, D.H.S. officials discussed trying to portray Mr. Abrego Garcia as a "leader" of the violent street gang MS-13, even though they could find no evidence to support the claim. They considered ways to nullify the original order that barred his deportation to El Salvador. They sought to downplay the danger he might face in one of that country's most notorious prisons.

And in the end, a senior Justice Department lawyer, Erez Reuveni, who counseled bringing Mr. Abrego Garcia back to the United States, was fired for what Attorney General Pam Bondi said was a failure to "zealously advocate on behalf of the United States."

Documents obtained by The New York Times laying out the debate among leading lawyers at the State, Justice and Homeland Security Departments reveal new details of the administration's early efforts to develop a strategy for a case that has become a major test of President Trump's mass deportation effort.

The discussions do not directly capture any conversations about the case inside the White House or at the level of the relevant cabinet secretaries. But the documents show how Trump officials, from the start, tried to keep Mr. Abrego Garcia out of the reach of the American judicial system.

To this day, Mr. Abrego Garcia remains locked up in El Salvador despite court rulings demanding that the United States work toward securing his release. And he got there in the first place through what everyone agreed was a bureaucratic slip-up.

"This was an administrative error," James Percival, a D.H.S. official appointed by Mr. Trump, wrote to his colleagues on March 30. "(Not that we should say publicly.)"

Tricia McLaughlin, a D.H.S. spokeswoman, said in a statement that Mr. Abrego Garcia's deportation was part of "a highly sensitive counterterrorism operation with national security implications."

"We invoked the state secrets privilege over many of the details — of course our officials discussed what should be divulged publicly," she added. "This just proves they are responsible public servants putting the safety of the American people first. The leakers of these emails, on the other hand, clearly do not care about public safety."

# Far-reaching Consequences

The main entrance to the Terrorism Confinement Center, or CECOT, where the Salvadorans had placed Mr. Abrego Garcia with members of the gang Barrio 18.  Fred Ramos for The New York Times

According to the documents, administration officials realized quickly that the case had sweeping implications for Mr. Trump's efforts to remove other immigrants from the United States and send them to a Salvadoran megaprison.

As Mr. Reuveni pointed out to the group, the case potentially "jeopardizes many far more important initiatives of the current administration." If the government fought and lost, it could have legal repercussions, not least of which for the nearly 140 Venezuelans who were sent to the same facility under the authority of a rarely used wartime law, the Alien Enemies Act of 1798.

Ultimately, three courts — including the Supreme Court — pushed back against the White House, ordering Trump officials to at least take steps toward freeing Mr. Abrego Garcia. But Mr. Trump and some of his top aides have taken a defiant stance, insisting that Mr. Abrego Garcia will not be coming back to the United States.

The turmoil started on March 12, when Mr. Abrego Garcia was arrested as he drove home from work in Maryland, swept up as immigration agents scrambled to meet one of Mr. Trump signature promises: the biggest deportation operation in U.S.

history.

Mr. Abrego Garcia had been under deportation orders, but there was a catch: In 2019, an immigration judge found that he could be deported to anywhere except El Salvador, his homeland, because his life was in danger there.

But on March 15, El Salvador is where the United States sent him, on one of three charter planes with scores of other immigrants. While Mr. Abrego Garcia was not deported under the Alien Enemies Act, he was a last-minute addition to the flights after someone in front of him was taken off the manifest.

On March 24, lawyers working with Mr. Abrego Garcia's wife, a U.S. citizen named Jennifer Vasquez Sura, filed a lawsuit in Federal District Court in Maryland, asking Judge Paula Xinis to issue an order forcing the White House to bring her husband back.

Jennifer Vasquez Sura, Mr. Abrego Garcia's wife, filed a lawsuit seeking the return of her husband. Haiyun Jiang for The New York Times

The news of the lawsuit was received very differently at the Justice Department's Office of Immigration Litigation, which typically handles such matters, than at D.H.S., which has been overseeing Mr. Trump's deportation policies.

The documents obtained by The Times show correspondence among the agencies and the State Department between March 27 and March 31 — a critical early period that ended with the administration acknowledging its error in deporting Mr. Abrego Garcia, setting off a legal and political furor.

A State Department spokesperson declined to address the documents obtained by The Times, saying the agency would not "discuss internal deliberations or ongoing litigation."

