UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

KILMAR ARMANDO ABREGO GARCIA,
*et al.*,

                              *Plaintiffs*,

            v.

                                                    Case No. 8:25-cv-00951 (PX)

KRISTI NOEM, Secretary of the Department of
Homeland Security, *et al.*,

                              *Defendants*.

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR DISCOVERY SANCTIONS

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

LEGAL STANDARD ........................................................................................................ 3

ARGUMENT ...................................................................................................................... 4

  I. DEFENDANTS' GOOD-FAITH EFFORTS TO COMPLY WITH THE COURT'S DISCOVERY ORDERS ARE NOT APPROPRIATE FOR SANCTIONS. ........................ 4

    A.  Defendants Acted in Good Faith to Comply with the Court's Orders........................... 4

    B.  The Government's Efforts to Comply with the Court's Discovery Orders Did Not Prejudice Plaintiffs' Ability to Secure Relief. ................................................................ 19

    C.  There is No "Need for Deterrence" of the Government's Conduct in its Good-Faith Effort to Comply with the Court's Discovery Orders.................................................... 20

    D.  Defendants' Good-Faith Effort to Comply with the Court's Discovery Orders Obviate the Need for any Sanctions, Much Less Drastic Sanctions. ......................................... 22

  II. THE LITIGATION OF DISCOVERY ISSUES IN CONNECTION WITH A PRELIMINARY INJUNCTION THAT HAS NOW BEEN SATISFIED UNNECESSARILY STRAINS JUDICIAL RESOURCES................................................. 24

  III. NONE OF THE RELIEF PLAINTIFFS SEEK IS APPROPRIATE. ............................... 25

    A.  Plaintiffs Are Not Entitled to Adverse Inferences, Privileged Documents, or a Special Master. .................................................................................................................... 25

    B.  Plaintiffs' Request for Fines is Barred by Sovereign Immunity.................................... 27

CONCLUSION.................................................................................................................. 30

CERTIFICATE OF SERVICE ......................................................................................... 30

## INTRODUCTION

Plaintiffs' motion for discovery sanctions is meritless. Over the course of approximately 60 days, the Government collected documents from 19 custodians, including cabinet-level officials. It processed those documents, with attorneys from the Department of Justice (DOJ), the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), and the Department of State (State), reviewing approximately 5,500 documents spanning approximately 56,899 pages. From that review, the Government produced approximately 404 documents spanning approximately 4,256 pages, withheld approximately 1,825 non-responsive documents spanning approximately 16,782 pages, and provided six detailed privilege logs regarding the remaining, withheld documents. The Government's discovery efforts were not limited to documents, however: Defendants also answered Plaintiffs' interrogatories, including providing two supplemental interrogatory answers, and made four senior officials available for fact depositions. All of these efforts—and many others behind the scenes—took place in a shorter amount of time than it takes discovery to get off the ground in a typical case.

And this is no typical case. It has already been to the Supreme Court once, with that Court highlighting the "due regard for the deference owed to the Executive Branch in the conduct of foreign affairs." *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025). Against that separation-of-powers backdrop, and exercising that deference, the Government has complied with this Court's order to facilitate—and has indeed effectuated—the return of Mr. Abrego Garcia to the United States. The result of those efforts is precisely what Plaintiffs sought in this lawsuit, rendering their substantive claims moot. *See* ECF No. 200. Plaintiffs nonetheless seek discovery sanctions regarding their moot claim by attempting to frame the Government's conduct without regard to the unique nature of discovery in this case, the extremely expedited timelines involved, and the

1

clearest evidence imaginable that Defendants complied with this Court's order. Plaintiffs' disappointment that there were few responsive, non-privileged documents generated in the mere weeks this case has been pending (and that many responsive documents are, in fact, privileged), or that fact witnesses in depositions could only provide testimony based on their own personal knowledge, does not give rise to sanctionable discovery violations.

In these and other regards, Plaintiffs cannot satisfy any of the four factors the Fourth Circuit has set forth for whether to impose discovery sanctions. Defendants have not acted in bad faith; to the contrary, the Government devoted an enormous number of hours to try to meet the Court's expedited discovery timeframes while working to ensure that privileged documents were not improperly disclosed to the detriment of national security and the enforcement of the nation's laws. Nor did the Government's efforts to comply with the Court's discovery orders prejudice Plaintiffs' ability to secure relief, as the relief sought by the Complaint—Mr. Abrego Garcia's return to the United States—has been satisfied, rendering this case moot. And in light of Mr. Abrego Garcia's return, it is unclear what, exactly, Plaintiffs are seeking to deter here: The Government has complied with the Court's preliminary injunction and has produced discovery regarding its efforts at compliance in the meantime. Plaintiffs' proposed sanctions—adverse inferences, preclusion of claims and defenses, additional production of documents, the appointment of a Special Master, and the possibility of seeking contempt—would be extreme in a mine-run case, much less a case in which the Government is both owed substantial deference as acknowledged by the Supreme Court and has complied with this Court's preliminary injunction. They certainly do not serve the aims of judicial economy and equity. Finally, sovereign immunity bars monetary sanctions against the Government, which are, in any event, inappropriate.

Plaintiffs' motion should be denied.

## LEGAL STANDARD

The Federal Rules of Civil Procedure grant district courts the ability to impose sanctions if "a party . . . fails to obey an order to provide or permit discovery," Fed. R. Civ. P. 37(b)(2)(A). "The rule's language clearly requires two things as conditions precedent to engaging the gears of the rule's sanction machinery: a court order must be in effect, and then must be violated, before the enumerated sanctions can be imposed." *R.W. Int'l Corp. v. Welch Foods, Inc.*, 937 F.2d 11, 15 (1st Cir. 1991); *see also Carriage Hill Mgmt., LLC v. Bos. Lobster Feast, Inc.*, 2018 WL 3329588, at *5 (D. Md. July 6, 2018); *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 518–20 (D. Md. 2010). Rule 37(b)(2)(A) "contains two standards—one general and one specific—that limit a district court's discretion. First, any sanction must be 'just'; second, the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery." *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982).

The Fourth Circuit has "developed a four-part test for a district court to use when determining what sanctions to impose" under Rule 37(b)(2)(A): "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective." *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 348 (4th Cir. 2001). The burden of proof is on the party seeking sanctions and, though the precise standard is somewhat unsettled, the "general approach" has been "to apply the clear and convincing evidence standard[.]" *Mod. Remodeling, Inc. v. Tripod Holdings*, LLC, 2021 WL 3852323, at *5, *10 (D. Md. Aug. 27, 2021). The factors must be evaluated together, such that "the presence or absence of any one of these factors is not dispositive." *Class Produce Grp., LLC v. Harleysville Worcester Ins. Co.*, 2018 WL 5892791, at *3 (D. Md. Nov. 9, 2018).

