# EXHIBIT A



1612 K Street NW Suite #808
Washington, DC, 20006
(202) 457-0034
whistleblower.org

June 24, 2025

*Sent via electronic mail*

Michael E. Horowitz
Inspector General
U.S. Department of Justice
Office of the Inspector General
950 Pennsylvania Avenue NW
Washington, D.C. 20530

Jamieson Greer
Acting Special Counsel
U.S. Office of Special Counsel
1730 M Street, NW, Suite 218
Washington, D.C. 20036

Honorable Chuck Grassley, Chair
Honorable Richard J. Durbin, Ranking Member
U.S. Senate Committee on the Judiciary
Washington, D.C. 20510

Honorable Jim Jordan, Chair
Honorable Jamie Raskin, Ranking Member
U.S. House Committee on the Judiciary
Washington, D.C. 20515

**Re:    Protected Whistleblower Disclosure of Erez Reuveni Regarding Violation of Laws, Rules & Regulations, Abuse of Authority, and Substantial and Specific Danger to Health and Safety at the Department of Justice**

Dear All:

We, the Government Accountability Project and Gilbert Employment Law, P.C., represent Mr. Erez Reuveni, formerly the Acting Deputy Director for the Office of Immigration Litigation (OIL) of the Department of Justice (DOJ), and a whistleblower. Mr. Reuveni presents the following disclosures to your attention for your respective offices to take appropriate oversight action.

Between March 14, 2025, and April 5, 2025, Mr. Reuveni, almost immediately after receiving notice of his promotion to serve as Acting Deputy Director of OIL, became aware of the plans of DOJ leadership to resist court orders that would impede potentially illegal efforts to deport noncitizens, and further became aware of the details to execute those plans.

On April 4, 2025, after raising concerns internally to his chain of command for nearly three weeks regarding the government's compliance with court orders and candor to the courts, Mr. Reuveni appeared before Judge Paula Xinis, United States District Court Judge in the District of Maryland, on behalf of the government in the case of Mr. Kilmar Abrego Garcia. During that appearance, Mr. Reuveni candidly and truthfully informed the court, based on the evidentiary record, that Mr. Abrego Garcia's removal from the United States was a mistake. Later that evening, Mr. Reuveni refused directions from his superiors to file a brief misrepresenting those facts to the

court. As a result, Mr. Reuveni was put on administrative leave on April 5, 2025, and his employment was ultimately terminated on April 11, 2025.[1]

In this letter Mr. Reuveni exercises his rights to make disclosures to Congress, the DOJ OIG, and the OSC pursuant to 5 U.S.C. § 2302 and 5 U.S.C. § 1213. Mr. Reuveni's disclosures detail violations of law, rules or regulations, and the abuse of authority by DOJ and White House personnel, as well as the creation of substantial and specific health and safety threats to noncitizens. These high-level governmental personnel knowingly and willfully defied court orders, directed their subordinate attorneys to make misrepresentations to courts, and engaged in a scheme to withhold relevant information from the court to advance the Administration's priority of deporting noncitizens.

Since April 5, 2025, it has been widely reported that, according to DOJ sources, Mr. Reuveni was put on administrative leave by DOJ for allegations of failure to "follow a directive" from his superiors, failure to "zealously advocate" on behalf of the United States, and for arguing "against Homeland Security and [the] State Department" when he truthfully represented to the court that Mr. Abrego Garcia's removal was in error.[2] These statements by Attorney General Pamela Bondi and her deputy, Todd Blanche, are false and misleading. Indeed, it has since been reported that prior to the April 4 hearing, Senior Counselor to the Secretary of Homeland Security and Trump appointee James Percival conceded that Mr. Abrego Garcia's removal "was an administrative error […] (Not that we should say publicly.)."[3]

Nevertheless, White House officials have publicly disparaged Mr. Reuveni to justify their refusal to comply with the Constitution and with court orders.[4] White House Deputy Chief of Staff Stephen Miller falsely stated, "The only mistake that was made is a lawyer put an incorrect line in

---

[1] Through counsel Gilbert Employment Law and Government Accountability Project, Mr. Reuveni has filed an appeal alleging that his no-notice termination violated the Civil Service Reform Act and the Whistleblower Protection Act with the Merit Systems Protection Board (MSPB).

[2] Glenn Thrush, "Justice Dept. Accuses Top Immigration Lawyer of Failing to Follow Orders," *New York Times*, April 5, 2025, https://www.nytimes.com/2025/04/05/us/politics/justice-dept-immigration-lawyer-leave.html; Evan Perez, "Justice Department Fires Immigration Lawyer Who Argued Case of Mistakenly Deported Man," *CNN*, April 15, 2025, https://www.cnn.com/2025/04/15/politics/doj-fires-immigration-lawyer-who-argued-abrego-garcia-case-source-says; Constitutional Accountability Center, "Bondi's Firing of DOJ Lawyer for Lack of 'Zealous Advocacy' in Deportation Case Raises Concerns," May 1, 2025, https://www.theusconstitution.org/news/bondis-firing-of-doj-lawyer-for-lack-of-zealous-advocacy-in-deportation-case-raises-concerns/.

[3] Hamed Aleaziz and Alan Feuer, "How Trump Officials Debated Handling of the Abrego Garcia Case: 'Keep Him Where He Is'," *New York Times*, May 21, 2025, https://www.nytimes.com/2025/05/21/us/politics/trump-abrego-garcia-el-salvador-deportation.html.

[4] Alan Feuer and Glenn Thrush, "Judges in Deportation Cases Face Evasion and Delay from Trump Administration," *New York Times*, June 3, 2025, https://www.nytimes.com/2025/06/03/us/politics/judges-trump-deportations-immigration.html; Perez, "Justice Department Fires"; Fox News, "Stephen Miller Doubles Down on Deportation of Alleged Gang Member: 'Not Mistakenly Sent' | Fox News Video," April 14, 2025, https://www.foxnews.com/video/6371474279112; Dareh Gregorian, Katherine Doyle and Lawrence Hurley, "El Salvador's president says he won't return mistakenly deported man to the U.S.," *NBC News*, April 14, 2025, https://www.nbcnews.com/politics/trump-administration/president-el-salvador-wont-return-deported-man-kilmar-abrego-garcia-rcna201136.

a legal filing," and labeled Mr. Reuveni a "saboteur, a Democrat."[5] Referring to Mr. Reuveni, President Trump stated, "Well, the lawyer that said it was a mistake was here a long time, was not appointed by us—should not have said that, should not have said that."[6]

What has not been reported to date are Mr. Reuveni's attempts over the course of three weeks and affecting three separate cases to secure the government's compliance with court orders, and his resistance to the internal efforts of DOJ and White House leadership to defy them through lack of candor, deliberate delay, and disinformation. Discouraging clients from engaging in illegal conduct is an important part of the role of a lawyer.[7] Mr. Reuveni tried to do so and was thwarted, threatened, fired, and publicly disparaged for both doing his job and telling the truth to the court. Because his clients engaged in unlawful activity, abused their authority, created substantial and specific threat to health and safety, and because the pattern of this conduct continues to this day,[8]

---

[5] Perez, "Justice Department Fires"; Fox News, "Stephen Miller Doubles Down," 2:46; Gregorian, Doyle and Hurley, "El Salvador's president says."

[6] Fritz Farrow, "Trump Says 'I Could' Get Abrego Garcia Back from El Salvador," *ABC News*, April 29, 2025, https://abcnews.go.com/Politics/trump-abrego-garcia-back-el-salvador/story?id=121298276.

[7] D.C. R. Prof'l Conduct § 3.3; s*ee also*, *In re Public Defender Service*, 831 A.2d 890, 901 (D.C. 2003) ("…discouraging clients from illegal conduct is a regular occurrence in an attorney's practice. '[A]bout half of the practice of a decent lawyer is telling would-be clients that they are damned fools and should stop.' *McCandless v. Great Atlantic & Pacific Tea Co.,* 697 F.2d 198, 201–02 (7th Cir.1983) (attributed to Elihu Root)."); *see also, id.*, (noting that when a "client misguidedly contemplates or proposes" illegal action, the "lawyer is then obliged, in the interests of justice and the client's own long-term best interests, to urge the client, as forcefully and emphatically as necessary, to abandon illegal conduct or plans.").

[8] Feuer and Thrush, "Judges in Deportation Cases Face Evasion and Delay From Trump Administration," (noting pattern of "obfuscations and delays" to courts in the context of legal challenges to deportation plans so significant that multiple judges in the cases referenced herein have considered or initiated criminal contempt proceedings against the Trump administration). *See also J.G.G. v. Trump*, 1:25-cv-00766, (D.D.C. Apr 16, 2025) ECF No. 81, Memorandum and Opinion at p. 1, https://www.courtlistener.com/docket/69741724/81/jgg-v-trump/ ("the court ultimately determines that the Government's actions on that day demonstrate a willful disregard for its Order, sufficient for the Court to conclude that probable cause exists to find the Government in criminal contempt."); *J.G.G*, (D.D.C. June 04, 2025) ECF No. 148, Memorandum Opinion at p. 3, https://www.courtlistener.com/docket/69741724/jgg-v-trump/?page=2&entry-148 ("This Court, at a swiftly convened hearing on March 15, ordered the Government not to relinquish custody of the men, but that mandate was ignored. Such defiance is currently the subject of the Court's contempt inquiry."); *D.V.D. v. U.S. Department of Homeland Security*, 1:25-cv-10676, (D. Mass. May 21, 2025) ECF No. 119, Order on Remedy for Violation of Preliminary Injunction at p. 1, https://www.courtlistener.com/docket/69775896/dvd-v-us-department-of-homeland-security/#entry-119 ("[t]he Court found that Defendants violated the Court's Preliminary Injunction."); *D.V.D.*,  (D. Mass. May 26, 2025) ECF No. 135, Order on Motion for Reconsideration at p. 7, https://www.courtlistener.com/docket/69775896/135/dvd-v-us-department-of-homeland-security/ ("The court reserved ruling on whether such a violation warranted a finding of contempt."); *Abrego Garcia v. Noem*, 8:25-cv-00951, (D. Md. Apr 16, 2025) ECF No. 86 at p. 69, https://www.courtlistener.com/docket/69777799/86/1/abrego-garcia-v-noem/ ("I'm not going to issue a show cause today for contempt findings, but I do find it well within my authority to proceed with expedited discovery specifically to determine whether you are abiding by the court order, my court orders, whether you intend to abide by the court orders."), ("the Court ultimately determines that the Government's actions on that day demonstrate a willful disregard for its Order, sufficient for the Court to conclude that probable cause exists to find the Government in criminal contempt."); *J.G.G*, (D.D.C. June 04, 2025) ECF No. 148, Memorandum Opinion at p. 3, https://www.courtlistener.com/docket/69741724/jgg-v-trump/?page=2&entry-148 ("This Court, at a swiftly convened hearing on March 15, ordered the Government not to relinquish custody of the men, but that mandate was ignored. Such defiance is currently the subject of the Court's contempt inquiry.");

