| Summary report: Litera Compare for Word 11.3.1.3 Document comparison done on 7/2/2025 4:56:21 PM | |
|---|---|
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Amended Complaint (Clean).pdf | |
| **Modified filename:** Original Complaint.pdf | |
| **Changes:** | |
| Add | 442 |
| Delete | 642 |
| Move From | 41 |
| Move To | 41 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1166 |

Case 8:25-cv-00951-AAQ Document 1 Filed 03/24/25 Page 1 of 21

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

) Kilmar Armando Abrego Garcia,___)
Jennifer Stefania Vasquez Sura,_____)
A.A.V., a minor, by and through his next friend____)
and mother, Jennifer Vasquez Sura,_)
) c/o Murray Osorio PLLC___)
8630 Fenton Street, Suite 918,_____)
Silver Spring, MD 20910_____)
) Plaintiffs,___)

v.)          Civil Action No. 8:25-cv-00951

) ) Kristi Noem, Secretary of Homeland Security,___)
) Secretary of Homeland Security___)
        Washington, DC 20508_____)
) Todd Lyons, Acting Director, U.S. Immigration
and Customs Enforcement,___)
        and Customs Enforcement,___)
Kenneth Genalo, Acting Executive Associate )
        Director, ICE Enforcement and Removal
Operations,___)
        Operations,___)
Nikita Baker, ICE Baltimore Field Office Director, )
) 500 12th St., SW___)
        Washington, D.C. 20536____)
)Pamela Bondi, Attorney General,___)
        )950 Pennsylvania Avenue, NW___)
        Washington, DC 20530-0001 )
) Marco Rubio, Secretary of State,___)
        ) The Executive Office of the Legal Adviser )
        and Bureau of Legislative Affairs____)
        Suite 5.600___)
        600 19th Street NW__)
        Washington DC 20522_____)
        )Defendants.__)

                                        )

v.
1

Case 8:25-cv-00951-AAQ Document 1 Filed 03/24/25 Page 2 of 21

FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR INJUNCTIVE
RELIEF AND DECLARATORY JUDGMENT

        1.        In 2019, Plaintiff Kilmar Armando Abrego Garcia
securedwon an order prohibiting Defendants
from an immigration judge granting him a form of relief called withholding of removal,
        which prohibits Defendants from removing him to El
        Salvador. Should Defendants wish to remove Plaintiff
        Abrego Garcia to El Salvador, the law sets forth specific

procedures by which they can reopen the case and seek to set aside the grant of withholding of removal. Should Defendants wish to remove Plaintiff Abrego Garcia to any other country, they would have no legal impediment in doing so. But Defendants found those legal procedures bothersome, so they merely ignored them and deported ~~from removing him to El Salvador in 2019 (the "Withholding Order"), and was released from ICE~~

~~custody on supervised release shortly thereafter. Defendants were entitled to appeal the Withholding Order or seek to set it aside utilizing well established judicial procedures. Deterred~~

~~by the factual record and findings supporting the Order, Defendants did neither. They instead chose~~

~~lawlessness.~~

~~2.    On March 12, 2025, in the course of an unlawful arrest, Defendants stopped the car~~

Plaintiff Abrego Garcia ~~was driving with his five year old~~ to El Salvador anyway, ripping him away from ~~his~~ U.S.-citizen wife, Plaintiff Vasquez Sura, and his disabled U.S.-citizen child, Plaintiff A.A.V. Defendants sent Plaintiff Vasquez Sura to El Salvador knowing that he would be immediately incarcerated and tortured in that country's most notorious prison; indeed, Defendants have paid the government of El Salvador millions of dollars to do exactly that. Such conduct shocks the conscience and cries out for immediate judicial relief.
~~A.A.V., forcibly removed Plaintiff Abrego Garcia from the car, and threatened to have child~~

~~services take his child. Following his unlawful detention, and as detailed below Defendants~~

~~improperly removed Plaintiff Abrego to El Salvador in violation of the Withholding Order and~~

~~without due process, where he at all times remained in Defendants' constructive custody pursuant~~

~~to arrangements between Defendants and the El Salvadorian government. During Plaintiff's~~

~~Abrego Garcia's unlawful two and a half month incarceration in El Salvador he was threatened~~

~~and tortured.~~

~~3.    In response to the unlawful incarceration of Plaintiff Abrego Garcia in El Salvador~~

~~at Defendants' direction, on April 4, 2025, the Federal District Court of Maryland (the "District~~

~~Court") ordered the government to facilitate the release and return of Abrego Garcia. ECF No. 31.~~

~~Following Defendants' appeal and an affirmation from the Federal Appeals Court of the Fourth~~

~~Circuit ("Fourth Circuit"), Abrego Garcia v. Noem, No, 25-2345, 2025 WL 1021113, (4th Cir.~~

~~Apr. 7, 2025), on April 10, 2025, the Supreme Court of the United States in a unanimous decision~~

~~ordered Defendants to "'facilitate' Abrego Garcia's release from custody in El Salvador and to~~

~~1~~

~~ensure that his case is handled as it would have been had he not been improperly sent to El Salvador." Noem, et al. v. Abrego Garcia, et. al., 604 U.S. ___ (2025), slip op., at 2. The same day the District Court revised its order to, among other things, provide that the Defendants "take all available steps to facilitate the return of Abrego Garcia to the United States as soon as possible." ECF No. 51 at 1.~~

~~4.    As has been exhaustively detailed in Plaintiffs' filings, Defendants failed to comply~~

~~with the orders of the Supreme Court and the District Court requiring Defendants to both (i) "facilitate Abrego Garcia's immediate return to the United States"; and (ii) "to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador." ECF Nos. 177, 196. While on June 2, 2025, Defendants abruptly returned Abrego Garcia to the United States to be charged with a criminal indictment — alleging that he engaged in the smuggling of aliens across state lines — he is in constant threat of being removed to El Salvador, or another country from which he will be refouled to El Salvador, all without due process. Accordingly, among the relief requested, Plaintiffs seek to restore the status quo ante, "[t]hat is, to return [Abrego Garcia] to where he was on March 12, 2025, before he was apprehended by ICE and spirited away to CECOT." ECF No. 31 at 16-17.~~

~~5.    Defendants' disdain for the law and legal process, and their cruelty, shocks the~~

~~conscience and demands immediate, sustained, judicial relief and oversight. It also marks a profound constitutional crisis in which executive agencies have repeatedly and deliberately flouted the authority of multiple federal courts — including the Supreme Court itself. This defiance undermines the foundational principles of our constitutional system by eroding the checks and balances and rule of law that protect individual liberty from government overreach. The integrity of our constitutional republic, and the rule of law, depends on Plaintiff Abrego Garcia's ability to~~

~~2~~

~~obtain complete relief for these egregious wrongs, lest we accept a government that operates above~~

~~the law and beyond the reach of judicial authority.~~

JURISDICTION AND VENUE

~~6~~ 1.    This Court has jurisdiction to hear this case under 28 U.S.C. § 2201, the Declaratory

Judgment Act, and 28 U.S.C. § 1331, Federal Question Jurisdiction; and because the individual Defendants are United States officials. 28 U.S.C. § 1346(a)(2).

~~7~~ 2.    The Court has authority to enter a declaratory judgment and to provide temporary,

preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, 28 U.S.C. §§ 2201-2202, the All Writs Act, and the Court's inherent equitable powers.

~~8~~ 3.    Venue lies in this District because Plaintiffs reside in Beltsville, Maryland and each

Defendant is an agency or officer of the United States sued in his or her official capacity.

28

2

Case 8:25-cv-00951-AAQ Document 1 Filed 03/24/25 Page 3 of 21

U.S.C. § 1391(e)(1). ~~The unlawful arrest complained of herein also took place within this District.~~ In addition, Defendant Baker's principal place of business is in Baltimore, Maryland, and the legal violations described herein took place at the direction and under the supervision of her predecessor in office.

THE PARTIES

~~9~~ 4.    Plaintiff Kilmar Armando Abrego Garcia is a citizen and native of El Salvador who

resides in Beltsville, Maryland. Defendants ~~revoked his supervised release, arrested him, and~~ have deported him to El Salvador without any legal process whatsoever, and in violation of ~~the Withholding Order~~ an immigration judge order and a federal statute ~~and regulations~~ prohibiting them from doing so.

~~10~~ 5.    Plaintiff Jennifer Vasquez Sura is a U.S. citizen, and the wife of Plaintiff Abrego

Garcia. ~~She is the next friend of Plaintiff Abrego Garcia.~~

~~3~~

~~11~~6.    Plaintiff A.A.V., a U.S. citizen, is a minor child. He is the child of Plaintiff Abrego

Garcia and Plaintiff Vasquez Sura.

~~12~~7.    Defendant Kristi Noem is the Secretary of the Department of Homeland Security

("DHS"). She is the cabinet-level secretary responsible for all immigration enforcement in the United States.

~~13~~8.    Defendant Todd Lyons is the Acting Director of U.S. Immigration and Customs

Enforcement ("ICE"). He is the head of the federal agency responsible for all immigration enforcement in the United States.

~~14~~9.    Defendant Kenneth Genalo is the Acting Executive Associate Director of ICE

Enforcement and Removal Operations. He is the head of the ICE office that carries out arrests of noncitizens and removals from the United States.

3

Case 8:25-cv-00951-AAQ Document 1 Filed 03/24/25 Page 4 of 21

~~15~~10.    Nikita Baker is the ICE Baltimore Field Office Director. She is the head of the ICE

office that unlawfully arrested Plaintiff, and ~~revoked his supervised release, which~~ such arrest took place under the direction and supervision of her predecessor in office.

~~16~~11.    Pamela Bondi is the Attorney General of the United States. The Immigration Judges

who decide removal cases and ~~applications~~ application for relief from removal do so as her designees.

