| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE DISTRICT OF MARYLAND |
| 2 | GREENBELT DIVISION |

```
 3  _____
                                       )
 4  KILMAR ARMANDO ABREGO GARCIA,      )
    et al.,                            )
 5                                     )
         Plaintiffs,                   )
 6                                     ) Docket Number
              vs.                      ) 8:25-cv-00951-PX
 7                                     )
    KRISTI NOEM, et al.,               )
 8                                     )
         Defendants.                   )
 9  _____)
```

```
10              TRANSCRIPT OF EVIDENTIARY HEARING
               BEFORE THE HONORABLE PAULA XINIS
11             UNITED STATES DISTRICT COURT JUDGE
                THURSDAY, JULY 10 2025, AT 1:05 P.M.
12
    APPEARANCES:
13
    On Behalf of the Plaintiffs:
14
         BY:  ANDREW ROSSMAN, ESQUIRE
15                SASCHA RAND, ESQUIRE
             QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
16           295 5th Avenue
             New York, NY  10016
17           (212)849-7000

18           BY:  JONATHAN COOPER, ESQUIRE
                   OLIVIA HORTON, ESQUIRE
19           QUINN, EMANUEL, URQUHART & SULLIVAN, LLC
             1300 I Street NW
20           Suite 900
             Washington, DC  20005
21           (617)712-7165

22           BY:  SIMON SANDOVAL-MOSHENBERG, ESQUIRE
             MURRAY OSORIO
23           4103 Chain Bridge Road, Suite 300
             Fairfax, VA  22030
24           (434)218-9376

25       ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPED NOTES***
```

```
 1   APPEARANCES CONTINUED:

 2   On Behalf of the Defendants:

 3        BY:  JONATHAN GUYNN, ESQUIRE
                BRIDGET O'HICKEY, ESQUIRE
 4              SARMAD M. KHOJASTEH, ESQUIRE
          DEPUTY ASSISTANT ATTORNEY GENERAL
 5        CIVIL DIVISION, DEPARTMENT OF JUSTICE
          950 Pennsylvania Avenue NW
 6        Washington, DC  20530
          (202)856-4809

 7
          BY:  ERNESTO H. MOLINA, JR., ESQUIRE
 8        OFFICE OF IMMIGRATION LITIGATION
          P.O. Box 878
 9        Ben Franklin Station
          Washington, DC  20044
10        (202)616-9344

11   ALSO PRESENT:  Natasha Patel, Paralegal

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                           I N D E X

2   DEFENDANT WITNESSES:                              PAGE

3   TESTIMONY OF THOMAS GILES

4        Direct by Mr. Khojasteh                       11
         Cross by Mr. Rand                             34
5        Redirect by Mr. Kohjasteh                    144

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1              P R O C E E D I N G S

 2      (Court called to order.)

 3          DEPUTY CLERK:  All rise.  The United States District

 4  Court for the District of Maryland is now in session.  The

 5  Honorable Paula Xinis presiding.

 6          THE COURT:  Good afternoon, everyone.  You all can

 7  have a seat.

 8      Ms. Derro, call the case.

 9          DEPUTY CLERK:  The matter now pending before the

10  court is Civil Case Number PX25-951, Kilmar Armando Abrego

11  Garcia, et al. v. Kristi Noem, et al.  The matter now comes

12  before the court for an evidentiary hearing.

13      Counsel, please identify yourselves for the record,

14  beginning with counsel for the plaintiffs.

15          MR. ROSSMAN:  Good afternoon, Your Honor.  Andrew

16  Rossman for the plaintiffs.  And, Your Honor, Ms. Vasquez Sura

17  could not make it today.  She's feeling ill.  Otherwise, she

18  would surely be here.

19          THE COURT:  All right.  Thank you.

20          MR. RAND:  Good afternoon -- I'm sorry, Your Honor.

21  Would you like to take the roll?

22          THE COURT:  Okay.  Good.

23          MR. RAND:  Good afternoon, Your Honor, Sascha Rand.

24          MR. COOPER:  Good afternoon, Your Honor.  Jonathan

25  Cooper.
```

1              **MR. SANDOVAL-MOSHENBERG:**  Simon Sandoval-Moshenberg.

2  Good afternoon, Your Honor.

3              **THE COURT:**  All right.  Good afternoon.

4      Okay.  Defense?

5              **MR. KHOJASTEH:**  Good afternoon, Your Honor.  Sarmad

6  Khojasteh from the United States Department of Justice.

7              **THE COURT:**  Okay.

8              **MR. GUYNN:**  Good afternoon, Your Honor.  Jonathan

9  Guynn with the Department of Justice.

10             **THE COURT:**  Okay.

11             **MS. O'HICKEY:**  Good afternoon, Your Honor.  Bridget

12  O'Hickey, also with the Department of Justice.

13             **MR. MOLINA:**  Good afternoon, Your Honor.  Ernesto

14  Molina with the Department of Justice.

15             **THE COURT:**  Okay.  Good afternoon, everyone.

16      I do see that we are joined by the witness that the

17  defendants will be calling.

18      Am I saying your name right, sir?  Thomas Giles; is that

19  correct?

20             **MR. GILES:**  Giles.

21             **THE COURT:**  And you're the assistant director for

22  immigration and customs enforcement and removal operations; is

23  that right?

24             **MR. GILES:**  Correct.

25             **THE COURT:**  Okay.  Sir, I'm going to invoke what's

1  called the rule on witnesses, because I want to discuss a few

2  things with the parties before you're called.  And all that

3  means is if you would do me the courtesy of sitting in one of

4  the witness rooms for just a minute so we can have that

5  conversation.

6          **MR. GILES:**  Okay.  Thank you.

7          **THE COURT:**  Thank you.

8      (Mr. Giles exited the courtroom.)

9          **THE COURT:**  All right.  A couple things that are not

10  witness-specific; but until my computer is up and running, we

11  really can't start because I have realtime like you all do but

12  it's only through my computer.

13      So -- and in that regard, I understand that the parties --

14  the lawyers have requested realtime, and Ms. Leeper have given

15  you strict instructions in that respect.  And I'm expecting

16  everybody to abide by them.

17      Second, I just want to discuss the procedure of calling

18  witnesses and examining witnesses in my court.  As best as we

19  can, while this is not a trial, you will conduct yourself as if

20  it's a trial, which means stick to the rules of evidence.

21      If you're examining the witness on direct, use open-ended

22  questions.  If you need permission to lead, you ask for

23  permission to lead.  Cross-examination is different, obviously,

24  closed-ended questions.

25      If you have objections, if you're not going to be able to

```
1    cite me the rule -- and way back I had judges who made me cite
2    the rule, and that was really hard -- you are to give one- or
3    two-word objections:  Hearsay.  Lack of foundation.
4         There will be no speaking objections.  I do not want
5    stumping, or, you know, speechifying in front of a witness.
6    You are not to do that because the witness's testimony is
7    obviously affected if you do.
8         If you have anything that you wish to put on the record,
9    you can simply ask to approach, and I will hear you outside the
10   presence of the witness.
11        So if you're not happy with my ruling and you want to put
12   something on the record, just ask and you can come on up.
13        Is that clear to both sides?
14             MR. MOLINA:  Yes.
15             MR. KHOJASTEH:  Yes, Your Honor.
16        One caveat, we -- defendants do -- do not have the
17   realtime.  We were unable to connect to it.
18             THE COURT:  All right.  Well, then, we'll have to
19   make sure you do because you have requested it, right?
20             MR. KHOJASTEH:  Yes.
21             MR. MOLINA:  It's just a matter of a Wi-Fi
22   connection.  We've been given a link, but we're not established
23   to the court's Wi-Fi system.
24             THE COURT:  And that's because you didn't request
25   advance permission?
```

1              **MR. MOLINA:**  I guess that's the case, Your Honor.

2              **THE COURT:**  I'm not sure there's much I can do about

3     that.  I can't -- I'm not sure what I can do about that.

4          Okay.  So IT is coming up for me.  So let's see if they

5     can help you as well.

6              **MR. MOLINA:**  We'd appreciate that, Your Honor.  Thank

7     you.

8              **THE COURT:**  All right.  That's great.

9              **MR. KHOJASTEH:**  Thank you, Your Honor.

10             **THE COURT:**  And then one attorney per witness.  So

11    there's only one witness; so I expect one attorney for the

12    plaintiffs and one attorney for the defendants.

13         You can certainly caucus with one another, but what I do

14    not want is a coffee klatch of commentary at the bench if you

15    all have issues to raise outside the presence of the witness.

16         Okay.  That's the nonsubstantive stuff.

17         While we wait for IT, I also received a stipulation from

18    defendants which -- it doesn't sound like there's an agreement,

19    but that -- the stipulation is what the defendants have agreed

20    they would commit to, I suppose, for lack of a better term.

21         Can I just get the plaintiffs' position on the record

22    regarding the stipulation.  In other words, how do you view it?

23    Does it moot the issues?  Does it go far enough?  Where --

24    where -- because the defendants say you don't -- you didn't

25    reach agreement, but I don't know why.  So if you can --

9

1              **MR. ROSSMAN:**  Sure, Your Honor.

2        So the stipulation, in our view, stipulates to that which

3    is already well established in the law and leaves open the

4    critical question of whether my client will receive effective

5    notice and an opportunity to be heard in a court before he is

6    removed to an as-yet-unidentified third country.

7        And that is not established by reference to DHS's March 30

8    memo and their policy.  We think that is the state of the law.

9    And we're happy to, you know, bring the cases before you that,

10   in fact, my client is required to be given notice and an

11   opportunity to challenge the removal decision.  But that is not

12   what I understand is being offered in the stip.

13       So, you know, that's -- that's where it falls short, Your

14   Honor.

15             **THE COURT:**  Okay.

16             **MR. ROSSMAN:**  And we asked the government if they

17   would be willing to stipulate to that.

18             **THE COURT:**  To the notice?

19             **MR. ROSSMAN:**  To the notice and the opportunity to be

20   heard in a court of competent jurisdiction, and they did not

21   agree to that.  They gave us the stip instead.

22             **THE COURT:**  Okay.  All right.  Well, I appreciate

23   the -- the stipulation being filed on the record, but I tend to

24   agree.  It just doesn't answer all the questions that I have

25   about what is going to happen to Mr. Abrego Garcia if he is

1  released from criminal custody next week and into ICE custody.

2      Again, for your benefit, Mr. Khojasteh -- am I saying it

3  right?

4          **MR. KHOJASTEH:**  You did great.

5          **THE COURT:**  Okay.  Well, you weren't here last time.

6  I'm sure you read everything.  But, in my view, this is not

7  hard.  We just need to know from the defendants what

8  specifically will happen if Mr. Abrego Garcia is in custody,

9  the who, what, when and where if he's in ICE custody as opposed

10  to criminal custody, and how will we effectuate basic -- you

11  know, basic minimal due process protections.  That's what I'm

12  interested in learning today.

13      Does that make sense to you?

14          **MR. KHOJASTEH:**  It makes sense, Your Honor.

15          **THE COURT:**  All right.  Then I guess, unless there's

16  anything else that either side wishes to discuss with me, are

17  we ready for the witness?

18          **MR. ROSSMAN:**  Ready on the plaintiffs' side, Your

19  Honor.

20          **MR. KHOJASTEH:**  Ready on the defendants' side, Your

21  Honor.

22          **THE COURT:**  Okay.  Let's make sure we have realtime.

23      Then we're not ready for the witness yet.  Let's see.

24      All right.  We're working on it, gentlemen, and young

25  women, younger than me.  That's all I'll say about the matter.

*DIRECT OF THOMAS GILES BY MR. KHOJASTEH*

1        And if this is going to take longer than just a few

2   minutes, we'll take a recess.  But I'm trying to get it done

3   for you all as quickly as possible.

4        (Off-the-record discussion regarding iPad setup for

5   realtime.)

6            **THE COURT:**  I think we are ready for the witness,

7   then.

8            **MR. GUYNN:**  Your Honor, should we go get the witness,

9   or has the marshal done that?

10            **THE COURT:**  Oh, no, you all need to go get the

11   witness.

12            **DEPUTY CLERK:**  Mr. Giles, please walk towards me and

13   stand right here to be sworn.

14        Please raise your right hand.

15                              THOMAS GILES

16   having been first duly sworn, was examined and testified as

17   follows:

18

19            **DEPUTY CLERK:**  Please have a seat in the witness box.

20   Watch your step as you enter.  And if you would please speak

21   loudly and clearly into the microphone.  State your name for

22   the record, and spell each name.

23            **THE WITNESS:**  Thomas Giles, T-H-O-M-A-S, G-I-L-E-S.

24            **DEPUTY CLERK:**  Thank you.

25                         **DIRECT EXAMINATION**

1  **BY MR. KHOJASTEH:**

2  **Q.**   Good afternoon, Mr. Giles.

3  **A.**   Good afternoon.

4  **Q.**   Can you please state your name for the record.

5  **A.**   Thomas Giles.

6  **Q.**   Where are you currently employed, Mr. Giles?

7  **A.**   I'm currently employed at Immigration and Customs

8  Enforcement headquarters in Washington, DC.

9  **Q.**   And what is your current title?

10 **A.**   My current title is the interim assistant director for

11 enforcement removal operations, field operations.

12 **Q.**   And how long have you held that role?

13 **A.**   I've held that role since May of 2025.

14 **Q.**   And what are your responsibilities in that role?

15 **A.**   My main responsibilities is I oversee the 25 field office

16 directors throughout the country.

17 **Q.**   Prior to May 2025, what position did you hold at ICE?

18 **A.**   I was the assistant director over the nondetained

19 management division from January 2024 until May 2025.

20 **Q.**   And in that role, what were your responsibilities?

21 **A.**   My main responsibilities was the management of the

22 nondetained docket, which consisted of 7.6, 7.7 million aliens

23 that were nondetained, to include oversight of the alternatives

24 to detention program.

25 **Q.**   And prior to January of 2024, what position did you hold?

1   **A.**    I've held -- I've been a field office director in three

2   different offices:  Los Angeles, most recently; Atlanta; and

3   San Diego.

4   **Q.**    And as a field office director, what were your

5   responsibilities?

6   **A.**    My responsibilities were to manage and oversee the

7   operations for ICE enforcement removal operations in those

8   jurisdictions.

9   **Q.**    And prior to being a field office director in Los Angeles,

10  San Diego, and Atlanta, what position, if any, did you hold in

11  ICE?

12  **A.**    I've held -- I started my career in 1998 as a student

13  aide, and I progressed through the ranks as a deportation

14  officer, a supervisory deportation officer, an assistant field

15  office director, a deputy chief of staff, a chief of staff, and

16  a deputy field office director prior to becoming a field office

17  director.

18  **Q.**    And, Mr. Giles, in those positions as well as the

19  positions we just discussed, to what extent, if at all, do you

20  have knowledge of the alien removal process based on your

21  experience?

22  **A.**    Based on my experience, I have a well-rounded knowledge of

23  the immigration removal process.

24  **Q.**    And approximately how long have you worked for ICE or its

25  predecessor agencies?

1  **A.**   I started my career in '98 as a student.   I became an

2  officer in 2001.   So just over 24 years as an officer.

3  **Q.**   We thank you for your service, Mr. Giles.

4       I would like to discuss with you the removal process for

5  aliens.   To what do you understand the term "alien" to refer in

6  the context of your employment with ICE?

7  **A.**   An alien is anyone that is not a citizen or a national of

8  the United States.

9  **Q.**   And when I refer to -- when I state -- say "removal of an

10  alien," to what do you understand that phrase to refer?

11  **A.**   The removal of an alien, that phrase means that that

12  individual has a -- more than likely has a removal order from

13  an immigration judge or an administrative removal order

14  removing them from the United States to their country of

15  citizenship.

16  **Q.**   Mr. Giles, to what extent, if at all, are you familiar

17  with fugitive operation teams at ICE?

18  **A.**   We have -- every field office has fugitive operations

19  teams that are at-large teams that work out in the field

20  identifying and arresting individuals that are here unlawfully.

21  **Q.**   And how, if at all, does ICE -- strike that.

22       How does ICE identify an alien for arrest?

23  **A.**   There's multiple ways that ICE can identify aliens for

24  arrest.   One of the more common ways is individuals that have

25  been arrested by a local law enforcement agency and booked into

*DIRECT OF THOMAS GILES BY MR. KHOJASTEH*

1   their county or state or local jail.

2        Once their fingerprints are taken and sent to the FBI, DHS

3   has an agreement with the FBI where those prints are bounced

4   off our system.  And if there's a hit on those prints, then our

5   officers or agents out in the field will conduct -- go through

6   our database checks to see if that individual is here

7   unlawfully.  And if they are, an immigration detainer will be

8   placed on that individual.

9   **Q.**   Separate and apart from immigration detainers, which we'll

10  discuss momentarily, are there arrests made by ICE -- ICE or

11  fugitive operations teams at ICE?

12  **A.**   Yes.  Those arrests are made out in the field.

13  **Q.**   And do ICE agents need a judicial warrant to make those

14  arrests?

15  **A.**   No, they do not.

16  **Q.**   Is it your understanding -- strike that.

17        What, if any, understanding do you have that Congress has

18  authorized ICE to arrest aliens without a judicial warrant?

19  **A.**   Our authority -- our authority by Congress, we can make

20  warrantless arrests.

21  **Q.**   Is there a standard that ICE agents need to satisfy when

22  arresting an alien?

23  **A.**   Yes.  We need to determine probable cause and determine

24  their alienage.  And that's usually done through a field

25  interview by the officers or agents that are out in the field.

*DIRECT OF THOMAS GILES BY MR. KHOJASTEH*

 1        If those officers or agents determine -- or that

 2   individual identifies as being here unlawfully, then those

 3   officers or agents will take an enforcement action, if

 4   necessary.

 5   **Q.**   Mr. Giles, what, if any, familiarity do you have with a

 6   240 removal proceeding?

 7   **A.**   Someone that's in 240 removal proceedings would tell me

 8   that that individual is going through immigration court process

 9   with the Executive Office of Immigration Review.

10        They would have a notice to appear issued upon them

11   alleging them of allegations of -- of them being here

12   unlawfully.

13   **Q.**   To what extent, if at all, is an immigration judge or an

14   immigration court involved in 240 removal proceedings?

15   **A.**   The immigration judge is the official that would decide

16   the case on the individual in court.

17   **Q.**   And what is the immigration judge adjudicating in the 240

18   removal proceeding?

19   **A.**   The immigration judge is adjudicating determining if that

20   alien in the court is here unlawfully, and a decision will be

21   made if that person is to be ordered removed from the United

22   States.

23   **Q.**   And if an immigration judge determines an alien should be

24   removed from the United States, does the alien have appeal

25   rights -- strike that.

*DIRECT OF THOMAS GILES BY MR. KHOJASTEH*

1    What, if any, appeal rights does an alien have to

2  challenge that immigration judge's decision?

3  **A.**    Yeah, if -- if a final order is given by the immigration

4  judge of removal, the alien has the opportunity to appeal that

5  decision within 30 days to the Board of Immigration Appeals.

6  **Q.**    And if that alien -- if the Board of Immigration Appeals

7  sustains or affirms the decision of the immigration judge, does

8  the alien have any additional appellate rights?

9  **A.**    Yes.  The alien can file something with the circuit court

10 of what circuit that they are in where they're detained at.

11 **Q.**    And going back to the immigration judge, if the

12 immigration judge determines an alien should be removed, to

13 what extent, if at all, does an alien have an opportunity to

14 challenge his removal to his country of origin?

15 **A.**    The alien can claim fear in the court process -- in the

16 immigration court process if they have fear of return to their

17 country of citizenship.

18 **Q.**    And so what happens if an immigration judge is convinced

19 or agrees that an alien is -- does have a legitimate fear of

20 returning to his country of origin?

21 **A.**    That case would be referred to first the United States

22 Citizenship and Immigration Services for an interview to

23 determine if that individual does have a fear of persecution or

24 torture to return to their home country.  And that evidence

25 will be presented to the judge, and the judge will make a final

1  decision on that.

2  **Q.**   And if the judge agrees that there's a legitimate fear,

3  what -- what impact does that have on the immigration judge's

4  order of removal?

5  **A.**   The immigration judge can order removal to their country

6  of citizenship but also have -- there's different avenues of

7  relief for the alien, such as withholding of removal or

8  Convention Against Torture.

9      What that means is you can still have an order of removal

10  to their country of citizenship with a grant of withholding.

11      And what that means is, is that that individual should not

12  be deported to their country of citizenship if they have an

13  order of -- if they have withholding granted or Convention

14  Against Torture, otherwise known as CAT.

15  **Q.**   So practically speaking, what does that mean for the

16  United States' ability to remove an alien from the United

17  States?

18  **A.**   So what that means is when the docket officer or case

19  officer will receive that file after a court indicating that

20  there's a final order of removal with the grant of withholding

21  or CAT, for example, the individual or the case officer will

22  work to try to remove that individual to a third country.

23  **Q.**   We're going to come back to third-country removals in a

24  few minutes.

25      But before we do so, what, if any, familiarity do you have

1  with a 235 expedited removal process?

2  **A.**   The 235 expedited removal process is a -- a mechanism that

3  the officers or agents can use when they are encountering an

4  individual that is -- if they have been in the United States

5  less than 2 years, we can expeditiously remove that alien from

6  the United States through the -- an administrative process.

7  **Q.**   And what, if any, opportunity does an alien have to

8  contest this expedited removal?

9  **A.**   They have the opportunity to claim fear of return to their

10  country of citizenship.  And if that is the case, those

11  individuals will be referred to the United States Citizenship

12  and Immigration Services for a credible fear interview.  And at

13  that time, the credible fear officer -- immigration officer

14  will determine if their fear is credible.

15  **Q.**   And if they do determine that their fear is credible?

16  **A.**   The case will be referred to an immigration judge for a

17  withholding hearing.

18  **Q.**   Mr. Giles, what, if any, familiarity do you have with the

19  process for administrative removal of aggravated felonies under

20  Section 238?

21  **A.**   Section 238 of the INA is if the individual is here

22  unlawfully, meaning that they have crossed the border without

23  being admitted or inspected by an immigration officer, and that

24  individual has an aggravated felon that's -- an aggravated

25  felony in the United States, we can administratively remove

1  that individual through the admin removal process.

2  **Q.**   And same question.  What opportunity, if any, does an

3  alien have to challenge an administrative removal order?

4  **A.**   The alien can challenge the administrative removal order

5  by claiming fear -- or reasonable fear of return to their

6  country.

7          **THE COURT:**  Counsel, can I just ask really quickly.

8  Section 238 of the INA, what U.S. code does that translate to?

9  1226?

10          **MR. MOLINA:**  1128, Your Honor.

11          **THE COURT:**  1128.

12          **MR. MOLINA:**  Correct.

13          **THE COURT:**  So that's 8 U.S.C. 1128?

14          **MR. MOLINA:**  Correct.

15          **THE COURT:**  Thank you.

16      Okay.  Thanks so much.

17  **BY MR. KHOJASTEH:**

18  **Q.**  Mr. Giles, a moment ago you referred to immigration

19  detainers.  And what is an immigration detainer?

20  **A.**   An immigration detainer is a request to a local law

21  enforcement agency -- you know, state, local, or federal that

22  ICE would like to have -- have -- to accept custody of this

23  alien after they're done doing their criminal time with the

24  local jurisdiction.

25  **Q.**   Is the -- is the detainer limited to those circumstances

1  where an alien has served time for a criminal offense?

2  **A.**    When -- when an individual comes in to ICE custody, it's

3  purely administrative.  We don't hold people for criminal time.

4  But when we serve the detainer on the local jurisdiction, it is

5  because they are being held for a crime he or she committed in

6  that jurisdiction.

7  **Q.**    So to what extent, if at all, does an immigration detainer

8  impact an alien or a trustee of the alien if they are being

9  released pursuant to bail, for example?

10  **A.**    If the -- in their criminal proceedings, if they get

11  granted bail by the judge and they post bail and if that

12  jurisdiction honors immigration detainers, that individual --

13  that jurisdiction will call the local ICE office and let them

14  know that this individual is set to be released, and we'll make

15  arrangements to come pick that individual up, only if they

16  accept the detainer.

17  **Q.**    And different jurisdictions treat -- honor -- strike that.

18      To what extent, if at all, does ICE need a judicial arrest

19  warrant to have an alien transferred to its custody pursuant to

20  a detainer?

21  **A.**    ICE does not need a judicial warrant for somebody to be

22  transferred on a detainer to ICE custody.

23  **Q.**    Assuming that the detainer is honored by the federal,

24  state, or local law enforcement agency, what happens to the

25  alien upon its -- upon release from that local law enforcement

*DIRECT OF THOMAS GILES BY MR. KHOJASTEH*

1  agency?

2  **A.**   Our officers or agents will go to the location where that

3  alien is at, and we'll take custody of that person.

4  **Q.**   And where is the alien detained?

5  **A.**   They would go to the nearest ICE detention facility in

6  that jurisdiction until -- they could stay there, or they could

7  go to another detention facility based on bed space.

8  **Q.**   What happens to the alien after he or she is sent to the

9  detention facilities?

10  **A.**   It's depending on what case -- what the status of their

11  case is that's going to determine what they do, but they will

12  be assigned a deportation officer or a docket officer, and they

13  will manage that case while they are in ICE custody.

14  **Q.**   So assuming an alien comes into ICE custody and is at a

15  detention facility when an order of removal has already been

16  issued by an immigration judge and the appeal process has been

17  exhausted or expired, what's involved in the process of

18  physically removing him or her from the United States?

19  **A.**   Generally speaking, when the case officer or docket

20  officer receives the alien registration file and that person

21  does have a final order of removal, that case officer will work

22  on trying to effectuate that order to whatever country was

23  deemed that person to be removed to.

24  **Q.**   So we talked a little bit earlier about removals to third

25  countries.

*DIRECT OF THOMAS GILES BY MR. KHOJASTEH*

1      To what extent, if at all, are aliens removed to third

2   countries that are not an alien's country of origin?

3   **A.**   I'm sorry.  Can you repeat the first part of the question?

4   **Q.**   To what extent, if at all, are aliens removed to third

5   countries that are not an alien's country of origin?

6   **A.**   It's -- if -- for us removing people to a third country,

7   there's a process that we have to follow.

8   **Q.**   So under what conditions are aliens deported to a country

9   that's not their country of origin?

10  **A.**   The conditions would be if they are -- if they have a

11  removal order to their country of citizenship, they have a

12  withholding of removal that's been granted by the judge or a

13  Convention Against Torture to that country, those individuals

14  should not be removed to their country of citizenship if they

15  have those forms of protection granted by the immigration

16  judge.

17  **Q.**   Mr. Giles, to what extent, if at all, are there procedures

18  at the Department of Homeland Security or ICE setting forth

19  guidance for the removal of aliens to third countries?

20  **A.**   There's a -- there is guidance issued by a memorandum by

21  the secretary of Homeland Security back in March of 2025.

22          **MR. KHOJASTEH:**  Permission to approach the witness,

23  Your Honor.

24          **THE COURT:**  Sure.  And are you giving the plaintiff a

25  copy of whatever --

1          MR. KHOJASTEH:  Yes, and I'm going to give you a copy

2   as well.

3          THE COURT:  Thank you.  I appreciate it.

4          THE WITNESS:  Thank you.

5          THE COURT:  Great.  Are you marking this as an

6   exhibit?

7          MR. KHOJASTEH:  Yes, Your Honor.  We're marking this

8   as Defendants' Exhibit 1.

9          THE COURT:  Okay.

10  BY MR. KHOJASTEH:

11  Q.   Mr. Giles, do you recognize this document?

12  A.   Yes.

13  Q.   What is this document?

14  A.   This document is the guidance regarding third-country

15  removals.

16  Q.   Is this the memorandum or document you were referring to a

17  moment ago?

18  A.   Yes.

19  Q.   I want you to take a brief moment and review the memo.

20  It's about a page, page and a half.

21       To what extent, if at all, are the procedures set forth in

22  this memorandum followed by ICE in connection with removals of

23  aliens to third parties -- third countries?

24  A.   They are followed.

25  Q.   When does ICE learn of a -- learn whether an alien has

1  some restriction on the removal to their country of origin?

2  **A.**    ICE would learn if that individual has a grant of

3  withholding or a grant of Convention Against Torture where we

4  can't remove those aliens to their country of citizenship but

5  they do still have a removal order; so we will work on doing a

6  third-country removal.

7  **Q.**    Mr. Giles, I'd like you to walk through -- walk the Court

8  through the steps that are taken and by whom when ICE deports

9  an alien to a third country.

10  **A.**    So the steps that are taken are by the docket officer or

11  deportation officer.  They would serve a document, notice of

12  removal, on the alien indicating that you will be removed to

13  country X.  And if that -- and we would serve that document on

14  the alien.

15      If the alien expresses fear of return to go to that third

16  country, we would refer that individual to the United States

17  Citizenship and Immigration Services for a credible fear

18  interview that's done by an immigration officer.

19  **Q.**    And if there is a credible -- if the immigration officer

20  deems that there is a credible fear of removal -- to the alien

21  for removal to that third country, what happens then?

22  **A.**    If the alien expresses fear and the credible fear officer

23  finds fear, that case will be referred to an immigration judge

24  for final decision.

25  **Q.**    And what is the immigration judge -- what -- if the

1  immigration judge credits the immigration officer's findings

2  and credits the credible fears of the alien, what can the

3  immigration judge do?

4  **A.**   The immigration judge in that case could grant a

5  withholding of removal to that country as well; and if that's

6  the case, then we would go back to start the process over again

7  and identify another country for the alien to be removed to.

8  **Q.**   Generally speaking, Mr. Giles, when does the -- strike

9  that.

10      When an alien comes into ICE custody, who at ICE takes

11  responsibility for that alien's file?

12  **A.**   The responsibility will fall on the docket officer or case

13  officer at the facility he or she is detained at.

14  **Q.**   And so when does the docket officer begin working to

15  identify a third country?

16  **A.**   If there's a -- if there's a final order of removal that

17  has a grant of withholding or Convention Against Torture, then

18  the docket officer will work on trying to identify a third

19  country of removal to remove that person since there is a final

20  order of removal on that individual.

21  **Q.**   To what extent, if at all, does that work begin prior to

22  ICE taking custody of the alien?

23  **A.**   That does not happen until the individual is in ICE

24  custody.  We don't work these cases that are in other

25  jurisdictions.  They are not worked until they are arrived in

1    ICE custody.

2    **Q.**    Mr. Giles, I want to speak with you about Mr. Abrego

3    Garcia.

4        Are you aware that the Court has ordered that the

5    government designate one or more individuals to testify today

6    on certain topics?

7    **A.**    Yes.

8            **MR. KHOJASTEH:**    I'm going to mark this as Defendants'

9    Exhibit 2.

10       Permission to approach the witness, Your Honor?

11           **THE COURT:**    Sure.

12           **THE WITNESS:**    Thank you.

13   **BY MR. KHOJASTEH:**

14   **Q.**    Mr. Giles, I want to refer you to a list of topics on

15   the -- in the first paragraph of the -- of the Court's order.

16       Do you see that?

17   **A.**    Yes.

18   **Q.**    The topics include the legal bases for defendants'

19   intended detention of Abrego Garcia; anticipated efforts to

20   remove him to a third country or seek termination of his

21   withholding of removal to El Salvador if he's released from the

22   U.S. Marshal custody; the nature and timing of any notice to be

23   provided to Abrego Garcia; the location of any proposed custody

24   or transfer; and the procedural steps defendants intend to

25   pursue.

*DIRECT OF THOMAS GILES BY MR. KHOJASTEH*

1      Are you prepared to testify on these topics today?

2  **A.**   Yes.

3  **Q.**   What is your understanding of Mr. Abrego Garcia's current

4  immigration status?

5  **A.**   My understanding of his current immigration status is that

6  this individual has a final order of removal to El Salvador

7  with a grant of withholding.

8  **Q.**   And so that final order of removal, that was a -- that's

9  an order that was issued by an immigration judge?

10  **A.**   Yes.

11  **Q.**   And that's an order that Mr. Abrego Garcia would have had

12  an opportunity to appeal?

13  **A.**   Yes.

14  **Q.**   And if he disagreed with the BIA, he would have had an

15  opportunity to appeal that to the circuit court?

16               **MR. RAND:**   Your Honor, leading.

17               **THE COURT:**   Yep.  Can you rephrase, nonleading?

18  **BY MR. KHOJASTEH:**

19  **Q.**   To what extent, if at all, did Mr. Abrego Garcia have an

20  opportunity to appeal the immigration judge's -- strike that.

21  Strike that.

22      Mr. Giles, to what extent, if at all, has ICE issued an

23  immigration detainer to federal law enforcement in Tennessee

24  for Mr. Abrego Garcia?

25  **A.**   There is an immigration detainer for this individual

1   that's currently in U.S. Marshal custody.

2          **THE COURT:**  There is, did you say, sir?  There is?

3          **THE WITNESS:**  Yes, there is.

4          **THE COURT:**  Okay.

5   **BY MR. KHOJASTEH:**

6   **Q.**   And if Mr. Abrego Garcia is released from criminal custody

7   in the Middle District of Tennessee on July 16th, do you have

8   an understanding one way or the other as to whether federal law

9   enforcement will honor the immigration detainer?

10  **A.**   Yes.

11  **Q.**   What is your understanding as to whether federal law

12  enforcement in Tennessee will honor the immigration detainer?

13  **A.**   My understanding is that the law enforcement agency will

14  honor the immigration detainer.

15  **Q.**   And if that detainer is honored, when will ICE take

16  Mr. Abrego Garcia into custody if he's released on July 16th?

17  **A.**   If he is released on July 16th, the local ICE field office

18  in Tennessee will take custody of that individual as soon as

19  possible.

20  **Q.**   Where will that -- without divulging details or specifics,

21  where will that occur?

22  **A.**   That will usually occur at the jail this individual is

23  detained at.

24          **THE COURT:**  You mean the handoff, the transfer of

25  custody will --

1          **THE WITNESS:**  Yes.  The transfer of custody will

2     occur in a secure environment in the jail.

3          **THE COURT:**  Okay.  Thanks.

4     **BY MR. KHOJASTEH:**

5     **Q.**   And, Mr. Giles, to date, what, if any, determinations have

6     been made as to where Mr. Abrego Garcia will be detained by ICE

7     if Tennessee law enforcement honors the immigration detainer

8     and transfers custody of him to ICE?

9     **A.**   When these individuals turn over to ICE, it's based on bed

10    space availability for us; so there's no exact location where

11    this individual will go.

12    **Q.**   As a general matter, how will that determination be made

13    by ICE?

14    **A.**   It's going to be based on -- be based on ICE by the

15    availability of bed space in that area.  If there's no bed

16    space in that area, the individual will be transferred to a

17    location where bed space is available.

18    **Q.**   Now, Mr. Giles, to date, what, if any, decision has been

19    made as to whether to remove Mr. Abrego Garcia to a third

20    country if Tennessee law enforcement honors the immigration

21    detainer and transfers him into ICE custody?

22    **A.**   There's been no decision made as he's not in ICE custody.

23    **Q.**   And as a general matter, how will that determination be

24    made by ICE?

25    **A.**   Once the individual comes into custody, the docket officer

1  will review the case and then a decision will be made at that

2  time.

3  **Q.**   To date, has ICE begun the process of identifying a third

4  country to which to remove Mr. Abrego Garcia?

5  **A.**   No.

6  **Q.**   To date, has ICE made a determination as to whether to

7  reopen the removal proceeding to eliminate the withholding of

8  removal to El Salvador for Mr. Abrego Garcia?

9  **A.**   No.

10  **Q.**   As a general matter, how would that determination be made?

11  **A.**   That determination would be made on a case-by-case basis.

12  Once the individual is in ICE custody, the docket officer will

13  work the case and a decision will be made at that time.

14  **Q.**   Why hasn't ICE begun the process of identifying a third

15  country or making plans for a reopening of the removal

16  proceedings for Mr. Abrego Garcia?

17  **A.**   We don't preempt -- we don't work cases that aren't in ICE

18  custody preemptively as our docket officers are worried about

19  the cases that they have in their custody now.  So no

20  decision -- we don't work these cases until they're in ICE

21  custody.

22  **Q.**   When you say your docket officers are worried about the

23  cases you have, to what extent, if at all, does the workload or

24  capacity inform the docket officer's ability to preplan for

25  aliens that have yet to be transferred to ICE custody?

1  **A.**    Yeah.  We're -- the docket officers are focused on the

2  cases in ICE custody given our resources.  We don't have the

3  resources to work cases where a decision hasn't even been made

4  on this case whether or not this individual is going to come --

5  be released from federal custody and come into ICE custody.

6      So no decision has been made.  Those cases are worked once

7  an individual is in ICE custody.

8  **Q.**    Now, I assume this varies, but how soon after Mr. Abrego

9  Garcia is in ICE custody will a decision be made as to whether

10  he will be removed to a third country or whether his removal

11  proceedings will be reopened?

12  **A.**    That decision will be made as soon as possible when they

13  come into ICE custody.

14  **Q.**    If a determination is made to remove him to a third

15  country, how long will it take before the United States

16  identifies a third country to which to remove him and provides

17  him notice?

18  **A.**    It can be a few days to a few weeks.

19  **Q.**    And when does ICE intend to begin the process of

20  identifying -- strike that.

21      If a determination is made to remove him to a third

22  country, when does ICE intend to begin the process of

23  identifying the third country to remove Mr. Abrego Garcia to?

24  **A.**    If that is the decision made, it will be -- it will begin

25  immediately.

1  **Q.**    Immediately when?

2  **A.**    Once the decision is made to determine what -- if there is

3  a third country for him to be removed to.

4  **Q.**    So I just want to make sure.  Is immediately before he is

5  in ICE custody or immediately after he is in ICE custody?

6  **A.**    The process wouldn't start until the individual is in ICE

7  custody.

8  **Q.**    Got it.

9        And if ICE -- if ICE determines to remove Mr. Abrego

10  Garcia to a third country, what notice will he be -- what

11  notice will he receive?

12  **A.**    He will receive a notice of removal.  We would follow the

13  process from the March 2025 memo.

14  **Q.**    And to what extent, if at all, will he have an opportunity

15  to contest his removal to the third country identified by the

16  United States?

17  **A.**    If the -- if he claims fear of returning to that third

18  country, he would be referred to the United States Citizenship

19  and Immigration Services for a fear interview, and the

20  Citizenship and Immigration Services will determine if there's

21  a fear of return to that country for this individual.

22  **Q.**    And if they do determine that there's a fear of the

23  individual -- Mr. Abrego Garcia being removed to the third

24  country, what happens?

25  **A.**    If there is a fear found by the immigration officer, the

1  case will be referred to an immigration judge for a final

2  decision.

3  **Q.**   And how soon after any challenges to his removal to a

4  third country by Mr. Abrego Garcia are resolved by either the

5  immigration officer or an immigration judge will he be removed

6  to the third country?

7  **A.**   If everything is resolved, the expectation would be he

8  would be removed to the third country.

9  **Q.**   But how soon after?

10  **A.**   How soon after?  It would -- it could be, as I mentioned

11  earlier, a few days to a few weeks.

12           **MR. KHOJASTEH:**   Thank you, Mr. Giles.

13      I have no further questions for the witness at this time.

14           **THE COURT:**   All right.  Plaintiffs' counsel?  Who is

15  up?  Mr. Rand?

16           **MR. RAND:**   Your Honor, Sascha Rand for the

17  plaintiff -- plaintiffs.  May I proceed?

18           **THE COURT:**   Yes.

19                     **CROSS-EXAMINATION**

20  BY MR. RAND:

21  **Q.**   Mr. Giles, good afternoon.  How are you, sir?

22  **A.**   Good afternoon.  I'm good.  Thank you.

23  **Q.**   At what point in time did you learn that you were going to

24  be testifying here today?

25  **A.**   Two days ago.

1  **Q.**   And prior to that moment in time -- by the way, was it in

2  the morning or the afternoon?

3  **A.**   I received a phone call in the morning, on Tuesday

4  morning.

5  **Q.**   Do you recall approximately what time?

6  **A.**   It was 7:47 a.m. West Coast time, as I was on the West

7  Coast.

8  **Q.**   And prior to that moment in time, 7:47 a.m. Eastern Time

9  on Tuesday of this week, had you had any involvement whatsoever

10  with Mr. Abrego Garcia's case?

11  **A.**   No.

12  **Q.**   Did you have any knowledge whatsoever prior to 7:47 in the

13  morning on Tuesday of this week of anything to do with

14  Mr. Abrego Garcia's immigration status?

15  **A.**   Well, let me back up on your first question, sir.

16       The only knowledge I had is that I knew that an

17  immigration detainer was placed on him sometime in early June.

18  As I'm over the field office directors, that information was --

19  been copied on an e-mail indicating that this individual had a

20  detainer placed on him.  And that would have been sometime in

21  early June.  I don't have the exact date.

22  **Q.**   And as of 7:47 Tuesday of this week, did you remember that

23  you had seen that detainer for Mr. Abrego Garcia?

24  **A.**   No.

25  **Q.**   All right.  So back to my question.

 1      Prior to 7:47 of this week, in the morning, you had no

 2   knowledge or experience with Mr. Abrego Garcia's case of any

 3   shape or form, correct?

 4   **A.**   I've heard about it in the media, but that was it.  As far

 5   as in my professional capacity, no.

 6   **Q.**   In your professional capacity, no experience whatsoever?

 7   **A.**   Correct.

 8   **Q.**   All right.  Now, since 7:47 a.m. of this week to the

 9   moment you walked into this court to testify, how much time

10   would you say you spent preparing for your testimony here today

11   as a designee in regard to the topics that are set forth --

12            **MR. RAND:**  And, Your Honor, I didn't want to

13   interrupt, but I assume Defendants' 1 and 2 are in evidence.

14   They weren't formally put into evidence, but I believe that a

15   foundation was laid.

16            **THE COURT:**  Also, the local rules are that, if the

17   exhibit is offered and there's no objection, it's automatically

18   in.

19            **MR. RAND:**  Thank you very much, Your Honor.  You've

20   cleared up my confusion.

21            **THE COURT:**  No problem.

22   **BY MR. RAND:**

23   **Q.**   In regards, sir, to what's in front of you as Defendants'

24   Exhibit 2 -- you have that?  It says "order" at the top, sir?

25   **A.**   Yes.

*CROSS OF THOMAS GILES BY MR. RAND*

1   **Q.**   You've seen that before, right, sir?

2   **A.**   I received it on Tuesday.

3   **Q.**   Tuesday at some point in the day?

4   **A.**   Correct.

5   **Q.**   How much time have you spent since 7:47 in the morning on

6   Tuesday to when you walked into this courtroom today to prepare

7   for your testimony here today?

8   **A.**   I spent a couple of hours, probably three or four hours.

9   **Q.**   How were those spaced, at a high level?

10  **A.**   I did some stuff yesterday a couple of times, two hours

11  yesterday, and approximately an hour and a half, two hours

12  today.

13  **Q.**   And is that the sum and substance of how you prepared for

14  your testimony here today?

15  **A.**   Yes.

16  **Q.**   Separate and apart from the lawyers who are sitting to my

17  left at government's table, did you meet with anybody at any

18  point in time?

19  **A.**   Regarding this case?  I spoke with my supervisor letting

20  them know that I wouldn't be in the office today.

21  **Q.**   Separate from a -- the procedural matter of letting folks

22  know where you'd be this afternoon, did you speak to somebody

23  in your professional capacity, other than the lawyers to my

24  left, to prepare for your testimony here today, sir?

25  **A.**   No.

*CROSS OF THOMAS GILES BY MR. RAND*

1  Q.   Did you call anybody in your professional capacity at DHS

2  or ICE or DOJ or the White House or the executive branch in any

3  shape or form for your testimony here today?

4  A.   No.

5  Q.   Did you look at any -- did you share any e-mails or any

6  communications of any sort with any person that you understood

7  in your mind, based on all your experience, would have

8  experience with Mr. Abrego Garcia's case and his current

9  disposition?

10  A.   No.

11  Q.   Was anyone put on the phone with you when you were sitting

12  with counsel to the left, I assume, preparing during those

13  three and a half odd hours in the last two days for your

14  testimony, was anyone put on the phone that described to you in

15  any shape or form what the government was thinking about how

16  they were going to deal with Mr. Abrego Garcia's potential

17  release from criminal custody next Wednesday?

18  A.   No.

19  Q.   Did you suggest to anybody at any point in time as a

20  designee -- as a designee -- in preparing yourself to testify

21  for something you had no knowledge of, did you suggest to

22  anybody sitting to my left that maybe you should speak to

23  somebody who actually was involved in the case at any point in

24  time?

25  A.   No.   I was selected by ICE to be the witness for this

1  case.

2  **Q.**    Did it cross your mind, when you looked at Defendants'

3  Exhibit 2 and you understood you were coming to this court to

4  testify about what was going to happen to Mr. Abrego Garcia,

5  perhaps, next week, if he's released from criminal custody, did

6  it cross your mind to suggest that maybe you should speak to

7  somebody who's familiar with this case in any shape or form at

8  DHS or ICE?

9  **A.**    No, it did not cross my mind.

10 **Q.**    Did you make inquiry of any counsel sitting to my left

11 that maybe before you came to this hearing as a designee --

12         **MR. RAND:**  It's not privilege.  He's a designee.

13     Withdrawn.

14     I'm sorry, I don't mean to colloquy with counsel, Your

15 Honor, I apologize.

16 **BY MR. RAND:**

17 **Q.**    Sir, at any point in time, was it suggested to you that

18 maybe you should speak to anybody by anybody to my left or

19 anybody you understood to be counsel for the government in your

20 preparation?

21 **A.**    No.  I mean, when I read the first sentence here, I do not

22 have personal knowledge of the case, but the sequent portion of

23 that sentence says, "I will acquire such knowledge," which I

24 did acquire that in the last two days.

25 **Q.**    Okay.  Well, let's cover that for a moment.

1       What exactly did you do for those approximate three and a

2   half hours, two on one day, an hour and a half on the other?

3   **A.**   I worked with the ICE attorneys and the DOJ attorneys to

4   my right.

5   **Q.**   And who were the ICE attorneys, please?  Just name.

6   **A.**   One of them is Bryan Hudson, Jorge Montesino.  And I don't

7   recall.  One of them is named Lucy; I don't know the last name.

8   And I don't know the other gentleman that was with us.

9   **Q.**   And in terms of the Department of Justice, were there any

10  other attorneys present other than the four attorneys to my

11  left?

12  **A.**   On the -- on my Microsoft Teams call yesterday, I think

13  there might have been another one, but I would have to defer to

14  them.  I don't know.

15  **Q.**   During those approximate three and a half -- withdrawn.

16  Let me ask you a better question.

17      Were you always in the presence -- attorneys always in

18  your presence during those three and a half hours?

19  **A.**   Yes.

20  **Q.**   Were there any documents shown to you during those three

21  and a half hours?

22  **A.**   Yes.

23  **Q.**   Can you describe them for us in terms of what documents

24  were placed in front of you for your preparation as a designee

25  on matters for which you did not have personal knowledge.

1   **A.**    The two documents that were identified as Exhibit 1 and 2

2   were presented to me.

3   **Q.**    Anything else?

4   **A.**    And I had an executive summary on the -- on the case

5   history of the individual.

6   **Q.**    And that executive summary, approximately how many pages

7   was it?

8   **A.**    I believe it's like a page and a half.

9   **Q.**    And you relied upon that executive summary for purposes of

10  your preparation for your testimony as a designee to this court

11  today?

12  **A.**    Part of it, yes.

13  **Q.**    Okay.

14         **MR. RAND:**  We're going to ask for production of --

15  I'll make a note, Your Honor.  We'll ask for production of that

16  executive summary.

17         **THE COURT:**  Yeah, can we get that now to the

18  plaintiffs, since this witness has testified he's relied on it?

19      We can take a break.

20         **MR. KHOJASTEH:**  Yeah, we'll get it -- yes, Your

21  Honor.  We're happy --

22         **THE COURT:**  Yes.  Let's do it right now.

23      Okay.  We've been going for an hour.  Let's just take a

24  five-minute break.  We can give the witness a break.  Make sure

25  you get your document.

*CROSS OF THOMAS GILES BY MR. RAND*

1      Let's make sure from the witness, were there any other

2  documents that you used in preparation for your testimony

3  today?

4           **THE WITNESS:**  Yes.  I had one other document I was

5  going to get to.

6           **THE COURT:**  Okay.  Why don't we get that on the

7  record.  And then we'll just take a break and make sure we wrap

8  that up.  Okay?

9      So go ahead, Mr. Rand, if you want to finish with the

10  witness on what documents were used in preparation for your

11  testimony.

12           **MR. RAND:**  Thank you, Your Honor.

13  **BY MR. RAND:**

14  **Q.**   Mr. Giles, you just indicated there's a fourth document

15  that you recall reviewing, correct?

16  **A.**   Yeah, it was -- it was just a broadcast message that went

17  out through the director's office yesterday that talks about

18  third-country removals that might have some knowledge to this

19  case.  But it just explains the process for third-country

20  removals.

21  **Q.**   And you're relying upon that document for purposes of the

22  information you're providing the Court today as a designee,

23  correct, sir?

24  **A.**   The main document I used for the third-country removal,

25  sir, would be the guidance from March of 2025.

 1  **Q.**   Back to my question, respectfully.

 2      You relied on that fourth document, that blast that you

 3  thought might have pertinent information in connection to

 4  prepare yourself to provide Her Honor with testimony about how

 5  the procedures might go next week.  Fair?

 6  **A.**   Yes.  Fair, because it was regarding third-country

 7  removals.

 8  **Q.**   Very good.

 9          **MR. RAND:**  I would call for the production of that

10  document during the break, Your Honor.

11          **THE COURT:**  Okay.  All right.

12      And there are no other documents; is that right,

13  Mr. Giles?

14          **THE WITNESS:**  That is correct.

15          **THE COURT:**  All right.  Let's take a break.  Let's

16  get those documents to plaintiffs, and we'll resume as soon as

17  you all are ready.

18          **MR. RAND:**  Thank you.

19          **THE WITNESS:**  Can I step down?

20          **THE COURT:**  Yes.  You're still under oath.  Don't

21  talk to anybody about your testimony.

22          **THE WITNESS:**  Can I talk to the attorneys?

23          **THE COURT:**  You may not.  You may not talk to the

24  attorneys.

25      And we will see you back here in short order.  Just

1  pretend you're still on the stand except you get to walk around

2  and stretch your legs.

3          **THE WITNESS:**  Okay.  Thanks.

4          **THE COURT:**  Okay.  See you in a bit.

5          **DEPUTY CLERK:**  All rise.  This Honorable Court stands

6  in recess for five minutes.

7      (Recess taken from 2:06 p.m. to 2:31 p.m.)

8          **DEPUTY CLERK:**  All rise.  This Honorable Court

9  resumes in session.

10         **THE COURT:**  All right.  Counsel, are we ready to go?

11         **MR. KHOJASTEH:**  Yes, we are.  We have copies of the

12  documents that we've shared with counsel and we are prepared to

13  share with the Court.

14      We just want to note for the record, Your Honor, we -- the

15  Department of Justice --

16         **DEPUTY CLERK:**  Mr. Khojasteh, I'm sorry.  Can you

17  move your microphone a little closer.

18         **THE COURT:**  Does this need to be said in the presence

19  of the witness, or do you want to come up?

20         **MR. KHOJASTEH:**  It's okay to be said.

21         **THE COURT:**  Okay.  It's not substantive?

22         **MR. KHOJASTEH:**  It's just me apologizing.

23         **THE COURT:**  All right.  I appreciate that.

24      All right.  You all can have a seat.

25         **MR. KHOJASTEH:**  Judge, we didn't share it with the

 1  witness, and this was -- so we were -- this is -- we didn't

 2  think to -- we didn't have these in our possession, and we

 3  didn't share them with the witness.

 4          **THE COURT:**  I'm not sure what that means.

 5          **MR. KHOJASTEH:**  My point is we weren't hiding the

 6  ball here, Your Honor.

 7          **THE COURT:**  Well, I don't know whether you were or

 8  you weren't, but these are the two documents to which Mr. Giles

 9  testified to a moment ago.  They've been produced to the

10  plaintiffs, and you have a courtesy copy for me, right?

11          **MR. KHOJASTEH:**  Yes.  I'm going to give Mr. Rand a

12  copy of these that he can share with the witness if he'd like

13  to examine the witness on them.

14          **THE COURT:**  Okay.

15          **MR. RAND:**  Thank you.

16          **THE COURT:**  Okay.  Thank you.

17      All right.  And, Mr. Giles, you're still under oath.

18      And whenever you're ready, Mr. Rand.

19          **THE WITNESS:**  Yes.

20          **MR. RAND:**  Thank you, Your Honor.

21  **BY MR. RAND:**

22  **Q.**  Mr. Giles, as you sit here today, are you aware that it's

23  the government's position that Mr. Abrego Garcia has received a

24  final order of removal?

25  **A.**   Yes.

1    **Q.**    And what is the basis of that understanding?

2    **A.**    The basis of that understanding is, you know, after

3    reviewing the case from the documents I looked at, it indicated

4    that this individual has a final order of removal with a

5    withholding grant to El Salvador.

6    **Q.**    Okay.  You have not seen the final order of removal, have

7    you, sir?

8    **A.**    What do you mean by that?

9    **Q.**    I mean, you have not seen a piece of paper that represents

10   the final order of removal vis-a-vis Mr. Abrego Garcia,

11   correct?

12   **A.**    No, I have not.

13   **Q.**    And are you aware, as you sit here today, whether

14   Mr. Abrego Garcia received any notice of his appellate rights

15   in 2019 in regard to a purported notice -- excuse me -- in

16   regard to a purported final order of removal?

17   **A.**    Are you asking if I know if this individual has received

18   his decision from the BIA?

19   **Q.**    I'm asking you --

20   **A.**    Well, I don't know if he's seen it, but the information I

21   reviewed indicated his BIA was dismissed.

22   **Q.**    I appreciate that information.  Just stay with my

23   question.

24          As you sit here today, are you familiar or understand in

25   any way whether Mr. Abrego Garcia in 2019 received notice of

 1  his appellate rights in connection with a purported final order

 2  of removal that you just testified you believe he received but

 3  have never seen?

 4  **A.**    Well, you asked if I -- my understanding was you asked if

 5  I've seen the piece of paper.  And I said no, I did not see the

 6  piece of paper that says he's been ordered removed.  My

 7  information is based on the information that I reviewed prior

 8  to this testimony.

 9  **Q.**    And the information you reviewed prior to this testimony

10  was in the document that summarized Mr. Abrego Garcia's case, I

11  assume?

12  **A.**    Yes.

13  **Q.**    Okay.

14          **MR. RAND:**  And, Your Honor, with the Court's

15  permission, may I approach the witness?

16          **THE COURT:**  You may.  Sure.

17          **MR. RAND:**  Thank you.

18          **THE COURT:**  Is this -- you're going to use for

19  refresh recollection, or are you going to admit it?

20          **MR. RAND:**  I just want to put it in the record to

21  establish it's the document.

22          **THE COURT:**  Okay.  So is this going to be

23  Plaintiffs' 1?

24          **MR. RAND:**  Yeah, we'll make this Plaintiffs' 1.  And

25  we have this marked for identification.  Sorry.  I didn't

1  explain it.

2            **THE COURT:**  Yes.  Unless there's an objection,

3  Plaintiffs' 1.

4            **THE WITNESS:**  Thank you.

5  **BY MR. RAND:**

6  **Q.**  All right.  So you have Plaintiffs' Exhibit 1 in front of

7  you?

8  **A.**  Yes.

9  **Q.**  Do you recognize this document?

10 **A.**  Yes.

11 **Q.**  What do you recognize it -- withdrawn.

12      Is this the document you testified before the break that

13 you had seen in connection with your preparation?

14 **A.**  Correct.

15 **Q.**  And is this a document, as you just told me, where you --

16 from which you understood that Mr. Abrego Garcia had a final

17 order of removal?

18 **A.**  Yes.

19 **Q.**  And can you point out to me where in this document you

20 discerned that information from.

21 **A.**  It says about two-thirds of the way down on -- where is

22 it? -- October 10, 2019, an IJ in Baltimore, Maryland, issued

23 Abrego a final order with withholding of removal granted.

24 **Q.**  That's the sole basis of your understanding, fair?

25 **A.**  Yes.

 1  **Q.**   All right.  And now, you are aware, as per that

 2  information and what you provided me earlier, that there was

 3  a -- that the order of withholding of removal -- excuse me --

 4  the order had a withholding of removal for El Salvador?  You

 5  testified to that already, correct?

 6  **A.**   Yes.

 7  **Q.**   And you are aware, at least from the media, that

 8  Mr. Abrego Garcia was sent to El Salvador despite that

 9  withholding order, correct?

10  **A.**   When he was sent to El Salvador, I was not familiar with

11  the case.

12  **Q.**   Well, I'm just asking you a different question.

13      You understood at the time he was sent to El Salvador

14  earlier this year and spent about ten weeks there roughly?

15  **A.**   I know that from this document.  On March 15th, 2025, he

16  was removed to El Salvador.

17  **Q.**   Okay.  Thank you, sir.  And so he was removed to El

18  Salvador in violation of that order, correct, sir?

19  **A.**   This individual has a final order of removal.

20  **Q.**   I'm asking a different question.

21      He was removed to El Salvador in violation of the

22  withholding order that you've testified about multiple times

23  today you recognize he had against -- in regard to not being

24  removed to El Salvador, correct?

25  **A.**   Yes.

1  **Q.**    Okay.  Now, do you know who his case agent was in March of

2  this year, Mr. Abrego Garcia, when he was picked up by DHS ICE?

3  **A.**    No, I do not.

4  **Q.**    Do you know whether that would be the same case agent he

5  would have if he was transferred into ICE custody next

6  Wednesday if he's released?

7  **A.**    No, I don't know who the case agent will be.

8  **Q.**    Would it be a case agent in Maryland or would it be a case

9  agent in Tennessee?

10 **A.**    It's going to depend on -- if that individual gets

11 released and comes into ICE custody, this individual will be

12 assigned a case agent or officer at what detention facility

13 they're located at.

14 **Q.**    Is it possible that ICE and DHS will pick him up from the

15 Tennessee court and drive him a couple of hundred miles

16 somewhere else so that he has a case agent outside of that

17 location?

18 **A.**    I don't know.  We need to find bed space for the

19 individual.  If he is released from federal custody, and he

20 comes into ICE custody, we will find bed space for this

21 individual.  And we don't know where that is.

22 **Q.**    Is it possible in your view, sir, that the only bed space

23 available for Mr. Abrego Garcia, if he's released from criminal

24 custody next Wednesday in Tennessee, is in Texas, for instance?

25 Is that possible?

1  **A.**   It's a possibility.  It could be anywhere in the United

2  States.

3  **Q.**   All right.  And -- and your testimony to this court under

4  oath is that the sole consideration for that is where there's

5  an open bed?

6  **A.**   It's where there's bed space available, yes.

7  **Q.**   So in your view, sir, if I understand it, if he's

8  transported a thousand miles to a completely different ICE

9  detention facility far away from Maryland and Tennessee, that

10 transfer and removing him that far away would solely relate to

11 whether there was an open bed available to DHS and ICE in order

12 for him to be able to sleep in it; is that correct?

13 **A.**   Yeah.  We transfer people all over the country for bed

14 space and to decompress detention facilities.

15 **Q.**   Who would decide where he'd be transferred to next

16 Wednesday, if, in fact, he was released from criminal custody?

17 **A.**   It would be -- you know, if a field office can't find a

18 bed for that individual in their jurisdiction, then we would

19 make -- the field officer would make a request to have -- to

20 find a bed for those or -- for those individuals if we don't

21 have bed space in that jurisdiction.

22 **Q.**   I want to get more specific.  I want to get granular, sir.

23     Who specifically -- you're very senior in the

24 organization; we'll touch on that in a moment.

25     Well, you have national oversight right now in your new

1  position since May, correct?

2  **A.**    Yes.

3  **Q.**    You're third from the top, correct?

4  **A.**    Yes.

5  **Q.**    There are only two people between you and Secretary Noem,

6  correct?

7  **A.**    No.  I'm third from the top in enforcement removal

8  operations.

9  **Q.**    Fair enough.  Fair enough.  Enforcement removal

10  operations, you're third from the top.

11      Who specifically -- given your 24 years of service and

12  your role and your current job responsibilities, who

13  specifically decides where Mr. Abrego Garcia goes next

14  Wednesday if he's released from criminal custody in Tennessee?

15  **A.**    It's going to be up to the field office where this

16  individual is released at a supervisory level, where, if

17  there's no bed space available, we would move that individual

18  to another bed.  We transfer people all over the country every

19  single day.

20  **Q.**    Do you -- can you tell me who the supervisor in that

21  office in Tennessee is who would be making this decision?

22  **A.**    I don't have that information.  It could be anyone that's

23  on duty that day if this individual does get released from

24  custody.

25  **Q.**    Did you consider, when you got the order two days ago

1 about what you're going to be testifying here today about,

2 checking in to see what the bed space situation might look like

3 in Tennessee and where he might be sent?

4 **A.**   Our bed space changes every day, sir.

5 **Q.**   Changes every hour?

6 **A.**   Yes.

7 **Q.**   Every minute?

8 **A.**   It changes every day, every hour, depending on the cases

9 that are in custody and if they are getting removed, released

10 on bond, or transferred to another facility to decompress that

11 facility.

12 **Q.**   Would you agree with me that Mr. Abrego Garcia's case has

13 received a fair amount of -- fair amount of attention from

14 senior government officials?

15 **A.**   All I know is that I've seen the case on the media here

16 and there.  And I -- once I found out I was going to testify on

17 this two days ago, I started working with my attorneys on my

18 testimony.

19 **Q.**   Are you aware that the President of the United States has

20 talked about this individual and this case publicly on a number

21 of occasions over the last three months?

22 **A.**   I'm aware that he has spoken on it, yes.

23 **Q.**   Are you aware that Stephen Miller has spoken about this

24 case and this individual over the last three months on a number

25 of occasions publicly?

1    **A.**    Through a public source, yes.

2    **Q.**    Are you aware that Secretary Noem has?

3    **A.**    Through a public source, yes.

4    **Q.**    Attorney General Bondi?

5    **A.**    Through a public source, yes.

6    **Q.**    Secretary of State Rubio?

7    **A.**    With that gentleman, I'm not sure; but I could have seen

8    it on the media.  But I don't know.

9    **Q.**    All right.  And -- and it's your testimony, despite the

10   focus that the most senior people in our government have paid

11   to this man in this case, that he is going to be transferred

12   somebody next Wednesday based on an unnamed person field

13   officer, based on how many -- what beds are available at that

14   point in time?

15        Is that your testimony, sir?

16   **A.**    Yeah, we don't have a decision of where this individual is

17   going to go at the time of release.  He could stay in the New

18   Orleans field office.  It's just going to depend on the bed

19   space.

20   **Q.**    And you made no attempt -- I think we've established this.

21   You made no attempt whatsoever to check in with that field

22   office in Tennessee to see what thoughts, if any, they had

23   about this extremely high-profile case in connection with your

24   testimony here today, correct?

25   **A.**    We have -- we have people that we arrest.  We arrest

 1  hundreds, if not thousands, a day.  And we have people that are

 2  released from custody from local, state, and federal custody,

 3  hundreds a day throughout the country.

 4      So our bed space today could be completely different than

 5  what it is tomorrow.  I can't predict what it's going to be,

 6  you know, in six or seven days from now.

 7          **THE COURT:**  Can I just interrupt you for one second?

 8      Where did New Orleans come from?

 9          **MR. RAND:**  I was about to ask that.

10          **THE COURT:**  I'm sorry.  I'm sorry to interrupt.

11          **MR. RAND:**  I just -- I just had Mr. Rossman prompt

12  me.

13          **THE COURT:**  All right.  Yeah, can we get to the

14  bottom of that.

15          **THE WITNESS:**  I can answer that.

16  **BY MR. RAND:**

17  **Q.**   Yeah.

18  **A.**   New Orleans is the field office that oversees the state of

19  Tennessee.  So that's how I -- New Orleans covers Tennessee.

20  That's where the main field office is, is in New Orleans.

21          **THE COURT:**  So there's no field office in Tennessee?

22          **THE WITNESS:**  We have a suboffice in Tennessee in

23  Nashville.  But the main field office, where they report to, is

24  New Orleans, Louisiana.

25          **THE COURT:**  So your testimony is it would be someone

1  in New Orleans who would make this decision?

2          **THE WITNESS:**  Well, the New Orleans field office, not

3  necessarily someone in downtown New Orleans.  It's just the New

4  Orleans field office is where this individual is detained right

5  now by the U.S. Marshals Service.

6          **THE COURT:**  Okay.  I'm confused.  I'm going to turn

7  it over to you to clear it up.  If I'm still confused --

8  because I'm usually the last one to get it -- I will follow up

9  with you, Mr. Rand.  Go ahead.

10          **MR. RAND:**  I doubt that very much, Your Honor, but

11  thank you.

12          **THE WITNESS:**  We have 25 field offices across the

13  country, and each field office covers a certain jurisdiction or

14  multiple states.  And the New Orleans field office happens to

15  cover Tennessee.

16  **BY MR. RAND:**

17  **Q.**  What other states does the New Orleans field office cover?

18  **A.**  It would be Louisiana, Mississippi, Kentucky, Tennessee,

19  and Arkansas.  I believe that's the five states that it covers.

20  **Q.**  And let me ask you a question.

21          Is it your testimony that it's impossible, in your mind,

22  that there's being some thought given within the New Orleans

23  field office about where Mr. Garcia might be detained if he's

24  released from criminal custody next week?

25  **A.**  We don't know if he's going to be released.  But once --

1  if a decision is made by the federal judge in this case, then

2  the decision will be made at that time where that individual is

3  going to go based on bed space.

4  **Q.**   Well, sir, you've given me that answer many times.  Listen

5  to my question.  It's a little different.

6       Is it impossible, in your mind, to imagine that the people

7  responsible in New Orleans for dealing with Mr. Abrego Garcia's

8  situation, if he's released next week, are considering where

9  he's going to be detained?  Is that impossible, in your mind,

10 for some reason based upon your experience working within this

11 organization?

12 **A.**   I mean, I guess it's a possibility.  But I would have to

13 check with that office to see what planning they've done

14 because I haven't communicated with them on where this

15 individual is going to be detained.

16      That's not my responsibility.  It's the responsibility of

17 the New Orleans field office of where this individual is going

18 to be detained.

19 **Q.**   As we've established -- I don't mean to keep asking --

20 repeating myself -- you didn't check with that field office in

21 connection with today?

22 **A.**   I have not checked with that field office, no.

23 **Q.**   If you wanted to check with them or if you were asked to

24 check with them by anybody, who would you call?

25 **A.**   I would call the field office, the -- well, the acting

1  field office director.

2  **Q.**  And who is that?

3  **A.**  Right now, the acting field office director in the New

4  Orleans field office's name is Brian Acuna.

5  **Q.**  And just so we're clear, it's possible Mr. Acuna -- if I'm

6  giving the pronunciation justice --

7  **A.**  That's correct.

8  **Q.**  It's possible Mr. Acuna is considering this issue; you

9  just don't know, sitting here today, because you didn't check

10  with him, fair?

11  **A.**  It's very possible.  But I would have to check with him to

12  see what he's done to see if that individual is going to be

13  released and what facility he would be transferred to.

14  **Q.**  Now, do you know Mr. Evan Katz?

15  **A.**  Yes, I know Mr. Evan Katz.

16  **Q.**  And Mr. Katz works at DHS, correct?

17  **A.**  He works at ICE, yes.

18  **Q.**  ICE.

19      He has similar responsibilities to you?

20  **A.**  Right now, he is a deputy assistant director in the

21  enforcement division.

22  **Q.**  And how -- how does his -- in terms of an organizational

23  chart, can you just describe for us where he sits in

24  relationship to you?

25  **A.**  He -- I'm at the assistant director level, and he would be

 1   at a deputy assistant director level not in my division.

 2   **Q.**   So he's a little lower than you and not in your division?

 3   **A.**   Correct.

 4   **Q.**   Do you understand Mr. Katz has knowledge about Mr. Abrego

 5   Garcia's case?

 6   **A.**   Yes.

 7   **Q.**   You understand Mr. Katz was deposed in this case?

 8   **A.**   I believe he was, yes.

 9   **Q.**   Did you ever look at that testimony?

10   **A.**   No, I did not.

11   **Q.**   Do you know if Mr. Katz was unavailable today to provide

12   answers about what -- where Mr. Abrego Garcia's situation was

13   and where he might be detained next Wednesday?

14   **A.**   That, I don't know.  I was told by my management that I

15   would be testifying today.

16   **Q.**   Who specifically told you that you would be testifying

17   today?

18   **A.**   The acting deputy executive associate director, Mellissa

19   Harper, through the phone call I got on Tuesday morning when I

20   was on the West Coast.

21   **Q.**   Now, how many times -- I'm going to switch gears for a

22   moment.

23       How many times have you been involved in the removal of an

24   alien to a third country prior to March of this year?

25   **A.**   When I was a case officer, I had some very little

 1  experience in doing it, but unsuccessfully.

 2  **Q.**   And when you say little experience, one time?

 3  **A.**   When I was a deportation officer in the early 2000s, I

 4  had -- there's a process that we would follow.  We would fill

 5  out a form, and we would send it to that embassy to see if they

 6  would accept this alien under a third country.  And I don't

 7  recall or don't know of any of that I have successfully done

 8  personally.

 9  **Q.**   That's just one instance, though?

10  **A.**   I'm sure there was, like, maybe a handful; but I

11  couldn't -- I can't remember, sir.

12  **Q.**   And you weren't successful because the embassy indicated

13  that country to which you wanted to send that alien wouldn't

14  take the alien, fair?

15  **A.**   That's a fair statement, yes.

16  **Q.**   And prior to March of this year, what was the process that

17  one had to go through in order to -- by way of the alien, by

18  way of notice and right to -- right to hear it?

19  **A.**   We would fill out a document.  I believe it's I-241,

20  Request of Alien.  I don't know the exact title of it.  And

21  that would be filled out and sent to the embassy of the third

22  country or consulate to see if they would accept that alien.

23  **Q.**   A notice would be given to the alien that this potential

24  removal to that third country was being considered, correct?

25  **A.**   Yes, I believe so; yes.

1   **Q.**   And did the alien have a time period after they received

2   the notice in order to take any action they may want to take

3   based on the rights they had?

4   **A.**   Yeah, I believe they would.   Yes.   I mean, like, the

5   process now is if, you know, they would claim fear if they had

6   fear to go back to that country, and it would be the same

7   process to refer them to the United States Citizenship and

8   Immigration Services.

9   **Q.**   Yeah.   No, I'll talk about the process now in a moment and

10  Defendants' Exhibit 1.   I want to go back to pre-March.

11       What was the process upon the notice being given to the

12  alien that they were going to be removed to a third country

13  and, in parallel, the consultation with the embassy as to

14  whether they would take the alien?   What was the process

15  available to the alien?

16  **A.**   It was determined by, you know, the deportation officer.

17  The case agent would talk with -- would issue that document to

18  the alien.

19       In the experience that I had, sir, in immigration court,

20  sometimes the alien would designate a third country of removal

21  if they are from, say, the country of France and we couldn't

22  get a document for them to go to France but they suggested

23  Italy to go, we would work with the Italian embassy to see if

24  they would accept that alien.

25  **Q.**   So there was a case officer; there was an immigration

1  judge; there was a proceeding underway; and the alien was able

2  to assert whatever rights the alien might have?

3  **A.**    That's the experience that I have, sir.

4  **Q.**    And that process took some period of time, correct?

5  **A.**    From what I remember, it could have taken a couple of days

6  to a couple of weeks, depending on how fast the embassy got

7  back to you.  But as I said, I've never personally experienced

8  someone, in my capacity as a deportation officer, third-country

9  removal.

10 **Q.**    But in terms of that timeline, a couple of days to a

11 couple of weeks, at least your personal experience is it was

12 more along the couple of weeks' line, right, sir?

13 **A.**    It would be fair to say, yes.  I mean, I can't remember.

14 **Q.**    Now, a slightly different question.  What experience do

15 you have, if any, with the removal to a third country of an

16 individual who has a withholding order -- to a third country

17 other than the one governed by the withholding order?

18        You ever had that happen in your life, sir, before, let's

19 say, March of this year?

20 **A.**    Since March of this year or before March?

21 **Q.**    No, before.  Let's stay before.

22 **A.**    Before?  Yeah, there's been instances where individuals

23 have been removed and we've -- that -- as a field office

24 director in those three field offices, I'm sure there's been a

25 case or two that had been removed that had withholding and

1   those individuals were brought back to the United States.

2   **Q.**    You sound like you're speculating.  Do you recall specific

3   cases?

4   **A.**    I don't recall specific cases, but I do have some

5   recollection that it has happened.  I just can't recall a

6   specific case or where I was.

7   **Q.**    Is there any information on your personal knowledge, based

8   on your prior experience, on what the procedure was in that

9   situation?

10  **A.**    I -- I can't remember, sir.

11  **Q.**    Do you know if you ever knew?

12  **A.**    I'm sure I did, yes, but as I moved up in management and

13  everything else, the processing has changed differently from

14  when I was an officer to what the officers do now.

15  **Q.**    Would you agree with me as a general statement that the

16  rate of third-party country removal is a very small percentage

17  of overall deportation proceedings?

18  **A.**    Can you repeat that, please?

19  **Q.**    Yeah.

20         Do you agree with me that the situation in which somebody

21  is being sent to a third country, not one of which they're a

22  citizen of, right, a third-party country removal is a very

23  small percentage of overall deportation?

24  **A.**    I don't know how you define "small," but it's definitely

25  less than people going to their country of citizenship.  I

1  don't have numbers right now of how many -- what the percentage

2  is of people being deported to a third country.

3  **Q.**   I don't know if you're a Supreme Court buff in terms of

4  reading Supreme Court decisions.  Are you familiar with a case

5  called *Albence v. Chavez,* by any chance?

6  **A.**   *Albence v. Chavez*?  No, I'm not familiar with that case.

7  **Q.**   The quotation there -- I'm not asking statement of fact;

8  I'm asking your view.  The quotation in that Supreme Court case

9  a couple of years ago, in terms of what the percentage was, was

10 1.6 percent of deportations involved third-party country

11 removal.

12      Does that seem about right to you?

13 **A.**   Yeah.  I don't have knowledge on that.  But if that's what

14 was said in there, then I'm sure they got that number from

15 somewhere, sir.  But I don't have knowledge of that.

16 **Q.**   Does it seem wrong to you given your 24 years of

17 experience?

18 **A.**   Wrong as in what sense?

19 **Q.**   Does it seem too small to you based upon your experience

20 in having worked in this field and for the government in this

21 area for 24 years?  Does that seem wrong to you, 1.6 percent,

22 or seem about right?

23 **A.**   Again, I can only speak from personal experience.  I told

24 you earlier in my testimony that I have never had success for

25 that.  So I don't know if that number is accurate -- if it's

1  right or not.  But if it's -- it is definitely a lesser

2  percentage than what would be removed to the country of

3  citizenships.

4  **Q.**   Sitting here today, you have no reason to dispute it's

5  approximately 1.6 percent third-party country removal of

6  overall deportation, fair?

7  **A.**   Fair.

8  **Q.**   It's an unusual situation, fair?

9  **A.**   Fair.

10  **Q.**   Sending someone to a country that they have no citizenship

11  and connection to whatsoever is a very, very unusual thing,

12  isn't it, sir?

13  **A.**   The alien has the right to contest the third-country

14  removal if they claim fear and they go through that process.

15  **Q.**   I understand that, sir.  I asked you a different question.

16      It is an unusual thing -- unusual thing -- to send

17  somebody to a country, in deporting them, that they have no

18  connection or relationship to whatsoever, isn't it, sir?

19  **A.**   Well, our job as officers, if they have a final order of

20  removal, is to effectuate that final order of removal.  By us

21  sending these individuals to a third country, it means that we

22  aren't able to effectuate their removal to their country of

23  citizenship.

24  **Q.**   Is that the answer you give me no matter how many times I

25  ask that question of you, sir?

1  **A.**    That's the way I understand the question, sir.

2  **Q.**    Do you think it's normal to be sent to a country, in being

3  deported, that's not a country you have any relationship

4  whatsoever or citizenship with?

5  **A.**    Our job as deportation officers in the field are to

6  effectuate the immigration judge's order.

7  **Q.**    All right.  I think you just answered my prior question.

8       All right.  I would like to go to Defendant Exhibit 1,

9  which is the March 30th, 2025, guidance regarding third-party

10  country removal.

11       Do you have that in front of you, sir?

12  **A.**    Yes.  Yes.

13  **Q.**    And in addition, although I've got it just before we came

14  back on -- I haven't had a chance to study it -- you indicated

15  that this is an e-mail that you just saw yesterday, right?

16  **A.**    Yes.

17          **MR. RAND:**  And with the Court's permission, may I

18  mark this as Exhibit -- Plaintiffs' Exhibit 2 and approach the

19  witness?

20          **THE COURT:**  Yes, you may.

21          **MR. RAND:**  Thank you, Your Honor.

22       Let the record reflect I'm placing in front of the witness

23  what's been marked as Plaintiffs' Exhibit 2.

24  **BY MR. RAND:**

25  **Q.**    Do you recognize this document, sir?

1  **A.**    Yes.

2  **Q.**    This is one of the two -- excuse me -- four documents you

3  saw in the last two days in the approximate three and a half

4  hours you spent preparing for this testimony here today, right,

5  sir?

6  **A.**    Yes.

7  **Q.**    And I haven't had a chance to read it, I confess, and I

8  don't want to waste your time reading it now with you, but can

9  you tell me how, if at all, your understanding is that this

10  e-mail that all ICE employees received yesterday, July 9th,

11  2025, interacts with or adjusts in any way the March 23rd,

12  2025, guidance that is Defendants' Exhibit 1?

13  **A.**    I opened this e-mail up when I got it yesterday afternoon

14  because it indicated third-country removals.  And when I opened

15  it up, it has -- it's in regards to another litigation.  And it

16  just explains the process of how -- how ERO will go through the

17  process to offer third-country removal.

18  **Q.**    Does it adjust anything about how you understood the

19  process to have worked prior to July 9th, 2025?

20  **A.**    I'm sorry.  Can you repeat that?

21  **Q.**    Yeah.  So in other words, on July 8th, 2025, you, as a

22  senior person in your job responsibilities with this agency,

23  had an understanding of what the March 30, 2025, guidance,

24  which is Defendants' Exhibit 1, provided for, correct?

25  **A.**    Correct.

1  **Q.**    All right.  And then you got this e-mail yesterday,

2  correct?

3  **A.**    Yes.

4  **Q.**    And my question is did this e-mail change anything in your

5  mind about how you understood the process to go for third-party

6  country removal?

7  **A.**    No.

8  **Q.**    It was entirely the same, in your view?

9  **A.**    Yes.

10  **Q.**    Okay.  Now, I want to go to -- and we'll come back to that

11  later after I have an opportunity to review it.

12      I want to go to Defendants' Exhibit 1, which was the

13  March 30th guidance.

14      Do you have that in front of you, sir?

15  **A.**    Yes.

16  **Q.**    Now, when you -- on direct, you testified -- withdrawn.

17      There are two channels set out in this guidance of

18  March 30, 2025, correct?

19  **A.**    If I understand you correctly, what would you be referring

20  the two channels to be?

21  **Q.**    So there's one channel that if the United States has

22  received assurances that a third country will not persecute or

23  torture folks sent there by the United States, right, and it --

24  the Department of State believes those assurances to be

25  credible, then there can be removal without the need for

1    further procedures.

2        I paraphrased it, but it's the bottom of page 1 to the top

3    of page 2, correct?

4    **A.**    That's correct.

5    **Q.**    That's one channel, right?

6    **A.**    Yes.

7    **Q.**    The channel you described on direct is the second channel,

8    right, to deal with situations for third-party countries where

9    there is no such diplomatic assurances that the alien's removal

10   not be persecuted or tortured, A, meaning the State Department

11   believes those assurances to be credible.

12       What you described earlier today is the second channel,

13   correct?

14   **A.**    Yes.

15   **Q.**    And that's the channel which, under this guidance, the

16   alien has to, without being prompted, themselves say, "I'm

17   afraid to go there," and then that starts the process you

18   described, right?

19   **A.**    That is correct.

20   **Q.**    Okay.  There's no evaluation whatsoever by DHS, ICE, State

21   Department about whether that alien will be tortured or

22   persecuted in that country under that second channel, correct?

23   **A.**    Yeah.  If these individuals get removed via a third

24   country, that means that country is going to accept this alien

25   and with the -- and then the assurances are there that they

1  won't be persecuted or tortured upon removal to that third

2  country.

3  **Q.**   Where are those assurances you just described in this

4  document that's Exhibit 1 -- Defendants' Exhibit 1, sir, under

5  the second channel where the alien themselves have to say, "No,

6  no.  I don't want to go there because I'm frightened"?

7  **A.**   The second channel is if and when the alien claims fear of

8  return to that country; so that's when that second process

9  starts, is the way that I understand the memo.  And these are

10  kind of two parts.

11      We're not going to send somebody to a country that we know

12  that country is not going to accept.  We have to have a travel

13  document or an emergency document for that alien to be removed

14  to that country.  We can't just go send anyone to a third

15  country.  That government needs to accept them.

16  **Q.**   Okay.  Let's go -- I'm just reading the language, sir.

17  This is your business that you do this every day.  I only have

18  the document in front of me.

19      I want to go to the top of page 2 of the March 30th, 2025,

20  guidance.

21      You with me, sir?

22  **A.**   Yes.

23  **Q.**   The sentences before on page 1 talk about the process

24  where DHS gets assurances and Department of State evaluates

25  them for credibility that people sent there are not going to be

1  tortured and persecuted.  Fair?

2  **A.**    Yes.

3  **Q.**    That's what the words on the page say, correct?

4  **A.**    Correct.

5  **Q.**    The e-mail yesterday changed nothing about that.  You've

6  told us that, right, sir?

7  **A.**    My understanding when I glanced at the e-mail from

8  yesterday, yes.

9  **Q.**    Let's go to the sentence at the top of page 2.

10      "If the United States has not received those assurances or

11  if the Department of State does not believe them to be

12  credible, DHS must follow the procedures below."

13      You see that?

14  **A.**    Yes.

15  **Q.**    And then it lays out a second track, correct?

16  **A.**    Correct.

17  **Q.**    And what you were testifying to earlier on direct today

18  was that second track.  Fair, sir?

19  **A.**    Fair, yes.

20  **Q.**    When you were testifying about that on direct, did you

21  know in your mind there were two tracks?

22  **A.**    I kind of used the two tracks together because these

23  individuals aren't going to be able to go back to that

24  country -- that third country without that country accepting

25  them and giving them an emergency document for them to travel

1    to that country.

2    **Q.**    I don't quite follow that testimony.  Can you unpack that

3    for me?  I'm not understanding.  Actually, withdrawn.  Let me

4    do it differently.

5        This document, the March 30th procedures, sets out two

6    tracks, correct?

7    **A.**    Yes.

8    **Q.**    Okay.  Now, are there any countries that have satisfied

9    the first track that you're aware of, sitting here today, in

10   the world?

11   **A.**    What do you mean by that?

12   **Q.**    That the Department of -- that DHS has evaluated and got

13   assurances that aliens sent there for third-party removal won't

14   be tortured and persecuted and the Department of State has

15   found those assurances to be credible.

16       Has any country gone through that process that you're

17   aware of, sitting here today, of this first track?

18   **A.**    That I'm aware of, Mexico has.  We're allowed to send

19   certain nationalities to Mexico.

20   **Q.**    Any other country that has satisfied this first track?

21   **A.**    Yeah.  One that comes to mind would be South Sudan.

22   **Q.**    Any -- so I just want to be clear.  The U.S. government

23   has gotten assurances from South Sudan that aliens sent there

24   will not be persecuted and tortured?

25   **A.**    Yes, that's my understanding.

*CROSS OF THOMAS GILES BY MR. RAND*

1  **Q.**   And the Department of State has found those assurances to

2  be credible?

3  **A.**   I can't confirm that the Department of State is, but we

4  have been able to remove people to South Sudan.

5  **Q.**   Well, if it's being done pursuant to this first track and

6  it's a third-party country, you had to have the Department of

7  State say they were credible?

8  **A.**   Yes.

9  **Q.**   Do you know if that's happened?

10  **A.**   I believe -- I believe it has; otherwise, those

11  individuals would not have been sent to South Sudan.

12  **Q.**   How are you so certain of that?  People seem to be sent

13  all over the place.

14          **MR. KHOJASTEH:**  Object to the form.

15          **MR. RAND:**  Withdrawn.  That was fair.  I apologize.

16          **THE COURT:**  Can you rephrase.

17  BY MR. RAND:

18  **Q.**   Can you --

19          **THE COURT:**  I'm sorry.  I'm going to stop you for a

20  second.

21      Who's handling this witness?  Did you object?

22          **MR. KHOJASTEH:**  I objected.

23          **THE COURT:**  You objected?

24          **MR. KHOJASTEH:**  I did, ma'am.

25          **THE COURT:**  I heard it from over here somewhere.

*CROSS OF THOMAS GILES BY MR. RAND*

1              **MR. RAND:**  I withdrew my question.

2              **THE COURT:**  I just wanted to make sure I knew who was

3      objecting because it literally must be acoustics.  Sorry about

4      that.

5         And you're going to rephrase?

6              **MR. RAND:**  Going to rephrase, Your Honor.  Thank you.

7      **BY MR. RAND:**

8      **Q.**   Why are you confident that those aliens who have been sent

9      to South Sudan, where that's a third-party country, was

10     following the Department of State finding assurances from DHS

11     credible?

12     **A.**   Sir, I wasn't involved in the decisions from those.  I

13     just know that we had individuals sent to that country.  So

14     I -- based on this guidance, I could assume that the Department

15     of State has given those assurances to the United States for us

16     to remove those people from South Sudan.

17        I wasn't involved in those decisions.  I wasn't in the

18     position I was in now.

19     **Q.**   Sitting here today, do you know whether the assurances

20     have been given and found credible for South Sudan?

21     **A.**   I would say, yes, I would assume, because we did that.

22     We're not going to send people to a country where they're going

23     to get persecuted or tortured.  Like I said, they need a

24     document to go to that country to be accepted by that country.

25     **Q.**   Was Mr. Abrego Garcia persecuted and tortured when he was

 1  sent to CECOT in El Salvador?

 2  **A.**    I'm unaware.  I don't know.

 3  **Q.**    I want to understand whether your testimony on direct

 4  earlier today means that Mr. Abrego Garcia is only going to be

 5  in the second track, whether you have knowledge you can provide

 6  this Court as to whether Mr. Abrego Garcia is only going to be

 7  in the second track and that's what you meant by testifying

 8  only about the second track earlier in your direct.

 9       Do you understand my question?

10  **A.**    Do I understand your question?  Yes.

11  **Q.**    Okay.  Do you have knowledge that you're offering, as a

12  representative of the government here today under oath, that

13  Mr. Abrego Garcia is not going to be sent to a third-party

14  country pursuant to the first track?

15  **A.**    I don't have that information.  Again, that -- those

16  decisions aren't going to be made until that individual arrives

17  in ICE custody.

18  **Q.**    Well, the procedure off the first track, as it says at the

19  top of page 2, is may be removed without need for further

20  procedures.

21       There's no procedure, correct?

22  **A.**    That's what the memo says, yes.

23  **Q.**    Well, this is the memo that you understand you and your

24  colleagues to be following, fair?

25  **A.**    Yes.

*CROSS OF THOMAS GILES BY MR. RAND*

1   **Q.**   Okay.  So when you testified earlier today on direct and

2   you said there were all these procedures available to

3   Mr. Abrego Garcia in regard to potential removal to a

4   third-party country, were you making a representation to this

5   Court that Mr. Abrego Garcia wasn't going to be removed

6   pursuant to the first track or they are, pursuant to this memo,

7   at least -- put aside whether it's lawful -- there are no

8   procedures?

9           **MR. KHOJASTEH:**  Objection.  Mischaracterization --

10          **THE COURT:**  Can you rephrase.  Break it down.  It's a

11  compound question.

12          **MR. RAND:**  That's fair, Your Honor.  I'll come up

13  with a better question.

14  **BY MR. RAND:**

15  **Q.**   Sitting here today, sir, do you have any actual knowledge

16  of which one of these tracks Mr. Abrego Garcia might be put on

17  next Wednesday if he's released from criminal custody and taken

18  into custody by DHS ICE?

19          **MR. KHOJASTEH:**  Your Honor, I'm going to object.

20  This lacks foundation --

21          **THE COURT:**  If it's not objection and foundation,

22  then we need to approach.

23          **MR. KHOJASTEH:**  It's foundation.

24          **THE COURT:**  Lack of foundation?

25          **MR. KHOJASTEH:**  Lack of foundation.  He has --

1           **THE COURT:**  No, no, no.  Overruled.

2      If you need to say anything, I told you what to do.

3    Otherwise, it's overruled.

4      Go ahead.

5    **BY MR. RAND:**

6    **Q.**  Do you have my question in your head, sir?

7           **MR. KHOJASTEH:**  Your Honor, can we do sidebar?

8           **THE COURT:**  Sure.  Come on up.

9      (A bench conference was held on the record but out of the

10   hearing of the courtroom as detailed below:)

11          **THE COURT:**   Go ahead.  Put your objection on the

12   record.

13          **MR. KHOJASTEH:**  I apologize for interrupting.  I'm

14   just confused.  Your Honor, it appears to me that Mr. Rand's

15   understanding --

16          **THE COURT REPORTER:**  I'm sorry, Your Honor.  I can't

17   hear.

18      (The following statement was held in open court:)

19          **DEPUTY CLERK:**  Ladies and gentlemen, during a

20   sidebar, we need everyone to please remain quiet.  We can still

21   hear you.  Thank you so much.

22      (A bench conference was continued on the record but out of

23   the hearing of the courtroom as detailed below:)

24          **THE COURT:**  Okay.  Go ahead.

25          **MR. KHOJASTEH:**  Your Honor, I don't believe Mr. Rand

 1  has established that this document sets out two tracks.  And

 2  he's attempting to get the witness to agree with him on -- with

 3  the language of one track versus two tracks.

 4      I think it would be better if Mr. Rand was actually

 5  referring to what he's saying what the track is.  "Are you

 6  saying Mr. Abrego Garcia will not have an opportunity to

 7  contest?"

 8          **THE COURT:**  That's fine.  I think that's a fair

 9  objection.  If you stick to the document and ask because the

10  document says "removal without further procedures," and then

11  what happens next?  And you can walk him through it as to

12  whether he has any knowledge regarding Abrego Garcia.

13          **MR. RAND:**  I'll follow that course.

14          **MR. KHOJASTEH:**  And just one, that second

15  paragraph -- that second area in italics where the person

16  expresses fear, right?  That section, you haven't established

17  that that doesn't tie -- you haven't got him to establish that

18  his understanding that that first section doesn't apply to the

19  bottom -- the bottom section doesn't apply to the top.

20          **THE COURT:**  I mean, it reads the way it reads.  So

21  let the --

22          **MR. KHOJASTEH:**  I understand.  But I'm trying to --

23          **THE COURT:**  Listen, this memo is so problematic.  So

24  let's just get what this witness thinks this memo tells him is

25  going to happen to Mr. Abrego next week.  So far I've heard, we

 1  don't know -- see what I'm saying? -- when he comes into

 2  custody.  So I don't know if that's going to be his answer or

 3  something else.

 4          **MR. KHOJASTEH:**  Right.  I'm not trying to give Sascha

 5  Rand advice on how to do a cross, but if you perhaps --

 6          **MR. RAND:**  I take notes.  That's okay.

 7          **MR. KHOJASTEH:**  -- perhaps take him through, like,

 8  this decision process.

 9          **THE COURT:**  Your objection is noted and agreed upon

10  that this is more characterization of the document than

11  examination on the document.

12      So if you can examine him on the document, I think it will

13  clear a lot of this up.

14          **MR. KHOJASTEH:**  Appreciate it, Your Honor.

15          **THE COURT:**  Thank you.

16          **MR. RAND:**  Thank you.  Thank you.

17      (The bench conference concluded and proceedings resumed

18  within the hearing of the courtroom as follows:)

19          **THE COURT:**  All right.  Whenever you're ready.

20          **MR. RAND:**  Thank you, Your Honor.

21  **BY MR. RAND:**

22  **Q.**  Mr. Giles, do you have Defendants' Exhibit 1 in front of

23  you?

24  **A.**  Yes.

25  **Q.**  All right.  Now, at the bottom of page 1 -- I'm just

1  reading it out -- it says, "If the United States has received

2  such assurances and if the Department of State believes those

3  assurances to be credible, the alien may be removed without the

4  need for further procedures."

5      Do you see that?

6  **A.**  Yes.

7  **Q.**  In your performance of your job responsibilities, what do

8  you understand that sentence to provide for by way of

9  procedure, if any?

10 **A.**  Exactly how it sounds, sir.  If the U.S. has received such

11 assurances and the Department of State believe those assurances

12 to be credible, the alien may be removed without the need for

13 further procedures.  So that's it -- I read it as it states

14 there.

15 **Q.**  So, for instance, Mr. Abrego Garcia next Wednesday -- and

16 we'll get into the -- you know, the order you discussed that

17 transfers him later.  But he's handed over to DHS ICE.

18     If he's sent to a country like South Sudan, which it

19 sounds like has the assurances and then the secretary -- I'm

20 sorry -- the State Department's credibility assessment of it as

21 being credible, Mr. Abrego Garcia just is removed without any

22 notice, any procedures whatsoever.

23     Is that your understanding, sir?

24 **A.**  No.  Like I mentioned earlier in my testimony, if the

25 alien expresses fear to go to that country, then they will go

1  through that process again.

2  **Q.**   Okay.  So the memo, at least insofar as saying "without

3  the need for further procedures," is ambiguous, perhaps?

4  **A.**   I read that as if that country -- if the Department of

5  State -- if the Department of State assures that that country

6  to be credible and that those individuals won't be persecuted

7  or tortured, then that's the agreement that we have with that

8  country.

9      If the alien says that they fear -- they fear they're

10  going to be persecuted or tortured, they can go through the

11  credible fear process again with the United States Citizenship

12  and Immigration Services, as I mentioned earlier.

13  **Q.**   I just want to be very clear on this.  Your testimony is

14  on behalf of the government as a designee on this issue in

15  response to this court's order, that if, for instance,

16  Mr. Abrego Garcia indicates fear of going to South Sudan,

17  hypothetically, for instance, that he will go through the

18  process you described in your direct that's laid out in the

19  second page of Defendants' Exhibit 1.

20  **A.**   When the alien is served paperwork to be removed to a

21  third country, the alien has the opportunity to express fear.

22  **Q.**   And upon expressing fear, whether it's a country that has

23  gone through the DHS assurance/State Department credibility

24  evaluation, irrespective of that, if the alien expresses fear,

25  they get a notice of removal to that country, correct, as I

*CROSS OF THOMAS GILES BY MR. RAND*

1  understood it?

2  **A.**   The case officer will serve a notice on the alien that

3  says you are going to be removed to country X.

4  **Q.**   Okay.

5  **A.**   If that alien expresses fear to go to country X, they need

6  to express that at that time.  And at that time, the case will

7  be referred to the United States Citizenship and Immigration

8  Services.

9  **Q.**   And if the United States Citizenship and Immigration

10 Services agree -- just to follow up on your earlier testimony,

11 if they agree, then what happens?

12 **A.**   If the U.S. Citizenship and Immigration Services agree

13 that that individual's threat is credible, it will be referred

14 to an immigration judge for a final decision.

15 **Q.**   And if the USCIS, to use the acronym, disagrees, what

16 exactly happens?

17 **A.**   Then we would proceed with removal.

18 **Q.**   And would the alien have any right to any kind of hearing

19 in front of any type of tribunal of any sort prior to removal?

20 **A.**   No.  We would proceed with removal on that individual

21 because -- I'm not an asylum officer, and my officers are not

22 asylum officers.  Those decisions are made by the USCIS.

23    They take into account what the alien says to see if that

24 fear is credible for that alien.  So that would be something I

25 can't speak of.

1          **THE COURT:**  But I just want to be clear of something,

2    Mr. Giles.

3          **THE WITNESS:**  Yes.

4          **THE COURT:**  So this memo says that if the United

5    States -- well, if you determine -- meaning one of your

6    officers determine there's a country to which you wish to send

7    a deportee, an alien, first the United States seeks assurances

8    that that country will not torture that person, right?

9          **THE WITNESS:**  If they are deported to that country,

10   yes.

11         **THE COURT:**  Yeah, if deported --

12         **THE WITNESS:**  Yes.

13         **THE COURT:**  -- the country won't torture the person,

14   correct?

15         **THE WITNESS:**  Correct.

16         **THE COURT:**  And the State Department also has to say

17   we determine that to be credible, that the country won't

18   torture the person, right?

19         **THE WITNESS:**  Correct.

20         **THE COURT:**  This memo says, in that instance, the

21   person may be removed without need for further procedures,

22   right?

23         **THE WITNESS:**  Yes.

24         **THE COURT:**  Okay.  My question is if that person

25   says, "I have a credible fear of going to that country," your

1   testimony is that person receives a credible fear hearing?

2           **THE WITNESS:**  If they -- if they express fear at that

3   time that that paperwork is served on the alien, yes, then that

4   case would be referred to --

5           **THE COURT:**  USCIS.

6       **THE WITNESS:**  -- USCIS to conduct a credible fear

7   interview.

8       **THE COURT:**  So in that situation, there are further

9   procedures?

10      **THE WITNESS:**  That's my understanding, yes.

11      **THE COURT:**  Have you put this -- to your knowledge

12  based on your position, is this process actually in place right

13  now for aliens in this -- in the circumstance we've discussed?

14      **THE WITNESS:**  Yes.

15      **THE COURT:**  And how do you know that?

16      **THE WITNESS:**  Well, I know that -- I mean, with our

17  third-country removals, we primarily remove to Mexico with the

18  seven countries.  And that's where they -- that's where those

19  individuals would be removed to.  If they expressed fear, then

20  they go through that process.

21          **THE COURT:**  You're saying "with the seven countries."

22  What do you mean by that?

23          **THE WITNESS:**  There's seven countries that Mexico

24  will accept:  Cuba, Haiti, Nicaragua, Venezuela, Guatemala, El

25  Salvador, and Honduras.

1      **THE COURT:**  So you're saying citizens of the seven

2    countries, if that alien cannot be removed to the country of

3    origin --

4      **THE WITNESS:**  Yes.

5      **THE COURT:**  -- then you already have a -- you have

6    Mexico that will take the alien and the United States has

7    confirmed the prerequisites that we've discussed in Defense 1?

8      **THE WITNESS:**  That is correct.

9      **THE COURT:**  Are there any other countries for which

10   El Salvador -- the United States has such assurances for

11   citizens of El Salvador other than Mexico right now?

12     **THE WITNESS:**  Right now, I'm not aware of any.  I

13   don't know.  I just know, when this policy came out in March,

14   we were able to remove those seven countries to Mexico.

15     **THE COURT:**  And given your position, you would know

16   if there's another country available right now to citizens of

17   El Salvador who are aliens here?

18     **THE WITNESS:**  I would -- I would more than likely

19   know, yes.  But we primarily -- since March of 2025, we

20   primarily do third-country removals to Mexico right now.

21     **THE COURT:**  Okay.  So it's fair for me to find that

22   if Mr. Abrego Garcia is going to be removed to a third country,

23   pursuant to this memo, it will be Mexico?

24     **THE WITNESS:**  That, I don't know.

25     **THE COURT:**  Why don't -- well, at a minimum, it would

 1    be Mexico, right, because you have a relationship with Mexico?

 2                **THE WITNESS:**  Yes.

 3                **THE COURT:**  That's a fair inference for me or no?

 4                **THE WITNESS:**  It's just the decision to be made on

 5    this case.  But the decision won't be made until the individual

 6    comes into custody is when the case would start --

 7                **THE COURT:**  What other countries could be on the

 8    table, given the process we've discussed?

 9                **THE WITNESS:**  Your Honor, I don't know.  All I know

10    is about Mexico right now.

11                **THE COURT:**  Okay.  Thank you for that indulgence.

12                **MR. RAND:**  Of course, Your Honor.

13    **BY MR. RAND:**

14    **Q.**    South Sudan could be one of the countries, as I

15    understood, correct?

16    **A.**    We have removed people to South Sudan, yes.

17    **Q.**    And I guess I'm asking if Mr. Abrego Garcia -- well,

18    withdrawn.

19         Has South Sudan, to your knowledge, gone through the

20    process of assurance and the State Department finding it

21    credible?

22    **A.**    To my knowledge, yes.

23    **Q.**    Okay.  So South Sudan is on the table for Mr. Abrego

24    Garcia, fair?

25    **A.**    For the -- sir, I don't know what's on the table.  I'm

1  just telling you my knowledge of what I know since March of

2  2025 on the countries that we remove to.

3  **Q.**    In response to Her Honor's question regarding a -- and I

4  forget -- I lost it in the live; I don't know if she said

5  hearing or not.

6       But can you describe for us exactly what the USCIS

7  interview is?

8  **A.**    I'm not -- I'm not -- I don't work for the USCIS, and

9  those interviews are -- our officers aren't involved in those

10  because it's between the immigration officer and the alien.  So

11  we're not involved.  I'm not sure what questions are asked in

12  that interview.

13  **Q.**    It's an immigration officer and the alien and no one else,

14  correct?

15  **A.**    If the alien wants to have their attorney present, I'm

16  sure that can happen.  But I've never sat in on a credible fear

17  interview.

18  **Q.**    Are you certain whether the attorney is allowed to

19  participate?

20  **A.**    In my experience as a deportation officer, the alien's

21  attorney could participate.

22  **Q.**    But there's no right, depending on what the USCIS says, to

23  go to an immigration judge to challenge that finding or that

24  view?

25  **A.**    I don't work for Citizenship and Immigration Services; so

1  I don't know what their policy and procedure is on that.  I

2  just know we refer those cases to them, and they conduct the

3  interview.

4  **Q.**    Your previous testimony -- I think twice at least, once on

5  direct and once in response to my questions -- I believe was

6  that if the USCIS interviewer concludes that the fear expressed

7  by the alien is not credible or supported, then that alien will

8  be removed without any further procedure?

9  **A.**    Yes.

10  **Q.**    Okay.  So --

11  **A.**    Yes.

12  **Q.**    So there is no right of appeal or oversight by any person

13  whose title includes the word in some way "judge" off of that

14  interview, fair?

15  **A.**    Fair.

16  **Q.**    Now, how long -- in this process and procedure, how long

17  does the alien have to express fear before being removed?  In

18  other words, they get a notice -- withdrawn.

19        Is the notice oral or written?

20  **A.**    It's written, sir.

21  **Q.**    Is it written in Spanish for folks who don't read English?

22  **A.**    It's going to be presented to them in the language that

23  the alien understands.

24  **Q.**    And how is that -- what procedure is in place to ensure

25  that that's the case?

*CROSS OF THOMAS GILES BY MR. RAND*

1   **A.**   We have translation services that we can use if they don't

2   understand the English language.  So we would use a

3   translator -- a certified translation service.

4   **Q.**   So there's a written notice in a language that the alien

5   understands that's sent about what country they're going to

6   potentially be removed to, fair?

7   **A.**   Yes.

8   **Q.**   Is that notice provided to counsel if DHS and ICE are

9   aware that the alien is represented?

10   **A.**   I would be -- the alien could provide that to their

11   counsel, because they are served the document and given a copy

12   of it.

13   **Q.**   But they are in detention at this point in time, correct?

14   **A.**   Yes.

15   **Q.**   Okay.  So how are they going to give it to their counsel?

16   **A.**   I -- all I know, sir, is that our officers serve that

17   document on the alien.  And if the alien expresses fear, then

18   we will go through that second process.

19   **Q.**   All right.  Based upon your experience in 24 years, what

20   procedure is in place that this document indicating what

21   country they are going to be sent to they have no relationship

22   to or citizenship is that that's going to be provided to

23   counsel who's representing them and their rights?

24   **A.**   I mean, it's -- I don't -- you know, in my experience, I

25   didn't get the information -- I didn't have this process when I

1  was an officer.  So as far as what the officers do now, I can't

2  speak to that.

3      All I know is that we are -- our guidance is we give them

4  a notice of -- a notice of referral to what country they're

5  going to be removed to, and then they can go through the

6  process on that way.

7  **Q.**  As of March 30th, pursuant to this guidance, there is no

8  such process for counsel to get notice, is there, sir?

9  **A.**  According to the guidance from March 30th, there's nothing

10  in here that indicates about the counsel, no.

11  **Q.**  And there's nothing you're aware of in connection with

12  performing your day-to-day job responsibilities since

13  March 30th until today that any such procedure or process

14  exists.  Fair, sir?

15  **A.**  I mean, there could be a process, but I'm unaware of one.

16  **Q.**  You would be speculating?  You're not aware of one, right,

17  sir?

18  **A.**  I'm not aware of one, sir.

19  **Q.**  So that procedure and process, though I haven't studied it

20  yet, is not in Plaintiffs' Exhibit 2, right, the July 9th

21  e-mail?

22  **A.**  Oh, yeah.  This one, yes.

23  **Q.**  It's not in there, right, sir?

24  **A.**  I don't believe so.  Like I said, I skimmed this.  I read

25  this to see if it had anything to do with this.  It just

1  explains the process.

2  **Q.**    Putting aside whether the notice is provided to counsel

3  for the alien, will the alien be able to consult with an

4  attorney before they're removed?

5  **A.**    The alien has the right to contact their attorney in

6  custody.

7  **Q.**    During the USCIS interview process, they have a -- they

8  have an absolute right to be able to contact and talk with

9  their attorney about what's happening?

10 **A.**    My understanding is that they can contact -- consult with

11 their attorney during a CIS interview, but you're going to have

12 to talk to them on that.

13 **Q.**    And when you say talk to them, you mean USCIS?

14 **A.**    That's correct.

15 **Q.**    What are they under?  Who do they report to?

16 **A.**    They work for the Department of Homeland Security.

17 They're their own agency, United States Citizenship and

18 Immigration Services, separate and apart from ICE.

19 **Q.**    Are you aware of any procedures that have been provided to

20 USCIS that -- that go along with or correspond to the

21 March 30th, 2025, guidance?

22 **A.**    Well, this memo was also sent to the senior official

23 performing the duties of the director for the U.S. Citizenship

24 and Immigration Services, Kika Scott.

25 **Q.**    So that would include USCIS?

*CROSS OF THOMAS GILES BY MR. RAND*

1  **A.**   This memo was addressed to USCIS as well as ICE and

2  Customs and Border Protection.

3  **Q.**   All right.  So if there's no additional procedures in here

4  about how USCIS should deal with a counsel issue in terms of

5  the involvement of counsel in this last moment of potential

6  process before someone is removed, there is none, right, sir?

7  **A.**   There -- the alien can request to have counsel.  Even

8  though it specifically doesn't say it in here, they can -- my

9  understanding is they can request counsel with the USCIS during

10 their interview.

11 **Q.**   And my question was a little different, sir.

12      Given Defendants' Exhibit 1 in front of you and

13 Plaintiffs' Exhibit 2, which is the July 9th e-mail that now

14 you've indicated went to USCIS, there's nothing in there

15 advising USCIS of how they're supposed to involve counsel for

16 aliens in any shape or form in connection with the limiting

17 procedures laid out there for removal to a third country,

18 right?

19 **A.**   Well, in the second memo, sir, if I understand you

20 correctly, it mentions the same thing.  If the alien

21 affirmatively states that they have fear of returning to that

22 third country, we will refer the case to U.S. Citizen and

23 Immigration Services for a screening for eligibility for

24 protection under Section 241(b)(3) of the INA and the

25 Convention Against Torture.

1    USCIS will generally screen the alien within 24 hours of

2   referral.

3   **Q.**   Is there something in 241(b)(3) of INA that includes

4   procedures about how counsel is involved in this process that

5   could be as little as 24 hours with USCIS's interview?

6   **A.**   I'd have to look at the statute to see if it

7   specifically -- I don't know what the statute specifically

8   says.

9   **Q.**   All right.  My original question was, respectfully, does

10   this July 9th e-mail, Plaintiffs' Exhibit 2, or Defendants'

11   Exhibit 1, which it relates to, say anything to USCIS about

12   such procedures?

13    And then you quoted me back 241(b)(3) of INA.  And so I'm

14   wondering, is there something in there that you're trying to

15   point me to that contains this information that actually USCIS

16   is getting some guidance of how counsel is involved in these

17   final moments or final day of this interview before people are

18   removed to a third-party country?

19   **A.**   There's nothing in this guidance that indicates that

20   counsel can be provided to the alien.  The alien can ask for

21   that during their interview with CIS.

22        **THE COURT:**  And I'm sorry.  What happens if the alien

23   asks for that during the interview?

24        **THE WITNESS:**  Asks for counsel?

25        **THE COURT:**  Yeah.

1          **THE WITNESS:**  In my experience, Your Honor, they were

2     afforded counsel in the experience I did.  But that would be a

3     question that I would have to defer to my colleagues at USCIS,

4     what they do for that.

5          **THE COURT:**  So let me understand your testimony.

6     Your testimony is based on the one time you went through this

7     process earlier in your career?

8          **THE WITNESS:**  It was the process how I understood it

9     early in my career, yes.

10         **THE COURT:**  Okay.  But you have no personal knowledge

11    as to what would happen presently if an alien requested a

12    lawyer during a credible fear interview in this context?  Am I

13    getting it right?

14         **THE WITNESS:**  Yes, Your Honor.  But my understanding

15    is that they can ask USCIS to have an attorney present during

16    their credible fear interview.  Whether USCIS accepts that,

17    that's going to be a question for them.

18         **THE COURT:**  Okay.  But you today do not have any

19    knowledge or experience on that process.  Am I right?

20         **THE WITNESS:**  That is correct.

21         **THE COURT:**  Okay.  All right.

22    BY MR. RAND:

23    Q.   And let me -- let me -- let me move on into another topic,

24    if I could.

25         Immigration detainer, you testified on your direct about

1    the immigration detainer.  And you had indicated, I think,

2    earlier in your back-and-forth with me that that immigration

3    detainer was issued sometime in June; is that correct?

4    **A.**    That's my understanding, yes.

5    **Q.**    Have you seen that document?

6    **A.**    No, I have not.

7    **Q.**    By the way, are you aware whether there are any documents

8    of any form that were created in connection with the return of

9    Mr. Abrego Garcia to the United States on or around June 5th or

10   6th?

11   **A.**    I am not aware of any documents.  I found out that he

12   returned to the United States through a public source.

13   **Q.**    All right.  But based on your 24 years of experience,

14   would you expect such documents to have been created or exist?

15       In other words, if somebody is being removed -- withdrawn.

16       If somebody is being moved from El Salvador to the United

17   States, would you expect documents to have been created in

18   connection with that return?

19   **A.**    I would assume, yes, there would be some type of

20   documents.  But, again, I don't -- I haven't seen any

21   documents, and I'm not aware of what documents those would be

22   for this individual case.

23   **Q.**    What type of documents would you have expected based on

24   your over two decades of experience in service to have been

25   created to bring Mr. Abrego Garcia back?

1          **MR. KHOJASTEH:**  Your Honor, I'm going to object here.

2    This is on relevance, FRE 402.  This is outside the scope.

3          **THE COURT:**  Overruled.

4     What are the documents?  What would you see if someone

5    were being brought back to the United States.

6          **THE WITNESS:**  Arrangements would be made with the

7    port of entry of where they are going to be coming back to.

8    And they would be paroled into the United States by, more than

9    likely, Customs and Border Protection, for -- in this case,

10   this individual was being brought back for prosecution of a

11   charge.

12         **THE COURT:**  Okay.  Thank you.

13   **BY MR. RAND:**

14   **Q.**   How long would it take to create such documentation, in

15   your experience?

16   **A.**   The document is created at the port of entry.

17   **Q.**   In the same day?

18   **A.**   When the arrangements are made with the -- whatever port

19   of entry the individual will be returning to, arrangements are

20   made with that port.  And the alien will present themselves for

21   admission, and they would be paroled in for prosecution.

22   **Q.**   In your experience, how long in advance would the port of

23   entry have to be told of such an individual coming back into

24   the United States in order to get things ready?

25   **A.**   In my experience, it could be one day or it could be two

1  weeks.

2  **Q.**   And what's the difference between one day and two weeks,

3  in your experience?

4  **A.**   I think it's just getting hold of the correct people to do

5  that and making sure the alien can be -- you know, if the alien

6  is in, say, southern Mexico and they're traveling by bus up,

7  that they're not going to more than likely be there in one day.

8  **Q.**   Was Mr. Abrego Garcia, to your knowledge, in ICE

9  detention -- in ICE custody when he was returned from El

10  Salvador?

11  **A.**   When he came back in June, you said?

12  **Q.**   Yeah.

13  **A.**   He went into U.S. Marshal custody is my understanding.

14  **Q.**   A slightly different question.

15      When Mr. Abrego Garcia left prison in El Salvador,

16  presumably was on an airstrip somewhere, and went into a plane

17  that in some way belonged to the United States, was he in ICE

18  custody?

19          **MR. KHOJASTEH:**  Object.  Lacks foundation.

20          **THE COURT:**  If you know.

21          **THE WITNESS:**  If -- I don't know if he was in ICE

22  custody.

23  **BY MR. RAND:**

24  **Q.**   Was he in nobody's custody while he was on that plane?

25  **A.**   He was in -- I don't know who -- if it was the marshals

1  service that brought him back.  I'm unaware, sir.

2  **Q.**   Who would I ask that question of?  Who would be most

3  knowledgeable about such a question?

4  **A.**   I would have to, you know, look further into that to see

5  how that was or -- I don't even know what port of entry he

6  arrived at.

7  **Q.**   I'm asking a slightly different question.

8       Who would I ask in the government who would know the

9  answer to that question based upon your two decades plus of

10  service and your senior role in this agency?

11  **A.**   I would probably start with the New Orleans field office

12  to see, you know, what documents were presented for him to come

13  in and see how he came back into the United States.

14       But I don't have that information.  I was not spoken to --

15  I was not spoken to about that.

16  **Q.**   You agree with me there was no extradition set up for him,

17  right, from El Salvador?

18            **MR. KHOJASTEH:**  Objection.  Foundation.

19  BY MR. RAND:

20  **Q.**   To your knowledge.

21            **THE COURT:**  Sustained.

22            **MR. RAND:**  Fair enough.  Withdrawn, Your Honor.

23  BY MR. RAND:

24  **Q.**   Let me go to immigration detainer.  Do I have that --

25  immigration detainer?  That's what you called it?

1  **A.**    Yes.

2  **Q.**    Okay.  And just to bring us back to where we were before I

3  segued a little bit, that was -- do I call it -- is it created

4  or issued, in your view?  Are those issued or created?  I just

5  want to use the right verb.

6  **A.**    Are you saying an immigration detainer created or issued?

7  **Q.**    Yeah.  Like, on the day that it happened, was it created

8  or issued or what should I call it?

9  **A.**    It was issued to the local jurisdiction that this

10  individual was detained at.

11  **Q.**    Okay.  So it was issued in early June to the local

12  jurisdiction that this individual was detained at, correct?

13  **A.**    Yes.

14  **Q.**    All right.  And is that pursuant to 1231(a)(6)?

15  **A.**    You're going to have to -- I don't know what 12 -- off the

16  top of my head, what 1231(a)(6) is.

17  **Q.**    I was putting great faith in your ability to have

18  memorized all of these.  All right.  Perhaps we'll get a copy

19  in front of you.  I don't have a copy.

20        **THE COURT:**  I'm sorry.  I have a basic question.

21     Does a copy of the detainer exist?

22        **MR. RAND:**  Well, that's fair enough, Your Honor.

23        **THE WITNESS:**  There is a detainer in place on this

24  individual with the U.S. Marshals, but I do not have a copy of

25  it.

1          **THE COURT:**  Okay.  But it's a physical document,

2    right?

3          **THE WITNESS:**  It's a document that would either be

4    faxed, e-mailed, or personally delivered to the jail.

5          **THE COURT:**  And in what repository would your office

6    keep it?  In other words, is it in an A-File?  Is it in an

7    admin file?  Where is the detainer?

8          **THE WITNESS:**  It would be in the -- it would more

9    likely be in the alien registration file or on one of our

10   databases.

11         **THE COURT:**  Okay.  So when I say A-File, you say

12   alien registration file?

13         **THE WITNESS:**  That's how I refer to it in my career,

14   but I can say A-File, yes.

15         **THE COURT:**  In my prior life, it was A-File.  So I

16   just want to make sure we're talking about the same thing.

17         **THE WITNESS:**  Yes, we are.

18         **THE COURT:**  So the detainer would be in the A-File?

19         **THE WITNESS:**  There should be a copy in there, yes.

20         **THE COURT:**  In the ordinary course?

21         **THE WITNESS:**  Yes.  Unless it's in, like, a work

22   folder or something else.  But in our systems, it should

23   indicate a detainer is placed -- there is a detainer on this

24   individual.

25         **THE COURT:**  And that's what your system says?

1          **THE WITNESS:**  Yes.  That would -- I know there's a

2     detainer placed from the e-mails that I received from the New

3     Orleans field office back in early June.

4          **THE COURT:**  Does the detainer, in the ordinary

5     course, say on what basis a person -- an alien is being

6     detained?

7          **THE WITNESS:**  It says -- yes, it does.  It would say

8     why ICE, or Immigration and Customs Enforcement, is interested

9     in this individual.

10          **THE COURT:**  Okay.

11          **THE WITNESS:**  So there would be a box checked.  And

12     without seeing the detainer, the box is probably checked as

13     you've been ordered removed by an immigration judge.

14          **THE COURT:**  Okay.  So there should, somewhere, be a

15     detainer for Mr. Abrego that would indicate the basis for the

16     detention?

17          **THE WITNESS:**  Yes.

18          **THE COURT:**  But you haven't seen it.

19          **THE WITNESS:**  The basis of why we would want him --

20     have interest in him coming into ICE custody.

21          **THE COURT:**  Correct.

22          **THE WITNESS:**  Yes.

23          **THE COURT:**  That's what I meant, but you said it

24     better.

25          You have not seen that document?

1              THE WITNESS:  No, I have not.

2              THE COURT:  Do you know that document exists?

3              THE WITNESS:  I know that from the e-mails that I was

4    carbon-copied on and received from the New Orleans field office

5    that says an immigration detainer has been placed on this

6    individual.

7              THE COURT:  And that's the basis of your testimony

8    today?

9              THE WITNESS:  Yes.  I have not seen the document.

10             THE COURT:  Thank you.

11        Go ahead, Mr. Rand.

12   **BY MR. RAND:**

13   **Q.**   Did you review the document just described to Her Honor in

14   connection with your preparation as a designee here today?

15   **A.**   Did I review the document?

16   **Q.**   Withdrawn.  Fair clarification.

17        You reviewed something on a screen that gave you

18   confidence that such a document exists, fair?

19   **A.**   Yes.  Yes.

20   **Q.**   And what exactly did you see on a screen that gave you

21   high confidence such a document exists?

22   **A.**   It says "detainer placed."

23   **Q.**   And placed means there was a physical, actual document

24   created that includes the information you described to Her

25   Honor, correct?

1  **A.**   Yes.  It would be a document that would be sent to the

2  jail that this individual was detained at.

3  **Q.**   Is it -- I apologize.

4  **A.**   It's a physical document.

5  **Q.**   And you relied upon what you saw on this screen in

6  connection with preparing for your testimony here today?

7  **A.**   Yeah, and the e-mails that I was carbon-copied on from the

8  New Orleans field office.

9  **Q.**   Okay.

10      **MR. RAND:**  I'm going to ask for production of all

11  that material, Your Honor.

12      **THE COURT:**  I -- I want the detainer soon.

13      **MR. KHOJASTEH:**  You got it, Your Honor.

14      **THE COURT:**  Thank you.  Appreciate it.

15      **MR. RAND:**  Just for the record, and the e-mails,

16  please, the e-mails that he was carbon-copied on.

17      **THE COURT:**  We can talk about that when the witness

18  is --

19      **MR. RAND:**  Yeah.  Fair enough, Your Honor.

20      **THE COURT:**  When you're not burdened by our

21  conversation.  You're just here to answer your questions and

22  mine.

23      Go ahead.

24  **BY MR. RAND:**

25  **Q.**   Sir, what was the authority -- the regulatory authority

1  for the detainer at issue here that we've just been talking

2  about, the immigration detainer?

3  **A.**  Our authority to detain this individual is under

4  Section 241 of the INA.

5  **Q.**  And who ordered the detainer to be issued and provided to

6  the marshals service in early June?

7  **A.**  I don't -- that individual, when they're in custody, if

8  they're foreign-born, we have officers and agents that review

9  the individuals that are booked into custody.  And if they're

10  amenable to removal or deportation, then an immigration

11  detainer will be placed by the local field office.

12  **Q.**  I'm asking a very specific question.

13      Who, by name, from your review of these carbon-copy

14  e-mails you were on, ordered or directed that such a detainer

15  be issued in early June?

16  **A.**  The communication I had was with the field office

17  director, but the officers and agents have the authority to

18  issue detainers.

19  **Q.**  The New Orleans field office director?

20  **A.**  That's who I received -- I know I probably received

21  e-mails from him.  I mean, I get hundreds and hundreds of

22  e-mails a day.  So I -- for me, looking -- you know, I know

23  that I did receive some in early June on the detainer.

24  **Q.**  Specifically, how many e-mails did you review in

25  connection with preparing yourself for your -- as a designee

1    for your testimony here today?

2            **MR. KHOJASTEH:**  Objection.

3    **BY MR. RAND:**

4    **Q.**    In this regard.  Not generally.  In this regard.

5            **MR. KHOJASTEH:**  Objection.  Mischaracterizes the

6    testimony.  Lacks foundation.

7            **THE COURT:**  Sir, apart from e-mails from lawyers, did

8    you review any other e-mails in preparation for today?

9            **THE WITNESS:**  I skimmed some of my e-mails on the

10   individual's last name.  And what came up was some -- in early

11   June.  And I just skimmed them and immigration detainer, and

12   then that was the extent of my search for any e-mails.

13       I could have more, but what comes up to mind is in early

14   June.

15           **THE COURT:**  And those e-mails that you -- so if I'm

16   understanding you right, you went back in your e-mail inbox and

17   looked for e-mails associated with Mr. Abrego from early June?

18           **THE WITNESS:**  Yes.

19           **THE COURT:**  Okay.  Those were not e-mails to or from

20   lawyers; they were e-mails of other personnel in your

21   department?

22           **THE WITNESS:**  I'd have to see who else was on the to

23   line or the carbon copy line.  I don't know.  I can't remember

24   exactly who else -- who was on those e-mails, which some of

25   them are law enforcement sensitive.

1          **THE COURT:**  Okay.

2      Without getting into the substance, Mr. Rand, do you have

3  any other questions about those documents so we can have a

4  conversation -- a lawyer conversation later about them?

5          **MR. RAND:**  Let me ask one last question, if I may,

6  Your Honor, on this, and then we'll move on.  I understand.

7  **BY MR. RAND:**

8  **Q.**  Sir, the e-mails you just described, they were e-mails

9  that you reviewed in preparation for preparing to be a designee

10 on the topics that you understood yourself to be testifying

11 about today, correct?

12 **A.**  I glanced at them, sir.  That's all I did.  I didn't spend

13 a lot of time on the e-mails; I focused on the documents that

14 were presented to me physically.

15 **Q.**  But you glanced at them in connection with preparing

16 yourself for the testimony you're providing today as a

17 designee, correct, sir?

18 **A.**  Yeah.  You asked earlier what documents I received.  And

19 those were documents -- what I looked at my e-mail are not

20 documents the way I interpreted the question.

21     So I apologize to the Court if it was misinterpreted, but

22 I did look at some -- you know, I googled -- not googled, I

23 typed his name in my e-mail.  And then those are the ones that

24 came up.  And detainer placed.  And that was all I did.  I

25 didn't look at anything else.

1  **Q.**   I understand that.  But just to be very clear, when you

2  typed his name in, it pulled up -- or came up in your e-mails

3  and skimmed them or glanced through them, it was in preparation

4  for your -- preparing yourself to testify today as a designee,

5  correct?

6  **A.**   You -- yes.

7  **Q.**   Thank you.

8       All right.  So let me ask you.  Do you know what the

9  term -- you know what the term "refoulement" means, right?

10 Refoulement.

11 **A.**   Can you describe it?

12 **Q.**   When you're sent to a third-party country and then you're

13 sent to another country as a result of it where you're going to

14 be persecuted and tortured.

15 **A.**   I'm not familiar with the term, no.

16 **Q.**   Are you aware with any situation where an alien has raised

17 a concern of being sent to a third-party country out of concern

18 that they're just going to be then immediately shipped off to

19 another country where they have a withholding order, for

20 instance?

21 **A.**   I -- I don't know.

22 **Q.**   That's never come up in your experience at any point in

23 time --

24 **A.**   Not in my experience, no.

25 **Q.**   -- in 24 years?

1  **A.**    Not in my experience, no.  I have very little experience

2  with third party -- or third-country removals.  As I mentioned

3  earlier, when I was a deportation officer, I haven't processed

4  somebody in over, you know, 18 years.

5  **Q.**    So you've had -- it's not something you have any

6  familiarity with whatsoever, sitting here today?

7  **A.**    I have familiarity with the process that we have in place

8  now.

9  **Q.**    Okay.  The process you have in place now, that's reflected

10  in plaintiffs' -- I'm sorry -- Defendants' Exhibit 1 and

11  Plaintiffs' Exhibit 2?  That's the March 30th guidance and the

12  July 9th e-mail.

13        Do you have those, sir?

14  **A.**    This one?

15  **Q.**    Yeah.

16  **A.**    Yes, I have it.

17  **Q.**    Nowhere in either of these documents, this process, is

18  that issue addressed in any shape or form, refoulement, right,

19  sir?

20  **A.**    No.  I don't see that in this -- these two documents.

21  **Q.**    Sitting here today, there's no procedure you're aware of

22  that's been put in place in regard to the procedures described

23  in those two documents I've just referred to you that deals

24  with the situation of third-party country removal where

25  somebody has a withholding order and has the -- and has a

1   concern or has a procedure in place to address the concern that

2   they will merely be sent to a third-party country and then

3   shipped off to the withholding country, right?

4        That's not addressed in these?

5   **A.**   Yeah, I -- the reason why we would do a third-country

6   removal, sir, is because they were not able to effectuate the

7   removal to their country of citizenship.

8   **Q.**   Okay.  I understand that.

9        But do you agree with me that you can't send somebody to a

10  third-party country with any knowledge that they're just going

11  to send that person right on to the country where they're going

12  to be persecuted?

13  **A.**   When we do third-party removals -- or third-country

14  removals, we are sending them to the country that has been

15  receiving that individual.  We are not transiting -- we

16  shouldn't be transiting countries.

17  **Q.**   Right.  So as part of the evaluation of whether they can

18  go to the third-party country that you want to remove them to,

19  there has to be an evaluation and some assurance that they are

20  not really going to be transited to the party from -- with

21  which -- the country with which they have a withholding order,

22  correct?

23  **A.**   When they are served the document, notice of removal, it's

24  going to be you are going to be removed to country X.  And

25  after the procedures are followed, there is no fear found by

1  USCIS, the individual will be removed to that country on that

2  piece of paper.

3  **Q.**    I understand that.  You described that procedure a couple

4  times today.

5       Nowhere in that procedure is there any check to ensure

6  that the third-party country is not a country that is merely

7  going to turn around and transit the alien to a country in

8  which they have a valid withholding order in connection with,

9  correct?

10 **A.**    Sir, I'm not -- I mean, I'm not -- I don't understand your

11 question you're asking me.

12      When these individuals get served these documents, they

13 are going to their country -- they are going to the country

14 that we serve the document on.

15          **THE COURT:**  How about we make it real simple?

16      In Mr. Abrego's case, he has a valid withholding of

17 removal to El Salvador, correct?

18          **THE WITNESS:**  Correct.

19          **THE COURT:**  If your department is inquiring of a

20 third country whether they will accept Mr. Abrego, is that

21 country asked whether, upon receipt of Mr. Abrego, they will

22 deport him to El Salvador?

23          **THE WITNESS:**  The expectation is, when we deport

24 these individuals to a third country, they won't be persecuted

25 or tortured.  So they should remain in that -- that country

 1   shouldn't be removing them to --

 2           **THE COURT:**  It shouldn't is what you're saying,

 3   right?

 4           **THE WITNESS:**  That's what I'm saying, yes.  That's my

 5   understanding.

 6           **THE COURT:**  What due diligence does our government do

 7   to ensure that does not happen, removal back to the country

 8   from which we as the United States said he cannot be returned

 9   to?  What do we do?

10           **THE WITNESS:**  I'm sorry, Your Honor.  I'm kind of

11   confused by the question.

12       The way I understand it is --

13           **THE COURT:**  Okay.

14           **THE WITNESS:**  -- on the third-country removal, we're

15   sending -- say it's country X.  We're going to send them to

16   country X.  Whether we transit through country Y, they won't

17   be -- in other words, they're still going to be in the custody

18   of ICE, and we will get them to country X.

19           **THE COURT:**  So if the United States -- an immigration

20   judge said alien cannot go back to country Y --

21           **THE WITNESS:**  Okay.

22           **THE COURT:**  -- but then DHS and the State Department

23   go through their due diligence, they find a third country,

24   right, X --

25           **THE WITNESS:**  Okay.

1          **THE COURT:**  -- who is willing to take that alien,

2    what, if anything, do you do to get assurances from X that X

3    won't deport the alien to Y?

4          **THE WITNESS:**  The assurances that we have are that

5    the individual, according to our guidances, they are not going

6    to be persecuted and tortured.  And they're not to be turned

7    over -- they shouldn't be -- you know, we're deporting them to

8    that country of -- that third country of removal.  And our job

9    is done.  I don't know what assurances we have --

10         **THE COURT:**  Stop, stop, stop.

11     You say in the memo that this assurance of X will not

12   deport to Y is in the memo somewhere?

13         **THE WITNESS:**  No, no, no.  I was --

14         **THE COURT:**  Yeah, that's why I'm asking the question.

15   Because it's not in the memo; so I want to understand what the

16   practice is, if any, to assure that X will not deport to Y.

17         **THE WITNESS:**  I don't know what assurances they have.

18   I know we just deport to country X, and we've effectuated that

19   removal to a third country.

20         **THE COURT:**  Okay.  Very good.

21     Mr. Rand.

22         **THE WITNESS:**  Your Honor, may I take a five-minute

23   break?

24         **THE COURT:**  Sure.  You need a comfort break?

25         **THE WITNESS:**  Yeah, I just need to run outside really

1  quick.  I'm sorry.

2          **THE COURT:**  It's 10 to 4:00.  Let's go until 4:00.

3  Let's take a break.  And hopefully that will give everyone a

4  minute to stretch.

5      I'll just remind you, Mr. Giles, you're still under oath.

6  So don't talk to anybody about your testimony.  We'll see

7  everybody back in ten minutes.  Thank you.

8          **THE WITNESS:**  Thank you, Your Honor.

9          **MR. RAND:**  Thank you, Your Honor.

10          **DEPUTY CLERK:**  All rise.  This Honorable Court stands

11  in recess for ten minutes.

12      (Recess taken from 3:50 p.m. to 4:02 p.m.)

13          **DEPUTY CLERK:**  All rise.  This Honorable Court

14  resumes in session.

15          **THE COURT:**  All right.  Counsel, are we ready to pick

16  back up?

17          **MR. RAND:**  Yes, Your Honor.

18          **THE COURT:**  All right.

19      You can have a seat, Mr. Giles.  And I'll just remind you

20  you're still under oath.

21      Mr. Rand?

22          **THE WITNESS:**  Thank you.

23  **BY MR. RAND:**

24  **Q.**  I just wanted to follow up on a couple of things,

25  Mr. Giles.

*CROSS OF THOMAS GILES BY MR. RAND*

1       We were talking earlier about the process in terms of when

2  an alien expresses fear under the procedures laid out on the

3  March 30th, 2025, procedures.

4       You recall that?

5  **A.**   Yes.

6  **Q.**   All right.

7       And how long after the -- an alien is provided with the

8  notice that you described about where -- what third country

9  they would be potentially removed to do they have to -- to

10 evaluate the issue of whether they have fear of going to that

11 country?

12 **A.**   Upon service of the document, if they express fear to the

13 officer serving the document, we will refer that to the United

14 States Citizenship and Immigration Service as soon as possible.

15 **Q.**   But that -- in terms of the period between when they get

16 the notice and when that expression of fear has to be

17 registered, is that immediate?

18 **A.**   I would assume so, yes.  I mean, they -- the officer would

19 go back to their desk, and then they would notify USCIS that

20 this individual expressed fear for this third-country removal.

21 And then the interview would be set up with USCIS and the

22 alien.

23 **Q.**   So just so I understand it, sir, basically, the written

24 notice is given to the alien in a language that at least people

25 believe they understand.  And in that moment, once it's handed

1    to them and they see the country, they have to express fear or

2    not express fear, and that's the end of it?

3    **A.**    Upon service, they are going to -- they would express --

4    if they express fear, yes, then the process would start.

5        If they didn't, the -- the alien could -- we're going to

6    continue with removal unless the alien expresses fear up until

7    removal.

8    **Q.**    Yeah.  No, I'm focused just on that period about how long

9    they have to express fear.

10        Is it that the document is handed to them and in the

11    moment of them receiving the document, they have to express

12    fear or not express fear, and that's when that first

13    determination is made as to whether they will be able to go to

14    a USCIS interview?

15    **A.**    At the time of service, if they express fear, yes.  And

16    prior to removal, if they express fear, they should be referred

17    to USCIS as well.

18    **Q.**    But we're talking about a matter of seconds or moments

19    here, right?

20    **A.**    I don't have an exact time, sir.  When the document is

21    served on them, up until removal, they can express fear to that

22    third country.

23    **Q.**    They can express fear at any time until they are actually

24    removed?  In other words, leave the United States?

25    **A.**    That's my understanding, yes.

*CROSS OF THOMAS GILES BY MR. RAND*

1    **Q.**    Just so I understand it, is it your understanding that the

2    procedure provides that if they are provided with that

3    document, even if they didn't get a USCIS interview -- because

4    they didn't express fear in that moment -- if they express fear

5    before they are put on the plane and the plane leaves the

6    ground, they are entitled to a USCIS interview?

7    **A.**    That is my understanding.

8    **Q.**    And is that laid out in some procedure that you've seen,

9    sir?

10   **A.**    The procedure that's laid out is in the memo, the

11   Defendant Exhibit 1.

12   **Q.**    Okay.  And I just want to -- I need to probe.  Initially

13   in response to my questions, you had seemed to indicate that it

14   was momentarily.  And I just wanted to --

15   **A.**    That's usually when it is, sir.

16   **Q.**    I apologize for the court reporter's benefit.  I notice

17   we're speaking on top of each other, which is impossible for

18   folks to follow.

19   **A.**    I apologize.

20   **Q.**    So let me finish my question, and I'll extend you the same

21   courtesy on your answers.

22          When you say that the notice has been served upon them or

23   provided to them, that's the -- in other words, somebody walks

24   into the place they're being detained, a cell, and hands them a

25   piece of paper.  And that's the moment they receive it.  That's

1  what you were referring to in response to my initial question,

2  fair?

3  **A.**    Fair.

4  **Q.**    And then you subsequently extended it out to be up until

5  the moment they leave U.S. soil.  And I want to understand what

6  you are recalling or thinking about in between those answers.

7              **MR. KHOJASTEH:**  Object to form.  Mischaracterizes and

8  lacks foundation.

9              **THE COURT:**  Yeah.  Can you rephrase that.

10              **MR. RAND:**  Yeah, withdrawn.  Fair enough, Your Honor.

11  **BY MR. RAND:**

12  **Q.**    How long does the alien have to express fear after

13  receiving the notice of removal with the country?

14      From the moment they receive it, how long do they have to

15  express fear?

16  **A.**    Up until removal.

17  **Q.**    And by that you mean, from your prior answer, sir, all the

18  way up to the point where the plane is leaving the ground with

19  them on it?

20  **A.**    When that document is served, removal is going to be

21  imminent.  And that alien has the opportunity, if they express

22  fear prior to them leaving the United States, they will be

23  referred to USCIS.

24  **Q.**    And I just want to be very clear.  That includes after

25  they've left the ICE detention facility and may be on their way

1    to an airport to leave the United States.

2        Is that your testimony?

3    **A.**    That should be the process.

4    **Q.**    And as somebody who is senior in the department and 24

5    years of experience, that's your understanding of the process

6    and what you tell those who report to you the process is, fair?

7    **A.**    That is fair.

8    **Q.**    All right.

9        Now, are -- I just want to make sure there's no ambiguity.

10       In terms of the countries that have gone -- that the

11   United States -- withdrawn -- that DHS has gotten the

12   assurances of and the State Department has found those to be --

13   those assurances to be credible under the March 30th, 2025,

14   guidance, they include Mexico and South Sudan, correct?

15   **A.**    Yes.

16   **Q.**    Is there any other country, sitting here, that you're

17   aware of that has -- where those assurances, based on due

18   diligence, have satisfied -- DHS and the Department of State

19   have found those assurances to be credible?  Any other country

20   other than those two?

21   **A.**    Not to my knowledge, sir.

22   **Q.**    Was El Salvador -- is El Salvador a country that has

23   satisfied those two requirements, to your knowledge?

24   **A.**    What do you mean by that?

25   **Q.**    Is El Salvador a country that DHS has concluded there's

1  sufficient assurances that aliens who are sent there as a third

2  country will not be tortured or persecuted, and has the

3  Department of State evaluated those assurances and found them

4  credible?

5       **MR. KHOJASTEH:**  Object to form.  Lacks foundation.

6       **THE COURT:**  He's just asking is El Salvador one of

7  those countries.

8       **MR. KHOJASTEH:**  If we can do a sidebar, I'll explain

9  it, Your Honor.

10      **THE COURT:**  Sure.

11   (A bench conference was held on the record but out of the

12  hearing of the courtroom as detailed below:)

13      **MR. KHOJASTEH:**  I apologize if I'm misunderstanding,

14  but my understanding was that you're going to get these

15  assurances for a particular alien, not --

16      **THE COURT:**  Yeah, he didn't testify -- well,

17  actually, Mr. Giles testified earlier that Mexico gave

18  assurances for seven countries of citizenship, right?

19      **MR. KHOJASTEH:**  Agreed.

20      **THE COURT:**  So that's a countrywide citizens from

21  this country, right, will not be tortured in Mexico.

22      **MR. KHOJASTEH:**  Right.  And so my question -- when

23  he's asking regarding Mr. Abrego Garcia, and Mr. Abrego Garcia

24  has a withholding from El Salvador --

25      **THE COURT:**  No, I think he's just asking about the

1  country generally.

2          **MR. KHOJASTEH:**  Just a general question --

3          **THE COURT:**  I think so, right.  Is this one of those

4  countries that the United States has gotten the assurances for,

5  yes or no?  Not for Mr. Abrego but just generally.  So you got

6  to -- you got someone from Guatemala who can't be returned to

7  Guatemala.  Has the United States identified El Salvador as a

8  third country?

9          **MR. KHOJASTEH:**  And I think the question I'm

10 asking -- so for Mexico, you've identified seven places --

11 seven countries that we can send there.

12         **THE COURT:**  Right.

13         **MR. KHOJASTEH:**  Who is the home country for El

14 Salvador he's referring to?

15         **THE COURT:**  Who is the home country?

16         **MR. KHOJASTEH:**  Or country of origin.

17         **THE COURT:**  I think the preliminary question is just

18 is El Salvador passing the -- passing muster?

19         **MR. RAND:**  Correct.

20         **THE COURT:**  Is it a country for which our country

21 received assurances, if you send us someone, we won't torture

22 them?

23         **MR. KHOJASTEH:**  Someone from where?  Because Mexico,

24 the agreement is someone from El Salvador, Guatemala, these

25 seven countries.

```
1              THE COURT:  I suppose you could rephrase.  Are there

2    any countries -- to your knowledge, has El Salvador --

3              MR. RAND:  Yeah.

4              THE COURT:  However you want to put it -- passed --

5    you know --

6              MR. RAND:  Yeah, yeah.

7              THE COURT:  -- passed inspection --

8              MR. RAND:  Understood.  Right.

9              THE COURT:  -- for another country?

10             MR. KHOJASTEH:  Yeah, citizens of another -- citizens

11   of another country to be imported.  That's all I'm asking.

12             THE COURT:  Okay.  No worries.

13      (The bench conference concluded and proceedings resumed

14   within the hearing of the courtroom as follows:)

15             MR. RAND:  May I proceed, Your Honor?

16             THE COURT:  Yes, you may.

17             MR. RAND:  Thank you.

18   BY MR. RAND:

19   Q.   Mr. Giles, let me withdraw the last question and ask you a

20   slightly different question.

21      Has El Salvador been found by DHS to have given sufficient

22   assurances for there not being persecution or torture for

23   aliens from any particular country of citizenship and the

24   Department of State have found those assurances to be credible?

25   A.   I do not know.  All I know is that Mexico, we were able to
```

1    remove seven people from those countries I mentioned earlier to

2    Mexico.

3    **Q.**    And other than that, you can provide no information in

4    regard to what limitations, if any, might exist in terms of the

5    original citizenship for South -- necessary to be able to be

6    removed to South Sudan or El Salvador or anywhere else; is that

7    correct?

8    **A.**    Yes.

9    **Q.**    Okay.  And these assurances in regard to there being no

10   torture or persecution that's set out in the guidance, is it

11   fair for me to understand that that means that people who are

12   aliens who were removed to the country in which those

13   assurances are given -- have been given are not going to be

14   confined?

15   **A.**    Our job is to effectuate the immigration judge's order.

16   And when they get to that country, we remove them and turn them

17   over to the immigration officials at that country when we

18   remove them.

19   **Q.**    Well, I'm asking a slightly different question.

20        When DHS is engaging in this process of getting the

21   assurances from the third-party country that aliens who are

22   removed there won't be tortured or persecuted, was one of the

23   assurances that the aliens will not be confined?

24   **A.**    I'm not involved in those conversations.

25   **Q.**    Who -- who -- I have a whole bunch of questions in that

1   regard.

2        Who would I ask those of?  Who is the right person to ask

3   those questions of?

4   **A.**   I don't know who to ask.  I don't know who's been in those

5   conversations.  I would have to get back to the Court on that.

6   I don't have the answer.

7   **Q.**   So it's possible that DHS, for purposes of the March 30th,

8   2025, guidance, that the assurances of no persecution or

9   torture don't exclude that aliens who were sent there are going

10  to be confined in prison?

11  **A.**   I don't have -- I don't know what assurances have been

12  made.  Those discussions have probably happened above my level.

13  **Q.**   Yes, but is it your understanding, sir, that the March 30,

14  2025, guidance is providing a procedure whereby aliens are

15  going to be sent to third-party countries where they're going

16  to be confined --

17        **MR. KHOJASTEH:**  Object to form.

18  **BY MR. RAND:**

19  **Q.**   -- to prison?

20        **MR. KHOJASTEH:**  I apologize.

21        Object to form.  Lacks foundation.  He already testified

22  what his knowledge is regarding that piece.  And he said he

23  didn't know.

24        **THE COURT:**  Right.  I sustain that.

25        **MR. RAND:**  Okay.  Fair enough.

1  **BY MR. RAND:**

2  **Q.**   And you have no information -- just to be clear, sir, you

3  have no information whatsoever as to who those questions should

4  be asked of?  In other words, who at DHS are the right folks to

5  ask those questions of in terms of what procedure or protocols

6  exist in regard to those assurances and what they mean

7  vis-a-vis the Convention Against Torture?

8           **MR. KHOJASTEH:**  Same objection.

9  **BY MR. RAND:**

10 **Q.**   I'll take a department.

11          **THE COURT:**  Yeah.  Do you know of anyone who we would

12 ask these questions of?

13          **THE WITNESS:**  Oh, I heard him say objection; so I was

14 waiting for you.  I'm sorry.

15          **THE COURT:**  So I'm just trying to cut right to it.

16     Do you know who we would ask these questions of?

17          **THE WITNESS:**  No, I do not.

18          **THE COURT:**  Go ahead.

19 **BY MR. RAND:**

20 **Q.**   To your knowledge, was DHS satisfied that CECOT was not

21 a -- that aliens sent to CECOT would not be subject to torture

22 and persecution?

23 **A.**   I was not involved in those discussions, sir.

24 **Q.**   No information you could provide me as to whether CECOT

25 passed muster under that guidance, right?

1          **MR. KHOJASTEH:**  Your Honor, I'm going to object.

2          **THE COURT:**  Sustained.

3          **MR. KHOJASTEH:**  This is far outside the scope.

4          **THE COURT:**  Sustained.

5          **MR. RAND:**  Withdrawn.

6   **BY MR. RAND:**

7   **Q.**   How many people, sir, have been removed to third-party

8   countries -- in other words, not countries that they have a

9   relationship or citizenship with -- since March of 2025?

10         **MR. KHOJASTEH:**  Object to form.  Outside the scope of

11  Your Honor's order.

12         **THE COURT:**  Overruled.

13     If you know, how many aliens have been removed to

14  third-party countries since March of 2025?  If you know.

15         **THE WITNESS:**  I don't have -- I don't have that

16  information, Your Honor.

17  **BY MR. RAND:**

18  **Q.**   Do you have any idea how many USCIS interviews have been

19  conducted of the -- of the type that are laid out in the

20  March 30th guidance?

21  **A.**   I don't have that information.

22  **Q.**   Okay.

23         **MR. RAND:**  Give me one second, Your Honor, please.

24         **THE COURT:**  Are you looking at your notes to wrap up?

25         **MR. RAND:**  Yes.

1          **THE COURT:**  Okay.  Can I ask a question while --

2          **MR. RAND:**  Please, Your Honor.  That would be very

3    efficient.

4          **THE COURT:**  Okay.

5       So, sir, earlier, way back when when you first started

6    testifying, you discussed the process of a case officer --

7    after a final order of deportation has been issued by an

8    immigration judge, a case officer attempting to find a third

9    country to remove a person when that person is also subject to

10   a withholding order.

11      Do you remember that testimony?

12          **THE WITNESS:**  Yes.

13          **THE COURT:**  And, again, I'm paraphrasing because I

14   don't have your testimony in front of me.  But I think you

15   testified that the case officer would be the one who begins the

16   process of looking for that third-party country, right?

17          **THE WITNESS:**  That is correct.

18          **THE COURT:**  And that's been the process since you've

19   been in the organization; is that fair?  That the case officer

20   does it?

21          **THE WITNESS:**  Yes.

22          **THE COURT:**  Okay.  So Mr. Abrego was ordered removed

23   in 2019 and then was issued a final order of removal -- I mean,

24   a final order of removal and then a withholding of removal in

25   2019, correct?

*CROSS OF THOMAS GILES BY MR. RAND*

1          **THE WITNESS:**  Yes.

2          **THE COURT:**  So in his case, a case officer would have

3   already gone through the third-party country process, right?

4          **THE WITNESS:**  Not necessarily.

5          **THE COURT:**  Why not?

6          **THE WITNESS:**  Back -- the third party -- this

7   individual was granted withholding of removal.  I would have to

8   check to see if that case officer five, six years ago did do

9   that process.  I don't know if they did.  According to the

10  document that I have, the individual was released on an order

11  of supervision.

12         **THE COURT:**  He was also detained for some time before

13  he was released.  And so I'm asking in the ordinary --

14         **THE WITNESS:**  Yes.

15         **THE COURT:**  -- if we presume ordinary course of

16  business, wouldn't what you testified to have already been

17  done?

18         **THE WITNESS:**  That, I don't know if the process --

19  this process I'm discussing now came out in March of 2025.

20         **THE COURT:**  No, I'm talking about the process you

21  testified to as the ordinary course for --

22         **THE WITNESS:**  Yes.  If the -- if the officer can't

23  find a country of removal, then we would take the next steps in

24  that case.

25         Whether that was done for this individual case, I don't

*CROSS OF THOMAS GILES BY MR. RAND*

 1  know.

 2           **THE COURT:**  But that's the ordinary course, correct?

 3           **THE WITNESS:**  It should be, yes.  That's what I

 4  learned at the academy.

 5           **THE COURT:**  Okay.  And so if it wasn't done here,

 6  that was out of the ordinary, correct?

 7           **THE WITNESS:**  Yes.  Yes.

 8           **THE COURT:**  Where would the information -- what --

 9  what file would it be located in if this process were already

10  done for Mr. Abrego in 2019?

11      Would that be the A-File that would have the proof of what

12  was done or not done in his case?

13           **THE WITNESS:**  It should have the information in it if

14  it was done, yes.

15           **THE COURT:**  Okay.  All right.  Do you know one way or

16  another whether Mr. Abrego had received work authorization?

17           **THE WITNESS:**  I don't know if he's received work

18  authorization.

19           **THE COURT:**  Okay.  I've seen some evidence he had.

20  So my next question is going to be based on that assumption.

21  Okay?

22      And I promise, I'll make it clear what I'm asking.  Okay?

23      Are you familiar in the immigration statute with the

24  section that applies to individuals subject to release after a

25  final order of deportation, what has to happen before they get

 1  work authorization?

 2          **THE WITNESS:**  Yes.  I believe they work with CIS.

 3  And there's a section -- it's either going to be under C14 or

 4  C18.

 5          **THE COURT:**  Okay.  All right.  Well, then, maybe I'll

 6  just -- I don't have it in front of me for you, but I can tell

 7  you -- this is where I'm reading from for the benefit of the

 8  lawyers too so they can help me understand what I'm reading.

 9      But my understanding is 18 U.S.C. 1231 is the statute that

10  governs postremoval proceedings for aliens.  And I'm using the

11  U.S.C.

12      Are you familiar with that statute?

13          **THE WITNESS:**  I'm not familiar with that statute off

14  the top of my head.

15          **THE COURT:**  Okay.  If someone can get you the -- is

16  Mr. Molina --

17          **MR. MOLINA:**  Your Honor, it's INA 241.

18          **THE COURT:**  It's INA 241?

19          **MR. MOLINA:**  241 is 8 U.S.C. 1231.

20          **THE COURT:**  I'm sorry.  So I'm looking at 1231, and

21  you're saying INA 241 is 8 U.S.C. 1231?

22          **MR. MOLINA:**  Yes.

23          **THE COURT:**  Are you familiar with INA 241?

24          **THE WITNESS:**  Yes.  INA 241 is our detention

25  authority.

 1          **THE COURT:**  Okay.  So there's a section under this

 2     statute that reads, "Employment Authorization.  No alien

 3     ordered removed" -- which would be Mr. Abrego -- "shall be

 4     eligible to receive authorization to be employed in the United

 5     States unless the attorney general makes a specific finding

 6     that:

 7          "(A) the alien cannot be removed due to the refusal of all

 8     countries designated by the alien or under this section to

 9     receive the alien, or

10          "(B) the removal of the alien is otherwise impracticable

11     or contrary to the public interest."

12          Are you familiar with this section of INA 241?

13          **THE WITNESS:**  I'm somewhat familiar, but I want to

14     make it clear that employment authorization documents are

15     issued by the United States Citizenship and Immigration

16     Service.  ICE has no control or management of that.

17          **THE COURT:**  Okay.  So if I had questions about this,

18     you won't be the right person to ask?

19          **THE WITNESS:**  No.  We do not issue employment

20     authorization documents.

21          **THE COURT:**  Okay.  And in terms of the postremoval

22     process that's laid out in INA 241, some of it applies to you

23     and your agency; some does not.

24          Is that what I'm hearing?

25          **THE WITNESS:**  Yes.

1      **THE COURT:**  Okay.  So if I had questions about, well,

2  what happened back in 2019 when Mr. Abrego was released and

3  presumably given work authorization? what happened with this

4  effort to find the third country? those questions would not be

5  for you; they would be for somebody else?

6      **THE WITNESS:**  Yes, if that -- if the attempt was made

7  by the case officer to find a third country, that information

8  should be in the case file if it -- if the process was done.

9      **THE COURT:**  And the case officer, is that under ICE

10  or is that under USCIS when you talk about the case officer?

11      **THE WITNESS:**  I'm talking about my officers out in

12  the field would be a deportation officer that managed that case

13  while that individual was in custody.

14      **THE COURT:**  And would the case officer file have any

15  record if that information -- efforts to find a third

16  country -- was also communicated to USCIS for other purposes

17  like employment authorization?

18      **THE WITNESS:**  That information should be in the file

19  if it was done, Your Honor.

20      **THE COURT:**  And is the case officer file also located

21  within the A-File or is it somewhere else?

22      **THE WITNESS:**  Oh, when I say case officer or file,

23  I'm referring to the alien file.

24      **THE COURT:**  Okay.  So --

25      **THE WITNESS:**  That's our document of record.

1        **THE COURT:**  So it's fair that the A-File is the

2  central location for all activity related to the alien?

3        **THE WITNESS:**  Yes.  And USCIS owns the A-Files.  And

4  so if an employment authorization document was issued to this

5  individual -- again, I have no knowledge of that -- that

6  information would be in that alien file.

7        **THE COURT:**  So DHS provides your part of it in your

8  records.  You put it in the A-File.  And then that is held with

9  USCIS as the custodian.  Am I getting that right?

10       **THE WITNESS:**  Yes.  Everything that has happened with

11  an alien's case will be in the A-File.  It doesn't matter what

12  agency did it.  There's no separate file for ICE, no separate

13  file for CIS, et cetera.

14       **THE COURT:**  Got it.  That's very helpful.

15       **THE WITNESS:**  It's one -- it's one file.

16       **THE COURT:**  Thank you.  Okay.  I appreciate it.

17     I think that's all I have.

18       **MR. RAND:**  Thank you, Your Honor.

19       **THE WITNESS:**  Thank you.

20  **BY MR. RAND:**

21  **Q.**  Just a couple of additional questions.

22     Now, previously in your testimony, sir, you said that when

23  a person receives the notice -- this is under the March 30th

24  procedure.  Okay?

25     When a person receives the notice -- an alien receives a

1  notice of removal, that removal to a third country is imminent.

2       Do you recall saying something along those lines?

3  **A.**   Unless the alien expresses fear, they will be referred to

4  the USCIS.

5  **Q.**   And when you say the word "imminent" there, are we talking

6  minutes?  Ten minutes?  Hours?  What are we talking?

7  **A.**   We're talking a day to a week.

8  **Q.**   Okay.  So it's at least 24 hours?

9  **A.**   More than likely, yes.

10  **Q.**   And what could make it less than likely?

11  **A.**   If -- less than likely if the alien doesn't express fear

12  or whatnot and wants to go back and we can effectuate the

13  removal at that time, arrangements could be made for that.  It

14  all depends on where the alien is detained.

15  **Q.**   Let me ask it a little differently, I guess.

16       If the alien doesn't express fear, how quickly in time is

17  "imminent" as you're using that word?

18  **A.**   It's a case-by-case basis, sir.  It all depends on when

19  the document was served.  If it was served in the evening, we

20  don't repatriate to Mexico in the evening.  There's certain

21  ports of entries that we can utilize.  So that person will be

22  probably scheduled for removal the following day.

23       If it was served in the morning, they can be gone in the

24  afternoon.  If it was served on the southern border, they could

25  be repatriated to Mexico if that was the country on the

 1  document.

 2  **Q.**   So it could be just a matter of hours?  It depends on the

 3  circumstances?

 4  **A.**   It could be, yes.

 5  **Q.**   Now, just so I make sure I understand, we've had a lot of

 6  discussion about evaluating potential countries that an alien

 7  may be sent to for purposes of third-party removal.

 8       So, hypothetically, Mr. Abrego Garcia comes out of

 9  criminal detention next week and is in ICE custody.  And then

10  the case officer, wherever he is, picks up the file, as you've

11  described.

12       Are they -- is the case officer then involved in making a

13  unique evaluation of where Mr. Abrego Garcia should go by way

14  of a third-country party?

15       And -- let me start with that question.

16            **MR. KHOJASTEH:**  Object to form.  Lacks foundation.  I

17  have no idea what unique means.

18            **THE COURT:**  Yeah, I'm not sure either.  Can you

19  rephrase that.

20            **MR. RAND:**  Yeah, I'll rephrase it.

21  **BY MR. RAND:**

22  **Q.**   Is the case officer just figuring out -- they have a list

23  of potential countries, and it doesn't really matter about

24  anything to do with Mr. Abrego Garcia and they're just picking

25  this country?  Or are they evaluating Mr. Abrego Garcia and

1   trying to determine which is the third-party country that

2   Mr. Abrego Garcia should go to and talking to the embassy in

3   the manner you described previously and considering those types

4   of issues in coordination with other agencies?

5   **A.**   No.   Again, these decisions aren't made until the

6   individual comes into ICE custody.   But, generally speaking,

7   for individuals that have a grant of withholding to a certain

8   country, the officer, if they meet -- if they're from one of

9   those seven countries that Mexico accepts, the process should

10  be the officer will talk to the alien and let them know that

11  they will be removed to Mexico.   And then they have that

12  opportunity to express fear at that time.

13       But, again -- I'll make it very clear -- no decision has

14  been made on this particular case.   And the case won't be --

15  start working until the individual -- if and when the

16  individual is in ICE custody.

17  **Q.**   All right.   And if it's not -- if the individual isn't of

18  one of those seven countries that can go to Mexico -- I

19  understand your testimony that nothing happens until the alien

20  is in ICE custody.

21       But once that happens and once the case officer has the

22  case, are they making an evaluation in regard to that specific

23  individual and figuring out where they can go and not be

24  persecuted or tortured by calling individual embassies and so

25  forth, or are they just picking off of a list of countries that

1    are potentially available?

2         **MR. KHOJASTEH:**  Object to form.  By its terms, the

3    question is outside the relevance of this order, Your Honor.

4         **THE COURT:**  No, because I'm still trying to figure it

5    out, right?

6         So let me try -- let me try real sort of --

7         **MR. KHOJASTEH:**  You got it, Your Honor.

8         **THE COURT:**  What does the case officer do, very

9    specifically?  They have some guidance step by step.  They're

10   asked to find a third country for this person.  What do they

11   do?

12        **THE WITNESS:**  Well, the guidance that we have from

13   March of 2025, we would go -- we would -- the officer, right

14   now, the countries that -- we have seven countries.  If they

15   fall under one of those seven countries, we can remove them to

16   Mexico, if that's the decision to be made on that particular

17   case.

18        I'm sorry, Your Honor.  I don't have a specific answer for

19   how the case officer is going to think or work on that.

20        **THE COURT:**  I'm just trying to figure out the process

21   generally.  So a case officer gets a file.  And the person is a

22   citizen of El Salvador and has a withholding of removal.

23        I think your testimony is, in that situation, Mexico is

24   already designated as a country that will accept citizens of El

25   Salvador; so the case officer would proceed accordingly.

1      Is that what you're saying?

2           **THE WITNESS:**  That would be my understanding, yes,

3   what the case officer would do, yes.

4           **THE COURT:**  Okay.

5           **THE WITNESS:**  Generically speaking.

6           **THE COURT:**  Right.  I know you haven't made any

7   decisions with Mr. Abrego -- and I'll ask you about that in a

8   minute.

9      But what if the alien is a citizen of another country not

10  one of those seven?  What's the first thing that a case officer

11  will do to try to find a third country?

12          **THE WITNESS:**  They would -- you know, I can't

13  necessarily speak to what they would do.  They would try to

14  attempt to find a third country by maybe speaking with the

15  alien or -- I -- I -- Your Honor, I don't know.

16          **THE COURT:**  So you don't have a protocol?  You don't

17  have a -- guidelines for your case officers to do this or this?

18          **THE WITNESS:**  They would work -- they would fill out

19  a 241 and send it to a country that could potentially accept

20  them in -- you know, and if that country doesn't accept them,

21  then we would look at other -- we will do a redetermination on

22  that individual if we can't remove them to -- say, you know,

23  they have withholding of removal to China; we couldn't remove

24  them to China.  What other options do we have?  We would

25  attempt to find a country.  If we couldn't, we would have to

1  look at doing a custody redetermination.

2        **THE COURT:**  Okay.  So as of today, we know that DHS

3  has -- the case officers have Mexico as the third country for

4  folks or who are citizens of El Salvador, right?

5        **THE WITNESS:**  Correct.

6        **THE COURT:**  But you can't tell me today that that's

7  the path DHS will take if Abrego comes into your custody?

8        **THE WITNESS:**  I don't have that answer today.  The

9  individual is not in ICE custody.  So I don't know what the --

10  the case won't be worked until the alien is in ICE custody.

11        **THE COURT:**  I understand that.  But can you tell me

12  why you can't say one way or another?  It's, like, less than a

13  week until Mr. Abrego might be released.

14        **THE WITNESS:**  Yeah, when that -- I mean, I know I've

15  mentioned this many times.  We don't typically work cases while

16  they're in federal custody or local custody.  We'll work them

17  when they get into ICE custody.  And then the decision will be

18  made at that time of what process is going to happen.

19        **THE COURT:**  Okay.  Thank you.

20        **THE WITNESS:**  All right.  Thank you, Your Honor.

21      **MR. RAND:**  Your Honor, anything further from you?

22        **THE COURT:**  You may.

23      **MR. RAND:**  Thank you, Your Honor.

24  BY MR. RAND:

25  **Q.**    Just a couple of last questions.

```
 1        Sir, what would be the prejudice of DHS and the government

 2   giving somebody like Mr. Abrego a reasonable notice of the

 3   intention to remove them to a third country?

 4           MR. KHOJASTEH:  Object to form.  Lacks --

 5   BY MR. RAND:

 6   Q.   Like a certain number of days, for instance, what would be

 7   the prejudice of doing that?

 8           MR. KHOJASTEH:  Object to form.  Lacks foundation.

 9           THE COURT:  Can you rephrase what's meant by

10   prejudice.

11   BY MR. RAND:

12   Q.   In -- in your mind, based upon your experience, is there

13   some hardship that would be incurred if there was, for

14   instance, a number of days given after notice before somebody

15   leaves the continental United States by plane who has been

16   issued a notice of removal?

17           MR. KHOJASTEH:  Same objection.

18           THE COURT:  Overruled.

19           THE WITNESS:  Sir, I'm confused by your question.  I

20   don't understand it.  I'm sorry.

21   BY MR. RAND:

22   Q.   I'm asking, based upon all your experience and your

23   seniority in DHS, if an alien receives a notice of removal to a

24   third country, a place that they weren't a citizen and no

25   relationship with, what -- what hardship would, in your mind,
```

 1  you and others at DHS suffer if there was a set enough period

 2  of time before they left the continental United States by way

 3  of removal?

 4      A period of days.  You've described, for instance,

 5  sometimes it's a couple of hours; sometimes it's a week.  What

 6  would be the hardship if there was a set amount of time so that

 7  there was some certainty for those individuals and those

 8  representing them?

 9          **MR. KHOJASTEH:**  Object to form.

10      I'm just going to note this, Your Honor.  The witness is

11  not here to testify as to DHS's opinions.

12          **THE COURT:**  The question -- the question on the table

13  is, from your agency's perspective, would there be any burden

14  if the detainee, the alien, were given a frame -- a window by

15  which they would be able to assert credible fear, like a

16  predictable window, like two days or three days?  Would that

17  upset your operations?

18          **THE WITNESS:**  No, our -- our guidance that we have

19  is, once we've served that document on them, we are going --

20  and there's no fear claimed at the time of service, we're going

21  to go ahead and effectuate removal.

22      We -- you know, once these individuals have a final order

23  of removal, then it's our responsibility to effectuate that

24  judge's order and not hold that individual in administrative

25  ICE custody any longer than they have to.

1      **THE COURT:**  And what would be the burden?  If you had

2   to hold the alien for two days, let's say, what would be the

3   administrative burdens on your agency?

4      **MR. KHOJASTEH:**  Your Honor, just for the record, I

5   have to -- I apologize.

6     Mr. Giles is not prepared or being offered --

7      **THE COURT:**  This is all about the prejudice to your

8   agency if I grant the order.  So why can't I ask this question?

9      **MR. KHOJASTEH:**  You can ask this question.  My only

10  point is Mr. Giles is not testifying on behalf of DHS on this

11  answer.

12     **THE COURT:**  Well, he is -- he's pretty high up at

13  DHS.  So I'll take the answer.  You can argue about its

14  relevance later.

15     **MR. KHOJASTEH:**  Understood, Your Honor.

16     **THE COURT:**  So I want to go back and make sure the

17  question is answered.

18    So if you need me to reorient you, sir, just let me know.

19    My question was and what would be the burden?  If you had

20  to hold the alien for two days, let's say, what would be the

21  administrative burden on your agency?

22     **THE WITNESS:**  Well, generally speaking, Your Honor,

23  the burden could be it's taking up a bed for us, where we only

24  have a finite amount of beds.  It's costing the taxpayer money

25  for that individual to be in ICE custody when we have a removal

1  order that we can effectuate immediately.

2      So those are a couple things that could be the burden

3  where it costs taxpayer money and it's taking up a bed for

4  other individuals.

5          **THE COURT:**  Okay.  All right.  Anything else that --

6          **THE WITNESS:**  No, Your Honor.

7          **THE COURT:**  Thanks.

8      All right.  Go ahead.

9          **MR. RAND:**  Your Honor, I pass the witness, reserving

10  all rights.  Thank you.

11          **THE COURT:**  And in fairness to you, sir, let me make

12  sure I don't have any other questions.  That way, you all get

13  to do your cleanup.  Okay?

14      I thought you said earlier, sir, that if a third-party

15  country is identified, one of the things that has to happen is

16  that travel documents are issued for that person to go to the

17  third country.  Is that right?

18          **THE WITNESS:**  Yes.  But with the country of Mexico,

19  we have an agreement where a travel document is not required.

20          **THE COURT:**  Okay.  So when the alien lands in Mexico,

21  what proof do they -- are they given that they can stay in

22  Mexico?

23          **THE WITNESS:**  Prior to removal, we have a manifest of

24  the individuals that are going to be removed.  And that is

25  shared with the Mexican government.

1        **THE COURT:**  And is it -- maybe another way to say it.

2   Is it up to the Mexican government to issue that alien some

3   permission to stay in the country?

4        **THE WITNESS:**  Yes.  We have an agreement with Mexico

5   they will accept citizens of those seven countries I mentioned

6   earlier.

7        **THE COURT:**  And are they given some form of -- some

8   proof that they are legally permitted to stay in Mexico?

9        **THE WITNESS:**  Who is who giving proof?  I'm sorry.

10       **THE COURT:**  Well, either the United States or Mexico.

11  I'm assuming it would be Mexico.

12       **THE WITNESS:**  Yes.  My understanding -- my

13  understanding is yes, Your Honor, because we have those

14  agreements with Mexico that those individuals will not be

15  persecuted or tortured when they go into Mexico -- when they --

16       **THE COURT:**  That's a different question.

17    I'm talking about authorization to live in the country

18  like the equivalent in our country of a visa or a green card or

19  some permission to be there in Mexico.  What are they given?

20       **THE WITNESS:**  If we're repatriating them to that

21  country, my understanding is that they would have permission to

22  reside in that country since that's where -- since that's where

23  we repatriated them to and that government accepted that alien.

24       **THE COURT:**  Okay.  And do you have any specific

25  information as to what the proof would be for that person?

 1              **THE WITNESS:**  I don't have any specific information.

 2     We can -- I can get back to you on that.

 3              **THE COURT:**  Okay.  That was going to be my next

 4     question -- or the last question on this is who would know?

 5     Would that be your agency or another agency?

 6              **THE WITNESS:**  I can check and see if it's my agency.

 7     If not, we can get -- we can get an answer for the Court, Your

 8     Honor.

 9              **THE COURT:**  Okay.  All right.  That would be great.

10        That may be it.  Let me make sure.

11        Yes.  That's it.  Okay.

12              **THE WITNESS:**  Thank you, Your Honor.

13              **MR. KHOJASTEH:**  Your Honor, I'll be brief.

14                         REDIRECT EXAMINATION

15     **BY MR. KHOJASTEH:**

16     **Q.**  Mr. Giles, thank you again for taking the time this

17     afternoon.

18        Just one point of cleanup, and I just wanted to make sure

19     the record is clear on this.

20        My friend across the caption asked you a few questions

21     about which lawyers were participating in the preparation in

22     which you participated in advance of this appearance today.

23     And I believe you identified lawyers from the Justice

24     Department.  And I just wanted to clear -- clear the record.

25        There were other -- were there any other lawyers there

*REDIRECT OF THOMAS GILES BY MR. KHOJASTEH*

1  from other agencies?

2  **A.**    I don't know everyone that was on the phone, and I can't

3  remember.  I just know that, you know, with my counterparts at

4  ICE, OPLA, and with you guys.  I don't know who else was on the

5  video screen.

6  **Q.**    Sure.  I want to make sure the record reflects that OPLA

7  lawyers participated as well.

8        Mr. Giles, Mr. Rand asked you some questions regarding why

9  you didn't reach out to the New Orleans field office or

10  communicate with them in advance of today's appearance.

11       Do you recall that?

12  **A.**    Yes.

13  **Q.**    I want to ask you, you testified -- you've testified

14  repeatedly to Your Honor just a moment ago that ICE and the

15  officers in charge of that case of an alien doesn't begin its

16  work on where it's -- where an alien is going or what's going

17  to happen to the alien, where they're going to sleep that

18  night, until ICE has that alien in custody, right?

19  **A.**    That is correct.

20  **Q.**    So what sense would it have made for you to reach out to

21  the New Orleans field office a week, two weeks, three weeks

22  before or two days -- or today even to ask about what's going

23  to happen with Mr. Abrego Garcia?

24  **A.**    It wouldn't have made any sense because, as I mentioned

25  earlier, we don't know where the bed space is going to be.  And

1    right now at this point in time, he's in the custody of the

2    U.S. Marshals Service, and we don't even know if and when this

3    individual is going to be released.

4    **Q.**    Got it.

5            **THE COURT:**  I do have a follow-up question about

6    that.  Can I just get it out because I keep forgetting it.

7            **MR. KHOJASTEH:**  Absolutely, Your Honor.  Feel free to

8    interrupt me all you want.

9            **THE COURT:**  Thank you.

10        In Mr. Abrego Garcia's case, he has a pending criminal

11    matter in federal court, right?

12            **THE WITNESS:**  Yes.

13            **THE COURT:**  Okay.  I know you, as a matter of course,

14    don't inquire ahead of time.  But can you, especially when a

15    person is facing criminal charges in a certain district and

16    would need to be available for that district?

17            **THE WITNESS:**  When the individuals -- when aliens

18    come into our custody off a detainer, if they have a criminal

19    proceeding still pending, our position is we're administrative

20    detention.  We don't hold for punitive.  We don't hold for

21    criminal stuff.

22            **THE COURT:**  Right.

23            **THE WITNESS:**  And we are going to do what we can for

24    their immigration case going forward.

25            **THE COURT:**  So without regard to the criminal case.

 1   Am I getting that right?

 2          **THE WITNESS:**  Yes.

 3          **THE COURT:**  So in this example -- and this is

 4   hypothetical -- bed space is available in Nome, Alaska, right?

 5   That's the place that ICE says we've got bed space for

 6   Mr. Abrego Garcia.  You would put him there even though he has

 7   an open criminal case in Nashville, Tennessee?

 8          **THE WITNESS:**  It's -- everything is a case by case.

 9   I can say that we would make an attempt to keep him somewhere

10   locally.  So with that -- but when he comes into ICE custody,

11   we're going to work on -- you know, he is a final order of

12   removal.  Unless there's a warrant from the magistrate judge

13   that indicates that this individual needs to come back to

14   marshals' custody to finish the proceedings that he was in.

15          **THE COURT:**  Right.  So there's going to be a trial

16   date set.  And that trial date is going to be on the docket

17   soon.

18      Will your agency take that into account in determining

19   where to place Mr. Abrego?

20          **THE WITNESS:**  I don't have -- I don't have that

21   answer.  Typically, when someone comes into ICE custody, they

22   are -- we're going to do -- we're going to start the

23   immigration process or finish the immigration process.

24          **THE COURT:**  Okay.  I understand that.  For

25   purposes -- because it's getting late; so I want to get sort of

*REDIRECT OF THOMAS GILES BY MR. KHOJASTEH*

1   a straight answer on -- will you take that into account or

2   won't you, that there is a trial date in Nashville for someone

3   accused of a federal crime?  Will you take that into account

4   when you place the person in custody?

5             **THE WITNESS:**  It can be taken into account.

6             **THE COURT:**  Will you here?  Because we know it's

7   happening here.  Will you take it into account with Mr. Abrego

8   Garcia?

9             **THE WITNESS:**  It can be taken into account, yes.

10            **THE COURT:**  So that means you're not going to answer

11  my question?  I want to know if you're going to take it into

12  account for him.  There is an open felony federal charge

13  against him.  Will you take it into account?

14            **THE WITNESS:**  Yes, Your Honor.  Yes, Your Honor.

15            **THE COURT:**  Okay.  You will?

16            **THE WITNESS:**  Yes, Your Honor.

17            **THE COURT:**  Okay.  Because you know he has a right to

18  counsel in that case, right?

19            **THE WITNESS:**  Yes, Your Honor.

20            **THE COURT:**  And that's a Sixth Amendment and a Fifth

21  Amendment right.  Those are constitutional rights.  You

22  understand that?

23            **THE WITNESS:**  Yes, Your Honor.

24            **THE COURT:**  So what will you do to take that fact

25  that he's got open criminal charges into account when you place

*REDIRECT OF THOMAS GILES BY MR. KHOJASTEH*

1  him?  What will you do procedurally?

2      THE WITNESS:  It would be taken into account of how

3  the case is going to be determined going forward when he's in

4  immigration custody.

5      THE COURT:  So you do have some discretion in terms

6  of how you place someone or where you place someone in custody,

7  correct?

8      THE WITNESS:  Yes.

9      THE COURT:  And it sounds like for Mr. Abrego Garcia

10  it's not going to solely be a matter of bed space because

11  you've acknowledged you'll take his open criminal charges into

12  account.

13      THE WITNESS:  It's a factor.  It's a case-by-case

14  basis.  We can take that into account, but I can't guarantee

15  that -- I can't guarantee that he's going to be in that local

16  jurisdiction.  And I can't guarantee that -- I don't know when

17  the criminal trial is going to be set, how long that's going to

18  be.

19      THE COURT:  Right.

20      THE WITNESS:  When he's in immigration custody, it's

21  purely administrative, and we need to continue our process

22  going forward.

23      THE COURT:  Understood.  Thank you.

24      THE WITNESS:  Thank you, Your Honor.

25

*REDIRECT OF THOMAS GILES BY MR. KHOJASTEH*

1    **BY MR. KHOJASTEH:**

2    **Q.**    Mr. Giles, we also heard a lot -- we've heard from

3    Mr. Rand about statements that the president has made or AG

4    Bondi or Secretary of State Rubio, all the attention the media

5    has put on this case.

6        From your perspective, however, as someone operating ICE

7    and working with the men and women who are out there serving

8    ICE, to what extent, if at all, has this case changed the

9    ordinary course of how ICE is doing business day in and day

10   out?

11       **THE WITNESS:**  This case is treated just like any

12   other case that we have and the situation that it is.  There's

13   no special preference given to this case.

14   **BY MR. KHOJASTEH:**

15   **Q.**    No politics with this case?

16   **A.**    No.  Our officers are going to effectuate the final order

17   of removal.

18   **Q.**    Mr. Giles, can we go back to Defendants' Exhibit 1.

19       **THE COURT:**  I'm sorry.  You just said you're going to

20   effectuate the final order of removal?

21       **THE WITNESS:**  No.  I said since he has a final order

22   of removal, our officers' job is to effectuate that order.

23       **THE COURT:**  Right.  The final order of removal?

24       **THE WITNESS:**  Yes.  Once they come into ICE custody,

25   if that's the decision that's made, you know, he's a final

*REDIRECT OF THOMAS GILES BY MR. KHOJASTEH*

 1  order; so he's gotten his due process.  And we -- you know, we

 2  don't need to keep him in detention any longer; so we're going

 3  to -- if the decision is to remove him --

 4          **THE COURT:**  Yeah.

 5          **THE WITNESS:**  -- that would be the decision to do

 6  that.  We're not going to hold somebody in custody if they're a

 7  final order and we can remove them, if that's the decision

 8  that's going to be made.

 9          **THE COURT:**  The final order of removal for Mr. Abrego

10  is to El Salvador, right?

11          **THE WITNESS:**  Yes.  And he has a withholding to El

12  Salvador; so --

13          **THE COURT:**  You won't effectuate the final order of

14  removal?

15          **MR. KHOJASTEH:**  To a third-party country, Your Honor.

16          **THE COURT:**  Well, he didn't say that.  That's why I'm

17  asking.

18          **THE WITNESS:**  I apologize if I misspoke.  I was

19  generically speaking.  If someone comes into custody and they

20  have a final order, those officers are going to work to

21  effectuate that final order.

22          **THE COURT:**  Okay.  All right.  Well, this was in

23  response to the question about how you were handling

24  Mr. Abrego.  And you were handling him just like any other case

25  is what the testimony was.

1          **THE WITNESS:**  Yes.

2          **THE COURT:**  And then you said you would effectuate

3    the final order of removal, which gave me some pause given that

4    Mr. Abrego cannot be returned to El Salvador.

5       You agree with me on that, right?

6          **THE WITNESS:**  That's correct, Your Honor.  Yes.

7          **THE COURT:**  All right.  Thank you.  It's getting a

8    little late.

9       Go ahead.

10   **BY MR. KHOJASTEH:**

11   **Q.**   If we look at Defendants' Exhibit 1, this is the

12   March 30th, 2025, memorandum.

13      We spent a lot of time on this document about what it

14   supposedly does and supposedly doesn't.  I just want to refer

15   you first to the first sentence of -- under the subheading

16   "Purpose."

17      "This memorandum clarifies DHS policy regarding the

18   removal of aliens with final orders of removal pursuant to

19   Sections 240," right?  That's the -- that's a removal

20   proceeding we talked about earlier today, right, that has an

21   immigration judge, the opportunity to appeal it, the

22   opportunity to appeal the BIA to the circuit court, right?

23          **MR. RAND:**  Objection, Your Honor --

24          **THE WITNESS:**  Correct.

25          **MR. RAND:**  -- counsel is -- objection.

*REDIRECT OF THOMAS GILES BY MR. KHOJASTEH*

1          **THE COURT:**  Yeah.  Can you orient without testifying?

2          **MR. KHOJASTEH:**  You got it, Your Honor.

3  **BY MR. KHOJASTEH:**

4  **Q.**   241(a)(5), do you know what that is?

5  **A.**   Yes, it's a reinstatement of a final -- a reinstatement of

6  a prior order.

7  **Q.**   And what does that mean?

8  **A.**   What that means is if someone has been removed from the

9  United States and illegally reenters the country, the officers

10 can issue a reinstatement of final order reinstating that prior

11 order.

12 **Q.**   Meaning that person already had a removal order that would

13 have resulted from an immigration judge, a BI -- opportunity to

14 appeal to a BIA, an opportunity to appeal to a circuit court,

15 right?

16          **MR. RAND:**  Same objection, Your Honor.

17          **THE COURT:**  Sustained.  Why are we talking about

18 reinstatement?  That's not Mr. Abrego, is it?

19          **MR. KHOJASTEH:**  We've talked about a lot today that

20 isn't Mr. Abrego Garcia, with respect, Your Honor --

21          **THE COURT:**  Okay.  But why don't you get to the

22 questions that are responsive to the cross, please.

23          **MR. KHOJASTEH:**  I'm going to get there subject to

24 continuation.  Give me two more questions on this.

25          **THE COURT:**  Okay.

*REDIRECT OF THOMAS GILES BY MR. KHOJASTEH*

1    **BY MR. KHOJASTEH:**

2    **Q.**    Those folks have already gone through a process, right?

3    They've had -- they were in front of an immigration judge, they

4    had the time to appeal through BIA, they had the opportunity to

5    appeal it to a circuit court, right?

6    **A.**    Yes.

7    **Q.**    Now, the last one.  238(b), what is that?

8    **A.**    238(b) is an administrative removal if the individual has

9    come in unlawfully and has a conviction for an aggravated

10   felony.

11   **Q.**    A conviction, right?  They've been in front of a judge in

12   the United States?

13              **THE COURT:**  Please don't testify.

14              **MR. RAND:**  Objection, Your Honor.

15              **THE COURT:**  You got the answer.  Now ask the next

16   question without testifying.

17        Next question.

18   **BY MR. KHOJASTEH:**

19   **Q.**    So this -- this -- this document here is the end of a

20   process for the folks who --

21              **MR. RAND:**  Leading, Your Honor.

22   **BY MR. KHOJASTEH:**

23   **Q.**    -- who it is subject to, right?

24              **THE COURT:**  Sustained.

25        Can you rephrase that.  I'm having a little trouble

*REDIRECT OF THOMAS GILES BY MR. KHOJASTEH*

1   understanding myself.

2   **BY MR. KHOJASTEH:**

3   **Q.**   Third-party removals are being -- the folks who are

4   subject to them in this policy have already gone through a

5   process, correct?

6   **A.**   Yes.

7           **MR. RAND:**   Objection, Your Honor.   Leading.

8           **THE COURT:**   Sustained.

9           **MR. KHOJASTEH:**   I'm just trying to move it along,

10  Your Honor.   I apologize.

11          **THE COURT:**   I don't understand the call of your

12  question; so can you start from scratch.

13          **MR. KHOJASTEH:**   Let's start from scratch.

14          **THE COURT:**   Okay?   Ask nonleading questions that are

15  responsive to the cross.

16          **MR. KHOJASTEH:**   You got it.   I apologize, Your Honor.

17          **THE COURT:**   No problem.

18          **MR. KHOJASTEH:**   I'm getting passionate.

19  **BY MR. KHOJASTEH:**

20  **Q.**   To what extent, if at all, have aliens who these policies

21  apply to already have had process at all?

22          **MR. RAND:**   Objection.

23          **THE COURT:**   All right.   Can you all approach?

24      (A bench conference was held on the record but out of the

25  hearing of the courtroom as detailed below:)

1          **MR. KHOJASTEH:**  Our sidebar was on the record, Judge.

2    Is that okay?

3          **THE COURT:**  Yes, yes, yes.  They're all on the

4    record; they're just not for the -- the witness's and

5    everybody's consumption.

6      I'm not sure where you're going with this; so I just want

7    to understand so I don't keep cutting you off.

8          **MR. KHOJASTEH:**  The point is the way this is being

9    represented to the Court is somehow we're picking people up off

10   the street and putting them on planes to other countries and

11   they have no process other than objecting to the fact that

12   they're afraid of going to this third country.

13     These people have gone through numerous rounds of process

14   where they had lawyers and the like.  And I'm going to get to

15   the point that --

16         **THE COURT:**  But you haven't established that with

17   this witness.

18         **MR. KHOJASTEH:**  That's what we just did with 240,

19   241, and 248.

20         **THE COURT:**  No, no, not really.  All that that shows

21   me is that this is a policy per *D.V.D.* that applies to

22   categories of aliens, not Mr. Abrego.  So that's all that I'm

23   getting from this.

24     And to say that they've had process in terms of a new

25   action on the part of the agency is not persuasive to me.  That

*REDIRECT OF THOMAS GILES BY MR. KHOJASTEH*

1    you're saying that some -- that's why I asked the questions I

2    asked of Mr. Abrego.  Because you, in this case, have not

3    established at all that he had any process in terms of

4    third-country removals.  And I think what you're going to argue

5    is that, wait a minute, when he had that final order of

6    removal, that was the time.

7         **MR. KHOJASTEH:**  No, that's not what I was going to

8    say.

9         **THE COURT:**  Then why are we going there with this?

10        **MR. KHOJASTEH:**  The next -- I'll tell you as a

11   question.  The next group of -- the next set of questions are,

12   in your 24 years of experience, is there any reason for you to

13   read and interpret this policy as precluding, directing, or

14   foreclosing sharing the notice for third party removal with

15   counsel?  Because there's some -- the implication here is

16   because it doesn't say the word "counsel," we're, like, not

17   doing that.

18        **THE COURT:**  How about this?  Ask that.  You know,

19   Mr. Rand had a number of questions for you about whether

20   counsel is notified --

21        **MR. KHOJASTEH:**  Right.

22        **THE COURT:**  -- regarding third parties and whether

23   it's in this document, right?

24        **MR. KHOJASTEH:**  Right.  Listen, I'll do it whatever

25   way you want to do it.  But that's the point.

1          **THE COURT:**  So just go there and then ask him about

2    it.

3          **MR. KHOJASTEH:**  Sure.

4          **THE COURT:**  Just because it's not in this document,

5    does it happen?  How does it happen?

6          **MR. KHOJASTEH:**  Right.

7          **THE COURT:**  That's your point.

8          **MR. KHOJASTEH:**  The point is -- for the Court's

9    benefit, I wanted to know that the folks that are subject to

10   this policy have gone through rounds of --

11         **THE COURT:**  See, that's a different point than what

12   you're saying this is all responsive to.  The question is now.

13   Does the lawyer get notice now?

14         **MR. KHOJASTEH:**  But why --

15         **THE COURT:**  Not back in --

16         **MR. KHOJASTEH:**  I appreciate it.  And, again, my

17   point is I feel as if there's a default thought that if the

18   word "counsel" is not there, then the government is not doing

19   it.  My point is why would the implication be that after rounds

20   of us giving process, at the very end, we're treating them

21   like --

22         **MR. RAND:**  This is all argument, Your Honor.  It's

23   all argument.

24         **THE COURT:**  Frankly, the rounds of giving process at

25   the removal stage is not the point, because we're now

1  postremoval.  The question is postremoval process.  So not only

2  is it really not helpful to me; it's not responsive to

3  Mr. Rand's questions.

4         **MR. KHOJASTEH:**  I want to be helpful to you.

5  Sometimes you -- sometimes lawyers are tone deaf.  I apologize.

6  I missed it.

7         **THE COURT:**  No, no, no.  I think if you're going to

8  argue, frankly -- and I'll tell you now that if you're going to

9  argue, well, you know, Mr. Abrego had this opportunity to

10 protest a third country --

11        **MR. KHOJASTEH:**  I'm not arguing.

12        **THE COURT:**  Okay.  I'll tell you.  It's not moving --

13        **MR. KHOJASTEH:**  Okay.  I got you.

14        **THE COURT:**  Okay.  Great.

15     (The bench conference concluded and proceedings resumed

16 within the hearing of the courtroom as follows:)

17 **BY MR. KHOJASTEH:**

18 **Q.**  Mr. Giles, Mr. Rand asked you about the opportunity for an

19 alien to share the notice of removal to a third country with

20 his counsel.

21     Do you remember that?

22 **A.**  Yes.

23 **Q.**  Or whether ICE itself provided the notice to counsel.

24     Do you remember that?

25 **A.**  Yes.

1    **Q.**    When you read this policy, based on your 24 years of

2    experience at ICE, is there any reason for you to read this to

3    interpret it as foreclosing, preventing, directing you not to

4    share that notice with counsel?

5              **MR. RAND:**  Objection.  Leading and argumentative.

6              **THE COURT:**  Overruled.

7              **THE WITNESS:**  No, it does not.

8    **BY MR. KHOJASTEH:**

9    **Q.**    Regarding refoulement -- which was a new concept to you

10   that Mr. Rand raised.

11        Do you remember that?

12   **A.**    Yes.

13   **Q.**    So is there anything in this document -- based on what you

14   understand this -- the policies of ICE, Department of Homeland

15   Security, your experience in the agency, is there anything in

16   this document that would indicate to you that the United States

17   is permitting the nations in which it reaches agreements to

18   receive these deported aliens to then send them back to their

19   countries of origin in contravention of what the United States

20   wanted them to do?

21   **A.**    No.

22             **MR. KHOJASTEH:**  I have no further questions, Your

23   Honor.

24             **THE COURT:**  Any recross subject to the redirect?

25             **MR. RAND:**  No, Your Honor.  Thank you very much.

*REDIRECT OF THOMAS GILES BY MR. KHOJASTEH*

1          **THE COURT:**  Okay.

2      All right.  Mr. Giles, you are going to be really happy to

3  hear that this concludes your testimony.

4          **THE WITNESS:**  Thank you, Your Honor.  What do I do

5  with these?

6          **THE COURT:**  You're free to leave.

7      I would give them to -- Ms. Derro is fine.

8          **THE WITNESS:**  Thank you, Your Honor.

9          **THE COURT:**  All right.  Thank you.

10     (Witness exited the witness stand.)

11         **THE COURT:**  All right.  Any other -- there are no

12  other witnesses; is that correct?

13         **MR. KHOJASTEH:**  Yes, Your Honor, no other witnesses.

14         **THE COURT:**  No other witnesses.  And any other

15  evidence or testimony from either side?

16         **MR. KHOJASTEH:**  Not from us, Your Honor.

17         **MR. ROSSMAN:**  No, Your Honor.

18         **THE COURT:**  So it is two minute to 5:00.

19     What I was hoping to accomplish is to have some helpful

20  argument on what exactly the plaintiff is asking for and the

21  law that supports it in light of the testimony.  That's not

22  going to be accomplished tonight.  It's just -- isn't.  But we

23  got to move quickly.

24     So my question to all of you is can you be here tomorrow

25  morning for a follow-up on this case?

1          **MR. ROSSMAN:**  We're here as the Court needs us, Your

2    Honor.

3          **MR. KHOJASTEH:**  Your Honor, I -- unfortunately, I

4    cannot.  I can be here Monday morning.

5          **THE COURT:**  We can't do Monday morning because -- I

6    mean, you know, I can't because this case -- well -- the only

7    way in which -- maybe we could talk about this right now.

8      The only way in which I'd be willing to suspend a

9    full-throated analysis of this -- and I've been knocking this

10   around -- is under the following circumstances:

11     Judge Crenshaw has the criminal case, and he's got to

12   review the release order next week.  According to the docket,

13   that will involve argument and, I believe, new evidence

14   presentation.

15     At some point Judge Crenshaw will issue a decision.  At

16   which juncture, this -- this issue is either going to be mooted

17   or not, which another way to look at this issue is it's not

18   quite ripe until Judge Crenshaw issues its order.

19     However, I'm not willing to allow just an unfettered

20   release of Mr. Abrego Garcia into ICE custody.  I want a pause

21   on any actions that ICE may take which might potentially

22   adversely affect my jurisdiction or adversely affect Mr. Abrego

23   Garcia's interests, such as access to counsel and other issues

24   that, including from the plaintiffs' perspective, a full

25   effectuation of my order.

1          So how do we do this?

2          One proposal would be that, in the event Mr. Abrego Garcia

3    is released on conditions and he's taken into ICE custody, that

4    he's taken to the local facility in Tennessee and he's left

5    there for 48 hours and we have a hearing.  And then I will hear

6    you all on it, and I'll issue a decision forthwith.  And I'll

7    prepare for that.

8          But, in other words, I need some pause on that -- that

9    delta between when Mr. Abrego -- if Mr. Abrego Garcia is

10   released and then this issue is ripe to my decision.

11         What -- give me your thoughts on this.

12             **MR. KHOJASTEH:**  Could we have one minute to confer,

13   Your Honor?

14             **THE COURT:**  Sure.  You can each sort of think about

15   it and --

16             **MR. KHOJASTEH:**  Your Honor --

17             **THE COURT:**  Who is going first?  Because it seems

18   like you both --

19             **MR. ROSSMAN:**  I would very cordially invite the

20   government to tell us what their position is on this because

21   the government is well positioned to suspend all of the relief

22   that they're going to take that creates the problem in the

23   first place.

24         So I have strong thoughts on it, but I think it's fair for

25   the government to go first.

1    **THE COURT:**  Yeah, because if the government is

2    willing to press pause for 48 hours on all of the testimony

3    that we've heard about DHS being able to move Mr. Abrego pretty

4    much anywhere, begin immediate proceedings to remove him to --

5    whether it be Mexico or somewhere else without any real

6    guidance as to where he would be, it would seem like the best

7    course of action would be if -- if there is a release order,

8    let him go into immigration custody, you begin the process, we

9    come back in 48 hours, and now I know what's happening.

10   But you don't remove him from a third country, and you

11   don't -- you know, yet spirit him to Nome, Alaska, or somewhere

12   far-flung until I can deal with this issue as opposed to -- and

13   decide whether I have the authority, and, if so, how do I

14   exercise it very judiciously?

15   On the other hand, if he's detained, it moots the entire

16   issue, and you don't have what amounts to an advisory opinion.

17   So it seems to be beneficial to all sides to allow for this

18   very brief hold on what ICE would do.

19   Does that make sense?

20   **MR. KHOJASTEH:**  Your Honor, just -- I understand.

21   And it seems entirely reasonable.  Is -- are you suggesting

22   us -- the folks coming back here Wednesday, Thursday, or Friday

23   of next week?

24   **THE COURT:**  What I'm suggesting is that I would issue

25   a TRO that essentially memorializes this without a ton of

1  findings or a robust analysis because it's temporary, right?

2  It's just to hold the place of this hearing.

3      It would be if Mr. Abrego Garcia is released from criminal

4  custody, then DHS will, for 48 hours, not -- and then the

5  question is exactly how I put it.  So I'd like your input on

6  that.  But not -- will take him into custody and begin its

7  decisional process, but will not remove Mr. Abrego beyond

8  the -- the local confines of Tennessee and will not remove him

9  from the United States for 48 hours.

10     So then I can make my decision.  That will also give us

11 time for you all to be heard in a schedule that is -- is --

12 works for you all but also works for me to be heard on the

13 merits of the motion.  Because once I issue that decision,

14 that's the decision you all live with.  It's -- it's a final

15 decision on the request for this order.

16     So yes, it -- it would mean that you don't have to come

17 back tomorrow.

18         **MR. KHOJASTEH:**  So, Your Honor, I think we're going

19 to come back tomorrow.  I'll -- it's -- it's a personal issue.

20         **THE COURT:**  And you realize that I might still go

21 ahead and do the TRO because I'm really trying not to step out

22 on some limb I don't need to.  So maybe you all should be

23 prepared tomorrow to address why this isn't ripe until it's

24 ripe.  And the only way I can stop from losing jurisdiction or

25 from some of the grave concerns I have about what I heard today

1    and what will happen to Mr. Abrego Garcia is to take a really

2    incremental approach, the most incremental, the least intrusive

3    on the administration.  And that would be a 48-hour hold on all

4    processes.

5         If you can't agree to that given what has happened to

6    Mr. Abrego Garcia, I want to hear from you tomorrow as to why.

7    Make sense?

8              **MR. KHOJASTEH:**  Your Honor, if -- I would be better

9    positioned if I had 30 minutes to make this decision.

10             **THE COURT:**  Sure.

11             **MR. KHOJASTEH:**  I'm defaulting to coming tomorrow.

12   But if you give me 30 minutes, I'll be better positioned.  And

13   I can send an e-mail to counsel.  I'll send an e-mail to

14   chambers.

15             **MR. ROSSMAN:**  We'll stay right here in the courtroom,

16   Your Honor.

17             **THE COURT:**  Yeah, yeah, yeah.  We could take a

18   30-minute recess if that's what you need.  That's not a

19   problem.

20             **MR. ROSSMAN:**  One clarification.  There's different

21   kinds of 48 hours.  And these are the kinds of 48 hours that

22   could make all the difference in the world.

23        So we would ask that it be 48 business hours, effectively,

24   so -- you know, that courts are open during that time period.

25             **THE COURT:**  Yeah, that would make sense, that it

1  would have to be 48 hours of court days because I can't come in

2  on a Saturday.  And if Judge Crenshaw issues a decision on a

3  Friday --

4          MR. ROSSMAN:  Precisely.

5          THE COURT:  Yes.  It would have to be the following

6  Monday or Tuesday is the thought.

7          MR. ROSSMAN:  Thank you.

8          THE COURT:  Yes.  That's what I'm contemplating so

9  that you have full knowledge of that.  Okay?

10         MR. KHOJASTEH:  Sure.  Thank you.

11         THE COURT:  All right.  Half hour.  Sounds great.

12  Thank you.

13         MR. ROSSMAN:  Thank you, Your Honor.

14         MR. KHOJASTEH:  Thank you.

15         DEPUTY CLERK:  All rise.  This Honorable Court stands

16  in recess for 30 minutes.

17     (Recess taken from 5:07 p.m. to 5:30 p.m.)

18         DEPUTY CLERK:  All rise.  This Honorable Court

19  resumes in session.

20         THE COURT:  All right, everyone.  You can have a

21  seat.

22     Who wants to go first?

23         MR. KHOJASTEH:  Your Honor, the government is happy

24  to go first.

25     The government's view of the TRO proposal Your Honor

1  offered is that a TRO at this stage would be improper as the

2  issue is not ripe, as you --

3          **THE COURT:**  Well, that's why the TRO -- listen, if

4  you're not interested in hammering out something, that's fine.

5  We'll have a hearing tomorrow.  And then I'll take all these

6  arguments under advisement.  We will talk about the testimony

7  that I heard today and what the implications of that are.  And

8  we'll talk about the validity of the order -- the requested

9  order.

10          **MR. KHOJASTEH:**  Your Honor --

11          **THE COURT:**  You don't need to go any further.

12          **MR. KHOJASTEH:**  Oh, I'd like to go further, with

13  respect, Your Honor.

14          **THE COURT:**  No.  Hold on.  If you're going to

15  argue -- hold on.  If you're going to argue the propriety of a

16  TRO --

17          **MR. KHOJASTEH:**  I'm not.

18          **THE COURT:**  Because we'll do that tomorrow.

19          **MR. KHOJASTEH:**  I'm not.  I'm not.  I'm not.

20      That said, I am unavailable tomorrow.  I'm a single

21  father, and it's my weekend with the kids.  And I have to go

22  back up to New York to be with them.

23      My colleague John Guynn, who you've met repeatedly, he's

24  been leading efforts here.  He has a long-planned family

25  reunion in Utah.  Flight for tomorrow morning at 7:00 a.m.

1          **THE COURT:**  I'm sorry.  But then someone else is

2    going to have to cover it.  Mr. Molina is able and competent,

3    as is Ms. O'Hickey.  But I got to make a decision in a few

4    days.

5          **MR. KHOJASTEH:**  Three days, Your Honor.  We have

6    Monday, Tuesday, and Wednesday.

7          **THE COURT:**  Yeah, I know.  And I've got -- I got 400

8    other cases.

9          **MR. KHOJASTEH:**  Understood, Your Honor.

10         **THE COURT:**  So if there's no room or -- and that's

11   okay.

12         **MR. KHOJASTEH:**  And we're happy to stay tonight.

13   We're happy to stay --

14         **THE COURT:**  Listen, this witness took four times as

15   long, in part because he knew nothing after my order said make

16   sure you bring a witness who knows something.  So this one is

17   on the government.  If you want me to talk about that now, I

18   will.

19         **MR. KHOJASTEH:**  We respectfully disagree, Your Honor.

20         **THE COURT:**  Okay.  I hear you.  And I am not going to

21   hold any one lawyer responsible for being here.  Don't need it.

22   I need a lawyer who is ready to argue tomorrow the merits of

23   this case -- the merits of this motion.  That's it.

24         **MR. KHOJASTEH:**  What time, Your Honor?

25         **THE COURT:**  I'm happy to do it early, if that would

 1   help you.  I'm happy to do it later.  I mean, you tell me, and

 2   I'll move my stuff around.

 3          **MR. KHOJASTEH:**  Early would be better for us.

 4          **MR. ROSSMAN:**  The earlier, the better, Your Honor.

 5          **THE COURT:**  Early?

 6          **MR. KHOJASTEH:**  Yes, Your Honor.

 7          **THE COURT:**  Okay.  You want to say 9:00 a.m.?

 8          **MR. KHOJASTEH:**  Sure, Your Honor.

 9          **THE COURT:**  Okay.  All right.  9:00 a.m., and then

10   hopefully we'll get you all out before the rush hour starts.

11   And then I have all the argument and the treatment of today's

12   testimony, and I will then be able to do what I need to do.

13          **MR. KHOJASTEH:**  One -- one other option, Your Honor.

14   The government's completely prepared to put this on submission

15   on the papers and the testimony you heard today.

16          **THE COURT:**  Yeah, I know, but I have questions.  And

17   I need this to be in open court.  And I don't need to wait for

18   your papers.  I need -- I need some answers.  And I want to

19   hear from you all and the cases that you've cited in your

20   briefs and how they apply or don't apply.

21      So it is what it is.  And again --

22          **MR. KHOJASTEH:**  But you have our papers, Your Honor.

23          **THE COURT:**  I do.

24          **MR. KHOJASTEH:**  You already have our papers.  So you

25   wouldn't be waiting for papers.

1        **THE COURT:**  Oh, no, you're saying -- listen, if you

2   don't want to come and argue, that's fine.  You've got, like,

3   ten lawyers on your side.  If there's a lawyer that does not

4   want to come and argue, that's okay because I can have my

5   questions answered by the plaintiffs.

6        But I got to imagine there's some -- someone in the team

7   who is prepared to answer questions tomorrow about this or

8   argue your position.

9        **MR. KHOJASTEH:**  Of course, Your Honor.  As you -- as

10  you are aware, there's -- we're invested.  We want to be

11  advocating for our client here just as if we were in private

12  practice.

13       The idea of skipping a hearing for family obligations, I

14  know the folks at Quinn, similar work ethics.  We generally

15  don't do that.  So it's -- I'm -- I'm being honest with you on

16  the record here.  It puts us in an extremely difficult

17  position.

18       I don't -- I understand this whole circumstance.  I

19  understand that there's other issues that you're interested in.

20  But I would -- I would have appreciated some flexibility on

21  a -- this needed to be done on Friday as opposed to --

22       **THE COURT:**  Listen -- hey, if the government wants to

23  give flexibility to the plaintiff, I'm all for it.  But you're

24  asking for flexibility from the Court with no flexibility for

25  Mr. Abrego Garcia.  I can't -- I can't abide by that.

1          MR. KHOJASTEH:  No, I --

2          THE COURT:  So I got to be fair to both sides.  And

3    the fairest thing to do is to try to accommodate as early as

4    you need me to accommodate in the morning so you have your

5    position put on the record and then you're free to go, or you

6    can pick any of the other attorneys who are able and competent

7    on your side to come do this.

8          MR. KHOJASTEH:  Can we do it by Zoom, Your Honor?

9          THE COURT:  You cannot do it by Zoom.  I can't do a

10   hybrid.  And I find Zoom to be incredibly difficult to

11   accommodate the public.  That's my -- like, if you guys have a

12   workaround that you want to consider, but Zoom, accommodating

13   the public on a late notice like this is really hard.

14         MR. KHOJASTEH:  Okay.

15         THE COURT:  But you've got -- if you've got

16   alternatives, I'm happy to hear you.

17      Okay.  So 9:00 a.m.

18         MR. KHOJASTEH:  We'll see you, Your Honor.

19         MR. ROSSMAN:  9:00 a.m. tomorrow, we'll be ready,

20   Your Honor.

21         THE COURT:  Okay.  And I understand you're all going

22   to get a transcript of today in short order so we'll all have

23   it ready to go tomorrow.

24      All right.  Thank you all for your time.  See you in the

25   morning.

1          **DEPUTY CLERK:**  All rise.  This Honorable Court stands

2    adjourned.

3          (Proceedings were concluded at 5:36 p.m.)

1          CERTIFICATE OF OFFICIAL REPORTER

2

3

4     I, Paula J. Leeper, Federal Official Court Reporter, in

5 and for the United States District Court for the District of

6 Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that

7 the foregoing is a true and correct transcript of the

8 stenographically-reported proceedings held in the

9 above-entitled matter and the transcript page format is in

10 conformance with the regulations of the Judicial Conference of

11 the United States.

12                              Dated this 10th day of July 2025.

13

14

15                         */S/ Paula J. Leeper*
                         _____
16
                         Paula J. Leeper, RPR, CRR
17                       Federal Official Reporter

18

19

20

21

22

23

24

25

BY MR. KHOJASTEH: **[18]**  20/12 24/10 27/19 28/10
29/5 30/4 14.... 150/8 151/6 154/21 155/19 156/8
154/18 154/22 155/19 159/17 160/8
BY MR. RAND: **[39]**  34/20 36/22 39/16 42/13 45/21
48/5 55/16 56/16 66/24 73/17 74/7 76/14 77/5 79/21
86/13 94/22 96/13 97/23 98/19 98/23 102/12 103/24
105/3 106/7 113/23 117/11 121/18 123/18 124/1
124/9 124/19 125/6 125/17 132/20 134/21 138/24
139/5 139/11 139/21
**DEPUTY CLERK: [14]**  4/3 4/9 11/12 11/19 11/24 44/5
44/8 44/16 77/19 113/10 113/13 167/15 167/18 173/1
**MR. COOPER: [1]**  4/24
**MR. GILES: [3]**  5/20 5/24 6/6
**MR. GUYNN: [2]**  5/8 11/8
**MR. KHOJASTEH: [126]**  5/5 7/15 7/20 8/9 10/4 10/14
10/20 23/22 24/1 24/7 27/8 34/12 41/20 44/11 44/20
44/22 44/25 45/5 45/11 73/14 73/22 73/24 76/9
76/19 76/23 76/25 77/7 77/13 77/25 78/14 78/22
79/4 79/7 79/14 96/1 97/19 98/18 103/13 105/2
105/5 117/7 119/5 119/8 119/13 119/18 119/22 120/2
120/9 120/13 120/16 120/23 121/10 121/17 123/20
124/8 125/1 125/3 125/10 134/16 136/2 136/7 139/4
139/8 139/17 140/9 141/4 141/9 141/15 144/13 146/7
151/15 153/2 153/19 153/23 155/9 155/13 155/16
155/18 156/1 156/8 156/18 157/7 157/10 157/21
157/24 158/3 158/6 158/8 158/14 158/16 159/4
159/11 159/13 160/22 161/13 161/16 162/13 163/12
163/16 164/20 165/18 166/8 166/11 167/10 167/14
167/23 168/10 168/12 168/17 168/19 169/5 169/9
169/12 169/19 169/24 170/3 170/6 170/8 170/13
170/22 170/24 171/9 172/1 172/8 172/14 172/18
**MR. MOLINA: [11]**  5/13 7/14 7/21 8/1 8/6 20/10
20/12 20/14 129/17 129/19 129/22
**MR. RAND: [66]**  4/20 4/23 28/16 34/16 36/12 36/19
39/12 41/14 42/12 43/9 43/18 45/15 45/20 47/14
47/17 47/20 47/24 53/19 55/11 56/10 66/17 66/21
73/15 74/1 74/6 76/12 78/13 79/6 79/16 79/20 86/12
98/22 99/22 103/10 103/15 103/19 106/5 113/9
113/17 117/10 120/19 121/3 121/6 121/8 121/15
121/17 123/25 125/5 125/23 125/25 126/2 132/18
134/20 138/21 138/23 142/9 152/23 152/25 153/16
154/14 154/21 155/7 155/22 158/22 160/5 160/25
**MR. ROSSMAN: [15]**  4/15 9/1 9/16 9/19 10/18 161/17
162/1 163/19 165/15 166/20 167/4 167/7 167/13
170/4 172/19
**MR. SANDOVAL-MOSHENBERG: [1]**  5/1
**MS. O'HICKEY: [1]**  5/11
**THE COURT REPORTER: [1]**  77/16
**THE COURT: [341]**
**THE WITNESS: [158]**  11/23 24/4 27/12 29/3 30/1 42/4
43/14 43/19 43/22 44/3 45/19 48/4 55/15 55/22 56/2
56/12 83/3 83/9 83/12 83/15 83/19 83/23 84/2 84/6
84/10 84/14 84/16 84/23 85/4 85/8 85/12 85/18
85/24 86/2 86/4 86/9 93/24 94/1 94/8 94/14 94/20
96/6 97/21 99/23 100/3 100/8 100/13 100/17 100/19
100/21 101/1 101/7 101/11 101/17 101/19 101/22
102/1 102/3 102/9 105/9 105/18 105/22 110/18
110/23 111/4 111/10 111/14 111/21 111/25 112/4
112/13 112/17 112/22 112/25 113/8 113/22 124/13
124/17 125/15 126/12 126/17 126/21 127/1 127/4
127/6 127/14 127/18 127/22 128/3 128/7 128/13
128/17 129/2 129/13 129/24 130/13 130/19 130/25
131/6 131/11 131/18 131/22 131/25 132/3 132/10
132/15 132/19 136/12 137/2 137/5 137/12 137/18
138/5 138/8 138/14 138/20 139/19 140/18 141/22
142/6 142/18 142/23 143/4 143/9 143/12 143/20
144/1 144/6 144/12 146/12 146/17 146/23 147/2
147/8 147/20 148/5 148/9 148/14 148/16 148/19
148/23 149/2 149/8 149/13 149/20 149/24 150/11
150/21 150/24 151/5 151/11 151/18 152/1 152/6
152/24 160/7 161/4 161/8

**'**
**'98 [1]**  14/1

**--**
**-- but [1]**  111/22
**-- counsel [1]**  152/25
**-- in [1]**  107/25
**-- regarding [1]**  157/22
**-- that [1]**  151/5
**-- the [1]**  83/13
**-- to [1]**  123/19
**-- who [1]**  112/1

**/**
**/S [1]**  174/15

**1**
**1.6 percent [3]**  64/10 64/21 65/5
**10 [3]**  1/11 48/22 113/2
**10016 [1]**  1/16
**10th [1]**  174/12
**11 [1]**  3/4
**1128 [3]**  20/10 20/11 20/13
**12 [1]**  99/15
**1226 [1]**  20/9
**1231 [6]**  99/14 99/16 129/9 129/19 129/20 129/21
**1300 [1]**  1/19
**144 [1]**  3/5
**15th [1]**  49/15
**16th [3]**  29/7 29/16 29/17
**18 [1]**  108/4
**18 U.S.C [1]**  129/9
**1998 [1]**  13/12
**1:05 [1]**  1/11

**2**
**20005 [1]**  1/20
**2000s [1]**  60/3

**2001 [1]**  14/2
**20044 [1]**  2/9
**202 [2]**  2/6 2/10
**2024 [2]**  12/19 12/25
**2025 [29]**  1/11 12/13 12/17 12/19 23/21 33/13 42/25
49/15 66/9 67/11 67/12 67/19 67/21 67/23 68/18
70/19 85/19 87/2 92/21 114/3 118/13 123/8 123/14
125/9 125/14 127/19 136/13 152/12 174/12
**20530 [1]**  2/6
**212 [1]**  1/17
**218-9376 [1]**  1/24
**22030 [1]**  1/23
**235 [2]**  19/1 19/2
**238 [5]**  19/20 20/1 20/9 20/8 154/7 154/8
**23rd [1]**  67/11
**24 [12]**  14/2 52/11 64/16 64/21 89/19 93/5 95/13
123/23 133/18 157/12 160/1
**24 hours [1]**  93/1
**240 [6]**  16/6 16/7 16/14 16/17 152/19 156/18
**241 [16]**  60/19 92/24 93/3 93/13 104/4 129/17
129/18 129/19 129/21 129/23 129/24 130/12 130/22
137/19 153/4 156/19
**248 [1]**  156/19
**25 [2]**  12/15 56/12
**28 [1]**  174/6
**295 [1]**  1/16
**2:06 [1]**  44/7
**2:31 [1]**  44/7

**3**
**30 [8]**  9/7 17/5 67/23 68/18 123/13 166/9 166/12
167/16
**30-minute [1]**  166/18
**300 [1]**  1/23
**30th [15]**  66/9 68/13 70/19 72/5 90/7 90/9 90/13
91/21 108/11 114/3 118/13 123/7 125/20 132/23
152/12
**34 [1]**  3/4
**3:50 [1]**  113/12

**4**
**400 [1]**  169/7
**402 [1]**  96/2
**4103 [1]**  1/23
**434 [1]**  1/24
**48 [9]**  163/5 164/2 164/9 165/4 165/9 166/21 166/21
166/24 167/1
**48-hour [1]**  166/3
**4809 [1]**  2/6
**4:00 [2]**  113/2 113/2
**4:02 [1]**  113/12

**5**
**5:00 [1]**  161/18
**5:07 [1]**  167/17
**5:30 [1]**  167/17
**5:36 [1]**  173/3
**5th [2]**  1/16 95/9

**6**
**616-9344 [1]**  2/10
**617 [1]**  1/21
**6th [1]**  95/10

**7**
**7.6 [1]**  12/22
**7.7 million [1]**  12/22
**7000 [1]**  1/17
**712-7165 [1]**  1/21
**7165 [1]**  1/21
**753 [1]**  174/6
**7:00 [1]**  168/25
**7:47 [4]**  35/12 35/22 36/1 37/5
**7:47 a.m [3]**  35/6 35/8 36/8

**8**
**849-7000 [1]**  1/17
**856-4809 [1]**  2/6
**878 [1]**  2/8
**8:25-cv-00951-PX [1]**  1/6
**8th [1]**  67/21

**9**
**900 [1]**  1/20
**9344 [1]**  2/10
**9376 [1]**  1/24
**950 [1]**  2/5
**951 [1]**  4/10
**9:00 a.m [4]**  170/7 170/9 172/17 172/19
**9th [6]**  67/10 67/19 90/20 92/13 93/10 108/12

**A**
**a.m [8]**  35/6 35/8 36/8 168/25 170/7 170/9 172/17
172/19
**abide [2]**  6/16 171/25
**ability [3]**  18/16 31/24 99/17
**able [18]**  6/25 51/12 62/1 65/22 71/23 73/4 85/14
91/3 91/8 109/6 115/13 121/25 122/5 140/15 164/3
169/2 170/12 172/6
**above [2]**  123/12 174/9
**above-entitled [1]**  174/9
**ABREGO [111]**  1/4 4/10 9/25 10/8 27/2 27/19 27/23
28/3 28/11 28/19 28/24 29/9 29/18 29/25 31/4 31/4
31/8 31/16 32/9 32/23 33/9 33/23 34/4 35/10 35/14
35/23 36/2 38/8 38/16 39/4 45/23 46/10 46/14 46/25
47/10 48/16 48/23 49/8 50/2 50/23 52/13 53/17 57/7
59/4 59/12 74/25 75/4 75/13 76/3 76/5 76/16 78/16
78/6 78/12 78/25 80/15 80/21 81/16 85/22 86/17

86/23 95/9 95/25 97/8 97/15 101/15 105/17 110/20
110/21 119/23 119/23 120/5 126/22 128/10 128/16
128/18 128/21 129/6 129/24 134/25 135/2 137/7
148/7 149/9 151/9 151/24 152/4 154/25 134/25 153/2
156/22 157/2 159/9 161/22 164/12 163/9 163/9
164/3 165/3 165/7 166/1 166/6 171/25
**Abrego's [1]**  110/16
**absolute [1]**  91/8
**Absolutely [1]**  146/7
**academy [1]**  128/4
**accept [14]**  20/22 21/16 60/6 60/22 61/24 69/24
70/12 70/15 24/24 130/6 134/24 137/19 137/20
143/5
**accepted [2]**  74/24 143/23
**accepting [1]**  71/24
**accepts [2]**  94/16 135/9
**access [1]**  162/23
**accommodate [3]**  172/3 172/4 172/11
**accommodating [1]**  172/12
**accomplish [1]**  161/19
**accomplished [1]**  161/22
**according [4]**  90/9 112/5 127/9 162/12
**accordingly [1]**  136/25
**account [3]**  82/23 147/18 148/1 148/3 148/5 148/7
148/9 148/12 148/3 148/25 149/2 149/12 149/14
**accurate [1]**  64/25
**accused [1]**  148/3
**acknowledged [1]**  149/11
**acoustics [1]**  74/3
**acquire [2]**  39/23 39/24
**acronym [1]**  82/15
**across [2]**  56/12 144/20
**acting [3]**  57/25 58/3 59/18
**action [4]**  16/3 61/2 156/25 164/7
**actions [1]**  162/21
**activity [1]**  132/2
**actual [2]**  76/15 102/23
**actually [7]**  38/23 72/3 78/4 84/12 93/15 115/23
119/17
**Acuna [3]**  58/4 58/5 58/8
**addition [1]**  66/13
**additional [3]**  17/8 92/3 132/21
**address [2]**  109/1 165/23
**addressed [3]**  92/1 108/18 109/4
**adjourned [1]**  173/2
**adjudicating [2]**  16/17 16/19
**adjust [1]**  67/18
**adjusts [1]**  67/11
**admin [2]**  20/1 100/7
**administration [1]**  166/3
**administrative [12]**  14/13 19/6 19/19 20/3 20/4
21/3 140/24 141/3 141/21 146/19 149/21 154/8
**administratively [1]**  19/25
**admission [1]**  96/21
**admit [1]**  47/19
**admitted [1]**  19/23
**advance [4]**  7/25 96/22 144/22 145/10
**adversely [2]**  162/22 162/22
**advice [1]**  79/5
**advisement [1]**  168/6
**advising [1]**  92/15
**advisory [1]**  164/16
**advocating [1]**  171/11
**affect [2]**  162/22 162/22
**affected [1]**  77/7
**affirmatively [1]**  92/21
**affirms [1]**  17/7
**afforded [1]**  94/2
**afraid [2]**  69/17 156/12
**after [20]**  18/19 20/23 22/8 32/8 33/5 34/3 34/9
34/10 46/2 61/1 68/11 109/23 114/7 117/12 117/24
126/7 128/24 139/14 158/19 169/15
**afternoon [7]**  4/6 4/15 4/20 4/23 4/24 5/2 5/3 5/5
5/8 5/11 5/13 5/15 12/2 3/21 34/21 34/22 35/2
37/22 67/13 133/24 144/17
**AG [1]**  150/3
**again [19]**  10/2 26/6 64/23 75/15 81/1 81/11 95/20
126/13 132/5 135/5 135/13 144/16 158/16 170/21
**against [9]**  18/8 18/14 23/13 25/3 26/17 49/23
92/25 124/7 148/13
**agencies [3]**  13/25 135/4 145/1
**agency [19]**  14/25 20/21 21/24 22/1 29/13 67/22
91/17 98/10 130/23 132/12 141/3 141/8 141/21 144/5
144/5 144/6 147/14 156/25 161/15
**agency's [1]**  140/13
**agent [8]**  50/1 50/4 50/7 50/8 50/9 50/12 50/16
61/17
**agents [10]**  15/5 15/13 15/21 15/25 16/1 16/3 19/3
22/2 104/8 104/17
**aggravated [4]**  19/19 19/24 19/24 154/9
**ago [9]**  20/18 24/17 34/25 45/9 52/25 53/17 64/9
127/8 145/14
**agree [5]**  9/21 9/24 53/12 61/13 63/20 78/2 82/10
82/11 82/12 98/16 119/9 152/5 166/5
**agreed [3]**  8/19 79/9 119/13
**agreement [7]**  8/18 8/25 15/3 81/7 120/24 142/19
143/4
**agreements [2]**  143/14 160/17
**agrees [2]**  72/9 160/7
**ahead [13]**  42/9 56/9 77/4 77/11 77/24 102/11
103/23 124/18 140/21 142/8 146/14 152/9 165/21
**aide [1]**  131/3
**AIDED [1]**  1/25
**airport [1]**  118/1
**airstrip [1]**  97/16
**al [4]**  1/4 1/7 4/11 4/11
**Alaska [2]**  147/4 164/11
**Albence [2]**  64/5 64/6
**alien [160]**  13/20 14/5 14/7 14/10 14/11 14/22
15/22 16/20 16/23 16/24 17/1 17/4 17/6 17/8 17/9
17/12 17/13 17/15 17/19 18/7 18/16 19/5 19/7 20/3
20/4 20/23 21/1 21/8 21/9 21/19 21/25 22/3 22/4

## A

**alien... [127]** ... 52/8 52/14 52/20 54/20 54/24 55/7
25/14 25/15 26/23 56/15 57/17 58/12 59/1
59/24 60/6 60/13 60/14 60/23 60/23
61/1 61/12 61/14 61/15 61/18 61/20 61/24 62/1 62/2
65/13 69/16 69/21 69/24 70/5 70/7 70/13 80/3 80/12
80/25 81/9 81/20 81/21 81/24 82/2 82/5 82/18 82/23
82/24 83/7 84/3 85/2 85/6 87/10 87/13 87/15 88/7
88/7 88/17 88/23 89/4 89/9 89/10 89/17 89/17 91/3
91/3 91/5 92/7 92/20 93/1 93/20 93/20 93/22 94/11
96/20 97/5 97/5 100/9 100/12 101/5 107/16 110/7
111/20 112/1 112/3 114/2 114/7 114/22 114/24 115/5
115/6 117/12 117/21 119/15 130/2 130/7 130/8 130/9
130/10 131/23 132/2 132/6 132/25 133/3 133/11
133/14 133/16 134/6 135/10 135/19 137/9 137/15
138/10 139/23 140/14 141/2 141/20 142/20 143/2
143/23 145/15 145/16 145/17 145/18 159/19
**alien's [6]** 23/2 23/5 26/11 69/9 87/20 132/11
**alienage [1]** 15/24
**aliens [32]** 12/22 14/5 14/23 15/18 23/1 23/4 23/8
23/19 24/23 25/4 31/25 72/13 72/23 74/8 84/13
85/17 92/16 119/1 121/23 122/12 122/21 122/23
123/9 123/14 124/21 125/13 129/10 146/17 152/18
155/20 156/22 160/18
**all [149]** 4/3 4/6 4/19 5/3 6/2 6/9 6/11 7/18 8/8
8/15 9/22 9/24 10/15 10/20 11/15 12/9 13/2 13/19
14/16 14/21 16/13 17/13 21/7 21/18 23/1 23/4 23/17
24/21 26/21 28/19 28/22 31/23 33/14 34/14 35/25
36/8 38/7 43/11 43/15 43/17 44/5 44/8 44/10 44/23
44/24 44/24 45/17 48/6 49/1 51/3 51/13 52/18 53/15
54/9 55/13 66/7 66/8 67/9 67/10 68/1 73/13 76/2
79/19 79/25 86/9 89/16 89/19 90/3 92/9 93/9 94/21
95/13 99/14 99/18 99/18 103/10 106/12 106/24 107/8
113/10 113/13 113/15 113/18 114/6 117/17 118/8
121/11 121/25 128/15 129/5 130/7 132/2 132/17
133/14 133/18 135/17 138/20 139/22 141/7 142/5
142/8 142/10 142/12 144/9 146/8 150/4 150/8 151/22
152/7 155/20 155/21 155/23 155/23 156/3 156/20
156/22 157/3 158/12 158/22 158/23 161/2 161/9
161/11 161/24 163/16 163/21 164/2 164/17 165/11
165/12 165/14 165/22 166/3 166/22 167/1 167/15
167/18 167/20 168/5 170/9 170/10 170/11 170/19
171/23 172/21 172/22 172/24 172/24 173/1
**allegations [1]** 16/11
**alleging [1]** 16/11
**allow [2]** 162/19 164/17
**allowed [2]** 72/18 87/18
**along [4]** 62/12 91/20 133/2 155/9
**already [14]** 9/3 22/15 49/5 85/5 123/21 127/3
127/16 128/9 136/24 153/12 154/2 155/4 155/21
170/24
**also [14]** 2/11 5/12 8/17 18/6 36/16 83/16 91/22
126/9 127/12 131/16 131/20 150/2 165/10 165/12
**alternatives [2]** 12/23 172/16
**although [1]** 66/13
**always [2]** 40/17 40/17
**am [9]** 5/18 10/2 94/12 94/19 95/11 132/9 147/1
168/20 169/20
**ambiguity [1]** 118/9
**ambiguous [1]** 81/3
**amenable [1]** 104/10
**Amendment [2]** 148/20 148/21
**amount [4]** 53/13 53/13 140/6 141/24
**amounts [1]** 164/16
**analysis [2]** 162/9 165/1
**ANDREW [2]** 1/14 4/15
**Angeles [2]** 13/2 13/9
**another [20]** 8/13 22/7 26/7 40/13 52/18 53/10
67/15 85/16 94/23 107/13 107/19 121/9 121/10
121/11 128/16 137/9 138/12 143/1 144/5 162/17
**answer [19]** 9/24 55/15 57/4 65/24 79/2 98/9 103/21
117/17 123/6 136/18 138/8 141/11 141/13 144/7
147/21 148/1 148/10 154/15 171/7
**answered [3]** 66/7 141/17 171/5
**answers [4]** 59/12 116/21 117/6 170/18
**anticipated [1]** 27/19
**anybody [10]** 37/17 38/1 38/19 38/22 39/18 39/18
39/19 43/21 57/24 113/6
**anyone [6]** 14/7 38/11 38/14 52/22 70/14 124/11
**anything [16]** 7/8 10/16 35/13 41/3 67/18 68/4 77/2
90/25 93/11 106/25 112/2 134/24 138/21 142/5
160/13 160/15
**anywhere [3]** 51/1 122/6 164/4
**apart [4]** 15/9 67/16 91/18 105/7
**apologize [14]** 39/15 73/15 77/13 103/3 106/21
116/16 116/19 119/13 123/20 141/5 151/18 155/10
155/16 159/5
**apologizing [1]** 44/22
**appeal [14]** 16/24 17/1 17/4 22/16 28/12 28/15
28/20 88/12 152/21 152/22 153/14 153/14 154/4
154/5
**Appeals [2]** 17/5 17/6
**appear [1]** 16/10
**appearance [2]** 144/22 145/10
**APPEARANCES [2]** 1/12 2/1
**appears [2]** 77/14
**appellate [3]** 17/8 46/14 47/1
**applies [3]** 128/24 130/22 156/21
**apply [5]** 78/18 78/19 155/21 170/20 170/20
**appreciate [9]** 8/6 9/22 24/3 44/23 46/22 79/14
103/14 132/16 158/16
**appreciated [1]** 171/20
**approach [8]** 7/9 23/22 27/10 47/15 66/18 76/22
155/23 166/2
**approximate [2]** 40/1 40/15 67/5
**approximately [5]** 13/24 35/5 37/11 41/6 65/5
**are -- our 1]** 87/9
**area [4]** 30/15 30/16 64/21 78/15
**aren't [6]** 31/17 65/22 71/23 75/16 87/9 135/5
**argue [10]** 141/13 157/4 159/8 159/9 168/15 168/15
169/22 171/2 171/4 171/8
**arguing [1]** 159/11
**argument [5]** 158/22 158/23 161/20 162/13 170/11

**argumentative [1]** 160/5
**arguments [2]** 168/6
**ARMAND [1]** 1/17
**around [5]** 44/1 95/9 110/7 162/10 170/2
**arrangements [5]** 21/15 96/6 96/18 96/19 133/13
**arrest [6]** 14/22 14/24 15/18 21/18 54/25 54/25
**arrested [1]** 14/25
**arresting [2]** 14/20 15/22
**arrests [4]** 15/10 15/12 15/14 15/20
**arrived [2]** 26/25 98/6
**arrivus [1]** 75/16
**as-yet-unidentified [1]** 9/6
**aside [2]** 76/7 91/2
**ask [38]** 6/22 7/9 7/12 20/7 40/16 41/14 41/15 55/9
56/20 65/25 78/9 93/20 94/15 98/2 98/8 103/10
106/5 107/8 121/19 123/2 123/7 123/4 124/5 124/12
124/16 126/1 130/18 133/15 137/7 141/8 147/9
145/13 145/22 154/15 155/14 157/18 158/1 166/23
159/18
**asked [15]** 9/16 47/4 47/4 57/23 65/15 87/11 106/18
110/21 124/4 136/10 144/20 145/8 157/1 157/12
159/18
**asking [24]** 46/17 46/19 49/12 49/20 57/19 64/7
64/8 86/17 98/7 104/12 110/11 112/14 119/6 119/23
119/25 120/10 121/11 122/19 127/13 128/22 139/22
151/17 161/20 171/24
**asks [2]** 93/23 93/24
**assert [2]** 62/2 140/15
**assessment [1]** 80/20
**assigned [2]** 22/12 50/12
**assistant [8]** 2/4 5/21 12/10 12/18 13/14 58/20
58/25 59/1
**associate [1]** 59/18
**associated [1]** 105/17
**assume [8]** 32/8 36/13 38/12 47/11 74/14 74/21
95/19 114/18
**assuming [3]** 21/23 22/14 143/11
**assumption [1]** 128/20
**assurance [4]** 81/23 86/20 109/19 112/11
**assurance/State [1]** 81/23
**assurances [45]** 68/22 68/24 69/9 69/11 69/25 70/3
70/24 71/10 72/13 72/15 72/23 73/1 74/10 74/15
74/19 80/2 80/3 80/11 80/11 80/19 83/7 85/10 112/2
112/4 112/9 112/17 118/12 118/13 118/17 118/19
119/1 119/3 119/9 119/18 120/4 120/11 121/22
121/24 122/9 122/13 122/21 122/23 123/8 123/11
123/24
**assure [1]** 112/16
**assures [1]** 81/5
**asylum [2]** 82/21 82/22
**Atlanta [2]** 13/2 13/10
**attempt [6]** 54/20 54/21 131/6 137/14 137/25 147/9
**attempting [2]** 78/2 126/8
**attention [2]** 53/13 150/4
**attorney [14]** 2/4 8/10 8/11 8/12 54/4 87/15 87/18
87/21 91/4 91/5 91/9 91/11 94/15 130/5
**attorneys [10]** 40/3 40/3 40/9 40/10 40/10 40/17
43/22 43/24 53/17 172/6
**authority [8]** 15/19 15/19 103/25 103/25 104/3
104/17 129/25 164/13
**authorization [11]** 126/18 128/18 129/1 130/2 130/4
130/14 130/20 131/3 131/17 132/4 143/17
**authorized [1]** 15/18
**automatically [1]** 36/17
**availability [2]** 30/10 30/15
**available [22]** 30/17 50/23 51/6 51/11 52/17 54/13
61/15 76/2 85/16 136/1 146/16 147/4
**Avenue [2]** 1/16 2/5
**avenues [1]** 18/6
**aware [25]** 27/4 45/22 46/13 49/1 49/7 53/19 53/22
53/23 54/2 72/9 72/17 72/18 85/12 89/9 90/11 90/16
90/18 91/19 95/7 95/11 95/21 107/16 108/21 118/17
171/10
**away [2]** 51/9 51/10

## B

**back [50]** 7/1 17/11 18/23 23/21 26/6 35/15 35/25
43/1 43/25 61/6 61/10 62/7 63/1 66/14 68/10 71/23
93/13 95/8 95/21 96/1 96/7 96/12 96/23 97/11 98/1
98/13 99/2 101/3 105/16 111/7 111/20 113/7 113/16
114/19 123/5 126/5 127/6 131/2 133/12 141/16 144/2
147/13 150/18 158/15 160/18 164/9 164/22 165/17
165/19 168/22
**bail [3]** 21/9 21/11 21/11
**ball [1]** 45/6
**Baltimore [1]** 48/22
**based [28]** 13/20 13/22 22/7 30/9 30/14 30/14 38/7
47/7 54/12 54/13 57/3 57/5 61/3 63/7 64/19 74/14
84/12 89/19 94/6 95/13 95/23 98/9 118/17 128/20
139/12 139/22 160/1 160/13
**bases [1]** 27/18
**basic [3]** 10/10 10/11 99/20
**basically [1]** 114/23
**basis [10]** 31/11 46/1 46/2 48/24 101/5 101/15
101/19 102/7 133/18 149/14
**became [1]** 14/1
**because [51]** 6/1 6/11 7/6 7/19 7/24 8/24 25/5 43/6
56/8 57/14 58/9 60/12 67/14 70/6 71/22 74/3 74/21
78/9 82/21 86/1 87/10 89/11 110/6 112/15 116/3
120/23 126/13 136/4 143/13 145/24 146/6 147/25
148/6 148/17 149/19 157/2 157/15 157/16 158/4
158/25 162/5 162/6 163/17 163/20 164/1 165/1
165/13 165/21 167/1 168/18 169/15 171/4
**becoming [1]** 13/16
**bed [28]** 22/7 30/9 30/15 30/15 30/17 50/18 50/20
50/22 51/5 51/6 51/11 51/13 51/18 51/20 51/21
52/17 52/17 52/18 53/2 53/4 54/18 58/9 57/3 141/23 142/3
145/25 147/4 147/15 149/10
**beds [2]** 54/13 141/24
**before [31]** 12/9 47/4 47/12 6/2 9/5 9/9 18/25 32/15
33/4 37/1 39/11 48/12 62/18 62/20 62/21 62/21
62/22 66/13 70/23 88/17 91/4 92/6 93/17 99/2 116/5
127/12 128/25 139/14 140/2 145/22 170/10

## C

**begin [9]** 26/14 26/21 32/19 32/22 32/24 145/15
164/4 164/8 165/6
**beginning [2]** 16/25 35/24
**begun [2]** 31/3 31/14
**behalf [4]** 1/13 2/2 81/14 141/10
**being [35]** 9/12 9/23 13/9 16/2 16/11 19/23 21/5
21/8 33/23 49/23 56/22 60/24 61/11 63/21 64/2 66/2
69/16 73/5 80/21 88/17 95/15 95/16 96/5 96/10
101/5 107/17 116/24 121/22 122/9 145/16 155/3 156/8
164/3 169/21 171/15
**believe [19]** 36/14 41/8 47/2 56/19 59/8 60/19
60/25 61/4 71/11 73/10 73/10 77/25 80/11 88/5
90/24 114/25 129/2 144/23 162/13
**believes [8]** 68/24 69/1 82/2
**belonged [1]** 97/17
**below [5]** 71/12 77/10 77/23 119/12 155/25
**Ben [1]** 2/9
**beneficial [1]** 164/17
**benefit [4]** 10/2 116/16 129/7 158/9
**best [2]** 6/18 164/6
**better [9]** 82/20 40/16 76/13 78/4 101/24 166/8
166/12 170/3 170/4
**between [6]** 52/5 87/10 97/2 114/15 117/6 163/9
**beyond [1]** 165/7
**BI [1]** 153/13
**BIA [8]** 28/14 46/18 46/21 152/22 153/14 154/4
**bit [3]** 22/24 44/4 99/3
**blast [1]** 43/2
**Board [2]** 17/5 17/6
**bond [1]** 53/10
**Bondi [2]** 54/4 150/4
**booked [2]** 14/25 104/9
**border [4]** 19/22 92/2 96/9 133/24
**born [1]** 104/8
**both [3]** 7/13 163/18 172/2
**bottom [5]** 55/14 69/2 78/19 78/19 79/25
**bounced [1]** 15/3
**box [4]** 2/8 11/19 101/11 101/12
**branch [1]** 38/2
**break [11]** 41/19 41/24 41/24 42/7 43/10 43/15
48/12 76/10 112/23 112/24 113/3
**Brian [1]** 58/4
**Bridge [1]** 1/23
**BRIDGET [2]** 2/3 5/11
**brief [3]** 24/19 144/13 164/18
**briefs [1]** 170/20
**bring [4]** 9/9 95/25 99/2 169/16
**broadcast [1]** 42/16
**brought [4]** 63/1 96/5 96/10 98/1
**Bryan [1]** 40/6
**buff [1]** 64/3
**bunch [1]** 122/25
**burden [6]** 140/13 141/1 141/19 141/21 141/23 142/2
**burdened [1]** 103/20
**burdens [1]** 141/3
**bus [1]** 97/6
**business [4]** 70/17 127/16 150/9 166/23

## C

**C14 [1]** 129/3
**C18 [1]** 129/3
**call [12]** 4/8 21/13 35/3 38/1 40/12 43/9 57/24
57/25 59/19 99/3 99/8 155/11
**called [5]** 4/2 6/1 6/2 64/5 98/25
**calling [3]** 5/17 6/17 135/24
**came [9]** 39/11 66/13 85/13 97/11 98/13 105/10
106/24 107/2 127/19
**can't [34]** 6/11 8/3 25/4 51/17 55/5 60/11 62/13
63/5 63/10 70/14 73/7 77/16 82/25 90/1 105/23
109/9 120/6 127/22 137/12 137/22 138/6 138/12
141/8 145/2 149/14 149/15 149/16 162/5 162/6 166/5
167/1 171/25 171/25 172/9
**cannot [7]** 85/2 111/8 111/20 130/7 152/4 162/4
172/9
**capacity [6]** 31/24 36/5 36/6 37/23 38/1 62/8
**caption [1]** 144/20
**carbon [5]** 102/4 103/7 103/16 104/13 105/23
**carbon-copied [3]** 102/4 103/7 103/16
**carbon-copy [1]** 104/13
**card [1]** 143/18
**career [5]** 13/12 14/1 94/7 94/9 100/13
**case [132]** 4/8 4/10 8/1 16/16 17/21 18/18 18/21
19/10 19/14 22/10 22/11 22/13 22/19 22/21 25/23
26/4 26/6 26/12 31/1 31/11 31/11 31/13 32/4 34/1
35/10 36/2 37/19 38/8 38/23 39/1 39/7 39/22 41/4
42/19 46/3 47/19 49/11 50/1 50/4 50/7 50/8 50/18
50/12 50/16 53/12 53/15 53/20 53/24 54/11 54/23
57/1 59/5 59/7 59/25 61/17 61/20 62/8 63/4 63/5 64/4
64/6 64/8 82/2 82/6 84/4 86/5 86/6 86/25 92/22
95/22 96/9 110/16 126/6 127/2 127/10 127/16 127/17
127/23 128/8 127/24 127/25 128/12 131/7 131/8 131/9
131/10 131/12 131/14 131/20 131/22 132/11 133/18
133/18 134/10 134/12 134/22 135/14 135/14 135/21
135/22 136/8 136/17 136/19 136/21 136/25 137/23
137/10 137/17 138/3 138/10 138/20 138/25 139/1 139/6
139/11 139/13 146/2 148/1 149/1 149/3 149/3 149/13
149/21 150/5 150/8 150/11 150/12 150/13 151/3 151/5
151/24 157/2 161/25 162/6 163/11 169/23
**cases [16]** 9/9 26/24 31/17 31/19 31/20 31/23 32/2
32/3 32/6 53/8 63/3 63/4 88/2 138/15 169/8 170/19
**CAT [2]** 18/14 18/21
**categories [1]** 156/22
**caucus [1]** 39/3
**cause [1]** 15/23
**caveat [1]** 7/16
**CECOT [4]** 75/1 124/20 124/21 124/24
**cell [1]** 116/24
**central [1]** 132/2
**certain [9]** 27/6 56/13 72/19 73/12 87/18 133/20
135/7 139/6 146/15

**C**

certainly [1] 15/13
certainly [1] 15/13
CERTIFICATE [1] 173/4
certified [1] 89/3
certify [1] 174/6
cetera [1] 132/13
Chain [1] 1/23
challenge [6] 9/11 17/2 17/14 20/3 20/4 87/23
challenges [1] 34/3
chambers [1] 166/14
chance [3] 64/5 66/14 67/7
change [1] 68/4
changed [3] 63/13 71/5 150/8
changes [3] 53/4 53/5 53/8
channel [9] 68/21 69/5 69/7 69/7 69/12 69/15 69/22 70/5 70/7
channels [2] 68/17 68/20
characterization [1] 79/10
charge [3] 96/11 145/15 148/12
charges [3] 146/15 148/25 149/11
chart [1] 58/23
Chavez [2] 64/5 64/6
check [10] 54/21 57/13 57/20 57/23 57/24 58/9 58/11 110/5 127/8 144/6
checked [5] 57/22 101/11 101/12
checking [1] 53/2
checks [1] 15/6
chief [2] 13/15 13/15
China [2] 137/23 137/24
circuit [6] 17/9 17/10 28/15 152/22 153/14 154/5
circumstance [2] 84/13 171/18
circumstances [3] 20/25 134/3 162/10
CIS [4] 91/11 93/21 129/2 132/13
cite [2] 7/7 7/1
cited [1] 170/19
citizen [6] 14/7 63/22 92/22 136/22 137/9 139/24
citizens [9] 85/1 85/11 85/16 119/20 121/10 121/10 136/24 138/4 143/5
citizenship [34] 14/15 17/17 17/22 18/6 18/10 18/12 19/10 19/11 23/11 23/14 25/4 25/17 33/18 33/20 61/7 63/25 65/10 65/23 66/4 81/11 82/7 82/9 82/12 87/25 89/22 91/17 91/23 109/7 114/14 119/18 121/23 122/5 125/9 130/15
citizenships [1] 65/3
CIVIL [2] 2/5 4/10
claim [4] 17/15 139/9 61/5 65/14
claimed [1] 140/20
claiming [1] 20/5
claims [2] 33/17 70/7
clarification [2] 102/16 166/20
clarifies [1] 152/17
cleanup [2] 142/13 144/18
clear [16] 7/13 56/7 58/5 72/22 79/13 81/13 83/1 107/1 117/24 124/2 128/22 130/14 135/13 144/19 144/24 144/24
cleared [1] 36/20
clearly [1] 11/21
client [3] 9/4 9/10 171/11
closed [1] 6/24
closed-ended [1] 6/24
closer [1] 44/17
Coast [3] 35/6 35/7 59/20
code [1] 20/8
coffee [1] 8/14
colleague [1] 168/23
colleagues [2] 75/24 94/3
colloquy [1] 39/14
come [24] 7/12 18/23 21/15 32/4 32/5 32/13 44/19 55/8 68/10 76/12 77/8 98/12 107/22 146/18 147/13 150/24 154/9 164/9 165/16 165/19 167/1 171/2 171/4 172/7
comes [17] 4/11 21/2 24/10 26/10 30/25 50/11 50/20 72/21 79/1 86/6 105/13 134/8 135/6 138/7 147/10 147/21 151/19
comfort [1] 112/24
coming [7] 8/4 39/3 96/7 96/23 101/20 164/22 166/11
commentary [1] 8/14
commit [1] 8/20
committed [1] 21/5
common [1] 14/24
communicate [1] 145/10
communicated [2] 57/14 131/16
communication [1] 104/16
communications [1] 38/6
competent [3] 9/20 169/2 172/6
completely [3] 51/8 55/4 170/14
compound [1] 76/11
computer [3] 1/25 6/10 6/11
COMPUTER-AIDED [1] 1/25
concept [1] 160/9
concern [14] 107/17 107/17 109/1 109/1
concerns [1] 165/25
concluded [5] 79/17 118/25 121/13 159/15 173/3
conclusions [1] 88/6 161/3
conditions [3] 23/8 23/10 163/3
conduct [4] 6/19 15/5 84/6 88/2
conducted [1] 125/19
confer [1] 163/12
conference [8] 77/9 77/22 79/17 119/11 121/13 155/24 159/15 174/10
confess [1] 67/7
confidence [2] 102/18 102/21
confident [1] 74/8
confined [4] 122/14 122/23 123/10 123/16
confines [1] 165/8
confirm [1] 73/3
confirmed [1] 85/7
conformance [1] 174/10
confused [5] 56/6 56/7 77/14 111/11 139/19
confusion [1] 36/20
Congress [2] 15/17 15/19

**connect** [1] 7/17
connection [1] 7/22 24/22 43/3 47/1 48/13 54/23
consider [5] 52/25 172/12
consideration [1] 51/4
considered [1] 60/24
considering [3] 57/58 58/8 135/3
consisted [1] 12/22
constitutional [1] 148/21
consulate [1] 60/22
consult [2] 91/3 91/10
consultation [1] 61/13
consumption [1] 156/5
contact [3] 91/5 91/8 91/10
contains [1] 93/15
contemplating [1] 167/8
contest [4] 19/8 33/15 65/13 78/7
contest [2] 14/6 94/12
continental [2] 139/15 140/2
continuation [1] 153/24
continue [2] 115/6 149/21
continued [2] 2/1 77/22
contrary [1] 130/11
contravention [1] 160/19
control [1] 130/16
Convention [7] 18/18 18/13 23/13 25/3 26/17 92/15 121/24
conversation [4] 6/5 103/21 106/4 106/4
conversations [2] 122/24 123/5
conviction [2] 154/9 154/11
convinced [1] 17/18
COOPER [2] 1/18 4/25
coordination [1] 135/4
copied [4] 35/19 102/4 103/7 103/16
copies [1] 44/11
copy [22] 23/25 24/1 45/10 45/12 49/11 99/18 99/19 99/21 99/24 100/19 104/13 105/23
cordially [1] 163/19
correct [78] 5/19 5/24 20/12 20/14 36/3 36/7 37/4 42/15 42/23 43/14 46/11 48/14 49/5 49/9 49/18 49/24 51/12 52/1 52/3 52/6 54/24 58/7 58/16 59/1 60/24 62/4 67/24 67/25 68/2 68/18 69/3 69/4 69/13 69/19 69/22 71/3 71/4 71/15 71/16 72/6 75/21 81/25 83/14 83/15 83/19 85/8 86/15 87/14 89/13 91/14 94/20 95/3 97/4 99/12 101/21 102/25 106/11 106/17 107/5 109/22 110/9 110/17 110/18 118/14 120/19 122/7 126/17 126/25 128/2 128/6 138/5 145/19 149/7 152/6 152/24 155/5 161/12 174/7
correctly [2] 68/19 92/20
correspond [1] 91/20
costing [1] 141/24
costs [1] 142/3
couldn't [4] 60/11 61/21 137/23 137/25
counsel [39] 4/13 4/14 20/7 34/14 38/12 39/10 39/14 39/19 44/10 44/12 89/8 89/11 89/15 89/23 90/8 90/10 91/2 92/4 92/5 92/7 92/9 92/15 93/4 93/16 93/20 93/24 94/2 113/15 148/18 152/25 157/15 157/16 157/20 158/18 159/20 159/23 160/4 162/23 166/13
counterparts [1] 154/3
countries [41] 22/25 23/2 23/5 23/19 24/23 69/8 72/8 84/18 84/21 84/23 85/2 85/9 85/14 86/7 86/14 87/2 109/16 118/10 119/7 119/18 120/4 120/11 120/25 121/2 122/1 123/15 125/8 125/8 125/14 130/8 134/6 134/23 135/9 135/15 135/25 136/14 136/15 143/5 156/10 160/19
country [247]
countrywide [1] 119/20
county [1] 15/1
couple [16] 6/9 37/8 37/10 50/15 62/5 62/6 62/10 62/11 62/12 64/9 110/3 113/24 132/21 138/25 140/5 142/2
course [11] 78/13 86/12 100/20 101/5 127/15 127/21 128/2 146/13 150/9 164/7 171/9
court [56] 1/1 1/11 4/2 4/4 4/10 4/12 6/18 9/5 9/20 16/8 16/14 16/16 16/20 17/9 17/15 17/16 18/19 25/7 27/4 28/15 36/9 39/3 41/10 42/22 44/5 44/8 44/13 50/15 51/3 61/19 64/3 64/4 64/8 75/6 76/5 77/18 106/21 113/10 113/13 116/16 123/5 144/7 146/11 152/22 153/14 154/5 156/9 162/1 167/1 167/15 167/18 170/17 171/24 173/1 174/4 174/5
court's [6] 7/23 27/15 47/14 66/17 81/15 158/8
courtesy [3] 6/3 45/10 116/21
courtroom [10] 6/4 37/6 77/10 77/23 79/18 119/12 121/14 155/25 159/16 166/15
courts [1] 166/24
cover [4] 39/25 56/15 56/17 169/2
covers [3] 55/19 56/13 56/19
create [1] 96/14
created [10] 95/8 95/14 95/17 95/25 96/16 99/3 99/4 99/6 99/7 102/24
creates [1] 163/22
credibility [37] 70/25 80/20 81/23
credible [38] 19/12 19/13 19/14 19/15 25/17 25/19 25/20 25/22 26/2 68/25 69/11 71/12 72/15 73/2 73/7 74/11 74/20 80/3 80/12 80/21 81/6 81/11 82/13 82/24 83/17 83/25 84/1 84/6 86/21 87/6 88/7 94/12 94/16 118/13 118/19 119/4 121/24 140/16 141/16
credits [2] 26/1 26/2
Crenshaw [5] 162/11 162/15 162/18 167/2
crime [2] 21/5 148/3
criminal [26] 10/1 10/10 20/23 21/1 21/3 21/10 29/6 38/17 39/5 50/23 51/16 52/14 56/24 76/17 136/9 146/10 146/15 146/18 146/21 146/25 147/7 148/25 149/11 149/17 162/11 165/3
critical [1] 9/4
cross [39] 3/4 6/23 34/19 39/2 39/6 39/9 79/5 132/15
Cross-examination [2] 6/23 34/19
crossed [1] 19/22
CRR [1] 174/16
Cuba [1] 84/24

**current** [6] 12/9 12/10 28/3 28/5 38/8 52/12
currently [3] 12/6 12/7 29/1
custody [2] 29/24 29/9
customs [24] 58/12 59/24 60/2 109/10 109/10 10/22 21/2 21/19 21/22 22/3 22/13 23/17 24/16 26/22 26/24 27/1 27/22 27/23 27/24 29/1 29/6 29/20 30/1 30/8 30/21 30/22 30/25 31/12 31/18 31/19 31/21 31/25 32/2 32/5 32/15 32/13 33/5 33/5 33/7 38/17 39/5 50/5 50/11 50/19 50/20 50/24 52/14 52/19 53/9 55/2 55/6 55/24 75/17 76/17 76/18 79/2 86/6 91/6 97/9 97/13 97/12 97/24 101/20 104/7 104/9 111/17 131/13 134/9 135/6 136/15 135/20 138/7 138/14 138/16 138/17 140/25 141/25 145/8 146/4 149/24 148/6 149/4 149/6 149/20 150/24 151/6 151/19 162/20 163/3 164/8 165/4 165/6
customs [5] 5/22 12/7 92/2 96/9 101/8
cut [1] 124/15
cutting [1] 156/7
cv [1] 1/6

**D**

D.V.D [1] 156/21
database [1] 15/6
databases [1] 100/10
date [8] 30/5 30/18 31/3 31/6 35/21 147/16 147/16 148/2
Dated [1] 174/12
day [23] 37/3 40/2 52/19 52/23 53/4 53/8 55/1 55/3 70/17 90/12 90/22 93/17 96/17 96/25 97/2 97/7 99/7 104/22 133/7 133/22 150/9 150/9 174/12
days [23] 17/5 32/18 34/11 34/25 38/13 39/24 52/25 53/17 55/6 62/5 62/10 67/3 139/6 139/14 140/4 140/16 140/16 141/2 141/20 145/22 146/4 169/4 169/5
DC [4] 1/20 2/6 2/9 12/8
deaf [1] 159/5
deal [4] 38/16 69/8 92/4 164/12
dealing [1] 57/7
deals [1] 108/23
decades [2] 95/24 98/9
decide [3] 51/5 51/15 164/13
decides [1] 52/13
decision [46] 9/11 16/20 17/2 17/5 17/7 18/1 25/24 30/18 30/22 31/1 31/3 31/20 32/3 32/6 32/9 32/12 32/24 33/2 34/2 46/18 52/21 52/25 54/16 56/1 57/1 57/12 79/8 82/14 86/4 86/5 135/13 136/16 138/17 150/25 151/3 151/5 151/7 162/15 163/6 163/10 165/10
decisional [1] 165/7
decisions [7] 64/4 74/12 74/17 75/16 82/22 135/5 137/7
decompress [2] 51/14 53/10
deemed [1] 22/23
deems [1] 25/20
default [1] 158/17
defaulting [1] 166/11
DEFENDANT [3] 3/2 66/8 116/11
defendant [10] 1/8 2/2 5/17 7/16 8/12 8/18 8/19 8/24 10/7 27/24
defendant's [19] 10/20 24/8 27/8 27/18 36/13 36/23 39/2 61/10 67/10 67/24 68/12 70/4 79/22 81/19 92/12 93/10 108/10 150/18 152/11
Defense [2] 5/4 85/7
Defense 1 [1] 85/7
defer [2] 40/13 94/3
define [1] 63/24
definitely [2] 63/24 65/1
delivered [1] 100/9
delta [1] 163/9
department [39] 2/5 5/6 5/9 5/12 5/14 23/18 40/9 44/15 68/24 69/10 69/21 70/24 71/11 72/12 72/14 73/1 73/3 73/6 74/10 74/14 80/2 80/11 81/4 81/5 81/23 83/16 86/20 91/16 105/21 110/19 111/22 118/4 118/12 118/18 119/3 121/24 124/10 144/24 160/14
Department's [1] 80/20
depend [2] 50/10 54/18
depending [4] 22/10 53/8 62/6 87/22
depends [3] 133/14 133/18 134/2
deport [6] 110/22 110/23 112/3 112/12 112/18
deportation [17] 13/13 13/14 22/12 25/11 60/3 61/16 62/8 63/17 63/23 65/6 66/5 87/20 104/10 108/3 126/7 128/25 131/12
deportations [1] 64/10
deported [7] 18/12 23/8 64/2 66/3 83/9 83/11 160/18
deportee [1] 83/7
deporting [2] 65/17 112/7
deports [1] 25/8
deposed [1] 59/7
deputy [6] 2/4 13/15 13/16 58/20 59/1 59/18
Derro [2] 4/8 161/7
describe [6] 40/23 58/23 87/6 107/11
described [38] 38/14 69/7 69/12 69/18 70/3 81/18 102/13 102/24 106/8 108/22 110/3 114/8 134/11 135/3 140/4
designate [2] 27/5 61/20
designated [2] 130/8 136/24
designee [14] 36/11 38/20 38/20 39/11 39/12 40/24 41/10 42/22 81/14 102/14 104/25 106/9 106/17 107/4
desk [1] 114/19
despite [2] 49/8 54/9
detailed [4] 77/10 77/23 119/12 155/25
details [1] 29/20
detain [1] 104/9
detained [19] 17/10 22/4 26/13 29/23 30/6 56/4 56/23 57/9 57/15 57/18 59/13 99/10 99/12 101/6 103/2 116/24 127/12 133/14 164/15
detainee [1] 140/14
detainee [49] 15/7 20/19 20/20 20/25 21/4 21/7 21/16 21/20 21/22 21/23 28/25 29/9 29/12 29/14 29/15 30/7 30/21 35/17 35/20 35/23 94/25

## D

**detainer... [22]** 95/1 95/4 98/24 98/25 99/2 99/4
99/23 100/7 101/16 101/22 102/6 102/8 103/3
101/12 101/15 103/4 104/1 104/2 104/3 104/2
104/5 104/11 104/14 104/23 105/11 106/24 146/18
**detainers [4]** 15/9 20/19 21/12 104/18
**detention [17]** 12/24 22/5 22/7 22/9 22/15 27/19
50/12 51/9 51/14 89/13 97/9 101/16 117/25 129/24
134/9 146/20 151/2
**determination [8]** 30/12 30/23 31/3 31/6 31/10 31/11
32/14 32/21 115/13
**determinations [1]** 30/5
**determine [14]** 15/23 15/23 16/1 17/23 19/14 19/15
22/11 33/2 33/20 33/22 83/5 83/6 83/17 135/1
**determined [2]** 61/16 149/3
**determines [3]** 16/23 17/12 33/9
**determining [2]** 16/19 147/18
**DHS [36]** 15/2 38/1 39/8 50/2 50/14 51/11 58/16
69/20 70/24 71/12 72/12 74/10 76/18 80/17 81/23
89/8 111/22 118/11 118/18 118/25 121/21 122/20
123/7 124/4 124/20 132/7 138/24 138/7 139/1 139/23
140/1 141/10 141/13 152/17 164/3 165/4
**DHS's [2]** 9/7 140/11
**Diego [2]** 13/3 13/10
**difference [2]** 97/2 166/22
**different [19]** 6/23 13/2 18/6 21/17 49/12 49/20
51/8 55/4 57/5 62/14 65/5 92/11 97/14 98/7 121/20
122/19 143/16 158/11 166/20
**differently [2]** 63/13 72/4 133/25
**difficult [2]** 171/16 172/10
**diligence [3]** 111/6 111/23 118/18
**diplomatic [1]** 69/9
**direct [13]** 3/4 6/21 11/25 68/16 69/7 71/17 71/20
75/3 75/8 76/1 81/18 88/5 94/25
**directed [1]** 104/14
**directing [2]** 157/13 160/3
**director [19]** 5/21 12/10 12/18 13/1 13/4 13/9
13/15 13/16 13/17 58/1 58/9 58/20 58/25 59/1 59/18
62/24 91/23 104/17 104/19
**director's [1]** 42/17
**directors [2]** 12/16 35/18
**disagree [1]** 169/19
**disagreed [1]** 28/14
**disagrees [1]** 82/15
**discerned [1]** 48/20
**discretion [1]** 149/5
**discuss [5]** 6/1 6/17 10 52/6 124/14 15/10
**discussed [6]** 13/19 80/16 84/13 85/7 86/8 126/6
**discussing [1]** 127/13
**discussion [2]** 11/4 134/6
**discussions [2]** 123/12 124/23
**dismissed [1]** 46/21
**disposition [1]** 38/9
**dispute [1]** 65/4
**district [10]** 1/1 1/1 1/1 4/3 4/4 29/7 146/15
146/16 174/5 174/5
**division [6]** 1/2 2/5 12/19 58/21 59/1 59/2
**divulging [1]** 29/20
**do [160]** 5/16 6/3 6/11 7/4 7/6 7/7 7/16 7/16 7/19
8/2 8/3 8/13 8/22 13/19 14/5 14/10 15/13 15/15
15/17 16/5 18/25 18/25 19/15 19/18 22/11 24/11
25/5 26/3 27/16 29/7 33/22 35/5 35/13 39/21 40/1
41/22 44/19 46/8 48/9 48/11 50/1 50/3 50/4 52/20
58/14 59/4 59/11 62/14 63/2 63/4 63/11 63/14 63/20
66/2 66/11 66/25 68/14 70/17 72/4 72/11 73/9 74/15
75/9 75/10 75/11 76/15 77/2 77/6 77/7 79/5 79/22
80/5 80/7 84/15 84/22 85/20 90/1 90/25 91/15 94/4
94/18 97/4 98/24 99/3 99/24 102/2 106/2 107/8
108/13 109/5 109/9 109/13 111/6 111/9 111/9 112/2
112/2 114/9 117/14 118/24 119/8 121/25 124/11
124/16 124/17 125/18 126/11 127/8 128/15 130/19
133/2 134/24 136/8 136/10 136/11 137/3 137/11
137/13 137/17 137/21 137/24 142/3 142/21 143/24
145/11 146/5 146/23 147/22 148/24 149/1 149/15
151/5 153/4 157/24 157/25 159/21 159/24 160/11
160/20 161/4 161/14 162/5 163/1 163/1 164/13 164/18
165/21 168/18 169/25 170/1 170/12 170/12 170/23
171/15 172/3 172/7 172/8 172/9 172/9 174/6
**docket [17]** 1/6 12/22 18/18 22/12 22/19 25/10
26/12 26/14 26/18 30/25 31/12 31/18 31/22 31/24
32/1 147/16 162/12
**document [76]** 24/11 24/13 24/14 24/16 25/11 25/13
41/25 42/4 42/14 42/21 42/24 43/2 43/10 47/10
47/21 48/9 48/12 48/15 48/19 49/15 60/19 61/17
61/22 66/25 70/4 70/13 70/13 70/18 71/25 72/5
74/24 78/1 78/9 78/10 79/10 79/11 79/12 89/11
89/17 89/20 95/5 96/16 100/1 100/3 101/25 102/2
102/9 102/13 102/15 102/18 102/21 102/23 103/1
103/4 109/23 110/14 114/12 114/13 115/10 115/11
115/20 116/3 117/20 117/20 131/25 132/4 133/19
134/1 140/19 142/19 152/13 154/19 157/23 158/4
160/13 160/16
**documentation [1]** 96/14
**documents [33]** 40/20 40/23 41/1 42/2 42/10 43/12
43/16 44/12 45/8 46/3 67/2 95/7 95/11 95/14 95/21
95/20 95/21 95/23 96/4 98/12 106/3 106/13
106/18 106/19 106/20 108/17 108/20 108/23 110/12
130/14 130/20 142/16
**doing [8]** 20/23 25/5 60/1 138/1 139/7 150/9 157/17
158/18
**DOJ [2]** 38/2 40/3
**doubt [1]** 56/10
**down [3]** 43/19 48/21 76/10
**downtown [1]** 56/3
**drive [1]** 50/15
**due [6]** 6/17 11/6 111/23 118/17 130/7 151/1
**duly [1]** 11/16
**during [14]** 38/12 40/15 40/18 40/20 43/10 77/19
91/7 91/11 92/9 93/21 93/25 94/12 94/15 166/24
**duties [1]** 91/23
**duty [1]** 52/23

## E

**e-mail [7]** 35/19 66/21 67/10 67/13 68/1 99/4
105/6 105/7 105/9 105/17 105/20 105/24 106/3 106/8
166/13 166/15
**e-mailed [1]** 100/4
**e-mails [23]** 38/5 101/2 102/3 103/7 103/15 103/16
104/14 104/21 104/22 104/24 105/7 105/8 105/9
105/12 105/15 105/17 105/19 105/20 105/24 106/8
106/8 106/13 107/2
**each [4]** 11/22 56/13 116/17 163/14
**earlier [26]** 22/24 34/11 49/2 49/14 64/24 69/12
71/17 75/4 75/8 76/1 80/24 81/12 82/10 94/7 95/2
106/18 108/3 114/1 119/17 122/1 126/5 142/14 143/6
145/25 152/20 170/4
**early [16]** 35/17 35/21 60/3 94/9 99/11 101/3 104/6
104/15 104/23 105/10 105/13 105/17 169/25 170/3
170/5 172/3
**Eastern [1]** 35/8
**effective [1]** 9/4
**effectively [1]** 166/23
**effectuate [17]** 10/10 22/22 65/20 65/22 66/6 109/6
122/15 133/12 140/21 140/23 142/1 150/16 150/20
150/22 151/13 151/21 152/2
**effectuated [1]** 112/18
**effectuation [1]** 162/25
**efficient [1]** 126/3
**effort [1]** 131/4
**efforts [3]** 27/19 131/15 168/24
**either [9]** 10/14 34/4 100/3 108/17 129/3 134/18
143/10 161/15 162/16
**El [41]** 27/21 28/6 31/8 46/5 49/4 49/8 49/10 49/13
49/16 49/17 49/21 49/24 75/1 84/24 85/10 85/11
85/17 95/16 97/9 97/15 98/17 110/17 110/22 118/22
118/22 118/25 119/6 119/24 120/7 120/13 120/18
120/24 121/2 121/21 122/6 136/22 136/24 138/4
151/10 151/11 152/4
**eligibility [1]** 92/23
**eligible [1]** 130/4
**eliminate [1]** 31/7
**else [17]** 10/16 41/3 50/16 63/13 79/3 87/13 100/22
105/22 105/24 106/25 122/6 131/5 131/21 142/5
145/4 164/5 169/5
**EMANUEL [2]** 1/15 1/19
**embassies [1]** 135/24
**embassy [7]** 60/5 60/12 60/21 61/13 61/23 62/6
135/22
**emergency [2]** 70/13 71/25
**employed [2]** 12/6 12/7 130/4
**employees [1]** 67/10
**employment [6]** 14/6 130/2 130/14 130/19 131/17
132/4
**encountering [1]** 19/3
**end [3]** 115/12 154/19 158/20
**ended [2]** 6/21 6/24
**enforcement [20]** 5/22 12/8 12/11 13/7 14/25 16/3
20/21 21/24 21/25 28/23 29/9 29/12 29/13 30/7
30/20 52/7 52/9 58/21 101/8 105/25
**engaging [1]** 122/20
**English [2]** 88/21 89/2
**enough [9]** 8/23 52/9 52/9 98/22 99/22 103/19
117/10 123/25 140/1
**ensure [3]** 88/24 110/5 111/7
**enter [1]** 11/20
**entire [1]** 116/15
**entirely [2]** 68/8 164/21
**entitled [2]** 116/6 174/9
**entries [1]** 133/21
**entry [5]** 96/7 96/16 96/19 96/23 98/5
**environment [1]** 30/2
**equivalent [1]** 143/18
**ERNESTO [2]** 2/7 5/13
**ESQ [1]** 67/16
**especially [2]** 146/14
**ESQUIRE [9]** 1/14 1/15 1/18 1/18 1/22 2/3 2/3 2/4
2/7
**essentially [1]** 164/25
**establish [2]** 47/21 78/17
**established [9]** 7/22 9/3 9/7 54/20 57/19 78/1
78/16 156/16 157/3
**et [5]** 1/4 1/7 4/11 4/11 132/13
**ethics [1]** 171/14
**evaluate [1]** 114/10
**evaluated [2]** 72/12 119/3
**evaluates [1]** 70/24
**evaluating [2]** 134/6 134/25
**evaluation [6]** 69/20 81/24 109/17 109/19 134/13
135/22
**Evan [2]** 58/14 58/15
**even [7]** 32/3 92/7 98/5 116/3 145/22 146/2 147/6
**evening [2]** 133/19 133/20
**event [1]** 163/2
**ever [3]** 59/9 62/18 63/11
**every [8]** 14/18 52/18 53/4 53/5 53/7 53/8 53/8
70/17
**everybody [2]** 6/16 113/7
**everybody's [1]** 156/5
**everyone [6]** 4/6 5/15 77/20 113/3 145/2 167/20
**everything [5]** 10/6 34/7 63/13 132/10 147/8
**evidence [7]** 6/20 17/24 36/13 36/14 128/19 161/15
162/13
**evidentiary [2]** 1/10 4/12
**exact [4]** 30/10 35/21 60/20 115/20
**exactly [8]** 40/1 80/10 82/16 87/6 102/20 105/24
161/20 165/5
**examination [5]** 6/23 11/25 34/19 79/11 144/14
**examine [2]** 45/13 79/12
**examined [1]** 11/16
**examining [2]** 61/8 61/23
**example [3]** 18/21 21/9 147/3
**except [1]** 44/1
**exclude [1]** 123/9
**excuse [3]** 46/15 49/3 67/2
**executive [7]** 16/9 38/2 41/4 41/6 41/9 41/16 59/18

## F

**exercise [1]** 164/14
**exhausted [2]** 22/17
**exhibit [18]** 36/6 36/17 36/24 39/3 41/1
40/7 44/20 44/22 66/1 66/21 66/23 67/17
68/12 70/4 70/4 79/22 81/19 90/20 92/12 92/13
93/10 93/11 108/10 108/11 116/11 150/12 152/11
**exist [4]** 95/14 99/21 122/4 124/6
**exists [4]** 90/14 102/2 102/18 102/21
**exited [2]** 6/8 161/10
**expect [3]** 8/11 95/14 95/17
**expectation [2]** 34/7 110/23
**expected [1]** 95/23
**expecting [1]** 6/15
**expedited [3]** 19/1 19/2 19/8
**expeditiously [1]** 19/5
**experience [39]** 13/21 13/22 36/2 36/6 38/7 38/8
57/10 60/1 60/2 61/19 62/3 62/11 62/14 63/8 64/17
64/19 64/23 87/20 89/19 89/24 94/1 94/2 94/19
95/13 95/24 96/15 96/22 96/25 97/3 107/22 107/24
108/1 108/1 118/5 139/12 139/22 157/12 160/2
160/15
**experienced [1]** 62/7
**expired [1]** 22/17
**explain [2]** 48/1 119/8
**explains [3]** 42/19 67/16 91/1
**express [24]** 81/21 82/6 84/2 88/17 114/12 115/1
115/2 115/3 115/4 115/9 115/11 115/12 115/15
115/16 115/21 115/23 116/4 116/4 117/12 117/15
117/21 133/11 133/16 135/12
**expressed [3]** 84/19 88/6 114/20
**expresses [10]** 25/15 25/22 78/16 80/25 81/24 82/5
89/17 114/2 115/6 133/5
**expressing [1]** 81/22
**expression [1]** 114/16
**extend [1]** 116/20
**extended [1]** 117/4
**extent [18]** 13/19 14/16 16/13 17/13 21/7 21/18
23/1 23/4 23/7 24/21 26/21 28/19 32/22 33/23
33/14 105/12 150/8 155/20
**extradition [1]** 98/16
**extremely [2]** 54/23 171/16

## F

**facilities [2]** 22/9 51/14
**facility [11]** 22/5 22/7 22/15 26/13 50/12 51/9
53/10 53/11 58/13 117/25 163/4
**facing [1]** 146/15
**fact [5]** 9/10 51/16 64/7 148/24 156/11
**factor [1]** 143/13
**fair [45]** 43/5 43/6 48/24 52/9 52/9 53/13 53/13
58/10 60/14 60/15 62/13 65/6 65/7 65/8 65/9 71/1
71/18 71/19 73/15 75/24 76/12 78/8 85/21 86/3
86/24 88/14 88/15 89/6 90/14 98/22 99/22 102/14
102/18 103/19 117/2 117/3 117/10 118/6 118/7
122/11 123/25 126/19 132/1 163/24 172/2
**fairest [1]** 172/3
**Fairfax [1]** 1/23
**fairness [1]** 142/11
**faith [1]** 99/17
**fall [2]** 26/12 136/15
**falls [1]** 9/13
**familiar [3]** 14/16 39/7 46/24 49/10 64/4 64/6
107/15 128/23 129/12 129/13 129/23 130/12 130/13
**familiarity [5]** 16/5 18/25 19/18 106/8 108/7
**family [2]** 168/24 171/13
**far [8]** 8/23 36/4 51/9 51/10 78/25 90/1 125/3
164/12
**far-flung [1]** 164/12
**fast [1]** 62/6
**father [1]** 168/21
**faxed [1]** 100/4
**FBI [2]** 15/2 15/3
**fear [78]** 15/17 17/16 17/19 17/23 18/2 19/9 19/12
19/13 19/14 19/15 20/5 20/5 25/18 25/20 25/22 25/20
25/22 25/22 25/23 33/17 33/19 33/21 33/22 33/25
61/5 61/6 65/14 70/7 78/16 80/25 81/9 81/9 81/11
81/16 81/21 81/22 81/24 82/9 82/24 83/25 84/1 84/2
84/6 84/19 87/16 88/6 88/17 89/17 92/21 94/12
94/16 109/25 114/2 114/10 114/12 114/16 114/20
115/1 115/12 115/13 115/6 115/9 115/12 115/12 115/15
115/15 115/16 115/23 116/4 116/4 117/12 117/15
117/22 133/3 133/11 133/16 135/12 140/15 140/20
**fears [1]** 26/2
**federal [15]** 20/21 21/23 28/23 29/8 29/11 32/5
50/19 51/2 57/1 138/16 146/11 148/3 148/12 174/4
174/17
**feel [2]** 146/7 158/17
**feeling [1]** 4/17
**felon [1]** 19/24
**felonies [1]** 19/19
**felony [3]** 19/25 148/12 154/10
**few [9]** 6/1 11/1 18/24 32/18 32/18 34/11 34/11
144/20 169/3
**Fi [2]** 7/21 7/23
**field [54]** 12/11 12/15 13/1 13/4 13/9 13/14 13/16
13/16 14/18 14/19 15/15 15/12 15/24 15/25 29/17
35/18 51/17 51/19 52/15 54/14 54/18 54/21 55/18
55/20 55/21 55/23 56/2 56/4 56/12 56/13 56/14
56/17 56/23 57/17 57/20 57/22 57/25 58/1 58/3 58/4
62/23 62/24 64/20 64/25 98/11 101/3 102/4 103/8
104/11 104/16 104/19 131/12 145/9 145/21
**Fifth [1]** 148/20
**figure [2]** 146/3 160/20
**figuring [2]** 134/22 135/23
**file [30]** 17/9 18/19 22/20 26/11 100/6 100/7 100/9
100/11 100/12 100/14 100/15 100/18 128/9 128/11
131/8 131/14 131/18 131/20 131/21 131/22 131/23
132/1 132/6 132/8 132/11 132/12 132/13 132/15
134/10 136/21
**filed [1]** 9/21
**Files [1]** 132/3
**fill [3]** 60/4 60/19 137/18
**filled [1]** 60/21

# F

**final [46]** 17/3 17/25 18/20 22/21 25/24 26/13 26/19 28/6 28/23 34/7 37/11 45/14 47/1 48/16 48/23 49/19 65/20 82/14 93/17 93/17 126/7 126/23 126/24 128/25 140/22 147/11 150/16 150/20 150/21 150/23 150/25 151/7 151/9 151/13 151/20 151/21 152/3 152/18 153/5 153/10 157/5 165/14
**find [16]** 50/18 50/20 51/17 51/20 85/21 111/23 126/8 127/23 131/4 131/7 131/15 136/10 137/11 137/14 137/25 172/10
**finding [4]** 74/10 86/20 87/23 130/5
**findings [2]** 26/1 165/1
**finds [1]** 25/23
**fine [4]** 78/8 161/7 168/4 171/2
**fingerprints [1]** 7/3
**finish [4]** 42/9 116/20 147/14 147/23
**finite [1]** 141/24
**first [25]** 11/16 17/21 23/3 27/15 35/15 39/21 72/9 72/17 72/20 73/5 75/16 75/18 76/6 78/18 83/7 115/12 126/5 137/10 152/15 152/15 163/17 163/23 163/25 167/22 167/24
**five [5]** 41/24 44/6 56/19 122/22 127/8
**five-minute [2]** 41/24 112/22
**flexibility [4]** 171/20 171/23 171/24 171/24
**Flight [1]** 168/25
**flung [1]** 164/12
**focus [1]** 54/12
**focused [3]** 32/1 106/13 115/8
**folder [1]** 100/7
**folks [12]** 37/21 68/23 88/21 116/18 124/4 138/4 154/2 154/20 155/3 158/9 164/22 171/14
**follow [12]** 23/7 33/12 56/8 60/4 71/12 72/2 78/13 82/10 113/24 116/18 146/5 161/25
**follow-up [2]** 146/5 161/25
**followed [3]** 24/22 24/24 109/25
**following [6]** 74/10 75/24 77/18 133/22 162/10 167/5
**follows [4]** 1/17 79/18 121/14 159/16
**foreclosing [2]** 157/14 160/3
**foregoing [1]** 174/7
**foreign [1]** 104/8
**foreign-born [1]** 104/8
**forget [1]** 87/4
**forgetting [1]** 146/6
**form [20]** 36/3 38/3 38/15 39/7 60/5 73/14 92/16 95/8 108/18 117/7 119/5 123/17 123/21 125/10 134/16 136/2 139/4 139/8 140/9 143/7
**formally [1]** 36/14
**format [1]** 174/9
**forms [1]** 23/15
**forth [5]** 23/18 24/21 36/11 95/2 135/25
**forthwith [1]** 163/6
**forward [3]** 146/24 149/3 149/22
**found [12]** 33/25 53/16 72/15 73/1 74/20 95/11 109/25 118/12 118/19 119/3 121/21 121/24
**foundation [15]** 7/3 36/15 76/16 76/21 76/23 76/24 76/25 97/19 98/18 105/6 117/8 119/5 123/21 134/16 139/8
**four [4]** 37/8 40/10 67/2 169/14
**fourth [2]** 42/14 43/2
**frame [1]** 140/14
**France [2]** 61/21 61/22
**Franklin [1]** 2/9
**frankly [2]** 158/24 159/8
**FRE [1]** 96/2
**FRE 402 [1]** 96/2
**free [3]** 146/7 161/6 172/5
**Friday [3]** 144/22 167/3 171/21
**friend [1]** 144/20
**frightened [1]** 70/6
**front [16]** 7/5 36/23 40/24 48/6 66/11 66/22 68/14 70/18 79/22 82/19 92/12 99/19 126/14 129/6 154/3 154/11
**fugitive [3]** 14/7 14/18 15/11
**full [3]** 162/9 162/24 167/9
**full-throated [1]** 162/9
**further [15]** 34/13 69/1 75/19 78/10 80/4 80/13 81/3 83/21 84/8 88/8 98/4 138/21 160/22 168/11 168/12

# G

**G-I-L-E-S [1]** 11/23
**GARCIA [72]** 1/4 4/11 9/25 10/8 27/3 27/19 27/23 28/11 28/19 28/24 29/6 29/9 29/16 30/6 30/19 31/4 31/8 31/16 32/9 32/23 33/10 33/23 34/4 35/23 39/4 45/23 46/10 46/14 46/25 48/16 49/8 50/2 50/23 52/13 56/23 74/25 75/4 75/6 75/13 76/3 76/5 76/16 78/6 78/12 80/15 80/21 81/16 85/22 86/17 86/24 95/9 97/16 97/15 119/23 119/23 134/8 134/13 134/24 134/25 135/2 145/23 147/6 148/8 149/9 153/20 162/20 163/2 163/9 165/3 166/1 166/6 171/25
**Garcia's [13]** 28/3 35/10 35/14 36/2 38/8 38/16 47/10 53/12 57/7 59/5 59/12 146/10 162/23
**gave [5]** 9/21 102/17 102/20 119/17 152/3
**gears [1]** 59/21
**general [8]** 2/4 30/12 30/23 31/10 54/4 63/15 120/2 130/5
**generally [10]** 22/19 26/8 93/1 105/4 120/1 120/5 135/6 136/21 141/22 171/14
**generically [2]** 137/5 151/19
**gentleman [2]** 40/8 54/7
**gentlemen [2]** 10/24 77/19
**getting [12]** 53/7 93/16 94/13 97/4 106/2 122/20 132/9 147/1 147/25 152/7 155/18 156/23
**GILES [47]** 3/3 5/18 5/20 6/8 11/12 11/15 11/23 12/2 12/5 12/6 13/18 14/3 14/16 16/5 19/18 20/18 23/17 24/11 25/7 26/8 27/2 27/14 28/22 30/5 30/18 34/12 34/21 42/14 43/13 45/8 45/17 45/22 79/22 83/2 113/5 113/9 113/21 115/11 121/9 141/6 141/10 144/16 145/8 150/2 150/18 159/18 161/2
**give [16]** 7/2 24/1 41/24 45/11 65/24 79/4 89/15

# H

**Haiti [1]** 84/24
**half [11]** 24/20 37/11 38/13 40/2 40/2 40/15 40/18 40/21 41/6 67/3 167/11 167/11
**hammering [1]** 168/4
**hand [2]** 11/14 164/15
**handed [3]** 80/17 114/25 115/10
**handful [1]** 60/10
**handling [3]** 73/21 151/23 151/24
**handoff [1]** 29/24
**hands [1]** 116/24
**happen [17]** 9/25 10/8 26/23 39/4 62/18 78/25 87/16 94/11 111/7 128/25 138/18 142/15 145/17 145/23 158/5 158/5 166/1 170/1
**happened [8]** 63/5 73/9 99/7 123/12 131/2 131/3 132/10 166/5
**happening [3]** 91/9 148/7 164/9
**happens [22]** 17/18 21/24 22/8 25/21 33/24 56/14 78/11 82/11 82/16 93/22 135/19 135/21
**happy [10]** 7/11 9/9 41/21 141/2 167/23 169/12 169/13 169/25 170/1 172/16
**hard [3]** 7/2 10/7 172/13
**hardship [3]** 139/13 139/25 140/6
**Harper [1]** 59/19
**hasn't [2]** 31/14 32/3
**having [3]** 11/6 64/20 154/25
**he'd [2]** 45/12 51/15
**he's released [1]** 39/5
**head [3]** 77/6 99/16 129/14

# 90/3 113/3 125/23 153/24 161/7 163/11 165/10

90/3 113/3 125/23 153/24 161/7 163/11 165/10 166/12 171/23
**giving [7]** 23/24 58/6 71/25 129/3 142/9 158/20 166/5
**glanced [4]** 71/7 106/12 106/15 107/3
**go [82]** 8/23 11/8 11/10 15/5 22/2 22/5 22/7 25/15 26/6 30/11 42/9 43/5 44/10 54/17 56/9 57/3 60/17 61/6 61/10 61/22 61/23 65/14 66/8 67/16 68/5 68/10 68/12 69/17 70/6 70/14 70/16 70/19 71/9 71/23 74/24 77/4 77/11 77/24 80/25 80/25 81/10 81/17 82/5 84/20 87/23 88/19 90/5 91/20 98/24 102/11 103/23 109/18 111/20 111/23 113/2 114/19 115/13 124/18 133/12 134/3 135/2 135/18 135/23 136/11 140/21 141/16 142/8 142/14 143/15 150/18 152/9 158/1 163/25 164/8 165/20 167/22 167/24 168/11 168/12 168/21 172/5 172/23
**goes [1]** 52/13
**going [156]** 5/25 6/25 9/25 11/1 16/8 17/11 18/23 22/11 24/1 27/8 30/14 32/4 34/23 38/16 39/4 41/14 41/23 42/5 45/11 47/18 47/19 47/22 50/10 52/15 53/1 53/14 54/11 54/7 54/18 55/5 56/6 56/25 57/3 57/9 57/15 57/17 58/12 59/21 61/12 63/25 69/24 70/11 70/12 70/25 71/23 73/19 74/5 74/6 74/22 74/22 75/4 75/6 75/13 75/16 76/5 76/19 78/25 79/2 81/10 81/16 82/3 83/25 85/22 88/22 89/5 89/15 89/21 89/22 90/5 91/11 94/1 96/1 96/7 97/7 99/15 103/10 107/13 107/18 109/10 109/11 109/20 109/24 109/24 110/7 110/13 110/15 111/7 111/9 111/23 112/9 115/15 115/25 117/20 119/14 122/10 123/13 123/15 125/1 128/20 129/3 136/19 138/18 140/10 140/19 140/20 142/24 144/3 145/24 145/16 145/17 145/22 145/25 146/3 146/23 146/24 147/1 149/13 149/3 149/15 149/17 149/17 149/22 150/16 150/19 151/2 151/16 151/20 153/23 156/6 156/12 156/14 157/7 157/9 159/7 159/8 161/2 161/22 162/16 163/7 163/22 165/18 168/14 168/15 169/2 169/20 172/22
**gone [10]** 72/16 81/23 86/19 118/10 127/3 133/23 154/2 155/4 156/13 158/10
**good [20]** 4/6 4/15 4/20 4/22 4/23 4/24 5/2 5/5 5/8 5/15 5/13 5/15 12/2 12/3 34/21 34/22 34/22 43/8 112/20
**googled [2]** 106/22 106/22
**got [32]** 33/8 52/25 59/19 62/6 64/14 66/13 67/13 68/1 72/12 78/17 103/13 120/5 120/16 132/14 136/7 146/4 147/5 148/25 153/2 154/15 155/16 159/13 161/23 162/11 169/3 169/7 169/7 171/2 171/6 172/2 172/15 172/15
**gotten [4]** 72/23 118/11 120/4 151/1
**governed [1]** 62/17
**government [25]** 9/16 27/5 38/15 39/19 53/14 54/10 64/20 70/15 72/22 75/12 81/14 98/8 111/6 139/3 142/25 143/2 143/23 158/18 163/20 163/21 163/25 164/1 167/22 169/17 171/22
**government's [4]** 37/17 45/23 167/25 170/14
**governs [1]** 129/10
**grant [10]** 18/12 18/20 25/2 25/3 26/4 26/17 28/7 46/5 135/7 141/8
**granted [6]** 18/13 21/11 23/12 23/15 48/23 127/7
**granular [1]** 51/22
**grave [1]** 165/25
**great [7]** 8/8 10/4 24/5 99/17 144/9 159/14 167/11
**green [1]** 143/18
**GREENBELT [1]** 1/2
**ground [2]** 116/6 117/18
**group [1]** 157/11
**guarantee [3]** 149/14 149/15 149/16
**Guatemala [4]** 84/24 120/6 120/7 120/24
**guess [8]** 2/1 10/15 57/12 86/17 133/15
**guidance [29]** 23/19 23/20 24/14 42/25 66/9 67/12 67/23 68/13 68/17 69/15 70/20 74/14 90/3 90/7 90/9 91/21 93/16 93/19 108/11 138/14 122/10 123/8 123/14 124/25 125/20 136/9 136/12 140/18 164/6
**guidelines [1]** 137/17
**GUYNN [3]** 2/3 5/9 168/23
**guys [2]** 145/4 172/11

# headquarters [1] 12/8

**headquarters [1]** 12/8
**hear [10]** 7/9 60/18 77/17 77/21 161/3 163/5 166/6 169/7
**heard [11]** 27/10 33/24 35/2 35/25 55/25 78/25 124/13 150/2 150/2 164/3 165/11 165/12 165/25 168/7 170/15
**hearing [19]** 1/10 4/12 19/17 39/11 77/10 77/23 79/18 82/18 84/1 87/5 119/12 121/14 124/10 159/3 163/5 165/2 168/5 171/13
**Hearsay [1]** 7/3
**held [11]** 12/12 12/13 13/1 13/12 21/5 77/9 77/18 119/11 132/8 155/24 174/8
**help [3]** 8/5 129/8 170/1
**helpful [4]** 132/14 159/2 159/4 161/19
**hereby [1]** 174/6
**hey [1]** 171/22
**hiding [1]** 45/5
**high [4]** 37/9 54/23 102/21 141/12
**high-profile [1]** 54/23
**him [47]** 22/18 27/20 30/8 30/21 32/14 32/16 32/17 32/21 33/3 35/17 35/20 50/14 50/15 51/10 51/12 58/10 58/11 78/2 78/11 78/17 78/24 79/7 79/12 80/17 98/1 98/12 98/16 102/10 104/21 110/22 124/13 147/6 147/9 148/12 148/13 149/1 151/2 151/3 151/5 151/24 164/4 164/8 164/10 164/11 165/6 165/8 165/9
**his [25]** 17/14 17/14 17/20 27/20 28/5 32/10 33/15 34/3 38/8 46/14 46/18 46/21 47/1 50/1 58/22 78/18 79/2 106/23 107/2 123/22 127/2 128/12 149/1 151/1 151/1 159/20
**history [1]** 41/5
**hit [1]** 15/4
**hold [17]** 12/17 12/25 13/10 21/3 97/4 140/24 141/2 141/20 146/20 146/20 151/6 164/18 168/14 168/15 169/2 168/5 168/15 169/21
**home [3]** 17/24 120/13 120/15
**Homeland [4]** 23/18 23/21 91/16 160/14
**Honduras [1]** 84/25
**honest [1]** 171/16
**honor [151]** 4/15 4/16 4/20 4/23 4/24 5/2 5/5 5/8 5/11 5/13 7/15 8/1 8/6 8/9 9/1 9/14 10/14 10/19 10/21 11/8 20/10 21/17 23/23 24/7 27/10 28/16 29/9 29/12 29/14 34/16 36/12 36/19 37/15 41/15 41/21 42/12 43/4 43/10 43/14 45/6 45/8 45/20 47/14 56/10 66/21 74/6 76/12 76/19 77/7 77/14 77/16 77/25 79/14 79/20 86/9 86/12 94/1 94/14 96/1 98/10 98/12 102/23 102/25 103/1 103/13 103/18 103/19 106/6 111/10 112/22 113/8 113/17 117/10 119/9 121/15 121/22 125/5 125/16 125/23 128/6 132/18 136/3 136/7 136/18 137/15 138/20 138/21 138/22 138/23 140/10 140/23 141/13 141/14 141/15 141/22 142/16 144/8 144/12 144/13 145/4 145/14 146/7 148/14 148/16 148/19 148/23 149/6 150/4 151/5 151/20 152/5 152/6 152/23 153/2 153/18 153/20 154/14 154/24 155/5 155/7 155/10 155/16 158/22 160/23 160/24 161/8 161/18 161/21 161/23 164/10 164/20 165/18 165/19 166/16 167/13 167/21 167/23 167/25 168/10 168/13 169/5 169/9 169/19 169/24 170/6 170/8 170/13 170/12 172/11 172/18 172/22
**Honor's [2]** 87/3 125/11
**HONORABLE [9]** 1/10 4/5 44/5 44/8 113/10 113/13 146/2 173/13 125/1
**honored [2]** 21/23 29/15
**honors [3]** 21/12 30/7 30/20
**hopefully [2]** 113/3 170/10
**hoping [1]** 161/19
**HORTON [1]** 1/18
**hour [8]** 37/11 40/2 41/23 53/5 53/8 166/3 167/11 170/10
**hours [24]** 37/8 37/8 37/10 37/11 38/13 40/2 40/18 40/21 67/4 93/1 93/5 133/6 133/8 134/2 140/5 163/5 164/2 164/9 165/4 165/9 166/21 166/21 166/23 167/1
**House [1]** 38/2
**however [3]** 121/4 150/6 162/19
**Hudson [1]** 40/6
**hundred [1]** 50/15
**hundreds [4]** 55/1 55/3 104/21 104/21
**hybrid [1]** 172/10
**hypothetical [1]** 147/4
**hypothetically [2]** 81/17 134/8

# I

**I'd [6]** 25/7 93/6 105/22 162/8 165/5 168/12
**I'll [28]** 10/25 41/15 61/9 76/12 78/13 113/5 113/19 116/20 119/8 124/20 128/22 129/5 134/20 135/13 137/1 141/13 144/13 157/10 157/24 159/9 159/12 163/6 163/15 165/16 166/12 166/13 168/5 170/2
**I'm [149]** 4/20 5/25 6/15 8/2 8/3 10/6 10/11 11/2 12/7 23/3 24/1 27/8 34/22 35/18 39/14 44/16 45/4 45/11 46/19 49/12 49/20 52/7 53/22 54/7 55/10 55/10 56/6 56/6 56/7 56/8 58/5 58/25 59/1 60/10 62/24 63/12 64/6 64/7 64/8 64/14 66/22 67/20 69/16 70/6 70/16 70/22 73/9 73/19 75/6 76/19 77/13 77/25 78/22 79/4 79/25 80/19 83/25 86/17 86/25 87/8 87/11 87/15 90/15 90/18 93/13 93/22 95/21 96/1 98/1 98/7 99/20 103/10 104/3 104/12 105/15 105/17 107/18 108/10 110/7 110/10 110/13 111/4 111/9 111/25 112/11 112/12 112/22 112/24 112/25 118/25 118/25 119/25 120/11 121/12 122/19 122/24 124/14 124/15 125/1 126/13 127/13 127/19 128/12 128/20 129/18 129/22 130/13 130/14 130/24 134/18 134/14 136/20 136/21 138/16 139/2 139/20 139/22 140/10 143/9 143/11 143/17 150/19 151/16 153/23 154/22 154/25 155/6 156/8 156/14 156/22 159/11 162/19 162/21 164/21 166/19 167/18 168/19 169/25 169/25 168/20 169/5 171/25 169/9
**I've [16]** 12/13 13/1 13/12 13/12 36/4 47/5 53/15 62/7 66/13 78/25 87/16 108/23 128/19 138/14 162/9 169/7
**I-24 [1]** 60/19
**ICE [125]** 10/1 10/9 12/17 13/7 13/11 13/24 14/6 14/17 14/21 14/22 14/23 15/10 15/10 15/11 15/13 15/18 15/21 20/22 21/2 21/13 21/18 21/21 21/22

**I**

ICE... **[102]** 22/5 22/13 22/14 23/18 24/21 25/7
25/2 25/8 26/6 26/15 28/2 29/11 29/13 30/6 30/12 30/19
29/17 30/6 30/8 30/9 30/13 30/14 30/21 30/22 30/24
31/3 31/6 31/12 31/14 31/17 31/20 31/25 32/2 32/5
32/7 32/9 32/13 32/19 32/22 33/5 33/5 33/6 33/9
33/9 38/2 38/25 39/8 40/3 40/5 50/2 50/5 50/11
50/14 50/20 51/8 51/11 58/17 58/18 67/10 69/20
75/17 76/18 80/17 89/8 91/18 92/1 97/8 97/9 97/17
97/21 101/8 101/20 111/18 117/25 133/5 133/19
132/12 134/9 135/6 135/16 135/20 138/9 138/10
138/17 140/25 141/25 145/4 145/14 145/18 147/5
147/10 147/21 150/6 150/8 150/9 150/24 159/25
160/2 160/14 162/20 162/21 163/3 164/18
**idea [3]** 125/18 134/17 171/13
**identification [1]** 47/25
**identified [6]** 33/15 41/1 120/7 120/10 142/15
144/23
**identifies [2]** 16/2 32/16
**identify [6]** 4/13 14/22 14/23 24/6 7 26/15 26/18
**identifying [5]** 12/20 30/3 31/14 32/20 32/23
**IJ [1]** 48/22
**ill [1]** 4/17
**illegally [1]** 153/9
**imagine [2]** 57/6 171/6
**immediate [2]** 114/17 164/4
**immediately [6]** 32/25 33/1 33/4 33/5 107/18 142/1
**immigration [110]** 2/8 5/22 12/7 13/23 14/13 15/7
15/9 16/8 16/9 16/13 16/14 16/15 16/17 16/19 16/23
17/2 17/3 17/5 17/6 17/7 17/11 17/12 17/16 17/18
17/22 18/3 18/5 19/12 19/13 19/16 19/23 20/18
20/19 20/20 21/7 21/12 22/16 22/15 25/17 25/18
25/19 25/23 25/25 26/1 26/1 26/3 26/4 28/4 28/5
28/9 28/20 28/23 28/25 29/9 29/12 29/14 30/7 30/20
33/3 33/20 33/25 34/1 34/5 34/5 35/14 35/17 61/8
61/19 61/25 66/6 81/12 82/7 82/9 82/12 82/14 87/10
87/13 87/23 87/25 91/18 91/24 92/23 94/25 95/1
95/2 98/24 98/25 99/6 101/8 101/13 102/5 104/2
104/10 105/11 111/19 114/14 122/15 122/17 126/8
128/23 130/15 144/24 147/23 147/23 149/4 149/20
152/21 153/13 154/3 164/8
**imminent [4]** 117/21 133/1 133/5 133/17
**impact [2]** 18/3 21/8
**implication [2]** 157/15 158/19
**implications [1]** 168/7
**imported [1]** 121/11
**impossible [6]** 54/2 56/7 57/9 116/17
**impracticable [1]** 130/10
**improper [1]** 168/1
**INA [13]** 19/21 20/8 92/24 93/3 93/13 104/4 129/17
129/18 129/21 129/23 129/24 130/12 130/22
**INA 241 [1]** 129/18
**inbox [1]** 105/16
**include [4]** 12/23 27/18 91/25 118/14
**includes [4]** 88/13 93/3 102/24 117/24
**including [1]** 162/24
**incredibly [1]** 172/10
**incremental [2]** 166/2 166/2
**incurred [1]** 139/13
**indicate [4]** 100/23 101/15 116/13 160/16
**indicated [8]** 42/14 46/3 46/21 60/12 66/14 67/14
92/14 95/1
**indicates [4]** 81/16 90/10 93/19 147/13
**indicating [4]** 18/19 25/12 35/19 89/20
**individual [95]** 14/12 15/6 15/8 16/2 16/8 16/16
17/23 18/11 18/21 18/22 19/4 19/21 19/24 20/1 21/2
21/12 21/14 21/15 25/2 25/16 26/20 26/23 28/6
28/25 29/18 29/20 32/11 32/12 33/16 36/25 31/12 32/4
32/7 33/6 33/21 33/23 35/19 41/5 46/4 46/17 49/19
50/10 50/11 50/19 50/21 51/18 52/16 52/17 52/23
53/20 53/24 54/16 56/4 57/2 57/15 57/17 58/12
62/16 75/16 82/20 86/5 95/22 96/10 54/6 96/23
99/10 99/12 99/24 100/24 101/9 102/6 103/2 104/3
104/7 109/15 110/1 112/5 114/20 127/7 127/10
127/25 131/13 132/5 135/6 135/15 135/16 135/17
135/23 135/24 137/22 138/9 140/24 141/25 146/3
147/13 154/8
**individuals [2]** 82/13 105/10
**individuals [27]** 14/20 14/24 19/11 23/13 27/5 30/9
51/20 62/22 63/1 65/21 69/23 71/23 73/11 74/13
81/6 84/19 104/9 110/12 110/24 128/25 124/8 135/7 140/7
140/22 142/4 142/24 143/14 146/17
**indulgence [1]** 86/11
**inference [1]** 86/3
**inform [1]** 31/24
**information [31]** 35/18 42/22 43/3 46/20 46/22 47/7
47/7 47/9 48/20 49/2 52/22 63/7 75/15 89/25 93/15
98/14 102/24 122/3 124/2 124/3 124/4 124/24 125/16
125/21 128/8 128/13 131/7 131/15 131/18 132/6
140/22 142/4 146/8
**initial [1]** 117/1
**Initially [1]** 116/12
**input [1]** 165/5
**inquire [1]** 146/14
**inquiring [1]** 110/19
**inquiry [1]** 39/10
**insofar [1]** 81/2
**inspected [1]** 19/23
**inspection [1]** 121/7
**instance [10]** 50/4 60/9 80/15 81/15 81/17 83/20
107/20 139/6 139/14 140/4
**instances [1]** 62/22
**instead [1]** 9/21
**instructions [1]** 6/15
**intend [3]** 27/24 32/19 32/22
**intended [1]** 27/19
**intention [1]** 139/3
**interacts [1]** 67/11
**interest [2]** 101/20 130/11
**interested [4]** 10/12 101/8 168/4 171/19
**interests [1]** 162/23
**interim [1]** 12/10
**interpret [2]** 157/13 160/3

**interpreted [1]** 106/20
**interrupt [4]** 36/13 55/7 55/10 146/8
**intrusive [1]** 166/2
**interviewer [1]** 88/6
**interviews [2]** 87/9 125/18
**intrusive [1]** 166/2
**invested [1]** 171/10
**invite [1]** 163/19
**invoke [1]** 5/25
**involve [2]** 92/15 162/13
**involved [14]** 16/14 22/17 38/23 59/23 64/10 74/12
74/17 87/9 87/11 93/4 93/16 122/24 124/23 134/12
**involvement [2]** 35/9 92/5
**iPad [1]** 11/4
**irrespective [1]** 81/24
**is [486]**
**isn't [5]** 65/12 65/18 153/17 153/20 161/22 165/23
**issue [22]** 58/8 61/17 81/14 92/4 104/1 104/18
108/18 114/10 130/19 143/2 153/10 162/15 162/16
162/17 163/6 163/10 164/12 164/16 164/24 165/13
165/19 168/2
**issued [21]** 16/10 22/16 23/20 28/9 28/22 48/22
95/3 99/4 99/4 99/6 99/8 99/9 99/11 104/5 104/15
126/7 126/23 130/15 132/4 139/16 142/16
**issues [7]** 8/15 8/23 135/4 162/18 162/23 167/2
171/19
**Italian [1]** 61/23
**italics [1]** 78/15
**Italy [1]** 61/23
**itself [1]** 159/23

**J**

**jail [5]** 15/1 29/22 30/2 100/4 103/2
**January [2]** 12/19 12/25
**January 2024 [1]** 12/19
**job [9]** 52/12 65/19 66/5 67/22 80/7 90/12 112/8
122/15 150/22
**John [1]** 168/23
**joined [1]** 5/16
**JONATHAN [4]** 1/18 2/3 4/24 5/8
**Jorge [1]** 40/6
**JR [1]** 2/7
**judge [48]** 1/11 14/13 16/13 16/15 16/17 16/19
16/23 17/4 17/7 17/11 17/12 17/18 17/25 17/25 18/2
18/5 19/16 21/11 22/12 23/16 25/23 25/25
26/1 26/3 26/4 28/9 34/1 34/5 44/25 57/1 62/1
82/14 87/23 88/13 101/13 111/20 126/8 147/12
152/21 153/13 154/1 156/1 162/11 162/15
162/18 167/2
**judge's [6]** 17/2 18/3 28/20 66/6 122/15 140/24
**judges [1]** 7/1
**judicial [5]** 15/13 15/18 21/18 21/21 174/10
**judiciously [1]** 164/14
**JULY [12]** 1/11 29/7 29/16 29/17 67/10 67/19 67/21
90/20 92/13 93/10 108/12 174/12
**July 16th [3]** 29/7 29/16 29/17
**July 8th [1]** 67/21
**July 9th [6]** 67/10 67/19 90/20 92/13 93/10 108/12
**juncture [1]** 162/16
**June [13]** 35/17 35/21 95/3 95/9 97/11 99/11 101/3
104/6 104/15 104/23 105/11 105/14 105/17
**June 5th [1]** 95/9
**jurisdiction [15]** 9/20 20/24 21/4 21/6 21/12 21/13
22/6 51/18 51/21 56/13 99/9 99/12 149/16 162/22
165/24
**jurisdictions [3]** 13/8 21/17 26/25
**justice [19]** 2/5 5/6 5/9 5/12 5/14 40/9 44/15 58/6
144/23

**K**

**Katz [6]** 58/14 58/15 58/16 59/4 59/7 59/11
**keep [6]** 57/19 100/6 146/6 147/9 151/2 156/7
**Kentucky [1]** 56/18
**KHOJASTEH [6]** 2/4 3/4 5/6 10/2 12/1 44/16
**kids [1]** 168/21
**Kika [1]** 91/24
**KILMAR [2]** 1/4 4/10
**kind [4]** 70/10 71/22 82/18 111/10
**kinds [2]** 166/21 166/21
**klatch [1]** 8/14
**knew [4]** 35/16 63/11 74/2 169/15
**knocking [1]** 162/9
**knowledge [34]** 13/20 13/22 35/12 35/16 36/2 38/21
39/22 39/23 40/25 42/18 59/4 63/7 64/13 64/15 75/5
75/11 76/15 78/12 84/11 86/19 86/22 87/1 94/10
94/19 97/8 98/22 109/10 118/21 118/23 121/2 123/22
124/20 132/5 167/9
**knowledgeable [1]** 98/3
**known [1]** 18/14
**knows [1]** 169/16
**Kohjasteh [1]** 3/5
**KRISTI [2]** 1/7 4/11

**L**

**lack [4]** 8/13 8/20 76/24 76/25
**lacks [9]** 76/20 97/19 105/6 117/8 119/5 123/21
134/16 139/4 139/8 146/8
**Ladies [1]** 77/19
**laid [8]** 36/15 81/18 92/17 114/2 116/8 116/10
125/19 130/22
**lands [1]** 142/20
**language [6]** 70/16 78/3 88/22 89/2 89/4 114/24
**large [1]** 14/19
**last [15]** 10/5 38/13 39/24 40/7 53/21 53/24 56/8
67/3 92/5 105/10 106/5 121/19 138/25 144/4 154/7
**late [3]** 147/25 152/8 172/13
**later [5]** 68/11 80/17 106/4 141/14 170/1
**law [14]** 9/3 9/8 14/25 20/20 21/24 21/25 28/23

**M**

**made [47]** 7/1 15/10 15/12 16/21 30/6 30/12 30/19
30/22 30/24 31/1 31/6 31/10 31/11 31/13 32/3 32/6
32/9 32/12 32/14 32/21 32/24 33/2 54/20 54/21 57/1
57/2 75/16 82/22 84/6 96/6 96/18 96/20 115/23 123/12
123/12 131/6 133/13 135/5 135/7 135/14 136/7 137/6
138/18 145/20 148/24 150/3 150/25 151/8
**magistrate [1]** 147/12
**mail [17]** 35/19 66/15 67/10 67/13 68/1 68/4 71/5
71/7 90/21 92/13 93/19 101/3 105/16 108/2 108/12
166/13 166/13
**mailed [1]** 100/4
**mails [23]** 38/5 101/2 102/3 103/7 103/15 103/16
104/14 104/21 104/22 104/24 105/7 105/8 105/9
105/12 105/15 105/19 105/20 105/24 106/8
106/8 106/13 107/2
**main [5]** 12/15 12/21 42/24 55/20 55/23
**make [41]** 4/17 7/19 10/13 10/22 15/13 15/19 17/25
21/14 33/4 39/10 41/15 41/24 42/1 42/17 44/24 51/19
51/19 56/1 74/12 100/16 110/15 118/9 128/22 130/14
133/10 134/5 135/13 141/16 142/11 144/10 144/18
145/6 147/9 164/19 165/10 166/7 166/9 166/22
166/25 169/3 169/15
**makes [2]** 10/14 130/5
**making [6]** 31/15 52/21 76/4 97/5 134/12 135/22
**man [1]** 54/11
**manage [2]** 13/6 22/13
**managed [1]** 131/12
**management [5]** 12/19 12/21 59/14 63/12 130/16
**manifest [1]** 142/23
**manner [1]** 133/2
**many [22]** 41/6 54/13 57/4 59/21 59/23 64/1 65/24
104/24 125/7 125/13 125/18 128/14
**March [38]** 9/7 23/21 33/13 42/25 49/15 50/1 59/24
60/16 61/10 62/19 62/20 62/20 66/9 67/11 67/23
68/13 68/18 70/19 72/5 85/13 85/19 87/1 90/7 90/9
90/13 91/21 108/11 114/3 118/13 123/7 123/13 125/9
125/14 125/20 127/19 132/23 136/13 152/12
**March 15th [1]** 49/15
**March 2025 [1]** 33/13
**March 23rd [1]** 67/11

**1 of M** text continues:

29/8 29/11 29/13 30/7 30/20 105/25 161/21
**lawful [1]** 76/7
**lawyer [3]** 169/21 169/22 171/3
**lawyers [3]** 78/5 105/17 105/20 129/8
144/21 144/23 144/25 145/7 156/14 159/5 171/3
**lays [1]** 71/15
**lead [2]** 6/22 6/23
**leading [5]** 28/16 154/21 155/7 160/5 168/24
**learn [4]** 24/25 24/25 25/2 34/23
**learned [1]** 128/4
**learning [1]** 10/12
**least [8]** 49/7 62/21 76/7 81/2 88/4 114/24 133/8
166/2
**leave [4]** 115/24 117/5 118/1 161/6
**leaves [3]** 9/3 116/5 139/15
**leaving [2]** 117/18 117/22
**Leeper [4]** 6/14 174/4 174/15 174/16
**left [13]** 37/17 37/24 38/12 38/22 39/10 39/18
40/11 97/15 117/25 140/2 163/4
**legal [2]** 17/18
**legally [1]** 143/8
**legitimate [2]** 17/19 18/2
**legs [1]** 44/2
**less [5]** 19/5 63/25 133/10 133/11 138/12
**lesser [1]** 65/1
**letting [2]** 37/19 37/21
**level [5]** 57/9 72/16 58/25 59/1 123/12
**life [2]** 62/18 100/15
**light [1]** 161/21
**likely [8]** 14/12 85/18 96/9 97/7 100/9 133/9
133/10 133/11
**limb [1]** 165/22
**limitations [1]** 122/4
**limited [1]** 20/25
**limiting [1]** 92/16
**line [3]** 62/12 105/23 105/23
**lines [1]** 133/2
**link [1]** 7/22
**list [3]** 27/14 134/22 135/25
**listen [7]** 57/4 78/23 157/24 168/3 169/14 171/1
171/22
**literally [1]** 74/3
**litigation [2]** 2/8 67/15
**little [13]** 22/24 44/17 57/5 59/2 59/25 60/2 92/11
93/5 93/5 93/5 133/6 133/15 152/8 154/25
**live [3]** 87/4 143/17 165/14
**LLC [1]** 1/19
**LLP [1]** 1/15
**local [19]** 14/25 15/1 20/20 20/21 20/24 21/4 21/13
21/24 21/25 29/17 36/16 55/2 99/9 99/10 104/11
138/16 149/15 163/4 165/8
**locally [1]** 147/10
**located [3]** 50/13 128/9 131/20
**location [6]** 22/2 27/23 30/10 30/17 50/17 132/2
**long [14]** 12/12 13/24 32/15 88/16 88/16 96/14
96/22 114/7 115/8 117/12 117/14 149/17 168/24
169/15
**long-planned [1]** 168/24
**longer [3]** 121/1 140/25 151/2
**look [11]** 38/5 53/2 59/9 93/6 98/4 106/22 106/25
137/21 138/1 152/11 162/17
**looked [4]** 39/2 46/3 105/17 106/19
**looking [4]** 104/22 125/24 126/16 129/20
**Los [2]** 13/2 13/9
**losing [1]** 165/24
**lost [1]** 87/4
**lot [6]** 79/13 106/13 134/5 150/2 152/13 153/19
**loudly [1]** 11/21
**Louisiana [2]** 55/24 56/18
**lower [1]** 59/2
**Lucy [1]** 40/7

**M**

**March 30 [4]** 24/7 67/23 69/18 123/11
**March 30th [14]** 10/18 22/10 48/1 76/4 91/12
91/21 108/11 114/3 118/13 123/7 125/20 132/23
152/12
**mark [2]** 27/8 66/18
**marked [4]** 47/25 66/23
**marking [2]** 24/5 24/7
**marshal [4]** 11/9 27/22 29/1 97/13
**marshals [5]** 56/5 97/25 99/24 104/6 146/2
**marshals' [1]** 147/14
**MARYLAND [6]** 1/1 4/4 48/22 50/8 51/9 174/6
**material [1]** 103/11
**matter [17]** 4/9 4/11 7/20 10/25 30/12 30/23 31/10
37/21 65/24 115/18 132/11 134/2 134/23 146/11
146/13 149/10 174/9
**matters [1]** 40/25
**may [25]** 12/13 12/17 12/19 34/17 43/23 43/23 47/15
47/16 52/1 61/2 66/17 66/20 75/19 80/3 80/12 83/21
106/5 112/22 117/25 121/15 121/16 134/7 138/22
144/10 162/21
**May 2025 [1]** 12/17
**maybe [10]** 38/22 39/6 39/11 39/18 60/10 129/5
137/14 143/1 162/7 165/22
**mean [20]** 18/15 29/24 39/14 39/21 46/8 46/9 57/12
57/19 61/4 62/13 72/11 78/20 84/16 84/22 89/24
90/15 91/13 104/21 110/10 114/18 117/17 118/24
124/6 126/23 138/14 153/7 162/6 165/16 170/1
**meaning [4]** 19/22 69/10 83/5 153/12
**means [6]** 6/3 6/20 14/11 18/9 18/11 18/18 45/4
65/21 69/24 75/4 102/23 107/9 122/11 134/17 148/10
153/8
**meant [3]** 75/7 101/23 139/9
**mechanism [1]** 19/2
**media [5]** 36/4 49/7 53/15 54/8 150/4
**meet [2]** 37/17 135/8
**Mellissa [1]** 59/18
**memo [20]** 9/8 24/19 33/13 70/9 75/22 75/23 76/6
78/23 78/24 81/2 83/4 83/20 85/23 91/22 92/1 92/19
112/11 112/12 112/15 116/10
**memorandum [5]** 23/20 24/16 24/22 152/12 152/17
**memorializes [1]** 164/25
**memorialize [1]** 99/18
**men [1]** 150/7
**mentioned [8]** 34/10 80/24 81/12 108/2 122/1 138/15
143/5 145/24
**mentions [1]** 92/20
**merely [2]** 109/2 110/6
**merits [3]** 165/13 169/22 169/23
**message [1]** 42/16
**met [1]** 168/23
**Mexican [2]** 142/25 143/2
**Mexico [39]** 72/18 72/19 84/17 84/23 85/6 85/11
85/14 85/20 85/23 86/1 86/2 86/10 97/6 118/14
119/17 119/21 120/10 120/23 121/25 122/2 133/20
133/25 135/9 135/11 135/18 136/16 136/23 138/2
142/18 142/20 142/22 143/4 143/8 143/10 143/11
143/14 143/15 143/19 146/5
**microphone [2]** 11/21 44/17
**Microsoft [1]** 40/12
**Middle [1]** 29/7
**might [14]** 40/13 42/18 43/3 43/5 53/2 53/3 56/23
59/13 62/2 76/16 122/4 138/13 162/21 165/20
**miles [2]** 50/15 51/8
**Miller [1]** 53/23
**million [1]** 12/22
**mind [13]** 38/7 39/2 39/6 39/9 56/21 57/6 67/9 68/5
71/21 72/21 105/13 139/12 139/25
**mine [1]** 103/22
**minimal [1]** 10/11
**minimum [1]** 85/25
**minute [10]** 6/4 41/24 53/7 112/22 113/4 137/8
157/5 161/18 163/12 166/18
**minutes [10]** 11/2 18/24 44/6 113/7 113/11 113/6
133/6 166/9 166/12 167/16
**Mischaracterization [1]** 76/9
**Mischaracterizes [2]** 105/5 117/7
**misinterpreted [1]** 106/21
**missed [1]** 159/6
**Mississippi [1]** 56/18
**misspoke [1]** 151/18
**misunderstanding [1]** 119/13
**MOLINA [4]** 2/7 5/14 129/16 169/2
**moment [19]** 20/18 24/17 24/19 35/1 35/8 36/9 39/25
45/9 51/24 59/22 61/9 92/5 114/25 115/11 116/4
116/25 117/5 117/14 145/14
**momentarily [2]** 15/10 116/14
**moments [2]** 93/17 115/18
**Monday [4]** 162/4 162/5 167/6 169/6
**money [2]** 11/24 142/3
**Montesino [1]** 40/6
**months [2]** 53/21 53/24
**moot [1]** 8/23
**mooted [1]** 162/16
**moots [1]** 164/15
**morning [14]** 35/2 35/3 35/4 35/13 36/1 37/5 59/19
133/23 161/25 162/4 162/5 168/25 172/4 172/25
**MOSHENBERG [2]** 1/22
**most [4]** 13/2 54/10 98/2 166/2
**motion [2]** 165/13 169/23
**move [8]** 44/17 52/17 94/23 106/6 155/9 161/23
164/3 170/2
**moved [2]** 63/12 95/16
**moving [1]** 159/12
**Mr [6]** 3/4 3/4 35/3 12/1 102/11 153/18
**Mr. [176]**
**Mr. Abrego [103]** 9/25 10/8 27/2 28/3 28/11 28/19
28/24 29/6 29/16 30/6 30/19 31/4 31/8 32/9 32/18
32/23 33/9 33/23 34/4 35/10 35/14 35/23 36/2 38/8
38/16 39/4 45/23 46/10 46/14 46/25 47/10 48/16
49/8 50/2 50/23 52/13 53/12 57/7 59/4 59/12 74/25

**N**

**name [11]** 5/18 11/21 11/22 12/4 40/5 40/7 58/4
104/13 105/10 106/23 107/2
**named [1]** 40/7
**Nashville [3]** 55/23 147/7 148/2
**Natasha [1]** 2/11
**national [2]** 14/7 51/25
**nationalities [1]** 72/19
**nations [1]** 160/17
**nature [1]** 27/22
**nearest [1]** 22/5
**necessarily [3]** 56/3 127/4 137/13
**necessary [2]** 16/4 122/5
**need [40]** 6/22 10/7 11/10 15/13 15/21 15/23 21/18
21/21 44/18 50/18 68/25 74/23 75/19 76/22 77/2
77/20 80/4 80/12 81/3 82/5 83/21 112/24 112/25
116/12 141/18 146/16 149/21 151/2 163/8 165/22
166/18 168/11 169/21 169/22 170/12 170/17 170/17
170/18 170/18 172/4
**needed [1]** 171/21
**needs [3]** 70/15 147/13 162/1
**never [5]** 47/3 62/7 64/24 87/16 107/22
**new [29]** 11/16 51/25 54/17 55/8 55/18 55/19 55/20
55/24 56/1 56/2 56/3 56/3 56/14 56/17 56/22 57/7
57/17 58/3 98/11 101/2 102/4 103/8 104/19 145/9
145/21 156/24 160/9 162/13 168/22
**next [27]** 10/1 38/17 39/5 43/5 50/5 52/24 51/15
52/13 54/12 56/24 57/8 59/13 76/17 78/11 78/25
80/15 122/23 128/24 139/4 144/3 154/15 154/17
157/10 157/11 157/11 162/12 164/23
**Nicaragua [1]** 84/24
**night [1]** 145/18
**no [130]** 7/4 11/10 15/15 30/10 30/15 30/22 31/5
31/9 31/19 32/6 34/13 35/11 35/24 36/1 36/5 36/6
36/17 36/21 37/25 38/4 38/10 38/18 38/21 38/25
39/9 39/21 43/12 46/12 47/5 50/3 50/7 52/12 53/11
54/20 54/21 55/21 57/22 59/10 61/2 63/24 65/4 65/4
65/10 65/17 65/24 68/7 69/9 69/20 70/5 70/6 75/21
76/7 77/11 77/11 77/1 80/24 82/20 86/3 87/13 87/22
88/12 89/21 90/7 90/10 90/23 94/10 95/6 98/16 102/1
107/15 107/24 108/1 108/20 108/21 109/25 112/13
112/13 112/13 115/8 118/9 119/21 119/25 120/5 121/12
122/3 122/9 123/8 124/2 124/3 124/17 124/24 127/20
130/2 130/16 130/19 132/5 132/12 132/12 134/17
135/5 135/13 136/4 136/21 137/9 140/20 142/6
150/13 150/15 150/16 150/21 155/21 156/11 156/20
156/20 157/7 159/7 159/7 159/17 160/21 160/22
160/25 161/11 161/13 161/14 161/17 168/14 169/10
171/1 171/24 172/1
**nobody's [1]** 97/24
**NOEM [4]** 1/7 4/11 52/5 54/2
**Nome [2]** 147/4 164/11
**nondetained [3]** 12/18 12/22 12/23
**none [1]** 92/6
**nonleading [2]** 28/17 155/14
**nonsubstantive [1]** 8/16
**normal [1]** 66/2
**not [198]**
**note [31]** 41/15 44/14 140/10
**noted [1]** 79/9
**notes [3]** 1/25 79/6 125/24
**nothing [7]** 71/5 90/9 90/11 92/14 93/19 135/19
169/15
**notice [49]** 9/5 9/10 9/18 9/19 16/10 25/11 27/22
32/17 33/10 33/11 33/12 46/14 46/15 46/25 60/18
60/23 61/2 61/11 80/22 81/25 82/2 88/18 88/19 89/4
89/8 90/4 90/4 90/8 91/2 109/23 114/8 114/16
114/24 116/16 116/22 117/13 132/23 132/25 133/1
139/2 139/14 139/16 139/23 157/14 158/19 158/19
159/23 160/4 172/13
**notified [1]** 157/20
**notify [1]** 114/19
**Nowhere [2]** 108/17 110/5

**number [9]** 1/6 4/10 53/20 53/24 64/14 64/25 139/6
139/14 157/19
**numbers [1]** 51/7
**numeral [1]** 8/11
**numerous [1]** 123/2
**NW [2]** 1/19 2/5
**NY [1]** 1/16

**O**

**O'HICKEY [3]** 2/3 5/12 169/3
**oath [6]** 43/20 45/17 51/14 75/12 113/5 113/20
**object [16]** 73/14 73/21 76/19 96/1 97/19 117/7
119/5 123/17 123/21 125/1 125/10 136/16 136/2
133/2 139/2
**objected [2]** 73/22 73/23
**objecting [2]** 74/3 156/11
**objection [20]** 36/17 48/2 76/9 76/21 77/11 78/9
79/9 98/18 105/2 105/5 124/8 124/13 139/17 152/23
152/25 153/16 154/14 155/7 155/22 160/5
**objections [3]** 6/25 7/3 7/4
**obligations [1]** 171/13
**obviously [1]** 6/23 7/7
**occasions [2]** 53/21 53/25
**occur [3]** 29/21 29/22 30/2
**October [1]** 48/22
**October 10 [1]** 48/2
**odd [1]** 38/13
**off [12]** 11/4 15/4 75/18 88/13 99/15 107/18 109/3
129/13 135/25 146/18 156/7 156/9
**offense [1]** 21/1
**offer [1]** 67/17
**offered [4]** 9/12 36/17 141/6 168/1
**offering [1]** 75/11
**office [48]** 2/8 12/15 13/1 13/3 14/3 13/9 13/15 13/16
31/17 31/19 16/9 21/13 29/17 35/18 37/20 42/17
51/17 52/15 52/21 54/18 54/22 55/18 55/20 55/21
55/23 56/2 56/4 56/13 56/14 56/17 56/23 57/13
57/17 57/20 57/22 57/25 58/1 58/3 62/23 98/11
100/5 101/3 102/4 103/8 114/8 116/9 130/16 139/16
145/21
**office's [1]** 58/4
**officer [73]** 13/14 13/14 14/2 14/2 18/18 18/19
18/21 19/13 19/13 19/23 22/12 22/12 22/19 22/20
22/21 25/10 25/11 25/18 25/19 25/22 26/12 26/13
26/14 26/18 30/25 31/12 33/25 34/5 50/12 51/19
54/13 59/25 60/3 61/16 61/25 62/8 63/14 82/2 82/21
87/10 87/13 87/20 90/13 100/3 114/13 114/18 126/9
126/8 126/15 126/19 127/2 127/8 127/22 131/7 131/9
131/10 131/12 131/14 131/20 131/22 134/10 134/12
136/21 136/25 135/21 136/8 136/13 136/13 136/19
136/21 136/25 137/3 137/10
**officer's [2]** 26/1 31/24
**officers [27]** 15/5 15/25 16/1 16/3 19/3 22/2 31/18
31/22 32/1 63/14 65/19 66/5 82/21 82/22 83/6 87/9
89/16 90/1 104/9 114/21 117/11 137/17 138/3 145/15
150/16 151/20 153/9
**officers' [1]** 150/22
**offices [3]** 13/2 56/12 62/24
**official [5]** 16/15 91/22 174/1 174/4 174/17
**officials [2]** 53/14 122/17
**Oh [6]** 11/10 90/22 124/13 131/22 168/12 171/1
**okay [125]** 4/22 5/4 5/7 5/10 5/15 5/25 6/6 8/4
8/16 9/15 9/22 10/5 10/22 20/16 24/9 29/4 30/3
39/25 41/13 41/23 42/6 42/8 43/11 44/3 44/4 44/20
44/21 45/14 45/16 46/6 47/13 47/22 48/17 50/1 56/6
68/10 69/20 70/16 72/8 75/11 76/1 77/24 79/6 81/2
82/4 83/24 85/21 86/11 86/23 88/10 89/15 94/10
94/18 94/21 96/12 99/2 99/11 100/1 100/11 101/10
101/14 103/20 105/19 106/1 108/9 109/8 111/13
111/21 111/25 112/20 116/12 121/12 122/9 123/25
125/22 126/11 126/24 126/12 128/15 128/19 128/22
128/21 128/22 129/25 129/15 130/7 130/17 130/21
131/1 131/24 132/16 132/24 133/8 137/4 138/8 138/17
138/19 142/13 142/20 143/24 144/3 144/9
144/11 146/13 147/24 148/15 148/17 151/22 153/21
153/25 155/14 156/12 159/12 159/13 159/14 161/7
167/9 169/11 169/20 170/7 170/9 170/9 171/4 172/14
**OLIVIA [1]** 1/18
**once [16]** 15/2 30/25 31/12 32/6 33/2 53/16 56/25
88/4 88/5 114/25 135/25 135/21 140/19 140/22
150/24 165/13
**one [67]** 6/3 7/2 7/16 8/10 8/11 8/11 8/12 8/13
14/24 27/5 29/8 40/2 40/6 40/7 40/13 42/4 55/7
56/8 60/2 60/9 60/17 62/17 63/21 67/2 68/21 69/5
72/21 76/16 78/3 78/14 83/5 86/14 87/13 90/15
90/16 90/18 90/22 94/6 96/25 97/2 97/7 100/9 106/5
108/14 119/6 120/3 122/22 125/23 126/15 128/15
132/5 132/15 135/8 135/18 136/15 137/10 138/12
142/15 144/18 154/7 163/2 163/12 166/20 169/16
169/21 170/13 170/13
**ones [1]** 106/23
**only [17]** 6/12 8/11 21/15 35/16 50/22 52/5 64/23
70/17 75/4 75/6 75/8 141/9 141/23 159/7 162/6
162/8 165/24
**open [11]** 6/21 9/3 51/5 51/11 77/18 147/7 148/12
148/15 149/11 166/24 170/17
**open-ended [1]** 6/21
**opened [2]** 67/13 67/14
**operating [2]** 150/6
**operation [1]** 14/7
**operations [10]** 5/22 12/11 12/11 13/7 13/7 14/18
15/11 52/8 52/10 140/17
**opinion [1]** 164/6
**opinions [1]** 140/11
**OPLA [2]** 145/4 145/6
**opportunity [24]** 9/5 9/11 9/19 17/4 17/13 19/7
17/21 18/5 19/12 25/21 30/24 33/14 68/11 78/6 81/21
117/21 135/12 151/21 152/22 153/13 154/4 154/4
159/9 159/18
**opposed [3]** 10/9 164/12 171/21
**option [1]** 170/13
**options [1]** 137/24
**oral [1]** 88/19

**O**

order [95]  4/2 14/12 14/13 17/3 18/4 18/6 18/9
18/13 18/20 18/24 19/4 19/12 26/7 26/10 26/13
26/16 26/20 27/15 28/6 28/8 28/13 29/5 29/10 29/25
45/24 46/4 46/6 46/10 46/16 47/1 48/17 48/23 49/3
49/4 49/9 49/18 49/19 49/22 51/11 52/25 60/17 61/2
62/16 62/17 65/19 65/20 66/6 80/16 81/15 96/24
107/19 108/25 109/21 110/8 122/15 125/11 126/7
126/10 126/23 126/24 127/10 128/25 136/3 140/22
140/24 141/8 142/1 147/11 150/16 150/20 150/21
150/22 150/23 151/1 151/7 151/9 151/13 151/20
151/21 152/3 153/6 153/10 153/11 153/12 157/5
162/12 162/18 162/25 164/7 165/15 168/8 168/9
169/15 172/22
ordered [8]  16/21 27/4 47/6 101/13 104/5 104/14
126/22 130/3
orders [1]  152/18
ordinary [8]  100/20 101/4 127/13 127/15 127/21
128/2 128/6 150/9
organization [3]  51/24 57/11 126/19
organizational [1]  58/22
orient [1]  123/1
origin [9]  17/14 17/20 23/2 23/5 23/9 25/1 85/3
120/16 160/19
original [2]  93/9 122/5
Orleans [23]  54/18 55/8 55/18 55/19 55/20 55/24
56/1 56/2 56/3 56/4 56/14 56/17 56/22 57/7 57/17
58/4 98/11 101/3 102/4 103/8 104/19 145/9 145/21
OSORIO [1]  1/22
other [59]  8/22 26/24 29/8 37/23 40/2 40/8 40/10
40/10 42/1 42/4 43/12 56/17 62/17 67/21 72/20 85/9
85/11 86/7 88/18 95/15 100/6 105/8 105/20 106/3
111/17 115/24 116/17 116/23 118/16 118/19 118/20
122/3 124/4 125/8 131/16 135/4 137/21 137/24 142/4
142/12 144/25 144/25 145/1 150/12 151/24 156/10
156/11 161/11 161/12 161/13 161/14 161/14 162/23
163/8 164/15 169/8 170/13 171/19 172/6
others [1]  104/1
otherwise [5]  4/17 18/14 73/10 77/3 130/10
out [48]  14/19 15/15 15/12 15/25 42/17 48/19 53/16
60/5 60/19 60/21 68/17 71/15 72/5 77/9 77/22 78/1
80/1 81/18 85/13 92/17 95/11 107/17 114/2 116/8
116/10 117/4 119/11 122/10 125/19 127/19 128/6
130/22 131/11 134/8 134/22 135/23 136/5 136/20
137/18 145/9 145/20 146/6 150/7 150/10 155/24
165/21 168/4 170/10
outside [8]  7/9 8/15 50/16 96/2 112/25 125/3
125/10 136/3
over [17]  12/18 14/2 26/6 30/9 35/18 51/13 52/18
53/21 53/24 56/7 73/13 73/25 80/17 95/24 108/4
112/7 122/17
overall [1]  63/17 63/23 65/6
overruled [6]  77/1 77/3 96/3 125/12 139/18 160/6
oversee [2]  12/15 13/6
oversees [1]  55/18
oversight [3]  12/23 51/25 88/12
own [1]  91/17
owns [1]  132/3

**P**

p.m [8]  1/11 44/7 44/7 113/12 113/12 167/17 167/17
173/3
P.O [1]  2/8
page [14]  3/2 24/20 24/20 41/8 69/2 69/3 70/19
72/23 71/3 71/9 75/19 79/25 81/9 174/9
pages [1]  41/6
paid [1]  54/10
paper [5]  46/9 47/5 47/6 110/2 116/25
papers [5]  170/15 170/18 170/22 170/24 170/25
paperwork [2]  81/20 84/3
paragraph [2]  27/15 78/15
Paralegal [1]  2/11
parallel [1]  61/13
paraphrased [1]  69/2
paraphrasing [1]  126/13
paroled [2]  96/8 96/21
part [6]  23/3 41/12 109/17 132/7 156/25 169/15
participate [2]  87/19 87/21
participated [2]  144/22 145/7
participating [1]  144/21
particular [4]  119/15 121/23 135/14 136/16
parties [4]  6/2 6/13 24/23 157/22
parts [1]  70/10
party [37]  63/16 63/22 64/10 65/5 66/9 68/5 69/8
72/13 73/6 74/9 75/13 76/4 93/18 107/12 107/17
108/2 108/24 109/3 109/18 109/23 109/18 109/20
110/6 122/21 123/15 125/7 125/14 126/16 127/3
127/6 134/7 134/14 135/1 142/14 151/15 155/3
157/14
pass [1]  142/9
passed [3]  121/4 121/7 124/25
passing [2]  120/18 120/18
passionate [1]  155/18
Patel [1]  2/11
path [1]  138/7
PAULA [5]  1/10 4/5 174/4 174/15 174/16
pause [4]  152/3 162/20 163/8 164/2
pending [3]  4/9 146/10 146/19
Pennsylvania [1]  2/5
people [25]  21/3 23/6 51/13 52/5 52/18 54/10 54/25
55/1 57/6 63/25 64/2 70/25 73/4 73/12 74/16 74/22
86/16 93/17 97/4 114/24 122/1 122/11 125/7 156/9
156/13
per [3]  8/10 49/1 156/21
percent [3]  64/10 64/21 65/5
percentage [5]  63/16 63/23 64/1 64/9 65/2
performance [1]  80/7
performing [2]  90/12 91/23
perhaps [5]  39/5 79/5 79/7 81/3 99/18
period [7]  61/1 62/4 114/15 115/8 140/1 140/4
166/24
permission [10]  6/22 6/23 7/25 23/22 27/10 47/15

---

66/17 143/3 143/19 143/21
permitted [1]  143/8
persecuted [1]  143/10
persecuted [18]  69/10 69/22 70/1 71/1 72/14 72/20
74/23 74/25 81/6 81/10 107/14 109/18 112/6
119/2 122/22 135/24 143/15
persecution [5]  17/23 121/22 122/10 123/8 124/22
person [32]  16/21 22/3 22/20 22/23 26/19 38/6
54/12 67/22 78/15 83/8 83/13 83/18 83/21 83/24
84/1 88/12 101/5 109/11 123/2 126/9 126/9 130/18
132/23 132/25 133/21 136/10 136/21 142/16 143/25
146/15 148/4 153/12
personal [7]  39/22 40/25 121/3 63/7 64/23 94/10
165/19
personally [2]  60/8 62/7 100/4
personnel [1]  105/20
perspective [2]  140/13 150/6 162/24
persuasive [1]  156/25
pertinent [1]  43/3
phone [5]  35/3 38/11 38/14 59/19 145/2
phrase [2]  14/10 14/11
physical [3]  100/1 102/23 103/4
physically [2]  22/18 106/14
pick [4]  21/15 50/14 113/15 172/6
picking [3]  134/24 135/25 156/9
picks [1]  134/10
piece [6]  46/9 47/5 47/6 110/2 116/25 123/22
place [19]  73/13 84/12 88/24 89/20 99/23 108/7
108/9 108/22 109/1 116/24 129/24 147/15 147/19
148/4 148/25 149/6 149/6 163/23 165/2
placed [11]  15/8 35/17 35/20 40/24 100/23 101/2
102/5 102/22 102/23 104/11 106/24
places [1]  120/10
placing [1]  66/22
plaintiff [4]  23/24 34/17 161/20 171/23
plaintiffs [10]  1/5 1/13 4/14 4/16 8/12 34/17
41/18 43/16 45/10 171/5
plaintiffs' [15]  8/21 10/18 34/14 47/23 47/24 48/3
48/6 66/18 88/23 90/20 92/13 93/10 108/10 108/11
162/24
Plaintiffs' 1 [1]  47/23
plane [6]  97/16 97/24 116/5 116/5 117/18 139/15
planes [1]  156/10
planned [1]  168/24
planning [1]  57/13
plans [1]  31/15
please [14]  4/13 11/12 11/14 11/19 11/20 12/4 40/5
63/18 77/20 103/16 125/23 126/2 153/22 154/3
plus [1]  98/9
point [26]  34/23 37/3 37/18 38/19 38/23 39/17 45/5
48/19 54/14 89/13 93/15 107/22 117/18 141/10
144/18 146/1 156/8 156/15 157/25 158/7 158/8
158/11 158/17 158/19 158/25 162/15
policies [2]  155/20 160/14
policy [9]  9/8 85/13 88/1 152/17 155/4 156/21
157/13 158/10 160/1
politics [1]  150/15
port [6]  96/7 96/16 96/18 96/20 96/22 98/5
portion [1]  39/22
ports [1]  133/21
position [14]  8/21 12/17 12/25 13/10 45/23 52/1
74/18 84/12 85/15 146/19 163/20 171/8 171/17 172/5
positioned [3]  163/21 166/9 166/12
positions [2]  13/18 13/19
possession [1]  45/2
possibility [2]  51/1 57/12
possible [11]  11/3 29/19 32/12 50/14 50/22 50/25
58/5 58/8 58/11 114/14 123/7
post [1]  21/11
postremoval [1]  129/10 130/21 159/1 159/1
potential [6]  38/16 60/23 76/3 92/5 134/6 134/23
potentially [5]  89/6 114/19 136/1 137/19 162/21
practically [1]  18/15
practice [2]  112/16 171/12
pre [2]  61/10 167/4
pre-March [1]  61/10
Precisely [1]  167/4
precluding [1]  157/13
predecessor [1]  13/25
predict [1]  55/5
predictable [1]  140/16
preempt [1]  31/17
preemptively [1]  31/18
preference [1]  150/13
prejudice [4]  139/1 139/7 139/10 141/7
preliminary [1]  120/17
preparation [11]  39/20 40/24 41/10 42/2 42/10
48/13 102/14 105/8 106/9 107/3 144/21
prepare [4]  37/6 37/24 43/4 163/7
prepared [7]  28/1 37/13 44/12 141/6 165/23 170/14
171/7
preparing [9]  36/10 38/12 38/20 67/4 103/6 104/25
106/9 106/15 107/4
preplan [1]  31/24
prerequisites [1]  85/7
presence [5]  7/10 8/15 40/17 40/18 44/18
present [5]  2/11 40/10 87/15 94/5 96/18
presentation [1]  162/14
presented [5]  17/25 41/2 88/22 98/12 106/14
presently [1]  94/11
president [2]  53/19 150/3
presiding [1]  4/5
press [1]  164/2
presumably [2]  97/16 131/3
presume [1]  127/15
pretend [1]  44/1
pretty [2]  141/12 164/3
preventing [1]  160/3
previous [1]  88/4
previously [2]  132/22 135/3
primarily [1]  34/17 85/19 85/20

---

prints [2]  15/3 15/4
prior [24]  12/17 12/25 13/9 13/16 26/21 35/1 35/8
67/25 75/13 79/15 80/17 82/2 82/4 83/8 66/7 67/19
82/23 95/16 98/11 98/13 117/22 142/23 153/6
153/10
privacy [3]  97/15 123/10 123/19
private [1]  171/11
privilege [1]  39/12
probable [1]  15/23
probably [6]  37/8 98/11 101/12 104/20 123/12
133/22
probe [1]  116/12
problem [4]  36/21 155/17 163/22 166/19
problematic [1]  78/23
procedural [2]  27/24 37/21
procedurally [1]  149/1
procedure [22]  6/17 63/8 75/18 75/21 80/9 88/1
88/8 88/16 88/24 89/20 90/13 90/19 108/21 109/1
110/3 110/5 116/2 116/8 116/10 123/4 124/5 132/24
procedures [25]  23/17 24/21 43/5 69/1 71/12 72/5
75/20 76/2 76/8 78/10 80/4 80/13 80/22 81/3 83/21
84/9 91/19 92/3 92/17 93/4 93/12 108/22 109/25
114/2 114/3
proceed [5]  34/17 82/17 82/20 121/15 136/25
proceeding [6]  16/6 16/18 31/7 62/1 146/19 152/20
proceedings [14]  16/7 16/14 21/10 31/16 32/11
63/17 79/17 121/13 129/10 147/14 159/15 164/4
173/3 174/8
process [103]  10/11 13/20 13/23 14/4 16/8 17/15
17/16 19/1 19/2 19/4 19/9 19/21 22/16 22/17 23/7
26/6 31/3 31/14 32/19 32/22 33/6 33/13 42/19 60/4
60/16 61/5 61/7 61/9 61/11 61/14 62/4 65/14 67/16
67/17 67/19 68/5 69/17 70/8 70/23 72/16 79/8 81/1
81/11 81/18 84/12 84/20 86/8 86/20 88/16 89/18
89/25 90/6 90/8 90/13 90/15 90/19 91/1 91/7 92/6
93/4 94/7 94/8 94/19 98/7 108/9 108/17 114/1
115/4 118/3 118/5 118/6 122/20 126/6 126/16 126/18
127/3 127/9 127/18 127/19 127/20 128/9 130/22
131/8 135/9 136/20 138/18 147/23 147/23 149/21
151/1 154/12 154/20 155/5 155/21 156/11 156/13
156/24 157/3 158/20 158/24 159/1 164/8 165/7
processed [1]  118/1
processes [1]  166/4
processing [1]  63/13
produced [1]  45/9
production [4]  41/14 41/15 43/9 103/10
professional [4]  36/5 36/6 37/23 38/1
profile [1]  54/23
program [1]  12/24
progressed [1]  13/13
promise [1]  128/22
prompt [1]  55/11
prompted [1]  69/16
pronunciation [1]  58/6
proof [5]  128/1 142/21 143/8 143/9 143/25
proposal [2]  163/2 167/25
proposed [2]  27/23
propriety [1]  168/15
prosecution [2]  96/10 96/21
protection [4]  23/15 92/2 92/24 96/9
protections [1]  10/11
protest [1]  159/10
protocol [1]  137/16
protocols [1]  124/5
provide [6]  43/4 59/11 75/5 80/8 89/10 122/3
124/24
provided [13]  27/23 49/2 67/24 89/8 89/22 91/2
91/19 93/20 104/17 116/2 116/23 159/23
provides [3]  32/16 116/2 132/7
providing [3]  42/22 106/16 123/14
public [7]  54/1 54/3 54/5 95/12 130/11 172/11
172/13
publicly [2]  53/20 53/25
pulled [1]  107/2
punitive [1]  146/20
purely [2]  21/3 149/21
purported [3]  46/15 46/16 47/1
Purpose [1]  152/16
purposes [6]  41/9 42/21 123/7 131/16 134/7 147/25
pursuant [11]  21/9 21/19 73/5 75/14 76/6 76/6
85/23 90/7 99/14 152/18 174/6
pursue [1]  27/25
put [19]  7/8 7/11 16/14 38/11 38/14 47/20 76/7
76/16 77/11 84/11 108/22 116/15 122/7 138/22 147/6
150/5 165/15 170/14 172/5
puts [1]  171/16
putting [3]  91/2 99/17 156/10
PX [1]  1/6
PX25 [1]  4/10
PX25-951 [1]  4/10

**Q**

question [76]  9/4 20/2 22/3 33/15 35/25 40/16 43/1
46/23 49/12 49/20 56/20 57/5 62/14 65/15 65/25
66/1 66/7 68/4 74/1 75/9 75/10 76/11 76/13 77/6
83/24 87/3 92/11 93/9 94/17 97/14 98/2 98/3
98/7 98/9 99/20 104/12 106/5 106/20 110/11 111/11
112/14 116/20 117/1 119/22 120/2 120/9 120/17
120/24 129/12 140/12 141/8 141/9 141/17 141/19
143/16 144/4 144/4 146/5 148/11 151/23 156/16
154/17 155/12 157/15 160/22 170/16 171/5 171/7
questions [34]  6/22 6/24 9/24 34/13 87/11 88/5
103/21 106/3 116/13 122/25 123/3 124/13 124/25
124/12 124/16 130/17 131/1 131/4 132/21 138/25
142/16 142/19 145/8 153/22 153/24 155/14 157/1
157/11 157/19 159/3 160/22 170/16 171/5 171/7
quick [1]  113/1
quickly [4]  11/3 20/7 133/16 161/23
quiet [1]  77/20
QUINN [3]  1/15 1/19 171/14
quite [2]  72/2 162/18
quotation [2]  64/7 64/8

**Q**

quoted [1] 93/11

**R**

raise [2] 8/15 11/14
raised [2] 107/16 160/10
RAND [21] 1/15 3/4 4/23 34/15 34/16 42/9 45/11
45/18 56/9 77/25 78/4 79/5 102/11 106/2 112/21
113/21 145/8 150/3 157/19 159/18 160/10
Rand's [2] 77/14 159/3
ranks [1] 1/13
rate [1] 63/16
reach [3] 8/25 145/9 145/20
reaches [1] 160/17
read [10] 11/6 39/21 67/7 80/13 81/4 88/21 90/24
157/13 160/1 160/2
reading [6] 64/4 67/8 70/16 80/1 129/7 129/8
reads [3] 78/20 78/20 130/2
ready [14] 10/17 10/18 10/20 11/23 11/6 43/17
44/10 45/18 79/9 96/24 113/5 169/22 172/19
172/23
real [3] 110/15 136/6 164/5
realize [1] 165/20
really [12] 6/11 7/2 20/7 109/20 112/25 134/23
156/20 159/2 161/2 165/21 166/1 172/13
realtime [5] 6/1 6/14 7/17 10/22 12/15
reason [5] 57/10 65/4 119/5 157/12 160/2
reasonable [3] 20/5 139/2 164/21
recall [10] 35/5 40/7 42/15 60/7 63/2 63/4 63/5
114/4 133/2 145/11
recalling [1] 117/6
receipt [1] 110/21
receive [10] 9/4 18/19 33/11 33/12 104/23 116/25
117/14 130/4 139/9 160/18
received [23] 8/17 35/3 37/2 45/23 46/14 46/17
46/25 47/2 53/13 61/1 67/10 68/22 71/10 80/1 80/10
101/2 102/4 104/20 106/18 120/21 128/16
128/17
receives [6] 22/20 84/1 132/23 132/25 132/25
139/23
receiving [3] 109/15 115/11 117/13
recently [1] 13/2
recess [8] 11/2 44/6 44/7 113/11 113/12 166/18
167/16 167/17
recognize [5] 24/11 48/9 48/11 49/23 66/25
recollection [2] 47/19 63/5
record [28] 4/13 7/8 7/12 8/21 9/23 11/4 11/22
12/4 42/7 44/14 47/20 66/22 77/9 77/12 77/22
103/15 119/11 131/15 131/25 141/4 144/19 144/24
145/6 155/24 156/1 156/4 171/16 172/5
records [1] 132/8
recross [1] 160/24
redetermination [2] 137/21 138/1
redirect [3] 3/5 144/14 160/24
reenters [1] 153/9
refer [11] 14/5 14/9 14/10 25/16 27/14 61/7 88/2
92/22 100/13 114/13 152/14
reference [1] 9/7
referral [2] 90/4 93/2
referred [14] 17/21 19/11 19/16 20/18 25/23 33/18
34/1 82/7 82/13 84/4 108/23 115/16 117/23 133/3
referring [6] 24/16 68/19 78/5 117/1 120/14 131/23
reflect [1] 66/22
reflected [1] 108/9
reflects [1] 145/6
refoulement [4] 107/9 107/10 108/18 160/9
refresh [1] 47/19
refusal [1] 130/7
regard [15] 6/13 36/11 46/15 46/16 49/23 76/3
105/4 105/4 108/22 122/4 122/9 123/1 124/6 135/22
146/25
regarding [14] 8/22 11/4 24/13 37/19 43/6 66/9
78/12 87/3 119/23 123/22 145/8 152/17 157/22 160/9
regards [2] 36/23 67/15
registered [1] 114/17
registration [3] 22/20 100/9 100/12
regulations [1] 174/10
regulatory [1] 103/25
reinstatement [4] 153/5 153/5 153/10 153/18
reinstating [1] 153/10
relate [1] 51/10
related [1] 132/2
relates [1] 93/11
relationship [7] 58/24 65/18 66/3 86/1 89/21 125/9
139/25
release [7] 21/25 38/17 54/17 128/24 162/12 162/20
164/7
released [32] 10/1 21/9 21/14 27/21 29/6 29/16
29/17 32/5 39/5 50/6 51/9 51/16 51/16 52/14
52/23 53/9 55/2 56/24 56/25 57/8 58/13 76/17
127/10 127/13 131/2 138/13 146/3 163/3 163/10
165/3
relevance [3] 96/2 136/3 141/14
relief [4] 41/9 41/18 43/2 103/5
relief [2] 18/7 163/21
relying [1] 42/21
remain [2] 77/20 110/25
remember [13] 35/22 60/11 62/5 62/13 63/10 105/23
126/11 145/3 159/21 159/24 160/11
remind [2] 113/5 113/19
removal [150] 5/22 9/11 12/1 13/7 13/20 13/23
14/4 14/9 14/11 14/12 14/13 16/6 16/7 16/14 16/18
17/4 17/14 18/4 18/5 18/7 18/8 18/20 19/1 19/2
19/8 19/19 20/1 20/3 20/4 22/15 22/20 23/11 23/12
23/19 25/1 25/5 25/6 25/12 25/20 25/21 26/5 26/16
26/19 26/20 27/21 28/6 28/8 31/7 31/8 31/15 32/10
32/12 33/15 34/3 42/24 45/24 46/4 46/10 46/16
47/2 48/17 48/23 49/4 49/19 52/7 52/9 59/23
60/24 61/20 62/9 62/15 63/16 63/22 64/11 65/5
65/14 65/20 65/20 65/22 66/14 67/17 68/6 68/25
69/9 70/1 72/13 76/3 78/10 81/25 82/17 82/19 82/20
92/17 104/10 108/24 109/6 109/7 109/23 110/17
111/7 111/14 112/8 112/19 114/20 115/6 115/7
115/16 115/21 117/13 117/16 117/20 126/23 126/24
140/21 140/23 141/25 142/23 147/12 150/17 150/20
150/22 150/23 154/2 154/3 154/12 154/18 157/23
152/19 153/12 154/8 157/6 157/14 158/25 159/19
157/4
removals [5] 18/23 22/24 24/15 24/22 42/18 42/20
43/7 67/14 84/17 85/20 108/2 109/13 109/14 155/3
157/4
remove [34] 18/16 18/22 19/5 19/25 25/4 26/19
27/20 30/19 31/4 32/14 32/16 32/21 32/23 33/9 73/4
74/16 84/17 85/14 87/2 109/18 122/1 122/16 122/18
126/9 136/15 137/22 137/23 139/7 151/3 151/7 164/4
164/10 165/7 165/8
removed [63] 9/6 16/21 16/24 17/12 22/23 23/1 23/4
23/14 25/12 26/7 32/10 33/3 32/23 34/5 34/8 47/6
49/16 49/17 49/21 49/24 53/9 61/12 62/23 62/25
65/2 69/23 70/13 75/19 76/5 80/3 80/12 80/21 81/20
82/3 83/21 84/19 85/2 85/22 86/16 88/8 88/17 89/6
90/5 91/4 92/6 93/18 95/15 101/13 109/24 110/1
114/9 115/24 122/13 122/22 125/7 125/13
126/22 130/3 130/7 135/11 142/24 153/8
removing [5] 14/14 22/18 23/6 51/10 111/1
reopen [1] 31/7
reopened [1] 32/11
reopening [1] 31/15
reorient [1] 141/18
repatriate [1] 133/20
repatriated [2] 133/25 143/23
repatriating [1] 143/20
repeat [3] 23/3 63/18 67/20
repeatedly [2] 145/14 168/23
repeating [1] 57/20
rephrase [13] 28/17 73/16 74/5 74/6 76/10 117/9
121/1 134/19 134/20 139/9 154/25
report [3] 55/23 91/15 118/6
reported [1] 174/8
REPORTER [3] 174/1 174/4 174/17
reporter's [1] 116/16
repository [1] 100/5
representation [1] 76/4
representative [1] 75/12
representative [2] 89/9 156/9
representing [2] 89/23 140/8
represents [1] 46/9
request [7] 7/24 20/20 51/19 60/20 92/7 92/9
165/15
requested [4] 6/14 7/19 94/11 168/8
required [2] 9/10 142/19
requirements [1] 118/23
reserving [1] 142/9
reside [1] 143/22
resolved [2] 34/4 34/7
resources [2] 32/2 32/3
respect [3] 6/15 153/20 168/13
respectfully [3] 43/1 93/9 169/19
response [6] 81/15 87/3 88/5 116/13 117/1 151/23
responsibilities [11] 12/14 12/15 12/20 12/21 13/5
13/6 52/12 58/19 67/22 80/7 90/12
responsibility [5] 26/11 26/12 57/16 57/16 140/23
responsible [2] 57/7 169/21
responsive [4] 153/22 155/5 158/12 159/2
restriction [1] 25/1
result [1] 107/13
resulted [1] 153/13
resume [1] 43/16
resumed [2] 79/17 121/13 159/15
resumes [3] 44/9 113/14 167/19
return [9] 17/16 17/24 19/9 20/5 25/15 33/21 70/8
95/8 95/18
returned [5] 95/12 97/9 111/8 120/6 152/4
returning [4] 17/20 33/17 92/21 96/19
reunion [1] 168/25
review [11] 16/9 24/19 31/1 68/11 102/13 102/15
104/8 104/13 104/24 105/8 162/12
reviewed [5] 46/21 47/7 47/9 102/17 106/9
reviewing [2] 42/15 46/3
right [172] 4/19 5/3 5/18 5/23 6/9 7/18 7/19 8/8
9/22 10/3 10/15 10/24 11/13 11/14 34/14 35/25 36/8
37/1 40/4 41/22 43/11 43/12 43/15 44/10 44/23
44/24 45/10 45/17 48/6 49/1 51/3 51/25 54/9 55/13
56/4 58/3 58/20 60/18 60/18 62/12 63/22 64/1 64/12
64/22 65/1 65/13 66/7 66/8 66/15 67/4 68/1 68/23
69/5 69/8 69/18 71/6 78/16 79/4 79/19 79/25 82/18
83/8 83/18 83/22 84/12 85/11 85/12 85/16 85/20
86/1 86/10 87/22 88/12 89/19 90/16 90/20 90/23
91/5 91/8 92/3 92/6 92/18 93/9 94/13 94/19 94/21
95/13 98/17 99/5 99/14 99/18 100/2 105/16 107/8
107/9 108/18 109/3 109/11 109/17 111/3 111/24
113/15 113/18 114/6 115/13 118/8 119/18 119/20
119/22 120/3 120/12 121/10 122/8 123/24 124/4
124/15 124/25 126/16 127/3 128/15 129/5 130/18
132/9 135/17 136/5 136/8 137/4 138/20 138/20 142/5
142/8 142/17 144/9 145/18 146/1 146/11 146/22
147/1 147/4 147/15 148/17 148/18 148/21 149/19
150/23 151/10 151/22 152/5 152/7 152/19 152/20
152/22 153/15 154/2 154/5 154/11 154/23 155/23
157/21 157/23 157/24 158/6 161/2 161/9 161/11
162/7 165/1 166/15 167/1 167/17 169/6 170/22
rights [10] 16/25 17/1 17/8 46/14 47/1 61/3 62/2
89/23 142/10 148/21
ripe [5] 162/18 163/10 165/23 165/24 168/2
rise [8] 43/3 44/5 44/8 113/10 113/13 167/15 167/18
173/1
Road [1] 1/23
robust [1] 165/1
role [6] 12/12 13/12 13/14 12/20 52/12 98/10
roll [1] 4/21
room [1] 169/10
rooms [1] 6/4
ROSSMAN [3] 1/14 4/16 55/11
roughly [1] 49/14

rounded [1] 13/22
rounds [4] 156/13 158/10 158/19 158/24
RPR [1] 174/3
Rubin [1] 50/13
rule [3] 6/1 7/1 7/2
rules [2] 6/20 6/25
ruling [1] 7/11
run [1] 112/25
running [1] 6/10
rush [1] 170/10

**S**

Salvador [41] 27/21 28/6 31/8 46/5 49/4 49/8 49/10
49/13 49/16 49/18 49/21 49/24 75/1 84/25 85/10
85/11 85/17 95/16 97/10 97/15 98/17 110/17 110/22
118/22 118/22 118/25 119/6 119/24 120/7 120/14
120/18 120/24 121/2 121/21 122/6 136/22 136/25
138/4 151/10 151/12 152/4
same [11] 20/7 62/6 63/1 66/8 92/20 96/17 100/16
116/20 124/8 139/17 153/16
San [2] 13/3 13/10
SANDOVAL [2] 1/22 5/1
SANDOVAL-MOSHENBERG [2] 1/22 5/1
SARMAD [2] 2/4 5/5
SASCHA [4] 1/15 4/23 34/16 79/4
sat [1] 87/16
satisfied [5] 72/8 72/20 118/18 118/23 124/20
satisfy [1] 15/21
Saturday [1] 167/2
saw [3] 66/15 67/3 103/5
saying [17] 5/18 10/2 78/5 78/6 79/1 81/2 84/21
85/1 99/6 111/2 111/4 129/21 133/2 137/1 157/1
158/12 171/1
schedule [1] 165/11
scheduled [1] 133/22
scope [3] 96/2 125/3 125/10
Scott [1] 91/24
scratch [2] 155/12 155/13
screen [5] 93/1 102/17 102/20 103/5 145/5
screening [1] 92/23
search [1] 105/2
seat [5] 4/7 11/19 44/24 113/19 167/21
second [20] 6/17 55/7 69/7 69/12 69/22 70/5 70/7
70/8 71/15 71/18 73/20 75/5 75/7 75/8 78/14 78/15
81/19 89/18 92/19 125/23
seconds [1] 115/18
secretary [6] 23/21 52/5 54/2 54/6 80/19 150/4
section [13] 23/21 52/5 74/6 78/16 78/18 78/19
92/24 104/4 128/24 129/3 130/1 130/8 130/12
Section 238 [3] 19/20 19/21 20/8
Section 241 [1] 14/4
Sections [1] 152/19
secure [1] 30/2
Security [4] 23/18 23/21 91/16 160/15
see [36] 5/16 8/4 10/23 15/6 27/9 42/25 44/4 47/5
53/2 54/22 57/13 58/12 58/12 60/5 60/22 61/23
71/13 79/1 80/5 82/23 90/5 93/6 96/4 98/4 98/12
98/13 102/20 105/22 108/20 113/6 115/1 127/8 144/6
158/11 172/18 172/24
seeing [1] 101/12
seek [1] 27/20
seeks [1] 83/7
seem [7] 64/12 64/16 64/19 64/21 64/22 73/12 164/6
seemed [1] 116/13
seems [3] 163/17 164/17 164/21
seen [7] 35/23 37/1 46/6 46/9 46/20 47/3 47/5
48/13 53/15 54/7 95/5 95/20 101/18 101/25 102/9
116/8 128/19
segued [1] 99/3
selected [1] 38/25
send [17] 60/5 60/13 65/16 70/11 70/14 72/18 74/22
83/6 109/9 109/11 111/15 120/11 120/21 137/19
160/18 166/13 166/13
sending [4] 65/10 65/21 109/14 111/15
senior [7] 51/23 53/14 54/10 67/22 91/22 98/10
118/4
seniority [1] 139/23
sense [8] 10/13 10/14 64/18 145/20 145/24 164/19
166/7 166/25
sensitive [1] 105/25
sent [33] 15/2 22/8 49/8 49/10 49/13 53/3 60/21
63/21 66/2 68/23 72/25 72/13 72/23 73/11 73/12
74/8 74/13 75/1 75/13 80/18 89/5 89/21 91/22 103/1
107/12 107/13 107/17 109/2 119/1 123/9 123/15
124/21 134/7
sentence [5] 39/21 39/23 71/9 80/8 152/15
sentences [1] 70/13
separate [6] 15/9 37/16 37/21 91/18 132/12 132/12
sequent [1] 39/22
serve [6] 21/4 25/11 25/13 82/2 89/16 110/14
served [14] 21/1 81/20 84/3 89/11 109/23 110/12
115/21 116/22 117/20 133/19 133/19 133/23 133/24
140/19
service [15] 14/3 52/11 56/5 89/3 95/24 98/1 98/10
104/6 114/12 114/14 115/3 115/15 130/16 140/20
146/2
services [15] 17/22 19/12 25/17 33/19 33/20 61/8
81/12 82/8 82/10 82/12 87/25 89/1 91/18 91/24
92/23
serving [2] 114/13 150/7
session [4] 4/4 44/9 113/14 167/19
set [12] 21/14 24/21 36/11 68/17 98/16 114/21
122/10 140/1 140/6 147/16 149/17 157/11
sets [2] 72/5 78/1
setting [1] 23/18
setup [1] 11/4
seven [17] 55/6 84/18 84/21 84/23 85/1 85/14
119/18 120/10 120/11 120/25 122/1 135/9 135/18
136/14 136/15 137/10 143/5
shall [1] 130/3
shape [6] 36/3 38/15 38/15 39/7 92/16 108/18
share [7] 38/5 44/13 44/25 45/3 45/12 159/19 160/4
shared [2] 44/12 142/25

S

sharing [1] 152/14
shipped [2] 155/14 156/18
short [3] 9/13 43/25 112/7
shouldn't [4] 109/16 111/1 111/2 112/7
shows [1] 40/20
shown [1] 156/20
side [6] 10/16 10/18 10/20 161/15 171/3 172/7
sidebar [4] 77/7 77/20 119/8 156/1
sidea [3] 7/13 164/17 172/2
similar [2] 58/19 171/14
SIMON [2] 1/22 5/1
simple [1] 110/15
simply [1] 7/9
since [16] 12/13 26/19 36/8 37/5 41/18 52/1 62/20
 85/19 87/1 90/12 125/15 126/18 143/22 143/22
 150/22
single [2] 52/19 168/20
sit [3] 45/22 46/13 46/24
sits [1] 58/23
sitting [14] 6/3 37/16 38/11 38/22 39/10 58/9 65/4
 72/9 72/17 74/19 76/15 108/6 108/21 118/16
situation [13] 53/2 57/8 59/12 63/9 63/20 65/8
 84/8 107/16 108/24 136/23 150/12
situations [1] 69/8
six [2] 55/6 127/8
Sixth [1] 148/20
skimmed [4] 90/24 105/9 105/11 107/3
skipping [1] 171/13
sleep [2] 51/12 145/17
slightly [5] 62/14 97/14 98/7 121/20 122/19
small [4] 63/16 63/23 63/24 64/19
so [190]
soil [1] 117/5
sole [2] 48/24 51/4
solely [2] 51/10 149/10
somebody [19] 21/21 37/22 38/23 39/7 54/12 63/20
 65/17 70/11 95/15 95/16 108/4 108/25 109/9 116/25
 118/4 131/15 139/2 139/14 151/6
somehow [1] 156/9
someone [21] 16/7 55/25 56/3 62/8 65/10 92/6 96/4
 120/6 120/21 120/23 120/24 129/15 147/21 148/2
 149/6 149/8 149/6 151/19 153/8 169/1 171/6
something [14] 7/12 17/9 38/21 79/3 82/24 83/1
 93/3 93/14 100/22 102/17 108/5 133/2 168/4 169/16
sometime [3] 35/17 35/20 95/3
sometimes [5] 61/20 140/5 140/15 159/5 159/5
somewhat [1] 113/19
somewhere [10] 50/16 64/15 73/25 97/16 101/14
 112/12 131/21 147/9 164/5 164/11
soon [10] 29/18 32/8 32/12 34/3 34/9 34/10 43/16
 103/12 114/14 147/17
sorry [24] 4/20 23/3 39/14 44/16 47/25 55/10 55/10
 67/20 73/19 74/3 77/15 90/20 93/22 99/20 108/10
 111/10 113/1 124/14 129/16 138/14 139/20 143/9
 150/19 169/1
sort [5] 38/6 82/19 136/6 147/25 163/14
sound [2] 8/18 63/2
sounds [4] 80/10 80/19 149/9 167/11
source [4] 54/1 54/3 54/5 95/12
South [16] 72/21 72/23 73/4 73/11 74/9 74/16 74/20
 80/18 81/16 86/14 86/16 86/23 118/14 122/5
 122/6
southern [2] 97/6 133/24
space [21] 22/7 30/10 30/15 30/16 30/17 50/18
 50/20 50/22 51/6 51/14 51/21 52/17 53/2 53/4 54/19
 55/4 57/3 145/25 147/4 147/5 149/10
spaced [1] 37/9
Spanish [1] 88/21
speak [10] 11/20 27/2 37/22 38/22 39/6 39/18 64/23
 82/25 90/2 137/13
speaking [10] 7/4 18/15 22/19 26/8 116/17 135/6
 137/5 137/14 141/22 151/19
special [1] 150/13
specific [11] 6/10 51/22 63/2 63/4 63/6 104/12
 130/5 135/22 136/18 143/24 144/1
specifically [10] 10/8 51/23 52/11 52/13 59/16
 92/8 93/7 93/7 104/24 136/9
specifics [1] 29/20
speculating [2] 63/2 90/16
speechifying [1] 7/5
spell [1] 11/22
spend [1] 106/12
spent [6] 36/10 37/5 37/8 49/14 67/4 152/13
spirit [1] 164/11
spoke [1] 37/19
spoken [6] 53/22 53/23 98/14 98/15
staff [2] 13/15 13/15
stage [2] 158/25 168/1
stand [3] 11/13 44/1 161/10
standard [1] 15/21
stands [4] 44/5 113/10 167/15 173/1
start [11] 6/11 26/6 33/6 86/6 98/11 115/4 134/15
 135/15 147/22 155/12 155/13
started [4] 13/12 14/1 53/17 126/5
starts [3] 69/17 70/9 170/10
state [35] 9/8 11/21 12/4 14/9 15/1 20/21 21/24
 54/6 55/2 55/18 68/24 69/10 69/20 70/24 71/11
 72/14 73/1 73/3 73/7 74/10 74/15 80/2 80/11 80/20
 81/5 81/5 81/23 83/16 86/20 111/22 118/12 118/18
 119/3 121/24 150/4
statement [4] 60/15 63/15 64/7 77/18
statements [1] 150/3
states [70] 1/1 1/11 4/3 5/6 14/8 14/14 16/22
 16/24 17/21 18/17 19/4 19/6 19/11 19/25 22/18
 25/16 32/15 33/16 33/18 51/2 53/19 56/14 56/17
 56/19 61/7 63/1 68/21 68/21 70/14 70/15 80/1 80/3
 81/11 82/7 82/9 83/5 83/7 85/6 85/10 91/17 92/21
 95/9 95/12 95/17 96/5 96/8 96/24 97/7 98/13 111/8
 111/19 114/14 115/24 117/22 118/1 118/11 120/4
 120/7 130/5 130/15 139/15 140/2 143/10 153/9
 154/12 160/16 160/19 165/6 174/5 174/11
States' [1] 18/16

Station [1] 2/9
status [4] 22/10 28/4 28/5 35/14
stay [10] 22/6 46/22 54/17 62/21 142/21 143/3
 143/5 146/15 169/12 169/13
stenographically [1] 174/8
stenographically-reported [1] 174/8
STENOTYPED [1] 1/25
step [5] 11/20 43/19 136/9 136/9 165/21
Stephen [1] 53/23
steps [4] 25/8 25/10 27/24 127/23
stick [2] 6/20 78/9
still [13] 18/9 25/5 43/20 44/1 45/17 56/7 77/20
 111/17 113/5 113/20 136/14 146/19 165/20
stip [2] 9/12 9/21
stipulate [1] 9/17
stipulates [1] 9/2
stipulation [5] 8/17 8/19 8/22 9/2 9/23
stop [5] 73/19 112/10 112/10 112/10 165/24
straight [1] 148/1
street [2] 1/19 156/10
stretch [2] 44/2 113/4
strict [1] 6/15
strike [8] 14/21 15/16 16/25 21/17 26/8 28/20
 28/21 32/20
strong [1] 163/24
student [2] 13/12 14/1
studied [1] 90/19
study [1] 66/14
stuff [4] 9/16 37/10 146/21 170/2
stumping [1] 7/1
subheading [1] 152/15
subject [8] 124/21 126/9 128/24 153/23 154/23
 155/4 158/9 160/24
submission [1] 170/14
suboffice [1] 55/22
subsequently [1] 117/4
substance [2] 37/13 106/2
substantive [1] 44/21
success [1] 64/24
successful [1] 60/12
successfully [1] 60/7
such [17] 18/7 39/23 69/9 80/2 80/10 85/10 90/8
 90/13 93/12 95/14 96/14 96/23 98/3 102/18 102/21
 104/14 162/23
Sudan [15] 72/21 72/23 73/4 73/11 74/9 74/16 74/20
 80/18 81/16 86/14 86/16 86/19 86/23 118/14 122/6
suffer [1] 140/1
sufficient [2] 119/1 121/21
suggest [3] 38/19 38/21 39/6
suggested [2] 39/17 61/22
suggesting [2] 164/21 164/24
Suite [2] 1/20 1/23
SULLIVAN [2] 1/15 1/19
sum [1] 37/13
summarized [1] 47/10
summary [4] 41/4 41/6 41/9 41/16
supervision [1] 127/11
supervisor [2] 37/19 52/20
supervisory [2] 13/14 52/16
supported [1] 88/7
supports [1] 161/21
suppose [2] 8/20 121/1
supposed [1] 92/15
supposedly [2] 152/14 152/14
Supreme [3] 64/3 64/4 64/8
Sura [1] 4/16
surely [1] 4/18
suspend [2] 162/8 163/21
sustain [1] 123/24
Sustained [6] 98/21 125/2 125/4 153/17 154/24
 155/8
sustains [1] 17/7
switch [1] 59/21
sworn [2] 11/13 11/16
system [3] 7/23 15/4 100/25
systems [1] 100/22

T

table [5] 37/17 86/8 86/23 86/25 140/12
taken [13] 15/2 25/8 25/10 44/7 62/5 76/17 113/12
 148/5 148/9 149/2 163/3 163/4 167/17
takes [1] 26/10
taking [4] 26/22 141/23 142/3 144/16
talk [17] 43/21 43/22 43/23 61/9 61/17 70/23 91/8
 91/12 91/13 103/17 113/6 131/10 135/10 162/7 168/6
 168/8 169/17
talked [4] 22/24 53/20 152/20 153/19
talking [12] 100/16 104/1 114/1 115/18 127/20
 131/11 133/5 133/6 133/7 135/2 143/17 153/17
talks [1] 42/17
taxpayer [2] 141/24 142/3
team [1] 171/6
teams [5] 14/17 14/19 14/19 15/11 40/12
tell [22] 16/7 52/20 67/9 118/6 129/6 138/6 138/11
 157/10 159/8 159/12 163/20 170/1
telling [1] 87/1
tells [1] 78/24
temporary [1] 165/1
ten [5] 49/14 113/7 113/11 133/6 171/3
tend [1] 9/3
Tennessee [23] 28/23 29/7 29/12 29/18 30/7 30/20
 50/9 50/15 50/24 51/9 52/14 52/21 53/3 54/22 55/19
 55/19 55/21 55/22 56/15 56/18 147/7 163/4 165/8
term [5] 8/20 14/5 10/7 107/9 107/15
termination [1] 27/20
terms [17] 40/9 40/23 58/22 62/10 64/3 64/9 92/4
 114/1 114/15 118/10 122/4 124/5 130/21 136/2 149/5
 149/10 160/25
testified [17] 11/16 41/18 45/9 47/2 48/12 49/5
 49/22 68/16 76/1 94/25 119/17 123/21 126/15 127/16
 127/21 145/13 145/13

testify [10] 27/5 28/1 36/9 38/20 39/4 53/16 107/4
 119/16 140/11 154/13
testifying [5] 39/15 59/16 71/17 71/20
 75/22 162/11 154/16
testimony [54] 3/3 7/6 36/10 37/7 37/14 37/24 38/3
 38/14 41/10 42/2 42/11 43/4 43/21 47/8 47/9 51/3
 53/18 54/9 54/15 54/24 55/25 56/21 59/9 64/24 67/4
 72/2 75/3 80/24 81/13 82/5 82/17 84/1 88/4 94/5 94/6
 102/7 103/6 105/1 105/6 106/16 113/6 118/2 126/11
 126/14 132/22 135/19 136/23 151/25 161/3 161/15
 161/21 164/2 168/6 170/12 170/15
Texas [1] 50/24
Thanks [4] 20/16 30/3 44/3 142/7
themselves [3] 69/16 70/5 96/20
they're [34] 17/10 20/23 31/20 50/13 63/21 74/22
 81/9 89/5 90/4 91/4 91/17 92/15 97/6 97/7 104/7
 104/8 104/9 117/8 109/10 109/11 111/17 112/6
 116/24 123/15 134/24 135/8 136/9 138/16 145/17
they've [6] 45/9 57/13 117/25 134/3 154/11 156/24
thing [7] 65/11 65/16 65/16 92/20 100/16 137/10
 172/3
things [6] 6/2 6/9 96/24 113/24 142/2 142/15
think [26] 9/8 11/6 40/12 45/2 54/20 66/2 66/7
 78/4 78/8 79/12 88/4 95/1 97/4 119/25 120/3 120/9
 120/17 126/14 132/17 136/19 136/23 157/4 159/7
 163/14 163/24 165/18
thinking [2] 38/15 117/6
thinks [1] 78/24
third [135] 9/16 18/22 18/23 22/24 23/1 23/4 23/6
 23/19 24/14 24/23 24/23 25/6 25/9 25/15 25/21
 26/15 26/18 27/20 30/19 31/3 31/14 32/10 32/14
 32/16 32/21 32/23 33/3 33/10 33/15 33/17 33/23
 34/4 34/6 34/8 41/18 42/19 42/24 43/6 52/3 52/7
 52/10 59/24 60/6 62/1 60/24 61/12 61/20 62/8
 62/15 62/16 63/16 63/21 63/22 64/2 64/10 65/5
 65/13 65/21 66/9 67/14 67/17 68/5 68/22 69/8 69/23
 70/1 70/14 71/24 72/13 73/6 73/9 75/13 76/4 81/21
 84/17 85/20 85/22 92/17 92/22 93/18 107/12 107/17
 108/2 108/22 108/24 109/2 109/5 109/10 109/13
 109/13 109/18 110/6 110/20 110/24 111/14 112/23
 112/24 112/8 114/8 114/8 114/20 115/22 119/2 120/8
 122/21 123/15 125/7 125/14 126/8 126/16 127/3
 127/6 131/4 131/7 131/11 133/1 134/7 134/14 135/1
 136/10 137/13 137/14 138/3 139/3 139/24 142/14
 142/17 151/15 155/3 156/12 157/4 157/14 157/22
 158/20 159/24
third-country [20] 18/23 24/14 25/6 42/18 42/19
 42/24 43/6 62/8 65/13 67/14 67/17 84/17 85/20
 108/2 109/5 109/13 111/14 114/20 134/14 157/14
third-party [32] 63/16 63/22 64/10 65/5 66/9 68/5
 69/8 72/13 73/6 74/9 75/13 76/4 93/18 107/12
 107/17 108/24 109/2 109/10 109/13 109/18 110/6
 122/21 123/15 125/7 125/14 126/16 127/3 134/7
 157/22 142/14 151/15 155/3
thirds [1] 48/21
THOMAS [5] 3/3 5/18 11/15 11/23 12/5
though [4] 60/9 90/19 92/8 147/6
thought [5] 43/3 56/22 142/14 158/17 167/6
thoughts [3] 54/22 163/11 163/24
thousand [1] 51/8
thousands [1] 55/1
threat [1] 82/13
three [14] 13/1 37/8 38/13 40/1 40/15 40/18 40/20
 53/21 53/24 62/24 67/3 140/16 145/21 169/5
throated [1] 162/9
through [39] 6/12 13/13 15/5 15/24 16/8 19/6 20/1
 25/7 25/8 42/17 54/1 54/3 54/5 59/19 60/17 65/14
 67/16 72/16 78/11 79/7 81/1 81/10 81/17 81/23
 84/20 86/19 89/18 90/5 94/6 95/12 107/3 111/16
 111/23 127/3 154/2 154/4 155/4 156/13 158/10
throughout [2] 1/11 164/22
THURSDAY [2] 1/11 164/22
tie [1] 78/17
time [56] 10/5 19/13 20/23 21/1 21/3 31/2 31/13
 34/13 34/23 35/1 35/5 35/6 35/8 35/8 36/9 37/5
 37/18 38/19 38/24 39/17 49/13 54/14 54/17 57/2
 60/2 61/1 62/4 67/8 82/6 82/6 84/3 89/13 94/6
 106/13 107/23 115/15 115/20 115/23 127/12 133/13
 133/15 133/22 138/18 140/2 140/6 140/20 144/16
 146/1 146/14 152/13 154/4 157/8 165/11 166/24
 169/24 172/24
timeline [1] 26/1
times [9] 37/10 49/22 57/4 59/21 59/23 65/24 110/4
 138/15 169/14
timing [1] 27/22
title [12] 129/12/10 60/20 88/13
today [63] 4/17 10/12 27/5 28/1 34/24 36/10 37/6
 37/7 37/12 37/14 37/14 37/24 38/3 41/11 42/3 42/22
 45/22 46/13 46/24 49/23 53/1 54/24 55/4 57/21 58/9
 59/11 59/15 59/17 65/4 67/4 68/9 69/12 71/17 72/7 72/17
 74/19 76/15 77/15 79/24 80/13 94/18 94/24 98/17 98/19
 102/14 103/6 105/1 105/8 106/11 106/16 107/4 108/6
 108/21 110/4 138/22 138/6 146/22 147/4 147/22 145/22
 152/20 153/19 165/25 168/7 170/15 172/22
today's [2] 145/10 170/11
together [1] 71/22
told [7] 48/15 59/14 59/16 64/23 71/6 77/2 96/23
tomorrow [15] 55/5 161/24 164/5 165/3 165/23
 166/6 166/11 168/5 168/18 168/20 168/25 169/22
 171/7 172/19 172/23
ton [1] 164/25
tone [1] 159/5
tonight [2] 161/22 169/12
took [2] 62/4 169/14
top [12] 36/24 52/3 52/7 52/10 69/2 70/19 71/9
 75/19 78/19 99/16 116/17 129/14
topic [1] 94/23
topics [6] 27/6 27/14 27/18 28/1 36/11 106/10
torture [17] 17/24 18/8 18/14 23/13 25/3 26/17
 68/23 83/8 83/13 83/18 92/25 120/21 121/22 122/10
 123/9 124/7 124/21
tortured [18] 69/10 69/21 70/1 71/1 72/14 72/24

## T

tortured... **[12]** 74/23 74/25 81/7 81/10 109/16 110/25 112/6
touch **[1]** 51/24
towards **[1]** 11/12
track **[14]** 71/15 71/18 72/9 72/17 72/20 73/5 75/5 75/7 75/8 75/14 75/18 76/6 78/3 78/5
tracks **[6]** 71/21 71/22 72/6 76/16 78/1 78/3
transcript **[1]** 1/10 172/22 174/7 174/9
TRANSCRIPTION **[1]** 1/25
transfer **[6]** 27/24 29/24 30/1 51/10 51/13 52/18
transferred **[9]** 21/19 21/22 30/16 31/25 50/5 51/15 53/10 54/11 58/13
transfers **[3]** 30/8 30/21 80/17
transit **[2]** 110/7 111/16
transited **[1]** 109/20
transiting **[2]** 109/15 109/16
translate **[1]** 20/8
translation **[2]** 89/1 89/3
translator **[1]** 89/3
transported **[1]** 51/8
travel **[4]** 70/12 71/25 142/16 142/19
traveling **[1]** 97/6
treat **[1]** 21/17
treated **[1]** 150/11
treating **[1]** 158/20
treatment **[1]** 170/11
trial **[6]** 6/19 6/20 147/15 147/16 148/2 149/17
tribunal **[1]** 82/19
TRO **[6]** 164/25 165/21 167/25 168/1 168/3 168/16
trouble **[1]** 154/25
true **[1]** 174/7
trustee **[1]** 21/8
try **[6]** 18/22 136/6 136/6 137/11 137/13 172/3
trying **[12]** 21/22 22/22 26/18 78/22 79/4 93/14 124/15 135/1 136/4 136/20 155/9 165/21
Tuesday **[10]** 35/3 35/9 35/13 35/22 37/2 37/6 59/19 167/6 169/6
turn **[4]** 30/9 56/6 110/7 122/16
turned **[1]** 112/6
twice **[1]** 88/4
two **[39]** 7/3 34/25 37/10 37/11 38/13 39/24 40/2 41/1 45/8 48/21 52/5 52/25 53/17 62/25 67/2 67/3 68/17 68/20 70/10 71/21 71/22 72/5 78/1 78/3 95/24 96/25 97/2 98/9 108/20 108/23 118/20 118/23 140/16 141/2 141/20 145/21 145/22 153/24 161/18
two-thirds **[1]** 48/21
two-word **[1]** 7/3
type **[4]** 82/19 95/19 95/23 125/19
typed **[2]** 106/23 107/2
types **[1]** 135/3
typically **[2]** 138/15 147/21

## U

U.S **[13]** 20/8 27/22 29/1 56/5 72/22 80/10 82/12 91/23 92/22 97/13 99/24 117/5 146/2
U.S.C **[6]** 20/13 129/9 129/11 129/19 129/21 174/6
unable **[1]** 7/7
unavailable **[2]** 59/11 168/20
unaware **[3]** 75/2 90/15 98/1
under **[28]** 19/19 23/8 43/20 45/17 51/3 60/6 69/15 69/22 70/4 75/12 91/15 92/24 104/3 113/5 113/20 114/2 118/13 124/25 129/3 130/1 130/8 131/9 131/10 132/23 136/15 152/15 162/10 168/6
understand **[47]** 6/13 9/12 14/5 14/10 46/24 51/7 59/4 59/7 65/15 66/1 68/9 70/9 75/3 75/9 75/10 75/23 78/22 80/8 89/2 92/19 94/5 106/7 106/9 110/3 110/10 111/12 112/15 114/23 114/25 116/1 117/5 122/11 129/8 134/15 139/14 139/20 147/24 148/22 155/11 156/7 160/14 164/20 171/18 171/19 172/21
understanding **[39]** 15/16 15/17 28/3 28/5 29/8 29/11 29/13 46/1 46/2 47/4 48/24 67/9 67/23 71/7 72/3 72/25 77/15 78/18 80/23 84/10 91/10 92/9 94/14 95/4 97/13 105/16 111/5 115/25 116/1 116/7 118/5 119/14 123/13 129/9 137/2 143/12 143/13 143/21 155/1
understands **[2]** 88/23 89/5
understood **[15]** 38/6 39/3 39/19 48/16 49/13 67/18 68/5 82/1 86/15 94/8 106/10 121/8 141/15 149/23 169/9
underway **[1]** 62/1
unfettered **[1]** 162/19
unfortunately **[1]** 162/3
unidentified **[1]** 9/6
unique **[2]** 134/13 134/17
UNITED **[66]** 1/1 1/11 4/3 5/6 14/8 14/14 16/21 16/24 17/21 18/16 18/16 19/4 19/6 19/11 19/25 22/18 25/16 32/15 33/16 33/18 51/1 53/19 61/7 63/1 62/23 82/13 71/10 74/15 80/1 81/11 82/7 82/9 83/4 83/7 85/6 85/10 91/17 95/9 95/12 95/16 96/5 96/8 96/24 97/17 98/13 111/8 111/19 114/13 115/24 117/22 118/1 118/11 121/4 122/7 130/4 130/15 139/15 140/2 143/10 153/9 154/12 160/16 160/19 165/9 174/5 174/11
unlawfully **[7]** 14/20 15/7 16/2 16/12 16/20 19/22 154/9
unless **[7]** 10/15 48/2 100/21 115/6 130/5 133/3 147/12
unnamed **[1]** 54/12
unpack **[1]** 72/2
unsuccessfully **[1]** 60/1
until **[25]** 6/10 12/19 22/6 26/23 26/25 31/20 33/6 75/16 86/5 90/13 113/2 115/6 115/21 115/23 117/4 117/16 135/5 135/15 135/19 138/10 138/13 145/18 162/18 164/12 165/23
unusual **[4]** 65/8 65/11 65/16 65/16
up **[47]** 6/10 7/12 8/4 21/15 34/5 35/15 36/20 42/8 44/19 50/2 50/14 52/15 56/7 56/8 63/12 67/13 67/15 76/12 77/8 79/13 82/10 97/6 98/16 105/10 105/13 106/24 107/2 107/2 107/22 113/16 113/24 114/21 115/6 115/21 117/4 117/16 117/18 125/24 134/10

## V

VA **[1]** 1/23
valid **[2]** 110/8 110/16
validity **[1]** 168/8
varies **[1]** 32/8
Vasquez **[1]** 4/16
Venezuela **[1]** 84/24
verb **[1]** 90/9
versus **[1]** 78/3
very **[25]** 36/19 43/8 51/23 56/10 58/11 59/25 63/16 63/22 65/11 65/11 81/13 104/12 107/1 108/1 112/20 117/24 126/2 132/14 135/13 136/8 158/20 160/25 163/19 164/14 164/18
via **[1]** 90/3
video **[1]** 145/5
view **[10]** 8/22 9/2 10/6 50/22 51/7 64/8 68/8 87/24 99/4 167/25
violation **[2]** 49/18 49/21
via **[4]** 46/10 46/10 124/7 124/7
visa **[1]** 143/18
vs **[1]** 1/6

## W

wait **[3]** 8/17 157/5 170/17
waiting **[2]** 124/14 170/25
walk **[5]** 11/12 25/7 25/7 44/1 78/11
walked **[2]** 36/9 37/6
walks **[1]** 116/23
want **[58]** 6/1 6/17 7/4 7/11 8/14 24/19 27/2 27/14 33/4 36/12 42/9 44/14 44/19 47/20 51/22 51/22 61/2 61/10 67/8 68/12 68/12 70/6 70/19 72/22 75/3 81/13 83/1 99/5 100/16 101/19 103/12 109/18 112/15 116/12 117/5 117/24 118/9 121/4 130/13 141/16 145/6 145/13 146/8 147/25 148/11 152/14 156/6 157/25 159/14 162/20 166/6 169/17 170/18 171/4 171/10 172/12
wanted **[9]** 57/23 60/13 74/2 113/24 116/14 144/18 144/24 158/9 160/20
wants **[4]** 87/15 133/12 167/22 171/22
warrant **[5]** 15/13 15/18 21/19 21/21 147/12
warrantees **[1]** 15/20
was **[179]**
Washington **[4]** 1/20 2/6 2/9 12/8
wasn't **[5]** 74/12 74/17 74/17 76/5 128/5
waste **[1]** 67/8
Watch **[1]** 11/20
way **[33]** 7/1 29/8 35/1 46/25 48/21 60/17 60/18 66/1 67/11 70/9 78/20 80/8 88/13 90/6 95/7 97/17 106/20 111/12 117/18 117/25 126/15 128/15 134/13 138/12 140/2 142/12 143/1 156/8 157/25 162/7 162/8 162/17 165/24
waya **[2]** 14/23 14/24
We'd **[1]** 8/4
we'll **[25]** 7/18 11/12 15/9 21/14 22/3 41/15 41/20 42/7 43/16 47/24 51/24 68/10 80/16 99/18 106/6 113/6 138/16 166/15 168/5 168/8 168/18 170/10 172/18 172/19 172/22
Wednesday **[11]** 38/17 50/6 50/24 51/16 52/14 54/12 59/13 76/17 80/15 164/22 169/6
week **[18]** 10/1 35/9 35/13 35/22 36/1 36/8 39/5 43/5 56/24 57/8 78/25 133/7 134/9 138/13 140/5 145/21 162/12 164/23
weekend **[1]** 168/21
weeks **[9]** 32/18 34/11 49/14 62/6 62/11 97/1 97/2 145/21 145/21
well **[47]** 7/18 8/5 9/3 9/22 10/5 13/18 13/22 24/2 26/5 35/15 39/25 45/7 46/20 47/4 49/12 51/25 56/2 57/4 57/25 65/19 73/5 75/18 75/23 83/5 84/16 85/25 86/17 91/22 92/1 92/19 99/22 115/17 119/6 122/19 129/5 131/1 136/12 141/12 141/22 143/10 145/7 151/16 151/22 159/9 162/6 163/21 168/3
well-rounded **[1]** 13/22
went **[6]** 42/16 92/14 94/6 97/13 97/16 105/16
West **[3]** 35/6 35/6 59/20
whatever **[5]** 22/22 23/25 62/2 96/18 157/24
whatnot **[1]** 133/12
whatsoever **[11]** 35/9 35/12 36/6 54/21 65/11 65/18 66/4 69/20 80/22 108/6 124/3
whenever **[2]** 45/18 79/19
whereby **[1]** 123/14
wherever **[1]** 134/10
whether **[41]** 9/4 24/25 29/8 29/11 30/19 31/6 32/4 32/9 32/10 45/7 46/13 46/25 50/5 51/11 61/14 69/21 74/19 75/3 75/5 75/6 76/7 78/12 81/22 87/18 91/2 94/16 95/7 109/17 110/20 110/21 111/16 114/10 115/13 124/24 127/20 128/16 157/19 157/22 159/23 164/5 164/13
while **[7]** 6/19 8/17 22/13 97/24 126/1 131/13 138/15
White **[1]** 38/2
who's **[4]** 39/7 73/21 89/23 123/4
whole **[2]** 122/25 171/18

## Whom / etc.

whom **[1]** 25/8
whose **[1]** 88/13
Wi **[1]** 24/25
Wi-Fi **[1]** 24/25
willing **[5]** 9/17 112/1 162/8 162/19 164/2
window **[2]** 140/14 140/16
wish **[2]** 7/8 83/6
wishes **[1]** 10/16
withdraw **[1]** 121/19
withdrawn **[14]** 39/13 40/15 48/11 68/16 72/3 73/15 86/18 88/18 95/15 98/22 102/16 117/10 118/11 125/5
withdrew **[1]** 74/1
withholding **[35]** 18/7 18/10 18/13 18/20 19/17 23/12 25/3 26/5 26/17 27/21 28/7 31/7 46/5 48/23 49/3 49/4 49/9 49/22 62/16 62/17 62/25 107/19 108/25 109/3 109/21 110/8 110/16 116/20 126/24 127/17 135/7 136/22 137/23 151/11
within **[8]** 17/5 56/22 57/10 79/18 93/1 121/14 132/1 165/1
without **[21]** 15/18 19/22 29/20 68/25 69/16 71/24 75/19 78/10 80/3 80/12 80/21 81/2 83/21 88/8 101/12 106/2 146/25 153/1 154/16 164/5 164/25
witness **[42]** 5/16 6/4 6/10 6/21 7/5 7/10 8/10 8/11 8/15 10/17 10/23 11/6 11/8 11/11 11/19 23/22 27/10 34/13 38/25 41/18 41/24 42/1 42/10 44/19 45/1 45/3 45/12 45/13 47/15 66/19 66/22 73/21 78/2 78/24 103/17 140/10 142/9 156/17 161/10 161/10 169/14 169/16
witness's **[2]** 7/6 156/4
witness-specific **[1]** 6/10
witnesses **[7]** 3/2 6/1 6/18 6/18 161/12 161/13 161/14
woman **[2]** 10/25 150/7
won't **[16]** 70/1 72/13 81/6 83/13 83/17 86/5 110/24 111/16 112/3 120/21 122/22 130/18 135/14 138/10 148/2 151/13
wondering **[1]** 93/14
word **[6]** 7/3 88/13 133/5 133/17 157/16 158/18
words **[12]** 8/22 67/21 71/3 88/18 95/15 105/16 111/17 115/24 116/23 124/4 125/8 163/8
work **[29]** 14/19 18/22 22/21 25/5 26/18 26/21 26/24 31/13 31/17 31/20 32/3 61/23 87/8 87/25 91/16 100/21 128/16 128/17 129/1 129/2 131/3 136/19 137/18 138/15 138/16 145/16 147/11 151/20 171/14
workaround **[1]** 172/12
worked **[7]** 13/24 26/25 32/6 40/3 64/20 67/19 138/10
working **[6]** 10/24 26/14 53/17 57/10 135/15 150/7
workload **[1]** 31/23
works **[4]** 58/16 58/17 165/12 165/12
world **[2]** 72/10 166/22
worried **[2]** 31/18 31/22
worries **[1]** 121/12
wouldn't **[6]** 33/6 37/20 60/13 127/16 145/24 170/25
wrap **[2]** 42/7 125/24
written **[5]** 88/19 88/20 88/21 89/4 114/23
wrong **[3]** 64/16 64/18 64/21

## X

XINIS **[2]** 1/10 4/5

## Y

yeah **[51]** 17/3 32/1 41/17 41/20 42/16 47/24 51/13 54/16 55/13 55/17 61/4 61/9 62/22 63/19 64/13 67/21 69/23 72/21 83/11 90/22 93/25 97/22 99/7 103/7 103/19 106/18 108/15 109/5 112/14 112/25 115/8 117/9 117/10 119/16 121/3 121/6 121/6 121/10 124/11 134/18 134/20 138/14 151/4 153/1 164/1 166/17 166/17 166/17 166/25 169/7 170/16
year **[6]** 49/14 50/2 59/24 60/16 62/19 62/20
years **[14]** 14/2 19/5 52/11 64/9 64/16 64/21 89/19 95/13 107/25 108/4 118/5 127/8 157/12 160/1
Yep **[1]** 28/17
yes **[188]**
yesterday **[10]** 37/10 37/11 40/12 42/17 66/15 67/10 67/13 68/1 71/5 71/8
yet **[5]** 9/6 10/23 31/25 90/20 164/11
York **[2]** 1/16 168/22
you'd **[1]** 37/22
you'll **[1]** 149/11
young **[1]** 10/24
younger **[1]** 10/25
yourself **[7]** 6/19 38/20 43/4 104/25 106/10 106/16 107/4
yourselves **[1]** 4/13

## Z

Zoom **[4]** 172/8 172/9 172/10 172/12

## (column header entries)

141/12 141/23 142/3 143/2 146/5 156/9 161/25 168/22
upon **[8]** 27/21 44/25 55/12 60/8 62/25 74/23 114/12 115/13 116/22 139/12 139/22
upset **[1]** 140/17
URQUHART **[2]** 1/15 1/19
USC18 **[37]** 82/15 82/22 84/5 84/6 87/6 87/8 87/22 88/6 91/7 91/13 91/20 91/25 92/1 92/4 92/9 92/14 92/15 93/1 93/11 93/15 94/3 94/16 94/16 110/1 114/19 114/21 115/16 115/17 116/3 116/17 123 125/18 131/10 131/16 132/3 132/9 133/4
USC18's **[1]** 93/5
use **[7]** 6/21 19/3 47/18 82/15 89/1 89/2 99/5
used **[4]** 42/2 42/10 42/24 71/22
using **[2]** 129/10 133/17
usually **[4]** 15/24 29/22 56/8 116/15
Utah **[1]** 168/25
utilize **[1]** 133/21