```
1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MARYLAND
2                        GREENBELT DIVISION

3    _____
                                        )
4    KILMAR ARMANDO ABREGO GARCIA,      )
     et al.,                            )
5                                       )
          Plaintiffs,                   )
6                                       ) Docket Number
                vs.                     ) 8:25-cv-00951-PX
7                                       )
     KRISTI NOEM, et al.,               )
8                                       )
          Defendants.                   )
9    _____)

10           TRANSCRIPT OF CONTINUED EVIDENTIARY HEARING
                 BEFORE THE HONORABLE PAULA XINIS
11              UNITED STATES DISTRICT COURT JUDGE
                 FRIDAY, JULY 11 2025, AT 9:06 A.M.
12

     APPEARANCES:
13

     On Behalf of the Plaintiffs:
14

          BY:  ANDREW ROSSMAN, ESQUIRE
15               SASCHA RAND, ESQUIRE
          QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
16        295 5th Avenue
          New York, NY  10016
17        (212)849-7000

18        BY:  JONATHAN COOPER, ESQUIRE
               OLIVIA HORTON, ESQUIRE
19        QUINN, EMANUEL, URQUHART & SULLIVAN, LLC
          1300 I Street NW
20        Suite 900
          Washington, DC  20005
21        (617)712-7165

22        BY:  SIMON SANDOVAL-MOSHENBERG, ESQUIRE
          MURRAY OSORIO
23        4103 Chain Bridge Road, Suite 300
          Fairfax, VA  22030
24        (434)218-9376

25        ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPED NOTES***
```

```
1   APPEARANCES CONTINUED:

2   On Behalf of the Defendants:

3       BY:  SARMAD M. KHOJASTEH, ESQUIRE
             BRIDGET O'HICKEY, ESQUIRE
4       DEPUTY ASSISTANT ATTORNEY GENERAL
        CIVIL DIVISION, DEPARTMENT OF JUSTICE
5       950 Pennsylvania Avenue NW
        Washington, DC  20530
6       (202)353-0261

7       BY:  ERNESTO H. MOLINA, JR., ESQUIRE
        OFFICE OF IMMIGRATION LITIGATION
8       P.O. Box 878
        Ben Franklin Station
9       Washington, DC  20044
        (202)616-9344
10
    ALSO PRESENT:  Natasha Patel, Paralegal
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2        (Court called to order.)

3            **DEPUTY CLERK:**  All rise.  The United States District

4    Court for the District of Maryland is now in session.  The

5    Honorable Paula Xinis presiding.

6            **THE COURT:**  Good morning, everyone.  You can have a

7    seat.

8        Ms. Derro?

9            **DEPUTY CLERK:**  The matter pending before the Court is

10   Civil Case Number PX-25-951, Kilmar Armando Abrego Garcia, et

11   al., v. Kristi Noem, et al.

12       The matter now comes before the Court for a continuation

13   of the evidentiary hearing.

14       Counsel, please identify yourselves for the record,

15   beginning with counsel for the plaintiffs.

16           **MR. ROSSMAN:**  Good morning, Your Honor.  Andrew

17   Rossman for the plaintiffs.

18           **MR. COOPER:**  Good morning, Your Honor.  Jonathan

19   Cooper for the plaintiffs.

20           **MR. SANDOVAL-MOSHENBERG:**  Simon Sandoval-Moshenberg.

21   Good morning, Your Honor.

22           **MR. RAND:**  Good morning, Your Honor.  Sascha Rand.

23           **THE COURT:**  All right.

24           **MR. KHOJASTEH:**  Good morning, Your Honor.  Sarmad

25   Khojasteh for the United States Department of Justice.

1      **MS. O'HICKEY:**  Good morning, Your Honor.  Bridget

2 O'Hickey, Department of Justice.

3      **MR. MOLINA:**  Good morning, Your Honor.  Ernesto

4 Molina for the Department of Justice.

5      **THE COURT:**  Okay.  Good morning, everybody.

6    Okay.  So there's no more evidence to be taken, but we --

7 I called this morning's hearing so I can give both sides an

8 opportunity to be heard on yesterday, as well as the pending

9 motion.  So I'll start with the plaintiffs.

10      **MR. ROSSMAN:**  Thank you, Your Honor.  Andrew Rossman

11 for the plaintiffs.

12      Your Honor, I assure the Court that as much as it has been

13 my privilege to appear in this courtroom, there is nothing that

14 I would rather do than return to my plow, as it were, to my

15 commercial cases rather than spend a good summer Friday with

16 Your Honor.  But the job is unfinished, and I'm here until the

17 job is finished.

18      And what we find ourselves, after three months of being in

19 this courtroom, is right back where we started, seeking the

20 fundamental constitutional protections of due process and

21 adherence to the rule of law.

22      And let's start with the Constitution, and the Fifth

23 Amendment could not be plainer:  No person shall not be

24 deprived of life, liberty or property without due process of

25 law.  The Supreme Court has spoken twice this year in equally

plain terms in the *AARP* case and the *JGG* case, quotes the same,

the Fifth Amendment entitles aliens to due process of law in

the context of removal proceedings.  That's the law of the

land.

Why is due process so critical?  The Supreme Court tells

us that in *AARP* as well.  Procedural due process rules are

meant to protect against the mistaken or unjustified

deprivation of life, liberty or property.  And that's exactly

what we witnessed in this case.  In fact, this case has taught

the entire world just how precious due process is.

DHS seized Mr. Abrego without notice, and before he even

had the opportunity to appear in court, and whisked him away to

the very country where a judge had already granted him

withholding.

Had the government given my client notice and a day in

court back then before removing him, I might never have been

here, frankly, Your Honor.  But he certainly could have

presented that withholding order they received from an

immigration judge in 2019, and he never would have been sent to

CECOT in the first place.  Whether that was a mistake or

otherwise unjustified, that serious harm could have and should

have been averted.

And let's remember, the government has taken the position

in this case, for two months, that it was powerless to rectify

that error and bring Mr. Abrego Garcia back to the United

 1  States.  And but for the -- I'll say it plainly, Your Honor,

 2  you know, but for the convenience of the Tennessee indictment,

 3  he might still be in custody in El Salvador without any

 4  prospect for return.

 5      If you look at the law of this case alone, it's plain that

 6  due process is required prior to removal.  I cite the Fourth

 7  Circuit's decision on April 7th, 2025, affirming, Your Honor,

 8  the United States government has no legal authority to snatch a

 9  person who is lawfully present in the United States off the

10  street and remove them from the country without due process.

11  We all know three days later, the Supreme Court, 9-0, affirmed

12  the ruling that the government had to facilitate Mr. Abrego

13  Garcia's return.

14      And one might hope that the government would learn this

15  lesson, but it's dejá-vous all over again.  We are, once again,

16  staring at the possibility that the government will remove

17  Mr. Abrego Garcia without having a day in court.

18      In fact, Your Honor, the government's position is stark

19  and is chilling.  They contend that they can remove a person to

20  a foreign country to which that person has no ties, without

21  giving that person reasonable notice or an opportunity to be

22  heard in court.

23      And, Your Honor, you will continue to be addressed by, you

24  know, lawyers who put reasonable tones and straight faces

25  around an outrageous position that the government is taking,

1    and I don't want the Court to be lulled by that.

2        What we have seen, what we have seen is the government, as

3    an actor in this case, has been intransigent throughout.  They

4    have made unmistakably clear they are not interested in a fair

5    process, they are interested in a game that gives them

6    unchecked power to do what they will in removing people to

7    other countries, including countries of which we don't even

8    know, as we stand here today, what it will be.

9            **THE COURT:**  Well, according to the government, we

10   won't know until Mr. Abrego is sitting next to a duty officer.

11           **MR. ROSSMAN:**  Exactly.

12           **THE COURT:**  I mean, in this case, really?

13           **MR. ROSSMAN:**  Exactly, Your Honor.

14           **THE COURT:**  So -- but assume that to be the case,

15   okay?  The biggest hurdle that I see for the plaintiffs is that

16   there is authority which says I can't control the manner of

17   detention, although there's more recent authority which

18   suggests in light of some of the constitutional harms that have

19   happened in this case and others, I can.

20       What do I make of those cases?  How do I reconcile, for

21   example, the Tenth Circuit case, I believe, that is cited with

22   respect to the statute that confers the Attorney General with

23   discretion regarding places of detention, with *Suri* and *Ozturk*,

24   and I believe the New Jersey case with Judge Ho, about a

25   district court having power to restrain that unfettered

1  movement based on bed space?

2      **MR. ROSSMAN:**  Well, Your Honor, there's a couple of

3  propositions I would offer Your Honor on that question.

4      First, we very much submit that *Suri* and *Ozturk* are the

5  right statement of the law.  *Suri* is the Fourth Circuit, so it

6  is controlling law in this case.

7      And it -- the courts there have taken the view, both

8  district courts and the circuits in those cases, Fourth and

9  Second, have taken the view that the Court does have the power

10  to bring detainees to the district where it all began, where

11  the case began.

12      And we remembered here that, you know, when we filed this

13  case, you had an individual who was overseas in El Salvador, in

14  the government's view, in a -- in a lawless zone reached by no

15  one and nothing.  I think plainly, we believe that the

16  unidentified-custodian rule gives the Court the power to have

17  acted in the inception of this case, as it did.

18      And what we have is an injunction in place that requires

19  the restoration of the status quo.  And the fulfillment of that

20  injunction requires the return of Mr. Abrego Garcia to his

21  residence where he was status quo ante, which is Maryland.  So

22  we think *Suri* --

23      **THE COURT:**  Well, what if I don't read it as tightly

24  as you do, and I say at a minimum, he must be restored to the

25  immigration posture he had been in?  I can't necessarily,

9

like -- we're going to get to the -- the legal basis to detain

him at all, because I asked for the detainer, and I really want

the detainer, because we don't operate -- we're a court of

laws, and we don't operate on take my word for it.  I've said

that from the beginning.

     I asked for the arrest warrant to show that there was a

lawful basis to arrest Mr. Abrego Garcia, and Mr. Reuveni very

candidly admitted that there was none.  And so there is none,

in my view.

     The same with the detainer.  I want to see it.  That's a

document that gives ICE the authority to arrest Mr. Abrego.

     Do you have it?

          **MR. ROSSMAN:**  I do not have it, Your Honor.

          **THE COURT:**  Why not?

          **MR. KHOJASTEH:**  Your Honor --

          **THE COURT:**  Just answer that question.  Why do we not

have the detainer today when I asked for it yesterday?  The

detainer is a really simple thing.  It's in the file.  Why

don't we have it?

          **MR. KHOJASTEH:**  Understood, Your Honor.  We're

working on obtaining it and producing it to you and to the

plaintiffs.

          **THE COURT:**  What's to work on?  It's a piece of

paper.

          **MR. KHOJASTEH:**  It just has -- it didn't happen

1  between five -- 6:00 p.m. last night and this morning.

2          **THE COURT:**  I understand that.  Can someone get an

3  e-mail to someone who has the physical copy of the detainer so

4  we can get it so I see the lawful basis or unlawful basis for

5  detaining him?

6          **MR. KHOJASTEH:**  Just for -- you're referring to the

7  detainer for his detention --

8          **THE COURT:**  This time.

9          **MR. KHOJASTEH:**  -- in the event that he's released on

10 July 16th, correct?

11         **THE COURT:**  Correct.  That's right.  The June --

12         **MR. MOLINA:**  Your Honor?

13         **THE COURT:**  Yes?

14         **MR. MOLINA:**  I assure you I did write to the agency

15 immediately.  They are pursuing it right now.  In fact, I just

16 got an update saying they are trying to find out whether it was

17 an electronic form or wet signature.  They are working on

18 getting it as we speak.

19         **THE COURT:**  Because you know if this were a detention

20 hearing in my court and ICE came in and said they had a

21 detainer and they couldn't produce it, they wouldn't have the

22 authority to take the individual.  That's just sort of -- you

23 know, if the State -- if the State of Maryland comes in and

24 says if you release this federal prisoner, we have a state

25 detainer, okay, marshals, do you have the detainer?

1      Yes, we do.

2      Can you produce it, if I want to see it?

3      Sure.

4      Okay, then you can release the person.

5      That's how it works.

6      So sorry for being sharp at nine in the morning.  I've had

7   three cups of coffee.  But the reality is, this has been a

8   process, from day one, you have taken the presumption of

9   regularity and you've destroyed it in my view, because I can't

10  presume anything to be regular in this highly irregular case.

11      **MR. KHOJASTEH:**  Your Honor, with respect, do you

12  doubt the fact that a retainer [sic] is in place in -- a

13  detainer is in place?

14      **THE COURT:**  I absolutely doubt the fact until I see

15  it.  Because you know what?  You all have taken a position over

16  and over again that you have done things lawfully, and then a

17  witness gets on the stand yesterday and admits you haven't done

18  it lawfully.

19      **MR. KHOJASTEH:**  What did the witness say yesterday

20  that was unlawfully?

21      **THE COURT:**  I'm not here to answer your questions,

22  sir.  You're here to answer mine.

23      Get me the detainer.  Please.  And thank you.

24      **MR. KHOJASTEH:**  Agreed, Your Honor.

25      **THE COURT:**  Respectfully.

1              MR. KHOJASTEH:  We will.

2              THE COURT:  All right.  Go ahead.

3              MR. ROSSMAN:  Your Honor, I don't know what to say

4    after that exchange other than we think -- and this is one of

5    the fundamental points that I want to make to Your Honor this

6    morning, we think that there is an utter failure of proof in

7    the government's case that by itself warrants fact findings

8    that support our application for an injunction, TRO, however we

9    want to style it, Your Honor.

10       The government was given the opportunity to come to court

11   yesterday and prove that they have both a lawful basis to

12   detain Mr. Abrego Garcia, and that he will be handled in a

13   manner that is consistent with what the Constitution guarantees

14   him, due process of law.

15             THE COURT:  And also the INA.

16             MR. ROSSMAN:  And the INA, thank you, Your Honor.

17   Absolutely.

18       And it is Your Honor's role, it is the judiciary's role to

19   police those things, to ensure that the statute is followed,

20   and to ensure that the Constitution is adhered to.

21       And the government's -- the government produced yesterday

22   a witness who was told what the four topics were, knew that the

23   detainer was an issue, didn't produce the detainer.  You asked

24   about it specifically yesterday, it still wasn't produced.  And

25   I think the Court is well within the Court's rights to

1    determine that there is no lawful basis that has been shown.

2        The government wants to come forward and cure that, then

3    let them make an application for it.  But as we stand today,

4    the government has failed to make that fundamental showing.

5        In the *Suri* case, Your Honor, the actual -- there were two

6    orders.  One of the orders the District Court gave was an order

7    to release the detainee.  And the Court and Fourth Circuit

8    found that there was appropriate jurisdiction for that order,

9    and, in part, the jurisdiction was an All Writs Act

10   jurisdiction.

11       So, Your Honor, on the question --

12           **THE COURT:**  And that's the part that just stuns me,

13   because, you know, I'm asked a question from the defendants

14   when, frankly, the cull of my questions is because I'm trying

15   to be restrained.  I'm trying -- because I'm not sure if it's

16   proper in this case to order release.

17       And so the reason why I'm asking for this, Defendants, is

18   because I'm actually trying to adhere to the scope of my

19   jurisdiction and draw that line for myself and for you.  So

20   that's why I need the detainer, because it starts the whole

21   analysis.  And if you don't have it, then -- then you're not

22   entitled to that -- to that restraint because you have no basis

23   to keep Mr. Abrego.  So then I have every right to say he must

24   be released.

25       You see how the chain of events go?

1      **MR. KHOJASTEH:**  Your Honor, I understand what you're

2  saying.

3      **THE COURT:**  Okay.

4      **MR. ROSSMAN:**  Thank you, Your Honor.

5  So -- and we think, you know, to state the obvious, a

6  fortiori, if the Court has the power to release Mr. Abrego

7  Garcia because there is no showing that he's properly lawfully

8  being detained, then of course the Court has the power to order

9  the lesser relief that we actually seek in this case, which is

10 to return him to his place of residence where this all began.

11     And, fundamentally, which is the critical protection that

12 I -- that I beseech the Court to give us today, okay, the

13 critical protection of ensuring that upon his being placed in

14 ICE detention, that he will receive the due process that he is

15 allowed, that he is guaranteed.

16     **THE COURT:**  And what do you say, under the current

17 jurisprudence, is the minimum due pro process that he's

18 accorded?

19     **MR. ROSSMAN:**  That's where I want to go to.

20     I think our view, what we asked for, is we asked for ten

21 days' notice and an opportunity to be heard in court.  And Your

22 Honor, I think, rightly seizes on the question what is the

23 appropriate time frame.  Yesterday we talked about 48 hours, 48

24 business hours being important.  The question is, how long does

25 it take you to get into court to have an opportunity --

1    **THE COURT:**  Well, I'm not sure -- again, so

2 yesterday, we did get -- and I have questions about the sort of

3 memorandum and how this is working, because it's as clear as

4 mud to me, so I'm hoping that the lawyers will explain it for

5 me.

6    But yesterday, we heard of the process to include an

7 opportunity to reach out to counsel, once the third country is

8 presented to the alien, and that alien's opportunity to make a

9 credible fear statement so that a USCIS officer could assess

10 that.

11    What you're talking about is something different.  So ten

12 days to appear in court, according to the procedure yesterday,

13 for better or for worse, that's up to the USCIS officer it

14 sounds like; is that right?

15    **MR. ROSSMAN:**  Correct.  Correct.

16    **THE COURT:**  So what more granularly are you asking

17 for in the context of third-country removal?

18    **MR. ROSSMAN:**  In the context of third-country

19 removal.  Right.

20    So, Your Honor, there's -- I want to spend a little bit of

21 time, if you'll permit me, to talk about the policy and the

22 infirmities of the policy and the grave risks that are

23 presented by the policy.

24    **THE COURT:**  And you're talking about the March 30th?

25    **MR. ROSSMAN:**  Correct.  The March 30 policy, which is

1   Defendants' Exhibit 1 in the record.

2              **THE COURT:**  Okay.

3              **MR. ROSSMAN:**  But just as -- just as a table setter,

4   what I was referring to a moment ago is trying to adumbrate

5   what are the minimum constitutional requirements of due

6   process.  That's an issue that the Supreme Court took up in

7   *AARP.*  The Supreme Court said essentially that the process was

8   insufficient, I think it was 24 hours' notice was not

9   sufficient to obtain counsel and have a day in court.  And then

10  remanded to the Fifth Circuit --

11             **THE COURT:**  To say what it is.

12             **MR. ROSSMAN:**  -- to specify what is required.  I

13  understand there was just argument on that.  There's not even a

14  transcript yet.  We were listening to the audio on it.  I have

15  some things to say, if Your Honor wants, about that position.

16        It seemed -- it seemed that the government was taking the

17  position that 72 hours was sufficient.

18        And I'll give the language that was argued to the Fifth

19  Circuit by Mr. Ensign on June 30th, but it seemed like they

20  were focusing on 72 hours.

21        The quote that we have from the audio, Your Honor, is, "of

22  individual aliens who have filed habeas petitions all have done

23  so, I believe, within 72 hours of their detention."

24        Point being the government there was arguing that seven

25  days was too much, 72 hours was all that was needed to give

1   people an opportunity to get counsel and file habeas petitions.

2           **THE COURT:**   So you're saying by analogy here, for

3   Mr. Abrego, who has clearly had his rights violated

4   historically, at a minimum, for him, individually, 72 hours is

5   fair?

6           **MR. ROSSMAN:**   72 hours we think would be the

7   minimum --

8           **THE COURT:**   The minimum.

9           **MR. ROSSMAN:**   -- to comport with due process, Your

10  Honor, that's right.

11       And as you can tell throughout this case, you know, we've

12  been prepared to move quickly.  We would not let grass grow

13  under our feet.  But I think 72 hours of courts being open, I

14  think is a fair minimum standard.  And that's what we would

15  submit.

16       But pause there, Your Honor.

17          **THE COURT:**   Okay.

18          **MR. ROSSMAN:**   So --

19          **THE COURT:**   But let me make sure I understand, the 72

20  hours is three days to do -- to do what?

21          **MR. ROSSMAN:**   To challenge the third-country removal.

22  Really, to challenge any removal, but specifically, in this

23  case.

24          **THE COURT:**   So to be the lawyers who represent

25  Mr. Abrego to make whatever credible fear or other arguments

1   you make regarding third-party removal in his case?

2       **MR. ROSSMAN:**  Right.  We can't anticipate what

3   arguments will be available or what the right court of

4   competent jurisdiction would be in advance until we know what

5   the facts are.

6       But what we're anticipating, what we want protection

7   against, is that he will need some time to actually have an

8   effective opportunity to be heard in court.

9       And 72 hours seems like the bare minimum if you expect

10  people to move with lightning speed.  So that's our position on

11  timing, Your Honor.

12      And I want --

13      **THE COURT:**  Are you asking for any -- like, because

14  you're clearly -- so this is, you know, to try to -- for us to

15  pretend like this case is just the ordinary course, it's really

16  contrary to the weight of the evidence, right?

17      **MR. ROSSMAN:**  I agree.

18      **THE COURT:**  I mean, this case is anything but

19  ordinary.

20      So you're in this case.  You're representing Mr. Abrego.

21  You're representing him here, as well as in his immigration

22  case; am I right about that?  I mean, I don't know if there is

23  a case to -- that you've actually formally entered an

24  appearance, but am I getting that right?

25      **MR. ROSSMAN:**  Well, Your Honor, speaking for me and

1  my firm, we're representing Mr. Abrego Garcia in this case in

2  this courtroom.  And he has other counsel --

3          **THE COURT:**  Mr. Sandoval-Moshenberg.

4       **MR. ROSSMAN:**  -- Mr. Sandoval-Moshenberg, who is

5  representing him in his immigration matters.  He has yet other

6  counsel who is representing him in Tennessee in the criminal

7  case.

8          **THE COURT:**  So there's no problem giving

9  Mr. Sandoval-Moshenberg notice?  He's in, right?  I mean,

10 today, if he wanted to, he could stand up and say we assert a

11 credible fear against Mexico or any other country on behalf of

12 Mr. Abrego just in case?

13         **MR. ROSSMAN:**  We might.

14      But, Your Honor, the point is he would have to know.

15 So -- and that's why I want to get to the policy, if Your Honor

16 will permit me.

17         **THE COURT:**  Sure, go ahead.

18         **MR. ROSSMAN:**  He would have to know.

19      So the -- you know, as -- and I want to be clear about

20 this, okay?  One could easily question the credibility and

21 truthfulness of the government's case here, okay?  But I don't

22 have to do that in order to win this motion.

23      You could take at face value some of the things that they

24 are saying.  You could take at face value the text of the

25 policy.  And you could even take at face value the testimony

1    from Mr. Giles yesterday.  And it still doesn't come close to

2    according Mr. Abrego Garcia or anyone else due process.

3        But I want to point out, you know, first, a contradiction

4    between the policy and testimony, and then I want to talk about

5    the infirmities of even the testimony which I think puts a

6    better face on the policy than the policy.

7        So the policy, as I read it, and as I read the July 9th

8    internal e-mail, which is PX-2, Your Honor.  Okay?

9        It -- it seems to imagine two -- seems to imagine a fork

10   in the road at the inception as to whether or not the United

11   States government has received assurances that the third

12   country is a country that will -- will not cause the detained

13   person to suffer persecution or torture.  Okay?

14       And as I read it, and I'm looking at, you know, the

15   sentence at the bottom of the first page of DX-1, if those

16   assurances are received, that's the end of the game.

17           **THE COURT:**  That's how I read it.

18           **MR. ROSSMAN:**  Okay?  It says, if the United States

19   has received such assurances and if the Department of State

20   believes those assurances to be credible, the alien may be

21   removed without the need for further procedures.

22       That's it.  Game over.  Off you go to South Sudan or

23   El Salvador or Mexico or a third country to be named later.

24   Okay?

25       There's no opportunity for Mr. Sandoval-Moshenberg to

1    receive notice of what that country is.  The person in the cell

2    is taken away and sent to that country with no opportunity to

3    express a fear, right?  No opportunity to be protected against

4    torture, to be protected against persecution, which are not

5    just fundamental human rights, they are constitutional rights.

6    We have a Convention Against Torture, it's the law of the land,

7    as I understand it, Your Honor.

8        So, you know, those -- the absence of those protections in

9    the policy dooms the policy from a due process perspective.

10       Now, if we accept Mr. Giles' testimony, you know, at face

11   value, what I understood Mr. Giles to be saying -- we have a

12   transcript, so don't take my word for it, of course, but what I

13   understood him to be saying, essentially, was that if the

14   detainee expresses a fear, okay, then there is an additional

15   peppercorn of process here that the detainee's expressed fear

16   is then to be relayed to an USCIS agent, and that agent

17   conducts a reasonable fear interview.  Stop there for a moment.

18       Assume that that's true, in contradiction to the policy,

19   to the written policy, okay?  There's still no opportunity for

20   counsel as per the policy.  There's no guarantee of a right to

21   counsel during that interview.  There's no guarantee of the

22   opportunity to be heard in court.

23           **THE COURT:**  And just for the defendants' benefit, the

24   reason why I agree with you is because the memo goes on to say

25   in all other cases, I must comply with the following, and sets

1  out this -- the procedure very similar, not exact, to what the

2  witness testified to.

3      So what are the all other cases?  And even if you can't

4  answer that for me, it means that the preliminary sentence is

5  not that case.

6          MR. ROSSMAN:  That's exactly how we read PX-2, Your

7  Honor.  Yes.

8      So I think it -- the government seems to be taking the

9  position, seems to have a policy that is informing ICE agents

10 that as long as they've got a country that's given assurances,

11 off you go.  No opportunity for a lawyer, no opportunity to be

12 heard in court, no further proceedings, no reasonable fear

13 interview; nothing, off you go.

14     And I'll say, Your Honor, and this morning I'm back here,

15 it's quite important, so, you know, I hope the Court will

16 indulge me with some time.  I'll say, Your Honor, that we heard

17 testimony that the government has obtained those assurances

18 with respect to South Sudan.  Okay?

19     The State Department has issued a terrifying travel

20 advisory with respect to South Sudan.  Okay?  And it's on the

21 State Department's website, the government -- the Court can

22 take judicial notice of it.  Okay?  Do not travel to South

23 Sudan due to crime, kidnapping, and armed conflict.  The State

24 Department ordered the departure of nonemergency U.S.

25 government employees from South Sudan.

1    And it goes on to talk about armed conflict, violent

2   crime, kidnappings, among other things.  And it specifically

3   advises people -- and, you know, this is an advisory to U.S.

4   citizens, among other things, if you travel to South Sudan,

5   draft a will and designate appropriate insurance beneficiaries

6   and a power of attorney.  Choose one family member to serve as

7   the point of contact; they will communicate with kidnappers,

8   hostage takers, the media, U.S. and host country government

9   agencies if you're kidnapped or taken hostage.

10    This is terrifying.  I have a reasonable fear of going to

11   South Sudan, Your Honor.  So -- I don't know how those

12   assurances --

13           **THE COURT:**  So the District of Massachusetts had

14   restrained a class of aliens from removal to South Sudan

15   without process.  That's my oversimplification of it.  And the

16   Supreme Court --

17           **MR. ROSSMAN:**  Stayed it.

18           **THE COURT:**  -- stayed it.

19           **MR. ROSSMAN:**  For unstated reasons.

20           **THE COURT:**  Right.  I suppose however you want to

21   look at it, they said no dice.  They didn't really -- they

22   didn't write on it at all.

23           **MR. ROSSMAN:**  No.

24           **THE COURT:**  They just -- they just, you know, got rid

25   of the order.  And it seems as if this memo relies on that

