IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KILMAR ARMANDO ABREGO GARCIA, *et al.*, | * | |
| Plaintiffs, | * | |
| | | Civil Action No. 8:25-cv-00951-PX |
| v. | * | |
| KRISTI NOEM, Secretary, United States Department of Homeland Security, *et al.*, | * * * | |
| Defendants. | | |
| | * | |

\*\*\*
**MEMORANDUM OPINION**

Pending before the Court is Plaintiffs' Emergency Motion for an Order to Return Kilmar Abrego Garcia to the District of Maryland After Release in The Tennessee Criminal Proceedings. ECF No. 203. The issues are fully briefed, and, after an evidentiary hearing, the Court GRANTS the motion. The requested relief is necessary to preserve this Court's jurisdiction and to ensure that Abrego Garcia receives the full injunctive relief previously ordered "to restore the status quo ante," ECF No. 31, and consistent with the United States Supreme Court's mandate that "his case is handled as it would have been had he not been improperly sent to El Salvador." *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025). By Order of this Court, Defendants (1) are prohibited from taking Abrego Garcia into immediate ICE custody in Tennessee; (2) must restore him to his ICE Order of Supervision in Baltimore; and (3) if they initiate third-country removal proceedings, must provide seventy-two (72) business hours' notice to Abrego Garcia and his counsel of the intended third country, as more fully detailed below.

**I.     Background**

On March 12, 2025, United States Immigration and Customs Enforcement ("ICE") agents arrested and detained Abrego Garcia without any lawful basis.[1] Three days later, Defendants forcibly expelled Abrego Garcia from the United States to the one country they were prohibited from removing him to—El Salvador. *Id.* They expected he would be held at the Terrorism Confinement Center ("CECOT"), a facility widely regarded as one of the most dangerous and violent prisons in the world. *Id.* The United States Government has since admitted his removal was in error.[2] The error, indeed, violated the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(b)(3)(A) and Abrego Garcia's Fifth Amendment due process rights. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.").

Accordingly, the Court ordered preliminary injunctive relief. ECF No. 21. The relief commanded Defendants to (1) facilitate Abrego Garcia's return to the United States *and* (2) restore him to the *status quo ante*—that is, the "last uncontested status between the parties which preceded the controversy." *See* ECF No. 31 at 16 (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014)). The Supreme Court affirmed that the relief

---

[1] *See* ECF No. 31 at 4; *see also* ECF No. 33 at 21:14–22 (The Court: "There is no warrant for his arrest by an order of removal. . . . So what is the actual document that gave these officers the authority to start this process?" Erez Reuveni, then-counsel for Defendants: "That is not in the record, and the government has not put that into the record. And that's the best I can do.").

[2] *See* ECF No. 11-3 ¶ 15 ("Through administrative error, Abrego-Garcia was removed from the United States to El Salvador. This was an oversight . . . ."); *see also* ECF No. 33 at 19:11–13 (Reuveni: "[T]he plaintiff, Abrego Garcia, should not have been removed. That is not in dispute."); ECF No. 234 at 152:2–6 (Assistant Director of ICE's Enforcement and Removal Operations Thomas Giles admitting that Abrego Garcia cannot be returned to El Salvador absent termination of his withholding of removal). *But see* Rebecca Beitsch, *Stephen Miller Contradicts DOJ Court Docs on Man Mistakenly Deported*, THE HILL (Apr. 14, 2025), https://thehill.com/policy/national-security/5248143-stephen-miller-doj-man-mistakenly-deported/ ("Nobody was mistakenly deported anywhere. That's a big fact that all of you, most of you, have gotten wrong. No one was mistakenly sent anywhere. The only mistake that was made is a lawyer put an incorrect line in a legal filing that's since been relieved.") (statement of Stephen Miller, White House Deputy Chief of Staff and Homeland Security Advisor).

2

encompassed "ensur[ing] that [Abrego Garcia's] case is handled as it would have been had he not been improperly sent to El Salvador." *Abrego Garcia*, 145 S. Ct. at 1018.

For three months after this Court issued the injunction, Defendants disclaimed any authority to facilitate his return[3] and disregarded court orders.[4] Defendants' defiance and foot-dragging are, to be sure, the subject of a separate sanctions motion. ECF No. 195. The Court will not recount this troubling history in detail, other than to note Defendants' persistent lack of transparency with the tribunal adds to why further injunctive relief is warranted.