On March 28, Mr. Percival, the D.H.S. official, told his colleagues that they would be working to make sure that Mr. Abrego Garcia would not return to the United States.

"We are working to fix it so he doesn't need to be returned to the U.S.," he wrote. Joseph Mazzara, a Trump-appointed official serving as the top lawyer at D.H.S., concurred: "We're also trying to keep him where he is."

Not everyone was onboard.

Over several days, Mr. Reuveni, a Justice Department lawyer who had risen up the ranks over more than a decade with the agency, advised colleagues that they needed to return Mr. Abrego Garcia at once.

That was standard practice. Migrants wrongfully removed from the country had been brought back under both Republican and Democratic administrations — including during Mr. Trump's first term.

One of Mr. Reuveni's chief concerns was that Judge Xinis would not look kindly on the fact that the U.S. government was keeping someone abroad who had been wrongfully removed.

"I do not think the court will receive the suggestion it's fine to keep him there while we sort this out with any sympathy," he wrote. "And the longer he stays there, the more difficult it becomes for us to hold the line on this is not our own custody just paid through the El Salvadorans."

D.H.S. officials said they wanted to solve the problem by trying to reverse the original order that should have kept Mr. Abrego Garcia from being sent to El Salvador in the first place. And they wanted to do so while he was still in Salvadoran custody.

Mr. Reuveni did not agree.

"How do we reopen his removal proceedings with him abroad?" he asked. "At that point he won't have a valid executable order."

"The cleanest solution," Mr. Reuveni had said just days before, was to bring Mr. Abrego Garcia back to U.S. soil.

## The P.R. Battle Ahead

In this handout photograph provided by El Salvador's presidential press office, Mr. Abrego Garcia is shown as the second person down in the column on the right. Secretaria De Prensa De La Presidencia, via Agence France-Presse

State Department officials wanted to know more.

Were there any reasons, one asked, to avoid complying if Judge Xinis ordered the government to bring Mr. Abrego Garcia back?

"I cannot think of any basis for us to take the position that we can ignore such an order, nor would we," Mr. Reuveni wrote.

Already, the government appeared to be highly alert to any possible backlash over the mistake. Mr. Percival, for instance, had asked his colleagues early on if the D.H.S. spokeswoman had been informed about the "comms implications" of the case.

Mr. Percival appeared to quickly realize that withholding the information was not tenable. A day after telling his colleagues that the government should not admit its error publicly, he reversed course and suggested the Justice Department's response in court "would be much better if we could own that we made a mistake."

"But I guess we need to figure out whether we're allowed to say that…" he added.

Around the same time, officials at D.H.S. began to float the idea internally that Mr. Abrego Garcia was a leader in MS-13, a violent street gang at the center of the president's deportation agenda.

If that were the case, it might make leaving him in El Salvador more palatable.

The only problem was that nobody seemed to know if it was true.

Mr. Percival asked other officials at one point whether they could tell Judge Xinis that Mr. Abrego Garcia was an MS-13 leader. Mr. Reuveni said that they could — but only if someone put their name to the accusation in a sworn court declaration.

Mr. Percival also wanted to say that Mr. Abrego Garcia was not in any immediate danger.

In the end, Immigration and Customs Enforcement officials backed away from the claims.

"So far I have found 'verified member,' which is included," an ICE lawyer wrote to Mr. Percival. "I have not found anything indicating 'leader,' but I'll keep looking."

In a statement, a Justice Department spokesman said that Mr. Abrego Garcia "was illegally in our country and has been identified as a member of MS-13, a foreign terrorist organization, by multiple officials, including an immigration judge and an appellate board."

Mr. Abrego Garcia has never been charged with, let alone convicted of, being a member of the gang. He has said that he came to the United States illegally more than a decade ago because he was fleeing a different gang, Barrio 18.

During his deportation proceedings in 2019, some evidence was introduced that he belonged to MS-13, but Judge Xinis has cast doubt on it, saying in a court order that the "'evidence' against Abrego Garcia consisted of nothing more than his Chicago Bulls hat and hoodie, and a vague, uncorroborated allegation from a confidential informant."

In 2019, an immigration judge in Maryland had ruled that Mr. Abrego Garcia should not be sent to El Salvador at all because the gang was "targeting him and threatening him with death" over his family's business selling pupusas.