3

## ARGUMENT

### I. DEFENDANTS' GOOD-FAITH EFFORTS TO COMPLY WITH THE COURT'S DISCOVERY ORDERS ARE NOT APPROPRIATE FOR SANCTIONS.

Under the Fourth Circuit's four-part test, Defendants did not engage in sanctionable conduct under Fed. R. Civ. P. 37(b)(2). To the contrary, the Government's efforts to comply with the Court's discovery orders were made in good faith and did not prejudice Plaintiffs' ability to secure relief—relief that they have now obtained through the very actions of the Government. There is certainly no "need for deterrence" of the Government's conduct in its good faith effort to comply with the Court's discovery orders, much less its compliance with this Court's preliminary injunction, and no need for any sanctions.

#### A. Defendants Acted in Good Faith to Comply with the Court's Orders.

In clarifying this Court's preliminary injunction, the Supreme Court emphasized the "due regard for the deference owed to the Executive Branch in the conduct of foreign affairs." *Noem*, 145 S. Ct. at 1018. Against that backdrop, the Supreme Court also noted that "the Government should be prepared to share *what it can* concerning the steps it has taken and the prospect for further steps." *Id.* (emphasis added). Discovery then commenced regarding the Government's conduct of foreign affairs, with Plaintiffs seeking information from senior Government officials regarding sensitive foreign policy matters. All of that took place on an extremely compressed timeline, requiring the Government to exert its best efforts to comply with its discovery obligations while also protecting sensitive governmental interests.

Sanctions under Rule 37 must consider whether a party's actions in a discovery dispute were "substantially justified." Generally, "a party meets the 'substantially justified' standard when there is a 'genuine dispute' or if 'reasonable people could differ' as to the appropriateness" of that party's position or conduct. *Peterson v. Hantman*, 277 F.R.D. 13, 16 (D.D.C. 2005) (quoting

4

*Pierce v. Underwood*, 487 U.S. 552, 565 (1988)); *accord* Fed. R. Civ. P. 37 advisory committee note to 1970 amendment (explaining that a party "is substantially justified" in taking a discovery dispute to court if the dispute "is genuine"). The "position can be justified even though it is not correct" and "it can be substantially (i.e., for the most part) justified if a reasonable person could think it correct, that is, if it has a reasonable basis in law and fact." *Pierce*, 487 U.S. at 566 n.2.

The Government's actions were substantially justified. Plaintiffs quarrel with Defendants' document productions, but as explained below, a large volume of materials were reviewed in a short period of time, and the fact that there were few responsive, non-privileged documents is not sanctionable—it is simply the product of the discovery that Plaintiffs sought. Plaintiffs dispute the Government's assertions of privilege—issues being litigated on a separate track—but Defendants are not acting in bad faith and sanctions are inappropriate when refusals to answer questions or produce documents are because of privilege assertions. *See E.E.O.C. v. Freeman*, 288 F.R.D. 92, 100 (D. Md. 2012) ("[P]rivilege is an appropriate ground for instructing a deponent not to answer a question."). As for the interrogatories, Defendants provided answers and then supplemented them twice. Especially because of the unique circumstances of this case, and the unique separation-of-powers backdrop, there is no basis to find that the Government acted in bad faith.

### 1. Defendants' Document Productions Required Extensive Document Review in a Short Period of Time.

Responding to Plaintiffs' document requests involved enormous efforts in a short period of time. To summarize:

- Defendants responded to Plaintiffs' requests for production with ten (10) productions, which occurred on April 21, May 5, May 7, May 12 (with the foregoing productions supplemented on May 23), May 28, May 30, June 3 (an updated version on June 4), June 11, June 13 (an updated version on June 16), and June 24, 2025.

- Defendants have reviewed approximately 5,500 documents, spanning approximately 56,899 pages.

- Defendants have reviewed and produced approximately 404 documents, spanning approximately 4,256 pages, to Plaintiffs.

- Defendants have reviewed approximately 1,825 documents withheld as privileged, spanning approximately 16,782 pages.

- On May 23, 2025, with only one week to do so, Defendants served an amended privilege log, which contained more than 1,000 entries and was updated to provide substantially more detailed privilege descriptions as well as a "cast of characters," designed to give Plaintiffs and if necessary the Court the opportunity to better assess Defendants' privilege assertions.

- Defendants produced four additional detailed privilege logs, which were provided on May 30 (234 entries) (updated log served on June 3), June 11 (103 entries), two separate logs on June 13, 2025 (401 entries total, as corrected) (corrected logs served on June 16), and one log on June 24, 2025 (193 entries); and

- On May 23, 2025, Defendants filed an updated declaration from Secretary of State Marco Rubio supplementing the Secretary's invocation of the state secrets privilege.

Declaration of Benjamin Mark Moss, Acting Senior Counsel for District Court Litigation of the Office of Immigration Litigation—General Litigation and Appeals Section ("OIL-GLAS") (hereinafter, "Moss Decl.") at ¶¶ 5-13; *see* ECF No. 155.

Each of these actions required substantial behind-the-scenes work. For example, to complete document productions, Defendants had to take the following steps:

1. Document custodians and parameters had to be identified.

2. Collection had to occur. For electronically stored information, generally this task was handled by the Information Technology (IT) and/or records personnel of the government agency in question.

3. Data had to be processed and transmitted to the Civil Division's Automation Litigation Support Lab ("the Lab") so it could be further processed (if needed) and loaded into Relativity document review software. If data had not been processed before being transmitted to the Lab, it would likely have taken between one and three weeks to process it into a format that can be reviewed using Relativity.

4. Once processing was completed, data in Relativity was sorted into batches for review by document reviewers.

5. Each batch of documents for review generally went through several layers of review for responsiveness and, if responsive, privilege:  first level (1L) and second level (2L) review within the originating agency (here, DHS, ICE, and State); then review by DOJ attorneys; and in the event of questions about responsiveness or privilege, a fourth and fifth round of interagency (IA) review until a final determination was made concerning whether a given document was responsive and, if so, whether any privilege applies.

6. In the event a document was responsive and privileged, care was taken to draft a privilege description that describes the basis for the privilege. Owing to the expedited nature of discovery ordered by the Court, Defendants made best efforts to balance thoroughness of the privilege description with the need to work speedily to meet expedited discovery deadlines. For a single document, it can take over 30 minutes to review, consult with colleagues to ask questions, and prepare a privilege description.

7. When it was time to run a production, all document reviewers needed to exit the Relativity software platform for a period of time so that a production could be assembled. This can take the Lab somewhere between two and six hours, depending on various factors.

8. Once the Lab confirmed that a run of documents was ready for production, it generally took between two and five hours for the DOJ litigation team to conduct quality checks and consult as needed with leadership before making a production to Plaintiffs.

9. For the steps above to occur, document reviewers within the agencies and within DOJ must be identified, trained, and assigned batches of documents to review. The departure of over 30 attorneys from OIL-GLAS leading up to and during the production period considerably depleted the personnel with the requisite document review training, leading to emergency efforts to rapidly identify and train document reviewers. The departure of these attorneys from OIL-GLAS also increased the workload on the attorneys who remained, making the task of identifying personnel to participate in document review significantly more difficult. Nevertheless, mindful of the urgency of the Court's orders, OIL-GLAS expended considerable effort recruiting and training personnel to serve as document reviewers for this case.