Mr. Reuveni is exercising his rights under 5 U.S.C. § 2302 and 5 U.S.C. § 1213 to report wrongdoing.[9]

Since his unlawful termination, six members of Congress have written to Attorney General Bondi and Deputy Attorney General Blanche decrying the "Hobbesian choice" DOJ leadership has created for attorneys "who may be forced to choose between their jobs and their oath of candor to the courts," and calling for Mr. Reuveni's reinstatement.[10] We thank these members for their support of Mr. Reuveni, and urge all members of Congress committed to the rule of law along with the DOJ Inspector General and the U.S. Office of Special Counsel to investigate the disclosures presented in this letter.

### I.    Erez Reuveni: Nonpartisan Zealous Advocate with Distinguished Service at DOJ

Before his unlawful removal from federal service on April 11, 2025, Mr. Reuveni had an exemplary, nearly 15-year legal career at DOJ. Mr. Reuveni began his career at the Office of Immigration Litigation (OIL), District Court Section (DCS) in 2010 as a trial attorney and was promoted multiple times under both Republican and Democratic administrations.[11]

Most recently, Mr. Reuveni served as the Acting Deputy Director for the Office of Immigration Litigation responsible for all of OIL's immigration litigation arising in U.S. district courts nationwide, overseeing over one hundred attorneys handling hundreds of cases. His

---

*D.V.D.*, (D. Mass. May 21, 2025) ECF No. 119, Order on Remedy for Violation of Preliminary Injunction at p. 1, courtlistener.com/docket/69775896/dvd-v-us-department-of-homeland-security/#entry-119 ("[t]he Court found that Defendants violated the Court's Preliminary Injunction."); *D.V.D.*, (D. Mass. May 26, 2025) ECF No. 135, Order on Motion for Reconsideration at p. 7, courtlistener.com/docket/69775896/135/dvd-v-us-department-of-homeland-security/ ("The court reserved ruling on whether such a violation warranted a finding of contempt."); *Abrego Garcia*, (D. Md. Apr 16, 2025) ECF No. 86 at p. 69, courtlistener.com/docket/69777799/86/1/abrego-garcia-v-noem/ ("I'm not going to issue a show cause today for contempt findings, but I do find it well within my authority to proceed with expedited discovery specifically to determine whether you are abiding by the court order, my court orders, whether you intend to abide by the court orders.").

[9] As an attorney subject to rules of professional conduct, Mr. Reuveni has consulted extensively with ethics counsel, Kathleen Clark and Richard Zitrin, regarding the exercise of his whistleblower rights. Mr. Reuveni's disclosures contained herein are permitted under the DC Bar Rules of Professional Conduct 1.6 and California Rules of Professional Conduct 8.5.

[10] Rep. Daniel Goldman et al., *Letter to Attorney General Bondi and Deputy Attorney General Blanche*, April 16, 2025, https://goldman.house.gov/sites/evo-subsites/goldman.house.gov/files/evo-media-document/4.16.25_letter-from-rep-goldman%2C-et-al.%2C-to-ag-bondi-%26-dag-blanche.pdf.

[11] Mr. Reuveni was promoted to Senior Litigation Counsel in 2015, to Assistant Director of OIL-DCS in 2017, and has twice served as Acting Deputy Director for OIL, responsible for all of OIL's immigration litigation in U.S. district courts nationwide. From December 2023 to October 2024, Mr. Reuveni first served as counsel and then senior counsel to Principal Deputy Assistant Attorney General Brian Boynton and Deputy Assistant Attorney General Chris Tenorio. Mr. Reuveni first served as Acting Deputy Director of OIL, District Court Section from November to December 2024. OIL was then restructured, and the District Court Section was merged with the OIL Appellate Section into OIL, General Litigation and Appeals. After this merger, Mr. Reuveni was counsel to Acting Assistant Attorney General Yaakov Roth, Principal Deputy Assistant Attorney General Brett Shumate, and Deputy Assistant Attorney General Drew Ensign for approximately two months until Mr. Reuveni was again promoted and began a role as Acting Deputy Director of OIL, General Litigation and Appeals beginning March 21, 2025.

supervisory responsibilities included oversight of the government's defense against many significant legal challenges to multiple Executive Orders signed by President Trump and defending multiple immigration policy initiatives on behalf of the Departments of Homeland Security (DHS), State (DOS), Defense (DOD), Labor (DOL) and Health and Human Services (HHS). Mr. Reuveni received notice of his promotion to that role on March 14, 2025, effective Friday, March 21, and in the following week alone oversaw and defended the government's position in at least seven cases involving motions for temporary restraining orders or preliminary injunctions seeking court orders enjoining Trump Administration policies nationwide, including multiple emergency appeals to various courts of appeal.

Prior to Mr. Reuveni's termination following his candid and truthful representations to the court in the Abrego Garcia case, Department of Justice leadership under the Trump administration had consistently lauded Mr. Reuveni's work. For example, in a March 21, 2025 email announcing Mr. Reuveni's recent promotion, Deputy Assistant Attorney General Drew Ensign remarked that Mr. Reuveni "is a top notched [sic] litigator who has taken on some of OIL's most challenging cases over the past nearly 15 years," including as "Assistant Director for over 7 years," and "multiple stints as counsel in the Civil Division front office," having "led and litigated complex cases protecting our immigration authorities, developed sanctuary city affirmative cases, and worked closely with our many excellent attorneys handling district court litigation."[12]

Additionally, Mr. Reuveni's most recent performance review under the prior Trump administration was stellar. Then-Deputy Director Colin Kisor wrote that "Assistant Director Erez Reuveni continues to be one of OIL-DCS's [OIL District Court Section] premier litigators and supervisors. He is an outstanding attorney, legal writer, and oral advocate. He continues to handle some of the section's most difficult and highest profile cases."[13] Mr. Kisor further noted that "Mr. Reuveni routinely received accolades for his efforts from senior personnel within DOJ and the agencies he advocates for," is an "indispensable asset to OIL-DCS, the Civil Division, DOJ, and the many client agencies he works closely with," and "has truly earned an excellent rating for this rating period."[14]

Indeed, Mr. Reuveni has received an "excellent rating" for every year he has worked at the Department, since 2010. On top of that, he is a recipient of nine Civil Division awards, including three during the prior Trump Administration for helping lead the COVID-19 Immigration Litigation Response Team in 2020, leading district court litigation on behalf of the Sanctuary Cities Litigation Team in 2019, and leading defense of the Protecting the Nation from Foreign Terrorist Entry Executive Order in 2017.[15]

---

[12] Exhibit A.
[13] On file with Government Accountability Project.
[14] On file with Government Accountability Project.
[15] Exhibits B-D.

For years, Mr. Reuveni oversaw the defense of immigration priorities, regardless of political party. During the first Trump Administration Mr. Reuveni led the defense of the Administration's initiatives, including the Executive Orders and proclamation barring entry of certain nationalities to the United States; multiple rules barring access to asylum to migrants at the southern border, including the entry, transit, and criminal asylum bars; the Migrant Protection Protocols; and the defense of the Expedited Removal statute against constitutional challenges. Mr. Reuveni also led an affirmative suit challenging the state of California's laws alleged to interfere with federal immigration enforcement efforts. During the Biden Administration, Mr. Reuveni defended multiple immigration matters, including several rules barring access to asylum to those arriving on the southern border.[16] Earlier in his career, he defended multiple Obama-era labor and employment regulations as well as detention and removal policies and procedures.[17] Before his abrupt termination, Mr. Reuveni oversaw multiple high-profile Trump Administration immigration initiatives.[18]

In short, Mr. Reuveni has been a tireless advocate on behalf of the interests of the United States for years, with a stellar record of advocating successfully on behalf of multiple Presidential administrations, both Republican and Democratic. To suggest Mr. Reuveni is anything but a zealous advocate for the United States who takes his oath to uphold the Constitution seriously is both false and outrageous.

---

[16] Initiatives Mr. Reuveni defended under the Biden administration included: Secure the Border and Circumvention of Lawful Pathways rules, *Las Americas Immigrant Advocacy Center v. DHS*, 24-cv-1702 (D.D.C. 2024); *M.A. v. Mayorkas*, 23-cv-1843 (D.D.C. 2023), as well as ICE's immigration enforcement priorities, *Texas v. United States*, 21-cv-16 (S.D. Tex. 2022), the Asylum Officer Rule, *Arizona v. Garland*, 22-cv-1130 (W.D. La. 2024); *Texas v. Mayorkas*, 22-cv-94 (N.D. Tex. 2024), the Central American Minors program, *Texas v. Trump*, 22-cv-780 (N.D. Tex. 2025), the CHNV parole program, *Texas v. DHS*, 23-cv-7 (S.D. Tex. 2024), the termination of the Migrant Protection Protocols, *Texas v. Biden*, 21-cv-67 (N.D. Tex. 2025), and the Keeping Families Together initiative, *Texas v. DHS*, 24-cv-306 (E.D. Tex. 2024), among many others.