~~17~~12.    Marco Rubio is the Secretary of State of the United States. He is the individual

whom Plaintiffs ~~requested~~ request this Court order to request the return of Plaintiff Abrego Garcia to the United States from El Salvador.

~~18~~13.    All government defendants are sued in their official capacities.

~~PROCEDURAL HISTORY~~

19.     On March 24, 2025, Plaintiff Abrego Garcia filed his initial Complaint and First Motion for Temporary Restraining Order against Defendant Noem and others. ECF No. 1, 3. The following day, on March 25, 2025, Plaintiff filed a Second Motion for Temporary Restraining Order. ECF No. 6.

20.     By no later than March 31, 2025, Defendants admitted that the removal of Plaintiff Abrego Garcia was an "administrative error." ECF No. 11-3 at 3 (Cerna Decl. Mar. 31, 2025).

21.     On April 4, 2025, the District Court granted preliminary injunctive relief, ordering the government to facilitate the return of Plaintiff Abrego Garcia. ECF No. 21.

22.     Defendants filed various stay motions, all of which were denied by the District Court and the Fourth Circuit. ECF Nos. 31, 32, 39.

23.     On April 7, 2025, Defendants appealed to the Supreme Court of the United States. After a brief administrative stay, on April 10, 2025, the Supreme Court affirmed the District Court's order, noting only that the order to return Abrego Garcia by April 7, 11:59 PM could no longer be effective (as the deadline had passed) and stating that the term "effectuate" required further clarification from this Court. Noem, et al. v. Abrego Garcia et al., 604 U.S. ___ (2025), slip op., at 2. The Supreme Court further ordered Defendants "to ensure that [Plaintiff Abrego Garcia's] case is handled as it would have been had he not been improperly sent to El Salvador." Id.

24.     The same day, the District Court amended its order to direct Defendants to "take all available steps to facilitate the return of Abrego Garcia to the United States as soon as possible" and requiring regular status updates. ECF No. 51 at 1.

25.     On April 11, 2025, the District Court found that Defendants had failed to comply with its previous order and instituted daily reporting requirements. ECF No. 61.

26.     Despite the amended order and daily reporting requirements, Defendants failed to provide substantive information regarding steps taken toward compliance moving forward. See, e.g., ECF Nos. 63, 74, 77.

27.     Although Defendants purported to comply with the District Court's orders, high-level government officials made repeated pronouncements that, as detailed herein, suggested they had no intention of complying with the Court's orders.

28.     Between April 15, 2025 and the present, the parties engaged in expedited discovery. See, e.g., ECF Nos. 79, 98, 112.

29.     On June 6, 2025—nearly two months after the Supreme Court's affirmation and without prior notice to this Court or Plaintiffs—Defendants abruptly announced that they

~~had returned Plaintiff Abrego Garcia to the United States to face criminal indictment in Tennessee.~~

~~RELEVANT~~ LEGAL ~~DOCTRINES~~ BACKGROUND

~~Withholding of Removal~~

~~30~~14.    Federal law prohibits the government from removing a noncitizen to a country

where ~~they are~~he is more likely than not to face persecution on account of a statutorily protected ground. 8 U.S.C. § 1231(b)(3)(A). This protection is ~~typically~~usually referred to as "withholding of removal."

~~31~~15.    For an immigration judge (serving as the designee of Defendant Bondi) to grant

withholding of removal to a noncitizen, the noncitizen must prove that he is more likely than not to suffer persecution. "The burden of proof is on the applicant for withholding of removal ~~...~~[] to establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 1208.16(b).

~~6~~

~~32~~16.    If a noncitizen is granted withholding of removal, "DHS may not remove the alien

to the country designated in the removal order unless the order of withholding is terminated." Johnson v. Guzman Chavez, 594 U.S. 523, 531 (2021). No exceptions lie. However, withholding

4

Case 8:25-cv-00951-AAQ Document 1 Filed 03/24/25 Page 5 of 21

of removal is a country-specific form of relief, and an individual granted withholding of removal can still be deported to any other country.

~~33~~17.    Federal regulations provide a procedure by which a grant of withholding of removal

issued by an immigration judge may be terminated: DHS must move to reopen the removal proceedings before the immigration judge, and then DHS will bear the burden of proof, by a preponderance of the evidence, that grounds for termination exist. 8 C.F.R. § 1208.24(e). After a grant of withholding of removal is terminated, there would be no impediment to removal.

~~Third Country Removal~~

~~34.    An individual with an order of withholding of removal to a particular country may~~

~~only be removed to another country upon receiving notice and associated due process, including having an opportunity to apply for protection from removal to that third country. See 8 U.S.C. § 1231(b)(3)(A); see also Guzman Chavez v. Hott, 940 F.3d 867, 879 (4th Cir. 2019) ("[I]f a noncitizen who has been granted withholding as to one country faces removal to an alternative country, then she must be given notice and an opportunity to request withholding of removal to that particular country), rev'd on other grounds sub nom. Johnson v. Guzman Chavez, 594 U.S. 523 (2021); Andriasian v. INS, 180 F.3d 1033, 1041 (9th Cir. 1999); Kossov v. INS, 132 F.3d 405, 408-09 (7th Cir. 1998).~~

~~35.    An individual with an order of withholding of removal to a particular country may~~

~~not be removed to another country with the intent or prospect of "chain~~

refoulement" – i.e. that they will be subsequently sent to the country for which they have an order of withholding of removal. See 8 C.F.R. § 1208.18(a)(1); see also Murillo Morocho v. Garland, 80 F.4th 61, 71 (1st

7

Cir. 2023) (vacating decision denying CAT protection where the Board of Immigration Appeals failed to properly consider risk of torture by non-state actors).

36.    Federal law also places restrictions on removal of aliens to countries to which they

have no connection, or a country to where their "life or freedom would be threatened." 8 U.S.C. § 1231(b)(3)(A); see also Jama v. Immigr. & Customs Enf't, 543 U.S. 335, 348 (2005).

37.    Likewise, the Convention Against Torture (CAT), as implemented in U.S. law

through the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), prohibits Defendants from removing an individual to any country where such individual is more likely than not to face torture by or at the acquiescence of the government. See Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified at 8 U.S.C. § 1231 note); 8 C.F.R. § 1208.16(c); 8 C.F.R. § 1208.18.

38.    The CAT also prohibits refoulement, which includes chain refoulement – where an

individual will be sent to a country which will, in turn, send him to another country where he is more likely than not to be tortured.

Revocation of Supervised Release and Arrest

39.    Federal regulations governing enforcement actions by immigration officers require

that "[a] warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." 8 C.F.R. § 287.8(c)(2)(ii).

40.    Where an individual with a final removal order has been released on supervision, 8

C.F.R. § 241.4(l)(2) provides that only the Executive Associate Commissioner or a district director may revoke supervised release, and the district director may do so only "when, in the district director's opinion, revocation is in the public interest and circumstances do not reasonably permit

8

referral of the case to the Executive Associate Commissioner." That regulation also requires that an individual whose supervised release is revoked be informed as to the reasons why, and be given a prompt post-deprivation opportunity to be heard as to why his supervised release should be restored.

Detention Beyond Removal Period

41.    Under 8 U.S.C. § 1231(a), the government may detain a noncitizen for removal

only during the 90-day "removal period," which begins when the removal order becomes administratively final. 8 U.S.C. § 1231(a)(1)(A)-(B)(i). This period may be extended only if the noncitizen "fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal." 8 U.S.C. § 1231(a)(1)(C).

~~42.    The Supreme Court has also recognized a constitutional limitation on post-removal~~
~~period detention: such detention is permissible only when there is a "significant~~
~~likelihood of removal in the reasonably foreseeable future." Zadvydas v. Davis, 533 U.S.~~
~~678, 701 (2001). After six months of detention    the "presumptively reasonable~~
~~period"    the government bears the burden of proving this likelihood if the noncitizen~~
~~provides "good reason to believe" that removal is not reasonably foreseeable. Id.~~

FACTS

~~43~~18.    Plaintiff <u>Kilmar Armando</u> Abrego Garcia is a citizen of El Salvador and no other
country.

~~44.    Plaintiff Abrego Garcia is not a member of~~ and has no affiliation
with Tren de

<u>19.      Plaintiff Abrego Garcia is not a member of or has no affiliation with Tren de</u>
Aragua, MS-13, or any other criminal or street gang.

~~45.~~    Although ~~Plaintiff Abego Garcia~~<u>he</u> has been accused of general "gang affiliation,"
 the U.S. government has never produced ~~credible~~<u>an iota of</u> evidence ~~supporting~~<u>to
support</u> this <u>unfounded</u> accusation~~, and there has been no finding made by any judicial
tribunal of any such affiliation~~.
~~9~~

~~46.    Prior to April 2025,~~ <u>20.       </u>Plaintiff Abrego Garcia ~~had~~<u>has</u> no criminal
history. ~~Separate and~~<u>He has never been charged or
convicted of any</u> ~~apart from his May 21, 2025 Tennessee indictment, he~~ has never been
~~charged or~~ ~~convicted of any~~
 criminal charges, in the United States, El Salvador, or any other country.
Plaintiff Abrego Garcia's 2019 removal proceedings

~~47~~<u>21.</u>    Plaintiff Abrego Garcia left El Salvador when he was around sixteen years old,
fleeing gang violence. Beginning around 2006, gang members <u>had </u>stalked, hit, and
threatened to kidnap and kill him in order to coerce his parents to succumb to their
increasing demands for extortion.
<u>5</u>
<u>Case 8:25-cv-00951-AAQ Document 1 Filed 03/24/25 Page 6 of 21</u>

~~48~~<u>22.</u>    Sometime around 2011, Plaintiff Abrego Garcia entered the United States without
inspection. He then made his way to the state of Maryland, where his older brother, a
U.S. citizen, resided. In the United States, Plaintiff Abrego Garcia has only ever resided
in Maryland.