1  decision as the authority to lay out the processes they've had

2  which could result in Mr. Abrego going to South Sudan.

3        So what do you make of that?

4        **MR. ROSSMAN:**  Well, I think that is -- it's obvious

5  that the policy and what appears to be the stance of the United

6  States government is not one that affords my client the

7  constitutional protections that he would be entitled to.

8        Forget about the -- for a moment the merits of what life

9  would be like, you know -- or the substance of what life would

10  be like in South Sudan.  Before someone is sent to a country

11  that puts their, literally, life and limb at risk, where they

12  could be subject to torture, they could be subject to

13  persecution, the statute in the Constitution guarantees

14  individuals the opportunity to be heard to contest that, right?

15  The action of the United States government that would be

16  challenging is the removal in placing someone in that country.

17        And what we submit, Your Honor, is, you know, it's been

18  well established, and it's established, you know, in the Fourth

19  Circuit in the *Hott* case, the *Guzman Chavez v. Hott* case, and

20  specifically with respect to third-country removals, that a

21  detainee has a due process right.  And that case, to be candid

22  with the Court, was overturned on other grounds.

23        I think the core ruling is good law.

24        It's still the law of the Seventh Circuit in the *Kossov*

25  case.  It's the law of the Ninth Circuit as well.

1     But in the Fourth Circuit, the *Hott* case, the Court said

2    precisely because withholding of removal is country specific,

3    if a citizen has been granted withholding as to one country,

4    faces removal to an alternative country, then she must be given

5    notice and an opportunity to request withholding of removal to

6    that particular country.

7         The *Kossov* case is instructive.  In the *Kossov* case, there

8    was a hearing before an immigration judge.  There was a Bureau

9    of Immigration Appeals proceeding.  In those proceedings, what

10   was being addressed was asylum application with respect to

11   removal to Russia -- I'm sorry, with respect to removal to

12   Latvia.  I got that backwards for a second, Your Honor.  A lot

13   of cases.

14        So then the question came up, could -- if not Latvia,

15   could the individuals be removed to Russia?

16             **THE COURT:**  Right.

17             **MR. ROSSMAN:**  Right?

18        And there -- and this is the Seventh Circuit.  The Seventh

19   Circuit held that they didn't -- despite having a hearing

20   before an immigration judge about removal, despite having an

21   appeal before the Bureau of Immigration Appeals, because Russia

22   wasn't on the table, the detainees didn't have the opportunity

23   to be heard on that question.  Right?

24        So here, what we have is a situation where -- and let's --

25   let's imagine the scenario, right?  You've got Mr. Abrego

1    Garcia, or it could be anyone, but we'll take my client, okay?

2    He's in a cell in ICE detention.  And perhaps a masked ICE

3    officer walks into that cell and hands him a notice that says

4    you're going to be removed to country X.  Okay?

5        If you accept Mr. Giles' account, okay?  There's an

6    opportunity for Mr. Abrego Garcia in that case to express a

7    reasonable fear of being removed to that country, but he's not

8    advised of his rights.

9        Okay?  Anyone who has ever watched TV knows about the

10   right to remain silent.  Okay?  You're confronted with, you

11   know, an intimidating officer of the law serving you with this

12   notice.  Your understanding of your constitutional rights may

13   well be that you have the right to remain silent, but here and

14   only here, that silence results in the immediate forfeiture of

15   your rights.

16             **THE COURT:**  But in this case --

17             **MR. ROSSMAN:**  Yes.

18             **THE COURT:**  Okay?  Because I don't want to go

19   anywhere I don't need to go.  One, I think the status of the

20   law is that I can't make ICE notify of these rights.  That's --

21   that's one question I have about the right to express a

22   credible fear.  He needs to do it, and, in fact, will do it,

23   right?

24       I mean, in other words, I'm trying to -- I'm trying to

25   really hone in on for this case, for Mr. Abrego Garcia, so

1  there's no accusation of, oh, the precedent, oh, the prejudice

2  to the government.

3          **MR. ROSSMAN:**  Understood.

4          **THE COURT:**  No, this is about one man.  And in this

5  case, isn't it fair from the facts that he's going to express a

6  credible fear?

7      I mean, the whole case is about whether Mr. Abrego truly

8  is MS-13.  Right?  He's got this label on him now that he can't

9  get rid of all that quickly without a whole lot of evidence.

10 Right?  How many courts have had to speak on this?

11         **MR. ROSSMAN:**  Yes, and none have been very impressed

12 with the evidence.

13         **THE COURT:**  Right.

14     But nonetheless, the world knows that this administration

15 believes he is.  So what's that going to do for any country

16 that this man has to face a third-party removal to?

17     So I guess my point is, this case is such a -- the only

18 word I can think of is snowflake, and that's not really fair,

19 because snowflakes are pretty and light, and we love them, and

20 no one wants to be struggling with these issues.

21         **MR. ROSSMAN:**  No, Your Honor, on that point, I

22 couldn't agree more.  I have described this case as a one of

23 one.  I think this is a unique case, and that's not a word that

24 I use lightly, in the true meaning of the word.

25     And I'm delighted to focus on the particulars of my

1    client.  I have one client here.  I'm not trying to set the law

2    for the world.

3              **THE COURT:**  Right.

4         **MR. ROSSMAN:**  But the point that I am making with

5    respect to policy is that we cannot rely on it.  We cannot rely

6    on it as conferring my client with due process.  There's no

7    process at all.  And there's an utter failure of proof on what

8    the process is.

9         And even if you give them every benefit of the doubt --

10   I'm happy to explain why that's not adequate process under the

11   law.  But focusing, you know, on my client's situation, even if

12   we either express, as lawyers, in advance a reasonable fear,

13   it's -- there are 195 countries, I understand, Your Honor, they

14   haven't identified which one yet, and they refuse to do it even

15   though we're staring at a potential release as early as

16   Wednesday.  Okay?  Hard to imagine they don't have some

17   thoughts on that issue, but they are not sharing them with the

18   Court.

19             **THE COURT:**  Right, they are not.  Because Mr. Giles

20   came in here not even speaking to the office who would handle

21   it.

22             **MR. ROSSMAN:**  Right, which --

23             **THE COURT:**  I mean, it kind of -- that insults my

24   intelligence, because the order was pretty clear, it was about

25   one man.  And if you're not going to do the due diligence to

1    find out who the duty officer would be that day, or the -- or

2    talk to the person in charge of that office, and you're the

3    boss of the boss of the boss, it's pretty hard for me to credit

4    that that's a good faith attempt to get me an answer.

5            **MR. ROSSMAN:**   Yeah.

6            **THE COURT:**   If Mr. Acuna said, well, you know what?

7    This is our process, and we can't tell you until the day of or

8    the day before because of the following reasons, maybe I would

9    have something to think about, but I don't have that.

10           **MR. ROSSMAN:**   We agree, Your Honor.  And so -- and

11   that's -- one of the valuable things that this process unveiled

12   for us, Your Honor, is that, you know, the government has an

13   intention to remove Mr. Abrego Garcia, not to hold him for

14   trial.

15           And, you know, put aside what I might think about, you

16   know, the propriety of that, the concern that we have that

17   we're here before the Court, you know, desperately seeking, you

18   know, the Court's assistance on, is that he'll be gone in a

19   blink and never to be heard from again.  He could be sent to

20   South Sudan, we don't know what the conditions are there.  We

21   have no idea whether he will be, for example -- yeah, I believe

22   Your Honor asked specifically, will he be confined there?

23           **THE COURT:**   Well, individuals who have been sent to

24   South Sudan are confined right now in South Sudan.

25           **MR. ROSSMAN:**   That's my understanding as well.

1        So if Mr. Abrego Garcia is sent there, will he be confined

2   without charge in a foreign prison without no court to ever

3   talk to?  That's the Gulag that they are going to send him to?

4        We don't know if he's sent to Mexico, the other country

5   that was mentioned yesterday, whether he will have status

6   there.

7            THE COURT:  Well, that's -- I mean, you got to have

8   travel documents or exactly what we're talking about could

9   happen.  Right?  I mean, it doesn't take a rocket scientist to

10  figure out, if you send someone to Mexico, and that someone

11  doesn't have permission to be there, then that means Mexico can

12  pick that person up and deport that person because that person

13  doesn't have legal status.

14            MR. ROSSMAN:  To their country of origin.

15            THE COURT:  Back to -- exactly.

16       And so it's a real quick, you know, very short road back

17  to El Salvador, the very country that this Court, meaning the

18  immigration judge, in the -- in the Executive Branch said he

19  couldn't go to.

20            MR. ROSSMAN:  Right.

21            THE COURT:  So I agree with you that that's

22  problematic, because I couldn't -- we couldn't get a solid

23  answer as to how the administration in Mr. Abrego's case would

24  deal with that.

25            MR. ROSSMAN:  Right.  What assurances do they have in

this particular case that he will not be -- we had a semantic
discussion about whether you want to call it refoulement or
chain deportation, whether he will be transited onward to
El Salvador where he has a withholding judgment, okay?  We
don't know.  There are no assurances in this courtroom.

 **THE COURT:**  And the problem that I'm having again,
and this is for the government's benefit so they can think
about it before they have their opportunity to speak, is that I
think that's a fact beyond change that it has already happened
once.

 **MR. ROSSMAN:**  Correct.

 **THE COURT:**  And they blatantly violated the INA and
due process in mistakenly deporting Mr. Abrego to El Salvador.
So it -- we're not operating on a clean slate --

 **MR. ROSSMAN:**  At all.

 **THE COURT:**  -- in this case.  It seems like this
would be the case where you would want to put a little meat on
the bones of exactly how you are going to do this lawfully and
constitutionally.

 **MR. ROSSMAN:**  Right.

 So we're -- the way I conceptualized it, Your Honor, is
where the government fails, the Court needs to step in.  And if
the government is intending, as I understand it, to imminently
subject my client to irreparable harm without due process of
law, to remove him -- and we've cited the Supreme Court case

1  and the Fourth Circuit, they all say you can't remove someone

2  without giving them due process, if that process is plainly

3  inadequate, lacks all the protections, all the assurances that

4  we described, no right to counsel, no right to a court hearing,

5  no opportunity to be safe from persecution or torture, no

6  opportunity to be protected from transiting on to El Salvador,

7  despite the Court order, if the government's intended process

8  as early as Wednesday doesn't provide for any of those things,

9  then what we need, at a minimum, is some kind of order from the

10  Court that gives my client that opportunity.  And that's why I

11  called it, at an earlier hearing, almost a gap-filling measure.

12      The request is so modest, it's so modest.  We're asking

13  for 72 hours, 72 hours' notice so that my client can have an

14  opportunity to run to whatever is the appropriate court at that

15  moment to get relief before he is shipped off to an as yet

16  unidentified country and he's potentially subject to torture or

17  persecution or in violation of a court order.  That's all we're

18  asking.

19      And when you think about it, in terms of a balance of the

20  hardships analysis, Your Honor, it's three days' notice for the

21  government.  The government frankly could tell us now, okay,

22  and we could sort this out in advance of Wednesday, okay?  If

23  the government wanted to act in good faith, right?  But give us

24  that opportunity.

25      And on the other side of the scale is truly irreparable

1  harm, the deprivation of liberty, perhaps permanently, for

2  someone who, you know, is -- is, you know, at the government's

3  whim, being sent to a third country that may be entirely

4  untested in terms of its ability to adhere to the Convention

5  Against Torture, or, you know, we have no idea, particularly

6  given the branding of my client that the government has put

7  upon him, we have no idea how he will be received or treated in

8  that country.

9       So, you know, to me, this is an extraordinarily lopsided

10 application.  We think the merits are clear.  It's a

11 constitutional right.  It's a statutory right.

12       **THE COURT:**  Can you speak a little bit to -- you do

13 have the A-File, right?  Do you have the A-File?

14       **MR. ROSSMAN:**  We do have -- as I understand it, we do

15 have the A-File.  It does not have a --

16       **MR. SANDOVAL-MOSHENBERG:**  I'm not sure we do.

17       **MR. ROSSMAN:**  Oh, I'm sorry.  Hang on a second.  I

18 want to be precise with the Court.

19       **THE COURT:**  Okay.  Sure.  Yeah.  Right.  Please.

20       **MR. ROSSMAN:**  So there's been a lot of terminology

21 around that.  And we have something that is called an EARM

22 file.  I don't want to mistakenly --

23       **THE COURT:**  Say it's the A-File.  Right.

24       **MR. ROSSMAN:**  I'm not an immigration lawyer.  I don't

25 want to mistakenly assume that is the A-File.  Maybe the

1    government can give us a steer on that.

2          **THE COURT:**  Right.  Because yesterday, it was clear

3    that that's the central repository of all action taken by any

4    agency or subagency involving Mr. Abrego, so I just want to

5    know whether you have it.

6          **MR. ROSSMAN:**  And we have not received anything at

7    all since he was returned to the United States in June of this

8    year.  So if there is an updated file or new A-File --

9          **THE COURT:**  You don't have that.

10         **MR. ROSSMAN:**  -- the equivalent, we don't have it.

11   We have no -- if there is a warrant, we don't have the warrant.

12   If there is a detainer, obviously, as the Court has observed,

13   we don't have that.

14         **THE COURT:**  Right.

15      I'm actually interested in what happened regarding any, if

16   any, search for a third country when Mr. Abrego was first

17   granted withholding.

18         **MR. ROSSMAN:**  In 2019.

19         **THE COURT:**  Correct.

20         **MR. ROSSMAN:**  We had that same question.  We're aware

21   of no effort in 2019 to consider a third-country removal.  And,

22   in fact, as Your Honor knows, he was given a work permit and

23   has reported to -- I have it, if Your Honor --

24         **THE COURT:**  Do you have the work --

25         **MR. ROSSMAN:**  It's apparently -- apparently not in

1    the docket as it stands now.  I do have it, if the Court wants

2    it.

3        But I don't think there's a dispute about it.  I believe

4    it's --

5            **THE COURT:**  It's a work authorization pursuant to the

6    statute and the regulations.

7            **MR. ROSSMAN:**  It's a form I-797C, which, you know,

8    is --

9            **MR. KHOJASTEH:**  Your Honor, with respect, could we

10   get a copy of these documents, both the State Department

11   document and the --

12           **MR. ROSSMAN:**  Of course.  Of course.

13           **MR. KHOJASTEH:**  We had an opportunity to present

14   evidence yesterday, and cross.

15           **THE COURT:**  Yeah, but I'm asking about this.

16           **MR. KHOJASTEH:**  I understand.  I'm just surprised.

17           **THE COURT:**  And I did ask this witness.  And this

18   witness had no knowledge, which was fairly stunning.  The

19   knowledge -- I asked him about this.  He had no understanding

20   of 1231 that -- that set out a necessary precondition of

21   getting work authorization that either the Attorney General had

22   determined that there was no third-party country available, or

23   it was impractical -- impracticable.  I mean, that's what I

24   asked him about, so --

25           **MR. KHOJASTEH:**  I'm just asking about the work

1   authorization.

2        THE COURT:  Yeah, you got it.  I think they just

3   handed you a copy, right?

4        MR. KHOJASTEH:  Appreciate it.

5        MR. ROSSMAN:  And, Your Honor, I have a copy of the

6   work authorization and the State Department travel advisory, if

7   Your Honor -- may I approach?

8        THE COURT:  Sure.  I appreciate it.  Sure.

9      We can mark them.  So let's mark them -- what are you on,

10  Plaintiffs' 3?  It will be the I-797C, which is a one-page

11  document.

12       MR. ROSSMAN:  Yep.

13       THE COURT:  And then Plaintiffs' 4 will be the

14  South Sudan travel advisory from the State Department.

15       MR. ROSSMAN:  Thank you, Your Honor.

16       THE COURT:  All right.  Let me take a minute and just

17  look at this.

18      Okay.  Thank you.  I appreciate it.

19       MR. ROSSMAN:  So, Your Honor, you'll observe in the

20  work authorization, it indicates, "We've approved your

21  application for employment authorization.  Your EAD card is

22  proof that you're allowed to work in the United States."

23      And I think Your Honor is already aware of the statutory

24  reference of -- in the removal statute.

25       THE COURT:  Of what has to happen before --

1          MR. ROSSMAN:  Yes.

2          THE COURT:  -- this authorization issues?

3          MR. ROSSMAN:  Yes, Your Honor.

4          THE COURT:  Okay.

5          MR. ROSSMAN:  So, Your Honor, I could -- I could

6    spend all morning railing on about what's wrong with this

7    policy and the dangers for my client.

8        I want to pause for a moment to make sure that Your Honor

9    has an opportunity to ask whatever questions you have of

10   plaintiff so that we provide you with all the information that

11   you need.

12         THE COURT:  Well, I guess, again, because the

13   original motion asked for certain relief, that now it sounds

14   like you may be either modifying or drilling down on in light

15   of the evidence, so I want to make sure I understand.

16       In the motion, you asked for two things:  One, that I

17   order that the defendants not remove Mr. Abrego from the

18   continental United States absent further court order.

19         MR. ROSSMAN:  Yes, Your Honor.

20         THE COURT:  And then, two, that I restore him to the

21   District of Maryland, which I can't do directly if I don't

22   believe I have the authority to release him, because there's no

23   ICE detention facility here.

24       So if I conclude that I have no authority to release him,

25   or I'm not -- I don't believe that the facts support it, I

1    haven't concluded anything yet, but if I get there, what's --

2    what are you asking for then?

3              **MR. ROSSMAN:**  Sure.  So -- so, you know, I'm going to

4    try to make our ask as tight as I can make it.

5              **THE COURT:**  Yeah.

6              **MR. ROSSMAN:**  Because I very much believe in, you

7    know, the administration of justice in a particular case, this

8    case.  And, you know, I believe in the adage of sufficient unto

9    the day, what do we actually need the Court to help us with.

10   Okay?

11             **THE COURT:**  Okay.

12             **MR. ROSSMAN:**  What we would ask the Court for, first

13   and foremost, is the second part of the relief we request,

14   which is that he not be removed from the continental United

15   States without 72 hours' notice or further order of this Court.

16   And I think that that minimal protection assures that upon his

17   release from marshals' custody, that there is not going to be

18   some gap that allows him to be whisked out of this country

19   without our getting a day in court.  That's the minimal

20   protection.

21             **THE COURT:**  And let me make sure, you're putting it

22   in the alternative, because in the event that the government

23   says we have some exigent circumstance, and we've got to move

24   less than 72 hours, then they come to me --

25             **MR. ROSSMAN:**  Sure.

1          **THE COURT:**  -- to make sure there's at least the

2    modicum of due process afforded?

3          **MR. ROSSMAN:**  Sure.  Exactly.  Exactly.

4      And that's why we think -- and you know, the courts have

5    observed this, and the cases that we cite, like, the burden of

6    the government of coming to court and proving their case and

7    showing that they are entitled to the relief under law is no

8    burden at all.  In fact, it's a benefit to all of us.  We

9    should all, we should all rest comfortably with the notion that

10   before someone is removed to a third country to which they have

11   no ties, that that removal order is one that has been validated

12   by the Court.

13         **THE COURT:**  No, but this also has just a -- a stop

14   gap, if you will, that's favorable to the government.

15         **MR. ROSSMAN:**  Correct.

16         **THE COURT:**  Which is, if you've got to do it sooner,

17   just tell the Court why, that's all.  That way we know that it

18   meets the basic minimum due process and the analysis the Court

19   has to use, which is, is there harm to the government if we

20   wait.

21         **MR. ROSSMAN:**  Exactly right.

22         **THE COURT:**  And if I sort of make a commitment to the

23   parties that whenever I get it, I'll move, you know, then --

24   then you have in this case a commitment to fulfill this --

25   this -- what you're asking for, to the benefit of both sides.

1          Okay.

2                    **MR. ROSSMAN:**  That's right, Your Honor.

3                    **THE COURT:**  What's the other relief?

4                    **MR. ROSSMAN:**  And the other relief, the request that

5    he be returned to Maryland.  I want to address that, Your

6    Honor.

7                    **THE COURT:**  Okay.

8                    **MR. ROSSMAN:**  So we think Your Honor has the

9    authority to do it, and we cite primarily *Ozturk* and *Suri* for

10   that proposition.  It is really just the follow-through from

11   the injunction that Your Honor has already granted.

12       And, you know, the -- the answer that there is no ICE

13   detention facility in Maryland does not preclude -- does not

14   preclude the relief of bringing him back to Maryland.

15       So the way, as I understand it, if there are individuals,

16   my client, for example, who are apprehended in Maryland and the

17   processing of their deportation removal proceeding, whatever

18   you want to call it, begins here.  And it creates -- if nothing

19   else, it creates a starting point from which my client's rights

20   attach.  Okay?  His residence in Maryland.  The status quo ante

21   before all the trouble began, he was a person walking at

22   liberty in -- on the streets of Maryland.

23       And the request that we have, we think the Court is

24   authorized to do it, bring him back here.  If ICE detains him

25   here, then the ballgame starts there, if you will, Your Honor,

1    with whatever -- so my client has all of the rights that are

2    attended to him in his home of residence where he was before

3    the government --

4         **THE COURT:**  So you're saying start the process over

5    with the holding facility that ICE uses in Maryland taking

6    custody of him and go from there?

7         **MR. ROSSMAN:**  And go from there.

8         **THE COURT:**  And understanding that ICE's position is

9    that's not a detention facility, that's a temporary hold, and

10   we move people out expeditiously.  That's been the subject of

11   litigation in our court.

12        **MR. ROSSMAN:**  And we understand, and I believe

13   Mr. Sandoval-Moshenberg is the expert on this, so I may have to

14   phone a friend on this, Your Honor, but I believe there are

15   recent orders where courts have determined that someone should

16   be held close to the jurisdiction, even if there's no facility

17   within the jurisdiction itself.

18        **THE COURT:**  Right.

19        **MR. ROSSMAN:**  So there are alternatives.

20        **THE COURT:**  That's why I'm asking, because it seems

21   like there's this District of New Jersey case where the judge

22   had sort of acknowledged that there may be a bed space

23   availability problem, and so he crafted the order to be really

24   narrow to say you got to put them -- if I remember correctly,

25   it was, you know, put them in New York when New York has bed

1    space available, and otherwise, as close as possible, or

2    something to that effect.

3            MR. ROSSMAN:    And, Your Honor, for the Court to read

4    Footnote 5 in the *Suri* case, where, you know, the government

5    took the position that, Mr. Giles said yesterday, detainees

6    were being moved around based on bed space.  The Fourth Circuit

7    didn't buy it, to put it lightly.  They -- and I'll just pull

8    it up, Your Honor.

9        It was not bed space that apparently was the determinant

10   of the location of that detainee, because they moved him from a

11   facility that had bed space to a facility that didn't, and he

12   had to sleep on a cot.

13       So, you know, I don't think that that explanation -- I

14   don't think it was even facially credible, but I don't think

15   that explanation is one that the Court needs to put stock in.

16       So our position is that he can be returned to Maryland, he

17   should be returned to Maryland, and then ICE can -- if it has

18   an appropriate basis to detain him, they can assert it here,

19   and then all rights flow from there.

20       And if it's appropriate for them to move him to a

21   detention facility, they got an appropriate detainer that's

22   been established, that's appropriate for him -- to move him to

23   a detention facility, then we would potentially have the

24   opportunity to argue, as they have in other cases, that it

25   should be one that's near his family so he could have access --

1  his family can potentially have access to him and so his

2  lawyers can have ready access to him.

3      So that's the reason why --

4      **THE COURT:**  What if I -- what if I focus on the open

5  criminal case?  I mean, I found it noteworthy that Mr. Giles

6  ultimately sort of exceeded on the bed space issue, particular

7  to Mr. Abrego, after being pressed about the constitutional

8  right to access to counsel for a criminal proceeding, that's in

9  Tennessee.

10      **MR. ROSSMAN:**  Yeah.

11      **THE COURT:**  And so until -- unless and until, you

12  know, the trial date comes, he's -- he needs that lawyer.  He

13  needs those lawyers.  And he needs to prepare for a case that's

14  in Tennessee.

15      Are you representing on behalf of the entire team that he

16  would rather be in Maryland even though the criminal case is

17  out of Tennessee?

18      **MR. ROSSMAN:**  I'm going to defer to

19  Mr. Sandoval-Moshenberg on that question.

20      **THE COURT:**  Yeah, because I think Tennessee

21  is easier -- frankly, an easier conceptual protection of

22  rights.

23      **MR. ROSSMAN:**  I certainly would say, Your Honor, that

24  Tennessee is a better choice than a place to be determined by

25  ICE.

1          THE COURT:  Than Nome, Alaska, or wherever -- I mean

2    he's got to be close to your lawyers.

3          MR. ROSSMAN:  Right.  Or Guantanamo Bay, or

4    wherever -- is there -- can I just confer with

5    Mr. Sandoval-Moshenberg?

6          THE COURT:  Yep.

7          MR. ROSSMAN:  So two points, Your Honor, on this.

8       One, Mr. -- reminds me that the conditions of his release,

9    if it is upheld by the District Court, on Wednesday, is that he

10   be released to his brother's house in Maryland under

11   supervision.  So we think that that makes sense.

12      And two, his -- as I understand it, his lead criminal

13   defense counsel is actually based in New York.  So there are

14   benefits to Maryland's proximity.  You know, I --

15         THE COURT:  But you're saying in the criminal case,

16   like this has already been litigated, and his rights have been

17   protected through counsel, and the Court has indicated that

18   with those rights in consideration, he should be released to

19   Maryland?

20         MR. ROSSMAN:  We think that's --

21         THE COURT:  So I'll defer to that.

22         MR. ROSSMAN:  We think that's consistent, correct.

23         THE COURT:  Okay.  Understood.

24         MR. ROSSMAN:  That's right, Your Honor.

25      But, you know -- and -- I'm essentially done, Your Honor,

1   but I -- you know, to just draw a line under what's critical,

2   the critical bottom line protection that we absolutely need

3   from the Court is the 72-hour-opportunity-to-be-heard

4   protection, wherever -- wherever Mr. Abrego is, so that he is

5   not ushered out of the country and beyond the reach of courts

6   in -- in that time period.

7       And, you know, we think it does make sense, and good

8   sense, for him to be returned to Maryland, and we think the

9   Court has all the jurisdiction it needs on that question.

10      I'm going to pause and see if Your Honor has any more

11  questions for me and look at one of the three, 400 notes that

12  I've been handed.

13          THE COURT:  I don't think so, but it's your motion,

14  so I'll certainly give you an opportunity, after I hear from

15  the defendants, as to your positions.

16          MR. ROSSMAN:  Yeah.  Oh, the one thing I would just

17  point, out -- yeah, we don't know why the Supreme Court did

18  what it did in granting the stay.

19          THE COURT:  In *DVD*?

20          MR. ROSSMAN:  Yes, while it's pending.

21          THE COURT:  Well, I surmise, but I don't know for

22  sure, that it was a very broad class, so it included

23  individuals subject to expedited deportation for aggravated

24  felonies, and it included individuals who could be, like

25  Mr. Abrego, no criminal history and entitled to, arguably under

1    the INA, much more process.

2         **MR. ROSSMAN:**  You have the point in mind already,

3    Your Honor.  My point is, we don't have a class issue here.

4         **THE COURT:**  Right.