Eventually, on June 6, 2025, Defendants returned Abrego Garcia much the same way they had removed him—in secret and with no advance notice.[5] Nonetheless, he is back, and the first part of this Court's injunctive relief has been met. But Defendants have demonstrated no appetite for fulfilling the second part: to restore Abrego Garcia to the status quo ante. *See Abrego Garcia*, 145 S. Ct. at 1018 ("to ensure that his case is handled as it would have been before he was wrongly sent to El Salvador."); *see also* ECF No. 21.

Rather, upon Abrego Garcia's return to the United States, Defendants took him into United States Marshals custody to appear on new criminal charges in the Middle District of Tennessee where he is now subject to release pending trial. *See United States v. Abrego Garcia*, No. 3:25-CR-00115-1 (M.D. Tenn.).[6] If Abrego Garcia is released on pre-trial conditions, however,

---

[3] *See A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1367 (2025) ("Had the detainees been removed . . . the Government may have argued . . . that no U.S. court had jurisdiction," referencing the Government's prior position in *Noem v. Abrego Garcia*); *see also* ECF No. 165 at 4 ("This Court lacks jurisdiction because Abrego Garcia is not in United States custody, [and] his injury is not redressable by this Court.").

[4] *See J.G.G. v. Trump*, No. 1:25-cv-766 (JEB), ECF No. 158-1 (Protected Whistleblower Disclosure of Erez Reuveni).

[5] Abrego Garcia's return was as surprising as it was mysterious. The Court still does not know who brought him back to the United States. *See* ECF No. 234 at 97:25–98:1 (Giles: "I don't know who—if it was the Marshals Service that brought him back. I'm unaware."). Defendants also did not notify the Court, Abrego Garcia's family, or his lawyers of his return to the United States. *See* ECF No. 217 at 20:19–22 (The Court: "Counsel, did you know in advance that Mr. Abrego Garcia was coming back?" Simon Sandoval-Moshenberg, counsel for Abrego Garcia: "Your Honor, we learned on ABC News.").

[6] The Court takes judicial notice of the docket in *United States v. Abrego Garcia*, No. 3:25-CR-00115-1 (M.D. Tenn.).

Defendants will take him into custody in Tennessee pursuant to an ICE detainer, which purports to hold Abrego Garcia for "ongoing removal proceedings."

Accordingly, the Court shares Plaintiffs' ongoing concern that, absent meaningful safeguards, Defendants may once again remove Abrego Garcia from the United States without having restored him to the status quo ante and without due process. Thus, additional relief is necessary. To better understand why, the Court first summarizes the evidence regarding Abrego Garcia's immigration status at the time he was wrongly removed to El Salvador (the status quo ante), and next what may await Abrego Garcia if he is taken into ICE custody in Tennessee.

### A.     The Status Quo Ante

On March 12, 2025, when Defendants pulled Abrego Garcia off the street and removed him to El Salvador, he was lawfully living and working in Maryland. Five years earlier, in 2019, an immigration judge deemed Abrego Garcia removable but granted withholding of removal to El Salvador under 8 U.S.C. § 1231(b)(3). ECF No. 211-7. At that time, Defendants could have appealed the withholding order to the Board of Immigration Appeals, but they did not.[7] Defendants also could have sought to remove Abrego Garcia to a third country ("third-country removal"), *see* 8 C.F.R. § 208.16(f), but they did not. Instead, Defendants released Abrego Garcia under an ICE Order of Supervision (the "ICE Supervision Order"). ECF No. 1-3.

---

[7] *See* ECF No. 33 at 24:15–16 (Reuveni: "The government did not appeal that decision, so it is final."). An immigration judge's decision becomes final "upon waiver of appeal or upon expiration of the time to appeal if no appeal is taken within that time." 8 C.F.R. § 1003.39. Once final, a grant of withholding of removal prohibits removal to the country of feared persecution unless and until the government formally reopens the case and terminates that protection. *See* 8 C.F.R. § 208.24.

Under the ICE Supervision Order, Abrego Garcia had Defendants' permission to live in Maryland. *Id.* They also gave him work authorization[8] and required him to check in periodically with an officer at the ICE Baltimore Field Office. ECF No. 1-3. The record reflects that Abrego Garcia remained in compliance with the ICE Supervision Order at the time he was wrongfully deported to El Salvador on March 12, 2025.