The gang had menaced Mr. Abrego Garcia's older brother, Cesar, and then turned its eyes on him after Cesar fled to the United States. When Mr. Abrego Garcia refused to join Barrio 18, some of its members threatened to kill him, the judge determined, prompting him to follow his brother to America.

Because of the potential danger that Mr. Abrego Garcia faced from members of Barrio 18 inside El Salvador's Terrorism Confinement Center, or CECOT, a State Department official, James L. Bischoff, asked officials from both the Justice and Homeland Security Departments what he should advise the U.S. ambassador in San Salvador to do: Should the ambassador ask the Salvadorans to keep Mr. Abrego Garcia separate from the prison's gang population or ask for his release?

Mr. Reuveni's answer was clear. They needed to do both.

"We should seek to keep him from the gangs," he wrote, "but more importantly and soonest should bring him back."

Mr. Mazzara, the D.H.S. lawyer, told his colleagues that Kristi Noem, the homeland security secretary, had taken steps to seek Mr. Abrego Garcia's segregation from other inmates, including members of Barrio 18. And the next day, he said the administration was still waiting for assurances from El Salvador that he was safe in the prison.

But Mr. Mazzara still seemed unconvinced that the gang was a threat to Mr. Abrego Garcia.

"Is Barrio 18 even in CECOT?" he asked.

In fact, the documents show that Mr. Bischoff had told Mr. Mazzara two days earlier that there were "many members of Barrio 18 in CECOT."

## 'We Concede the Facts'

Officials at the Department of Homeland Security floated the idea that Mr. Abrego Garcia was a leader in MS-13, a violent street gang at the center of the president's deportation agenda, despite a lack of evidence.  Valerie Plesch for The New York Times

The tensions between Mr. Reuveni and his homeland security colleagues came to a head on April 4, when he appeared for the first time in court before Judge Xinis.

"We concede the facts," he immediately told her. "This person should — the plaintiff, Abrego Garcia — should not have been removed. That is not in dispute."

Mr. Reuveni went on to explain that although there was a final order allowing Mr. Abrego Garcia to be deported from the United States, there was also another — known as a withholding of removal order — that was supposed to have ensured that he was not sent to El Salvador, where he might face persecution.

Judge Xinis thanked him for his candor, but said she had more questions. Mr. Abrego Garcia had been living in Maryland under the protection of the withholding order for nearly six years, so what authority, she asked, had law enforcement

officials used when they took him off the streets on March 12?

"Your honor, my answer to a lot of these questions is going to be frustrating," Mr. Reuveni replied. "I am also frustrated that I have no answers for you on a lot of these questions."

The hearing, which took place on a Friday afternoon, ended with Judge Xinis entering an order clearly instructing the White House to bring Mr. Abrego Garcia back to the United States by no later than 11:59 p.m. that Monday night.

The order did not survive. The Supreme Court, quickly stepping in, first put it on hold and then issued an order directing the administration to "facilitate" Mr. Abrego Garcia's release from Salvadoran custody.

By the time that order came down, however, Mr. Reuveni was already out of a job.

On Saturday, April 5, Justice Department leadership suspended — and ultimately fired — him.

"At my direction, every Department of Justice attorney is required to zealously advocate on behalf of the United States," Ms. Bondi, the attorney general, wrote in a statement sent to The Times that day. "Any attorney who fails to abide by this direction will face consequences."

The case has moved forward without Mr. Reuveni, who declined to be interviewed for this article. Judge Xinis has opened an inquiry into what steps the White House has taken to comply with the Supreme Court's ruling.

Joseph A. Darrow, who is one of Mr. Reuveni's former colleagues and left his own job in the immigration section last month, said in an interview that people in the office were "shocked and despondent" over the retribution that Mr. Reuveni faced.

Two other lawyers who worked with Mr. Reuveni also left in recent weeks, citing his firing.

"I agree with what Joe wrote in his goodbye email — this was an act of intimidation against all the attorneys who work here," said Erin Ryan, a trial lawyer who announced her resignation on May 16 in an email.

She said it "put us in an impossible position where we have to decide between keeping this job pushing a partisan agenda, or maintaining our ethical obligation to the court and thus our bar license.

"I choose the latter."

**Hamed Aleaziz** covers the Department of Homeland Security and immigration policy for The Times.

**Alan Feuer** covers extremism and political violence for The Times, focusing on the criminal cases involving the Jan. 6 attack on the Capitol and against former President Donald J. Trump.