Moss Decl. at ¶ 14. Completing these tasks has been extremely burdensome on Defendants who, through their diligent work, dedicated an enormous number of attorney hours to their completion, notably between April 15, the date of the Court's discovery order, to present. Moss Decl. ¶ 22 (reporting more than 1,239 attorney hours); Declaration of Kateland Jackson ¶ 13 (reporting approximately 154 hours); Declaration of Annemarie Brennan-Linnan ¶ 7 (reporting approximately 105 attorney hours); Supplemental Declaration of Secretary of State Marco Rubio ¶ 7 ("Rubio Decl.") (reporting approximately 700 attorney hours). Additionally, Defendants

encountered a number of challenges in producing documents within the expedited timeframe. Some of those challenges are described below.

**Expanding the Scope of Discovery.** A significant challenge in producing documents by May 30, 2025, was Plaintiffs' repeated requests that Defendants considerably expand the scope of discovery. Moss Decl. at ¶ 15. In response, Defendants made numerous concessions to Plaintiffs, requiring Defendants to repeatedly task their IT/records personnel with identifying and collecting—and their limited staff available for document review with reviewing—additional documents. *Id.* These mid-stream adjustments to Defendants' document review protocol have, by necessity, introduced inefficiencies to the extent they have required additional document collections and processing in the midst of expedited document review and production. *Id.* For example, Plaintiffs asked to expand the date range for documents collected, to collect documents from ten additional custodians (including two cabinet-level secretaries, Secretary of Homeland Security Noem and Secretary of State Rubio), and Plaintiffs proposed additional search terms to identify potentially responsive documents. *Id.* Defendants agreed to all of these changes. *Id.* Additionally, the Court also ordered Defendants to collect documents in the custody and control of Attorney General Bondi. *Id.* ¶ 17. Despite their best efforts, the time and resources needed to collect, process, and review the additional documents requested by Plaintiffs exceeded Defendants' ability to complete these tasks within the expedited discovery timeframe. *Id.*

**Collecting and Reviewing Documents from High-Level Officials.** Plaintiffs' discovery required the collection of documents from high-level officials at State, DHS, and DOJ, to include three cabinet-level officials. By its very nature, this was not a straightforward process. Instead, collecting and reviewing those documents required time-consuming controls and procedures to help ensure security, including a severely curtailed number of document reviewers granted access

to sensitive documents. Moss Decl. at ¶ 16. This review required careful screening for responsiveness and any applicable privileges, as well as conferral with agency attorneys. Moss Decl. at ¶ 18. Further, some of the documents that were collected in the document pulls had been sent to or by senior White House officials, implicating the Presidential Communications Privilege and requiring conferral with a chain of command and potentially review by White House counsel. *Id.* Similarly, many documents collected required screening for the potential invocation of the State Secrets Privilege and Deliberative Process Privilege, requiring time-consuming rounds of conferral with agency attorneys given the potential need for involving the Secretary of State and/or the Secretary of Homeland Security in asserting these government privileges. *Id.*

**Collecting and Reviewing Records from Attorney General Bondi.** The Court also ordered Defendants to collect documents in the custody and control of Attorney General Bondi. This collection presented particular challenges beyond those outlined above. Defendants of course complied with the Court's order by collecting paper records and ESI, including mobile device data. *Id.* at ¶ 17. Illustrating the burden involved in collecting and reviewing documents in the custody and control of Attorney General Bondi, in addition to many hours of work performed by Justice Management Division IT and records management staff and Office of the Attorney General staff facilitating and performing collections, Acting OIL-GLAS Senior Counsel Benjamin Moss personally spent approximately 20 hours facilitating the collection and review of Attorney General Bondi's data. *Id.* This included coordinating with relevant chains of command—including the Assistant Attorney General for Administration and the Civil Division's Acting Assistant Attorney General—and coordinating with the individuals tasked with performing the collection. *Id.*

In addition, a technological issue prevented the review of data on Attorney General Bondi's mobile device from being completed by the May 30, 2025 deadline, and required the procurement

of a separate software package to complete the review of that data. Moss Decl. at ¶ 17. Although data from the Attorney General's mobile device was collected before the May 30, 2025 deadline, it was not possible to extract and review that data using available software. *Id.* The Justice Management Division therefore procured software that would do so, but was not able to complete the procurement until after May 30. *Id.* Thus, despite best efforts and diligence, it was not possible to complete all required steps for the Attorney General Bondi collection and review by the May 30 deadline. *Id.*

As a result of efforts by attorneys and staff from OIL-GLA, Civil Division and Department leadership, and the Justice Management Division, a review of Attorney General Bondi's materials was ultimately completed. Moss Decl. at ¶ 17. Notably, these efforts were not visible in any privilege log or any production of documents because the search revealed no responsive documents. *Id.* On June 11, 2025, Defendants notified Plaintiffs that the search of Attorney General Bondi's records was complete and that no responsive materials were identified. *Id.*

**Most Documents Collected Were Nonresponsive or Privileged.** Plaintiffs have unfairly attacked the nature of documents that Defendants produced, calling Defendants' productions "a mockery of the discovery process" because they consisted of many publicly available or redacted documents. Plaintiffs' Motion for Discovery Sanctions, ECF No. 195 ("Pl. Mot.") at 7. It is true that most of the documents collected in document discovery were either nonresponsive or privileged, resulting in an enormous expenditure of time with comparatively few documents to produce. Moss Decl. at ¶ 19. But that outcome is hardly surprising—and certainly no indication of bad faith—given the subject of expedited discovery and substance of Plaintiffs' discovery requests.

The Court authorized expedited discovery into Defendants' efforts to comply with its order. ECF No. 79. Compliance with a court order necessarily involves many lawyers and generates

11

many privileged documents. The subject of the discovery alone, therefore, explains the existence of so many privileged documents. Moreover, many of Plaintiffs' requests sought a behind-the-scenes look into how the nation interacts with a foreign government. But the substance of any such discussions is highly sensitive and often privileged. So too are the deliberations about whether, when, and how the United States negotiates with its foreign counterparts. Far from a simple phone call or letter, the approach the Government uses when conducting foreign affairs involves extensive deliberations across multiple departments, agencies, and the Executive Office of the President. And courts have recognized that the specifics of this process are secret. *See, e.g.*, *El-Masri v. United States*, 479 F.3d 296, 303 (4th Cir. 2007).

Plaintiffs also sought documents and testimony protected by attorney-client privilege—for example, all documents in the possession, custody, or control of the Acting General Counsel of the Department of Homeland Security "that relate to Abrego Garcia." ECF No. 112-2 at 6 (RFP No. 11). It should have come as no shock that many of those documents were privileged.