[17] Under the Obama Administration, Mr. Reuveni defended, for example: *Washington All. of Tech. Workers v. DHS*, 650 F. App'x 13 (D.C. Cir. 2016); *G.H. Daniels III & Assocs., Inc. v. Perez*, 626 F. App'x 205 (10th Cir. 2015); *Bayou Lawn & Landscape Servs. v. Sec'y, U.S. Dept of Labor*, 621 F. App'x 620, 621 (11th Cir. 2015); *Save Jobs USA v. DHS*, 210 F. Supp. 3d 1 (D.D.C. 2016), detention and removal policies and expedited removal procedures, *Castro v. DHS*, 835 F.3d 422 (3d Cir. 2016), *cert denied* 137 S. Ct. 1581 (2017), refugee settlement procedures, *Bilbro v. Haley*, 229 F. Supp. 3d 397 (D.S.C. 2017). Mr. Reuveni also secured an appellate win in a Ninth Circuit case rejecting an entitlement to counsel for minors in removal proceedings in a nation-wide class action. *JEFM v. Holder*, 837 F.3d 1026 (9th Cir. 2016).

[18] These initiatives have included: President Trump's invocation of the Alien Enemies Act the weekend of March 15, *J.G.G. v. Trump*, 25-cv-766 (D.D.C. 2025); the DHS's policies concerning removal of noncitizens to third countries, *D.V.D. v. U.S. Dept. of Homeland Security,* 25-cv-10676 (D. Mass. 2025); DHS's revocation of legal status programs for hundreds of thousands of migrants from countries like Ukraine, Venezuela, and Haiti, *National TPS Alliance v. Noem,* 25-cv-01766 (N.D. Cal. 2025); *Doe v. Noem*, 25-cv-10495 (D. Mass. 2025); the expansion of expedited removal deportation procedures to the entire United Staes, *Make the Road New York v. Huffman*, 25-cv-190 (D.D.C. 2025); Trump's declaration of an "invasion" at the southern border and Proclamation directing DHS to halt all asylum processing for individuals subject to the Proclamation, *Refugee and Immigrant Center for Education and Legal Services v. Noem*, 25-cv-306 (D.D.C. 2025); lawsuits challenging the so-called "sanctuary policies" of Illinois and New York, among others, *United States v. Illinois*, 25-cv-1285 (N.D. Ill. 2025), *United States v. New York*, 25-cv-205 (N.D. N.Y. 2025); and most recently a lawsuit challenging the wrongful removal of an Salvadoran national to his home country despite that order not being legally executable. *Abrego Garcia v. Noem*, 25-cv-951 (D. Md. 2025).

II.    **March 14, 2025: DOJ Leadership Expressed Intent to Ignore Court Orders to Effectuate Removal Flights Under the Alien Enemies Act**

On Friday March 14, 2025, Mr. Reuveni received notice of his promotion to Acting Deputy Director of the Office of Immigration Litigation. That same day, following news reports that the President intended to sign a presidential proclamation invoking the Alien Enemies Act (AEA), Mr. Reuveni was summoned to a meeting by Deputy Assistant Attorney General (DAAG) of OIL, Drew Ensign. At the meeting were Principal Assistant Attorney General (PADAG) Emil Bove, Counselor to the Deputy Attorney General James McHenry, Associate Deputy Attorney General (ADAG) Paul Perkins, DAAG Ensign, Acting Director for OIL and Mr. Reuveni's direct supervisor, August Flentje, and other OIL attorneys.

At the meeting Bove indicated to those in attendance that the AEA proclamation would soon be signed and that one or more planes containing individuals subject to the AEA would be taking off over the weekend – meaning Saturday, March 15 and Sunday, March 16. Bove did not provide further details and ███████████████████████████.[19] Bove indicated ██████████████████████████████[20] and stressed to all in attendance that the planes needed to take off no matter what.

Bove then made a remark concerning the possibility that a court order would enjoin those removals before they could be effectuated. Bove stated that DOJ would need to consider telling the courts "fuck you" and ignore any such court order. Mr. Reuveni perceived that others in the room looked stunned, and he observed awkward, nervous glances among people in the room. Silence overtook the room. Mr. Reuveni and others were quickly ushered out of the room. Notwithstanding Bove's directive, Mr. Reuveni left the meeting understanding that DOJ would tell DHS to follow all court orders.[21]

Mr. Reuveni was stunned by Bove's statement because, to Mr. Reuveni's knowledge, no one in DOJ leadership – in any Administration – had ever suggested the Department of Justice could blatantly ignore court orders, especially with a "fuck you." Mr. Reuveni was in disbelief, because, on the contrary, the Department of Justice consistently advises its clients of their obligation to follow court orders, not to ignore them. Mr. Reuveni knew that it was absurd and unlawful to do otherwise, a proposition that Mr. Reuveni felt even more certain of after a brief conversation with his supervisor, August Flentje, shortly after the meeting.

---

[19] This clause is redacted because it is not clear that an exception to the lawyer's duty of confidentiality applies here.
[20] This clause is redacted because it is not clear that an exception to the lawyer's duty of confidentiality applies here.
[21] Mr. Reuveni left the meeting with this impression because ████████████████████████████
████████████████████████. This clause is redacted because it is not clear that an exception to the lawyer's duty of confidentiality applies here.

III.    **Between March 14, 2025, and His Unlawful Suspension on April 5, 2025, Mr. Reuveni Refused to Obey an Illegal Order and Made Protected Whistleblower Disclosures**

Mr. Reuveni's disbelief following the meeting with Bove is now a relic of a different time. Over the next three weeks, Mr. Reuveni was involved in three separate cases involving the legality of the Administration's immigration removal operations under its newly implemented priorities during which time he directly witnessed and reported:

- DOJ officials undermining the rule of law by ignoring court orders;
- DOJ officials presenting "legal" arguments with no basis in law;
- high-ranking DOJ and DHS officials misrepresenting facts presented before courts; and
- DOJ officials directing Mr. Reuveni to misrepresent facts in one of these cases in violation of Mr. Reuveni's legal and ethical duties as an officer of the court.[22]

Mr. Reuveni's internal reporting and ultimately his refusal to obey this illegal order directly resulted in his suspension and termination.

A.    ***J.G.G. v. Trump*: Flights departed the U.S. through invocation of the Alien Enemies Act during issuance of injunction with government claiming oral injunctions are not binding**

At 1:12 a.m.[23] on Saturday March 15, 2025, prior to publication of the Alien Enemies Act Proclamation, the American Civil Liberties Union filed suit on behalf of five Venezuelan men facing imminent deportation under the AEA and moved for a Temporary Restraining Order (TRO) to prevent their removal. When Mr. Reuveni woke up that morning, he reviewed the plaintiffs' motion and learned that the removals were allegedly to prisons in El Salvador, known for their torture and human rights abuses.[24] After learning from plaintiffs' counsel that at least one plaintiff was reportedly already aboard a removal flight, Judge James Boasberg of the U.S. District Court

---

[22] These incidents involved senior political leadership at DOJ and DHS including but not limited to: Counselor to the DAG McHenry, ADAG Perkins, Counselor to the Attorney General Henry Whitaker, Senior Counselor to the Secretary of Homeland Security James Percival, and Acting General Counsel of DHS Joe Mazzara. McHenry, Perkins, Whitaker, Percival, and Mazzara were frequently listed together in communications, including in communications from the White House, and as explained further below, appeared to hold decision making power between DOJ and DHS.

[23] All times listed are in Eastern Time.

[24] President Bukele of El Salvador instituted a state of emergency in 2022 in response to gang violence that resulted in high numbers of detentions and deaths in custody. Associated Press, "At least 261 people have died in El Salvador's prisons under anti-gang crackdown, rights group says," *Associated Press*, July 10, 2024, https://apnews.com/article/bukele-el-salvador-gang-crackdown-prison-deaths-9d14cbb1ea35175d75d007f6faade61f. Reports of formerly detained persons, families of detained persons, and autopsy reports indicate conditions of torture. "Executive Summary: One Year Under State of Exception: A Permanent Measure of Repression and Human Rights Violations," Cristosal, 2023, https://cristosal.org/EN/wp-content/uploads/2023/06/English-Executive-Summary-One-Year.pdf. *See also* U.S. State Dep't, *2023 Country Reports on Human Rights Practices: El Salvador*, https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/.

for the District of Columbia entered an *ex parte* TRO prohibiting the government from removing the five named plaintiffs and set a hearing for 4:00 p.m., which the court later changed to 5:00 p.m., to hear argument on a broader TRO.

### 1. Deputy Assistant Attorney General Ensign willfully misled the court while DHS and DOS ignored Mr. Reuveni's advice

Shortly after Judge Boasberg entered the initial TRO, Mr. Reuveni informed the District Court via email at 10:18 a.m. that its order had been received and "disseminated to the relevant executive branch agencies."[25] At the 5:00 p.m. hearing later that day, DAAG Ensign represented the government in court while Mr. Reuveni listened on the public line, emailing DHS and DOS agency counsel periodically.

At this hearing, Judge Boasberg said that "the plaintiffs ... expected planes to be departing within the last couple of hours," and asked Ensign "if any of the named plaintiffs are, in fact, on any plane that has departed?" Ensign assured the court that none of the named plaintiffs would be removed during the pendency of the TRO. When Judge Boasberg asked if that meant the plaintiffs "are either not on the planes or that they will not be removed from the planes and will be brought back once the planes land in El Salvador," Ensign asserted, "I don't know the status of the planes. If there are removal flights, the five would not be on them." When Judge Boasberg asked whether any deportations or removals were imminent, as "in the next 24 or 48 hours," Ensign answered, "I don't know the answer to that question."[26]

Mr. Reuveni reasonably believes Ensign's statement to the court that he did not know whether AEA removals would take place "in the next 24 or 48 hours" was false. Ensign had been present in the previous day's meeting when Emil Bove stated clearly that one or more planes containing individuals subject to the AEA would be taking off over the weekend *no matter what*.