~~49~~<u>23.</u>    Around 2016, Plaintiff Abrego Garcia met Plaintiff Jennifer Vasquez Sura, a U.S.
citizen with two U.S.-citizen children from a prior relationship. Over time, they became
close and eventually became romantically involved.

~~50~~<u>24.</u>    Around December 2018, Plaintiff Abrego Garcia moved in with Plaintiff Vasquez
Sura and her two children, after Plaintiff Vasquez Sura learned she was pregnant with

their child. Plaintiff Abrego Garcia supported himself, Plaintiff Vasquez Sura, and her two children through work in the construction industry.

~~51~~25.   On March 28, 2019, Plaintiff Abrego Garcia went to a Home Depot in Hyattsville,
Maryland to solicit employment. When he arrived, he joined three other young men who were also at Home Depot soliciting employment, two of whom he recognized from prior occasions at the Home Depot, though he had never interacted with them in any other context. The young men proceeded to chat to pass the time.

~~52~~26.   At 2:27 PM, while the four of them were chatting, a detective from the Hyattsville
City Police approached the group. The detective did not speak to Plaintiff Abrego Garcia, but only

~~10~~

one of the other men. Soon thereafter, officers from Prince George County Police Department ("PGPD") arrived on the scene and proceeded to handcuff all four young men, including Plaintiff Abrego Garcia.    ~~53.~~    At no point did police explain why they were arresting Plaintiff Abrego Garcia, nor
 was Plaintiff Abrego Garcia ever charged with any crime. This was Plaintiff Abrego Garcia's first and only time in state custody.

6
Case 8:25-cv-00951-AAQ Document 1 Filed 03/24/25 Page 7 of 21

~~54~~27.   At the police station, the four young men were placed into different rooms and
questioned. Plaintiff Abrego Garcia was asked if he was a gang member; when he told police he was not, they said that they did not believe him and repeatedly demanded that he provide information about other gang members. The police told Plaintiff Abrego Garcia that he would be released if he cooperated, but he repeatedly explained that he did not have any information to give because he did not know anything.

~~55~~28.   Plaintiff Abrego Garcia was then transferred to another room and told that ICE
officers would be coming to take him into federal immigration custody. Eventually, ICE officers arrived and took Plaintiff Abrego Garcia into detention.

~~56~~29.   The following day, Plaintiff Abrego Garcia was served with a Notice to Appear, 8
U.S.C. § 1229, commencing removal proceedings against him pursuant to 8 U.S.C. § 1229a. He was charged as removable pursuant to 8 U.S.C. § 1182(a)(6)(A)(i) ("An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible"), and no other charges.

~~57~~30.   On April 24, 2019, Plaintiff Abrego Garcia appeared for his first hearing in
immigration court. Through counsel, he moved for release on bond pursuant to 8 U.S.C. § 1226(a), submitting over seventy pages of evidence in support thereof. ICE opposed a change in custody

~~11~~

status, arguing that Plaintiff Abrego Garcia presented a danger to the community because local police had ~~purportedly~~supposedly "verified" that he is an active gang member.

58̶31.    In support thereof, ICE offered a Gang Field Interview Sheet ("GFIS") generated
by PGPD. The GFIS explained that the only reason to believe Plaintiff Abrego Garcia
was a gang member was that he was wearing a Chicago Bulls hat and a hoodie; and that a
confidential informant advised that he was an active member of MS-13 with the
Westerns clique. The GFIS

7

Case 8:25-cv-00951-AAQ Document 1 Filed 03/24/25 Page 8 of 21

had been entered into PGPD's database at 6:47 PM, approximately four hours after police
met Plaintiff Abrego Garcia for the first time.

59̶32.    According to the Department of Justice and the Suffolk County District Attorney's
Office, the "Westerns" clique operates in Brentwood, Long Island, in New York, a state
that Plaintiff Abrego Garcia has never lived in.

60̶33.    The attorney for Plaintiff Abrego Garcia subsequently made multiple attempts to
obtain additional information from law enforcement concerning these allegations. PGPD
indicated that it did not have any incident report related to the Home Deport episode at
all, nor did the Department have any incident reports containing his name. The
Hyattsville City Police Department ("HCPD"), on the other hand, confirmed it had an
incident report for the Home Depot incident, but that only ~~three~~3 people were named and
Plaintiff Abrego Garcia was not one of them, nor did it have any other incident reports
with his name in its database.

~~61.~~    His attorney also contacted the PGPD Inspector General requesting to speak to the
 detective who authored the GFIS sheet, but was informed that the detective had been
suspended. A request to speak to other officers in the Gang Unit was declined.

~~62.    Upon information and belief, the detective was suspended for passing confidential~~
~~information to a sex worker. See Ex. A.~~

~~12~~

63̶34.    On June 25, 2019, Plaintiff Vasquez Sura and Plaintiff Abrego Garcia were married
in the Howard Detention Center. Plaintiff Vasquez Sura was in her third trimester of
pregnancy at the time. Due to a pre-existing condition, uterus didelphys, her pregnancy
was categorized as high-risk. See Ex. B (Declaration of Plaintiff Vasquez Sura).

64̶35.    Plaintiff Abrego Garcia ~~subsequently~~then filed an I-589 application
for asylum, withholding of ~~withholding of~~ removal, and protection under the Convention Against Torture with the
Baltimore Immigration Court and was scheduled for an individual hearing. His individual
hearing spanned over two days: August 9, 2019, and September 27, 2019.

8

Case 8:25-cv-00951-AAQ Document 1 Filed 03/24/25 Page 9 of 21

65̶36.    In advance of his hearing, Plaintiff Abrego Garcia, through counsel, filed a motion
for a subpoena to require the appearance of two PGPD detectives, and any evidence
substantiating his alleged gang membership.

66~~37~~.   In addition, Plaintiff Abrego Garcia, through counsel, submitted a legal brief and a
voluminous evidentiary filing establishing his eligibility for protection and contesting the unfounded allegation of gang membership levied against him.

~~67~~38.   On August 9, 2019, the attorney for ICE indicated on the record that ICE had
conferred with its law enforcement partners and that all the evidence and intelligence they had was what was contained in the GFIS. As a result, a subpoena was deemed unnecessary.

~~68~~39.   On August 11, 2019, Plaintiff Vasquez Sura gave birth to the couple's son, Plaintiff
A.A.V. Plaintiff Abrego Garcia was unable to witness the birth of his son as he remained detained, awaiting to continue the second part of his hearing.

~~69~~40.   A.A.V. was born with Microtia, congenital malformation of the external ear,
resulting in an underdeveloped ear. Testing later confirmed that A.A.V. was deaf in his right ear. See Ex. B (Declaration of Plaintiff Vasquez Sura).
~~13~~

~~70~~41.   On October 10, 2019, Plaintiff Abrego Garcia was granted withholding of removal
pursuant to 8 U.S.C. § 1232(b)(3)(A), after the immigration judge agreed that he had established it was more likely than not that he would be persecuted by gangs in El Salvador because of a protected ground. See Ex. ~~B~~A (Immigration Judge ~~Order~~order).
~~71.~~   ICE did not appeal the grant of relief, see Ex. ~~C~~E (immigration court "Automated Case Information" page); and Plaintiff Abrego Garcia was ~~then~~ promptly released from custody ~~on supervised release~~.
~~72.   At no time have Defendants ever sought to reopen Plaintiff Abrego Garcia's~~
~~removal proceeding or seek to challenge or rescind the Withholding Order.~~

~~73~~42.   Plaintiff Abrego Garcia went home to his wife and children. They all have
continuously resided in Prince George's County, Maryland.
9
Case 8:25-cv-00951-AAQ Document 1 Filed 03/24/25 Page 10 of 21

~~74~~43.   In addition to hearing problems, A.A.V., who is now five years old, is intellectually
disabled and has a speech disorder. To this day, he is unable to verbally communicate and in October 2024 he was diagnosed with autism.

~~75~~44.   Both Plaintiff Vasquez Sura and Plaintiff Abrego Garcia work to support their
family of five.
~~76.   Before his unlawful removal,~~ Plaintiff Abrego Garcia ~~was~~is a union member and ~~was~~
is employed full-time as a first-year Sheetmetal Apprentice. In addition, he ~~had~~has been pursuing his own license at the University of Maryland.

~~77~~45.   As a condition of his withholding of removal status, Plaintiff Abrego Garcia is
required to check in with ICE once a year, and has been fully compliant. He appeared for

his most recent check-in on January 2, 2025, without incident. See Ex. C (ICE check-in record).

46.    Aside from these check-ins, after being granted withholding protection and being
released from custody, Plaintiff Abrego Garcia has had no contact with any law enforcement agency.
~~14~~

~~78.    Separate and apart from the May 21, 2025 Tennessee indictment, Plaintiff Abrego~~

47.    Plaintiff Abrego Garcia has never been arrested or charged with any crime in the
U.S. or in El Salvador.

~~79.~~    There ~~remains~~is no known link or association between him and the MS-13 gang~~, or~~
~~any other gang, and no judicial tribunal has found that any such link or association exists~~. Prince George's County law enforcement never again questioned him regarding MS-13 or accused him of membership in MS-13.

Plaintiff Abrego Garcia's ~~March,~~ 2025 arrest and removal

~~80~~48.   In the early afternoon of Wednesday, March 12, 2025, after completing a shift as a
sheet metal worker apprentice at a new job site in Baltimore, Plaintiff Abrego Garcia picked up his five-year old son, A.A.V., from his grandmother's house.
10
Case 8:25-cv-00951-AAQ Document 1 Filed 03/24/25 Page 11 of 21

~~81~~49.   While driving with his son A.A.V. in the backseat, Plaintiff Abrego Garcia was
pulled over by ICE officers acting at the direction and under the supervision of Defendant Baker's predecessor in office.