5         **MR. ROSSMAN:**  We have an individual.  There's no

6    question about the Court's authority with respect to that

7    individual.

8         I thank you, Your Honor.

9         **THE COURT:**  Okay.  Thank you.

10        All right, Mr. Khojasteh?

11        **MR. KHOJASTEH:**  Good morning, Your Honor.

12        **THE COURT:**  Good morning.

13        **MR. KHOJASTEH:**  Thank you for the opportunity.

14        Happy to report, I have detainers for you.

15        **THE COURT:**  Great.  Thank you.

16        **MR. KHOJASTEH:**  And again, I apologize, it was just a

17   matter of after work hours --

18        **THE COURT:**  Understood.  I appreciate it.

19        So this will be Defense 3?

20        **MR. KHOJASTEH:**  Yes.

21        **THE COURT:**  Okay.  Thank you.

22        **MR. KHOJASTEH:**  And --

23        **THE COURT:**  Just if you could give me a second to

24   take a look at it.

25        **MR. KHOJASTEH:**  Sure.  Sure.  Sure.

1              THE COURT:  And give the plaintiffs an opportunity,

2    and then we'll go from there.

3         Okay.  All right.  Thank you for this.  I appreciate it.

4    Let me just look at one other thing.  Hold on.

5         Okay.  Great, thanks so much.

6              MR. KHOJASTEH:  No problem.  Your Honor, again, we

7    apologize for the delay in getting that to you.

8         Your Honor, I was unprepared to discuss the emergency

9    motion plaintiffs filed.  But much of what we've discussed this

10   morning seems to me to concern a prospective TRO that

11   plaintiffs may want to file in the event that Mr. Abrego is

12   released next Wednesday into ICE custody and then is given a

13   notice for -- notice to you're going to be removed to a third

14   country.

15        Things that haven't happened yet, and while there may be a

16   likelihood they may happen or they may not happen, Your Honor

17   rightly --

18              THE COURT:  Mr. Khojasteh?

19              MR. KHOJASTEH:  Yes, Your Honor?

20              THE COURT:  You're making the plaintiffs' point.  The

21   point is the utter refusal of your clients to engage in any

22   conversation about what's going to happen on Wednesday despite

23   the extraordinary facts of this case.

24        So they do need the preliminary relief precisely because

25   you won't give any information about what's going to happen to

1  Mr. Abrego.  I mean, you're relying on this notion that

2  Mr. Abrego is going to get treated like everybody else, and

3  some duty officer is going to sit down with him, and she or he

4  is going to put the thinking cap on and figure out what country

5  he's going to go to.

6       **MR. KHOJASTEH:**  That's the evidence in the record,

7  Your Honor.

8       **THE COURT:**  And that's the evidence that's not

9  credible.  It's insufficient and it's incredible.  Because you

10 know why?  That witness took no effort to make his testimony

11 specific to Mr. Abrego.  And we can go through the transcript

12 together.

13      But he didn't call anyone.  He didn't look at anything.

14 He didn't -- he learned about the case and Mr. Abrego's

15 situation the same way the plaintiffs did, from the news.

16      There's -- that is plainly insufficient to tell me what's

17 going to happen to Mr. Abrego, apart from what you would have

18 me believe, which is that we have given this no thought, no

19 conversation, no preplanning.  We're just going to roll the

20 dice on Wednesday, or whatever day he's released, if he's

21 released to ICE custody.  And I'm just telling you, I'm not --

22 I'm not buying that because of the posture of this case.

23      So let me put it this way:  If -- if you and your clients

24 are sincere about remediating the harm that was caused to

25 Mr. Abrego by your own confessed violation of the INA and the

1   Constitution, then there would be some more particularized

2   information about what you're going to do with Mr. Abrego.  And

3   there's been none.  So that's the problem I have.

4       If you want to offer up something more specific for --

5   about him today, I would appreciate it.

6           **MR. KHOJASTEH:**  With respect, Your Honor, I -- you

7   and I can disagree, and obviously your opinion means more than

8   mine.  But Mr. Giles was contacted and designated to testify as

9   to what will happen to Mr. Abrego Garcia.  He knows what

10  happens to aliens like Mr. Abrego Garcia.

11          **THE COURT:**  Name me one alien that's like Mr. Abrego

12  Garcia who has had what happened to him happen to him.  Do you

13  see my point?

14          **MR. KHOJASTEH:**  There's 15 million of them that

15  haven't been detained yet, Your Honor, and gone through removal

16  proceedings.

17          **THE COURT:**  That were removed -- that were removed in

18  violation of the INA and the Fifth Amendment?

19          **MR. KHOJASTEH:**  I'm -- so candidly, I'm not -- and it

20  wasn't elicited on cross-examination yesterday.  And I don't

21  have an understanding as to what the prior events regarding

22  Mr. Abrego Garcia, like how he's arrived at this moment, that

23  he's in the Middle District of Tennessee, informed what happens

24  next by ICE.  There's no evidence in the record that ICE is

25  treating him any differently --

1          **THE COURT:**  Okay.  ICE is a sub agency of DHS.

2          **MR. KHOJASTEH:**  Yes, Your Honor.

3          **THE COURT:**  DHS, through this witness, has admitted

4    that Mr. Abrego Garcia was removed unlawfully to the very

5    country for which he had protection, protection that this

6    country gave him.

7          **MR. KHOJASTEH:**  Right.

8          **THE COURT:**  Okay?  So what are you talking about no

9    evidence?

10          **MR. KHOJASTEH:**  No, I apologize.  That's not -- that

11   was not what I was saying there's no evidence of.

12      I was saying that the -- he's been returned now, right?

13          **THE COURT:**  Right.

14          **MR. KHOJASTEH:**  So that harm has been addressed.

15          **THE COURT:**  But it doesn't get erased.

16          **MR. KHOJASTEH:**  Agreed.

17          **THE COURT:**  Okay.

18          **MR. KHOJASTEH:**  But for the purposes of what happens

19   to him next, it is erased.

20          **THE COURT:**  So say you.  But if I have to protect,

21   very, very judiciously and carefully with minimal intervention,

22   to protect his constitutional rights, I have to weigh whether

23   this witness came in good faith yesterday to give me the

24   information about Mr. Abrego Garcia.  All he gave me was what

25   happens in the garden variety case.

1          **MR. KHOJASTEH:**  And that's how Mr. Abrego Garcia is

2    being treated if -- if -- if he is actually released on

3    Wednesday and if ICE takes him into custody.

4          **THE COURT:**  Okay.  You're telling me ICE isn't going

5    to take him into custody?  You have a detainer.  Of course they

6    are going to take him into custody.

7          **MR. KHOJASTEH:**  My expectation is they are going to

8    take him into custody if he's released, Your Honor, yes.

9          **THE COURT:**  And your expectation is he's going --

10   you're going to begin proceedings to a third country for

11   removal, right?

12         **MR. KHOJASTEH:**  No, well, he's -- Mr. Giles didn't

13   testify to that.  He testified there's two decisions with two

14   options that the officer assigned to Mr. Abrego Garcia is going

15   to choose between.  One will be deportation to -- removal to a

16   third country.

17         **THE COURT:**  Uh-huh.

18         **MR. KHOJASTEH:**  One will be reopening the

19   immigration -- the removal proceedings to modify the

20   withholding of removal or to El Salvador eliminated.

21         **THE COURT:**  And you have nothing as to which road

22   you'll take if he's released next week?

23         **MR. KHOJASTEH:**  I do -- we do not, Your Honor, and

24   neither does Mr. Giles.

25         And while I understand, I appreciate --

1          **THE COURT:**  Who is going to make that decision?  And

2    when?

3          **MR. KHOJASTEH:**  When -- when Mr. Abrego Garcia is in

4    the custody of -- if he's released into the custody of ICE next

5    Wednesday --

6          **THE COURT:**  Yeah.

7          **MR. KHOJASTEH:**  -- and he gets transferred to

8    wherever he's going to get transferred, whatever -- whatever

9    determination you make on bed space, my understanding is when

10   he gets to that detention facility, he's going to be assigned

11   an officer.  That person is going to become the person who

12   quarterbacks that decision-making process.

13         **THE COURT:**  The desk officer?

14         **MR. KHOJASTEH:**  My understanding -- based on

15   Mr. Giles' testimony yesterday and my understanding, is that

16   that's what -- that's how --

17         **THE COURT:**  Your clients.

18         **MR. KHOJASTEH:**  I don't know -- I don't mean -- I

19   don't know what the desk officer is.  It's an immigration

20   officer.

21         **THE COURT:**  Okay.  Let me tell you, like, bottom-line

22   litigation reasons why I have a problem with this.  Your

23   clients are real parties in interest.  They are still in this

24   case.  They have a vested interest in preserving their

25   position.  Their position is on tender hooks.

1      And so you're going to have me believe that your clients,

2  who are real parties in interest, who have a vested interest in

3  winning this case, are going to leave it to a desk officer to

4  decide where Mr. Abrego is going to go?  They are not going to

5  have any input, yet they have told the world about all the

6  input they have had up to date?

7      It just -- it just -- it defies reality that this is going

8  to be left to a desk officer.  And the more you press that, the

9  more concern I have.

10         **MR. KHOJASTEH:**  Your Honor, with respect, I don't

11  know what winning this case means for -- from the perspective

12  of our clients.  We've returned Mr. Abrego Garcia to the United

13  States.

14         **THE COURT:**  After three months of telling me you had

15  no power.  So, Judge, this case is moot.  That's how -- that

16  was the first way you tried to prevail in this case.

17      And then when that didn't work, it became, well, we

18  brought him back, so he's accorded all the relief, which is

19  directly contrary to what you had argued for the first three

20  months.

21      So you see, I don't have a whole lot of faith that I

22  understand exactly what -- what's going on, except I do know

23  that the process has been altered, all depending on what your

24  clients' interests are.  So it's just really hard for me to

25  believe --

1          **MR. KHOJASTEH:**  Your Honor --

2          **THE COURT:**  -- a desk officer is going to make this

3   decision.

4          **MR. KHOJASTEH:**  Your Honor, with respect, I don't

5   believe that your characterization of the government's posture

6   here is fair.

7          **THE COURT:**  Okay.

8          **MR. KHOJASTEH:**  We stated that we had no power for

9   some period of time, but we were attempting to comply with Your

10  Honor's court to -- Your Honor's order to facilitate his return

11  to the United States, that we were telling you that we had no

12  power to wave a magic wand and have him turned around here.

13  That was honest and candid.  When we were able to facilitate

14  his return, we did.

15      And with respect, from our -- we understood that once he

16  was returned, the relief sought by plaintiffs had been

17  satisfied, that he had been returned to the United States.

18          **THE COURT:**  And I've ruled to the contrary.

19          **MR. KHOJASTEH:**  Understood.

20          **THE COURT:**  So now you will have me believe that a

21  desk officer will quarterback where Mr. Abrego goes and what

22  you will do next.  Okay.  That's fine, that's your position.  I

23  accept that.  I'm just letting you know that I think that

24  actually weakens your case, it doesn't make it stronger.

25  Because it just means that everything is on the table for

1  Mr. Abrego, including where he ends up.  So one of the, what,

2  100 and -- how many facilities does ICE have throughout the

3  United States?

4        **MR. KHOJASTEH:**  My understanding, there's 200 or so

5  facilities around the United States, though they vary in size.

6  I think there are some that are larger than others.

7        **THE COURT:**  And there's already been at least one

8  court that has found that the bed space justification was

9  factually untrue and unreliable.  That's the only ground that

10 you've given me, through Mr. Giles, that Mr. Abrego may be

11 moved anywhere.  So what do I -- so, you know, that's one.

12    So there's no reassurance whatsoever that he'll have

13 access to counsel, that he'll be able to participate in this

14 case or his criminal case, or that there will be any advanced

15 notice.  So maybe you can help me with that.

16       **MR. KHOJASTEH:**  Sure.

17       **THE COURT:**  What is -- what are the defendants

18 willing to do in terms of advanced notice to Mr. Abrego's

19 counsel or to this court as to which fork in the road you

20 choose?

21       **MR. KHOJASTEH:**  My understanding is Mr. Abrego Garcia

22 is going to have the ability to contact his counsel when he's

23 in the detention facility.

24       **THE COURT:**  That means you're not willing to answer

25 my question.  Have the ability, what does that mean?  What

1    specifically are you going to do?

2        Are you, as counsel for the other side, going to do the

3    courtesy to the lawyers of picking up the phone and telling

4    them where he's going to be, and under what -- which fork in

5    the road you've chosen?  Can you do that?

6            **MR. KHOJASTEH:**  As opposed to him -- them

7    communicating with their own client?

8            **THE COURT:**  Right.  When historically, like, for a

9    day, you left him on a bus in Texas while you were getting

10   ready to deport him or remove him, or whatever the word is when

11   you don't do it illegally, to El Salvador, he was on a bus for

12   a day.  So, yeah, I have a concern about that, especially when,

13   again, plaintiffs tell me they learned he came back from the

14   news.

15       I don't understand why as officers of the Court in this

16   case, you can't pick up the phone and say Mr. Abrego is now in

17   ICE custody, this is our plan.

18           **MR. KHOJASTEH:**  We can certainly take it under

19   advisement, Your Honor.  I'm not prepared to be able to make

20   that commitment today.

21       But, again, I think we should take a step back because

22   there's an emergency motion that's been filed that was briefed.

23   It's the only thing that's been moved, filed and briefed here,

24   in regards -- a request for this Court to order ICE to transfer

25   Mr. Abrego Garcia if and when he's released into their custody

1  to Maryland.  Right?

2      I want to -- if you -- would you like me to go through

3  that?

4          THE COURT:  No.  I would like you to tell me a little

5  bit more about door number one and door number two for the --

6  for the defendants.  In other words, let's not even get to

7  Maryland yet.

8          MR. KHOJASTEH:  Okay.

9          THE COURT:  Because I'm not necessarily convinced

10 that I can accord emergency relief in that regard.  Okay?

11     But I'm deeply concerned that if there is not some

12 restraint on you, Mr. Abrego will be on another plane to

13 another country with no notice to his lawyers, because that's

14 what you've done before, and that's what you've done in other

15 cases, and now I've got this policy that I'm looking at that I

16 don't understand with respect to the third-party removal to a

17 third country.

18     So maybe you can explain to me what you know about

19 Mr. Abrego's case, and if you choose door number one, what

20 you're going to do.

21         MR. KHOJASTEH:  Sure.  I know I'm not supposed to ask

22 you questions, right?  But just --

23         THE COURT:  Well, not in the -- the type you did

24 earlier.

25     But go ahead.  If you need clarification, you can.

1          MR. KHOJASTEH:  And I hope this exchange resolves any

2  concerns from the lawyers that some of my demeanor is lulling

3  the Court into less interest in the things that Your Honor

4  finds important.

5       But I -- there's -- plaintiffs discuss the process

6  afforded to Mr. Abrego Garcia, and they refer to two cases,

7  *AARP* and *JGG*, that were both deportations pursuant to Alien

8  Enemies Act, where those folks had no -- they had not gone

9  through 240 proceedings.

10          THE COURT:  That's not persuasive to me.

11          MR. KHOJASTEH:  No, no, I'm asking -- I'm asking a

12  question.  Asking a question.

13          THE COURT:  He is on the same plane -- okay.  This is

14  what I want to know.  I'll tell you.  I'll try again.

15       I want to know, if he comes into your custody, whenever

16  next week, and you choose third-party country -- third-country

17  removal, what are you going to do?

18          MR. KHOJASTEH:  Right.  So what's -- the -- this is

19  the part of the -- this is what my question was going to go to.

20          THE COURT:  Okay.

21          MR. KHOJASTEH:  The part of the process that Your

22  Honor is concerned with is not what process he was afforded in

23  2019, it's about what's going to happen in terms of the

24  processes afforded if and when he's provided notice to -- if

25  and when a determination is made that he's going to be removed

1  to a third country.

2          THE COURT:  That means what are you going to do, yes.

3  That means next week.

4          MR. KHOJASTEH:  Right.  That -- that -- right.

5  Understood.

6          THE COURT:  Okay.

7          MR. KHOJASTEH:  I'm just trying to get there.

8          THE COURT:  I'm just trying to understand what you

9  don't understand about what are you going to do.

10          MR. KHOJASTEH:  Well, there's a lot of people --

11  we're talking about cases where people were in completely

12  different immigration postures, and saying that no one is

13  afforded process and due process has been violated.  I want to

14  make sure what we're talking about here.

15          THE COURT:  Mr. Abrego.

16          MR. KHOJASTEH:  There's case law on point relating to

17  this -- whether the credible fear hearing is sufficient for due

18  process.

19          THE COURT:  I just want to know what you're going to

20  do with Mr. Abrego if you go through door number one.  So what

21  happens next?  He's in ICE custody, a decision is made.

22          MR. KHOJASTEH:  He'll be provided notice of the

23  country.

24          THE COURT:  What's the first thing, do you identify a

25  country?

1          **MR. KHOJASTEH:**  My -- my understanding, based on

2  Mr. Giles' testimony, is that the -- if there's an agreement in

3  place with the country that they have identified, that's one

4  thing.  If there's not an agreement with the country they

5  identified, there's a form, and I have it here, it's I-241.

6  I-241.

7          **THE COURT:**  I looked up I-241, I couldn't find it.

8          **MR. MOLINA:**  It's a very old document, Your Honor.  I

9  did the same -- I did the exact same.

10          **THE COURT:**  Okay.

11          **MR. MOLINA:**  And it's very difficult -- very hard to

12  find, but it's even mentioned in the Register, it's known as a

13  request for travel documentation, if I recall.  It's -- I

14  understand where the Court is coming from.  It was hard for us.

15  I have not found a copy yet.

16          **MR. KHOJASTEH:**  It's served on --

17          **THE COURT:**  You have not found a copy of it,

18  Mr. Molina?

19          **MR. MOLINA:**  I have seen it in the past, Your Honor,

20  but I was not able to obtain one online.

21          **THE COURT:**  Right.  So I don't know whether it still

22  exists, but it sounds like that's the vehicle by which ICE

23  would ensure that the third country would provide, it sounds

24  like, travel documents, right?

25          **MR. MOLINA:**  That's correct, Your Honor.

 1          **MR. KHOJASTEH:**  So that -- that document is served on

 2   the embassy of that country.

 3          **THE COURT:**  Uh-huh.

 4          **MR. KHOJASTEH:**  To receive the travel documents.

 5      And at the same time, in parallel, the State Department

 6   would begin the assurances program to make sure that there's no

 7   risk of violations of the Convention Against Torture.

 8          **THE COURT:**  Okay.  So that's step number one.

 9          **MR. KHOJASTEH:**  That would be step one.

10      And then -- and then once a country is identified, they

11   would be served that -- they determine -- the alien would be

12   determined -- Mr. Abrego Garcia will receive notice of that --

13   the country he's going to be deported to, or removed to,

14   apologies, and he'll have an opportunity to express the

15   credible fear if he does.

16          **THE COURT:**  Okay.  Can I stop you then, and can you

17   explain how that squares with the memo?  Because the memo seems

18   to say something different, the March 30 memo, which was also

19   in the April -- or the July e-mail.

20          **MR. KHOJASTEH:**  Right.  So I think we went through

21   this yesterday.

22          **THE COURT:**  Well, we didn't really, because I don't

23   understand it.

24          **MR. KHOJASTEH:**  Right.  But at the sidebar, I was

25   raising -- we raised this issue together, with --

1      **THE COURT:**  Okay.  Well, let's go to -- if you're

2   looking at the July 9 e-mail, it's the third paragraph.  If

3   you're looking at the memo, it's the bottom of the page onto

4   the top of the second page.  And it's the colloquy that I had

5   with Mr. Rossman about it sounds as if what you just described

6   as step one is covered in the sentence if the United States has

7   received diplomatic assurances from the country of removal,

8   that aliens removed from the United States will not be

9   persecuted or tortured.  And if the Department of State

10  believes these assurances to be credible, the alien may be

11  removed without the need for further procedures.

12     But what you're describing is further procedures.

13     **MR. KHOJASTEH:**  I don't think that -- I think that

14  the -- I don't know what the -- precisely the further

15  procedures, how that relates to the -- well, strike that.

16     If you go to the second subheading, where the alien

17  affirmatively states a fear, I think that applies -- my

18  understanding from Mr. Giles' testimony, is that that applies

19  to everyone.

20     **THE COURT:**  Where are you?

21     **MR. KHOJASTEH:**  It's the -- it's the bottom of --

22  it's the last two paragraphs of the document.

23     **THE COURT:**  I understand that, but the plain language

24  of the memo is at odds with that.

25     **MR. KHOJASTEH:**  Well, Mr. Giles, who works at --

1   unlike me, and plaintiffs, and with respect to Your Honor, he

2   has been at ICE for 25 years.  He interpreted the document

3   to -- and said his practice is consistent with that.

4           **THE COURT:**  That doesn't cut it, because he has been

5   with ICE for 25 years, but this memo is from his boss, the

6   Department of Homeland Security, and it says this is the

7   procedure as of March 30th you will follow.

8       And so the delta here, in the light most favorable to you,

9   the delta is, we don't know what they are going to do when it

10  comes to this -- after step one is satisfied, because the memo

11  very specifically goes on to say no further procedures.  But in

12  all other cases, here are the procedures, and they are very

13  consistent with what Mr. Giles testified to.  But the plain

14  language suggests, well, if you're in -- satisfy step one,

15  you're not getting those procedures because it's in all other

16  cases.  What do I do with that?

17          **MR. KHOJASTEH:**  I apologize, Your Honor, do you

18  mind --

19          **THE COURT:**  Yeah, you want to take a minute and --

20          **MR. KHOJASTEH:**  No, no, no.  I want -- do you mind

21  asking the question again?

22          **THE COURT:**  Sure.

23          **MR. KHOJASTEH:**  I just --

24          **THE COURT:**  So I read to you the first sentence of

25  the -- of this section that I'm struggling with.  And I am

1  looking at the July 9 e-mail, just so we're clear.  Because

2  that's the most recent directive.

3          **MR. KHOJASTEH:**  I'm looking at -- I apologize, I was

4  looking at the March 30.

5          **THE COURT:**  Okay.  That's the most recent directive

6  post *DVD* in following the guidance from March 30th.  And this

7  is a readout to all ICE employees as to what to do, guidance

8  that is given, their marching orders in light of the most

9  recent law.  Okay?  And I was reading from the third paragraph

10  that it says, what we talked about, in the event, you know, you

11  have diplomatic assurances from the country, then the alien may

12  be removed without the need for further procedures.

13      Then it goes on to say, ICE will seek written confirmation

14  from the Department of State; the HSI and ERO will be made

15  aware of such assurances.  And then it says, in all other

16  cases, ICE must comply with the following procedures.  And

17  those are the procedures regarding giving the alien the

18  opportunity to raise a credible fear and what will happen next.

19      So the disconnect for me is, all other cases distinguishes

20  for the boots-on-the-ground employees those aliens for whom

21  there's already assurances of the third country versus those

22  aliens who may be deported somewhere else, and this is what you

23  do for them.

24      You see what I'm saying?

25          **MR. KHOJASTEH:**  I understand.  And unfortunately, I

1  actually don't have a copy of the July 9th thing with me at the

2  table.

3          **THE COURT:**  Does anybody have a copy for you?

4  Because this is really important, yeah.

5          **MR. KHOJASTEH:**  Understood -- I 1,000 percent

6  understand it's very important, Your Honor.

7          **THE COURT:**  Okay.  Let's see if we can --

8          **MR. KHOJASTEH:**  I'll have it in one second, Your

9  Honor.  Give me one second.

10          **THE COURT:**  Okay.  Great.

11          **MR. KHOJASTEH:**  Your Honor, I apologize, we had

12  physical -- our only physical copy of that document was in the

13  exhibit -- in the exhibits that we gave to the Court that we

14  returned, and my colleague, John Guynn, took them with him

15  yesterday.

16          **THE COURT:**  Okay.  Do plaintiffs have an extra clean

17  copy, by any chance?

18          **MR. ROSSMAN:**  Yeah, a clean copy we don't have.

19  Look, I'm -- if you'll indulge me, I'm happy to hand my copy

20  with my notes on it, as long as --

21          **THE COURT:**  Which has what, stars, exclamation

22  points, like what does this mean?

23          **MR. ROSSMAN:**  Yeah.  So as long as -- as long as it's

24  not a waiver of any privilege.

25          **THE COURT:**  Yeah, it is not a waiver of work product.

1          **MR. KHOJASTEH:**  We consent.  We stipulate to that.

2          **THE COURT:**  Okay.  All right.  Very good.

3          **MR. ROSSMAN:**  I don't even know what the notes are.

4          **MR. KHOJASTEH:**  Thank you very much.  I appreciate

5     it, Judge.  And I apologize, Your Honor.

6          **THE COURT:**  Okay.  So we're looking at -- and just to

7     roll it back, this guidance says effective immediately when

8     seeking to remove an alien with a final order of removal other

9     than expedited removal to an alternative country as identified

10    in 241(b)(1)(C), et cetera, ICE must adhere to the Secretary of

11    Homeland Security, Kristi Noem's March 30, 2025, memorandum as

12    detailed below.

13        So I consider this to be an expansion of the memorandum.

14        And that's when we get to Paragraph 3, which is what I'm

15    struggling with.  So if you want to take a moment and read it

16    and then we can chat.

17         **MR. KHOJASTEH:**  So, Your Honor, we didn't cross

18    Mr. -- we didn't examine Mr. Giles on what the -- what this

19    means, and neither did -- and plaintiffs didn't cross him on

20    it.  So I'm reading --

21         **THE COURT:**  They did.  They did.  I mean it, it got

22    all kind of wonky because you had a couple, like, trips up to

23    the bench.

24         **MR. KHOJASTEH:**  It was actually the March 30th, 2025,

25    document.

1          **THE COURT:**  I know, but this is the expansion of it

2     where Mr. Rand was trying to establish that there are two

3     tracks.  And so the fact that you didn't ask -- you offered

4     this up as an exhibit.

5          **MR. KHOJASTEH:**  I didn't, Your Honor.

6          **THE COURT:**  Okay.  I'm sorry, I'm sorry.  No, you're

7     right.  This witness relied on it.  And then when I made you

8     give it over to the plaintiffs, that's when --

9          **MR. KHOJASTEH:**  I would --

10         **THE COURT:**  -- it became -- so what's the point that

11    you didn't examine --

12         **MR. KHOJASTEH:**  I didn't --

13         **THE COURT:**  -- this witness about it?  This is the

14    policy that gets read out.

15         **MR. KHOJASTEH:**  Your Honor, a couple of things,

16    because there's a record.

17         I don't agree with the characterization that you forced us

18    to give it to you.

19         We found out that he had looked at -- he had received an

20    e-mail the same time as you found out he had received an

21    e-mail, on July 9th.  He received an e-mail, he looked at this

22    document.

23         My understanding from Mr. Giles was that the March 30th,

24    2025, and this July 9th, that there's -- there's not a

25    meaningful difference between what those policies are.  The

1  only policy we discussed, when we were at sidebar with

2  Mr. Rand, was the March 30th, 2025.

3       All I'm saying, is I can't speak to how this is drafted or

4  what particular -- but I'm happy to indulge you and go through

5  it with you and give you my best --

6       **THE COURT:**  But the fact that you can't speak to it

7  is remarkable, because this is your client's memo to all ICE

8  employees.

9       **MR. KHOJASTEH:**  I'm --

10      **THE COURT:**  I'm sorry, but no.  If you are going to

11  offer that up, then you have to hear my response.

12      **MR. KHOJASTEH:**  Understood.

13      **THE COURT:**  Because my response is, if you're going

14  to prepare this witness in good faith, and you're going to have

15  that conversation that you apparently had with him consistent

16  with my order to get him ready for this --

17      **MR. KHOJASTEH:**  Right.

18      **THE COURT:**  -- and he offers up that this memo was

19  something that he looked at in advance to prepare himself, and

20  the memo came in yesterday, and then we know we're going to

21  talk about it today, the response can't be "I haven't had a

22  chance to think about it."

23      I mean, this is the directive that's going to all ICE

24  employees, which is there's the countries for which we've

25  gotten these assurances, and then there's all other cases.