Because Abrego Garcia was under an ICE Supervision Order, had Defendants sought to lawfully commence new immigration proceedings on March 12, those proceedings would have begun in Baltimore. *See* ECF No. 235 at 87:8–10. If, for example, Defendants had pursued third-country removal, they would have issued Abrego Garcia a notice to appear in the Baltimore Field Office and gone from there. *See id.* at 72:1–7. The same would apply if Defendants had sought to reopen his immigration case to terminate the withholding order. Immigration proceedings, in short, would have originated in ICE's Baltimore Field Office had Abrego Garcia not been wrongfully removed to El Salvador.

## B.   Defendants' Proposed Custody Transfer to ICE in Tennessee

Since returning Abrego Garcia to the United States, Defendants made plain they have no intention of facilitating his return to the ICE Supervision Order. Instead, they plan to detain him in Tennessee pursuant to the ICE detainer. Because Abrego Garcia's release in the Tennessee criminal case appeared imminent, the Court ordered expedited briefing on Abrego Garcia's emergency motion and set a hearing for July 7. ECF No. 206. At that hearing, Defendants

---

[8] 8 U.S.C. § 1231(a)(7), which governs issuance of work authorization, provides:

> No alien ordered removed shall be eligible to receive authorization to be employed in the United States unless the Attorney General makes a specific finding that—
> (A) the alien cannot be removed due to the refusal of all countries designated by the alien or under this section to receive the alien, or
> (B) the removal of the alien is otherwise impracticable or contrary to the public interest.

8 U.S.C. § 1231(a)(7).

5

confirmed both their intent to take him into ICE custody and their plan to initiate removal proceedings.[9]

But when pressed for detail on the removal proceedings, counsel merely articulated what Defendants *could* do. Not what they would do. *See* ECF No. 217 at 59:1–60:4. (Guynn: "[Defendants] *could* present evidence that conditions in El Salvador have changed, that the order of withholding of removal is no longer justified" or *could* "remove him to a third country.") (emphasis added). In fact, Defendants insisted they would not decide which removal proceedings to initiate until Abrego Garcia was in ICE custody in Tennessee. *Id.* at 61:10–22.

Given the history of this case, and with Abrego Garcia's likely release from criminal custody only days away, the Court found Defendants' position untenable. So, the Court pressed further. Counsel acknowledged that Defendants' "present intent" is to commence third-country removal once Abrego Garcia is in ICE custody in Tennessee.[10] *Id.* at 62:1–8. The Court, in turn, asked the obvious next question: "What third country?" *Id.* at 62:4. To which counsel replied that Defendants have not identified a third country and have not even started looking for one. *Id.* at 62:7–8; 64:7–8. Counsel further represented that the third-country removal process cannot even begin until Abrego Garcia is physically in ICE custody because they need to obtain "additional information" from him. *Id.* at 66:5–7. Defendants maintained this position despite having spent months investigating nearly every aspect of Abrego Garcia's life. Now, counsel's proffers seem patently incredible.

---

[9] *See* ECF No. 214 at 4:3–8 (Jonathan Guynn, counsel for Defendants, stating: "[O]ur plan is . . . he will be taken into ICE Custody and removal proceedings will be initiated"); *see also* ECF No. 217 at 41, 46 & 54.

[10] By the third day of hearings Defendants, through counsel, walked back that representation. *See* ECF No. 235 at 51:9–20 (The Court: "And your expectation is he's going—you're going to begin proceedings to a third country for removal, right?" Sarmad Khojasteh, counsel for Defendants: "No . . . there's two decisions with two options that the officer assigned to Mr. Abrego Garcia is going to choose between. One will be deportation to—removal to a third country. . . . One will be reopening the immigration—the removal proceedings to modify the withholding of removal. . . ." The Court: "And you have nothing as to which road you'll take if he's released next week?" Khojasteh: "I do—we do not, Your Honor. . . .").

6

Accordingly, the Court set an evidentiary hearing for July 10, 2025, and ordered Defendants to:

> Designate [for sworn testimony] one or more individuals who have personal knowledge, or will acquire such knowledge based on information reasonably available to Defendants, to testify on their behalf regarding the legal bases for their intended detention of Kilmar Abrego Garcia ("Abrego Garcia") and anticipated efforts to remove him to a third country or to seek termination of his withholding of removal to El Salvador, if he is released from U.S. Marshals custody in *United States v. Abrego Garcia*, No. 3:25-cr-00115 (M.D. Tenn.). The testimony shall address, among other topics, the asserted lawful bases for detention, the nature and timing of any notice to be provided to Abrego Garcia, the location of any proposed custody or transfer, and the procedural steps Defendants intend to pursue.