**Other Technical Collection and Production Issues.** Other time-consuming technical collection and production issues arose, necessitating time to resolve them. For instance, some documents were in Spanish, requiring time to locate, train, and deploy Spanish-speaking personnel who had been assigned to other priorities to instead conduct document review tasks. Moss Decl. at ¶ 20. The review in Spanish was necessary to determine responsiveness; a review of these documents is ongoing and Defendants will produce any responsive, nonprivileged documents—in addition to the one already produced—as soon as practicable. *Id.*

On June 2, 2025, a systems outage prevented a large percentage of OIL-GLAS attorneys as well as Lab personnel from accessing their computers. Moss Decl. at ¶ 21. This included the personnel responsible for document review and production in this case. As a result, very little

12

document review and production could be accomplished on June 2, 2025, and some OIL-GLAS attorneys were not able to regain full access to their computers until late on June 3, 2025. *See id.*

Due to the substantial amount of time it takes to complete these productions within the expedited discovery timeframe, OIL-GLAS assigned more than 30 attorneys at various points to assist with the massive amount of document review necessary to accomplish these productions. Moss Decl. at ¶ 22. OIL-GLAS dedicated more than 1,200 attorney hours to this task, with attorneys routinely working up to and past midnight and during weekends, and putting their substantial caseloads on hold to facilitate review of documents for these productions. *Id.*

Even with dedicating many attorneys and attorney hours to this case, there reached a time when Defendants became aware that they needed additional time to comply with the expedited discovery schedule. Moss Decl. at ¶ 23. On May 29, 2025, Defendants notified the Court of their partial compliance to date and, "in light of . . . collection and production issues . . . leading to challenges fully complying with that deadline" despite "their diligence," Defendants moved the Court to extend the time for them to complete supplemental production of discovery referenced at ECF No. 143, by 14 days. ECF No. 167. However, the Court denied the motion. ECF No. 172. After the Court denied the extension motion, Defendants worked steadily to complete discovery by May 30, 2025, but, despite diligent efforts, were not able to do so. *See* Moss Decl., Ex. 1.

**The Expedited Nature of Discovery.** The many steps that Defendants took to comply with their discovery obligations also needs to be evaluated in the context of the expedited discovery the Court ordered. This was not a situation in which typical discovery rules applied such that Defendants had 30 days to prepare initial objections and responses to discovery requests, collect and process information, confer with opposing counsel in an orderly fashion, negotiate an ESI agreement that would provide a clear path for document collection and review, and present

13

disputes to the Court while producing documents over the course of a few months. Instead, extremely complex discovery involving sensitive privileges and senior officials was compressed into a matter of weeks. Defendants' ability to comply with its discovery obligations should be viewed in that context.

In their motion, Plaintiffs cite cases imposing discovery sanctions involving run of the mill discovery unfolding over the course of a typical discovery window. Those cases are inapposite.[1] None supports what Plaintiffs request here: sanctions against the Government for failing to produce privileged documents related to foreign affairs and internal deliberations.

> ### 2. Plaintiffs' Fact Witnesses Provided Appropriate Testimony Within Their Personal Knowledge, and Were Properly Instructed Not to Answer Based on Privilege.

Defendants have acted in good faith regarding depositions. Plaintiffs' deposition notices were for fact witnesses, not Rule 30(b)(6) depositions. Fact witness depositions are distinct from

---

[1] *See Sines v. Kessler*, 2019 WL 3767475, *13-14 (W.D. Va. Aug. 9, 2019) (over 18 months of refusal to participate in discovery before sanctions were issued); *Lynn v. Monarch Recovery Mgmt., Inc*., 285 F.R.D. 350, 354 (D. Md. 2012) (six months between the start of discovery and the first motion for sanctions, eight months before the court issued sanctions); *Meredith v. Int'l Marine Underwriters*, 2012 WL 3025139 (D. Md. July 20, 2012) (discovery lasted over a year and party was sanctioned for having an expert compile a report just days after the close of discovery without disclosing it to other party); *Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs., Inc*., 872 F.2d 88 (4th Cir. 1989) (discovery lasted nearly two years with non-compliance before court found party acted in bad faith); *Wilson v. Volkswagen of Am., Inc.*, 561 F.2d 494, 501 (4th Cir. 1977) (discovery lasted over a year with party refusing to answer interrogatories for over four months); *LeCompte v. Manekin Constr., LLC*, 573 B.R. 187, 193 (D. Md. 2017) (discovery period was over a year using standard timetables); *Hughley v. Leggett*, 2013 WL 3353746 (D. Md. July 2, 2013) (discovery period was extended to over a year where party did not respond or participate before court issued sanctions); *Mey v. Phillips*, 71 F.4th 203, 209 (4th Cir. 2023) (discovery period was over a year); *Smith v. Devine*, 126 F.4th 331, 336–37 (4th Cir. 2025) (discovery period lasted more than two years); *Chilcutt v. United States*, 4 F.3d 1313, 1316–17 (5th Cir. 1993) (discovery period lasted over a year); *Power Home Solar, LLC v. Sigora Solar, LLC*, 339 F.R.D. 64, 70 (W.D. Va. 2021) (discovery lasted more than a year); *Gibbs v. Miracles in Sight*, 2023 WL 2992825 (M.D.N.C. Mar. 22, 2023) (time period between first order for failure to participate in discovery and sanctions was almost six months); *Nutramax Lab'ys, Inc. v. Twin Lab'ys, Inc*., 32 F. Supp. 2d 331 (D. Md. 1999) (discovery period was over a year).

Rule 30(b)(6) depositions in that fact witnesses are under no duty to educate themselves about reasonably available information on a particular topic, as a Rule 30(b)(6) deponent is obligated to do. *See, e.g., Smith v. Gen. Mills, Inc.*, 2006 WL 7276959, at *5–6 (S.D. Ohio Apr. 13, 2006). Plaintiffs nonetheless appear to take issue with deponents answering "I don't know" to questions. Pl. Mot. at 9. However, fact witnesses can only answer questions based on their personal knowledge; they are not required to educate themselves in advance about information known to an organization because fact witnesses are not answering on behalf of an entity. *In re: Am. Med. Sys., Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2016 WL 6645778, at *4 (S.D.W. Va. Nov. 8, 2016).

To the extent Plaintiffs nonetheless seek to hold Defendants' fact witnesses to a higher standard by faulting Defendants for not producing witnesses with knowledge regarding particular topics, it would be inappropriate to do so. Rule 30(b)(6) exists to provide notice of the topics about which a particular witness should testify—notice that was absent here. Instead, Plaintiffs deposed witnesses who previously submitted declarations regarding particular facts. For example, Defendants submitted a declaration from Robert Cerna on March 31, 2025, as part of the Government's response to Plaintiffs' Motion for a Temporary Restraining Order. ECF No. 11-3. The declaration described Mr. Cerna's role as Acting Field Office Director at ICE and the removal process of Abrego Garcia. Despite Mr. Cerna's limited role, Plaintiffs spent considerable time during Mr. Cerna's deposition asking him about facts beyond his job duties, such as detention standards in El Salvador and how he would proceed with having an individual returned to the United States. *See generally* Tr. 145-147, ECF No. 129-8; *see also id*. at 146:19-20 ("That's not part of my duties. So yeah, I don't know."); *id*. at 138:10-14 ("Q: And do any of these detention standards apply to CECOT? A: I don't know."). It is therefore unsurprising that he lacked

knowledge regarding topics outside the scope of his declaration.  Nor would it have been feasible, under this Court's expedited discovery schedule, for him to be prepared regarding these topics— especially because those topics were never identified. *See In re: Am. Med. Sys., Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2016 WL 6645778, at *4 ("[A]s a fact witness, [she] was not required to prepare or educate herself on the topics of inquiry."); *cf. United States v. Taylor*, 166 F.R.D. 356, 360–62 (M.D.N.C. 1996) (outlining the requirements to prepare for a 30(b)(6) deposition).