Ensign then added, "We can certainly investigate that and report that back to you." When Judge Boasberg asked how soon he could get that information, Ensign said that the government could "certainly include" the information in a document they were planning to file "tomorrow night." The plaintiffs' lawyer stressed the urgency of the situation, noting his "understanding from people on the ground, from different sources, ... that planes are going right now taking Venezuelans to El Salvador"; that two flights "may have already taken off ... during this hearing"; and urged the "Court to issue a class TRO now to avoid any more harm."[27]

---

[25] *J.G.G.*, (D.D.C. Apr 16, 2025) ECF No. 81, Memorandum & Opinion at p. 5, https://www.courtlistener.com/docket/69741724/81/jgg-v-trump/.
[26] *J.G.G.*, (D.D.C. Mar 16, 2025) ECF No. 20, Transcript at pp. 4-5, 11, https://www.courtlistener.com/docket/69741724/20/jgg-v-trump/.
[27] *Id* at pp. 11-13.

At that point, Judge Boasberg adjourned the hearing until 6:00 p.m. to "let Mr. Ensign do some digging." The court specified, "Mr. Ensign, I will want to know, have planes, in fact -- is deportation of people under the proclamation pursuant to the AEA in motion now and will it be for the next 48 hours." Ensign responded, "We can do that, Your Honor."[28]

The adjournment began at 5:22 p.m. Mr. Reuveni was not included in Ensign's conversation with DHS, DOS, or DOJ leadership during this period.

However, prior to 5:24 p.m., DOJ attorneys, including Ensign and Mr. Reuveni, received an email from plaintiffs' attorney citing public reporting of flight information and stating that they had reason to believe that people were on planes for imminent deportation. According to public reports and various websites that track the whereabouts of airplanes in real-time, at least two planes took off from Texas after the start of the hearing: the first at 5:26 p.m. and the second at 5:45 p.m. en route to what online sources speculated was a final destination of El Salvador.[29]

Yet, at 6:00 p.m., following the 38-minute adjournment, DAAG Ensign provided Judge Boasberg with no information regarding flight departures. Specifically, Ensign told the court, "I don't have many details to share," explaining that his "clients" said that the "operational details ... raised potential national security issues, particularly ones if discussed with a public line." When Ensign said that his clients "raised that we may be able to provide Your Honor additional details in an *in camera* hearing," Judge Boasberg quickly arranged "to disconnect the public [phone] line" and start an *in camera* proceeding. But even after the court accommodated the request for an *in camera* proceeding, Ensign failed to provide information about the flights. He explained that "we would have to sort out what can still be provided *in camera*. They suggested that as a way to potentially provide some details, but I do not personally have those right now." Once it became clear that Ensign would not provide information even *in camera*, the court ended the *in camera* proceeding and reconnected the public line.

---

[28] *Id* at pp. 13-14.

[29] Josh Gerstein, Senior Legal Affairs Reporter, POLITICO, (@joshgerstein.bsky.social), "Looks like one El Salvador-bound flight took off during a break in the hearing," *Bluesky*, March 15, 2025, https://bsky.app/profile/joshgerstein.bsky.social/post/3lkh4yqxaek2d. and FlightAware, "Flight GXA6145 History, March 15, 2025," https://www.flightaware.com/live/flight/GXA6145/history/20250315/1930Z/KHRL/MHPR (indicating that the plane took off at 4:45 p.m. CT). Also see later confirmation of flight departures, Michael Kunzelman and Regina Garcia Cano, "A Timeline of the Legal Wrangling and Deportation Flights After Trump Involved the Alien Enemies Act," *AP News*, March 21, 2025, https://apnews.com/article/trump-deportation-courts-aclu-venezuelan-gang-timeline-43e1deafd66fc1ed4e934ad108ead529; Reuters, "Flight Data Shows Timeline of Venezuelan Deportation Operation," *Reuters*, March 17, 2025, https://www.reuters.com/world/americas/flight-data-shows-timeline-venezuelan-deportation-operation-2025-03-17/.

Plaintiffs' counsel told the court, "We understand that two flights went to El Salvador this afternoon," and that a third flight was "scheduled for 6:23, so only in a matter of minutes." After several minutes of legal argument, the court found that "class certification is warranted."[30]

When a court issues an injunction against the federal government, the normal practice is for Justice Department lawyers to work with agency counsel in developing guidance explaining what the government must do to comply with the injunction. The relevant agencies then disseminate that guidance to their components. For example, when a court order impacts DHS immigration removal operations, in normal practice DOJ and DHS lawyers create guidance that DHS would then, once approved, disseminate to Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO), and other relevant components. Because Mr. Reuveni's name was on the court papers the government filed in the three cases at issue, and because of his role as Acting Deputy Director for OIL, he had a responsibility to confirm that the government was abiding by the court orders in those cases.

With this in mind, at 6:14 p.m., as the hearing continued, Mr. Reuveni, again listening on the public line, emailed attorneys with the DHS Office of General Counsel, ICE Office of the Principal Legal Advisor (OPLA), and the DOS Office of Legal Advisor informing them along with other DOJ attorneys that the "Judge is certifying a nationwide class as we speak. It is likely a class-wide tro is imminent." At 6:44 p.m., Mr. Reuveni sent a follow-up email: "The judge is presently issuing a class-wide TRO. Can folks confirm for us if at the moment any individuals subject to the AEA are being staged for removal, or are presently in the air as part of removal (but not yet having landed and disembarked)?"

At 6:44 p.m., Mr. Reuveni texted his supervisor Mr. Flentje referencing Bove's March 14, 2025, comment that it might become necessary to tell a court "fuck you." Mr. Flentje acknowledged Bove's comment with a joke referencing the possibility that either he or Mr. Reuveni could be fired, impliedly for reporting up their chain of command concerns that a court order may have been violated.

At 6:46 p.m., Mr. Reuveni emailed DHS the substance of Judge Boasberg's oral order concerning class certification and a TRO: "The class is 'all noncitizens in US custody subject to the AEA' a minute order with more specifics will issue. Please confirm receipt of this email and let us know ASAP on the questions below concerning removals not yet effectuated, including those involving folks in the air." At 6:48 p.m. Mr. Reuveni sent another email: "Sorry for all the emails. Last email: the judge specifically ordered us to not remove anyone in the class, and to return anyone in the air."

---

[30] *J.G.G.*, (D.D.C. Mar 16, 2025) ECF No. 20, Transcript at pp. 15-18, 23, https://www.courtlistener.com/docket/69741724/jgg-v-trump/#entry-20.

After additional legal argument, Judge Boasberg stated that "a TRO is appropriate for the class members," prohibiting removal of class members, with the class consisting of "all noncitizens in U.S. custody who are subject to the proclamation of March 15, 2025, and its implementation."

Judge Boasberg explained that the court was "required to act immediately" and could not "wait any longer," particularly in light of "the plaintiffs' information, unrebutted by the government, that flights are actively departing and plan to depart," instructing Ensign:

> [Y]ou shall inform your clients of this immediately, and that any plane containing these folks that is going to take off or is in the air needs to be returned to the United States, but those people need to be returned to the United States. However that's accomplished, whether turning around a plane or not embarking anyone on the plane or those people covered by this on the plane, I leave to you. But this is something that you need to make sure is complied with immediately.[31]

At 7:04 p.m., Mr. Reuveni emailed DHS and DOS as follows:

> As we await the written order, clarifying our understanding of the injunction as clarified at the end. No one subject to AEA in our custody can be removed. And anyone in the air should be returned, unless they have a title 8 final order. Please confirm receipt and let us know what if anything is happening. Thank you.

> DHS and DOS attorneys did not respond.

Mr. Reuveni followed up with DHS at 7:18 p.m. requesting confirmation that no one without a final order of removal under Title 8 would be removed from the planes as they landed, including one scheduled to land at 7:20 p.m., noting that "We need to address this asap to avoid contempt." Mr. Reuveni again received no response.

At 7:26 p.m., the court issued a minute order memorializing its TRO.

At 7:27 p.m., Mr. Reuveni sent another email to DHS and DOS with a copy of the minute order.

At 7:31 p.m., Ensign emailed James Percival, Senior Counselor to the Secretary of Homeland Security, and Joseph Mazzara, Acting General Counsel for the Department of Homeland Security, informing them of the injunction, and two minutes later emailed DOS counsel. Both of these emails, on which Mr. Reuveni and Flentje were copied, informed the recipients of both the oral and written injunctions, informed the agency counsel that their clients were required

---

[31] *Id.* at pp. 42-43. While there is no time stamp for Judge Boasberg's statements on the transcript, Mr. Reuveni's records indicate this statement occurred at approximately 6:47 p.m.

to not remove anyone within the class definition, and reflected that Ensign understood the judge to be requiring that DHS not deplane any planes that had departed U.S. airspace. Mr. Reuveni was not copied on any response.

At 10:13 p.m., after he and Mr. Flentje had exchanged numerous emails and he had no information about any DHS compliance, Mr. Reuveni again emailed DHS to ask about whether guidance had been disseminated with direction for DHS to turn any planes around if not yet landed or to not deplane the people on board if already landed.

Shortly thereafter, DHS responded via email that they were holding issuance of guidance pending a decision from the Attorney General.