~~82~~50.   One ICE officer, who identified himself as part of Homeland Security
Investigations, told Plaintiff Abrego Garcia that his "status has changed." Within minutes, Plaintiff Abrego Garcia was handcuffed and detained in one of several ICE vehicles on the scene. Plaintiff Vasquez Sura was called and instructed to appear at their location within ten minutes to get her five-year old son, A.A.V.; otherwise, the ICE officers threatened that the child would be handed over to Child Protective Services. See Ex. B (Declaration of Plaintiff Vasquez Sura).

~~83.    The ICE officers who carried out this vehicle stop and subsequent arrest did not~~
~~have a warrant, nor did they have any articulable reason to believe that Plaintiff Abrego~~
~~Garcia would flee before a warrant could be obtained.~~

~~84.    Plaintiff Abrego Garcia's supervised release was not revoked by the Executive~~
~~Associate Commissioner, nor by the District Director. Nor did reasons exist to believe~~
~~that circumstances did not reasonably permit referral of the case to the Executive~~
~~Associate Commissioner.~~
~~15~~

~~85~~51.   After Plaintiff Vasquez Sura arrived at the scene, she was able to briefly talk with

Plaintiff Abrego Garcia, who appeared confused, distraught, and crying. Moments later, Plaintiff Abrego Garcia was driven away. No explanation was provided to ~~Plaintiff Vasquez Sura~~Jennifer as to why her husband was detained, where he was going, or what was happening. Id.

~~86~~52.    Almost immediately after Plaintiff Vasquez Sura left with her son A.A.V., she
began to try to locate Plaintiff Abrego Garcia through the online ICE Detainee Locator system and by calling various immigration detention centers and facilities. ~~Upon information and belief,~~It appeared that between Wednesday, March 12, and Saturday, March 15, Plaintiff Abrego Garcia was moved to various different locations across the country. See Ex. B (Declaration of Plaintiff Vasquez Sura).

~~87~~53.    The evening after his arrest, Plaintiff Vasquez Sura received a call from Plaintiff
Abrego Garcia. At that time, it appeared that he was in Baltimore~~, where he had been brought immediately after his arrest for interrogation.~~

~~88.~~.    During that conversation, Plaintiff Abrego Garcia informed Plaintiff Vasquez Sura
 that he was being questioned about gang affiliations. He repeatedly informed his interviewers that he was never a gang member and had no gang affiliations. He was shown several photos where he appeared in public, and asked about other

11

people in those photos, but was unable to provide any information on them, as he did not know them or anything about them. Plaintiff Abrego Garcia also told his wife that he had been told that he ~~understood that he~~ would go before an immigration judge and then be released. See Ex. B (Declaration of Plaintiff Vasquez Sura).

~~89.    Following his interrogation in Baltimore, officers instructed Plaintiff Abrego Garcia to sign documents without adequate explanation of their contents or legal significance. He was subsequently placed with approximately ten other detainees and transported to BWI airport.~~

~~16~~

~~90.    At no time was Plaintiff Abrego Garcia informed as to the reasons why his supervised release was revoked, nor given the opportunity to be heard by means of the required interview as to why it should be restored.~~

~~91.    Despite Plaintiff Abrego Garcia's repeated assertions that he possessed a valid Employment Authorization Document, officials disregarded this information and placed him on a flight to Louisiana.~~

~~92.    In Louisiana, Plaintiff Abrego Garcia explicitly requested to speak with an ICE agent. When granted this opportunity, he clearly communicated that he had received judicial relief and needed to speak with a judge. The ICE agent falsely assured Plaintiff Abrego Garcia that he was not being deported to El Salvador but rather was being transported to Texas to appear before a judge. Relying on this misrepresentation, Plaintiff Abrego Garcia cooperated with further transport.~~

93.    Consistent with this account, 54.    Plaintiff Vasquez Sura received a call from Plaintiff Abrego Garcia on the evening of March 13. Plaintiff Abrego Garcia told his wife that he believed he was in Louisiana, but was not sure because he had been moved around so many times. Plaintiff Abrego Garcia advisedindicated to his wife that he was very confused. However, he was still being assured (falsely) that he would soon be brought before an immigration judge. soon. See Ex. B (Declaration of Plaintiff Vasquez Sura).

9455.   In an attempt to ascertain his actual location and find further information about his arrest and detention, Plaintiff Vasquez Sura called different detention centers, trying to speak to someone. She recalls one brief conversation where she was told that "El Salvador was asking for him." Her attempts to protest by explainingsaying that Plaintiff Abrego Garciahe had won protection from being removed to El Salvador fell on deaf ears. See Ex. B (Declaration of Plaintiff Vasquez Sura). 17

95.    Upon arrival in Texas, officers separated Plaintiff Abrego Garcia and four to five other Salvadorans from the remaining passengers. The detainees were confined to a stationary bus for an entire day while officials waited for additional deportees to arrive. Plaintiff Abrego Garcia overheard ICE agents discussing plans to transport detainees to CECOT1 in El Salvador. This was the first time Plaintiff Abrego Garcia learned that officials had been misleading him about being brought before a judge and that they instead intended to deport him.

9656.   Around 11:00 AM on Saturday, March 15, 2025, Plaintiff Vasquez Sura received a her last call from Plaintiff Abrego Garcia. During that conversation, Plaintiff Abrego Garcia informed her that he was being held by ICE at the East Hidalgo Detention Center in La Villa, Texas. See Ex. B (Declaration of Plaintiff Vasquez Sura).

9757.   Plaintiff Abrego Garcia then relayed that he was told that he was being deported to El Salvador. With a sense of urgency, he asked his wife to contact his mother so their family could get him from "CECOT," as that is where he was told they were sending him.1

98.    The following morning, officials processed Plaintiff Abrego Garcia through a crowded office, calling detainees individually and loading them onto buses. The transport caravan proceeded to the airport under significant security, including helicopter surveillance. At the airport, multiple federal agencies were present, including FBI, DEA, and ICE personnel.

99.    Throughout this entire process, Plaintiff Abrego Garcia continuously informed officials that he possessed legal permission to remain and work in the United States until 2029 and had been granted withholding of removal. He repeatedly requested judicial review. Officials consistently responded with false assurances that he would see a judge, deliberately misleading Plaintiff Abrego Garcia to prevent him from taking actions to assert his legal rights.

1 CECOT is the Terrorism Confinement Center in El Salvador, one of the largest prisons in the
 world.

~~18~~12

~~100. Plaintiff Abrego Garcia only realized the true nature of his dire situation upon arrival at the airport in El Salvador, at which point it was too late to challenge the unlawful deportation.~~

~~Abrego Garcia's Detention in El Salvador~~

Case 8:25-cv-00951-AAQ Document 1 Filed 03/24/25 Page 13 of 21

58.    Since that conversation, Plaintiff Vasquez Sura has not had any further contact with Plaintiff Abrego Garcia. See Ex. B (Declaration of Plaintiff Vasquez Sura).

~~101. On~~    59.    The following day, on Sunday, March 16, ~~Plaintiff~~Ms. Vasquez Sura was sent a photo from
a news article discussing the deportation of alleged Venezuelan gang members that were deported without a hearing. The photo showed men kneeling on the ground, with their shaved heads bowed and their arms over their head. Their faces were not visible. Upon inspection, Jennifer identified one of these men as Plaintiff Abrego Garcia based on her husband's distinctive tattoos and two scars on his head ~~and personally selected, unaffiliated, and distinctive tattoos~~. See Ex. ~~E~~D (CECOT photos).

~~102.~~    60.    For the next few days, the ICE Detainee Locator continued to indicate that Plaintiff
Abrego Garcia was located at the East Hidalgo Detention Center, even though staff at that detention center told Plaintiff Vasquez Sura that he had left on Saturday. See Ex. B (Declaration of Plaintiff Vasquez Sura). (Now, Plaintiff Abrego Garcia no longer appears in the ICE Detainee Locator.)

~~103.~~    61.    Watching the news, Plaintiff Vasquez Sura was horrified to see more photos of
CECOT prisoners that included her husband, and a video where Plaintiff Abrego Garcia was frog-walked through the CECOT prison.

~~104.~~ Plaintiff Abrego Garcia's family subsequently hired a lawyer in El Salvador, who has confirmed that Plaintiff Abrego Garcia is, in fact, being held at CECOT. The lawyer has ascertained that to ~~105. To~~ date, there are no known criminal charges levied against Plaintiff Abrego Garcia in El Salvador either.

~~106.~~    62.    ICE and DHS took no steps to reopen the removal case of Plaintiff Abrego Garcia,
nor to ~~challenge or~~ rescind his ~~Withholding Order~~order of withholding of removal. See Ex. ~~C~~E (immigration court "Automated Case Information" page, showing no activity since October 10, 2019).

~~19~~13

Case 8:25-cv-00951-AAQ Document 1 Filed 03/24/25 Page 14 of 21

63.    Upon information and belief, ICE and DHS leadership, including Defendants

~~107. Defendants, including Defendants~~ Noem, Lyons, Genalo, and the predecessor in office of Defendant Baker, decided to deport Plaintiff Abrego Garcia without following the law.

Upon information and belief, they ~~108. They~~ did so knowing and ~~having arranged and intended~~intending that the Government of El Salvador would detain Plaintiff Abrego Garcia in CECOT immediately upon arrival.

~~109. Plaintiff Abrego Garcia had exhausted all administrative remedies. No administrative remedies were available to Plaintiff Abrego Garcia, precisely because Defendants made the choice to unlawfully forego proceedings before the immigration judge, which would entail a right to administrative review before the Board of Immigration Appeals and then a petition for review to the U.S. Court of Appeals for the Fourth Circuit.~~

Conditions in CECOT

~~110.~~  64.    On March 15, 2025, Defendants deported 261 noncitizens, including 238 Venezuelan nationals and 23 Salvadoran nationals, to El Salvador without going through any legal processes whatsoever in front of an immigration judge.