```
1          If you need a moment to speak with Mr. Molina to find out

2    what this means, that's fine.

3          MR. KHOJASTEH:  No, I'm happy to take -- I'm happy to

4    take -- state our position.

5          Our position, consistent with the March 30th, 2025,

6    policy, is that all of the aliens who are subject to

7    third-party removals that are subject to the policies set forth

8    here, meaning they have gone through removal proceedings in

9    240, 241(a)(5) and 238(b), which is what the March 30th, 2025,

10   policy concerns, are being provided notice of removal to a

11   third-party country before they are removed.

12         THE COURT:  Okay.  And so there's no further --

13         MR. KHOJASTEH:  Irrespective --

14         THE COURT:  Okay.  Irrespective of this July 9th.

15         MR. KHOJASTEH:  Assurances Program.

16         THE COURT:  Okay.  Then I have another question

17   because it sounds like this "in all other cases," you're saying

18   read that, draw a line through it, they get processed.

19         MR. KHOJASTEH:  There may be some other set of things

20   that have to happen.  I just -- my -- my -- with respect to --

21   I don't think that all-other-cases language impacts the

22   requirement that the government provide the notice -- well, not

23   that required, but that the government's process to provide

24   notice --

25         THE COURT:  Yeah.
```

 1         MR. KHOJASTEH:  -- to the aliens of the countries to

 2    which they are being removed.

 3         THE COURT:  So you're saying according -- you're

 4    saying as of today, if step one is accomplished, you're still

 5    going to give the alien notice and an opportunity to be heard?

 6         MR. KHOJASTEH:  There are going to be -- they are

 7    going to have -- provided notice, and if they express fear,

 8    they are going to have a credible fear hearing before an

 9    officer -- an immigration officer at USCIS.

10         THE COURT:  Okay.  And you're getting that from

11    where?  Is that the March 30 memo?  Despite the July directive,

12    which may very well be inconsistent, you're saying look to the

13    March 30 memo for what you intend to do with Mr. Abrego Garcia?

14         MR. KHOJASTEH:  My understanding from both -- my

15    understanding is that there's no meaningful difference between

16    what's set forth in the March 30th, 2025, process and the

17    July 9th process, and that Mr. Abrego Garcia, because that's

18    who we're talking about right now --

19         THE COURT:  Yeah.

20         MR. KHOJASTEH:  -- if he's going to be removed to a

21    third country, he's going to be provided written notice, just

22    as Mr. Giles testified yesterday.

23         THE COURT:  Okay.  Then I'm going to stop you,

24    because it sounds like you're saying -- you're saying a lot

25    here, one is that the process that's outlined in the July 9

1   would apply to Mr. Abrego?  Because there's a process that's

2   outlined that is more detailed and potentially quite relevant

3   to Mr. Abrego.  And this is what ICE officers are being told to

4   do, so I just want the record to be clear.

5       Are you saying Mr. Abrego gets these protections outlined

6   in the July 9 memo?

7           **MR. KHOJASTEH:**  My understanding is yes.

8           **THE COURT:**  So he'll be given the notice of removal

9   that -- that includes the intended country.  He won't be asked

10  whether the alien is afraid of being removed, but ERO will

11  generally wait 24 hours following service before effectuating

12  removal, except in exigent circumstances.

13      ERO may execute a removal order six or more hours after

14  service in those exigent circumstances as long as the alien is

15  provided reasonable means and an opportunity to speak with an

16  attorney prior to removal, and so on and so forth.

17      Am I getting it right?

18          **MR. KHOJASTEH:**  Yes.

19          **THE COURT:**  All of these -- okay.  Okay.

20      So let me ask you this, if I go to the next page and

21  the -- it says if the alien has gone through the credible fear

22  determination and USCIS will screen the individual, and if

23  USCIS determines the alien has met the standard, then the

24  matter will be referred back to the original immigration court.

25          **MR. KHOJASTEH:**  Right.

1          **THE COURT:**  Right?  So in Mr. Abrego's case, that

2     means it would come back to Baltimore.

3          **MR. KHOJASTEH:**  My understanding is that's where the

4     original immigration case was, yes.

5          **THE COURT:**  I'm sorry?

6          **MR. KHOJASTEH:**  That's my understanding that's where

7     the original immigration case was, so yes.

8          **THE COURT:**  Okay.  In your view, does that lend any

9     credence to what the plaintiffs are saying, which is we ought,

10    in fairness, restore the status quo to the Baltimore field

11    office?  Because in the end of the day, for Mr. Abrego Garcia,

12    there's likely going to be -- I mean, it's going to be a real

13    horse race as to whether he has a credible fear because of

14    everything that's happened in this case.  So -- so doesn't this

15    at least -- is consistent with, in his case, coming back to

16    Baltimore?

17         **MR. KHOJASTEH:**  Your Honor, with respect, I don't

18    believe so.  Again, I think -- and I don't mean this in a

19    pejorative way, but we're speculating a lot.  We've speculated

20    now that he's been released on the 16th, he's been detained by

21    ICE, he's then sent somewhere that -- that censors -- an ICE

22    facility that plaintiffs, presumably, will be unhappy with.

23    And then the determination is made it's going to be a third

24    country, and that third country is going to be a third country

25    that he has a credible fear from, and that the USCIS is going

1    to credit his credible fear.  So it's six layers deep in

2    speculation.

3            **THE COURT:**  Well, it's not -- it's not that

4    speculative.  Because, one, there's already a release order in

5    place that's being reviewed.  So there's actually a 60-page

6    opinion that suggests he's getting released next week.  May

7    change.  May change.  But it's not wholly speculative.  That's

8    number one.

9        And number two, given that he's been given the moniker of

10   MS-13, he's likely to have a credible fear to at least the two

11   countries that have been offered as reasonable countries to

12   which you may attempt to deport Mr. Abrego to.

13       So there's some factual predicate to believe that this is

14   real and the need for his protection to make those -- those

15   claims with counsel is real.

16       And -- and third, we haven't yet talked about the other

17   option, which is to move for termination of removal, which

18   would be in Maryland, right?  That would go back to the

19   original IJ for that district?

20           **MR. KHOJASTEH:**  Move -- you're saying move for

21   terminating the withholding to El Salvador?

22           **THE COURT:**  Correct.  I'm sorry.  Yeah, in other

23   words, in terms of -- it's not that speculative that he's going

24   to end up, all depending on which way you go, coming back to

25   revisit his removal proceedings, right?

1          **MR. KHOJASTEH:**  So if there's a likelihood one way or

2    the other, my point of it being speculative, is that none of

3    this is ripe, Your Honor.

4          **THE COURT:**  Well, it may not be ripe, which is what I

5    asked about yesterday, which is --

6          **MR. KHOJASTEH:**  Yeah, and that when I -- to be clear,

7    when I say it's speculative, the point I'm driving at, these

8    things haven't happened yet, the controversy is not ripe.

9          **THE COURT:**  Right.  But the fact is, the controversy

10   will be ripe on a particular day.  And then at -- you know,

11   after-business hours, Mr. Abrego will be moved.  And he'll be

12   moved -- if past is prologue, what's gone on in the last three

13   months, he's going to be moved to, like, Texas or Louisiana, or

14   who knows where else.  And then I've lost -- and before we know

15   it, he's on a plane, and I've lost jurisdiction.

16       And that's why I asked yesterday, a 48-hour hold to

17   maintain the status quo so that we can make sure we know what's

18   happening in this case and so due process is afforded.  I'm

19   talking about a really narrow window of relief, if we're

20   talking to -- as you say, to deal with the fact that it's not

21   ripe.  And it may never be ripe.  So that's -- that's a good

22   point, and maybe we should talk about that.

23       Why isn't the best next step to be as careful as possible

24   that I'm not wading into a territory I don't need to be wading

25   into to simply talk about the 48 hours after Mr. Abrego comes

 1   into ICE custody only?

 2           **MR. KHOJASTEH:**  So, Your Honor, I -- and I will get

 3   to the answer to the question.

 4           **THE COURT:**  Okay.

 5           **MR. KHOJASTEH:**  I'm not attempting to be

 6   nonresponsive, but I just think there's a couple of points

 7   in -- in what you just stated that we need to address that

 8   helps frame what -- frame the discussion we're having.

 9       With respect, Your Honor, you said that you're going to

10   lose jurisdiction over him when he goes to -- if he gets

11   transferred to Texas, to an ICE facility in Texas.

12           **THE COURT:**  No, when he's then put on a plane and

13   taken out of the United States.  Because --

14           **MR. KHOJASTEH:**  So after he's received notice --

15           **THE COURT:**  Well, I don't know that.  See, that's the

16   thing, again --

17           **MR. KHOJASTEH:**  But how don't we know it, Your Honor?

18           **THE COURT:**  What's that?  Because you haven't done it

19   before.  And your own -- your own policy here is inconsistent

20   with each other.  So if I find that there's really no assurance

21   without court intervention that he will receive, as the Supreme

22   Court said, all nine justices said, he's due, right?  I mean,

23   that is what *AARP* and *JGG* stand for, that there's some modicum

24   of process that's due, and the Fifth Circuit is trying to

25   figure that out.

1          You and I can have a conversation about whether Mr. Abrego

2    is materially different than the alien enemies designees.

3          **MR. KHOJASTEH:**  Well, those folks had no final orders

4    of removal.

5          **THE COURT:**  Right.  I understand that.  But those

6    folks also didn't have a withholding of removal that was

7    violated by your client.  So you keep coming back to that, but

8    you do conveniently omit the fact that you weren't supposed to

9    remove him to El Salvador.

10         **MR. KHOJASTEH:**  And agree that that happened.

11         The point is that we are where we are today.  He's back in

12    the United States, he's not in ICE custody yet.  When he gets

13    in ICE custody, there's going to be two paths, right?  That we

14    described, either opening up the removal proceedings or

15    beginning the process of having to remove to a third country.

16         We just went through a policy.  I just represented on the

17    record as an officer of the Court, as a member of the

18    Department of Justice, that he's going to be provided the

19    notice that's outlined there.

20         **THE COURT:**  And all I'm saying is --

21         **MR. KHOJASTEH:**  So I'm -- on jurisdiction --

22         **THE COURT:**  Before you take him anywhere and do

23    anything, for 24 or 48 hours, fulfill this order.  Fulfill what

24    you just put on the record you're going to do.  Do it.  And I'm

25    going to press pause to make sure you do it in a case in which

1    you haven't done it before.

2           **MR. KHOJASTEH:**  Your Honor, with respect, I don't

3    believe you have the jurisdiction to press pause on -- I

4    think --

5           **THE COURT:**  Okay.  Well, let's do this then, because

6    my poor staff needs a break.  So why don't we come back and you

7    tell me why I don't have jurisdiction to order a freeze, if you

8    will, to make sure this case is ripe.  And if it is ripe, to

9    keep everyone in place for 48 hours so that you can give

10   Mr. Abrego the process you say you're going to give him and the

11   notice to counsel.

12          **MR. KHOJASTEH:**  With respect, I can do it in five

13   minutes, but let's give everyone --

14          **THE COURT:**  Okay.  I need to give my staff a break.

15          **MR. KHOJASTEH:**  Sure.

16          **THE COURT:**  Okay?  We'll come back.  Let's take ten.

17          **MR. KHOJASTEH:**  Thank you, Your Honor.

18          **DEPUTY CLERK:**  All rise.  This Honorable Court stands

19   in recess for ten minutes.

20      (Recess taken from 10:47 a.m. to 11:01 a.m.)

21          **DEPUTY CLERK:**  All rise.  This Honorable Court

22   resumes in session.

23          **THE COURT:**  All right, everyone, you can have a seat.

24      Okay.  Mr. Khojasteh, I'm going to be really mindful of

25   your time and try not to interrupt you.  I just have one

1   question, and it's a real technical question, which is -- which

2   is the regional field office that's responsible for the

3   Baltimore field office?

4       Do you know that, Mr. Molina?

5               MR. MOLINA:  I believe that is Baltimore, Your Honor.

6               THE COURT:  So Baltimore is the regional that --

7               MR. MOLINA:  I believe Baltimore is the regional

8   field office.  I can doublecheck on that real quickly, but --

9   and I will, actually, while we continue to present.  But I'll

10  get that answer for you certainly.

11              MR. SANDOVAL-MOSHENBERG:  That's correct.  Baltimore

12  is a field office, and the director of the field office, Nikita

13  Baker, is one of the defendants in this case.

14              THE COURT:  Are there other detention facilities,

15  though, under that office?  Other than -- because there is no

16  Maryland detention facility, so I was just curious.

17              MR. KHOJASTEH:  My understanding is that the closest

18  facility to Maryland is Philadelphia.

19              THE COURT:  Is Philadelphia?

20              MR. KHOJASTEH:  That's my understanding.

21              THE COURT:  Okay.  All right.  Thank you.

22       Okay.  Go ahead.

23              MR. KHOJASTEH:  Your Honor, before we broke, I

24  respectfully stated that the Court lacked jurisdiction to enter

25  the TRO that you were contemplating.  This is an initial

1  matter.  We haven't briefed a TRO, no one has moved for a TRO.

2  That -- and we've gone through the reasons why that TRO is

3  ripe.

4       But my -- if taking it all together, what plaintiffs say

5  in their papers regarding the All Writs Act, and what they --

6  what they assert that empowers this Court to do, I -- I think

7  the analysis is flawed and wrong, Your Honor, respectfully.

8       The All Writs Act permits a court to grant relief to

9  preserve its jurisdiction over a case not created.  And the

10 relief that they are seeking here, and the TRO that you're

11 contemplating, is -- are -- is all outside the jurisdiction of

12 this court right now.

13      And so we've gone through the reasons why they are ripe,

14 and I won't bore you with that.

15      With respect to the -- and I know -- bear with me, the

16 claims now are moot.  I understand we addressed this earlier

17 this week on the motion to dismiss, but plaintiffs' claims in

18 this case are now moot.

19      In view of the July 9th stipulation filed by the

20 government providing that defendants will not remove

21 Mr. Abrego Garcia to El Salvador again without first reopening

22 his immigration proceeding and terminating his withholding of

23 removal, the case is moot.

24           THE COURT:  But it's not moot because I've decided

25 it's not moot.  And I have -- I have found that there's a

1   colorable claim on the plaintiffs' side that it's only moot if

2   you restore him to the status quo ante.  I haven't fully

3   decided that yet, because you've asked me to dissolve the

4   injunction.  And that is part of that analysis.  But for

5   today's purposes, the case isn't moot because I've decided it's

6   not.  So can you refine that argument a little bit so I can

7   understand it?

8           **MR. KHOJASTEH:**  Sure.  So when you entered your

9   order, you -- you reasoned on the record that the risk of

10  future violations is not off the table.  And simply because the

11  government has rewound the challenged practice today alone

12  doesn't deprive Your Honor from determining the legality of

13  that practice --

14          **THE COURT:**  The future.

15          **MR. KHOJASTEH:**  -- in preventing the government from

16  doing it again.  Right?

17          **THE COURT:**  Right.

18          **MR. KHOJASTEH:**  And the case you cited was *Porter v.*

19  *Clarke* which states that -- and you said that the defendants

20  failed to satisfy their heavy burden of avoiding the voluntary

21  cessation doctrine because they had not entered a, quote,

22  unquote, unconditional and irrevocable agreement that prevented

23  them from returning to the challenged conduct, right?

24      What -- what we did with the July 9th stipulation is that

25  promise, that is the unconditional agreement that we're not

1   going to go back to that -- we're not going to do that again.

2          **THE COURT:**  What's the unconditional agreement?

3          **MR. KHOJASTEH:**  The stipulation that we provided the

4   Court that we will not deport -- we will not remove Mr. Abrego

5   Garcia to El Salvador without first reopening his removal

6   proceedings and terminating the withholding on his -- to El

7   Salvador.

8          **THE COURT:**  But how about the second prong of that

9   stipulation, which, you know, I read both of those to be we

10  won't violate the law.

11         **MR. KHOJASTEH:**  Right.  So we -- you have the

12  agreement --

13         **THE COURT:**  Right.

14         **MR. KHOJASTEH:**  -- that says that we're not going to

15  return to the challenged conduct.  So respectfully, the case is

16  moot.

17         **THE COURT:**  But -- but that's not satisfactory of the

18  heavy burden.  I mean, we just violated the law.  We violated

19  it, like, you know, just -- just undisputedly, and now we

20  promise we won't do it again but without any -- any showing

21  factually of how you won't do it again.  You just basically

22  cited the statute to me, the CFRs, that's how I read it.

23         **MR. KHOJASTEH:**  Well, what did the Court in *Porter v.*

24  *Clarke* -- I don't understand what they were referring to in

25  terms of an unconditional agreement, that they wouldn't return

1    to the unchallenged --

2         **THE COURT:**  So I'll give you an example.  Like, you

3    know, I had it in a case where there was a certain policy that

4    a school had promised they were going to implement, and they

5    began to implement it.  And then midway through the school

6    year, they said, okay, we're not going to implement it anymore.

7    Kind of similar to what you are doing.  And that didn't satisfy

8    the voluntary cessation doctrine.  You got to do more.

9    Because, otherwise, it would be so easy for an adverse party to

10   moot a question that really implicates injunctive relief, you

11   just say we promise we won't do it again.

12        And so in my view, that's exactly what you're doing.  And

13   there has to be more.  There could be -- there could be,

14   literally, a settlement agreement, some sort of agreement with

15   the plaintiff, plaintiff specific, that factually, this is what

16   you will do to make sure that the conduct isn't -- isn't --

17   isn't returned to.  And just telling me you're going to

18   violate -- you're not going to violate the law, when there is

19   so much daylight in terms of the process accorded to be

20   consistent with the Constitution.

21        **MR. KHOJASTEH:**  Look, there's a lot -- for example,

22   right now, what you are, I believe, referring to is the process

23   for what's going to happen when he receives notice of a removal

24   to -- if that's a determination that's made, to a third

25   country.  But the relief that was sought in this case, not

1  somewhere else, not in the future --

2          **THE COURT:**  Yeah.

3          **MR. KHOJASTEH:**  -- the relief sought in this case was

4  his return to the United States.  That's done.

5          **THE COURT:**  But I --

6          **MR. KHOJASTEH:**  It's been completed, and the

7  agreement --

8          **THE COURT:**  I disagreed with you, and I have already

9  determined that.  And for once, will the defendants accept that

10  if I -- if I make a determination on the law and apply it to

11  the facts, at least for now, that's the decision until a court

12  above me says I'm wrong.

13          **MR. KHOJASTEH:**  Your Honor, with respect, the only

14  reason I'm -- we're not rehashing the argument just simply to

15  relitigate.  There has been a change in circumstance since you

16  entered your order on Monday.  We filed a stipulation.

17          **THE COURT:**  And I'm telling you that at least at this

18  juncture, it hasn't -- I haven't decided this yet, right?

19          **MR. KHOJASTEH:**  Understood.

20          **THE COURT:**  So I hear that your position is this.

21          **MR. KHOJASTEH:**  It's my job to tell you about it.  My

22  job is to tell you about it.

23          **THE COURT:**  Okay.  And the stipulation -- I get it.

24  Your position is the stipulation basically takes any need for

25  emergency relief off the table.

1     **MR. KHOJASTEH:**  The stipulation just -- it's not

2 whether -- whether it touches emergency relief -- because the

3 relief they are seeking is different.  It's different than what

4 this case was initially about, right?  It was returning him to

5 the United States.

6     And the voluntary cessation doctrine is about the

7 challenged conduct, which was sending him to El Salvador when

8 he had the withholding of removal to El Salvador.  We now made

9 the agreement unconditionally to this court and the stipulation

10 filed in the court, which I believe is binding, as between us

11 with you, that we're not going to do that.  But understood, we

12 can move past it.

13     **THE COURT:**  Right.  I mean, I think I understand your

14 argument, and you understand the plaintiffs', which is no,

15 relief would be to restore him.  Maybe not --

16     **MR. KHOJASTEH:**  We should talk about the status quo,

17 Your Honor, because this is interesting --

18     **THE COURT:**  Well, hold on.  Let me finish.

19     **MR. KHOJASTEH:**  I apologize.

20     **THE COURT:**  One can have a healthy debate about

21 whether that means Mr. Abrego must live in Maryland, but, you

22 know, your own detainer notes that part of the basis is because

23 there are ongoing removal proceedings, and the removal

24 proceedings originated in Baltimore.  And there was an IJ in

25 Baltimore who decided that, and the Fourth Circuit has

1  jurisdiction over that case.

2      So it stands to reason that if you're really going to

3  restore him to the status quo ante, since you're saying this is

4  part and parcel of the removal proceedings, the removal

5  proceedings started in Baltimore.  You haven't explained to me

6  why that doesn't wash.

7          **MR. KHOJASTEH:**  I'll explain it to you.  They want to

8  take you back to a March 12th world that Mr. Abrego Garcia is

9  walking down the street and hasn't been detained by ICE.

10         **THE COURT:**  No, no, no.  I'm talking about something

11  different.  I'm talking about a legal restoration to the

12  jurisdiction that had his case to begin with, when your -- the

13  basis for his detention is ongoing removal proceedings.  Now,

14  maybe I don't understand how immigration works, but that seems

15  to me is a real basic one.

16         **MR. KHOJASTEH:**  Well, the place he was before the

17  violation occurred, meaning he was sent to El Salvador

18  before -- because -- the violation being sent to El Salvador

19  with the withholding of removal to El Salvador, the place that

20  he was, the status quo before that event happened, he wasn't in

21  Baltimore.  He was in Texas.

22         **THE COURT:**  No, he was in -- no, because the status

23  of the record is that he was arrested without any proof of why

24  he was arrested on the streets of Baltimore, taken to a

25  detention facility in Baltimore.  And then, again, this ship

1   has sailed, but there's lots of reasons why this court had

2   jurisdiction to accept this case.

3       So stay with me for a second because I really would like

4   an answer to this.

5           **MR. KHOJASTEH:**  Sure.

6           **THE COURT:**  If the basis of the detention is the

7   pendency of ongoing removal proceedings, and there's only one

8   removal proceeding that I have a record of, and that originated

9   in Baltimore, what authority is there to begin removal

10  proceedings elsewhere?  Or if I'm restoring -- better question,

11  if I'm restoring Abrego Garcia to the status quo ante, why am I

12  not doing it in the district where he had his removal

13  proceedings?

14          **MR. KHOJASTEH:**  Understood.

15      I think removal proceedings is what -- it's a -- he's

16  going to be removed because he has a final order of removal,

17  and he's going to be removed.

18          **THE COURT:**  Okay.

19          **MR. KHOJASTEH:**  Right?  So I don't think it's taking

20  you back to 2019 or 2020.

21          **THE COURT:**  Yeah.

22          **MR. KHOJASTEH:**  Or taking you back to where he's

23  initially arrested, that's the position.

24          **THE COURT:**  Not arrested.  Where the removal

25  proceedings -- where that withholding of removal order was

1    filed was -- it was adjudicated.

2              **MR. KHOJASTEH:**  Back in 2019, 2020.

3              **THE COURT:**  Correct.  Because if you're going to take

4    steps to reopen that, to terminate the withholding, right?  It

5    would stand to reason, at least, you would do that in the

6    district, maybe not -- I don't know this, but would you do it

7    in the district in which the original order was filed?

8              **MR. MOLINA:**  Yes, Your Honor, the Baltimore

9    immigration court would be the court of jurisdiction for any

10   motion to reopen.

11             **THE COURT:**  Okay.  Because in that situation, then,

12   any process the loser receives would be the same circuit in

13   which the original orders were held, right?  I mean, that's

14   part of it?  You stay in the circuit.

15             **MR. MOLINA:**  Well, yes, you stay in that circuit,

16   Your Honor.  But, again, no matter where -- for example, no

17   matter where the alien lives in the United States, they can

18   move to Maine, they can move to Nome, Alaska, they remain

19   subject to the -- any motion reopened will have to be filed in

20   the Baltimore immigration court.

21             **THE COURT:**  Okay.  So if -- if the government -- if

22   the defendants take door number two and decide to reopen the

23   removal or seek termination of withholding, that will happen in

24   Maryland?

25             **MR. MOLINA:**  Correct.

1      THE COURT:  Okay.  How about removal to a third

2  country, since now -- again, I would have expected Mr. Abrego

3  to have had this process back originally when he was ordered

4  removed.

5      MR. KHOJASTEH:  Is that -- is that a question for

6  Mr. Molina?

7      THE COURT:  Yes, this is a question for Mr. Molina,

8  because Mr. Molina, I do consider you to be somewhat the

9  subject matter expert on these laws and regulations.

10     MR. MOLINA:  Certainly, Your Honor.

11   Could you repeat the question one more time for me?

12     THE COURT:  Sure.

13   So back in 2019, given what we talked about with Mr. Giles

14 yesterday, I would have expected that there would have been at

15 least the opportunity to explore whether Mr. Abrego would be

16 subject to third-party -- third-country removal during the

17 initial removal proceedings.

18     MR. MOLINA:  Not during the initial removal

19 proceedings, Your Honor.

20     THE COURT:  After withholding of removal?

21     MR. MOLINA:  After withholding of removal is granted,