ECF No. 216. The Court emphasized that the purpose of the evidentiary hearing was simply to "get straight answers from the government" as to their deportation plans for Abrego Garcia so that it could best weigh whether his requested relief was warranted. *See* ECF No. 217 at 56:6–10.

In advance of the hearing, Defendants filed a stipulation about their future intentions regarding Abrego Garcia. ECF No. 221. The stipulation confirmed that if the Defendants again attempted to deport Abrego Garcia to El Salvador, they would not do so "without first reopening his immigration proceedings and terminating his withholding of removal to El Salvador, *see* 8 C.F.R. § 1208.24(f)." *Id.* This concession was meaningful. It confirmed that pursuant to 8 C.F.R. § 1208.24(f), any effort to terminate Abrego Garcia's withholding of removal would begin before an immigration judge in Baltimore, with formal notice and an opportunity to be heard. *Id.*

However, the stipulation went on to state that if Defendants pursued third-country removal, they would "follow the procedures . . . set forth in the defendants-appellants' stay application, filed and granted in *United States Department of Homeland Security v. D.V.D.*, No. 24A1153 28–32 (May 27, 2025); *see also id*. at 54a–55a." This was a convoluted way of saying Abrego Garcia would be subject to removal under a United States Department of Homeland Security ("DHS")

7

March 30, 2025 Memorandum ("the Memorandum"). *See* July 10, 2025 Hr'g, Defs.' Ex. 1. The Memorandum provides that before an alien is removed to a third country:

> DHS must determine whether the country has provided diplomatic assurances that aliens removed from the United States will not be persecuted or tortured. If the United States has received such assurances, and if the Department of State believes those assurances to be credible, the alien may be removed *without the need for further procedures.*

*Id.* at 1–2 (emphasis added). The Court found this concession less meaningful. On its face, the Memorandum provided that, for any country from which Defendants had secured blanket assurances against persecution or torture of aliens, an individual facing removal to that country could be denied further process prior to deportation. *Id.* The stipulation likewise offered no detail pertinent to Abrego Garcia's potential third-country removal. Adherence to the Memorandum thus raised a substantial risk that Abrego Garcia could once again be removed without due process and in a manner that would evade this Court's jurisdiction and the attendant protection against further constitutional violation. *See Suri v. Trump*, No. 25-1560, 2025 WL 1806692, at *5 (4th Cir. July 1, 2025) (explaining that without injunctive relief, the plaintiff "may well have been deported without the reasonable notice and opportunity for judicial review that 'all nine Justices agree[]' is due.") (quoting *A.A.R.P.*, 145 S. Ct. at 1368).

So, the Court proceeded with the evidentiary hearing on July 10. Defendants called one witness: Thomas Giles, Assistant Director of ICE's Enforcement and Removal Operations. ECF No. 222. Giles, a twenty-four-year veteran of the agency, currently supervises twenty-five ICE field offices across the country. *See* ECF No. 234 at 12:15–16. He has served at all levels of the agency. *Id.* at 13:12–17. And yet, despite his extensive experience, Giles was ill-prepared to discuss Abrego Garcia's immigration case.

8

Giles knew virtually nothing about Abrego Garcia beyond what he had seen in the press. *Id.* at 53:15–18. He had no professional involvement in this case. *Id.* at 36:4–7. He spent only a few hours preparing with counsel, during which he learned that Abrego Garcia had at some point received a "final order of removal with a withholding grant to El Salvador." *Id.* at 46:4–5.

Giles did explain, however, that Defendants would take Abrego Garcia into custody in Tennessee upon his release in the criminal matter, and whatever proceedings DHS eventually chose would commence there, or wherever else ICE decided to ultimately detain him. *Id.* at 31:11–13. Those proceedings, according to Giles, could start "anywhere in the United States," all depending on where ICE finds an available bed for Abrego Garcia.[11] *Id.* at 51:1–2.