Plaintiffs also complain of Defendants' invocation of privilege in not answering questions. Pl. Mot. at 8. Privilege is an appropriate ground for instructing a deponent not to answer a question. Fed. R. Civ. P. 30(d)(3); *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B*, 230 F.R.D. 398, 421 (D. Md. 2005); *see also E.E.O.C.*, 288 F.R.D. at 101 (holding that it was proper for deponent not to answer questions by invoking deliberative process privilege). It is reasonable for counsel to object—and for a deponent to follow counsel's direction—where counsel believes the line of questioning would intrude into privilege. *E.E.O.C.*, 288 F.R.D. at 101 (citing *Neuberger*, 230 F.R.D. at 421 ("Rule 37(a)(2)(B) specifically contemplates a motion to compel when a deponent refuses to answer a question, thus suggesting that it is acceptable for the witness to decline to answer and then wait to defend such a motion.")). A "colorable privilege argument provides [] a valid justification for instructing the deponent not to answer these questions." *Id.* In fact, not only is it reasonable for counsel to object on the basis privilege, but it is counsel's duty to raise good-faith privilege objections. *See, e.g.*, *United States v. Edgar*, 82 F.3d 499, 508 (1st Cir. 1996) ("A lawyer also has an obligation to assert privilege on behalf of a client."). Accordingly, Defendants were plainly not acting in bad faith merely by invoking privilege.

Finally, Plaintiffs accuse Mr. Mazzara of giving untruthful testimony at his deposition because when asked whether he knew if anyone at "DHS had reached out to anyone in El Salvador

to check on Mr. Abrego Garica" or if DHS "coordinated with anyone else at an international level with respect to Mr. Abrego Garcia," he responded that "foreign affairs is generally conducted by the President and then the Department of State," and that he lacked further knowledge. Pl. Mot. at 9 (quoting Mazzara Tr. 76:9-13, 155:10-7). Plaintiffs cite a *New York Times* article reporting that, in emails predating his deposition, Mr. Mazzara supposedly said Secretary Noem "had taken steps to seek Mr. Abrego Garcia's segregation from other inmates," and that DHS was "trying to keep him where he [was]." *Id*. But unauthenticated, out-of-context statements from the media cannot discredit Mr. Mazzara's testimony. To start, "[g]enerally a news article cannot be judicially noticed for the truth of what is reported." *Bradacs v. Haley*, 58 F. Supp. 3d 499, 511 (D.S.C. 2014) (citing *Shahar v. Bowers*, 120 F.3d 211, 214 n.5 (11th Cir. 1997)). Thus, the Court cannot presume the truthfulness or appropriate characterization of statements reported therein. Anyway, there is no conflict between the reporting and the testimony. The *New York Times* article purportedly concerns email correspondence from March 27 to 31, mere days after Plaintiffs filed suit and before this Court issued any orders. Alleged statements made in a preliminary discussion about whether certain options were legally available to the agency says nothing about whether Mr. Mazzara was aware of international coordination efforts the agency may have engaged in pursuant to the Court's subsequent orders. Moreover, even assuming the reporting of unauthenticated, privileged material were accurately described, there is no basis to conclude that any "steps" Secretary Noem may have taken regarding Abrego Garcia's segregation would amount to "check[ing] on" him, let alone that Mr. Mazzara believed they did and nonetheless lied. Nor can he be responsible for public statements made by other Executive Branch officials. Pl. Mot. at 10.

### 3.    Defendants Fairly Answered Plaintiffs' Interrogatories.

Plaintiffs fail to articulate in their motion what specifically in Defendants' interrogatory

answers is deficient, let alone rising to the level of bad faith. *See, e.g.,* Pl. Mot. at 4-7, 14-18. The "false premise" issue raised by Plaintiffs regarding Defendants' "First Response," *see* Pl. Mot. at 4-5, was addressed in the Government's subsequent interrogatory answers, which did not raise this objection. *See, e.g.,* ECF No. 177-2, Defendants' Second Supplemental Objections and Responses to Plaintiffs' Amended First Set of Interrogatories. Regarding the purported privilege issues of Defendants' "First Response," the Government addressed any such issues by subsequently serving detailed privilege logs providing the bases of the privileges asserted. *See supra* at 6-7.

With regard to Defendants' "Second Response" and "Third Response," Plaintiffs argue that the Government "simply asserted, flatly, and without proof, that "the State Department has engaged in appropriate diplomatic discussions with El Salvador regarding Abrego Garcia." Pl. Mot. at 5; *see also id.* at 6 (as to Third Response, claiming that "the Government insisted, without proof, that 'the State Department has engaged in appropriate diplomatic discussions with El Salvador regarding Abrego Garcia. . . . Again, it refused to say what that meant.")." But Plaintiffs do not argue why this response is insufficient, much less sanctionable. Moreover, the verification of the interrogatories by Michael G. Kozak, Senior Bureau Official in the Bureau of Western Hemisphere Affairs for the United States Department of State, prove the reliability of the Government's statement. Indeed, the proof is in the pudding: Abrego Garcia's return to the United States confirms that Defendants' interrogatory responses were accurate all along. *Accord* Rubio Decl. ¶ 3. Plaintiffs equate invoking the state-secret and deliberative-process privileges with bad faith, but additional detail about negotiations and diplomatic discussions with a foreign government falls well within those privileges. *See* Pl. Mot. at 7-9, 15.

Rather than bad faith, Defendants' interrogatory answers provide substantial, substantive information. *See, e.g.*, ECF No. 177-2 at 5, 8 (noting DHS's process to facilitate Abrego Garcia's

presence in the U.S.), 9-11 (identifying several individuals involved in actions responsive to Interrogatories 1-4 and have been involved in Abrego Garcia's removal to El Salvador), 13-14 (detailing communications with the government of El Salvador). For these reasons, there is no basis for this Court to impose sanctions based on Defendants' interrogatory answers.

B.     **The Government's Efforts to Comply with the Court's Discovery Orders Did Not Prejudice Plaintiffs' Ability to Secure Relief.**

For the second factor, Plaintiffs have not been prejudiced by any alleged non-compliance with this Court's discovery orders. Plaintiffs implicitly concede as much, devoting only a scant paragraph to that factor. *See* Pl. Mot. at 16. That is not surprising—Plaintiffs have already obtained the substantive relief they seek in this lawsuit. In that regard, this Court has ruled that a party is not prejudiced when they have received the ultimate relief they were seeking. *See Gen. Eng'g & Tech. Support Servs. v. Baltimore Gas & Elec.*, 2019 WL 4016846, at *7 (D. Md. Aug. 26, 2019) (holding that because the court granted summary judgment on the merits, sanctions in the form of adverse evidentiary rulings are moot); *see also Eke v. United Therapeutics*, 2023 WL 5297428, at *11 (D. Md. Aug. 16, 2023) (holding that any prejudice arising from unsatisfactory compliance is "blunted" by the grant of summary judgment).