### 2. Emil Bove advised the Department of Homeland Security that it may take actions that violate the court's injunction because the injunction was not yet issued in writing

For the next few hours on the night of March 15, Mr. Reuveni exchanged emails with Flentje and engaged in multiple phone calls with Ensign. He was concerned about two things: 1) that deplaning any passengers would violate the court's orders, and 2) the need to notify the court of the government's compliance with those orders, or its interpretation of the orders. Sometime around midnight, Ensign informed Mr. Reuveni that DOJ would be filing a notice with the court, signed by Bove, explaining its interpretation of the court order, including that no violation of the court order had occurred because the two planes left U.S. airspace before the court's *written* minute order. Ensign directed Mr. Reuveni to prepare Bove's notice of appearance. While Mr. Reuveni disagreed with the interpretation that there was no violation of a court order, the fact that Bove, a senior DOJ official, was willing to enter an appearance in the case and make this representation to the court somewhat lessened his concerns because he believed he and his staff would not be put in the untenable position of defending this argument.

That quickly changed. On Sunday, March 16, 2025, at 12:23 a.m. Ensign informed Mr. Reuveni by phone that Bove would no longer be filing either a notice of appearance or a notice to the court explaining the government's interpretation of the court's orders. Thereafter, Mr. Reuveni and Flentje exchanged several more emails. Mr. Reuveni anticipated that the government would be held in contempt of court for deplaning those on the flight and communicated his belief that a notice to the court was necessary. At 12:33 a.m., Ensign telephoned Mr. Reuveni informing him that DOJ leadership did not appear to be in a hurry to file any such notice. Mr. Reuveni responded that the government would likely face a show cause motion seeking an explanation as to why the government should not be held in contempt of court.

That same morning at 8:07 a.m., Mr. Reuveni emailed DHS and DOS asking for confirmation of their compliance with Judge Boasberg's oral and written orders, specifically asking for the status of the individuals on each of the previous day's three flights. Mr. Reuveni's

email included a reminder that to comply with the injunction, no one subject to AEA removal should have been deplaned and anyone who had been deplaned needed to be returned to the United States. Mr. Reuveni also asked whether conversations on these issues were happening at a higher level of leadership between and among DOJ, DHS, and DOS. Mr. Reuveni received no response.

Given the absence of any email or notice from the agencies or DOJ leadership at that point, Mr. Reuveni's concerns from the prior night that DHS had been directed to violate the court orders began to escalate. Early in the morning of Sunday March 16, President Bukele of El Salvador posted a comment on social media stating "Oopsie … Too late," in reference to Judge Boasberg's order, and Secretary of State Rubio re-posted the comment soon after.[32] Soon after Bukele's initial comment, Bukele posted a video of men being escorted from planes into the Terrorism Confinement Center ("CECOT") prison.[33]

As the day continued, Mr. Reuveni's emails asking for confirmation of the status of the removal flights remained unanswered. Mr. Reuveni reported his concerns to August Flentje that based on public reporting, social media posts of the Secretary of State and the President of El Salvador, and the failure of DHS to answer any of Mr. Reuveni's questions concerning the three flights that had taken off the previous day, it appeared the government had violated the court's order and removed individuals to El Salvador.

Eventually, agency counsel for DHS informed Mr. Reuveni by telephone that DOJ leadership had advised DHS to deplane the flights in El Salvador and directed Mr. Reuveni to consult DOJ leadership if he had any questions. Through the course of the events on March 16, it became clear to Mr. Reuveni that DHS and DOS were receiving contrary directions from someone else to take actions in violation of court orders. By 2:00 p.m., the identity of that individual became

---

[32] Nayib Bukele (@nayibbukele), "Oopsie...Too Late," X, March 16, 2025, 6:46 a.m., https://x.com/nayibbukele/status/1901238762641517965.

[33] According to human rights groups like Cristosal, prison officials at CECOT have reportedly beaten, tortured, and denied prisoners access to food, water, clothing, and healthcare, allegedly causing at least 368 deaths. William Brangham, Ian Couzens, Shrai Popat, "The Conditions Inside the Infamous El Salvador Prison where Deported Migrants are Held," PBS, April 8, 2025, https://www.pbs.org/newshour/show/the-conditions-inside-the-infamous-el-salvador-prison-where-deported-migrants-are-held. CECOT is described as "a judicial black hole": the prison exists under a state of exception suspending constitutional rights and prisoners are detained incommunicado. Brangham, "Conditions Inside." ("'We have documented systematic physical beatings, torture, intentional denial of access to food, water, clothing, health care. And the combination of both the physical abuse and the denial of basic needs has led to the death of at least 368 people, according to our investigations... The CECOT prison has become sort of the public face of President Bukele's security strategy, which is understood as a state of exception... families and lawyers do not have access to the prisoners. They're entirely cut off... They're in a judicial black hole.'")
The 15,000 prisoners are meant to be held "permanent[ly]," and information from CECOT is tightly controlled by the Salvadoran government. Thomas Graham, "The El Salvador Mega-Prison at the Dark Heart of Trump Immigration Crackdown," The Guardian, April 30, 2025, https://www.theguardian.com/world/2025/apr/30/el-salvador-cecot-mega-prison-trump ("'[CECOT] is meant for permanent exile, permanent punishment'... This tight control on information coming out of Cecot allows authorities to shape its image.")

clear. In an email from Acting Assistant Attorney General (AAG) Yaakov Roth to Ensign, Flentje, and Mr. Reuveni, Roth explained that Bove had advised DHS that under the court order it was permissible to deplane individuals on the flights that departed U.S. airspace before the minute order had issued on the docket.

That afternoon, the Department of Justice filed a Notice indicating that defendants "were promptly notified of the court's temporary restraining order issued in the morning and the 7:26 PM EDT minute order that temporarily enjoined any removals pursuant to the Presidential Proclamation." The Notice also asserted that "some gang members subject to removal under the Proclamation had already been removed from United States territory under the Proclamation before the issuance of this court's second [written] order."[34]

By day's end, multiple media reports and postings from senior government officials in both the United States and El Salvador on social media confirmed that all individuals on two of the three planes that had taken off March 15 had been detained in the CECOT prison in El Salvador.[35]

The next hearing in the case occurred on Monday, March 17, 2025. At some point prior to the March 17 hearing, Ensign informed Mr. Reuveni that Ensign would not be handling the hearing given concerns that the court would likely interrogate Ensign concerning the March 15 events.

### 3. Government refused to comply with court's reporting order

On March 17, the court held a hearing to determine whether the government complied with its orders. The court issued a minute order demanding the government state "whether, and in what form, it would provide answers to the court's questions regarding the particulars of the flights."[36] The order further stated that if "the Government takes the position that it will not provide that information to the court under any circumstances, it must support such position, including with classified authorities if necessary."[37] Following this order, Flentje and Ensign told Mr. Reuveni that leadership at DOJ were reporting "down the chain" that the government was not going to answer the court's questions about anything that happened before 7:26 p.m. on March 15, and so not to provide information about when the flights took off.[38]

---

[34] *J.G.G*, (D.D.C. Mar 16, 2025) ECF No. 19, Notice to the Court at p. 1, courtlistener.com/docket/69741724/19/jgg-v-trump/.
[35] Reports later indicated that 8 individuals who were on one of the three flights were returned to the United States. Laura Romero, "Venezuelans Deported Last Week Included 8 Women Who Were Returned to US, Court Filings Say," *ABC News*, March 24, 2025, https://abcnews.go.com/US/venezuelans-deported-week-included-8-women-returned-us/story?id=120111090.
[36] *J.G.G.,* (D.D.C Mar 17, 2025), Minute Order, https://www.courtlistener.com/docket/69741724/jgg-v-trump/#minute-entry-424393366.
[37] *Id.*
[38] At the March 17, 2025, hearing, the government did provide some responsive information. The attorney for the government stated, "no planes took off from the United States after the written order came through […] the two

**B.** ***D.V.D. v. DHS***: **Mr. Reuveni advised that injunction against third country removals without torture screenings applied nationwide, but government removed people in violation of the injunction nonetheless**

The second case in which Mr. Reuveni exercised his right to make protected disclosures unfolded over the weekend of March 28-30, 2025: *D.V.D. v. U.S. Dept. of Homeland Security,* 25-cv-10676 (D. Mass.). This case involved allegations that DHS had begun to remove individuals with final orders of removal to third countries without first ascertaining whether such individuals would be safe in those countries or potentially tortured, as required by the Convention Against Torture (CAT).

On the afternoon of Friday March 28, 2025, around 2:30 p.m., Judge Brian Murphy, United States District Court Judge in the District of Massachusetts, issued a nationwide TRO. The order enjoined the government from removing the three named plaintiffs and "any individual subject to a final order of removal from the United States to a third country, i.e., a country other than the country designated for removal in immigration proceedings" without providing the individual and their counsel "with written notice of the third country to where they may be removed" and "a meaningful opportunity for that individual to submit an application for CAT protection to the immigration court, and if any such application is filed, UNTIL that individual receives a final agency decision on any such application."[39]

**1. Friday March 28: Senior Leadership took the position that the injunction did not have nationwide applicability despite DOJ-OIL's instruction**

DOJ leadership determined to seek an immediate appeal and stay of the order. The argument for the emergency stay in the appellate brief was that the TRO, which by its terms applied nationwide, was impermissible under the Immigration and Nationality Act (INA), and, in any event, had to be limited to the named plaintiffs. Curiously, James McHenry, Counselor to the Deputy Attorney General, directed through Ensign that afternoon that it was necessary to include a peculiar footnote with no context stating, "the operational effects of [the] order is [*sic*] ambiguous."

Over the course of the afternoon and evening of Friday, March 28, it became apparent why McHenry had insisted on including this odd footnote. First, Mr. Reuveni learned that DHS was directed by someone within the administration unknown to Mr. Reuveni not to issue guidance to its officers concerning the fact of and terms of the injunction. This was despite the fact that DHS

---

planes that the plaintiffs cite in their filing, the timing of whether it was during the verbal order or the written order does not have any material bearing based on the time lines that they have given," and agreed with the judge's summary that the third flight carried detained persons, "removable on grounds other than the proclamation and is, therefore, irrelevant." *J.G.G.*, (D.D.C. Mar 17, 2025) ECF No. 25, Transcript at pp. 6-7, https://www.courtlistener.com/docket/69741724/25/jgg-v-trump/.