Upon information and belief, ~~111.~~ Plaintiff Abrego Garcia was one of those 23 Salvadoran nationals~~who were~~. Salvadoran President Nayib Bukele confirmed they have been sent to the country's mega-prison CECOT, the Terrorism Confinement Center. Upon information and belief, Defendants carried out this deportation through extrajudicial means because they believed that going through the immigration judge process took too long, and they feared that they might not win all of their cases before immigration judges.

65.    Upon information and belief, ICE and DHS has paid or continues to pay the Government of El Salvador six million dollars in order for the Government of El Salvador to detain these individuals, including Plaintiff Abrego Garcia.2

~~112.~~  66.    Upon information and belief, all Defendants are aware that the government of El Salvador tortures individuals detained in CECOT. Indeed, U.S. President Donald Trump has made comments to the press expressing glee and delight at the torture that the Government of El Salvador inflicts upon detainees in CECOT.

2 "US to pay El Salvador to jail 300 alleged gang members, AP reports" (Mar. 15, 2025), available at https://www.reuters.com/world/us/us-pay-el-salvador-jail-300-alleged-gang-members-ap-reports-2025-03-15/.

14

Case 8:25-cv-00951-AAQ Document 1 Filed 03/24/25 Page 15 of 21

~~113.~~  67.    CECOT conditions have garnered attention from human rights organizations. Each of the 256 cells is intended to hold approximately 80 inmates but often holds nearly double.~~See Ex. F.~~3 The cramped cells are equipped with tiered metal bunks without mattresses, two basins for washing, and two open toilets. There are no windows, fans, or air conditioning, despite the region's warm and humid climate.~~See Ex. G.~~420

~~114.~~  68.    Inmates in CECOT are confined to their cells for 23.5 hours daily and cannot go outdoors. They are denied access to reading materials, including even letters from friends or family. Inmates are prohibited from receiving visits from family and friends. Meals are

provided through the bars, and the facility enforces strict regulations to maintain order. ~~See Ex. H.~~5

~~115.~~   69.    In May 2023, Cristosal, a leading human rights organization in El Salvador,

released a comprehensive report detailing severe human rights abuses within the country's prison system, especially CECOT. ~~See Ex. I.~~6 The investigation documented the deaths of 153 inmates between March 27, 2022, and March 27, 2023, attributing many to torture, beatings, mechanical asphyxiation (strangulation), and lack of medical attention. Id. Autopsies revealed common patterns of lacerations, hematomas, sharp object wounds, and signs of choking or strangulation. Id. Survivors reported being forced to pick food off the floor with their mouths, subjected to

3 Leire Ventas & Carlos Garcia, "El Salvador's Secretive Mega-Jail," BBC News (July 14, 2023), available at
https://www.bbc.com/news/resources/idt-81749d7c-d0a0-48d0-bb11-eaab6f1e6556.
4 Maanvi Singh, "US Deportees Face Brutal Conditions in El Salvador Mega-Prison: 'Severe Overcrowding, Inadequate Food,'" The Guardian (Mar. 20, 2025), available at
https://www.theguardian.com/us-news/2025/mar/20/trump-deportations-venezuela-prison
5 "Inside El Salvador's prison holding Venezuelans deported from US," CNN (March 17. 2025),
available       at
https://edition.cnn.com/2025/03/17/world/video/el-salvador-prison-holding-venezuelans-deported-us-trump-digvid.
6 Nob López, "Inmates in El Salvador Tortured and Strangled: A Report Denounces Hellish Conditions in Bukele's Prisons," El País (May 29, 2023), available at
https://english.elpais.com/international/2023-05-29/inmates-in-el-salvador-tortured-and-strangled-a-report-denounces-hellish-conditions-in-bukeles-prisons.html.
15
Case 8:25-cv-00951-AAQ Document 1 Filed 03/24/25 Page 16 of 21

electric shocks, and exposed to untreated skin fungus epidemics. Id. Cristosal's director has
emphasized that these systemic violations have become state policy. Id.

70.    Plaintiff Abrego Garcia is at imminent risk of irreparable harm with every additional day he spends detained in CECOT, included but not limited to torture and possible

~~116. Plaintiff Abrego Garcia reports that he was subjected to severe mistreatment upon arrival at CECOT, including but not limited to severe beatings, severe sleep deprivation, inadequate nutrition, and psychological torture.~~

~~117. Plaintiff Abrego Garcia was the first name called to disembark the plane that transported him to El Salvador on March 15, 2025. As he exited the aircraft, still in chains, two officials grabbed his arms and pushed him down the stairs, forcing his head down.~~

~~118. There were strong lights illuminating the area despite it being nighttime, and cameras were filming the detainees' arrival.~~

~~119. Plaintiff Abrego Garcia was pushed toward a bus, forcibly seated, and fitted with a second set of chains and handcuffs. He was repeatedly struck by officers when he attempted to~~

~~21~~  death.

71.    Plaintiff Abrego Garcia has exhausted all administrative remedies. No

~~raise his head. He observed an ICE agent on the bus communicating with Salvadoran~~
~~officials to confirm the identities of the Salvadoran nationals on board before the bus~~
~~departed.~~

~~120. Upon arrival at CECOT, the detainees were greeted by a prison official who~~
~~stated, "Welcome to CECOT. Whoever enters here doesn't leave." Plaintiff Abrego~~
~~Garcia was then forced to strip, issued prison clothing, and subjected to physical abuse~~
~~including being kicked in the legs with boots and struck on his head and arms to make~~
~~him change clothes faster. His head was shaved with a zero razor, and he was~~
~~frog-marched to cell 15, being struck with wooden batons along the way. By the~~
~~following day, Plaintiff Abrego Garcia had visible bruises and lumps all over his body.~~

~~121. In Cell 15, Plaintiff Abrego Garcia and 20 other Salvadorans were forced to~~
~~kneel from approximately 9:00 PM to 6:00 AM, with guards striking anyone who fell~~
~~from exhaustion. During this time, Plaintiff Abrego Garcia was denied bathroom access~~
~~and soiled himself. The detainees were confined to metal bunks with no mattresses in an~~
~~overcrowded cell with no windows, bright lights that remained on 24 hours a day, and~~
~~minimal access to sanitation.~~

~~122. After approximately one week at CECOT, prison director Osiris Luna and~~
~~other officials separated the 21 Salvadorans who had arrived together. Twelve individuals~~
~~with visible gang-related tattoos were moved to another cell, while Plaintiff Abrego~~
~~Garcia remained with eight others who, like him, upon information and belief had no~~
~~gang affiliations or tattoos.~~

~~123. As reflected by his segregation, the Salvadoran authorities recognized that~~
~~Plaintiff Abrego Garcia was not affiliated with any gang and, at around this time, prison~~
~~officials explicitly acknowledged that Plaintiff Abrego Garcia's tattoos were not~~
~~gang-related, telling him "your tattoos are fine."~~
~~22~~

~~124. While at CECOT, prison officials repeatedly told Plaintiff Abrego Garcia~~
~~that they would transfer him to the cells containing gang members who, they assured him,~~
~~would "tear" him apart.~~

~~125. Indeed, Plaintiff Abrego Garcia repeatedly observed prisoners in nearby cells~~
~~who he understood to be gang members violently harm each other with no intervention~~
~~from guards or personnel. Screams from nearby cells would similarly ring out throughout~~
~~the night without any response from prison guards on personnel.~~

~~126. During his first two weeks at CECOT, Plaintiff Abrego Garcia suffered a~~
~~significant deterioration in his physical condition and lost approximately 31 pounds~~
~~(dropping from approximately 215 pounds to 184 pounds).~~

~~127. On April 9, Plaintiff Abrego Garcia and four others were transferred to a~~
~~different module in CECOT, where they were photographed with mattresses and better~~
~~food—photos that appeared to be staged to document improved conditions.~~

~~128. On or about April 10, 2025, Plaintiff Abrego Garcia was transferred alone to~~
~~the Centro Industrial prison facility in Santa Ana, El Salvador.~~

~~129. While at Centro Industrial, Plaintiff Abrego Garcia was frequently hidden~~
~~from visitors, being told to remain in a separate room whenever outside visitors came to~~
~~the facility.~~

~~130. During his entire time in detention in El Salvador, Plaintiff Abrego Garcia~~
~~was denied any communication with his family and access to counsel until Senator Van~~
~~Hollen visited him on April 17, 2025.~~

~~Statements Refusing Return of~~ administrative remedies are available to Plaintiff Abrego Garcia ~~to the United States~~, precisely because Defendants made the choice to unlawfully forego proceedings before the immigration judge, which would entail a right to administrative review before the Board of Immigration Appeals and then a petition for review to the U.S. Court of Appeals for the Fourth Circuit.

~~131. Since the Supreme Court affirmed the District Court's order requiring that Defendants facilitate Abrego Garcia's release and return from custody in El Salvador and ensure~~

~~23~~

~~that Plaintiff Abrego Garcia's case is handled as it would have been had he not been improperly sent to El Salvador, numerous high-ranking government officials, including Defendants, have publicly stated that they would not comply with the Courts' orders.~~

~~132. By way of example:~~

- ~~On April 16, 2025, Attorney General Pamela Bondi stated: "He is not coming back to our country. President Bukele said he was not sending him back. That's the end of the story. If he wanted to send him back, we would give him a plane ride back. . . . But he's from El Salvador. He's in El Salvador, and that's where the president plans on keeping him." Ex. J.~~
- ~~On April 18, 2025, the official White House account posted on social media: "he's NOT coming back." Ex. K.~~
- ~~On April 25, 2025, President Trump stated in a public interview that he had not asked President Bukele to return Plaintiff Abrego Garcia, saying "I haven't been asked to ask him by my attorneys." Ex. L.~~
- ~~On April 29, 2025, President Trump acknowledged he could secure Plaintiff Abrego Garcia's return, stating "I could" call the president of El Salvador and request his return, and that "if he were the gentleman that you say he is, I would do that. But he's not." Ex. M.~~
- ~~On May 2, 2025, the official DHS account posted that Plaintiff Abrego Garcia "will never be allowed to return to the United States" and "will not return to our country under the Trump Administration." Ex. N.~~
- ~~On May 8, 2025, Secretary of Homeland Security Kristi Noem testified before the Senate that "There is no scenario where Abrego Garcia will be in the United States again." Ex. O.~~
- ~~When asked whether DHS had taken steps to process parole paperwork to allow Plaintiff Abrego Garcia to be readmitted into the United States in this case, Acting General Counsel of DHS Joseph Mazzara was adamant that he would not, under any circumstances, do so. See ECF No. 129-9.~~

~~133. These statements represent only a sampling of the numerous public declarations by Defendants and other associated high-ranking government officials demonstrating their categorical refusal to comply with the orders of the District and Supreme Court.~~

~~Return to the United States~~

~~24~~

134. Despite the Government's repeated public statements that Plaintiff Abrego Garcia would never return to the United States, on June 6, 2025, the Government abruptly transported him from El Salvador to the United States.