22 the proceedings close, and there's nothing ongoing.  If

23 Mr. Abrego Garcia were to then be removed -- or considered

24 for -- be considered for removal to a third country, that would

25 be done by the case officer of the immigration and customs

89

1    enforcement, who would have Mr. Abrego come in, whether it is

2    through telling him to report, or his arrest, or whatever else,

3    then that case manager, once they have him at the detention

4    facility where they are going to begin to process him for

5    possible removal, you know, that could have been Baltimore, it

6    is no longer Baltimore -- or Baltimore because there are no

7    detention facilities, so whatever detention facility he gets

8    landed to -- landed at for processing, the case officer there

9    will begin to make the arrangements.

10        So if he goes to Philadelphia, the case manager there will

11    begin to make the arrangements.  If he goes to New Orleans, he

12    would be -- again, the case manager there would begin to make

13    the arrangements for the third party.  And, you know --

14        **THE COURT:**  So -- so it's fair, then, that this

15    third-country removal process you're saying is not dependent on

16    the original removal proceedings?

17        **MR. MOLINA:**  That is correct, Your Honor, but I do

18    want to finish the story for you.

19        **THE COURT:**  Okay.

20        **MR. MOLINA:**  Which is, of course, we've heard a lot

21    about the screening process for -- with -- for any fear to the

22    third country.

23        **THE COURT:**  Right.

24        **MR. MOLINA:**  And you've heard about the case being

25    referred to the immigration judge -- the immigration judge.

1          THE COURT:  Right.

2          MR. MOLINA:  In that case, it would likely have to be

3  referred back to the Baltimore immigration court.

4          THE COURT:  That was going to be my question.

5          MR. MOLINA:  Okay.

6          THE COURT:  So while the initiation might start

7  virtually anywhere, you're saying if Mr. Abrego gets to that

8  point where USCIS has determined the fear is real, then the IJ

9  referral goes back to Baltimore?

10         MR. MOLINA:  That is correct, Your Honor.

11         THE COURT:  Okay.  All right.

12         MR. SANDOVAL-MOSHENBERG:  Your Honor, I apologize,

13  I -- I feel the need to add one thing here with regards to the

14  procedure, which is Mr. Molina is absolutely correct that the

15  matter would be referred to the initial immigration judge in

16  Baltimore, but if Mr. Abrego Garcia is detained, you know, in

17  Texas and Louisiana, what have you, it is extraordinarily

18  common, if not virtually a hundred percent, that that judge

19  will then kick it to a judge with jurisdiction over the place

20  of detention for the actual trial in the matter.

21         THE COURT:  In what -- in what scenario?  Because I

22  heard Mr. Molina say in the termination of withholding case, it

23  would come back to Baltimore and the IJ in Baltimore would

24  decide it.

25         MR. SANDOVAL-MOSHENBERG:  The --

1          **THE COURT:**  Are you talking about that?

2          **MR. SANDOVAL-MOSHENBERG:**  The government would have

3    to file its motion before the judge in Baltimore.

4          **THE COURT:**  To transfer venue?

5          **MR. SANDOVAL-MOSHENBERG:**  To reopen the proceedings

6    in order to terminate.

7          **THE COURT:**  Okay.

8          **MR. SANDOVAL-MOSHENBERG:**  But then there needs to be

9    a trial on the merits.

10         **THE COURT:**  Right.  And that would happen --

11         **MR. SANDOVAL-MOSHENBERG:**  The judge in Baltimore is

12   going to kick it to whatever jurisdiction he's detained in for

13   that trial on the merits.

14         **THE COURT:**  Oh, I see.  You're saying it would go the

15   other way, that there would be a transfer to wherever he is

16   detained?

17         **MR. SANDOVAL-MOSHENBERG:**  That's right, Your Honor.

18         **THE COURT:**  And you would have to fight about that?

19   Or you would have to oppose it?

20         **MR. SANDOVAL-MOSHENBERG:**  Well, the immigration

21   courts are pretty clear about this, that a trial on the merits

22   is going to go forward in the jurisdiction where the individual

23   is detained.

24         **THE COURT:**  Even if it's a reopening of the

25   withholding of removal?

1          **MR. SANDOVAL-MOSHENBERG:**  They call it an individual

2    hearing.  It's essentially a merits trial.  And just because a

3    motion to reopen is filed in front of one court doesn't -- and

4    then the court grants the reopening, doesn't mean that that

5    court is going to keep it for trial.

6          **THE COURT:**  And the only way to keep it for trial is

7    make sure the person is in the district?

8          **MR. SANDOVAL-MOSHENBERG:**  That's right, Your Honor.

9          **THE COURT:**  I see.  Okay.

10       Would you agree with that, Mr. Molina, in terms of the

11   procedural --

12         **MR. MOLINA:**  That sounds accurate, Your Honor.

13         **THE COURT:**  Okay.

14         **MR. KHOJASTEH:**  Your Honor, to put those two

15   contributions together, the fact is he's going to get access

16   to -- if -- if and when he's in a position that he needs -- he

17   asserts a credible fear and it's credited by an immigration

18   officer, he's going to have an immigration judge looking --

19   he'll be working with an immigration judge --

20         **THE COURT:**  I know, but just to put a finer point on

21   it, if you hadn't done what you did in March, that would be in

22   Baltimore, and there wouldn't be any question about which

23   jurisdiction would handle it.  It would be Baltimore.

24         **MR. KHOJASTEH:**  That's -- Your Honor, with respect,

25   he wasn't being detained in Baltimore prior to his removal

1    to --

2           **THE COURT:**  No, no, no.  I'm saying say you initiate

3    removal proceedings to a third country, and a person is on

4    supervision, on release in Baltimore.

5           **MR. KHOJASTEH:**  But that's not what happened with us.

6           **THE COURT:**  I understand that.  But that's why the

7    status quo ante matters.  Because what happened was this -- the

8    defendants' wrongful conduct deprived Mr. Abrego of that

9    procedural posture he would have otherwise been in.

10      I'm just saying that when the Supreme Court says restore

11   him to where he would have been had he not been wrongfully

12   deported, I suppose there's some daylight as to whether that

13   means now you bring him back and you can put him anywhere in

14   the country versus in the original jurisdiction, which had you

15   done what you say you were going to do, you would do it in

16   Maryland.

17          **MR. KHOJASTEH:**  But technically speaking, he was

18   arrested here.

19          **THE COURT:**  Yeah.

20          **MR. KHOJASTEH:**  His initiation of removal to

21   wherever, no -- about El Salvador or anywhere else, didn't

22   begin until he was in the detention facility and he was working

23   with a case officer.  Until ICE arrested him, gets him to the

24   holding, and then transfers him to a bed in a detention

25   facility, it doesn't begin.

1          **THE COURT:**  No, no, no.  I --

2          **MR. KHOJASTEH:**  So the beginning point, with respect,

3     isn't Baltimore when he's in a holding facility or when he's

4     been arrested.  It's when he's in Texas and they are making a

5     determination, they are looking at where does this guy go, and

6     then where the --

7          **THE COURT:**  So the defendants' position is, as a

8     matter of law, no detainee -- no alien who resides in Maryland

9     for whom third-party removal is contemplated can actually have

10    his day in immigration court in Maryland?  It's ultimately

11    going to be somewhere else?  Like, what happens if you don't

12    detain him?  What happens if you don't detain the person?

13    Because Mr. Abrego was on release under an order of

14    supervision.

15         Say I -- USCIS or DHS, I'm not sure which one, said, okay,

16    we're going to -- we're going to initiate third-party removal

17    proceedings.  Can that happen in Maryland?  I mean, what

18    happens to that person?  Mr. Molina?

19         **MR. MOLINA:**  Again, Your Honor, in order to begin

20    that process, the -- the ICE officer would likely -- would have

21    to call in Mr. Abrego to begin the processing, and that would

22    occur either through asking him to self-report or by taking him

23    into detention.  Ordinarily, the case officer is located in the

24    district where, you know, there were proceedings.  That's

25    usually where the file will stay.

1          **THE COURT:**  There is a case officer, and in

2     Mr. Abrego's case -- for example, when he reports for his

3     supervision, his check-ins, does that occur with a case

4     officer?

5          **MR. MOLINA:**  Yes, Your Honor.

6          **THE COURT:**  So a case officer could then say, for

7     whatever reason that's within the discretion of your

8     department, I want to initiate third-party removal proceedings,

9     third-country removal proceedings?

10         **MR. MOLINA:**  That is correct, Your Honor.

11         **THE COURT:**  And that would stay in Maryland?

12         **MR. MOLINA:**  It would, if he were still in that

13    district, yes, Your Honor.

14         **THE COURT:**  So if the case officer says, "I want to

15    initiate the proceedings, I'm going to take him into custody,

16    but I'm going to initiate the proceedings, I'm -- I'm the

17    person doing it," then what happens?

18         **MR. MOLINA:**  Well, then that -- I mean, that person

19    would begin that processing, Your Honor.

20         But ordinarily, I think what the testimony yesterday was,

21    that the person would be taken into custody.  You know, in

22    Maryland, there are no permanent beds available, so we would go

23    to a local facility.  Whether the case manager would change at

24    that point to the ERO officers located in, for example,

25    Philadelphia, you know, it's highly likely, and then those

1  individuals would begin the process.

2       **THE COURT:**  So you're saying at the point at which,

3  even if you just indulge me for a second, that the status quo

4  ante is to return Mr. Abrego to where he was vis-a-vis ICE

5  as -- under an order of supervision to report, he would report,

6  and one of two things would happen.  Either that officer would

7  review for a third-country removal, or they would take him into

8  custody, move him, and then the next officer would review it;

9  is that what you're saying?

10      **MR. MOLINA:**  That is correct, Your Honor.

11      **THE COURT:**  And is there any guidance or protocol or

12  anything that tells me which one is more likely?

13      **MR. MOLINA:**  Right now, no, Your Honor.

14      **THE COURT:**  Okay.

15      **MR. MOLINA:**  Other than I would tell you -- I would

16  suggest to Your Honor, if he is in detention and subject to

17  arrest, that he would likely be the -- again, the ERO officer

18  at the more permanent detention facility.

19      **THE COURT:**  Okay.

20      **MR. KHOJASTEH:**  So, look, we have a -- we may have a

21  disagreement on what the status quo is, Your Honor.

22      **THE COURT:**  Right, that's my point, which is why it's

23  really not moot.  Yeah.  Okay.

24      **MR. KHOJASTEH:**  With respect, we disagree, but

25  obviously your opinion matters more.

97

1          **THE COURT:**  Go ahead.

2          **MR. KHOJASTEH:**  There's a piece to this that they are

3    seeking him to be transferred to Maryland or asking this Court

4    to have him transferred to any particular place versus another

5    place.  It doesn't touch on the TRO, but I believe -- I

6    understand is the -- really is the actual applicable motion.

7          The Court lacks jurisdiction there as well.  Congress,

8    through the Immigration and Naturalization Act, committed those

9    decisions as to where to detain an alien pending removal to the

10   discretion of the Secretary of Homeland Security.

11         I understand there's a circuit split as to whether a

12   district court has the opportunity to judiciously review a

13   decision made by DHS in that respect.  However, there is no

14   authority anywhere that says that Your Honor or a district

15   court has the right to make that determination in the first

16   instance.

17         And this, again, dovetails back to why this isn't ripe.

18         There's no determination for even if you are allowed to

19   review, and we disagree, and we think *Reyna* -- there's other

20   reasons where *Reyna* doesn't work.

21         But if the argument is you have a right to judiciously

22   review decisions of DHS as to where they are putting -- where

23   this guy is sleeping, that decision hasn't been made yet.

24   There is no authority that gives you the right to make the

25   decision in the first instance.

1          **THE COURT:**  No, okay.  But, like, then how do you

2    explain what the Fourth Circuit affirmed in *Suri*?

3          **MR. KHOJASTEH:**  So the Fourth Circuit's decision in

4    *Suri*, that was relating to, in this -- my -- plaintiffs'

5    counsel referred to the exception, the unknown custodian

6    exception.  In that case, at the time that the habeas petition

7    was filed, *Suri* was on a plane.  There was no place for her.

8    There was no warden.

9          **THE COURT:**  No, I'm talking about the second part of

10    *Suri*.

11      So you're beyond jurisdiction.  I found jurisdiction for

12    the reasons I have found, and probably more as the case goes

13    on.

14      What I'm talking about --

15          **MR. KHOJASTEH:**  Well, Your Honor, with respect --

16          **THE COURT:**  -- is the affirmance of the -- of the

17    merits of the May 14th order.

18      So, in other words, once they found that, in *Suri*, the

19    reason was the unknown custodian, okay, there was jurisdiction

20    over the habeas.  But then the Court affirmed, Judge Giles

21    ordering release, ordering that ICE release *Suri*, and *Suri*

22    return to Virginia.  And then she actually set release

23    conditions, if I'm reading it right, that he -- she required

24    that he participate in the removal proceedings as a condition

25    of release.  And the government argued that that was barred by

1    1252, that the district judge lacked jurisdiction to do that,

2    and the Fourth Circuit disagreed.

3        And the reason why they did is because the government

4    didn't contest that there had been a constitutional violation

5    in taking *Suri* into custody in the first instance.

6        **MR. KHOJASTEH:**  But even to get to that relief that

7    the Court affirmed the Fourth Circuit --

8        **THE COURT:**  Yeah.

9        **MR. KHOJASTEH:**  -- you have to first find

10   jurisdiction, Your Honor.

11       **THE COURT:**  I did that already.  Here's my point.

12   It's the analogy --

13       **MR. KHOJASTEH:**  Did you find jurisdiction on this --

14   on the ability to grant this relief?

15       **THE COURT:**  No, no, no, the original case.  Here's

16   how, in my view, so you can respond to it, it stands on all

17   fours with *Suri*.

18       I've already found that the original arrest and detention

19   in Baltimore was patently unconstitutional, that there was just

20   no evidence that you had the authority to arrest Mr. Abrego

21   Garcia and start this process.

22       And so there was a constitutional violation, at least at

23   the initial -- at the outset.  And for purposes of *Suri*, the

24   constitutional violation was revoking this visa and taking *Suri*

25   into custody.

1      And that -- there was, at least in the Fourth Circuit's

2 mind, an admission, for lack of a better term, not contesting

3 the unconstitutionality of the detention for *Suri* in

4 retaliation for posting on social media.  And then went on to

5 find that that is the authority from which Judge Giles was

6 about to not order his release, but conditions of release.

7      So I just want your response on, assume for purposes of

8 argument I go back to that original conclusion that Mr. Abrego

9 was taken into custody, in the first instance,

10 unconstitutionally, does that -- is there something else

11 that -- that makes this case different than *Suri*?

12      **MR. KHOJASTEH:**  The fact that I don't believe *Suri*

13 had a final removal order.

14      **THE COURT:**  And *Suri* didn't have a final withholding

15 of removal that was violated.  You see, we go back to that.

16      **MR. KHOJASTEH:**  Yeah, but you're talking about at the

17 point of arrest, and you want to know the constitutionality.

18 You're asking me why I think it's --

19      **THE COURT:**  Yeah, yeah.

20      **MR. KHOJASTEH:**  -- what -- if there's a relevant

21 distinction.  I don't necessarily agree with the holding.

22      **THE COURT:**  Right.

23      **MR. KHOJASTEH:**  And respectfully, that will be a

24 subject of litigation.

25      But to compare Mr. Abrego Garcia, who has a final order of

1    removal, irrespective of what's happened in the last three

2    months with respect to being sent to El Salvador, and now

3    returned, where he is today, who he is today, with his

4    immigration status, to say that he's the same as *Suri* and that

5    *Suri* -- this is a visa that was revoked and she was on -- in a

6    plane, and the Court claimed jurisdiction because no one knew

7    what the custodian was, I think it's a reach, Your Honor,

8    respectfully.

9            **THE COURT:**  Okay.  All right.

10           **MR. KHOJASTEH:**  And look, on -- I think with respect

11   to *Reyna,* I think one point to know is that there, the

12   plaintiffs in that case, notwithstanding the Fourth Circuit

13   affirmed that the district court had the right to judicially

14   review DHS's determination as to where the aliens would be

15   detained, the Court ultimately dismissed their claims stating

16   that being close to family and these issues didn't rise to

17   Constitution or due process grounds.

18           **THE COURT:**  So that's the real rub, right?  If the

19   claims don't rise to a due process violation, then I have no

20   jurisdiction?  I mean, that's not even up for debate, right?

21       But if they do rise to a due process violation, then I

22   arguably do, like under *Suri* and *Ozturk*, and the distinction

23   you just made.

24           **MR. KHOJASTEH:**  I think in *Reyna,* they said you do

25   have jurisdiction because the jurisdiction-stripping provision

1  in the INA didn't apply to this provision, and then they went

2  on to look at the merits of the case.

3          **THE COURT:**  Okay.

4          **MR. KHOJASTEH:**  And dismissed the case, I think, on

5  12(b)(1) or 12(b)(6) grounds because the claim that we want to

6  be close to our family or we want to be in any particular place

7  in the continental United States didn't trigger due process --

8  valid due process concerns.

9          **THE COURT:**  Okay.

10         **MR. KHOJASTEH:**  And, Your Honor, these were the

11  reasons why we don't believe -- the government respectfully

12  asserts that this Court doesn't obtain jurisdiction by virtue

13  of the All Writs Act.

14      And the last piece here is even if jurisdiction existed,

15  the All Writs Act isn't appropriate where -- where the

16  Courts -- if you look at the case, Mr. Abrego Garcia's presence

17  in the United States -- in this district hasn't been necessary

18  for you to grant a whole host of relief, right?

19         **THE COURT:**  Except not complete relief, that's what

20  the plaintiffs say.  You're right, I have been able to, but --

21         **MR. KHOJASTEH:**  I mean, complete relief from the

22  plaintiffs' perspective would be he's a sitting U.S.

23  Congressman and citizen of the United States.

24         **THE COURT:**  Okay.  You know what?

25         **MR. KHOJASTEH:**  I mean, but candidly.

1          **THE COURT:**  If that's -- if that's where you are at

2     this point, you can sit down.  That's not what the plaintiffs

3     are saying.  That is hyperbole.  It's rhetoric.  It doesn't

4     help me.  It doesn't advance the analysis.  And you know that

5     you need to catch a train home, so we don't need to go there.

6          **MR. KHOJASTEH:**  I appreciate that, Your Honor.  I

7     apologize for the outburst.

8          **THE COURT:**  Okay.  So what the plaintiffs are saying,

9     in fairness to you, is that he should be restored to the

10    jurisdiction in which his case originated.  And if you wanted

11    to lawfully remove him, you would do so out of Maryland.

12    That's how I'm reading it.  Like, I don't necessarily disagree

13    with you that, you know, sending him home is the proper, full

14    relief, meaning, like, you go home to live with your family.

15    I -- I don't know that.  But I do know there's a real question

16    in my mind, does he get the process to start over through

17    immigration in Maryland.

18        So why don't we talk about that.

19          **MR. KHOJASTEH:**  Sure.  And I appreciate Your Honor --

20    I think, again, this is the delta between whether it's in the

21    context of status quo ante or in the delta of what complete

22    relief here is.  We have a disagreement, and that's something

23    that the Court is going to have to square on its decision.

24          **THE COURT:**  You're right.

25          **MR. KHOJASTEH:**  And so I appreciate that.

1          Those are our positions with respect as to why the TRO

2     would be inappropriate at this time and unwarranted and not

3     ripe, and why the emergency motion sought by plaintiffs should

4     be denied by the Court.

5          **THE COURT:**  Okay.

6          **MR. KHOJASTEH:**  Thank you.

7          **THE COURT:**  All right.  Thank you.

8          Okay.  Mr. Rossman, your motion, you get the last word.

9          **MR. ROSSMAN:**  Thank you, Your Honor.

10         And it's been a long morning, and a long week, and I'll

11    try to go as quickly as I possibly can, Your Honor.

12         **THE COURT:**  Okay.  I appreciate that.

13         **MR. ROSSMAN:**  I'll start with the latest exhibit that

14    we received, the detainer.

15         The detainer has a massive hole in it.  Okay?  It says,

16    Section 1, DHS has determined that probable cause exists that

17    the subject is a removable individual.  This determination is

18    based on, and the very first category, a final order of removal

19    against the individual, that box is not checked.  Okay?

20         DHS has not, apparently, taken the position, for purposes

21    of the detainer, that there is a final order of removal.  Your

22    Honor observed in your --

23         **THE COURT:**  Or that they are moving on, is that what

24    your point is?  Like, it's just odd that we've heard a lot of

25    argument that comes back to the final order, but it's not the

1  basis for detention?

2        **MR. ROSSMAN:**  There has been -- yes, Your Honor.

3        **THE COURT:**  Okay.

4        **MR. ROSSMAN:**  Does not seem to be the basis for

5  detention.

6        There has been a flurry of ipse dixit assertions by the

7  government lawyers and by their witness that there is a final

8  order of removal.  None has been produced in this case.  Your

9  Honor observed that at Page 14 of the preliminary injunction

10  order.

11        Purely focusing on the issues for today, that doesn't seem

12  to be the basis that they are asserting, is probable cause

13  for -- for the detention.

14        The -- the next box they do check.  My head was spinning

15  to hear the explanation of what ongoing removal proceedings

16  means with respect to this individual.  The only one that we're

17  aware of is the Baltimore proceeding that was commenced in

18  2019.

19        **THE COURT:**  Because nothing else has been commenced.

20        **MR. ROSSMAN:**  To our knowledge and based on the

21  record, there is no other proceeding.

22        So that's, you know, we think why Baltimore makes sense

23  here, Your Honor.

24        **THE COURT:**  Well, I -- okay.  Let me make sure I

25  understand the point here, because it is, now that you've said

1    it, confusing.

2        You're saying the government gets up and says we don't

3    know which way we're going to go, we're going to go door number

4    one or door number two, we can't make that decision, we haven't

5    made that decision until he comes into custody.

6        What's your lawful basis for detaining Mr. Abrego pendency

7    of removal proceedings?  But we've already been told neither

8    has started.

9        Am I getting that right?  It's like --

10        **MR. ROSSMAN:**  Correct.  I think we have an obvious

11    chicken/egg problem on that, Your Honor.

12        **THE COURT:**  Got it.

13        **MR. ROSSMAN:**  There may well be reason to question

14    the validity of the detainer.  All we're trying to do for today

15    is ensure that there is no constitutional violation.  That's,

16    you know, the root of what we're asking for.  We think it's

17    plain.  Your Honor has already decided that the case is not

18    moot.  I think it's plain that we've got a live case of

19    controversy on this.  I think it's plain that the risk of

20    irreparable harm is imminent as early as Wednesday.

21        And the constitutional predicate for Your Honor to rule is

22    clearly present, right?  The risk of deprivation of liberty

23    without due process, removal to a third country without notice.

24        And I want to focus on that, and I'll just return for a

25    moment.  I've only got a couple of things I want to raise, and

1    then I'll sit down and we can all go about our days.

2        The policy itself, okay, as Your Honor has looked at it in

3    the July 9th memo, as Your Honor has looked at, it seems to

4    have two branches.  And if branch number one is satisfied that

5    there are assurances that the third country is not going to

6    persecute or torture a person sent there, I'm not quite sure

7    how that can happen in a vacuum without knowing who the actual

8    individual is that you are sending over there.  But if there

9    are assurances, then as I read the policy, there will be no

10   notice; there will be no notice, no opportunity to raise a

11   reasonable fear, no interview by USCIS, no counsel.

12       **THE COURT:**  But Mr. Khojasteh has said, as an officer

13   of the Court, as a representative of the defendants, take the

14   notice that's in the July -- the process that's in the July

15   memo, and that's what Mr. Abrego will get.

16       **MR. ROSSMAN:**  So what we're supposed to rely on is

17   Mr. Khojasteh's interpretation of the July 9th memo and a

18   statement made at the podium.  We certainly have seen a lot of

19   statements made by lawyers at the podium that deviated from

20   reality in this case.

21       And I don't mean to, you know, cast any doubt on his

22   personal intentions.  I don't know if that binds the

23   government.  I don't know if that would satisfy the

24   requirements for voluntary cessation, for example.  I certainly

25   don't know that that's, you know, a sufficient bulwark of

1  constitutional protection, you know, for us to sleep at night

2  in representing a client who has already once been removed

3  illegally and sent to a country where he did face persecution

4  and -- you know, and maybe worse.

5      So, you know, that's -- to us, Your Honor, I think that,

6  you know, provides the constitutional underpinnings for the

7  order that we're asking for in and of itself.  It also is well

8  supported by the All Writs Act doctrine.  And the All Writs

9  Act, Your Honor -- excuse me, I left my notes over here -- the

10 All Writs Act, according to the Fourth Circuit case in

11 *Scardeletti*, empowers the Court to issue orders, quote, to

12 effectuate and prevent the frustration of orders it has

13 previously issued in its exercise of jurisdiction otherwise

14 obtained.

15     So I think Your Honor quite rightly assessed the question

16 of the Court's jurisdiction at the time the complaint was

17 filed.  All the claims relate back, including we have a pending