Giles also maintained that he was unaware of any advanced planning, preparation, or even conversation as to possible future immigration proceedings. *Id.* at 56–57. He reiterated that no decision about removal proceedings would be made until Abrego Garcia "arrives in ICE custody" in Tennessee,[12] and even claimed such decisions would fall to the "docket officer [who] reviews the case." *Id.* at 31:10–13 (Khojasteh: "As a general matter, how will that determination be made by ICE?" Giles: "Once the individual comes into custody, the docket officer will review the case and then a decision will be made at that time."); *see also id.* at 25:10–18 (explaining that a docket officer will decide where to detain Abrego Garcia); *id.* at 58:3–11.

As to the general third-country removal process, Giles confirmed that Defendants follow the procedures set forth in the Memorandum. ECF No. 234 at 24:24. Giles also attested that the United States has advance arrangements with Mexico and South Sudan to accept removals from

---

[11] Giles maintained this position until pressed about whether placing Abrego Garcia in a remote ICE facility could interfere with meaningful access to his counsel for the criminal case. He then acknowledged that such access may be "a factor" to be considered "on a case-by-case basis," ECF No. 234 at 147, but that there were no "guarantee[s] . . . he's going to be in that local jurisdiction." *Id.*

[12] ECF No. 234 at 75:16–17 (Giles: "[D]ecisions aren't going to be made until that individual arrives in ICE custody."); *see also id.* at 26:23–27:1.

the United States based on assurances that aliens generally will not face persecution or torture. *Id.* at 72; 84:24–25. But he could not say whether Defendants were contemplating removal for Abrego Garcia at all, *id.* at 55:5–6 (Giles: "I can't predict what [the decision is] going to be . . . ."), let alone whether Mexico or South Sudan was under consideration. *Id.* at 86:23–25 (Sascha Rand, counsel for Abrego Garcia: "So South Sudan is on the table for Mr. Abrego Garcia, fair?" Giles: "For the—sir, I don't know what's on the table.")

Giles also provided little clarity as to how Abrego Garcia could raise any fears of persecution or torture with respect to countries the United States has pre-cleared for removal, particularly given that the Memorandum articulates no such process. *See* July 10, 2025 Hr'g, Defs.' Ex. 1; *cf.* 8 U.S.C. § 1231(b)(3) (prohibiting removal to a country where an individual's life or freedom would be threatened on account of a protected ground); 8 C.F.R. § 208.16(f) (permitting removal to a third country, provided it is not the country to which removal has been withheld or deferred). Although Giles could speak generally about the historic practice of allowing aliens to raise credible fears of persecution or torture, ECF No. 234 at 25–26, he offered minimal insight on the process that occurs under the Memorandum, or what process Abrego Garcia would be afforded, if any. *Id.*

Left with no meaningful information regarding Defendants' next steps upon Abrego Garcia's release from criminal detention, the Court reconvened for a third day of hearings. It began by directing Defendants to produce the ICE detainer currently in place, hoping at last to ascertain the basis upon which ICE sought to hold him in Tennessee. But the detainer raised more questions than it answered. The detainer stated simply that probable cause exists to remove Abrego Garcia, "based on . . . the pendency of *ongoing* removal proceedings." Yet by Defendants' own admission, *there are no ongoing removal proceedings*. Abrego Garcia has a final order of removal

subject to a final withholding order, and Defendants have initiated nothing new. Thus, the ICE detainer seemed thin cover for Defendants to take Abrego Garcia into custody in Tennessee and next transfer him to any ICE facility in the United States. It certainly confirmed for the Court that Defendants had no intention of returning Abrego Garcia to the ICE Supervision Order in Maryland and commencing lawful immigration proceedings from there.

## II. Analysis

Plaintiffs seek limited, well-circumscribed relief under the All Writs Act, which authorizes courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. §1651(a). The Act "empowers a federal court to 'issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.'" *Scardelletti v. Rinckwitz*, 68 F. App'x 472, 477 (4th Cir. 2003) (quoting *Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 40 (1985)). In the immigration context, courts have recently invoked the All Writs Act to preserve their jurisdiction over constitutional challenges to lightning-fast deportations. *See, e.g.*, *A.A.R.P.*, 145 S. Ct. at 1369 (noting that the Court "had the power to issue injunctive relief to prevent irreparable harm to the applicants and to preserve our jurisdiction over the matter," by ordering their continued presence in the United States until further order of the Court (citing 28 U.S.C. §1651(a))); *J.G.G.*, 145 S. Ct. at 1006 (holding that noncitizens subject to removal must receive notice sufficient to permit the exercise of habeas rights); *Ozturk v. Trump*, 2025 WL 1145250, at *23 (D. Vt. Apr. 18, 2025) (ordering return of detainee from Louisiana to Vermont), *stay and mandamus denied sub nom.*, *Ozturk v. Hyde*, 136 F. 4th 382 (2d Cir. 2025); *Perez v. Noem*, 2025 U.S. Dist. Lexis 113509, at *4–5 (S.D.N.Y. June 13, 2025) (enjoining detainee's transfer outside New York and New Jersey absent further court order).