Plaintiffs instead claim prejudice because they were not provided "all the relevant information" in real time on how the Defendants facilitated the return of Mr. Abrego Garcia to the United States. But this is not a FOIA case, and Plaintiffs point to no prejudice arising from their discovery dispute that affects any of the substantive claims in their Complaint. Plaintiffs also assert that it is the Defendants' "ultimate burden to establish compliance" with the Court's order, Pl. Mot. at 16, but that flips the standard: The burden of proof is on the party seeking sanctions and the standard generally applied is "clear and convincing." *Mod. Remodeling v. Tripod Holdings, LLC*, 2021 WL 3852323, at *10 (D. Md. Aug. 27, 2021). Plaintiffs have not met that standard.

19

**C.    There is No "Need for Deterrence" of the Government's Conduct in its Good-Faith Effort to Comply with the Court's Discovery Orders.**

The third factor relates to the need for deterrence. *Belk*, 269 F.3d at 348. "There is a need for deterrence in cases where a party has brought the case to a significant standstill through failure to participate in discovery." *Doggett v. City of Hyattsville, Md.,* 2014 WL 6471748, at *4 (D. Md. Nov. 17, 2014); *see Hughley v. Leggett,* 2013 WL 3353746 at *3 (D. Md. July 2, 2013) ("Plaintiff's complete lack of participation in the discovery process, over the span of six months, has directly inhibited and delayed the resolution of this dispute, and there is an obvious need to deter such conduct."). This case is the opposite: Rather than being brought to a "significant standstill," it has been substantively resolved as a result of the Government's diligent efforts.

Even viewing discovery in isolation and separate from the relief Plaintiffs sought, Defendants have consistently engaged in, and complied with, that process. Specifically, Defendants completed document discovery tasks in a very short time frame which included the review of approximately 5,500 documents, spanning approximately 56,899 pages, as well as the production of approximately 404 documents, spanning approximately 4,256 pages. Moss Decl. ¶ 5. Despite Plaintiffs' contentions that this process took longer and has been less fruitful than they wished, there has been no willful or deliberate circumvention of any court orders. *See, e.g., id.* at ¶ 6 ("On May 16, 2025, the Court ordered Defendants to produce a more detailed privilege log. On May 23, 2025, with only one week to do so, Defendants served an amended privilege log of more than 1,000 entries . . . ."). Rather, throughout these proceedings, Defendants have been responsive and engaged in an attempt to move the case forward. Defendants also made numerous concessions to Plaintiffs to expand the scope of discovery, requiring Defendants to repeatedly task their IT personnel with identifying and collecting—and their limited staff available for document review with reviewing—additional documents. *See id.* ¶ 15.

This feat was even more extraordinary given the cross-government coordination required to fulfill the Court's orders. Attorneys and operational units from multiple agencies had to review for potential privileges. And in the government context, unlike in a run-of-the-mill business litigation case, the potential privileges are numerous. Additionally, senior government officials, who sometimes spend several hours in a given day away from their phones and email while addressing national emergencies in Sensitive Compartmentalized Information Facilities, were nonetheless able to submit declarations, assist with document retrieval, and provide appropriate input, all in service of discovery compliance. Thus, despite the challenges unique to government, Defendants have been highly engaged in efforts to comply with the Court's orders.

By contrast, this Court has held that a need for deterrence was present when the only participation from the non-complying party was a single status phone call over the span of six-months. *See Doggett v. City of Hyattsville, Md.,* 2014 WL 6471748, at \*4 (D. Md. Nov. 17, 2014). Such a delay "go[es] to the heart of the court process and totally inhibit[s] a just resolution of disputes" and therefore needs to be deterred. *Vien v. Walker,* 2014 WL 900803 at \*2 (D. Md. Mar. 5, 2014) (finding bad faith where plaintiff failed to respond to repeated requests for interrogatories and production of documents and did not appear at a hearing on a motion for sanctions). That scenario is a far cry from what occurred here. While the power to impose sanctions under Rule 37(b) is discretionary, it is not without bounds or limits. Instead, that discretion must be exercised appropriately and never "when it has been established that failure to comply has been due to inability, and not to willfulness, bad faith, or any fault." *Vien*, 2014 WL 900803, at \*2.

Any delay in compliance of Court orders was not done in bad faith but, rather, as a result of various steps and layers of review that were unavoidably time-consuming. There simply was

21

not a level of willful disregard or obstruction by Defendants, and thus sanctions for the purpose of deterrence are inappropriate. *See Smith v. Devine*, 126 F.4th 331 (4th Cir. 2025).

### D.     Defendants' Good-Faith Effort to Comply with the Court's Discovery Orders Obviate the Need for any Sanctions, Much Less Drastic Sanctions.

The fourth factor relates to "whether less drastic sanctions would have been effective," *Belk*, 269 F.3d at 348. In cases where a party has been *completely unresponsive* in discovery, this Court has found that any sanctions less drastic than those Plaintiffs seek here would be ineffective. *See McFeeley,* 2014 WL 4182231 at *2 ("[Plaintiff] has failed to respond to the granting of her own counsel's motion to withdraw as counsel or to the letter sent by the court, [therefore] it is clear that her behavior would not be altered by less drastic sanctions [than dismissal]"). For example, in situations where one party has brought the case to a halt through a failure to participate in discovery, the other relevant sanctions available under Rule 37 are a poor fit because their effectiveness depends on the lawsuit moving forward. *See Doggett*, 2014 WL 6471748, at *4; *see also Hughley v. Leggett*, 2013 WL 3353746, at *3 (D. Md. July 2, 2013) ("Plaintiff's continued silence, even in the face of the pending motion and letter from the clerk, indicates that Plaintiff's behavior would be unaltered by a less drastic sanction."); *Smith*, 126 F.4th at 344 (finding less severe sanctions inappropriate when "[d]espite . . . warnings, Appellants continued to disregard court orders and obstruct discovery efforts."). That is not the case here: Defendants have neither abandoned the case nor brought the case to a halt; they have complied with this Court's preliminary injunction by bringing Mr. Abrego Garcia back to the United States. And all the while, Defendants were active participants in the discovery process, making four fact witnesses available for depositions, responding to Plaintiffs' requests for production with nine document productions, and responding to Plaintiffs' interrogatories by providing answers, and then supplementing those answers twice. *See supra* at 2-3, 11-14. Defendants were also responsive to Plaintiffs' questions

about Defendants' discovery parameters and discovery items, agreeing to expand the scope of discovery and sharing additional information as it has become available. *See* Moss Decl. ¶ 15.