[39] *D.V.D.*, (D. Mass. Mar 28, 2025) ECF No. 34, Temporary Restraining Order at p. 2, https://www.courtlistener.com/docket/69775896/34/dvd-v-us-department-of-homeland-security/.

agency counsel had drafted guidance concerning the injunction that noted the nationwide applicability of the TRO, which Mr. Reuveni and others at OIL had agreed was appropriate. Mr. Reuveni sent multiple emails to DHS counsel requesting updates regarding when the guidance would be disseminated. Multiple line attorneys at DHS alerted Mr. Reuveni that the guidance was never distributed. Ensign eventually told Mr. Reuveni that the Office of the Deputy Attorney General (ODAG) had directed a hold on dissemination of the guidance as they were reviewing it, an unusual, but not unheard-of level of review.

On March 28, at 11:28 p.m., Mr. Reuveni sent an email to DHS counsel noting his understanding that guidance had not yet been issued, as OIL had advised, and asking for confirmation whether anyone subject to the injunction was being staged for removal. Mr. Reuveni noted that the government's brief argued in requesting an emergency stay that the court order applied broadly, beyond named plaintiffs. In response, at 12:34 a.m., Senior Counselor to the Secretary of Homeland Security James Percival responded for DHS that "My take on these emails is that DOJ leadership and DOJ litigators don't agree on the strategy. Please keep DHS out of it." Mr. Reuveni responded at 12:36 a.m., "what is the position," to which Percival responded at 12:38 a.m., "Ask your leadership."

With this clear disconnect, it was evident to Mr. Reuveni that DHS had received direction contrary to the guidance OIL had provided concerning the scope of the injunction. Mr. Reuveni had attempted to contact Ensign and Flentje multiple times by phone between 10:40 p.m. and 12:04 a.m., and Roth via email, but no one answered.[40]

> **2. Night of March 28–Morning of March 29: White House directed Mr. Reuveni to file brief asking for emergency stay with assurances of understanding of nationwide applicability**

Mr. Reuveni, unable to contact his chain of command, made the decision that the brief requesting an emergency stay could not be filed given the lack of consensus that the injunction applied nationwide, and notified DHS of the same at 12:42 a.m. on Saturday, March 29.

At 12:50 a.m., Mr. Reuveni received frantic emails from multiple senior DOJ and DHS officials, ultimately including McHenry, Perkins, Counselor to the Attorney General Henry Whitaker, and Percival, asking him to call them.

Mr. Reuveni first called ADAG Perkins, and he and McHenry were on the line. They asked Mr. Reuveni why the brief had not been filed. Mr. Reuveni explained that, per his email, there seemed to be a fundamental disconnect between the brief, which acknowledged nationwide applicability of the injunction as the basis for seeking an emergency stay, and DHS's

---

[40] Ensign was teleworking from Arizona as he often did and later told Mr. Reuveni that he missed the calls because his phone was silenced.

understanding that the injunction only applied to three named plaintiffs. On the call, Mr. Reuveni perceived McHenry to be acting strangely, answering questions evasively and suggesting additional odd language to add to the brief. Neither Perkins nor McHenry confirmed whether ICE had even received the text of the injunction. The call ended when McHenry said that he and Perkins needed to go make a call and would be back in touch.

Around 1:18 a.m., Whitaker and Percival emailed Mr. Reuveni asking him to call them. Mr. Reuveni called Whitaker, who immediately patched in Percival. Similar to McHenry and Perkins, Whitaker and Percival asked Mr. Reuveni why the brief had not been filed. They stated that the White House wanted the brief filed by midnight. Mr. Reuveni stated that DHS seemed to be saying that DOJ leadership was giving them guidance contrary to that provided by OIL. He explained that the brief acknowledged the injunction applied nationwide, but DHS's position was that it only applied to the three named plaintiffs.

Mr. Reuveni explained to Whitaker and Percival that if the brief were filed acknowledging nationwide applicability of the injunction, that would be the official position of the United States. If there were also removal flights planned for that weekend, they would have to be consistent with this injunction or risk contempt of court. If removals inconsistent with the injunction were effectuated nonetheless, the government would have to withdraw or modify its brief and notify the court. Mr. Reuveni also shared his understanding that no guidance had been disseminated to DHS regarding the position in the brief. Mr. Reuveni asked Whitaker and Percival if they agreed that the injunction required nationwide applicability. Percival hurriedly responded, "Yeah, sure," and Whitaker said, "Yeah, buddy."

Still concerned but relying on the assurances from Whitaker and Percival that they agreed the injunction applied to more than the three named plaintiffs, Mr. Reuveni directed his staff to file the brief. Later that day Mr. Reuveni learned with certainty that DHS had never disseminated the injunction or guidance about its applicability within the agency.

### 3. Saturday March 29: Gag order instructed Mr. Reuveni to stop asking about injunction compliance guidance

On the morning of March 29, Mr. Reuveni learned that individuals were again being staged in Texas by DHS, possibly for removal. Against that backdrop, Mr. Reuveni heard from DHS that DHS was again working on disseminating guidance to ICE. Relieved, Mr. Reuveni briefly turned to other matters.

However, by early afternoon it again became clear no guidance would be forthcoming; Mr. Reuveni heard from agency counsel that no guidance had been disseminated and instead was stuck somewhere within DHS. This meant no field officer at ICE involved in deportations had yet been told how to conduct their operations consistent with the injunction and how to ensure that persons

removed to third countries were given notice of their right to alert the government to claims of torture in those countries. Mr. Reuveni called DHS agency counsel around 3:20 p.m. and confirmed directly that no guidance had been issued. He immediately sent an email to DHS agency counsel, in addition to Percival and Acting General Counsel for DHS, Mazzara, again requesting an update on the status of guidance.

Separately, Mr. Reuveni contacted Ensign by phone, who informed him that the head of ICE Enforcement and Removal Operations had been given "verbal" notice of the injunction, but again, no written guidance had been disseminated to the agency. Sometime after this call, during the mid-to-late afternoon, Ensign informed Mr. Reuveni by phone that it would be advisable to stop sending emails with many recipients, including Percival, concerning the injunction-compliance guidance.[41]

### 4. Sunday March 30: Mr. Reuveni reported a possible violation of injunction

On the morning of Sunday, March 30, despite Ensign's instruction to stop email correspondence on the matter, Mr. Reuveni again emailed DHS to ask if any guidance on the injunction had been disseminated. Mr. Reuveni continued to press on the matter pursuant to his job responsibilities to ensure quick dissemination of guidance instructing injunction compliance, his ethical duties, and his role as an officer of the court.

Thereafter, Mr. Reuveni spoke twice with Ensign on the phone between approximately 11:00 a.m. and noon, during which time Ensign told Mr. Reuveni that "leadership" had concluded and directed that no injunction compliance guidance would be issued. Ensign also again told Mr. Reuveni that he should no longer contact DHS asking about guidance.[42] Mr. Reuveni informed Ensign that plaintiffs' counsel had notified OIL attorneys that their class member clients were being or had been prepared for removal, and without further information this appeared to be a violation of the injunction. Ensign made comments to the effect that he agreed with Mr. Reuveni, acknowledged the decisions were not ideal and would make it harder to win cases, and stated that he was not a decision maker in these circumstances.

### 5. Monday March 31: Evidence demonstrated government violated injunction

Finally on Monday, March 31, the Secretary of State issued a press release announcing a "successful counter-terrorism operation with our allies in El Salvador" through which "the United

---

[41] The Department of Justice's implementation of restrictions on communications may be in violation of 5 U.S.C. 2302(b)(13).
[42] The Department of Justice's implementation of restrictions on communications may be in violation of 5 U.S.C. 2302(b)(13).

States military transferred a group of 17 violent criminals from the Tren de Aragua and MS-13 organizations, including murderers and rapists."[43]

Upon seeing this press release, Mr. Reuveni immediately contacted counsel for DOS and DHS, including Mazzara, to inquire about the operation referred to in the release. Mazzara refused to discuss these events with Mr. Reuveni or others at OIL, stating this was a DOD matter, directing Mr. Reuveni to the Acting General Counsel of the DOD, and instructing Mr. Reuveni not to ask DHS again about the matter.

Mr. Reuveni then contacted DOD and learned through conversation with Charles Young, the Acting General Counsel for the Department of Defense, that on March 29, those 17 individuals had departed Texas on a flight to Guantanamo *after* the court issued its injunction in *D.V.D.* Then on March 30 they were transferred to El Salvador. Young informed Mr. Reuveni that he was not aware of the injunction and appeared upset that DHS had not communicated the existence of the injunction to DOD. The plain language of the injunction stated that it applied to not only DHS but also anyone with whom they were "acting in concert."[44]

These removals occurred notwithstanding the district court's TRO and absent any explanation from any agency or other party bound by the *D.V.D.* injunction as to how DHS had implemented processes that comported with the injunction. It appeared to Mr. Reuveni that there was no plausible way these removals did not violate the court order.

Mr. Reuveni reported this development to Ensign and Flentje by phone and email.[45] Mr. Reuveni further informed Ensign that DOD's Young had explicitly referenced Mazzara of DHS as a point of contact in the removal flight operations, which was inconsistent with Mazzara's representation to Mr. Reuveni that he had no knowledge of the removal operations.