135. Demonstrating Defendants' constructive custody of Plaintiff Abrego Garcia throughout his detention in El Salvador, he was not returned through any formal extradition process and upon information and belief, this transportation occurred without any immigration parole paperwork or other formal immigration status documentation of any kind.

136. On June 6, 2025, at a press conference, Defendant Bondi announced that the government returned Plaintiff Abrego Garcia so that he could face criminal charges in Tennessee relating to his alleged smuggling of illegal aliens across state lines. Ex. P.

137. Upon information and belief, Defendants' investigation into Abrego Garcia's alleged human smuggling was pretextual, and only began on or around April 28, 2025. United States v. Abrego Garcia, No. 3:25-cr-00115, ECF No. 61 at 12-13 (M.D. Tenn. June 26, 2025).

Defendants' Continued Threat to Remove Abgrego Garcia To El Salvador

138. Now that Plaintiff Abrego Garcia is back in the United States, Defendants continue to state publicly that they intends to remove Plaintiff Abrego Garcia, even though his removal to El Salvador is prohibited by his Withholding Order, and no other country has been properly designated for his removal through immigration court proceedings or otherwise.

139. Indeed, immediately upon his return, Defendant Attorney General Bondi declared: "Upon completion of sentence we anticipate he will be returned to his home country of El Salvador." Chris Strohm et al., Abrego Garcia Charged With Illegally Transporting Migrants, Bloomberg (June 6, 2025).
25

140. Senior White House official Stephen Miller similarly stated that Abrego Garcia is "now being prosecuted. After a lengthy prison sentence, it is back home to El Salvador," and reiterated: "He will be tried, jailed, and then deported again to El Salvador." Ex. Q; Ex. R. The federal prosecutors handling Plaintiff Abrego Garcia's proceeding in Tennessee also recently confirmed that he may be removed "in the near future," United States v. Abrego Garcia, No. 3:25-cr-00115 (M.D. Tenn. June 22, 2025), ECF No. 46.

141. At a hearing on June 26, 2025, counsel for Defendants also represented to the District Court that it was his understanding that Defendants intended to remove Abrego Garcia to a third country upon his release from pretrial custody, but was unable to state which country or when such removal would take place.

142. Defendants also continue to insist, without basis, that their disproven claim of MS-13 membership allow them to remove Abrego Garcia to El Salvador despite Abrego Garcia's withholding of removal there. E.g., ECF No. 86-1 at 2 ("Abrego Garcia—a member of a foreign terrorist organization (MS-13), who no longer has any right to withholding of removal in the first place."); ECF No. 77 at 2 (Mazzara's declaring "Abrego Garcia is no longer eligible for withholding of removal because of his membership in MS-13"); Petitioners' Application to Vacate Injunction at 3, Noem v. Abrego Garcia, 145 S. Ct. 1017 (2025) (No. 24A) ("For starters, because MS-13 members such as Abrego Garcia have since been designated members of a foreign terrorist organization, they are no longer eligible for withholding of removal under 8

U.S.C. 1231(b)(3)(B).”); id. at 20 (“MS-13’s ensuing designation as a foreign terrorist organization whose members cannot invoke withholding of removal”).

26

The Whistleblower Disclosure

143. On June 24, 2025, Erez Reuveni, the former Acting Deputy Director for the Office of Immigration Litigation (OIL) at the Department of Justice, submitted a protected whistleblower

disclosure to Congress, the DOJ Inspector General, and the Office of Special Counsel. Mr.

Reuveni’s disclosure detailed violations of law and abuse of authority by the Department of Justice

and White House personnel in connection with several cases, including that of Plaintiff Abrego

Garcia.

144. The whistleblower disclosure details how, after Mr. Reuveni truthfully informed this Court at the April 4, 2025 hearing that Plaintiff Abrego Garcia’s removal was an error, he was

instructed to, among other things, file an appeal brief making arguments he believed were unsupported by evidence and law. When Mr. Reuveni refused to sign the brief, he was placed on

administrative leave on April 5, 2025, and terminated on April 11, 2025.

CAUSES OF ACTION

FIRST CAUSE OF ACTION:

VIOLATION OF THE WITHHOLDING OF REMOVAL STATUTE,

8 U.S.C. § 1231(b)(3)(A)

(Plaintiff Abrego Garcia)

~~145.~~    72.____Plaintiffs incorporate the foregoing paragraphs ~~1-144~~1-71 by reference.

~~146.~~    73.____The Withholding of Removal statute, 8 U.S.C. § 1231(b)(3)(A), prohibits Defendants from removing a noncitizen to any country from which he has been granted withholding of removal, unless such grant is formally terminated by lawful means.

~~147.~~    74.____As set forth above, Defendants removed Plaintiff Abrego Garcia to El Salvador, the

country from which he had been granted withholding of removal, without formally terminating his

grant of withholding of removal, thus violating ~~the~~this law.

27

~~148.~~    75.____Defendants’ violation of law, as set forth herein, ~~caused~~is causing Plaintiff Abrego Garcia ~~to~~

~~face~~ irreparable harm with each day that he ~~spent~~spends outside the United States and detained in CECOT.

and the Centro Industrial prison facility.

16

Case 8:25-cv-00951-AAQ Document 1 Filed 03/24/25 Page 17 of 21

~~149.~~    76.____Even ~~now that~~if Plaintiff Abrego Garcia ~~was~~were released from CECOT

and the Centro, he would still be

Industrial prison facility and returned to the United States, he has not been placed back in the

~~position he would have been had he not been improperly sent to El Salvador and is~~
~~suffering~~

suffering irreparable harm in the form of separation from his U.S. citizen wife, Plaintiffs Vasquez

Sura, and his severely disabled U.S. citizen child, Plaintiff A.A.V.

~~150.~~    77.    Plaintiffs ask the Court to immediately order Defendants to take all steps reasonably

available to them, proportionate to the gravity of the ongoing harm, to ~~place~~return Plaintiff Abrego

~~Garcia back in the position he would have been had he not been improperly sent to El~~
~~Salvador,~~

~~and not remove Plaintiff Abrego Garcia to El Salvador or to a third country that will or~~
~~may send~~

Garcia to the United States. This should begin with ordering that Defendants immediately halt all

payments to the Government of El Salvador to hold individuals in CECOT, and an order that

Defendants immediately request that the Government of El Salvador release Plaintiff Abrego

Garcia from CECOT and deliver him to the U.S. Embassy in El Salvador ~~without prior~~
~~notice and opportunity to be heard~~.

SECOND CAUSE OF ACTION:
PROCEDURAL DUE PROCESS
U.S. CONSTITUTION, AMENDMENT V
(Plaintiff Abrego Garcia)

~~151.~~    78.    Plaintiffs incorporate the foregoing paragraphs ~~1-144~~1-71 by reference.

~~152.~~    79.    Plaintiff Abrego Garcia has a procedural due process right not to be removed to El

Salvador, the country from which he had been granted withholding of removal, ~~or any~~
~~other~~without an

~~country, without an~~immigration judge first carrying out the procedures set forth in statute and federal regulations.

~~153.~~    80.    As set forth above, Defendants removed Plaintiff Abrego Garcia to El Salvador, the

country from which he had been granted withholding of removal, without formally terminating his

~~28~~

grant of withholding of removal, thus violating his procedural due process rights under the Fifth

Amendment to the U.S. Constitution.

~~154.~~    81.    Defendants' violation of law, as set forth herein, ~~caused~~is causing Plaintiff Abrego Garcia

irreparable harm ~~for~~with each day that he ~~spent~~spends outside the United States and detained in CECOT ~~and.~~

~~the Centro Industrial prison facility.~~

17

Case 8:25-cv-00951-AAQ Document 1 Filed 03/24/25 Page 18 of 21

155.    82.    Even ~~now that~~if Plaintiff Abrego Garcia ~~was~~were released from CECOT ~~and the Centro, he would still be~~

~~Industrial prison facility and returned to the United States, he has not been placed back in the~~

~~position he would have been had he not been improperly sent to El Salvador and is suffering~~

suffering irreparable harm in the form of separation from his U.S. citizen wife, Plaintiffs Vasquez

Sura, and his severely disabled U.S. citizen child, Plaintiff A.A.V.

~~156.~~    83.    Plaintiffs ask the Court to immediately order Defendants to take all steps reasonably

available to them, proportionate to the gravity of the ongoing harm, to ~~place~~return Plaintiff Abrego

Garcia to the United States. This should begin with ordering that Defendants immediately halt all

~~Garcia back in the position he would have been had he not been improperly sent to El Salvador,~~

~~and not remove Plaintiff Abrego Garcia to El Salvador or to a third country that will or may send~~

~~him~~payments to the Government of El Salvador ~~without prior notice and opportunity to be heard, and to~~to hold individuals in CECOT, and an order that ~~Plaintiff~~ Defendants immediately request that the Government of El Salvador release Plaintiff Abrego

Garcia from CECOT and deliver him to the U.S. Embassy in El Salvador.