18 motion to a certain amended complaint.

19     But even on the existing complaint, the relief that we

20 sought was the restoration of the status quo ante in our motion

21 and in our complaint.  I've already identified that for the

22 Court in the prior argument.

23     We think the All Writs Act gives the Court all of the

24 jurisdiction it needs to do that.

25     And, you know, in reference to -- I think there's

1   reference to a circuit split on the question of whether or not

2   you can move someone, bring them to the jurisdiction for

3   purposes of their confinement.  We've obviously -- we're in the

4   Fourth Circuit, so, you know, I think we'll take our marching

5   orders from the Fourth Circuit.  And, you know, the case there,

6   the Deyna [sic] case -- I'm sorry, *Reyna* case.  And the *Reyna*

7   case, and this is -- if you'll allow me to use my reading

8   glasses, Your Honor.

9              **THE COURT:**  Sure.

10             **MR. ROSSMAN:**  At 921 F.3d at Page 210 makes clear

11  that it is not following the Tenth Circuit.  And that's the

12  authority that the government urges in the *Van Dinh v. Reno*

13  case, it's cited as a But see in the paragraph where the Court

14  talks about the jurisdiction that it has.

15       It so happened that in *Reyna,* the Court did not find that

16  family unity itself was a sufficient constitutional concern.

17  That's not what we're urging here.  Our basis for

18  constitutionality, of course, Your Honor, is due process of the

19  Fifth Amendment, substantive and procedural, and of course we

20  also have jurisdictional basis under the statute itself.

21       So, you know, for all those reasons, Your Honor, we think

22  there's no question that Your Honor has jurisdiction over this

23  case.  There's no question that the injunction has not been

24  fully effectuated and you have All Writs Act authority to do

25  that.

1      We respectfully request that Mr. Abrego Garcia be returned

2  here and any removal proceedings be continued here in Baltimore

3  so that he has the full measure of the rights that he would

4  have had had he not been unlawfully removed in the first place.

5  And at a bare minimum, at a constitutional, bedrock bare

6  minimum, we ask the Court to enter an order that we get at

7  least 72 hours, or 48 hours, whatever period of time Your Honor

8  thinks is necessary, in order for Mr. Abrego Garcia to receive

9  notice of intention to remove him anywhere.  And for him to

10  contact counsel, have effective assistance of counsel, and be

11  able to get a hearing in front of a court of confident

12  jurisdiction.

13      Thank you, Your Honor.

14      **THE COURT:**  Okay.  All right.  Thank you all.  I

15  appreciate it.

16      Obviously you'll get some decision from me before long, I

17  suppose.  And we'll sort of see how things play out in

18  Tennessee next week.

19      I mean, I do intend to address this prior to

20  Judge Crenshaw's decision not to -- again, with a healthy

21  appreciation for not getting out over my skis and issuing an

22  advisory opinion.  But at the same time, if I do believe that I

23  have to act to preserve my jurisdiction, and to preserve -- to

24  address some of the concerns that the plaintiffs raised in

25  terms of Mr. Abrego's being moved too quickly out of this

1  jurisdiction, then I have to address it before he's released

2  into the custody of the defendants.

3      But, again, my assurance to all of you is I'm going to

4  deal with this as narrowly as I can, because that's my mandate.

5  And I'll get you an order one way or the other on this motion

6  as soon as I'm able.  Okay?

7      And with that, I wish you all a great weekend.  Be safe in

8  your travels, and I really appreciate your time.

9          **MR. KHOJASTEH:**  Thank you, Your Honor.

10         **MR. ROSSMAN:**  Thank you, Your Honor.

11         **DEPUTY CLERK:**  All rise.  This Honorable Court stands

12  adjourned.

13      (Proceedings were concluded at 11:45 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2

3

4      I, Paula J. Leeper, Federal Official Court Reporter, in

5  and for the United States District Court for the District of

6  Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that

7  the foregoing is a true and correct transcript of the

8  stenographically-reported proceedings held in the

9  above-entitled matter and the transcript page format is in

10  conformance with the regulations of the Judicial Conference of

11  the United States.

12                          Dated this 13th day of July 2025.

13

14

15                          */S/ Paula J. Leeper*
                            _____
16
                            Paula J. Leeper, RPR, CRR
17                          Federal Official Reporter

18

19

20

21

22

23

24

25

DEPUTY CLERK: [5]  3/3 3/5 17/18 77/22 91/21
MR. COOPER: [1]  3/6
MR. KHOJASTEH: [177]
MR. MOLINA: [30]  4/3 10/12 10/14 60/8 60/11 60/19
60/25 78/5 78/7 87/8 87/15 87/25 88/10 88/18 88/21
89/17 89/20 89/24 90/2 90/5 90/10 92/12 94/19 95/5
95/10 95/12 95/18 96/10 96/13 96/15
MR. RAND: [1]  3/22
MR. ROSSMAN: [105]  3/16 4/10 7/11 7/13 8/2 9/13
12/3 12/16 14/4 14/19 15/15 15/18 15/25 16/3 16/12
17/6 17/9 17/18 17/21 18/2 18/17 18/25 19/4 19/13
19/18 20/18 22/6 23/17 23/19 23/23 24/4 25/17
26/17 27/3 27/11 27/21 28/4 28/22 29/5 29/25 30/8
30/14 30/20 30/25 31/11 31/15 31/20 33/14 33/17
33/20 33/24 34/6 34/10 34/18 34/20 34/25 35/7
35/12 36/5 36/12 36/15 36/19 37/1 37/3 37/5 37/19
38/3 38/6 38/12 38/25 39/3 39/15 39/21 40/2 40/4
40/8 41/7 41/12 41/19 42/3 43/10 43/18 43/23 44/3
44/7 44/20 44/22 44/24 45/16 45/20 46/2 46/5 65/18
65/23 66/3 104/9 104/13 105/2 105/4 105/10 106/10
106/13 107/16 109/10 111/10
MR. SANDOVAL-MOSHENBERG: [13]  3/20 33/16 78/11
90/12 90/25 91/2 91/5 91/8 91/11 91/17 91/20 92/1
92/8
MS. O'HICKEY: [1]  4/1
THE COURT: [312]

/

/S [1]  112/15

0

0261 [1]  2/6

1

1,000 percent [1]  65/5
100 and [1]  55/2
10016 [1]  1/16
10:47 [1]  77/20
11 [1]  1/11
11:01 [1]  77/20
11:45 [1]  111/13
12 [2]  102/5 102/5
1231 [1]  35/20
1252 [1]  59/1
12th [1]  85/8
13 [2]  27/8 73/10
1300 [1]  1/19
13th [1]  112/12
14 [1]  105/9
14th [1]  98/17
15 million [1]  49/14
16th [2]  10/10 72/20
195 [1]  28/13

2

200 [1]  55/4
20005 [1]  1/20
20044 [1]  2/4
2019 [8]  5/19 34/18 34/21 58/23 86/20 87/2 88/13
105/18
202 [2]  2/6 2/9
2020 [2]  86/20 87/2
2025 [10]  1/11 6/7 66/11 66/24 67/24 68/2 69/5
69/9 70/16 112/12
20530 [1]  2/5
210 [1]  109/10
212 [1]  1/17
218-9376 [1]  1/24
22030 [1]  1/23
238 [1]  69/9
24 [3]  16/8 71/11 76/23
240 [2]  58/9 69/9
241 [5]  60/5 60/6 60/7 66/10 69/9
25 [2]  63/2 63/5
28 [1]  112/6
295 [1]  1/16

3

30 [6]  15/25 61/18 64/4 66/11 70/11 70/13
300 [1]  1/23
30th [10]  15/24 16/19 63/7 64/6 66/24 67/23 68/2
69/5 69/9 70/16
353-0261 [1]  2/6

4

400 [1]  45/11
4103 [1]  1/23
434 [1]  1/24
48 [6]  14/23 14/23 74/25 76/23 77/9 110/7
48-hour [1]  74/16

5

5th [1]  1/16

6

60-page [1]  73/5
616-9344 [1]  2/9
617 [1]  1/21
6:00 [1]  10/1

7

7000 [1]  1/17
712-7165 [1]  1/21
7165 [1]  1/21
72 [14]  16/17 16/20 16/23 16/25 17/4 17/6 17/13
17/19 18/9 32/13 32/13 38/15 38/24 110/7
72-hour-opportunity-to-be-heard [1]  45/3
753 [1]  112/6

---

797C [2]  35/7 36/10
7th [1]  6/7

8

849-7000 [1]  1/17
878 [1]  2/8
8:25-cv-00951-PX [1]  1/6

9

9-0 [1]  6/11
900 [1]  1/20
921 [1]  109/10
9344 [1]  2/9
9376 [1]  1/24
950 [1]  2/5
951 [1]  3/10
9:06 [1]  1/11
9th [10]  20/7 65/1 67/21 67/24 69/14 70/17 79/19
80/24 107/3 107/17

A

a.m [4]  1/11 77/20 77/20 111/13
AARP [5]  5/1 5/6 16/7 58/7 75/23
ability [4]  33/4 55/22 55/25 99/14
able [7]  54/13 55/13 56/19 60/20 102/20 110/11
111/6
above [2]  83/12 112/9
above-entitled [1]  112/9
ABREGO [96]  3/4 3/10 5/11 5/25 6/12 6/17 7/10 8/20
9/7 9/11 12/12 13/23 14/6 17/3 17/25 18/20 19/1
19/12 20/2 24/2 25/25 26/6 26/25 27/7 29/13 30/1
31/13 34/4 34/16 37/17 45/4 45/25 47/11 48/1
48/2 48/11 48/17 48/25 49/2 49/9 49/10 49/11 49/22
50/4 50/24 51/1 51/14 52/3 53/4 53/12 54/21 55/1
55/10 55/21 56/16 56/25 57/12 58/6 59/15 59/20
61/12 70/13 70/17 71/1 71/3 71/5 72/1 73/12 74/11
74/25 76/1 77/10 79/21 81/4 84/21 85/9 88/2 88/22
88/15 88/23 89/1 90/7 90/16 93/8 94/13 94/21 96/4
99/20 100/8 100/25 102/16 106/6 107/15 110/1 110/8
Abrego's [7]  30/23 48/14 55/18 57/19 72/1 95/2
110/25
absence [1]  21/8
absent [1]  37/18
absolutely [4]  11/14 12/17 45/2 90/14
accept [5]  21/10 26/5 54/23 83/9 86/2
access [6]  42/25 43/1 43/2 43/8 55/13 92/15
accomplished [1]  70/4
accord [1]  57/10
accorded [3]  14/18 53/18 82/19
according [5]  7/9 15/12 20/2 70/3 108/10
account [1]  26/5
accurate [1]  92/12
accusation [1]  27/1
acknowledged [1]  41/22
act [14]  13/9 32/23 58/8 79/5 79/8 97/8 102/13
102/15 108/8 108/9 108/10 108/23 109/24 110/23
acted [1]  87/8
action [2]  24/15 34/3
actor [1]  7/3
actual [4]  13/5 90/20 97/6 107/7
actually [15]  13/18 14/9 18/7 23/23 34/15 38/9
44/13 51/2 54/24 65/1 66/24 73/5 78/9 94/9 98/22
Acuna [1]  29/6
adage [1]  38/8
add [1]  90/13
additional [1]  21/14
address [5]  40/5 75/7 110/19 110/24 111/1
addressed [4]  6/23 25/10 50/14 79/16
adequate [1]  28/10
adhere [3]  13/18 33/4 66/10
adhered [1]  12/20
adherence [1]  4/12
adjourned [1]  111/12
adjudicated [1]  87/1
administration [3]  27/14 30/23 38/7
admission [1]  100/2
admits [1]  11/17
admitted [2]  9/8 50/3
adumbrate [1]  16/4
advance [8]  18/4 28/12 32/22 68/19 103/4
advanced [2]  55/14 55/18
adverse [1]  82/9
advised [1]  26/8
advisement [1]  56/19
advises [1]  23/3
advisory [5]  22/20 23/3 36/6 36/14 110/22
affirmance [1]  98/16
affirmatively [1]  62/17
affirmed [5]  6/11 98/2 98/20 99/7 101/13
affirming [1]  6/7
afforded [6]  39/2 58/6 58/22 58/24 59/13 74/18
affords [1]  24/6
afraid [1]  71/10
after [13]  4/18 12/4 43/7 45/14 46/17 53/14 63/10
71/13 74/11 74/25 75/14 88/20 88/21
after-business [1]  74/11
again [31]  6/15 6/15 11/6 15/1 29/19 31/6 37/12
46/16 47/6 56/13 56/21 58/14 63/21 72/18 75/16
79/21 80/16 81/1 81/20 82/11 82/11 85/25 87/16
88/2 89/12 94/19 96/17 97/17 103/20 110/20 111/3
against [9]  5/7 18/7 19/11 21/3 21/4 21/6 33/5
61/7 110/19
agencies [1]  23/9
agency [3]  11/4 34/4 50/1
agent [2]  21/16 21/16
agents [1]  22/9
aggravated [1]  45/23
ago [1]  16/4
agree [9]  18/17 21/24 27/22 29/10 30/21 67/17
76/10 92/10 100/21
Agreed [1]  11/24 50/16
agreement [11]  60/2 60/4 80/22 80/25 81/2 81/12

---

81/25 82/14 82/14 83/7 84/9
ahead [5]  12/2 19/17 57/25 78/22 97/1
AIDED [1]  2/6
al [1]  1/6
Alaska [2]  44/1 87/18
alien [19]  15/8 20/20 49/11 58/7 61/11 62/10 62/16
64/11 64/17 66/8 70/5 71/10 71/14 71/21 71/23 76/2
87/17 94/8 97/9
alien's [1]  15/8
aliens [10]  5/2 16/22 23/14 49/10 62/8 64/20 64/22
69/6 70/1 101/14
all [89]  3/3 3/23 6/11 6/15 8/10 9/2 11/15 12/2
13/9 14/10 16/22 16/25 21/25 22/3 23/22 27/9 28/7
31/15 32/1 32/3 32/3 32/17 34/3 34/7 36/11 37/6
37/10 39/8 39/9 39/9 39/9 39/17 40/21 41/9 42/8
45/9 46/10 47/3 50/24 53/5 53/18 53/23 63/12 63/15
64/7 64/15 64/19 66/2 66/22 68/3 68/7 68/23 68/25
69/6 69/17 69/21 71/19 73/24 75/22 76/20 77/18
77/21 77/23 78/21 79/4 79/5 79/8 79/12 90/1 99/16
101/9 102/13 102/15 104/7 106/14 107/1 108/8 108/8
108/10 108/17 108/23 109/21 109/24 110/14
110/14 111/3 111/7 111/11
all-other-cases [1]  69/21
allow [1]  109/7
allowed [3]  14/15 36/22 97/18
allows [1]  38/18
almost [1]  32/11
alone [2]  6/5 80/11
already [16]  5/13 31/9 36/23 40/11 44/16 46/2 55/7
64/21 73/4 83/8 99/11 99/18 106/7 106/17 108/2
108/21
also [7]  2/10 12/15 39/13 61/18 76/6 108/7 109/20
altered [1]  53/23
alternative [3]  25/4 38/22 66/9
alternatives [1]  41/19
although [1]  7/17
am [7]  18/22 18/24 28/4 63/25 71/17 86/11 106/9
amended [1]  108/18
Amendment [4]  4/23 5/2 49/18 109/19
among [2]  23/2 23/4
analogy [2]  17/2 99/12
analysis [6]  13/21 32/20 39/18 79/7 80/4 103/4
ANDREW [1]  1/14 3/16 4/10
another [4]  57/12 57/13 69/16 97/4
answer [11]  9/16 11/21 11/22 22/4 29/4 30/23 40/12
55/24 75/3 78/10 86/4
ante [9]  8/21 40/20 80/2 85/3 86/11 93/7 96/4
103/21 108/20
anticipate [1]  18/2
anticipating [1]  18/6
anybody [1]  61/3
anymore [1]  82/6
anyone [4]  20/2 26/1 26/9 48/13
anything [7]  11/10 18/18 34/6 38/1 48/13 76/23
96/12
anywhere [8]  26/19 55/11 76/22 90/7 93/13 93/21
97/14 110/9
apart [1]  48/17
apologies [1]  61/14
apologize [10]  46/16 47/7 50/10 63/17 64/3 65/11
66/5 84/19 90/12 103/7
apparently [5]  34/25 34/25 42/9 68/15 104/20
appeal [1]  25/21
Appeals [2]  25/9 25/21
appear [3]  4/13 5/12 15/12
appearance [1]  18/24
APPEARANCES [2]  1/12 2/1
appears [1]  24/5
applicable [1]  97/6
application [5]  12/8 13/3 25/10 33/10 36/21
applies [2]  62/17 62/18
apply [3]  71/1 83/10 102/1
appreciate [14]  36/4 36/6 36/18 46/18 47/3 49/5
51/25 66/4 103/6 103/19 103/25 104/12 110/15 111/8
appreciation [1]  110/21
apprehended [4]  40/16
approach [1]  36/7
appropriate [9]  13/8 14/23 23/5 32/14 42/18 42/20
42/21 42/22 102/15
approved [1]  36/20
April [2]  6/7 61/19
April 7th [1]  6/7
arguably [2]  45/25 101/22
argue [1]  42/24
argued [3]  16/18 53/19 98/25
arguing [1]  16/24
argument [8]  16/13 80/6 83/14 84/14 97/21 100/8
104/25 108/22
arguments [2]  17/25 18/3
ARMANDO [2]  1/4 3/10
armed [2]  22/23 23/1
around [5]  6/25 33/21 42/6 54/12 55/5
arrangements [3]  89/9 89/11 89/13
arrest [8]  9/6 9/7 9/11 89/2 96/17 99/18 99/20
100/17
arrested [7]  85/23 85/24 86/23 86/24 93/18 93/23
94/4
arrived [1]  49/22
aside [1]  29/15
ask [8]  35/17 37/9 38/4 38/12 57/21 67/3 71/20
110/6
asked [16]  9/2 9/6 9/17 12/23 13/13 14/20 14/20
29/22 35/19 35/24 37/13 37/16 71/9 74/5 74/16 80/3
asking [19]  13/17 15/16 18/13 32/12 32/18 38/15
35/25 38/2 39/25 41/20 58/11 58/11 58/12 63/21
94/22 97/3 100/18 106/16 108/9
assert [3]  19/10 42/18 79/8
asserting [1]  105/12
assertions [1]  105/6
asserts [2]  92/17 102/12
assess [1]  15/9
assessed [1]  108/15
assigned [2]  51/14 52/10

## A

assistance [2] 39/18 130/6
ASSISTANT [1] 14/19
assume [4] 7/14 21/18 133/20 130/7
assurance [2] 75/20 111/3
assurances [20] 20/11 20/16 20/19 20/20 22/10 22/17 23/12 30/25 31/5 32/3 61/6 62/7 62/10 64/11 64/15 64/21 68/25 69/15 107/5 107/9
assure [2] 4/12 10/14
assures [2] 38/16
asylum [1] 25/10
attach [1] 40/20
attempt [2] 29/4 73/12
attempting [2] 54/9 75/5
attended [1] 41/2
attorney [5] 2/4 7/22 23/6 35/21 71/16
audio [1] 16/14 16/21
authority [17] 6/8 7/16 7/17 9/11 10/22 24/1 37/22 37/24 40/9 46/6 86/9 97/14 97/24 99/20 100/5 109/12 109/24
authorization [7] 35/5 35/21 36/1 36/6 36/20 36/21 37/2
authorized [1] 40/24
availability [1] 41/23
available [4] 18/3 35/22 42/1 95/22
Avenue [2] 1/16 2/5
averted [1] 5/22
avoiding [1] 80/20
aware [4] 34/20 36/23 64/15 105/17
away [2] 5/12 21/2

## B

back [37] 4/19 5/16 5/25 22/14 30/15 30/16 40/14 40/24 53/18 56/13 56/21 66/7 71/24 72/2 72/15 73/18 73/24 76/7 76/11 77/6 77/16 81/1 85/8 86/20 86/22 87/2 88/3 88/13 90/3 90/9 90/23 93/13 97/17 100/8 100/15 104/25 108/17
backwards [1] 25/12
Baker [1] 78/13
balance [1] 32/19
ballgame [1] 40/25
Baltimore [36] 72/2 72/10 72/16 78/3 78/5 78/6 78/7 78/11 84/24 84/25 85/5 85/21 86/25 86/9 87/8 87/20 89/5 89/6 89/6 90/3 90/9 90/16 90/23 90/23 91/3 91/11 92/22 92/23 92/25 93/4 94/3 99/19 105/17 105/22 110/24
bare [3] 18/9 110/5 110/5
barred [1] 98/25
based [7] 8/1 42/6 44/13 52/14 60/1 104/18 105/20
basic [2] 39/18 85/15
basically [2] 81/21 83/24
basis [17] 9/1 9/7 10/14 12/11 13/1 13/22 42/18 84/22 85/13 86/6 105/1 105/14 105/12 106/6 109/17 109/20
Bay [1] 44/3
bear [1] 79/15
became [2] 53/17 67/10
because [89] 9/2 9/3 10/19 11/9 11/15 13/13 13/14 13/15 13/18 13/20 13/22 14/7 15/3 18/13 21/24 25/2 25/21 26/18 27/19 28/19 28/24 29/8 30/12 30/22 34/2 37/12 37/22 38/6 38/22 41/20 42/10 43/20 47/24 48/9 48/22 54/25 56/21 57/9 57/13 61/17 61/22 63/4 63/10 63/15 64/1 65/4 66/22 67/16 68/7 68/13 69/17 70/17 70/24 71/1 72/11 72/13 73/4 75/13 75/18 77/5 78/15 79/24 80/3 80/5 80/10 80/21 82/9 84/2 84/17 84/22 85/18 85/22 86/3 86/16 87/3 87/11 88/8 89/6 90/21 92/2 93/7 94/13 99/3 101/6 101/25 102/5 105/19 105/25 109/1
become [1] 52/11
bed [10] 8/1 41/22 41/25 42/6 42/9 42/11 43/6 52/9 55/8 93/24
bedrock [1] 110/5
beds [1] 95/22
before [32] 1/10 3/9 3/12 5/11 5/16 24/10 25/8 25/20 25/21 29/8 29/17 31/8 32/15 36/25 39/10 40/21 41/2 57/14 69/11 70/8 71/11 74/14 75/19 76/22 77/1 78/23 85/16 85/18 85/20 91/3 110/16 111/1
began [5] 8/10 8/11 14/10 40/21 82/5
begin [14] 51/10 61/6 85/12 86/9 89/4 89/9 89/11 89/12 93/22 93/25 94/19 94/21 95/19 96/1
beginning [1] 3/15 9/5 76/15 94/2
begins [1] 40/18
behalf [4] 1/13 2/2 19/11 43/15
being [25] 4/18 11/6 14/8 14/23 14/24 16/24 17/13 15/10 26/7 33/3 42/6 43/7 51/2 69/10 70/2 71/3 71/10 73/5 74/2 85/18 89/24 92/25 101/2 101/16 110/25
believe [28] 7/21 7/24 8/15 16/23 29/21 35/3 37/22 37/25 38/6 38/8 41/12 41/14 48/18 53/1 53/25 54/5 54/20 72/18 73/13 77/3 78/5 78/7 82/22 84/10 97/5 100/12 102/11 110/22
believes [3] 20/20 27/15 62/10
below [1] 66/12
Ben [1] 2/8
bench [1] 64/25
beneficiaries [1] 23/5
benefit [5] 21/23 28/9 31/7 39/8 39/25
benefits [1] 44/14
beseech [1] 14/12
best [2] 68/5 74/23
better [5] 13/3 63/6 43/24 86/10 100/2
between [7] 10/1 20/4 51/15 67/25 70/15 84/10 103/20
beyond [1] 34/9 45/5 98/11
biggest [1] 7/15
binding [1] 84/10
binds [1] 107/22
bit [4] 15/20 33/12 57/5 80/6
blatantly [1] 31/12
blink [1] 29/19
bones [1] 31/18

boots [1] 64/20
bore [1] 79/14
boss [3] 63/1 63/4 63/5
both [5] 20/25 54/17 62/2 72/4 77/16
bottom [5] 20/15 45/2 52/21 62/3 62/21
bottom-line [1] 52/21
box [3] 2/8 104/19 105/14
branch [2] 30/18 107/4
branches [1] 107/4
branding [1] 33/6
break [2] 77/6 77/14
Bridge [1] 1/23
BRIDGET [2] 2/3 4/1
briefed [3] 56/22 56/23 79/1
bring [5] 5/25 8/10 40/24 93/13 109/2
bringing [1] 40/14
broad [1] 45/22
broke [1] 78/23
brother's [1] 44/10
brought [1] 53/18
bulwark [1] 107/25
burden [4] 39/5 39/8 80/20 81/18
Bureau [2] 25/8 25/21
bus [2] 56/9 56/11
business [2] 14/24 74/11
buy [1] 48/22
buying [1] 48/7

## C

call [5] 31/2 40/18 48/13 92/1 94/21
called [4] 3/4 4/7 32/11 33/21
came [6] 10/20 25/14 28/20 50/23 56/13 68/20
can't [15] 7/16 8/25 11/9 18/2 22/3 26/20 27/8 29/7 32/1 37/21 56/16 68/3 68/6 68/21 106/4
candid [2] 24/21 54/13
candidly [3] 9/8 49/19 102/25
cannot [2] 28/5 28/5
cap [1] 48/4
card [1] 36/21
careful [1] 74/23
carefully [1] 50/21
case [1138]
cases [18] 4/15 7/20 8/8 21/25 22/3 25/13 39/5 42/24 57/15 58/6 59/11 63/12 63/16 64/16 64/19 68/25 69/17 69/21
cast [1] 107/21
catch [1] 103/5
category [1] 104/18
cause [3] 20/12 104/16 105/12
caused [1] 48/24
CECOT [1] 5/20
cell [3] 21/1 26/2 26/3
censors [1] 72/21
central [1] 34/3
certain [3] 37/13 82/3 108/18
certainly [8] 5/17 43/23 45/14 56/18 78/10 88/10 107/18 107/24
CERTIFICATE [1] 111/14
certify [1] 112/6
cessation [4] 82/1 82/8 84/6 107/24
cetera [1] 66/10
CFRs [1] 81/22
chain [3] 1/23 13/25 31/3
challenge [2] 17/21 17/22
challenged [4] 80/11 80/22 81/15 84/7
challenging [1] 24/16
chance [2] 65/17 68/22
change [5] 31/9 73/7 73/7 83/15 95/23
characterization [2] 54/5 67/17
charge [2] 29/2 30/2
chat [1] 66/16
Chaves [1] 24/19
Chavez v. Hott [1] 24/19
check [2] 95/3 105/14
check-ins [1] 95/3
checked [1] 104/19
chicken [1] 106/11
chicken/egg [1] 106/11
chilling [1] 6/19
choice [1] 43/24
choose [5] 23/6 51/15 55/20 57/19 58/16
chosen [1] 56/5
circuit [28] 7/21 8/5 13/7 16/10 16/19 24/19 24/24 24/25 25/1 25/18 25/19 32/1 42/6 75/24 84/25 87/12 87/14 87/15 97/11 98/2 99/2 99/7 101/12 108/10 109/1 109/4 109/5 109/11
Circuit's [3] 6/7 98/3 100/1
circuits [1] 8/8
circumstance [2] 38/23 83/15
circumstances [2] 71/12 71/14
cite [3] 6/6 39/5 40/9
cited [5] 7/21 31/25 80/18 81/22 109/13
citizen [2] 25/3 102/23
citizens [1] 23/4
CIVIL [2] 2/4 3/10
claim [2] 80/1 102/5
claimed [1] 101/6
claims [6] 73/15 79/16 79/17 101/15 101/19 108/17
clarification [1] 35/1
Clarke [2] 80/19 81/24
class [3] 23/14 45/22 46/3
clean [3] 31/14 65/16 65/18
clear [11] 7/4 19/3 18/19 28/24 33/10 34/2 64/1 71/4 74/6 91/21 109/10
clearly [3] 17/3 18/14 106/22
client [16] 51/5 24/6 26/1 28/1 28/1 28/6 31/24 32/10 32/13 33/6 37/7 40/16 41/1 56/7 58/22 58/23
client's [3] 28/11 40/19 68/7
clients [6] 47/21 48/23 52/17 52/23 53/1 53/12
clients' [1] 53/24
close [7] 20/1 41/16 42/1 44/2 88/22 101/16 102/6
closest [1] 37/14
coffee [1] 11/7

colleague [1] 65/14
colloquy [1] 62/4
colorful [1] 32/20
come [15] 21/23 22/6 22/16 44/24 72/2 77/6 77/16 89/1 90/23
comes [8] 3/12 10/23 43/12 58/15 63/10 74/25 104/25 106/5
comfortably [1] 39/9
coming [5] 39/6 60/14 72/15 73/24 76/7
commenced [2] 105/17 105/19
commercial [1] 4/15
commitment [3] 39/22 39/24 56/20
committed [1] 97/8
common [1] 90/18
communicate [1] 23/7
communicating [1] 56/7
compare [1] 100/25
competent [1] 18/4
complaint [4] 108/16 108/18 108/19 108/21
complete [3] 102/19 102/21 103/21
completed [1] 83/6
completely [1] 59/11
comply [3] 21/25 54/9 64/16
comport [1] 17/9
COMPUTER [1] 1/25
COMPUTER-AIDED [1] 1/25
conceptual [1] 43/21
conceptualized [1] 31/21
concern [5] 29/16 47/10 53/9 56/12 109/16
concern [2] 57/11 58/22
concerns [4] 58/2 69/10 102/8 110/24
conclude [1] 37/24
concluded [2] 38/1 111/13
conclusion [1] 100/8
condition [1] 98/24
conditions [2] 29/20 44/8 98/23 100/6
conduct [5] 80/23 81/15 82/16 84/7 93/8
conducts [1] 21/17
confer [1] 44/4
Conference [1] 112/10
conferring [1] 28/6
confers [1] 7/22
confessed [1] 48/25
confident [1] 110/11
confined [3] 29/22 29/24 30/1
confinement [1] 109/3
confirmation [1] 64/13
conflict [2] 22/23 23/1
conformance [1] 112/10
confronted [1] 26/10
confusing [1] 106/1
Congress [1] 97/7
Congressman [1] 102/23
consent [1] 66/1
consider [3] 34/21 66/13 88/8
consideration [1] 44/18
considered [2] 88/23 88/24
consistent [8] 12/13 44/22 63/3 63/13 68/15 69/5 72/15 82/22
Constitution [7] 4/22 12/13 12/20 24/13 49/1 82/20 101/17
constitutional [18] 4/20 7/18 16/5 21/5 24/7 26/12 33/11 43/7 50/22 99/4 99/22 99/24 106/18 106/21 108/1 108/16 109/16 110/5
constitutionality [2] 100/17 109/18
constitutionally [1] 31/19
contact [3] 23/7 55/22 110/10
contacted [1] 49/8
contemplated [1] 94/9
contemplating [2] 78/25 79/11
contend [1] 6/19
contest [2] 24/14 99/4
contesting [1] 100/2
context [4] 5/3 15/17 15/18 103/21
continental [3] 37/18 38/14 102/7
continuation [1] 3/12
continue [1] 6/23 78/9
continued [3] 1/10 2/1 110/2
contradiction [2] 20/3 21/18
contrary [3] 18/16 53/19 54/18
contributions [1] 92/15
control [1] 7/16
controlling [1] 8/6
controversy [3] 74/8 74/9 106/19
convenience [1] 6/2
conveniently [1] 76/8
Convention [3] 21/6 33/4 61/7
conversation [4] 47/22 48/19 68/15 76/1
convinced [1] 57/9
COOPER [2] 1/18 3/19
copy [12] 10/3 35/10 36/3 36/5 60/15 60/17 65/1 65/3 65/12 65/17 65/18 65/19
core [1] 24/23
correct [21] 10/10 10/11 15/15 15/15 15/25 31/11 34/19 39/15 44/22 60/25 73/22 78/11 87/3 87/25 89/17 90/10 90/14 95/10 96/10 116/10 112/7
correctly [1] 41/24
cot [1] 42/12
couldn't [6] 10/21 27/22 30/19 30/22 30/22 60/7
counsel [23] 3/14 3/15 15/7 16/9 17/1 19/2 19/6 21/20 21/21 32/4 43/18 44/13 44/17 53/15 55/19 55/22 56/2 73/8 73/15 73/22 74/24 77/7 79/1 83/14 84/24 100/4 102/14 110/14
countries [77] 7/7 28/13 68/24 70/1 73/11 73/11 80/24 90/18 92/5 5/13 6/10 6/20 15/7 15/17 15/18 17/21 19/11 20/12 20/12 20/23 21/1 21/22 21/22 23/8 24/10 24/16 24/20 25/2 25/3 25/4 25/6 26/4 26/7 27/25 30/4 30/14 30/17 32/16 33/3 33/8 34/16 34/21 35/24 38/18 39/10 45/5 47/14 48/9 51/16 51/17 58/16 58/16 59/1 59/23 59/25 60/3 60/4 60/23 61/12 61/10 61/13 62/7 64/11 62/16 66/9 69/11 67/13 67/20 68/5 68/6 72/24 72/24 76/15 82/25 88/2 88/24 89/24 89/15 89/22 93/3 93/14 95/9 96/7 106/23 107/5 108/3
country [80] 5/13 6/10 6/20 15/7 15/17 15/18 17/21 19/11 20/12 20/12 20/23 21/1 21/22 23/8 24/10 24/16 24/20 25/2 25/3 25/4 25/6 26/4 26/7 27/25 30/4 30/14 30/17 32/16 33/3 33/8 34/16 34/21 35/24 36/18 39/10 45/5 47/14 48/9 51/16 51/17 58/16 58/16 59/1 59/23 59/25 60/3 60/4 60/23 61/10 61/12 61/13 62/7 64/11 62/16 66/9 67/13 67/20 68/5 68/6 72/24 72/24 76/15 82/25 88/2 88/24 89/24 89/15 89/22 93/3 93/14 95/9 96/7 106/23 107/5 108/3

## C

couple [5]  8/7 66/22 67/15 85/6 106/20
course [9]  15/24 16/9 16/11 40/22 55/24 88/8
 109/18 109/19
court [130]
Court's [4]  12/25 29/18 46/6 108/16
courtesy [1]  56/3
courtroom [4]  4/13 4/19 19/2 31/5
courts [9]  8/7 8/8 17/13 27/10 39/4 41/15 45/5
 91/21 102/16
covered [1]  62/6
crafted [1]  41/23
created [1]  79/9
creates [2]  40/18 40/19
credence [1]  72/9
credibility [1]  19/20
credible [19]  15/9 17/25 19/11 20/20 26/22 27/6
 42/14 48/9 59/17 61/15 62/10 64/18 70/8 71/21
 72/13 72/25 73/1 110/12 92/17
credit [2]  29/3 73/1
credited [1]  92/17
Crenshaw's [1]  110/20
crime [2]  22/23 23/2
criminal [8]  19/6 43/5 43/8 43/16 44/12 44/15
 45/25 55/14
critical [5]  5/5 14/11 14/13 45/1 45/2
cross [4]  35/14 49/20 66/17 66/19
cross-examination [1]  49/20
CRR [1]  112/16
cull [1]  13/14
cups [1]  11/7
cure [1]  13/2
curious [1]  78/16
current [1]  14/16
custodian [4]  8/16 98/5 98/19 101/7
custody [26]  6/3 38/17 41/6 47/12 48/21 51/3 51/5
 51/6 51/8 52/4 52/4 56/7 56/18 59/21 75/1
 76/12 76/13 95/15 95/21 96/8 99/5 99/25 100/9
 106/11 88/25
customs [1]  88/25
cut [1]  63/4
cv [1]  1/6

## D

dangers [1]  37/7
date [2]  43/12 53/6
Dated [1]  112/12
day [16]  5/15 6/17 11/8 16/9 29/1 29/7 29/8 38/9
 38/19 48/20 56/9 56/12 72/11 74/10 94/10 112/12
daylight [2]  82/19 93/12
days [5]  6/11 15/12 16/25 17/20 107/1
days' [2]  14/21 32/20
DC [3]  1/20 2/5 2/9
deal [3]  30/24 74/20 111/4
debate [2]  84/20 101/20
decide [3]  53/4 87/22 90/24
decided [6]  79/24 80/3 80/5 83/18 84/25 106/17
decision [16]  6/7 24/1 52/1 52/12 54/3 59/21 83/11
 97/13 97/23 97/25 98/3 103/23 106/4 106/5 110/16
 110/20
decision-making [1]  52/12
decisions [3]  51/13 97/9 97/22
deep [1]  73/1
deeply [1]  57/11
defendants [15]  1/8 2/2 13/13 13/17 37/17 45/15
 55/17 57/6 78/13 79/20 80/19 83/9 87/22 107/13
 111/2
defendants' [4]  16/1 21/23 93/8 94/7
defense [2]  44/13 46/19
defer [2]  43/18 44/21
defies [1]  53/7
deja [1]  6/15
deja-vous [1]  6/15
delay [1]  47/7
delighted [1]  27/25
delta [4]  63/8 63/9 103/20 103/21
demeanor [1]  58/2
denied [1]  104/4
department [16]  2/4 3/25 4/2 4/4 20/19 22/19 22/24
 35/10 36/6 36/14 61/5 62/9 63/6 64/14 76/18 95/8
Department's [1]  22/21
departure [1]  22/24
dependent [1]  89/15
depending [2]  53/23 73/24
deport [4]  30/12 56/10 73/12 81/4
deportation [4]  31/3 40/17 45/23 51/15
deportations [1]  58/7
deported [3]  61/13 64/22 93/12
deporting [1]  31/13
deprivation [3]  5/8 33/1 106/22
deprive [1]  80/12
deprived [2]  4/24 93/8
DEPUTY [1]  2/4
Derro [1]  3/8
described [4]  27/22 32/4 62/5 76/14
describing [1]  62/12
designate [1]  23/5
designated [1]  49/8
designees [1]  76/2
desk [6]  52/13 52/19 53/3 53/8 54/2 54/21
desperately [1]  29/17
despite [5]  25/19 25/20 32/7 47/22 70/11
destroyed [1]  11/9
detailed [2]  66/12 71/2
detain [6]  9/1 12/12 42/18 94/12 94/12 97/9
detained [11]  14/8 20/12 49/15 72/20 85/9 90/16
 91/12 91/16 91/23 92/25 101/15
detainees [15]  13/7 21/14 24/21 42/10 94/8
detainee's [1]  21/15
detainees [3]  8/10 25/22 42/5
detainer [23]  9/2 9/3 9/10 9/17 9/18 10/3 10/7
 10/21 10/25 10/25 11/13 11/23 12/23 12/23 13/20

 34/12 42/21 51/5 84/22 104/14 104/15 104/21 106/14
detainers [1]  46/14
detained [1]  112/13
detention [33]  7/17 7/23 10/7 10/19 14/14 16/23
 26/2 37/23 40/13 41/9 42/21 42/23 52/10 55/23
 78/14 78/16 85/13 85/25 86/6 89/3 89/7 89/7 90/20
 93/22 93/24 94/23 96/16 96/18 99/18 100/3 105/1
 105/5 105/13
determinant [1]  42/9
determination [11]  52/9 58/25 71/22 72/23 82/24
 83/10 94/5 97/15 97/18 101/14 104/17
determine [2]  11/1 61/11
determined [7]  35/22 41/15 43/24 61/12 83/9 90/8
 104/16
determines [1]  71/23
determining [1]  80/12
deviated [1]  107/19
Deyna [1]  109/6
DHS [8]  5/11 50/1 50/3 94/15 97/13 97/22 104/16
 104/20
DHS's [1]  101/14
dice [2]  23/21 48/20
difference [2]  67/25 70/15
different [8]  15/11 59/12 61/18 76/2 84/3 84/3
 85/11 100/11
differently [1]  49/25
difficult [1]  60/11
diligence [1]  28/25
Dinh [1]  109/12
diplomatic [2]  62/7 64/11
directive [4]  64/2 64/5 68/23 70/11
directly [2]  37/21 53/19
director [1]  78/12
disagree [4]  49/7 96/24 97/19 103/12
disagreed [2]  83/8 99/2
disagreement [2]  96/21 103/22
disconnect [1]  64/19
discretion [3]  7/23 95/7 97/10
discuss [2]  47/8 58/5
discussed [2]  47/9 68/1
discussion [2]  31/2 75/8
dismiss [1]  79/17
dismissed [2]  107/15 102/4
dispute [1]  35/3
dissolve [1]  80/3
distinction [2]  100/21 101/22
distinguishes [1]  64/19
district [28]  1/1 1/1 1/11 3/3 3/4 7/25 8/8 8/10
 13/6 23/13 37/21 41/21 44/9 49/23 73/19 86/12 87/6
 87/7 92/7 94/24 95/13 97/12 97/14 99/1 101/13
 102/17 112/5 112/25
DIVISION [2]  1/2 2/4
dixit [1]  105/6
do [101]  4/14 7/6 7/20 7/20 8/24 9/12 9/13 9/16
 10/25 11/1 11/11 14/16 17/20 17/20 19/22 22/22
 24/3 26/22 26/22 27/15 28/14 28/25 30/25 31/18
 33/12 33/13 33/14 33/14 33/16 34/24 35/1 37/21
 38/9 39/16 40/9 40/24 47/24 49/2 49/12 51/3 51/23
 53/22 54/22 55/11 55/18 56/1 56/2 56/5 56/12 57/20
 58/17 59/2 59/9 59/20 59/24 63/9 63/16 63/17
 63/20 64/7 64/23 65/16 70/13 71/4 76/8 76/22 76/24
 76/24 76/25 77/5 77/12 78/4 79/6 81/1 81/20 81/21