11

Abrego Garcia asks the Court to invoke the Act for two reasons.  <u>First</u>, to command that Defendants restore him to the status quo ante as previously ordered; and <u>second</u>, to impose modest due process protections necessary to prevent Defendants from unconstitutionally removing Abrego Garcia from the United States again.  The Court considers each reason separately.

**A. Return to the Status Quo Ante**

An alien wrongly removed from the United States is "afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Abrego Garcia's immigration status at the time of his wrongful removal was decidedly not detention in ICE custody and not in Tennessee.  Rather, it was release on an ICE Supervision Order out of the Baltimore Field Office.  Defendants concede that had they commenced any lawful immigration proceedings instead of unlawfully expelling him to El Salvador, those would have begun in the Baltimore Field Office.  *See* ECF No. 235 at 87:8–10 (Ernesto Molina, counsel for Defendants: "[T]he Baltimore Immigration Court would be the court of jurisdiction for any motion to reopen.").  Thus, if, as Defendants now claim, a "desk officer" is to initiate any future immigration proceedings against Abrego Garcia, the proceedings must start in Baltimore.  *Cf.* 8 C.F.R. § 1003.14(a) ("Jurisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by the Service."); 8 C.F.R. § 1003.20(a) ("Venue shall lie at the Immigration Court where jurisdiction vests pursuant to § 1003.14.").

This seems especially noncontroversial because—as remarkable as it may be—Defendants insist that no decisions will be made until Abrego Garcia is in ICE custody and an officer is assigned to him. ECF No. 234 at 22:8–23.  Yet Defendants have no intention of restoring Abrego Garcia "to ensure that his case is handled as it would have been had he not been improperly sent

12

to El Salvador." *Abrego Garcia*, 145 S. Ct. at 1018.  Accordingly, the requested relief is necessary not only to fulfill this Court's prior order, but also to provide the kind of "effective relief" to which a wrongfully removed alien is entitled upon return. *Nken*, 556 U.S. at 435.  The relief is also narrowly tailored: it permits Defendants to initiate lawful immigration proceedings upon Abrego Garcia's return to Maryland but requires that those proceedings begin in Baltimore.

Defendants, in response, simply reiterate many of the jurisdictional arguments this Court has previously rejected.  *See* ECF No. 31 (Mem. Op. granting preliminary injunction and finding jurisdiction proper); ECF No. 217 at 5–30 (denying Defendants' renewed jurisdictional objections).  Particular to this motion, Defendants also contend that the requested relief would improperly interfere with the exercise of their statutory immigration enforcement authority.  That contention is without merit.

Defendants made clear that they have not yet taken *any* immigration-related action against Abrego Garcia, and that such action will not start until a desk officer decides what to do next.  ECF No. 235 at 51.  Thus, an order directing Abrego Garcia's return to ICE supervision in Maryland fulfills this Court's injunction without impairing Defendants' authority to "'commence proceedings, adjudicate cases, or execute removal orders.'"  *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) (quoting 8 U.S.C. §1252(g)); *cf. Suri*, 2025 WL 1806692, at *7 (affirming order directing ICE to release alien to supervision in Virginia, where the injunction did not interfere with ongoing removal proceedings or otherwise "prevent" the Government from enforcing the immigration statutes).

As to whether the requested relief impacts "detention" decisions, as Defendants suggest, the Order does nothing of the sort.  Once Abrego Garcia is restored under the ICE Supervision Order out of the Baltimore Field Office, Defendants may take whatever action is available to them