Moreover, Plaintiffs' own conduct has hardly been beyond reproach in this litigation, further militating against the requested sanctions. In particular, Plaintiffs' counsel filed documents in this case making false representations to the Court. Plaintiffs' Complaint, for example, avers that "Abrego Garcia has had no contact with any law enforcement agency" since obtaining his order of withholding of removal in 2019, ECF No. 1 ¶ 46, and Vasquez Sura's sworn declaration asserts that Abrego Garcia "was never arrested or accused of a crime," ECF No. 1-2 ¶ 29. But Vasquez Sura herself sought a protective order against Abrego Garcia in August 2020, citing a long pattern of domestic violence. *Vasquez v. Garcia*, Case No. 0502SP010652020 (Prince George's Circuit Court). That court ultimately granted Vasquez Sura a temporary protective order, which the local sheriff's office served on Abrego Garcia according to the court's docket. Vasquez Sura sought and received a second protective order in May 2021 from the District Court of Maryland for Prince George's County, which found that Abrego Garcia assaulted, punched, scratched, grabbed, and bruised her. *Vasquez v. Garcia*, Case No. 0502SP019272021 (Prince George's Circuit Court). The court's docket also indicates the local sheriff's office served this order on Abrego Garcia. Additionally, the Tennessee Highway Patrol stopped Abrego Garcia for a traffic violation on November 30, 2022, suspecting him of smuggling the vehicle's nine passengers. *United States v. Garcia*, No. 3:25-cr-115, ECF No. 3 ¶ 30 (M.D. Tenn. May 21, 2025) (indictment). Abrego Garcia claimed they were on their way back to Maryland after two weeks of construction work in St. Louis yet no one had any tools or luggage. *Id*. These encounters with law enforcement contradict statements in both Plaintiffs' Complaint and Vasquez Sura's declaration. They have also been widely reported in the media. Yet Plaintiffs have made no effort to correct

23

their false filings in this Court. Such inequitable conduct by Plaintiffs further undercuts their request for sanctions.

## II. THE LITIGATION OF DISCOVERY ISSUES IN CONNECTION WITH A PRELIMINARY INJUNCTION THAT HAS NOW BEEN SATISFIED UNNECESSARILY STRAINS JUDICIAL RESOURCES.

Alongside principles of equity, promoting judicial economy and avoiding needless litigation are central considerations in the Court's analysis of Plaintiffs' motion.[2] Here, Plaintiffs' purported discovery disputes are inextricably interwoven with a preliminary injunction with which Defendants have fully complied, effectively rendering the injunction moot. Any further litigation regarding discovery disputes at this juncture thus flies in the face of judicial economy.

It is uncontroverted that Defendants have fully complied with the sole directive of the amended preliminary injunction, as the government has fully facilitated, and indeed, effectuated, Abrego Garcia's return to the United States. Order, ECF No. 51. Abrego Garcia's return to the United States not only satisfies the preliminary injunction, but also satisfies the relief sought in Plaintiff's Complaint (Abrego Garcia's "detention" in El Salvador; his "release" from CECOT in El Salvador; and his "return" from El Salvador to the United States), Compl. at ¶¶ 20-21, 77, 83, 89, 95, 99, thus rendering this case moot. Similarly, the discovery disputes at issue ultimately hinged on the details of Abrego Garcia's detention and what steps were or would be undertaken by the Government to facilitate his return to the United States. ECF No. 79 at 7-8. In this vein, Plaintiffs' motion for sanctions should be denied because it serves no equitable purpose, as there is no form of relief this Court could grant that would satisfy either the preliminary injunction or

---

[2] *See, e.g.*, *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 502 (2006); *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 586 (1999); *Nat'l Assn. of Diversity Officers in Higher Educ. v. Trump*, 2025 WL 1262926, at *6 (D. Md. May 1, 2025); *Evans v. Hurtado*, 2025 WL 563368, at *3 (D. Md. Feb. 20, 2025); *Lindauer v. Ocwen Loan Servicing, LLC*, 2022 WL 2716840, at *4 (D. Md. July 13, 2022).

the relief sought in the Complaint. *See Washington v. Trump*, 2:25-cv-00244 (W.D. Wash. June 15, 2025), ECF No. 284 at 8 (denying plaintiffs' motion to compel because discovery requests based on the court's limited grant of discovery into whether defendants violated an injunction by revoking grant were mooted when defendants reinstated grant). Accordingly, the sanctions motion before the Court amounts to needless litigation that poses an unnecessary strain on judicial resources. *See, e.g., Nat'l Assn. of Diversity Officers in Higher Educ. v. Trump*, 2025 WL 1262926, at *6 (D. Md. May 1, 2025) ("Plaintiffs have not shown that judicial resources (or the parties' resources) would be conserved by [the relief they seek]."); *Arbaugh v. Y&H Corp.*, 546 U.S. at 502 (stressing that the potential "unfairness and waste of judicial resources" precluded defendant from asserting subject-matter jurisdiction so late into the lawsuit).

## III.    NONE OF THE RELIEF PLAINTIFFS SEEK IS APPROPRIATE.

Plaintiffs seek numerous, over-the-top sanctions. *See* Pl. Mot. at 18-25. As described above, Plaintiffs have not shown that Defendants acted in bad faith—a threshold requirement for the sanctions they seek. *See Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 348 (4th Cir. 2001). Notwithstanding that the discovery Plaintiffs seek has been rendered moot in light of Abrego Garcia's return, any outstanding discovery has been withheld in good faith based on Defendants' reasonable and timely assertions of privilege or delays inherent to the process of seeking discovery. Since Plaintiffs cannot point to any bad faith by Defendants, no sanctions are necessary or appropriate. That, by itself, should resolve the issue. Defendants nonetheless address below the flaws associated with the particular sanctions Plaintiffs seek.

### A.    Plaintiffs Are Not Entitled to Adverse Inferences, Privileged Documents, or a Special Master.

Plaintiffs are not entitled to adverse inferences, privileged documents, or the appointment of a Special Master. None of Plaintiffs' arguments regarding these forms of relief has merit. And,

25

because Plaintiffs have already received the relief they requested, none of these sanctions would further any purpose in this litigation.

Specifically, Plaintiffs seek adverse inferences and the preclusion of claims, defenses, and evidence, *see* Pl. Mot. at 18-20, but the cases Plaintiffs rely upon for this relief are inapposite. For example, Plaintiffs cite *Power Home Solar, LLC v. Sigora Solar, LLC*, 339 F.R.D. 64 (W.D. Va. 2021), for the proposition that evidence can be precluded as a discovery sanction, *see* Pl. Mot. at 18, but in that case, the court imposed sanctions because the plaintiff failed meet its Rule 30(b)(6) obligation to prepare for noticed deposition topics. Here, only fact depositions occurred. Plaintiffs similarly cite *Sines v. Kessler*, 2021 WL 5492826 (W.D. Va. Nov. 19, 2021), for the proposition that an adverse inference can be imposed where a party withholds requested discovery documents, Pl. Mot. at 19. But the documents in *Sines* were "withheld" because the sanctioned party failed to preserve (and therefore could not produce) ESI. *See Sines*, 2021 WL 5492826, at *3. Here, by contrast, Defendants have produced responsive documents to Plaintiffs.