Indeed, over email on Monday March 31, 2025, at around 5:00 p.m., Mr. Reuveni asked Mazzara how DHS could take the position that it had nothing to do with the removal operation when the individuals removed were in DHS-ICE custody in Texas before being transferred to Guantanamo, and remained in DHS-ICE custody while detained at Guantanamo. Mazzara did not respond. During this same time DOS attorneys expressed dismay to Mr. Reuveni at the removal operation, as it clearly appeared to violate the *D.V.D.* injunction. As with DOD, DOS was bound by the injunction as the plain language of the order stated that it applied to all with whom DHS

---

[43] U.S. Department of State, "More Foreign Gang Terrorists Deported Out of America," March 31, 2025, https://www.state.gov/more-foreign-gang-terrorists-deported-out-of-america/.
[44] *D.V.D.*, (D. Mass. Mar 28, 2025) ECF No. 34, Temporary Restraining Order at p. 1, https://www.courtlistener.com/docket/69775896/34/dvd-v-us-department-of-homeland-security/.
[45] Bill Melugin (@BillMelugin_), "BREAKING: 17 illegal aliens with serious criminal histories were removed to El Salvador last night after being held at Guantanamo Bay, WH officials tell Fox News," X, March 31, 2025, 9:47 AM, https://x.com/BillMelugin_/status/1906719922522357963.

operated in "concert," and Secretary Rubio's social media post suggested DOS had violated that injunction through its participation in the removals.

On April 1, Mr. Reuveni was again told to stop asking questions. Mr. Reuveni received a phone call from Acting AAG Roth, in which Roth relayed that Bove was very unhappy that Mr. Reuveni had contacted counsel at various agencies to ascertain whether DOJ had violated a court order. Roth conveyed that Mr. Reuveni should stop emailing agency counsel on the matter, to instead communicate by phone only, where possible.[46] Mr. Reuveni understood this instruction to be based on leadership's aim to avoid generating written material subject to disclosure through FOIA. Roth also informed Mr. Reuveni that he should not expect any answers from the agencies concerning whether the removal operation discussed in the Secretary of State's press release was in violation of the court order. Mr. Reuveni reported this conversation to Flentje and Ensign sometime that afternoon, with Ensign reaffirming that the DOJ position on responding to plaintiffs' inquiries concerning injunction compliance was, "let's not respond."

The evidence demonstrates that senior DOJ leadership withheld information from DOJ-OIL, interfered with DOJ-OIL's efforts to ensure agency clients were informed about the requirements of the injunction, and provided contrary instruction to DHS and DOD, which resulted in removals in violation of a court order. This also appears to explain why McHenry insisted on the inclusion of the footnote in the brief that "the operational effects of [the] order is [*sic*] ambiguous": though the injunction plainly had nationwide applicability, which leadership acknowledged, operators at high levels of political leadership apparently planned and implemented operations that violated a court order. In retrospect, McHenry's insistence on the footnote appears to be an attempt to suggest ambiguity where there was none. The evident goal was to provide cover for leadership's knowing violation of the nationwide injunction.

### C. Kilmar Abrego Garcia: Wrongful removal with unsubstantiated gang allegations; Government made legally erroneous claim that withholding of removal can be revoked without due process

The third illegal order arose in connection with *Abrego Garcia v. Noem*, 25-cv-951 (D. Md.). On March 15, 2025, as part of the Alien Enemies Act operation described above, DHS removed a Maryland resident, Mr. Kilmar Abrego Garcia, to the CECOT prison in El Salvador without lawful basis. On March 24, 2025, Mr. Abrego Garcia's attorneys filed a complaint in the United States District Court for the District of Maryland alleging this removal was in violation of an October 10, 2019, Immigration Judge order prohibiting his removal to El Salvador.

---

[46] The Department of Justice's implementation of restrictions on communications may be in violation of 5 U.S.C. 2302(b)(13).

1. **Mr. Reuveni took on Abrego Garcia case where government's record showed Mr. Abrego Garcia was erroneously removed**

Mr. Reuveni learned of this complaint on the date of filing, and in his new role as Acting Deputy Director took the case on personally so that more junior attorneys would not have to work on such a high-profile and sensitive matter.

It has been the prior practice going back years in situations where DHS removed someone in error to seek to resolve cases without further litigation by correcting the error. Indeed, it was Mr. Reuveni's understanding that the Solicitor General of the United States had informed the Supreme Court that the policy of the United States is to return wrongfully removed migrants as a matter of course if the Supreme Court or a U.S. court of appeals has ruled that the migrant has the legal right to remain in the country.[47]

Therefore, despite the high-profile nature of the case, Mr. Reuveni initially believed the case could be resolved through a straightforward return of Mr. Abrego Garcia to the United States. Accordingly, beginning on March 24 when the case was filed, through the date of the hearing on April 4, Mr. Reuveni and other agency counsel from DHS and DOS continuously discussed the possibility of requesting Mr. Abrego Garcia's return to U.S. custody. During this time, they also discussed the possibility that pending his return, DOS could ask the government of El Salvador for assurances of Mr. Abrego Garcia's safety at CECOT.

2. **On March 31, 2025, Senior Counselor to the Secretary of Homeland Security James Percival asked whether the government could allege that Mr. Abrego Garcia was a "leader of MS-13" without evidence to support the allegation**

By at least March 27, 2025, in communications including DHS, DOS, and DOJ counsel, questions were raised regarding the existence of evidence that Mr. Abrego Garcia was a gang member and why he was included on the removal flight to CECOT. DHS could not provide direct evidence of Mr. Abrego Garcia's alleged MS-13 gang affiliation.

Then, on Monday March 31, 2025, the day the government's brief was due, Senior Counselor to the Secretary of Homeland Security James Percival asked whether the brief could make a number of factual allegations including that Mr. Abrego Garcia was an MS-13 "leader." Mr. Reuveni noted that any such factual allegations would need to be supported by evidence such as a declarant on behalf of DHS.

---

[47] *See* Letter from Deputy Solicitor General Michael Dreeben to Clerk of the Supreme Court re: *Jean Marc Nken v. Holder*, S. Ct. No. 08-681 (April 24, 2012) ("upon request with respect to a specific alien who was removed before prevailing in the courts; the government will investigate and facilitate the alien's return"); U.S. Immigration and Customs Enforcement, Facilitating the Return to the United States of Certain Lawfully Removed Aliens (Feb. 24, 2012) 1 (Appendix B) (if an alien "was removed while his or her PFR was pending" and later "prevails before the U.S. Supreme Court or a U.S. court of appeals," ICE "will facilitate the alien's return to the United States"); *Lopez-Sorto v. Garland*, 103 F.4th 242, 249-53 (4th Cir. 2024) (discussing ICE policy to facilitate returns).

Approximately two hours after the exchange between Percival and Mr. Reuveni, DHS provided a declaration. The declarant was Robert Cerna, acting field office director (AFOD) for Enforcement and Removal Operations at Immigration and Customs Enforcement. Through Cerna's declaration DHS conceded that because Mr. Abrego Garcia had obtained "withholding of removal" protection, DHS had no legal authority to remove him to his home country of El Salvador.

Nevertheless, Mr. Abrego Garcia was, according to Cerna, placed on a plane to El Salvador. Cerna stated that "ICE was aware of this grant of withholding of removal at the time [*sic*] Abrego Garcia's removal from the United States" and that "[r]eference was made to this status on internal forms," but yet "[t]hrough administrative error, Abrego Garcia was removed from the United States to El Salvador . . . This was an oversight." Cerna also could not personally confirm and declined to attest to Mr. Abrego Garcia's gang membership, let alone his status as an MS-13 "leader." Instead, Cerna's declaration stated that Mr. Abrego Garcia was removed on March 15 based on his "*purported* membership in MS-13." (Emphasis added). Cerna's declaration was included as an exhibit to the brief submitted to the court on March 31 along with decisions from immigration adjudicators referencing MS-13 gang allegations but lacking in direct supporting evidence of those allegations.

### 3. Mr. Reuveni raised concerns about sufficiency of the evidence and urged remedial actions to address Mr. Abrego Garcia's erroneous removal

After the brief was filed, because DHS had still not presented direct evidence justifying Mr. Abrego Garcia's removal, Mr. Reuveni repeatedly and consistently requested updates on efforts to secure Mr. Abrego Garcia's return to the U.S. and assurances of his safety in CECOT. Mr. Reuveni was surprised that lawyers for both DHS and DOS informed Mr. Reuveni that they would only consider any action to attempt to remedy the illegal removal of Mr. Abrego Garcia if DOJ leadership approved it.

DOJ leadership never did. Instead, on several occasions on April 2 and 3 through both phone calls and email, Mr. Reuveni was directed by McHenry, through Roth and Ensign, to cease making requests of DHS and DOS, to stop asking for facts supporting any possible defense of the case, that no "asks" of El Salvador of any sort should be made, and to rest on threshold jurisdictional arguments at the hearing.[48]

Mr. Reuveni raised concerns in multiple emails to both DHS and DOS about the sufficiency of the evidence to support Mr. Abrego Garcia's alleged gang affiliation and the lack of action to correct his erroneous removal. Mr. Reuveni also raised those concerns in multiple emails and phone calls to his DOJ leadership, including Roth and Ensign, on several occasions on April 1-4.

---

[48] The Department of Justice's implementation of restrictions on communications may be in violation of 5 U.S.C. 2302(b)(13).