~~Abrego Garcia is afforded all appropriate procedural due process in connection with any further~~

~~removal proceedings.~~

THIRD CAUSE OF ACTION:
SUBSTANTIVE DUE PROCESS
U.S. CONSTITUTION, AMENDMENT V
(All Plaintiffs)

~~157.~~    84.    Plaintiffs incorporate the foregoing paragraphs ~~1-144~~1-71 by reference.

~~158.~~    85.    Plaintiff Abrego Garcia has a substantive due process right under the Fifth Amendment to the U.S. Constitution not to be subjected to government conduct that shocks the

conscience. Defendants' conduct as set forth above violates that right.

~~29~~

~~159.~~    86.    Plaintiffs Vasquez Sura and A.A.V., as the U.S.-citizen spouse and minor child of

Plaintiff Abrego Garcia, also have a family unity interest in Plaintiff Abrego Garcia not being

removed from the United States in a manner that shocks the conscience. Defendants' conduct as

set forth above violates that right.

~~160.~~    87.    Defendants' conscience-shocking actions, as set forth herein, ~~caused~~is causing Plaintiff

Abrego Garcia irreparable harm with each day that he ~~spent~~spends outside the United States and ~~was~~

detained in CECOT ~~and the.~~

~~Centro Industrial prison facility.~~

18

~~161.~~ 88.    Even ~~now that~~if Plaintiff Abrego Garcia ~~was~~were released from CECOT ~~and the Centro,~~ he would still be

~~Industrial prison facility and returned to the United States, he has not been placed back in the~~

~~position he would have been had he not been improperly sent to El Salvador and is suffering~~

suffering irreparable harm in the form of separation from his U.S. citizen wife, Plaintiffs Vasquez

Sura, and his severely disabled U.S. citizen child, Plaintiff A.A.V.

~~162.~~ 89.    Plaintiffs ask the Court to immediately order Defendants to take all steps reasonably

available to them, proportionate to the gravity of the ongoing harm, to ~~place~~return Plaintiff Abrego

Garcia to the United States. This should begin with ordering that Defendants immediately halt all

~~Garcia back in the position he would have been had he not been improperly sent to El Salvador,~~

~~and not remove Plaintiff Abrego Garcia to El Salvador or to a third country that will or may send~~

~~him~~payments to the Government of El Salvador to hold individuals in CECOT, and ~~to~~an order that ~~Plaintiff Abrego Garcia is afforded all appropriate substantive~~

~~due process in connection with any further removal proceedings.~~

Defendants immediately request that the Government of El Salvador release Plaintiff Abrego

Garcia from CECOT and deliver him to the U.S. Embassy in El Salvador.

FOURTH CAUSE OF ACTION:

ADMINISTRATIVE PROCEDURE ACT

5 U.S.C. § 706(2)(A)

(Plaintiff Abrego Garcia)

~~163.~~ 90.    Plaintiffs incorporate the foregoing paragraphs ~~1-144~~1-71 by reference.

~~30~~

~~164.~~ 91.    The Administrative Procedure Act provides that courts "shall . . . hold unlawful and

set aside agency action" that is "arbitrary, capricious, an abuse of discretion." 5 U.S.C. §

~~§~~706(2)(A).

~~165.~~ 92.    Defendants' actions as set forth herein were arbitrary, capricious, and an abuse of

discretion.

~~166.~~ 93.    Defendants' arbitrary and capricious actions, as set forth herein, ~~caused Plaintiff~~are causing

Plaintiff Abrego Garcia irreparable harm with each day that he ~~spent~~spends outside the United States

and detained in CECOT.

~~in CECOT and the Centro Industrial prison facility.~~

~~167.~~ 94.    Even ~~now that~~if Plaintiff Abrego Garcia ~~was~~were released from CECOT ~~and the Centro,~~ he would still be

~~Industrial prison facility and returned to the United States, he has not been placed back in the~~

~~position he would have been had he not been improperly sent to El Salvador and is suffering~~

suffering irreparable harm in the form of separation from his U.S. citizen wife, Plaintiffs Vasquez

Sura, and his severely disabled U.S. citizen child, Plaintiff A.A.V.

19

Case 8:25-cv-00951-AAQ Document 1 Filed 03/24/25 Page 20 of 21

~~168.~~ 95.    Plaintiffs ask the Court to immediately order Defendants to take all steps reasonably

available to them, proportionate to the gravity of the ongoing harm, to return Plaintiff Abrego

Garcia to the ~~position he was in prior to his unlawful arrest, including~~United States. This should begin with ordering that Defendants ~~not remove~~immediately halt all ~~Plaintiff Abrego Garcia to El Salvador or to a third country that may or will send him to El Salvador~~

~~without prior notice and opportunity to be heard.~~

payments to the Government of El Salvador to hold individuals in CECOT, and an order that

Defendants immediately request that the Government of El Salvador release Plaintiff Abrego

Garcia from CECOT and deliver him to the U.S. Embassy in El Salvador.

FIFTH CAUSE OF ACTION:

HABEAS CORPUS

28 U.S.C. § 2241

(Plaintiff Abrego Garcia)

~~169.~~ 96.    Plaintiffs incorporate the foregoing paragraphs ~~1-144~~1-71 by reference.

~~170.~~ 97.    The writ of habeas corpus is available to any individual who is held in custody of

the federal government in violation of the Constitution or laws or treaties of the United States.

~~31~~

~~171.~~ 98.    As set forth herein, Plaintiff Abrego Garcia ~~will imminently be~~is being held in ~~federal ICE~~ custody~~, without~~ by the

Government of El Salvador, but the Government of El Salvador is detaining Plaintiff Abrego

Garcia at the direct request of Defendants, and at the financial compensation of Defendants. Such

~~legal basis and~~detention is in violation of ~~statutes and regulations, as set forth herein~~the Constitution or laws or treaties of the United States.

~~172. This Court should issue a writ of habeas corpus ad testificandum, ordering that Plaintiff Abrego Garcia be brought before this Court for a habeas corpus hearing.~~

~~173. At the habeas corpus hearing, this Court should order Defendants to show cause why continued detention is lawfully permissible; and if they cannot meet their burden of so~~

showing, issue a writ of habeas corpus and order Plaintiff Abrego Garcia's immediate release from
custody.
SIXTH CAUSE OF ACTION:
UNLAWFUL ARREST
8 C.F.R. § 241.4(l) AND 8 C.F.R. § 287.8(c)(2)(ii)
(Plaintiff Abrego Garcia)
174. Plaintiffs incorporate the foregoing paragraphs 1-144 by reference.
175. When ICE arrested Mr. Abrego Garcia on March 12, 2025, they flagrantly violated federal regulations.
176. Mr. Abrego Garcia was under a valid Order of Supervision following his 2019 grant of withholding of removal. He had fully complied with all requirements, including attending his
most recent check-in on January 2, 2025, without incident. See Ex. D (ICE check-in record).
177. Defendants violated 8 C.F.R. § 241.4(l)(1), which requires that upon revocation of supervised release, "the alien will be notified of the reasons for revocation of his or her release or
parole. The alien will be afforded an initial informal interview promptly after his or her return to
Service custody to afford the alien an opportunity to respond to the reasons for revocation stated
in the notification."
178. Defendants provided Mr. Abrego Garcia with no written notification of revocation, no explanation of the reasons for revocation, and no opportunity to contest the revocation.
32

179. Defendants further violated 8 C.F.R. § 241.4(l)(2), which provides that only the Executive Associate Commissioner or a district director may revoke supervised release, and the district director may do so only "when, in the district director's opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate Commissioner." Upon information and belief, no such determination was made by the Executive Associate Commissioner or district director, and no exigent circumstances existed that would have prevented referral to the proper authority.
180.    Additionally, Defendants violated 8 C.F.R. § 287.8(c)(2)(ii), which requires that
"[a] warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained."
181. Defendants had no reason to believe Mr. Abrego Garcia was likely to escape before a warrant could be obtained. To the contrary, they knew he was living openly in Maryland, working at a legitimate job, supporting his U.S. citizen family, and consistently complying with his supervision requirements. Yet Defendants deliberately bypassed the warrant requirement, ambushing Mr. Abrego Garcia while he was driving with his disabled five-year-old child.
182. These regulations were promulgated to safeguard due process rights of noncitizens, and Defendants' violations severely prejudiced Plaintiff Abrego Garcia. Had these regulations been followed, Mr. Abrego Garcia would have had a meaningful

opportunity to contest the revocation of his supervised release, demonstrate his compliance with the Order of Supervision, and prevent his unlawful removal to El Salvador.

183. Under the well-established Accardi doctrine, "when an agency fails to follow its own procedures or regulations, that agency's actions are generally invalid." Nader v. Blair, 549

33

F.3d 953, 962 (4th Cir. 2008) (citing United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260,

268 (1954)); see also Sanchez v. McAleenan, 2024 WL 1256264, at \*7 (D. Md., Mar. 25, 2024).

184. Defendants' unlawful arrest of Mr. Abrego Garcia set in motion the chain of events that led to his wrongful deportation, torture, and continued suffering and detention. This Court

must not permit Defendants to benefit from these flagrant regulatory violations.

185. As relief, 99.    Plaintiffs ask the Court to immediately order Defendants to release Mr.immediately cease

compensating the Government of El Salvador for its detention of Plaintiff Abrego Garcia from custody and restore his Order of Supervision on the same conditions as before, and to

his March 2025 arrest.