 82/8 82/11 82/16 84/11 87/5 87/6 88/8 89/17 93/15
 93/15 98/1 99/1 101/21 101/22 101/24 103/11 103/15
 105/14 106/14 108/24 109/24 110/19 110/22 112/6
docket [2]  1/6 35/1
doctrine [4]  80/21 82/8 84/6 108/8
document [10]  9/11 35/11 36/11 60/8 61/1 62/22
 63/2 65/12 66/25 67/22
documentation [1]  60/13
documents [4]  30/8 35/10 60/24 61/4
doing [5]  80/16 82/7 82/12 86/12 95/17
dooms [1]  21/9
door [7]  57/5 57/5 57/19 59/20 87/22 106/3 106/4
doublecheck [1]  78/8
doubt [4]  11/12 11/14 28/9 107/21
dovetails [1]  97/17
down [5]  37/14 48/3 85/9 103/2 107/1
draft [1]  23/5
drafted [1]  68/3
draw [3]  13/19 45/1 69/18
drilling [1]  37/14
driving [1]  74/7
due [36]  4/20 4/24 5/2 5/5 5/6 5/10 6/6 6/10 12/14
 14/14 14/17 16/5 17/9 20/2 21/9 22/23 24/21 28/6
 28/25 31/13 31/24 32/2 39/2 39/18 59/13 59/17
 74/18 75/22 75/24 101/17 101/19 101/21 102/7 102/8
 106/23 109/18
during [3]  21/21 88/16 88/18
duty [3]  7/10 29/1 48/3
DVD [2]  45/19 64/6
DX [1]  20/15
DX-1 [1]  20/15

## E

e-mail [8]  10/3 20/8 61/19 62/2 64/1 67/20 67/21
 67/21
each [4]  54/1 75/20
EAD [1]  36/21
earlier [3]  32/11 57/24 79/16
early [3]  28/15 32/8 106/20
EARM [1]  33/21
easier [2]  43/21 43/21
easily [1]  19/20
easy [1]  82/9
effect [1]  42/2
effective [3]  18/8 66/7 110/10
effectuate [1]  108/12
effectuated [1]  105/24
effectuating [1]  71/11
effort [2]  34/21 48/10
egg [1]  106/11

either [6]  28/12 35/21 37/14 76/14 94/22 96/6
El [21]  3/1 8/13 20/23 30/17 31/4 31/13 32/6 51/20
 56/12 64/23 65/9 65/10 67/20 79/5 81/2 81/6 84/7 84/8 85/17
 85/19 86/16
El Salvador [2]  20/23 31/4
electronic [1]  10/3
elicited [1]  49/20
eliminated [1]  51/20
else [11]  20/2 40/19 48/2 64/22 74/14 83/1 89/2
 93/21 94/11 100/10 105/19
elsewhere [1]  86/10
EMANUEL [2]  1/15 1/19
embassy [1]  61/2
emergency [6]  47/8 56/22 57/10 83/25 84/2 104/3
employees [5]  22/25 64/7 64/20 68/8 68/24
employment [1]  36/21
empowers [2]  79/6 108/11
end [3]  20/16 72/11 73/24
ends [1]  55/1
enemies [2]  58/8 76/2
enforcement [1]  89/1
engage [1]  47/21
Ensign [1]  16/19
ensure [4]  12/19 12/20 60/23 106/15
ensuring [1]  14/12
enter [2]  78/24 110/6
entered [4]  18/23 80/8 80/21 83/16
entire [2]  5/10 43/15
entirely [1]  33/3
entitled [5]  13/22 24/7 39/7 45/25 112/9
entitles [1]  5/2
equally [1]  4/25
equivalent [1]  34/10
erased [2]  50/15 50/19
ERNESTO [2]  2/7 4/3
ERO [5]  64/14 71/10 71/13 95/24 96/17
error [1]  5/25
especially [1]  56/12
ESQUIRE [8]  1/14 1/15 1/18 1/18 1/22 2/3 2/3 2/7
essentially [4]  16/7 21/13 44/25 92/2
establish [1]  67/2
established [3]  24/18 24/18 42/22
et [5]  1/4 1/7 3/10 3/11 66/10
even [23]  5/11 7/7 16/13 19/25 20/5 22/3 28/9
 28/11 28/14 28/20 41/16 42/14 43/16 57/6 60/12
 66/3 91/24 96/3 97/18 99/6 101/20 108/19
event [5]  10/9 38/22 47/11 64/10 85/20
events [2]  13/25 49/21
ever [2]  26/9 30/2
every [2]  13/23 28/9
everybody [2]  4/5 48/2
everyone [5]  3/6 62/19 77/9 77/13 77/23
everything [2]  54/25 72/14
evidence [12]  4/6 18/16 27/9 27/12 35/14 37/15
 48/6 48/8 49/24 50/9 50/11 99/20
evidentiary [2]  1/10 3/13
exact [2]  22/1 60/9
exactly [12]  5/8 7/11 7/13 22/6 30/8 30/15 31/18
 39/3 39/3 39/21 53/22 82/12
examination [1]  49/20
examine [2]  66/18 67/11
example [9]  7/21 29/21 40/16 82/2 82/21 87/16 95/2
 95/24 107/24
exceeded [1]  43/6
except [3]  53/22 71/12 102/19
exception [2]  98/5 98/6
exchange [2]  12/24 58/1
exclamation [1]  65/21
excuse [1]  108/9
execute [1]  71/13
Executive [1]  30/18
exercise [1]  108/13
exhibit [4]  16/1 65/13 67/4 104/13
exhibits [1]  65/13
exigent [3]  38/23 71/12 71/14
existed [1]  102/14
existing [1]  108/19
exists [2]  60/22 104/16
expansion [2]  66/13 67/1
expect [1]  18/9
expectation [2]  51/7 51/9
expected [2]  88/2 88/14
expedited [2]  45/23 66/9
expeditiously [1]  41/10
expert [2]  41/13 88/9
explain [6]  15/4 28/10 57/18 61/17 85/7 98/2
explained [1]  85/5
explanation [3]  42/13 42/15 105/15
explore [1]  88/15
express [7]  21/3 26/6 26/21 27/5 28/12 61/14 70/7
expressed [1]  21/15
expresses [1]  11/16
extra [1]  65/16
extraordinarily [2]  33/9 90/17
extraordinary [2]  47/23

## F

F.3d [1]  109/10
face [7]  19/23 19/24 19/25 20/6 21/10 27/16 108/3
faces [2]  6/24 25/4
facially [1]  42/14
facilitate [1]  6/12 54/10 54/13
facilitiam [4]  55/2 55/5 78/14 89/7
facility [23]  37/23 40/13 41/5 41/9 41/16 42/11
 42/11 42/21 42/23 52/10 55/23 72/22 75/11 78/16
 78/18 85/25 89/4 89/7 93/22 93/25 94/3 95/23 96/18
face [17]  5/9 6/18 10/15 12/12 12/14 12/7 26/22
 31/9 34/22 39/6 67/3 68/6 74/9 74/20 76/8 92/15
 100/12
face [5]  18/5 27/5 37/25 47/23 83/11
factual [1]  73/13
factually [5]  55/9 81/21 82/15
failed [2]  13/4 80/20

**F**

fails [1] 31/22
failure [2] 86/23 109/8
fair [7] 7/4 17/5 17/14 27/5 27/18 64/6 89/14
Fairfax [1] 1/23
fairly [1] 35/18
fairness [2] 72/10 103/9
faith [5] 29/4 32/23 50/23 53/21 68/14
family [7] 23/6 42/25 43/1 101/16 102/6 103/14 109/16
favorable [2] 39/14 63/8
fear [28] 15/9 17/25 19/11 21/3 21/14 21/15 21/17 22/12 23/10 26/7 26/22 27/6 28/12 59/17 61/15 62/17 64/18 70/7 70/8 71/21 72/13 72/25 73/1 73/10 89/21 90/8 92/17 107/11
federal [3] 10/24 112/4 112/17
feel [1] 90/13
feet [1] 17/13
felonies [1] 45/24
field [6] 72/10 78/2 78/3 78/8 78/12 78/12
Fifth [7] 4/22 5/2 16/10 16/18 49/18 75/24 109/19
fight [1] 91/18
figure [3] 30/10 48/4 75/25
file [13] 9/18 17/1 33/13 33/13 33/15 33/22 33/23 33/25 34/8 34/8 47/11 91/3 94/25
filed [14] 8/12 16/22 47/9 56/22 56/23 79/19 83/16 84/10 87/1 87/7 87/19 92/3 98/7 108/17
filling [1] 32/11
final [10] 66/8 76/3 86/16 100/13 100/14 100/25 104/18 104/21 104/25 105/7
find [11] 4/18 10/16 29/1 60/7 60/12 69/1 75/20 99/9 99/13 100/5 109/15
findings [1] 12/7
finds [1] 58/4
fine [2] 54/22 69/2
finer [1] 92/20
finish [2] 84/18 89/18
finished [1] 4/17
firm [1] 19/1
first [19] 5/20 8/4 20/3 20/15 34/16 38/12 53/16 53/19 59/24 63/24 79/21 81/5 97/15 97/25 99/5 99/9 100/9 104/18 110/4
five [2] 10/1 77/12
flawed [1] 79/7
flow [1] 42/19
flurry [1] 105/6
focus [3] 27/25 43/4 106/24
focusing [3] 16/20 28/11 105/11
folks [3] 58/8 76/3 76/6
follow [2] 40/10 63/7
follow-through [1] 40/10
followed [1] 12/19
following [6] 21/25 29/8 64/6 64/16 71/11 109/11
Footnote [1] 42/4
forced [1] 67/17
foregoing [1] 112/7
foreign [2] 6/20 30/2
foremost [1] 38/13
forfeiture [1] 26/14
Forget [1] 24/8
fork [3] 20/9 55/19 56/4
form [3] 10/17 35/7 60/5
formally [1] 18/23
formation [1] 112/9
forth [3] 69/7 70/16 71/16
fortiori [1] 14/6
forward [2] 13/2 91/22
found [12] 13/8 43/5 55/8 60/15 60/17 67/19 67/20 79/25 98/11 98/12 98/18 99/18
four [1] 12/22
foura [1] 99/17
Fourth [18] 6/6 8/5 8/8 13/7 24/18 25/1 32/1 42/6 84/25 98/2 98/3 99/2 99/7 100/1 101/12 108/10 109/4 109/5
frame [3] 14/23 75/8 75/8
Franklin [1] 2/8
frankly [5] 5/17 13/14 32/21 43/21
freeze [1] 77/7
FRIDAY [2] 1/11 4/15
friend [1] 41/14
front [2] 92/3 110/11
frustration [1] 108/12
fulfill [3] 39/24 76/23 76/23
fulfillment [1] 8/19
full [2] 103/13 110/3
fully [2] 80/2 109/24
fundamental [4] 4/20 12/5 13/4 21/5
fundamentally [1] 14/11
further [10] 20/21 22/12 37/18 38/15 62/11 62/12 62/14 63/11 64/12 69/12
future [3] 80/10 80/14 83/1

**G**

game [3] 7/5 20/16 20/22
gap [3] 32/11 38/18 39/14
gap-filling [1] 32/11
GARCIA [21] 1/4 3/10 5/25 6/17 8/20 9/7 12/12 14/7 19/1 20/2 26/1 26/6 26/25 29/13 30/1 49/9 49/10 49/12 49/22 50/4 50/24 51/1 51/14 52/3 53/2 55/21 56/25 58/6 61/12 70/13 70/17 72/11 79/21 81/5 85/9 86/11 88/23 90/16 99/21 100/25 110/1 110/8
Garcia's [2] 6/13 102/16
garden [1] 50/25
gave [4] 13/6 50/6 50/24 65/13
GENERAL [3] 2/4 7/22 35/21
generally [1] 71/11
getting [12] 10/18 18/24 35/21 38/19 47/7 56/9 63/15 70/10 71/17 73/6 106/9 110/21
Giles [17] 20/1 21/11 28/19 42/5 43/5 49/8 51/12 51/24 55/10 62/25 63/13 66/18 67/23 70/22 88/13 98/20 100/5
Giles' [5] 21/10 26/5 52/15 60/2 62/18

**H**

habeas [4] 16/22 17/1 98/6 98/20
hadn't [1] 92/21
hand [1] 65/19
handed [2] 36/3 45/12
handle [2] 28/20 92/23
handled [1] 12/12
hands [1] 26/3
Hang [1] 33/17
happen [19] 9/25 30/9 36/25 47/16 47/16 47/22 47/25 48/17 49/9 49/12 58/23 64/18 69/20 82/23 87/23 91/10 94/17 96/6 107/17
happened [13] 7/19 31/9 34/15 47/15 49/12 72/14 74/8 76/10 85/20 93/5 93/7 101/1 109/15
happening [1] 74/18
happens [9] 49/10 49/23 50/18 50/25 59/21 94/11 94/12 94/18 95/17
happy [6] 28/10 46/14 65/19 68/4 69/3 69/3
hard [5] 28/16 29/3 53/24 60/11 60/14
hardships [1] 32/20
harm [7] 5/21 31/24 33/1 39/19 48/24 50/14 106/20
harms [1] 7/18
hasn't [4] 83/18 85/9 97/23 102/17
having [7] 6/17 7/25 25/19 25/20 31/6 75/8 76/15
he'll [8] 29/18 55/12 55/13 59/22 61/14 71/8 74/11 92/25
head [1] 105/14
healthy [2] 84/20 110/20
hear [4] 45/14 68/11 83/20 105/15
heard [17] 4/8 6/22 14/21 15/6 18/8 21/22 22/12 22/16 24/14 25/23 29/19 45/3 70/5 89/20 89/24 90/22 104/24
hearing [12] 1/10 3/13 4/7 10/20 25/8 25/19 32/4 32/11 59/17 70/18 84/15 87/9 89/24
heavy [2] 80/20 81/18
held [4] 25/19 41/16 87/13 112/8
help [3] 38/9 55/15 103/4
helps [1] 75/8
hereby [1] 112/6
highly [2] 111/10 95/25
him [88] 5/12 5/13 5/16 9/2 10/5 12/14 14/10 17/4 18/21 19/5 19/6 21/3 21/6 26/3 27/8 29/13 30/3 31/25 33/7 34/19 35/24 37/20 37/22 37/24 38/18 40/14

**I**

I'll [20] 4/9 6/1 16/18 22/14 22/16 39/23 42/7 44/21 45/14 58/14 58/14 65/8 78/9 82/2 85/7 104/10 104/13 106/24 107/1 107/3
I'm [95] 4/16 11/21 13/13 13/14 13/15 13/15 13/17 13/18 15/1 15/24 20/14 22/14 25/11 26/24 26/24 27/25 28/1 28/10 31/6 33/16 33/17 33/24 34/15 35/15 35/16 35/25 37/25 38/3 41/20 43/18 44/25 45/10 48/21 48/21 48/22 49/9 49/19 54/23 56/19 57/9 57/11 57/15 57/21 58/11 58/11 59/7 59/8 63/25 64/3 64/24 65/9 65/19 66/14 66/20 67/6 67/6 68/3 68/4 68/9 68/10 69/3 69/3 69/23 72/5 73/22 74/7 74/18 74/24 75/6 76/20 76/21 76/24 77/24 83/12 83/14 83/17 85/10 85/11 86/10 86/11 93/2 93/10 94/15 95/15 95/16 95/16 95/16 98/9 98/14 98/23 103/12 107/6 109/6 111/3 111/6
I've [12] 9/4 11/6 45/12 56/18 57/15 74/14 74/15 79/24 80/5 99/18 106/25 108/21
I-241 [3] 60/5 60/6 60/7
I-797C [2] 35/7 36/10
ICE [46] 9/11 10/20 14/14 22/9 26/2 26/2 26/20 37/23 40/12 40/24 41/5 42/17 43/25 47/12 48/21 49/24 49/24 50/1 51/3 51/4 52/4 55/2 56/17 56/24 59/21 60/22 63/2 63/5 64/7 64/13 64/16 66/10 68/7 68/23 71/3 72/21 72/21 75/1 75/11 76/12 76/13 85/9 93/23 94/20 96/4 98/21
ICE's [1] 41/8
idea [3] 29/21 33/5 33/7
identified [6] 28/14 60/3 60/5 61/10 66/9 108/21
identify [2] 3/14 59/24
IJ [4] 73/19 84/24 90/8 90/23
illegally [2] 56/11 108/3
imagine [4] 20/9 20/9 25/25 28/16
immediate [1] 26/14
immediately [2] 10/15 66/7
immigration [35] 2/7 5/19 8/25 18/21 19/5 25/8 25/9 25/20 25/21 30/18 33/24 51/19 52/19 59/12 70/9 71/24 72/4 72/9 77/9 77/22 85/14 87/9 87/20 88/25 89/25 89/25 90/3 90/15 91/20 92/17 92/18 92/19 94/10 97/18 101/4 103/17
imminent [1] 106/20
imminently [1] 31/23
impacts [1] 69/21
implement [3] 82/4 82/5 82/6
implicates [1] 82/10
important [5] 14/24 22/15 58/4 65/4 65/6
impracticable [1] 35/23
impractical [1] 35/23
impressed [1] 27/11
INA [7] 12/15 12/16 31/12 46/1 48/25 49/18 102/1
inadequate [1] 32/3
inappropriate [1] 104/2
inception [2] 8/17 20/10
include [1] 15/6
included [2] 45/22 45/24
includes [1] 71/9
including [3] 7/7 55/11 108/19
inconsistent [2] 70/12 75/19
incredible [1] 48/9
indicated [1] 44/17
indicates [1] 36/20
indictment [1] 6/2

**I**

individual [12]   8/13 10/23 66/22 66/23
91/22 92/1 103/14 103/19 104/7 104/16
individuality [1]   71/4
individuals [7]   24/14 25/15 29/23 40/15 45/23
45/24 96/1
indulge [1]   22/16 65/19 68/4 96/3
infirmities [2]   15/22 20/5
information [4]   37/10 47/25 49/2 50/24
informed [1]   49/23
informing [1]   22/9
initial [5]   78/25 88/17 88/18 90/15 99/23
initially [2]   84/4 86/23
initiate [5]   93/2 94/16 95/8 95/15 95/16
initiation [2]   90/6 93/20
injunction [7]   8/18 8/20 12/8 40/11 80/4 105/9
109/22
injunctive [1]   82/10
input [2]   53/5 53/6
ins [1]   95/3
instance [4]   97/16 97/25 99/5 100/9
instructive [1]   25/7
insufficient [3]   16/8 48/9 48/16
insults [1]   28/23
insurance [1]   23/5
intelligence [1]   28/24
intend [2]   70/13 110/19
intended [2]   32/7 71/9
intending [1]   31/23
intention [2]   29/13 110/9
intentions [1]   107/22
interest [5]   52/23 52/24 53/2 53/2 58/3
interested [3]   7/4 7/5 34/15
interesting [1]   84/17
interests [1]   53/24
internal [1]   20/8
interpretation [1]   107/17
interpreted [1]   63/2
interrupt [1]   77/25
intervention [2]   50/21 75/21
interview [4]   21/17 21/21 22/13 107/11
intimidating [1]   26/11
intransigent [1]   7/3
involving [1]   34/4
ipse [1]   105/6
irregular [1]   11/10
irreparable [3]   31/24 32/25 106/20
irrespective [3]   69/13 69/14 101/1
irrevocable [1]   80/22
is [394]
is easier [1]   43/21
isn't [10]   27/5 51/14 74/23 80/5 82/16 82/16 82/17
94/3 97/17 102/15
issue [7]   12/23 16/6 28/17 43/6 46/3 61/25 108/11
issued [2]   22/19 108/13
issues [4]   27/20 37/2 101/16 105/11
issuing [1]   110/21
itself [6]   12/7 41/17 107/2 108/7 109/16 109/20

**J**

Jersey [2]   7/24 41/21
JGG [3]   5/1 58/7 75/23
job [4]   4/16 4/17 83/21 83/22
job to [1]   83/21
John [1]   65/14
JONATHAN [2]   1/18 3/18
JR [1]   2/7
judge [23]   1/11 5/13 5/19 7/24 25/8 25/20 30/18
41/21 53/15 66/5 89/25 89/25 90/15 90/18 90/19
91/3 91/11 92/18 92/19 98/20 99/11 110/20 110/20
Judge Crenshaw's [1]   110/20
judgment [1]   31/4
judicial [2]   22/22 112/10
judicially [1]   101/13
judiciary's [1]   12/18
judiciously [3]   50/21 97/12 97/21
JULY [21]   1/11 10/10 20/7 61/19 62/2 64/1 65/1
67/21 67/24 69/14 70/11 70/17 70/25 71/6 79/19
80/24 107/3 107/14 107/14 107/17 112/12
July 16th [1]   10/10
July 9 [4]   62/2 64/1 70/25 71/6
July 9th [10]   20/7 65/1 67/21 67/24 69/14 70/17
79/19 80/24 107/3 107/17
juncture [1]   83/18
June [3]   10/11 16/19 34/7
June 30th [1]   16/19
jurisdiction [48]   13/8 13/9 13/10 13/19 18/4 41/16
41/17 45/9 74/15 75/10 76/21 77/3 77/7 78/24 79/9
79/11 85/1 85/12 86/2 87/9 90/19 91/12 91/22 92/23
93/14 97/7 98/11 98/11 98/14 99/9 99/11 99/11 99/13
101/6 101/20 101/25 101/25 102/12 102/14 103/10
108/13 108/16 108/24 109/2 109/4 109/22 110/12
110/23 111/1
jurisdiction-stripping [1]   101/25
jurisdictional [1]   109/20
jurisprudence [1]   14/17
justice [6]   2/4 3/25 4/2 4/4 38/7 76/18
justices [1]   75/22
justification [1]   55/8

**K**

keep [5]   13/23 76/7 77/9 92/5 92/6
KHOJASTEH [2]   2/3 3/25 46/10 47/18 77/24 107/12
Khojasteh's [1]   107/17
kick [2]   90/19 91/12
kidnapped [1]   23/9
kidnappers [1]   23/7
kidnapping [1]   22/23
kidnappings [2]   13/2
KILMAR [2]   1/4 3/10
kind [4]   28/23 32/9 66/22 82/7
knew [2]   12/22 101/6

**knowing [1]   107/7**
knowledge [3]   35/18 35/19 105/20
Kosovo [3]   24/24 25/7 25/7
Kossov [3]   24/24 25/7 25/7
KRISTI [1]   1/7 3/11 66/11

**L**

label [1]   27/8
lack [1]   100/2
lacked [2]   78/24 99/1
lacks [2]   32/3 97/7
landed [2]   89/8 89/8
language [4]   16/18 62/23 63/14 69/21
larger [1]   55/6
last [6]   10/1 62/22 74/12 101/1 102/14 104/8
later [2]   6/11 20/23
latest [1]   104/13
Latvia [2]   25/12 25/14
law [25]   4/21 4/25 5/2 5/3 6/5 8/5 8/6 12/14 21/6
24/23 24/24 24/25 26/11 26/20 28/1 28/11 31/25
39/7 59/16 64/9 81/10 81/18 82/18 83/10 94/8
lawful [5]   9/7 10/4 12/11 13/1 106/6
lawfully [6]   6/9 11/16 11/18 14/7 31/18 103/11
lawless [1]   8/14
laws [2]   9/4 88/9
lawyer [3]   22/11 33/24 43/12
lawyers [12]   6/24 15/4 17/24 28/12 43/2 43/13 44/2
56/3 57/13 58/2 105/7 107/19
lay [1]   24/1
layers [1]   73/1
lead [1]   44/12
learn [1]   6/14
learned [2]   48/14 56/13
least [11]   39/1 55/7 72/15 73/10 83/11 83/17 87/5
88/15 99/22 100/1 110/7
leave [1]   53/3
Leeper [3]   112/4 112/15 112/16
left [3]   53/8 56/9 108/9
legal [4]   6/8 9/1 30/13 85/11
legality [1]   80/12
lend [1]   72/8
less [2]   38/24 58/3
lesser [1]   14/9
lesson [1]   6/15
letting [1]   54/23
liberty [5]   4/24 5/8 33/1 40/22 106/22
life [5]   4/24 5/8 24/8 24/9 24/11
light [5]   7/18 27/19 37/14 63/8 64/8
lightly [2]   27/24 42/7
lightning [1]   18/10
likelihood [2]   47/16 74/1
likely [7]   72/12 73/10 90/2 94/20 95/25 96/12
96/17
limb [1]   24/11
line [5]   13/19 45/1 45/2 52/21 69/18
listening [1]   16/14
literally [2]   24/11 82/14
litigated [1]   44/16
litigation [4]   2/7 41/11 52/22 100/24
little [5]   15/20 31/17 33/12 57/4 80/6
live [3]   84/21 103/14 106/18
lives [1]   87/17
LLC [1]   1/19
LLP [1]   1/15
local [1]   95/23
located [2]   94/23 95/24
location [1]   42/10
long [9]   14/24 22/10 65/20 65/23 65/23 71/14
104/10 104/10 110/16
longer [1]   89/6
look [14]   6/5 23/21 36/17 45/11 46/24 47/4 48/13
65/19 70/12 82/21 96/20 101/10 102/12 102/16
looked [6]   60/7 67/19 67/21 68/3 69/17 107/2 107/3
looking [10]   20/14 57/15 62/2 62/3 64/3 64/4
92/18 96/18 96/25 98/12
lopsided [1]   33/9
lose [1]   75/10
loser [1]   87/12
lost [2]   74/14 74/15
lot [11]   25/12 27/9 33/20 53/21 59/10 70/24 72/19
82/21 89/20 104/24 107/18
lots [1]   86/1
Louisiana [2]   74/13 90/17
love [1]   27/9
lulled [1]   7/1
lulling [1]   58/2

**M**

made [14]   7/4 58/25 59/21 64/14 66/7 72/23 82/24
84/8 97/13 97/23 101/23 106/5 107/18 107/19
magic [1]   54/12
mail [8]   10/3 20/8 61/19 62/2 64/1 67/20 67/21
67/21
Maine [1]   87/18
maintain [1]   74/7
make [40]   7/20 12/5 13/3 13/4 15/8 17/19 17/25
18/1 24/3 26/20 37/8 37/15 38/4 38/21 39/1
39/22 45/7 48/10 52/1 52/9 54/2 54/24 56/19 59/14
61/6 73/14 74/17 76/25 77/8 82/16 84/10 89/9 89/11
89/12 92/7 97/15 97/24 105/24 106/4
makes [4]   44/11 100/11 105/22 109/10
making [4]   28/4 47/20 52/12 92/4 94/4
man [3]   27/4 27/16 28/25
manager [4]   89/3 89/10 89/12 95/23
mandate [1]   11/4
manner [2]   7/16 12/13
many [2]   27/10 55/2
March [17]   15/24 15/25 61/18 63/7 64/4 64/6 66/11
66/24 67/23 68/2 69/5 69/9 70/11 70/14 70/16 85/8
92/21
March 12th [1]   85/8

**March 30 [6]**   15/25 61/18 64/4 66/11 70/11 70/13
March 30th [7]   15/24 64/6 64/24 67/23 68/2 69/5
70/16 82/7 82/7
marching [1]   28/4
Marco [2]   36/9 36/9
marshals [1]   10/25
marshals' [1]   38/17
MARYLAND [35]   1/1 3/4 8/21 10/23 37/21 40/5 40/13
40/14 40/16 40/20 40/22 41/5 42/16 42/17 43/16
44/10 44/19 45/8 57/1 57/7 73/18 78/16 78/18 84/21
87/24 93/16 94/8 94/10 94/17 95/11 95/22 97/3
103/11 103/17 112/6
Maryland's [1]   44/14
masked [1]   26/2
Massachusetts [1]   23/13
massive [1]   104/15
materially [1]   76/2
matter [12]   3/9 3/12 46/17 71/24 79/1 87/16 87/17
88/9 90/15 90/20 94/8 112/9
matters [3]   19/5 93/7 96/25
may [26]   20/20 26/12 33/3 36/7 37/14 41/13 41/22
47/11 47/15 47/16 47/16 55/10 62/10 64/11 64/22
69/19 70/12 71/13 73/6 73/7 73/12 74/4 74/21 96/20
98/17 106/13
May 14th [1]   98/17
maybe [9]   29/8 33/25 55/15 57/18 74/22 84/15 85/14
87/6 108/4
mean [32]   7/12 18/18 18/22 19/9 26/24 27/7 28/23
30/7 30/9 35/23 43/5 44/1 48/1 52/18 55/25 65/22
66/21 68/23 72/12 72/18 75/22 81/18 84/13 87/13
92/4 94/17 97/18 101/20 102/21 102/25 107/21
110/19
meaning [5]   27/24 30/17 69/8 85/17 103/14
meaningful [2]   67/25 70/15
means [15]   22/4 30/11 49/7 53/11 54/25 55/24 59/2
59/3 66/19 69/2 71/15 72/2 84/21 93/13 105/16
meant [1]   5/7
measure [2]   32/11 110/3
meat [1]   31/17
media [2]   23/8 100/4
meets [1]   39/18
member [2]   23/6 76/17
memo [18]   21/24 23/25 61/17 61/17 61/18 62/3 62/24
63/5 63/10 68/7 68/18 68/20 70/11 70/13 71/6 107/1
107/15 107/17
memorandum [3]   15/3 66/11 66/13
mentioned [2]   30/5 60/12
merits [8]   24/8 33/10 91/9 91/13 91/21 92/2 98/17
102/2
met [1]   71/23
Mexico [5]   19/1 20/23 30/4 30/10 30/11
Middle [1]   49/23
midway [1]   82/5
might [6]   5/16 6/3 6/14 19/13 29/15 90/6
million [1]   49/14
mind [5]   46/2 63/18 63/20 100/2 103/16
mindful [1]   77/24
mine [2]   11/22 49/8
minimal [3]   38/16 38/19 50/21
minimum [12]   8/24 14/17 16/5 17/14 17/7 17/8 17/14
18/9 32/9 39/18 110/5 110/6
minute [2]   36/16 63/19
minutes [2]   77/13 77/19
mistake [1]   5/20
mistaken [1]   5/7
mistakenly [3]   31/13 33/22 33/25
modest [2]   32/12 32/12
modicum [2]   39/2 75/23
modify [1]   51/19
modifying [1]   37/14
MOLINA [12]   2/7 4/4 60/18 69/1 78/4 88/6 88/7 88/8
90/14 90/22 92/10 94/18
moment [9]   16/4 21/17 24/8 32/15 37/8 49/22 66/15
69/1 106/25
Monday [1]   83/16
moniker [1]   73/9
months [6]   4/18 5/24 53/14 53/20 74/13 101/2
moot [12]   53/15 79/16 79/18 79/23 79/24 79/25 80/1
80/5 81/16 82/10 96/23 106/18
more [21]   4/6 7/17 15/16 27/22 45/10 46/1 49/1
49/4 49/7 53/8 53/9 57/5 71/2 71/13 82/8 82/13
88/11 96/12 96/18 96/25 98/12
morning [18]   3/6 3/16 3/18 3/21 3/22 3/24 4/1 4/3
4/5 10/1 11/6 34/17 36/6 46/11 46/12 47/10
104/10
morning's [1]   4/7
MOSHENBERG [9]   1/22 3/20 19/3 19/4 19/9 20/25
41/13 43/19 44/5
most [4]   63/8 64/2 64/5 64/8
motion [18]   4/9 19/22 37/13 37/16 45/13 47/9 56/22
79/17 87/10 87/19 91/3 92/3 97/6 104/3 104/8
108/18 108/20 111/5
move [15]   17/12 18/10 38/23 39/23 41/10 42/20
42/22 72/13 72/20 73/20 84/12 87/18 87/18 96/8
109/2
moved [9]   42/6 42/10 55/11 56/23 74/11 74/12 74/13
79/1 110/25
movement [1]   8/1
moving [1]   104/23
Mr [4]   44/8 56/25 66/18 78/4
Mr. [147]
Mr. Abrego [91]   5/11 5/25 6/12 6/17 7/10 8/20 9/7
9/11 12/12 13/23 14/6 17/3 17/25 18/20 19/1 19/12
20/22 24/2 25/25 26/6 26/25 27/7 29/13 30/1 31/13
34/4 34/16 37/17 43/7 45/4 45/25 47/11 48/1 48/2
48/11 48/17 48/25 49/9 49/13 49/21 49/22 50/4
50/24 51/1 51/14 52/3 53/4 53/12 54/21 55/1 55/10
55/21 56/16 57/12 58/6 59/15 59/17 60/12 70/3
70/17 71/1 71/3 71/5 72/11 73/12 74/11 74/25 76/1
77/10 81/4 84/21 85/8 86/2 88/3 88/15 89/1 90/7
90/16 93/8 94/14 97/15 101/6 104/9 104/13 104/19
102/16 106/6 107/15 110/1 110/8

Mr. Abrego Garcia [1]   79/21

**M**

Mr. Abrego's [21] 30/23 49/14 55/18 57/10 79/19 90/2
110/25
Mr. Acuna [1] 19/3
Mr. Ensign [1] 16/19
Mr. Giles [15] 20/1 21/11 28/19 42/5 43/5 49/8
51/12 51/24 55/10 62/25 63/13 66/18 67/23 70/22
88/13
Mr. Giles' [5] 21/10 26/5 52/15 60/2 62/18
Mr. Khojasteh [4] 46/10 47/18 77/24 107/12
Mr. Khojasteh's [1] 107/17
Mr. Molina [9] 60/18 69/1 88/6 88/7 88/8 90/14
90/22 92/10 94/18
Mr. Rand [2] 47/2 68/2
Mr. Reuveni [1] 9/7
Mr. Rossman [2] 62/5 104/8
Mr. Sandoval-Moshenberg [7] 19/3 19/4 19/9 20/25
41/13 43/19 44/5
MS [2] 27/8 73/10
MS-13 [2] 27/8 73/10
Ms. [1] 3/8
Ms. Derro [1] 3/8
much [9] 4/12 8/4 16/25 38/6 46/1 47/5 47/9 66/4
82/19
mud [1] 15/4
MURRAY [1] 1/22
must [7] 8/24 13/23 21/25 25/4 64/16 66/10 84/21
myself [1] 13/19

**N**

Name [1] 49/11
named [1] 20/23
narrow [2] 41/24 74/19
narrowly [1] 111/4
Natasha [1] 2/10
Naturalization [1] 97/8
near [1] 42/25
necessarily [4] 8/25 57/9 100/21 103/12
necessary [3] 35/20 102/17 110/8
need [21] 13/20 18/7 20/21 26/19 32/9 37/11 38/9
45/2 47/24 57/25 62/11 64/12 69/1 73/14 74/24 75/7
77/14 83/24 90/13 103/5 103/5
needed [1] 16/25
needs [11] 26/22 31/22 42/15 43/12 43/13 43/13
45/9 77/6 91/8 92/16 108/24
neither [3] 51/24 66/19 106/7
never [4] 5/16 5/19 29/19 74/21
new [8] 1/16 7/24 34/8 41/21 41/25 41/25 44/13
89/11
news [2] 48/15 56/14
next [17] 7/10 47/12 49/24 50/19 51/22 52/4 54/22
58/16 59/3 59/21 64/18 71/20 73/6 74/23 96/8
105/14 110/18
night [2] 10/1 108/1
Nikita [1] 78/12
nine [2] 11/6 75/22
Ninth [1] 24/25
no [127]
NOEM [2] 1/7 3/11
Noem's [1] 66/11
Nome [2] 44/1 87/18
none [6] 9/8 9/8 27/11 49/3 74/2 105/8
nonemergency [1] 22/24
nonetheless [1] 27/14
nonresponsive [1] 75/6
not [139]
notes [6] 1/25 45/11 65/20 66/3 84/22 108/9
noteworthy [1] 43/5
nothing [7] 4/13 8/15 22/13 40/18 51/21 88/22
105/19
notice [38] 5/11 5/15 6/21 14/21 16/8 19/9 21/1
22/22 25/5 26/3 26/12 32/13 32/20 38/15 47/13
47/13 55/15 55/18 57/13 58/24 59/22 61/12 69/10
69/22 69/24 70/5 70/7 70/21 71/8 75/14 76/19 77/11
82/23 106/23 107/10 107/10 107/14 110/9
notify [1] 26/20
notion [2] 39/9 48/1
notwithstanding [1] 101/12
number [13] 1/6 3/9 57/5 57/5 57/19 59/20 61/8
73/8 73/9 87/22 106/3 106/4 107/4
NW [2] 1/19 2/5
NY [1] 1/16

**O**

O'HICKEY [2] 2/3 4/2
observe [1] 36/19
observed [4] 34/12 39/5 104/22 105/9
obtain [3] 16/9 60/20 102/12
obtained [2] 22/17 108/14
obtaining [1] 9/21
obvious [3] 14/5 24/4 106/10
obviously [5] 34/12 49/7 96/25 109/3 110/16
occur [2] 94/22 95/3
occurred [1] 85/17
odd [1] 104/24
odds [1] 62/24
off [7] 6/9 20/22 22/11 22/13 32/15 80/10 83/25
offer [3] 8/3 49/4 68/11
offered [2] 67/3 73/11
offers [1] 68/18
office [10] 2/7 28/20 29/2 72/11 78/2 78/3 78/8
78/12 78/12 78/15
officer [33] 7/10 15/9 15/13 26/3 26/11 29/1 48/3
51/14 52/11 52/13 52/19 52/20 53/3 53/8 54/2 54/21
70/9 70/9 76/17 88/25 89/8 92/18 93/23 94/20 94/23
95/1 95/4 95/6 95/14 96/6 96/8 96/17 107/12
officers [3] 56/15 71/3 95/24
OFFICIAL [3] 112/1 112/4 112/17
oh [5] 27/1 27/11 33/17 45/16 91/14
okay [1153]
old [1] 60/8
OLIVIA [1] 1/18

**P**

omit [1] 76/8
once [9] 6/15 15/7 31/10 54/15 61/10 83/9 89/3
98/5 101/4
one [9] 26/25 36/10 62/3 62/4 71/20 73/5 105/9
25/3 26/19 26/21 27/4 27/20 27/24 27/23 28/1 28/14
28/25 29/11 36/10 37/16 39/11 42/15 42/25 44/8
45/11 45/16 47/9 47/11 51/15 51/18 55/1 55/7 55/11
55/17 55/19 59/12 59/20 60/3 60/20 61/8 61/9 62/6
63/10 63/14 65/8 65/9 70/4 70/25 73/4 73/8 74/1
77/25 78/13 79/1 84/20 85/15 86/7 88/11 90/13 92/3
94/15 96/6 96/12 101/6 101/11 105/16 106/4 107/4
111/5
one thing [1] 45/16
one-page [1] 36/10
online [1] 60/20
only [13] 26/14 27/17 55/9 56/23 65/12 68/1 75/1
80/1 83/13 86/7 92/6 105/16 106/25
onward [1] 31/3
open [2] 17/13 43/4
opening [1] 76/14
operate [2] 9/3 9/4
operating [1] 31/14
opinion [4] 49/7 73/6 96/25 110/22
opportunity [41] 4/8 5/12 6/21 12/10 14/21 14/25
15/7 15/8 17/1 18/8 20/25 21/2 21/3 21/19 21/22
22/11 22/11 24/14 25/5 25/22 26/4 31/8 32/5 32/6
32/10 32/14 32/24 35/13 37/9 42/24 45/3 45/14
46/13 47/1 61/14 64/18 70/5 71/15 88/15 97/12
107/10
oppose [1] 91/19
opposed [1] 56/6
option [1] 73/17
options [1] 51/14
order [47] 3/2 5/18 13/6 13/8 13/16 14/8 19/22
23/25 28/24 32/7 32/9 32/17 37/17 37/18 38/15
39/11 41/23 54/10 56/24 66/8 68/16 71/13 73/4
76/23 77/7 80/9 83/16 86/16 86/25 87/7 91/6 94/13
94/19 96/5 98/17 100/6 100/13 100/25 104/18 104/21
104/25 105/8 105/10 108/7 110/6 110/8 111/5
ordered [2] 22/24 88/3
ordering [2] 98/21 98/21
orders [9] 13/6 13/6 41/15 64/8 76/3 87/13 108/11
108/12 109/5
ordinarily [2] 94/23 95/20
ordinary [2] 18/15 18/19
origin [1] 30/14
original [12] 37/13 71/24 72/4 72/7 73/19 87/7
87/13 89/16 93/14 99/15 99/18 100/8
originally [1] 88/3
originated [3] 84/24 86/8 103/10
Orleans [1] 89/11
OSORIO [1] 1/22
other [42] 7/7 12/4 17/25 19/2 19/5 19/11 21/25
22/3 23/2 23/14 24/2 32/25 34/4 32/25 40/3 40/4
42/24 47/4 56/2 57/6 57/14 63/12 63/15 64/15 64/19
66/8 68/25 69/17 69/19 69/21 73/16 73/22 74/2
75/20 78/14 78/15 91/15 96/15 97/19 98/18 105/21
111/3
others [2] 7/19 55/6
otherwise [5] 5/21 42/1 82/9 93/9 108/13
ought [1] 72/9
ourselves [1] 4/18
out [25] 10/16 15/7 20/3 22/1 24/1 29/1 30/10
32/22 35/20 38/18 41/10 43/17 45/5 45/17 48/4
67/14 67/19 67/20 69/1 75/13 75/25 103/11 110/17
110/21 110/25
outburst [1] 103/7
outlined [4] 70/25 71/2 71/5 76/19
outrageous [1] 6/25
outset [1] 99/23
outside [1] 79/11
over [16] 6/15 11/15 11/16 20/22 41/4 67/8 75/10
79/9 85/1 90/19 98/20 103/16 107/8 108/9 109/22
110/21
overseas [1] 8/13
oversimplification [1] 23/15
overturned [1] 24/22
own [5] 48/25 56/7 75/19 75/19 84/22
Ozturk [4] 7/23 8/4 40/9 101/22

**P**

p.m [1] 10/1
P.O [1] 2/8
page [90] 20/15 36/10 62/3 62/4 71/20 73/5 105/9
109/10 112/9
paper [1] 9/24
papers [1] 79/5
paragraph [4] 62/2 64/9 66/14 109/13
paragraphs [1] 62/22
Paralegal [1] 2/10
parallel [1] 61/5
parcel [1] 85/4
part [10] 13/9 13/12 38/13 58/19 58/21 80/4 84/22
85/4 87/14 98/9
participate [2] 55/13 98/24
particular [8] 25/6 31/1 38/7 43/6 68/4 74/10 97/4
102/6
particularized [1] 49/1
particularly [1] 33/5
particulars [1] 27/25
parties [3] 39/23 52/23 53/2
party [13] 18/1 27/16 35/22 57/16 58/16 69/7 69/11
82/9 88/16 89/13 94/9 94/16 95/8
past [3] 60/19 74/12 84/12
Patel [1] 2/10
patently [1] 99/19
paths [1] 76/13
PAULA [5] 1/10 3/5 112/4 112/15 112/16
pause [5] 17/16 37/8 45/10 76/25 77/3
pejorative [1] 72/19
pendency [2] 86/7 106/6
pending [5] 3/9 4/8 45/20 97/9 108/17

**P**

Pennsylvania [1] 2/5
people [7] 7/6 17/1 18/10 23/3 41/10 59/10 59/11
pepper [1] 2/2
peppersprayed [1] 2/2
percent [2] 65/5 90/18
perhaps [2] 26/2 33/1
period [3] 45/6 54/9 110/7
permanent [2] 95/22 96/18
permanently [1] 33/1
permission [1] 30/11
permit [3] 15/21 19/16 34/22
permits [1] 79/8
persecute [1] 107/6
persecuted [1] 62/9
persecution [6] 20/13 21/4 24/13 32/5 32/17 108/3
person [23] 4/23 6/9 6/19 6/20 6/21 11/24 20/13
21/1 29/2 30/12 30/12 30/12 40/21 52/11 52/11 92/7
93/3 94/12 94/18 95/17 95/18 95/21 107/6
personal [1] 107/22
perspective [3] 21/9 53/11 102/22
persuasive [1] 58/10
petition [1] 98/6
petitioner [2] 16/22 17/1
Philadelphia [4] 78/18 78/19 89/10 95/25
phone [3] 41/14 56/3 56/16
physical [3] 10/3 65/12 65/12
pick [2] 30/12 56/16
picking [1] 56/3
piece [3] 9/23 97/2 102/14
place [17] 5/20 8/18 11/12 11/13 14/10 43/24 60/3
73/5 77/9 85/16 85/19 90/19 97/4 97/5 98/7 102/6
110/4
placed [1] 14/13
places [1] 7/23
placing [1] 24/16
plain [7] 5/1 6/5 62/23 63/13 106/17 106/18 106/19
plainer [1] 4/23
plainly [4] 6/1 8/15 32/2 48/16
plaintiff [3] 37/10 82/15 82/15
plaintiffs [29] 1/5 1/13 3/17 3/19 4/9 4/11
7/15 9/22 47/1 47/9 47/11 48/15 54/16 56/13 58/5
63/1 65/16 66/19 67/8 72/9 72/22 79/4 101/12
102/20 103/2 103/8 104/3 110/24
plaintiffs' [8] 36/10 36/13 47/20 79/17 80/1 84/14
98/4 102/22
plan [1] 56/17