under the law. But that is a different question from whether Defendants have shown any reason *not* to restore Abrego Garcia to the status quo ante upon his release from criminal custody. Certainly, the ICE detainer does not do the trick. The detainer cites "ongoing removal proceedings" as the basis for holding him. But by Defendants' own admission, no such proceedings exist. Abrego Garcia's withholding of removal has been *final* since 2019. And if Defendants wish to revisit withholding, they must move to reopen such proceedings in Baltimore, which has not been done. Nor are there any other "ongoing removal proceedings" because Defendants have not yet made *any* decisions as to what they will do next. ECF No. 235 at 51:21–24 (The Court: "And you have nothing as to which road you'll take if he's released next week?" Khojasteh: "I do—we do not, Your Honor, and neither does Giles."). Thus, the detainer appears infirm on its face and cannot impede Abrego Garcia's return to ICE supervision in Baltimore. *Cf. Abrego Garcia* v. Noem, No. 25-1345, 2025 WL 1021113, at *2 (4th Cir. Apr. 7, 2025) (Thacker, J., concurring) (explaining that only actions within the Attorney General's lawful discretion fall under the jurisdictional bar in 8 U.S.C. § 1252(g)) (citing *Reno*, 525 U.S. at 482 (1999)); *see also id.* at *3 (noting that where Executive action violates the law, it may be treated as "null and void") (quoting *Powell v. McCormack*, 395 U.S. 486, 506 (1969)).

That said, once Abrego Garcia is restored to ICE supervision in this District, he may be ordered to appear at the Baltimore Field Office for commencement of immigration proceedings, and these proceedings may or may not include lawful arrest, detention and eventual removal. So long as such actions are taken within the bounds of the Constitution and applicable statutes, this Court will have nothing further to say. But to ensure that Abrego Garcia is given the opportunity to raise any challenges before he is removed, the Court must turn to his second request for relief.

### B.     Seventy-Two Hours' Notice

Since filing the motion, Abrego Garcia has narrowed his requested prospective relief.  He now asks that if Defendants begin third-country removal proceedings, they give him and his lawyers seventy-two hours' notice of the identified third country,[13] and an opportunity to be heard on any credible fear of persecution or torture pursuant to the INA and well-established precedent. *See Johnson v. Guzman Chavez*, 594 U.S. 523, 532 (2021) (noting that a reasonable-fear determination triggers procedural safeguards in withholding proceedings).  As grounds, Plaintiffs emphasize that Defendants had unlawfully removed him once without *any* process and at grave risk to his safety.  Plaintiffs also highlight that the Defendants' recent unconstitutional practice of shuttling aliens to far-flung countries with no notice or protections demand advance notice here. *See Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (per curiam) (holding that Alien Enemies Act detainees "must receive notice . . . within a reasonable time and in such a manner as will allow them to actually seek habeas relief").  Third, Plaintiffs point to Defendants' own directives which render likely that Abrego Garcia will be removed to at least certain third countries without "further procedures."  The Court agrees with Plaintiffs and will order the requested relief.

Defendants have done little to assure the Court that absent intervention, Abrego Garcia's due process rights will be protected.  According to the Memorandum and a supplemental July 9 directive, *see* July 10, 2025 Hr'g, Pls.' Ex. 2; Defs.' Ex. 1, Defendants could afford Abrego Garcia "no further procedures" should they elect removal to South Sudan, Mexico, or any other country from which they receive "advance" assurances that the country does not generally torture aliens.

---

[13] Seventy-two hours' notice is consistent with the Defendants' position articulated before the Fifth Circuit in *A.A.R.P*, where they asserted that "individual aliens who have filed habeas petitions all have done so . . . within seventy-two hours of their detention," suggesting that this window affords sufficient time to raise statutory and constitutional objections to third-country removal. *See* ECF No. 235 at 16:16–23; *see also Fifth Circuit Hears Deportations Case*, C-SPAN (June 30, 2025), https://www.c-span.org/program/public-affairs-event/fifth-circuit-court-hears-deportations-case/661896.

No "further procedures" means no notice and no opportunity to be heard *before* removal, and thus, no opportunity for this Court to maintain jurisdiction to hear any constitutional challenges. *See J.G.G.*, 145 S. Ct. at 1006 ("'It is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings.") (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)); *see also A.A.R.P.*, 145 S. Ct. at 1368 (holding that expedited deportation without sufficient notice or an opportunity to seek relief violates the Constitution). Nor can the Court simply read more protection into the directives than inherent in the words themselves.[14] This is especially so considering that these same Defendants not only "screwed up" once by unlawfully expelling Abrego Garcia, *Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *6 (4th Cir. Apr. 7, 2025) (Wilkinson, J., concurring), but also refused to make "what was wrong, right," *Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, at *1 (4th Cir. Apr. 17, 2025).