Plaintiffs also seek the additional production of documents, including the blanket production of privileged documents. *See* Pl. Mot. at 20-21. Defendants, however, are completing the production of their non-privileged documents. As for the privileged documents, Plaintiffs acknowledge that litigation of the Government's privilege assertions is proceeding on a separate track. *See* Pl. Mot. at 21; *see generally* ECF No. 184 (letter brief detailing the Government's claims of privilege). And they cite no authority supporting a blanket waiver of privilege as a sanction for unrelated misconduct. Pl. Mot. at 20. Indeed, a blanket waiver of privilege that is unmoored from any specific discovery violation would amount to an abuse of discretion. By contrast, in the case Plaintiffs cite, *see* Pl. Mot. at 20, the court ordered waiver as to a specific issue (a Fifth Amendment privilege against self-incrimination) based on misconduct in relation to that issue (submitting an

affidavit regarding the issue and then refusing to testify about it at a deposition) and issued a narrow sanction to correct the issue (striking the affidavit and ordering the witness to testify). *See Nutramax Lab'ys, Inc. v. Twin Lab'ys, Inc.*, 32 F. Supp. 2d 331, 333, 338-39 (D. Md. 1999).[3] Plaintiffs fail to identify any improper (let alone sanctionably improper) assertion of privilege, and never show how any such assertion of privilege prejudices them regarding their substantive claims such that the privilege should be waived.  Nor could they do so, because they have already obtained the relief they sought.

Plaintiffs also request the appointment of a Special Master. *See* Pl. Mot. at 21-23. Defendants, however, have explained—through this filing and elsewhere—their efforts to comply with this Court's discovery orders and their obligations under the Federal Rules of Civil Procedure. Appointing a Special Master to investigate the Government's discovery efforts—when the Government has already provided the substantive relief Plaintiffs are seeking—would be an inappropriate waste of the Court's and the Government's resources.

### B.    Plaintiffs' Request for Fines is Barred by Sovereign Immunity.

Plaintiffs' request for monetary sanctions is also barred for two independent reasons. First, the Court may not rely on its inherent authority to impose monetary sanctions against the Government because sovereign immunity has not been waived in this case. Absent an express waiver, sovereign immunity shields the federal government and its agencies from monetary damages. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994); *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999). "[S]overeign immunity is presumed and cannot be overcome without an

---

[3]    Plaintiffs also reference a potential contempt motion, *see* Pl. Mot. at 21, and elsewhere vaguely refer to civil contempt, *see* Pl. Mot. at 25, but the Government has complied with this Court's preliminary injunction and has complied as best it can with the Court's discovery orders. There is simply no basis for a finding of contempt under these circumstances.

express and unequivocal statutory waiver [] and all ambiguities must be resolved in favor of the sovereign." *O'Brien v. Moore*, 395 F.3d 499, 503 (4th Cir. 2005). "The Department [of Homeland Security] thus enjoys as a federal agency a presumption of immunity from the present lawsuit." *Robinson v. U.S. Dept. of Educ.*, 917 F.3d 801, 802 (4th Cir. 2019); *see also F.D.I.C. v. Meyer*, 510 U.S. at 475.

The Fourth Circuit has stressed the importance of the sovereign-immunity doctrine in the context of monetary awards, noting that "[m]oney judgments against a sovereign allow the 'judgmental creditor' to compete with 'other important needs and worthwhile ends … for access to the public fisc.'" *Robinson,* at 801 (citing *Alden v. Maine*, 527 U.S. 706, 751 (1999)); *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428-32 (1990) (applying same rationale to damages against the federal government). Here, sovereign immunity has not been expressly waived and, as such, monetary sanctions against the Government are inappropriate. *See F.D.I.C. v. Meyer*, 510 U.S. at 475; *O'Brien v. Moore*, 395 F.3d at 503; *Robinson,* at 801-02. Plaintiffs' arguments to the contrary are unavailing: they cite *Bradley v. Am. Household Inc.*, 378 F.3d 373, 378 (4th Cir. 2004), for the proposition that "the Court may levy fines on parties, including the Government, for failing to comply with discovery orders." Pl. Mot. at 23. But *Bradley* did not involve the Government, so the basis for Plaintiffs' citation for their proposition is unclear. To the extent Plaintiffs are relying on their "see also" cite, *United States v. Gavilan Joint Cmty. College Dist.*, 849 F.2d 1246, 1251 (9th Cir. 1988), that is an older, out-of-circuit case. Notably, two circuit courts that have specifically addressed the issue have held that monetary sanctions imposed under the Court's inherent authority against the Government are barred by the doctrine of sovereign immunity. *United States v. Horn*, 29 F.3d 754 (1st Cir. 1994) (sovereign immunity bars an award of monetary sanctions made under the Court's inherent authority); *Coleman v. Espy*, 986 F.2d

28

1184 (8th Cir. 1993), *cert. denied*, 510 U.S. 913 (1993) (compensatory civil contempt fines barred by doctrine of sovereign immunity). *See also United States v. Carter*, No. 16-20032-02-JAR, 2020 WL 430739, at *4 (D. Kan. Jan. 28, 2020) (following *Horn*).

Second, Plaintiffs request monetary fines for failure to comply with discovery orders, citing cases where civil contempt fines were levied against the government on a per-day basis until the outstanding discovery had been complied with. ECF No. 196 at 23. However, such fines are inappropriate where, as here, the discovery at issue is tied to a preliminary injunction order with which Defendants have fully complied, rendering the injunction and the affiliated discovery orders moot. *Cf. United States v. Westinghouse Electric Corp.*, 648 F.2d 642, 652 (9th Cir. 1981) (fining the government $500 per day until the parties complied with a discovery directive to answer interrogatories); *cf. RLI Ins. Co. v. Nexus Services, Inc.*, 2022 WL 2654227 (W.D. Va. July 8, 2022) (imposing a $1,000 per day civil fine until the contemnors satisfactorily supplemented their responses to outstanding discovery demands).

Plaintiffs single out Mr. Mazzara for "personal sanctions," and argue that "it [is] within the court's power to" bar the government "from reimbursing . . . government attorneys." Pl. Mot. at 25. But, as already explained, Plaintiffs unsuccessfully attempt to discredit Mr. Mazzara's testimony as untruthful. And they make no effort to explain why Mr. Mazzara can or should be held personally liable for sanctions.

In the end, the sole purpose of the outstanding discovery was to determine the status of Abrego Garcia's return to the United States. Now that he has been returned and the relief sought in the Complaint has been achieved, the discovery being sought is moot. Accordingly, levying civil fines on Defendants serves no equitable purpose.

## CONCLUSION

For the reasons stated above, this Court should deny Plaintiffs' motion for discovery sanctions.


Dated: June 25, 2025                          Respectfully submitted,

                                              BRETT A. SHUMATE
                                              Assistant Attorney General

                                              /s/ *Drew C. Ensign*
                                              DREW C. ENSIGN
                                              Deputy Assistant Attorney General
                                              Civil Division, Office of Immigration Litigation
                                              950 Pennsylvania Avenue, NW
                                              Washington, DC 20530
                                              Telephone: (202) 514-2000
                                              Email: drew.c.ensign@usdoj.gov

                                              JONATHAN D. GUYNN
                                              Deputy Assistant Attorney General
                                              Civil Division, Torts Branch

                                              BRIDGET K. O'HICKEY
                                              Counsel to the Assistant Attorney General

                                              *Attorneys for Defendants*


## CERTIFICATE OF SERVICE

I certify that on June 25, 2025, I caused to be filed the foregoing document via CM/ECF, which caused a copy to be served on all parties.

                                              /s/ Drew Ensign
                                              Drew C. Ensign
                                              Deputy Assistant Attorney General
                                              Office of Immigration Litigation
                                              Civil Division