**4. After Mr. Reuveni repeated in court, per the record, the government's concession that Mr. Abrego Garcia was erroneously removed, Ensign asked Mr. Reuveni for the first time why he did not argue that Mr. Abrego Garcia was a terrorist**

At oral argument on Friday, April 4 before Judge Paula Xinis in the U.S. District Court for the District of Maryland, and in the brief he signed that was submitted to the court, which was reviewed by DOJ and DHS and agency leadership including Ensign and Mazzara, Mr. Reuveni made the threshold jurisdictional arguments and informed the court as conceded by the ICE declarant that the removal of Mr. Abrego Garcia was in error.[49]

A few minutes after the hearing, Mr. Reuveni went from the courtroom to the U.S. Attorney's office space in the court building. The press had been present at the hearing, and by the time he was leaving the courtroom, Mr. Reuveni had already received multiple text messages sharing news headlines about his statements to the court. Mr. Reuveni also received an email from Ensign directing Mr. Reuveni to call him, which Mr. Reuveni did. On that call, Ensign asked Mr. Reuveni – for the first time – why Mr. Reuveni had not argued that Mr. Abrego Garcia was a terrorist and that therefore his withholding of removal order was invalid. Mr. Reuveni told Ensign words to the effect of, "I understand you've seen the headlines, but read the transcript, I did not say the things the headlines say that I said."

Ensign asked Mr. Reuveni why he did not argue that Mr. Abrego Garcia was a member of a terrorist organization or that being a member of such organization meant Mr. Abrego Garcia's protection from removal to El Salvador was nullified. Mr. Reuveni told Ensign he did not make those arguments because: 1) those were not arguments in the government's briefs, which Ensign had reviewed; 2) there was no evidence in the record to support the arguments; and 3) the laws governing withholding of removal do not support a theory that declaring someone a member of a terrorist organization retroactively nullifies a grant of withholding relief. Ensign had little reaction but called again a few minutes later asking similar questions and informing Mr. Reuveni that these inquiries were prompted by the White House. Mr. Reuveni again repeated the same concerns he had on the first call.

Indeed, in order to revoke a grant of withholding of removal, binding federal regulations require the government to move to reopen removal proceedings in the United States and make an affirmative showing that the withholding grant is no longer warranted.[50] Further, the only evidence submitted by DHS at the time of the filing of the government's brief and by the date of oral arguments, the Cerna declaration, did not support a terrorist designation, given Cerna's

---

[49] The government's brief raised three jurisdictional arguments, conceding the merits, arguing that: (1) the court lacked habeas jurisdiction because Mr. Abrego Garcia was in Salvadoran custody, (2) Plaintiffs' claims lacked redressability for Article III standing purposes, and (3) a provision of the INA, 8 U.S.C. § 1252(g), stripped the court of jurisdiction to hear Plaintiffs' claims.
[50] 8 C.F.R. § 1208.24(f).

equivocation on Mr. Abrego Garcia's alleged gang membership and the absence of any other supporting evidence.

### 5.  Mr. Reuveni refused to sign an appeal brief with arguments unsupported by evidence or law and was put on administrative leave in retaliation for his protected activity and refusal to obey an illegal order

That same afternoon of Friday April 4, Roth circulated an outline of an appeal brief to multiple attorneys, including Mr. Reuveni. Mr. Reuveni understood that his name would appear on this brief. Mr. Reuveni responded to that email, including Roth and others, with the same points he had told Ensign in their phone call. Additionally, he noted that because the government had not argued that Mr. Abrego Garcia was a member of a terrorist organization to the court in the brief DOJ and agency leadership cleared for filing, it could not do so on appeal for the first time.

That evening, Mr. Reuveni received an email with a draft brief that made the same legal arguments to which Mr. Reuveni had consistently objected. Mr. Reuveni responded saying that the draft brief still contained the arguments discussed earlier that were not supported by law or the record.

Then later that night, the appeal brief was again circulated. This time, the same arguments Mr. Reuveni had objected to were moved to a different section of the brief. Mr. Reuveni emailed Flentje and said that he could not sign the brief given the unsupported arguments. Early the morning of Saturday, April 5, Flentje emailed Mr. Reuveni and asked him to call him. Mr. Reuveni and Flentje had a phone call around 1:20 a.m. in which Mr. Reuveni again repeated the same objections he had made previously. Flentje told Mr. Reuveni that he should sign the brief, and that he had signed up for the responsibility to do so when he accepted the Deputy position. Mr. Reuveni responded, "I didn't sign up to lie." Ultimately, someone else signed that brief, making arguments contrary to law, which was filed at 1:41 a.m. on April 5.

Less than seven hours later, Mr. Reuveni was placed on administrative leave for alleged "failure to follow a directive from your superiors; failure to zealously advocate on behalf of the United States; and engaging in conduct prejudicial to your client." The letter signed by Deputy Attorney General Todd Blanche placing Mr. Reuveni on administrative leave was leaked to the press and reported that same day.[51] The news report included a statement from Attorney General Pam Bondi, that, "At my direction, every Department of Justice attorney is required to zealously advocate on behalf of the United States…Any attorney who fails to abide by this direction will face consequences."[52] On April 11, Mr. Reuveni was terminated without notice.

---

[51] Thrush, "Justice Dept. Accuses"
[52] Thrush, "Justice Dept. Accuses"

## IV.    Unlawful Retaliation

In the weeks following the notable March 14 meeting during which Bove stated DOJ might have to tell a federal court "fuck you" to implement the administration's removal priorities, Mr. Reuveni witnessed and internally reported to his DOJ leadership multiple incidents that led him to reasonably believe the government was in violation of court orders. Mr. Reuveni also expressed, to personnel who were in contact with and who were relaying directives from the White House, his unwillingness to obey an order he reasonably believed to be unlawful, namely to file a brief with misrepresentations to the United States District Court for the District of Massachusetts. Mr. Reuveni's management interfered with his ability to perform his duties in accordance with his obligations of professional responsibility to his clients and to the court.

Then, on April 4, 2025, Mr. Reuveni made truthful representations to Judge Paula Xinis about the government's own record in the case of Mr. Kilmar Abrego Garcia, abiding by his obligations under the Federal Rules of Civil Procedure and the Rules of Professional Conduct. The next day, Mr. Reuveni refused a directive from DOJ leadership to file an emergency appeal brief in Mr. Abrego Garcia's case that Mr. Reuveni reasonably believed asserted arguments that were contrary to law, frivolous, and untrue.

In reprisal for his whistleblowing and refusal to obey illegal orders, Mr. Reuveni was placed on administrative leave on April 5, 2025, and removed from federal service on April 11, 2025, both violations of 5 U.S.C. § 2302. The Whistleblower Protection Act (WPA), among other protections, prohibits federal agencies from taking retaliatory personnel actions against employees who raise whistleblower concerns internally and who refuse to obey illegal orders. There is no question here, particularly based on this administration's own statements, that these actions taken against Mr. Reuveni were meant to silence Mr. Reuveni and other DOJ attorneys who resist unlawful actions.

Instead, Mr. Reuveni will continue to tell the truth in defense of the rule of law. Mr. Reuveni both exercises his rights to make protected whistleblower disclosures and seeks a remedy for DOJ's due process violation in terminating him without notice, and for DOJ's unlawful retaliation against him under the WPA with the Merit Systems Protection Board.

## V.    Conclusion

Mr. Reuveni refuses to stay silent despite the retaliation he has already faced and the serious risk of additional retaliation for his choice to continue to exercise his rights by disclosing to Congress, the DOJ Inspector General, and the Office of Special Counsel information about senior DOJ and White House leadership's intent and action to defy the rule of law. The consequences of DOJ's actions Mr. Reuveni reports have grave impacts not only for the safety of individuals removed from the country in violation of court orders, but also for the constitutional rights and

protections of all persons – citizen and noncitizen alike – who are potential victims of flagrant, deliberate disregard of due process and the rule of law by the agency charged with upholding it.

Mr. Reuveni does not make these disclosures lightly. In his disclosures he has carefully exercised his rights under the Whistleblower Protection Act to report serious illegality and abuses of power, consistent with and in compliance with the Rules of Professional Conduct. Mr. Reuveni remains committed to the rule of law and to his oath as an attorney and as a nonpartisan civil servant that he swore when he joined the Department of Justice in 2010 and that he has carried out across administrations:

> I, Erez Reuveni, do solemnly swear that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God.[53]

We ask that members of Congress, the DOJ Inspector General, and the leadership of the Office of Special Counsel remain similarly committed to their oaths of office and discharge their duties of oversight and accountability without fear or favor.

Respectfully Submitted,

_____
Dana L. Gold
Government Accountability Project
1612 K Street, NW, Suite 808
Washington, D.C. 20006
(202) 926-3306

_____
Andrea Meza
Government Accountability Project
1612 K Street, NW, Suite 808
Washington, D.C. 20006
(202) 926-3311

_____
Kevin L. Owen
Gilbert Employment Law, P.C.
8403 Colesville Rd., Suite 1000
Silver Spring, MD 20910
(301) 608-0880

Attorneys for Erez Reuveni

_____

[53] 5 U.S.C. § 3331.

# EXHIBIT A

| From: | Ensign, Drew C (CIV) |
|---|---|
| To: | CIV-OIL-GLA-ALL |
| Subject: | New Acting Deputy Director - Erez Reuveni |
| Date: | Friday, March 21, 2025 12:41:33 PM |

Hi all,

I am pleased to announce that the Civil Division has selected Erez Reuveni to serve as the Acting Deputy Director covering district court litigation and litigation teams at OIL-GLA.  As you know, Erez is a top notched litigator who has taken on some of OIL's most challenging cases over the past nearly 15 years.  Before that time, he served as a law clerk for Judge Jon O. Newman on the Second Circuit and in private practice.  While at OIL, Erez has led a team as Assistant Director for over 7 years, served multiple stints as counsel in the Civil Division front office and Associate's Office, led and litigated complex cases protecting our immigration authorities, developed sanctuary city affirmative cases, and worked closely with our many excellent attorneys handling district court litigation.  I have particularly benefitted from his most recent stint in the front office as I started my service as Deputy Assistant Attorney General.

I want to thank those who submitted interest for the Acting positions – we had outstanding choices which helps go to show the excellent caliber of our team here at OIL.

Sincerely,
Drew


Drew C. Ensign
Deputy Assistant Attorney General – Immigration Litigation
Civil Division

# EXHIBIT B



# EXHIBIT C



# EXHIBIT D