SEVENTH CAUSE OF ACTION:

UNLAWFUL DETENTION BEYOND REMOVAL PERIOD

8 U.S.C. § 1231(a)(6) AND DUE PROCESS UNDER ZADVYDAS v. DAVIS

(immediately request that the Government of El Salvador release Plaintiff Abrego Garcia) from

186. Plaintiffs incorporate the foregoing paragraphs 1-144 by reference.

187. Under 8 U.S.C. § 1231(a), the government may detain a noncitizen for removal only during the 90-day "removal period," which begins when the removal order becomes administratively final. 8 U.S.C. § 1231(a)(1)(A)-(B)(i). This period may be extended only if the

noncitizen "fails or refuses to make timely application in good faith for travel or other documents

necessary to the alien's departure or conspires or acts to prevent the alien's removal." 8 U.S.C.

§ 1231(a)(1)(C).

188. The Supreme Court has recognized a constitutional limitation on post-removal-period detention: such detention is permissible only when there is a "significant likelihood of

removal in the reasonably foreseeable future." Zadvydas v. Davis, 533 U.S. 678, 701 (2001). After

six months of detention—the "presumptively reasonable period"—the government bears the

34

burden of proving this likelihood if the noncitizen provides "good reason to believe" that removal is not reasonably foreseeable. Id.

189. Plaintiff Abrego Garcia was initially released from custody in October 2019 because Defendants could not remove him from the United States given his Withholding Order.

190. Mr. Abrego Garcia's removal order became final in 2019, and his 90-day removal period ended in January 2020. His 180-day Zadvydas presumptively reasonable period expired in April 2020.

191. More than five years later, Plaintiff Abrego Garcia remains unremovable to El Salvador due to his still-valid Withholding Order. As of the filing of this amended and supplemental complaint, Defendants have not designated any other country for his removal.

192. Even if Defendants were to designate a third country, Plaintiff Abrego Garcia would be entitled to apply for withholding of removal or protection from refoulement under, among other things, the Convention Against Torture with respect to that country, and those proceedings would further delay any potential removal.

193. Plaintiff Abrego Garcia has established far more than a "good reason to believe" that there is no significant likelihood of his removal in the reasonably foreseeable future as (1) he cannot legally be removed to El Salvador; (2) no other country has agreed to accept him; and (3) even if such a country were identified, Mr. Abrego Garcia would be entitled to apply for protection from removal to that country, including on the basis that the country would send him to El Salvador, a process that would take many months if not years to complete.

194. Under Zadvydas, Defendants cannot detain Mr. Abrego Garcia indefinitely while they search for a country that might accept him or while they pursue lengthy legal proceedings to

35

try to overcome his withholding protection. Such detention violates both the statutory limitations

of 8 U.S.C. § 1231(a)(6) and his constitutional due process rights.

195. As relief, Plaintiffs request an order from this Court immediately releasing Mr. Abrego Garcia from Defendants' custody and placing him on supervision pursuantCECOT and deliver him to 8the U.S.C Embassy in El Salvador.

§ 1231(a)(3).

EIGHTH CAUSE OF ACTION:

THIRD COUNTRY REMOVAL WITHOUT OPPORTUNITY FOR PROTECTION

8 U.S.C. § 1231(b)(3) AND THE CONVENTION AGAINST TORTURE

(Plaintiff Abrego Garcia)

196. Plaintiffs incorporate the foregoing paragraphs 1-144 by reference.

197. In Abrego Garcia, the Supreme Court ordered that Defendants "ensure that [Mr. Abrego Garcia's] case is handled as it would have been had he not been improperly sent to El

Salvador." Noem, 145 S. Ct. at 1018. As Justice Sotomayor explained in her concurrence, this

means Defendants "must also comply with [their] obligations under the Convention Against

Torture."

198. The Convention Against Torture, as implemented in U.S. law, prohibits Defendants from removing an individual to any country where such individual is more likely than not to face

~~torture by or at the acquiescence of the government. See Foreign Affairs Reform and Restructuring~~
~~Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified at 8 U.S.C.~~
~~§ 1231 note); 8 C.F.R. §§ 1208.16(c), 1208.18. This prohibition extends to chain refoulement —~~
~~the practice of deporting someone to a country which will in turn deport that person to be tortured~~
~~elsewhere. See 8 C.F.R. § 1208.18(a)(1); see also Murillo Morocho v. Garland, 80 F.4th 61, 71~~
~~(1st Cir. 2023) (vacating decision denying CAT protection where the Board of Immigration~~
~~Appeals failed to properly consider risk of torture by non-state actors).~~
~~36~~

~~199. For an individual with an order of withholding of removal to a particular country, like~~ Plaintiff Abrego Garcia, ~~Defendants can only remove him to another country if he first receives notice and an opportunity to apply for protection from removal to that third country. See 8 U.S.C. § 1231(b)(3)(A); see also Andriasian v. INS, 180 F.3d 1033, 1041 (9th Cir. 1999); Kossov v. INS, 132 F.3d 405, 408-09 (7th Cir. 1998).~~

~~200.~~ Plaintiff Abrego Garcia has ~~no claim to citizenship or permanent residence in any country other than El Salvador. Accordingly, any third country to which he might be deported would, in turn, likely deport him to El Salvador, where it has already been held that he faces a substantial risk of torture at the hands of or with the acquiescence of the Salvadoran government.~~

~~201. Defendants have repeatedly stated their intent to remove Mr. Abrego Garcia to a third country. However, they have refused to identify which country they propose to remove him to, thereby denying him the opportunity to seek protection from removal to that country as required by law.~~

~~202. Plaintiff Abrego Garcia could face persecution or torture if removed directly to various other countries, including but not limited to countries with notorious human rights abuses like Libya, South Sudan, and Eritrea. Without knowing which country Defendants intend to try to remove him to, Plaintiff Abrego Garcia cannot prepare or file an application for protection.~~

~~203. As relief, Plaintiffs request an order from this Court that Defendants may not remove Mr. Abrego Garcia from the continental United States without first providing him and his counsel with written notice of the specific country they intend to remove him to, and a reasonable period of time — which Plaintiffs respectfully suggest is ten days — to file an application for relief under, among other things, the withholding of removal statute and the Convention Against Torture with respect to such country.~~
~~37~~

REQUEST FOR RELIEF

Plaintiffs pray for judgment against Defendants and respectfully request that the Court enters an order:

20

a) Declaring that Defendants' actions, as set forth herein, violated the laws of the United States and the Fifth Amendment to the U.S. Constitution;

b)      ~~Immediately ordering Defendants to restore the status quo ante, which includes returning Abrego Garcia to Maryland, where he was before being picked up by DHS agents in March, 2025;~~

c)      ~~Issue a writ of habeas corpus ad testificandum, ordering that Plaintiff Abrego Garcia be brought before this Court for a habeas corpus hearing. At the habeas corpus hearing, this Court should order Defendants to show cause why continued detention is lawfully permissible; and if they cannot meet their burden of so showing, issue a writ of habeas corpus and order Plaintiff Abrego Garcia's immediate release from custody;~~

b) Immediately ordering Defendants to immediately cease compensating the Government of El Salvador for its detention of Plaintiff Abrego Garcia;

c) Immediately ordering Defendants to immediately request that the Government of El Salvador release Plaintiff Abrego Garcia from CECOT and deliver him to the U.S. Embassy in El Salvador;

d) Should the Government of El Salvador decline such request, ordering Defendants to take all steps reasonably available to them, proportionate to the gravity of the ongoing

~~d)~~      ~~Order that Defendants~~harm, to return ~~Plaintiff~~ Abrego Garcia to ~~his prior Order of Supervision~~the United States;

~~e~~e) Granting Plaintiffs costs and fees under the Equal Access to Justice Act; and

~~d~~f)      Granting such other relief at law and in equity as justice may require.

~~38~~

~~Dated: July 2~~Respectfully submitted,~~, 2025~~

~~//s/~~ ~~Jonathan G. Cooper~~/ Simon Sandoval-Moshenberg          Date: March 24, 2025
Simon Y. Sandoval-Moshenberg, Esq.
~~QUINN EMANUEL URQUHART &~~
~~SULLIVAN, LLP~~
~~Jonathan G. Cooper (~~D. Md. Bar ~~No. 21345)~~no. 30965
~~Olivia Horton*~~
~~1300 I St. NW, Suite 900~~
~~Washington, DC 20005~~
~~(202) 538-8000~~
~~jonathancooper@quinnemanuel.com~~
~~oliviahorton@quinnemanuel.com~~
~~*admitted in Texas; not admitted in D.C.~~
~~Supervised by attorney admitted in D.C.~~
~~Andrew J. Rossman~~
~~Sascha N. Rand~~
~~K. McKenzie Anderson~~
~~Samuel P. Nitze~~
~~Courtney C. Whang~~
~~Roey Goldstein~~
~~Sam Heavenrich~~
~~Victoria Martin~~
~~Morgan L. Anastasio~~
~~295 Fifth Avenue, 9th Floor~~
~~New York, NY 10016~~
~~(212) 849-7000~~
~~andrewrossman@quinnemanuel.com~~

~~sascharand@quinnemanuel.com~~
~~mckenzieanderson@quinnemanuel.com~~
~~samuelnitze@quinnemanuel.com~~
~~courtneywhang@quinnemanuel.com~~
~~roeygoldstein@quinnemanuel.com~~
~~samheavenrich@quinnemanuel.com~~
~~victoriamartin@quinnemanuel.com~~
~~morgananastasio@quinnemanuel.com~~
Counsel for ~~Plaintiffs~~Plaintiff
~~MURRAY OSORIO~~Murray Osorio PLLC ~~Simon Y. Sandoval-Moshenberg Rina Gandhi~~
4103 Chain Bridge Road, Suite 300
Fairfax, Virginia 22030
~~(703) 352-2399~~
Telephone: 703-352-2399
Facsimile: 703-763-2304
ssandoval@murrayosorio.com
~~QUINN EMANUEL URQUHART &~~
~~SULLIVAN, LLP~~
~~Stephen E. Frank~~
~~111 Huntington Ave, Suite 520~~
~~Boston, MA 02199~~
~~(617) 712-7100~~
~~stephenfrank@quinnemanuel.com~~
~~39~~21