plane [6] 57/12 58/13 74/15 75/12 98/7 101/6
play [1] 110/17
please [3] 3/14 11/23 33/19
plow [1] 4/14
podium [2] 107/18 107/19
point [32] 16/24 19/14 20/3 23/7 27/17 27/21 28/4
40/19 45/17 46/2 46/3 47/20 47/21 49/13 59/16
67/10 74/2 74/7 74/22 76/11 90/8 92/20 94/2 95/24
96/2 96/22 99/11 100/17 101/11 103/2 104/24 105/25
points [4] 12/5 44/7 65/22 75/6
police [1] 12/19
policies [2] 67/25 69/7
policy [29] 15/21 15/22 15/23 15/25 19/15 19/25
20/4 20/6 20/6 20/7 21/9 21/9 21/18 21/19 21/20
22/9 24/5 28/5 37/7 57/15 67/14 68/1 69/6 69/10
75/19 76/16 82/3 107/2 107/9
poor [1] 77/6
Porter [2] 80/18 81/23
position [5] 5/23 6/18 6/25 11/15 16/15 16/17
18/10 22/9 41/8 42/5 42/16 52/25 52/25 54/22 69/4
69/5 83/20 83/24 86/23 92/16 94/7 104/20
positions [2] 45/15 104/1
possibility [1] 6/16
possible [3] 42/1 74/23 89/5
possibly [1] 104/11
post [1] 64/6
posting [1] 100/4
posture [4] 8/25 48/22 54/5 93/9
postures [1] 59/12
potential [1] 28/15
potentially [4] 32/16 42/23 43/1 71/2
power [10] 7/6 7/25 8/9 8/16 14/6 14/8 23/6 53/15
54/8 54/12
powerless [1] 5/24
practice [3] 63/3 80/11 80/13
precedent [1] 27/1
precious [1] 5/10
precise [1] 33/18
precisely [3] 25/2 47/24 62/14
preclude [2] 40/13 40/14
precondition [1] 35/20
predicate [2] 73/13 106/21
prejudice [1] 27/1
preliminary [3] 22/4 47/24 105/9
prepare [3] 43/13 68/14 68/19
prepared [2] 17/12 56/19
preplanning [1] 48/19
presence [1] 102/16
present [5] 2/10 6/9 35/13 78/9 106/22
presented [3] 5/18 15/8 15/23
preserve [3] 79/9 110/23 110/23
preserving [1] 52/24
presiding [1] 3/5
press [3] 53/8 76/25 77/3
pressed [1] 43/7
presumably [1] 72/22
presume [1] 11/10
presumption [1] 11/8
pretend [1] 18/15
pretty [4] 27/19 28/24 29/3 91/21
prevail [1] 53/16
prevent [1] 108/12
prevented [1] 80/22
preventing [1] 80/15
previously [1] 108/13
primarily [1] 40/9
prior [6] 6/6 49/21 71/16 92/25 108/22 110/19

## P

**prison [1]** 30/2
**prisoner [1]** 111/8
**privilege [2]** 4/13 65/24
**pro [1]** 14/17
**probable [2]** 104/16 105/12
**probably [1]** 98/12
**problem [7]** 19/8 31/6 41/23 47/6 49/3 52/22 106/11
**problematic [1]** 30/22
**procedural [4]** 5/6 92/11 93/9 109/19
**procedure [4]** 11/22 62/21 63/7 90/14
**procedures [10]** 20/21 62/11 62/12 62/15 63/11 63/12 63/15 64/12 64/16 64/17
**proceeding [7]** 25/9 40/17 43/8 79/22 86/8 105/17 105/21
**proceedings [39]** 5/3 22/12 25/9 49/16 51/10 51/19 58/9 69/8 73/25 76/14 81/6 84/23 84/24 85/4 85/5 85/13 86/7 86/10 86/13 86/15 86/25 88/17 88/19 88/22 89/16 91/5 93/3 94/17 94/24 95/8 95/9 95/15 95/16 98/24 105/15 106/7 110/2 111/13 112/8
**process [73]** 4/20 4/24 5/2 5/5 5/6 5/10 6/6 6/10 7/5 11/8 12/14 14/14 14/17 15/6 16/6 16/7 17/9 20/2 21/9 21/15 23/15 24/21 28/6 28/17 28/20 29/7 29/11 31/13 31/24 32/2 32/9 37/9 39/18 41/4 46/1 52/12 53/23 58/5 58/21 58/22 59/13 59/13 59/18 69/23 70/16 70/17 70/25 71/1 74/18 75/24 76/15 77/10 82/19 82/22 87/12 88/3 89/4 89/15 89/21 94/20 96/1 99/21 101/17 101/19 101/21 102/7 102/8 103/16 106/23 107/14 109/18
**processed [1]** 69/18
**processes [2]** 24/1 58/24
**processing [4]** 40/17 89/8 94/21 95/19
**produce [3]** 10/21 11/2 12/23
**produced [3]** 12/21 12/24 105/8
**producing [1]** 9/21
**product [1]** 65/25
**program [2]** 61/6 69/15
**prologue [1]** 74/12
**promise [3]** 80/25 81/20 82/11
**promised [1]** 82/4
**prong [1]** 81/8
**proof [4]** 12/6 28/7 36/22 85/23
**proper [2]** 13/16 103/13
**properly [1]** 14/7
**property [2]** 4/24 5/8
**proposition [1]** 40/10
**propositions [1]** 8/3
**propriety [1]** 29/16
**prospect [1]** 6/4
**prospective [1]** 47/10
**protect [3]** 5/7 50/20 50/22
**protected [2]** 21/3 21/4 32/6 44/17
**protection [12]** 14/11 14/13 18/6 38/16 38/20 43/21 45/2 45/4 50/5 50/5 73/14 108/1
**protections [5]** 4/20 21/8 24/7 32/3 71/5
**protocol [1]** 96/11
**prove [1]** 12/11
**provide [5]** 32/8 37/10 60/23 69/22 69/23
**provided [8]** 58/24 59/22 69/10 70/7 70/21 71/15 76/18 81/3
**provides [1]** 108/6
**providing [1]** 79/20
**proving [1]** 39/6
**provision [2]** 101/25 102/1
**proximity [1]** 44/14
**pull [1]** 42/7
**Purely [1]** 105/11
**purposes [6]** 50/18 80/5 99/23 100/7 104/20 109/3
**pursuant [3]** 35/5 58/7 112/6
**pursuing [1]** 10/15
**put [15]** 6/24 29/15 31/17 33/6 61/24 61/25 62/7 62/15 68/4 68/23 75/12 76/24 92/14 92/20 93/13
**puts [2]** 20/5 24/11
**putting [2]** 38/21 97/22
**PX [4]** 1/6 3/10 20/8 22/6
**PX-2 [2]** 20/8 22/6
**PX-25-951 [1]** 3/10

## Q

**quarterback [1]** 54/21
**quarterbacks [1]** 52/12
**question [36]** 8/3 9/16 13/11 13/13 14/22 14/24 19/20 25/14 25/23 26/21 34/20 43/19 45/9 46/6 55/25 58/12 58/12 58/19 63/21 69/16 75/3 78/1 78/1 82/10 86/10 88/5 88/7 88/11 90/4 92/22 103/15 106/13 108/15 109/1 109/22 109/23
**questions [6]** 11/21 13/14 15/2 37/9 45/11 57/22
**quick [1]** 30/16
**quickly [5]** 17/12 27/9 78/8 104/11 110/25
**QUINN [2]** 1/15 1/19
**quite [4]** 22/15 71/2 107/6 108/15
**quo [15]** 8/19 8/21 40/20 72/10 74/17 80/2 84/16 85/3 85/20 86/11 90/3 93/7 96/3 96/21 103/21 108/20
**quote [3]** 16/21 80/21 108/11
**quotes [1]** 5/1

## R

**race [1]** 72/13
**railing [1]** 37/6
**raise [3]** 64/18 106/25 107/10
**raised [2]** 61/25 110/24
**raising [1]** 61/25
**RAND [4]** 1/15 3/22 67/2 68/2
**rather [3]** 4/14 4/15 43/16
**reach [3]** 15/7 45/5 101/7
**reached [1]** 8/14
**read [14]** 8/23 20/7 20/7 20/14 20/17 22/6 42/3 63/24 66/15 67/14 69/18 81/9 81/22 107/9
**reading [5]** 64/9 66/20 98/23 103/12 109/7
**readout [1]** 64/7
**ready [3]** 43/2 56/10 68/16
**real [12]** 30/16 52/23 53/2 72/12 73/14 73/15 78/1

78/8 95/5 90/8 101/18 103/15
**reality [3]** 11/7 53/7 107/20
**really [20]** 4/5 8/17 16/24 17/20 17/21 22/2 26/24
77/24 82/10 85/2 86/3 96/23 97/6 111/8
**reason [10]** 13/17 21/24 43/3 83/14 85/2 87/5 95/7
98/19 99/3 106/13
**reasonable [10]** 6/21 6/24 21/17 22/12 23/10 26/7
28/12 71/15 73/11 107/11
**reasoned [1]** 80/9
**reasons [10]** 23/19 29/8 52/22 79/2 79/13 86/1
97/20 98/12 102/11 109/21
**reassurance [1]** 55/12
**recall [1]** 60/13
**receive [6]** 14/14 21/1 61/4 61/12 75/21 110/8
**received [12]** 5/18 20/11 20/16 20/19 33/7 34/6
62/7 67/19 67/20 67/21 75/14 104/14
**receives [2]** 82/23 87/12
**recess [6]** 7/17 41/15 64/2 64/5 64/9
**recess [2]** 77/19 77/20
**reconcile [1]** 7/20
**record [32]** 3/14 16/1 48/6 49/24 67/16 71/4 76/17
76/24 80/9 85/23 86/8 105/21
**rectify [1]** 5/24
**refer [1]** 58/6
**reference [3]** 36/24 108/25 109/1
**referral [1]** 90/9
**referred [5]** 71/24 89/25 90/3 90/15 98/5
**referring [4]** 10/6 16/4 81/24 82/22
**refine [1]** 80/6
**refoulement [1]** 31/2
**refusal [1]** 47/21
**refuse [1]** 28/14
**regard [1]** 57/10
**regarding [6]** 7/23 18/1 34/15 49/21 64/17 79/5
**regards [2]** 56/24 90/13
**regional [3]** 78/2 78/6 78/7
**Register [1]** 60/12
**regular [1]** 11/10
**regularity [1]** 11/9
**regulations [3]** 36/8 88/9 112/10
**rehashing [1]** 83/14
**relate [1]** 108/17
**relates [1]** 62/15
**relating [2]** 59/16 98/4
**relayed [1]** 21/16
**release [19]** 10/24 11/4 13/7 13/16 14/6 28/15
37/22 37/24 38/17 44/8 73/4 93/4 94/13 98/21 98/21
98/22 98/25 100/6 100/6
**released [15]** 9/19 13/24 44/10 44/18 47/12 48/20
48/21 51/2 51/8 51/22 52/4 56/25 72/20 73/6 111/1
**relevant [7]** 71/2 100/20
**relied [1]** 67/7
**relief [30]** 14/9 32/15 37/13 38/13 39/7 40/3 40/4
40/14 47/24 53/18 54/16 57/10 74/19 79/8 79/10
82/10 82/25 83/3 83/25 84/2 84/3 84/15 99/6 99/14
102/18 102/19 102/21 103/14 103/22 108/19
**relies [2]** 23/25
**relitigate [1]** 83/15
**rely [3]** 28/5 28/5 107/16
**relying [1]** 48/1
**remain [3]** 26/10 26/13 87/18
**remanded [1]** 16/10
**remarkable [1]** 68/7
**remediating [1]** 48/24
**remember [2]** 5/23 41/24
**remembered [1]** 91/2
**reminds [1]** 44/8
**removable [1]** 104/17
**removal [91]** 5/3 6/6 15/17 15/19 17/21 17/22 18/1
23/14 24/16 25/2 25/4 25/5 25/11 25/11 25/20 27/16
34/21 36/24 39/11 40/17 49/15 51/11 51/15 51/19
51/20 57/16 58/17 62/7 66/8 69/8 69/10 71/8
71/12 71/13 71/16 73/17 73/25 76/4 76/6 76/14
79/23 81/5 82/23 84/8 84/23 84/23 85/4 85/4 85/13
85/19 86/7 86/8 86/9 86/12 86/15 86/16 86/24 86/25
87/23 88/1 88/16 88/17 88/18 88/20 88/21 88/24
89/5 89/15 89/16 91/25 92/25 93/3 93/20 94/9 94/16
95/8 95/9 96/7 97/9 98/24 100/13 100/15 101/1
104/18 104/21 105/18 105/15 106/7 106/23 110/2
**removals [2]** 24/20 69/7
**remove [15]** 6/10 6/16 6/19 29/13 31/25 32/1 37/17
56/10 66/8 76/9 76/15 79/20 81/4 103/11 110/9
**removed [25]** 20/21 25/15 26/4 26/7 38/14 39/10
47/13 49/17 49/17 50/4 58/25 61/13 62/8 62/11
64/12 69/11 70/2 70/20 71/10 86/16 86/17 88/4
88/23 108/2 110/4
**removing [2]** 5/16 7/6
**Reno [1]** 109/12
**reopen [5]** 87/4 87/10 87/22 91/5 92/3
**reopened [1]** 87/19
**reopening [5]** 51/18 79/21 81/5 91/24 92/4
**repeat [1]** 88/11
**report [5]** 46/14 89/2 94/22 96/5 96/5
**reported [2]** 34/23 112/8
**REPORTER [3]** 112/1 112/4 112/17
**reports [1]** 95/2
**repository [1]** 34/3
**represent [1]** 17/24
**representative [1]** 107/13
**represented [1]** 76/16
**representing [7]** 18/20 18/21 19/1 19/5 19/6 43/15
108/2
**request [8]** 25/5 32/12 38/13 40/4 40/23 56/24
60/13 110/1
**required [4]** 6/6 16/12 69/23 98/23
**requirement [1]** 69/22
**requirements [2]** 16/5 107/24
**requires [2]** 8/18 8/20
**residence [4]** 8/21 14/10 40/20 41/2
**resides [1]** 94/8
**resolves [1]** 58/1
**respect [32]** 7/22 11/11 22/18 22/20 24/20 25/10

25/11 28/5 35/9 46/6 49/6 53/10 54/14 54/15 57/16
63/1 69/20 72/17 75/9 77/2 77/12 79/15 83/13 92/24
93/11 103/12 104/3 109/6 109/6
**respecting [2]** 71/15 99/7
**respond [2]** 79/6 79/7 81/15 100/23
**respond [1]** 99/16
**response [4]** 68/11 68/13 68/21 100/7
**responsible [1]** 78/2
**rest [1]** 39/9
**restoration [3]** 8/19 85/11 108/20
**restore [6]** 37/20 72/10 80/2 84/15 85/3 93/10
**restored [2]** 8/24 103/9
**restoring [2]** 86/10 86/11
**restrain [1]** 7/25
**restrained [2]** 13/15 23/14
**restraint [2]** 13/22 57/12
**result [1]** 24/2
**results [1]** 26/14
**resumes [1]** 77/22
**retainer [1]** 11/12
**retaliation [1]** 100/4
**return [13]** 4/14 6/4 6/13 8/20 14/10 54/10 54/14
81/15 81/25 83/4 96/4 98/22 106/24
**returned [13]** 34/7 40/5 42/16 42/17 45/8 50/12
53/12 54/16 54/17 65/14 82/17 101/3 110/1
**returning [2]** 80/23 84/4
**Reuveni [1]** 9/7
**review [6]** 96/7 96/8 97/12 97/19 97/22 101/14
**reviewed [1]** 73/5
**revisit [1]** 73/25
**revoked [1]** 101/5
**revoking [1]** 99/24
**rewound [1]** 80/11
**Reyna [7]** 97/19 97/20 101/11 101/24 109/6 109/6
109/15
**rhetoric [1]** 103/3
**rid [2]** 23/24 27/9
**right [127]** 
**rightly [3]** 14/22 47/17 108/15
**rights [16]** 12/25 17/3 21/5 21/5 26/8 26/12 26/15
26/20 40/19 41/1 42/19 43/22 44/16 44/18 50/22
110/3
**ripe [12]** 74/3 74/4 74/8 74/10 74/21 74/21 77/8
77/8 79/3 79/13 97/17 104/3
**rise [7]** 3/3 77/18 77/21 101/16 101/19 101/21
111/11
**risk [5]** 24/11 61/7 80/9 106/19 106/22
**risks [1]** 15/22
**road [6]** 1/23 20/10 30/16 51/21 55/19 56/5
**rocket [1]** 30/9
**role [2]** 12/18 12/18
**roll [2]** 48/19 66/7
**root [1]** 106/16
**ROSSMAN [5]** 1/14 3/17 4/10 62/5 104/8
**RPR [1]** 112/16
**rub [1]** 101/18
**rule [3]** 4/21 8/16 106/21
**ruled [1]** 54/18
**rules [1]** 5/6
**ruling [2]** 6/12 24/23
**run [1]** 8/12
**Russia [3]** 25/11 25/15 25/21

## S

**safe [2]** 32/5 111/7
**sailed [1]** 36/14
**Salvador [21]** 6/3 8/13 20/23 30/17 31/4 31/13 32/6
51/20 56/11 73/21 76/9 79/21 81/5 81/7 84/7 84/8
85/17 85/18 85/19 93/21 101/2
**same [12]** 5/1 9/10 34/20 48/15 58/13 60/9 60/9
61/5 67/20 87/12 101/4 110/22
**SANDOVAL [19]** 1/22 3/20 19/3 19/4 19/9 20/25 41/13
43/19 44/5
**SANDOVAL-MOSHENBERG [2]** 1/22 3/20
**SARMAD [2]** 2/3 3/24
**SASCHA [2]** 1/15 3/22
**satisfactory [1]** 81/17
**satisfied [3]** 54/17 63/10 107/4
**satisfy [4]** 63/14 80/20 82/7 107/23
**saying [34]** 10/16 14/2 17/2 19/24 21/11 21/13 41/4
44/15 50/11 50/12 59/12 64/24 68/3 69/17 70/3 70/4
70/12 70/24 70/24 71/5 72/9 73/20 76/20 85/3 89/15
90/7 91/14 93/2 93/10 96/2 96/9 103/3 103/8 106/2
**scale [1]** 32/25
**Scarcletti [1]** 108/11
**scenario [2]** 25/25 90/21
**school [2]** 82/4 82/5
**scientist [1]** 30/9
**scope [1]** 13/18
**screen [1]** 71/22
**screening [1]** 89/21
**search [1]** 34/16
**seat [2]** 3/7 77/23
**second [13]** 8/9 25/12 33/17 38/13 46/23 62/4 62/16
65/8 65/9 81/3 96/3 96/3 98/9
**Secretary [2]** 66/10 97/10
**section [2]** 63/25 104/16
**Security [3]** 63/6 66/11 97/10
**see [17]** 7/15 9/10 10/4 11/2 11/14 13/25 45/10
49/13 53/21 64/24 65/7 75/15 91/14 92/9 100/15
109/13 110/17
**seek [3]** 14/9 64/13 87/23
**seeking [6]** 4/19 29/17 66/8 79/10 84/3 97/3
**seem [2]** 105/4 105/11
**seemed [3]** 16/16 16/16 16/19
**seems [12]** 18/9 20/9 20/9 22/8 22/9 23/25 31/16
41/20 47/10 61/17 85/14 107/21
**seen [4]** 9/22 72/10 109/10 107/18
**seized [1]** 5/11
**seizes [1]** 14/22
**self [1]** 94/22
**self-report [1]** 94/22
**semantic [1]** 31/1

**S**

send [2]  30/3 30/10
sending [3]  3/24 24/2 38/18
sense [4]  44/11 45/7 45/8 105/22
sent [14]  5/19 21/2 24/10 29/19 29/23 30/1 30/4 33/3 52/21 85/17 85/18 101/2 107/6 108/3
sentence [4]  20/15 22/4 42/6 63/24
serious [1]  5/21
serve [1]  23/6
served [3]  60/16 61/1 61/11
service [2]  71/11 71/14
serving [1]  26/11
session [2]  3/4 77/22
set [6]  28/1 35/20 69/7 69/19 70/16 98/22
sets [1]  21/25
setter [1]  16/3
settlement [1]  82/14
seven [1]  16/24
Seventh [3]  24/24 25/18 25/18
shall [1]  4/23
sharing [1]  28/17
sharp [1]  11/6
ship [1]  85/25
shipped [1]  32/15
short [1]  30/16
show [1]  9/6
showing [4]  13/4 14/7 39/7 81/20
shown [1]  13/1
sic [2]  11/12 109/6
side [3]  32/25 56/2 80/1
sidebar [2]  61/24 68/1
sides [2]  4/7 39/25
signature [1]  10/17
silence [1]  26/14
silent [2]  26/10 26/13
similar [2]  22/1 82/7
SIMON [2]  1/22 3/20
simple [1]  9/18
simply [3]  74/25 80/10 83/14
since [4]  34/7 83/15 85/3 88/2
sincere [1]  48/24
sit [3]  48/3 103/2 107/1
sitting [2]  7/10 102/22
situation [4]  25/24 28/11 48/15 87/11
six [2]  71/13 73/1
size [1]  55/5
skis [1]  110/21
slate [1]  31/14
sleep [2]  42/12 108/1
sleeping [1]  97/23
snatch [1]  6/8
snowflake [1]  27/18
snowflakes [1]  27/19
so [207]
so there's [1]  69/12
social [1]  100/4
solid [1]  30/22
someone [11]  10/2 10/3 24/10 24/16 30/10 30/10 32/1 33/2 39/10 41/15 109/2
something [10]  15/11 29/9 33/21 42/2 49/4 61/18 68/19 85/10 100/10 103/22
somewhat [1]  88/8
somewhere [4]  64/22 72/21 83/1 94/11
soon [1]  111/6
sooner [1]  39/16
sorry [9]  11/6 25/11 33/17 67/6 67/6 68/10 72/5 73/22 109/6
sort [10]  10/22 15/2 22/22 39/22 41/22 43/6 82/14 110/17
sought [5]  54/16 82/25 83/3 104/3 108/20
sounds [8]  15/14 37/13 60/22 60/23 62/5 69/17 70/24 92/12
South [14]  20/22 22/18 22/20 22/22 22/25 23/4 23/11 23/14 24/2 24/10 29/20 29/24 29/24 36/14
South Sudan [1]  36/14
space [9]  8/1 41/22 42/1 42/6 42/9 42/11 43/6 52/9 55/8
speak [8]  10/18 27/10 31/8 33/12 68/3 68/6 69/1 71/15
speaking [3]  18/25 28/20 93/17
specific [4]  25/2 48/11 49/4 82/15
specifically [7]  12/24 17/22 23/2 24/20 29/22 56/1 63/11
specify [1]  16/12
speculated [1]  52/19
speculating [1]  72/19
speculation [1]  73/2
speculative [5]  73/4 73/7 73/23 74/2 74/7
speed [1]  18/10
spend [3]  4/15 15/20 37/6
spinning [1]  105/14
split [2]  97/11 109/1
spoken [1]  4/25
square [1]  103/23
squares [1]  61/17
staff [2]  77/6 77/14
stance [1]  24/5
stand [6]  7/8 11/17 13/3 19/10 75/23 87/5
standard [2]  17/14 71/23
stands [5]  35/1 77/18 85/2 99/16 111/11
staring [2]  6/16 28/15
stark [1]  6/18
stars [1]  65/21
start [7]  4/9 4/22 41/4 90/6 99/21 103/16 104/13
started [3]  4/19 85/5 106/8
starting [1]  40/19
starts [2]  13/20 40/25
state [15]  10/23 10/23 10/24 14/5 20/19 22/19 22/21 22/23 35/10 36/6 36/14 61/5 62/9 64/14 69/4
stated [3]  54/8 75/7 78/24
statement [3]  5/5 15/9 107/18
statements [1]  107/19
states [34]  1/1 1/11 3/3 3/25 6/1 6/8 6/9 20/11

20/18 24/6 24/15 34/7 36/22 37/18 38/15 53/13 54/11 54/17 57/3 57/15 58/3 67/13 76/12 80/4 80/17 80/19 80/24 80/25 80/25 81/24 81/25 82/24 83/25
stating [1]  101/15
Station [1]  12/9
status [20]  8/19 8/21 26/19 30/5 30/13 40/20 72/10 74/17 80/2 84/16 85/3 85/20 85/22 86/11 93/7 96/3 96/21 101/14 103/21 108/20
statute [7]  7/22 12/19 24/13 15/6 36/24 81/22 109/20
statutory [2]  33/11 36/23
stay [6]  45/18 86/3 87/14 87/15 94/25 95/11
stayed [2]  23/17 23/18
steer [1]  34/1
stenographically [1]  112/8
stenographically-reported [1]  112/8
STENOTYPED [1]  1/25
step [9]  31/22 56/21 61/8 61/9 62/6 63/10 63/14 70/4 74/23
steps [1]  87/4
still [9]  6/3 12/24 20/1 21/19 24/24 52/23 60/21 70/4 95/12
stipulate [1]  66/1
stipulation [9]  79/19 80/24 81/3 81/9 83/16 83/23 83/24 84/1 84/9
stock [1]  42/15
stop [4]  21/17 39/13 61/16 70/23
story [1]  89/18
straight [1]  6/24
street [3]  1/19 6/10 85/9
streets [2]  40/22 85/24
strike [1]  62/15
stripping [1]  101/25
stronger [1]  54/24
struggling [3]  27/20 63/25 66/15
stunning [1]  35/18
stuns [1]  13/12
style [1]  12/9
sub [1]  5/1
subagency [1]  34/4
subheading [1]  62/16
subject [14]  24/12 24/12 31/24 32/16 41/10 45/23 69/6 69/7 87/19 88/9 88/16 96/16 100/24 104/17
submit [3]  8/4 17/15 24/17
substance [1]  24/9
substantive [1]  109/19
such [3]  20/19 27/17 64/15
Sudan [14]  20/22 22/18 22/20 22/23 22/25 23/4 23/11 23/14 24/2 24/10 29/20 29/24 29/24 36/14
suffer [1]  20/13
sufficient [6]  16/9 16/17 38/8 59/17 107/25 109/16
suggest [1]  96/16
suggests [3]  7/18 63/14 73/6
Suite [2]  1/20 1/23
SULLIVAN [2]  1/15 1/19
summer [1]  4/15
supervision [5]  44/11 93/4 94/14 95/3 96/5
support [2]  12/8 37/25
supported [1]  108/8
suppose [3]  23/20 93/12 110/17
supposed [3]  57/21 76/8 107/16
Supreme [10]  4/25 5/5 6/11 16/6 16/7 23/16 31/25 45/17 75/21 93/10
Suri [25]  7/23 8/4 8/5 8/22 13/5 40/9 42/4 98/2 98/4 98/7 98/10 98/18 98/21 99/1 99/5 99/17 99/23 99/24 100/3 100/11 100/12 100/14 101/4 101/5 101/22
surmise [1]  45/21
surprised [1]  35/16

**T**

table [6]  16/3 25/22 54/25 65/2 80/10 83/25
taken [15]  4/6 5/23 8/7 8/19 11/8 11/15 21/2 23/9 34/3 75/13 77/20 85/24 95/21 100/9 104/20
takers [1]  23/8
takes [2]  51/3 83/24
taking [10]  6/25 16/16 22/8 41/5 79/4 86/19 86/22 94/22 99/5 99/24
talk [10]  15/21 20/4 23/1 29/3 68/21 74/22 74/25 84/16 103/18
talked [4]  14/23 64/10 73/16 88/13
talking [15]  15/11 15/24 30/8 50/8 59/11 59/14 70/18 74/19 74/20 85/10 85/11 91/1 98/9 98/14 100/16
talks [1]  109/14
taught [1]  5/9
team [1]  43/15
technical [1]  78/1
technically [1]  93/17
tell [13]  17/11 29/7 32/21 39/17 48/16 52/16 54/10 57/4 58/14 77/7 83/21 83/22 96/15
telling [8]  48/21 51/4 53/14 54/11 56/3 82/17 83/17 89/2
tells [2]  5/5 96/12
temporary [1]  41/9
ten [4]  14/20 15/1 77/16 77/19
tender [1]  52/25
Tennessee [9]  6/2 19/6 43/9 43/14 43/17 43/20 43/24 49/23 110/18
Tenth [2]  7/21 109/11
term [1]  100/2
terminate [2]  87/4 91/6
terminating [3]  73/21 79/22 81/6
termination [3]  73/17 87/23 90/22
terminology [1]  33/20
terms [10]  5/1 32/19 33/4 55/18 58/23 73/23 81/25 82/19 92/10 110/25
terrifying [2]  22/19 23/10
territory [1]  74/24
testified [4]  22/2 51/13 63/13 70/22
testify [2]  49/8 51/13
testimony [10]  19/25 20/4 20/5 21/10 22/17 48/10

52/15 60/2 62/18 95/20
Texas [4]  56/9 74/13 75/11 75/11 85/21 90/17 94/4
text's [2]  22/10 24/1
thank [1]  96/24
thing [9]  9/18 45/16 47/4 56/23 59/24 60/4 65/1 75/16 90/13
things [17]  11/16 12/19 16/15 19/23 23/2 23/4 29/11 32/8 37/16 47/15 58/3 67/15 69/19 74/8 96/6 106/25 110/17
think [78]  8/15 8/22 12/4 12/6 12/25 14/5 14/20 14/22 16/8 17/6 17/13 17/14 20/5 22/8 24/4 24/23 26/19 27/18 27/23 29/9 29/15 31/7 31/9 32/19 33/10 35/3 36/2 36/23 38/16 39/4 40/8 40/23 42/13 42/14 42/14 43/20 44/11 44/20 44/22 45/7 45/8 45/13 54/23 55/6 56/21 61/20 62/13 62/13 62/17 68/22 69/21 72/18 75/6 77/4 79/6 84/13 86/15 86/19 95/20 97/19 100/18 101/7 101/10 101/11 101/24 102/4 103/20 105/22 106/10 106/16 106/18 106/19 108/5 108/8 108/23 108/25 109/4 109/21
thinking [1]  48/4
thinks [1]  110/8
third [50]  15/7 15/17 15/18 17/21 18/1 20/11 20/23 24/20 27/16 33/7 34/16 34/21 35/22 39/10 47/13 51/10 51/16 57/16 57/17 58/16 58/16 59/11 60/22 62/2 64/9 64/21 69/7 69/11 70/21 72/23 72/24 72/24 73/16 76/15 82/24 88/1 88/16 88/16 88/24 89/13 89/15 89/22 93/3 94/9 94/16 95/8 95/9 96/7 106/23 107/5
third-country [10]  15/17 15/18 17/21 24/20 34/21 58/16 88/16 89/15 95/9 96/7
third-party [11]  18/1 27/16 33/7 57/16 58/16 69/7 69/11 88/16 94/9 94/16 95/8
though [4]  28/15 43/16 55/5 78/15
thought [1]  48/18
thoughts [1]  28/17
three [10]  4/18 6/11 11/7 17/20 32/20 45/11 53/14 53/19 74/12 101/1
through [22]  40/10 44/17 48/11 49/15 50/3 55/10 57/2 58/9 59/20 61/20 68/4 69/8 69/18 71/21 76/16 79/2 79/13 82/5 89/7 94/22 97/8 103/16
throughout [3]  7/3 17/11 55/2
ties [2]  6/20 39/11
tight [1]  38/4
tightly [1]  8/23
time [17]  10/8 14/23 15/21 18/7 22/16 45/6 54/9 61/5 67/20 77/25 88/11 98/6 104/2 108/16 110/7 110/22 111/8
timing [1]  18/11
today [15]  7/8 9/17 13/3 14/12 19/10 49/5 56/20 68/21 70/4 76/11 80/11 101/3 101/3 105/11 106/14
today's [1]  80/5
together [4]  48/12 61/25 79/4 92/15
told [4]  12/22 53/5 71/3 106/7
tones [1]  6/24
took [4]  16/6 42/5 48/10 65/14
top [1]  62/4
topics [1]  12/22
torture [9]  20/13 21/4 21/6 24/12 32/5 32/16 33/5 61/7 107/6
tortured [1]  62/9
touch [1]  97/5
touches [1]  84/2
tracks [1]  67/3
train [1]  103/5
transcript [6]  1/10 16/14 21/12 48/11 112/7 112/9
TRANSCRIPTION [1]  1/25
transfer [5]  56/24 91/4 91/15
transferred [5]  52/7 52/8 75/11 97/3 97/4
transfers [1]  31/3
transited [1]  31/3
transiting [1]  32/6
travel [9]  22/19 22/22 23/4 30/8 36/6 36/14 60/13 60/24 61/4
travels [1]  111/8
treated [3]  33/7 48/2 51/2
treating [1]  49/25
trial [9]  29/14 43/12 90/20 91/9 91/13 91/21 92/2 92/5 92/6
tried [1]  53/16
trigger [1]  102/7
trips [1]  66/22
TRO [9]  12/8 47/10 78/25 79/1 79/1 79/2 79/10 97/5 104/1
trouble [1]  40/21
true [1]  21/18 27/24 112/7
truly [2]  27/7 32/25
truthfulness [1]  19/21
try [5]  18/14 38/4 58/14 77/25 104/11
trying [13]  10/16 13/14 13/15 13/18 16/4 26/24 42/1 50/7 59/7 59/8 67/2 75/24 106/14
turned [1]  54/12
TV [1]  26/9
twice [1]  4/25
two [21]  5/24 13/5 20/9 37/16 37/20 44/7 44/12 51/13 51/13 57/5 58/6 62/22 67/2 73/9 73/10 76/13 87/22 92/14 96/6 104/4 107/4
type [1]  57/23

**U**

U.S [4]  22/24 23/3 23/8 102/22
U.S.C [1]  112/6
Uh [2]  51/17 61/3
Uh-huh [2]  51/17 61/3
ultimately [3]  43/14 90/10 101/15
unchallenged [1]  82/1
unchecked [1]  7/6
unconditional [4]  80/22 80/25 81/2 81/25
unconditionally [1]  84/9
unconstitutional [1]  99/19
unconstitutionality [1]  100/12
unconstitutionally [1]  100/10
under [14]  14/16 17/13 28/10 39/7 44/10 45/1 45/25

**U**

under... [7]   26/4 56/18 75/15 94/19 96/6 101/25
109/20
underpinnings [1]   108/6
understand [35]   10/2 14/1 16/13 17/19 21/7 28/13
31/23 33/14 35/16 37/16 41/16 41/12 44/12 51/25
53/22 56/15 57/16 59/8 59/9 60/14 61/23 62/23
64/25 65/6 76/5 79/16 80/7 81/24 84/13 84/14 85/14
93/6 97/6 97/11 105/25
understanding [20]   26/12 29/25 35/19 41/8 49/21
52/9 52/14 52/15 55/4 55/21 60/1 62/18 67/23 70/14
70/15 71/7 72/3 72/6 78/17 78/20
understood [14]   9/20 21/11 21/13 27/3 44/23 46/18
54/15 54/19 59/5 65/5 68/12 83/19 84/11 86/14
undisputedly [1]   81/19
unfettered [1]   7/25
unfinished [1]   4/16
unfortunately [1]   64/25
unhappy [1]   72/22
unidentified [2]   8/16 32/16
unidentified-custodian [1]   8/16
unique [1]   27/23
UNITED [32]   1/1 1/11 3/3 3/25 5/25 6/8 6/9 20/10
20/18 24/5 24/15 34/7 36/22 37/18 38/14 53/12
54/11 54/17 55/3 55/5 62/6 62/8 75/13 76/12 83/4
84/5 87/17 102/7 102/17 102/23 112/5 112/11
unity [1]   109/16
unjustified [2]   5/7 5/21
unknown [2]   98/5 98/19
unlawful [1]   10/4
unlawfully [3]   11/20 50/4 110/4
unless [1]   43/11
unlike [1]   63/1
unmistakably [1]   7/4
unprepared [1]   47/8
unquote [1]   80/22
unreliable [1]   55/9
unstated [1]   23/19
untested [1]   33/4
until [11]   4/16 7/10 11/14 18/4 29/7 43/11 43/11
83/11 93/22 93/23 106/5
unto [1]   38/8
untrue [1]   55/9
unveiled [1]   29/11
unwarranted [1]   104/2
up [20]   15/13 16/6 19/10 25/14 30/12 42/8 49/4
53/6 55/1 56/3 56/16 56/17 66/22 67/4 68/11 68/18
73/24 76/14 101/20 106/2
update [1]   10/16
updated [1]   34/8
upheld [1]   44/9
upon [3]   14/13 33/7 38/16
urges [1]   109/22
urging [1]   109/17
URQUHART [2]   1/15 1/19
USCIS [10]   57/9 15/13 21/16 70/9 71/22 71/23 72/25
90/8 94/15 107/11
use [3]   27/24 39/19 109/7
uses [1]   41/5
ushered [1]   45/5
usually [1]   94/25
utter [3]   12/6 28/7 47/21

**V**

v. [1]   24/19
VA [1]   1/23
vacuum [1]   107/7
valid [1]   102/8
validated [1]   39/11
validity [1]   106/14
valuable [1]   29/11
value [4]   19/23 19/24 19/25 21/11
Van [1]   109/12
variety [1]   50/25
vary [1]   55/5
vehicle [1]   60/22
venue [1]   91/4
versus [3]   64/21 93/14 97/4
very [22]   5/13 8/4 9/7 22/1 27/11 30/16 30/17 38/6
45/22 50/4 50/21 50/21 60/8 60/11 60/11 63/11
63/12 65/6 66/2 66/4 70/12 104/18
vested [2]   52/24 53/2
view [10]   8/7 8/9 8/14 9/9 11/9 14/20 72/8 79/19
82/12 99/16
violate [3]   81/10 82/18 82/18
violated [7]   17/3 31/12 59/13 76/7 81/18 81/18
100/15
violation [11]   32/17 48/25 49/18 85/17 85/18 99/4
99/22 99/24 101/19 101/21 106/15
violations [2]   61/7 80/10
violent [1]   23/1
Virginia [1]   98/22
virtually [2]   90/7 90/18
virtue [1]   102/12
vis [2]   96/4 96/4
visa [2]   99/24 101/5
voluntary [4]   80/20 82/8 84/6 107/24
vous [1]   6/15
vs [1]   1/6

**W**

wading [2]   74/24 74/24
wait [2]   39/20 71/11
waiver [2]   65/24 65/25
walking [2]   40/21 85/9
walks [1]   26/3
wand [1]   54/12
want [47]   7/1 9/2 9/10 11/2 12/5 12/9 14/19 15/20
18/6 18/12 19/15 19/19 20/3 20/4 23/20 26/18 31/2
31/17 33/18 33/22 33/25 34/7 37/8 37/15 40/5 40/18
47/11 49/4 57/2 58/14 58/15 59/13 59/19 63/19
63/20 66/15 71/4 85/7 89/18 95/8 95/14 100/7
100/17 102/5 102/6 106/24 106/25
wanted [3]   19/10 32/23 103/10
wants [3]   19/15 19/19 93/20 35
warrant [3]   9/6 34/11 34/11
warrants [1]   12/7
was [134]
wash [1]   85/6
Washington [3]   1/20 2/5 2/9
wasn't [5]   12/24 25/22 49/20 85/20 92/25
watched [1]   26/9
wave [1]   54/12
way [13]   31/21 39/17 40/15 48/15 48/23 53/16 72/19
73/24 74/1 91/15 92/6 106/3 111/5
we'll [5]   26/1 47/2 77/16 109/4 110/17
weakens [1]   54/24
website [1]   22/21
Wednesday [10]   28/16 32/8 32/22 44/9 47/12 47/22
47/23 51/3 52/5 106/20
week [7]   51/22 58/16 59/3 73/6 79/17 104/10 110/18
weekend [1]   111/7
weigh [1]   50/22
weight [1]   18/16
well [46]   4/8 5/6 7/9 8/2 8/23 12/25 15/1 18/21
18/25 24/4 24/18 24/25 26/13 29/6 29/6 29/25 30/7
37/12 45/21 51/12 53/17 57/23 59/10 61/22 62/1
62/15 62/25 63/14 69/22 70/12 73/3 74/4 75/15 76/3
77/5 81/23 84/18 85/16 87/15 91/20 95/18 97/7
98/15 105/24 106/13 108/7
went [4]   61/20 76/16 100/4 102/1
wet [1]   10/17
whatever [14]   17/25 32/14 37/9 40/17 41/1 48/20
52/8 52/8 56/10 89/2 89/7 91/12 95/7 110/7
whatsoever [1]   55/12
whenever [2]   39/23 58/15
wherever [7]   44/1 44/4 45/4 45/4 52/8 91/15 93/21
whether [25]   5/20 10/16 20/10 27/7 29/21 30/5 31/12
31/3 34/5 50/22 59/17 60/21 71/10 72/13 76/1 84/2
84/2 84/21 88/15 89/1 93/12 95/23 97/11 103/20
109/1
while [6]   45/20 47/15 51/25 56/9 78/9 90/6
whim [1]   33/3
whisked [2]   5/12 38/18
whole [5]   13/20 27/7 27/9 53/21 102/18
wholly [1]   73/7
whom [2]   64/20 94/9
willing [2]   55/18 55/24
win [1]   19/22
window [1]   74/19
winning [2]   53/3 53/11
wish [1]   111/7
withholding [22]   5/14 5/18 25/2 25/3 25/5 31/4
34/17 51/20 73/21 76/6 79/22 81/6 84/8 85/19 86/25
87/4 87/23 88/20 88/21 90/22 91/25 100/14
within [4]   12/25 16/23 41/17 95/7
without [25]   4/24 5/11 6/3 6/10 6/17 6/20 20/21
23/15 27/9 30/2 30/2 31/24 32/2 38/15 38/19 62/11
64/12 75/21 79/21 81/5 81/20 85/23 106/23 106/23
107/7
witness [13]   11/17 11/19 12/22 22/2 35/17 35/18
48/10 50/3 50/23 67/7 67/13 68/14 105/7
witnessed [1]   5/9
won't [8]   7/10 47/25 71/9 79/14 81/10 81/20 81/21
82/11
wonky [1]   66/22
word [7]   9/4 21/12 27/18 27/23 27/24 56/10 104/8
words [4]   26/24 57/6 73/23 98/18
work [13]   9/23 34/22 34/24 35/5 35/21 35/25 36/6
36/20 36/22 46/17 53/17 65/25 97/20
working [5]   9/21 10/17 15/3 92/19 93/22
works [3]   11/5 62/25 85/14
world [5]   5/10 27/14 52/3 55/3 85/8
worse [2]   15/13 108/4
wouldn't [3]   10/21 81/25 92/22
write [2]   10/14 23/22
Writs [10]   13/9 79/5 79/8 102/13 102/15 108/8
108/8 108/10 108/23 109/24
written [3]   21/19 64/13 70/21
wrong [3]   37/6 79/7 83/12
wrongful [1]   93/8
wrongfully [1]   93/11

**X**

XINIS [2]   1/10 3/5

**Y**

yeah [29]   29/5 29/21 33/19 35/15 36/2 38/5 43/10
43/20 45/16 45/17 52/6 56/12 63/19 65/4 65/18
65/23 65/25 69/25 70/19 73/22 74/6 83/2 86/21
93/19 96/23 99/8 100/16 100/19 100/19
year [3]   4/25 34/8 82/6
years [2]   63/2 63/5
Yep [2]   36/12 44/6
yes [24]   10/13 11/1 22/7 26/17 27/11 37/1 37/3
37/19 45/20 46/20 47/19 50/2 51/8 59/2 71/7 71/18
72/4 72/7 87/8 87/15 88/7 95/5 95/13 105/2
yesterday [27]   4/8 9/17 11/17 11/19 12/11 12/21
12/24 14/23 15/12 15/6 15/12 20/1 30/5 34/2 35/14
42/5 49/20 50/23 52/15 61/21 65/5 68/20 70/22
74/5 74/16 88/14 95/20
yet [16]   16/14 19/5 28/14 32/15 38/1 47/15 49/15
53/5 57/7 60/15 73/16 74/8 76/2 80/3 83/18 97/23
York [4]   1/16 41/25 41/25 44/13
you and [1]   68/5
you'll [6]   15/21 36/19 51/22 65/19 109/7 110/16
yourselves [1]   3/14

**Z**

zone [1]   8/14