Separately, the requested notice is necessary to prevent a repeat of Abrego Garcia's unlawful deportation to El Salvador by way of third-country removal. Defendants have taken no concrete steps to ensure that any prospective third country would not summarily return Abrego Garcia to El Salvador in an end-run around the very withholding order that offers him uncontroverted protection. Giles testified that he knows of "no reassurances" obtained from cleared countries that aliens will not be promptly re-deported to their native countries despite valid withholding orders. ECF No. 234 at 112. Nor is this fear far-fetched. Defendants have already wrongly deported at least one other alien who was immediately refouled to the country from which

---

[14] To ascertain whether Defendants intended to provide Abrego Garcia with any notice in advance of third-country removal, the Court engaged Defendants' counsel in an extended colloquy. ECF No. 235 at 57–71. Although counsel stated Abrego Garcia would be accorded some notice and opportunity to be heard, he could not square that representation with the plain language of the Memorandum and July 9 directive, which appear to state the opposite, at least as to certain third-country removals.

he had a valid withholding order.[15] Given this, requiring Defendants to give seventy-two hours' notice to Abrego Garcia and his counsel will ensure he has the time to raise any credible fears through the appropriate channels in the immigration process.[16]

### III.    Conclusion

In sum, the Court concludes that it must accord modest relief that ensures the fulfillment of this Court's injunction and protects Abrego Garcia from re-deportation without due process.[17] Thus, for the reasons stated above, Defendants are hereby ORDERED (1) to not take Abrego Garcia into ICE custody in Tennessee and to restore him to his ICE Order of Supervision out of the Baltimore Field Office; and (2) should Defendants commence third-country removal proceedings against Abrego Garcia, Defendants must transmit immediate written notice to Abrego Garcia and all counsel of record in this case of the intended third country at least seventy-two hours prior to commencing removal so that Abrego Garcia may assert claims of credible fear or seek any other relief available to him under the law and the Constitution.

---

[15] O.C.G., a plaintiff in *D.V.D. v. U.S. Dep't of Homeland Sec.,* is a native of Guatemala with a valid grant of withholding of removal to that country. No. 1:25-cv-10676-BEM (D. Mass.). He was summarily deported to Mexico, only for Mexico to immediately return him to Guatemala. *Id.* O.C.G. remained in hiding in Guatemala until Defendants successfully facilitated his court-ordered return. *Id.* Defendants have also recently negotiated a prisoner swap in which several Venezuelan nationals, who had been removed from the United States to El Salvador under the Alien Enemies Act, have now been sent back to Venezuela. *See* Aram Roston, Ted Hesson & Vivian Sequera, *El Salvador Sends Detained Venezuelans Home in Swap for Americans*, REUTERS (July 19, 2025), https://www.reuters.com/world/americas/el-salvador-sends-detained-venezuelans-home-swap-americans-2025-07-19/. Many of those Venezuelan nationals had pending asylum and other fear hearings at the time they were taken to El Salvador. The United States nonetheless negotiated their re-deportation to Venezuela, thus stripping them of the protections those hearings could have afforded them. *See* ECF No. 31 at 11 n.14 (affidavits chronicling missed credible fear hearings once removed to El Salvador); *see also generally J.O.P. v. U.S. Dep't of Homeland Sec.*, No. 8:19-CV-01944-SAG (pending matter involving unlawful removal of Venezuelan national "Cristian" to El Salvador without required asylum hearing who subsequently was re-deported to Venezuela in lieu of court-ordered return to the United States).

[16] Seventy-two hours' notice does not include Saturdays, Sundays, and federal holidays. So, for example, assuming no federal holidays, if Defendants were to provide notice on Friday at 10:00 AM, Defendants shall not commence removal until the following Wednesday at 10:00 AM.

[17] Abrego Garcia initially asked this Court to bar removal to a third country "absent further Order of this Court." ECF No. 203 at 1. Given Defendants have not yet commenced any proceedings against Abrego Garcia, such relief is premature. However, the Court will not hesitate to revisit the request if Defendants fail to comply with this Order or otherwise attempt to remove Abrego Garcia from the United States without due process.

Defendants shall immediately communicate or otherwise transmit this Opinion and Order to all involved agents, officers and employees, including but not limited to, the United States Marshals Service in the Middle District of Tennessee, the ICE New Orleans Regional Office, and the ICE Baltimore Field Office.

A separate Order follows.

July 23, 2025  /S/
Date  Paula Xinis
  United States District Judge